
IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | CIVIL ACTION |
| **Plaintiff** | : | |
| | : | NO. |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| WAVERLY HEIGHTS LTD and THOMAS P. GARVIN | : | |
| | : | |
| **Defendant** | : | |

## COMPLAINT

### NATURE OF THIS ACTION

1. In this action, Plaintiff Kathleen M. Jungclaus, a wrongfully discharged HR Manager seeks to recover damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, ("Title VII"), the Age Discrimination in Employment Act ("ADEA") of 1967, 29 U.S.C. Sections 621 *et seq.*, the Pennsylvania Human Relations Act, P.S. Sections 951 *et seq,* and invokes other Pennsylvania legal protections providing relief for defamation and having been placed in a false light. This is all as a result of Waverly Heights LTD's unlawful employment practices, consisting of the maintenance of an illegal discriminatory working environment and discrimination against Plaintiff due to her sex and age. This discrimination extended to the terms and conditions of her employment, including job conditions, benefits, job advancement and ultimately resulting in her firing. Plaintiff has been retaliated against, as a result of her advocacy for equal treatment of women, ultimately being fired for that advocacy, contrary to

1

Defendants pretextual assertion that she was fired for tweeting what amounted to personally protected political speech. This tweeting was done entirely away from Waverly's sites or email. This is in contrast to circumstances where other males connected with Waverly Heights, LTD were allowed to directly use Waverly sites and email to express racist political views. Ms. Jungclaus seeks declaratory and injunctive relief, as well as back pay, front pay, compensatory and punitive damages, together with attorneys' fees, and the costs and expenses of this suit to redress the effects of Waverly's' pervasive discriminatory employment policies, practices and procedures. In addition, Ms. Jungclaus seeks damages directly against Waverly Heights' CEO, Thomas P. Garvin, for defamatory comments made by him to others about her which placed her in a false light.

## PARTIES

2.  Plaintiff Kathleen M. Jungclaus ("Jungclaus" or "Plaintiff") is an adult Caucasian American female over the age of 40, who resides at 1129 Mill Road Circle, Rydal, PA 19046. For virtually her entire career, beginning in 1985, Plaintiff has been employed in the human relations field. Since 1997, and for approximately the next twenty years, she has been employed by Waverly Heights LTD first as its Director of Human Resources, and later until the time of her termination as Vice President of Human Resources. As a female born on December 9, 1960, Plaintiff is over the age of forty and, as such, she is member of a certain protected categories of individuals under pertinent civil rights statutes.

3.  Defendant, Waverly Heights LTD ("Waverly" or "Employer") is a Pennsylvania non-profit corporation located at 1400 Waverly Road, Gladwyne, PA, 19035, doing business under the fictitious name of Waverly Heights. Defendant was created in 1982. According to its website, in 1986 it opened as a non-profit continuing care retirement community, operating on

what was the former Main Line estate of a railroad baron. At all relevant times, Employer has continuously been engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§2000e (b), (g) and (h).

4. Defendant Thomas P. Garvin ("Garvin") has been, at all times pertinent to this lawsuit, President and Chief Executive Officer of Defendant Waverly, since July 2010 working on Waverly's premises. During her employment, Plaintiff reported directly to Garvin.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiffs' claims for relief under 28 U.S.C. §§1331, 1337, 1343, 2201, and 2202, since those claims are based in part on violations of Section 706 (f) (1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5(f) (1) and (3) ("Title VII") and violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Section 623, et seq.

6. Jurisdiction is also invoked pursuant to 28 U.S.C. §1367 granting this Court supplemental or pendent jurisdiction over the state claims under the laws of Pennsylvania, including the Pennsylvania Human Relations Act, 43 P.S. Sections 951 *et seq*, as well as Pennsylvania statutory and common law claims, because the state claims and federal claims are so interrelated that they are the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in this District under 28 U.S.C. Section 1391 (b) and (c) since Defendants do business and are headquartered in the Eastern District of Pennsylvania and Plaintiff has worked and resides in the same District.

## FULFILLMENT OF TITLE VII CONDITIONS

8. Plaintiff has fulfilled all conditions precedent to the institution of this action under Title VII. Charges were filed with the Equal Employment Opportunity Commission ("EEOC") and simultaneously dual-filed with the Pennsylvania Human Relations Commission. A "Right to Sue" letter was issued by the EEOC to Plaintiff on August 16, 2017 and Plaintiff is filing suit within ninety (90) days of receipt of those letters.

## FACTUAL ASSERTIONS

9. The focus of Plaintiff's entire career has been in social and human services. After graduating from Gwynedd Mercy College with a B.A. in Psychology and a minor in Education/Community Services, Plaintiff assumed the roles of Staff Supervisor, then Senior Staff Supervisor for Bayada Nurses, responsible for all office personnel and office functions including accreditation. After eight years there, she worked for two years as Human Resource Director for Northwestern Human Services and then as Director/ Vice President for Human Resources at Waverly from 1997 until 2016, when she was terminated. Her work for Waverly was key to its attaining recognition as a "Best Place to Work" in Pennsylvania for the years 2011-2013.

10. On its website Waverly's stated "Mission" reads as follows:

> Waverly Heights is a non-profit corporation established to provide high quality life care services to seniors in a professional and caring manner. We do this by providing an exceptional environment, a wide range of outstanding cultural activities, a well-maintained physical plant, wellness support and comprehensive medical services. We are the employer of choice for people who are committed and attentive to the needs of seniors. We accomplish this while meeting rigorous standards of financial stability.

11. Waverly is among the most elite senior living facilities in the region, if not the entire country, housing a collection of residents who in their younger years enjoyed success,

4

distinction and privilege. Its board is comprised largely of CEO's and upper management of a host of professions which, purported "is dedicated to ensuring that Waverly Heights provides the highest quality programs, services and amenities for senior living."

12. As touted by Waverly in its website, "For more than 25 years, Waverly Heights has offered exceptional independent living, personal care and skilled nursing accommodations and services, and it has met industry standards of excellence in management, financial stability, and quality of care and service." Given her long tenure of approximately 20 years, this "excellence" in significant part can be attributed to Plaintiff. She has always received very high ratings in her performance reviews including under Mr. Garvin's tenure. Her consistent job performance has resulted in an 11% personnel turnover rate, which is one of the lowest in a healthcare environment. Her responsibilities included risk control and worker compensation management resulting in over $1,000,000 in dividends being paid back to Waverly, reducing costs to the entity. Ms. Jungclaus was elected by her peers and served as a board member of insurance company Churchill Casualty Ltd., in which Waverly participates. With glowing reviews, she taught the Human Resource section of the Nursing Home Administration certification program. She was responsible for developing and implementing all employee training, including customer service training, further saving the company costs. She has attempted to provide fair and equitable treatment to all employees regardless of their race, gender or sexual orientation over her twenty years of service. This was not always possible, given Mr. Gavin's tendencies and direction. Ironically, it was his reaction to her personally expressed convictions that ended her career. She was not afforded the same fair treatment accorded others.

13.     For years prior to her firing, as would be consistent with her responsibilities as HR Director, Plaintiff made the mistake of protesting various discriminatory and questionable practices employed by Defendant Garvin and acquiesced in by the Board of Waverly. This proved to be a fatal mistake when it came to her career.

14.     Until her firing, Plaintiff enjoyed an excellent reputation among Defendant's staff and residents, along with an excellent reputation in the community.

15.     After almost twenty years as HR Director/Vice-President of Human Resources, Plaintiff was called into Tom Garvin's office on September 20, 2016. When she entered, he was holding a manila folder which held a purportedly anonymous letter protesting a July 24, 2016 Twitter posting about the Presidential election on Plaintiff's personal account.

16.     The actual Twitter text was:

> @realdonaldtrump I am the VP of HR in a comp outside of Philly
> An informal survey of our employees shows 100% AA employees
> Voting Trump

17.     During that meeting Plaintiff was dumbfounded and distraught. Defendant Garvin promised that she would not be fired and that she should not worry. He characterized the situation as being a mere nuisance. He then left to attend a conference in Florida and did not return until Monday September 26th.

18.     Directly after that initial meeting, Plaintiff deleted the posting which had attracted neither comment, sharing or responses.

19.     On his return date, Plaintiff attempted to see Defendant Garvin several times. He was very evasive. Finally, at 3:30 p.m. on Tuesday September 27, Plaintiff was called to Mr. Garvin's office. He was with Mr. Dick Bauer, the Chairman of Defendant Waverly's Board of Trustees.

20. Defendant Garvin told her that this meeting was about the "anonymous" letter and the Twitter posting. He stated that he was very upset by it and decided to take it to the Board's Human Resources Committee. He stated that the Human Resources Committee and the full Board of Trustees had voted unanimously to terminate her employment based on a violation of Defendant's Social Media Policy.

21. Plaintiff questions whether, in fact, the full Board and a committee were convened in the space of one day. What is clear however, was that a decision had been made without investigation of any sort, without the requisite "due process" hearing, or affording Plaintiff any opportunity to defend herself.

22. Without success, Plaintiff begged for her job, asking Messrs. Bauer and Garvin to reconsider and/or to allow her to discuss the situation with the Human Resources Committee and full Board of Trustees. Her request was refused.

23. Realizing that Defendant Garvin was giving her no chance to regain her position, Plaintiff requested the opportunity to instead resign and to say goodbye to the Waverly employees and residents she had grown to love. This too was denied.

24. At this meeting, Defendant Garvin then told Plaintiff, "I don't want you to think that we think you are a racist. That's not the case." This proved to be at complete variance with what Defendant Garvin told others about Plaintiff.

25. The meeting concluded with Defendant Garvin informing Plaintiff that two individuals were waiting to pack up her office and accompany her off campus. This calculatingly choreographed tactic was totally uncalled for given Plaintiff's twenty-year tenure and her position. Plaintiff then told Defendant Garvin, what he already knew, namely that because her in-laws were Waverly residents, she was very concerned about the impression that her

termination would have on them specifically, and on the resident population in general. She specifically told him that she was worried about her reputation. He reassured her that he would be very careful about what was said. Further, he promised that he would say that she had simply resigned and would not be back. Notwithstanding, Plaintiff was escorted out by two individuals in plain view of the Waverly staff and residents.

26. Shortly after Plaintiff was forced from the premises, Defendant Garvin called a meeting of the Senior Leadership Team proceeding to violate the promises he had made to her, instead defaming her and placing her in a false light, telling them that she was fired for violating the Social Media Policy.

27. Defendant Garvin's false and defamatory communications were not limited to in-house employees. As an example, on the very next day after her departure, Plaintiff learned from an outside consultant that Defendant Garvin had told him that she was fired and that it was because of an inappropriate post on Facebook. This same mis-information was passed on to others, including Waverly residents in what was clearly a malicious fashion.

28. Notwithstanding Defendant Garvin's assurances to Plaintiff and his awareness that Plaintiff's in-laws were Waverly residents, he further disparaged and defamed her by authoring a memorandum to "Our Valued Residents" notifying them of her departure from employment at Waverly. This has had a severe emotional effect, particularly on Plaintiff's mother-in-law, deterring her from fully participating in life at Waverly.

29. A reading of the plain words of Ms. Jungclaus' tweet can only be characterized as a matter of individual belief; a political observation regarding a matter of public concern; i.e., the Presidential election.

30. A consideration of its method of transmission and content reinforces the fact that the tweet was purely a matter of personal opinion, not in any way referent to or connected with Waverly. It was done on personal time on a personal Twitter account. It was not posted using any Waverly software or hardware. It was not on any of Waverly's hosted web sites. Plaintiff's personal Twitter account was not linked to Waverly's website. There was nothing identifying Plaintiff in any way as an employee of Waverly, nor disclosing anything in the way of company-privileged information. Moreover, Twitter postings, by their very nature are only seen by those who choose to go to an individual Twitter page. They are not in the public domain.

31. A plain reading of Defendant's Social Media Policy shows that there was no violation by Plaintiff. Set forth in the Waverly Heights Employee Handbook, the Social Media Policy makes a clear distinction between "company owned assets", and "work-related blogging" on the one hand, and "personal blogging" on the other, stating that "Waverly Heights respects the rights of employees to write blogs and use social networking sites and does not want to discourage employees from self-publishing and self-expression."

32. Given Waverly's system of progressive discipline, even if there were the customary in house due process investigation followed by a determination of a violation, this determination in and of itself would not justify termination; the penalty she received. Never in her twenty years' experience in HR at Waverly has Plaintiff seen any employee be terminated without the opportunity of presenting his or her point of view. Standard practice for an egregious offense would be suspension pending investigation. As an example, a former Waverly executive blatantly discriminated against a direct report by mocking the employee's use of the English language. This demeaning and demoralizing mocking was frequently done in front of other staff and in meetings. This egregious violation was handled by sending the executive to a

seminar called "Cultural Diversity and Effective Management Training". In virtually all terminations of which Plaintiff was aware, or in which she was involved, there was a process and the chance for the employee to admit his or her deficiencies and take corrective action. It is ironic that the head of HR would not be afforded that same process.

33. Waverly contends that it does not "discriminate against employees" when it comes to Social Media Policy, or anything else for that matter.

34. In pertinent point of fact, Waverly deliberately discriminated against Plaintiff after disregarding blatantly offensive email of other males circulating on and throughout Waverly's email system. The "good ole boy" network has proved to be alive and well at Waverly given former Board Chairman Charles Soltis' use of Waverly email to transmit his own unsolicited, base and deplorable political views, which included fallacious "birther" jokes and racial slurs against President Obama. Plaintiff certainly did not invite such emails, though she received them regularly. Mr. Soltis was never sanctioned for this activity.

35. The empty declaration of Plaintiff's violation of the Social Media Policy, absent investigation by Waverly or affording Plaintiff the opportunity to defend herself, was a mere pretext for firing her in retaliation for her repeatedly advocating for herself and other females. Simply stated, with the acquiescence of Waverly's Board, Defendants maintained an illegal and hostile working environment, characterized by sex discrimination disfavoring women and those over forty years of age. Notwithstanding the fact that Defendant Waverly is a nonprofit entity, Defendant Garvin, was permitted to create a private self-serving, self-enriching and discriminatory environment which cast aside Waverly's professed ideals and its Mission.

36. To her eventual detriment, over the past few years Plaintiff specifically challenged Defendant Garvin and that male-dominated empire, when it came to pay and benefit equity issues.

37. Each year members of Defendant Waverly's Senior Leadership Team completed a self-evaluation and received a review and salary increase in December, to be processed for the first pay period of the next year.

38. After discussing her inadequate compensation and her frustration over her percent of increases over the years, with Meredith Feher, Senior Vice President of Health Care Services. Ms. Feher encouraged and coached the Plaintiff to advocate for herself. Based on that conversation, in December 2015, Plaintiff requested a meeting with Defendant Garvin. At that time, Plaintiff earned $110,000.00 a year plus benefits which included full family health insurance, full family dental insurance, life insurance, and contribution to the Waverly 401(a) plan. Plaintiff's status and approach stood in stark contrast to that of Mr. Garvin who was hired as President on July 4, 2010. Throughout his tenure, his compensation and benefits have been more akin to a corporate, rather than a non-profit, environment. His current yearly salary approximates $325,000, with a 4-5% yearly increase, together with a $30,000 to $35,000 annual bonus, not to mention an additional $25,000 purportedly to cover health insurance which was unnecessary as Defendant and his family have health insurance through Defendant Waverly. Consistent with the most egregious examples of corporate greed, his local relocation costs including window draperies, were all been paid for by Waverly. What is more, in 2016, Garvin coincidentally purchased an additional home for his family in State College, Pennsylvania from an architect whose firm had been awarded the contract for Waverly's then current $30-million-dollar renovation project. at Waverly Heights.

39. Although there are purportedly no exemptions from Waverly's rules, those rules apparently don't apply to Defendant Garvin. Garvin's elitist attitude was demonstrated by his being the only employee who was permitted to use the resident's gym, in full view of the Waverly Staff. He participated in employee contests, accepting the prize money, otherwise depriving hourly employees who earned as little as $10.00 per hour. Despite his salary, he used Waverly's facility, staff and food, at cost, for his private functions. He has had the transportation staff clean his car windows because "the kids' feet were all over them", treating the staff as his personal staff, rather than as employees hired to care for residents. Defendant Garvin has made a practice of having his wife attend conferences with him, apparently with Waverly paying for her as well. This self-professed male superiority resulted in constant complaints to the Plaintiff by the other female members of the leadership team as well as female staff who were long term employees of Waverly Heights. These include but are not limited to: Meredith Feher, Senior Vice President Health Care Services; Janet Thompson, Vice President of Marketing; Constance Dogan, Director of Environmental Services; Debra Best, Dining Services Manager; Marge Carpenter, Resident Services Manager; Jacqueline Levin, Recruiter and Benefits Specialist; and Amy Blessing; Executive Administrative Assistant.

40. Since Defendant Garvin started his employment at Waverly in 2010, he has systematically removed senior level management and replaced them with his own male-dominated, hand-picked team. Notwithstanding, each time someone was terminated, Garvin made it a point to tell Plaintiff and others: "You don't have to worry about your job, I am really not out to get the old timers." This in and of itself constitutes an admission of age discrimination. Plaintiff was told that Garvin repeated this same comment to Marc Heil, Vice President of Building Services after announcing Plaintiff's termination.

41. Plaintiff requested a meeting with Garvin in December 2015. Plaintiff explained that as a 19-year employee she thought that she should be receiving pay increases more in line with her performance and years of employment. She also requested that she be considered for a bonus based on the successful worker's compensation management program she had accomplished over the years, returning more than $1,000,000.00 to Waverly since 2002. Moreover, Plaintiff also made the case that she has successfully "assisted" him with numerous difficult employment issues during his tenure and that she was responsible for all of the in-house training (including the development and implementation for ongoing customer service training) which would normally be outsourced at a significant cost to Waverly. Garvin stated that those were all great accomplishments and that he valued the Plaintiff's support. He assured Plaintiff that he would consider her accomplishments for a generous bonus. In fact, this did not occur.

42. In contrast to Plaintiff's situation, when performance reviews were completed for 2015, the male Sr. VP of Finance, Robert Supper (employed for only 3 years), was assigned a compensation ratio of approximately 125% of market value, in contrast to Plaintiff's ratio of 102% of market value, despite her many years of service. Larger increases and bonuses were given to the other male members of the leadership team though their overall ratings were often lower than hers. Plaintiff received the smallest bonus of the entire leadership team.

43. In January, 2016, Plaintiff discussed the outcome of her performance review and increase/bonus with Meredith Feher, Senior Vice President of Health Care Services. With Ms. Feher's encouragement Plaintiff decided to discuss this situation with Garvin, knowing full well that he would be unhappy and that he would hold it against her. Since she was a direct report to Garvin, her only option was to advocate for herself. Defendant Garvin's response was to

become visibly upset with her for challenging his decisions. He then went so far as to question whether she could do her job at all. After this meeting, Plaintiff and Defendant Garvin's relationship was never the same.

44. In August, 2016, Plaintiff discussed another compensation disparity issue with Defendant Garvin. him. At the time, Waverly had only two Sr. VP positions. One was held by a male and the other by a female. Only the male was afforded a car. The female Sr. VP of Healthcare was not and complained about the discriminatory situation to Plaintiff. Again, Defendant Garvin was not receptive, even hostile, to this complaint. Subsequent events amply demonstrated that the male Sr. V.P. did not deserve a car.

45. The extent of the hostile working environment for women can be contrasted with the favorable environment enjoyed by Robert Supper, Sr. VP of Finance.

46. On many occasions Defendant Garvin spoke with Plaintiff privately about his concern over Mr. Supper. Mr. Supper repeatedly bragged about his gambling and drinking habits in front of the staff. Defendant Garvin and other employees knew that he often left work early to go to happy hour. Notwithstanding this and the liability it posed for Waverly, Mr. Supper was provided with a company vehicle. He was repeatedly coached by Defendant Garvin on many occasions not to discuss those activities with his staff. Yet the drinking bravado continued unabated. Mr. Supper's condition was such that Defendant Garvin instructed Plaintiff not to talk to Mr. Supper until after lunch on Mondays, so that he would have a chance to recover from his weekend.

47. In August of 2016, Mr. Supper took his family to Atlantic City. With him was his son who has struggled with addiction issues. Upon information and belief, Mr. Supper was drinking and gambling with his son. Sometime during the evening, his son removed the Waverly

company vehicle from the hotel valet. Driving erratically, he was pulled over by the police. The Waverly car was impounded and he was arrested for DUI, drug possession and other offenses. Prior thereto, the young Mr. Supper had an extensive criminal background that includes a great deal more than the most recent incident.

48. When Defendant Garvin learned of the incident, Garvin and the Board Chairman decided to keep things quiet and not inform the Human Resource Committee, let alone the full Board of Trustees.

49. Defendant Garvin discussed the Supper incident with Plaintiff in her office. Knowing that Defendant Garvin would not fire Mr. Supper for his obvious negligence, Plaintiff again sought to have Defendant Garvin remove the car from him, noting that there was no traveling required of him. Further, Plaintiff emphasized that the other Senior Vice President, a female, was being discriminated against by not having the same benefit. Garvin was emphatic in retorting that he would not bring about parity for the female Senior Vice President. Instead, Defendant asked Mr. Supper to return the car, in turn, replacing this perk with a new stipend amounting to $10,500 per year. Plaintiff again requested that Defendant Garvin simply take the benefit away, given the discriminatory optics of having two Senior V. P's of different gender with vastly different benefits. Again, Defendant Garvin expressed resentment over Plaintiff's questioning his decision. Incredibly, given Mr. Supper's misbehavior, Mr. Garvin simply gave him a raise.

50. Mr. Supper made it a practice of uttering degrading comments about women to those on Waverly's Leadership Team, as well as to his staff. He also made it a practice of yelling, talking over, and dismissing women's' comments in meetings. On several occasions, he

exhibited this behavior with impunity, in front of Defendant Garvin. When Plaintiff and others complained, Defendant Garvin's response was dismissive, saying "It's just Bob."

51. Another indication of Defendant Garvin's discriminatory disregard for proper procedure and the law involves his castigation of Plaintiff for filing a workers' compensation report. In August, 2016, Plaintiff was working on a project dealing with Human Resources files going back to 1986. This was conducted in the Manor House Attic where files needed to be marked for shredding or saving. After 20 minutes in the attic she came downstairs and immediately had a severe asthma attack. After using her rescue inhaler, she had no relief and went to the Assistant Director of Nursing's office for further treatment. After being put on a nebulizer, there was still no immediate response. She was told that if she didn't respond soon that she would have to be sent out by ambulance for emergency treatment. As a last resort, she was told to walk into the walk- in freezer in the main kitchen, where after 10 minutes she began to feel a little better. When she told Defendant Garvin about the incident, his response was: "You're not filing a worker's comp claim are you? You are the risk manager! Imagine how ridiculous you will look at the Captive meetings if you file a claim." ("Captive" refers to Waverly's related insurance company.) Plaintiff did file a report and claim for workers' comp. However, out of fear, she did not submit claims for payment, instead personally paying the bills for necessary follow-up treatment. Given the hostile environment fostered by Defendant Garvin directed towards women, Bob Supper remains employed and Plaintiff was fired.

52. Defendant Waverly, through its Board, has repeatedly shown affirmative support for the hostile and discriminatory environment fostered and maintained by Defendant Garvin.

53. Plaintiff's firing stemmed from something far deeper than a dummied-up claim of violation of Waverly's Social Media Policy. It stemmed from a hostile and discriminatory

16

environment directed at women, in general, and her specifically. The end result is that favored and offending men remain in their jobs at Waverly and Plaintiff has been fired, unable to secure another suitable position. In the meantime, Plaintiff has been replaced by a younger candidate.

54. After Plaintiff's firing, Defendants further retaliated against Plaintiff by contesting her qualifying for unemployment benefits, claiming that Plaintiff had committed "willful misconduct", despite the facts and clear wording of Defendant Waverly's Social Media Policy to the contrary.

## COUNTS

### COUNT I

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e *et seq*
SEX DISCRIMINATION, MAINTENANCE OF A HOSTILE WORK ENVIRONMENT and RETALIATION**

**Kathleen Jungclaus vs. Waverly Heights LTD**

55. Plaintiff restates and realleges paragraphs 1 through 54 as though set forth here in full.

56. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, *et seq.* as amended by the Civil Rights Act of 1991 ("Title VII), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

57. Discrimination on the basis of sex that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under Title VII as sex discrimination. In order to establish a hostile work environment, five factual elements must be established: (1) that the employee suffered intentional discrimination because of his or her race; (2) that the discrimination detrimentally affected him or her; (3) that the discrimination was pervasive and regular; (4) that the discrimination would detrimentally affect a reasonable person

in the same position as the employee; and (5) that respondeat superior liability exists. In the totality of circumstances described in the Facts set forth hereinbefore, the foregoing five elements are established.

58. Defendant Waverly is responsible for retaliating against Plaintiff as a result of her complaints of discriminatory treatment and a hostile work environment.

59. Defendant Waverly is liable for discrimination alleged herein under the doctrine of *respondeat superior* due to the actions and statements of its managers and employees.

60. Defendant Waverly is liable for the acts of management and Plaintiff's co-workers, because it knew of their proclivities permitting discrimination and a hostile work environment to exist, but did nothing about it.

61. Defendant Waverly is liable for the acts alleged herein because its board, owners and managers established the corporate culture which encouraged racial discrimination, harassment and retaliation.

62. Based upon the foregoing facts, Defendant Waverly has discriminated against Plaintiff on the basis of her sex, retaliated against her for standing up for herself and other females and has deprived her of her rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq. as amended.*

63. Defendant Waverly's conduct has been disparate, intentional, deliberate, willful and conducted in callous disregard of the rights of the Plaintiff.

64. Defendant Waverly's policies and/or practices have produced a disparate impact against the named Plaintiff with respect to the terms and conditions of employment.

65. By reason of Defendant Waverly's discrimination, Plaintiff is entitled to all legal and equitable remedies available.