# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 17-4462 |
| | : | |
| WAVERLY HEIGHTS, LTD., THOMAS P. GARVIN, and JOHN and JANE DOES NUMBERS 1–21, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                              **APRIL 9, 2018**

      Plaintiff Kathleen Jungclaus ("Ms. Jungclaus") filed suit in this Court on October 6, 2017, against Defendants Waverly Heights, LTD. ("Waverly Heights") and Thomas Garvin ("Mr. Garvin"). On November 17, 2017, Ms. Jungclaus filed an Amended Complaint that added twenty-one unnamed members of the Board of Directors of Waverly Heights ("the Board" or "Board Members") as additional defendants (collectively, "Defendants"). In Counts I through IV of her Amended Complaint, Ms. Jungclaus claims violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951–63 against Waverly Heights. In Count V, Ms. Jungclaus asserts claims for Defamation against Waverly Heights, Mr. Garvin, and the Board. In Count VI, Ms. Jungclaus asserts a claim for Negligent Supervision of Mr. Garvin against Waverly Heights and the Board.

      Presently before the Court is Defendants' Motion to Dismiss Counts V and VI of Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and Ms.

Jungclaus' Memorandum of Law in Opposition. For the reasons noted below, Defendants' Motion is granted.

## I. BACKGROUND[1]

Waverly Heights is a senior living facility in Gladwyne, Pennsylvania. (Am. Compl. ¶¶ 3, 12.) Ms. Jungclaus served as Waverly Heights' Director/Vice President for Human Resources from 1997 to 2016. (*Id.* ¶ 10.) Ms. Jungclaus earned a degree in Psychology from Gwynedd Mercy College and had worked in social and human services for ten years before taking the position at Waverly Heights. (*Id.*) During her time at Waverly Heights, Ms. Jungclaus reported directly to Mr. Garvin, the Chief Executive Officer. (*Id.* ¶ 4.)

Ms. Jungclaus asserts that, in her capacity as Director/Vice President for Human Resources, she was occasionally at odds with Mr. Garvin over his "tendencies and direction" not to "provide fair and equitable treatment to all employees regardless of their race, gender, or sexual orientation." (*Id.* ¶ 13.) She routinely protested "various discriminatory and questionable practices employed by Mr. Garvin" and the Waverly Heights Board Members. (*Id.* ¶ 14.) Ms. Jungclaus cites numerous instances of discriminatory, sexually abusive, and racist behavior that occurred at Waverly Heights. (*Id.* ¶¶ 45–60.) While these allegations may relate to Ms. Jungclaus' other claims, they are not pertinent to the Motion at bar, therefore, we will not address them in detail at this time.

Ms. Jungclaus was ultimately fired from Waverly Heights on September 27, 2016, for an alleged violation of the company's social media policy. Ms. Jungclaus asserts this was a "dummied-up claim" and was used as pretense to justify her unlawful, discriminatory firing. (*Id.* ¶¶ 60–62.) According to Ms. Jungclaus, on September 20, 2016, she was called into Mr.

---

[1] We take the facts alleged in the Amended Complaint as true, as we must when deciding a motion under Federal Rule of Civil Procedure 12(b)(6). *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citation omitted).

2

Garvin's office. (*Id.* ¶ 16.) Mr. Garvin proceeded to explain that he had received an "anonymous letter" concerning a tweet Ms. Jungclaus had sent from her personal Twitter account on July 24, 2016. (*Id.*) The tweet said:

> @realdonaldtrump I am the VP of HR in a comp[any] outside of Philly[. A]n informal survey of our employees shows 100% AA employees Voting Trump![2]

(Am. Compl. ¶ 17; Defs.' Mem. Law in Supp. 2.) It is commonly known that "@realdonaldtrump" is the official Twitter account used by President Donald J. Trump, then a candidate for President in the 2016 Presidential Election. Mr. Garvin told Ms. Jungclaus that the tweet was a "mere nuisance" and that she need not worry about being fired. (*Id.* ¶ 18.)

However, the following week, Ms. Jungclaus was again called into Mr. Garvin's office. There, she met with Mr. Garvin and the Chairman of the Board, Mr. Dick Bauer. (*Id.* ¶ 20.) Mr. Garvin informed Ms. Jungclaus that she was being fired for violating Waverly Heights' social media policy and that the Board had voted unanimously in favor of her termination. (*Id.* ¶ 21.) Mr. Garvin then allegedly told Ms. Jungclaus, "I don't want you to think that we think you are a racist. That's not the case." (*Id.* ¶ 25.) Ms. Jungclaus was accompanied by two individuals to her office to pack her personal items and was then escorted from the premises. (*Id.* ¶ 26.)

Ms. Jungclaus claims, in the following days, Mr. Garvin proceeded to defame her and place her in a false light by telling the Waverly Heights Senior Leadership Team, other Waverly Heights employees, outside contractors, and the residents of Waverly Heights that "she was fired for violating the Social Media Policy." (*Id.* ¶¶ 27–32.) Ms. Jungclaus cites the following incidents as proof of such defamation: a phone call from a former co-worker saying she heard

---

[2] There is a slight discrepancy between the Amended Complaint and Defendants' Motion to Dismiss regarding the actual punctuation and grammar of the tweet. (*Compare* Am. Compl. ¶ 17 *with* Defs. Mem. Law in Supp. 2.) According to Ms. Jungclaus, the original tweet has since been deleted. (Am. Compl. ¶ 19.) Therefore, we have inserted alterations where appropriate for the sake of clarity and a lack of social media grammatical conventions.

3

Ms. Jungclaus "was fired for violating Waverly's Social Media Policy"; a phone call from her former boss that "he had heard that she was fired for violating Waverly's Social Media Policy"; a memorandum addressed to "Our Valued Residents" written by Mr. Garvin that informed the residents of Waverly Heights of Ms. Jungclaus' "departure from employment at Waverly"; and a phone call from a "housekeeping employee . . . who said she heard [Ms. Jungclaus] was fired for a 'bad post on Facebook [sic] . . . .'" (*Id.* ¶¶ 29–32.)

Additionally, Waverly Heights contested Ms. Jungclaus' application for unemployment compensation before the Unemployment Compensation Board of Review and on appeal before the Commonwealth Court. (*Id.* ¶ 36.) Ms. Jungclaus claims that, during these unemployment compensation proceedings, Waverly Heights' lawyer incorporated defamatory falsehoods in several filings. (*Id.* ¶ 37.)

Ms. Jungclaus brought suit in this Court on October 6, 2017. Count V of her Amended Complaint alleges claims of Defamation against Mr. Garvin, Waverly Heights, and the Board for Defamation. (*Id.* ¶¶ 99–109.) Count VI alleges claims of Negligent Supervision against Waverly Heights and the Board for allowing Mr. Garvin to "engage in the conduct" alleged, mainly creating a "hostile and discriminatory environment" for Ms. Jungclaus that ultimately led to her termination. (*Id.* ¶¶ 63, 110–13.) Defendants' move to dismiss the Defamation count for failure to state a claim and seek to dismiss the Negligent Supervision count on the basis that such common law claims are preempted by the PHRA.

## II. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to

4

relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).  In deciding a motion to dismiss under Rule 12(b)(6), courts must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (quoting *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)) (internal quotation marks omitted).  However, courts need not "accept mere[] conclusory factual allegations or legal assertions." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016) (citing *Iqbal*, 556 U.S. at 678–79).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Twombly*, 550 U.S. at 555.  Finally, we may consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." *Davis*, 824 F.3d at 341 (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)) (internal quotation marks omitted).

### III. DISCUSSION

Defendants seek dismissal of Ms. Jungclaus' claims of Defamation and Negligent Supervision.  We will first address her claim of Defamation and will then discuss any claims of Negligent Supervision.

#### A. Defamation

Under Pennsylvania law, defamation is the "tort of detracting from a person's reputation or injuring a person's character by false and malicious statements." *Patel v. Patel*, No. 14-2949, 2015 WL 6735958, at *4 (E.D. Pa. Nov. 11, 2015) (citing *Zartman v. Lehigh Cnty. Humane Soc'y*, 482 A.2d 266, 268 (Pa. Super. Ct. 1984)) (Kelly, J.).  There are seven elements of

5

defamation under Pennsylvania law: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of the intention to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. *Banka v. Columbia Broad. Co.*, 63 F. Supp. 3d 501, 506–07 (E.D. Pa. 2014) (citing 42 Pa. Cons. Stat. § 8434(a)). In cases where special damages cannot be shown, courts have created an exception for statements considered defamation *per se*. *Patel*, 2015 WL 6735958, at *5. Defamation *per se* encompasses statements concerning four categories: (1) a criminal offense; (2) a loathsome disease; (3) business misconduct; or (4) serious sexual misconduct. *Id.*

In the present case, Ms. Jungclaus attempts to assert several instances of defamatory statements made against her by Mr. Garvin, Waverly Heights, or the Board. She alleges that defamation occurred in conversations between Mr. Garvin and the Board regarding her July 2016 tweet. (Am. Compl. ¶ 34.) She also claims that defamatory statements were made to Waverly Heights' employees, residents, and third-party contractors. (*Id.* ¶¶ 27–32.) And, finally, she asserts that defamatory statements were made during the course of proceedings in front of the Unemployment Compensation Board of Review. (*Id.* ¶ 37.) Only from one of these instances, the conversations between Mr. Garvin and the Board, does Ms. Jungclaus claim any special harm arose — her termination. Therefore, we will review that claim under the standard for defamation, while the remaining claims must meet the exception for defamation *per se*.

        1.    *Conversations between Mr. Garvin and the Board*

Ms. Jungclaus asserts very limited facts regarding any conversations between Mr. Garvin and the Board, including during a Board Meeting that took place between September 20-27,

2016. Since the statute of limitations for defamation under Pennsylvania law is one year, anything said during this time period or meeting is time-barred. *See* 42 Pa. Cons. Stat. § 5523(1). Ms. Jungclaus agrees that because she did not file her case until October 6, 2017, that any statements made during that meeting may be time-barred, however, she believes they are relevant to show the "prevailing environment . . . and intent of those who made allegedly defamatory comments after [the filing date]." (Pl.'s Mem. Law in Opp'n 15.)

What, exactly, Ms. Jungclaus believes to be relevant is unclear, as she does not provide any information regarding what was said in that meeting. According to Ms. Jungclaus, after her September 20, 2016 meeting with Mr. Garvin, Mr. Garvin "was very upset by [her tweet] and decided to take it to the Board's Human Resources Committee." (Am. Compl. ¶ 21.) The committee, and later the Board as a whole, decided her tweet was a violation of the social media policy and voted unanimously in favor of Ms. Jungclaus' termination. (*Id.*) Ms. Jungclaus was informed of that decision on September 27, 2016. (*Id.*)

Ms. Jungclaus fails to assert that any defamatory statements were made during these conversations or that any of the elements of defamation were met. Rather, the facts, as stated and for the purposes of this section only, show the following: an employee engaged in behavior that potentially violated a company policy; her supervisor brought the behavior to the attention of, what was in effect, a disciplinary committee; and that committee then determined that a negative employment action against the employee was appropriate. Simply because a meeting was held that determined Ms. Jungclaus should be fired, does not mean that she was defamed during that meeting. Without more, we cannot determine whether defamation has occurred. Ms. Jungclaus has failed to allege any facts that show she was defamed at any time leading up to her termination. Fired employees may not bring defamation suits against former employers on the

7

factually conclusory grounds that something defamatory must have been said that resulted in their termination. *See In re Asbestos Prods*, 822 F.3d at 133 (citing *Iqbal*, 556 U.S. at 678–79).

### 2. *Statements Made to Employees, Residents, and Third-Parties*

Ms. Jungclaus cites multiple examples of Defendants supposedly defaming her to employees, residents, and contractors. (*Id.* ¶¶ 29–32.) Ms. Jungclaus does not claim any special damages arose from these statements. Therefore, they must meet one of the four categories of defamation *per se*. In particular, we will focus on whether any statement concerns business misconduct on the part of Ms. Jungclaus, as she alleges. (Pl.'s Mem. Law in Opp'n 11.)

"A statement is considered defamation *per se* relating to business misconduct when the 'speaker imputes to another conduct, characteristics, or a condition that would adversely affect [plaintiff in her] lawful business or trade.'" *Patel*, 2015 WL 6735958, at *5 (quoting *Walker v. Grand Cent. Sanitation, Inc.*, 634 A.2d 237, 241 (Pa. Super. Ct. 1993)) (alteration in original). Typically, business misconduct refers to conduct that is illegal or connotes illegal activity. *See* Restatement (Second) of Torts § 573 (Am. Law Inst. 1977); *see also Patel*, 2015 WL 6735958, at *6 (finding statements regarding stolen funds, thuggish behavior, and prior arrests met defamation *per se* where character traits, such as honesty, loyalty, and integrity were important business criteria); *Agriss v. Roadway Exp., Inc.*, 483 A.2d 456 (Pa. Super. Ct. 1984) (finding charge of "opening company mail" to be understood as unfitness for business and possible criminal activity). "The statement must be 'peculiarly harmful to one engaged in [that] business or profession.'" *Patel*, 2015 WL 6735958, at *6 (quoting *Clemente v. Espinosa*, 749 F. Supp. 672, 677 (E.D. Pa. 1990)) (alteration in original). Typically, disparaging someone's character would not be considered defamation *per se*, unless that trait is "peculiarly valuable in [that] business or profession." *Id.*

The United States District Court of the Southern District of New York considered two factors in deciding whether a statement against one's character could establish defamation *per se*. *See Korry v. Int'l Tele. & Tele. Corp.*, 444 F. Supp. 193, 196 (S.D.N.Y. 1978). In *Korry*, a former diplomat and journalist was accused of being a "communist." *Id.* at 195. First, the court examined the career status of the plaintiff and found that, because he was no longer pursuing a career in diplomacy, the "statement cannot have impugned him in that career." *Id.* at 196. Then, the court looked at the nature of the term, itself, and decided that the "communist" label was no longer "laden with emotion" in "today's more relaxed atmosphere." *Id.*

Ms. Jungclaus claims that Defendants repeatedly characterized her "and her tweet as being racist" to others. (Am. Compl. ¶ 102.) A favorable reading of the facts pleaded allows us to infer that Ms. Jungclaus is still pursuing a career in human resources and is, therefore, susceptible to attacks on her character. Additionally, we also find that the term "racist" still has a deplorable connotation in American culture and that no reasonable person would wish to be described as such. Thus, a charge of racism would be considered disparaging to Ms. Jungclaus' character and adversely affect her ability to do business in human resources.

However, nowhere in Ms. Jungclaus' Amended Complaint does she actually assert a single instance of anyone calling her a racist or saying that she was fired for being a racist.[3] Ms. Jungclaus relies on several instances of Defendants "defaming her and placing her in a false

---

[3] Ms. Jungclaus asserts that, upon being told she was fired on September 27, 2016, Mr. Garvin said, "I don't want you to think that we think you are a racist. That's not the case." (Am. Compl. ¶ 25.) Ms. Jungclaus relies on this particular statement throughout much of her Amended Complaint as somehow implying Defendants' *did* believe she was a racist. (*See generally* Am. Compl.) Ms. Jungclaus provides no facts showing that Mr. Garvin lied when he made that statement. As for Mr. Garvin's statement, itself, it certainly does not meet any of the requirements for defamation. Furthermore, it is time-barred because Ms. Jungclaus did not bring suit in this Court until October 6, 2017, after the one-year statute of limitations had run. *See* 42 Pa. Cons. Stat. § 5523(1). Therefore, Ms. Jungclaus cannot be successful on her claim for Defamation with regards to this statement.

light."[4] (*Id.* ¶ 27.) According to Ms. Jungclaus' Amended Complaint, this "campaign of defamation" consisted only of disseminating to others "that she was fired for violating the Social Media Policy." (*Id.* ¶ 27.) Ms. Jungclaus notes conversations that she had with former co-workers, a former boss, and Waverly Heights staff that all say they heard she was fired for "violating the Social Media Policy." (*Id.* ¶¶ 27–32.) It is unclear whether Ms. Jungclaus believes the mere fact that Defendants made statements that she was fired for violating the social media policy constitutes defamation *per se* or whether the nature of her violation implies that she is a racist.

We find neither theory compelling. First, violating a social media policy does not reach the level of business misconduct needed to sustain a claim of defamation *per se*. We are unsure, and Ms. Jungclaus provides no reasoning, how a violation of the social media policy is the type of conduct that would adversely affect Ms. Jungclaus in the business of human resources. *See Patel*, 2015 WL 6735958, at *5.

Second, we are equally, if not more, perplexed by Ms. Jungclaus' theory that a statement noting that she was fired for "a violation of the social media policy" can imply that she is a racist. According to Ms. Jungclaus, she engaged in political speech by sending a "pro-Trump" tweet. (Am. Compl. ¶¶ 1, 38.) Then, after being fired for her tweet, Defendants made statements saying that she was fired for violating the social media policy. (*Id.* ¶¶ 29–32.) Even though she does not plead that people were told about the contents or the nature of her tweet, Ms. Jungclaus appears to be implying that by sending a "pro-Trump" tweet, she is perceived as a

---

[4] Ms. Jungclaus also asserts that on the day she was fired, she was escorted off the premises "by two individuals in plain view of Waverly staff and residents." (Am. Compl. ¶ 26.) Citing *Byars v. Sch. Dist. of Phila.*, Ms. Jungclaus claims this act constituted a defamatory communication under Pennsylvania law. 942 F. Supp. 2d 552, 564–65 (E.D. Pa. 2013) (holding that claim of being escorted out of building "in the presence of others . . . sufficiently alleged a defamatory communication as well as publication to others.") However, by Ms. Jungclaus' own admission, this occurred on September 27, 2016. She did not bring suit in this Court until October 6, 2017, after the one-year statute of limitations had run. Therefore, this claim is dismissed as untimely. *See* 42 Pa. Cons. Stat. § 5523(1).

racist. Ms. Jungclaus offers no explanation for why she believes that a "pro-Trump" tweet would equate to an act of racism. Therefore, claims for this theory of defamation are dismissed.

### 3. *Statements Made During the Course of a Judicial Proceeding*

Ms. Jungclaus alleges that, upon information and belief, Defendants made defamatory statements about her to the "Waverly Heights's lawyer." (*Id.* ¶ 37.) In turn, even though this lawyer is not a named defendant in this action, he or she, "apparently without exercising independent judgment," published those defamatory remarks into filings before the Unemployment Compensation Board of Review while contesting Ms. Jungclaus' claim for unemployment compensation. (*Id.*) Ms. Jungclaus calls this a "chain of defamation." (*Id.*)

Defendants argue that "statements made during the course of judicial proceedings are absolutely privileged when it comes to defamation, whether they occur in open court or in the pleadings." (Defs.' Mem. Law in Supp. 11 (citing *Binder v. Triangle Pubs., Inc.*, 275 A.2d 53, 56 (Pa. 1971); *Greenberg v. McGraw*, 161 A.3d 976, 981 (Pa. Super. Ct. 2017)).) This principle is generally understood as true and Ms. Jungclaus admits herself that "indeed, there is an absolute privilege for proceedings." (Pl.'s Mem. Law in Opp'n 13.)

Defendants' needlessly cite a Chester County Court of Common Pleas case, *Bochetto v. Gibson*, that found judicial privilege extended to a communication with a newspaper reporter. (Defs.' Mem. Law in Supp. 12 (citing No. 3722, 2002 WL 434551 (C.P. Chester Cty. 2002)).) On appeal, the Supreme Court of Pennsylvania ultimately reversed the decision regarding the narrow issue that sending a copy of the complaint to the reporter was not protected by judicial privilege. *See Bochetto v. Gibson*, 860 A.2d 67 (Pa. 2004) (finding the transmission "was an extrajudicial act that occurred outside of the regular course of the judicial proceedings and was not relevant in any way to those proceedings [and] was not protected by the judicial privilege").

Though Ms. Jungclaus argues that this mistake is fatal to Defendants' Motion, the *Bochetto* court still recognized that judicial privilege applies to "communications which are issued *in the regular course of judicial proceedings* and which are *pertinent and material to the redress or relief sought.*" *Id.* (quoting *Post v. Mendel*, 507 A.2d 351, 355 (Pa. 1986)) (emphasis in original).

Notably, Ms. Jungclaus never asserts any instance, in either her Amended Complaint or Memorandum of Law in Opposition, of an extra-judicial statement by Defendants, or Defendants' counsel, that would not be protected by judicial privilege. Ms. Jungclaus merely "doubts that the defamatory communications were limited as solely between attorney and client." (Am. Compl. ¶ 37.) Since she has not identified any statement made by Defendants that meet any of the elements of defamation, she cannot sustain a claim of Defamation here. As with the rest of Ms. Jungclaus' claims for Defamation, this is merely a "conclusory factual assertion" that we need not accept as true and to which no relief is available. *See In re Asbestos Prods.*, 822 F.3d at 133 (citing *Iqbal*, 556 U.S. at 678–79).

### 4. *Plaintiff's Right to Amend Complaint*

We now must decide whether Ms. Jungclaus should be given leave to amend her Amended Complaint with respect to her claim for Defamation. According to Federal Rule of Civil Procedure 15, "a party may amend its pleading once as a matter of course"; otherwise they must have consent from the opposing party or leave from the court. Fed. R. Civ. P. 15(b). Leave to amend shall be freely given. *Id.* However, the United States Court of Appeals for the Third Circuit ("Third Circuit") has held that the District Court may deny an opportunity to amend where the amendment would be futile. *See Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000) (citing *Smith v. NCAA*, 139 F.3d 180, 190 (3d Cir. 1998), *rev'd on other grounds*, 525 U.S. 459

(1999); *Centifanti v. Nix*, 865 F.2d 1422, 1431 (3d Cir. 1989)). "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Id.* at 121. In deciding this issue, the District Court "applies the same standard of legal sufficiency as under [Federal Rule of Civil Procedure] 12(b)(6)." *See Smith*, 139 F.3d at 190 (citing *In re Burlington Coat Factory*, 114 F.3d 1410, 1434 (3d Cir. 1997)).

Ms. Jungclaus has not requested leave to amend or supplied a proposed amendment; therefore, it would not be an abuse of discretion to deny her the opportunity to amend. *See U.S. ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 243 (3d Cir. 2013) (holding District Court did not abuse discretion when plaintiff failed to properly move for leave to amend or attach a draft amended complaint). Regardless, it is readily apparent that any amendment would be futile. Ms. Jungclaus' Amended Complaint makes clear on its face that any claim made during the board meeting in question would be time-barred. Further, any statements made by Defendants, or their counsel, during the judicial proceedings before the Unemployment Compensation Board of Review are privileged. And, finally, all statements made to third parties do not assert or meet the necessary elements for defamation. *See Morrison v. Chatham Univ.*, No. 16-476, 2016 WL 4701460, at *4 (W.D. Pa Sept. 8, 2016) (dismissing defamation claim with prejudice where amended complaint showed defamatory statements were facially true). The Defamation claims alleged in Ms. Jungclaus' Amended Complaint are inherently deficient and cannot survive a motion to dismiss. *See In re Burlington*, 114 F.3d at 1435. Accordingly, we see no need to allow Ms. Jungclaus leave to amend her complaint a second time.

Therefore, Defendants' Motion to Dismiss is granted as it relates to Count V of the Amended Complaint. Ms. Jungclaus' claim for Defamation is dismissed from the Amended Complaint with prejudice.

B.    **Negligent Supervision**

Defendants also move to dismiss Count VI of Ms. Jungclaus' Amended Complaint for Negligent Supervision against Waverly Heights and the Board under Federal Rule of Civil Procedure 12(b)(6). Defendants argue negligent supervision cannot apply against the Board and that any claim for negligent supervision against Waverly Heights is preempted by the PHRA. (Defs.' Mem. Law in Supp. 15–17.)

The Third Circuit has defined negligent supervision as a state tort claim "where the employer fails to exercise ordinary care to prevent an intentional harm to a third party which (1) is committed on the employer's premises by an employee acting outside the scope of his employment and (2) is reasonably foreseeable." *Petruska v. Gannon Univ.*, 462 F.3d 294, 309 n.14 (3d Cir. 2006) (quoting *Mullen v. Topper's Salon & Health Spa, Inc.*, 99 F. Supp. 2d 553, 556 (E.D. Pa. 2000)). For an act to be reasonably foreseeable, an employer must have known or should have known "of the necessity for exercising control of its employee" and that "the harm that the improperly supervised employee caused to the third party must also have been reasonably foreseeable." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 491 (3d Cir. 2013) (citing *Petruska*, 462 F.3d at 309 n.14; *Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 132 (E.D. Pa. 2011); Restatement (Second) of Agency § 213 (Am. Law Inst. 1958); Restatement (Second) of Torts § 317 (Am. Law Inst. 1975)).

However, "negligent supervision claims arising out of discrimination cases . . . must be brought under the [PHRA]." *Randler v. Kountry Kraft Kitchens*, No. 11-474, 2012 WL 6561510, at *14 (M.D. Pa. Dec. 17, 2012). Where a statute already "provides a legal remedy, Pennsylvania courts will not recognize a common law cause of action." *Murray v. Commercial Union Ins. Co.*, 782, F.2d 432, 436–37 (3d Cir. 1986) (citing *Bruffett v. Warner Commc'ns, Inc.*,

692 F.2d 910, 919 (3d Cir. 1982); *Wolk v. Saks Fifth Ave., Inc.*, 728 F.2d 221, 223–24 (3d Cir. 1984)). *Bruffett* and *Wolk* both held that cases involving public policy implications surrounding employment termination based on a disability or sexual discrimination fall under actions governed by the PHRA. *Id.* (noting *Bonham v. Dresser Industries, Inc.*, 569 F.2d 187, 195 (3d Cir. 1977) concluded age discrimination was also covered by the PHRA). In creating this "*Bruffett-Wolk* prediction," the Third Circuit noted that the "PHRA condemns so many employment practices that few tort actions for wrongful discharges that violate public policy will stand." *Id.* The Third Circuit decided this was the "probable approach of the Pennsylvania legislature," otherwise "a common law action for the same claims would give the claimant an opportunity to circumvent the carefully drafted legislative procedures." *Id.*

Ms. Jungclaus claims, in Count VI of her Amended Complaint, that "Defendants Waverly [Heights] and [the Board] were negligent in their supervision of [Mr.] Garvin, thereby allowing him to engage in the conduct as heretofore alleged." (Am. Compl. ¶ 111.) Though vague, we understand the alleged conduct to be a "discriminatory environment directed at women" that ultimately resulted in Ms. Jungclaus' termination and defaming Ms. Jungclaus as a "racist." (*Id.* ¶¶ 62–63.) Since we dismissed the defamation claims above, all that remains is Ms. Jungclaus' claims of discrimination and retaliation. Defendants, therefore, argue that Ms. Jungclaus' claim for "negligent supervision sounds in allegedly discriminatory actions and inactions [and] is preempted by the PHRA." (Defs.' Mem. Law in Supp. 17.)

Ms. Jungclaus argues that a "common law claim will not be preempted by the PHRA if it is factually independent of the discrimination." (Pl.'s Mem. Law in Opp'n 20 (quoting *Keck v. Commercial Union Ins. Co.*, 758 F. Supp. 1034, 1038 (M.D. Pa. 1991)).) In *Keck*, the court found that where "plaintiff's tort claims were procedurally and functionally independent of her . .

15

. discrimination claims, [they are] not preempted and need not be adjudicated within the framework of the PHRA." *Keck*, 758 F. Supp. at 1038. The court provided an example that where "an employer effected all the elements of intentional infliction of emotional distress upon an employee, and chose to do so because the employee was black, the employer may be found liable for discrimination as well as intentional infliction of emotional distress." *Id.* (citing *Schweitzer v. Rockwell Int'l*, 586 A.2d 383 (Pa. 1990) ("[N]othing in the intent of the Legislature or in the language of the Act forbids independent legal actions based upon the underlying acts"); *Clay v. Advanced Comput. Applications*, 559 A.2d 917 (Pa. 1989) (describing "other remedies" available to wrongfully terminated employees to include those not superseded by PHRA)).

Ms. Jungclaus, however, misinterprets the meaning of "factually independent." In countering Defendants' argument that the underlying facts of this case fall under the PHRA claim, Ms. Jungclaus states, "[t]o the contrary, the factual support for the various counts is found in the body of pleading that precedes the counts." (Pl.'s Mem. Law in Opp'n 20.) She seems to be arguing that because she physically wrote the Amended Complaint with a general "Factual Assertions" section, the facts are, therefore, independent from the PHRA claim. (*Id.* ("[T]he body of fact pleading is anything but co-terminous [sic] with the discrimination claims."))

This is clearly incorrect. In *Keck*, the court proffered the following:

> [T]he general rule that has emerged . . . is simply that if all or part of the facts that would give rise to a discrimination claim would also independently support a common law claim, the common law claim is not preempted by the PHRA and need not be adjudicated within its framework. If, however, the act that would support the common law claim is only an act of discrimination, the claim is preempted by and must be adjudicated within the framework of the PHRA.

758 F. Supp. at 1039. This rule makes no reference to where in the pleadings the facts are established. Rather, it requires us to look at whether the facts *themselves* can support a common law claim separate from a claim for discrimination.

In Ms. Jungclaus' case, they do not. Since we have already dismissed the defamation claim, Ms. Jungclaus' only remaining claims arise from discrimination. Ms. Jungclaus' claim for Negligent Supervision is based on the "hostile and discriminatory environment towards women" that was allowed to exist at Waverly Heights. (Am. Compl. ¶¶ 62, 111.) Ms. Jungclaus pleads no other independent cause of action nor do the facts support one that is not based in discrimination.

Ms. Jungclaus also argues that she is allowed to plead alternate theories of liability. (*Id.*) Relying on *Randler*, Ms. Jungclaus argues that she must be afforded discovery in order to determine which cause of action to pursue. (Pl.'s Mem. Law in Opp'n 21.) Ms. Jungclaus, ironically, confuses *Randler v. Kountry Kraft, Inc.*, No. 11-474, 2011 WL 5040787 (M.D. Pa. Oct. 24, 2011) (hereinafter "*Randler (2011)*") (deciding defendant's partial motion to dismiss) with *Randler v. Kountry Kraft, Inc.*, No. 11-474, 2012 WL 6561510 (M.D. Pa. Dec. 17, 2012) (hereinafter "*Randler (2012)*") (deciding defendant's motion for partial summary judgment and plaintiff's cross-motion for summary judgment). Ms. Jungclaus claims *Randler (2012)* allowed a party to join a claim for Negligent Supervision and the PHRA by citing Federal Rules of Civil Procedure 8(d)(3) and 18. (*Id.*) This is wrong. The plaintiff in *Randler (2011)* argued that the Federal Rules of Civil Procedure allowed her to assert both a claim under the PHRA and a claim for Negligent Supervision. *Randler (2011)*, 2011 WL 5040787, at *3 ("[Plaintiff] contends . . . that at the pleading stage it is appropriate to plead alternative counts and that only through discovery can she determine which claim is better suited for recovery.") However, the court

dismissed that argument because the plaintiff "clearly invoked the PHRA by explicitly pleading it in her complaint." *Id.* ("[T]he issue here is preemption, not inconsistent or alternative claims.") The court granted plaintiff leave to amend her complaint "to assert her negligent supervision claim and drop her PHRA claim." *Id.*

In *Randler (2012)*, plaintiff appeared to have dropped her PHRA claim and proceeded only under a claim of Negligent Supervision. However, the court found that "it is firmly established that negligent supervision claims arising out of discrimination cases situated in the Commonwealth of Pennsylvania must be brought under the [PHRA]." *Randler (2012)*, 2012 WL 5040787, at *14. The court further stated, "[Plaintiff's] failure to invoke her rights under the PHRA does not allow her to circumvent its statutory framework and, thus, bring a common law tort cause of action." *Id.* (quoting *Wolk*, 728 F.2d at 224 ("The procedures mandated in the PHRA must be strictly followed. If common law action for the same claims were recognized, it would give the claimant an opportunity to circumvent the carefully drafted legislative procedures. The PHRA embodies a discrete, comprehensive administrative procedure, including conciliation and negotiation.")) Thus, neither *Randler (2011)* nor *Randler (2012)* allow discovery in order to "determine which cause of action to pursue." (*Contra* Pl.'s Mem. Law in Opp'n 21.) Ms. Jungclaus' claim for Negligent Supervision is clearly preempted by the PHRA.[5]

For the above reasons, Defendants' Motion to Dismiss is granted as it relates to Count VI of the Amended Complaint. Ms. Jungclaus' claim for Negligent Supervision is dismissed from the Amended Complaint with prejudice.

---

[5] Since the claim of Negligent Supervision is preempted by the PHRA, we need not address whether such a claim may be brought against a Board of Directors.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss Counts V and VI of Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is granted.

An appropriate Order follows.