IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS,                          :
                                                :
                              Plaintiff          :        NO.    17-cv-04462-RK
        v.                                      :
                                                :
WAVERLY HEIGHTS, LTD.,                          :        Jury Trial Demanded
                                                :
                              Defendant          :

## TABLE OF CONTENTS OF APPENDIX FOR DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – VOL. II

| BATES NUMBER | DOCUMENT |
| --- | --- |
| **VOL. I** | |
| Appendix 1 – 90 | Waverly's Employee Handbook, 2014 |
| Appendix 91 – 93 | List of Waverly's Board of Trustees, 2015 |
| Appendix 94 – 96 | List of Waverly's Board of Trustees, 2016 |
| Appendix 97 | Waverly's EEO-1, 2015 |
| Appendix 98 | Waverly's EEO-1, 2016 |
| Appendix 99 | Waverly's Non-Discrimination Policy, 2011 |
| Appendix 100 | Waverly's Open Door Policy |
| Appendix 101 – 102 | Waverly's Problem-Solving/Grievances Policy, 2011 |
| Appendix 103 | Waverly's Sexual Harassment Policy, 2014 |
| Appendix 104 | Waverly's Civil Rights Compliance – Employee Awareness, 1997 |
| Appendix 105 – 107 | Social Media Policy, 2014 |
| Appendix 108 | Chart Showing Demographic Information Regarding Waverly's Senior Leadership Team as of 09/16 |
| Appendix 109 – 110 | Waverly's letter to Kathleen Jungclaus dated 3/26/1997 offering her employment |
| Appendix 111 – 112 | Resume of Kathleen Jungclaus 1997 – 09/16 |
| Appendix 113 – 114 | Resume of Kathleen Jungclaus 09/16 – Present |
| Appendix 115 – 117 | 1995 Job Profile of Plaintiff |
| Appendix 118 – 121 | Plaintiff's Job Profile (Job Description), 2005 |
| Appendix 122 – 128 | Silver Chair Learning Certificates Courses taken by Plaintiff covering Diversity and Sexual Harassment 2011 – 2016 |
| Appendix 129 – 136 | Class Completion Certificates for Nursing Home Administration Course 2013-2014 |
| Appendix 137 – 226 | Performance Evaluations of Plaintiff 1998 – 2015 |

1

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 227 – 264 | Recommendations for Salary Increases from Mr. Wozniak 12/8/10-11/2/15 |
| Appendix 265 – 266 | Graph of Plaintiff's Salary History 2005 – 2016 |
| Appendix 267 | Chart showing Plaintiff's Salary History 2010 – 2016 |
| Appendix 268 | Chart of Compensation of Senior Team for 2015 |
| Appendix 269 | Chart of Compensation of Senior Team for 2016 |
| Appendix 270 – 272 | Anonymous Letter dated 09/14/16 |
| Appendix 273 – 279 | Tweet dated 7/24/16 and screenshot showing link from Waverly to Jungclaus Twitter Page |
| Appendix 280 – 281 | Chart showing Termination of Employees without Progressive Discipline 2010-2016 |
| Appendix 282 – 289 | Emails between Mr. Garvin, Mr. Bauer and Board Committee Members regarding Employment Issue, 09/22/16 – 09/26/16 |
| Appendix 290 – 293 | Plaintiff's Unemployment Compensation Application dated 10/02/16 |
| Appendix 294 – 297 | Notice of Unemployment Application dated 10/06/16 and Waverly's Response to Unemployment Claim dated 10/11/16 |
| Appendix 298 – 300 | Interview of Plaintiff by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 301 – 305 | Interview of Mr. Garvin by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 306 – 308 | Approval of Plaintiff for Unemployment Compensation dated 10/25/16 |
| Appendix 309 – 310 | Waverly's Appeal from Granting of Unemployment dated 10/31/16 |
| Appendix 311 – 326 | Letter from Mark Schwartz, Esquire to Waverly dated 11/08/16 |
| Appendix 327 – 354 | Transcript of Unemployment Compensation Hearing dated 11/28/16 |
| Appendix 355 – 361 | Decision of Unemployment Compensation Referee dated 11/29/16 |
| Appendix 362 | EEOC Complaint dated 12/13/16 |
| Appendix 363 | EEOC Notice of Charge dated 01/05/17 |
| Appendix 364 – 368 | Email from Raymond Jungclaus to Plaintiff dated 10/09/08 – Food for Thought (Why not voting for Obama) Raymond Jungclaus suggests that Plaintiff post this on her Facebook page |
| Appendix 369 – 375 | Email from Raymond Jungclaus to Plaintiff dated 04/07/11- re: Obama's Classmate Speaks out |
| Appendix 376 – 377 | Emails between Plaintiff and Raymond Jungclaus dated 06/28/12 re Health Care Bill being upheld |
| Appendix 378 – 381 | Email from Raymond Jungclaus to Plaintiff dated 10/18/12 – Why Mitt Romney is Unlikeable |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 382 – 383 | Emails between Plaintiff and her husband, Raymond Jungclaus dated 08/19/13 re making up story that she has doctor's appointment so she can leave early |
| Appendix 384 – 388 | Emails between Plaintiff and Marc Heil dated 08/26/13 re: Discipline of employee for violation of social media policy and reference to contact with Debbie Sandler, Esq. |
| Appendix 389 | Email from Plaintiff to Raymond Jungclaus – dated 08/30/13 – her reaction to Garvin email regarding a discussion about her NHA license |
| Appendix 390 – 391 | Email from Raymond Jungclaus to Plaintiff dated 10/24/13 re:  If you can't fix it with a hammer – political comment |
| Appendix 392 – 394 | Email from Gregory Gangi to Plaintiff dated 10/24/13 – "How pathetic are those of you who still love the Obama (intentional small case) man" |
| Appendix 395 – 406 | Email from Raymond Jungclaus to Plaintiff dated 12/19/13 – Problem with Public Housing – criticizing Obama for putting feet on furniture |
| Appendix 407 | Email dated 08/18/14 from Plaintiff to R. Supper asking for recommendation |
| | |
| **VOL. III** | |
| Appendix 408 – 567 | Emails from Mr. Soltis on which Plaintiff was copied 2011 – 2016 |
| Appendix 568 – 598 | First Amended Complaint |
| Appendix 598 – 603 | Plaintiff's Initial Disclosure under F.R.C.P.26 |
| Appendix 604 – 605 | Plaintiff's Supplemental Disclosure under F.R.C.P.26 |
| Appendix 606 – 621 | Plaintiff's Answers to Interrogatories |
| | |
| **VOL. IV** | |
| Appendix 622 – 690 | Deposition of Plaintiff, Kathleen Jungclaus, Day 1, 11/01/18 |
| Appendix 691 – 817 | Deposition of Plaintiff, Kathleen Jungclaus, Day 2, 11/02/18 |
| | |
| **VOL. V** | |
| Appendix 818 – 860 | Deposition of Raymond Jungclaus, 11/01/18 |
| Appendix 861 – 911 | Deposition of Anita Summers, 11/26/18 |
| Appendix 912 – 1039 | Deposition of Richard Bauer, 11/26/18 |
| | |
| **VOL. VI** | |
| Appendix 1040 – 1171 | Deposition of Thomas Garvin, Day 1, 11/02/18 |
| Appendix 1172 – 1213 | Deposition of Thomas Garvin, Day 2, 11/26/18 |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. VII** | |
| Appendix 1214 – 1218 | Bing Search of Kathleen Jungclaus, 07/30/19 |
| Appendix 1219 | Affidavit of Carolyn Baysmore |
| Appendix 1220 – 1221 | Affidavit of Debra Best |
| Appendix 1222 – 1229 | Affidavit of Amy Blessing |
| Appendix 1230 – 1231 | Affidavit of Margaret Carpenter |
| Appendix 1232 – 1235 | Affidavit of Constance Dogan |
| Appendix 1236 – 1239 | Affidavit of Meredith Feher |
| Appendix 1240 – 1241 | Resume of Meredith Feher |
| Appendix 1242 – 1251 | Affidavit of Thomas Garvin |
| Appendix 1252 – 1253 | Resume of Thomas Garvin |
| Appendix 1254 – 1256 | Affidavit of Marc Heil |
| Appendix 1257 – 1260 | Resume of Marc Heil |
| Appendix 1261 – 1265 | Affidavit of Lauren Kelley |
| Appendix 1266 – 1268 | Resume of Lauren Kelley |
| Appendix 1269 – 1270 | Affidavit of Patricia Rodgers |
| Appendix 1271 – 1272 | Resume of Patricia Rodgers |
| Appendix 1273 – 1275 | Affidavit of Tanya Salgado, Esquire |
| Appendix 1276 – 1279 | Affidavit of Deborah Sandler, Esquire |
| Appendix 1280 – 1282 | Affidavit of Robert Supper |
| Appendix 1283 – 1289 | Resume of Robert Supper |
| Appendix 1290 – 1294 | Affidavit of Janet Thompson |
| Appendix 1295 – 1296 | Resume of Janet Thompson |
| Appendix 1297 | Affidavit of Basheer Womack |
| Appendix 1298 – 1301 | Affidavit of Thomas Wozniak |
| Appendix 1302 – 1303 | Summary of Qualifications of Thomas Wozniak |

December 8, 2010

CONFIDENTIAL

Mr. Thomas P. Garvin
President
Waverly Heights, Ltd.
1400 Waverly Road
Gladwyne, PA 19035

**RE:  2011 Executive Compensation Planning**
   *--for Vice President Level Positions on the Executive Team*

Dear Tom:

Strategic Compensation Planning, Inc. has completed its annual review of compensation levels and practices for selected executive positions in the "Nonprofit Services" and "Nonprofit Other Healthcare Services" sectors of the U.S. and Philadelphia area labor markets. ("Nonprofit Other Healthcare Services" includes nonprofit CCRCs.)  This letter provides a summary of our research findings and offers compensation programming suggestions to ensure competitive total rewards opportunities for the two (2) Vice President level positions on the Executive Team.


## Study Methods, Position Pricing Considerations and Survey Data Sources

In assessing compensation levels and practices for executive positions, SCP focuses first on the nature of the organization (industry affiliation) and the size of the operation (in terms of operating budget and full-time equivalent employees).  And, then, it examines the roles of the positions in the organization, evaluating the their scope of responsibility and level of autonomy in the organization.

In the case of Waverly's Vice President, Finance position, SCP has based its pricing on a somewhat broader than typical position role in the current organization.  While not reaching the level of a Chief Operating Officer, the position does have responsibilities for certain operations functions that go beyond the norm for a Top Financial Executive.

Similarly, SCP recognizes that the role of the Vice President, Healthcare is expanding beyond the traditional definition of this role as Waverly Heights moves into new health service areas, i.e. dementia, advanced therapies, etc.

As in previous years, SCP extracted comparative pay practice data from several nationally recognized survey sources, including Watson Wyatt's *Top Management Personnel Report*, PRM Consulting's *Report on Nonprofit Compensation* and the Economic Research Institute (ERI)

Waverly-0799

Mr. Thomas P. Garvin
Waverly Height, Ltd.
December 8, 2010
Page 2

executive compensation database. Consultants examined pay levels and practices for Top Financial and Healthcare Executive positions in similar size organizations in several related industry sectors including Leisure & Hospitality, Other Health Care Services (both for- and nonprofit), and Nonprofit Services. Consultant found few differences in compensation practices—program design and actual pay levels—among these industry segments.

This year, given the IRS's continuing scrutiny of executive compensation practices in tax-exempt organizations, consultant also examined latest available 990 reports for several Philadelphia area CCRCs, including Beaumont, Bryn Mawr Terrace, Meadowood Corporation, Whitemarsh, White Horse Village, Cathedral Village, and LLS/Paul's Run. This research satisfies the IRS requirement to demonstrate reasonableness through case example.

**NOTE:**     Many of these 990 reports are at least 2 years old and, consequently, the compensation data offered can only be taken as an indicator of likely current practice. The data, however, is sufficient to support consultant's finding of reasonableness in current compensation levels and practices.

## Current Industry Practices: Cash Compensation Levels and Programming Trends

For the second year running, executive compensation levels among CCRCs, both nationally and locally, are "flat" when compared year-over-year (2010 v. 2009). Study findings for the current year indicate that the average 2010 salary increase for those executives actually receiving increases is 3.2%, down from 3.9% a year ago. Similarly, total annual cash compensation (salary plus bonus) for executives is expected to remain at last year's levels or even drop slightly. The continuing increases in pay for CCRC executives reflects the relatively stable financial and operating conditions in this industry segment compared to other aspects of the healthcare industry and the continuing competition for proven executive talent as demand for elder care rises and the current generation of leaders begins to retire.

Survey data extracted from the sources noted earlier indicate a wide spread in salary levels for Top Functional Executives in comparable CCRCs. The *median salary* for Top Financial Executives (with expanded administrative and/or operational duties) in Philadelphia area CCRCs with operating budgets between $20M and $24M is $170,314, up only 2.0% from the year earlier median salary. *The local industry median salary* for positions comparable to your Vice President, Healthcare is $118,273, also up about 2.0% from the year earlier.

Using a standard range of +/-15% around those median salary values, the competitive salary ranges for the two positions are:

|  | *Low* | *Midpoint* | *High* |
|---|---|---|---|
| VP, Finance | $145.0 | $170.3 | $196.0 |
| VP, Healthcare | $101.0 | $118.3 | $136.0 |

Waverly-0800

Mr. Thomas P. Garvin
Waverly Height, Ltd.
December 8, 2010
Page 3

As noted in past pricing letters, the lower end of the range typically accommodates less experienced and short-tenured individuals who may not have yet demonstrated full competency in the position while the upper end of the range accommodates longer-service and better performing incumbents.)

SCP continues to find increasing evidence of incentive compensation opportunities for Executives in Nonprofit Other Healthcare Services and the broader Nonprofit Services categories. As previously reported, some organizations are offering discretionary bonus awards on an "after-the-fact" or "look-back" basis. In these instances, bonuses are running in the 5%-8% (of salary) range. Other organizations are basing incentive award opportunities on performance against goals established at the beginning of a fiscal period. In these instances, the bonus award opportunities for VP level positions tend to be substantially larger, in a range from 12%-15% of salary @Target level performance with upside potential to 20% for Outstanding achievement.

Lastly, consultant has also observed increasing use of supplemental retirement plans and deferred compensation arrangements to provide additional income to executives in retirement. Typically, these plans are designed to ensure that covered executives will receive replacement income benefits in the range of 45% to 55% of their final active year's earnings for a period of at least five (5) and usually as long as ten (10) years into retirement. (The breakpoint for participation in such programming is currently $190,000 in total annual cash compensation. Since the incumbents are both currently paid below that threshold, SCP does not recommend including the incumbents in such a plan at the present time.)

## 2011 Compensation Trends

The national and regional economies are expected to continue a slow recovery through next year and likely beyond. Many organizations will continue to struggle to increase revenues to offset rising operating costs for essentials like utilities and employee benefits, putting further pressure on operating margins. SCP projects that executive salaries will increase again in 2011, but only at rates equal to those offered to other employee segments, about 2.6%-3.2%. Bonuses for executives are likely to be still smaller in 2011 than those projected for 2010 performance.

## 2011 Programming & Pay Adjustment Suggestions for the VP Level Positions

Both position incumbents are already paid salaries in the competitive range for their respective roles; within 6% of their respective median salary targets for 2011.

*Base Salary Increase Consideration.* Based on the survey data examined for this year's review and assuming that the organization wishes to maintain at least a median practice market philosophy for salary and total annual compensation, 2011 salary growth opportunities for the incumbents should be in the average to above average range, depending on performance ratings and position in

Waverly-0801

Mr. Thomas P. Garvin
Waverly Height, Ltd.
December 8, 2010
Page 4

pay range.    For both incumbents, an increase in the range of 2.75% - 3.75% would seem appropriate, assuming each is rated as being a good to very good performer. (The suggested range of increase is consistent with the organization's pay increase guidechart for 2011.)

*Performance Incentive Consideration.*  SCP has previously suggested that Waverly Heights move from its current practice of making discretionary year-end bonus awards to the Vice Presidents to a goal-based approach where you and the Vice Presidents would agree on performance goals and standards at the beginning of the fiscal year and then base year-end awards on actual performance (results) against those goals.  Award opportunities should follow the industry norms discussed earlier in this letter.  As tax-exempt organizations strive for greater transparency in their governance practices, "goal-based" has become the preferred approach to providing incentive compensation opportunities to executives.  This programming trend will accelerate over the coming years with continuing IRS interest in executive compensation levels and practices and more detailed reporting of those practices in the revised 990 form.

SCP again urges you and the Board to make this programming change for Waverly Heights.

## Consultant's Statement of Reasonableness and Compliance With Internal Revenue Code Section 4958

Strategic Compensation Planning, Inc. has examined cash compensation provisions and levels for the group's two Vice President level positions in light of U.S. Internal Revenue Code Section 4958 guidelines on the reasonableness of executive compensation.    *It found that the current compensation levels and practices affecting the two executive positions fall within the normal parameters of prevailing industry practices for comparable positions and do not pose a risk of incurring intermediate sanctions from the Internal Revenue Service.  Further, SCP believes that the programming suggestions outlined in this letter also comply with current IRS standards for reasonableness in executive compensation.*

Tom, SCP appreciates the continuing opportunity to work with you and the Board of Trustees in managing Waverly's executive compensation program and practices.  Please feel free to contact me to discuss any questions that you or the Trustees may have about the industry practice information or the 2011 programming suggestions offered in this letter.  You can reach me by telephone on 610.644.3599 or by e-mail on tom@scpsmartpay.com.

Sincerely,



Thomas E. Wozniak
Managing Principal

**TO:**      Kathy Jungclaus, Director of Human Resources
            Waverly Heights, Ltd.

**FROM:**    Tom Wozniak
            Strategic Compensation Planning, Inc.

**RE:**       2012 Compensation Planning

**DATE:**    July 16, 2011

*Business Confidential*

Kathy, as requested, we have reviewed latest available survey data on local area pay practices for selected WHL positions.  Results of this research are provided in **Table 1**, attached.

The data shows a continuing sluggish market with pay rates essentially "flat" or increasing at very modest rates.  Based on this review, the only position in benchmark sample that may warrant a grade change is the Dining Services Manager.

Looking at 2011 midpoint, or market, values for the benchmark positions, we find only small differentials between those values and the latest median survey results.  See **Table 2**, attached.

Based on these comparisons, SCP is recommending only minor maintenance adjustments to the WHL pay charts for 2012.  We are suggesting midpoint/market value increases of just 0.75% for the exempt leadership, general exempt and general nonexempt pay grade and range schedules.  We are suggesting an increasing of approximately 1.5% in the pay grade and range schedule for nonexempt healthcare positions.  (The updated pay schedules are provided in the attached EXCEL file.)

Our increase recommendation for the nonexempt healthcare schedule is based largely on the continuing increases in pay rates for RNs and Medical Records Clerks in the Philadelphia marketplace.  Survey data suggests that pay rates for LPNs and CNAs are "flat" at the moment.  The further range adjustment for 2012 should provide WHL with a competitive pay advantage in recruiting LPNs and CNAs to WHL as staffing needs require.

*Pay Increase Projections for 2012*.  We came into 2011 with pretty modest expectations of pay increase opportunities for most employees.  Many employers were hedging their bets by delaying actual increases until mid-year.  The early reports on this block of "delayed increase" employers suggest that a good number have either further

1

Waverly-0795

delayed the pay increases for their employees or elected to postpone any pay actions until the beginning of 2012. These decisions simply reflect the continuing uncertainties surrounding our economic recovery.

Among those employers who did increase employee pay rates this year—2011—the average increase percentage was at the lower end of the projection range of 2.7% to 3.2%.

Looking forward to 2012, with continuing unevenness in the economic recovery expected, pay increase budgets will be "mixed", ranging from 0% to as much as 3.0%. Early forecasts indicate the middle range of pay increase budgets will be between 2.4% and 2.8%.

SCP is suggesting that, for planning purposes, WHL use a target average increase percentage of 2.6%. See the suggested Pay Increase Guidechart attached. Note in the giudechart that we've also suggested tightening up the range of performers who may qualify for larger increases. This modification in the guidechart is simply intended to strike a balance between meeting the budget target and recognizing the very best performers in the group.

Obviously, a 2.6% target average increase doesn't leave a lot of room to recognize the outstanding performers within the workforce. We suggest that you do a more detailed analysis of where WHL employees stand against their respective position pay range midpoints to determine if there is justification for a larger increase budget for 2012. We suggest focusing on those employees who have been with WHL between 3 and 6 years and who are still below their range midpoints. If there are significant numbers of these situations within the group, it may serve as a basis for seeking a larger increase budget with the additional funds focused on those quality performers below midpoint.

Given the "thin" salary increase prospects in the coming year, it may also be appropriate for Tom Garvin to lobby the Board for a larger bonus pool for Leadership Team members and other key contributors.


Kathy, I'm traveling during the week of July 18, with limited access to e-mail. I will, however, be reachable by cell—610.304.9249—should you have any questions or issues that you'd like to review.

As always, thanks for the opportunity to serve WHL's compensation planning needs.


2

**Waverly Heights, Ltd.**
**2012 Pay Increase Guide chart**
**--For Management Use Only--**
**Target Average Increase: 2.6%**

Highly Confidential

| Performance Level | Rating from Performance | Position in Pay Range | | | | |
|---|---|---|---|---|---|---|
| | | C/R <95 | C/R 95-105 | C/R >105 | C/R over Range Maximum | |
| Performs majority of job responsibilities well - goal(s) noted | 2.5 - 3.0 | 3.50% | 3.0% | 2.5% | 2.25%  (lump sum award) | (lump sum) |
| Performs certain job responsibilities well - significant goal(s) noted | 1.5 – 2.49 | 2.50% | 2.0% | 1.5% | 1.25%  (lump sum award) | |
| Performance Probation | 0 – 1.49 | 0% | 0% | 0% | 0% | |

_How is the Average Rate Used_

market value of their position. (compa ratio is between 91 and 105 ).
of their position (compa ratio of 91 or below).
of their position (compa ratio over 105).
ratio, relative to the target average.
based on performance.
Employees who are on performance probation will not receive an increase

## Waverly Heights, Ltd.
### Recommended 2012 Pay Range Structure for Leadership Positions
—representing a 0.75% increase over 2011 ranges—

| Pay Grade | Min. | Mkt Val | 75%ile | Max. | Administration & Marketing | Finance & Human Resources | Health Services | Housekeeping & Building Services | Dining Services | Waverly Care |
|---|---|---|---|---|---|---|---|---|---|---|
| E14 | $146,968 | $183,710 | $205,755 | $220,452 | | Chief Financial Officer | | | | |
| E13 | $122,473 | $153,091 | $171,462 | $183,710 | | | | | | |
| E12 | $102,061 | $127,576 | $142,885 | $153,091 | | | VP Healthcare | | | |
| E11 | $86,860 | $108,576 | $121,605 | $130,291 | Director of Marketing | HR Director | | Director of Bldg. Serv. | | |
| E10 | $75,531 | $94,413 | $105,743 | $113,296 | | Controller | Director of Nursing | | Director Dining Services | |
| E09 | $65,679 | $82,099 | $91,130 | $98,518 | | | | Director Housekeeping | | |

Pay Grade assignments represent median market practice as recommended by our Compensation Consultant, Strategic Compensation Planning, Inc., based on survey data from other local retirement communities, Watson Wyatt and Economic Research Institute.

Range midpoint progression: 15% thru E11, 17.5% to E12 and 20% thereafter. Range spread: +/-20%.

Revised: 07/15/11

Effective 01/01/12

Appendix V34

Waverly-0798

**TO:**       Kathy Jungclaus, Human Resources Director
              Waverly Heights, Ltd.

**FROM:**     Tom Wozniak, Managing Principal
              Strategic Compensation Planning, Inc.

**RE:**       2014 Compensation Planning

**DATE:**     September 5, 2013

*Business Confidential*

Kathy, SCP has completed its annual review of industry pay practices and programming trends. This memo summarizes our research findings and offers suggestions for maintaining a competitive base pay opportunity for Waverly Heights employees during 2014.

## 2013 Pay Actions and 2014 Programming Trends

Pay increases in 2013 will mark the first time in the last five (5) years that the actual average rate of increase exceeded the forecast. Most analysts had predicted an average increase of 2.7%-2.8% during 2013. Reports to date indicate that the year will finish at about 2.9%.

This "uptick" in the pay increase trend reflects overall improvements in the economy, including the rapid improvement in the equity markets. It also reflects the pent up expectations of lower paid employees for bigger pay increases to cope with the sharp rises in energy (transportation, utilities), food and housing costs. (Many employers of lower level labor were experiencing increasing rates of turnover as individuals moved from job-to-job to increase their rates of pay.)

Within Healthcare and related industry groups (Retirement Communities, Leisure Living), we observed a pay increase trend right in line with national cross-industry norms. The Philadelphia market also followed the national industry practice.

Early forecasts for 2014 indicate that employers are planning to offer employees an

Waverly-0785

and highly skilled professionals like Nurse Practitioner are increasing at more rapid annual rates of 5%–8%.

## 2014 Programming Recommendations

Based on our observations of 2013 pay actions and the early forecasts of 2014 activity, SCP suggests that Waverly Heights consider increases in the base pay ranges for all categories of positions, and that it plan to offer its employees an average pay increase of 3.0% during 2014.

Specifically, SCP is recommending:

- Increases in the Leadership and Other Exempt position base salary ranges of between 2.0% and as much as 6.6%. See the note below.
- A 2.3% range increase for Nonexempt Classified Healthcare positions.
- A 1.75% range increase for Other Nonexempt positions.

See the displays in the attached EXCEL file.

**NOTE:** Based on latest survey data and a review of 990 filings, SCP also recommends adjusting (increasing) the midpoint progression in the Leadership pay schedule to more closely reflect the rapid increases in executive position market values. A small adjustment is already built into our suggested Leadership position pay schedule for 2014. If this pattern of pay increase continues, anticipate a further adjustment in the midpoint progression going into 2015.

Further, SCP has placed the VP, Healthcare and the Nurse Practitioner positions on a "watch list" for possible grade change later during 2014 or at the beginning of 2015.

As noted above, in addition to the base pay range adjustments, SCP also recommends that Waverly Heights budget for an average base pay increase of 3.0% for all categories of positions during 2014. See the suggested pay increase guidechart in the EXCEL file.

Waverly-0786

**Waverly Heights, Ltd.**
*Recommended 2014 Pay Range Structure for Leade*

*--representing a 4.4% to 6.6% increase over 201*

| Pay Grade | Pay Range | | | | Administration & Marketing | Finance & Human Resources | Health Services |
|------|------|------|------|------|------|------|------|
| | Min. | Mkt Val | 75% Ile | Max. | | | |
| E14 | $145,492 | $181,865 | $203,689 | $218,238 | | Chief Financial Officer | |
| E13 | $121,243 | $151,554 | $169,740 | $181,865 | | | |
| E12 | $103,186 | $128,982 | $144,460 | $154,779 | | | VP Healthcar |
| E11 | $87,818 | $109,772 | $122,945 | $131,726 | Director of Marketing | HR Director | Director of Nurs |
| E10 | $76,363 | $95,454 | $106,908 | $114,545 | | Controller | |
| E09 | $66,403 | $83,003 | $92,134 | $99,604 | | | |

Pay Grade assignments represent median market practice as recommended by our Compensation Consultant, Strategic Compens

Revised:    08/28/13                        **Range midpoint progression:  15% Grade 10 and Grade 11, 17.5%**

Effective    01/01/14

## Waverly Heights, Ltd.
### 2014 Pay Increase Guide chart
--For Management Use Only—
**Suggested Target Average Increase: 3.0%**

*Highly Confidential*

| Performance Level | Rating from Performance Evaluation | C/R <95 | C/R 95-105 |
|---|---|---|---|
| Performs majority of job responsibilities well - goal(s) noted | 2.75 – 3.0 | 4.0% | 3.25% |
| Performs certain job responsibilities well - significant goal(s) noted | 1.5 – 2.74 | 2.5% | 2.0% |
| Performance Probation | 0 – 1.49 | 0% | 0% |

### How is the Average Rate Used

The target average % of increase is paid to employees who perform the majority of their job responsibilities well and whose pay rate their position. (compa ratio is between 91 and 105 ).

A higher % of increase is paid to employees who perform the majority of their job responsibilities well and whose rate of pay is belo (compa ratio of 91 or below).

A lower % of increase is paid to employees who perform the majority of their job responsibilities well and who pay rate is higher thar (compa ratio over 105).

For employees who perform certain job responsibilities well and have significant areas of improvement, their % of increase is based target average.

For employees whose rate of pay exceeds the maximum rate for their position a nominal percent of increase in the form of a one-ti performance.

Employees who are on performance probation will not receive an increase

Waverly-0788

Approved 2014

## Waverly Heights, Ltd.
### Recommended 2014 Pay Range Structure for Leadership Positions
--representing a 4.4% to 6.6% increase over 2013 ranges--

| Pay Grade | Pay Range | | | | Administration & Marketing | Finance & Human Resources | Health Services | Housekeeping & Building Services | Dining Services | Waverly Care |
|---|---|---|---|---|---|---|---|---|---|---|
| | Min. | Mkt Val | 75% ile | Max. | | | | | | |
| E14 | $145,492 | $181,865 | $203,689 | $218,238 | | Chief Financial Officer | | | | |
| E13 | $121,243 | $151,554 | $169,740 | $181,865 | | | | | | |
| E12 | $103,186 | $128,982 | $144,460 | $154,779 | | | VP Healthcare | | | |
| E11 | $87,818 | $109,772 | $122,945 | $131,726 | Director of Marketing | HR Director | Director of Nursing | Director of Bldg. Serv. | | |
| E10 | $76,363 | $95,454 | $106,908 | $114,545 | | Controller | | | Director Dining Services | |
| E09 | $66,403 | $83,003 | $92,134 | $99,604 | | | | Director Housekeeping | | |

Pay Grade assignments represent median market practice as recommended by our Compensation Consultant, Strategic Compensation Planning, Inc.

Revised: 08/28/13

Effective 01/01/14

Range midpoint progression: 15% Grade 10 and Grade 11, 17.5% Grade 12 and Grade 13 and Grade 13 and 20% thereafter. Range spread: +/-20%.

Appendix 239

Waverly-0789

## Waverly Heights, Ltd.
### Recommended 2014 Pay Range Structure for Exempt Classified Positions
--representing a 2.0% to 3.8% increase over 2013 ranges--

| Pay Grade | Pay Range | | | | Administration & Marketing | Finance & Human Resources | Health Services | Housekeeping & Building Services | Dining Services | Waverly Care |
|---|---|---|---|---|---|---|---|---|---|---|
| | Min. | Mkt Val | 75%ile | Max. | | | | | | |
| E10 | $76,363 | $95,454 | $106,908 | $114,545 | | | | | | |
| E09 | $66,403 | $83,003 | $92,134 | $99,604 | | | Nurse Practitioner Physical Therapist Therapy Coordinator | | | |
| E08 | $57,742 | $72,177 | $80,116 | $86,612 | | Accounting Manager | ADON/RNAC | Maintenance Manager Supvr Training, Security, Transportation | Executive Chef | |
| E07 | $51,326 | $64,157 | $70,573 | $76,989 | | Information Technologist | Director Social Services Healthcare Coordinator | Maintenance Supervisor | | |
| E06 | $45,623 | $57,029 | $62,732 | $68,434 | | Financial Analyst | Exercise Physiologist | | Production Manager | |
| E05 | $40,554 | $50,692 | $55,508 | $60,831 | Exec. Admin. Assistant Resident Services/ Activities Supervisor | HR Manager Staff Accountant | Social Worker | Landscape Supvr | Chef de Cuisine Dining Service Manager Nutrition Care Manager | |
| E04 | $36,048 | $45,060 | $49,340 | $54,072 | | | Activities Coordinator Social Worker Therapeutic Rec. | | | |
| E03 | $32,771 | $40,963 | $44,650 | $49,156 | Resident Services Coordinator | | | | Assistant Dining Svcs Mgr Dietary Manager Food Production Supvr Sous Chef | |
| E02 | $29,792 | $37,239 | $40,591 | $44,687 | Gift Shop Manager | | | | Coffee Shop Supervisor Dietary Supervisor | |
| E01 | $27,083 | $33,854 | $36,901 | $40,625 | | | Ass't Activities Coord. | | | |

Pay Grade assignments represent median market practice as recommended by our Compensation Consultant, Strategic Compensation Planning, Inc.

Revised: 08/27/13
Effective 01/01/14

Range midpoint progression: 10% thru grade E4, 12.5% Grades 5 through to E8, 15% thereafter. Range spread: +/-20%.

Appendix 240

Waverly-0790

## Waverly Heights, Ltd.
### Recommended 2014 Pay Range Structure for Nonexempt Classified Healthcare Positions
#### --representing a 2.3% increase over 2013 ranges--

| Pay Grade | Pay Range | | | | Direct Healthcare | Healthcare Support | Waverly Care |
|---|---|---|---|---|---|---|---|
| | Min. | Mkt Val / 30 mo | 75% Ile | Max. | | | |
| N10 | $28.02 | $32.97 | $36.92 | $37.91 | Primary Nurse RN/ Residential Nurse | | |
| N9 | $23.35 | $27.47 | $30.77 | $31.59 | Office Manager / Primary Nurse LPN | | |
| N8 | $19.46 | $22.89 | $25.41 | $26.33 | | | |
| N7 | $16.92 | $19.91 | $21.90 | $22.89 | | | |
| N6 | $15.11 | $17.77 | $19.37 | $20.44 | | | |
| N5 | $13.73 | $16.16 | $17.53 | $18.58 | | Medical Records Clerk, Unit Clerk | |
| N4 | $12.49 | $14.69 | $15.94 | $16.89 | CNA | | |
| N3 | $11.35 | $13.35 | $14.42 | $15.36 | | | |
| N2 | $10.32 | $12.14 | $13.11 | $13.96 | | | |

Pay Grade assignments represent median market practice as recommended by our Compensation Consultant, Strategic Compensation Planning, Inc.

Range midpoint progression: 10% thru grade N6, 12% to N7, 15% to N8 and 20% thereafter.  Range spread: +/-15%.

| Shift Differentials | RN and LPN | C.N.A |
|---|---|---|
| Day (Weekday/Weekend) | $0.00 / $4.00 | 0.00 / 0.00 |
| Evening (Weekday / Weekend) | $3.00 / $6.00 | $.50 / $.50 |
| Night (Weekday / Weekend) | $2.00 / $5.00 | $1.00 / $1.00 |

**Pool Rates:**
N8  -  $13.25
N9  -  $26.00
N10  -  $30.00

Revised: 08/27/2013
Effective:  01/01/14

Waverly-0791

## Waverly Heights, Ltd.
### Recommended 2014 Pay Range Structure for Nonexempt Classified Positions
--representing a 1.75% increase over 2013 ranges--

| Pay Grade | Min. | Mkt Val / 30 mo | 75% ile | Max. | Administration / Administrative | Finance and Human Resources | Health Services | Housekeeping and Building Services | Dining Services | Waverly Care |
|---|---|---|---|---|---|---|---|---|---|---|
| N10 | $25.82 | $30.37 | $33.56 | $34.93 | | | | | | |
| N9 | $21.97 | $25.85 | $28.44 | $29.73 | | Staff Accountant | | Lead Mechanic | | |
| N8 | $19.11 | $22.48 | $24.61 | $25.85 | | | | HVAC Mechanic / Plumber | | |
| N7 | $16.61 | $19.55 | $21.31 | $22.48 | Administrative Assistant | H.R. Assistant / Junior Accountant | Fitness Instructor | Administrative Assistant / General Mechanic / Carpenter | Administrative Assistant / Lead Cook | |
| N6 | $14.83 | $17.45 | $19.02 | $20.07 | | AP/Payroll Specialist | | Painter | 1st Cook | |
| N5 | $13.49 | $15.87 | $17.21 | $18.25 | Receptionist | Accounting Clerk | Therapeutic Recreation Coordinator | Ass't Security Supervisor / Housekeeping Supervisor / Landscaper | Groundsman / Receiver / Second Cook | |
| N4 | $12.26 | $14.42 | $15.65 | $16.59 | General Office Clerk / Residential Assistant | | Outpatient Office Asst. | Driver / Housekeeping Team Leader / Houseperson / Laundry Supervisor / Security Officer | Lead Production / Lunchbox Server / Menu Server / Short Order Cook | |
| N3 | $11.15 | $13.11 | $14.16 | $15.08 | | | | Housekeeper / Laundry | Host/Hostess / Kitchen Assistant | |
| N2 | $10.13 | $11.92 | $12.87 | $13.71 | | | | | Server/Utility | |

Pay Grade assignments represent median market practice as recommended by our Compensation Consultant, Strategic Compensation Planning, Inc.
Range midpoint progression: 10% thru grade N6, 12% to N7, 15% to N9 and 17.5% to N10. Range spread: +/-15%.

Revised: 08/27/13
Effective 01/01/14

**Shift Differentials**
Day (Weekday / Weekend)
Evening (Weekday / Weekend)
Night (Weekday / Weekend)

**Security**
0.00 / $2.00
$2.00 / $2.00
$1.00 / $1.00

Appendix 242

Waverly-0792

**Waverly Heights, Ltd.**
**2014 Pay Increase Guide chart**
**--For Management Use Only--**
**Suggested Target Average Increase:  3.0%**

*Highly Confidential*

| Performance Level | Rating from Performance Evaluation | Position in Pay Range | | | |
|---|---|---|---|---|---|
| | | C/R <95 | C/R 95-105 | C/R >105 | C/R over Range Maximum |
| Performs majority of job responsibilities well - goal(s) noted | 2.75 – 3.0 | 4.0% | 3.25% | 2.75% | 2.75%  (lump sum award) |
| Performs certain job responsibilities well - significant goal(s) noted | 1.5 – 2.74 | 2.5% | 2.0% | 1.5% | 1.25% (lump sum award) |
| Performance Probation | 0 – 1.49 | 0% | 0% | 0% | 0% |

*How is the Average Rate Used*

The target average % of increase is paid to employees who perform the majority of their job responsibilities well and whose pay rate is at or near the market value of their position. (compa ratio is between 91 and 105 ).

A higher % of increase is paid to employees who perform the majority of their job responsibilities well and whose rate of pay is below the market value of their position (compa ratio of 91 or below).

A lower % of increase is paid to employees who perform the majority of their job responsibilities well and who pay rate is higher than the market value of their position (compa ratio over 105).

For employees who perform certain job responsibilities well and have significant areas of improvement, their % of increase is based on their compa ratio, relative to the target average.

For employees whose rate of pay exceeds the maximum rate for their position a nominal percent of increase in the form of a one-time bonus is given based on performance.

Employees who are on performance probation will not receive an increase

Appendix 243                                          Waverly-0793

## WAVERLY HEIGHTS
### 2013 Compensation Review @ 12/2012 – Vice Presidents and Department Directors

| Employee | Title | Date of Hire | Length of Service as of 12/31/12 | Pay Grade | A 2013 Grade Market Value | 2013 75% of Pay Grade | B 1/01/12 Pre-Adj. Current Salary | C (B/A) C/R (Compa Ratio) | D % Increase based on performance | E (B x D) Increase Amount | F (B + E) 1/01/13 Adjusted Salary | G (F/A) New C/R | H Bonus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. Rogers | VP Finance | 8/7/1989 | 23.4 | E14 | 174,212. | 195,117. | 179,555. | 103 | | | | | |
| M. Guenveur | VP HCC | 6/29/2001 | 11.5 | E12 | 120,981. | 135,498. | 124,942. | 104 | 3% | 3,748. | 128,690. | 1.06 | ** 6K |
| J. Thompson | Director Marketing | 4/14/1995 | 17.8 | E11 | 102,962. | 115,318. | 107,504. | 105 | 3% | 3,225. | 110,729. | 1.08 | ** 4K |
| M. Heil | Director Bldg. Serv. | 10/13/1997 *11/14/1999 | 15.2 | E11 | 102,962. | 115,318. | 101,108. | 99 | 3% | 3,033. | 104,141. | 1.01 | ** 8K |
| K. Jungclaus | Director H.R. | 4/7/1997 | 15.8 | E11 | 102,962. | 115,318. | 106,171. | 104 | 3% | 3184. | 109,345. | 1.06 | |
| C. Gallagher | Director Dining Serv. | 4/1/1997 *4/1/2004 | 15.8 | E10 | 89,532. | 100,276. | 92,000. | 103 | 2% | 1,840. | 93,840. | 1.05 | |
| L. Larrabee | Director Nursing | 4/22/2002 | 10.8 | E10 | 89,532. | 100,276. | 98,849. | 111 | 2.5% | 2,471. | 101,320. | 1.13 | |
| Constance Dogan | Director Housekeeping | 6/6/2006 *07/11/2012 | <1 yr. | E9 | 77,854. | 86,418. | 59,000. | 76 | 3.5% | 2,065. | 61,065. | .78 | |

* Date promoted to Dept. Director
** Recommended bonus based on performance and additional responsibilities related to HCC expansion/construction

KMJ 11/29/12

Waverly-079

Appendix 244

**TO:**       Tom Garvin, President
              Waverly Heights, Ltd.

**FROM:**     Tom Wozniak
              Strategic Compensation Planning, Inc.

**RE:**       2014 Compensation Planning for Executive Team Positions

**DATE:**     November 22, 2013

*Business Confidential*

Tom, we've completed our annual review of compensation levels and practices for selected executive positions on your Leadership Team.  This memo provides a summary of our research findings and offers compensation programming recommendations to ensure competitive *total rewards* opportunities for the Vice President level positions in Finance, Healthcare and Waverly Care.

## Study Methods, Position Pricing Considerations and Survey Data Sources

In assessing compensation levels and practices for executive positions, SCP focuses first on the nature of the organization (industry affiliation) and the size of the operation (in terms of operating budget and full-time equivalent employees).  And, then, it examines the roles of the positions in the organization, evaluating the position's scope of responsibility and level of autonomy in the organization.

In the case of Waverly's Vice President, Finance position, SCP has again based its pricing on a somewhat broader than typical position role in the current organization, recognizing that it does have responsibilities for certain operations functions that go beyond the norm for a Top Financial Executive. (We presume here that even with the change in incumbents that some of the non-finance administrative and operations duties that Anne Rogers had continue with Bob Supper.)

Similarly, SCP recognizes that the role of the Vice President, Healthcare has grown over the last three years with the expansion of Waverly's health center and the addition of new patient treatment programs.

Lastly, the Vice President, Waverly Care position is somewhat different from the other executive level positions in that it functions within a for-profit subsidiary environment.  The scope of this job is growing in line with the development of the Waverly Care franchise in the Western Suburbs of Philadelphia.

SCP extracted comparative pay practice data from several nationally recognized survey sources, including Towers Watson's *Top Management Personnel Report*, PRM

Waverly-0781

Consulting's *Report on Nonprofit Compensation* and the Economic Research Institute (ERI) executive compensation database. Consultants examined pay levels and practices for Top Financial, Healthcare, and Health-related Services Executive positions in similar size organizations in several related industry sectors including Leisure & Hospitality, Other Health Care Services (both for- and nonprofit), and Nonprofit Services.

Given the IRS's continuing scrutiny of executive compensation practices in tax-exempt organizations, consultants also examined latest available 990 filings of selected Philadelphia area CCRCs, including Beaumont, Bryn Mawr Terrace, Meadowood Corporation, Whitemarsh, White Horse Village, Cathedral Village, and LLS/Paul's Run. *This research satisfies the IRS requirement to demonstrate reasonableness through case example.*

## Industry Practices: Compensation Levels and Programming Trends

We observed in last year's pricing memo the beginning of a slight upward trend in salaries for key senior positions, both nationally and locally. While survey data suggests a fairly broad spread in actual salary levels and recent total annual cash compensation levels, the median salary values and the median level of total annual cash compensation continue to show slow but steady improvement.

Projected 2014 median salary values for the three Waverly positions are:

| *Position* | *Projected 2014 Median Salary* | *Change from 2013* |
|---|---|---|
| VP, Finance | $182,000 | +2.0% |
| VP, Healthcare | $129,350 | +2.0% |
| VP, Waverly Care | $108,400 | +4.0% |

Availability of variable pay opportunities for comparable positions in nonprofit organizations continues to increase, with recent actual awards in a broad range between 3% and 13% of salary (down slightly from the prior year). The median award was approximately 6.8%. **NOTE:** Variable pay opportunities for executives in for-profit enterprises tend to be significantly stronger, usually averaging 12%-15% of salary with some awards in excess of 20%-25% of salary.

In the area of noncash compensation, consultant continues to observe increasing use of supplemental retirement plans and deferred compensation arrangements to provide additional income to executives in retirement. As reported previously, these plans are typically designed to ensure that covered executives will receive annual replacement income benefits equal to 45% to 55% of their final year's earnings for a period of at least five (5) and usually as long as ten (10) years into retirement. (Based on current income levels among Waverly incumbent executives, only the VP, Finance is likely to have a

2

serious issue with respect to the level of available retirement income benefits.)

Looking ahead to calendar year 2014, we foresee slow but continuing improvement in economic conditions, resulting in a further "uptick" in the demand for labor, including experienced executive level talent.  As a consequence, prospects for compensation growth in 2014 will improve, albeit modestly.

The composite of leading forecasts on 2014 compensation trends are in agreement that salary increases for executives in healthcare-related industry sectors will average 3.0%-3.2%, with a spread of actual increases between 0% and as much 7%-8%.

With improving business/activity results in 2013, variable pay awards (payable in early 2014) should show a healthy increase over 2012 awards, averaging 6%-8% for most eligible executives in nonprofit groups and 15%-18% in for-profits.

## 2014 Programming & Pay Adjustment Suggestions for Executive Team Positions

**Program Structure**.  The current compensation program structure for the three (3) Vice President level positions remains sound and competitive; no significant change in approach or structure is suggested at this time.  Base salaries and the discretionary year-end bonus award opportunities at competitive, and participation in the supplemental retirement benefit plan makes the total package very attractive.

A few comments about each of the component features:

**Base Salary**.  All three position incumbents currently receive base salaries that fall well into the competitive range for their respective positions.  However, the VPs for Finance and Healthcare fall just short of the midpoint values in the 2014 pay range structure for Leadership Team positions.  The VP, Waverly Care, a position not included in the Leadership Team structure, falls a bit below the projected median market salary value for comparable positions.

Based on the survey data examined for this year's review and assuming that the organization wishes to maintain at least a median practice market philosophy for salary and total annual compensation, 2014 salary growth opportunities for the incumbents should again be in the "average" to "above average" range, depending on performance ratings and position in pay range. For all three incumbents, an increase in the range of at least 2.50% - 4.50% would seem appropriate, provided that their individual performances are rated as "good" to "very good".

**_Performance Incentive Consideration_**.  The bonuses awarded to Meg and Pattie for 2012 were consistent with similar after-the-fact awards to comparable executives in

3

similar business situations.

As noted above, typical bonus awards for 2013 performance in nonprofit CCRCs are likely to be the 6%-8% range while incentives to executives in for-profit operations like Waverly Care will range between 15% and as much as 25% of salary. Consideration within these parameters should provide each incumbent with competitive recognition of their contributions to the success of Waverly Heights during 2013.

**Supplemental Retirement Plan Benefits.** As we observed in last year's memo, the fact that Waverly has a plan in place puts its program in a better-than-typical competitive position. While the contribution formula appears to be generous, it would still be appropriate to model outcomes for current participants to determine if the retirement income benefits from all sources—qualified retirement plans, Social Security and the supplemental plan—will provide participants with a competitive level of replacement income when they retire.

## Consultant's Statement of Reasonableness and Compliance With Internal Revenue Code Section 4958

Strategic Compensation Planning, Inc. has examined cash and noncash compensation provisions and levels for the organization's three Vice President level positions in light of U.S. Internal Revenue Code Section 4958 guidelines on the reasonableness of executive compensation. It found that the current compensation levels and practices affecting the three executive positions fall within the normal parameters of prevailing industry practices for comparable positions and do not pose a risk to Waverly Heights of incurring intermediate sanctions from the Internal Revenue Service. Further, SCP believes that the programming suggestions outlined in this letter also comply with current IRS standards for reasonableness in executive compensation.

Tom, SCP appreciates the continuing opportunity to work with you and the Board of Directors in managing Waverly's executive compensation program and practices. Please feel free to contact me to discuss any questions that you or the Directors may have about the industry practice information or the 2014 programming suggestions offered in this memo. You can reach me by telephone on 610.644.3599 or by e-mail on tom@scpsmartpay.com.

4

TO:       Kathy Jungclaus, Human Resources Director
          Waverly Heights, Ltd.

FROM:     Tom Wozniak, Managing Principal
          Strategic Compensation Planning, Inc.

RE:       2015 Compensation Planning

DATE:     September 10, 2014

*Business Confidential*

Kathy, SCP has completed its annual review of industry pay practices and programming trends. This memo summarizes our research findings and offers a series of recommendations to maintain the organization's competitive base pay program in 2015.

## State of the Labor Market and Recent Pay Movements

Generally, across the labor markets, employee pay is now rising at rates not seen since pre-recession days. Further, the increasing demand for experienced workers with specific job skills and/or technical training is driving pay for some job categories even faster.

2014 marks the first year since 2007 when the average pay increase for all types of employees will exceed 3.0%. Tracking on pay increase activity to date suggests that U.S. workers will realize an average increase of about 3.1% over the course of this year.

As suggested in last year's update report, the "uptick" in the pay increase trend reflects overall improvements in the economy, and a reaction by employers to the pent up expectations of many workers whose pay stagnated during the recession period. (For some employers, the rise in pay increase rates is seen as necessary to avoid potential turnover among valued employees.)

Within Healthcare and related industry groups (Retirement Communities, Leisure Living), we continue to observe a pay increase trend that is right in line with national cross-industry norms. The Philadelphia market also continues to follow the national cross-industry practice trends.

Compensation practice forecasts for 2015 suggest that a majority of employers are planning to offer employees an average base pay increase of 3.2% in the coming year. These same reports also indicate that about 90% of mid-size and larger employers will offer pay increases to their employees. *This level of market participation is consistent with pre-recession level activity.*

Waverly-0773

As noted earlier, pay for some job levels and categories is increasing faster than it is for other job types. Specifically, SCP found that market values for senior healthcare management positions and some cross-industry professional positions are rising very rapidly. Consequently, we are recommending some salary grade changes for affected positions in the Waverly Heights organization. See our recommendations below.

## 2015 Programming Recommendations

Based on current industry and local labor market pay trends and the forecasts for 2015 pay increases, SCP offers the following base pay program update recommendations for consideration:

- Increase the base pay ranges for Leadership, Other Exempt and Nonhealthcare Nonexempt positions by 2.0%, effective January 1, 2015.

- Increase the base pay ranges for Nonexempt Classified Healthcare positions by 2.2%, effective January 1, 2015.

- Increase the base pay grade level assignments for the following positions by one (1) grade level, effective January 1, 2015:
  - ➢ Vice President, Healthcare from E12 to E13.
  - ➢ Nurse Practitioner from E9 to E10.
  - ➢ Information Technologist from E7 to E8.
  - ➢ Accountant from E5 to E6.
  - ➢ Human Resources Manager from E5 to E6.

  (These positions are listed in *bold italics* on the pay charts.)

- If affordable, plan to provide employees with an average pay increase of 3.2% during 2015.

See the displays in the attached EXCEL file.

Kathy, as always, thanks for the continuing opportunity to work with Waverly Heights in maintaining a competitive base pay program for its associates. I look forward to meeting with you and the Human Resources Committee of the Board on Monday, September 22, 2014 to review the results of our research and to discuss our programming recommendations for 2015.

**TO:**     Tom Garvin, President
            Waverly Heights, Ltd.

**FROM:**   Tom Wozniak
            Strategic Compensation Planning, Inc.

**RE:**     2015 Compensation Planning for Executive Team Positions

**DATE:**   November 2, 2014

*Business Confidential*

Tom, we've completed our annual review of compensation levels and practices for selected executive positions on your Leadership Team. This memo provides a summary of our research findings and offers compensation programming recommendations to ensure competitive *total rewards* opportunities for the Officer level positions in Finance, Healthcare and Waverly Care.

## Study Methods, Position Pricing Considerations and Survey Sources

*Study Methods*. In assessing compensation levels and practices for executive positions, SCP focuses first on the nature of the organization (industry affiliation) and the size of the operation (in terms of operating budget and full-time equivalent employees). Then, it examines the roles of the positions in the organization, evaluating the position's scope of responsibility and level of autonomy in the organization.

*Pricing Considerations*. In many mid-size organizations, positions comparable to Waverly's Vice President, Finance role have a variety of responsibilities that go beyond the basic accounting and financial management functions of the enterprise. The positions have expanded over time to include a variety of administrative and even some operational activities and programs from Human Resources and Security to Food Service and Housekeeping. We have evaluated the Vice President, Finance position at Waverly in this broader context.

Similarly, SCP recognizes that the role of the Vice President, Healthcare has grown over the last three years with the expansion of Waverly's health center and the addition of new patient treatment programs.

And lastly, we note that the Vice President, Waverly Care position is somewhat different from the other executive level positions in that it functions within a for-profit subsidiary environment. The scope of this job is growing in line with the development of the Waverly Care franchise in the Western Suburbs of Philadelphia.

Waverly-0775

*Survey Sources*.  SCP extracted comparative pay practice data from several nationally recognized survey sources, including Towers Watson's *Top Management Personnel Report*, PRM Consulting's *Report on Nonprofit Compensation* and the Economic Research Institute (ERI) executive compensation database.

Consultants examined pay levels and practices for Top Financial, Healthcare, and Health-related Services Executive positions in similar size organizations in several related industry sectors including Leisure & Hospitality, Other Health Care Services (both for- and nonprofit), and Nonprofit Services.

Given the IRS's continuing scrutiny of executive compensation practices in tax-exempt organizations, consultants also examined latest available 990 filings of selected Philadelphia area CCRCs, including Beaumont, Bryn Mawr Terrace, Dunwoody, Whitemarsh at Lafayette Hill, White Horse Village, Cathedral Village, Riddle Village, Maris Grove and Kendal-Crosslands.  *This research satisfies the IRS requirement to demonstrate reasonableness through case example.*

## Industry Practices: Compensation Levels and Programming Trends

Starting in 2012, SCP has observed a steady upward trend in salaries for key senior positions, both nationally and locally.  Latest available survey reports suggest significant increases in the values of the senior Finance and Healthcare positions.

The market value of the Vice President, Waverly Care role is also increasing, but not as dramatically as the salary values of the other two positions.

Projected 2015 median salary values for the three Waverly positions are:

| *Position* | *2014 Midpoint Values* | *Proj'd 2015 Median* | *Change* |
|---|---|---|---|
| VP, Finance | $181, 865 | $194,600 | 7.0% |
| VP, Healthcare | $128,982 | $148,450 | 15.1% |
| VP, Waverly Care | $109,772 | $114,750 | 4.5% |

Additionally, as reported in last year's pricing memo, more nonprofit organizations are providing comparable position incumbents with variable pay opportunities.  Recent awards have ranged from a low of 2% of base salary to as much as 16% of base salary. The median variable pay award for 2013 was approximately 6.4%.

**NOTE:**  Variable pay opportunities for executives in for-profit enterprises tend to be stronger than those provided by nonprofit organizations; usually averaging 12%-15% of salary with some awards in excess of 20%-25% of salary.

2

*The Year Ahead*. Looking ahead to calendar year 2015, SCP foresees a continuation of the pay trends of the past three years for executive level positions: above average salary growth and greater variable pay opportunities for positions comparable to Waverly's Top Finance, Healthcare and Waverly Care roles.

The composite of leading forecasts on 2015 compensation trends are in agreement that salary increases for executives in healthcare-related industry sectors will average 3.4%-3.6%, stronger than the 3.2% average increase expected for other employee categories. The spread of actual salary increases for executives is likely to again range between 0% and as much 7%-8% of current salary.

With business results continuing to improve for many organizations, variable pay awards for 2014 (payable in early 2015) should show another increase over 2013 awards, averaging 7%-9% for most eligible executives in nonprofit groups and 17%-20% among for-profits.

## 2015 Programming & Pay Adjustment Suggestions for Selected Officer Positions on the Leadership Team

**Salary Grade Assignments in the Program Structure**. Based on the latest available survey data, the current salary grade situations for the three (3) positions under review vary. SCP suggests keeping the Vice President, Finance position at its current E14 grade level. While the survey data indicates the market value of this position is increasing significantly, latest available 990 filings of other local area CCRCs do not yet support a grade change.

SCP is recommending a grade change for the Vice President, Healthcare position from its current E12 level in 2014 to E13 in 2015.   Both survey data and recent 990 filings support such a change in grade assignment for this position. (NOTE: SCP was prepared to recommend this change in grade assignment a year ago, but agreed to hold off on the proposed change until the expended healthcare program was fully implemented.)

Current grading for the Vice President, Waverly Care position remains competitive.  No change in grade assignment is recommended at this time

in compensation program structure for the three (3) Vice President level positions remains sound and competitive; no significant change in approach or structure is suggested at this time.  Base salaries and the discretionary year-end bonus award opportunities at competitive, and participation in the supplemental retirement benefit plan makes the total package very attractive.

3

Waverly-0777

**Base Salary Increase Consideration**.  All three position incumbents are currently compensated within the competitive range for their respective positions, although the new Vice President, Healthcare is being paid at the very low end of the suggested 2015 salary range for her position (compa-ratio of 84).

*All three incumbents should be eligible for normal salary increase consideration going into calendar 2015.*

**Performance Incentive Opportunities**.  The bonuses awarded to Bob and Patti for their 2013 performances/contributions were certainly competitive and in-line with industry practices for their respective positions.

*Maintaining the same level of award opportunities for the Vice Presidents when the organization determines bonuses for 2014 would keep total annual cash compensation for the incumbents in the competitive range of prevailing industry practices.*

**Health & Welfare and Fringe Benefits**. Current provisions for these key officer roles are comprehensive and very competitive.  No changes or enhancements are necessary or suggested at this time.

## Consultant's Statement of Reasonableness and Compliance With Internal Revenue Code Section 4958

Strategic Compensation Planning, Inc. has examined cash and noncash compensation provisions and actual compensation levels for the organization's three Vice President positions in light of U.S. Internal Revenue Code Section 4958 guidelines on the reasonableness of executive compensation.  It found that the current compensation levels and practices affecting the three executive positions fall within the normal parameters of prevailing industry practices for comparable positions and do not pose a risk to Waverly Heights of incurring intermediate sanctions from the Internal Revenue Service.  Further, SCP believes that the programming and compensation change suggestions outlined in this letter also comply with current IRS standards for reasonableness in executive compensation.

Tom, SCP appreciates the continuing opportunity to work with you and the Board of Directors in managing Waverly's executive compensation program and practices. Please feel free to contact me to discuss any questions that you or the Directors may have about the industry practice information provided or our 2015 programming suggestions.  You can reach me by telephone on 610.644.3599 or by e-mail on tom@scpsmartpay.com.

4

Highly Confidential

## Waverly Heights, Ltd.
### 2015 Pay Increase Guide chart
---For Management Use Only---
Suggested Target Average Increase:  3.2%

| Performance Level | Rating from Performance Evaluation | Position in Pay Range | | | |
|---|---|---|---|---|---|
| | | C/R <95 | C/R 95-105 | C/R >105 | C/R over Range Maximum |
| Performs majority of job responsibilities well - goal(s) noted | 2.5 – 3.0 | 4.0% | 3.25% | 2.75% | 2.75%  (lump sum award) |
| Performs certain job responsibilities well - significant goal(s) noted | 1.5 – 2.49 | 2.5% | 2.0% | 1.5% | 1.25% (lump sum award) |
| Performance Probation | 0 – 1.49 | 0% | 0% | 0% | 0% |

Appendix  255

### How is the Average Rate Used
The target average % of increase is paid to employees who perform the majority of their job responsibilities well and whose pay rate is at or near the market value of their position. (compa ratio is between 91 and 105 ).
A higher % of increase is paid to employees who perform the majority of their job responsibilities well and whose rate of pay is below the market value of their position (compa ratio of 91 or below).
A lower % of increase is paid to employees who perform the majority of their job responsibilities well and who pay rate is higher than the market value of their position (compa ratio over 105).
For employees who perform certain job responsibilities well and have significant areas of improvement, their % of increase is based on their compa ratio, relative to the target average.
For employees whose rate of pay exceeds the maximum rate for their position a nominal percent of increase in the form of a one-time bonus is given based on performance.

Employees who are on performance probation will not receive an increase

Waverly-0779

## Waverly Heights, Ltd.
### Recommended 2015 Pay Range Structure for Leadership Positions
*--representing a 2.0% increase over 2014 ranges--*

| Pay Grade | Pay Range | | | | Administration & Marketing | Finance & Human Resources | Health Services | Housekeeping & Building Services | Dining Services | Waverly Care |
|---|---|---|---|---|---|---|---|---|---|---|
| | Min. | Mkt Val | 75%ile | Max | | | | | | |
| E14 | $148,402 | $185,502 | $207,762 | $222,603 | | Chief Financial Officer | | | | |
| E13 | $123,668 | $154,585 | $173,135 | $185,502 | | | *Sr. VP Healthcare* | | | |
| E12 | $105,249 | $131,562 | $147,349 | $157,874 | | | | | | |
| E11 | $89,574 | $111,967 | $125,404 | $134,361 | Vice President of Marketing | Vice President of Human Resources | Director of Nursing | Vice President of Building Services | | |
| E10 | $77,890 | $97,363 | $109,047 | $116,836 | | Controller | | | Director Dining Services | |
| E09 | $67,731 | $84,663 | $93,976 | $101,596 | | | | Director Housekeeping | | |

Revised:   09/08/14

Effective   01/01/15

Pay Grade assignments represent median market practice as recommended by our Compensation Consultant, Strategic Compensation Planning, Inc.

Range midpoint progression:   15% Grade 10 and Grade 11, 17.5% Grade 12 and Grade 13 and 20% thereafter.   Range spread:   +/-20%.

Waverly-0780

**TO:**    Kathy Jungclaus, Human Resources Director
           Waverly Heights, Ltd.

**FROM:**  Tom Wozniak, Managing Principal
           Strategic Compensation Planning, Inc.

**RE:**    2016 Compensation Planning

**DATE:**  September 16, 2015

*Business Confidential*

Kathy, SCP has completed its annual review of industry pay practices and programming trends. This memo summarizes our research findings and offers a series of recommendations to maintain a competitive base pay program for Waverly Heights and its associates in 2016.

## State of the Labor Market and Recent Pay Movements

As reported in last year's program update, employee pay is now rising at rates not seen since pre-recession days. Further, the increasing demand for experienced workers with specific job skills and/or technical training is driving pay for some job categories even faster than the general market trend.

Last year, 2014, marked the first year since 2007 when the average pay increase for all types of employees exceeded 3.0%. Tracking on pay increase activity to date suggests that U.S. workers will realize an average increase of about 3.2% over the course of this year, 2015.

As suggested in last year's update report, the "uptick" in the pay increase trend reflects overall improvements in the economy, and a reaction by employers to the pent up expectations of many workers whose pay stagnated during the recession period. (For some employers, the rise in pay increase rates is seen as necessary to avoid potential turnover among valued employees.)

Within Healthcare and related industry groups (Retirement Communities, Leisure Living), we continue to observe a pay increase trend that is right in line with national cross-industry norms. The Philadelphia market also continues to follow the national cross-industry practice trends.

Compensation practice forecasts for 2016 suggest that a majority of employers are planning to offer employees an average base pay increase of 3.4%-3.5% during the coming year. These same reports also indicate that 90%-93% of mid-size and larger

Waverly-0765

employers will again provide base pay increases for their employees in 2016. *This level of market participation is consistent with pre-recession level activity.*

As noted earlier, pay for some job levels and categories is increasing faster than it is for other job types. Specifically, SCP found that market values for experienced healthcare workers and healthcare management positions are rising more rapidly than pay values for other disciplines. *However, we are not recommending any pay grade changes for these types of positions at this time.* SCP will continue to monitor the pace of pay growth and advise Waverly Heights management when it may be appropriate to consider pay grade changes. See our 2016 programming recommendations below.

## 2016 Programming Recommendations

Based on current industry and local labor market pay trends and the forecasts for 2016 pay increases, SCP offers the following base pay program update recommendations for consideration:

- Increase the base pay ranges for Leadership positions by 2.5%, effective January 1, 2016.

- Increase the base pay ranges for Nonexempt Classified Healthcare positions by 2.4%, effective January 1, 2016.

- Increase the base pay ranges for Other Exempt Classified positions by 2.2%, effective January 1, 2016.

- Increase the base pay ranges for Nonhealthcare Nonexempt Classified positions by 2.0%, effective January 1, 2016.

- Lastly, if affordable, plan to provide employees with an average pay increase of 3.5% during 2016.

See the displays of suggested 2016 pay grade and range structures and the suggested 2016 pay increase guide chart in the attached EXCEL file.

Kathy, as always, thanks for the continuing opportunity to work with Waverly Heights in maintaining a competitive base pay program for its associates. I look forward to meeting with you and the Human Resources Committee of the Board on Thursday, September 24, 2015 to review the results of our research and to discuss our programming recommendations for 2016.

**TO:**       Tom Garvin, President
            Waverly Heights, Ltd.

**FROM:**     Tom Wozniak
            Strategic Compensation Planning, Inc.

**RE:**       2015 Compensation Planning for Executive Team Positions

**DATE:**     November 2, 2015

*Business Confidential*

Tom, we've completed our annual review of compensation levels and practices for selected executive positions on your Leadership Team. This memo provides a summary of our research findings and offers compensation programming recommendations to ensure competitive *total rewards* opportunities for the Officer level positions in Finance, Healthcare and Waverly Care.

## Study Methods, Position Pricing Considerations and Survey Sources

*Study Methods.* In assessing compensation levels and practices for executive positions, SCP focuses first on the nature of the organization (industry affiliation) and the size of the operation (in terms of operating budget and full-time equivalent employees). Then, it examines the roles of the positions in the organization, evaluating each position's scope of responsibility and level of autonomy in the organization.

*Pricing Considerations.* In many mid-size organizations, positions comparable to Waverly's Vice President, Finance role have a variety of responsibilities that go beyond the basic accounting and financial management functions of the enterprise. The positions have expanded over time to include a variety of administrative and even some operational activities and programs from Human Resources and Security to Food Service and Housekeeping. We have evaluated the Vice President, Finance position at Waverly in this broader context.

Similarly, SCP recognizes that the role of the Vice President, Healthcare has grown over the last three years with the expansion of Waverly's health center and the addition of new patient treatment programs.

And lastly, we note that the Vice President, Waverly Care position is somewhat different from the other executive level positions in that it functions within a for-profit subsidiary environment. The scope of this job is growing in line with the development of the Waverly Care franchise in the Western Suburbs of Philadelphia.

*Survey Sources*. SCP extracted comparative pay practice data from several nationally recognized survey sources, including Towers Watson's *Top Management Personnel Report*, PRM Consulting's *2015 Management Compensation Report for Not-for-Profit Organizations* and the Economic Research Institute (ERI) executive compensation database.

Consultants examined pay levels and practices for Top Financial, Healthcare, and Health-related Services Executive positions in similar size organizations in several related industry sectors including Leisure & Hospitality, Other Health Care Services (both for- and nonprofit), Assisted Living and Long-term Care and Residential Care, Adult Care and Service Programs..

Given the IRS's continuing scrutiny of executive compensation practices in tax-exempt organizations, consultants also examined latest available 990 filings of selected Philadelphia area CCRCs, including Beaumont, Bryn Mawr Terrace, Dunwoody, Whitemarsh at Lafayette Hill, White Horse Village, Cathedral Village, Riddle Village, Maris Grove and Kendal-Crosslands. *This research satisfies the IRS requirement to demonstrate reasonableness through case example.*

## Industry Practices: Compensation Levels and Programming Trends

Starting in 2012, SCP has observed a steady upward trend in salaries for key senior positions, both nationally and locally. Latest available survey reports suggest continuing but moderating growth in the salary values of the three senior staff positions at Waverly Heights.

Projected 2016 median salary values for the three Waverly positions are:

| Position | 2016 Midpoint Values | Proj'd 2016 Median | Change |
|----------|---------------------|--------------------|--------|
| VP, Finance | $190, 151 | $198,975 | 2.3% |
| VP, Healthcare | $158,460 | $155,000 | 4.4% |
| VP, Waverly Care | $114,774 | $119,625 | 4.2% |

Additionally, as reported in previous pricing memo, more nonprofit organizations are providing comparable position incumbents with variable pay opportunities. Recent awards have ranged from a low of 2% of base salary to as much as 18% of base salary. The median variable pay award for 2014 was approximately 6.8%.

**NOTE:** Variable pay opportunities for executives in for-profit enterprises tend to be stronger than those provided by nonprofit organizations; usually averaging 12%-15% of salary with some awards in excess of 20%-25% of salary.

2

Waverly-0768

*The Year Ahead*. Looking ahead to calendar year 2016, SCP foresees a continuation of the pay trends of the past three years for executive level positions: above average salary growth and greater variable pay opportunities for positions comparable to Waverly's Top Finance, Healthcare and Waverly Care roles.

The composite of leading forecasts on 2016 compensation trends are in agreement that salary increases for executives in healthcare-related industry sectors will average 3.5%-3.7%, a bit stronger than the 3.5% average increase expected for other employee categories. The spread of actual salary increases for executives is likely to range from 0% and as much 7%-8% of current salary.

With business results continuing to improve for many organizations, variable pay awards for 2015 (payable in early 2016) should show another increase over 2014 awards, averaging 8%-10% for most eligible executives in nonprofit groups and 18%-22% among for-profits.

## 2016 Programming & Pay Adjustment Suggestions for Selected Officer Positions on the Leadership Team

**Salary Grade Assignments in the Program Structure**. Based on the latest available survey data, the current salary grade assignments for the three (3) positions are appropriate. They represent "best fit" in the 2016 Pay Range structure for Leadership Positions, *even though in two of the three cases, the projected 2016 median market value is higher than the 2016 range midpoint*. **No changes are suggested for 2016.**

The overall compensation program structure for the three (3) Vice President level positions remains sound and competitive; *no significant change in approach or structure is suggested at this time*. Base salaries and the discretionary year-end bonus award opportunities at competitive, and participation in the supplemental retirement benefit plan makes the total package very attractive.

**Base Salary Increase Consideration**. All three position incumbents are currently compensated within the competitive range for their respective positions, although the Vice President, Healthcare is still paid at the lower end of the suggested 2016 salary range for her position (compa-ratio of 87).

*All three incumbents should again be eligible for normal salary increase consideration going into calendar 2016*.

**Performance Incentive Opportunities**. The bonuses awarded to Bob and Patti for their 2014 performances/contributions were certainly competitive and in-line with industry

3

practices for their respective positions.   The award to the VP, Healthcare was below average but I believe the award reflected her newness in the position.

*Maintaining percentage award opportunities at the levels provided for Bob and Patti in 2014 for all three executives when determining 2015 bonuses would be appropriate. And would keep total annual cash compensation for the incumbents in the competitive range of prevailing industry practices.*

**Health & Welfare and Fringe Benefits.**  Current provisions for these key officer roles are comprehensive and very competitive.  No changes or enhancements are necessary or suggested at this time.

## Consultant's Statement of Reasonableness and Compliance With Internal Revenue Code Section 4958

Strategic Compensation Planning, Inc. has examined cash and noncash compensation provisions and actual compensation levels for the organization's three senior executive positions in light of U.S. Internal Revenue Code Section 4958 guidelines on the reasonableness of executive compensation. It found that the current compensation levels and practices affecting the three executive positions fall within the normal parameters of prevailing industry practices for comparable positions and do not pose a risk to Waverly Heights of incurring intermediate sanctions from the Internal Revenue Service. Further, SCP believes that the programming and compensation change suggestions outlined in this letter also comply with current IRS standards for reasonableness in executive compensation.

Tom, SCP appreciates the continuing opportunity to work with you and the Board of Directors in managing Waverly's executive compensation program and practices. Please feel free to contact me to discuss any questions that you or the Directors may have about the industry practice information provided or our 2016 programming suggestions. You can reach me by telephone on 610.644.3599 or by e-mail on tom@scpsmartpay.com.

4

Waverly-0770

**Waverly Heights, Ltd.**
**2016 Pay Increase Guide chart**
**--For Management Use Only--**
**Suggested Target Average Increase: 3.5%**

*Highly Confidential*

| Performance Level | Rating from Performance Evaluation | Position in Pay Range | | | |
|---|---|---|---|---|---|
| | | C/R <95 | C/R 95-105 | C/R >105 | C/R over Range Maximum |
| Performs majority of job responsibilities well - goal(s) noted | 2.5 – 3.0 | 4.50% | 3.75% | 2.75% | 2.75% (lump sum award) |
| Performs certain job responsibilities well - significant goal(s) noted | 1.5 – 2.49 | 2.75% | 2.50% | 1.5% | 1.25% (lump sum award) |
| Performance Probation | 0 – 1.49 | 0% | 0% | 0% | 0% |

*How is the Average Rate Used*

The target average % of increase is paid to employees who perform the majority of their job responsibilities well and whose pay rate is at or near the market value of their position. (compa ratio is between 91 and 105 ).

A higher % of increase is paid to employees who perform the majority of their job responsibilities well and whose rate of pay is below the market value of their position (compa ratio of 91 or below).

A lower % of increase is paid to employees who perform the majority of their job responsibilities well and who pay rate is higher than the market value of their position (compa ratio over 105).

For employees who perform certain job responsibilities well and have significant areas of improvement, their % of increase is based on their compa ratio, relative to the target average.

For employees whose rate of pay exceeds the maximum rate for their position a nominal percent of increase in the form of a one-time bonus is given based on performance.

Employees who are on performance probation will not receive an increase

Appendix 263

Waverly-0771

## Waverly Heights, Ltd.
### Recommended 2016 Pay Range Structure for Leadership Positions
--representing a 2.5% increase over 2015 ranges--

| Pay Grade | Pay Range | | | | Administration & Marketing | Finance & Human Resources | Health Services | Housekeeping & Building Services | Dining Services | Waverly Cline |
|---|---|---|---|---|---|---|---|---|---|---|
| | Min. | Mkt Val | 75%ile | Max. | | | | | | |
| E14 | $152,121 | $190,151 | $212,970 | $228,182 | | Chief Financial Officer | | | | |
| E13 | $126,768 | $158,460 | $177,475 | $190,151 | | | *Sr. VP Healthcare* | | | |
| E12 | $107,887 | $134,859 | $151,042 | $161,831 | | | | | | |
| E11 | $91,819 | $114,774 | $128,547 | $137,729 | Vice President of Marketing | Vice President of Human Resources | Director of Nursing | Vice President of Building Services | | |
| E10 | $79,843 | $99,803 | $111,780 | $119,764 | | Controller | | | Director Dining Services | |
| E09 | $69,221 | $86,526 | $96,044 | $103,831 | | | | Director Housekeeping | | |

Pay Grade assignments represent median market practice as recommended by our Compensation Consultant, Strategic Compensation Planning, Inc.

Range midpoint progression:   15%   Grade 10 and Grade 11, 17.5% Grade 12 and Grade 13 and 20% thereafter.   Range spread:  +/-20%.

Revised:    08/11/15

Effective   01/01/16

Appendix 264

Waverly-0772



Kathleen Jungclaus Base Pay Rate v. Market Value

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base Pay Rate | 76051 | 83374 | 86709 | 90351 | 94869 | 98189 | 101135 | 106171 | 109345 | 112909 | 116579 | 120659 |
| Market Value | | 76314 | 90392 | 92380 | 94690 | 96110 | 100658 | 101441 | 102962 | 109772 | 111967 | 114774 |

* Not including bonuses received in 2016, 2013, 2012, and 2011.

| Year | Base Pay Rate | Market Value |
|------|--------------|--------------|
| 2005 | $ 76,051.00 | 76,314.00 |
| 2006 | $ 83,374.00 | 90,392.00 |
| 2007 | $ 86,709.00 | 92,380.00 |
| 2008 | $ 90,351.00 | 94,690.00 |
| 2009 | $ 94,869.00 | 96,110.00 |
| 2010 | $ 98,189.00 | 100,658.00 |
| 2011 | $ 101,135.00 | 101,441.00 |
| 2012 | $ 106,171.00 | 102,962.00 |
| 2013 | $ 109,345.00 | 109,772.00 |
| 2014 | $ 112,909.00 | 111,967.00 |
| 2015 | $ 116,579.00 | 114,774.00 |
| 2016 | $ 120,659.00 | |

| Kathy Jungclaus Compensation History 2010 to 2016 | | | | | |
|---|---|---|---|---|---|
| YEAR | BASE PAY RATE | MARKET VALUE | COMPENSATION RATIO | % INCREASE | BONUS |
| 2010 | $ 98,189 | $ 96,110 | 1.02 | 3.5% | |
| 2011 | $ 101,135 | $ 100,658 | 1.00 | 3.0% | BPTW |
| 2012 | $ 106,171 | $ 101,441 | 1.05 | 5% | ES COVERAGE X2 |
| 2013 | $ 109,345 | $ 102,962 | 1.06 | 3% | BPTW |
| 2014 | $ 112,909 | $ 109,772 | 1.03 | 3% | |
| 2015 | $ 116,579 | $ 111,967 | 1.04 | 3.25% | |
| 2016 | $ 120,659 | $ 114,774 | 1.05 | 3.5% | DISC |

BPTW – Best Places to Work

ES Coverage x2 – Covering Environmental Services during search for replacement for Director

DISC – Discretionary Bonus

Appendix 267

## Waverly Heights, Ltd.
### Recommended 2015 Pay Range Structure for Leadership Positions

*--representing a 2.0% increase over 2014 ranges--*

| Pay Grade | Pay Range | | | | Administration & Marketing | Finance & Human Resources | Health Services | Housekeeping & Building Services | Dining Services | Waverly Care |
|---|---|---|---|---|---|---|---|---|---|---|
| | Min. | Mkt Val | 75%ile | Max. | | | | | | |
| E14 | $148,402 | $185,502 | $207,762 | $222,603 | | Chief Financial Officer | | | | |
| E13 | $123,668 | $154,585 | $173,135 | $185,502 | | | *Sr. VP Healthcare* | | | |
| E12 | $105,249 | $131,562 | $147,349 | $157,874 | | | | | | |
| E11 | $89,574 | $111,967 | $125,404 | $134,361 | Vice President of Marketing | Vice President of Human Resources | Director of Nursing | Vice President of Building Services | | |
| E10 | $77,890 | $97,363 | $109,047 | $116,836 | | Controller | | | Director Dining Services | |
| E09 | $67,731 | $84,663 | $93,976 | $101,596 | | | | Director Housekeeping | | |

Pay Grade assignments represent median market practice as recommended by our Compensation Consultant, Strategic Compensation Planning, Inc.

Revised:  09/08/14

Effective  01/01/15

**Range midpoint progression:  15% Grade 10 and Grade 11, 17.5% Grade 12 and Grade 13 and 20% thereafter.  Range spread: +/-20%.**

Appendix 268

## WAVERLY HEIGHTS
### 2016 Compensation Review @ 12/2015 – Senior Leadership Team

| Employee | Title | Date of Hire | Length of Service as of 12/31/15 | Pay Grade | A 2016 Grade Market Value | 2016 75% of Pay Grade | B 1/01/15 Pre-Adj. Current Salary | C (B/A) C/R (Compa Ratio) | D % Increase based on performance | E (B x D) Increase Amount | F (B + E) 1/01/16 Adjusted Salary | New C/R | Bonus 2015 | Recommend Bonus 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R. Supper | VP Finance | 5/2/2013 | 2.7 | E14 | 190,151. | 212,970. | 193,284. | 1.02 | 3.5% | 6,765 | 200,049 | 1.05 | 17,000 | 25,000 |
| M. Feher | VP HCC | 4/29/2014 | 1.8 | E13 | 158,460. | 177,475. | 137,800. | .87 | 9.2% | 12,737 | 150,537 | .95 | 5,000 | 15,000 |
| J. Thompson | V.P. Marketing | 4/14/1995 | 20.8 | E11 | 114,774. | 128,547. | 118,040. | 1.03 | 3.5% | 4,131 | 122,171 | 1.06 | 6,000 | 15,000 |
| M. Heil | V.P.Bldg. Serv. | 10/13/1997 *11/14/1999 | 18.2 | E11 | 114,774. | 128,547. | 113,340. | .99 | 3.5% | 3,967 | 117,306 | 1.02 | | |
| K. Jungclaus | V.P. H.R. | 4/7/1997 | 18.8 | E11 | 114,774. | 128,547. | 116,579. | 1.02 | 3.5% | 4,080 | 120,659 | 1.05 | 20,000 | 23,000 |
| Pattie Rogers | V.P. Operations | | | E11 | 114,774. | 128,547. | 114,508. | 1.00 | 3.5% | 4,011 | 118,619 | 1.03 | | |
| Jim Heen | Director Dining Serv. | 9/8/2014 | 1.25 | E10 | 99,803. | 111,780. | 95,000. | .95 | 5.0% | 4,803 | 99,803 | 1.0 | | |
| Jackie Donnelly | Director Nursing | 3/15/1997 *8/28/2015 | 17.8 .4 | E11 | 114,774. | 128,547. | 108,000. | .94 | 4.25% | 4,590 | 112,590 | .98 | | |
| Constance Dogan | Director of Environmental Services | 6/6/2006 *07/11/2012 | 2.5. | E9 | 86,526. | 96,044. | 73,214. | .85 | 18% | 13,312 | 86,526 | 1.0 | | |
| Tom Lynch | Director of Maintenance | 9/8/1988 *9/2/2015 | .3 | E9 | 86,526. | 96,044. | 80,096. | .93 | 3.5% | 2,803 | 82,899 | .96 | | |

Appendix 269

KMJ 11/04/2015

September 14, 2016

Mr. Thomas Garvin, President and CEO
Waverly Heights, Ltd.
1400 Waverly Road
Gladwyne, PA 19035

Dear Mr. Garvin,

I have been a member of the Waverly community for longer than I care to admit. Please excuse the anonymous nature of this letter. I would have preferred to deliver it in person, but as I am inextricably involved in this community, I do not wish my characteristically kind and considerate countenance to be defined by one outcry; even for the sake of social justice. Since my arrival at Waverly I have come to adore the staff, and have found myself heartbroken as they have come and gone over the years; sometimes without warning or explanation. I have been inquisitive in my own way in several instances, but never felt I gleaned a satisfying enough explanation for some of the dismissals in recent years. As someone who is accustomed to the nature of business, I understand that privacy and discretion are necessary tools, and that communication of such events must be carefully crafted and disseminated. This is why I have never pursued these matters beyond a level of polite conservation. However, as I have recently delved into the world of social media and am now party to the anything-goes nature of social communication, I came across something disconcerting enough that I feel it warrants mention.

Joining social media is reminiscent of the first day of school: you're not sure of yourself, you're not sure of your company, and you don't quite know who to align with. Naturally, one of the first accounts I sought out was @waverlyheights. Hoping to expand, I checked your "followers," and of course, a few familiar names stood out to me, specifically @kmjungclaus, which couldn't be a clearer identifier for Kathleen Jungclaus. I recognized the name because I have come to know her in passing, but also because my aforementioned concerns with dismissals over the years led me to inquire into who directs personnel. I was disturbed to find that Ms. Jungclaus' twitter, which is so blatantly linked with her employer's, would be so politically charged. She is of course rightfully blanketed by Free Speech, which every citizen of this country enjoys, so my distaste for her political jabs and vigorous support of extremist characters belonging to the Republican party (specifically Donald Trump) is personal, and therefore

irrelevant. However, when I came across the following "tweet," I couldn't help but wonder if Ms. Junclaus is improperly placed as the Vice President of Human Resources. I couldn't help but wonder if her position has more to do with what I have perceived (at a distance) as unfair dismissal of the staff. The "tweet" read:

"@realdonaldtrump I am the VP of HR in a comp outside of Philly

an informal survey of our employees shows 100% AA employees

voting Trump!" 7/24/16

As I mentioned, I am accustomed with the nature of business. I would assume that not only is there likely a policy in place to discourage staff, especially high ranking staff, from sharing their political views in an arena so closely linked to their place of employment, but that at no time, official or unofficial, would a survey having to do with the political beliefs of their employees be conducted, and especially not evaluated and published; even on a casual social media platform. This is alarming in and of itself, only becoming more egregious when you realize "AA" more than likely stands for "African Americans." If I believed everything I read on the internet, I would have no choice but to deduce from this "tweet" that the Caucasian Vice President of an equal-opportunity employer, Waverly Heights, ltd., conducted an informal survey of the staff that seemed to communicate that despite having hundreds employees of varying racial backgrounds, she feels confident enough to report publically that 100% the African American employees will be voting for Donald Trump. If this is even a shadow of the way Ms. Jungclaus operates professionally at Waverly Heights, then whether or not dismissal and treatment of employees by the Human Resources department has been appropriate and morally rounded reads less like a question and more like a necessary accusation. Can we safely assume she has not attempted to manipulate vulnerable employees toward her own personal aim? Can we safely assume she has not been sharing these views within the walls of this community? Am I wrong to assume that the administration of Waverly Heights would find this public exclamation by their Vice President of Human Resources completely inappropriate, fallacious, and defaming to an otherwise respected organization? I am astonished at the notion that a person in her position would not recognize the ramifications at play. I am also deeply concerned to know that she is likely the first point of contact for employees. The role of Vice President of Human Resources demands the practice of moral and ethical judgement at a level Ms. Jungclaus does not seem capable of achieving. I would ask at the very least that Ms. Jungclaus remove her offensive message from her feed, and that she extend an apology to the community that she so brazenly attempted to speak for. I'm not entirely sure that in this increasingly transparent age in which more and more people and organizations are being held accountable for discriminatory behavior, inflammatory language, bullying, and good old fashioned dishonesty, that Ms. Jungclaus should not be dismissed from the community, herself.

I've lived my life among people that above all else, strive to conduct themselves in an honorable manner no matter what situation they find themselves in; be it a conversation, a close

relationship, a work environment, a social arena, or a passing exchange. I've made it a point to exclusively surround myself with people who show respect for themselves, for others, and for any and all that would choose to uphold a different set of values. A "Vice President" of any department or organization would do well to maintain the same approach.

I urge you to read the above "tweet" again. I hope you realize as I do, that the more you read it, the more appallingly unforgivable it reveals itself to be. I hope you recognize the weight of which this measures on a broader scale of decency; political agenda being the less insidious of its implications.

Thank you.

Tweets with replies by Kathy Jungclaus (@kmjungclaus) | Twitter          Page 1 of 8



| | TWEETS | FOLLOWING | FOLLOWERS | LIKES | |
|---|---|---|---|---|---|
| **Kathy Jungclaus** @kmjungclaus FOLLOWS YOU | 48 | 22 | 6 | 1 | ✿  👤 Follow |

**Kathy Jungclaus**
@kmjungclaus FOLLOWS YOU

📍 Pennsylvania, USA
🏛 Joined August 2015

Supplemental Employer
Documents
9/19/2016

Tweets with replies by Kathy Jungclaus (@kmjungclaus) | Twitter                    Page 2 of 8





🏠 Home     ⚡ Moments     🔔 Notifications     ✉ Messages        @realDonaldTrump please please do not blow this.  My faith is in you.

Kathy Jungclaus @kmjungclaus · Aug 4
Dear mr trump. Please don't blow this my faith is in you.

Kathy Jungclaus @kmjungclaus · Aug 2
The week is off to a pretty good start smile emoticon:) Dylan seemed
much more himself today, a...

**Love For Dilly**
Pete, Nicole and Jake Stroman share their story about Super Dilly: In
February 2016, we discovered a lump on Dylan's upper back. Super Dilly...
gofundme.com

Kathy Jungclaus @kmjungclaus · Aug 1

**An open letter to Mr. Khizr Khan**
As you well know, Mr. Khan, we live in violent times, dangerous times.
foxnews.com

Kathy Jungclaus @kmjungclaus · Aug 1
Love For Dilly

🏠 Home      ⚡ Moments      🔔 Notifications      ✉ Messages      🐦      Search Twitter      🔍  🎟  ✍

**Kathy Jungclaus** @kmjungclaus · Aug 1
This week has had many ups and downs. We are more then ready for the weekend. Dylan continues t...

**Love For Dilly**
Pete, Nicole and Jake Stroman share their story about Super Dilly: In February 2016, we discovered a lump on Dylan's upper back. Super Dilly...
gofundme.com

↰ In reply to Donald J. Trump

**Kathy Jungclaus** @kmjungclaus · Jul 24
@realDonaldTrump I am the VP of HR in a comp outside of philly an informal survey of our employees shows 100% AA employees voting Trump!

**Kathy Jungclaus** @kmjungclaus · Jul 18
Love For Dilly

**Love For Dilly**
Pete, Nicole and Jake Stroman share their story about Super Dilly: In February 2016, we discovered a lump on Dylan's upper back. Super Dilly...



Home    Moments    Notifications    Messages        Search Twitter

**Kathy Jungclaus** @kmjungclaus · Jul 18
Day 4 of radiation went well and was followed by a fun adventure at the zoo...

**Kathy Jungclaus** @kmjungclaus · Jun 26
Love For Dilly dt.gofund.me/gpxdkby4&rcid=...

**Kathy Jungclaus** @kmjungclaus · Jun 26
Dilly had treatment today followed by a meeting with the oncologists. They will be adding some...

**Kathy Jungclaus** @kmjungclaus · Jun 24
Love For Dilly gofundme.com/gpxdkby4?pc=14... via @gofundme

Tweets with replies by Kathy Jungclaus (@kmjungclaus) | Twitter          Page 6 of 8



Kathy Jungclaus @kmjungclaus · Jun 24
After undergoing all of the tests a few days ago, we got some good
news and some bad news. The...

Kathy Jungclaus @kmjungclaus · Jun 22
Dilly is blessed to be surrounded by his very own Super Heros!
Mommy, Daddy and big brother Jak...

Kathy Jungclaus @kmjungclaus · Jun 22

 Appendix 278          9/19/2016

Home    Moments    Notifications    Messages    Dilly has scans today, a PET, CT and MRI, to see what effect the chemo has had on his tumor. H...    Search Twitter

| Last Name | First Name | Birthdate | Gender | Race Code | Original Hire Date | Date Terminated | Reason | AOD Reason |
|---|---|---|---|---|---|---|---|---|
| Johnson | Tanieka | 12/29/1988 | F | CA | 5/22/2015 | 7/28/2016 | Hostile Workplace - Insubordination | Poor work Ethic |
| Jungclaus | Kathleen | 12/9/1960 | F | CA | 4/7/1997 | 9/27/2016 | Policy | |
| Richardson | P | 10/19/1987 | F | AA | 4/3/2014 | 7/28/2016 | Hostile Workplace - Insubordination | Poor work Ethic |
| Handl | Kathleen | 12/23/1959 | F | CA | 11/3/2015 | 4/25/2016 | Multiple Medication Errors | Termed for Cause |
| Hedrick | Kimberly | 2/18/1977 | F | CA | 7/10/2012 | 1/12/2016 | Sexual Misconduct | Termed for Cause |
| Williams | Hassan | 7/8/1989 | M | AA | 10/5/2015 | 12/9/2015 | Theft | Termed for Cause |
| Zidor | Micheal | 10/22/1997 | M | AA | 7/17/2015 | 12/3/2015 | Theft | Termed for Cause |
| Hitchan | Robert | 6/9/1972 | M | CA | 11/27/2013 | 10/28/2015 | Fraud | Termed for Cause |
| Artoba | Mosunmola | 5/5/1963 | F | AA | 11/6/2002 | 10/9/2015 | Fall issue (not listed) | Ineligible for rehire |
| Whelan | Gerald | 12/7/1960 | M | CA | 3/27/2015 | 9/14/2015 | no info | Ineligible for rehire |
| Sfida | Fermida | 4/15/1970 | F | HI | 7/26/2011 | 7/15/2015 | fighting | Ineligible for rehire |
| Gason | Christian | 12/22/1986 | M | AA | 8/22/2012 | 3/16/2015 | fighting | Ineligible for rehire |
| Batchelor | Damien | 10/14/1983 | M | AA | 7/31/2012 | 1/29/2015 | fighting | Ineligible for rehire |
| Ellis | Lance | 9/9/1989 | M | AA | 9/20/2011 | 1/27/2015 | fighting | Ineligible for rehire |
| Nilles | Eyana | 8/8/1994 | F | AA | 11/12/2012 | 1/27/2015 | fighting | Ineligible for rehire |
| Jacinto | Genaro | 9/19/1966 | M | HI | 8/3/2001 | 11/21/2014 | sleeping | Ineligible for rehire |
| Allen | Corey | 7/10/1992 | M | AA | 4/9/2008 | 11/8/2014 | Sexual Misconduct - Insubordination | Ineligible for rehire |
| Hootman | Lawrence J | 7/31/1940 | M | CA | 2/4/1989 | 3/14/2014 | sexual misconduct | Ineligible for rehire |
| Thompson | Anthony | 6/12/1990 | M | AA | 4/16/2010 | 1/17/2014 | theft (wasn't ringing up customers) | Ineligible for rehire |
| Terry | Carl | 3/14/1956 | M | AA | 8/19/2002 | 10/28/2013 | Theft | Ineligible for rehire |
| Smith | Leslie | 10/7/1988 | F | AA | 1/29/2013 | 10/25/2013 | cell phone use while feeding | Poor work Ethic |
| Flyer | Vernard | 10/15/1975 | M | AA | 8/26/2011 | 10/14/2013 | Dometic Dispute on sight | Termed for Cause |
| Conti | Samuel | 12/2/1986 | M | CA | 12/5/2013 | 9/13/2013 | drug test | Termed for Cause |
| Porter | Stefan | 6/8/1989 | M | AA | 12/5/2013 | 8/27/2013 | Toms office | Poor work Ethic |
| Lewis | Ebony | 8/12/1983 | F | AA | 8/1/2007 | 5/6/2013 | not answering when on-call | Termed for Cause |
| Lewis | Johnny | 6/1/1959 | M | AA | 7/28/2006 | 4/8/2013 | accident and didn't report it | Termed for Cause |
| Vincent | Joseph | 4/17/1962 | M | CA | 4/6/1987 | 10/19/2012 | employee abuse | Termed for Cause |
| Cruz | Celia | 6/28/1968 | F | HI | 3/10/2008 | 7/31/2012 | Theft | Termed for Cause |
| Stewart | Marcia | 4/8/1957 | F | AA | 10/25/1994 | 7/31/2012 | Theft | Termed for Cause |
| Griffin | Chrystal | 10/13/1951 | F | AA | 1/20/2011 | 10/12/2011 | mistreatement of resident | Termed for Cause |
| Garvin | Aliyah | 5/9/1987 | F | AA | 1/11/2011 | 8/2/2011 | used profanity and inapropriate discussion | Termed for Cause |

Appendix 280

Waverly-0521

Immediate Dismissal

| Last Name | First Name | Birthdate | Gender | Race Code | Original Hire Date | Date Terminated | Reason | AOD Reason |
|---|---|---|---|---|---|---|---|---|
| Hailu | Rahwa | 1/11/1990 | F | | 4/6/2011 | 8/1/2011 | used profanity and inappropriate discussion | Termed for Cause |
| Horne | Kendall | 3/12/1976 | M | AA | 1/20/2009 | 8/1/2011 | didn't follow cue cards | Termed for Cause |
| Silas | Robert | 2/17/1975 | M | CA | 5/13/2011 | 7/26/2011 | drug test | Termed for Cause |
| Mcguire | Brian | 1/2/1983 | M | CA | 10/26/2009 | 3/21/2011 | drug test | NONE GIVEN |
| Gonzalez | Fausto | 6/10/1947 | M | HI | 7/24/2002 | 2/22/2011 | gross carelessness and negligence | Termed for Cause |
| Allen | Nakeda | 10/3/1981 | F | AA | 2/22/2000 | 2/16/2011 | violation of timeclock procedure | Termed for Cause |
| Chisholm | Delores | 6/20/1956 | F | AA | 3/3/2008 | 12/22/2010 | file off site | Termed for Cause |
| ...ez | Sonia | 4/7/1982 | F | AA | 10/15/2010 | 11/13/2010 | file off site | Termed for Cause |

2 of 2

Appendix 281

Waverly-0522

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Thursday, September 22, 2016 3:12 PM |
| **To:** | Dick Bauer |
| **Subject:** | Re: [EXTERNAL] |

Okay, we can finalize when we talk tomorrow. I think we can aim to set-up the call for 10:30 Monday morning if possible. Hopefully you can connect with Anita before we talk tomorrow so we can get her onboard before I send the invitation for a call to the HR Committee.

The conference ends at noon tomorrow, so I'll try to call you by 12:30.

Also, I expect to have the bullet point email from our attorney by end of day tomorrow.

Thanks again,

Tom

From: Richard Bauer <rebauer65@yahoo.com>
Date: Thursday, September 22, 2016 at 3:04 PM
To: Tom Garvin <thomas.Garvin@waverlyheightsltd.org>
Subject: [EXTERNAL]

Hi again,
I really like your approach to moving this forward and the Board tactics are superb in my view.
I have an early morning dental appointment which should be done by 10:15 at the latest. It is in Bryn Mawr. I am free the rest of the day with one exception which I can handle. I can be very flexible the rest of the week. If you are free around 10:30 on Monday I can either swing by or give you a call to discuss further.
You might want to think about the possibility of my saying something to the HR Committee and perhaps the Board later about your comments to me earlier this year regarding the individual in question. I have some other questions and suggestions which we can discuss either tomorrow afternoon or next week as circumstances warrant.
I hope you can enjoy your weekend down there. This, too, shall pass.

*Dick*

Richard E. Bauer

Waverly-0893

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Friday, September 23, 2016 9:14 AM |
| **To:** | Dick Bauer |
| **Subject:** | Re: [EXTERNAL][CONTENT] |

Hi Dick,

Thank you for your assistance with this unfortunate situation. Let's definitely plan to talk on Sunday.
Please let me know after you speak with Anita so I can send out an invitation for a call with the HR Committee on Monday. I agree that in advance of that call, I'll send out the policy information. I'm figuring that we should probably send the letter and the attorney's review just prior to the call. I would really like to have the committee review the letter and the twitter feed prior to the call so they have all the information.

We can talk more about that when we speak this weekend.

Tom

From: Richard Bauer <rebauer65@yahoo.com>
Date: Friday, September 23, 2016 at 8:59 AM
To: Tom Garvin <thomas.Garvin@waverlyheightsltd.org>
Subject: [EXTERNAL][CONTENT]

HI Tom,
I sent Anita an e-mail last night indicating that I would call her this morning. She responded that she will be unavailable until this afternoon and I sent a note back indicating that I would call after 3 today. I will send you an email summary following that discussion.
I have not read the policy info that you sent yet, but I will get to that today. It might be good to send this same info to the HR Committee and Anita prior to our upcoming meeting if you feel that is appropriate.
Feel free to call if I can be helpful on Sunday any time if you wish to discuss any of this but do not feel obliged to do so.
I know this is a big issue and you are handling it extremely well. Enjoy your family time and safe trip home.
*Dick*
Richard E. Bauer

Waverly-0894

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Sunday, September 25, 2016 4:59 PM |
| **To:** | Richard Bauer; Edwin Mahoney; Gary Bragg; Eleanor Davis; Donald Fleischer; Kathleen McEndy; Charles Soltis |
| **Cc:** | Anita Summers |
| **Subject:** | Re: HIGHLY CONFIDENTIAL |
| **Attachments:** | Twitter Issue.pdf |

HR Committee:

I received the attached anonymous letter last week regarding the conduct of ~~Kathy Jungclaus~~ with respect to her personal Twitter account. The content of the letter is the subject of our upcoming confidential conference call. The issue is very serious and I have asked one of our Labor Relations Attorneys to review the situation. Our attorney has summarized the legal issues in the email included below.

Also, Dick and I feel that the nature of the issues warrant including Anita as Chair of our Ethics Committee.

Please let me know if you are able to attend the conference call at 11:00 tomorrow morning.

Thank you,

Tom

Waverly-0896

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

**From:** Thomas Garvin
**Sent:** Sunday, September 25, 2016 4:59 PM
**To:** Richard Bauer <richard.bauer@waverlyheightsltd.org>; Edwin Mahoney <edwin.mahoney@waverlyheightsltd.org>; Gary Bragg <gary.bragg@waverlyheightsltd.org>; Eleanor Davis <eleanor.davis@waverlyheightsltd.org>; Donald Fleischer <donald.fleischer@waverlyheightsltd.org>; Kathleen McEndy <kathleen.mcendy@waverlyheightsltd.org>; Charles Soltis <charles.soltis@waverlyheightsltd.org>
**Cc:** Anita Summers <summers@wharton.upenn.edu>
**Subject:** Re: HIGHLY CONFIDENTIAL

HR Committee:

I received the attached anonymous letter last week regarding the conduct of Kathy Jungclaus with respect to her personal Twitter account. The content of the letter is the subject of our upcoming confidential conference call. The issue is very serious and I have asked one of our Labor Relations Attorneys to review the situation. Our attorney has summarized the legal issues in the email included below.

Also, Dick and I feel that the nature of the issues warrant including Anita as Chair of our Ethics Committee.

Please let me know if you are able to attend the conference call at 11:00 tomorrow morning.

Thank you,

Tom

Waverly-0901

## Thomas Garvin

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Sunday, September 25, 2016 4:42 PM |
| **To:** | Richard Bauer; Edwin Mahoney; Gary Bragg; Eleanor Davis; Donald Fleischer; Kathleen McEndy; Charles Soltis |
| **Cc:** | Anita Summers |
| **Subject:** | HIGHLY CONFIDENTIAL  Conference Call |
| | |
| **Categories:** | My Contacts |

Human Resources Committee:

We have an urgent need to have a CONFIDENTIAL conference call regarding a significant issue with one of our senior managers. Dick and are are hoping to plan the call for 11:00 Monday Morning. Please RSVP to this email regarding your availability.

Time: 11:00 AM
Date: Monday, September 26th
Call-In Number: 800-501-8979
Meeting I.D.: 6458600

By way of separate email, I will forward documents for your review prior to the call.

We are also asking Anita, as Chair of Ethics Committee to join the discussion.

Please keep this call confidential.

Thank you,

Tom

CONFIDENTIALITY NOTICE
This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited.

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Monday, September 26, 2016 10:22 AM |
| **To:** | 'Richard Bauer' |
| **Subject:** | RE: [EXTERNAL] |

Hi Dick,

We are ready for the call.  I have touched based with everyone and all can be on the call except Eleanor and Don.  I spoke in detail to both of them and they concur that she cannot remain in her role given the fact of the situation.

I'll talk to you on the call at 11.

Tom

Thomas P. Garvin
President & Chief Executive Officer
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone:  610.645.8607
Fax:    610.645.8602

-----Original Message-----
From: Richard Bauer [mailto:rebauer65@yahoo.com]
Sent: Monday, September 26, 2016 10:20 AM
To: Thomas Garvin <thomas.garvin@waverlyheightsltd.org>
Subject: [EXTERNAL]

I have a feeling that you are having a challenging morning.  Let me know how you are doing when you can.  Thanks.

Sent from my iPhone

Waverly-0898

## Thomas Garvin

**From:** Thomas Garvin
**Sent:** Monday, September 26, 2016 2:59 PM
**To:** 'Summers, Anita A'
**Subject:** RE: [EXTERNAL]quick thought

Thank you so much Anita, I appreciate your support on this very difficult situation.

I will definitely pull her email and freeze everything the minute she is released. Dick is coming tomorrow afternoon to be with me when I terminate her employment. At that point her access to everything will be cut-off.

It should be an interesting day!

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

BEST PLACES
to work in PA 2011 2013 2014



**From:** Summers, Anita A [mailto:summers@wharton.upenn.edu]
**Sent:** Monday, September 26, 2016 2:29 PM
**To:** Thomas Garvin
**Subject:** [EXTERNAL]quick thought

Tom: You are such a wondrous CEO!
Quick thought: should you freeze her Waverly email address, and look over recent mail?......................Anita

Waverly-0899

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Monday, September 26, 2016 3:02 PM |
| **To:** | 'Eleanor Davis'; ebmahoney@ebmahoney.com; donfle@comcast.net |
| **Cc:** | rebauer65@yahoo.com |
| **Subject:** | RE: [EXTERNAL]Re: HIGHLY CONFIDENTIAL |

Hi Eleanor, Don & Ed,

I wanted to let you know that everyone on the HR Committee call was in agreement that Kathy Jungclaus should be terminated from Waverly Heights. We will offer her the opportunity to resign with a severance agreement put in place.

Dick Bauer and I plan to meet with Kathy tomorrow afternoon so I can communicate that she is being relieved our her duties. Until then, please keep this highly confidential.

Thank you for your support on this very difficult situation.

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602





**From:** Eleanor Davis [mailto:edavis5167@gmail.com]
**Sent:** Monday, September 26, 2016 2:02 PM
**To:** Thomas Garvin
**Subject:** [EXTERNAL]Re: HIGHLY CONFIDENTIAL

Tom,
Please keep me informed of the out come of the conference call. I can be reached by email now.
Glad we had a chance to talk this morning.
I will return on Wed.
Sincerely,
Eleanor

Sent from my iPhone

On Sep 26, 2016, at 2:11 PM, Thomas Garvin <thomas.garvin@waverlyheightsltd.org> wrote:

Waverly-0900

#4

AB Date : 10/02/2016

Existing Claim : -

Clmt Language : 1

Create Date: 10/4/2016  3:33:21PM

## Internet Initial Claims

**COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF LABOR AND INDUSTRY
BUREAU OF UC BENEFITS AND ALLOWANCES**

Information at time of Create Date :

WBA : $

High Qtr Wages : $

Base Yr Wages: $

Financial Code:

### CLAIMANT INFORMATION

**Claimant Name:** KATHLEEN M JUNGCLAUS

**Previous Name:**

**Mailing Address:**

1129 MILL ROAD CIRCLE

RYDAL, PA 19046

**Residence Address, if different:**

**Social Security Number:** 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

**Gender:** FEMALE

**Birth Date:** 12/9/1960

**PA Drivers License:**

**Email Address:** kmjungclaus@gmail.com

**Phone:** (215) 758-2724

**Fax:** ( )

A.  Are you a citizen of the United States?  Y
    If no, what is your alien registration number?

B.  If you live outside Pennsylvania, do you commute to work in Pennsylvania?  N

C.  Are there any conditions under which you may not be able and available to work during the next year?
    N

### SEPARATING EMPLOYER INFORMATION

**Employer:**   WAVERLY HEIGHTS

**Address:**    1400 WAVERLY ROAD

            GLADWYNE, PA 19035

**Phone:** (610) 645-8622

**Fax:** (610) 645-8814

**Email Address:**

**Contact Person:**

**Contact Title:**

**Employer UC Account #:**

**Plant Number:**

**Employee badge or timecard number:**

CONTINUED ON REVERSE

VFOTHER  (Page 1 of 4)  6-06        COMMONWEALTH OF PENNSYLVANIA        DEPARTMENT OF LABOR AND INDUSTRY
Claimant Name: KATHLEEN M JUNGCLAUS                                    Social Security Number: 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

## INTERNET INITIAL CLAIMS

| | | |
|---|---|---|
| **Name:** | KATHLEEN M JUNGCLAUS | **Social Security Number:** 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 |
| **Address:** | 1129 MILL ROAD CIRCLE | **Gender:** FEMALE |
| | RYDAL, PA 19046 | |

WAVERLY HEIGHTS
1400 WAVERLY ROAD          <-- Employer Name and Address
GLADWYNE, PA 19035

1. What was your job title? <u>VICE PRESIDENT HUMAN RESOURCES</u>

2. First Date Worked for this employer: <u>4/7/1997</u>

3. Last Date Worked for this employer: <u>9/27/2016</u>

4. Was your job a full-time or part-time job? <u>FULL-TIME</u>
   If part-time, please list your hourly rate (per hour) and average number of hours worked per week:

5. Was your job temporary or permanent? <u>PERMANENT</u>
   If temporary, on what date was the job scheduled to end?

6. What was your reason for leaving? <u>01 - OTHER</u>

7. Do you have a definite date of recall from this employer? <u>N</u>
   If yes, when?

8. Did you earn $3,438 or more from this employer during your most recent period of employment? <u>Y</u>

9. Are you working full or part time for any other employer, including the Reserves or National Guard? <u>N</u>

10. Were you discharged or suspended? <u>DISCHARGED</u>
    Note: For UC purposes, a suspension is considered a discharge for the period of the suspension.

    The name of the individual who discharged or suspended you: <u>TOM GARVIN, DICK BAUER</u>

11. If suspended, list:
    a) When suspension began:
    b) When suspension is expected to end:

12. Were you discharged or suspended as a result of a rule violation? <u>N</u>
    If yes:
    a) Were you aware of this rule violation? <u>N</u>
    b) Was this rule uniformly enforced? <u>No</u>
       If no, please explain:
    c) Did violation of the rule require a discharge or suspension? <u>N</u>
    d) What was the rule that you were accused of violating?

---

| | | |
|---|---|---|
| AB Date : 10/02/2016 | **Internet Initial Claims** | Information at time of Create Date : |
| Existing Claim : | | WBA : $ |
| | | High Qtr Wages : $ |
| Clmt Language : 1 | **COMMONWEALTH OF PENNSYLVANIA** | Base Yr Wages: $ |
| | **DEPARTMENT OF LABOR AND INDUSTRY** | |
| Create Date: 10/4/2016  3:33:21PM | **BUREAU OF UC BENEFITS AND ALLOWANCES** | Financial Code: |

## OTHER

13. Please list the reason(s) for your actions which caused you to be discharged or suspended? <u>TERMINATED THROUGH NO FAULT OF MY OWN</u>

14. Do you admit to being involved in the incident, which caused your separation? <u>N</u>

15. On what date did the incident, which caused your separation from work, occur? <u>9/27/2016</u>

16. Were you working at the time of the incident, which caused your separation? <u>N</u>

17. Were the actions, which caused your separation related to your work? <u>N</u>

18. Did your conduct affect your ability to perform your job? <u>N</u>

19. Did the employer suffer an adverse effect as a result of your actions? <u>N</u>

20. Please provide the reasons(s) you were given for being discharged or suspended. <u>ANONYMOUS LETTER</u>

CONTINUED ON REVERSE

VFOTHER  (Page 3 of 4)  6-06          COMMONWEALTH OF PENNSYLVANIA          DEPARTMENT OF LABOR AND INDUSTRY
Claimant Name: KATHLEEN M JUNGCLAUS                                        Social Security Number: 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

Appendix 292

## ADDITIONAL INFORMATION

Are you able to work? <u>Y</u>
If no, please explain.

Are you available for work? <u>Y</u>
If no, please explain.

Are you voluntarily restricting your work hours or type of work? <u>N</u>

Is there any additional information that you feel may affect your eligibility for unemployment compensation?
<u>TERMINATED THROUGH NO FAULT OF MY OWN</u>

**EMPLOYER'S NOTICE OF APPLICATION**
Request for Separation and Wage Information

The individual identified below has filed a claim for unemployment compensation benefits. Complete this form as requested and return it to the address on the reverse in the enclosed envelope WITHIN 4 BUSINESS DAYS. Failure to reply within this period will result in a determination as to eligibility based on available facts. Your signature and the date signed are required on the bottom of this form.

PLEASE COMPLETE PARTS:  [X] A   [X] B   [X] C   [X] D

| Social Security No. | Claimant's Name | Badge No. | FOR LOCAL OFFICE USE ONLY |
|---|---|---|---|
| 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 | KATHLEEN M. JUNGCLAUS | | Mailing Date 10-06-16  Renewal Date  CER WN |

The claimant has indicated the reason for separation or partial unemployment as:

FIRED

Date of Application: 10-02-16

PGM 1 / Seq. No. 01  L.O No./Sep Cd 0996  01  45

---

### PART A

If applicable, list wages, hours worked, tips, and hours absent when work was available for the dates below. If none, check this block [X]

* If the employe was absent when work was available, give average hourly wage: §

| Dates | Gross Wages Ernd. Ea. Day | Hrs. Worked Each Day | Tips and Gratuities | * Hours Absent |
|---|---|---|---|---|
| 10-02-16 | | | | |
| 10-03-16 | | | | |
| 10-04-16 | | | | |
| 10-05-16 | | | | |
| 10-06-16 | | | | |
| 10-07-16 | | | | |
| 10-08-16 | | | | |
| TOTAL | | | | |

### PART B

What was the claimant's last day of work prior to: 10-02-16 ?
Please enter the date here: 09/27/2016

Did the claimant earn $ 3438 or more during THE PERIOD FROM 04-07-97 TO 09-27-16?

[X] YES   [ ] NO; If NO, amount earned $ _____

EMPLOYER'S NAME AND ADDRESS

WAVERLY HEIGHTS
1400 WAVERLY ROAD
GLADWYNE          PA
                  19035

---

### PART C

1. Last date worked (Complete if date is different from PART B above): _____

2. Was the claimant hired for:  [X] Full Time?   [ ] Part Time?
   If part time, explain: _____

3. Reason for Separation or Partial Unemployment: IMPORTANT - Please check the appropriate block below. If the employe was separated for reasons other than lack of work, provide an explanation below. If you indicate the reason for separation is employe misconduct, this statement should be signed by a person with firsthand knowledge and must be accompanied by copies of relevant documentation such as time cards, personnel files, written warnings, employer's rules, medical statements, and statements of persons with firsthand knowledge of the events leading to the termination.   [ ] Lack of Work   [ ] Voluntary Quit   [X] Misconduct   [ ] Other, explanation: (Use extra sheet if necessary)

Employee violated Social Media Policy by sending out a Tweet representing her-self as VP of our company.  The content of the tweet was deemed highly  Contin

4. Will the claimant receive a pension payment?   [ ] YES   [X] NO;   If YES, amount $ _____   [ ] Monthly   [ ] Lump Sum
   If YES, provide the effective date _____

5. Educational Institutions and Educational Service Agencies: Does this individual have a contract or reasonable assurance of returning to work when school reopens? [ ] YES [ ] NO Reasonable assurance means that an individual who performs services for an educational institution or educational service agency in the first of two successive academic years or terms, or immediately prior to an established vacation or holiday closing, has a verbal, written or implied agreement to return to work for an educational institution or educational service agency in the same capacity and under substantially the same economic terms and conditions in the second of such academic years or terms immediately following the vacation or holiday period.

### PART D

1. What is the claimant's gross full time base wage? $ 58.01 hr;   $ 464.08 day;   $ 2320.38 week.

2. Type of Separation:  [X] Permanent   [ ] Partial Unemployment   [ ] Temporary - enter expected date of recall _____
   WAS THE CLAIMANT PAID OR WILL HE/SHE BE PAID:

3. For any days after his/her last day of work? [ ] YES   [X] NO; If YES, amount $ _____ representing wages thru _____

4. Holiday Pay?  [ ] YES   [X] NO; If YES, amount $ _____ holiday _____

5. Vacation Pay?  [ ] YES   [X] NO; If YES, amount $ _____ payment date _____
   If payment is for vacation shutdown or designated period, specify the period from _____ OCT 14 2016

6. Will the claimant receive severance pay?  [X] YES   [X] NO   (illegible agreement)
   If yes, what is the total amount that will be received?   $ _____ per _____ (wk., mo, yr.)

7. Remarks: _____

By my signature, I certify that the information that I have supplied is true and correct. I realize that the Pennsylvania Unemployment Compensation Law provides penalties for making false statements.

| Date | Signature | Title | Telephone No. |
|---|---|---|---|
| 10-11-2016 | Thomas Harr | President / CEO | 610 645 8607 |

Appendix 294

NO FURTHER NOTICE WILL BE ISSUED TO YOU UNLESS YOU HAVE INDICATED SOME LEGAL BASIS FOR THE DENIAL OF BENEFITS.

LANCASTER UC SERVICE CENTER
36 EAST GRANT STREET
LANCASTER  PA  17602-2831


WAVERLY HEIGHTS
1400 WAVERLY ROAD
GLADWYNE  PA  19035

---

FOLD ON THIS LINE

IMPORTANT − BE SURE YOU HAVE:
1. Completed the indicated parts of the form.
2. Signed and dated the form.
3. Inserted the form in the envelope so that our
   address appears in the window.
4. Affixed the proper postage to the envelope.
5. Put your return address on the envelope.

FOLD ON THIS LINE

---

LANCASTER UC SERVICE CENTER
36 EAST GRANT STREET
LANCASTER  PA  17602-2831

Appendix 295

Unemployment Application for Kathy Jungclaus-Continued

## Part C

3. Mrs. Jungclaus violated company Social Media Policy by sending out a Tweet that represented her in her position as our Vice President of Human Resources. The content of the tweet was deemed to be highly offensive, inappropriate and inaccurate. The tweet provided information that could easily and with little difficulty be linked to our organization. Mrs. Jungclaus, the Vice President of Human Resources for our organization, not only enabled the reader to find easily the company she worked for, and the fact that she is a Vice President of Human Resources, she reportedly took a poll at the workplace. She also managed to compartmentalize one of our protected classes. This posting by Mrs. Jungclaus put into question her ability to enforce the policies of our company in an equitable fashion.

## Part D

Mrs. Jungclaus was offered a severance package that includes 20 weeks of pay and payout of her accrued Paid Time Off balance. In addition Waverly Heights would not contest her unemployment compensation benefits. She has yet to sign the agreement.



BUR-266R REV 10-09

FROM: Administration University Hospital

1400 Wheatly Road

Gladwyne, PA 19035

PHILADELPHIA
PA 191
12 OCT '16
PM 1 L

Hasler
10/12/2016
US POSTAGE

PROPER
FIRST CLASS POSTAGE
$0 0.465 REQUIRED
400 5 DELIVERY

ZIP 19035
011D11630630

17502-263135

# RECORD OF ORAL INTERVIEW
## Claimant

| | | | |
|---|---|---|---|
| Claimant's Name: | KATHLEEN M JUNGCLAUS | Social Security Number: | 179548362 |

Claimant's Phone:   215-758-2724        Date: **10/18/2016**    Time: **9:57 AM**

Employer's/Employer's Consultant's Name:    WAVERLY HEIGHTS

☐ Initial Information                    ☐ No Answer

☒ Additional Information            ☐ Phone Disconnected

☒ Rebuttal                                      ☐ Phone Busy

☐ Message Left on Answering Machine

☐ Message Left With:         to Have Claimant Return Call By:

**Message to Claimant:**
PLEASE CALL THE UC SERVICE CENTER BY CLOSE OF BUSINESS ON           (DATE) TO
PROVIDE INFORMATION NECESSARY FOR DETERMINING YOUR UC ELIGIBILITY.  FAILURE TO
RESPOND BY THIS DATE WILL RESULT IN A DETERMINATION BASED ON AVAILABLE
INFORMATION.

Statement Given:
Q: FDW? LDW?
A: My first day was 04/07/1997; my last actual day was 09/27/16.

Q: THE EMPL STATES YOU WRE DISCHD AS A RESULT OF A TWEET - PLS VERIFY:
A; A tweet was sent out on my twitter page, not on the public Waverly page. A resident of Waverly Hghts
went to my twitter page, read the tweet (which my husband posted, not me).
It said "I'm the Vice President of HR in a small company outside of Philadelphia based on an informal
survey 100% AA voting Trump @realdonaldtrump"
No one commented on the page about it. MY husband told me at the time that he did write the tweet, to
let me know, and I didn't think there was anything wrong with it! What happened was, one of HIS staff
asked him who he's voting for president - and he said "I don't know" - bc we both know you don't talk
about your personal politics at work. Another staff person heard the question and said she was voting for
Donald Trump. Other staff then also joined in and said they were voting for Donald Trump also. He
learned that all his staff were Trump supporters, as he is.

q: Why did your husband post a twitter message using your twitter page?
a: He doesn't have his own twitter page.
And he's also the Vice Pres of HR of a small company near Philadelphia.
The reader of the tweet misidentified me as the writer of it, however it was my husband who wrote it. I
thought there was nothing wrong with it - it's not a public page. You have to specifically search for my
name, go to my page, and scroll down to get to that tweet.
q: was this considered a rule violation?
a: Well, they said it violated the Social Media Policy (which i wrote).
 I was called into the president's office. Someone had written a letter to the president of Waverly Heights
to complain about the tweet. It was anonymous, but based on the information in the letter, I believe I
know who wrote it. She's a senior citizen who is a resident of Waverly Hghts. I had let her housekeeper
go - hiring employees is part of my job, as is letting them go if necessary.

So, we discovered this resident was looking into the twitter accounts of all the people who work for Waverly Hgts. The tweet was in July, and she wrote this letter in September. This person said she was offended and she wrote a letter to the company, and that's how this started.

q: is the tweet still on your page?

a: no - the day the president told me about the letter, I immediately took it off my page. I have 6 followers and they're all family - it's not like I'm a big twitter person. I only had the page in the first place bc I was told by my boss to set up a Go Fund Me account for someone, and when you set that up it says you'll get more "mileage" if you have twitter account also. That's the only reason I set it up. I only have 6 followers. Almost all the tweets are about the GoFundMe account.

My husband wrote the tweet and @realdonaldtrump bc people at his work said most of them were voting for Trump but they didn't tell people about it for fear of backlash. So he wanted the Trump campaign to know that there were supporters out there, in case they wanted the information.

D/RULE: The Employer considers the tweet to be a policy violation:

q: What is the rule you were accused of violating?

a: Social Media Policy. I know what it says bc I wrote it. It says you can't post anything that identifies the company you work for, and you can't ost on the pulbic Waverly page. It was not on the Waverly page, it was on my personal account. It was NOT public. And it does NOT identify the company I work for - I didn't even write it.

Q: what did 'AA" mean in the tweet?

a: AA can mean anything - I really don't know what my husband meant by that.

q: Did you violate the rule?

a: no, i did not the written policy. first of all, I didn't write the tweet, my husband wrote it. Second, it's on a private page. And lastly, it does not identify my company at all.

q: Date of incident?

a: I believe it was in July 27th.

The annonymous resident letter was written 09/14/16.

q: Were you aware of the rule? Or should you have been aware of it?

a: Yes - I wrote the rule.

q: If a warning was needed before disch, was it given?

a: No.

q: Did violation of the rule *require* discharge/suspension?

a: It says you may be terminated but it's not required. i could have received a warning or suspension. I was an employee there for over 27 years. To be disch'd over this is ridiculous.

q: Are you aware of any other violation of this rule where an employee was not discharged for the first offense, Or in other words, Was the rule uniformly enforced?

a: No - they're not. Every other time any one has had a performance issue or investigation, they were suspended during the investigation. The policy says MAY be disciplined. There were many other options that could have taken place.

q: the employer indicates your tweet 'COMPARTMENTALIZED ONE OUR PROTECTED CLASSES".

A: They said that AA stands for African American. But it could have meant anything. I don't even know what he meant by that.

q: Were you told that they could no longer trust you to equitably enforce the policies of the company?

a: No.


POSS SEVERANCE:

Q: DID YOU ACCEPT A SEVERANCE AGREEMENT?

A; No. They did offer me 20 weeks of severance. I've retained an attorney and he instructed me to not sign anything at this point. So - No, I'm not getting a severance.

Appendix 299

UC Office Representative: CBE

Auxiliary aids and services are available upon request to individuals with disabilities.
Equal Opportunity Employer/Program

## RECORD OF ORAL INTERVIEW
### Employer/Employer Consultant

Employer's/Employer's Consultant's Name: WAVERLY HEIGHTS

Employer's/Employer Consultant's Phone:  610-645-8607  Date: **10/18/2016**      Time: **12:45 PM**

Claimant's Name:     KATHLEEN  M JUNGCLAUS                    Social Security Number:   179548362

| | | |
|---|---|---|
| ☐ Initial Information | ☐ No Answer | |
| ☒ Additional Information | ☐ Phone Disconnected | |
| ☒ Rebuttal | ☐ Phone Busy | |
| ☐ Message Left on Answering Machine | | |
| ☐ Message Left With: | to Have Employer Return Call By: | |

**Message to Employer:**
PLEASE CALL THE UC SERVICE CENTER BY CLOSE OF BUSINESS ON          (DATE)  TO
PROVIDE INFORMATION NECESSARY FOR DETERMINING THE CLAIMANT'S UC ELIGIBILITY.
FAILURE TO RESPOND BY THIS DATE WILL RESULT IN A DETERMINATION BASED ON
AVAILABLE INFORMATION.

Name of Individual Interviewed:  TOM GARVIN      Title:  CEO

Statement Given:
Q: ON WHAT DATE DID THE 'TWEET" GO OUT?
A; July 24th.
Q: WHAT DID THE TWEET SAY THAT WAS CONSIDERED TO BE HIGHLY OFFENSIVE,
INAPPROPRIATE, AND INACCURATE?
A; it says "@realdonaldtrump I am the VP of HR in a comp outside of phillie an informal survey of our
employees shows 100% AA employees voting trump!"
q: What is meant by AA?
a: One could read it as African American. kathleen is not African American. That's the highly offensive
part of the tweet.
q: How do you come to the conclusion that it means African American?
a: Just logic.
q: Did she say it meant African American?
a: No, but she didn't deny it in the subsequent conversations if she was refering to a different group of
employees.
q: Did you speak with her personally about the tweet?
a: yes. I had 2 personal conversations with her about the tweet.
q: Are the members of her staff African American?
a: ... Um, well, she has only 2 staff who work with her, but our staff at Waverly Hghts are many African
Americans.
q: Did she admit that she wrote the tweet?
a: She went up and removed it when I asked her to. She denied that she wrote it, and then she
apologized for it.
She told me her husband sent the tweet. She told me that in the middle of the discharge.

Q: DID THE TWEET VIOLATE A RULE OR POLICY?
A; Social Media Policy

UC-169  REV 11-12 (Page 1)                COMMONWEALTH OF PENNSYLVANIA        DEPARTMENT OF LABOR AND INDUSTRY

q: Was the tweet made on the clmt's personal twitter account, or on a public account?
a; It was her personal account.
q: How did you find out about it?
a: We recd an anonymous ltr, and that's what brought it to my attention. The ltr was dated Sept 14.
q; did the clmt explain that it was her husband who used her account to write the tweet, and not the clmt herself, and her husband is also a Vice Pres of HR for a small business near Phila?
a; yes, during the process of the discharge.
She was aware of the rule because she was the HR director and she wrote it.
This was a critical violation and didn't require a suspension or warning before being discharge. In our opinion, it required a discharge.

Q: Are the rules and policies uniformly enforced with all employees?
A: Yes, they are. Definitely.
*** PLEASE PROVIDE A COPY OF:
* THE RULE VIOLATED BY THE CLMT,
* AND EVIDENCE TO SHOW THAT THE CLMT KNEW ABOUT THE RULE,
* and A COPY OF THE DISCIPLINARY PROCESS FOR EMPLOYEES WHO VIOLATE THE RULE ***

"yes - It's #13 of our Social Media policy - it's a critical violation. I can email that to you." - Tom   by cob 10-20-16
*************************************************************************************

POSS UC1974E SEVERANCE ISSUE:
Q: WHAT IS THE TOTAL AMOUNT OF THE SEVERANCE THE CLMT WILL RECEIVE?
A; WE offered her a severance package. She has not signed it. Part of that agreement wsa that we wouldn't contest her Unemployment compensation claim.

If she signs it, it's equal to 20 weeks of pay would equal to 2320.00 per week x 20 weeks = $46,400.00

UC Office Representative: CBE

Auxiliary aids and services are available upon request to individuals with disabilities.
Equal Opportunity Employer/Program

Appendix 302

## RECORD OF ORAL INTERVIEW
## Claimant

Claimant's Name:     KATHLEEN M JUNGCLAUS          Social Security Number: 179548362

Claimant's Phone:    215-758-2724          Date: **10/18/2016**     Time: **9:57 AM**

Employer's/Employer's Consultant's Name:    WAVERLY HEIGHTS

| | |
|---|---|
| ☐ Initial Information | ☐ No Answer |
| ☒ Additional Information | ☐ Phone Disconnected |
| ☒ Rebuttal | ☐ Phone Busy |
| ☐ Message Left on Answering Machine | |
| ☐ Message Left With:    to Have Claimant Return Call By: | |

**Message to Claimant:**
PLEASE CALL THE UC SERVICE CENTER BY CLOSE OF BUSINESS ON          (DATE) TO
PROVIDE INFORMATION NECESSARY FOR DETERMINING YOUR UC ELIGIBILITY. FAILURE TO
RESPOND BY THIS DATE WILL RESULT IN A DETERMINATION BASED ON AVAILABLE
INFORMATION.

Statement Given:
Q: FDW? LDW?
A: My first day was 04/07/1997; my last actual day was 09/27/16.

Q: THE EMPL STATES YOU WRE DISCHD AS A RESULT OF A TWEET - PLS VERIFY:
A; A tweet was sent out on my twitter page, not on the public Waverly page. A resident of Waverly Hghts
went to my twitter page, read the tweet (which my husband posted, not me).
It said "I'm a the Vice President of HR in a small company outside of Philadelphia based on an informal
survey 100% AA voting Trump @realdonaldtrump"
No one commented on the page about it. MY husband told me at the time that he did write the tweet, to
let me know, and I didn't think there was anything wrong with it! What happened was, one of HIS staff
asked him who he's voting for president - and he said "I don't know" - bc we both know you don't talk
about your personal politics at work. Another staff person heard the question and said she was voting for
Donald Trump. Other staff then also joined in and said they were voting for Donald Trump also. He
learned that all his staff were Trump supporters, as he is.

q: Why did your husband post a twitter message using your twitter page?
a: He doesn't have his own twitter page.
And he's also the Vice Pres of HR of a small company near Philadelphia.
The reader of the tweet misidentified me as the writer of it, however it was my husband who wrote it. I
thought there was nothing wrong with it - it's not a public page. You have to specifically search for my
name, go to my page, and scroll down to get to that tweet.
q: was this considered a rule violation?
a: Well, they said it violated the Social Media Policy (which i wrote).
I was called into the president's office. Someone had written a letter to the president of Waverly Heights
to complain about the tweet. It was anonymous, but based on the information in the letter, I believe I
know who wrote it. She's a senior citizen who is a resident of Waverly Hghts. I had let her housekeeper
go - hiring employees is part of my job, as is letting them go if necessary.

UC-169  REV 11-12 (Page 1)                COMMONWEALTH OF PENNSYLVANIA                DEPARTMENT OF LABOR AND INDUSTRY

So, we discovered this resident was looking into the twitter accounts of all the people who work for Waverly Hgts. The tweet was in July, and she wrote this letter in September. This person said she was offended and she wrote a letter to the company, and that's how this started.

q: is the tweet still on your page?

a: no - the day the president told me about the letter, I immediately took it off my page. I have 6 followers and they're all family - it's not like I'm a big twitter person. I only had the page in the first place bc I was told by my boss to set up a Go Fund Me account for someone, and when you set that up it says you'll get more "mileage" if you have twitter account also. That's the only reason I set it up. I only have 6 followers. Almost all the tweets are about the GoFundMe account.

My husband wrote the tweet and @realdonaldtrump bc people at his work said most of them were voting for Trump but they didn't tell people about it for fear of backlash. So he wanted the Trump campaign to know that there were supporters out there, in case they wanted the information.

D/RULE: The Employer considers the tweet to be a policy violation:

q: What is the rule you were accused of violating?

a: Social Media Policy. I know what it says bc I wrote it. It says you can't post anything that identifies the company you work for, and you can't ost on the pulbic Waverly page. It was not on the Waverly page, it was on my personal account. It was NOT public. And it does NOT identify the company I work for - I didn't even write it.

Q: what did 'AA" mean in the tweet?

a: AA can mean anything - I really don't know what my husband meant by that.

q: Did you violate the rule?

a: no, i did not the written policy. first of all, I didn't write the tweet, my husband wrote it. Second, it's on a private page. And lastly, it does not identify my company at all.

q: Date of incident?

a: I believe it was in July 27th.

The annonymous resident letter was written 09/14/16.

q: Were you aware of the rule? Or should you have been aware of it?

a: Yes - I wrote the rule.

q: If a warning was needed before disch, was it given?

a: No.

q: Did violation of the rule *require* discharge/suspension?

a: It says you may be terminated but it's not required. i could have received a warning or suspension. I was an employee there for over 27 years. To be disch'd over this is ridiculous.

q: Are you aware of any other violation of this rule where an employee was not discharged for the first offense, Or in other words, Was the rule uniformly enforced?

a: No - they're not. Every other time any one has had a performance issue or investigation, they were suspended during the investigation. The policy says MAY be disciplined. There were many other options that could have taken place.

q: the employer indicates your tweet 'COMPARTMENTALIZED ONE OUR PROTECTED CLASSES".

A: They said that AA stands for African American. But it could have meant anything. I don't even know what he meant by that.

q: Were you told that they could no longer trust you to equitably enforce the policies of the company?

a: No.


POSS SEVERANCE:

Q: DID YOU ACCEPT A SEVERANCE AGREEMENT?

A; No. They did offer me 20 weeks of severance. I've retained an attorney and he instructed me to not sign anything at this point. So - No, I'm not getting a severance.

---

Appendix 304

UC Office Representative: CBE

Auxiliary aids and services are available upon request to individuals with disabilities.
Equal Opportunity Employer/Program

Appendix 305



| | | The final day to file a timely appeal to this determination is November 09,2016. |
|---|---|---|
| | | **SSN:** 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 |
| | **pennsylvania** | **Type Claim:** UC |
| **NOTICE OF** | DEPARTMENT OF LABOR & INDUSTRY | **AB Date:** October 02,2016 |
| **DETERMINATION** | OFFICE OF UNEMPLOYMENT COMPENSATION BENEFITS | **Mailed On:** October 25,2016 |
| | | **Page:** 1 of 3 |

**EMPLOYER:**

WAVERLY HEIGHTS
1400 WAVERLY ROAD
GLADWYNE PA 19035-

**CLAIMANT:**

KATHLEEN M. JUNGCLAUS
1129 MILL ROAD CIRCLE
RYDAL PA 19046-

### FINDINGS OF FACT

1. The Claimant last worked on 9/27/2016.
2. The Claimant was discharged for violating a rule.
3. The Employer did not provide information to show that the Claimant violated the rule.
4. The Claimant denied violating the rule.
5. The Claimant performed work as a Human Resources manager
6. The Employer's rule was the Social Media Policy.
7. The Claimant's husband shares a personal, private twitter account with her.
8. The Claimant's husband also work as a Human Resources manager in a small company.
9. The Claimant's husband posted a political statement on their twitter account.
10. A resident at the Employer's facility searched for and found the Claimant's twitter account.
11. The resident saw the twitter comment and wrote an anonymous letter of complaint.
12. In the letter, the resident admits she/he has a distaste for the Claimant's political jabs and support of 'characters' in the Republican party.
13. The tweet used the letters AA to identify some staff members of company where the Claimant's husband works.
14. The Employer assumed AA refereed to African Americans.
15. The Employer determined the tweet to be highly offensive.
16. There is no evidence to show what AA meant in the tweet.
17. There is no evidence to show the Claimant was responsible for the tweet.
18. There is no evidence of any willful intent to violate the Employer's social media policy.

### DISCUSSION

In situations where the Claimant is discharged for violating a rule, the burden of proof is on the Employer to show that the Claimant was aware, or should have been aware of the rule and that the Claimant violated the rule. In order to qualify for benefits once this is established, the burden shifts to the Claimant to show good cause for her actions. In this situation, the Claimant denied violating the rule and the Employer did not provide information to show that the Claimant violated the rule. As such, the Employer has not sustained its burden of proof and benefits must be allowed under Section 402(e).

### DETERMINATION

The Claimant is eligible for benefits under Section 402(e) of the Pennsylvania Unemployment Compensation Law beginning with waiting week ending 10/8/2016.

**UC Representative:   C. Bell**

The last day to appeal this determination is:  November 09,2016

If you disagree with this determination, you may appeal.  If you want to file an appeal, you must do so on or before the date shown above.  Information for filing an appeal is included in this determination.

Appendix 306

CLAIMANT:   KATHLEEN M. JUNGCLAUS                      SSN:   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
EMPLOYER:  WAVERLY HEIGHTS                             Page:  2 of 3

## APPEAL INSTRUCTIONS

**The last day to appeal this determination is:** November 09,2016.

Under Section 501(e) of the Pennsylvania Unemployment Compensation Law, this determination becomes final unless an appeal is timely filed. If you disagree with this determination and wish to file an appeal, your appeal must be filed on or before the last day to appeal shown on this determination.

You may use a Petition for Appeal form, a letter or e-mail to appeal. Regardless of the format you choose, your appeal must include the name and address of the claimant, the social security number of the claimant, if known, the date of the determination being appealed, the reason for the appeal and the name and address of the individual filing the appeal. If you use a Petition for Appeal form or a letter to appeal, you may file your appeal by mail, common carrier or fax, or by personal delivery to any CareerLink office. Please follow these appeal instructions carefully:

- If you file your appeal by mail, the appeal is filed on the date of the U.S. Postal Service postmark, certificate of mailing, or certified mail receipt. If there is no postmark, certificate of mailing or certified mail receipt, but the appeal contains a postage meter mark, the appeal is filed on the date of the postage meter mark. If there is no Postal Service information or postage meter mark, the appeal is filed on the date recorded by the Department when the appeal is received. If you file your appeal by common carrier, the appeal is filed on the date it is delivered to the common carrier as established by the records of the common carrier. If the date of the delivery to the common carrier cannot be determined by documents in the record, the appeal is filed on the date it is received by the Department. Please complete Section 1 of the enclosed Petition for Appeal form and return the form to the following address, or send a letter of appeal to:

  **Lancaster UC Service Center**
  **36 East Grant Street**
  **Lancaster PA 17602**

- If you file your appeal by fax, the appeal is filed on the date of receipt imprinted by the receiving fax machine. If the receiving fax machine does not imprint a legible date, the appeal is filed on the date of transmission imprinted by the sending fax machine. If the faxed appeal does not contain a legible date of transmission, it is filed on the date recorded by the Department when it receives the appeal. If you appeal by fax, you are responsible for any delay, disruption, or interruption of electronic signals and the readability of the appeal, and you accept the risk that the appeal may not be properly or timely filed. Please complete Section 1 of the enclosed Petition for Appeal or FAX a letter of appeal to: **717-299-7557**.

- If you file your appeal by e-mail, the appeal is filed on the date of receipt recorded by the Department's electronic transmission system, if the e-mail is in a form capable of being processed by the Department's system. If you appeal by e-mail, you are responsible for any delay, disruption, or interruption of electronic signals and the readability of the appeal, and you accept the risk that the appeal may not be properly or timely filed. If you wish to appeal by e-mail, forward your appeal information to the Department at **ucappeals@pa.gov**. **Warning: information submitted by e-mail is not secure.**

- If you file your appeal by personal delivery to a CareerLink, your appeal is filed on the date it is delivered to the CareerLink, during normal business hours. If you wish to appeal by personal delivery, take the completed appeal form (UC-46B) or letter to the nearest Pennsylvania CareerLink. The CareerLink representative will forward your appeal or letter of appeal to the UC Service Center. **NOTE: Appeals can not be filed in-person at UC Service Centers.**

**IMPORTANT:** If you remain partially or fully unemployed while an appeal concerning your eligibility is pending, continue to file your bi-weekly claims for benefits. If the appeal is decided in your favor, only benefits for the weeks you claimed will be released for payment. Your employer has the same rights of appeal as you do.

---

The last day to appeal this determination is: November 09,2016
If you disagree with this determination, you may appeal. If you want to file an appeal, you must do so on or
before the date shown above. Information for filing an appeal is included in this determination.

| | |
|---|---|
| **CLAIMANT:**  KATHLEEN M. JUNGCLAUS | **SSN:**  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 |
| **EMPLOYER:**  WAVERLY HEIGHTS | **Page:**  3 of 3 |

## PROVISIONS OF THE PENNSYLVANIA UNEMPLOYMENT COMPENSATION LAW

Section 402(e) of the Law provides, in part, that a Claimant shall be ineligible to receive benefits for any week in which her unemployment is due to suspension or discharge for willful misconduct connected with the work.

THE EXPLANATION OF THE PENNSYLVANIA UNEMPLOYMENT COMPENSATION LAW PROVISIONS IS PROVIDED FOR INFORMATION ONLY.   FOR FURTHER EXPLANATION OF THIS DETERMINATION, CONTACT THE PENNSYLVANIA UC SERVICE CENTER INDICATED IN THE APPEAL INSTRUCTIONS.

**CONTRIBUTING BASE YEAR EMPLOYER:** This is not a determination on relief from charges. However, this determination may affect a request for relief from charges.

• An appeal to a Claimant's eligibility and a request for relief from charges <u>MUST BE FILED SEPARATELY</u>.

• For procedures and time limits for requesting relief from charges, see Form UC-44FR previously sent to you with the Claimant's Notice of Financial Determination or contact the Employers' Charge Section, 7th Floor, Labor & Industry Building, 7th & Forster Streets, Harrisburg, PA 17121.

**A REQUEST FOR RELIEF FROM CHARGES, WHETHER GRANTED OR NOT, WILL HAVE NO EFFECT ON THIS DETERMINATION.**

The last day to appeal this determination is:  November 09,2016
If you disagree with this determination, you may appeal.  If you want to file an appeal, you must do so on or before the date shown above.  Information for filing an appeal is included in this determination.

Appendix 308



**pennsylvania**
DEPARTMENT OF LABOR & INDUSTRY
UNEMPLOYMENT COMPENSATION BOARD OF REVIEW

# PETITION FOR APPEAL

**IMPORTANT! — READ THE INFORMATION ON THE REVERSE OF THIS FORM BEFORE FILING AN APPEAL.
EXPRESS APPEAL FILING INFORMATION IS INCLUDED.**

If you want to appeal a notice of determination, you must file by the last date to appeal as indicated on the determination. To ensure prompt filing, use the express link www.uc.pa.gov/appeals, complete the UC-46B, Petition for Appeal, and file directly to the electronic resource account of the UC Service Center listed on your determination. You may also file the appeal by fax or mail by completing Section I below and returning this form in accordance with the appeal instructions on the notice of determination.

**FOLLOW THE APPEAL INSTRUCTIONS CAREFULLY.**

## SECTION I: TO BE COMPLETED BY PERSON FILING APPEAL

CLAIMANT'S NAME AND ADDRESS:
KATHLEEN M JUNGCLAUS
1129 MILL ROAD CIRCLE
RYDAL PA 19046

DATE OF DETERMINATION BEING APPEALED __October 25, 2016__

CLAIMANT'S SOCIAL SECURITY NO. __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__

CLAIMANT'S TELEPHONE NO. ( 215 ) 758 - 2724

EMPLOYER'S NAME AND ADDRESS WHERE THE CLAIMANT LAST WORKED:
WAVERLY HEIGHTS LTD
1400 WAVERLY RD
GLADWYNE PA 19035

EMPLOYER'S TELEPHONE NO. ( 610 ) 645 - 8604

REASON(S) FOR DISAGREEING WITH THE DETERMINATION AND FILING THIS APPEAL ARE:

I certify that all information I have provided in this document is correct and complete. I acknowledge that false statements in this document are punishable pursuant to 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

__WAVERLY HEIGHTS LTD -THOMAS GARVIN__
**NAME OF PERSON FILING APPEAL**

## SECTION II: TO BE COMPLETED ONLY BY THE UC SERVICE CENTER

APPEAL FILED ON __October 31, 2016__   REFEREE OFFICE __KING OF PRUSSIA__   APPEAL NO. __16-09-F-6840__

APPEAL FILED BY:   CLAIMANT ☐   EMPLOYER ☒   EMPLOYMENT SECURITY ☐

APPEAL RECEIVED BY: UCSC ☐   PA CAREERLINK® ☐   PERSONALLY DELIVERED ☐   POSTMARKED ☐   FAXED ☒   OTHER ☐

TYPE CLAIM: UC ☒   UCFE ☐   UCX ☐   EB ☐   DUA ☐   TRA ☐   TRADE ACT PETITION NO._____   OTHER_____   NAFTA PETITION NO._____

APPELLANT REQUIRES ASSISTANCE BECAUSE OF DISABILITY WITH:   HEARING ☐   SPEECH ☐   VISION ☐
FOR THE FOLLOWING SPOKEN LANGUAGE_____   OTHER_____

ELIGIBLE SECTION(S)_____ 402E _____   INELIGIBLE SECTION(S) _____

APPLICATION FOR BENEFITS DATE ____October 2, 2016____   CLAIM WEEK(S) RULED ON _____ WW 10/8/16 _____

__RDA__   UC SERVICE CENTER _____ 0996 _____
**SIGNATURE OF APPEAL CLERK**

NAME AND ADDRESS OF EMPLOYER(S) AND ANY OTHER PARTY INVOLVED IN THE CLAIMANT'S ELIGIBILITY
**EMPLOYER'S ADDRESS**   EMPLOYER'S REPRESENTATIVE
WAVERLY HEIGHTS
1400 WAVERLY RD
GLADWYNE PA 19035

**RECEIVED**
NOV 0 4 2016
UC BOARD OF REVIEW
Erie Referee Office

UC-46B REV 04-14 (Page 1)

Appendix 309

10/31/2016  12:21  6106458602                    WAVERLYADMIN                      PAGE  01/01



**pennsylvania**
DEPARTMENT OF LABOR & INDUSTRY
UNEMPLOYMENT COMPENSATION BOARD OF REVIEW

# PETITION FOR APPEAL
## (WEB)

179 54 8362

If you want to appeal a notice of determination, complete Section I below and submit this form. To be timely, an appeal must be filed by the last date to appeal as indicated on the determination.

### *ALL SECTION I FIELDS ARE MANDATORY*

**SECTION I: TO BE COMPLETED BY PERSON FILING APPEAL**

CLAIMANT'S NAME AND ADDRESS:

Kathleen M. Jungclaus
1129 Mill Road Circle
Rydal, PA 19046

DATE OF DETERMINATION BEING APPEALED 10/25/2016

CLAIMANT'S SOCIAL SECURITY NO. XXX - XX - [8][3][6][2]

CLAIMANT'S TELEPHONE NO. ( 2 1 5 ) 7 5 8 . 2 7 2 4

EMPLOYER'S NAME AND ADDRESS WHERE THE CLAIMANT LAST WORKED:

Waverly Heights Ltd.
1400 Waverly Road
Gladwyne, PA 19035

EMPLOYER'S TELEPHONE NO. ( 6 1 0 ) 6 4 5 . 8 6 0 4

REASON(S) FOR DISAGREEING WITH THE DETERMINATION AND FILING THIS APPEAL ARE:

1. Item #3 in Finding of Fact is disputed. Information was provided
2. The Claimant clearly violated the company Social Media Policy which she assisted in developing.
3. Claimant never indicated her husband posted the message on her account when it was brought to her attention
4. The reference to AA clearly was a reference to African Americans in the context of the posting. 5. The posting was in her name on her accoun

I certify that all information I have provided in this document is correct and complete. I acknowledge that false statements in this document are punishable pursuant to 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Thomas P. Garvin

**NAME OF PERSON FILING APPEAL**

**SECTION II: TO BE COMPLETED ONLY BY THE UC SERVICE CENTER**

APPEAL FILED ON_____    REFEREE OFFICE_____    APPEAL NO._____

APPEAL FILED BY:    CLAIMANT ☐    EMPLOYER ☐

APPEAL RECEIVED BY:    EMAIL ☐

TYPE CLAIM: UC☐ UCFE☐ UCX☐ EB☐ DUA☐ TRA☐  TRADE ACT PETITION NO._____  OTHER_____  NAFTA PETITION NO._____

APPELLANT REQUIRES ASSISTANCE BECAUSE OF DISABILITY WITH:   HEARING ☐    SPEECH ☐    VISION ☐
                        FOR THE FOLLOWING SPOKEN LANGUAGE_____    OTHER_____

ELIGIBLE SECTION(S)_____INELIGIBLE SECTION(S) _____

APPLICATION FOR BENEFITS DATE_____ CLAIM WEEK(S) RULED ON_____

_____    UC SERVICE CENTER _____
    SIGNATURE OF APPEAL CLERK

NAME AND ADDRESS OF EMPLOYER(S) AND ANY OTHER PARTY INVOLVED IN THE CLAIMANT'S ELIGIBILITY
        EMPLOYER'S ADDRESS                          EMPLOYER'S REPRESENTATIVE (IF ANY)

UC-46D(M) 04-14

   

Received Time Oct. 31. 2016 12:58PM No. 9002    Appendix 310

**MARK D. SCHWARTZ**
**Attorney at Law**
**Post Office Box 330**
**Bryn Mawr, Pennsylvania 19010-0330**
www.markschwartzesq.com
**610-525-5534**

November 8, 2016

The Board of Trustees of Waverly Heights
c/o Grace M. Deon, Esquire
Eastburn and Gray, P.C.
60 East Court Street
P.O. Box 1389
Doylestown, PA

Re: Kathleen M. Jungclaus vs. Waverly Heights, Tom Garvin, Jane Doe et al.

Ladies and Gentlemen:

I am honored to represent Ms. Kathleen M. Jungclaus and am prepared to file a complaint with the EEOC followed by a lawsuit in the U.S. Federal Court for the Eastern District of Pennsylvania against Waverly Heights, ("Waverly"), its Board of Trustees, CEO Tom Garvin and a certain Resident/Board Member. Given what is set forth herein, it seems clear the Defendant's positions are not synonymous, requiring the need for separate counsel for each of the named defendants above.

**ACCORDINGLY, I INSIST THAT YOU PLACE A LITIGATION HOLD ON ANY AND ALL INFORMATION IN YOUR POSSESSION PERTAINING TO MS. JUNGCLAUS DURING HER TENURE AT WAVERLY, AS WELL AS ALL INFORMATION PERTAINING TO ALL OF THOSE REFERENCED HEREIN TENDING TOWARDS RELEVANT EVIDENCE INCLUDING BUT NOT LIMITED TO EMAIL OF THE BOARD MEMBERS. I WILL NOT COUNTENANCE ANYTHING BEING DESTROYED. KINDLY ADVISE BOARD OF TRUSTEE MEMBERS AND EMPLOYEES OF ANTICIPATED LITIGATION AND NOT TO DELETE ANY EMAIL THAT MAY HAVE BEEN SENT TO MY CLIENT OR IN ANY WAY PERTAINED TO HER. IF ANY SUCH INFORMATION HAS ALREADY BEEN DESTROYED THEN I INSIST UPON YOUR PROVIDING ME WITH A DETAILED LOG OF WHAT WAS DELETED.**

Before starting the litigation process and fully engaging in the public discourse that is appropriate given the public nature of your facility, I want to detail the charges which your institution, its Board of Trustees, and its officers will face when it comes to discriminatory actions which led to her firing, as well as transactions involving questionable ethics.

**This letter should not be construed as a confidential settlement communication. To the contrary, given the fact that your facility relies upon the receipt of federal funds, what took place here is very much something that should be in the public domain.**

After almost twenty years as HR Director/Vice-President of Human Resources, on September 20, 2016, Ms. Jungclaus was called down to Tom Garvin's office. When she went to his office he was holding a manila folder which held a purportedly anonymous, yet clearly defamatory, letter which led to her firing. Although we have a clear sense of the identity of this resident and board member, for the time being I will refer to her as Jane Doe. Ms. Doe's letter protested a July 24, 2016 twitter posting on my client's personal account about the election. Let us look at the actual text of what was involved:

> @realdonaldtrump I am the VP of HR in a comp outside of Philly
>
> An informal survey of our employees shows 100% AA employees
>
> Voting Trump

After a discussion in which my client was very upset, Mr. Garvin promised that she would not be fired and that she should not worry. He characterized the situation as being a mere nuisance. He then left to go to the Zeigler Conference in Florida and did not return until Monday September 26th. My client attempted to see him several times that Monday, but he was very evasive.

After that initial meeting, my client immediately deleted the posting. Incidentally, in the 2 months after it was posted there were no comments, sharing or responses to the posting.

At 3:30 p.m. on Tuesday September 27, my client was called down to Mr. Garvin's office. He was with Mr. Dick Bauer, the Chairman of the Board of Trustees. Garvin told her that the meeting was about the letter and the twitter posting. He stated that he was very upset by it and decided to take it to the Human Resources Committee. He stated that the Human Resources Committee and the Full Board of Trustees had voted unanimously to terminate her employment based on a violation of the Social Media Policy. This action was taken without investigation of any sort or a due process hearing. Without success, she begged them to please reconsider and/or to allow her to discuss the situation with the HR Committee and Full Board of Trustees. I question whether Garvin managed to gather the Full Board of Trustees to a meeting in one day.

Ms. Jungclaus' tweet can only be characterized as a "political observation", or a matter of "public concern". It was not on any of Waverly's hosted sights. She did not identify nor disparage Waverly. Ms. Doe's letter admitted that she found out about the personal twitter posting after going to the Waverly Twitter page. Her twitter account was not "linked" to the Waverly website, "blatantly" or otherwise. My client never took any action to do so. My client's address popped up as a follower of Twitter@Waverly. Twitter postings, by their very nature are only seen by those who choose to go to an individual Twitter page. They are not in the public domain.

Moreover, my client did not make the posting using Waverly hardware or software and did not violate the clear terms of the Social Media policy. It is a real over-reach to suggest that she violated the Social Media Policy set forth beginning on page 24 of the Waverly Heights Employee Handbook. The Policy makes a clear distinction between "company owned assets", and "work-related blogging" on the one hand, and "personal blogging" on the other. As stated

on page 25, "Waverly Heights respects the rights of employees to write blogs and use social networking sites and does not want to discourage employees from self-publishing and self-expression." Further it states that it does not "discriminate against employees" in this regard. Simply stated, it is my position that Waverly deliberately discriminated against my client after looking the other way at blatantly offensive email of others. She did not link her blog to Waverly's website, did not disclose company privileged information, let alone in any way identify herself as an employee of Waverly. Even a violation of this policy would not automatically justify termination, the penalty which she received.

At her termination meeting, Ms. Jungclaus was completely blindsided and shocked. She begged for her job. She asked for an opportunity to discuss the situation with the HR Committee and the Full Board of Trustees. This was refused. Realizing that Mr. Garvin was giving her no chance to regain her position, she requested the opportunity to instead resign so that she could leave with some modicum of dignity. She offered to give notice so that she would have an opportunity to say goodbye to the employees and residents she had grown to love. This too was denied. Garvin then told my client, "I don't want you to think that we think you are a racist, that's not the case." In characteristic form, Garvin disparaged my client by telling the PA Unemployment Compensation Bureau representative that she "violated the rights of a protected class". This was admitted to my client by that representative.

Mr. Garvin then told her that two individuals were waiting to pack up her office and accompany her off campus. This demoralizing and demeaning storm-trooper tactic was totally uncalled for given my client's twenty-year tenure and her position.

Ms. Jungclaus told him that because her in-laws were residents, she was very concerned about the impression that would be left on them specifically, and the resident population in general. She specifically told him that she was worried about her reputation. He stated that he would be very careful about what was said. Further, he promised that he would say that she had simply resigned and would not be back. Again, contrary to his representation, immediately after she left, Garvin called a meeting of the Senior Leadership Team proceeding to violate his promise and to defame her, telling them that she was let go for violating the Social Media Policy. These communications were not limited to in house employees. For example, on the very next day, she learned from an outside consultant that Garvin told him that she was let go and that it was because of an inappropriate post on Facebook. This same mis-information was passed on to others in what was clearly a malicious fashion. Finally, he further disparaged her reputation by authoring a memorandum to "Our Valued Residents" ("Exhibit A") that "she was no longer with our organization."

## Defenses

If she were terminated for the reason stated, then:

a.     It was because of the facially incorrect conclusion that it was a violation of the Social Media Policy. Since her posting was a personal "blog," done on personal time, not identifying Waverly, and not on Waverly hardware or software, there was no violation of any of the restrictions listed in the policy. Clearly, the Jane Doe letter depicts the author's disagreement with my client's political statement. My client feels that her rights to personal

political speech have been violated.   Further it is clear that Ms. Doe harbors a grudge over an employment decision that my client was involved with some time ago.

b.      It was contrary to Waverly's customary practice of performing an investigation. The posting in question was never investigated, nor was she given a chance to explain.

c.      The termination was not handled in accordance with Waverly's consistent policy and practice of progressive discipline.  Never in her twenty years has my client seen any employee be terminated without the opportunity of presenting his or her point of view. Standard practice for an egregious offense would be suspension pending investigation.  In virtually all terminations my client knew of, or was involved with, over the past twenty years, there was a process and the chance for the employee to admit his or her deficiencies and take corrective action.  These opportunities were not afforded to her.

d.      It is clearly a restriction of her right of protected speech when it comes to public matters.  My client is sure that many on the Board of Trustees are aware of the past practice where the former Chairman of the Board, Charles Soltis used Waverly email to transmit his own unsolicited, base and deplorable political views which included fallacious "birther" jokes and slurs against President Obama.  My client certainly did not invite such emails, though she received them regularly.  Further, she is unaware that Mr. Soltis was ever sanctioned for this activity.  Unlike the Soltis emails, the context of my client's tweet contained no disparagement against any person or group of persons.

Clearly the social media excuse was a mere pretext to fire her.  The real reason was an illegal working environment characterized by sex discrimination to the disfavor of women.  My client had repeatedly challenged Garvin when it came to pay and benefit equity issues over the past year.  Notwithstanding the fact that Waverly is a nonprofit entity, Garvin, with the Board of Trustees' acquiescence, created a private self-serving empire and sexist environment which cast aside Waverly's professed ideals and its Mission.

### Discrimination in Compensation: Protests, December 2015, January 2016

Each year the Senior Leadership Team completes a self-evaluation and receives a review and increase in December to be processed for the first pay period of the next year.

In December 2015, my client asked to meet with Garvin regarding her compensation.  As a 19-year employee, she told Garvin that she would like to receive an increase more in line with her performance and years of employment.  She also requested that she be considered for a bonus based on the successful worker's compensation management she had accomplished over the years, returning more than $1,000,000.00 to Waverly since 2002.  Moreover, she also made the case that she has successfully "assisted" him with numerous difficult employment issues during his tenure and that she was responsible for all of the in-house training (including the development and implementation for ongoing customer service training) which would normally be outsourced at a significant cost to Waverly.

When the performance reviews were completed for the year, the male Sr. VP of Finance, Robert Supper (employed for only 3 years), was assigned a compensation ratio of

approximately 125% of market value, in contrast to my client's ratio of 102% of market value despite her many years of service.   Larger increases and bonuses were given to the other members of the leadership team though their overall ratings were often lower than hers.  She received the smallest bonus.

In January, 2016, Ms. Jungclaus decided to discuss this situation with Garvin, knowing full well that he would be unhappy and that he would hold it against her.  Since she was a direct report to Garvin, her only option was to advocate for herself to him.  Notwithstanding that she mustered all the professionalism and calm that she could, predictably he became upset with her for challenging his decisions. He then went so far as to question whether she could do her job at all.  After that, their relationship was never the same.

More recently, in August, 2016, she discussed another compensation issue with him.  Of the two Sr. VP positions, only the male had a car.  The female Sr. VP of Healthcare did not. Again Mr. Garvin was very unhappy that she even brought this up. Subsequent events amply demonstrated that the male Sr. V.P. did not deserve a car.

### Tom Garvin

My client's status and approach stood in stark contrast Mr. Garvin who was hired as President on July 4, 2010. Throughout his tenure, his compensation and benefits have been more akin to a corporate, rather than a non-profit environment. His current yearly salary approximates $325,000, with a 4-5% yearly increase, together with a $30,000 to $35,000 annual bonus.

Another example of the excess involved here is the fact that upon employment, he negotiated that $20,000 be added to his salary, purportedly to cover health insurance, as he was not enrolling in Waverly's plan.  This health insurance waiver bonus increased to about $25,000 in the ensuing years.  Incredibly, this bonus continues to this day even though Garvin subsequently enrolled himself and his family several years ago in the 100% paid insurance offered by Waverly.  This lack of oversight by the Board of Trustees allows Garvin to act unchecked in his little empire.

In true corporate CEO fashion Mr. Garvin now has three residences:

-In May, 2015 Garvin acquired an Ocean City, NJ summer residence.

-In 2016, he relocated his principal residence from Doylestown to Fort Washington.  The total cost of relocation including draperies for all the windows, was paid by Waverly.  This perquisite for a twelve-mile move would be very unusual for a "for-profit" entity, let alone a Medicare funded non-profit entity serving senior citizens.

-In 2016, Garvin coincidentally purchased a home in State College, Pennsylvania from an architect whose firm had been awarded the contract for Waverly's current $30-million-dollar renovation project at Waverly Heights. The sale was from Greg J. Scott, a partner of the firm of Reese Lower Patrick and Scott, the website of which emphasizes purported values of "integrity, empathy and creativity." This incident alone is fraught with questions ranging from at least the

appearance of a conflict of interest, to questions about fraud and collusion. After all, public Medicare funds contribute towards paying Waverly's bills.  What, if any, was the nature of Garvin's disclosure to the Board of Trustees?  There should have been an in-depth independent investigation of what transpired here.  What, if anything, did the Board of Trustees do to investigate this matter? These questions need to be explored. However, the bottom line is that Mr. Garvin is still employed and my client is not.

Although there are no exemptions to Waverly's rules, those rules don't seem to apply to Garvin, whether it involves use of the residents' gym, participation in employee contests and accepting the prize money, or use of the facility staff and food at cost for his private functions. He has also requested the transportation staff to clean his car windows because "the kids' feet were all over them." He treats the staff as his personal staff, rather than as employees hired to care for residents.  There should be an investigation into the extent of these and other questionable practices.  For example, Mr. Garvin sometimes had his wife attend conferences with him.   My client informs me that, on occasion he has budgeted for 5 attendees and instead sent 4 Waverly employees (including himself).  Had Waverly used company funds to pay for these trips?  As is the case with the relocation costs, and use of facilities, the question arises as to whether such compensation was classified for tax purposes as income.

Since Garvin started his employment at Waverly in 2010, he has systematically removed senior level management and replaced them with his own male-dominated, hand-picked team. There are only 2 directors left with whom he started with 6 years ago. Notwithstanding, each time someone is terminated, Garvin has made it a point to tell my client and others: "You don't have to worry about your job, I am really not out to get the old timers." This in and of itself is an admission.

While the Board of Trustees has allowed Garvin to act as if he owns this business, and runs it as a "good ole boys" network, he is merely the steward of a non-profit, just like anyone else employed there. The problem is that he has neither been treated as such, nor been held accountable.

### Blatant Discrimination and Cover-up in Favor of Robert Supper

On many occasions Mr. Garvin spoke with my client privately about his concern over Bob Supper, Sr. V.P of Finance.  Mr. Supper repeatedly bragged about his gambling and drinking habits in front of the staff.  His department staff and many other employees know that he often leaves work early to go to happy hour. Until recently, he drove a company vehicle, notwithstanding concerns over his drinking and driving, including the liability issues that it posed for Waverly.  Mr. Supper was told by Garvin on many occasions not to talk about those activities with his staff, yet he has continued his bragging.  Mr. Garvin has also jokingly told my client, not to talk to Mr. Supper until after lunch on Mondays so that he would have a chance to recover from his weekend.  Knowing that a chronic drinker and gambler is overseeing the finances of the Waverly community and driving a company vehicle brings into question Garvin's ability to supervise one of his most senior team members with a view towards protecting the interests of the organization.

This past August, Mr. Supper took his family to Atlantic City. With him was his son who has struggled with addiction issues. Apparently, showing incredibly bad judgment, Mr. Supper was drinking and gambling with his son. As he told my client, sometime during the night, his son removed the Waverly company vehicle from the hotel valet. Subsequently, he was driving erratically and was pulled over. He was arrested for DUI, possession and other offenses. The company car was impounded and a host of charges resulted. Attached herewith is the Mt. Laurel, New Jersey police blotter ("Exhibit B") as well as the Delaware County, Pennsylvania Court Summary ("Exhibit C") showing an extensive criminal background that includes a great deal more than the most recent incident.

When Bob Supper told Garvin about the incident, like my client, he stated that he was afraid that he would lose his job. He should have, however, Garvin and the Board Chairman decided to keep things quiet and not inform the Human Resource Committee nor the Full Board of Trustees.

Garvin discussed the situation with my client in her office. The discussion revolved around the car. My client told Garvin that this was the perfect time to remove the car from Bob. In addition to the obvious liability risks to Waverly, she observed that:

  -He does not need a car in his position, there is no traveling required in his position being a single site facility.

  -The other Senior Vice President, a female, was being discriminated against in not having the same benefit. Garvin retorted by saying that he wouldn't do that.

Incredibly, instead of being fired, Mr. Supper was asked to turn in the car and was given a stipend each pay-period totaling $10,500. per year. My client again told Garvin that he should just simply take the benefit away given the discriminatory optics of having two Senior V. P's of different gender with different benefits. Again, Mr. Garvin resented my client's questioning his decision. Incredibly, given Mr. Supper's misbehavior, Mr. Garvin simply gave him a raise.

When Garvin terminated my client, he told her in the presence of the Chairman, "I decided to bring this up to the HR Committee and the Full Board of Trustees and it was a unanimous decision to terminate you." This is an interesting contrast the treatment of Mr. Supper, given the misuse of a company car with the resulting impoundment, a DUI and drug charges against his son. Purportedly this was only discussed with the Board Chairman. In my client's case, an anonymous letter about a random personal twitter posting rose to the level of a purported vote by the Human Resource Committee and the full Board of Trustees.

### Abuse of women- "It's just Bob"

On numerous occasions, Mr. Supper, Sr. VP of Finance, has been degrading to the women on the Leadership Team as well as staff. He will yell, talk over and dismiss women's comments in meetings. There are at least three senior staff members who can corroborate this. On several occasions this has been done in front of and tolerated by Garvin. When my client and others have brought this to his attention, his response was dismissive, saying "It's

just Bob." This typifies a hostile work environment for my client and the other female employees.

Again, the bottom line is that my client was fired and Mr. Super remains in his job.

## Garvin's Threat about Reporting a Worker's Comp Incident

In August, my client was working on a project dealing with Human Resources files going back to 1986. This was conducted in the Manor House Attic where files needed to be marked for shredding or saving. After 20 minutes in the attic she came downstairs and immediately had a severe asthma attack. After using her rescue inhaler, she had no relief and went to the Assistant Director of Nursing's office for further treatment. After being put on a nebulizer, there was still no immediate response. She was told that if she didn't respond soon that she would have to be sent out by ambulance for emergency treatment. As a last resort, she was told to walk into the walk- in freezer in the main kitchen, where after 10 minutes she began to feel a little better.

When she went to tell Garvin about the incident to see if she could leave early to see a doctor, his response was incredibly: "You're not filing a worker's comp claim are you? You are the risk manager! Imagine how ridiculous you will look at the Captive meetings if you file a claim." In making this statement he showed discriminatory animus, as well as complete disregard for proper Human Resources practice, not to mention lack of concern for another human being. My client did file a report and claim for workers' comp. However, out of fear, she did not submit claims for payment. To date, Ms. Jungclaus has continued the necessary follow-up treatment and has personally paid the bills.

## Raymond and Jackie Jungclaus

My client's in-laws, who are in their 80s, are residents of Waverly. During January 2013, they were moved from their home in New Jersey to Waverly. The decision was based on my client's working there. When her mother-in-law found out about her firing, she became hysterical. Every time there is any contact, she starts crying and fears retaliation. Given Mr. Garvin's misrepresentations and defamation of my client, this is not an unrealistic expectation. My client's mother-in-law has avoided going to events because of Garvin's presence. The situation has greatly impeded her ability to enjoy her life at Waverly, all in conflict with Waverly's Mission Statement.

## Conclusion

My client has been a dedicated and committed employee of Waverly's for almost 20 years. She has always received very high ratings in her performance review including under Mr. Garvin's tenure. Her consistent job performance has resulted in an 11% personnel turnover rate, which is one of the lowest in a healthcare environment. Her responsibilities included risk control and worker compensation management resulting in over $1,000,000 in dividends paid

back to Waverly, reducing costs to the entity.  Ms. Jungclaus was elected by her peers and served as a board member of Waverly's captive insurance company Churchill Casualty Ltd. and with glowing reviews, she taught the Human Resource section of the Nursing Home Administration certification program. She was responsible for developing and implementing all employee training, including customer service training, further saving the company costs.  As part of her job, Garvin has placed her in numerous difficult personnel situation over the years where he depended on her professionalism and acumen. She has attempted to provide fair and equitable treatment to all employees regardless of their race, gender or sexual orientation over her twenty years of service. This was not always possible given Mr. Gavin's direction. Ironically, it was his reaction to her convictions that ended her career.  She was not afforded the same fair treatment accorded others.

My client has been advised that she has several remedies. These remedies include dual filing a complaint with the U.S. Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission to be followed by a federal law suit for sex discrimination, age discrimination and wrongful discharge. In addition, she is prepared to bring defamation claims personally against Mr. Garvin and Jane Doe. After all, those named in the caption at the beginning of this letter have made her virtually unemployable in her chosen field.

The legal steps outlined above will be commenced within 10 days of the date of this letter, unless I hear from a party with full settlement authority to bring this matter to a financial settlement commensurate with what Waverly has cost my client in terms of her career.

**As previously stated, in no way should this letter be construed as a confidential settlement communication. To the contrary, given the fact that your facility relies upon the receipt of federal funds, what took place here is very much something that should be in the public domain.  Based on the large monthly fees paid by the residents of Waverly Heights they too should be made aware of this gross mismanagement of staff and funds.**

Very truly yours,

Mark D. Schwartz, Esquire



# WAVERLY
*Heights*

## MEMORANDUM

**TO:**      OUR VALUED RESIDENTS
**FROM:**   THOMAS P. GARVIN, PRESIDENT AND CEO
**DATE:**    SEPTEMBER 30, 2016
**SUBJECT:** CHANGE IN PERSONNEL

Dear Residents,

I regretfully inform you that Kathy Jungclaus, our Vice President of Human Resources, is no longer with our organization. We are extremely appreciative of Kathy's many years of service to Waverly and wish her the best of luck in her future.

We will immediately begin the recruiting process, and will keep you informed of our progress. In the interim, the department's operations and needs pertaining to employees will be fulfilled by representatives of Senior Management and the current Human Resources staff.

Should you have any questions, please contact Amy Blessing at phone extension 8604.

Best regards,

Tom



EXHIBIT
A

**Mount Laurel Police Department**

POLICE BLOTTER:

BURGLARY: During the overnight hours of August 11th into the 12th a shed and a detached garage were entered at two different residences on the 100 block of Independence Lane. A set of bolt cutters was stolen from the garage and damage was done to the shed.

THEFT: A bicycle was reported stolen from the 4900 building of Essex Lane during the early morning hours of August 12th. The bicycle was located on a path behind the 3300 building of Chadbury Road at 8:45am on August 12th. The bike was returned to the owner.

CRIMINAL MISCHIEF: A resident of the unit block of Holly Cove reported his vehicle was vandalized between August 11th and August 12th. Someone scratched the vehicle with a sharp object.

ARREST: At 8:33 pm on August 12th Mount Laurel Police responded to a hotel on the 1100 block of Route 73 for a disturbance. During the investigation officers arrested Kashief J. White, age 32, of Camden, NJ. He was charged with possession of cocaine, possession of prescription drugs, and possession of drug paraphernalia. He was released pending a court hearing.

ARREST: At 7:14 pm Mount Laurel Police responded to a hotel on the 600 block of Fellowship Road for a disturbance. During the investigation officers arrested Christina N. Tirocke, age 21, of Mount Laurel. She had two outstanding warrants and was in possession of drug paraphernalia. She was charged with possession and released after satisfying her warrants.

CRIMINAL MISCHIEF: At 10:30 pm on August 14th Mount Laurel Police responded to the McDonalds on Route 73 for a criminal mischief. It was reported that three females in their 20's got into a dispute with the restaurant staff. The customers were upset that they were charged 40 cents for extra sauce on their order. They threw newspapers at the staff and knocked over a cement trash can as they left. The trash can, valued at $200.00 broke, when it hit the ground. The suspects could not be located.

ARREST: At 2:15 am on August 14th Mount Laurel Police conducted a motor vehicle stop on Route 73 near Rogers Walk. During the stop officers arrested Javier A. Alvarez, age 35, of Philadelphia PA and Noel Fernandez, age55, of Philadelphia, PA after officers observed drug in the vehicle. Alvarez was charged with possession of greater than 5 units of prescription legend drugs (suboxone) and possession of less than 50grams of marijuana. He also had an active arrest warrant. His bail was set at $8,500.00 with no 10% option. Fernandez was charged with possession of less than 50 grams of marijuana, possession of heroin, possession of cocaine, and possession of drug paraphernalia. His bail was set at $13,500.00 with no 10% option. Both subjects were committed to Burlington County Jail.

CRIMINAL MISCHIEF: The manager of a hotel on the 900 block of Route 73 reported that a guest caused over $1,200.00 damage to a room on August 16th. There were indications that the guest used a fraudulent name and credit card to rent the room. Investigation ongoing.

RECEIVING STOLEN PROPERTY: An investigation determined that item stolen during a residential burglary in Maple Shade were pawned at the Game Stop on Nixon Drive. The suspect was identified as Paul F. Scattergood Jr., age 24, of Maple Shade, NJ. He was charged with receiving stolen property with bail set at $30,000.00 no 10% option. He was served the warrant at the Burlington County Jail where he was being held on related charges.

ARREST: In February 2016 a representative of the Jaguars Hockey Booster Club reported that they suspected a board member was stealing money from the club. The investigation confirmed that at least $1,646.32 was stolen by board member Kelly A. Hauler, age 47, of Lumberton, NJ. On August 16th Ms. Hauler was arrested and charged with theft. Bail was set at $15,000.00 with no 10% option and she was committed to the Burlington County Jail.

ARREST: At 11:36 pm on August 16th Mount Laurel Police located a disabled vehicle on Route 38 near Marter Avenue. During the investigation officers arrested Robert L. Supper, Jr, age 29, of Springfield, PA. He was charged with driving while intoxicated and released pending a court hearing.

BURGLARY: A resident on the first block of Saddle Drive reported someone burglarized their residence on between 7:30 am and 5:20 pm on August 18th. Entry into the residence was gained by throwing a landscaping rock through a rear window. A laptop and an iPad were stolen.

ARREST: At 11:29 pm on August 18th Mount Laurel Police conducted a motor vehicle stop on Route 73 near Church Road. During the stop officers arrested Kyle M. Hendricks, age 33, of Millville, NJ. He was charged with possession of less than 50 grams of marijuana and released pending a court hearing.

Appendix 321

**EXHIBIT**

B

ALL-STATE LEGAL®

Comments

ARREST: At 12:21 am on August 19th Mount Laurel Police conducted a motor vehicle stop on Larchmont Boulevard near Willow Turn. During the stop officers arrested Thomas R. Brennan, age 63, of Collingswood, NJ. He was charged with driving while intoxicated and released pending a court hearing.
All persons are considered innocent unless and until proven guilty in a court of law.
//END//

August 22 at 1:50pm · Public
Like Page · Save · More


Like


React


Comment


Share

**O** 😊 24

**Jordan Staub**
Stealing money from a kids travel ice hockey program? Really?
Like · 👍4 · Reply · Report · Aug 22
Melanie Burke replied · 1 reply

**Debbie Lepo**
Thanks for the news. You guys do a great job.
Like · Reply · Report · Aug 22

**John Jewell**
I'm glad the officers in Mount Laurel do such a great job. it seems the cheap motels along 73 are a black eye on our community. Any suggestions or Solutions people?
Like · Reply · Report · Aug 24

Write a comment...

| Comment |

Mention Friends

Appendix 322



**Delaware County Court of Common Pleas**
**Court Summary**

| | | |
|---|---|---|
| **Supper, Robert** | DOB: 12/18/1986 | Sex: Male |
| Springfield, PA 19064 | | Eyes: Brown |
| Aliases: | | Hair: Brown |
| Robert L. Supper | | Race: White |

### Active
#### Delaware

**CP-23-CR-0006746-2007**   Proc Status: Warrant Rescinded   DC No:   OTN:L3719936
Arrest Dt: 09/06/2007   Trial Dt:   Legacy No:
Last Action: Bench Warrant Hearing   Last Action Date: 01/26/2009   Last Action Room:
Next Action:   Next Action Date:   Next Action Room:
Disp Date: 10/22/2008   Disp Judge: Koudelis, George

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | Program Period | | Sentence Length | |
| 1 | 35 § 780-113 §§ A30 | F | Manuf/Del/Poss/W Int Manuf Or Del | Guilty Plea |
| | 10/22/2008 | Confinement | Other | | Min: 18 Month(s) and Max: 36 Month(s) |
| 2 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Nolle Prossed |
| 3 | 35 § 780-113 §§ A32 | M | Use/Poss Of Drug Paraph | Nolle Prossed |

**CP-23-CR-0005539-2016**   Proc Status: Awaiting Trial Scheduling   DC No:   OTN:T8296142
Arrest Dt: 08/17/2016   Trial Dt:   Legacy No:
Last Action: Formal Arraignment   Last Action Date: 09/28/2016   Last Action Room:
Next Action: Pre-Trial Conference   Next Action Date: 10/11/2016   Next Action Room:

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 3701 §§ A1I | F1 | Robbery-Inflict Serious Bodily Injury | |
| 2 | 18 § 3701 §§ A1II | F1 | Robbery-Threat Immed Ser Injury | |
| 3 | 18 § 3701 §§ A1III | F1 | Robbery-Commit Threat 1st/2nd Deg Fel | |
| 4 | 18 § 3921 §§ A | F1 | Theft By Unlaw Taking-Movable Prop | |
| 5 | 18 § 3925 §§ A | F1 | Receiving Stolen Property | |
| 6 | 18 § 4106 §§ A1II | M1 | Access Device Issd To Another Who Did Not Auth Use | |
| 7 | 18 § 4106 §§ A1 | M1 | Access Device Used To Obt Or Att Obt Prop/Service | |
| 8 | 18 § 4106 §§ A1IV | M1 | Other Reason Access Device Is Unauth By Issuer | |
| 9 | 18 § 2706 §§ A1 | M1 | Terroristic Threats W/ Int To Terrorize Another | |
| 10 | 18 § 3928 §§ A | M2 | Unauth Use Motor/Other Vehicles | |
| 11 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | |
| 12 | 35 § 780-113 §§ A32 | M | Use/Poss Of Drug Paraph | |
| 13 | 75 § 3802 §§ D2* | M | DUI: Controlled Substance - Impaired Ability - 1st Offense | |
| 14 | 75 § 3323 §§ A | S | Intersections Controlled by Signs | |



EXHIBIT

C

---

CPCMS 3541   1   Printed: 10/7/2016 11:10 AM

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Appendix 323



## Delaware County Court of Common Pleas
## Court Summary

**Supper, Robert (Continued)**
  **Active (Continued)**
    **Delaware (Continued)**

CP-23-CR-0005539-2016    Proc Status: Awaiting Trial Scheduling    DC No:    OTN:T8296142

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 99999 | 75 § 3802 §§ A1* | M | DUI: Gen Imp/Inc of Driving Safely - 1st Off | Withdrawn |
| 99999 | 75 § 3802 §§ A2* | M | DUI: Gen Imp (BAC .08 - .10) 1st Off | Withdrawn |
| 99999 | 75 § 3802 §§ D1l* | | DUI: Controlled Substance - Schedule 1 - 1st Offense | Charge Changed |

  **Closed**
    **Delaware**

CP-23-CR-0003861-2013    Proc Status: Completed    DC No:    OTN:T3334052
Arrest Dt: 06/01/2013    Disp Date: 08/01/2013    Disp Judge: Hazel, Frank T.
Def Atty: Dunn, Taylor William - (PR)

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | Program Period | Sentence Length | |
| 1 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Guilty Plea - Negotiated |
| | 08/01/2013 | Confinement | Other | Max: 12 Month(s) |
| 2 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 3 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 4 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 5 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 6 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 7 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 8 | 35 § 780-113 §§ A32 | M | Use/Poss Of Drug Paraph | Dismissed |

CP-23-CR-0004425-2013    Proc Status: Completed    DC No:    OTN:L7902462
Arrest Dt: 06/03/2013    Disp Date: 08/01/2013    Disp Judge: Hazel, Frank T.
Def Atty: West, Kenneth E. - (PD)

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | Program Period | Sentence Length | |
| 1 | 18 § 3503 §§ B1l | M3 | Def Tres Actual Communication To | Guilty Plea - Negotiated |
| | 08/13/2014 | Confinement | Other | Max: 12 Month(s) |
| | 08/01/2013 | Probation | 1 Year | Max: 1 Year(s) |
| | 06/24/2015 | Confinement | Other | Max: 188 Day(s) |
| 2 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Guilty Plea - Negotiated |
| | 08/13/2014 | No Further Penalty | | |
| | 08/01/2013 | Confinement | Other | Max: 12 Month(s) |
| | 06/24/2015 | No Further Penalty | | |
| 3 | 35 § 780-113 §§ A32 | M | Use/Poss Of Drug Paraph | Dismissed |
| 4 | 18 § 5503 §§ A1 | S | Disorderly Conduct Engage In Fighting | Dismissed |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report Information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Appendix 324



**Delaware County Court of Common Pleas**
**Court Summary**

Supper, Robert (Continued)
Closed (Continued)
Delaware (Continued)

| Seq No | Statute | | Grade | Description | Disposition |
|--------|---------|---|-------|-------------|-------------|
| | Sentence Dt. | Sentence Type | Program Period | | Sentence Length |
| 5 | 18 § 5503 §§ A4 | | S | Disorder Conduct Hazardous/Physi Off | Dismissed |
| 99999 | 18 § 3503 §§ A1I | | | Crim Tres-Enter Structure | Disposed at Lower Court |
| 99999 | 18 § 5104 | | | Resist Arrest/Other Law Enforce | Disposed at Lower Court |

CP-23-MD-0001505-2013     Proc Status: Completed     DC No:     OTN:L7902462
Arrest Dt: 06/03/2013     Disp Date:     Disp Judge:

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 1 | 18 § 3503 §§ A1I | | Crim Tres-Enter Structure | |
| 2 | 18 § 3503 §§ B1I | | Def Tres Actual Communication To | |
| 3 | 18 § 5104 | | Resist Arrest/Other Law Enforce | |
| 4 | 18 § 5503 §§ A1 | | Disorderly Conduct Engage In Fighting | |
| 5 | 18 § 5503 §§ A4 | | Disorder Conduct Hazardous/Physi Off | |
| 6 | 35 § 780-113 §§ A16 | | Int Poss Contr Subst By Per Not Reg | |
| 7 | 35 § 780-113 §§ A32 | | Use/Poss Of Drug Paraph | |

CP-23-MD-0002497-2016     Proc Status: Completed     DC No:     OTN:T8296142
Arrest Dt: 08/17/2016     Disp Date:     Disp Judge:

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 1 | 18 § 3701 §§ A1I | | Robbery-Inflict Serious Bodily Injury | |
| 2 | 18 § 3701 §§ A1II | | Robbery-Threat Immed Ser Injury | |
| 3 | 18 § 3701 §§ A1III | | Robbery-Commit Threat 1st/2nd Deg Fel | |
| 4 | 18 § 3921 §§ A | | Theft By Unlaw Taking-Movable Prop | |
| 5 | 18 § 3925 §§ A | | Receiving Stolen Property | |
| 6 | 18 § 4106 §§ A1II | | Access Device Issd to Another Who Did Not Auth Use | |
| 7 | 18 § 4106 §§ A1 | | Access Device Used To Obt Or Att Obt Prop/Service | |
| 8 | 18 § 4106 §§ A1IV | | Other Reason Access Device Is Unauth By Issuer | |
| 9 | 18 § 2706 §§ A1 | | Terroristic Threats W/ Int To Terrorize Another | |
| 10 | 18 § 3928 §§ A | | Unauth Use Motor/Other Vehicles | |
| 11 | 35 § 780-113 §§ A16 | | Int Poss Contr Subst By Per Not Reg | |
| 12 | 35 § 780-113 §§ A32 | | Use/Poss Of Drug Paraph | |
| 13 | 75 § 3802 §§ A1* | | DUI: Gen Imp/Inc of Driving Safely - 1st Off | |

CPCMS 3541
Printed: 10/7/2016 11:10 AM
Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, the only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense.  In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition is for the offense.

Appendix - 325



**Delaware County Court of Common Pleas**
**Court Summary**

**Supper, Robert** (Continued)
  **Closed** (Continued)
    **Delaware** (Continued)

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 14 | 75 § 3802 §§ A2* | | DUI: Gen Imp (BAC .08 - .10) 1st Off | |
| 15 | 75 § 3802 §§ D1i* | | DUI: Controlled Substance - Schedule 1 - 1st Offense | |
| 16 | 75 § 3323 §§ A | | Intersections Controlled by Signs | |

Printed: 10/7/2016 11:10 AM

CPCMS 3541
Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Appendix 326



**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW**
**ROOM 1116, LABOR & INDUSTRY BUILDING**
**651 BOAS STREET**
**HARRISBURG, PA 17121-0750**

| Phone: 717-787-5122 | www.dli.pa.gov | Fax: 717-787-6125 |
|---|---|---|

## TRANSCRIPT OF TESTIMONY

**CLAIMANT**                    Kathleen M. Jungclaus
                                1129 Mill Road Circle
                                Rydal, PA 19046

**SS NUMBER**                   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

**APPEAL NUMBER**               16-09-F-6840

**DATE OF HEARING**             November 28, 2016 (Telephone)

**PLACE OF HEARING**            Erie, PA

**HEARING BEFORE:**        R    Jennifer Fisher, Referee

**APPEARANCES:**

Claimant                   C    Kathleen M. Jungclaus

Employer's Attorney        EL   Grace M. Deon

Employer Witnesses         EW1  Thomas Garvin
                           EW2  Maria DiPaul

*Auxiliary aids and services are available on request to individuals with disabilities.*
*Equal Opportunity Employer/Program*

BD-67  REV 1-16

Appendix 327

KATHLEEN M. JUNGCLAUS                16-09-F-6840                          1

UF      Good morning, Amy Blessing at Waverly Heights.

R       Good morning, this is Referee Fisher calling for an
        Unemployment hearing scheduled in the claim of Kathleen
        Jungclaus, do I have...
UF      Yes.

R       ...the right number for participation?
UF      You do. I'll transfer you into our conference room. Would
        you bear with me a moment please?

R       Yes ma'am, thank you.
UF      Thank you.
EW1     Hello?

R       Good morning, this is Referee Fisher calling for the
        Unemployment hearing scheduled in the claim of Kathleen
        Jungclaus. Do I have the participants for the Employer on
        the line?
EW1     Sure do, thank you.
EL      Yes...

R       Okay.
EL      ...yes, good morning Referee. This is Grace Deon, counsel
        for Waverly and I have with me Mr. Garvin, who is a
        corporate designee.  I also have one witness that is not in
        the room. I wasn't sure if you wanted me to have her present
        to be sworn at the opening of the hearing, or if you'd like
        me to just wait.

R       Yes ma'am, good morning Attorney Deon. If you would get your
        other witness in the room please, I'll identify everyone on
        the record and swear them in all at the beginning.  I am
        going to put you on hold while I attempt to conference in
        the Claimant.
EL      Okay.

R       If I do happen to disconnect you, I will call you right
        back. I've been having some telephone issues recently, so
        just bear with me here for a few moments and I'll be right
        back with you.
EL      Thank you very much.

R       Thank you.
C       Hello?

R       Good morning, may I please speak with Kathleen Jungclaus?
C       Speaking.

R     Good morning, this is Referee Fisher calling for your
      Unemployment hearing scheduled at 8:30. Are you ready to
      begin ma'am?
C     I am.

R     Okay, hang on one moment while I conference in the Employer.
C     Thank you.

R     Okay, Attorney Deon, do I have the Employer on the line?
EL    Yes.

R     And Ms. Jungclaus, are you on the line as well?
C     I am.

R     All right, thank you. I have a recorder running, we will go
      ahead and get started.  This hearing is the result of Appeal
      Number 16-09-F-6840 filed in the Unemployment Compensation
      claim of Kathleen M. Jungclaus.  Today's hearing is being
      conducted as a telephone hearing from the Erie, Pennsylvania
      Referee's Office.  The date today is November 28th, 2016, and
      the time is now currently 8:35 a.m.  My name is Jennifer
      Fisher. I'm a Pennsylvania Unemployment Compensation Appeals
      Referee.  I've been assigned by the Board of Review to
      conduct today's hearing in order to take testimony and
      evidence regarding the issues. I will then issue a written
      Decision.  Today's proceedings are being recorded and that
      recording will become the Official Record for today's
      hearing.  I'd like to begin by identifying parties
      participating in today's hearing for the record.  Today's
      hearing was scheduled as a telephone hearing for the
      convenience of both parties due to the hearing being held
      from the Erie Referee Office.  I do have both parties on the
      line today. Why don't we start with the Claimant? Ma'am, if
      you would please state your first and your last name and
      spell both for the record.
C     Kathleen Jungclaus, K-A-T-H-L-E-E-N J-U-N-G-C-L-A-U-S.

R     And what's your current mailing address Ms. Jungclaus?
C     1129 Mill Road Circle, Rydal, PA 19046.

R     Thank you, is that where you're currently today ma'am?
C     Yes.

R     And can you confirm that the phone number I reached you at
      is 215-758-2724?
C     That's correct.

R     Do you have any other witnesses or representatives for the
      hearing today besides yourself?
C     I have my husband available by phone if needed.

R     Will he be participating as a witness on your behalf?
C     Yes.

R     Okay and he's not with you today?
C     He had to leave to go to work, but he's available by telephone.

R     Okay, what's your husband's name ma'am?
C     Raymond Jungclaus.

R     Okay. All right, other than your husband potentially being called as a witness, anyone other than yourself and your husband?
C     No.

R     And is there anyone else there in the room with you that will be participating as an observer, simply listening to the hearing?
C     No.

R     Okay, we have the Employer on the line as well, why don't we start with the Employer's counsel. Attorney Deon, if you would please state first and last names and spell both as well.
EL    Yes, this is Grace Deon, D-E-O-N, with the law firm of Eastburn and Gray. I also have with me Thomas Garvin...

R     [inaudible] if you would just pause for one moment, Attorney Deon. If you would spell your first name for the record as well please.
EL    Yes, it's G-R-A-C-E.

R     Thank you and your mailing address for my Decision Attorney Deon?
EL    It's 60 East Court Street, P.O. Box 1389, Doylestown, D-O-Y-L-E-S-T-O-W-N, Pennsylvania 18901.

R     Thank you. And are you currently located at the Employer's facility today Attorney Deon?
EL    Yes I am.

R     All right and can you confront, confirm that the phone number I reached you at is 610-645-8604.
EL    Yes it is.

R     All right, thank you, how many witnesses do you have with you today for the Employer Attorney Deon?
EL    I have two.

R     Any observers in the room?
EL    No.

KATHLEEN M. JUNGCLAUS                16-09-F-6840                          4

R        Okay, why don't we have the first witness please state first
         and last name and spell both names for the record please.
EW1      Sure, it's Thomas Garvin and first name is spelled T-H-O-M-
         A-S, last name G-A-R-V like Victor, I-N.

R        And what's your title with the Employer Mr. Garvin?
EW1      I'm the CEO.

R        And the mailing address for the Employer for my Decision
         please?
EW1      1400 Waverly Road, W-A-V-E-R-L-Y Road, Gladwyne, which is
         spelled G-L-A-D-W-Y-N-E, Pennsylvania 19035.

R        Thank you, next witness?
EW2      Maria DiPaul and that's first spelling is M-A-R-I-A and the
         last is D-I-P-A-U-L.

R        And what's your title with the Employer Ms. DiPaul?
EW2      I'm the Social Worker, I'm the Admissions Coordinator
         [inaudible].

R        Thank you.  Okay, other than those already identified
         Attorney Deon, are there any other witnesses or
         representatives on behalf of the Employer today?
EL       No there are not Referee.

R        All right, thank you, the law requires that all testimony be
         taken under oath, Ms. Jungclaus, Mr. Garvin and Ms. DiPaul,
         if you'd all please raise your right hands for me.

PARTIES DULY SWORN

R        I'd like to remind parties of the rights that they have at
         the hearing today.  All parties have the right to present
         testimony and evidence and call and question witnesses.
         That includes the cross examination of adverse witnesses.
         All parties have the right to be represented by an attorney
         or other advocate, and all parties have the right to object
         to the hearing being conducted as a telephone hearing and
         request an in-person hearing.  Ms. Jungclaus, are you aware
         of your rights at the hearing today?
C        I am.

R        Do you have any objection to the hearing being conducted as
         a telephone hearing?
C        No I don't.

R        Are you aware that today's proceedings are being recorded?
C        Yes.

R    And do you have any objections to that recording?
C    No.

R    Thank you Attorney Deon, is the Employer aware of its rights
     at the hearing today?
EL   Yes, the Employer's aware.

R    Does the Employer have any objection to the hearing being
     conducted as a telephone hearing?
EL   No.

R    Are you aware that today's proceedings are being recorded?
EL   Yes.

R    And do you have any objections to that recording?
EL   No.

R    All right, thank you.  The issue for the hearing today falls
     under Section 402(e) of the Pennsylvania Unemployment
     Compensation Law.  That section of the law deals with
     whether the Claimant's unemployment was due to discharge or
     suspension for willful misconduct connected with the work.
     Now in this case, the Agency issued a Determination that was
     mailed October 25th, 2015 in which they approved benefits
     under 402(e), that was beginning with waiting week ending
     October 8th, 2016.  The Employer filed a Petition for Appeal
     to that Determination, which was received via facsimile on
     October 31st, 2016, making it a timely filed appeal.  The
     documents in the file were pre-circulated to all parties by
     regular U.S. Mail because the hearing today was scheduled as
     a telephone hearing, did you receive that packet of
     documents in the mail Ms. Jungclaus?
C    I did.

R    Did the Employer Attorney Deon?
EL   Yes.

R    All right, for the record, I'm going to identify the file
     exhibits first, we do have some additional documentation
     submitted by the Employer which we'll cover a little bit
     later, but the documentation that you received initially
     would have come in the hearing packet, along with your
     Notice of Hearing if you would like to follow along with me
     while I identify the documents, you're certainly welcome to
     do so.  In the packet that you received most likely there
     was a Notice of Hearing on the top with some accompanying
     information, list of issues, assistance postcard,
     translation document, things of that nature.  Then there
     would be a copy of the Petition for Appeal initiated by the
     Employer followed by a copy of the Determination that's
     under appeal at the hearing today.  Eventually, if you flip

past all of those documents you'll get to a document that at
the top right hand corner is marked Exhibit, Certification
of Documents.  That's where I'm going to begin, that's
Exhibit #1, it is a Certification of Documents form.  The
next page is Exhibit #2, it is an appeal instructions form.
Exhibit #3 is the next two pages, that is an Internet
Initial Claims form, this is the information provided by Ms.
Jungclaus at the time she filed her application for benefits
over the Internet.  4 is a three page document, this is a
Record of Oral Interview, documenting a phone call between
the Claimant and an Agency representative on October 18th,
2016.  5 is a two page Employer Notice of Application, this
appears to be completed by Mr. Garvin on October 11th, 2016.
6 is a photocopy of an envelope.  7 is two pages, a Record
of Oral Interview documenting a phone call between the
Employer and an Agency representative on October 18th, 2016.
8 is a three page Employer Questionnaire, again it appears
to have been completed by Mr. Garvin, signed October 17th,
2016.  9 is a, an email, this is correspondence between the
Employer and it appears to be the Agency on October 18th,
2016.  10 is a three page letter, this is dated September
14th, 2016, addressed to Mr. Garvin.  It is unsigned.  11 is
a three page Waverly Heights policy and procedure document.
The subject is social media policy.  12 is the next 10
pages, appears to be additional Employer policies.  13 is
the next four pages, it appears to be an Internet printout,
what does AA mean.  14 is a company description printout.
15 is a printout of the Claim Record.  16 is going back to
the beginning of the packet, this is the Determination
that's under appeal at the hearing today.  17 is the
Petition for Appeal initiated by the Employer, that's two
pages total.  Also in the file we have the documents that I
marked as Referee documents.  Referee Exhibit #1 is the
Notice of Hearing scheduling today's hearing.  Referee 2 is
correspondence from Attorney Deon entering her appearance on
behalf of the Employer and submitted documentation.  Referee
3 is a document that's entitled important information about
this hearing.  Referee 4 is a packet containing a list of
issues arising in appeals proceedings and assistance
postcard and a translation document.  You should also have a
packet of documents that was pre-circulated in accordance
with telephone hearing regulations, they appear to be a
printout, a number of pages of printout of different tweets
that the Employer has submitted for the hearing today.
We're going to hold off on entering those documents into the
record for now.  The documents I've just identified, those
are the file documents for the hearing today, Ms. Jungclaus,
do you have any objection to any of those documents being
entered into the record?

C       No.

KATHLEEN M. JUNGCLAUS                16-09-F-6840                          7

R      Attorney Deon, do you have any objections?
EL     No.

R      They are entered as marked.  As far as the documentation
       submitted by the Employer, Attorney Deon, you may have
       either your witnesses or Attorney, or Ms. Jungclaus on cross
       lay a foundation or identify those documents for the record
       and offer them for the record at that point in time once
       they've been identified.  As far as the procedure we'll
       follow today, I am going to begin by asking Ms. Jungclaus
       some background questions about her employment with Waverly
       Heights LTD.  After I get that background information on the
       record, we will move to testimony.  Our separation issue
       today falls under Section 402(e) of the Law, that is an
       involuntary separation or a discharge initiated by the
       Employer.  Because the Employer initiated this separation,
       I'll begin with their testimony first today.  At that time,
       Attorney Deon can have each Employer witness offer their
       testimony to explain what happened here, leading to Ms.
       Jungclaus's discharge.  After each Employer witness
       completes their testimony, Ms. Jungclaus will be provided an
       opportunity to cross examine them, meaning she can ask them
       any questions she might have for them about their testimony.
       After that we'll switch and proceed in the reverse, Ms.
       Jungclaus can offer her testimony to explain what happened
       here leading to the discharge from her perspective and
       Attorney Deon will be provided an opportunity to cross
       examine or question her about her testimony.  Also at that
       point in time, Ms. Jungclaus can let me know whether she
       intends to call her husband as a witness, and if so, we can
       have him offer his testimony by telephone and Attorney Deon
       would likewise be provided an opportunity to cross examine
       or question him.  I may ask additional questions of all of
       you as you offer your testimony.  After everyone has
       completed their testimony, we will conclude the hearing, I
       will issue a Decision in writing.  You should receive that
       in the mail within about one to two weeks.  Do you have any
       questions about procedures or anything else at all Ms.
       Jungclaus?
C      No.

R      Attorney Deon, any questions?
EL     May I just have clarification Referee of the Exhibit number
       it's the Record of Oral Interview of the Employer for Thomas
       Garvin, it's a two page document.  I believe it's 6, but I
       may be wrong.

R      That's Exhibit #7.
EL     7, okay, then that's the one I missed, okay and also, the
       letter, the anonymous letter that was referenced which, the
       attached facsimile page.

R       Okay, bear with me one moment.  That's Exhibit #10.  That's
        dated September 14th, 2016, the unsigned letter?
EL      That's correct, thank you.  Okay.

R       All right, any others?
EL      Not at the moment, thank you.

R       Okay, all right, let's get started then Ms. Jungclaus, I
        have a few background questions for you.
C       Okay.

R       The Claim Record shows that you began employment with
        Waverly Heights LTD in April of '97, does that sound about
        right to you?
C       Yes.

R       And it has a last day worked of September 27th of this year.
C       That's correct.

R       What was your position or job title as of September 27th?
C       Vice President of Human Resources.

R       Were you full time at the end?
C       Yes.

R       What was your final rate of pay or salary, roughly is okay
        if you don't know the exact number.
C       About $112,000.

R       All right, thank you, that is all the background questions
        that I have, Attorney Deon, you may go ahead and proceed
        with your first witness whenever you're ready.
EL      Thank you, I'd like to call Thomas Garvin.

R       All right.
EL      Mr. Garvin, can you please state your position with the
        company?
EW1     Sure, I'm the President and CEO.

EL      And if I could ask you what if anything came to your
        attention in mid-September with respect to Ms. Jungclaus and
        her position?
EW1     Well what came to my attention in possibly the third week of
        September was an anonymous letter that was Exhibit 10 I
        think we just discussed, that was about two and a half pages
        long that detailed a, at the end of the day, a tweet that
        went out on Mrs. Jungclaus's Twitter account that raised
        serious questions about her ability to continue to perform
        here at Waverly Heights.

EL      And what specifically gave you concern about the nature of
        the tweet that was associated with Ms. Jungclaus?

EW1     Well, the nature of the tweet being, and I'll just read it.
        It says #realdonaldtrump, I am the VP of HR at a comp
        outside of Philly, an informal survey of our employees shows
        100 percent capital A, capital A employees voting Trump.
        And it was dated 7/24/16.  The concern with that is many,
        one is as a not-for-profit, any political activity is
        strictly prohibited. Number two, the, as the vice president
        of HR, you would never expect something like this to go out
        that's so open and publicly tied to not only her account,
        but linked to ours as a follower, and then finally to
        segment a, segment of our population, capital A, capital A
        clearly in the context that it's written means African
        American and to segment and show that we're doing some kind
        of polling of our African American employees related to
        their political desires is extremely poor judgment on, you
        know, by someone in that position.

EL      And Mr. Garvin, how many employees, approximately, do you
        have at Waverly?

EW1     You know approximately, not including Waverly Care
        Associates, around 280, 290, that's a total of full and part
        time employees.

EL      And do you have a diversified group of employees at Waverly?

EW1     Yes, we have a very diverse group of employees there.

EL      And how about residents?

EW1     Not as diverse as employee population.

EL      And just for the record, what type of facility is Waverly,
        just for the Referee, so she knows.

EW1     Yeah, so we're a continuing care retirement community, we
        provide independent living, assisted living or personal care
        and skilled nursing to approximately a total of 360
        residents live here.

EL      And Referee Fisher, I would like at this time to mark a copy
        of the actual tweet. I believe it was submitted to your
        office and I was going to have Mr. Garvin identify it.

R       Okay, we'll mark, Ms. Jungclaus, you have the additional
        documentation submitted by the Employer in front of you
        there?

C       I do.

R       Okay, we're going to mark that as Employer's Exhibit #1, go
        ahead Attorney Deon.

EL      Yes, Mr. Garvin, if you could please identify what this is.
        Let's see, at the top of the page, it's page four of eight

EL    and at the bottom it's dated 9/19/2016, towards the middle of that page, is that the tweet that you were just referencing in the correspondence that you received anonymously?

EW1    Yes it is.

EL    And from that tweet it, with one looking at a tweet that was sent out be able to identify the name of the individual that was sending it?

EW1    Yes, it's under her name, Kathy Jungclaus.

EL    Okay and is that in fact her same email account that she also utilizes personally?

EW1    It looks like it, kmjungclaus.

EL    Okay.  And for the record, do you know whether there were any privacy settings on Ms. Jungclaus's Twitter account that she was utilizing for sending this?

EW1    It does not appear that there, we, you know, we were able to go on and find the tweet without any issues at all, so no, I would say that no privacy settings were on.

EL    And how about since this occurred, are you aware of whether there are now privacy settings on Ms. Jungclaus's account?

EW1    It appears that the, her, she took her Twitter account down, so it, I don't believe it exists anymore.

EL    Okay.  As the result of reviewing that correspondence, did you have occasion to have a meeting with Ms. Jungclaus on September 19th?

EW1    I did.

EL    Can you tell Referee Fisher what occurred during that initial meeting.

EW1    So Referee, when I received this letter which brought this issue to my attention for the first time, I immediately, within minutes of receiving the letter called Mrs. Jungclaus to my office, I had printed a copy of the letter for her and handed it to her in a manila envelope and said to her, you know, this just came in, you need to go up and immediately take your Twitter account down and remove these tweets.  Her response was, and pretty much the extent of the conversation was about 30 seconds, but her response was am I going to get fired, and my response to that was I just received the letter and I'm processing everything right now. All I know is that you need to go up and take this down immediately. That was the extent of the conversation. She went up to her office and immediately removed the tweet and you know, I assume took her Twitter account down because it disappeared.

KATHLEEN M. JUNGCLAUS                16-09-F-6840                    11

EL    And what concerns, if any, did you have about her judgment
      in posting a tweet of that type

EW1   That is the, one of the major cruxes of our concern is that
      my, when looking at this tweet and knowing that she's the
      vice president of Human Resources, whose sole responsibility
      is to enforce all the policies and procedures related to our
      management of our employees and yeah, it, the judgment it
      shows, it's just an extreme gross lack of good judgment for
      someone in that position.  And we've had to enforce this
      policy on other people and she wrote the social media
      policy, so it's just, really shows very poor decision
      making, poor judgment and unfortunately ended up the way
      that it did.

EL    And at that time when you first met with her, did Ms.
      Jungclaus offer any explanation that someone other than
      herself posted that to her Twitter account?
EW1   Absolutely not.

EL    Did she say that she had been hacked?
EW1   Not in that meeting.

EL    Okay.  Did she, strike that.  What, if anything did you do
      following the meeting with her on September 19th?  With
      respect to this incident.
EW1   Yeah, well with respect to this incident, at that point I
      needed to deal with the negative public relations and the
      fall out that came from this letter and contacted my
      chairman of my board and legal counsel.

EL    Okay [inaudible].  And with respect to Ms. Jungclaus's
      position when she was in charge of HR, would she have
      occasion to investigate matters that may have involved
      African American employees at Waverly?
EW1   Yes, very, very frequently.

EL    Okay and were there also instances where she had to
      recommend disciplinary measures or even termination for
      employees?
EW1   Yes.

EL    And that would have included African American employees.
EW1   Absolutely.

EL    And what concern, if any, did you have about the tone of the
      tweet with how she may then be able to implement her job
      duties as a result, with respect to that population.
EW1   Well the concern was that if this, if our employees, and
      some of them actually had seen it we found out, had any
      issue where Ms. Jungclaus was in a position where she had to
      terminate, participate in terminating or provide advice on

terminating, that this shows that she cannot be impartial to the African American population, or they could easily come back and question her ability to have been impartial in, you know, making a Decision to [inaudible] regarding their employment status with us.

EL   At some point was there a decision made to terminate Ms. Jungclaus?

EW1  Yes there was.

EL   Okay and was the board in favor of that?

EW1  The Human Resources committee of the board voted unanimously in favor of it.

EL   And was that then brought to the full board?

EW1  It has not, well, yes, it has gone to the full board, but the HR committee was the decision-making body.

EL   Okay.

EW1  It subsequently was reported to the full board.

EL   Okay and did you meet with Ms. Jungclaus a second time regarding this incident...

EW1  I did.

EL   ...in September.

EW1  Yes.

EL   Was that on September 30th?

EW1  I believe it was September 27th.

EL   And what, if anything, occurred during that meeting, and who was present at that meeting?

EW1  So present at that meeting was Dick Bauer (phonetic) who's the chairman of our board, he's also the chair of the Human Resources committed, along with myself.

EL   Okay, can you just explain what happened during that meeting?

EW1  Sure, I mean, at that meeting, you know, we had already had the discussions regarding the investigation into what took place and what the outcome was going to be, as far as the status of Ms. Jungclaus's employment with us, so that meeting, the intention of that meeting was to perform the discharge. So that's, we brought Kathy down and let her know why were there and what we were going to discuss and do you want me to go into...

EL   Yup.

EW1  ...into the detail. So we had a rather lengthy discussion during the discharge and I'm trying to handle it gently, but

during the, during the discharge, what happened was that she profusely apologized, asked us for an opportunity to apologize to the board, to the Human Resources committee and an opportunity to apologize to the employees for what she had done.  So it went on for a little while and then about halfway through the meeting, Mrs. Jungclaus then decided all of a sudden to come out with the fact she said she didn't do it, she denied doing it, said somebody else did it, but she was taking responsibility for it and she talked about that for a few minutes, and again, we talked further about everything else you talk about during discharges, including offering her severance to give her credit for all of her years of service here and then at the end again, she was apologizing for what she had done and then actually gave a hug to Dick and to myself and asked us to make sure that she, that we apologized on her behalf to everyone.

EL    And was there an opportunity for her to retrieve her belongings?

EW1   There was.

EL    And did you learn about the removal of her belongings prior to that meeting?

EW1   I did, she had told my assistant, both before the meeting and then during the meeting, had said that she had, began packing her office up because she felt that this was going to happen.

EL    And Mr. Garvin, have you recently received a, or, when I say you, had your counsel received a lengthy, nine page single spaced letter from an attorney on Ms. Jungclaus's behalf?

EW1   Yes we have.

EL    And in that correspondence, is there any mention whatsoever about her husband being the one that posted this tweet on her behalf?

EW1   There is not.

EL    Or I should say that her husband posted the tweet period, is there any mention in that nine page single space letter that that was the excuse and that she should not be terminated because it was her husband?

EW1   Absolutely not.

EL    Okay, when is the first time that you saw the reference to it being her husband that allegedly posted this?

EW1   In the Unemployment, in her response to the Unemployment hearing.

EL    All right, and if I may direct you to Mr. Garvin to Exhibit #7, which was previously identified, that is a recorded, a

|     | |
| --- | --- |
|     | Record of an Oral Interview that you had with someone from the Unemployment Compensation office, is that correct? |
| EW1 | Yes. |
| EL  | Okay.  When you reviewed the typewritten interview here, that you received prior to this hearing, was that an accurate depiction of what you stated during that interview? |
| EW1 | No it is not. |
| EL  | Okay, do you know whether this was recorded? |
| EW1 | I hope so, I don't know. |
| EL  | Okay and why do you hope so? |
| EW1 | Because it's, it's got several very inaccurate statements that... |
| EL  | Okay. |
| EW1 | ...I didn't, did not say. |
| EL  | Okay, without belaboring it, could you just briefly go through so that the Referee knows which points you disagree with in this recorded... |
| EW1 | Sure.  So as, yeah, as you go down, the first one is what is meant by AA and it has me quoted as saying one could read it as African American, Kathleen is not African American, that's the highly offensive part of the tweet.  That is not at all how I would have phrased or how I phrased it, I responded that in the context that it's written, it clearly means African American.  The next question, how do you come to the conclusion that it means African American, just logic, which is not something that I would have said, I would have said that in the context that you read it, that's clearly what it means.  And then the biggest issue I have with this, the way this is written is, questions, well there's a couple things, she went up and removed it when I asked her, she denied that she wrote it and then she apologized for it.  That's not accurate.  And then she, the she told me her husband sent the tweet, she told me that in the middle of discharge, was completely a false statement, I did not say that because that did not happen, and I have a witness to that affect and then the same thing on the next page where it says yes, or I'm sorry, where the question is did the Claimant explain that it was her husband who used her account to write the tweet and not the Claimant herself and her husband is also the vice president of HR for a small company near Philly, it has my answer as yes, during the process of discharge, that is completely false statement and I did not say that, because that did not happen.  And that, that's just [inaudible]... |

EL      Okay, if I may just review my notes, Referee Fisher, I may
        just about be done with this witness, just if you can give
        me one moment.

R       Yes, take your time.

EL      Mr. Garvin, did Ms. Jungclaus at any time every make
        complaints to you of discrimination or harassment on her own
        behalf?

EW1     No.

EL      Did she ever make any of those complaints to anyone else to
        the best of your knowledge?

EW1     No.

EL      And with respect to the reference in the tweet to Ms.
        Jungclaus's polling different employees at the workplace, do
        you have any information to that effect, that she was in
        fact engaging in that behavior?

EW1     The information I got was after the fact, where it was
        reported to me by our vice president of health care services
        that one of her employees had come to her and said that she
        had indicated that she was indeed asking employees who they
        were voting for.

EL      And let me, I think I'm just about done, let me just see.  I
        have nothing further for this witness.

R       Okay, I just want to follow up briefly Mr. Garvin.  You
        referenced the social media policy, it's been entered into
        the record at Exhibit #11, can you tell me in a nutshell
        what that policy prohibits that was in play here.

EW1     So the social media policy, yeah, if I pull out the sections
        that are the, have the issue, is under the policy statement,
        Waverly Heights has an interest in promoting and protecting
        its reputation, as well as the dignity, respect, and
        confidentiality of its residents, clients and employees as
        depicted in social media.  Whether it's a Waverly Heights
        own postings or that of others.  And I'll jump down, also
        Waverly Heights expects employees to identify themselves
        with Waverly Heights in either internal or external social
        media, to conduct themselves according to this policy.  And
        then if you go down to number two under respect.  And I'll
        start reading, well I'll just read it, postings will be
        respectful and uphold the dignity and reputation of
        residents, clients, employees, vendors and contractors.
        Waverly Heights and all those associated with the company,
        comments, comments should add value to the discussion
        respecting the different and differing opinion of others and
        avoid inflammatory debates or negative assessments.  And
        then, you know, if I back back up under integrity, number
        one, postings will reflect the, and emphasize the highest

moral principles and professional standards of conduct and content, accuracy and truth, truthfulness are expected.

R     Okay, you also referenced earlier that as a non-profit political activity was strictly prohibited, is that from your policies or where, what are you referencing when you made that statement?

EW1     So yeah, a non-profit 501(c)(3) organizations are not permitted by law to participate any political activity, it's referenced on the 990 tax return and it's very much part of the, I guess it's the IRS code to be honest with you.  So we do not do any political activity, we don't allow our residents to, we don't allow our, or I shouldn't say our residents, they can do personally what they want, but as a matter of practice, no not-for-profit can allow political activity to happen within its, you know, within its domain.

R     Okay, now the reference to AA and the tweet that was in question here, did you ever specifically discuss that with Ms. Jungclaus, was that ever referenced specifically during your two conversations with her?

EW1     I, well, in the first conversations like I said, it was a very quick, showed her the letter, showed her the tweet, the letter explains that it's, that they believe it's African American, you know again, in the context it was written clearly it is, in the discharge, we absolutely discussed that it meant African American.

R     And did she ever deny that at the time you discussed it with her?

EW1     No.  And subsequently like I said, I had some staff who are African American come forward saying that they were highly offended and upset when they saw that, when they had seen that.

R     Okay, all right, Attorney Deon, any other questions for Mr. Garvin based on mine?

EL     Just Mr. Garvin, the fact that there was a private Twitter account utilized, did that change your mind at all in terms of the conduct that was going on here?

EW1     It did not because of the fact that it was linked directly to our, to the Waverly Heights as a follower, so anyone could easily you know, pull that, pull that string up, that string of Twitters, or tweets if you will, up by going through our, the Waverly Heights Twitter account, which Kathy Jungclaus was a follower on, and all of her tweets were public and not protected, so the fact it was her private account really didn't, didn't make a difference the fact that it was accessible as evidence and the person who saw it with the letter and the multiple staff that came forward after the fact saying that they actually had seen

it, that's, it didn't come into the decision that it was a private Twitter account.

EL     And what significance, if any, was it that in the tweet it stated that Ms. Jungclaus was a VP of HR in a company outside Philadelphia.

EW1    Well since the Twitter account was under her name, you know, an easy Google search if you will, could, would show that vice president of HR, Philadelphia, the Twitter's under her name, Kathy Jungclaus, people could easily make the connection that she was our vice president of HR, therefore, damaging our reputation with a lot of our potential constituents, not to mention our employees.

EL     Thank you, I have nothing further.

R      All right, Ms. Jungclaus, do you have any questions for Mr. Garvin?

C      I do.

R      Go ahead.

C      The posting was posted off of work time, so I have a question Tom, you stated that at no time did you, did I mention that my husband posted the Twitter, the twit, the tweet on my Twitter page.  During my termination meeting, I had a discussion with you about my husband posting the Twitter page and what was your comment back to me, do you recall?

EW1    Kathy, you never said that your husband posted that tweet during the interview.  Dick Bauer and I were both there, that conversation didn't take place, in fact, what exactly happened was you looked up all of a sudden and said I didn't do it, somebody else did it but I'm not going to say who and you had a very, like you came to an epiphany that you were going to blame it on somebody else, but you never said who, and I have, you know, witnesses for that.

C      Well you have Dick Bauer, who's a witness, but okay, here's my question, at what point did you ever ask me directly what AA meant?

EW1    I'm sorry, what was that again?

C      When did you ever ask me directly what AA meant?

EW1    Well I didn't ask you directly, like I say...

C      Right, okay, so, thank you, you never asked me directly...

EL     Excuse me, excuse me Referee...

C      Thank you very much.

EL     ...may my witness finish his answer?

EW1    Yeah, so in the first meeting...

R     Yes, hang on, yes...

EL    [inaudible].

R     Yes, Ms. Jungclaus, we're going to allow Mr. Garvin to finish his...

EL    [inaudible].

R     ...answer before we move on to the next question.

C     Okay.

EW1   Yeah, in the initial meeting that we had where I brought it to her attention, you know, again, I showed her the letter, you know.  There was not a discussion about the specific meaning of AA, it was very clear what it meant, both between the letter and Kathy's lack of denial of it, so there's the answer to your question Kathy.

C     Okay, so the first meeting that we had when I was initially called down and you handed me the manila folder, it was not a 30 second meeting, it was more like a 10 minute meeting where we had a discussion and...

R     Well you have to phrase that as a question Ms. Jungclaus, you'll get your chance to respond with your own testimony where you can offer me your version...

C     Okay.

R     ...right now it's just question for Mr. Garvin, Mr. Garvin...

C     I understand.

R     ...could it have been possible it was closer to 10 minutes?

EW1   No.

C     I'm sorry?

R     I was framing your statement as a question for Mr. Garvin and I was asking him if that initial meeting where he handed you the manila envelope, was it possible that was closer to 10 minutes.

EW1   And the answer's no.

C     Was it possible Mr. Garvin that you told me that you told me after I asked you if I could lose my job that you stated to me I will not let that happen.

EW1   No.

C     I have no further questions when someone lies under oath.

R     Ma'am, that's not necessary.

EL    Objection.   **Appendix 345**

KATHLEEN M. JUNGCLAUS               16-09-F-6840                          19

R       Sustain the objection.
C       Thank you.  [inaudible]...

R       All right, Attorney Deon, anything further for Mr. Garvin?
EL      No.

R       All right...
EL      Thank you Your Honor.

R       You're welcome.  Testimony from Ms. DiPaul, Attorney Deon?
EL      Yes.

R       Go ahead when you're ready.
EL      Ms. DiPaul, you stated before that you are, what is your
        position, remind me please, Social Worker?
EW2     In Skilled Nursing Facility.

EL      Okay.  And was Kathy Jungclaus an employee that you
        interacted with during the time that she was employed by
        Waverly?
EW2     Yes.

EL      Okay, how often would the two of you have contact?
EW2     [inaudible] you know, we saw each other, we talked.

EL      Okay, was there an occasion that you had a conversation with
        Ms. Jungclaus regarding the taking of a poll of employees at
        Waverly concerning their political, political affiliation or
        should I say preferences, their political preferences with
        respect to the presidential race?
EW2     The conversation was that Kathy asked, told me that she
        asked employees who they were working for, excuse me, who
        they were voting for, employees that I do not know, who are
        you voting for, she said that she responded Trump and that
        the employee said I would have taken you for Hillary, but it
        wasn't necessarily that she told me she was conducting any
        polls, it was just a conversation that she had shared.

EL      Okay, I have nothing further.

R       All right, Ms. Jungclaus, do you have any questions for Ms.
        DiPaul?
C       Maria, is it possible that you have that, that flip-flopped?
        As in...
EL      Objection, I don't understand the question.

C       Is it possible that the employee asked me first who I was
        voting for and that you're recalling incorrectly?
EW2     From what I recall of the conversation no, but, no.

C       Is it possible?

Appendix 346

EL     Objection, asked and answered.

R      Sustained.  Any other questions Ms. Jungclaus?
C      No, no more questions.

R      Any other questions for Ms. DiPaul, Attorney Deon?
EL     No Referee, and may I excuse Ms. DiPaul?

R      Yes ma'am, that's fine, Ms. Jungclaus, do you have any
       further need for testimony from Ms. DiPaul?
C      No.

R      Okay, thank you Ms. DiPaul.
EW2    Thank you.

R      Okay...
EL     For the record Referee, she is exiting the room and...

R      Thank you, noted for the record, Attorney Deon, are you
       offering Employer's 1 for the record at this point in time?
EL     Yes I am.

R      Okay Ms. Jungclaus, do you have copies of Employer 1, that's
       the copies, the printouts of the tweets, any objection to
       those being entered today?
C      No.

R      E1 is entered, anything further from the Employer Attorney
       Deon?
EL     No.

R      Okay, let's move to the Claimant, Ms. Jungclaus, you've
       heard the Employer's testimony, tell me from your
       perspective what happened here?
C      On September 19th I was called down to Tom Garvin's office.
       I had previously met with him about an hour beforehand over
       some other employee related issues, and he called me
       downstairs and he handed me a manila, closed the door and
       handed me a manila folder and he said listen, you're going
       to be really upset about this.  You're going to be upset and
       I just want you to sit down and you know, read through it
       and then we're going to talk about it.  He told me he meant
       to give it to me earlier, but he had neglected to.  So I sat
       down, I opened the manila folder and it was this anonymous
       letter and Tom was talking to me the entire time and I
       specifically said to him I'm not actually reading this right
       now so I'm not absorbing it and he said well basically it's
       about this tweet that's on your Twitter page.  And I looked
       at the tweet and I said yes, it's on my Twitter page and he
       said I need you to take it down and I said that's no
       problem, I will immediately take it down.  And I said oh my

god, this is like a horrible letter, I was so taken aback by the letter that I wasn't actually thinking about what the context of the letter, so I said to Tom, oh my gosh, could I lose my job over this and he said I will make sure that that doesn't happen, those were his exact words.  We talked a little bit more and I got up to leave, and he said listen, I don't want you to worry about this, he presented it more as a nuisance than anything else, it was an anonymous letter, anonymous letters get written all the time by residents about all kinds of things, so he was leaving to go to the Ziegler conference in Florida, that was Wednesday, Thursday, and Friday.  On Monday I tried to see him on four separate occasions and all four times I was turned away by his administrative assistant.  On Tuesday, I went to see him first thing in the morning and then as the risk manager, I had fire drills all afternoon.  So I had no opportunity to see him again.  At 3:00 on Tuesday afternoon, the 27th, I got called down and Dick Bauer, the chairman of the board, and Tom Garvin were present, at which time they told me I was being terminated for violating the social media policy.  I, I was shocked, I was dumbfounded and I was hysterical crying.  And I know that Tom talked about, in his testimony, that I apologized. I had no understanding of what I was even saying in that meeting.  I also prayed to Our Father and asked for strength in front of the two of them, but I didn't see that as part of their testimony.  I tried to explain to Tom after he fired me, that I did not write the tweet. It was not to save my job. It was the truth and he said really Kathy, we're going to go there now, so I knew that there was no place to go with him and I, so I just, I didn't even bother. What was the point? He had made up his mind, and then he told me that they were going to offer me a separation agreement if I agreed to resign my job and that there were two people upstairs waiting to pack up my office. So I said to him, so this is, you're, I offered to resign my job. I offered all kinds of things. I said suspend me, you know, let me go to some kind of a training, you know. Suspend me. Let me talk to the board.  He told me that it was a unanimous decision by the Human Resource committee and the full board of trustees that I was being terminated, and I asked for an opportunity to speak to the board of trustees and I was refused.  They [inaudible] he reports to. I had no other avenue to go to. I was so hysterical in that meeting, that he asked me if I needed a nurse.  I mean, I, when he says that I apologized, I have no idea what I was even saying.  The tweet is innocuous.  It doesn't identify me anywhere of being on, an employee of Waverly Heights.  In any of these Twitter pages, there is no reference or anything to Waverly Heights, and the employee, Exhibit #1, if you look through those eight pages, there is not one reference to my being an employee of Waverly Heights. It

doesn't say where I work. It doesn't say anything.  The
tweet is not an offensive tweet. It doesn't talk about
anybody and I'd like to know if there was an investigation
done into whether or not I actually did take a poll because
I didn't take any kind of a poll, informal or formal.  My
husband posted the tweet and if you look on the Twitter
page, there are two other tweets at least that he posted on
my name, in my name, because he didn't have his own Twitter
account.  There was nothing in there that was offensive or
identified me in any way.  I was a follower of Waverly
Heights. A follower does not mean that everything that you
post automatically goes to the Waverly Heights webpage.  If
it had gone to the Waverly Heights, then I could understand
him having an issue with it, but it was my personal web, my
personal Twitter page.  I have a right to free speech, I
have a right to have a political opinion and I was fired
through no fault of my own.  I didn't deliberately or
willfully or knowingly violate any policy.

R        Okay, anything else at all Ms. Jungclaus?
C        No.

R        Attorney Deon, do you have questions for Ms. Jungclaus?
EL       Yes.

R        Okay, go ahead.
EL       Ms. Jungclaus, you agree that the tweet does reference the
         fact that the individual posting it is a VP of HR in a
         company outside of Philadelphia, correct?
C        My husband is a VP of HR in a company outside of
         Philadelphia.

EL       You agree that it states that in the actual tweet posting
         under your name.
C        Yes.

EL       And it's extremely easy with LinkedIn or Google or anything
         else for an individual to immediately find out which company
         you work with, do you deny that?
C        That would take a lot of research.  I am nowhere identified
         as the VP of HR except for the Waverly page. I don't
         identify myself anywhere as the VP of HR for Waverly
         Heights.

EL       And when you say difficult, or strike that, your husband
         doesn't have his own Twitter page, is there something
         difficult about someone obtaining a Twitter page?
C        He just didn't have one.  I know a lot of couples...

EL       Okay.
                          **Appendix 349**

C       ...that share a Twitter page, share a Facebook page, share different accounts, share email accounts, it's not unusual.

EL      Did you monitor what he was posting under your name?
C       No.

EL      And is that, in your mind, good judgment given the fact that you are linked in to Waverly, your Employer?
C       I'm not linked into Waverly. I am a follower of Waverly, which means that I can see what they post. Waverly cannot see what I post in any way, shape or form. Someone would have to leave the Waverly webpage and go to my personal Twitter page, which I have a right to have, and see my postings.

EL      And that's something that's unsecured so anyone in the public can in fact do that unless you have security settings, correct?
C       I have security settings so that only people that were, that followed me could see their, see my postings.

EL      And you're testifying that that's not something new in terms of having security on your Twitter page?
C       I don't have a Twitter page anymore.

EL      Fine. You don't dispute though that there are other tweets that you in fact utilized on the Twitter page that's the subject matter of this, of this proceeding. There's a July 18th entry [inaudible]...
C       Nothing on, excuse me, nothing on that Twitter page identifies me as an employee of Waverly Heights. There's no reference to Waverly Heights. The social media policy states that you, if you, if you post something to the Waverly Heights webpage, you have to identify yourself. I was not posting to the Waverly Heights Twitter page. I have a right to political free speech and that's what I was exercising. I did not post that tweet. There's nothing offensive about that tweet. It doesn't identify the group and the AA does not mean African American, but no one ever even asked me.

EL      And what did it mean?
C       Well that's what I'd like you to ask my husband.

EL      Well you haven't asked your husband in these number of months you've lost your job over this and you've never asked your husband...
C       I have asked my husband. But I would like for, I would like for him to testify for himself.

EL      Referee Fisher, may I have the witness answer the question.

R       Yes ma'am, please answer the question. What has your husband told you that AA stands for?

C       Administrative Assistant.

EL      So, strike that, so how about just the concept, you find nothing wrong with there, with there being a reference of a VP of HR conducting surveys in the workplace about people's political affiliations, you feel there's nothing inappropriate about that?

C       It was an, I, what the tweet says is an informal survey.

EL      Whatever the informal may be, you are as an HR professional director, you feel that it would be appropriate for an individual to be doing that in the workplace?

C       I don't believe that my husband did a survey and I certainly didn't.  And...

EL      [inaudible]...

C       ...we're talking about me.  I never, I never questioned a single employee about their political, who they were voting for.

EL      [inaudible].

C       I object to Maria DiPaul's testimony, that is not what I told her and I never once asked a single employee who they were voting for.

EL      Okay, [inaudible] the question I did was ask about you, you as...

C       Yes.  I ask a...

EL      ...a professional [inaudible]...

C       ...professional would never poll informally or formally any employee about whether or not they, who they were voting for.  I never did it and I never would.

EL      Okay, Ms. Jungclaus that wasn't my question, if you'd let me finish my question, as an HR professional you'd agree with me that that would be poor judgment to do so by polling employees in the workplace about political affiliation.

C       [inaudible] never did do it...

EL      It's not whether you did or didn't do it.  Would that be inappropriate in your mind, as an HR professional to do that?

C       I'm stating that for myself, yes, it's inappropriate.

EL      Okay.

C       In my position.

EL     And you do agree that the nine page single space letter from
       your counsel, at no point in any word in there said that
       your husband committed this act for which you're being
       terminated.

C      I'll let my...

EL     [inaudible].

C      ...attorney speak for himself.

EL     No, you, Ms. Jungclaus, are you familiar with the nine page
       single space letter that your attorney sent [inaudible]?

C      Yes, I am.

EL     And you're under oath, so let's keep that in mind.

C      I understand that.

EL     Would you please tell me whether the word your husband
       having any affiliation, or even the word husband appears in
       those nine pages of explanation as to why you were
       improperly terminated?

C      My attorney didn't think it was necessary to put that in.

EL     I just have to look at my notes Referee Fisher, may I just
       have a moment?

R      Yes.

EL     And Ms. Jungclaus, just, you did reference I believe that
       during that termination meeting, my client did ask whether
       you needed medical attention.  They were not just, they were
       concerned about your well-being at that moment.

C      I was hyperventilating and he asked me if I needed a nurse,
       yes.

EL     Okay and they also asked you if you needed a vehicle to get
       home and a ride home because they were concerned about your
       well-being.

C      Yes because I was hysterical crying.

EL     Okay.  Thank you, I have nothing further.

R      Okay, Ms. Jungclaus, anything further at all from yourself
       ma'am?

C      For testimony or a closing statement?

R      For testimony.

C      No.

R      Okay.  Do you want to have testimony from your husband
       ma'am?

C      No, I don't think it's necessary.

R     Okay, all right, so you're resting at this point in time?
C     Yes.

R     Thank you, Attorney Deon, anything by way of new additional
      testimony or evidence from the Employer?
EL    No, thank you.

R     Okay, we will conclude the hearing at this point in time.  I
      will allow both parties to make a brief closing argument if
      they'd like to just summarize their position today, it's not
      necessary but you can if you like.  Because the Employer
      bears the burden today, they can go last. Ms. Jungclaus,
      would you like to state anything in closing today?
C     Yes, I was fired over a knee jerk reaction to an anonymous
      letter, and speculation over what the meaning of the tweet
      was.  There was no investigation and I was lied to in the
      dismissal meeting when I was asked, when I was, asked to
      meet with the board of trustees who Tom reports to to
      discuss the situation.  I was told it was a unanimous
      decision by the board. The board didn't find out about my
      termination until they received a letter dated the day after
      my termination.  I was fired through no fault of my own.  I
      didn't violate a policy, blatantly, knowingly, or willfully.

R     All right, thank you, Attorney Deon, anything in closing?
EL    Yes.  With respect to the tweet that was posted, I am in
      agreement certainly that what private individuals do on
      their private time is permissible, however, when there is a
      social media post which has the ability to be accessed
      outside of the group intended and without the proper privacy
      settings, it can in fact wind up in the public arena, which
      is what occurred here, so that others can have access to it,
      that is extremely problematic.  And that is the reason why
      professionals take great concern in what they post, who has
      access to what they can post, monitoring of what is posted,
      there were clearly links here, there is a reference to the
      person Kathy Jungclaus being a VP of HR in a company outside
      of Philadelphia, that is a very simple Google search to link
      her to Waverly, in fact others were able to do so.  The
      nature of the tweet does suggest some type of workplace
      survey, which is inappropriate from a HR standpoint. Ms.
      Jungclaus even admitted that, and for anyone to say that AA
      stands for administrative assistant I think is highly
      unusual to even make such an argument.  There was even
      something submitted by Ms. Jungclaus herself, which
      Alcoholics Anonymous was one of the top things and AA is
      slang for African American, I believe that was something she
      even submitted in this proceeding.  So to say that that
      doesn't stand for a particular population of individuals I
      think is not accurate.

C       Excuse me, I did not submit that, that was submitted by the
        Employer.

R       Okay.  That's...
EW1     [inaudible].
EL      Well that's not our, that's not our understanding, maybe
        it's something from the UC center...

R       That's fine, noted for the record.
EL      Okay.  But even so, I would ask that traditional notice be
        taken of that document in terms of the meaning and it wasn't
        only a violation of the social media policy, Mr. Garvin
        referenced that what occurred here gave him great concern,
        as did the members of the board and the personnel committee,
        for the type of judgment that Ms. Jungclaus had utilized.
        Also, we stand by the fact that at no time did she say her
        husband did it. Mr. Garvin first learned that when he
        received the UC records where that is the argument that Ms.
        Jungclaus raises throughout those papers, which incidentally
        were not even raised in a nine page single space letter by
        her attorney two weeks ago as the basis for her wrongful
        termination, which is, again, very odd and strange.
        However, we stand by that there was a lack of judgment, one
        that a director level of an organization of this size
        certainly Mr. Garvin did not have a level of comfort, nor
        did the board in terms of keeping her on in her position.  I
        would ask that there be a finding in favor of the Employer
        for, for them, thank you.

R       Thank you, we will conclude the hearing at this point and
        time.  I will review the testimony and evidence that's been
        presented, apply the law to the facts in this case and issue
        a written Decision.  Like I said, you should receive that in
        the mail within about one to two weeks.  The time is 9:33
        a.m. and the record for this hearing is closed, thank you
        all for participating today.
C       Thank you.

R       You're welcome, bye-bye.
C       Bye-bye.


        I hereby certify that, to the best of my ability, the
        foregoing is an accurate transcript of the testimony given
        in the hearing held by the Referee in conjunction with the
        above captioned case.

        _____

        Joy Bearley, Transcriber
        DIAZ TRANSCRIPTION SERVICES
        December 21, 2016

**UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW**
Department of Labor & Industry
Commonwealth of Pennsylvania



APPEAL NUMBER  16-09-F-6840
DATE MAILED  11/29/2016
**FINAL DATE
TO APPEAL  12/14/2016**
SSN  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

# REFEREE'S DECISION/ORDER

CLAIMANT

KATHLEEN M JUNGCLAUS
1129 MILL ROAD CIRCLE
RYDAL PA  19046
US

EMPLOYER

WAVERLY HEIGHTS LTD
1400 WAVERLY ROAD
GLADWYNE PA 19035
US

**CLAIM:**

FILED:  10/2/2016

DETERMINATION/S ISSUED:  10/25/2016   BY:  LANCASTER UC SERVICE CENTER

    CLAIMANT DETERMINED UNDER UC LAW:  Eligible   402(e)

    FOR WAITING WEEK ENDING:  10/8/2016

    FOR COMPENSABLE WEEK/S ENDING:

**APPEAL:**

FILED:  10/31/2016   BY:  Employer

HEARING HELD:  11/28/2016   IN:  ERIE, PA

    ATTENDED BY:  Claimant, Employer, Employer's Attorney

**ENCLOSURE:**  A translation document UC-1627 is enclosed with this notice.

**FINDINGS OF FACT:**

1. The claimant was employed with Waverly Heights LTD as the vice president of human resources, full-time, at a final annual salary of approximately $112,000, from April 1997, until September 27, 2016, her last day of work.

2. The employer operates a continuing care retirement living community, which employs slightly less than 300 full-time and part-time employees, and houses approximately 360 residents.

3. The employer has a Social Media Policy, which states, "WHL has an interest in promoting and protecting its reputation as well as the dignity, respect, and confidentiality of its residents, clients, and employees as depicted in social media, whether through WHL's own postings or that of others.

UC-59 REV 5-09

Claimant — KATHLEEN M JUNGCLAUS                                    Appeal — 16-09-F-6840

Towards this end, WHL will actively manage the content of its social media sites to uphold the mission and values of the company. Also, WHL expects employees who identify themselves with WHL in either internal or external social media to conduct themselves according to this policy."

4. Also included in the policy, employees' postings are to reflect the highest moral principles and professional standards of conduct and content, as well as be respectful and uphold the dignity and reputation of residents, clients, employees, vendors, and contractors, WHL and all those associated with the company.

5. The Social Media Policy warns employees that communications via social media should never be considered to be private.

6. The claimant, in her position as vice president of human resources, assisted in creating the employer's Social Media Policy, and was therefore aware of the policy.

7. Sometime on or about September 19, 2016, the employer received an anonymous letter complaining about a "tweet" on the claimant's personal Twitter account.

8. In the claimant's Twitter account, she "followed" the employer's Twitter account and also that of "realDonaldTrump."

9. The claimant's Twitter account was listed under the name "Kathy Jungclaus," and linked to the claimant's personal email, @kmjungclaus.

10. The claimant made a posting on or about July 24, 2016, on her Twitter account that read, "@realDonaldTrump, I am the VP of HR in a comp outside of philly, an informal survey of our employees shows 100% AA employees voting Trump!"

11. AA in the claimant's tweet stands for African American.

12. The president of the company met with the claimant on or about September 19, 2016, as soon as he became aware of the situation.

13. The claimant did not deny making the tweet and confirmed that it was on her Twitter account.

14. The claimant immediately removed the tweet and closed her Twitter account.

15. On September 27, 2016, the employer again met with the claimant regarding the situation.

16. During that meeting, the claimant apologized profusely for the inappropriate tweet and attempted to save her job.

17. The claimant did not deny that "AA" was short for "African American."

18. Approximately halfway through the lengthy meeting on September 27, 2016, the claimant made the allegation for the first time that someone else had made the posting on her Twitter account, but did not disclose who had made the posting.

19. The claimant was discharged effective September 27, 2016, due to using poor judgment given her position with the employer in posting the tweet and also for violation of the employer's Social Media Policy.

**ISSUE**:  Whether the claimant was discharged for willful misconduct in connection with the work.

**REASONING**:

Section 402 of the Pennsylvania Unemployment Compensation Law provides in relevant part as follows:

Appendix 356

Claimant — KATHLEEN M JUNGCLAUS                    Appeal — 16-09-F-6840

An employe shall be ineligible for compensation for any week --

> (e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work.

While the term "willful misconduct" is not defined in the Act, the Pennsylvania Courts in numerous decisions have defined willful misconduct as an act of wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of standards of behavior which an employer has a right to expect of an employee, or negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations to the employer.

Under Section 402(e) of the Law, the burden is on the employer to establish that the claimant's discharge from employment was for reasons which rise to the level of willful misconduct.

The Pennsylvania Courts have consistently held that the deliberate violation of an employer's policies or rules will generally constitute willful misconduct in connection with the work, provided the employer provides competent evidence to establish the existence of its policy and the fact of its violation. Once the employer has proven both the existence of its policy and the fact of its violation, the burden then shifts to the claimant to establish either good cause for violating the employer's policy and/or that the policy is unreasonable, or that the policy is not fairly enforced or uniformly applied.

In the instant case, the Referee resolves issues of credibility in favor of the employer. The Referee does not find credible the claimant's assertions that her husband made the posting on her Twitter account, and does not find credible that "AA" stands for "administrative assistants." The claimant's behavior not only violated the employer's Social Media Policy, but also fell below the standards of behavior the employer had the right to expect. The claimant clearly indicated in the tweet that she had conducted an "informal survey" of the employees in her facility regarding their political preferences in relation to the ongoing presidential race. Such conduct, in and of itself, was inappropriate; however, the claimant's tweet of that inappropriate conduct elevates the situation to a further level of misconduct. Therefore, the employer has met its burden, and benefits are denied in accordance with the provisions of Section 402(e) of the Law.

**ORDER:**   The determination of the Unemployment Compensation Service Center is **REVERSED**. The claimant is **INELIGIBLE** for benefits under Section 402(e) of the Unemployment Compensation Law for waiting week ending October 8, 2016.

Jennifer Fisher, Referee

cgh - 9115

Appendix 357

Claimant — KATHLEEN M JUNGCLAUS                              Appeal — 16-09-F-6840

Pursuant to the provisions of the Law, this referee decision shall become final on the date it was mailed to the parties, unless any aggrieved party files a further appeal to the Pennsylvania Unemployment Compensation Board of Review within the fifteen (15) day appeal period.

**THE LAST DATE TO FILE AN APPEAL TO THIS DECISION IS 12/14/2016**

**IF YOU WISH TO FILE A FURTHER APPEAL**

You have the right to file a further appeal to this decision within fifteen (15) days of the date of mailing. Your appeal must include the following information: ▶your name; ▶the claimant's name and social security number; ▶the date of the decision being appealed; ▶the reason for appeal; ▶the appeal number; ▶your address. Under the provisions of Act 5 of 2005, you may file your own appeal, or your appeal may be filed by an attorney or by any other advocate of your choice.

You may file your appeal by mail. If you file your appeal by mail, the appeal is filed as of the date of the U.S. Postal Service postmark or a U.S. Postal Service form 3817 (Certificate of Mailing) or a U.S. Postal Service certified mail receipt. If there is no U.S. Postal Service postmark, the date of filing will be the date of a postage meter mark on the envelope containing the appeal. If the appeal contains neither a postmark nor a postage meter mark, the date of filing will be the date recorded by the Department when the appeal is received. Your appeal should be mailed to the following address:

**Department of Labor & Industry**
**UC Board of Review, Room 1119**
**651 Boas Street**
**Harrisburg, PA 17121**

**You may file your appeal by common carrier.** If you file your appeal by common carrier, the appeal is filed on the date it is delivered to the common carrier as established by the records of the common carrier. You should use the above address to send your appeal by common carrier.

**You may file your appeal by fax.** If you file your appeal by fax, it must be received by the Department by 11:59 p.m. on the last day to appeal. The filing date will be determined by the date of receipt imprinted by the receiving fax machine. If there is no receipt date imprinted by the receiving fax machine, the sender's fax banner will control the date of filing. If neither date appears on the fax, the date of receipt recorded by the Department will serve as the date of filing. Your appeal should be **faxed** to the following number:

**717-346-4484**

**NOTE:** A party filing an appeal by fax is responsible for delay, disruption or interruption of electronic signals and readability of the document and accepts the risk that the appeal may not be properly or timely filed.

**You may file your appeal via electronic mail (email).** If you file your appeal by email, the appeal is filed on the date of receipt recorded by the Department's electronic transmission system. If you wish to file your appeal by email, forward your appeal information to the Department at:

**UCBoardAppeals@pa.gov**

Appendix 358

Claimant — KATHLEEN M JUNGCLAUS                    Appeal — 16-09-F-6840

**WARNING:** Information submitted by email is not secure.

**NOTE:** A party filing an appeal via the internet or electronic mail is responsible for using the proper format and for delay, disruption or interruption of electronic signals and readability of the document and accepts the risk that the appeal may not be properly or timely filed.

If you wish to file your appeal **in person**, you may do so at any CareerLink office during normal business hours on or before the last day to appeal shown above. The CareerLink office will forward your appeal to the UC Board of Review for processing.

*Auxiliary aids and services are available upon request to individuals with disabilities.*
*Equal Opportunity Employer/Program*

Claimant — KATHLEEN M JUNGCLAUS                    Appeal — 16-09-F-6840

## ADDITIONAL INTERESTED PARTIES OR APPEARANCES AT HEARING

Employer's Attorney

GRACE M DEON ESQ
60 E COURT ST PO BOX 1389
DOYLESTOWN PA    18901
US

WAVERLY HEIGHTS LTD
1400 WAVERLY ROAD
GLADWYNE PA 19035

EEOC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other Information before completing this form.

Charge Presented to:    Agency(ies) Charge No(s):

___ FEPA

_X_ EEOC 530 2017-00958

Pennsylvania Human Relations Commission

*State or local Agency, if any*

| Name (indicate Mr. Ms. Mrs.) Ms. Kathleen M. Jungclaus | Home Phone (Incl. Area Code) 215 630-3094 | Date of Birth 12/09/1960 |
|---|---|---|

Street Address    1129 Mill Road Circle, Rydal, PA 19046    City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name Waverly Heights LTD | No. Employees, Members Approx. 560 (310 full time) | Phone No. (Include Area Code) 610 645-8600 |
|---|---|---|

1400 Waverly Road, Gladwyne, PA 19035

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

Street Address    City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

__ RACE __ COLOR _x_ SEX __ RELIGION __ NATIONAL ORIGIN

_x_ RETALIATION _x_ AGE __ DISABILITY __ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 2015    Latest 9/27/2016

_x_ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attached extra sheet(s)):

I have been discriminated against by virtue of being female, by male CEO Thomas Garvin who has been supported by a Board of Trustees that upholds one set of standards for females and another for males. After serving as the HR Manager for almost 20 years, I was fired on September 27, 2016 purportedly for violation of the Waverly "Social Media Policy". In point of fact, I did nothing of the kind. This should be contrasted with a board member's actually using Waverly email to communicate racist "birther" criticism of President Obama. I have been subjected to an illegal, sexist environment as well as age discrimination which culminated in my firing. Further, I have been retaliated against as a result of my sex and sexual orientation and as a result of my standing up for my rights and the rights of other females. Mr. Garvin and the Board have created and maintained an illegal and hostile working environment when it comes to me, other females and those over 40. I have been replaced by a younger candidate.

See attached summary provided to the Board of Waverly Heights, Ltd.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

I declare under penalty of perjury that the above is true and correct.

_Katthleen H Jungclaus_ 12/13/16

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLANANT

EEOC FORM 131 (11/09)

# U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms. Lauren Kelly<br>Human Resources Manager<br>WAVERLY HEIGHTS LTD<br>1400 Waverly Road<br>Gladwyne, PA 19035 | **Kahtleen Jungclaus** |

| THIS PERSON (check one or both) |
|---|
| [X] Claims To Be Aggrieved |
| [ ] Is Filing on Behalf of Other(s) |

| EEOC CHARGE NO. |
|---|
| **530-2017-00958** |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)    [ ] The Equal Pay Act (EPA)    [ ] The Americans with Disabilities Act (ADA)

[X] The Age Discrimination in Employment Act (ADEA)    [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge

3. [ ] Please provide by  a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by  to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by
to
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| Damon A. Johnson<br>Supervisory Investigator | **Philadelphia District Office**<br>**801 Market Street**<br>**Suite 1300**<br>**Philadelphia, PA 19107**<br>**Fax: (215) 440-2604** |
|---|---|
| *EEOC Representative* | |
| *Telephone* **(215) 440-2664** | |

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race   [ ] Color   [X] Sex   [ ] Religion   [ ] National Origin   [X] Age   [ ] Disability   [X] Retaliation   [ ] Genetic Information   [ ] Other

**ISSUES: Discharge**

DATE(S) (on or about):  EARLIEST: 09-27-2016    LATEST: 09-27-2016

A perfected charge will be provided to you once it has been received. Please send an email to PDOContact@eeoc.gov with the name, title, and email address of your organization's designated representative for EEOC matters.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **January 5, 2017** | **Spencer H. Lewis, Jr.**<br>**District Director** | |

FW: Food for thought from Huntley Brown!

**Subject:** FW: Food for thought from Huntley Brown!
**From:** "Ray Jungclaus" <rayjungclaus@fessendenhall.com>
**Date:** 10/9/2008, 9:49 AM
**To:** "Kathy Jungclaus"



You may want to post this on your facebook

<3R

**From:** Glenn Leaman [mailto:gmleaman@ptd.net]
**Sent:** Thursday, October 09, 2008 8:17 AM
**To:** Glenn & Jane Leaman
**Subject:** Food for thought from Huntley Brown!

Subject: Food For Thought

*I wanted to send this article from Huntley Brown (www.huntleybrown.com)*
*A fabulous concert pianist, a man of God and a black man. I appreciate*
*so much his reasoning for not voting for Obama. I would like to see*
*his article published or spread out via Email to as many as possible.*
*It's good stuff!*

Why I Can't Vote For Obama
By Huntley Brown

Dear Friends, A few months ago I was asked for my perspective on
Obama, I sent out an email with a few points. With the election just
around the corner I decided to complete my perspective. Those of you
on my e-list have seen some of this before but it's worth
repeating...

First I must say whoever wins the election will have my prayer support.
Obama needs to be commended for his accomplishments but I need to
explain why I will not be voting for him.

Many of my friends process their identity through their blackness. I
process my identity through Christ. Being a Christian (a Christ
follower) means He leads I follow. I can't dictate the terms He does
because He is the leader.

I can't vote black because I am black; I have to vote Christian
because that's who I am. Christian first, black second.  Neither

Wave??yrs16:020M

FW: Food for thought from Huntley Brown!

6

should anyone from the other ethnic groups vote because of ethnicity. 200 years from now I won't be asked if I was black or white. I will be asked if I knew Jesus and accepted Him as Lord and Savior.

In an election there are many issues to consider but when a society gets abortion, same-sex marriage, embryonic stem-cell research, human cloning to name a few, wrong economic concerns will soon not matter.

We need to follow Martin Luther King's words, don't judge someone by the color of their skin but by the content of their character. I don't know Obama so all I can go off of is his voting record. His voting record earned him the title of the most liberal senator in the US Senate in 2007.

NATIONAL JOURNAL: Obama: Most Liberal Senator in 2007 (01/31/2008)

To beat Ted Kennedy and Hillary Clinton as the most liberal senator, takes some doing. Obama accomplished this feat in 2 short years. I wonder what would happen to America if he had four years to work with.

There is a reason Planned Parenthood gives him a 100 % rating. There is a reason the homosexual community supports him. There is a reason Ahmadinejad, Chavez, Castro, Hamas etc. love him. There is a reason he said he would nominate liberal judges to the Supreme Court. There is a reason he voted against the infanticide bill. There is a reason he voted No on the constitutional ban of same-sex marriage. There is a reason he voted No on banning partial birth abortion. There is a reason he voted No on confirming Justices Roberts and Alito. These two judges are conservatives and they have since overturned partial birth abortion. The same practice Obama wanted to continue.

Let's take a look at the practice he wanted to continue

The 5 Step Partial Birth Abortion procedures:

A. Guided by ultrasound, the abortionist grabs the baby's leg with forceps.
(Remember this is a live baby)
B. The baby's leg is pulled out into the birth canal.
C. The abortionist delivers the baby's entire body, except for the head.
D. The abortionist jams scissors into the baby's skull. The scissors

Appendix 365

Waverly-1021
12/7/2018, 8:53 AM

FW: Food for thought from Huntley Brown!

ψ

are then opened to enlarge the hole.
E. The scissors are removed and a suction catheter is inserted. The child's brains are sucked out, causing the skull to collapse. The dead baby is then removed.

God help him. There is a reason Obama opposed the parental notification law.

Think about this: You can't give a kid an aspirin without parental notification but that same kid can have an abortion without parental notification. This is insane.

There is a reason he went to Jeremiah Wright's church for 20 years.

Obama tells us he has good judgment but he sat under Jeremiah Wright teaching for 20 years. Now he is condemning Wright's sermons. I wonder why now?

Obama said Jeremiah Wright led him to the Lord and discipled him. A disciple is one in training. Jesus told us in Matthew 28:19 - 20 "Go and make disciples of all nations." This means reproduce yourself. Teach people to think like you, walk like you; talk like you believe what you believe etc.

The question I have is what did Jeremiah Wright teach him?

Would you support a White President who went to a church which has tenets that said they have a ...

1. Commitment to the White Community
2. Commitment to the White Family
3. Adherence to the White Work Ethic
4. Pledge to make the fruits of all developing and acquired skills available to the White Community.
5. Pledge to Allocate Regularly, a Portion of Personal Resources for Strengthening and Supporting White Institutions 6. Pledge allegiance to all White leadership who espouse and embrace the White Value System 7. Personal commitment to embracement of the White Value System.

Would you support a President who went to a church like that?

FW: Food for thought from Huntley Brown!

Just change the word from white to black and you have the tenets of Obama's former church.   If President Bush was a member of a church like this, he would be called a racist. Jessie Jackson and Al Sharpton would have been marching outside.

This kind of church is a racist church. Obama did not wake up after 20 years and just discovered he went to a racist church. The church can't be about race. Jesus did not come for any particular race. He came for the whole world.

A church can't have a value system based on race. The churches value system has to be based on biblical mandate. It does not matter if it?s a white church or a black church it's still wrong. Anyone from either race that attends a church like this would never get my vote.

Obama's former Pastor Jeremiah Wright is a disciple of liberal theologian James Cone, author of the 1970 book A Black Theology of Liberation. Cone once wrote: "Black theology refuses to accept a God who is not identified totally with the goals of the black community. If God is not for us and against white people, then he is a murderer, and we had better kill him.

Cone is the man Obama's mentor looks up to. Does Obama believe this?

So what does all this mean for the nation?

In the past when the Lord brought someone with the beliefs of Obama to lead a nation it meant one thing - judgment.

Read 1 Samuel 8 when Israel asked for a king. First God says in 1 Samuel 1:9, "Now listen to them; but warn them solemnly and let them know what the king who will reign over them will do."

Then God says 1 Samuel 1:18 " When that day comes, you will cry out for relief from the king you have chosen, and the LORD will not answer you in that day." 19 But the people refused to listen to Samuel. "No!" they said. "We want a king over us. 20 Then we will be like all the other nations, with a king to lead us and to go out before us and fight our battles."  21 When Samuel heard all that the people said, he repeated it before the LORD. 22 The LORD answered, "Listen to them and give them a king."

Appendix 367

FW: Food for thought from Huntley Brown!

Here is what we know for sure.

God is not schizophrenic

He would not tell one person to vote for Obama and one to vote for McCain. As the scripture says, a city divided against itself cannot stand, So obviously many people are not hearing from God.

Maybe I am the one not hearing but I know God does not change and Obama contradicts many things I read in scripture so I doubt it.

For all my friends who are voting for Obama can you really look God in the face and say; Father based on your word, I am voting for Obama even though I know he will continue the genocidal practice of partial birth abortion. He might have to nominate three or four Supreme Court justices, and I am sure he will be nominating liberal judges who will be making laws that are against you.  I also know he will continue to push for homosexual rights, even though you destroyed Sodom and Gomorrah for this.  I know I can look the other way because of the economy.

I could not see Jesus agreeing with many of Obama's positions.
Finally I have two questions for all my liberal friends.

Since we know someone's value system has to be placed on the nation,

1. Whose value system should be placed on the nation.

2. Who should determine that this is the right value system for the nation?

Blessings, Huntley Brown

FW: bama's Classmate speaks out.

**Subject: FW: bama's Classmate speaks out.**
**From:** "Ray Jungclaus" <rayjungclaus@fessendenhall.com>
**Date:** 4/7/2011, 9:34 AM
**To:** "Kathy Jungclaus"



How come was he elected President? Someone didn't do their homework before voting. I hope this is a lesson to all Americans do your homework on the candidates before voting.

**Subject:** Obama's Classmate speaks out.

THANK YOU for deleting my address,
any other addresses, and personal information,
from this e-mail, if you plan to forward it.
THANK YOU also for using "Bcc"
instead of "To" and "Cc" when initiating both
individual and group e-mails.
This helps prevent spammers and
Hackers from obtaining addresses,
and thus the proliferation of Spam.

## OBAMA'S COLLEGE CLASSMATE SPEAKS OUT

By Wayne Allyn Root , June 6th, 2010

Barack Hussien Obama is no fool.   He is not incompetent.

To the contrary, he is brilliant.   He knows exactly what he's doing.

FW: bama's Classmate speaks out.

He is purposely overwhelming the U.S. economy to create systemic failure, economic crisis and social chaos -- thereby destroying capitalism and our country from within.

Barack Hussien Obama was my college classmate

(Columbia University, class of '83).

He is a devout Muslim do not be fooled.

Look at his Czars...anti-business..anti- american.
As Glenn Beck correctly predicted from day one, Barack Hussien Obama is following the plan of Cloward & Piven, two professors at Columbia University . They outlined a plan to socialize America by overwhelming the system with government spending and entitlement demands.

Add up the clues below.    Taken individually they're alarming.

Taken as a whole, it is a brilliant, Machiavellian game plan to turn

the United States into a socialist/Marxist state with a permanent majority

that desperately needs government for survival ... and can be counted

on to always vote for bigger government.

Why not?    They have no responsibility to pay for it.

Universal health care . The health care bill had very little to do with health

care.    It had everything to do with unionizing millions of hospital and

FW: bama's Classmate speaks out.

health care workers, as well as adding 15,000 to 20,000 new IRS agents (who will join government employee unions).

Obama doesn't care that giving free health care to 30 million Americans

will add trillions to the national debt.

What he does care about is that it cements the dependence of those 30 million voters to Democrats and big government .
Who but a socialist revolutionary would pass this reckless spending bill

in the middle of a depression?

Cap and trade.   Like health care legislation having nothing to do with health care, cap and trade has nothing to do with global warming.

It has everything to do with redistribution of income, government control of the economy and a criminal payoff to Obama's biggest contributors.
Those powerful and wealthy unions and contributors (like GE, which owns NBC, MSNBC and CNBC) can then be counted on to support everything Obama wants.

They will kick-back hundreds of millions of dollars in contributions to

Obama and the Democratic Party to keep them in power.
The bonus is that all the new taxes on Americans with bigger cars, bigger homes and businesses helps Obama "spread the wealth around."

Make Puerto Rico a state.   Why?   Who's asking for a 51st state?
Who's asking for millions of new welfare recipients and government entitlement addicts in the middle of a depression?

Certainly not American taxpayers.
But this has been Barack Hussien Obama's plan all along.

His goal is to add two new Democrat senators, five Democrat congressman and a million loyal Democratic voters who are dependent on big government.

Waverly-1015
12/7/2018, 8:50 AM

FW: bama's Classmate speaks out.

Legalize 12 million illegal Mexican immigrants.

Just giving these 12 million potential new citizens free health care alone could overwhelm the system and bankrupt America.
But it adds 12 million reliable new Democrat voters who can be counted on to support big government.
Add another few trillion dollars in welfare, aid to dependent children, food stamps, free medical, education, tax credits for the poor, and eventually Social Security .

Stimulus and bailouts.     Where did all that money go?

It went to Democrat contributors, organizations (ACORN), and unions -- including billions of dollars to save or create jobs of government employees across the country.

It went to save GM and Chrysler so that their employees could keep paying union dues.

It went to AIG so that Goldman Sachs could be bailed out

(after giving Obama almost $1 million in contributions).

A staggering $125 billion went to teachers (thereby protecting their union dues).

All those public employees will vote loyally Democrat to protect their bloated salaries and pensions that are bankrupting America.

The country goes broke, future generations face a bleak future, but Obama, the Democrat Party, government, and the unions grow more powerful.

The ends justify the means.

Raise taxes on small business owners, high-income earners, and job creators.    Put the entire burden on only the top 20 percent of taxpayers,

Appendix 372

redistribute the income, punish success, and reward those who did

nothing to deserve it (except vote for Obama).

Reagan wanted to dramatically cut taxes in order to starve the government. Barack Obama wants to dramatically raise taxes to starve his political opposition.   With the acts outlined above, Barack Hussien Obama and his regime have created a vast and rapidly expanding constituency of voters dependent on big government; a vast privileged class of public employees who work for big government; and a government dedicated to destroying capitalism and installing themselves as socialist rulers by overwhelming the
system.

Add it up and you've got the perfect Marxist scheme -- all devised by my Columbia University college classmate Barack Hussien Obama

using the Cloward and Piven Plan ..

# True per snopes!

http://www.snopes.com/politics/soapbox/overwhelm.asp

Appendix 373

Waverlys 1017
12/7/2078, 8:50 AM

FW: bama's Classmate speaks out.

Appendix 374

Waverly-1018
12/7/2018, 8:50 AM

FW: bama's Classmate speaks out.

Appendix 375

RE: Health Crae bill



**Subject:** RE: Health Crae bill
**From:** "Ray Jungclaus" <rayjungclaus@fessendenhall.com>
**Date:** 6/28/2012, 10:45 AM
**To:** "Kathy Jungclaus" <Kathy.Jungclaus@waverlyheightsltd.org>

Here here!!!!!

Are you at work or at depositions?

**From:** Kathy Jungclaus [mailto:Kathy.Jungclaus@waverlyheightsltd.org]
**Sent:** Thursday, June 28, 2012 10:34 AM
**To:** Ray Jungclaus
**Subject:** RE: Health Crae bill

Thoroughly depressed, but our only hope to to vote them all out of office so we can get our country back.

**From:** Ray Jungclaus [mailto:rayjungclaus@fessendenhall.com]
**Sent:** Thursday, June 28, 2012 10:34 AM
**To:** Kathy Jungclaus
**Subject:** RE: Health Crae bill

soooooosad

**From:** Kathy Jungclaus [mailto:Kathy.Jungclaus@waverlyheightsltd.org]
**Sent:** Thursday, June 28, 2012 10:17 AM
**To:** rayjungclaus@fessendenhall.com
**Subject:** Health Crae bill

THE Health Care Bill was upheld! BOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOO
The Individual Mandate was determined to be a TAX. That is the only bone thrown .

Kathleen M. Jungclaus
Director, Human Resources
Waverly Heights
1400 Waverly Road
Gladwyne, Pa. 19035
610-645-8610 (direct dial)
610-645-8814 (fax)

CONFIDENTIALITY NOTICE

This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited. If you have received this message in error, please notify the sender immediately then delete the original message.

Appendix 376

Waverly-1032
12/6/2018, 2:34 PM

RE: Health Crae bill

CONFIDENTIALITY NOTICE

This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited. If you have received this message in error, please notify the sender immediately then delete the original message.

Appendix 377

Waverly-1033
12/6/2018 2:34 PM

**Subject:** FW: Why Mitt Romney Is Unlikable
**From:** "Ray Jungclaus" <rayjungclaus@fessendenhall.com>
**Date:** 10/18/2012, 9:13 AM
**To:** "Kathy Jungclaus" <Kathy.Jungclaus@waverlyheightsltd.org>

**From:** Robert Schaefer [mailto:robertschaefer@fessendenhall.com]
**Sent:** Wednesday, October 17, 2012 1:51 PM
**To:** Ray Jungclaus; edgarlobley@fessendenhall.com; 'John Rock'
**Subject:** FW: Why Mitt Romney Is Unlikable

**Why Mitt Romney is Unlikable!?**

A lot is being said in the media about Mitt Romney not being "likable" or that he doesn't "relate well" to people.  Frankly, we struggled to understand why.
So after much research, we have come up with a Top Ten List to explain this "un-likability."

**Top Ten Reasons To Dislike Mitt Romney:**

1. Drop-dead, collar-ad handsome with gracious, statesmanlike aura.
Looks like every central casting's #1 choice for Commander-in-Chief.

2. Been married to ONE woman his entire life, and has been faithful to her, including through her bouts with breast cancer and MS.

3. No scandals or skeletons in his closet. (How boring is that?)

4. Can't speak in a fake, southern, "black preacher voice" when necessary.

5. Highly intelligent. Graduated cum laude from both Harvard Law School and HarvardBusiness School...and by the way, his academic records are NOT sealed.

6. Doesn't smoke or drink alcohol, and has never done drugs, not even in the counter-culture age when he went to college. Too square for today's America ?

7. Represents an America of "yesterday," where people believed in God, went to Church,
didn't mess around, worked hard, and became a SUCCESS!



FW: Why Mitt Romney Is Unlikable

**8. Has a family of five great sons....and none of them have police records or are in drug rehab.**
But of course, they were raised by a stay-at-home mom, and that "choice" deserves America 's scorn.

**9. Oh yes....he's a MORMON. We need to be very afraid of that very strange religion that**
teaches its members to be clean-living, patriotic, fiscally conservative, charitable, self-reliant, and honest.

**10. And one more point.....pundits say because of his wealth, he can't relate to ordinary Americans.**
I guess that's because he made that money HIMSELF.....as opposed to marrying it or inheriting it from Dad.

Apparently, he didn't understand that actually working at a job and earning your own money
made you un-relatable to Americans. My goodness, it's a strange world, isn't it?
****************************************************

**Personal Information:**

His full Name is: Willard Mitt Romney
He was Born: March 12, 1947 and is 65 years old.
His Father: George W. Romney, former Governor of the State of Michigan
He was raised in Bloomfield Hills , Michigan
He is Married to Ann Romney since 1969; they have five children.

**Education:**
B. A. from Brigham Young University , J. D. and M.B.A. from Harvard University

**Religion:**
Mormon - The Church of Jesus Christ of the Latter-Day Saints

**Working Background:**
After high school, he spent 30 months in France as a Mormon missionary.
After going to both Harvard Business School and Harvard Law School simultaneously,
he passed the Michigan bar exam, but never worked as an attorney.
In 1984, he co-founded Bain Capital a private equity investment firm,
one of the largest such firms in the United States .

In 1994, he ran for Senator of Massachusetts and lost to Ted Kennedy.

FW: Why Mitt Romney Is Unlikable

He was President and CEO of the 2002 Winter Olympic Games.

In 2002, he was elected Governor of the State of Massachusetts where he eliminated a 1.5 billion deficit..

Some Interesting Facts about Romney:

Bain Capital, starting with one small office supply store in Massachusetts, turned it into Staples; now over 2,000 stores employing 90,000 people.

Bain Capital also worked to perform the same kinds of business miracles again and again,
with companies like Domino's, Sealy, Brookstone, Weather Channel, Burger King, Warner Music Group, Dollarama, Home Depot Supply and many others.

He was an unpaid volunteer campaign worker for his dad's gubernatorial campaign 1 year.

He was an unpaid intern in his dad's governor's office for eight years.

He was an unpaid bishop and state president of his church for ten years.

He was an unpaid President of the Salt Lake Olympic Committee for three years.

He took no salary and was the unpaid Governor of Massachusetts for four years. He gave his entire inheritance from his father to charity.

Mitt Romney is one of the wealthiest self-made men in our country but has given more back to its citizens in terms of money, service and time than most men.

And in 2011 Mitt Romney gave over $4 million to charity, almost 19% of his income....

Just for comparison purposes, Obama gave 1% and Joe Biden gave $300 or .0013%.

Mitt Romney is Trustworthy:

He will show us his high school and college transcripts.

He will show us his social security card.

He will show us his law degree.

Appendix 380

Waverly 12/4/2018 9:30 PM

FW: Why Mitt Romney Is Unlikable

He will show us his draft notice.

He will show us his medical records.

Mitt Romney's background, experience and trustworthiness show him to be
a great leader and an excellent citizen for President of the United States.
You may think that Romney may not be the best representative the Republicans
could have selected. At least I know what religion he is, and that he won't desecrate
the flag,
bow down to foreign powers, or practice fiscal irresponsibility.

I know he has the ability to turn around this financial debacle that the current
regime has gotten
us into. We won't like all the things necessary to recover from this debt,
but someone with Romney's background can do it.

But, on the minus side, he never was a "Community Organizer",
never took drugs or smoked pot, never got drunk,
did not associate with communists or terrorists,
nor did he attend a church whose pastor called for God to damn the US.

If you care about our United States of America -- Send this to all your friends!

---

If I agreed with you, we'd both be wrong!
01/20/2013 - Change We Can Believe In!
My code never has bugs. Just unintentional features.

"Live Long and Prosper." - Mr Spock  \\//
"Resistance Is Futile" - Seven of Nine/The Borg
"I tawt I taw a puddy tat!" - Tweety Pie

Waverly 1931

imap://imap.gmail.com:993/fetch>UID>/[Gmail]/Sent Mail>62...

Re:

**Subject: Re:**
**From:** Kathy Jungclaus <kathy.jungclaus@waverlyheightsltd.org>
**Date:** 8/19/2013, 4:28 PM
**To:** Ray Jungclaus <rayjungclaus@fessendenhall.com>

I was planning on telling Tom I have a doctor appointment that day and head up to Eagle Rock with Clyde. I figured we would stay the weekend. The 20th we can wait and see. I would rather have the furniture delivered sooner rather than later. Whichever you prefer.

On Mon, Aug 19, 2013 at 4:22 PM, Ray Jungclaus <rayjungclaus@fessendenhall.com> wrote:

Babe,

You know that I have my board meeting on 9/6. I would probably be able to get to ER by 3pm. So you would need to be there to get the furniture, or reschedule to the mattress day?

What do you think?

Looking at the Calendar

8/23 to 26 we are at the beach

8/30 settlement - Assuming we don't have renters, we should probably just stay there for the weekend. I can get the gutters extended, pull out some shrubs, caulk the chimney and possibly do some painting.

9/6 we could do some more painting at ER possibly finish up schedule cable company for that weekend.

9/14 that the weekend I promised matt for the shore and the beginning of our vacation.

9/20 I think that is when the mattress is scheduled, if we push all of the furniture till then, maybe we can rent a truck and take up the sofa bed and stuff from my parents the spend the weekend setting up.

After that we get into Matt and Andrew's birthdays and I would like to go visit each of them sometime around the end of Sept beginning of Oct.

I guess that the rest of Oct and nov we can just kick pack and enjoy either house.

<3R

Waverly1001
12/5/2018, 2:19 PM

Appendix 382

imap://imap.gmail.com:993/fetch>UID>/[Gmail]/Sent Mail>62...

Re:



<3R

**Raymond A. Jungclaus, Jr.**
**Vice-President, Finance**
Fessenden Hall Incorporated
1050 Sherman Avenue
Pennsauken, NJ 08110
**Phone:** (856) 382-0225

This communication is for use by the intended recipient and contains information that may be privileged, confidential or copyrighted under applicable law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this e-mail, in whole or in part, is strictly prohibited. Please notify the sender by return e-mail and delete this e-mail from your system. Unless explicitly and conspicuously designated as "E-Contract Intended", this e-mail does not constitute a contract offer, a contract amendment, or an acceptance of a contract offer. This e-mail does not constitute a consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.

CONFIDENTIALITY NOTICE

This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited. If you have received this message in error, please notify the sender immediately then delete the original message.

Appendix 383

Waverly-1092
12/5/2018, 2:19 PM

RE: Videos

**Subject:** RE: Videos
**From:** Thomas Garvin <thomas.garvin@waverlyheightsltd.org>
**Date:** 8/26/2013, 1:49 PM
**To:** Marc Heil <marc.heil@waverlyheightsltd.org>, Kathy Jungclaus
<kathy.jungclaus@waverlyheightsltd.org>
**CC:** Brian Brown <brian.brown@waverlyheightsltd.org>, Colin Gallagher
<colin.gallagher@waverlyheightsltd.org>



is it one that Brian sent us?  That alone would be grounds for termination!

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax:   610.645.8602

BEST PLACES
to work in      2013

**From:** Marc Heil [mailto:marc.heil@waverlyheightsltd.org]
**Sent:** Monday, August 26, 2013 1:49 PM
**To:** Kathy Jungclaus
**Cc:** Thomas Garvin; Brian Brown; Colin Gallagher
**Subject:** Re: Videos

I just noticed that at least two of the videos he has posted on Instagram have a WAVERLY RESIDENT
in them: Mrs. Agro; Windsor 231 (private pay).!

Marc

Marc Heil
Director, Building Services
& Project Management
Waverly Heights, Ltd.
marc.heil@waverlyheightsltd.org

On Mon, Aug 26, 2013 at 12:53 PM, Kathy Jungclaus <kathy.jungclaus@waverlyheightsltd.org>
wrote:
I agree the Instagram videos are very disturbing as well I am waiting
to hear from Debbie Sandler to discuss our course of action
I will update you as soon I hear from anything
Kathy

Sent from my iPhone

On Aug 26, 2013, at 12:51 PM, Thomas Garvin

Appendix 384

imap://imap.gmail.com:993/fetch>UID>/[Gmail]/Important>2...

RE: Videos

<thomas.garvin@waverlyheightsltd.org> wrote:

> The sooner we can get these in the hands of the authorities the better.
> This is quite disturbing.
>
> Thomas P. Garvin
> President & Chief Executive Officer
> Waverly Heights Ltd.
> 1400 Waverly Road - Gladwyne, PA 19035
> www.waverlyheightsltd.org
> Phone:  610.645.8607
> Fax:     610.645.8602
>
>
>
>
> -----Original Message-----
> From: Brian Brown [mailto:brian.brown@waverlyheightsltd.org]
> Sent: Monday, August 26, 2013 12:46 PM
> To: Kathy Jungclaus; Thomas Garvin; Marc Heil; Colin Gallagher
> Subject: Videos

imap://imap.gmail.com:993/fetch>UID>/[Gmail]/Important>2...

RE: Videos

**Subject:** RE: Videos
**From:** Thomas Garvin <thomas.garvin@waverlyheightsltd.org>
**Date:** 8/26/2013, 2:21 PM
**To:** Marc Heil <marc.heil@waverlyheightsltd.org>, Kathy Jungclaus
<kathy.jungclaus@waverlyheightsltd.org>
**CC:** Brian Brown <brian.brown@waverlyheightsltd.org>, Colin Gallagher
<colin.gallagher@waverlyheightsltd.org>

Based on this, he needs to be terminated immediately.........we also need to bring Meg in the loop.

Let's meet in my office at 3:30 today.  Kathy can you call in?

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax:   610.645.8602

BEST PLACES ⏣⚓
  to work in PA 2013

**From:** Marc Heil [mailto:marc.heil@waverlyheightsltd.org]
**Sent:** Monday, August 26, 2013 2:05 PM
**To:** Kathy Jungclaus
**Cc:** Thomas Garvin; Brian Brown; Colin Gallagher
**Subject:** Re: Videos

I recorded them with my camera and attached them here: (there are two)

Marc

Marc Heil
Director, Building Services
& Project Management
Waverly Heights, Ltd.
marc.heil@waverlyheightsltd.org

On Mon, Aug 26, 2013 at 1:57 PM, Kathy Jungclaus <kathy.jungclaus@waverlyheightsltd.org> wrote:
Debbie and I are discussing cause. Because this is the first such circumstance we have encountered of
this nature we need to be careful how we  proceed. We are considering having him come to work
tomorrow and drug testing him for reasonable suspicion.
I have not seen the video where he discusses a resident. How can I access that?

Thoughts?

Waverly 2018007 PM

imap://imap.gmail.com:993/fetch>UID>/[Gmail]/important>2...

RE: Videos

Sent from my iPhone

On Aug 26, 2013, at 1:51 PM, Thomas Garvin <thomas.garvin@waverlyheightsltd.org> wrote:

Is it one that Brian sent us?  That alone would be grounds for termination!

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax:    610.645.8602

<image003.jpg>

**From:** Marc Heil [mailto:marc.heil@waverlyheightsltd.org]
**Sent:** Monday, August 26, 2013 1:49 PM
**To:** Kathy Jungclaus
**Cc:** Thomas Garvin; Brian Brown; Colin Gallagher
**Subject:** Re: Videos

I just noticed that at least two of the videos he has posted on Instagram have a WAVERLY RESIDENT in them: Mrs. Agro; Windsor 231 (private pay).!

Marc

Marc Heil
Director, Building Services
& Project Management
Waverly Heights, Ltd.
marc.heil@waverlyheightsltd.org

On Mon, Aug 26, 2013 at 12:53 PM, Kathy Jungclaus
<kathy.jungclaus@waverlyheightsltd.org> wrote:
I agree the Instagram videos are very disturbing as well I am waiting
to hear from Debbie Sandler to discuss our course of action
I will update you as soon I hear from anything
Kathy

Sent from my iPhone

On Aug 26, 2013, at 12:51 PM, Thomas Garvin
<thomas.garvin@waverlyheightsltd.org> wrote:

> The sooner we can get these in the hands of the authorities the better.
> This is quite disturbing.
>

Waverly1/mh1,028PM

Appendix 387

RE: Videos

> Thomas P. Garvin
> President & Chief Executive Officer
> Waverly Heights Ltd.
> 1400 Waverly Road - Gladwyne, PA 19035
> www.waverlyheightsltd.org
> Phone: 610.645.8607
> Fax:    610.645.8602
>
>
>
>
> -----Original Message-----
> From: Brian Brown [mailto:brian.brown@waverlyheightsltd.org]
> Sent: Monday, August 26, 2013 12:46 PM
> To: Kathy Jungclaus; Thomas Garvin; Marc Heil; Colin Gallagher
> Subject: Videos

(4)

**Subject:** Fwd: Kathy-NHA License Discussion
**From:** Kathy Jungclaus <kathy.jungclaus@waverlyheightsltd.org>
**Date:** 8/30/2013, 3:58 PM
**To:** rayjungclaus@fessendenhall.com

Uh oh!  Ahhhhhhhh!

Sent from my iPhone

Begin forwarded message:

**From:** "thomas.garvin@waverlyheightsltd.org" <thomas.garvin@waverlyheightsltd.org>
**To:** Kathy Jungclaus <Kathy.Jungclaus@waverlyheightsltd.org>
**Subject:** Kathy-NHA License Discussion

{no text body}

Appendix 389

Waverly-1003
12/5/2018, 2:24 PM

FW: IF YOU CAN'T FIX IT WITH A HAMMER,YOU'VE GOT AN EL...

**Subject: FW: IF YOU CAN'T FIX IT WITH A HAMMER,YOU'VE GOT AN ELECTR...**
**From:** "Ray Jungclaus" <rayjungclaus@fessendenhall.com>
**Date:** 10/24/2013, 4:57 PM
**To:** "'Kathy Jungclaus'" <kathy.jungclaus@waverlyheightsltd.org>



**IF YOU CAN'T FIX IT WITH A HAMMER,YOU'VE GOT AN ELECTRICAL PROBLEM"**
WRITTEN BY A 21 YEAR OLD FEMALE Wow, this girl has a great plan! Love the last thing she would do.... the best.

This was written by a 21 yr. old female who gets it. It's her future she's worried about and this is how she feels about the social welfare big government state that she's being forced to live in! These solutions are just common sense in her opinion.

This was in the Waco Tribune Herald, Waco , TX

**PUT ME IN CHARGE . . .**

Put me in charge of food stamps. I'd get rid of Lone Star cards; no cash for Ding Dongs or Ho Ho's, just money for 50-pound bags of rice and beans, blocks of cheese and all the powdered milk you can haul away. If you want steak and frozen pizza, then get a job.

Put me in charge of Medicaid. The first thing I'd do is to get women Norplant birth control implants or tubal ligations. Then, we'll test recipients for drugs, alcohol, and nicotine. If you want to reproduce or use drugs, alcohol, or smoke, then get a job.

Put me in charge of government housing. Ever live in a military barracks? You will maintain our property in a clean and good state of repair. Your home" will be subject to inspections anytime and possessions will be inventoried. If you want a plasma TV or Xbox 360, then get a job and your own place.

In addition, you will either present a check stub from a job each week or you will report to a "government" job. It may be cleaning the roadways of trash, painting and repairing public housing, whatever we find for you. We will sell your 22 inch rims and low profile tires and your blasting stereo and speakers and put that money toward the "common good.."

Before you write that I've violated someone's rights, realize that all of the above is voluntary. If you want our money, accept our rules. Before you say that this would be "demeaning" and ruin their "self-esteem," consider that it wasn't that long ago that taking someone else's money for doing absolutely nothing was demeaning and lowered self-esteem.

If we are expected to pay for other people's mistakes we should at least attempt to make them learn from their bad choices. The current system rewards them for continuing to make bad choices.

AND While you are on Gov't assistance, you no longer can VOTE! Yes, that is correct. For you to vote would be a conflict of interest. You will voluntarily remove yourself from



FW: IF YOU CAN'T FIX IT WITH A HAMMER,YOU'VE GOT AN EL...

voting while you are receiving a Gov't welfare check. If you want to vote, then get a job.

Appendix 391

Waverly 1035
12/8/2018, 2:16 PM

Obama's Staged Fainting Act

①

**Subject:** Obama's Staged Fainting Act
**From:** Gregory Gangi <gpgangi@gmail.com>
**Date:** 10/24/2013, 10:17 PM
**To:** Aaron Gronski <ajgtrx450r@gmail.com>, AJ Green <jgreenghost@verizon.net>, Alaina and Dave Wert <fimwerts@hotmail.com>, American Grassroots Energy <info@americangrassrootsenergy.com>, Amy <adaza@comcast.net>, Andy Damiani <andydamiani@comcast.net>, Anne Angie <info@diamondsoulessentials.com>, Anne Zweidler <annewhitezweidler@alumni.pitt.edu>, Anne Zweidler <awz1234@gmail.com>, Anne Zweidler <awz123@verizon.net>, Ash Lerenzo <Ash.lerenzo@gmail.com>, Ashley James <Ashley.James411@gmail.com>, Audrey Latourette <audreyla65@aol.com>, Aunt Effie <Effie.Arntz@judiciary.state.nj.us>, Aunt Effie <effiez1@comcast.net>, Aunt K Cell <Kathy.Jungclaus@waverlyheightsltd.org>, "Bair's Tree and Lawn" <vze4h2wi@gmail.com>, Bairs Tree and Lawn <info@bairstreeservice.com>, "Barry & Mary Jane Sheaffer" <fergie40@embarqmail.com>, BERL BLACK <BERLBLACK@gmail.com>, Bernard Gajkowski <Bernard.Gajkowski@aarcorp.com>, Bert <robertaharding@juno.com>, Beth Wilson <my1957bew@yahoo.com>, Bill <morton.h.william@gmail.com>, BILL BENO <Bill.Beno@austinpowder.com>, Bill Tomlinson <wmtoml@verizon.net>, bob poore <bobp3249@yahoo.com>, Bob Riviezzo <bob5304@verizon.net>, "Bogansky, John J." <jbogansky@cosel.com>, Brad Smith <bsmith@bradsmithphoto.com>, Brian Murphy <jeephead1975@yahoo.com>, Brigid <pnbbrady@yahoo.com>, Bruce Tollin <btollindds7@gmail.com>, Carl Zuber <carl_zuber@hotmail.com>, CARLO GRILLETTO <zouave@pacbell.net>, carson k <ctk4892@yahoo.com>, Chad Clemens <chadclemens@comcast.net>, Chad Scholl <clairsflowershop@verizon.net>, charles cde navy <usnsammons@gmail.com>, charles cde rapier <cfeiii@verizon.net>, Chris Shields <chris.shields@nasdaqomx.com>, Christopher Eblen <chris@eastbiz.com>, Christopher Hough callowhill furniture <callowhillfurniture@verizon.net>, Dale Krout <candypants878@aim.com>, Dan Burke <villanova41@yahoo.com>, Dana <DRieder@pmrbm.com>, "Darragh, Pat" <padmcgui29@aol.com>, Dave Black <dave.w.black@gmail.com>, "Dean, Amanda" <amandascakery@comcast.net>, Dello Russo <anthony.dellorusso@verizon.net>, diane <joeytata14@hotmail.com>, diane donegan <luvtoads@gmail.com>, Domenic Salvato <domenicsalvato@hotmail.com>, Domenic Salvato <domenicsalvato@gmail.com>, "Don & Adell P." <pete6312@verizon.net>, Don and Sandy <sjgreb@hughes.net>, "Dostramigo@aol.com" <Dostramigo@aol.com>, Doug Powell <dpowellconstruction@yahoo.com>, "Dulany, Mike" <mdulany@penncolor.com>, "e.gangi" <tigerliz29@aol.com>, ed hause <outdoorscout79@gmail.com>, ed perkins <e57perk@aol.com>, eileen knecht <ekjazz@aol.com>, Elizabeth Verheggen <verhegea@ptd.net>, Eric Schmoyer <eric@schmoyer.com>, Eric Schmoyer <eric@blkbx.com>, Eric Schmoyer <eric@fencingarts.com>, "Foster, Joseph" <Fosterj@whiteandwilliams.com>, fran wilkins <linfranwilk1@verizon.net>, Fred <frederoonie@yahoo.com>, "Gatchell, Rich" <rgatch1019@earthlink.net>, "George E. Federici" <docgeo@msn.com>, George Foley <mornside@comcast.net>, goldenram cde <goldenram@gmail.com>, Grassroot Biofuel <info@grbiofuel.com>, "Green, Eric" <rickyg103@gmail.com>, Greg Gangi <gpgangi@aol.com>, gregory clemens <grclemens@yahoo.com>, Gregory Gangi

**Appendix 392**

Obama's Staged Fainting Act

<gpgangi@gmail.com>, "J.P. Skipper" <jps_research@windstream.net>, Jack McKeam <jmckean310@comcast.net>, Jaime Faucette <jdeefaucette@gmail.com>, James Ceneviva <jamesceneviva@gmail.com>, James Hosgood <jghosgood@windstream.net>, James Matour <jmm@hangley.com>, Jarrod D Nyce <jarrod@landisbc.com>, Jay Green <greenghost38@yahoo.com>, jeff garber <jffgarber@yahoo.com>, Jim Matour <jmatour@dilworthlaw.com>, Jim Setney <jsetney@comcast.net>, "John (INSACO) Scheetz" <jrs@insaco.com>, JOHN DEASY <jdeasyiii@yahoo.com>, John Deodati <johnnyboyblu@aol.com>, John Liddy <jliddy6@icloud.com>, John Liddy <JLiddy2590@aol.com>, John Scavilla <hockeyjohn1@verizon.net>, John Scavilla <jsatfl@verizon.net>, "johnbstrobel@aol.com" <johnbstrobel@aol.com>, Josh <jkmsharkboy_66@yahoo.com>, Karen Ziegler <kziegler1@verizon.net>, karl schorr <coasternut@comcast.net>, "Kennel, Kathryn" <kkennel@pennridge.org>, kirk trentalange <kirktrenta@verizon.net>, kulp at setneys <planetkulp@verizon.net>, Kurt Gale <kurtgale@verizon.net>, Larry <larryyaw420@gmail.com>, "Lo, Amanda M" <amanda.lo@ml.com>, Luanne Sutch <Luanne@npaone.com>, M <vze4h2wi@verizon.net>, "M Steigerwald (Drexel Hamilton)" <msteigerwald@drexelhamilton.com>, Mail Delivery Subsystem <mailer-daemon@googlemail.com>, "Mallery, Kelly" <kmallery@pennridge.org>, "Marc Visconte (comcast.net)" <marcvisconte@comcast.net>, "Marc Visconte (yahoo)" <mvisconte@yahoo.com>, Mark Biresch <mbiresch@yahoo.com>, Mark Nolan <mark_nolan@merck.com>, mars <jskipper@marsanomalyresearch.com>, Martin Bair <martin.bair@verizon.net>, mary anastasiades <maryxander@yahoo.com>, mary licciardello <mcl600@gmail.com>, Mary Miller <grammymary29@yahoo.com>, "Massler, Jessica" <jessica.massler@gmail.com>, "Massler, Joan I." <massler@nyp.org>, "Massler, Martin" <MartinMassler@aol.com>, MasterCare John <mastercarejohn@verizon.net>, Matthew Beuke <mboykey@gmail.com>, "McKean, Amelia" <amc_kean@hotmail.com>, "McKean, Diana" <dmckean@sabresystems.com>, "McKean, Jocelyn" <jmckean410@yahoo.com>, "McKean, Seth" <smckean8@gmail.com>, Meenan <stentech@juno.com>, Michael H Agin <mhagincpa@aol.com>, Michael Savage <reply-f9524e3245-37b80f0533-3454@u.cts.vresp.com>, micheal Schwartz cde <michael_schwartz@merck.com>, Mike Heridia <mheridia@epix.net>, mike iraci <barnett8620@yahoo.com>, Mike Walsh <wpa92479@verizon.net>, Mike Walsh <wpa92479@comcast.net>, "Millar, Shep" <mshep6@comcast.net>, Natasha Waite <natasha@eastbiz.com>, NICOLE <fencerx33@yahoo.com>, Nykie <nstroman@gmail.com>, "Oprendek, Angela" <awoprendek@msn.com>, Pam Milcarek <rangers@epix.net>, "Pat Brady's Grandmom" <quig45@comcast.net>, "Patrick M. O'Hara" <POHara@bpitpa.com>, philip gangi <psgangi@gmail.com>, Phyllis Kosloff <pykoz@comcast.net>, "Piccoli, Ron" <ronp642@aol.com>, R Miller <richardpa2012@gmail.com>, "Rack, Vic" <vicdiane002@aol.com>, "Rakowski, Sondra" <srakowski@verizon.net>, "Regan, Vanessa" <jvregan@verizon.net>, "rhubrichgunworks@aol.com" <rhubrichgunworks@aol.com>, Richard Kotas <richkotas@sbcglobal.net>, RICHARD KOTAS <rkotas@msn.com>, Richard Miller <rich86chevy@gmail.com>, Richard Salvato <rsalvato@earthlink.net>, "rllankford3@aol.com" <rllankford3@aol.com>, "Robert B. White Jr." <rbwhite@rbwjr.com>, Robin Whitten <robinwhitten4@gmail.com>, Rogerio <sunguy2@aol.com>, "Rogerio C. Higa (via Twitter)" <i-

Obama's Staged Fainting Act

7

tctnatv=tznvy.pbz-098b0@postmaster.twitter.com>, "Ron & Carrie K."
<ma4kie@embarqmail.com>, Royal Caribbean
<royalcaribbean@explorer.royalcaribbean.com>, S slattery <SRSlatts@comcast.net>, sam gangi
<sagangi1@gmail.com>, "Schilling, Fred" <fschilling@pa.gov>, "Scott J. Edgell"
<scottedgell@comcast.net>, sean <okee02@hotmail.com>, Sherie of Mark
<Mom4Matt@aol.com>, "Skilton, Janice" <jskilton@pennridge.org>, Soccer Dad
<SoccerDad29615@aol.com>, "Spoltore, Tom" <tomspoltore1@verizon.net>, STAN
STEPNOWSKI <SJSTEP@hotmail.com>, Steffie <Stephstroman@meridianelectrical.com>,
"Stephan A. Zweidler" <zweidler@verizon.net>, Stephan on 2 whls
<stephanon2whls@hotmail.com>, Stephen Girone <SGirone@firstsavingsonline.com>,
"Sterner, Charles" <sternchar@verizon.net>, Steve and Beth Wilson
<lakeside12@suddenlink.net>, Steve Piotrowski <steviep382@gmail.com>, Steven Stroman
<stevenpstroman@yahoo.com>, "stevez@psualum.com" <stevez@psualum.com>, "Stumpo,
Andrea" <stumpoa6@verizon.net>, Sumie <sumie99@ps.ksky.ne.jp>, "Tanya & Tom Miller"
<nyj4l@yahoo.com>, Ted Kosloff <TKosloff@rooseveltpaper.com>, Thomas Day
<dayinsurance@yahoo.com>, "Tim (work) B." <timb@blessprecision.com>, "Tim & Lisa Bless"
<lisa_bless@hotmail.com>, "Tom & Vivian Gano" <t.gano@comcast.net>, Tom Day
<dayinsurancemail@yahoo.com>, Tom Mcgoldrick <tmcgoldrick@davisbucco.com>, Tom
Salvato <tsalvato@comcast.net>, Tomas Harding <tomasharding15@comcast.net>, "Tony
'barber" <borninsinn@msn.com>, Tony Frisco <afconsultants@comcast.net>, Townhall
<THeditor@townhallmail.com>, USAA <updates@usaa.delivery.net>, "V. Jones"
<vjones068@aol.com>, Valentino Jones <tinojones@hotmail.com>, Valerie Allen
<oaks7131@comcast.net>, "Vincent, Ken" <KVincent@pennridge.org>, Vinnie Vaccarello
<vvaccarello@arscorp.com>, viola driscoll <doubletalk66@aim.com>, White Andy
<andywhite1960@gmail.com>, "White, Andrew C." <Andrew.C.White@dynegy.com>, "Ziegler,
Donna" <donna.ziegler@hotmail.com>

Never have I sent out a complete email to all contacts until now. How pathetic are those of you
who still love the obama(intentional small case) man? It breaks my heart to think how, given
our camera technology, this fraud continues selling his snake oil AND morons just buy it up.

Listen to the commentator at around the 4:30 min. mark. It is so embarrassing to witness der
potus act like such an asshole. So too der hillary.

Watch: http://www.youtube.com/watch?v=dGZ4WeQwmIk#t=45

And now, he and his control your health care, "...can you catch this[bottle of plastic water
thrown to an actor pretending to faint ...]?"
Hey guvment, f' you and your health care[which you have exempted yourselves from] to hell.
Only God can save us now.
G.

Appendix 394

Wave #1 Trial 027

FW: The Problem With Public Housing

Subject: FW: The Problem With Public Housing
From: "Ray Jungclaus" <rayjungclaus@fessendenhall.com>
Date: 12/19/2013, 5:22 PM
To: "'Kathy Jungclaus'" <kathy.jungclaus@waverlyheightsltd.org>, <linda@lifeimagery.com>

# The problem with public housing is that the residents are not the owners.

The people who live in the house did not earn the house, but were merely loaned the property by the actual owners, the taxpayers.
Because of this, the residents do not have the "pride of ownership" that comes with the hard work necessary to become owners.
In fact, quite the opposite happens. The residents resent their benefactors, because the very house is a constant reminder that they themselves have not earned the right to live in the house.

They neither appreciate the value of the property nor understand the need to maintain or respect it in any way.

The result is the same, whether one is talking about either a studio apartment or a magnificent mansion full of priceless antiques. If the people who live there do not feel they've earned the privilege of occupancy, they will make this obvious through their actions.

Note the common theme of the following photographs.....

12/6/2018, 2:08 PM
Waverly-1036

FW: The Problem With Public Housing



FW: The Problem With Public Housing





Appendix 397

12/6/2018, 2:08 PM
Waverly-1038

FW: The Problem With Public Housing





FW: The Problem With Public Housing





Appendix 399

12/6/2018, 2:08 PM
Waverly-1040

FW: The Problem With Public Housing



Appendix 400

12/6/2018, 2:08 PM
Waverly-1041

FW: The Problem With Public Housing



Appendix 401

12/6/2018, 2:08 PM
Waverly-1042

FW: The Problem With Public Housing





Appendix 402

12/6/2018, 2:08 PM
Waverly-1043

FW: The Problem With Public Housing



12/6/2018, 2:08 PM
Waverly-1044

Appendix 403

FW: The Problem With Public Housing



12/6/2018, 2:08 PM

Appendix 404

Waverly-1045

FW: The Problem With Public Housing



## The desk, built from timbers of the HMS Resolute and a gift from
## Queen Victoria to President Rutherford B. Hayes
### is considered a national treasure and icon of the presidency.

The White House belongs to the people of America.
Its treasures should NOT be used by ANYONE for a foot rest..!
These photos, ongoing proof that this man has no class whatsoever,
all show an innate disrespect for our White House.

FW: The Problem With Public Housing

*SO, HERE'S A MESSAGE FROM THE PEOPLE OF AMERICA:*

*Mr. Obama, you're not in a hut in Kenya or Indonesia, or in Chicago public housing. You're in the White House, Barry, property of the people of the United States.*

*With all due respect, get your feet off our furniture..!*

12/6/2018, 2:08 PM

Waverly-1047

Appendix 406



**Subject:** RE: NHA license
**From:** Robert Supper <robert.supper@waverlyheightsltd.org>
**Date:** 3/18/2014, 3:29 PM
**To:** Kathy Jungclaus <kathy.jungclaus@waverlyheightsltd.org>

Sure. J

**From:** Kathy Jungclaus [mailto:kathy.jungclaus@waverlyheightsltd.org]
**Sent:** Tuesday, March 18, 2014 8:13 AM
**To:** Robert Supper
**Subject:** Re: NHA license

Is the end of next week ok?
Kathy


On Mon, Mar 17, 2014 at 5:30 PM, Robert Supper <robert.supper@waverlyheightsltd.org> wrote:
Glad to .  When do you need it by?

Robert L. Supper
VP & CFO
Waverly Heights
W - 610-645-8608
M - 610-908-2374

> On Mar 17, 2014, at 4:49 PM, Kathy Jungclaus <kathy.jungclaus@waverlyheightsltd.org> wrote:
>
> Bob
> I am wondering if you would write a letter of recommendation for me. I
> need it in order to pursue my NHA license! As the VP if finance and an
> NHA I thought you would be a great choice !
>
> I would greatly appreciate it!
> Kathy
>
>
>
> Sent from my iPhone