**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS, | : | |
| | : | |
| Plaintiff | : | NO.    17-cv-04462-RK |
| v. | : | |
| | : | |
| WAVERLY HEIGHTS, LTD., | : | Jury Trial Demanded |
| | : | |
| Defendant | : | |

## TABLE OF CONTENTS OF APPENDIX FOR DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT – VOL. III

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. I** | |
| Appendix 1 – 90 | Waverly's Employee Handbook, 2014 |
| Appendix 91 – 93 | List of Waverly's Board of Trustees, 2015 |
| Appendix 94 – 96 | List of Waverly's Board of Trustees, 2016 |
| Appendix 97 | Waverly's EEO-1, 2015 |
| Appendix 98 | Waverly's EEO-1, 2016 |
| Appendix 99 | Waverly's Non-Discrimination Policy, 2011 |
| Appendix 100 | Waverly's Open Door Policy |
| Appendix 101 – 102 | Waverly's Problem-Solving/Grievances Policy, 2011 |
| Appendix 103 | Waverly's Sexual Harassment Policy, 2014 |
| Appendix 104 | Waverly's Civil Rights Compliance – Employee Awareness, 1997 |
| Appendix 105 – 107 | Social Media Policy, 2014 |
| Appendix 108 | Chart Showing Demographic Information Regarding Waverly's Senior Leadership Team as of 09/16 |
| Appendix 109 – 110 | Waverly's letter to Kathleen Jungclaus dated 3/26/1997 offering her employment |
| Appendix 111 – 112 | Resume of Kathleen Jungclaus 1997 – 09/16 |
| Appendix 113 – 114 | Resume of Kathleen Jungclaus 09/16 – Present |
| Appendix 115 – 117 | 1995 Job Profile of Plaintiff |
| Appendix 118 – 121 | Plaintiff's Job Profile (Job Description), 2005 |
| Appendix 122 – 128 | Silver Chair Learning Certificates Courses taken by Plaintiff covering Diversity and Sexual Harassment 2011 – 2016 |
| Appendix 129 – 136 | Class Completion Certificates for Nursing Home Administration Course 2013-2014 |
| Appendix 137 – 226 | Performance Evaluations of Plaintiff 1998 – 2015 |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 227 – 264 | Recommendations for Salary Increases from Mr. Wozniak 12/8/10-11/2/15 |
| Appendix 265 – 266 | Graph of Plaintiff's Salary History 2005 – 2016 |
| Appendix 267 | Chart showing Plaintiff's Salary History 2010 – 2016 |
| Appendix 268 | Chart of Compensation of Senior Team for 2015 |
| Appendix 269 | Chart of Compensation of Senior Team for 2016 |
| Appendix 270 – 272 | Anonymous Letter dated 09/14/16 |
| Appendix 273 – 279 | Tweet dated 7/24/16 and screenshot showing link from Waverly to Jungclaus Twitter Page |
| Appendix 280 – 281 | Chart showing Termination of Employees without Progressive Discipline 2010-2016 |
| Appendix 282 – 289 | Emails between Mr. Garvin, Mr. Bauer and Board Committee Members regarding Employment Issue, 09/22/16 – 09/26/16 |
| Appendix 290 – 293 | Plaintiff's Unemployment Compensation Application dated 10/02/16 |
| Appendix 294 – 297 | Notice of Unemployment Application dated 10/06/16 and Waverly's Response to Unemployment Claim dated 10/11/16 |
| Appendix 298 – 300 | Interview of Plaintiff by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 301 – 305 | Interview of Mr. Garvin by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 306 – 308 | Approval of Plaintiff for Unemployment Compensation dated 10/25/16 |
| Appendix 309 – 310 | Waverly's Appeal from Granting of Unemployment dated 10/31/16 |
| Appendix 311 – 326 | Letter from Mark Schwartz, Esquire to Waverly dated 11/08/16 |
| Appendix 327 – 354 | Transcript of Unemployment Compensation Hearing dated 11/28/16 |
| Appendix 355 – 361 | Decision of Unemployment Compensation Referee dated 11/29/16 |
| Appendix 362 | EEOC Complaint dated 12/13/16 |
| Appendix 363 | EEOC Notice of Charge dated 01/05/17 |
| Appendix 364 – 368 | Email from Raymond Jungclaus to Plaintiff dated 10/09/08 – Food for Thought (Why not voting for Obama) Raymond Jungclaus suggests that Plaintiff post this on her Facebook page |
| Appendix 369 – 375 | Email from Raymond Jungclaus to Plaintiff dated 04/07/11- re: Obama's Classmate Speaks out |
| Appendix 376 – 377 | Emails between Plaintiff and Raymond Jungclaus dated 06/28/12 re Health Care Bill being upheld |
| Appendix 378 – 381 | Email from Raymond Jungclaus to Plaintiff dated 10/18/12 – Why Mitt Romney is Unlikeable |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 382 – 383 | Emails between Plaintiff and her husband, Raymond Jungclaus dated 08/19/13 re making up story that she has doctor's appointment so she can leave early |
| Appendix 384 – 388 | Emails between Plaintiff and Marc Heil dated 08/26/13 re: Discipline of employee for violation of social media policy and reference to contact with Debbie Sandler, Esq. |
| Appendix 389 | Email from Plaintiff to Raymond Jungclaus – dated 08/30/13 – her reaction to Garvin email regarding a discussion about her NHA license |
| Appendix 390 – 391 | Email from Raymond Jungclaus to Plaintiff dated 10/24/13 re: If you can't fix it with a hammer – political comment |
| Appendix 392 – 394 | Email from Gregory Gangi to Plaintiff dated 10/24/13 – "How pathetic are those of you who still love the Obama (intentional small case) man" |
| Appendix 395 – 406 | Email from Raymond Jungclaus to Plaintiff dated 12/19/13 – Problem with Public Housing – criticizing Obama for putting feet on furniture |
| Appendix 407 | Email dated 08/18/14 from Plaintiff to R. Supper asking for recommendation |
| | |
| **VOL, III** | |
| Appendix 408 – 567 | Emails from Mr. Soltis on which Plaintiff was copied 2011 – 2016 |
| Appendix 568 – 598 | First Amended Complaint |
| Appendix 598 – 603 | Plaintiff's Initial Disclosure under F.R.C.P.26 |
| Appendix 604 – 605 | Plaintiff's Supplemental Disclosure under F.R.C.P.26 |
| Appendix 606 – 621 | Plaintiff's Answers to Interrogatories |
| | |
| **VOL. IV** | |
| Appendix 622 – 690 | Deposition of Plaintiff, Kathleen Jungclaus, Day 1, 11/01/18 |
| Appendix 691 – 817 | Deposition of Plaintiff, Kathleen Jungclaus, Day 2, 11/02/18 |
| | |
| **VOL. V** | |
| Appendix 818 – 860 | Deposition of Raymond Jungclaus, 11/01/18 |
| Appendix 861 – 911 | Deposition of Anita Summers, 11/26/18 |
| Appendix 912 – 1039 | Deposition of Richard Bauer, 11/26/18 |
| | |
| **VOL. VI** | |
| Appendix 1040 – 1171 | Deposition of Thomas Garvin, Day 1, 11/02/18 |
| Appendix 1172 – 1213 | Deposition of Thomas Garvin, Day 2, 11/26/18 |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. VII** | |
| Appendix 1214 – 1218 | Bing Search of Kathleen Jungclaus, 07/30/19 |
| Appendix 1219 | Affidavit of Carolyn Baysmore |
| Appendix 1220 – 1221 | Affidavit of Debra Best |
| Appendix 1222 – 1229 | Affidavit of Amy Blessing |
| Appendix 1230 – 1231 | Affidavit of Margaret Carpenter |
| Appendix 1232 – 1235 | Affidavit of Constance Dogan |
| Appendix 1236 – 1239 | Affidavit of Meredith Feher |
| Appendix 1240 – 1241 | Resume of Meredith Feher |
| Appendix 1242 – 1251 | Affidavit of Thomas Garvin |
| Appendix 1252 – 1253 | Resume of Thomas Garvin |
| Appendix 1254 – 1256 | Affidavit of Marc Heil |
| Appendix 1257 – 1260 | Resume of Marc Heil |
| Appendix 1261 – 1265 | Affidavit of Lauren Kelley |
| Appendix 1266 – 1268 | Resume of Lauren Kelley |
| Appendix 1269 – 1270 | Affidavit of Patricia Rodgers |
| Appendix 1271 – 1272 | Resume of Patricia Rodgers |
| Appendix 1273 – 1275 | Affidavit of Tanya Salgado, Esquire |
| Appendix 1276 – 1279 | Affidavit of Deborah Sandler, Esquire |
| Appendix 1280 – 1282 | Affidavit of Robert Supper |
| Appendix 1283 – 1289 | Resume of Robert Supper |
| Appendix 1290 – 1294 | Affidavit of Janet Thompson |
| Appendix 1295 – 1296 | Resume of Janet Thompson |
| Appendix 1297 | Affidavit of Basheer Womack |
| Appendix 1298 – 1301 | Affidavit of Thomas Wozniak |
| Appendix 1302 – 1303 | Summary of Qualifications of Thomas Wozniak |

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Sunday, September 11, 2016 6:55 PM |
| **To:** | Linda Madera;'Beale Sandra';Patrick Gallagher;'Virginia Smith';Bill Murdock;Bill Bates;gilbi@comcast.net;Pat Walsh;Mari McCarthy;Ray McNeal;Barbara Klaproth;Sharon Babcock;Paul Vigyikan;Paul Watermulder;Bob Plimpton;Debbie Maggs;Bob Schubert;Kathy Jungclaus;Debbie Turner;Debbie Franklin;Debi Best;Charles W Babcock;Dick Bauer;Jay Goldenberg;jhwonderworks@verizon.net;Jim Kisela;John Van Horne;meisterbill4@yahoo.com;skip@hlchalfant.com |
| **Subject:** | [EXTERNAL][CONTENT] FW: Fwd: Disney hired this teen animator |

**From:** Joyce Soltis [mailto:greyghost144@gmail.com]
**Sent:** Sunday, September 11, 2016 1:57 PM
**To:** Sandy Fernet-Moody; Chuck Soltis; Barbara Wentling; diana fassett; Joyce Soltis & David Long; Alice Brown; Chris stephan; Teri Gay; Patti Webb
**Subject:** Fwd: Fwd: Disney hired this teen animator

Begin forwarded message:

**Subject: Fw: Disney hired this teen animator**
**Date:** September 4, 2016 at 1:32:27 PM EDT

: Fwd: Disney hired this teen animator

Subject: Disney hired this teen animator

https://www.youtube.com/embed/0zJoYNS6XHU

## Disney Offered a Job to the Student That Created This ...

www.youtube.com

Try watching this video on www.youtube.com, or enable JavaScript if it is disabled in your browser.

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Monday, July 04, 2016 10:01 AM |
| **To:** | leonesch@aol.com;Malcolm Schoenberg;verdi123@comcast.net;Suzanne DuPlantis;summers@wharton.upenn.edu;cesoltis@earthlink.net;Kristin Hevner;Barbara Wentling;Mari McCarthy;Charles W Babcock;Amy Blessing;Janet Thompson;Kathy Jungclaus;'Beale Sandra';meisterbill4@yahoo.com;Chris Rother;Kim Park;primroselanefarm@comcast.net;Diane LaForce;'David Baker';'Virginia Smith';Jim Kisela;Jerry Adair;skip@hlchalfant.com |
| **Subject:** | [CONTENT] FW: Penguin and Fisherman |

--

The penguin and the fisherman - Best Buds! (Picture: TV Globo)

Today's most heart warming story

is brought to you from a beach in Brazil. It's the story of a South American Magellanic penguin who swims 5,000 miles each year to be reunited with the man who saved his life. Retired bricklayer and part

time fisherman Joao Perei de Souza, 71, who lives in an island village just outside Rio de Janeiro, Brazil, found the tiny penguin, covered in oil and close to death, lying on rocks on his local beach in 2011.

Joao cleaned the oil off the penguin's feathers and fed him a daily diet of fish to build his strength. He named him Dindim.



The prodigal penguin returns (Picture: TV Globo)

After a week, he tried to release the penguin back into the sea. But, the bird wouldn't leave.

'He stayed with me for 11 months and then, just after he changed his coat

with new feathers, he disappeared,' Joao recalls. And, just a few months later, Dindim was back. He spotted the fisherman on the beach one day and followed him home



Look who's back (Picture: TV Globo)

For the past five years, Dindim has spent eight months of the year with Joao and is believed to spen

d the rest of the time breeding off the coast of Argentina and Chile. It's thought he swims up to 5,000 miles each year to be reunited with the man who saved his life.



(Picture: Rio de Janeiro Federal University)

'I love the penguin like it's my own child and I believe the penguin loves me,' Joao told Globo TV. 'No

one else is allowed to touch him. He pecks them if they do. He lays on my lap, lets me give him showers, allows me to feed him sardines and to pick him up.



It's thought Dindim believes the fisherman is also a penguin (Picture: TV Globo)

'Everyone said he wouldn't return but he has

been coming back to visit me for the past four years. He arrives in June and leaves to go home in February and every year he becomes more affectionate as he appears even happier to see me.'



(Picture: Rio de Janeiro Federal University )

Biologist Professor Krajewski, who interviewed the fisherman for Globo TV, told The Independent: 'I have never seen

anything like this before. I think the penguin believes Joao is part of his family andprobably a penguin as well. 'When he sees him he wags his tail like a dog and honks with delight. And, just like that, the world

seem
s a
kinde
r
place
again
.

a

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Wednesday, January 06, 2016 8:29 AM |
| **To:** | Ray McNeal;Mari McCarthy;'Carol Soltis';Kristin Hevner;Barbara Wentling;Bill Bates;Bill Murdock;Bill Leonard;gilbi@comcast.net;'Virginia Smith';Thomas Garvin;Bob Schubert;Bob Plimpton;Robert Supper;Bob Barry;Kathy McEndy;Kathy Jungclaus;Paul Vigyikan;Paul Watermulder;Jeff Brillhart;meisterbill4@yahoo.com;Jim Kisela;Jim Nettleton;John Van Horne;John Ball;John D Milner;archcpa@aol.com;elfshole@mac.com;Linda Madera;Charles W Babcock;Sharon Babcock;Suzanne DuPlantis;Laura Ward;Debbie Franklin;Debbie Turner;Debbie Maggs;Debi Best;debra_o'malley@ml.com;Lance Goldstein;Gary Bragg;Amy Blessing;summers@wharton.upenn.edu;oscarfalfo@gmail.com;Chris Rother;Chris Stephan;'Joyce Soltis';'Long';Dan Weiss;edavis5167@aol.com;verdi123 @comcast.net;leonesch@aol.com;Malcolm Schoenberg;Howard Buzzard |
| **Subject:** | FW: Yes I can!! Have fun |

# Here's another trick of Doctor Dementia to test your skills...

## Can you meet this challenge?

We've seen this with the letters out of order, but this is the first time we've seen it with numbers.  Good example of a Brain Study: If you can read this OUT LOUD you have a strong mind.  And better than that: Alzheimer's is a long long, way down the road before it ever gets anywhere near you.

7H15            M3554G3

53RV35      7O    PR0V3

H0W        0UR     M1ND5      C4N

D0      4M4Z1NG       7H1NG5!

1MPR3551V3        7H1NG5!

Appendix 425

1N       7H3       B3G1NN1NG

17       WA5       H4RD       BU7

N0W,       0N   7H15       LIN3

Y0UR       M1ND       1S

R34D1NG 17       4U70M471C4LLY

W17H0U7       3V3N

7H1NK1NG       4B0U7       17,

B3       PROUD!       0NLY

C3R741N       P30PL3       C4N

R3AD       7H15!

PL3453       F0RW4RD       1F

U   C4N       R34D       7H15.


To my 'selected' strange-minded friends: If you can read the following paragraph, forward it on to your friends with 'yes' in the subject line. Only great minds can read this. This is weird, but interesting!

If you can raed this, you have a sgtrane mnid, too.

Can you raed this? Olny 55 people out of 100 can.

I cdnuolt blveiee that I cluod aulaclty uesdnatnrd what I was rdanieg.  The phaonmneal pweor of the hmuan mnid, aoccdrnig to a rscheearch at Cmabrigde Uinervtisy, it dseno't mtaetr in what oerdr the ltteres in a word are, the olny iproamtnt tihng is that the frsit and last ltteer be in the rghit pclae.  The rset can be a taotl mses and you can still raed it whotuit a pboerlm.  This is bcuseae the huamn mnid deos not raed ervey lteter by istlef, but the word as a wlohe.  Azanmig huh?  Yaeh and I awlyas tghuhot slpeling was ipmorantt!  If you can raed this forwrad it.

FORWARD ONLY IF YOU CAN READ IT..

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Friday, December 11, 2015 1:58 PM |
| **To:** | Dick Bauer;Dick Conway;Ray McNeal;Mari McCarthy;Pat Walsh;Patrick Gallagher;Barbara Wentling;'Carol Soltis';Kristin Hevner;Joe Crean;Dan Weiss;Daniel Pantano;Bill Bates;'Virginia Smith';gilbi@comcast.net;plsvanda@aol.com;primroselanefarm@comcast.net;Jeff Brillhart;Kathy Jungclaus;Debbie Franklin;Debbie Turner;Debbie Maggs;Debi Best;John Van Horne;John Ball;leonesch@aol.com;verdi123@comcast.net;Malcolm Schoenberg;archcpa@aol.com;Linda Madera;elfshole@mac.com;Bill Murdock;Bill Leonard;Suzanne DuPlantis;Laura Ward;Moeller, Michael;Jay Goldenberg;Jay Cooperman;Jayne Ingram;jay stiefel;'David Baker';skip@hlchalfant.com;Jim Kisela;Jim Nettleton;Amy Blessing;Ashley Kreutzer;Bob Schubert;oscarfalfo@gmail.com;Chris Rother;Kim Park;edavis5167@aol.com;Howard Buzzard;jhaas@williampennfoundation.org;jfreyer@pensions.org;Paul Vigyikan;Charles W Babcock;Sharon Babcock;Thomas Garvin;'Sparkman, Thorne';'ed ziegler';Edward Landin |
| **Subject:** | FW: Fwd: FW: **Savez-vous que les girafes sont d'excellentes plongeuses ? |

Pretty unbelievable. Enjoy

**From:** Joyce Soltis [mailto:greyghost144@gmail.com]
**Sent:** Friday, December 11, 2015 9:04 AM
**To:** Chuck Soltis
**Subject:** Fwd: Fwd: FW: **Savez-vous que les girafes sont d'excellentes plongeuses ?

# Voir jusqu'a la fin.......Super...incroyable!!!!

## *Le spectacle des girafes avec tant d'élégance !*

## **_https://www.youtube-nocookie.com/embed/nPrWo5pEvyk?rel=0_**

Lori M. French

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Friday, October 30, 2015 11:08 AM |
| **To:** | Ray McNeal;Mari McCarthy;Pat Walsh;Patrick Gallagher;Jeff Brillhart;Bill Bates;Bill Murdock;Bill Leonard;Debbie Franklin;Debbie Turner;Debbie Maggs;Debi Best;Thomas Garvin;Robert Supper;Bob Plimpton;Bob Schubert;Suzanne DuPlantis;Laura Ward;'David Baker';Jeanne Helmers;archcpa@aol.com;Dick Bauer;Dick Conway;Jim Kisela;Jay Goldenberg;Jay Cooperman;Sharon Babcock;Charles W Babcock;meisterbill4 @yahoo.com;Diane Wyatt;skip@hlchalfant.com;oscarfalfo@gmail.com;Bob Barry;Ashley Kreutzer;Amy Blessing;summers@wharton.upenn.edu;debra_o'malley@ml.com;Ed Tabb;'ed ziegler';Chris Rother;Daniel Pantano;Dan Weiss;dmeassoc1@verizon.net;Don Fleischer;'Sparkman, Thorne';George Schnyder;verdi123@comcast.net;Howard Buzzard;'Joyce Soltis';'Long';Malcolm Schoenberg;leonesch@aol.com;Paul Vigyikan;Sam McKeel;spiccolo@history.pcusa.org;'Yobigdad';Rick Anthony;smjenks@aol.com;Kathy Jungclaus |
| **Subject:** | FW: History of one dollar bill |

Read this history of the $1 bill – **all the way to the bottom to know about <u>Haym Solomon</u>.**
You may be in for quite a surprise!

**On the rear of the One Dollar bill, you will see two circles. Together, they comprise the Great Seal of the United States. The First Continental Congress requested that Benjamin Franklin and a group of men come up with a Seal. It took them four years to accomplish this task and another two years to get it approved.**
*If you look at the left-hand circle, you will see a Pyramid.*

**Notice the face is lighted, and the western side is dark. This country was just beginning. We had not begun to explore the west or decided what we could do for Western Civilization. The Pyramid is uncapped,**

again signifying that we were not even close to being finished. Inside the Capstone you have the all-seeing eye, an ancient symbol for divinity. It was Franklin 's belief that one man couldn't do it alone, but a group of men, with the help of God, could do anything.

*'IN GOD WE TRUST' is on this currency.*

The Latin above the pyramid, ANNUIT COEPTIS, means, '*God has favored our undertaking.*'
The Latin below the pyramid, NOVUS ORDO SECLORUM, means, '*a new order has begun.*'
At the base of the pyramid is the Roman numeral for 1776. (MDCCLXXVI)

*If you look at the right-hand circle, and check it carefully, you will learn that it is on every National Cemetery in the United States .*
*It is also on the Parade of Flags Walkway at the Bushnell, Florida National Cemetery , and is the centerpiece of most heroes' monuments.*
*Slightly modified, it is the seal of the President of the United States , and it is always visible whenever he speaks, yet very few people know what the symbols mean.*

The Bald Eagle was selected as a symbol for victory for two reasons:
First, he is not afraid of a storm; he is strong, and he is smart enough to soar above it.
Secondly, he wears no material crown. We had just

broken from the King of England .

Also, notice the shield is unsupported. This country can now stand on its own.

At the top of that shield there is a white bar signifying congress, a unifying factor. We were coming together as one nation.

In the Eagle's beak you will read, ' E PLURIBUS UNUM' meaning, *'from many - one.'*

Above the Eagle, we have the thirteen stars, representing the thirteen original colonies, and any clouds of misunderstanding rolling away. Again, we were coming together as one.

*Notice what the Eagle holds in his talons. He holds an olive branch and arrows. This country wants peace, but we will never be afraid to fight to preserve peace. The Eagle always wants to face the olive branch, but in time of war, his gaze turns toward the arrows.*

An (untrue) old-fashioned belief says that the number 13 is an unlucky number. This is almost a worldwide belief. You will almost never see a room numbered 13, or any hotels or motels with a 13th floor. But think about this:

America, which relies on God (not a number) to direct and lead, boldly chose:

*13 original colonies,*
*13 signers of the Declaration of Independence ,*
*13 stripes on our flag,*
*13 steps on the pyramid,*
*13 letters in 'Annuit Coeptis',*
*13 letters in ' E Pluribus Unum,'*
*13 stars above the eagle,*

*13 bars on that shield,*

*13 leaves on the olive branch,*

*13 fruits, and if you look closely,*

*13 arrows.*

And finally, notice the arrangement of the 13 stars in the right-hand circle.

You will see that they are arranged as a Star of David.

*This was ordered by* George Washington who, when he asked Haym Solomon, a wealthy Philadelphia Jew, what he would like as a personal reward for his services to the Continental Army. Solomon said *he wanted nothing for himself, but he would like something for his people. The Star of David was the result. Few people know it was Solomon who saved the Army through his financial contributions ...then died a pauper. Haym Solomon gave $25 million to save the Continental Army, money that was sorely needed to help realize America's – our- freedom and independence from England .*

Therein lies America's Judeo-Christian beginning. Most American children do NOT know any of this. They are not taught because their history teachers do NOT know this.  [They were not taught!]

On America's Freedom:

*Too many veterans gave up too much to let the meaning fade.*

*Many veterans came home to an America that did not care.*

*Too many veterans never came home at all.*

*They served, they died for you ... for me.*

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Saturday, October 24, 2015 10:06 AM |
| **To:** | Thomas Garvin;Suzanne DuPlantis;Laura Ward;Bill Bates;Bill Leonard;gilbi@comcast.net;Dan Weiss;'David Baker';Debbie Turner;Debbie Franklin;Debbie Maggs;Debi Best;debra_o'malley@ml.com;Lance Goldstein;Dick Bauer;Dick Conway;Kathy Jungclaus;Janet Thompson;Jane Kamp;archcpa@aol.com;John Van Horne;John Ball;John D Milner;summers@wharton.upenn.edu;Ashley Kreutzer;Bill Murdock;Robert Supper;Bob Plimpton;Bob Schubert;Bob.Herbein@americaninfrastructure.com;Chris Rother;Chris Stephan |
| **Subject:** | FW: HALLOWEEN SPOOF |

Click on photo





**Epic Halloween Prank by Tom Mabe**

by MabeInAmerica

Check out ...

Help center • Report spam

©2015 YouTube, LLC 901 Cherry Ave. San Bruno, CA 94066

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Monday, October 12, 2015 3:06 PM |
| **To:** | Dick Conway;Dick Bauer;Pat Walsh;Bill Bates;Bob Supper;Paul Vigyikan;Bob Plimpton;vafs3201@gmail.com;gilbi@comcast.net;cesoltis@earthlink.net;Kristin Hevner;Barbara Wentling;Ray McNeal;Mari McCarthy;Debbie Turner;Debbie Franklin;Debbie Maggs;Debi Best;Thomas Garvin;Suzanne DuPlantis;Laura Ward;Loretta Witt;Dimitrios Diamantaras;Jane Kamp;Bill Leonard;Joe Crean;George Schnyder;Jim Kisela;'Horn, Jim';archcpa@aol.com;Bob Schubert;kathy.jungclaus@gmail.com;Sam McKeel;John Van Horne;John Ball;John D Milner;Jerry Adair;Daniel Pantano;Dan Weiss;meisterbill4@yahoo.com;Sharon Babcock;Ed Mahoney;summers@wharton.upenn.edu;Ashley Kreutzer;Bill Murdock;elfshole@mac.com;Linda Madera;Chris Rother;Chris Stephan;'David Baker';dmeassoc1@verizon.net;Gerry Renthal;Jeanne Helmers;Lance Goldstein;Bob Barry;'Yobigdad';smjenks@aol.com;Amy Blessing |
| **Subject:** | FW: Fwd: Social media new twist |

**Subject: FW: Social media new twist**



## THE NEW GENERATION

*Daughter: "Daddy, I am coming home to get married. Take out your checkbook. I'm in love with a boy who is far away from me. I am in California and he lives in New York. We met*

*on a dating website, became friends on Facebook, had long chats on Whatsapp, he proposed to me on Skype and now we've had two months of relationship through Viper. Dad, I need your blessings, good wishes, and a big wedding."*



*Father: "Wow!  Really!! Then get married on Twitter, have fun on Tango, buy your kids on Amazon and pay through PayPal. And if you get fed up with your husband....sell him on Ebay."*

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Saturday, September 12, 2015 10:46 AM |
| **To:** | cesoltis@earthlink.net;'Joyce Soltis';Kristin Hevner;Kristin Warriner;Barbara Wentling;Thomas Garvin;Bob Schubert;Bob Plimpton;Robert Supper;Bill Bates;Bill Murdock;Vail Garvin;vafs3201@gmail.com;plsvanda@aol.com;Pat Walsh;Ray McNeal;Mari McCarthy;Debbie Franklin;Debbie Turner;Debbie Maggs;Debi Best;Kathy Jungclaus;Joe Crean;Amy Blessing;Barbara Jordan;'Long';archcpa@aol.com;summers@wharton.upenn.edu;Suzanne DuPlantis;Ashley Kreutzer;Daniel Pantano;Dan Weiss;meisterbill4@yahoo.com;Bob Plimpton;Chris Rother;Chris Stephan;Chris Van Horne;'Yobigdad';David J. Farling ;dmeassoc1@verizon.net;Kim Park;Dick Bauer;Dick Conway;Ed Mahoney;Ed Tabb;Gerry Renthal;John Ball;George Schnyder;edavis5167@aol.com;Howard Buzzard;jhaas@williampennfoundation.org;Jay Goldenberg;Jay Cooperman;jay stiefel;Jim Kisela;jfreyer@pensions.org;Mike Miles;Juleann Miller;Paul Vigyikan;Rick Anthony;smjenks@aol.com;Jeff Brillhart;Sharon Babcock;'Sparkman, Thorne';jhorn@tri-mgroup.com |
| **Subject:** | FW: Makes you smile |

Many pictures that are really fun and pretty amazing; enjoy
Chuck Soltis

Here is a guy with talent who is having a good time for all to enjoy.



à-- Creation David Zinn

# David Zinn is an artist from Michigan. He runs around all day in the streets of Ann Arbor, with street

construction, cracks, etc. On the road with chalk to create a lot of street fairy tales.

























David Zinn's most famous creation was undoubtedly a little monster called Sluggo. Sluggo has a green body and long, round eyes, it and its partners have also become a small street in *Ann Arbor* unique scene.























Please share so more people can see.

This email has been checked for viruses by Avast antivirus software.
www.avast.com

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Saturday, June 20, 2015 10:59 AM |
| **To:** | Dick Bauer;Dick Conway;Bob Schubert;Thomas Garvin;Kathy Jungclaus;Janet Thompson;Bill Bates;Bill Murdock;Robert Supper;Bob Plimpton;Paul Vigyikan;Ray McNeal;Mari McCarthy;Pat Walsh;Joe Crean;George Schnyder;Jim Kisela;'Horn, Jim';Debbie Turner;Debbie Franklin;'David Baker';Jeff Brillhart;'Smith Virginia';elfshole@mac.com;Ed Mahoney;cesoltis@earthlink.net;Kristin Hevner;Rob Maggs;Jim Kisela;John Van Horne;John Ball;John Marrinucci;meisterbill4@yahoo.com;Jay Goldenberg;Jay Cooperman;jay stiefel;Barbara Wentling;Chris Rother;Chris Stephan;'Long';greyghost144@gmail.com;Bob Schubert;Bob.Herbein@americaninfrastructure.com;Ross Myers;archcpa@aol.com;Mary Tebeau;Ashley Kreutzer;oscarfalfo@gmail.com;mshalling@yahoo.com;Ed Tabb;Howard Buzzard;'Smith Virginia';Jill Acker;Sharon Babcock;Lance Goldstein;Penny Hunt;Rick Anthony;Jeanne Helmers;JR@germanautospecialist.com;jroders@eastern.edu |
| **Subject:** | FW: Our Modern Will Rogers: Thomas Sowell |

You really have to love this intellectual from Stamford

**Subject:** Fwd: Our Modern Will Rogers: Thomas Sowell

Begin forwarded message:

This guy is right on the mark!



"Much of the social history of the Western world, over the past three decades, has been a history of replacing what worked with what sounded good."

- Thomas Sowell

**Great Quotes From Great People**

"It is hard to imagine a more stupid or more dangerous way of making decisions than by putting those decisions in the hands of people who pay no price for being wrong."

*Thomas Sowell*

http://Quotefulness.com

" If you have been voting for politicians who promise to give you goodies at someone else's expense, then you have no right to complain when they take your money and give it to someone else, including themselves. "

- Thomas Sowell

100% FED Up!



"I have never understood why it is "greed" to want to keep the money you've earned, but not greed to want to take somebody else's money"

-Thomas Sowell



It is amazing that peo
think we cannot affor
for doctors, hospitals,
medication somehow
that we can afford to
doctors, hospitals, me
and a government bur
to administer it



"I think this man [Obama] really does believe he can change the world, and people like that are infinitely more dangerous than mere crooked politicians."

"If you have always believed that everyone should play by the same rules and be judged by the same standards, that would have gotten you labeled a radical 60 years ago, a liberal 30 years ago and a racist today."
-Thomas Sowell





**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Friday, April 17, 2015 10:29 AM |
| **To:** | Dick Bauer;Dick Conway;gilbi@comcast.net;'Smith Ginny';Thomas Garvin;Bill Bates;Bob Schubert;Robert Supper;Ray McNeal;Mari McCarthy;Barbara Wentling;John Van Horne;Joe Crean;George Schnyder;greyghost144@gmail.com;'Long';Vail Garvin;Debbie Franklin;Debbie Turner;Debi Best;Pat Walsh;'Rob Bowman';Robert Ker;elfshole@mac.com;Linda Madera;Kathy Jungclaus;Paul Vigyikan;Mary Tebeau;Arch McMichael;Ashley Kreutzer;Bill Murdock;meisterbill4@yahoo.com;Bob Plimpton;oscarfalfo@gmail.com;rlukens@chestercohistorical.org;Chris Rother;dabaker717@aol.com;pennyhunt@aol.com;dmeassoc1 @verizon.net;howard.buzzard@aol.com;Jay Goldenberg;'Horn, Jim';Jim Kisela;Lance Goldstein;pennyhunt@aol.net;Mike Miles;Rick Anthony;'Scott Jenkins';'carol soltis' |
| **Subject:** | FW: Letter to IRS |

**From:** mshalling@yahoo.com [mailto:mshalling@yahoo.com]
**Sent:** Thursday, April 16, 2015 8:15 PM
**Subject:** Letter to IRS

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Friday, April 03, 2015 10:41 AM |
| **To:** | 'Smith Ginny';Bill Bates;'Philip Richardson';Patrick Gallagher;PHILIP RICHARDSON;elfshole@mac.com;Linda Madera;Kristin Hevner;Kathy Jungclaus;Janet Thompson;Thomas Garvin;Bob Schubert;Robert Supper;Dick Bauer;Mari McCarthy;Howard Buzzard;meisterbill4@yahoo.com |
| **Subject:** | FW: Fwd: Fwd: A Father, a Daughter and a Dog |

**From:** Joyce Soltis [mailto:greyghost144@gmail.com]
**Sent:** Friday, April 03, 2015 9:33 AM
**To:** Sandy Fernet-Moody; diana fassett; Barbara Wentling; Alice Brown; CaroVail; Chris stephan; Teri Gay; Chuck Soltis
**Subject:** Fwd: Fwd: Fwd: A Father, a Daughter and a Dog

Sort of long read but you'll enjoy

*Dad had been a lumberjack in Washington and Oregon . He had enjoyed being outdoors and had*
*reveled in pitting his strength against the forces of nature. He had entered grueling lumberjack competitions,*

*and had placed often. The shelves in his house were filled with trophies that attested to his prowess.*

*The years marched on relentlessly. The first time he couldn't lift a heavy log, he joked about it;*
*but later that same day I saw him  outside alone, straining to lift it.*

*He became irritable whenever anyone teased him about his advancing age,*

*or when he couldn't do something he had done as a younger man.*

*Four days after his sixty-seventh birthday, he had a heart attack.*

*An ambulance sped him to the hospital while a paramedic administered*

*CPR to keep blood and oxygen flowing.*

Appendix 474

*At the hospital, Dad was rushed  into an operating room. He was lucky; he survived.*
*But something inside Dad died. His zest for life was gone.*
*He obstinately refused to follow doctor's orders. Suggestions and offers of help were*
*turned aside with sarcasm and  insults. The number of visitors thinned, then finally stopped altogether.   Dad was left alone.*

*My husband, Dick, and I asked Dad to come live with us on our small farm. We hoped the fresh air and rustic atmosphere would help him adjust.*

*Within a week after he moved in, I regretted the invitation. It seemed nothing was satisfactory.*
*He criticized everything I did. I became frustrated and moody.*
*Soon I was taking my pent-up anger out on Dick. We began to bicker and argue.*

*Alarmed, Dick sought out our pastor and explained the situation.*
*The clergyman set up weekly counseling appointments for us.*
*At the close of each session he prayed, asking God to soothe Dad's troubled mind.*

*The next day I sat down with the phone book and methodically called each of the mental health clinics listed in the Yellow Pages.*
*I explained my problem to each of the sympathetic voices that answered in vain.*

*Just when I was giving up hope, one of the voices suddenly exclaimed,*
*"I just read something that might help you! Let me go get the article."*

*I listened as she read. The article described a remarkable study done at a nursing home.*
*All of the patients were under treatment for chronic depression.*
*Yet their attitudes had proved dramatically when they were given responsibility for a dog.*

*I drove to the animal shelter that afternoon.. After I filled out a questionnaire,*
*a uniformed officer led me to the kennels. The odor of disinfectant stung my nostrils as I moved down the row of pens Each  contained five to seven dogs.*
*Long-haired dogs, curly-haired dogs, black   dogs, spotted dogs all jumped up, trying to reach me.*
*I studied each one but rejected one after the other for various reasons too big,*

*too small, too  much hair. As I neared the last pen a dog in the shadows of the far corner*
*struggled to his feet, walked to the front of the run and sat down. It was a pointer,*
*one of the dog world's aristocrats. But this was a caricature of the breed.*

*Years had etched his face and muzzle with shades of gray. His hip bones jutted out in lopsided triangles.*
*But it was his eyes that caught and held my attention. Calm and clear, they beheld me unwaveringly.*

*I pointed to the  dog. "Can you tell me about him?" The officer looked, then shook his head in puzzlement.*
*"He's a funny one. Appeared out of nowhere and sat in front of  the gate. We brought him in, figuring someone would be right down to claim him. That was two weeks ago and we've heard nothing. His time is up tomorrow."*
*He gestured helplessly.*

*As the  words sank in I turned to the man in horror. "You mean you're going to kill him?"*

*"Ma'am," he said gently, "that's our policy. We don't have room for every unclaimed dog."*

*I looked at the pointer again. The calm brown eyes awaited my decision. "I'll take him," I said. I drove home with the dog on the front seat beside me.*
*When I reached the house I honked the horn twice.*
*I was helping my prize out of the car when Dad shuffled onto the front porch.*
*"Ta-da!  Look what I got for you, Dad !" I said excitedly.*

*Dad looked, then wrinkled his face in disgust. "If I had wanted a dog I would have gotten one.*
*And I would have picked out a better specimen than that bag of bones. Keep it! I don't want it"*
*Dad waved his arm scornfully and turned back toward the house.*

*Anger rose inside me.. It squeezed together my throat muscles and pounded into my temples.*
*"You'd better get used to him, Dad. He's staying!"*

*Dad ignored me. "Did you hear me, Dad ?" I screamed. At those words Dad whirled angrily,*
*his hands clenched at his sides, his eyes narrowed and blazing with hate.*

*We stood  glaring at each other like duelists, when suddenly
the pointer pulled free from my grasp. He wobbled toward my dad and sat
down in front of him.
Then slowly, carefully, he raised his paw.*

*Dad's lower jaw trembled as he stared at the uplifted paw confusion
replaced the anger in his eyes.
The pointer waited patiently. Then  Dad was on his knees hugging the
animal.*

*It was the beginning of a warm and intimate friendship. Dad  named the
pointer Cheyenne .
Together he and Cheyenne explored the  community.
They spent long hours walking down dusty lanes.
They spent  reflective moments on the banks of streams, angling for tasty
trout.
They even started to attend Sunday services together,
Dad sitting in a pew and Cheyenne lying quietly at his feet.*

*Dad and  Cheyenne   were inseparable throughout the next three years.
Dad's bitterness faded, and he and Cheyenne made many friends.
Then late one night I was startled to feel Cheyenne 's cold nose burrowing
through our bed covers.
He had never before come into our bedroom at night.
I woke Dick, put on my robe and ran into my father's room.
Dad lay in his bed, his face serene. But his spirit had left quietly sometime
during the night.*

*Two days later my shock and grief deepened when I discovered Cheyenne
lying dead beside Dad's bed.
I  wrapped his still form in the  rug he had slept on.
As Dick and I buried  him near a favorite fishing hole,
I silently thanked the dog for the help he had given me in restoring Dad's
peace of mind.*

*The morning of Dad's funeral dawned overcast and dreary.
This day looks like the way I feel, I thought, as I walked down the aisle to
the  pews reserved for family. I was surprised to see the many friends
Dad and Cheyenne had  made filling the church.. The pastor began his
eulogy.
It was a tribute to  both Dad and the dog who had changed his life.*

*And then the pastor turned to Hebrews 13:2.
"Do not neglect to show hospitality to strangers, for by this some have
entertained angels without knowing it."*

*"I've often thanked God for sending that angel," he said.*

*For me, the past dropped into place, completing a puzzle that I had not seen before:*
*the sympathetic voice that had just read the right article ...*
  *Cheyenne 's unexpected appearance at the animal shelter ....*
*his calm acceptance and complete devotion to my father*
*and the proximity of their deaths. And suddenly I understood.*
*I knew that God had answered my prayers after all.*

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Wednesday, December 17, 2014 10:54 AM |
| **To:** | cesoltis@earthlink.net;Chris Rother;Chris stephan;Chris Van Horne;Debbie Maggs;Debbie Turner;Debbie Franklin;debra_o'malley@ml.com;Debi Best;'David Baker';elfshole@mac.com;Linda Madera;Pat Walsh;Ray McNeal;Mari McCarthy;Suzanne DuPlantis;Laura Ward;Bill Murdock;Bill Leonard;Rick Anthony;Dick Bauer;Dick Conway;Sarah Bauer;Sam McKeel;'Smith Ginny';summers@wharton.upenn.edu;suedmilbourne@aol.com;Jill Acker;'Jenkins, Scott';Steven Kirkpatrick;Thomas Garvin;Vail Garvin;Robert Supper;Bob Schubert;Bob Barry;Bob Plimpton;Jeff Brillhart;meisterbill4@yahoo.com;John Ball;John Marrinucci;John Van Horne;Jane Kamp;Janet Thompson;Kathy McEndy;cesoltis@earthlink.net;Kathy Jungclaus;greyghost144@gmail.com;'Long';'Sparkman, Thorne';David J. Farling ;'Robert W. Lyon';'Rob Bowman';'Horn, Jim';Jim Kisela |
| **Subject:** | FW: A Little Holiday Cheer |

What this Supermarket did to surprise its customers with some holiday cheer is
Edeka is Germany's largest supermarket chain. They hid 13 cameras and as cu
at the checkout counters the lights went off,
but the cashiers continued to scan items through the checkout. That's when the
machines began to beep a very familiar tune!
The cashiers choreographed a holiday classic to the delight of their customers.

Come On, HEB, WalMart, etc., Get with the program!!!

https://www.youtube.com/watch?v=H965m0Hkk5M

This email has been checked for viruses by Avast antivirus software.
www.avast.com

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Tuesday, September 30, 2014 1:42 PM |
| **To:** | Kristin Hevner;Barbara Wentling;Ray McNeal;Mari McCarthy;Pat Walsh;gilbe@comcast.net;'Smith Ginny';Bill Bates;Thomas Garvin;Robert Supper;Kathy Jungclaus;summers@wharton.upenn.edu;leonesch@aol.com;Gerry Renthal;John Ball;elfshole@mac.com;Linda Madera;'David Baker';Jeanne Helmers;John Marrinucci;John Balson;Bob Schubert;Bob Plimpton;Paul Vigyikan;Dan Weiss;mshalling@yahoo.com;meisterbill4@yahoo.com;Jeff Brillhart |
| **Subject:** | FW: Fwd: Fwd: Well Worth Watching |

**From:** Joyce Soltis [mailto:greyghost144@gmail.com]
**Sent:** Tuesday, September 30, 2014 11:18 AM
**To:** Chuck Soltis; carol soltis
**Subject:** Fwd: Fwd: Fwd: Well Worth Watching


---


-------- **Subject: FW: Well Worth Watching**


**Everyone needs to see this one; it only takes a minute.**

**Hong Kong movie theater asks its patrons to leave their cell phones ON when they enter the movie.**

**Using that, Volkswagen made an eye opening ad...**

**More than 1.5 million views in 3 days!**

  **https://www.youtube.com/embed/JHixelr_6BM?rel=0&autoplay=1&iv_load_policy=3**


---------------------------- IMPORTANT NOTICE: This message and any attachments are solely for the intended recipient and may contain confidential information which is, or may be, legally privileged or otherwise protected by law from further disclosure. If you are not the intended

recipient, any disclosure, copying, use, or distribution of the information included in this e-mail and any attachments is prohibited. If you have received this communication in error, please notify the sender by reply e-mail and immediately and permanently delete this e-mail and any attachments. -----------------------------

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Thursday, August 14, 2014 10:53 AM |
| **To:** | Dick Bauer;Dick Conway;gilbe@comcast.net;leonesch@aol.com;Vail Garvin;John Marrinucci;Pat Walsh;Linda Madera;elfshole@mac.com;Ray McNeal;Bob Schubert;Robert Supper;'Smith Ginny';Debbie Franklin;Debbie Turner;Kathy Jungclaus;Jim Kisela |
| **Subject:** | FW: The saluting boy on Omaha beach - YouTub |

Very interesting and actually, pretty amazing; makes one think.

Click here: Project Vigil: D-Day 2014, The saluting boy on Omaha beach - YouTube

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Friday, May 09, 2014 2:48 PM |
| **To:** | Bill Bates;Bill Murdock;'Smith Ginny';Vail Garvin;Tom Garvin;Bob Schubert;Bob Supper;Kathy Jungclaus;cesoltis@earthlink.net;Kristin Hevner;b888w@verizon.net;'Joyce Soltis';Pat Walsh;Lance Goldstein;Dan Weiss;'David Baker';Dick Bauer;Dick Conway;Joe Crean;roosthwb@aol.com;gilbi@comcast.net;elfshole@mac.com;Ray McNeal;Rick Anthony;Richard Miller;Chris stephan;Chris Rother;Chris Van Horne;Debbie Franklin;Debbie Maggs;Debbie Turner;Mary Tebeau;Mari McCarthy |
| **Subject:** | FW: Congressman Trey Gowdy turned the tables on the media |

**Subject:** Fw: Congressman Trey Gowdy turned the tables on the media

**Hello All,**
**Congressman Trey Gowdy (R-SC) turned the tables on the media and asked them questions about Benghazi.   The silence was deafening. Best video clip I've seen in months.   I hope you watch it ~ it's only 3 minutes.**
**The Media should be embarrassed by Congressman Trey Gowdy's questions.**

**This is most certainly the most embarrassing event that has occurred in the last 16 months.  The burden falls on the media who have not done anything to investigate this.**

**Have you seen this video yet? It's amazing!!!!!!**
**Click Here**

**After viewing this 3.5 minute video, I urge you to forward it to your sphere of influence.**

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Saturday, April 12, 2014 2:24 PM |
| **To:** | cesoltis@earthlink.net;Kristin Hevner;Ray McNeal;'Joyce Soltis';omsf144@gmail.com;Dick Bauer;Dick Conway;'David Baker';Rick Anthony;Bob Schubert;Bob Supper;Bob Plimpton;b888w@verizon.net;Mari McCarthy;Joe Crean;Pat Walsh;Mary Tebeau;'Smith Ginny';gilbi@comcast.net;Vail Garvin;Kathy Jungclaus;Ashley Kreutzer;Debbie Maggs;Debbie Turner;Debbie Franklin;Jay Goldenberg;Lance Goldstein;John Van Horne |
| **Subject:** | FW: Appalling |

Love him or hate him; NOTHING but the facts!

AND THIS MY FRIENDS IS WHAT GOES ON
IN OUR CAPITOL..... DID YOU VOTE FOR
THESE PEOPLE

**WATCH THIS AND CONSIDER
PASSING IT ON TO EVERYONE ON
YOUR LIST**

**This is appalling!**

**No intelligent American citizen, Left
or Right would condone
the actual process that will be
exposed in this video. It's
almost unbelievable. Please watch at
least the first 45
seconds... your eyes will be opened.
Every American needs to
see this video.**

**http://www.youtube.com/embed/svG
DZOW-brA?rel=0**

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Tuesday, April 08, 2014 9:35 AM |
| **To:** | Daniel Pantano;Dan Weiss;Kristin Hevner;cesoltis@earthlink.net;Ray McNeal;Mari McCarthy;Pat Walsh;gilbi@comcast.net;'Smith Ginny';leonesch@aol.com;Malcolm Schoenberg;Gerry Renthal;Vail Garvin;Joe Crean;Jay Goldenberg;Jay Cooperman;Mike Miles;Debbie Maggs;Debbie Turner;Debbie Franklin;Debi Best;Kathy McEndy;Kathy Jungclaus;Jane Kamp;Janet Thompson;meg.guenveur@waverlyheightsltd.org;Jeff Brillhart;meisterbill4@yahoo.com |
| **Subject:** | FW: Vintage Jonathan Winters |

THIS IS SPECIAL,  WHAT JONATHON WINTERS COULD DO WITH A STICK .... ENJOY ...

Subj: Vintage Jonathan Winters

# This is about 4 minutes of laughter...Enjoy!!!

## Jonathan Winters - "The Stick"

What were you  doing in 1964?
He was a unbelievable comic and entertainer!  A true one of a kind!

It is nearly 50 years old and as funny today as it was on that night in 1964 when Jack Paar handed a simple stick to Jonathan Winters without a script.

http://biggeekdad.com/2013/04/jonathan-winters-stick/#.UXfWSphGZzg.email

 This email is free from viruses and malware because <u>avast! Antivirus</u> protection is active.

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Saturday, January 04, 2014 10:49 AM |
| **To:** | cesoltis@earthlink.net;Kristin Hevner;Dick Bauer;Dick Conway;George Schnyder;Joe Crean;John Marrinucci;meisterbill4@yahoo.com;b888w@verizon.net;Debbie Turner;Debbie Franklin;Debbie Maggs;Rick Anthony;'Smith Ginny';Vail Garvin;Tom Garvin;Gerry Renthal;Kathy Jungclaus;Ray McNeal;'David Baker';Jeanne Helmers;Gus Perea;Mike Miles;Mike Marquez;PHILIP RICHARDSON;Chris Rother;Chris Van Horne;Bill Murdock;Bob Schubert;Bob Supper;Pat Walsh;Dan Weiss;Bill Bates |
| **Subject:** | FW: Treason Exposed! |

Friends,
VERY important to remember the facts

**From:** Gil Stein [mailto:gilbi@comcast.net]
**Sent:** Saturday, January 04, 2014 12:04 AM
**To:** Chuck Soltis
**Subject:** Treason Exposed!

http://www.youtube.com/watch?v=7HuSyMbbXK4&feature=em-share_video_user

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Friday, December 06, 2013 1:04 PM |
| **To:** | Dick Bauer;Dick Conway;David Long;'Joyce Soltis';cesoltis@earthlink.net;Kristin Hevner;b888w@verizon.net;Joe Crean;Debbie Franklin;Debbie Turner;John Marrinucci;Pat Walsh;Binny & Sandy Beale;George Schnyder;'Smith Ginny';Gilbert Stein;Bill Bates;Vail Garvin;Rick Anthony;Bob Supper;Kathy Jungclaus |
| **Subject:** | FW: The unspoken success of ObamaCare |

Interesting and there just may be some real truth to this concept. I think a lot of us have had thoughts such as this. Of course we would be pretty stupid to let a government that is often screwed up because it is too big, to tell us that now they have to "fix" the mess they have created; on purpose on not.

**From:** Rosalinda R. Madara [mailto:rosalindarmadara@me.com]
**Sent:** Friday, December 06, 2013 12:26 PM
**To:** Patty Cosgrove; Ted Madara, Jr; Dolores Andrews; Polly Ill; Karin Whitney; Dee Page; Don Kraftson; Mary Schnabel; Ingrid Morsman; Al Willoughby; Marjorie H. Fox; Mary Anne Stetzer; Ginny Smith; Chuck Soltis; Debbie Hamilton; Alberta Kindt; Wasabelle Vauclain; Diane Goad; Alice Hardenbergh; Donna Neff; Reggie Pakradooni; Jane Bacon; Annette Linck; Ed & Ellen Openshaw; Elise Carr; Tish Roberts; Stewart Patrick; Eileen Ware
**Subject:** The unspoken success of ObamaCare

> > This is worth reading
> >
> > CANADA  FREE PRESS
> >
> >
> >
> > The  unspoken success of ObamaCare
> >
> >
> > By Doug Hagmann
> > Tuesday,  November 12, 2013
> >
> >
> > Despite  what you are being told, the Affordable Health Care Act (ACA) commonly known  as ObamaCare, is already proving to be a resounding success. The problem  however, is that the majority of Americans don't fully understand  the  objectives of this plan, or the roles  of its architects and its defenders. Even the vast majority of conservative  pundits in all venues don't seem to 'get it'  and  consequently, are leading their readers and listeners astray by focusing on  the wrong issues.
> >
> >

> >

> >

> > First, it is vital to understand that the ACA is not now, nor never was, about providing affordable health care It is merely disguised as such. Rather, it is the vehicle that is being covertly used to conduct the most massive transfer of power to the Executive Branch of government that this nation has ever experienced. It is being done methodically and for a specific purpose. It is the vehicle that will ultimately disassemble and destroy significant parts of the United States Constitution and further enslave United States citizens.

> >

> >

> >

> > Presently, all eyes are on the ostensible failures of the internet gateway or ACA website. This is precisely where the Obama regime and globalist handlers want our focus to be. The reason is that they want us to get caught up in the minutia and not see the bigger picture. But it's a failure, you might say, and ascribe the failure to incompetence, graft, and so on. While generally true, we are being forced to examine only one tentacle of the octopus, while the rest of the creature is being hidden from view.

> >

> >

> >

> > Perhaps this will become clearer if you stop for a moment and ask yourself just one question. How is it possible that the United States government can build, implement and manage the most intricate surveillance apparatus in the world, using a complex array of computers to amass data on people not just in the U.S., but all across the world, yet fail miserably on a less complex health care portal, exchange or web site? Put aside everything you've been told by the government and the media, both proponents and opponents of the ACA, and think for yourself. Does this make sense? If you are being truly intellectually honest, you must conclude that it does not.

> >

> >

> >

> > So what is the real plan, the real objective? Moreover, how are they racing to accomplish their objectives? You are seeing it play out right in front of you, and there is no better example than the alleged failings of the internet based exchange or portal of the health care system. First, it is critical to understand that the internet exchange or website was intended to fail.

> >

> >

> >

> >

> >

> > Employing multiple Marxist methods.

> >

> >

> >

> > To understand what you are seeing unfold, one simply has to understand the Hegelian Dialectic. Simply put, is a method where a crisis or problem is manufactured, and that problem causes chaos within the system.

> >
> >
> > This chaos was intentionally orchestrated by the Obama regime  and their globalist
handlers, and is exactly what we are now witnessing. The  success of ObamaCare is, in part,
dependent on the failure of the website and  the resultant chaos.
> >
> >
> >
> >
> > Now  that chaos surrounding the website exists and "threatens" the entire program,  it is
important to understand that the architects of this massive power  transfer have already
created a number of various predetermined solutions to  advance their objectives. Their
ultimate  objective  is to completely nationalize the entire health care industry of the
United  States, thus completely taking over one-sixth of the U.S. economy.
> >
> >
> > Their goal all along has been to implement a single-payer  system, where the federal
government alone collects all fees for health care  services, pays all costs, and has complete
control. They are using the  Hegelian Dialectic to accomplish exactly that.
> >
> >
> >
> >
> > Therefore,  it is by design that the Obama regime and their handlers have thrust
upon  America the very system of failure that will advance their agenda to a  predetermined
solution of the complete takeover and nationalization of the  private health care industry.
Nearly everyone is playing right into the hands  of this Marxist ideology.
> >
> >
> >
> > "Hegel's  dialectic is the tool which manipulates us into a frenzied circular pattern
of  thought and action. Every time we fight for or defend against an ideology we  are playing a
necessary role in Marx and Engels' grand design to advance  humanity into a dictatorship of the
proletariat. The synthetic Hegelian  solution to all these conflicts can't be introduced unless we
all take a side  that will advance the agenda." [Emphasis mine].
> >
> >
> > But that's not all. In addition to employing the Hegelian  Dialectic, the other Marxist method
is detailed in the Cloward-Piven Strategy.  This strategy was formulated by Richard Andrew
Cloward and Frances Fox Piven,  the husband and wife team working as professors at
Columbia  University  in the 1960s. Their diabolical Marxist plan was first detailed in the May
2,  1966 issue of The Nation magazine.
> >
> >
> >
> >
> > Their  strategy is elegant in its evilness and simplicity. As detailed by David  Horowitz, the
goal is to "hasten the fall of capitalism by overloading the  government bureaucracy with a

flood of impossible demands, thus pushing society into crisis and economic collapse. It is the strategy of forcing political change through orchestrated crisis."

> >

> >

> >

> > End game objectives

> >

> >

> >

> > Once you understand that ObamaCare is not about providing a workable system of healthcare, and understand the Marxist tactics that are currently being used for its implementation as it was initially designed, the next logical step would be to identify the true objectives of the plan.

> >

> >

> >

> > ObamaCare is the Pandora's Box that will facilitate a number of objectives dear to the globalists. It will result in an unprecedented consolidation of power to the Executive Branch of the government.

> >

> > It will serve to essentially nullify the Bill of Rights, subjugating the citizens of the United States to offenses more egregious than those that caused the American Revolution. It will give the federal government (and its agents) direct access to all of your private and personal information, including your health records, your personal financial information, and your employment records. It will also serve as a conduit to abolish your right to own and possess a firearm.

> >

> >

> > It will advance eugenics, or population control that is near and dear to the Fabian Socialists from which this regime has its roots. If you find that difficult to believe, simply refer to the father of Fabian Socialism himself, George Bernard Shaw, in this short video here. While viewing, keep in mind the "conspiracy of the death panels" associated with ObamaCare, and how we were marginalized for even suggesting such a thing.

> >

> >

> >

> >

> > ObamaCare will also serve as a tool of economic sabotage and will facilitate the killing of the U.S. dollar as I have previously detailed. It will thereby provide the means to usher in a system of global governance, or the "New World Order" that so many U.S. presidents and world leaders have advocated.

> >

> >

> >

> > While the conservative leaders and pundits continue to keep you attentive to the failures of the ObamaCare website, please understand that the issue is much bigger, and the stakes are much greater. We're in a fight for our very lives and the liberty provided by our constitution, but we're being played.

Appendix 492

> >
> >
> >
> > Don't fall for it. Think bigger.
> >
> >
> >
> > Pray. Prepare.
> >
> >
> >
> > Copyright © Douglas J. Hagmann and Canada Free Press
> >
> > Douglas J. Hagmann and his son, Joe Hagmann host The Hagmann & Hagmann. Report, a live Internet radio program broadcast each weeknight from 8:00-10:00 p.m. ET.
> >
> >
> > Douglas Hagmann, founder & director of the Northeast Intelligence Network, and a multi-state licensed private investigative agency. Doug began using his investigative skills and training to fight terrorism and increase public awareness through his website.
> >
> >
> >
> >
> > Doug can be reached at: director@homelandsecurityus.com <mailto:director@homelandsecurityus.com>
> >
> >
> >
> >
> > __,_._,___
> >

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Wednesday, June 05, 2013 1:10 PM |
| **To:** | Linda Madera;elfshole@mac.com;Barbara Wentling;cesoltis@earthlink.net;Kristin Hevner;Bill Bates;Rick Anthony;John Marrinucci;Joe Crean;Bob Schubert;Bob Supper;Vail Garvin;Tom Garvin;rlukens@chestercohistorical.org;Ray McNeal;Kathy Jungclaus;meisterbill4@yahoo.com;Tom Zipfel;'Rob Bowman';Scott Jenkins;Pat Walsh;Malcolm Schoenberg;Jay Goldenberg;Jim Kisela;John Van Horne;'David Baker';Ed Mahoney;George Schnyder;'Howard Buzzard';Jack Moon;Janet Thompson;Debbie Franklin;Debbie Turner;Ashley Kreutzer;Dave Ludlum;Bob Schubert |
| **Subject:** | FW: Rules are Rules! |

**From:** Dick Bauer [mailto:rebauer65@yahoo.com]
**Sent:** Wednesday, June 05, 2013 12:52 PM
**To:** 'Chuck Soltis'; 'Sally Bauer'; 'Barbara Enoch'; glray@atlanticbb.net
**Subject:** FW: Rules are Rules!

This is a good one!

## The Good news:

It was a normal day in Sharon Spri when a Union Pacific crew boarde train for the long trek to Salina.

## The Bad news:

Just a few miles into the trip a whe became overheated and melted, let support drop down and grind on th white hot molten metal droppings s to the rail.

The Good news:

A very alert crew noticed smoke a[t]
back in the train and immediately s[topped?]
train in compliance with the Gover[nment]
Regulations.

The Bad news:

The train stopped with the hot whe[el on a]
wooden bridge with creosote ties a[nd]
When crew tried to explain to high[er?]
needed to move the train, they wer[e told not?]
to move the train because Federal [Regulations?]
prohibit moving the train when a p[?]
Well okee-dokey then, and the pict[ure shows the?]
rest. As always the Government kn[ows what's?]
best for us.









# REMEMBER, RULES ARE RUL

"Don't ever let common sense get i
Government Regulation."

=======
Email scanned by PC Tools - No viruses or
spyware found.
(Email Guard: 7.0.0.18, Virus/Spyware
Database: 6.21080)
http://www.pctools.com/?cclick=EmailFooterCl

ean_51

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.3343 / Virus Database: 3184/6369 - Release Date:
05/30/13

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Monday, May 20, 2013 4:23 PM |
| **To:** | Tom Garvin;Vail Garvin;Bob Supper;Kathy Jungclaus;Janet Thompson;Bill Bates;Bill Leonard;meisterbill4@yahoo.com;Ray McNeal;David Long;'Joyce Soltis';vasf3201 @gmail.com;peggy.faha@waverlyheightsltd.org;plsvanda@aol.com;Gilbert Stein |
| **Subject:** | FW: Fw: You will get a kick out of these!!!!!! |

**Thought you might need a smile today.**

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.2904 / Virus Database: 3162/6335 - Release Date: 05/18/13

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Tuesday, December 13, 2011 12:35 PM |
| **To:** | David Long;Bill Bates;Bill Murdock;Dick Bauer;Dick Conway;Barbara Wentling;Rick Anthony;Carol Soltis;Kristin Hevner;Kristin Warriner;Ashley Kreutzer;Debbie Turner;Debbie Franklin;debra_o'malley@ml.com;Debbie Maggs;Amy Blessing;Thomas P. Garvin;Tom Zipfel;tom@tntelec.com;Tom Wozniak;Anne Rogers;Janet Thompson;Meg Guenveur;John Marrinucci;Arch McMichael;Cara Nardone;Charles Grant;Charles Wallace;Horn, Jim;Jim Carter;Chris Rother;Elizabeth Calhoun;Ruth Cobb;Dan Weiss;Dan Callahan;Daniel Pantano;Debbie Franklin;Don Fleischer;Ed Mahoney;edavis5167 @aol.com;Grant Murray;roosthwb@aol.com;Jack Moon;Kathy Jungclaus;Kathy McEndy;Jeff Brillhart;Jim Kisela;Joe Crean;JP Burlington;Juleann Miller;Julian Wachner;Julius Matasovsky;Kat MacMurray;Linda Madara;Mike Miles;Pat Walsh;Pattie Rodgers;Pete Drayer;rbowman@charterhomes.com;Sam McKeel;Sandy Beale;Scott Jenkins;Sean Mullen;Steve Kirkpatrick;Susan Facciolli;Vail Garvin |
| **Subject:** | FW: music that You will probably enjoy |

To everyone,
Enjoy and have a very Merry Christmas
Chuck

You've seen the TV commercial where the guy shows up at Grand Central at the wrong time for a Flash Mob event.

Or the one in the DC Metro where no one paid any attention to a world famous violinist playing at rush hour.

**http://www.classicalarc hives.com/feature/dont_miss this..html**
<http://www.classicalarchives.com/fe ature/dont_miss_this..html>

**Not to be missed! On May 2, 2011, the Copenhagen Philharmonic amazed commuters at the Copenhagen Central Train Station, as they created a kind of orchestral "flash mob" – performing Ravel's famed Bolero, with the musicians gradually assembling in place as the work progresses. The video – which shows not only the assembling orchestra, but also the delighted faces of the commuters – has generated overwhelming interest, and indeed has exceeded the orchestra's expectations. We hope you enjoy it as much as we do!**

```
=======
```
Email scanned by PC Tools - No viruses or spyware found.
(Email Guard: 7.0.0.18, Virus/Spyware Database: 6.18780)
http://www.pctools.com
```
=======
```

```
=======
```
Email scanned by PC Tools - No viruses or spyware found.
(Email Guard: 7.0.0.18, Virus/Spyware Database: 6.18780)
http://www.pctools.com
```
=======
```

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Tuesday, April 24, 2012 11:14 AM |
| **To:** | David Long;Dick Bauer;Dick Conway;Linda Madara;elfshole@mac.com;Barbara Wentling;Debbie Franklin;Debbie Turner;Debbie Maggs;broweram@gmail.com;Mike Marquez;Mike Miles;Rick Anthony;Don Fleischer;Don Barbuto;Carol Soltis;Kristin Hevner;Kristin Warriner;Dan Weiss;rbowman@charterhomes.com;Ashley Kreutzer;Arch McMichael;'David Baker';Amy Blessing;Vail Garvin;Thomas P. Garvin;Tom Zipfel;Tom Wozniak;tom@tntelec.com;Anne Rogers;Kathy Jungclaus;Kathy McEndy;Scott Jenkins;Bill Bates;Bill Murdock;Bob Schubert;Bob Plimpton;Chris Van Horne;Chris Rother;cnardone@philamuseum.org;'Charles Wallace';Ruth Cobb;Dan Weiss;aludlum721@aol.com;Ed Kozar;George Bennyhoff;George Schnyder;Grant Murray;roosthwb@aol.com;Janet Thompson;Jay Cooperman;Jay Goldenberg;Jeanne Helmers;Jim Kisela;Joe Crean;John Marrinucci;Mary Tebeau;Juleann Miller;Lance Goldstein;leonesch@aol.com;Leo Knepper;debra_o'malley@ml.com;Pat Walsh;Pattie Rodgers;Pete Drayer;Sam McKeel;Steve Kirkpatrick |
| **Subject:** | FW: socialism |

Take a moment to laugh

**A must view!!!!**

!

I'd like to say this is hilarious, but I'm not sure it really is funny?

I have no idea who created this material, but imagine the amount of work, planning, researching, graphics etc, that w
into this.



Click on the "PLAY" button to watch the video...



FREE Animations for your email - by IncrediMail

Click Here! ►



**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Monday, April 30, 2012 9:50 AM |
| **To:** | Janet Thompson;Kathy Jungclaus;Amy Blessing |
| **Subject:** | FW: Sleeping Cats |

**From:** Chuck Soltis [mailto:soltis@earthlink.net]
**Sent:** Monday, April 30, 2012 8:22 AM
**To:** Carol Soltis (cesoltis@earthlink.net); Kristin Hevner (khevner@mac.com); David Long (omsf144@gmail.com); leonesch@aol.com
**Subject:** FW: Sleeping Cats

# Sleeping positions

# The Half  Sit-up
To  achieve the half sit-up, you must begin wi
the  intention of exercising your abs and prom
fall  asleep midway through the task. This pos
is  extremely advanced and not recommende
amateur  sleepers.



# The Awkward Spoon

The goal here is not so much for intimacy, as it the socially uncomfortable sharing of your physical space with someone. Bonus points if your arm falls asleep and you're too scared to move it.



# The Cool  Dude
The  trick here is to look totally relaxed while you're  really extremely uncomfortable.



# Bed Hog
The goal is not so  much comfort, as an expression of sheer, unadulterated  greed.



# Thinking Outside the Box

Two of your feet - preferably on opposite sides
your body -  must remain outside the box at
all  times.



# The Pile-Up
You end up colliding  with at least three others,
and you are hoping they all  have insurance.



# Be The Box

You must be able to  get your whole body in the box, no matter what it takes.    Become one with the  box!



# The Radiator
Your main goal here is  not about comfort......it's
just about  warmth.



# The Sleeping Dog

This one is easy.   Find a dog.  Imitate the  dog.



# The Positive  Thinker

You refuse to be let a bad  situation get the bes
you.



# The Drying  Rack

Imagine that you are a wet  t-shirt.  Drape yourself  accordingly.





# The  Head-Rush

Lay on your back, head hanging  off the side, paws in the air - and let gravity do the  rest.  A pounding headache will incur  shortly.



# The Non-Conformist

You will first need to  find two willing conformists in order to make your  statement.



# The Mid-Sentence
This position is only for those with extreme form
of narcolepsy.



# Some Assembly  Required
Have a friend take you apart and  then try to
reassemble you from  memory.



Same as above, except without  the box.



# The Dog Bed

It's probably the most  comfortable bed you will ever sleep on, but smells kind  of funky.



# The Dreaded Mid-Afternoon  Slump

Eating a big lunch, then falling  asleep at your desk.



# The Old Married  Couple
Your mate's snoring no  longer bothers you.





FREE Animations for your email

Click Here!

**Lori M. French**

| | |
|---|---|
| **From:** | Chuck Soltis <soltis@earthlink.net> |
| **Sent:** | Friday, July 27, 2012 2:23 PM |
| **To:** | Kristin Hevner;cesoltis@earthlink.net;David Long;Ray McNeal;Jim Kisela;Mike Marquez;Barbara Wentling;Janet Thompson;Kathy Jungclaus;Anne Rogers;Meg Guenveur;Amy Blessing;Rick Anthony;Debbie Franklin;Debbie Maggs;Debi Best;Pattie Rodgers;PHILIP RICHARDSON |
| **Subject:** | FW: DOES THIS KID UNDERSTAND PHOTOSHOP SOFTWARE OR WHAT? |

-----Original Message-----
From: Bob Nolan <rjnolan@comcast.net>
Sent: Wed, Jun 27, 2012 8:07 am
Subject: Fwd: DOES THIS KID UNDERSTAND PHOTOSHOP SOFTWARE OR WHAT?

### You can't even believe your lying eyes anymore!

## DOES THIS KID UNDERSTAND PHOTOSHOP SOFTWARE OR WH

**Erik Johansson - 21 year old Swedish photographer**



**Mind-Boggling Photo Manipulations by Erik Johansson**



erik-johansson-1
10.jpg



erik-johansson-13
2.jpg



erik-johansson-15
5.jpg



erik-johansson-16
3.jpg



erik-johansson-17
14.jpg



erik-johansson-18
17.jpg



erik-johansson-2
8.jpg



erik-johansson-21
18.jpg



erik-johansson-22
20.jpg



erik-johansson-23



erik-johansson-3
9.jpg



erik-johansson-4
11.jpg



erik-johansson-5
6.jpg



erik-johansson-retouching-7



glace3



by Erik Johansson 1



**Mind-Boggling Photo Manipulations by Erik Johansson**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS                          :
                                               :        **CIVIL ACTION**
                     **Plaintiff**             :
                                               :        **NO. 2:17-cv-04462- RK**
                                               :
                                               :
                     **v.**                    :        **JURY TRIAL DEMANDED**
                                               :
**WAVERLY HEIGHTS LTD.,**                      :
**THOMAS P. GARVIN and JOHN and**             :
**JANE DOE Numbers 1 through 21**              :
                                               :
                     **Defendants**            :
                                               :
_____:

## FIRST AMENDED COMPLAINT

## NATURE OF THIS ACTION

1.      In this action, Plaintiff Kathleen M. Jungclaus, a wrongfully discharged HR

Manager seeks to recover damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§2000e, ("Title VII"), the Age Discrimination in Employment Act ("ADEA") of 1967, 29 U.S.C.

Sections 621 *et seq.*, the Pennsylvania Human Relations Act, P.S. Sections 951 *et seq*, and

invokes other Pennsylvania legal protections providing relief for defamation and having been

placed in a false light, retaliation and negligent supervision of her superior, Thomas Garvin.

This is all as a result of Waverly Heights LTD's unlawful employment practices, consisting of

the maintenance of an illegal discriminatory working environment and discrimination against

Plaintiff due to her sex and age. This discrimination extended to the terms and conditions of her

employment, including job conditions, benefits, job advancement and ultimately resulting in her

firing.  Plaintiff has been retaliated against, as a result of her advocacy for equal treatment of

1

women, ultimately being fired for that advocacy, contrary to Defendants' pretextual assertion that she was fired for tweeting what amounted to personally protected political speech. This tweeting was done entirely away from Waverly's sites or email. This is in contrast to circumstances where other males connected with Waverly Heights, LTD were allowed to directly use Waverly sites and email to express racist political views. Ms. Jungclaus seeks declaratory and injunctive relief, as well as back pay, front pay, compensatory and punitive damages, together with attorneys' fees, and the costs and expenses of this suit to redress the effects of Waverly's' pervasive discriminatory employment policies, practices and procedures and its post-employment retaliation against her. In addition, Ms. Jungclaus seeks damages directly against Waverly Heights' CEO, Thomas P. Garvin, and John and Jane Doe numbers 1 though 21 for defamation of Plaintiff, consisting of comments which placed her in a false light and have been damaging to her reputation.

## PARTIES

2.     Plaintiff Kathleen M. Jungclaus ("Jungclaus" or "Plaintiff ") is an adult Caucasian American female over the age of 40, who resides at 1129 Mill Road Circle, Rydal, PA 19046. For virtually her entire career, beginning in 1985, Plaintiff has been employed in the human relations field. Since 1997, and for approximately the next twenty years, she has been employed by Waverly Heights LTD, first as its Director of Human Resources, and later until the time of her termination as Vice President of Human Resources. As a female born on December 9, 1960, Plaintiff is over the age of forty and, as such, she is member of certain protected categories of individuals under pertinent civil rights statutes.

3.     Defendant, Waverly Heights LTD ("Waverly" or "Employer") is a Pennsylvania non-profit corporation located at 1400 Waverly Road, Gladwyne, PA, 19035, doing business

2

under the fictitious name of Waverly Heights. Defendant was created in 1982. According to its website, in 1986 it opened as a non-profit continuing care retirement community, operating on what was the former Main Line estate of a railroad baron. At all relevant times, Employer has continuously been engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§2000e (b), (g) and (h).

4.    Defendant Thomas P. Garvin ("Garvin") has been, at all times pertinent to this lawsuit, President and Chief Executive Officer of Defendant Waverly, since July 2010 working on Waverly's premises. During her employment, Plaintiff reported directly to Garvin.

5.    Defendants John and Jane Doe Numbers 1 through 21 comprise the governing body of Defendant Waverly, its Board of Trustees, ultimately responsible for running the facility. These defendants will be specifically named as discovery proceeds in this matter.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over Plaintiffs' claims for relief under 28 U.S.C. §§1331, 1337, 1343, 2201, and 2202, since those claims are based in part on violations of Section 706 (f) (1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5(f) (1) and (3) ("Title VII") and violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Section 623, et seq.

7.    Jurisdiction is also invoked pursuant to 28 U.S.C. §1367 granting this Court supplemental or pendent jurisdiction over the state claims under the laws of Pennsylvania, including the Pennsylvania Human Relations Act, 43 P.S. Sections 951 *et seq*, as well as Pennsylvania statutory and common law claims, because the state claims and federal claims are

3

so interrelated that they are the same case or controversy under Article III of the United States Constitution.

8.    Venue is proper in this District under 28 U.S.C. Section 1391 (b) and (c) since Defendants do business and are headquartered in the Eastern District of Pennsylvania and Plaintiff has worked and resides in the same District.

## FULFILLMENT OF TITLE VII CONDITIONS

9.    Plaintiff has fulfilled all conditions precedent to the institution of this action under Title VII.  Charges were filed with the Equal Employment Opportunity Commission ("EEOC") and simultaneously dual-filed with the Pennsylvania Human Relations Commission. A "Right to Sue" letter was issued by the EEOC to Plaintiff on August 16, 2017 and Plaintiff filed her initial complaint in this court within ninety (90) days of receipt of those letters.

## FACTUAL ASSERTIONS

10.    The focus of Plaintiff's entire career has been in social and human services.  After graduating from Gwynedd Mercy College with a B.A. in Psychology and a minor in Education/Community Services, Plaintiff assumed the roles of Staff Supervisor, then Senior Staff Supervisor for Bayada Nurses, responsible for all office personnel and office functions including accreditation. After eight years there, she worked for two years as Human Resource Director for Northwestern Human Services and then as Director/ Vice President for Human Resources at Waverly from 1997 until 2016, when she was terminated. Her work for Waverly was key to its attaining recognition as a "Best Place to Work" in Pennsylvania for the years 2011-2013.

4

11.     On its website, Waverly's stated "Mission" reads as follows:

Waverly Heights is a non-profit corporation established to provide high quality life care services to seniors in a professional and caring manner. We do this by providing an exceptional environment, a wide range of outstanding cultural activities, a well-maintained physical plant, wellness support and comprehensive medical services. We are the employer of choice for people who are committed and attentive to the needs of seniors. We accomplish this while meeting rigorous standards of financial stability.

12.     Waverly is among the most elite senior living facilities in the region, if not the entire country, housing a collection of residents who in their younger years enjoyed success, distinction and privilege. Its Board of Trustees is comprised largely of CEO's and upper management of a host of professions which purportedly "is dedicated to ensuring that Waverly Heights provides the highest quality programs, services and amenities for senior living."

13.     As touted by Waverly in its website, "For more than 25 years, Waverly Heights has offered exceptional independent living, personal care and skilled nursing accommodations and services, and it has met industry standards of excellence in management, financial stability, and quality of care and service." Given her long tenure of approximately 20 years, this "excellence" in significant part can be attributed to Plaintiff.  She has always received very high ratings in her performance reviews including under Mr. Garvin's tenure.  Her consistent job performance has resulted in an 11% personnel turnover rate, which is one of the lowest in a healthcare environment.  Her responsibilities included risk control and worker compensation management resulting in over $1,000,000 in dividends being paid back to Waverly, reducing costs to the entity.  Ms. Jungclaus was elected by her peers and served as a board member of insurance company Churchill Casualty Ltd., in which Waverly participates. With glowing reviews, she taught the Human Resource section of the Nursing Home Administration

5

certification program. She was responsible for developing and implementing all employee

training, including customer service training, further saving the company costs. She has

attempted to provide fair and equitable treatment to all employees regardless of their race, gender

or sexual orientation over her twenty years of service. This was not always possible, given Mr.

Garvin's tendencies and direction. Ironically, it was his reaction to her personally expressed

convictions that ended her career. She was not afforded the same fair treatment accorded others.

14.     For years prior to her firing, as would be consistent with her responsibilities as

HR Director, Plaintiff made the mistake of protesting various discriminatory and questionable

practices employed by Defendant Garvin and acquiesced in by the Board of Trustees of Waverly

consisting of John and Jane Does Number 1 through 21 (hereinafter "The Board of Trustees").

This proved to be a fatal mistake when it came to her career.

15.     Until her firing, Plaintiff enjoyed an excellent reputation among Defendant's staff

and residents, along with an excellent reputation in the community.

16.     After almost twenty years as HR Director/Vice-President of Human Resources,

Plaintiff was called into Tom Garvin's office on September 20, 2016. When she entered, he was

holding a manila folder which held a purportedly anonymous letter protesting a July 24, 2016

Twitter posting about the Presidential election on Plaintiff's personal account.

17.     The actual Twitter text was:

> @realdonaldtrump I am the VP of HR in a comp outside of Philly
> An informal survey of our employees shows 100% AA employees
> Voting Trump

18.     During that meeting Plaintiff was dumbfounded and distraught. Defendant

Garvin promised that she would not be fired and that she should not worry. He characterized the

situation as being a mere nuisance. He then left to attend a conference in Florida and did not return until Monday September 26th.

19.     Directly after that initial meeting, Plaintiff deleted the posting which had attracted neither comment, sharing or responses.

20.     On his return date, Plaintiff attempted to see Defendant Garvin several times. He was very evasive. Finally, at 3:30 p.m. on Tuesday September 27, Plaintiff was called to Mr. Garvin's office. He was with Mr. Dick Bauer (one of the Does), the Chairman of Defendant Waverly's Board of Trustees.

21.     Defendant Garvin told her that this meeting was about the "anonymous" letter and the Twitter posting. He stated that he was very upset by it and decided to take it to the Board's Human Resources Committee. He stated that the Human Resources Committee and the full Board of Trustees had voted unanimously to terminate her employment based on a violation of Defendant's Social Media Policy.

22.     Plaintiff questions whether, in fact, the full Board of Trustees and a committee thereof were convened in the space of one day. What is clear however, was that a decision had been made without investigation of any sort, without the requisite "due process" hearing, or affording Plaintiff any opportunity to defend herself.

23.     Without success, Plaintiff begged for her job, asking Messrs. Bauer and Garvin to reconsider and/or to allow her to discuss the situation with the Human Resources Committee and full Board of Trustees. Her request was refused.

24.     Realizing that Defendant Garvin was giving her no chance to regain her position, Plaintiff requested the opportunity to instead resign and to say goodbye to the Waverly employees and residents she had grown to love. This too was denied.

Appendix 574

25.     At this meeting, Defendant Garvin then told Plaintiff, "I don't want you to think that we think you are a racist. That's not the case." This proved to be at complete variance with what Defendant Garvin came to tell others about Plaintiff.

26.     The meeting concluded with Defendant Garvin informing Plaintiff that two individuals were waiting to pack up her office and accompany her off campus. This calculatingly choreographed tactic was totally uncalled for given Plaintiff's twenty-year tenure and her position. Plaintiff then told Defendant Garvin, what he already knew, namely that because her in-laws were Waverly residents, she was very concerned about the impression that her termination would have on them specifically, and on the resident population in general. She specifically told him that she was worried about her reputation. He reassured her that he would be very careful about what was said. Further, he promised that he would say that she had simply resigned and would not be back. Notwithstanding, Plaintiff was escorted out by two individuals in plain view of the Waverly staff and residents.

27.     Shortly after Plaintiff was forced from the premises, Defendant Garvin called a meeting of the Senior Leadership Team proceeding to violate the promises he had made to her, instead defaming her and placing her in a false light by telling them that she was fired for violating the Social Media Policy. Upon information and belief this was the beginning of a campaign of defamation that has continued up to the present time.

28.     Defendant Garvin's false and defamatory communications were not limited to in-house employees. As an example, on the very next day after her departure, Plaintiff learned from an outside consultant that Defendant Garvin had told him that she was fired and that it was because of an inappropriate post on Facebook. This same mis-information was passed on to others, including Waverly residents in what was clearly a malicious fashion.

8

Appendix 575

29.     For example, sometime on or about October 7,8, or 9, 2016 Plaintiff received a telephone call from a previous co-worker, Meg Guenveur who said that she learned that Plaintiff was fired for violating Waverly's Social Media Policy.

30.     Similarly, Plaintiff heard from her former boss, Mr. Bill Macguire, in a telephone call on or about October 10, 2016 that he had heard that she was fired for violating Waverly's Social Media Policy.

31.     Notwithstanding Defendant Garvin's assurances to Plaintiff and his awareness that Plaintiff's in-laws were Waverly residents, he further disparaged and defamed her by authoring a memorandum to "Our Valued Residents" notifying them of her departure from employment at Waverly. This has had a severe emotional effect, particularly on Plaintiff's mother-in-law, deterring her from fully participating in life at Waverly.

32.     In early December of 2016, Plaintiff received a call from a housekeeping employee of Waverly who said she heard Plaintiff was fired for a "bad post on Facebook" and that "everybody was talking about it."

33.     Upon information and belief, the only opportunity for the full Board of Trustees to know of Plaintiff's firing was at its October, 2016 meeting, typically held on the second or third Tuesday of the month.

34.     Upon information and belief, Defendant Garvin defamed Plaintiff to the Board of Trustees mischaracterizing Plaintiff as being racist and as having violated Waverly's Social Media Policy.

35.     Upon information and belief, the Board of Trustees, carried forward the defamation of Plaintiff by failing to allow Plaintiff any opportunity to explain her side of what transpired. Instead the Board of Trustees acquiesced in and supported Defendant Garvin's

9

Appendix 576

contesting Plaintiff's application for unemployment compensation benefits based on unfounded claims of racism and violation of Waverly's Social Media Policy, both of which claims were patently false and ridiculous.

36.     Waverly had vigorously resisted Plaintiff's being awarded benefits based on those false and defamatory assertions. So as to bar her from those benefits, Garvin cast about for witnesses who would support his claims of racism and violation of the Social Media Policy before unemployment compensation officials.  Proceedings have continued since her application for benefits with the latest result being a November 13, 2017 Order of the Commonwealth Court of Pennsylvania which affirmed the Unemployment Compensation Board of Review's previous granting of unemployment compensation benefits to Plaintiff.  In its Opinion of November 13, 2017 in *Waverly Heights, Ltd., v. Unemployment Compensation Board of Review*, No. 312 C.D. 2017 the Commonwealth Court found that there was nothing racist about Plaintiff's tweet and that Plaintiff did not violate Waverly's Social Media Policy.

37.     Upon information and belief, the chain of defamation went from Defendant Garvin to Defendants John and Jane Does Number 1 through 21, who in turn republished or authorized republication of falsehoods defaming Plaintiff.  Apparently without exercising independent judgement, Waverly Heights's lawyer simply incorporated those falsehoods in Waverly's filings. Upon information and belief, Plaintiff doubts that the defamatory communications were limited as solely between attorney and client.

38.     A reading of the plain words of Ms. Jungclaus' tweet can only be characterized as a matter of individual belief; a political observation regarding a matter of public concern; i.e., the Presidential election.

39. A consideration of its method of transmission and content reinforces the fact that the tweet was purely a matter of personal opinion, not in any way referent to or connected with Waverly. It was done on personal time on a personal Twitter account. It was not posted using any Waverly software or hardware. It was not on any of Waverly's hosted web sites. Plaintiff's personal Twitter account was not linked to Waverly's website. There was nothing identifying Plaintiff in any way as an employee of Waverly, nor disclosing anything in the way of company-privileged information. Moreover, Twitter postings, by their very nature are only seen by those who choose to go to an individual Twitter page. They are not in the public domain.

40. A plain reading of Defendant's Social Media Policy shows that there was no violation by Plaintiff. Set forth in the Waverly Heights Employee Handbook, the Social Media Policy makes a clear distinction between "company owned assets", and "work-related blogging" on the one hand, and "personal blogging" on the other, stating that "Waverly Heights respects the rights of employees to write blogs and use social networking sites and does not want to discourage employees from self-publishing and self-expression."

41. Given Waverly's system of progressive discipline, even if there were the customary in house due process investigation followed by a determination of a violation, this determination in and of itself would not justify termination; the penalty she received. Never in her twenty years' experience in HR at Waverly has Plaintiff seen any employee be terminated without the opportunity of presenting his or her point of view. Standard practice for an egregious offense would be suspension pending investigation. As an example, a former Waverly executive blatantly discriminated against a direct report by mocking the employee's use of the English language. This demeaning and demoralizing mocking was frequently done in front of other staff and in meetings. This egregious violation was handled by sending the executive to a

11

seminar called "Cultural Diversity and Effective Management Training". In virtually all terminations of which Plaintiff was aware, or in which she was involved, there was a process and the chance for the employee to admit his or her deficiencies and take corrective action. It is ironic that the head of HR would not be afforded that same process.

42.    Waverly contends that it does not "discriminate against employees" when it comes to Social Media Policy, or anything else for that matter.

43.    In pertinent point of fact, Waverly deliberately discriminated against Plaintiff after disregarding blatantly offensive email of other males circulating on and throughout Waverly's email system. The "good ole boy" network has proved to be alive and well at Waverly given former Board Chairman Charles Soltis' use of Waverly email to transmit his own unsolicited, base and deplorable political views, which included fallacious "birther" jokes and racial slurs against President Obama. Plaintiff certainly did not invite such emails, though she received them regularly. Mr. Soltis was never sanctioned for this activity.

44.    The empty declaration of Plaintiff's violation of the Social Media Policy, absent investigation by Waverly or affording Plaintiff the opportunity to defend herself, was a mere pretext for firing her in retaliation for her repeatedly advocating for herself and other females. Simply stated, with the acquiescence of Waverly's Board, Defendants maintained an illegal and hostile working environment, characterized by sex discrimination disfavoring women and those over forty years of age. Notwithstanding the fact that Defendant Waverly is a nonprofit entity, Defendant Garvin, was permitted to create a private self-serving, self-enriching and discriminatory environment which cast aside Waverly's professed ideals and its Mission.

12

Appendix 579

45.     To her eventual detriment, over the past few years Plaintiff specifically challenged Defendant Garvin and that male-dominated empire, when it came to pay and benefit equity issues.

46.     Each year members of Defendant Waverly's Senior Leadership Team completed a self-evaluation and received a review and salary increase in December, to be processed for the first pay period of the next year.

47.     After discussing her inadequate compensation and her frustration over her low percent of increases over the years, with Meredith Feher, Senior Vice President of Health Care Services. Ms. Feher encouraged and coached the Plaintiff to advocate for herself. Based on that conversation, in December 2015, Plaintiff requested a meeting with Defendant Garvin. At that time, Plaintiff earned $110,000.00 a year plus benefits which included full family health insurance, full family dental insurance, life insurance, and contribution to the Waverly 401(a) plan. Plaintiff's status and approach stood in stark contrast to that of Mr. Garvin who was hired as President on July 4, 2010. Throughout his tenure, his compensation and benefits have been more akin to a corporate, rather than a non-profit, environment. His current yearly salary approximates $325,000, with a 4-5% yearly increase, together with a $30,000 to $35,000 annual bonus, not to mention an additional $25,000 purportedly to cover health insurance which was unnecessary as Defendant and his family have health insurance through Defendant Waverly. Consistent with the most egregious examples of corporate greed, his local relocation costs including window draperies, were all paid for by Waverly. What is more, in 2016, Garvin coincidentally purchased an additional home for his family in State College, Pennsylvania from an architect whose firm had been awarded the contract for Waverly's then current $30-million-dollar renovation project at Waverly Heights.

13

48.     Although there are purportedly no exemptions from Waverly's rules, those rules apparently don't apply to Defendant Garvin. Garvin's elitist attitude was demonstrated by his being the only employee who was permitted to use the resident's gym, in full view of the Waverly Staff. He participated in employee contests, accepting the prize money, otherwise depriving hourly employees who earned as little as $10.00 per hour. Despite his salary, he used Waverly's facility, staff and food, at cost, for his private functions. He has had the transportation staff clean his car windows because "the kids' feet were all over them", treating the staff as his personal staff, rather than as employees hired to care for residents. Defendant Garvin has made a practice of having his wife attend conferences with him, apparently with Waverly paying for her as well. This self-professed male superiority resulted in constant complaints to the Plaintiff by the other female members of the leadership team, as well as female staff who were long term employees of Waverly Heights. These include but are not limited to: Meredith Feher, Senior Vice President Health Care Services; Janet Thompson, Vice President of Marketing; Constance Dogan, Director of Environmental Services; Debra Best, Dining Services Manager; Marge Carpenter, Resident Services Manager; Jacqueline Levin, Recruiter and Benefits Specialist; and Amy Blessing; Executive Administrative Assistant.

49.     Since Defendant Garvin started his employment at Waverly in 2010, he has systematically removed senior level management and replaced them with his own male-dominated, hand-picked team. Notwithstanding, each time someone was terminated, Garvin made it a point to tell Plaintiff and others: "You don't have to worry about your job, I am really not out to get the old timers." This in and of itself constitutes an admission of age discrimination. Plaintiff was told that Garvin repeated this same comment to Marc Heil, Vice President of Building Services after announcing Plaintiff's termination.

14

50.     Plaintiff requested a meeting with Garvin in December, 2015. Plaintiff explained that as a 19-year employee she thought that she should be receiving pay increases more in line with her performance and years of employment. She also requested that she be considered for a bonus based on the successful worker's compensation management program she had accomplished over the years, returning more than $1,000,000.00 to Waverly since 2002. Moreover, Plaintiff also made the case that she had successfully "assisted" him with numerous difficult employment issues during his tenure and that she was responsible for all of the in-house training (including the development and implementation for ongoing customer service training) which would normally be outsourced at a significant cost to Waverly. Garvin stated that those were all great accomplishments and that he valued the Plaintiff's support. He assured Plaintiff that he would consider her accomplishments for a generous bonus. In fact, this did not occur.

51.     In contrast to Plaintiff's situation, when performance reviews were completed for 2015, the male Sr. VP of Finance, Robert Supper (employed for only 3 years), was assigned a compensation ratio of approximately 125% of market value, in contrast to Plaintiff's ratio of 102% of market value, despite her many years of service. Larger increases and bonuses were given to the other male members of the leadership team though their overall ratings were often lower than hers. In fact, Plaintiff received the smallest bonus of the entire leadership team.

52.     In January, 2016, Plaintiff discussed the outcome of her performance review and increase/bonus with Meredith Feher, Senior Vice President of Health Care Services. With Ms. Feher's encouragement Plaintiff decided to discuss this situation with Garvin, knowing full well that he would be unhappy and that he would hold it against her. Since she was a direct report to Garvin, her only option was to advocate for herself. Defendant Garvin's response was to

15

become visibly upset with her for challenging his decisions. He then went so far as to question whether she could do her job at all. After this meeting, Plaintiff and Defendant Garvin's relationship was never the same.

53.     In August, 2016, Plaintiff discussed another compensation disparity issue with Defendant Garvin. At the time, Waverly had only two Sr. VP positions. One was held by a male and the other by a female. Only the male was afforded a car. The female Sr. VP of Healthcare was not and complained about the discriminatory situation to Plaintiff. Again, Defendant Garvin was not only not receptive, but even hostile to this complaint. Subsequent events amply demonstrated that the male Sr. V.P. did not deserve a car.

54.     The extent of the hostile working environment for women can be contrasted with the favorable environment enjoyed by Robert Supper, Sr. VP of Finance.

55.     On many occasions Defendant Garvin spoke with Plaintiff privately about his concern over Mr. Supper. Mr. Supper repeatedly bragged about his gambling and drinking habits in front of the staff. Defendant Garvin and other employees knew that he often left work early to go to happy hour. Notwithstanding this and the liability it posed for Waverly, Mr. Supper was provided with a company vehicle. He was repeatedly coached by Defendant Garvin on many occasions not to discuss those activities with his staff. Yet the drinking bravado continued unabated. Mr. Supper's condition was such that Defendant Garvin instructed Plaintiff not to talk to Mr. Supper until after lunch on Mondays, so that he would have a chance to recover from his weekend.

56.     In August of 2016, Mr. Supper took his family to Atlantic City. With him was his son who has struggled with addiction issues. Upon information and belief, Mr. Supper was drinking and gambling with his son. Sometime during the evening, his son removed the Waverly

company vehicle from the hotel valet. Driving erratically, he was pulled over by the police. The Waverly car was impounded and he was arrested for DUI, drug possession and other offenses. Prior thereto, the young Mr. Supper had an extensive criminal background that includes a great deal more than the most recent incident.

57.     When Defendant Garvin learned of the incident, Garvin and the Board Chairman decided to keep things quiet and not inform the Human Resource Committee, let alone the full Board of Trustees.

58.     Defendant Garvin discussed the Supper incident with Plaintiff in her office. Knowing that Defendant Garvin would not fire Mr. Supper for his obvious negligence, Plaintiff again sought to have Defendant Garvin remove the car from him, noting that there was no traveling required of him. Further, Plaintiff emphasized that the other Senior Vice President, a female, was being discriminated against by not having the same benefit. Garvin was emphatic in retorting that he would not bring about parity for the female Senior Vice President. Instead, Defendant asked Mr. Supper to return the car, in turn replacing this perk with a new stipend amounting to $10,500 per year. Plaintiff again requested that Defendant Garvin simply take the benefit away, given the discriminatory optics of having two Senior V. P's of different gender with vastly different benefits. Again, Defendant Garvin expressed resentment over Plaintiff's questioning his decision. Incredibly, given Mr. Supper's misbehavior, Mr. Garvin simply gave him a raise.

59.     Mr. Supper made it a practice of uttering degrading comments about women to those on Waverly's Leadership Team, as well as to his staff. He also made it a practice of yelling, talking over, and dismissing women's' comments in meetings. On several occasions, he

17

exhibited this behavior with impunity, in front of Defendant Garvin. When Plaintiff and others complained, Defendant Garvin's response was dismissive, saying "It's just Bob."

60.     Another indication of Defendant Garvin's discriminatory disregard for proper procedure and the law involves his castigation of Plaintiff for filing a workers' compensation report. In August, 2016, Plaintiff was working on a project dealing with Human Resources files going back to 1986. This was conducted in the Manor House Attic where files needed to be marked for shredding or saving. After 20 minutes in the attic she came downstairs and immediately had a severe asthma attack. After using her rescue inhaler, she had no relief and went to the Assistant Director of Nursing's office for further treatment. After being put on a nebulizer, there was still no immediate response. She was told that if she didn't respond soon that she would have to be sent out by ambulance for emergency treatment. As a last resort, she was told to walk into the walk- in freezer in the main kitchen, where after 10 minutes she began to feel a little better. When she told Defendant Garvin about the incident, his response was: "You're not filing a worker's comp claim are you? You are the risk manager! Imagine how ridiculous you will look at the Captive meetings if you file a claim." ("Captive" refers to Waverly's related insurance company.) Plaintiff did file a report and claim for workers' comp. However, out of fear, she did not submit claims for payment, instead personally paying the bills for necessary follow-up treatment. Given the hostile environment fostered by Defendant Garvin directed towards women, Bob Supper remains employed and Plaintiff was fired.

61.     Defendant Waverly, through its Board, has repeatedly shown affirmative support for the hostile and discriminatory environment fostered and maintained by Defendant Garvin.

62.     Plaintiff's firing stemmed from something far deeper than a dummied-up claim of violation of Waverly's Social Media Policy. It stemmed from a hostile and discriminatory

18

environment directed at women, in general, and her specifically.  The end result is that favored and offending men remain in their jobs at Waverly and Plaintiff has been fired, unable to secure another suitable position.   In the meantime, Plaintiff has been replaced by a younger candidate.

63.     After Plaintiff's firing, Defendants further retaliated against Plaintiff by contesting her qualifying for unemployment benefits, claiming that Plaintiff was racist and had committed "willful misconduct", despite the facts and clear wording of Defendant Waverly's Social Media Policy to the contrary.

## COUNTS

## COUNT I

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e *et seq*
### SEX DISCRIMINATION, MAINTENANCE OF A HOSTILE WORK ENVIRONMENT and RETALIATION

### Kathleen Jungclaus vs. Waverly Heights LTD

64.     Plaintiff restates and realleges paragraphs 1 through 63 as though set forth here in full.

65.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, *et seq.* as amended by the Civil Rights Act of 1991 ("Title VII), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

66.     Discrimination on the basis of sex that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under Title VII as sex discrimination. In order to establish a hostile work environment, five factual elements must be established: (1) that the employee suffered intentional discrimination because of his or her sex; (2) that the discrimination detrimentally affected him or her; (3) that the discrimination was

19

pervasive and regular; (4) that the discrimination would detrimentally affect a reasonable person in the same position as the employee; and (5) that respondeat superior liability exists. In the totality of circumstances described in the Facts set forth hereinbefore, the foregoing five elements are established.

67.     Defendant Waverly is responsible for retaliating against Plaintiff as a result of her complaints of discriminatory treatment and a hostile work environment.

68.     Defendant Waverly is liable for discrimination alleged herein under the doctrine of *respondeat superior* due to the actions and statements of its managers and employees.

69.     Defendant Waverly is liable for the acts of management and Plaintiff's co-workers, because it knew of their proclivities permitting discrimination and a hostile work environment to exist, but did nothing about it.

70.     Defendant Waverly is liable for the acts alleged herein because its board, owners and managers established the corporate culture which encouraged racial discrimination, harassment and retaliation.

71.     Based upon the foregoing facts, Defendant Waverly has discriminated against Plaintiff on the basis of her sex, retaliated against her for standing up for herself and other females and has deprived her of her rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq. as amended.*

72.     Defendant Waverly's conduct has been disparate, intentional, deliberate, willful and conducted in callous disregard of the rights of the Plaintiff.

73.     Defendant Waverly's policies and/or practices have produced a disparate impact against the named Plaintiff with respect to the terms and conditions of employment.

74.     By reason of Defendant Waverly's discrimination, Plaintiff is entitled to all legal and equitable remedies available.

## COUNT II

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e *et seq* POST EMPLOYMENT RETALIATION

### Kathleen Jungclaus vs. Waverly Heights LTD

75.     Plaintiff restates and realleges paragraphs 1 through 74 as though set forth here in full.

76.     Defendant Waverly's retaliation against Plaintiff did not stop with her firing.

77.     After her firing Plaintiff dual-filed a charge with the EEOC and the Pennsylvania Human Relations Commission.

78.     Section 704 of Title VII, cited by this Court in *Stezzi v. Citizens Bank of Pennsylvania*, Civil Action No. 10-4333 at page four reads as follows:

> It shall be unlawful employment practice for an employer to discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice… or because he has made a charge… under this subchapter.

79.     As in *Strezzi*, Plaintiff contends that Defendant Waverly has violated Title VII in opposing her being granted unemployment benefits to the extent that Defendant Waverly has unsuccessfully appealed the determination that Plaintiff was eligible for benefits with the Commonwealth Court issuing an Order with findings that Defendant Waverly's arguments of racism and violation of Social Media Policy were both wanting. The appeal was made despite clear court precedent and plain statutory wording and applicable case law as to what constitutes "willful misconduct" as well as the wording of its own Social Media Policy.

21

80.    Defendant Waverly's actions has cost Plaintiff attorney's fees and Ha impaired her ability to gain suitable employment.

81.    Accordingly, Plaintiff is entitled all applicable damages under Title VII for Defendant Waverly's post-employment retaliation.

## COUNT III

### AGE DISCRIMINATION IN EMPLOYMENT, CREATING A HOSTILE WORK ENVIRONMENT AND RETALIATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967

### Kathleen Jungclaus vs. Waverly Heights LTD

82.    Plaintiff restates and realleges paragraphs 1 through 81 as though set forth here in full.

83.    The Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, *et seq.* as amended ("ADEA"), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of age.  At all times complained of herein, Plaintiff was an employee in the protected age category, of at least 40 years of age pursuant to 29 U.S.C. §631.

84.    The ADEA at Section 623 (a) provides that it is unlawful for an employer "(1)…to discharge or otherwise discriminate against any individual with respect to his compensation, terms conditions, or privileges of employment because of such individual's age; (2) to limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;" Further, Section 623(d) makes it illegal for an employer to discriminate against an employee for his or her opposition to unlawful practices.

22

85. Defendant Waverly is liable for discrimination alleged herein under the doctrine of *respondeat superior* due to the hostile work environment created by the actions and statements of its managers, employees and owners.

86. Defendant Waverly is liable for the acts of its Board, its management, and co-workers, because it knew of their proclivities when it came to age discrimination towards Plaintiff and permitted a hostile work environment to exist, but did nothing about it.

87. The age discrimination detrimentally affected Plaintiff and made her suffer emotional distress as a result of being replaced by a younger less qualified employee. as well as the emotional distress attendant to losing her job.

88. Defendant Waverly is liable for the acts alleged herein because its Board and managers established the corporate culture, which encouraged age discrimination, harassment and retaliation, as well as other forms of discrimination.

89. Based upon the foregoing facts, Defendant Waverly has discriminated against Plaintiff on the basis of her age, retaliated against her for standing up for herself, and has deprived her of her rights in violation of The Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, *et seq.*

90. As a result of such conduct by Defendant Waverly, Plaintiff has suffered damages and is entitled to back pay, front pay, and compensatory damages for, among other things, emotional trauma and the physical consequences thereof suffered by her as a consequence of Defendant's illegal conduct.

91. The described unlawful employment practices by Defendant Waverly were intentional and were done with malice or reckless indifference to Plaintiff's rights protected by the laws of the United States, as well as the laws of the Commonwealth of Pennsylvania. These

23

unlawful acts were committed because of her age and were in retaliation against her standing up for herself, in opposition to illegal practices directed against her.

92. The effect of the aforementioned practices has been to deprive Plaintiff of equal employment opportunities and adversely affect her status as an employee because of her age.

93. By reason of Defendant Waverly's discrimination, the named Plaintiff is entitled to all legal and equitable remedies available.

## COUNT IV

### VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT

### SEX and AGE DISCRIMINATION IN EMPLOYMENT, CREATING A HOSTILE WORK ENVIRONMENT AND RETALIATION

### Kathleen Jungclaus vs. Waverly Heights LTD

94. Plaintiff realleges paragraphs 1 to 93 and incorporates them by reference as though set forth here in full.

95. This claim arises under the Pennsylvania Human Relations Act ("PHRA"). The Pennsylvania Human Relations Act, 43 P.S. § 955 *et seq.*, makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment.

96. Plaintiff is in a protected class because of her sex and age.

97. Based upon the foregoing facts, Defendant Waverly has discriminated against Plaintiff on the basis of her sex and age and has deprived her of her rights in violation of the Pennsylvania Human Relations Act, 43 P.S. § 955 *et. seq.*

24

Appendix 591

98.     As a result of such conduct by Defendant Waverly, Plaintiff has suffered damages and is entitled to back pay, front pay, and compensatory damages for, among other things the consequences thereof suffered by Plaintiff as a consequence of Defendant Waverly's illegal conduct.

## COUNT V

### DEFAMATION
### 42 Pa. Cons. Stat. §§ 8341-8345

### Kathleen Jungclaus vs. Thomas P. Garvin, Waverly Heights LTD, and John and Jane Doe Numbers 1-21

99.     Plaintiff restates and realleges paragraphs 1 through 98 as though set forth here in full.

100.    As set forth hereinbefore, on various occasions Defendant Garvin referred to Plaintiff in a defamatory fashion in speaking without privilege of any sort to other employees and to the Board of Directors of directors individually or as a whole.

101.    Upon information and belief, Board of Trustees' members John and Jane Doe Numbers 1-21 repeated and endorsed Garvin's defamatory statements.

102.    Those defamatory statements consisting of characterizing Plaintiff and her tweet as being racist and in violation of the Waverly Social Media Policy were undoubtedly repeated to others, including witnesses for Waverly in unemployment proceedings, such that they ended up in filings made by Defendant Waverly with respect to Plaintiff's unemployment claim.

103.    Comments went so far as to indicate that Plaintiff was racist. Moreover, these comments were maliciously made as they were explicitly contrary to what Defendant Garvin had promised Plaintiff prior to her departure.

25

104.    Defendants made comments to others, including outsiders, Waverly employees and Waverly residents, which placed Plaintiff in a false light, as the clear inference was that Plaintiff had done something wrong, reprehensible, or possibly even criminal, when in fact as described hereinbefore, for decades, Plaintiff acted affirmatively and responsibly in her job in conformity with applicable law and regulation, Waverly policies, and values purportedly subscribed to by Defendant Waverly.

105.    Given Plaintiff's long job tenure and her popularity with residents and employees, the statements complained of tended to harm the reputation of Plaintiff, so as to lower her in the estimation of the community and/or to deter third persons from associating or dealing with her.

106.    Pennsylvania law provides defamation as a remedy available to the Plaintiff. Defamation is a general term for a legal claim involving injury to one's reputation, caused by a false statement of fact. Pennsylvania statutory law sets forth the burden of proof required of Plaintiff at 42 Pa. Cons. Stat. §8343(a) which includes the following:

      (a)    The communication must be defamatory in character

      (b)    The communication must be publicized by the defendant.

      (c)    The communication must be applied to the plaintiff.

      (d)    The understanding by the communications' recipients of its defamatory meaning.

      (e)    Special harm resulting to the Plaintiff from its publication.

      (f)    Abuse of a conditionally privileged occasion.

107.    Simply stated, Defendants: 1) made a defamatory comment about Plaintiff, 2) that was published to others, 3) that directly identified and concerned Plaintiff, 4) that was

26

Appendix 593

understood by those to whom it was published, who understood it as being defamatory, and who later told Plaintiff of its occurrence, 5) that brought harm to Plaintiff's reputation, and 6) went beyond any claim of conditional privilege. Discovery and the availability of compulsory process promise to lift the lid that Defendant Garvin has placed on employees from communicating with Plaintiff and achieve further detail.

108.    As Defendants have impugned Plaintiff's business conduct, character and standing, Plaintiff has suffered defamation "per se."

109.    As Defendants have defamed Plaintiff willfully, wantonly, and with malice, Plaintiff is entitled to punitive damages in addition to general damages.

## COUNT VI

### NEGLIGENT SUPERVISION OF THOMAS GARVIN

### Kathleen Jungclaus vs. Waverly Heights LTD, and John and Jane Doe Numbers 1-21

110.    Plaintiff restates and realleges paragraphs 1 through 109 as though set forth here in full.

111.    Defendants Waverly and John and Jane Doe Numbers 1-21 were negligent in their supervision of Garvin, thereby allowing him to engage in the conduct as heretofore alleged.

112.    The degree of negligence was willful and wanton.

113.    Plaintiff was injured and sustained damages as a result of such negligent supervision.

27

## RELIEF REQUESTED

This civil action seeks on behalf of Plaintiff, legal and equitable relief including:

a.    A declaratory judgment declaring that Defendant Waverly has illegally discriminated against Plaintiff under Title VII of the 1964 Civil Rights Act, as amended 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967, 29 U.S.C. Sections 621 *et seq.*, and the Pennsylvania Human Relations Act.

b.    An appropriate remedial order, granting injunctive relief, directing and requiring the following:

i.    Appointment of a civil rights monitor or trustee over Defendant' Waverly's operations, fully empowered to implement any injunctive relief issued by this Court, to oversee any and all employment practices until such time as Defendant Waverly no longer discriminates against its employees.

ii.    An immediate ban on any use of any discriminatory activities of the type described hereinbefore.

iii.    Such other remedial action as is needed to enforce compliance with all relevant standards of non-discrimination on the basis of age and color.

v.    Reinstatement of seniority and benefits with back and front pay for Plaintiff. and payment of compensatory and punitive damages, together with attorney's fees and the costs of suit, to Plaintiff in excess of $150,000, in an amount to be determined at trial for each of her Federal and State civil rights counts set forth hereinbefore.

28

vi.    Payment of general damages, compensatory damages, and punitive damages together with attorney's fees and the costs of suit to Plaintiff for the harm suffered by Plaintiff as a result of defamatory statements.

vii.    Payment of general damages, compensatory damages and punitive damages together with attorney's fees and the costs of suit to Plaintiff for the harm suffered as a result of the named Defendants' negligent supervision of Garvin.

vii.    Such other and further relief as the Court may deem just and proper.

viii.    Retention of jurisdiction by this Court until such time as the Court is satisfied that Defendant Waverly, Defendant Garvin, and John and Jane Doe Numbers 1 through 21 have remedied the practices complained of herein and are determined to be in full compliance with the law.

## JURY DEMAND

The Plaintiff demands trial by jury of all issues triable of right to a jury.

## CERTIFICATION

I hereby certify that this Plaintiff has not brought a similar or related lawsuit encompassing the claims brought in this matter.

Date: November 17, 2017

Respectfully Submitted,

Mark D. Schwartz, Esquire
P.O. Box 330
Bryn Mawr, PA  19010-0330
Telephone & Fax: 610 525-5534
Email: MarkSchwartz6814@gmail.com
Pa. I.D. #30527

Attorney for Plaintiff, Kathleen M. Jungclaus

29

## VERIFICATION

I, KATHLEEN M. JUNGCLAUS, do hereby verify that I am the Plaintiff in this matter

and that the facts contained in the foregoing Plaintiff's First Amended Complaint are true and

correct to the best of my knowledge, information and belief. I further understand that these

statements are made subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn

falsification to authorities.

10/17/2017
DATE

KATHLEEN M. JUNGCLAUS

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| KATHLEEN M. JUNGCLAUS | : | |
| | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | NO. 17-CV-4462 |
| v. | : | |
| WAVERLY HEIGHTS LTD., | : | |
| THOMAS P. GARVIN and John and Jane Doe | : | |
| Numbers 1 through 23 | : | |
| Defendants | : | |

---

## PLAINTIFF'S FRCP 26(a) INITIAL DISCLOSURES

Plaintiff, KATHLEEN M. JUNGCLAUS, by his undersigned counsel hereby submits his

Rule 26a Initial Disclosure as ordered by this Court as is set forth below:

Fed. R. Civ. P. 26(a) (1) Initial Disclosure

A. (i) information on persons with discoverable information in support of claims, (not impeachment)

| Name | Address | telephone | Subject of Information |
|---|---|---|---|
| Kathleen M. Jungclaus c/o her attorney | | | Plaintiff's tenure from hiring to firing, work environment & pertinent practices, |
| Thomas Garvin | c/o Defense Counsel | | Plaintiff's tenure and events surrounding her employment and firing |
| Richard Bauer | c/o Defense Counsel | | "       "       " |
| Board Members | c/o Defense Counsel | | "       "       " |

1

Appendix 598

Anonymous Waverly Resident   c/o Waverly       his/her Sept 14, 2016 letter about Plaintiff

Anita Summers            c/o Waverly       Plaintiff's tenure, the "anonymous" letter, board committees, her involvement in   Plaintiff's firing


Charles Soltis    c/o Defense Counsel             dissemination of political email to others including those affiliated with Waverly

Greg J. Scott   c/o Reese Lower Patrick & Scott, 250 Valleybrook Dr., Lancaster, PA 17601
                                              sale of house to Thomas Garvin

Robert Supper,       c/o Waverly            discriminatory working environment, abuse of women, alcohol abuse and his involvement with his son and misuse of Waverly automobile.

Robert Supper, Jr.   c/o Robt Supper       criminal record and abuse of Waverly vehicle

Meredith Feher      c/o Waverly   discriminatory working environment, Plaintiff's tenure

Janet Thompson     c/o Waverly   discriminatory working environment, Plaintiff's tenure, mistreatment by Robert Supper

Constance Dogan          "            "          "             "

Debra Best              "        discriminatory working environment, misuse of staff for personal benefit of Thomas Garvin, Plaintiff's tenure

Marge Carpenter         "        discriminatory working environment, Plaintiff's tenure

Jacqueline Levin        "            "          "             "

Amy Blessing            "        misbehavior of Robert Super, discriminatory working environment, Plaintiff's tenure

Pattie Rodgers          "            "          "             "

Jackie Donnelly         "            "          "             "

Susan Posoff            "            "          "             "

Marc Heil               "        discriminatory atmosphere, specifically Mr. Garvin's attitude regarding Age Discrimination

Brian Brown             "        discriminatory behavior of Defendant and his use of staff for personal benefit

Tom Wozniak       Strategic Comp Planning, 5 Great Valley Pkwy, Suite 210, Malvern, PA 19355                    Garvin's improper report of Plaintiff's dismissal

2

Appendix 599

**Bill McGuire**          **Past Waverly CEO   Plaintiff's tenure & proper procedures**

(ii) copy or description by category and location of all docs that disclosing party has in its possession that may be used in conjunction with claims.

**Defendant and Plaintiff have documents pertinent to Plaintiff's unemployment compensation case and the proceedings conducted in conjunction therewith.   (Pa. Dept of Labor and Commonwealth Court of Pennsylvania**

**Defendant and Plaintiff have access to the EEOC file maintained in this matter which includes Plaintiff's personnel file**

**Defendant and Plaintiff have access to the Waverly Employee Handbook and employee certifications**

**Plaintiff has various police reports with respect Robert Supper Jr.**

**Plaintiff has the deed to the State College home conveyed from Waverly's architecture firm principal Greg Scott to Tom Garvin.**

**Plaintiff has a copy of the website of Waverly's architecture firm- RLPS**

**Plaintiff counsel's letter to RLPS which received no response.**

**Plaintiff' counsel's correspondence to the Waverly Board.**

**"Anonymous" letter of Ms. Summers**

**Letter of January 5 by Defense counsel criticizing Plaintiff's visit with her in-laws, then Waverly residents**

**Proposed severance agreement.**


(iii)  computation of each category of damages claims and info on nature and extent of injuries suffered.

**Damages include but are not limited to the following:**

**- backpay from firing to the present with additional sums for benefits including loss of health insurance, loss of other benefits including profit sharing**

**-front pay representing promotions, bonuses and salary increases that would have taken place from date of firing to present,**

**-costs of job search**

**-emotional pain and suffering, inconveniences, loss of enjoyment of life, embarrassment and other non-pecuniary losses as allowable.**

**-costs and expenses of bringing this action, including legal fees attendant thereto.**

**-costs and expenses attendant to retaliatory behavior resulting in need to litigate unemployment compensation matter**

**-pre and post judgment interest**

**-punitive damages**

**-an allowance to compensate for negative tax consequence**

**-any and all relief allowable under law**

(iv) any insurance agreement under which may be liable

**Plaintiff requested the Declaration page of Defense counsel presented the same.**

(2) Disclosure of Expert Testimony

(A) **Plaintiff has not decided upon the use of an expert to be used at trial.**

(3) Pretrial Disclosures

(A) evidence it may present at trial

**SEE ABOVE TOGETHER WITH SUCH EVIDENCE AS MAY BE SECURED IN DISCOVERY**

(i) name, address and telephone number of each witness, those it expects to present and those it may call if the need arises.

**SEE ABOVE TOGETHER WITH SUCH EVIDENCE AS MAY BE SECURED IN DISCOVERY**

(ii) designation of those witnesses whose testimony the party expects to present by deposition

**Anita Summers**

(iii) identification of each document or other exhibit, including summaries of other evidence-separately identifying those items the party expects to offer and those it may offer if the need arises.

4

Appendix 601

Plaintiff expects to present any documents secured through discovery pertaining to the subject matter of her lawsuit, including but not limited to his personnel file and other documents maintained by Defendant.


**PLAINTIFF RESERVES THE RIGHT TO SUPPLEMENT OR MODIFY THIS REPORT IN ANY OR ALL RESPECTS AS DISCOVERY PROCEEDS**


Respectfully Submitted,

_/s/ Mark D. Schwartz____

Date:  August 9, 2018                    Mark D. Schwartz, Esquire


Mark D. Schwartz Esquire
PA ID # 30527

P.O. Box 330
Bryn Mawr, PA 19010

610 525-5534 telephone and fax

Email: markschwartz6814@gmail.com

Counsel for Plaintiff, Kathleen M. Jungclaus

5

## <u>CERTIFICATE OF SERVICE</u>

I, Mark D. Schwartz, hereby certify that on August 9, 2018, a true and correct copy of the attached was served by email upon the following.

Ms., Grace Deon, Esquire

*Counsel for Defendant*

/s/ *Mark D. Schwartz*

_____

Mark D. Schwartz, Esquire

6

Appendix 603

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | **NO. 17-CV-4462** |
| **v.** | : | |
| WAVERLY HEIGHTS LTD., | : | |
| THOMAS P. GARVIN and John and Jane Doe | : | |
| Numbers 1 through 23 | : | |
| **Defendants** | : | |

## PLAINTIFF'S SUPPLEMENT TO FRCP 26(a) INITIAL DISCLOSURES

Plaintiff, KATHLEEN M. JUNGCLAUS, by his undersigned counsel hereby submits this

supplement to her previous Rule 26a Initial Disclosure as ordered by this Court as is set forth

below:

Fed. R. Civ. P. 26(a) (1) Initial Disclosure

A. (i) information on persons with discoverable information in support of claims, (not
impeachment)

**Name**            **Address**      **telephone**      **Subject of Information**

**All individuals and entities mentioned in Defendants' disclosures and the exchange of email
between the parties and/or their counsel. In addition**

1. Tanya Salgado Attorney White and Williams: interaction with Plaintiff re: matters raised
   Philadelphia, PA | Direct 215.864.6368 | Fax 215.789.7671
   salgadot@whiteandwilliams.com

1

Appendix 604

2. Dr Thomas Hanley - Primary Physician: Plaintiff's health condition as a result of her firing.
   **Penn Family and Internal Medicine Cherry Hill**
   *Penn Medicine Cherry Hill1865 Route 70 East Cherry Hill, NJ 08003(856) 427-4336*

3. D. Min Ku – Allergist: Plaintiff's health condition as a result of her firing.
   1650 Huntingdon Pike, Meadowbrook, PA.
   (856) 795-5600

4. Rhoda Fuchs Morton -Therapist Plaintiff's health condition as a result of her firing.
   419 Old York Rd.  Jenkintown PA 19046  (267) 303-4189 • rfuchsmorton@gmail.com

5. Meg Guenveur;  Former NHA WHL: interaction with Plaintiff re: matters raised.
   5 Valmer Court Ocean City NJ.

6. Linda Larrabee – Former DON WHL: interaction with Plaintiff re: matters raised.
   Upper Darby, Pa.

7. Theresa Mcsisz – Current ADON WHL: interaction with Plaintiff re: matters raised.
   Testify to treatment during asthma attack; told not to complete an incident report she did one anyway.

(ii) copy or description by category and location of all docs that disclosing party has in its possession that may be used in conjunction with claims.

**All documents produced and to be produced by the parties in discovery.**

(iii)  computation of each category of damages claims and info on nature and extent of injuries suffered.

**As previously stated supplemented by expert report and expert testimony.**

2

Appendix 605

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

KATHLEEN M. JUNGCLAUS   :  NO. 17-cv-04462-RK
          :
      Plaintiff :
          :
 v.         :  Jury Trial Demanded
          :
WAVERLY HEIGHTS, LTD.,   :
THOMAS P. GARVIN and    :
JOHN and JANE DOES NUMBERS 1-21 :
          :
      Defendants :

**PLAINTIFF'S RESPONSES TO DEFENDANT, WAVERLY HEIGHTS, LTD'S
INTERROGATORIES DIRECTED TO
PLAINTIFF, KATHLEEN M. JUNGCLAUS**

  Plaintiff Kathleen M. Jungclaus's Response to Defendant, Waverly Heights, LTD's

("Waverly" or Defendant") interrogatories is as follows:

**INTERROGATORIES**

  1.  Provide a description of each and every position ever held, whether as an

employee, consultant, independent contractor, business owner or any other capacity,

whether full time, part time or seasonal, including the name and address of the employer,

individual or entity that employed you, the rate of pay/salary, the duties, the dates of such

employment or engagement, the name of your immediate supervisor and the reason for

discontinuing the employment or engagement if no longer ongoing.

  <u>Answer</u>: Plaintiff's first job was as a supervisor at Bayada Nurses, Inc which had

offices in Philadelphia and Willow Grove, PA from 1985-1993. She began at a salary of

1

approximately $18,000.00 and left making approximately $45,000. Plaintiff then served as Human Resource Director of Northwestern Human Services in Erdenheim, PA from 1995-1997. She began at a salary of approximately $52,000.00and left making approximately$55,000. Plaintiff then worked at Defendant Waverly from April 1997 until her firing in September of 2016, ultimately attaining the position Vice President of Human Resources. Defendant is in possession of the remaining information requested.

Since being terminated from Defendant Waverly, Plaintiff has operated under the name of KMJ Consulting from May of 2017 through to the present and has advised a client on its mission statements and goals, identifying various opportunities to reduce turnover rate, and contributing to various administration and employee matters. Since its inception, Plaintiff has earned approximately the net sum of $7,500.00 from KMJ Consulting.

2.      Other than the litigation filed against the Defendant, have you ever been a party to a lawsuit. If so, please specify the caption, the cause of action and the outcome of the litigation.

Answer:  There has been no other litigation other than minor auto accidents where a nominal settlement was received.  Plaintiff does not recall anything further including the specific dates.

2

3.      Identify any and all employment positions that you have held at any time that you were not employed by Defendant since September 2016, and with respect to each, state when you obtained such employment, salary history since obtaining employment, whether there is the ability to obtain a bonus or other compensation in addition to base salary and all fringe benefits received or expected at any point in the future, such as after the lapse of a probationary period (medical, dental and/or vision insurance, 401-K, disability insurance, vacation days, personal days).

Answer:  See question #1. Plaintiff has had no other employment, no additional compensation or benefits of any kind.

4.      Identify all employment opportunities you have pursued at any time that you were not employed by Defendant since September 2016.

Answer: Plaintiff has sought without success every opportunity to attain a similar job that she had with Defendant Waverly without success as a result of the publicity engendered by Defendant Waverly's unsuccessful and wholly unnecessary attempt to prevent her from collecting unemployment.   See documents provided.

5.     In the Amended Complaint, Plaintiff alleges that she sustained monetary damages, pain and suffering and other damages.  Please identify, with particularity, all damages that Plaintiff claims she has incurred or will continue to incur, as a result of Defendant's actions, and exactly how said damages were caused by Defendant's actions, as alleged.

Answer:  As described in her Amended complaint Plaintiff has indeed sustained monetary damages, pain and suffering and other damages. Aside from the loss of salary and benefits, Plaintiff's inability to obtain even an interview for any position that she has applied to as a result of Defendant Waverly and the other named Defendants has made for emotional distress. Retirement communities and health care providers in the region comprise a small community of interest. The manner in which Plaintiff was fired and the false light that she was placed in by Defendants contribute to those damages which are ongoing, all as a result of the stigma placed on Plaintiff and harm to her reputation as a result of Defendants actions.  Aside from the loss of pay and benefits, Plaintiff has yet to come up with a precise number as to the amount of her damages.

4

6.    Identify any and all documents you intend to introduce into evidence at the time of trial.

<u>Answer</u>: Plaintiff has yet to decide as to what specific documents to introduce into evidence at the time of trial. Moreover, applicable rules will require pre-trial disclosure of documents. However, the following categories are specifically referenced. Plaintiff reserves the right to introduce documents that relate or are referred to in Plaintiff's Amended Complaint. In addition, Plaintiff intends to submit publicly available documents such as the police report with respect to Bob Supper's son, the deed to the Penn State house obtained by Thomas Garvin from Defendant Waverly's architect, the results of a google search of Plaintiff's name and social media pages of those connected with Defendant Waverly. Further documents would come from written discovery, as yet unfinished coming from Plaintiff and Defendants, including but not limited to disgusting and racially insensitive emails circulated by and between Waverly board members and staff.

5

7.    Identify any and all witnesses, including names, addresses, title and relationship to Plaintiff, that have knowledge or information related to the subject matter of this lawsuit, including the subject matter, the nature and substance of each opinion or factual testimony, and the factual matter to which each such person identified in response to this Interrogatory is expected to testify.

**Objection: Given that discovery is proceeding, this interrogatory is vague and overbroad. Further, it is unduly burdensome and oppressive. Notwithstanding, see the answer below which Plaintiff reserves the right to supplement.**

Answer: See the contents of Plaintiff's Amended Complaint and Plaintiff's Disclosure Statement.

8.    Does Plaintiff claim that her claim(s) and/or defense(s) in this action is/are based in whole or in part upon expert opinion?  If so, what claim(s), what is that opinion and the identity of the person(s) from whom that opinion was obtained?

Answer:   At this time, Plaintiff does not contend that liability needs to be established by an expert. However, Plaintiff reserves the right to engage an economic expert with respect to a calculation of her damages. In the event that Plaintiff makes such a decision, then she will specifically supplement this response.

6

Appendix 611

9.      Identify any and all persons Plaintiff intends to call as expert witnesses at the trial of this matter.  Please provide the expert's full name, address, qualifications and the subject matter upon which that expert is expected to testify. Please have the expert(s) state the substance of any facts and/or opinions to which he or she will testify at trial and a summary of the grounds for each opinion identified.

Answer:      See previous response.

10.      If you claim that you have suffered and are suffering medical, psychological and psychiatric injuries and trauma as a result of Defendant's conduct, provide the names and addresses of any and all treating medical providers and/or psychologists, counselors, chiropractors, social workers or any other individual that rendered treatment, support and/or counseling, including the basis/reason you sought treatment and the duration of said treatment.

Answer: See document responses.

11.      Have you ever been involuntarily separated from an employment position and/or received disciplinary action from an employer.  If so, please provide a description of the circumstances underlying the separation from employment and/or the discipline, as well as the outcome.

Answer: No.

7

Appendix 612

12.    You maintain that you protested discriminatory practices by Thomas Garvin, CEO and Waverly's Board of Directors.    Please identify and describe the practices with specificity, including when you protested, about whom you protested, the specific subject matter, whether you protested verbally or in writing and to whom, others that witnessed your alleged protesting and the outcome.

Answer: As the Vice President of HR, Plaintiff's job was to bring areas of concern to Mr. Garvin on a regular basis. Frequently they were about his terminating or disciplining managers or employees. There are many times she presented him with derogatory views of him that staff had brought to her. Some of these areas of concerns are related by reference to the specific provisions of Plaintiff's Amended Complaint. By further way of example, Plaintiff currently recalls the following examples which are not exhaustive by any means:

There is the matter of Bob Supper's behavior as well as the eventual impounding of his Waverly-supplied car detailed in the Amended Complaint. Plaintiff historically complained about Mr. Super's improper behavior which Mr. Garvin excused or brushed off by saying "Its just Bob." Mr. Garvin knew well of Mr. Supper's drinking and suggested working around that.   When it came to disparate benefits accorded Mr. Garvin as opposed to a comparable female executive, Plaintiff complained to Mr. Garvin that the as to the disparity and inequality as well as insisting that the car be taken away. Mr. Garvin's reaction was to take the car but then award Mr. Supper an allowance of $10,500 per year for a car. And he told Plaintiff: "Don't bring it up again."

Plaintiff complained to Mr. Garvin when the Chairman of the Board wanted to give Marc Heil a cash bonus and pay for his entire family to go to Disney as part of the completion of the first construction project. Heil's job was to oversee the construction project. This was indicative of the preferential treatment exhibited toward certain males and represented an unnecessary expenditure of Waverly considering that it is a nonprofit. In typical demeaning fashion, Mr. Garvin told Plaintiff to make all of the arrangements. "Make it Happen Kathy"

When Mr. Garvin was hired he was paid $25,000.00 in lieu of health insurance. After a year he continued to get the health insurance coverage stipend which was increased to $30,000 and then enrolled his entire family in the Waverly Health Insurance Program. When he told Plaintiff to enroll him, Plaintiff asked if he was going to tell the committee. Garvin stated there is only one way they will know and that is if you tell them. Again, "Come on Kathy… Make it Happen." was his response.

Again, these are only examples which currently come to mind.

9

13.     Describe with particularity the content of each and every communication, oral or otherwise, including the date and mode of transmission, between you and any employee, agent, board member, representative or resident of Waverly (identifying such individuals by name) during the time following the September 20, 2016 meeting with Mr. Garvin up to and including your departure from the Waverly property following the meeting you attended with Mr. Garvin and Richard Bauer at which time your employment was terminated.

Answer:  None

14.     Who was the housekeeping employee referenced in paragraph 32 of the Amended Complaint and what was the content of your conversation with this individual?

Answer: Andrea Jones.  See Amended Complaint.  Jones informed Plaintiff that after being seen escorted from the property, staff and managers were saying Plaintiff was caught stealing.

10

15.     What are the facts that form the basis for your source of information upon which you base the allegations contained in paragraph 34 of the Amended Complaint.

Answer:  Plaintiff enjoys the friendships of many business owners and company CEO's in the area. These Business owners in turn are friends of Waverly Board Members. Plaintiff was contacted by these friends and told that the Board Members were told she violated the Social Media Policy by posting a racist tweet. This was a universal message as told by several board members. These Board Members also distanced themselves from the termination by saying that they knew nothing about it.

Additionally, William Maguire former President of Waverly Heights immediately contacted Plaintiff and asked her if he could call Board of Trustee Member Edwin Mahoney on her behalf and get her job back. Stating that she was terminated for no reason and that there had to be another motive for Garvin to terminate her.

11

16.     Did you pack some or all of your personal belongings after your September 20, 2016 meeting with Mr. Garvin and the date you were terminated?  If so, why did you do so?  If so, what items (if any) did you still need to remove following the meeting with Mr. Garvin and Mr. Bauer?

Answer: Nothing was packed or removed from the office following the September 20th meeting. On September 27th, Marc Heil packed the Plaintiff materials consisting of twenty years' worth of accumulation while she lay on the floor in tears. Plaintiff is unaware of what was kept. She was told at the termination meeting that she would be able to return over the weekend to retrieve anything that she missed, but when Plaintiff made the request, it was denied. It was denied the following week as well. Marc Heil is aware of the promise to be allowed back in the office.

12

Appendix 617

17.     You claim that you were retaliated against for advocating on behalf of others in the workplace as well as yourself due to discriminatory practices. Describe in detail the matters for which you allegedly advocated on behalf of others, including when you protested, about whom you protested, the specific subject matter, whether you protested verbally or in writing and to whom, others that witnessed your alleged protesting and the outcome.

Answer:  See the specifics of the Amended Complaint. In addition, what follows is a partial enumeration:

Plaintiff advocated on behalf of herself with respect to her own pay and bonus in a meeting of January 2106 with Mr. Garvin. This was done verbally. Ms. Meredith Feher counseled Plaintiff beforehand as to how to present herself. She was made aware of the outcome.

Plaintiff repeatedly advocated on behalf of Ms. Constance Dogan when it came to her pay. This was done roughly every December since she obtained the position of Director of Housekeeping.

Plaintiff advocated on behalf of Ms. Meredith Feher for her to receive a pro-rated contribution to her 401 K the year she was hired, so as to receive parity with Bob Supper received.  As described in the Amended Complaint Plaintiff advocated for her to receive the same car benefit as Bob Supper.  Meredith Feher was aware and upset by the fact that she was treated differently. She asked Plaintiff to intervene on her behalf and was upset when Mr. Garvin flatly turned it down.

Plaintiff complained over pay inequities and comp ratios of long-term Directors and newly hired directors, managers and staff.

13

Appendix 618

Plaintiff complained about Ms. Janet Thompson's complaints about Chuck Soltis Emails distributed over Waverly email.

Plaintiff asked Mr. Garvin to not include her in his personal financial discussions with Mr. Mike Hendrickson who had sexually harassed Plaintiff in front of both Mr. Garvin and Mr. Supper without repercussions. Although Plaintiff requested not to be in his presence; Mr. Garvin continued to make Plaintiff attend.

Plaintiff protested to Mr. Garvin about the way Bob Supper was treating women in meetings. These women included Pattie Rodgers, Jacqueline Donnelly, Janet Thompson, and Susan Posoff.  Mr. Garvin's response was "it's just Bob."

Plaintiff related to Mr. Garvin complaints from the employees in the business office about Bob Supper always leaving work to gamble or go to the bar. Mr. Garvin's response to Plaintiff as to the complaints was "Make it go away."

14

18.     Provide the dates when you allegedly received complaints about Mr. Garvin, as stated in paragraph 48 of the Amended Complaint, including the mode of receipt (written or verbal) and what you did, if anything, to address the complaints.  If you did nothing, explain why.

Answer:

Ms. Debi Best complained about the hardship posed on the Dining Services employees to cart food and staff to Doylestown, Pa for a graduation party at Garvin's House in May / June 2016. She complained that he only paid for the food and was not nice to her or the staff. She complained about his ego.

Ms. Janet Thompson complained on a weekly basis about how Mr. Garvin doesn't do anything. He made her go to meetings that she doesn't usually did not attend and then assigned her all of the work. This happened several times per year since Garvin's hire. Janet Thompson frequently complained about Mr. Gavin's "dumping" his work on everyone else. Typical of this was his suggestion that Plaintiff attend required education and continuing education courses for him and to sign his name. Janet Thompson complained about his having his moving expenses and new draperies paid for by Waverly some 6 years after he started his job.

Janet Thompson complained about Chuck Soltis emails and the fact that Mr. Garvin allowed them to continue.

Janet Thompson complained about Bob Supper's treatment of women, his drinking, his gambling and the treatment of his wife. Mr. Garvin referred to him as an "ass".

Appendix 620

15

In early 2015 Ms. Jacquie Donnelly complained about Bob Supper and his complete disrespect for her and other women.

Ms. Marge Carpenter complained about Mr. Garvin's treatment of staff and his ego, repeatedly since his hire.

Ms. Pattie Rodgers complained about Bob Supper's treatment of her and other women during a meeting about Waverly Care in 2015.

Regularly, Ms. Amy Blessing complained about the "Good ole Boys Club" and the fact that Mr. Garvin and Supper could do anything that they wished, and it was all ok.


In each of the above instances with the exceptions of the Supper complaints, the individuals who complained were fearful of their jobs and did not want Plaintiff to do anything about it. Given Mr. Garvin's record of firing employees, they were too scared to have Plaintiff pursue anything.

Respectfully submitted,


_/s/Mark D. Schwartz__
Mark D. Schwartz, Esq
For Plaintiff Kathleen M. Jungclaus

October 30, 2018

16