**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| KATHLEEN M. JUNGCLAUS, | | : | |
| | | : | |
| | Plaintiff | : | NO.   17-cv-04462-RK |
| v. | | : | |
| | | : | |
| WAVERLY HEIGHTS, LTD., | | : | Jury Trial Demanded |
| | | : | |
| | Defendant | : | |

**TABLE OF CONTENTS OF APPENDIX FOR DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT – VOL. IV**

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. I** | |
| Appendix 1 – 90 | Waverly's Employee Handbook, 2014 |
| Appendix 91 – 93 | List of Waverly's Board of Trustees, 2015 |
| Appendix 94 – 96 | List of Waverly's Board of Trustees, 2016 |
| Appendix 97 | Waverly's EEO-1, 2015 |
| Appendix 98 | Waverly's EEO-1, 2016 |
| Appendix 99 | Waverly's Non-Discrimination Policy, 2011 |
| Appendix 100 | Waverly's Open Door Policy |
| Appendix 101 – 102 | Waverly's Problem-Solving/Grievances Policy, 2011 |
| Appendix 103 | Waverly's Sexual Harassment Policy, 2014 |
| Appendix 104 | Waverly's Civil Rights Compliance – Employee Awareness, 1997 |
| Appendix 105 – 107 | Social Media Policy, 2014 |
| Appendix 108 | Chart Showing Demographic Information Regarding Waverly's Senior Leadership Team as of 09/16 |
| Appendix 109 – 110 | Waverly's letter to Kathleen Jungclaus dated 3/26/1997 offering her employment |
| Appendix 111 – 112 | Resume of Kathleen Jungclaus 1997 – 09/16 |
| Appendix 113 – 114 | Resume of Kathleen Jungclaus 09/16 – Present |
| Appendix 115 – 117 | 1995 Job Profile of Plaintiff |
| Appendix 118 – 121 | Plaintiff's Job Profile (Job Description), 2005 |
| Appendix 122 – 128 | Silver Chair Learning Certificates Courses taken by Plaintiff covering Diversity and Sexual Harassment 2011 – 2016 |
| Appendix 129 – 136 | Class Completion Certificates for Nursing Home Administration Course 2013-2014 |
| Appendix 137 – 226 | Performance Evaluations of Plaintiff 1998 – 2015 |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 227 – 264 | Recommendations for Salary Increases from Mr. Wozniak 12/8/10-11/2/15 |
| Appendix 265 – 266 | Graph of Plaintiff's Salary History 2005 – 2016 |
| Appendix 267 | Chart showing Plaintiff's Salary History 2010 – 2016 |
| Appendix 268 | Chart of Compensation of Senior Team for 2015 |
| Appendix 269 | Chart of Compensation of Senior Team for 2016 |
| Appendix 270 – 272 | Anonymous Letter dated 09/14/16 |
| Appendix 273 – 279 | Tweet dated 7/24/16 and screenshot showing link from Waverly to Jungclaus Twitter Page |
| Appendix 280 – 281 | Chart showing Termination of Employees without Progressive Discipline 2010-2016 |
| Appendix 282 – 289 | Emails between Mr. Garvin, Mr. Bauer and Board Committee Members regarding Employment Issue, 09/22/16 – 09/26/16 |
| Appendix 290 – 293 | Plaintiff's Unemployment Compensation Application dated 10/02/16 |
| Appendix 294 – 297 | Notice of Unemployment Application dated 10/06/16 and Waverly's Response to Unemployment Claim dated 10/11/16 |
| Appendix 298 – 300 | Interview of Plaintiff by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 301 – 305 | Interview of Mr. Garvin by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 306 – 308 | Approval of Plaintiff for Unemployment Compensation dated 10/25/16 |
| Appendix 309 – 310 | Waverly's Appeal from Granting of Unemployment dated 10/31/16 |
| Appendix 311 – 326 | Letter from Mark Schwartz, Esquire to Waverly dated 11/08/16 |
| Appendix 327 – 354 | Transcript of Unemployment Compensation Hearing dated 11/28/16 |
| Appendix 355 – 361 | Decision of Unemployment Compensation Referee dated 11/29/16 |
| Appendix 362 | EEOC Complaint dated 12/13/16 |
| Appendix 363 | EEOC Notice of Charge dated 01/05/17 |
| Appendix 364 – 368 | Email from Raymond Jungclaus to Plaintiff dated 10/09/08 – Food for Thought (Why not voting for Obama) Raymond Jungclaus suggests that Plaintiff post this on her Facebook page |
| Appendix 369 – 375 | Email from Raymond Jungclaus to Plaintiff dated 04/07/11- re: Obama's Classmate Speaks out |
| Appendix 376 – 377 | Emails between Plaintiff and Raymond Jungclaus dated 06/28/12 re Health Care Bill being upheld |
| Appendix 378 – 381 | Email from Raymond Jungclaus to Plaintiff dated 10/18/12 – Why Mitt Romney is Unlikeable |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 382 – 383 | Emails between Plaintiff and her husband, Raymond Jungclaus dated 08/19/13 re making up story that she has doctor's appointment so she can leave early |
| Appendix 384 – 388 | Emails between Plaintiff and Marc Heil dated 08/26/13 re: Discipline of employee for violation of social media policy and reference to contact with Debbie Sandler, Esq. |
| Appendix 389 | Email from Plaintiff to Raymond Jungclaus – dated 08/30/13 – her reaction to Garvin email regarding a discussion about her NHA license |
| Appendix 390 – 391 | Email from Raymond Jungclaus to Plaintiff dated 10/24/13 re:  If you can't fix it with a hammer – political comment |
| Appendix 392 – 394 | Email from Gregory Gangi to Plaintiff dated 10/24/13 – "How pathetic are those of you who still love the Obama (intentional small case) man" |
| Appendix 395 – 406 | Email from Raymond Jungclaus to Plaintiff dated 12/19/13 – Problem with Public Housing – criticizing Obama for putting feet on furniture |
| Appendix 407 | Email dated 08/18/14 from Plaintiff to R. Supper asking for recommendation |
| | |
| **VOL, III** | |
| Appendix 408 – 567 | Emails from Mr. Soltis on which Plaintiff was copied 2011 – 2016 |
| Appendix 568 – 598 | First Amended Complaint |
| Appendix 598 – 603 | Plaintiff's Initial Disclosure under F.R.C.P.26 |
| Appendix 604 – 605 | Plaintiff's Supplemental Disclosure under F.R.C.P.26 |
| Appendix 606 – 621 | Plaintiff's Answers to Interrogatories |
| | |
| **VOL. IV** | |
| Appendix 622 – 690 | Deposition of Plaintiff, Kathleen Jungclaus, Day 1, 11/01/18 |
| Appendix 691 – 817 | Deposition of Plaintiff, Kathleen Jungclaus, Day 2, 11/02/18 |
| | |
| **VOL. V** | |
| Appendix 818 – 860 | Deposition of Raymond Jungclaus, 11/01/18 |
| Appendix 861 – 911 | Deposition of Anita Summers, 11/26/18 |
| Appendix 912 – 1039 | Deposition of Richard Bauer, 11/26/18 |
| | |
| **VOL. VI** | |
| Appendix 1040 – 1171 | Deposition of Thomas Garvin, Day 1, 11/02/18 |
| Appendix 1172 – 1213 | Deposition of Thomas Garvin, Day 2, 11/26/18 |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. VII** | |
| Appendix 1214 – 1218 | Bing Search of Kathleen Jungclaus, 07/30/19 |
| Appendix 1219 | Affidavit of Carolyn Baysmore |
| Appendix 1220 – 1221 | Affidavit of Debra Best |
| Appendix 1222 – 1229 | Affidavit of Amy Blessing |
| Appendix 1230 – 1231 | Affidavit of Margaret Carpenter |
| Appendix 1232 – 1235 | Affidavit of Constance Dogan |
| Appendix 1236 – 1239 | Affidavit of Meredith Feher |
| Appendix 1240 – 1241 | Resume of Meredith Feher |
| Appendix 1242 – 1251 | Affidavit of Thomas Garvin |
| Appendix 1252 – 1253 | Resume of Thomas Garvin |
| Appendix 1254 – 1256 | Affidavit of Marc Heil |
| Appendix 1257 – 1260 | Resume of Marc Heil |
| Appendix 1261 – 1265 | Affidavit of Lauren Kelley |
| Appendix 1266 – 1268 | Resume of Lauren Kelley |
| Appendix 1269 – 1270 | Affidavit of Patricia Rodgers |
| Appendix 1271 – 1272 | Resume of Patricia Rodgers |
| Appendix 1273 – 1275 | Affidavit of Tanya Salgado, Esquire |
| Appendix 1276 – 1279 | Affidavit of Deborah Sandler, Esquire |
| Appendix 1280 – 1282 | Affidavit of Robert Supper |
| Appendix 1283 – 1289 | Resume of Robert Supper |
| Appendix 1290 – 1294 | Affidavit of Janet Thompson |
| Appendix 1295 – 1296 | Resume of Janet Thompson |
| Appendix 1297 | Affidavit of Basheer Womack |
| Appendix 1298 – 1301 | Affidavit of Thomas Wozniak |
| Appendix 1302 – 1303 | Summary of Qualifications of Thomas Wozniak |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS  :
      Plaintiff  :
  :
vs.  :  No. 17-CV-04462-RK
  :
WAVERLY HEIGHTS, LTD.,  :
THOMAS P. GARVIN and JOHN  :
and JANE DOES NUMBERS 1-21  :
      Defendant  :

Deposition of **KATHLEEN M. JUNGCLAUS**, taken by and before Michelle A. Katulka, Registered Professional Reporter, at the law offices of Eastburn and Gray, P.C., 60 East Court Street, Doylestown, Pennsylvania, on Thursday, **November 1, 2018**, commencing at 1:33 p.m., prevailing time.

*StenoSource*, LLC
*Committed to the Art of Verbatim Reporting*
Visit us at www.stenosourcellc.com • Call (215) 348-1095

1 okay, because it's nothing more than an attempt
2 to intimidate my client.
3 Secondly, I have been animated about the
4 kind of hate that's been spewing out of Waverly.
5 One of the reasons that I'm particularly
6 animated about it and shouldn't -- and will not
7 zip my mouth about it, according to Ms. Deon, is
8 the fact that my old synagogue was shot up in
9 Pittsburgh and people who I know died on
10 Saturday.
11 And since that time, I've had to
12 continually review this hate that was
13 memorialized in only the partial amount of
14 emails that were circulated by Mr. Soltis and
15 produced in this matter.  I have reason to
16 believe there are more of them.
17 So I want you to understand that what I'm
18 saying is not in the nature of an apology, but
19 perhaps an explanation for my zealousness, thank
20 you.
21 -----
22 KATHLEEN M. JUNGCLAUS, having been duly
23 sworn, was examined and testified as follows:
24 -----
25 MS. DEON:  And in response just briefly to

1 Mr. Schwartz's opening remarks, when I asked him
2 to zip his mouth off the record and to act in a
3 professional manner, it was in response to him
4 yelling across the table that my client is a
5 racist or engages in racist emails, or any other
6 number of personal attacks that he's made
7 against my client today.
8 I'm also unaware of a rule and he's not
9 cited to one that would mandate that I'm not
10 permitted to have both of these representatives,
11 one who was Chairman of the Board during the
12 time of these and is a representative even today
13 as a current board member of Waverly, as well as
14 the CEO and President.
15 MR. SCHWARTZ:  Well --
16 MS. DEON:  So I'm going to continue --
17 MR. SCHWARTZ:  In response I'm going to --
18 in response I'm going to say that the objection
19 to Mr. Jungclaus being here is because he was a
20 witness.  Mr. Bauer is going to be a witness,
21 he's going to have a long deposition, okay?
22 And in terms of the racist stuff, we'll be
23 able to substantiate that not only did he
24 receive the hate emails and the racist garbage
25 that prevails amongst his fellow board members,

1 but he circulated it to others, including his
2 wife.
3 MS. DEON:  My ob --
4 MR. SCHWARTZ:  So, again, he's going to be
5 a witness and we're going to spend a lot more
6 than a half an hour with him, Miss Sommers,
7 Mr. Garvin and lots of other board members,
8 okay?
9 MS. DEON:  You don't think he meant you?
10 MS. SOMMERS:  No, I don't think he meant
11 me.
12 MR. SCHWARTZ:  You know who I meant. You
13 know, the anonymous letter-writer, Miss Sommers,
14 okay?
15 MS. DEON:  Are you done?
16 MR. SCHWARTZ:  So far.
17 MS. DEON:  My objection had nothing to do
18 with Mr. Jungclaus being a witness, it had to do
19 with the fact that he's neither a party, nor
20 affiliated with the corporate entity, that was
21 the nature of the objection properly stated.
22 And further, there will be confidential
23 business matters and proprietary matters that
24 are discussed during the course of this
25 deposition which are not anything that he should

1 be privy to.
2 MR. SCHWARTZ:  There's nothing that is or
3 will be confidential about this deposition, let
4 me assure you.  So you kindly ask questions that
5 you can assume will be in The New York Times.
6 MS. DEON:  Okay, well, then on that basis
7 we're going to have to take a break, because
8 you're not sharing confidential information --
9 MR. SCHWARTZ:  There is not going to be any
10 confidentiality according -- accorded to your
11 deposition, or anything else.
12 MS. DEON:  Okay.
13 MR. SCHWARTZ:  There's not an order,
14 there's not an agreement.  You're a community
15 institution that is highly regarded, you
16 shouldn't have anything to be afraid of.
17 MS. DEON:  So, Mr. Schwartz, if we discuss
18 business records that are of a proprietary
19 nature, you're sitting here representing that
20 you're going to take that information and you're
21 going to give it to The New York Times.
22 MR. SCHWARTZ:  It depends what it is.  I
23 think I've -- I've learned from a client a long
24 time ago that when I ask a question or give an
25 answer, I should assume that it might be printed

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS      :
      Plaintiff    :
               :
   vs.         :  No. 17-CV-04462-RK
               :
WAVERLY HEIGHTS, LTD.,   :
THOMAS P. GARVIN and JOHN  :
and JANE DOES NUMBERS 1-21  :
      Defendant    :

      Deposition of KATHLEEN M. JUNGCLAUS, taken by
and before Michelle A. Katulka, Registered Professional
Reporter, at the law offices of Eastburn and Gray, P.C.,
60 East Court Street, Doylestown, Pennsylvania, on
Thursday, November 1, 2018, commencing at 1:33 p.m.,
prevailing time.

APPEARANCES:

MARK D. SCHWARTZ, ESQUIRE
   P.O. Box 330
   Bryn Mawr, PA  19010
   (610)525-5534
   *Representing the Plaintiff*

EASTBURN AND GRAY, P.C.
BY:  GRACE M. DEON, ESQUIRE
BY:  JOANNE D. SOMMER, ESQUIRE
   60 East Court Street
   Doylestown, PA  18901
   (215)345-7000
   *Representing the Defendant*

     ----

ALSO PRESENT:

Thomas Garvin
Richard E. Bauer

     -----

---

I N D E X

**DEPONENT:**               **PAGE:**
KATHLEEN M. JUNGCLAUS
   By:  Ms. Deon            11

     -----

**EXHIBITS:**         **PAGE:**
KJ-1 -- Right at Home compensation document  125
KJ-2 -- Interrogatories         132

     -----

DEPOSITION SUPPORT INDEX
*Instruction To Witness Not To Answer*
   **PAGE:**   **LINE:**
    73      3

     -----

StenoSource, LLC  (215)348-1095

---

                                     4

1         -----
2      STIPULATION OF COUNSEL
3        -----
4     It is stipulated by and between counsel
5     for the respective parties that the sealing,
6   certification and filing are waived, and that
7   all objections, except as to the form of the
8   question, are reserved to the time of trial;
9   each counsel reserving, however, the right to
10  advise his client or clients not to answer any
11  questions considered by counsel to be
12    improper.
13     -----
14     MR. SCHWARTZ:   Prior, at the time of our
15  break for lunch, I objected to Mr. Bauer's
16  continued presence here.  And Grace, Ms. Deon,
17  objected to my client's husband being able to
18  remain here.
19    My client's husband has other things to do,
20  so he's not here.
21    Mr. Bauer, however, is still here, he's not
22  a party.  Ms. Deon contends that he's not
23  involved with this lawsuit anymore.  Mr. Garvin
24  can certainly be the Corporate representative.
25    I don't -- I just want to object to this,

1    in The New York Times, and I'm giving you that
2    bit of advice as well.
3        MS. DEON:   Okay.
4        MR. SCHWARTZ:   You seem to have a problem
5    with my use of the media when it comes to
6    community institutions that don't live up to
7    their proper standards. I'm sorry about that,
8    but I'm not going to put a cloak of secrecy over
9    what you're trying to do.
10       MS. DEON:   Okay, Mr. Schwartz, I'm not here
11    to be the brunt of your personal attacks, so
12    let's keep me out of it. And I'm asking, shall
13    we decide to seal this with the Court, do we
14    need to now go through that exercise and delay
15    this proceeding --
16       MR. SCHWARTZ:   I am not going to seal
17    voluntarily anything. If there is something
18    that you and I can agree on that is specifically
19    proprietary and I'm shown it in advance, I may
20    agree to it, but there's not going to be a gag
21    order in this case, not with this community
22    institution, no gag order.
23       MS. DEON:   So would --
24       MR. SCHWARTZ:   And there is nothing
25    confidential in Mr. Jungclaus' deposition,

1    nothing, okay? So you can assume that that may
2    find its way into --
3       MS. DEON:   Off the record.
4       MR. SCHWARTZ:   No, no, no.
5       MS. DEON:   This is my deposition and she'll
6    go off the record if I told her to go off the
7    record --
8       MR. SCHWARTZ:   Fine, do whatever you want.
9       MS. DEON:   -- so cut your nonsense.
10    There are financial documents --
11       THE COURT REPORTER:   Are we on the record?
12       MS. DEON:   Off the record.
13       -----
14    (Discussion held off record.)
15       -----
16       MS. DEON:   We were just discussing off the
17    record a document in particular that was
18    produced in discovery, it is a Waverly Heights
19    2016 Compensation Review, at 12/20/15, for the
20    Senior Leadership Team.
21       There has been discussion between counsel
22    that certain of the information contained in
23    here is already in the public domain.
24       And I am going to note on the record and
25    for Mr. Schwartz's ears that to the extent

---

11

1    anything that is not in the public domain from
2    this document, or any other source, is divulged,
3    he will do so with the knowledge that that will
4    be in violation of the proprietary rights of
5    this organization, and he can take the fallout
6    of that.
7       MR. SCHWARTZ:   In response, I'd just say
8    there's no confidentiality order in this,
9    nothing has been marked Confidential and
10    Proprietary that I've received so far.
11   BY MS. DEON:
12   Q.    Do you prefer Ms. Junkclaus or Mrs.?
13   A.    Mrs. is fine.
14   Q.    And you've already been sworn, correct?
15   A.    Yes.
16   Q.    Have you ever been deposed before?
17   A.    Yes.
18   Q.    How many times?
19   A.    Three.
20   Q.    And in what types of matters?
21   A.    One was as a 12-year-old child when I was in an
22   accident off of the giant slide in Wildwood Crest for a
23   lawsuit. One -- and the other two were through the Human
24   Relations Commission or the EEOC.
25   Q.    And were --

12

1   A.    Representing Waverly.
2   Q.    Were those depositions for federal lawsuits that
3   arose from the Equal Employment Opportunity Commission
4   claims?
5   A.    Yes.
6   Q.    And do you remember the names of those cases?
7   A.    Marlene Thomas and Marcia Stewart.
8   Q.    And one of those cases was dismissed as a Motion to
9   Dismiss; is that correct?
10   A.    They both were.
11   Q.    There was no settlement in either?
12   A.    The Marcia Stewart case we paid out her remaining
13   paid time off.
14   Q.    And in one of those cases were you the alleged
15   harasser?
16   A.    I was named as part of the suit.
17   Q.    And you were not a party to the suit, but you were
18   named within the body of it --
19   A.    Yes.
20   Q.    -- is that correct?
21       And did she contend that you were treating her in a
22   racist manner?
23   A.    She who.
24   Q.    Plaintiff.
25   A.    Which one?

14

1   Q.   The one that involved Miss Thomas.  Was it Miss
2   Thomas?
3   A.   **Both claimants claimed racist behavior; however, they**
4   **were both dismissed.**
5   Q.   Which, if any, claimed racist behavior on your behalf
6   by you?
7   A.   **Both.**
8   Q.   Both claimed that you treated them in a racist
9   manner?
10   A.   **Yes, in the suit, and then under testimony said that**
11   **I never treated them with disrespect.**
12   Q.   Do you have copies of the deposition transcripts?
13   A.   **I don't, but I'm sure that Waverly could get them**
14   **from White and Williams.**
15   Q.   On any other occasion did anyone accuse you of being
16   racist?
17   A.   **Ah, the only other time that I can think of is**
18   **the -- was Marcia Stewart over the television issue in the**
19   **employee cafe.**
20   Q.   And that made you angry?
21   A.   **No, it didn't make me angry.**
22   Q.   Did you come into a meeting with the employees and
23   express that you were angry that you were being viewed as
24   a racist?
25   A.   **I didn't express that I was angry, I expressed that I**

15

1   please ask me to rephrase it.
2       Please ensure that only one of us are speaking at a
3   time so that the court reporter can take down our
4   testimony.
5       If there's an objection from counsel, please just
6   give us a moment to resolve the objection before you begin
7   responding.  And can we agree that if you answer a
8   question of mine, that you've understood that question?
9   A.   **Yes.**
10   Q.   And if you don't know the answer to a question,
11   please say that you don't know or you don't recall, or you
12   may certainly estimate or approximate your response.
13       Do you understand that?
14   A.   **Yes.**
15   Q.   Okay.  If you need to take a break to use the
16   restroom or to get a drink, or anything, please just let
17   me know, I only ask that we complete whatever question is
18   pending before you do so.
19       Are you taking any medication or is there any other
20   reason that you would have any difficulty today responding
21   and testifying in a truthful manner?
22   A.   **No.**
23   Q.   Okay.
24       MR. SCHWARTZ:   May I just interject, what's
25       your position with respect to objections?

14

1   was upset.
2   Q.   And you were --
3   A.   **There's a difference.**
4   Q.   Okay.  And were you being accused of being a racist?
5   A.   **I was -- I was accused of making a decision for the**
6   **employees that was viewed as being racist, yes.**
7   Q.   Okay.  Have you ever, other than that instance, had a
8   time where you were upset because someone was calling you
9   a racist or saying that something you did was racist?
10   A.   **No.**
11   Q.   Have you ever been a party to a lawsuit other than
12   the matter that you mentioned when you were 12 years old?
13   A.   **There were two automobile accidents over the course**
14   **of, I -- I don't know, maybe the last 15 years, I don't**
15   **remember the dates.**
16   Q.   Did they settle before trial or did they go to trial?
17   A.   **They settled before trial.**
18   Q.   Have you ever been a witness at a trial, presenting
19   trial testimony?
20   A.   **No.**
21   Q.   Have you ever provided expert testimony?
22   A.   **No.**
23   Q.   All right.  Let me just give you some instructions
24   before we continue.
25       If you don't understand a question that I'm asking,

16

1       MS. DEON:   I don't understand the question,
2   we have usual stips.
3       MR. SCHWARTZ:   Yes, except usual stips are
4   unusual everywhere.
5       Basically, all objections are — can be
6   postponed except for objections as to form.
7       MS. DEON:   And foundation.
8       MR. SCHWARTZ:   Fine.
9   BY MS. DEON:
10   Q.   Did you review anything in preparation of today's
11   deposition?
12   A.   **Yes.**
13   Q.   What did you review?
14   A.   **Everything that's been circulated between your party**
15   **and mine.**
16   Q.   Can you be more specific?
17   A.   **I reviewed the discovery requests that were provided**
18   **by you, the document requests.  I reviewed the Amended**
19   **Complaint.  I reviewed the information that I submitted on**
20   **the interrogatories and the document discovery.**
21   Q.   Anything else?
22   A.   **I think that's everything.**
23   Q.   Okay.  Did you meet with your attorney prior to this
24   deposition?
25   A.   **I did.**

1   Q.   And without telling me what you discussed, was the
2   meeting in preparation for the deposition?
3   A.   Yes.
4   Q.   Okay. How long did you meet?
5   A.   It was a little over an hour.
6   Q.   Am I correct that you were here this morning for the
7   testimony that was given by your husband, Ray Jungclaus?
8   A.   Yes.
9   Q.   Did he testify truthfully to the questions that were
10  posed?
11  A.   Yes.
12  Q.   The twitter handle that is Kathy
13  Jungclaus@kmjungclaus, are you familiar with that?
14  A.   Yes.
15  Q.   Does that still exist today?
16  A.   Yes.
17  Q.   Are you still utilizing that today?
18  A.   No.
19  Q.   When did you establish that twitter handle?
20  A.   To the best of my recollection, I never had a
21  Twitter -- Twitter handle, I didn't even know what Twitter
22  was.
23       Mr. Garvin was tweeting for Waverly Heights and was
24  upset that he only had a few followers, and so he asked me
25  to join Twitter and follow him so that his Followers could

increase, that was when it first started. I never had
2   anything on Twitter.
3   Q.   Okay. The use of the Twitter handle, I saw some
4   references, it looked like, to raising money for an
5   individual with cancer?
6   A.   Yes.
7   Q.   Okay. Is the individual that was referenced -- what
8   is the name of the person?
9   A.   Nicole Stroman.
10  Q.   Was that an employee of Waverly?
11  A.   Yes.
12  Q.   Is she still employed?
13  A.   I have no idea.
14  Q.   Was she employed at the time in 2016 when you
15  established this?
16  A.   Yes, she was on a leave of absence.
17  Q.   Okay. And I just assumed that it was established in
18  2016. Is that your recollection?
19  A.   I honestly don't remember when it started. I think
20  it was before that in 2015.
21  Q.   Okay. So am I correct that the Waverly Twitter was a
22  publicly-accessible Twitter feed that I could look at?
23  A.   I believe it's open to the public.
24  Q.   And if you clicked onto that Waverly Twitter feed,
25  would you be able to tell who followed it? Could you

19

1   click on a button of Followers and it would show the
2   different people?
3   A.   Yes.
4   Q.   And would Kathleen Jungclaus have been one of those
5   Followers?
6   A.   I'm not sure if I followed Waverly or not, honestly.
7   Q.   I'm showing you what was marked as RJ-3 this morning?
8   A.   Uh-huh.
9   Q.   If you look at the top left-hand corner, it says
10  Kathleen Jungclaus@jmJungclaus, and in capital letters,
11  FOLLOWS YOU.
12       Do you see that?
13  A.   Yes, I see that, but that just says that I'm
14  following myself.
15  Q.   Okay. So if there's testimony in this proceeding
16  that that was printed from the Waverly Twitter, and by
17  clicking onto you as a Follower, and that the pages that
18  appear there were printed, would that surprise you?
19  A.   These were printed off of my personal Twitter page.
20  You would have to leave the Waverly page.
21       I'm not linked in any way to Waverly other than being
22  a Follower. So that you would have to leave the Waverly
23  Twitter page, go to my personal Twitter page, and open
24  that up and then print it out.
25       Nothing I ever posted showed up on the Waverly

20

1   Twitter page; we were not linked in any way.
2   Q.   Okay. But you could though, you just said, click
3   from Waverly to your Twitter page because you were
4   following them?
5   A.   I suppose.
6   Q.   And it was not secure to -- anyone in the public
7   domain could have done that; is that correct?
8   A.   That's correct.
9   Q.   Do you recall testifying at the unemployment
10  compensation hearing that you were terminated based upon a
11  knee-jerk reaction to a Tweet that you sent?
12  A.   Yes.
13  Q.   And you didn't mention at any point in the waiver --
14  in the unemployment compensation proceeding that you
15  believed you were subjected to discrimination or
16  harassment in connection with your termination.
17       Is that correct?
18  A.   That's correct.
19  Q.   During your years as a VP of Human Resources, have
20  you had occasion to process unemployment compensation
21  claims?
22  A.   Yes.
23  Q.   Have you had any instance where an individual in that
24  context referenced the fact that they believed that they
25  were being harassed or discriminated against?

1   A.   I don't recall that.
2   Q.   Have you handled, on behalf of Waverly, responses to
3   claims by employees with the PHRA or the EEOC?
4   A.   Yes.
5   Q.   How many would you say during your tenure with
6   Waverly did you handle?
7   A.   I'm going to say maybe four.
8   Q.   Would you have handled them individually or with the
9   assistance of someone else?
10  A.   Well, it was always with the assistance of our labor
11  attorney.
12  Q.   Do you recall in your initial application for
13  unemployment compensation benefits stating that your
14  husband had sent the Tweet using your account?
15  A.   Yes.
16  Q.   Describe to me what was meant by that.
17  A.   What was meant by it was that he formulated the
18  statement and he told me what to tweet, and I did it.
19  Q.   In the Tweet, which was identified as RJ-1 earlier
20  this morning, who is the reference to *VP of HR*?
21  A.   That would be a combination of both of us.
22  Q.   So you would agree with me that it doesn't say *my*
23  *husband and I* in the Tweet, it uses the first person, I am
24  VP of HR?
25  A.   That's correct.

1   Q.   But you're saying now that that referred to a
2   combination of the two of you being VP of HR?
3   A.   That's correct.  You only have so many -- you only
4   have so many things that you can type on a Twitter page.
5   Q.   And the survey that's referenced in this, you're
6   testifying, was a survey, an informal survey, that you
7   took, as well as your husband took.
8        Is that correct?
9   A.   I didn't take an informal survey, that was his
10  language that he dictated to me.  I didn't take a survey
11  of any kind.
12  Q.   So you adopted language that does not represent what
13  you did?
14  A.   It was based off of a conversation that we had in the
15  car and a summation of information from both of us, that
16  he -- he dictated the Tweet.  So he made up *informal*
17  *survey*, it was really just based off of discussions.
18  Q.   Did you at any time -- he said that the two of
19  you -- it was a combined effort, that the two of you had
20  spoken to people at your workplace.
21  A.   The conversation that took place in the car that
22  night, we were driving somewhere, I don't remember where
23  we were headed, but we were listening to talk radio, and
24  talk radio was talking about how there were no minorities
25  voting for Donald Trump.

1        And I told my husband that that was a very
2   interesting statement since I had a conversation with an
3   employee that afternoon.  I was downstairs, outside the
4   Pineapple Grill, taking, ah -- doing Best Places to Work
5   surveys.
6        One of the employees from the kitchen came down and
7   asked if he could sit with me while he filled out his
8   survey, and I said that was fine.
9        And while he was sitting there, he asked me, Miss
10  Kathy, who are you voting for in the election?
11       And I said to him, I haven't decided yet, I'm waiting
12  for the debates.
13       And he was quiet.  And then he said to me, I would
14  think that you're voting for Hillary.
15       And I said, Well, that's interesting.  Like I said,
16  I'm waiting for the debates.
17       He was quiet again.  Then he said, I'm voting for
18  Trump.  The whole kitchen's voting for Trump.  My whole
19  family's voting for Trump.  The whole neighborhood's
20  voting for Trump.  And I said, Fascinating, all I said.
21       I shared that conversation with my husband in the car
22  and he told me about the conversations that he had had
23  with his employees over the course of the last few weeks.
24       And then he said, You know what, we really need to
25  let Donald Trump know this, so let's send him the

1   information.
2        And so he dictated the Tweet and I sent it.
3   Q.   Who was the kitchen employee you're speaking of?
4   A.   Basheer Womack.
5   Q.   How do you spell the last name?
6   A.   W-O-M-A-C-K.
7   Q.   And how about the first name?
8   A.   Basheer, B-A-S-H-E-E-R.
9   Q.   Do you know whether he's still employed?
10  A.   I don't know.  He was a utility worker in the
11  kitchen.
12  Q.   Have you had communication with him since leaving
13  Waverly?
14  A.   No.
15  Q.   Did you have a conversation with anyone else at
16  Waverly of the employees about who they were voting for?
17  A.   No.  The day that I was fired, I was conducting fire
18  drills outside over in the apartments, in the Blair or the
19  Andrews apartments.  And two of the Housekeeping staff
20  were walking around with Trump stickers in their pockets,
21  showing them to everyone.  And I asked them to please put
22  them away, they weren't allowed to have a political
23  affiliation during work hours.
24  Q.   Do you dispute the testimony of the Waverly employee
25  Maria DiPaul was her name I believe at the time, she's now

1  married, D-I-P-A-U-L, do you dispute that you asked her
2  who she was voting for?
3  A.   Yes, I do.
4  Q.   And what was the nature of your relationship with her
5  when you were employed by Waverly?
6  A.   She was the Social Worker in the healthcare center.
7       After I had the conversation with the employee,
8  Basheer Womack, I was walking down the hallway and Maria
9  was sitting in her office and I asked if I could talk to
10 her.
11      As the Vice President of HR, you have very few people
12 that you can confide in and discuss confidential things
13 with aside from your boss.
14      And I said to Maria, Can I talk to you?  And she
15 said, Sure.
16      And I said, You know, you have uncomfortable
17 conversations with residents and family members, and I
18 have them sometimes with staff.  I want to just run this
19 past you to make sure that you think that I handled it the
20 right way.
21      And so I told her the conversation, and that was the
22 extent the conversation.
23      She then proceeded to play a tape for me of a voice
24 recording, voicemail, from a resident's family member that
25 she mocks and makes fun of and shares to other people, um,

1  as one of the most difficult conversations that she's had
2  to have.
3       So I never asked her who she was voting for; I never
4  had that conversation.  I shared with her the conversation
5  that I had with Basheer and I asked for her honest
6  feedback.
7  Q.   What about the conversation with Basheer made you so
8  unsettled?
9  A.   You always want to make sure that when you're
10 presenting information to an employee, that you're coming
11 off the right way.  And so, you know, it's unsettling when
12 someone's talking about something that's so controversial
13 that I wanted to make sure that I didn't say anything that
14 could be misconstrued.
15 Q.   So in your mind discussing politics in the workplace
16 would be extremely controversial and something that as a
17 Vice President of HR you wouldn't do?
18 A.   I had conversations about politics with Mr. Garvin.
19 He enjoyed talking politics on numerous occasions, and we
20 engaged in those conversations on a pretty regular basis.
21      I would never have those conversations with
22 employees.
23 Q.   So would you agree then that it would be
24 inappropriate to have those types of conversations with
25 employees?

1  A.   It would be inappropriate to ask them who they were
2  voting for, of which I've never done.
3  Q.   How about just talking politics in general with
4  employees that are under you -- under the management
5  umbrella?
6  A.   I guess it depends on the conversation.
7  Q.   You'll agree with me that in the unemployment
8  compensation hearing testimony, you never said that the
9  Tweet was something your husband dictated and you sent on
10 his behalf?
11 A.   I honestly don't remember.
12 Q.   Okay.  Were you truthful that day when you were
13 testifying?
14 A.   Yes.
15 Q.   And with respect to ... Well, strike that.
16      At some point after you were terminated, did you have
17 a conversation with any Waverly employees prior to
18 returning to your office?
19      You came out Mr. Garvin's office and you spoke with,
20 I believe, two Waverly employees?
21 A.   Amy Blessing and Janet Thompson.
22 Q.   What was the content of that conversation?
23 A.   I was hysterical.  I was distraught and hysterical
24 and blindsided, and I honestly have no idea -- she
25 was -- I thought she was my friend for 20 years, and I

1  just went into her office and I have no idea what I said
2  to her other than I was fired, and things were just coming
3  out of my mouth.
4       And I honestly was so out of body that I could not
5  even -- I -- I don't know what I said, honestly.
6  Q.   And when you said her just now, were you referring to
7  Janet Thompson?
8  A.   Yes.
9  Q.   Okay.  Do you recall Mr. Garvin or Mr. Bauer asking
10 you if you needed any medical assistance?
11 A.   Yes.
12 Q.   And you did not accept that, correct?
13 A.   Correct.
14 Q.   Do you recall saying anything to Miss blessing or
15 Miss Thompson about someone else sending the Tweet and it
16 wasn't you?
17 A.   I don't remember.
18 Q.   And would you agree with me that in the letter that
19 your counsel sent, which was identified this morning as
20 RJ-4, that there is nothing in this letter that references
21 your husband having any involvement in this?
22 A.   That's correct.
23 Q.   Did you review the letter that Mr. Schwartz prepared
24 before he sent it?
25 A.   Yes.

1  Q.   And was it sent with your authority?

2  A.   Yes.

3  Q.   Do you believe everything in that letter to be true

4  and accurate?

5  A.   Yes.

6  Q.   When you tweeted about, "... 100% AA employees voting

7  Trump," do you recall at the unemployment compensation

8  proceeding saying that you didn't feel that that referred

9  to African-Americans?

10 A.   Are you referring to the hearing that was over the

11 telephone?

12 Q.   Correct.

13 A.   Yes.

14 Q.   And sitting here today, is it still your belief that

15 that was not referencing African-Americans?

16 A.   At that unemployment hearing, I was so completely

17 blindsided, I've never done a hearing like that over the

18 telephone.  I had no idea who was in the room until they

19 were introduced, I had no idea that that there were going

20 to be witnesses presented.  I was floored and I -- I

21 didn't think clearly.

22    I could have -- you know, had I had my attorney with

23 me, things would have gone very differently.  I think that

24 I just spewed out whatever I could think of.

25    My husband and I had had conversations about the

---

1  Administrative Assistants at his -- at his company, um,

2  how they were voting for Trump.  And when he dictated it,

3  his intention could have been one thing and mine was

4  something else.  So when I honestly said that, I honestly

5  meant it.

6  Q.   So you believed when you typed that, that it meant

7  Administrative Assistants?

8  A.   I didn't even think about it because it's an

9  obser-- it's an observation.  It's an observation and

10 it's a statement, it's not offensive in any way.  And the

11 Commonwealth Court found in my favor that I didn't do

12 anything wrong, so there's nothing wrong with that Tweet.

13 Q.   Okay, Miss Jungclaus --

14 A.   Regardless of what the AA stands for.

15 Q.   That may be your opinion and that's fine, but I'm

16 asking specifically, when you are the individual who has

17 authored a Tweet, I'm asking what you believed AA to mean

18 when you tweeted that?

19 A.   Again, the Tweet was my husband's verbiage; his

20 intention could have been one thing and mine was something

21 else.

22    When I testified about Administrative Assistants, at

23 the time I was so flabbergasted at the hearing, that

24 that's what came out.

25 Q.   So sitting here today, would you have testified

---

1  differently?

2  A.   You know, our -- our language is very different, my

3  husband and I.  So had I actually wrote the Tweet myself,

4  I probably would have worded it differently if I was

5  referring to a minority group, but I -- in my mind I was

6  thinking he was talking about his Administrative Assistant

7  staff because that's who we had just finished talking

8  about.

9     So I -- honestly, when I testified that at the

10 unemployment hearing, that was what was in my head.

11 Q.   And you were listening, you said, before this Tweet

12 about the fact that minority groups were not --

13 A.   Yes.

14 Q.   -- going to be voting for Trump?

15 A.   That's correct.

16 Q.   So by minority groups, that would mean to me ethnic

17 or racial minority groups, correct?

18 A.   It could be Hispanic, it could be Mexican, it could

19 be black; it could be anything.

20 Q.   So the Tweet that then results AA, would reference

21 African-Americans as opposed to Administrative Assistants?

22 A.   Not necessarily.

23 Q.   Okay.

24 A.   His Administrative Assistant is Hispanic.

25 Q.   And you were also speaking to an African-American

---

1  Waverly employee about who he was voting for, correct?

2  A.   There was a black employee who asked me who I was

3  voting for.

4  Q.   And when did that occur, prior to this Tweet or

5  after?

6  A.   Prior.

7  Q.   And in the context of Human Resources, have you ever

8  read about any of the cases where there was discrimination

9  found by recruiters who would put an AA on the top of a

10 resume to connote -- to have the connotation

11 African-American?

12 A.   No.

13 Q.   How many unemployment compensation hearings have you

14 attended either in person or telephonically in your

15 career?

16 A.   I've only -- my personal one telephonically, no

17 others.

18    And on behalf of Waverly, I always sent the

19 supervisors to the unemployment hearings, it was very

20 seldom that I attended.  I can only think of one that I

21 went to.

22 Q.   Mr. Schwartz was your attorney and already engaged

23 prior to the unemployment compensation hearing, correct?

24 A.   Yes.

25 Q.   And your husband at the time of that hearing was

---

34

1   available by telephone; is that correct?

2   **A.**   **I think he thought he was going to be, but then had a**

3   **conference call and could not be available.**

4   **Q.**   What would have been your purpose had he been

5   available of having him testify?

6   **A.**   **The same purpose that he had this morning, to tell**

7   **you that he dictated the Tweet.**

8   **Q.**   And that information would have been important?

9   **A.**   **I don't know.**

10   **Q.**   That information doesn't appear in any of the

11   Complaints that are filed in this action, correct?

12         **MR. SCHWARTZ:**   What information?

13         **THE WITNESS:**   I'm not clear on the

14         question.

15   BY MS. DEON:

16   **Q.**   Does it appear in either of the Complaints in this

17   matter that the Tweet was sent on behalf of your husband

18   or with your husband's involvement in any respect?

19   **A.**   **That's not important information because the Tweet**

20   **doesn't say anything.**

21   **Q.**   Ms. Jungclaus, if you could answer the question. It

22   doesn't matter if you think it's important or not, it's a

23   very simple question.

24       How does the --

25         **MR. SCHWARTZ:**   Go ahead.

35

1   that could be the equivalent of a perjury?

2   **A.**   **Yes.**

3   **Q.**   Do you dispute, sitting here today, the validity of

4   any of the allegations contained in the Complaint or the

5   Amended Complaint?

6   **A.**   **Do I dispute them?**

7   **Q.**   Yes.

8   **A.**   **No.**

9   **Q.**   Are you the one that provided the information that

10   formed the allegations contained in the Complaint; are you

11   the --

12         **MR. SCHWARTZ:**   Objection and instruct the

13         witness not to answer on the grounds that it's a

14         violation of the attorney/client privilege.

15   BY MS. DEON:

16   **Q.**   Have you ever requested that anyone provide

17   information to your attorney for purposes of formulating

18   the Complaint or the Amended Complaint filed in this

19   action?

20   **A.**   **No.**

21   **Q.**   Would that surprise you if anybody besides you

22   provided information to your attorney?

23   **A.**   **Would it surprise me? I don't believe that it's**

24   **happened.**

25   **Q.**   Did you authorize anyone to do so?

36

1   BY MS. DEON:

2   **Q.**   -- the text of either the Complaint or the Amended

3   Complaint reference at all or state that your husband had

4   involvement in sending the Tweet?

5         **MR. SCHWARTZ:**   I would object for a couple

6         reasons:

7         1) that the Complaints speak for

8         themselves; and 2) it will call for a legal

9         conclusion as far as whether that information

10         had to be in that Complaint.

11         But go ahead, you can answer.

12         **THE WITNESS:**   No.

13   BY MS. DEON:

14   **Q.**   Do you recall signing a Verification to the first

15   Complaint that was filed in this action?

16   **A.**   **Yes.**

17   **Q.**   And did you sign a Verification for the Amended

18   Complaint, also?

19   **A.**   **Yes.**

20   **Q.**   Do you know why you signed a Verification?

21   **A.**   **To attest that everything in it was accurate and**

22   **true.**

23   **Q.**   And in your mind -- strike that.

24       Are you aware that there's a provision within that

25   Verification that if you are making any untrue statements,

36

1   **A.**   **No. I mean, aside from my husband?**

2   **Q.**   Well, I thought your husband this morning testified

3   that he did not provide any information to Mr. Schwartz.

4   **A.**   **He didn't, but he would have -- he would have -- if**

5   **you asked him a question, he would have answered his**

6   **question, he didn't provide any information.**

7         **MR. SCHWARTZ:**   I believe the question was,

8         did she ask anyone else.

9         **THE WITNESS:**   No.

10   BY MS. DEON:

11   **Q.**   In 2016, were you a registered Republican for the

12   primary and the general election --

13   **A.**   **-- yes.**

14   **Q.**   In that year?

15       Did you find it strange that your husband didn't know

16   what your registration was?

17   **A.**   **No.**

18   **Q.**   Okay. Have you been other registrations overtime?

19   **A.**   **I was an Independent at some point.**

20   **Q.**   How long ago was that; do you know?

21   **A.**   **I don't remember.**

22   **Q.**   And were you Trump-supporter in 2016?

23   **A.**   **Yes.**

24   **Q.**   Okay. In addition to having a Twitter, do you have a

25   Facebook account?

37

| | |
|---|---|
| 1 | A. I do. |
| 2 | Q. Is it public or private? |
| 3 | A. It's private. |
| 4 | Q. Has it always been private? |
| 5 | A. Yes. |
| 6 | Q. Do you have any other social media forum? |
| 7 | A. Instagram. |
| 8 | Q. Anything else? |
| 9 | A. LinkedIn. |
| 10 | Q. Anything else? |
| 11 | A. No. |
| 12 | Q. Does your husband have Instagram? |
| 13 | A. He does. |
| 14 | Q. He does? |
| 15 | A. Yes, he does, but very seldom uses it. |
| 16 | Q. Does he use your Instagram? |
| 17 | A. I post pictures for both of us. |
| 18 | Q. Okay, but I'm just trying to understand whether you |
| 19 | have your own Instagram and he has his own Instagram? |
| 20 | A. Yes. |
| 21 | Q. So you each have an individual Instagram? |
| 22 | A. Yes. |
| 23 | Q. Does he post on his or are you the primary person |
| 24 | that posts on that? |
| 25 | A. On his? He posts on his. |

38

| | |
|---|---|
| 1 | Q. And you post on yours? |
| 2 | A. Yes, but sometimes he'll post on mine as well. |
| 3 | Q. Why is that? |
| 4 | A. Because he'll use my cell telephone, and when you |
| 5 | open Instagram, it's automatically on my account. |
| 6 | Q. Anything else besides Facebook, Instagram or |
| 7 | LinkedIn? |
| 8 | A. No. |
| 9 | Q. Would you agree that as the Vice President of Human |
| 10 | Resources of Waverly you oversaw the implementation and |
| 11 | oversight of the company's nondiscrimination and |
| 12 | harassment policies? |
| 13 | A. Yes. |
| 14 | Q. And people were encouraged to report things to you, |
| 15 | correct? |
| 16 | A. Yes. |
| 17 | Q. And you are named as a resource in multiple human |
| 18 | resource policies; would you agree with that? |
| 19 | A. Yes. |
| 20 | Q. And, in fact, you're listed as the individual to whom |
| 21 | people can feel comfortable to make a report if they |
| 22 | believe that they are victimized by harassment or |
| 23 | discrimination, correct? |
| 24 | A. Yes. |
| 25 | Q. Did you write, either individually or jointly, any of |

39

| | |
|---|---|
| 1 | the Human Resource policies that are contained in the |
| 2 | Employee Handbook? |
| 3 | A. It was always a joint effort. |
| 4 | Q. And who was the joint effort with? |
| 5 | A. Among the Senior Leadership Team. |
| 6 | Q. As the VP of HR, would you write the policy and then |
| 7 | the Senior Leadership Team would review it? |
| 8 | A. Yes. |
| 9 | Q. Okay. How is it that you obtained the title of VP of |
| 10 | HR? |
| 11 | A. That was termed a psychological promotion by Tom |
| 12 | Garvin. |
| 13 | Q. Did you ask for it? |
| 14 | A. Yes. |
| 15 | Q. Why did you ask for it? |
| 16 | A. I asked for all of the Senior Leadership Team to be |
| 17 | Vice Presidents. |
| 18 | Q. When did you do that? |
| 19 | A. Pretty much right at the beginning when Tom first got |
| 20 | hired. |
| 21 | Q. Had you made the same request of the prior CEO? |
| 22 | A. I did. |
| 23 | Q. What was the response? |
| 24 | A. We're not a bank. |
| 25 | Q. Had the prior CEO, Mr. Maguire, elevated anyone else |

40

| | |
|---|---|
| 1 | to VP status? |
| 2 | A. The positions were already established. So there was |
| 3 | a Vice President of Finance, there was a Nursing Home |
| 4 | Administrator, and the rest were Directors. |
| 5 | Q. So even though they may have already been established |
| 6 | for that prior CEO, did you ever make a direct request |
| 7 | that he consider moving the Directors into a VP status? |
| 8 | A. Are you talking about to Bill Maguire? |
| 9 | A. Yes. |
| 10 | A. Yes. |
| 11 | Q. And his response was that it's not a bank? |
| 12 | A. It's not a bank. |
| 13 | Q. Although you referenced it as a *psychological |
| 14 | promotion*, was that something satisfactory to you, to be |
| 15 | named a VP? |
| 16 | A. Yes. |
| 17 | Q. Prior to Mr. Maguire leaving as CEO, was there a |
| 18 | woman that he had elevated to the VP status? |
| 19 | A. Not that I recall. |
| 20 | Q. How long was Mr. Maguire CEO? |
| 21 | A. From 1986 until he left. I don't remember which year |
| 22 | it was, 2005 maybe. |
| 23 | Q. Was there anyone who served in between Mr. Maguire |
| 24 | and Mr. Garvin? |
| 25 | A. Mr. Bates. |

41

1   Q.   And was he there from 2005 to 2010 when Mr. Garvin
2   came in?
3   A.   Well, Mr. Bates is a Board Member, so he would just
4   go in and sit in the office and be available to any of the
5   Senior Leadership Team that might have had an issue.
6   Q.   Was there a lapse in the CEO position for a number of
7   years?
8   A.   Not years, months.
9   Q.   Okay. Well, I thought -- when is your understanding
10  when Mr. Garvin became CEO?
11  A.   I don't recall when he -- what year he started.
12  Q.   Okay. If I represented that it was 2010, does that
13  refresh your memory?
14  A.   Yes.
15  Q.   Okay. So getting back to Mr. Maguire's tenure, you
16  said that it was 1986 to 2005.
17  A.   It was probably 2010.
18  Q.   Okay. And then Mr. Bates was just for a brief
19  interim period of a number of months?
20  A.   Yes.
21  Q.   Okay. Now, with the change in timeframes of when
22  Mr. Garvin was there and your understanding of when he
23  came in, does that change your answer in terms of whether
24  there was any individual who was promoted to a VP status
25  prior to Mr. Garvin coming in?

42

1   A.   I think -- now that I'm refreshing my memory, I think
2   Meg Guenveur was a Vice President. She was the Vice
3   President of Healthcare Services.
4   Q.   Was she later replaced by someone else?
5   A.   Meredith Feher.
6   Q.   I'm sorry, what was her last name again?
7   A.   F-E-H-E-R.
8   Q.   Did you apply for the position of VP of Healthcare
9   Services?
10  A.   I spoke with Tom about being the successor to Meg
11  Guenveur.
12  Q.   And what was his response?
13  A.   He supported that. He supported my getting my
14  Nursing Home Administrator's license.
15  Q.   When did you wind up speaking with him about that
16  possibility?
17  A.   During one of my reviews.
18  Q.   Do you know when Meg left?
19  A.   I don't remember when she left. It was -- it was --
20  I had already started the course, I was three quarters of
21  the way finished it, I think I had two more classes and my
22  test, and Meg decided to retire. And Tom then hired
23  Meredith Feher, who was a friend and former coworker.
24  Q.   Although it would be obvious from her name, I assume
25  Meredith is a female?

43

1   A.   Yes.
2   Q.   And do you happen to know what her age is in
3   comparison to you?
4   A.   She's in her forties.
5   Q.   Okay. So did you -- at the time when Meg retired,
6   did you wind up applying for that position?
7   A.   I asked Tom about it, and he said that he was going
8   to bring someone in with more experience.
9   Q.   So the answer is that you did not apply for it?
10  A.   What was the point? He told me not to because I
11  wouldn't get the job, he was going to bring someone else
12  in with more experience.
13  Q.   Did you need have to your NHA certification for that
14  position?
15  A.   It was not mandatory. He was the Nursing Home
16  Administrator. As long as there's someone onsite that's a
17  Nursing Home Administrator, you could hire someone --
18        MR. SCHWARTZ:   Slow down.
19        -----
20        (Whereupon, the court reporter read back
21        the pending question.)
22        -----
23        THE WITNESS:   He could have hired someone
24        who was in the process of being the Nursing Home
25        Administrator and supported me through that

44

1        program.
2   BY MS. DEON:
3   Q.   Did Mr. Garvin reference any aspect of Meredith's
4   background that he considered as being superior to your
5   background for that position?
6   A.   He just said that he wanted someone with more
7   experience.
8   Q.   And he didn't say what type of experience?
9   A.   No.
10  Q.   Had she acted in that type of a role with another
11  organization?
12  A.   Yes.
13  Q.   For how long?
14  A.   I don't know.
15  Q.   Had you seen her resume or been involved in her
16  hiring?
17  A.   Yes, but I don't recall.
18  Q.   Were you involved in the interviews for that?
19  A.   Yes.
20  Q.   Did you have any involvement in the negotiation of
21  her compensation and benefits?
22  A.   Yes.
23  Q.   In what respect?
24  A.   Well, I just processed them. The negotiation
25  happened between Tom and Meredith, I just got the

46

**Page 45 (left top)**

1    information and processed it.
2    Q.    How about with respect to Mr. Garvin's hiring, were
3    you involved in the negotiations of determining his salary
4    and benefits?
5    **A.    That was a Board decision, I just delivered the**
6    **information.**
7    Q.    How about with respect to Mr. Soltis?
8    **A.    Same.**
9    Q.    Does anyone employed at Waverly have an employment
10   contract or is everyone employed at will?
11   **A.    The only people that are -- I believe are under**
12   **contract are the rehab staff.**
13   Q.    And the rehab staff, are you speaking of like
14   physicians that would have employment agreements?
15   **A.    No, they're the physical therapists, occupational**
16   **therapists and speech therapists.**
17   Q.    Are they independent contractors that are contracted
18   from another --
19   **A.    It's a company.  They had a contract with a company**
20   **and then the company provides the staff.**
21             -----
22        **(Discussion held off record.)**
23             -----
24   BY MS. DEON:
25   Q.    Okay.  Did you have something else to say?

**Page 46 (right top)**

1    **A.    I believe the Medical Director in the healthcare**
2    **center may have had a contract.**
3    Q.    Would you have been involved in the negotiation, and
4    when I say *negotiation*, I mean actually setting the terms
5    for that bargaining for the terms of anyone on the staff
6    at Waverly?
7    **A.    Are you talking about hourly employees, managers,**
8    **directors?**
9    Q.    Let me know if different categories -- if there is --
10   yes, how would you answer that question; would you be
11   involved in the negotiation of salary and benefits?
12   **A.    Yes.**
13   Q.    For what classification of employees?
14   **A.    Director on down; director, manager, supervisor,**
15   **hourly employees.**
16   Q.    And would you have full authority on that or would
17   you have to check with others?
18   **A.    I always ran every -- if it was a Director, obviously**
19   **Mr. Garvin would have involvement in that.  Typically, he**
20   **would set the salary and tell me what it was going to be.**
21        **If it was a Manager, I was in negotiation with the**
22   **Director, as well as Mr. Garvin always approved those**
23   **salaried rates.**
24        **If it was hourly employees, no, I -- myself and the**
25   **recruiter would develop the starting rate.**

47

**Page 47 (left bottom)**

1    Q.    Did you at any time make a complaint to Mr. Maguire,
2    the former CFO -- CEO, excuse me, that you were not
3    satisfied with your salary?
4    **A.    Yes.**
5    Q.    On how many occasions?
6    **A.    A couple.**
7    Q.    Did you receive any bonuses during the time that you
8    were serving under Mr. Maguire?
9    **A.    I honestly don't remember, it's a long time ago.**
10   Q.    When you made the complaints about your salary to
11   Mr. Maguire, did you have a fear that you would be
12   retaliated against?
13   **A.    No.**
14   Q.    Did you feel that your salary and the manner in which
15   it was set at that time instituted gender discrimination?
16   **A.    I felt that the women in the organization were a**
17   **little suppressed in terms of pay.**
18   Q.    Did you communicate that to him?
19   **A.    Yes.**
20   Q.    And were you of the belief that it was only the class
21   of women?
22   **A.    Yes.**
23   Q.    Did you at any point frame it as being discriminatory
24   on the basis of age?
25   **A.    No.**

48

**Page 48 (right bottom)**

1    Q.    Did you have particular women when you were speaking
2    with Mr. Maguire that you had in mind whose salaries you
3    felt were suppressed because they were women?
4    **A.    Janet Thompson and myself.**
5    Q.    When Mr. Garvin became CEO, I believe you testified
6    before that you spoke to him about the same issue?
7    **A.    Yes.**
8    Q.    Did you also reference Janet Thompson's --
9    **A.    Yes.**
10   Q.    -- salary at that time?
11        Just let me finish my question.
12   **A.    I'm sorry.**
13   Q.    How about any other women, did you speak to
14   Mr. Garvin and tell him that you believed any other
15   women's salaries were suppressed as a result of their
16   gender?
17   **A.    Constance Dogan.**
18   Q.    Anyone else?
19   **A.    I'm thinking.  I don't recall.**
20   Q.    I know you mentioned that you couldn't recall
21   whether Mr. Maguire had given you any bonuses.
22        Do you recall Mr. Garvin giving you any bonuses?
23   **A.    Yes.**
24   Q.    How many bonuses did he give you?
25   **A.    Maybe three.**

50

1    Q.   Were you pleased with any of those bonuses?
2    A.   No.
3    Q.   Why?
4    A.   **They were minimal.**
5    Q.   And was it your belief that they were minimal because
6    of your gender?
7    A.   **Yes.**
8    Q.   Were there any individuals that were male who
9    received similar bonuses?
10   A.   **They received more.**
11   Q.   All of the men received more?
12   A.   **Yes.**
13   Q.   Was there any explanation to you by Mr. Garvin or
14   anyone else as to how your bonus was determined?
15   A.   **He said it was because the other Directors had**
16   **brought -- been financially responsible and enhanced**
17   **Waverly Heights.**
18   Q.   And is it your position that he had that belief only
19   as to the men?
20   A.   **Yes.**
21   Q.   So there weren't any women that received bonuses that
22   were of the same value or more than the men?
23   A.   **Not to my knowledge.**
24   Q.   How about with respect to increases in your salary,
25   in looking at the records of your pay prior to Mr.

50

1    Garvin's tenure, would you agree with me that your salary
2    was under market in most instances?
3    A.   **Under or just at market.**
4    Q.   Okay.  And would you agree that the computation ratio
5    for your salaries prior to Mr. Garvin were all generally
6    under 100?
7    A.   **Generally.**
8    Q.   Would you agree that after Mr. Garvin was there, that
9    your comp ratio was 100 or more?
10   A.   **Slightly above market.**
11   Q.   And is it your belief that that is the result of your
12   gender?
13   A.   **Yes.**
14   Q.   Is it your belief that there were males that had
15   higher comp ratios than you did?
16   A.   **There were males that were -- had exceptions.  For**
17   **instance, Marc Heil, who is the Vice President of Building**
18   **Services, or Project Management now, does not have a**
19   **college degree.**
20       **Under Bill Maguire it was required that he take**
21   **college classes to obtain his degree in order for him to**
22   **continue with his position.**
23       **Under Mr. Garvin, that requirement went away, and he**
24   **continued to enjoy very large bonuses even though his**
25   **title was considered the Direc -- the Vice President of**

51

1    **Project Management to oversee the project management. He**
2    **would still get large bonuses, as well as a fully-paid**
3    **family trip to Florida, which was absurd.**
4    Q.   Was the Board aware of it?
5    A.   **It was the Chairman of the Board's idea.**
6    Q.   And are you aware of any of the Board Members
7    objecting to that?
8    A.   **I don't know.**
9    Q.   Did the job description for his position require a
10   college degree?
11   A.   **Yes.**
12   Q.   And when was he -- was he hired before or after you?
13   A.   **He was hired just right after me.**
14   Q.   Were you involved in his hiring?
15   A.   **Yes.**
16   Q.   And you're saying that he should have had a college
17   degree in order to fill that position?
18   A.   **He was initially hired as a Supervisor and was**
19   **promoted into his position.**
20   Q.   When he was promoted into the position of Director,
21   were you involved at all in that process?
22   A.   **Yes.**
23   Q.   Did you object to him being promoted?
24   A.   **Part of his requirement was that he get his degree.**
25   Q.   And that was set forth by Mr. Maguire?

52

1    A.   **Yes.**
2    Q.   Did he take any courses to your knowledge?
3    A.   **Yes.  It was a Board requirement.**
4    Q.   Was it required that he get a Master's -- or, excuse
5    me, strike that -- an associate's or a bachelor's?
6    A.   **Bachelor's degree.**
7    Q.   Do you know how close he came to getting that?
8    A.   **I think he took two or three semesters worth of**
9    **classes at the most, maybe four classes.**
10   Q.   And is it your position that at a later time the
11   Board was prevented from altering that policy?
12   A.   **Mr. Garvin stopped it; I don't know why.  It was no**
13   **longer a requirement for him to get his degree.**
14   Q.   Do you know how much Mr. Heil made in comparison to
15   you?
16   A.   **He makes slightly above me, but he enjoyed several**
17   **thousand-dollar bonuses each year, sometimes twice a year.**
18   Q.   Did Mr. Garvin ever explain to you that he made
19   determinations and the Board made determinations based
20   upon the impact an individual's work had on the nature of
21   the Waverly operations?
22   A.   **Yes, that was what they told me.**
23   Q.   And you disagreed with that?
24   A.   **I disagreed that I didn't provide the same kind of**
25   **contribution.**

53

1  Q.    What type of contribution were you desiring that they
2  take into consideration?
3  A.    I oversaw the workers' compensation program, which
4  was self-funded.  When we first took on the self-funding,
5  there was no return-to-work program.  I instituted a
6  return-to-work program that allowed employees to not lose
7  work time and then have to substitute with an additional
8  employee to cover them.
9        We had a -- we had stellar claims, minimal claims,
10  and based off of that dividends were returned to Waverly
11  in excess of a million dollars, and they continued to
12  enjoy those dividends since there is a three-year rollout
13  period.
14        I took on all of the training for Waverly Heights.
15  Initially, we were considering hiring a trainer, which
16  would have cost at least 70 or $80,000 per year to hire a
17  trainer.
18        I -- since that could not get approved, I was given
19  the responsibility of initiating the training programs
20  throughout Waverly Heights for Waverly Heights, as well as
21  Waverly Care.
22        I learned -- I was instructed to learn about the
23  FISH! training, of which I sent away for the book, I got
24  the manual, I taught myself the program, and I trained all
25  of the employees of Waverly Heights and Waverly Care in

54

1  employee relations and employee engagements, and not one
2  session, not one, did Mr. Garvin attend.  Even though I
3  repeatedly invited him to come, he never came to one
4  session.
5        So I contributed numerous times.  I covered for the
6  Housekeeping department in the absence of Directors for
7  months on end while he searched for new Housekeeping
8  Directors.
9        I covered for the Business Office and oversaw the
10  Business Office after he terminated Anne84 Rogers.
11        I provided backup for him, no one else ever
12  volunteered, I did everything.
13        And if you don't think that that contributes to the
14  overall operations of Waverly Heights, I don't know what
15  would.
16  Q.    You were provided with bonuses during the timeframes
17  when you had a dual role, correct?
18  A.    Two thousand dollars for months of work.
19  Q.    The amount that is returned for workers' compensation
20  for the dividend, if there had been injuries during that
21  timeframe, would that have impacted the dividends?
22  A.    Yes.
23  Q.    And how is it that you would be able to control the
24  injuries if someone had an injury?
25  A.    It's not controlling the injuries, employees are

55

1  going to get injured, it's about having people come back
2  to work in any capacity.
3        When I first started, employees thought that they
4  were hired to the Building Services Department or the
5  Housekeeping Department.  They're hired by Waverly
6  Heights, which means that they could do light duty in any
7  capacity.
8        So I instituted a return-to-work program where anyone
9  who was injured could go downstairs to the laundry and
10  fold washrags or dishrags, so that there was no time loss.
11        That was a direct result in having low cost to the
12  workers' comp program.
13  Q.    When did you institute that program?
14  A.    We started with the Captive in 2002, and it was
15  immediately following my first meeting that I learned
16  about return-to-work programs through the Captive
17  Insurance Group by participating on their Risk Management
18  committee and circulated -- other members would circulate
19  ideas for return-to-work programs.  And when I came back
20  from that meeting, I immediately instituted that.
21  Q.    So that was approximately eight years before
22  Mr. Garvin coming on?
23  A.    Yes.
24  Q.    Did Mr. Maguire give you bonuses as a result of your
25  efforts in the return-to-work?

56

1  A.    No.
2  Q.    Did you make a complaint to him about that?
3  A.    I did.
4  Q.    Did you ever bring any of these complaints to anyone
5  above the CEO status?
6  A.    I did a presentation on the workers' comp program to
7  the entire Board.
8  Q.    Did you ever make a complaint to anyone above Mr.
9  Garvin or Mr. Maguire that you were not being properly
10  compensated as a result of your efforts with respect to
11  the workers' compensation program?
12  A.    No, there was no one to go to.
13  Q.    You were prohibited in what way from going to the
14  Board of Director -- Board of Trustees?
15  A.    Under Mr. Maguire, the Board of Trustees was an
16  advisory board, so they didn't have as much involvement in
17  the overall operations as they developed under Mr. Garvin.
18        But the message is, you go to Tom and you don't go to
19  anybody else.
20  Q.    Who told you that?
21  A.    It's just you don't do it.  If you do it, you're
22  going to get fired.
23  Q.    Did anyone ever do so and then get fired?
24  A.    No one would ever do it.
25  Q.    And there was nothing in a written directive telling

58

1  you this?

2  A.   No. I went to Mr. Soltis when Mr. Garvin was hired

3  and I suggested to him that under the new President, that

4  they have an Executive session with myself to give

5  feedback to the HR committee on his interaction with the

6  Senior Leadership Team and his overall management, and

7  that was denied.

8  Q.   Was there ever a verbal directive by anyone telling

9  you not to ever go above Mr. Garvin?

10  A.   I was told by Anne Rogers not to go above Mr.

11  Garvin -- or not to go above Mr. Maguire, and so that --

12  that held true for my entire tenure.

13              MR. SCHWARTZ:   I'd just like to note for

14        the record, you were asking about writings,

15        about whether you could go to the Board.

16        May the record reflect that you've refused

17        to provide the handbook for the trustees, and

18        that that would have that information, and again

19        I ask you to provide it.

20  BY MS. DEON:

21  Q.   Do you have occasion to go to seminars where there

22  are other directors of human resources?

23  A.   Seminars?

24  Q.   Seminars, conferences.

25  A.   I would; I didn't go to any. I participated in a

---

59

1  statement, send someone to one of the panel physicians,

2  communicate with the panel physicians on the outcome of

3  their examination, get a written documentation of the

4  level of restrictions they may have, whether it's light

5  duty, modified duty, and then go from there.

6  Q.   Were there ever any instances when an individual had

7  a work-related incident that resulted in an injury that

8  you did not follow that process?

9  A.   No.

10  Q.   Did you report all incidents or work-related injuries

11  to the carrier?

12  A.   Only if there was -- if it was qualifying event that

13  would result in medical expenses or possible lost work

14  time.

15  Q.   So it's your understanding that the carrier would not

16  require any type of reporting of a workplace injury unless

17  the caveat is that there were medical expenses or loss of

18  work?

19  A.   Yes, employees could come to you and say that

20  they -- for example, an employee could come and say that

21  they strained their back.

22        And I would say, When did you strain your back?

23  Last Thursday, and it's Friday of the following week.

24        Well, that would not get reported because that would

25  not be considered a work-related injury. I have no idea

---

58

1  personnel professional network group. They weren't

2  conferences, they were get-togethers to share ideas.

3  Q.   Was there ever any discussion about return-to-work

4  programs?

5  A.   I'm not sure.

6  Q.   Were you a member of any human resource professional

7  societies during the time that you were employed by

8  Waverly?

9  A.   SHRM, the Society for Human Resource Management, it's

10  S-H-R-M for short.

11  Q.   Did you go to any types of conferences or seminars

12  with respect to SHRM?

13  A.   I did online trainings; I didn't go to conferences.

14  Q.   In your mind, is the establishment of a

15  return-to-work program something that is extraordinary for

16  a Human Resources Director or is that something that you

17  would consider to be within their obligation and duties?

18  A.   I think it's extraordinary. Most human resource

19  directors or vice-presidents are not also risk managers.

20  I was the Risk Manager as well as the Human Resources

21  Director, and so I think that that's an extraordinary

22  thing.

23  Q.   What was your procedure when work-related injuries

24  came to your attention?

25  A.   The procedure was to immediately take down the

---

60

1  what they did between last Thursday and this Friday,

2  there's eight days in between there, including a weekend.

3  So there is no way of knowing whether or not that's an

4  actual work-related injury, so that's not something that

5  would get reported.

6        If someone had a bee sting and was allergic to bees,

7  that would get reported because it would result in some

8  kind of medical treatment.

9  Q.   How about if someone was bit by a patient and needed

10  a tetanus shot, would that be considered a work-related

11  incident that should be reported?

12  A.   Yes.

13  Q.   How about if a resident who might have some

14  aggression due to their condition if they were to twist

15  someone's arm or grab their hand in a very abrupt manner,

16  which required ice and some type of medical attention even

17  just at Waverly, would that be a reportable incident?

18  A.   It depends on if they got first aid and the

19  nurse's -- in the doctor's office. If they received first

20  aid, it would be printed on the incident. If they -- if

21  they asked for medical treatment after that, then, yes, it

22  would be reported.

23  Q.   And by *reported*, you would report that to the

24  company, you would not just do an incident report?

25  A.   It would be reported to Gallagher Bassett, who was

---

62

1  the, um -- who was the company that we worked with.
2  Q.   And you're confident that for each and every instance
3  of an individual having an injury at work where medical
4  treatment was then received, that you have turned those
5  over to the carrier?
6  A.   **To the best of my knowledge.**
7  Q.   You attend biannual meetings for the Captive?
8  A.   **Yes.**
9  Q.   They were held offsite from Waverly?
10 A.   **Yes.**
11 Q.   During that time, although there may have been some
12 socializing, were there also educational forums that were
13 done?
14 A.   **There were meetings that were held, yes.**
15 Q.   And did the meetings ever review topics such as when
16 you should report incidents?
17 A.   **Yes.**
18 Q.   And what would be the concern if someone did not
19 report an incident?
20 A.   **It wouldn't get covered.**
21 Q.   And that would be detrimental to the company,
22 correct?
23 A.   **It would be detrimental to the employee because they**
24 **would have an out-of-pocket expense.**
25 Q.   And wouldn't the company also be liable potentially?

1  A.   **Potentially.**
2  Q.   Did you ever maintain a file called Noninjury with
3  respect to workers' compensation?
4  A.   **My Administrative Assistant I think did.**
5  Q.   Did you have any say in what was considered a
6  noninjury?
7  A.   **Well, a noninjury would be something that didn't**
8  **require medical treatment.**
9  Q.   So if it did require medical treatment, it should not
10 have been designated as a noninjury, correct?
11 A.   **Yes.**
12 Q.   Would you agree that in your performance evaluations
13 that you did a self-evaluation during the time that
14 Mr. Garvin was the CEO, there was a format where you would
15 include a self-evaluation, and then Mr. Garvin would also
16 give remarks about your performance?
17 A.   **Yes.**
18 Q.   And would you agree that he was very complimentary of
19 you in your performance evaluations?
20 A.   **Yes.**
21 Q.   And in, you know, a number of your self-evaluations,
22 you were also complimentary about your interactions with
23 him.
24       Do you dispute that?
25 A.   **I -- I had very good relationship up until**

63

1  December 2016.
2       **I'm sorry, December 2015.**
3  Q.   And is the event that you're referring to in
4  December 2015 when you went to Mr. Garvin about being
5  upset about your bonus?
6  A.   **Yes.**
7  Q.   Have you -- I know you mentioned reviewing some of
8  the discovery that has been exchanged in this proceeding
9  in preparation for your deposition.
10      Do you recall that one of the items produced was your
11 personnel file?
12 A.   **Parts of it, yes, I'm not sure it was everything.**
13 Q.   Okay.  Do you recall seeing performance evaluations
14 in there?
15 A.   **Yes.**
16 Q.   Did you happen to review those?
17 A.   **No.**
18 Q.   Do you have any reason to believe that the statements
19 that you made in the performance evaluations are untrue or
20 were you being candid and truthful when you wrote them?
21 A.   **I was being candid and truthful.**
22 Q.   Did you have any reason to believe that statements
23 Mr. Garvin was making about your performance being
24 complimentary, that he was being untrue when he was making
25 those statements?

64

1  A.   **Only he can answer that.**
2  Q.   Well, did it leave you with an impression that he was
3  not being forthcoming?
4  A.   **No.**
5  Q.   You mentioned that you don't think that everything
6  was produced with respect to your personnel files.
7       Can you tell me specifically what you're referencing?
8  A.   **It just seemed light; my file was like this fat**
9  **(indicating).  So I think the content that we received was**
10 **like this much (indicating).  I mean, it was -- it could**
11 **have been training information, it could have been**
12 **anything.**
13 Q.   Was it Mr. Garvin that suggested that you get the NHA
14 certification?
15 A.   **Yes.**
16 Q.   And did the company pay for that?
17 A.   **Yes.**
18 Q.   And is it also true that he changed the days of the
19 weeks when the Senior Management Team met to accommodate
20 your class schedule?
21 A.   **I'm not sure that that was the reason --**
22 Q.   You don't recall that?
23 A.   **-- he changed the date.**
24       **No, we changed the dates and the times numerous times**
25 **before something was established as a regular basis.**

65

1  Q.   Did he ever advise you that he would have you take
2  the test and act as the Supervisor --
3  A.   Yes.
4  Q.   -- in the process?
5       And what caused you to not take the test?
6  A.   I didn't see the point since he had already hired
7  Meredith to the position that I was going for.
8  Q.   And is the only thing that you had remaining to take
9  the test in order to have that certification?
10 A.   Yes.
11 Q.   Would that have made you more marketable?
12 A.   Not necessarily.
13 Q.   If you had that certification presently, would that
14 have opened certain doors for you?
15 A.   I don't think so.
16 Q.   And are there certain positions where that
17 certification is, in fact, required?
18 A.   Yes.
19 Q.   You were unable to apply for those positions,
20 correct?
21 A.   Yes.
22 Q.   I know that you mentioned that you've taken trainings
23 in HR-related matters.  Am I correct that you do not have
24 a degree in human resources?
25 A.   I have a bachelor's degree in psychology.

66

1  Q.   So that's not human-resources related, correct?
2  A.   Correct.
3  Q.   And how about, do you have any specialized human
4  resource certifications?
5  A.   No.
6  Q.   Are you required to take any type of continuing
7  education in the HR field?
8  A.   No.
9  Q.   Turning again to your role as Vice President of Human
10 Resources, were you responsible for conducting internal
11 investigations of discrimination and harassment?
12 A.   Yes.
13 Q.   How many would you say that you oversaw during your
14 tenure?
15 A.   Oh, my goodness, I have no idea.  A lot.
16 Q.   Can you estimate on an annual basis approximately how
17 many?
18 A.   We're talking about discrimination and harassment?
19 Q.   Investigations.
20 A.   Investigations.  One a year.
21 Q.   Would you do so as the lead on that investigation or
22 did you have someone overseeing you?
23 A.   I was the lead.
24 Q.   So is it fair to say you've done at least 20 of them?
25 A.   At least.

67

1  Q.   Were there instances when you offered counsel to
2  individuals who believed that they were subjected to
3  discrimination or harassment?
4  A.   Did I offer counsel?
5  Q.   By counsel, I mean in your HR status where they would
6  come and make the complaint to you, but it may not go to a
7  full-blown investigation.
8  A.   It depends on the person.
9  Q.   Were there instances like that?
10 A.   There were instances where people came to me and I
11 asked them if I had their permission to then do an
12 investigation.  And there were instances where people
13 said, no, they did not want me to intervene.
14 Q.   And in your capacity as an HR Director, given that
15 you represent the company, are there circumstances when
16 you would not be able to abide by that request, that you
17 not intervene or not move forward?
18 A.   If I thought that it was detrimental to an employee,
19 yes.
20      Most of the people who came to me that said that they
21 did not want me to intervene were senior-level staff, and
22 I would counsel them on having a conversation directly
23 themselves with the person that they thought was making
24 them uncomfortable, or to go to Mr. Garvin themselves, and
25 100 percent of them refused to do that.

68

1  Q.   Did you suggest that they consider filing an
2  administrative complaint --
3  A.   I did.
4  Q.   Let me finish my question.  -- with the PHRC or the
5  EEOC?
6  A.   No, I -- I suggested that they have a conversation
7  with Mr. Garvin first before they pursue anything else.
8  Q.   Did they report back to you after speaking with him?
9  A.   They didn't speak to him.
10 Q.   Did there ever come a time when you had a concern
11 that there was some type of culture or other conduct by
12 Mr. Garvin that was of a severe nature that you needed to
13 go to the Board or some other body?
14 A.   His tolerance of Bob Supper is something that I would
15 have taken to the Board had I felt comfortable, but based
16 on the nature of the relationship with Mr. Garvin and the
17 Board Members, I knew that that would only result in me
18 losing my job.
19 Q.   Did you ever seek legal counsel, without telling me
20 what that legal counsel may have been, at any time while
21 you were employed at Waverly about that issue?
22 A.   About Mr. Supper?
23 Q.   No, about the issue of not having -- not being able
24 to go above Mr. Garvin for fear of being terminated.
25 A.   There's a difference between legal counsel and having

70

1 a conversation with an attorney.
2     I did have conversations with attorneys where I
3 discussed some of the concerns that I had and sought their
4 advice, but I can't say that I formally in my position
5 sought counsel.
6 Q.    And when you had these conversations with these
7 attorneys, was it a situation where you actually engaged
8 them and paid them a fee for their counsel?
9 A.    No.
10 Q.    How many attorneys would you say fall into that
11 category?
12 A.    Two.
13 Q.    And who are they?
14 A.    One is Debbie Sandler, who works at White And
15 Williams and was our labor attorney for Waverly Heights.
16 And the second is my sister, Dana Rider, who is an
17 attorney-at-law.
18 Q.    And what did each of them -- well, why don't we start
19 with Ms. Sandler. What did she tell you when you posed
20 that to her?
21 A.    Debbie's advice was always that you have to ask the
22 employee if they went you to intervene first. And if they
23 want you to intervene, then you have to intervene. And if
24 it's something that's detrimental or at a peer level that
25 could go to directly to Tom, then that would be your

71

1     lawyer; calls for a legal conclusion.
2     THE WITNESS:   I'm not sure what you're
3     asking.
4 BY MS. DEON:
5 Q.    You're aware that there are statutes in place that
6 would dictate that an employer has to maintain an
7 environment that is free of discrimination, correct?
8 A.    Yes.
9 Q.    And you're aware that there, ah -- that if an
10 individual was, in fact, treating a group of individuals
11 based upon their gender in a particular manner, that would
12 be what we call in human resources a hostile workplace?
13 A.    Correct.
14 Q.    So knowing that you had these complaints and that you
15 went and made this complaint to Mr. Garvin -- is that what
16 you're telling me?
17 A.    Yes.
18 Q.    And what did Mr. Garvin do about it?
19 A.    I told you, he said, It's just Bob.
20 Q.    So now given the fact that you have gone that far
21 with things, did you ever go back to Mr. Garvin and say,
22 I've approached Mr. Garvin and he's told me, That's just
23 Bob, and he's not going to do anything about it?
24 A.    I told that to my sister.
25 Q.    And what did your sister tell you you should do at

72

1 advice to them, Go to Tom and talk about the issue.
2 Q.    So that would be for the senior management
3 individual, that was the advice and that's what you, in
4 fact, did?
5 A.    Yes.
6 Q.    And what was the advice in the event that the
7 individuals didn't feel comfortable to do that?
8 A.    The advice was that if I could find a way to have a
9 conversation with Mr. Garvin about the situation without
10 naming names, that I should do that.
11 Q.    Did you do that?
12 A.    Yes.
13 Q.    And with respect to what situation did you do that?
14 A.    With Mr. Supper.
15 Q.    So explain to me what you told Mr. Garvin.
16 A.    I received numerous complaints from the female staff
17 about Mr. Supper's behavior in meetings and his demeaning
18 and demoralizing treatment to them.
19     And I went to Mr. Garvin and told him that I got -- I
20 had gotten these complaints, and he said, It's just Bob.
21 Q.    So if that were, in fact, occurring, you'd agree that
22 that would be a violation of state and federal laws that
23 are in place against discrimination or a hostile work
24 environment?
25     MR. SCHWARTZ:   Objection, she's not a

1 that point?
2 A.    She said, Do you have an opportunity to talk to the
3 Board?
4     And I said, No, that is frowned upon and I will lose
5 my job.
6 Q.    What, if anything -- and let me back up for a moment.
7     What type of law does your sister practice?
8 A.    She does workers' compensation, and she does
9 employee-related cases, sexual harassment cases.
10 Q.    Did she tell you that it would be retaliatory if you
11 were then treated adversely after going to the Board with
12 that type of a complaint?
13     MR. SCHWARTZ:   I object as it's calling for
14     attorney/client privilege communication since
15     she did say that she sought the advice of -- her
16     sister's a lawyer.
17     MS. DEON:   She also testified that she
18     never engaged a lawyer. She referenced two
19     people, Debbie Sandler and Dana Rider, and that
20     they were never formally engaged and that there
21     was no money that changed hands.
22     MR. SCHWARTZ:   Do you know, I think that
23     that's Michael Cohen's defense and it's not a
24     terribly successful one.
25     MS. DEON:   Are you instructing her not to

74

```
 1    answer?
 2          MR. SCHWARTZ:   Yes.
 3          MS. DEON:   Okay.  Do you want to note that
 4    on the record?
 5          THE COURT REPORTER:   Yes.
 6    BY MS. DEON:
 7    Q.   You are familiar though with the anti-retaliation
 8    provision of the federal and state statutes?
 9    A.   Yes.
10    Q.   And, in fact, you're asserting retaliation in this
11    cause of action.
12    A.   I am.
13    Q.   Are you familiar with the Employee -- or the
14    Compliance Hotline that Waverly has?
15    A.   Yes.
16    Q.   Who is the Compliance Officer at Waverly?
17    A.   It's a Corporate Compliance Hotline; Janet Thompson
18    is the Compliance Officer.
19    Q.   What types of matters is that hotline utilized?
20    A.   It's utilized for fraud; Medicare fraud, billing
21    fraud, those kinds of things.
22    Q.   How about whistleblower claims?
23    A.   We never -- we never trained on it being a
24    whistleblower hotline, it was used just for any fraudulent
25    activity that you might observe.
```

75

```
 1    qualified?
 2    A.   Yes.
 3    Q.   How about if the individual that was overseeing
 4    financial affairs was incompetent in someone's opinion,
 5    would that be something that they would report?
 6    A.   No.
 7    Q.   So if someone was of the belief that an individual
 8    that was high level, Mr. Supper for instance, that he was
 9    in some manner not qualified for that role due to
10    alcoholism, would that be something that would be
11    reported?
12    A.   No.
13    Q.   If that were a concern, what would have been the
14    vehicle for -- what method would have been utilized to
15    report that and to whom?
16    A.   Someone would come to me or to go to -- or to go to
17    Mr. Garvin.
18    Q.   Did that ever happen?
19    A.   Yes.
20    Q.   What happened?
21    A.   Mr. Garvin came to me to tell me that he was
22    concerned that Bob Supper had a company car and that he
23    was a frequent, heavy drinker, and he was afraid for the
24    liability that it posed to Waverly Heights.
25          I had complaints from Janet Thompson about his
```

76

```
 1    Q.   During your 20 years, were there any complaints made
 2    to it?
 3    A.   When I left, the only thing that had ever been on the
 4    Compliance Hotline was a pizza order.
 5    Q.   A pizza order?
 6    A.   (Witness nodding affirmatively.)
 7    Q.   When did the corporate Compliance Hotline, when was
 8    it established?
 9    A.   Um, jeez.  I'm going to say it was -- we never had an
10    official hotline, that was a telephone number that was
11    established when we developed the Corporate Compliance
12    program.  I honestly don't remember when that went into
13    effect.
14    Q.   Was that meant for people to be able to leave
15    anonymous information?
16    A.   We did a corporate -- Janet Thompson did corporate
17    compliance training at annual training, and what was
18    stressed at that training was that it was for fraud,
19    Medicare billing, it was not really a whistleblower,
20    employee-related hotline.  It was never trained as that,
21    it was trained as billing fraud.
22          If you knew of anything that was going on of a
23    fraudulent activity, that that was the hotline to call.
24    Q.   How about if an individual was mismanaging the
25    financials of Waverly, would that be something that
```

76

```
 1    talking about leaving early on Thursdays to go to happy
 2    hour.  I had complaints from the Business Office staff who
 3    complained about his leaving early to go to happy hour,
 4    about his incessant conversations about gambling, about
 5    his yelling and his demeaning behavior.
 6          I had complaints from Amy Blessing about his
 7    screaming on the telephone to his wife, his obnoxious
 8    behavior, his, ah -- again, talking about his drinking,
 9    talking about his gambling, the man, he has no filter.
10    Q.   Did Mr. Supper ever yell at men, male employees?
11    A.   Not in my presence.
12    Q.   You're unaware of that ever occurring?
13    A.   No, never had -- never made aware of it.
14    Q.   If anyone else testified that he did, in fact, do
15    that, would that surprise you?
16    A.   A man?
17    Q.   Yes.
18    A.   Yes, I would be surprised.
19    Q.   Was Mr. Supper ever reported to be under the
20    influence when he was on the job?
21    A.   No, but I was told by Mr. Garvin to avoid Mr. Supper
22    on Mondays until at least noon until he -- so he had a
23    chance to recover from his weekend.
24    Q.   And you took that to mean because of some type of
25    alcohol abuse?
```

78

1  A.  Yes.
2  Q.  It couldn't have meant that he just wasn't a morning
3  person?
4  A.  No.
5  Q.  And, again, despite these concerns that you had that
6  you brought to Mr. Garvin and that you claim Mr. Garvin
7  brought to you, at no time did you go to any level above
8  that --
9  A.  I did not.
10 Q.  -- to report these things?
11     Did you ever have reason to write Mr. Supper up for
12 disciplinary infractions?
13 A.  That would not be my role.
14 Q.  Do you know whether Mr. Supper was ever counseled or
15 disciplined for any type of infraction, whether by you or
16 anyone else?
17 A.  The only infraction I know that he was addressed
18 about was the use of his cell phone.  He would sit in
19 meetings and be on his personal cell phone throughout the
20 entire meeting constantly, and I know that Mr. Garvin did
21 have a conversation about that.  It stopped for
22 approximately a week before it continued again, and then
23 it just continued.  His behavior was overly tolerated.
24 Q.  Did his behavior prevent you from doing your job?
25 A.  Effectively, yes.

79

1  Q.  What else did he do in front of people below the
2  Senior Management Team that you found objectionable as a
3  Vice President of Human Resources?
4  A.  He was overbearing and insulting to his staff.
5  Q.  Did he manage men and women?
6  A.  Yes.
7  Q.  And is it your position that he only was overbearing
8  to the women?
9  A.  No.
10 Q.  With respect to Mr. Supper, are you only attributing
11 a hostile workplace to gender as opposed to age?
12 A.  Oh, no, he discriminated based on age as well.
13 Q.  In what respect?
14 A.  His controller, Isthuhamil Hamid --
15 Q.  Are you able to spell that?
16 A.  I-S-T-H-U-H-A-M-I-L, I think, H-A-M-I-D.
17     Obviously, based on his name, he is a minority.
18 Mr. Supper would demoralize him in front of other staff,
19 and made it frequently known to the person that was a
20 direct report to Hamid, Chad Minix, who was a Caucasian
21 Account Manager, would tell Chad that his goal was to
22 terminate Hamid so that Chad could then become the
23 Controller, which actually did end up happening.
24 Q.  The last name Mini, M-I-N-I-X?
25 A.  Yes.

80

1  Q.  How?
2  A.  It's difficult when you have a Senior Vice President
3  who is allowed and permitted openly to be on their
4  personal cell phone, to come and go as they please, to
5  discuss inappropriate topics, and then to enforce the
6  rules for the hourly team.  It creates an us versus them
7  mentality that is very difficult to then manage.
8  Q.  How often did Mr. Supper interact with the employees
9  that were below management?
10 A.  Never.  His interaction was with his direct reports,
11 and maybe when he saw someone in the hallway or at the
12 Pineapple Grill, he didn't engage with employees.  He
13 would walk down the hallway with his head down on his cell
14 phone, never said hello, never interacted.
15 Q.  So the behavior that you're claiming was
16 objectionable was in front of other members of the Senior
17 Leadership Team?
18 A.  Yes.
19 Q.  But not those below?
20 A.  Everyone.  Every employee and every resident could
21 see him on his personal cell phone.
22 Q.  Walking in the hallway?
23 A.  Walking in the hallway, in the Pineapple Grill, in
24 meetings, in meetings with his subordinates, it was
25 constant.

1  Q.  How old was Chad?
2  A.  Chad is in his thirties.
3  Q.  Is he the current Controller?
4  A.  Yes.
5  Q.  Is he qualified for the position?
6  A.  I didn't make that determination, it was after my
7  termination.
8  Q.  Do you know the basis for how the other Controller
9  with the name that I can't pronounce, how he wound up
10 leaving the organization?
11 A.  I don't know, but when I was still -- when I was
12 there, it was Mr. Supper's mission to get him out of
13 there, and Hamid is in his -- was in his seventies.
14 Q.  Did anyone else have any objection about Mohammed's
15 conduct and performance?
16 A.  Not that I'm aware of.
17 Q.  Had he been an employee for the entire time that you
18 were an employee; was he a longterm person?
19 A.  Hamid?
20 Q.  Yes.
21 A.  No, he was hired maybe four or five years ago.
22 Q.  So he was hired under Mr. Garvin's tenure?
23 A.  Yes.
24 Q.  And he was in his seventies, you said?
25 A.  Yes.

82

1   Q.   Did anyone else create a hostile work environment on
2   the basis of age according to your claims other than
3   Mr. Supper?
4   A.   Mr. Garvin.
5   Q.   In what respect?
6   A.   He would make comments about — when we had our
7   benefit renewal and our premiums would go up, he would
8   make comments about getting rid of the older employees so
9   that we would have a different demographic and the
10  premiums would go down.
11  Q.   Did he instruct you to take any action in that
12  regard?
13  A.   He would make joking comments like, Why don't we get
14  rid of some of those older housekeepers?
15  Q.   Did he ask that you actually take action to eliminate
16  those people's positions or to determine them?
17  A.   No.
18  Q.   Anything else age-wise?
19  A.   He would make comments about -- whenever he fired
20  someone, about not having it -- that he wasn't out to get
21  the old-timers.  He made that comment to me directly when
22  he had terminated one of the other senior leaders, and
23  then he made that comment to Marc Heil right after my
24  termination.
25  Q.   And by the older senior leaders, did you take that to

84

1   mean the ages of individuals or just individuals that were
2   at Waverly prior to Mr. Garvin's tenure?
3   A.   They were all older individuals with the exception of
4   one man.
5   Q.   Okay.  Do you understand the distinction, sometimes
6   when a new person comes in, people are under the
7   impression that the older, meaning that people that have
8   been with the company for a long time before, are going to
9   be eliminated by the new CEO, was that your position, or
10  are you saying that it was on the basis of their ages?
11  A.   What I am saying is it's difficult to know what was
12  in his mind because the people that left were senior in
13  age and senior in tenure.  So when you say old-timers, I'm
14  not sure what his message was.
15  Q.   And who exactly wound up leaving that you're
16  referring to?
17  A.   Well, Anne Rogers was terminated.
18  Q.   Did you support that?
19  A.   Anne Rogers was -- her behavior was tolerated for so
20  long and she was given so many opportunities and went
21  through the progressive discipline program, and that when
22  it came time to let her go, I thought it was appropriate.
23       Meg Guenveur --
24  Q.   Before you go off on her, so you supported her
25  termination, Anne Rogers?

83

1   A.   Uh-huh.
2   Q.   And she was a female?
3   A.   Yes.
4   Q.   How old was she, approximately?
5   A.   Sixty-something.
6   Q.   Okay, anyone else?
7   A.   Meg Guenveur.
8   Q.   And why was she terminated?
9   A.   Meg was ladylike enough to say that she was retiring,
10  though she left because she was being bullied in the
11  workplace.
12  Q.   By whom?
13  A.   Mr. Garvin.  To the point of tears.
14  Q.   Did she have any performance issues?
15  A.   None that I know of.
16  Q.   Were you ever involved in any type of performance
17  improvement plan or any type of counseling on her
18  performance?
19  A.   Mr. Garvin put me in all kinds of difficult
20  situations.
21  Q.   Is that a yes or a no, were you involved in that?
22  A.   Yes.  Meaning --
23  Q.   Did you --
24  A.   -- meaning that I was a witness.
25  Q.   Did you have a different opinion concerning her

84

1   performance?
2   A.   I did.
3   Q.   What was that?
4   A.   I thought Meg was very good at her job.
5   Q.   Was Mr. Garvin -- who else then of the Senior
6   Leadership?  You mentioned Anne Rogers and Meg.
7   A.   Uh-huh.
8   Q.   Who else --
9   A.   Colin Gallagher.
10  Q.   How old was he?
11  A.   Colin was in his fifties, late fifties.
12  Q.   What position was he in?
13  A.   He was the Director of Dining Services.
14  Q.   And why did he separate from the company?
15  A.   Tom asked -- that was a contracted position through
16  FLIK, and Tom asked them to replace him.
17  Q.   Why?
18  A.   He didn't like his performance.
19  Q.   What about his performance didn't he like?
20  A.   Colin had a very overly assertive way of presenting
21  himself, and I think that Mr. Garvin didn't like that.
22  Q.   Did anyone complain about Mr. Gallagher being overly
23  assertive?
24  A.   He had issues with his Dining Services Manager,
25  Debbie Best.  Debbie Best had her own issues, ah, but they

1  had worked together for many, many years.
2  Q.    Did you support the decision to replace him?
3  A.    No.
4              MR. SCHWARTZ:   Can we take a break now?
5              MS. DEON:   Sure.
6              MR. SCHWARTZ:   Okay.
7              -----
8          (Recess declared.)
9              -----
10         (After recess.)
11             -----
12             MR. SCHWARTZ:   The matter of Dana Rider,
13     the deponent's sister, has come up.
14             For the record I'd like to state that I've
15     utilized her as assistance in this case.  So
16     she's assisted me in this case.
17             -----
18         (Whereupon, the court reporter read back
19         the pending question.)
20             -----
21  BY MS. DEON:
22  Q.    What is your source for Mr. Gallagher being in his
23  late fifties; is that just a guess?
24  A.    It's a guess.
25  Q.    And with respect to Mr. Hamid leaving, what is your

1  source of information about the circumstances of him
2  leaving?
3  A.    I only know that Chad was promoted to the Controller
4  position through his LinkedIn page.
5  Q.    We spoke before about the establishment of the Go
6  Fund Me page --
7  A.    Yes.
8  Q.    -- for an employee.
9          I've not done that before; is that something you set
10 up separate and apart from Twitter through in other means?
11 A.    You go to the Go Fund Me page, webpage.
12 Q.    And then is that something that can then from that
13 webpage be advertised and shared with your Facebook and
14 other means?
15 A.    Yes.
16 Q.    Can that also be shared on Twitter?
17 A.    When you -- I think when you first establish it, it
18 says, To get more mileage out of the Go Fund me account,
19 you can -- they suggest that you use -- you put it on
20 Facebook or Twitter.
21         And I think I just clicked -- I -- I had never done a
22 Go Fund Me page before, so I just clicked whatever means
23 to get the most advertisement.
24 Q.    Do you know whether you did click it for the Twitter
25 feed, also?

87

1  A.    I think that at the bottom it just says, Do you want
2  to get the most mileage out of your page?  And then -- I'm
3  not sure if the symbols are underneath it for Twitter and
4  Facebook, but you just -- I just clicked Yes, I want to
5  get the most mileage out of it.
6          And I know that they then share it with -- if it's a
7  medical issue, they'll share it on a medical page.  Um,
8  it -- I'm not really -- I've never done Go Fund Me before,
9  so it's the very first time I did it, so I just wanted to
10 get the most mileage as possible.
11 Q.    Before I was asking you about harassment claims
12 against Waverly, and is Trish Thompson also an individual
13 that brought a claim?
14 A.    A claim?
15 Q.    Yes.
16 A.    Of harassment.
17 Q.    Yes.
18 A.    I wouldn't say it was a claim; she wrote a letter to
19 Tom about me.
20         She was a direct report for 12 years and she -- the
21 position outgrew her and outgrew her skills.  And when I
22 was addressing things -- things of that nature with her,
23 she took offense and wrote a letter to Tom.
24         We had a meeting, where she was allowed to voice her
25 frustrations, and in that meeting Tom was fully supportive

88

1  of me.
2  Q.    And was she eventually terminated?
3  A.    She left on her own.
4  Q.    How about Vermita (sp) ...
5  A.    Vermita Smalls?
6  Q.    Yes.
7  A.    Vermita Smalls.  I honestly don't remember the nature
8  of her leaving.
9  Q.    Do you have any recollection of her doing a
10 harassment or discrimination claim --
11 A.    No.
12 Q.    -- asserting one?
13         What involvement, if any, did you have in the
14 drafting of Waverly's social media policy?
15 A.    When Bob Supper started working for Waverly Heights,
16 he suggested that we redo our employee handbook.  He gave
17 me a handbook that he had from a previous employer and I
18 duplicated the contents of that handbook for the Waverly
19 Heights' handbook.
20         We had never had a social media policy.  Social media
21 was not really a thing a couple years ago, and so it was a
22 standard social media policy that came from, I think it
23 was a Dunwoody handbook, I'm not positive.
24 Q.    Had you ever had to discipline anyone from the time
25 that that went into place -- would that have been 2014?

90

1   A.   Yes.

2   Q.   Had you had any role in disciplining anyone with

3   respect to social media policy?

4   A.   There was an hourly employee -- this is the only one

5   I recall -- an hourly employee who worked in our Assisted

6   Living Unit, who was in uniform with his name badge on and

7   took a picture of himself and a resident, and posted it on

8   his -- one of his social media accounts.

9   Q.   Was it your recommendation that he be terminated?

10   A.   It was Tom's recommendation to terminate him.

11   Q.   Did you support that?

12   A.   I did because he identified himself as being working

13   for Waverly Heights by his name badge.

14   Q.   Have you ever Googled your name?

15   A.   Yes.

16   Q.   And do you have any sense of how many individuals

17   with the first initial of K and the last name of Jungclaus

18   there are in the area?

19   A.   I have no idea.

20   Q.   Would it surprise you if there were very few?

21   A.   It's an unusual name.

22   Q.   And when your name is Googled, is there any

23   affiliation that comes up with Waverly? Have you ever had

24   occasion to do that?

25   A.   When you Google my name, if you Google Kathleen

91

1   someone else, it's really difficult to advocate for

2   yourself when you don't have anybody else that you can go

3   to. Like, this is it, this is the end of the line, you go

4   and you -- and I tried to get him to appreciate the value

5   of what I was bringing to the job.

6       And he was angry with me, and you always know when

7   Tom's angry because the vein in his neck starts to throb

8   and that's a clear, telltale sign that he's not happy with

9   what you're saying.

10       And I asked him in that meeting if it was going to

11   interfere in our relationship moving forward, and he said

12   no, but from that day forward, he approached me with an

13   arm's length. I was never included in anything else after

14   that, it was distance and silence.

15       And I went home and I said to my husband, I know that

16   I'm going to get fired; it might not be today, it might

17   not be next week, but he's going to fire me for something,

18   and that's exactly what happened.

19       And when I -- when he came to me about Bob Supper's

20   car being repossessed, he sought me out, he came to my

21   office and sat down and told me that Bob came to him and

22   told him that the car was repossessed and that he was

23   afraid he was going to lose his job.

24       And I said to him, This is a perfect time to take the

25   car away from him. He drinks, he has no reason for a car,

92

1   Jungclaus, all kinds of things come up, mostly about the

2   unemployment case; the amended finding from the Court to

3   eliminate the Board Members from being part of the

4   lawsuit; my name with Best Places to Work for Waverly

5   Heights comes up.

6       Um, I can't think of anything else.

7   Q.   And what is your belief or understanding of

8   why -- strike that.

9       What do you allege forms the basis for why you were

10   terminated?

11   A.   I believe that up until December of 2015, I had a

12   very nice, collegial working relationship with Mr. Garvin.

13   He included me -- I was with him in almost every meeting

14   that he held. I was with him in all kinds of difficult

15   situations with Senior Leadership Teams, with Senior

16   Leaders, Managers, making decisions, and when I confronted

17   him in December about my compensation, I was really upset

18   because I felt like he had completely taken advantage of

19   me. And, you know, when it comes down to it, like the

20   best recognition is in your pay.

21       And other people who had done far less than me got

22   far more than I did, and I was devastated by that, and it

23   took me weeks to get myself together in order to have a

24   conversation with him about it.

25       It's very difficult -- it's easy to advocate for

1   he doesn't travel in any capacity for his job, and

2   Meredith doesn't have a car.

3       The one thing that you didn't ask me is when Tom got

4   hired, he changed the level of positions. He created the

5   two Senior Vice President positions, he created them, they

6   should have been treated equally.

7       And when he took the car away from Bob, he should

8   have -- if -- if my Tweet rose to the occasion of taking

9   it to the full Board of Trustees and the Human Resource

10   committee, I am appalled that the repossession of a

11   company car doesn't result in some kind of communication,

12   instead it went to Dick Bauer for a secret conversation,

13   the car got removed and he got $10,000 to pay for his car.

14   That is absolutely discriminatory.

15       To tolerate that behavior and then permit him to

16   continue in that capacity, I knew then that there was a

17   problem because Tom said to me, Don't ever bring it up

18   again. And that was in August, a month before I got

19   fired.

20   Q.   That was the car --

21   A.   Yes. And that repossession was posted on the Mount

22   Laurel Police Blotter Facebook page.

23       THE WITNESS:   I need a minute.

24       MS. DEON:   Do you need a break?

25       MR. SCHWARTZ:   Yes.

94

**Top-left column:**

```
1              -----
2        (Discussion held off record.)
3              -----
4   BY MS. DEON:
5   Q.    Did you have anything else you wanted to finish your
6   answer before I ask you another question?
7              THE WITNESS:   Can you read back my answer?
8              -----
9         (Whereupon, the court reporter read back
10        the pending answer.)
11             -----
12             THE WITNESS:   I don't think so.
13  BY MS. DEON:
14  Q.    So the Police Blotter page, which is included with
15  RJ-4, Exhibit B, is that what you're referring to?
16  A.    Yes.
17  Q.    And that is referring to Robert Supper, Jr., the son,
18  correct?
19  A.    Yes, that's correct.
20  Q.    So there's nothing on the Police Blotter that
21  references Waverly, correct?
22  A.    Correct.
23  Q.    And there's nothing that lists Robert L. Supper, Sr.,
24  who works at Waverly, correct?
25  A.    Correct.  They have the same name.
```

**Top-right column:**

```
1   Q.    And by repossessing the car, did you mean that the
2   car was impounded by the police?
3   A.    Yes, that's what I meant, impounded.
4   Q.    But that information wasn't publicly displayed on
5   Facebook or anywhere, was it?
6   A.    No.
7   Q.    You referenced in -- the pleadings in the case keep
8   referencing that the decision to terminate you was by the
9   full Board of Directors.
10  A.    Yes.
11  Q.    What information do you base that upon?
12  A.    In my termination meeting, when I asked to meet with
13  the HR committee members and the Board of Trustees, I was
14  told that the decision was unanimous by the Board of
15  Trustees and the HR Committee.
16  Q.    Do you recall -- earlier you testified that you were
17  very upset at the termination meeting.
18        Do you recall that?
19  A.    Yes.
20  Q.    And also afterwards?
21  A.    Correct.
22  Q.    And you seem to say that you didn't really recall
23  what was happening because you were so upset.
24        Was that during the time of the termination meeting
25  or the meeting that you had after with the two coworkers
```

95

```
1   or both?
2   A.    When I was called down to Tom's office and I walked
3   in, he, Mr. Bauer, was sitting at the round table in Tom's
4   office, and Tom had a Manila folder in his hand and he
5   said, I guess you know why you're here.
6         And I said, I have no idea why I'm here.
7         And he asked me to sit down, and I sat in the back
8   with my back to the wall, and Mr. Bauer was to my right,
9   and Tom was here (indicating) at the round table.
10        And he said that it was about the Tweet and that he
11  was very upset about it and had decided to take it to the
12  Human Resource Committee, and that the decision was made
13  to terminate my employment.
14        When I heard that, I -- I was shocked.  It was like
15  having the earth pulled out from underneath my feet.  I
16  didn't understand.  I -- I begged for my job, it was
17  humiliating.  I begged and pleaded for my job.  I asked
18  them to send me to a training, suspend me, whatever, don't
19  let me lose my job.  I was stonewalled; there was nothing.
20        I said, Can I at least talk to the HR Committee?  I
21  had relationships with these members of the HR Committee,
22  I worked with them for years, I wanted an opportunity to
23  sit down and talk to them.
24        And Tom told me that it was a unanimous decision,
25  that they had discussed it, and that was the decision.
```

96

**Bottom-right column:**

```
1         And I said, Well, please let me take it to the Board.
2   Let me take -- take it to the full Board, I want to talk
3   to the full Board.
4         And he said, It was a unanimous decision by the full
5   Board and the Human Resource Committee to terminate my
6   employment, and I was shocked.
7         I was shocked that I -- all these things were going
8   through my head.  Other employees, who had done far more
9   egregious things than me, were permitted to continue on in
10  their employment.  They were given training classes, they
11  were sent to management sessions, there was progressive
12  discipline.
13        I had a meeting with Tom on September 20th, where
14  he handed me an anonymous letter in an envelope, I didn't
15  even have a chance to read it.  He blew it off as a
16  mere -- as a mere incident, it wasn't a big deal, he was
17  so anxious to leave for his conference.
18        He told me I had nothing to worry about, and the very
19  next time I see him, he fires me.  No questions, no
20  investigation, no Kathy, can we talk about this?
21        I worked with him for years, we had a trusting
22  relationship.  I was so betrayed by him and betrayed by
23  Dick Bauer.  I -- I was appalled that they would take this
24  to the full Board and humiliate me by showing them --
25  show -- and then to make the comment that says, I don't
```

1  want you to think that we think you're a racist.
2       Why would that even come up? Why would that come up
3  unless you thought I was a racist?
4       I was -- I -- I honestly remember bits and pieces of
5  that meeting. I remember crying. I remember begging for
6  my job. I remember praying the Our Father and asking for
7  strength. I remember asking to use the phone so I could
8  call my husband.
9       I remember asking if I could resign so that I could
10 leave with some modicum of dignity after 20 years.
11 Nothing. Nothing, not one iota of human compassion and
12 empathy.
13      With someone that you worked with and had a
14 relationship with, to be treated like a common criminal,
15 was so demoralizing. I can't even tell you the depth of
16 devastation to me. My whole purpose was my job; I loved
17 my job.
18      I knew every single employee; I knew something
19 personal about every one of them. I -- it was my mission
20 to make Waverly a wonderful place to work, and I was never
21 afforded the same treatment that every single other person
22 had, not once, but unless it was something so egregious
23 that somebody was terminated like that.
24      Anne Rogers, her sexual harassment of me, her
25 demoralizing employees. Her demoralizing an employee by

1  correcting his English in public meetings that -- that
2  resulted in actual harm to that employee, she was given
3  training. Go to training. Go to management training. Go
4  to cultural diversity training. Let's have a Plan of
5  Action for you.
6       But me, a Tweet on my personal Twitter page that is
7  not linked, that has no association with Waverly, that
8  isn't even offensive in any way, results in immediate
9  termination, approved by the Board and approved by the HR
10 Committee, that tells me there is something far greater
11 going on, so it's not about the Tweet.
12      And do I remember everything that happened in that
13 meeting? No, I don't, but there are things that stand
14 out.
15      I was rambling, I was devastated, I was crying. I --
16 I -- I was at a loss because there was no avenue for me,
17 they were giving me no avenue, nothing. It was just, no.
18 No. No. No.
19      And when I asked Tom what he would tell me people, he
20 said he would tell them that I resigned, I had simply
21 resigned and was gone.
22      I told him I was worried because my in-laws lived
23 there, and I was devastated by what they were going to be
24 told and that they had to continue to live there. It's
25 embarrassing for them. They couldn't even look at Tom

1  after that, they were so mortified that I was treated that
2  way.
3  Q.   Were you ever prevented from coming back on the
4  property to see them?
5  A.   Yes. Oh, to see them?
6  Q.   Yes.
7  A.   No.
8  Q.   And you've seen the notice that went out to the
9  residents?
10 A.   Yes.
11 Q.   And there's nothing in that that says you're a racist
12 or anything objectionable; would you agree?
13 A.   No, there's nothing in there, not in the letter.
14 Q.   Who were the other employees that you're referring to
15 that did far more egregious things than you under Mr.
16 Garvin's tenure?
17 A.   Anne Rogers.
18 Q.   And who else?
19 A.   Bob Supper, he continues to work there. Meredith
20 Feher, her treatment of employees is obnoxious.
21 Q.   And with respect to Mr. Supper, you're referring to
22 the demeaning manner which he -- all the testimony that
23 you gave before about his interactions with employees; is
24 that what you're referring to?
25 A.   That and the drinking and the gambling, the car.

1  Q.   And with respect to Meredith Feher, what specifically
2  are you referring to?
3  A.   Meredith's management style is *do as I say, not as I
4  do*. And her rapport with her CNAs and nurses were so
5  strained, that I was instructed to attend her staff
6  meetings to make sure that her delivery was a little bit
7  more positive.
8       So it's always Kathy, fix it. Fix it, Kathy. Make
9  it go away, Kathy. Make it happen, Kathy.
10 Q.   You had testified before about other employees were
11 given a chance, they had I believe, you were saying, done
12 things that were more egregious than you, and they were
13 given a second chance, and you mentioned Anne Rogers, and
14 now you just told me Bob Supper, and then Meredith Feher.
15      Is there anyone else?
16 A.   Under Tom, let me think. I can't think of anyone at
17 the moment.
18 Q.   And how about from an age perspective, is it your
19 position that but for your age, you would not have been
20 terminated?
21 A.   I didn't say *but for my age*.
22 Q.   Do you think that was a factor?
23 A.   I think that my advocating for myself, my advocating
24 for other employees, my disagreeing with Tom, all of those
25 things factor in. Probably my age as well since he hired

102

1 someone younger than me to replace me.
2 Q. Do you have any independent evidence that your age
3 was a factor in the determination of separating you from
4 employment?
5        MR. SCHWARTZ: Asked and answered. She's
6        talked about repeated instances where he talks
7        about getting rid of people because of their
8        age, that's the policy. I mean, I think this
9        has been asked and answered.
10        MS. DEON: You can answer the question.
11        THE WITNESS: Age is always an issue with
12 Tom. Aging Housekeeping staff, aging CNAs,
13 aging population in general, ah, it gives us a
14 higher instance in demographics for our benefit
15 renewal, it puts us at greater risk for injury
16 on the job.
17        Ah, they're higher paid, so their
18 compensation is higher. We can hire people at a
19 much lower rate if we brought them in -- if we
20 brought new people in.
21 BY MS. DEON:
22 Q. But specific to the decision to terminate you
23 following the Tweet, what evidence do you have that there
24 was consideration by Tom and the support of others for the
25 separation that age was something that was factored into

103

1 A. It depended on the time of the year.
2 Q. Were there budget-related issues that were discussed
3 and policy issues?
4 A. Budget-related issues only in the sense from my
5 perspective of benefit renewal. Mr. Supper would do the
6 financials, I suppose, at his Finance Committee meeting.
7     My meetings were typically in March, usually about
8 turnover reports, I did annual statistical reports. I
9 talked about training, orientation, the turnover. I'm
10 trying to think what else those reports were. And I would
11 talk about the benefit renewal, what that equated to in
12 terms of a percentage of increase.
13     We would meet again in September. You know, usually
14 it was just a topic. And at the end of the year we would
15 meet, and I was usually only there for five or 10 minutes
16 before I was dismissed and they would go into Executive
17 Session.
18     I was a token of information, I came in and reported
19 information and then I was asked to leave every meeting
20 for Executive Session.
21 Q. Were there any instances where you were asked to
22 remain for Executive Session?
23 A. No.
24 Q. So there was never a time there was discussion about
25 litigation that you were involved in, or anything like

104

1 that decision-making?
2 A. I think that my age was an issue for Tom.
3 Q. In that decision-making?
4 A. I think it was just an issue in general.
5 Q. Do you have any information concerning the individual
6 that replaced you about her background and credentials?
7 A. I only know her name, I only know her first name and
8 that she is in her forties.
9 Q. Do you have any reason or any evidence to suggest
10 that she's not qualified for the position?
11 A. I have no idea of her qualifications.
12 Q. How often would you have interaction with the Board,
13 if any?
14 A. With the Board of Trustees?
15 Q. Yes.
16 A. I was invited to meetings sporadically; Board Members
17 also rotate on and off the HR Committee.
18 Q. Was it a more regular basis that you interacted with
19 the Board's HR Committee?
20 A. Yes.
21 Q. How often would that be?
22 A. We met four times a year.
23 Q. Who would lead those meetings?
24 A. The Chairman of the Board.
25 Q. What was the purpose of those meetings?

104

1 that?
2 A. Well, it was -- if there was litigation, it would
3 have been just during the course of the regular meeting,
4 where we were talk about that. It was only HR Committee
5 members, Mr. Garvin, Mr. Supper, or before him, Anne
6 Rogers, myself, and whoever was taking the minutes of the
7 meeting as the Executive Assistant.
8 Q. So earlier you testified about certain senior
9 management females that came to you and made complaints.
10     Do you recall that?
11 A. Yes.
12 Q. And you said that you were asked by them not to go
13 any further with investigating or bringing it to anyone's
14 attention; is that correct?
15 A. Yes.
16 Q. How about for individuals that were below that tier
17 of management, did you have any individuals that made
18 complaints to you and Mr. Garvin or anyone else creating
19 a hostile work environment or discriminating?
20 A. I had complaints from Marge Carpenter, who worked in
21 Resident Services, and I had a complaint -- I had
22 complaints from Debbie Best, the Dining Services Manager,
23 and both of them were directed to take their issues to
24 their direct supervisor. That was usually the chain of
25 command, to take their concerns to their immediate

1  supervisor, and if they felt like they hadn't gotten
2  anywhere, to come back and bring it to me.
3  Q.   And who would have supervised each of those
4  individuals?
5  A.   Marge Carpenter is supervised by Janet Thompson, and
6  Debbie Best is supervised by Jim Heffron.
7  Q.   Do you know what their complaints were about?
8  A.   Yes.
9  Q.   How about with respect to Marge, what was her
10  complaint?
11  A.   Marge's complaint was she found it incredibly
12  insulting that Tom would participate in the employee
13  contests.  She knows that he earns a whole heck of money
14  than an hourly employee, and yet he would participate in
15  all of the employee contests, and then when he won, he
16  would flaunt it to the staff.
17       So, for instance, he won the NCAA Tournament pick,
18  got a trophy and a gift card, and would go into the
19  kitchen and taunt the staff with his $25 Target card or
20  Wawa card, whatever he happened to get, and his trophy,
21  and bragged about being the winner, she found that
22  obnoxious and appalling.
23  Q.   How was that discriminatory?
24  A.   It's discriminatory because, you know, he's a -- he's
25  a senior leader, who is taking money from an hourly

---

1  employee who can't even pay their rent or pay for gas to
2  get to and from work.
3  Q.   How does that complaint, how does that fit within a
4  Protected Class?  In order to be discriminated against, it
5  has to be on the basis of a Protected Class.  What --
6            MR. SCHWARTZ:   Well, I think that's
7       lecturing --
8            MS. DEON:   Excuse me, I'm speaking.
9            MR. SCHWARTZ:   Fine.
10            MS. DEON:   Let me speak.
11  BY MS. DEON:
12  Q.   You've heard the concept of a Protected Class?
13  A.   Yes.
14  Q.   So in order to have discriminatory treatment or a
15  hostile work environment, it would have to be geared
16  against a protected class, and I'm just trying to
17  understand how him keeping money from an employee contest
18  would be discriminatory?
19  A.   The majority of the employees at Waverly Heights are
20  not white.
21  Q.   So you considered that to be discriminatory against
22  the non-Caucasian employees?
23  A.   Correct.
24  Q.   And what basis do you have for your belief that he
25  retained prize money or other things that he won in

---

107

1  contests?
2  A.   He would -- I would give them to him.  I would give
3  him the prize money and he would take it.
4  Q.   And are you aware of him then passing it along to
5  anyone else?
6  A.   No.
7  Q.   So if someone from Waverly would testify that they
8  had knowledge of him passing along those gift cards or
9  money, nominal money winnings, you would say that
10  individual is lying?
11  A.   I would be shocked.
12  Q.   Would you think that that individual is not being
13  truthful?
14  A.   I would say that if that actually happened, that
15  would have been something that I heard of.
16  Q.   So because you didn't hear about it, you're thinking
17  that it's not truthful?
18  A.   Correct.
19  Q.   Is there an employee by the name of Constance?
20  A.   Constance Dogan.
21  Q.   Is she head of Housekeeping?
22  A.   Yes.
23  Q.   And what was your relationship like with her?
24  A.   We had a good relationship.
25  Q.   Did you find her to be a truthful person?

---

108

1  A.   Yes.
2  Q.   In fact, you assisted her in being elevated into the
3  Director position?
4  A.   I did.
5  Q.   And how about with respect to Marge, is that the only
6  instance that she complained about?
7  A.   She just complained about Tom's ego.
8  Q.   How about Debbie Best?
9  A.   Debbie Best came to me to complain about having to go
10  to Doylestown, the hardship that it posed to the Dining
11  Services staff, ah, carting food to Doylestown for a
12  private party.
13       You know, Waverly's Dining Services department
14  catered small events onsite.  They were not a catering
15  company, so it was a tremendous hardship for them to feed
16  the residents three meals a day, provide the care that
17  they were being paid to, and then in addition to that,
18  have to staff and get the food all the way to Doylestown,
19  so she complained about that.
20       She -- her exact comments to me were that Tom was
21  very social and very, you know, approachable before his
22  family and friends arrived.  And then upon that, he
23  immediately turned on a dime and treated her like hired
24  staff.  She was insulted, she thought it was such a misuse
25  of position, and she was very upset about it.

**110**

1   Q.   And were you of the opinion that that was
2   discriminatory treatment towards Debbie, if that were, in
3   fact, true?
4   A.   I think it's an abuse of power.
5   Q.   And what is Marge's position?
6   A.   She's Resident Services ... something.  Manager.
7   Q.   Manager.
8   A.   Coordinator.
9   Q.   Anyone else other than the Senior Leadership people
10  that you mentioned previously, and Marge and Debbie who
11  are both Managers, anyone else that ever came to you and
12  complained and you did not proceed because they asked you
13  not to do so?
14  A.   No.
15  Q.   Did you ever have occasion where an employee came to
16  you and made a complaint and said, I don't want anything
17  done with this, and because of the nature of it, you had
18  to say to them as the VP of HR, I will keep this as
19  confidential as possible, but I need to take action on
20  this matter of discrimination or harassment?
21  A.   Yes.
22  Q.   And can you give me a description or an example of
23  that?
24  A.   We had a Dining Services employee, actually several
25  Dining Services employees, who told me that they were

**111**

1   employee, um, about her sending text messages that were
2   sexual, calling this one gentleman's wife, providing
3   sexual activity in the closet of the Dining Services
4   room -- of the Dining Services kitchen, and so I had no
5   choice -- I -- I had no choice, whether they agreed or
6   not, I had to pursue that.
7   Q.   And was it your understanding that this woman was
8   engaging in some type of sexual conduct with them --
9   A.   Yes.
10  Q.   -- at the workplace?
11       And was it their position that they were
12  participating in this in an involuntary manner?
13  A.   Initially they were participating voluntarily, it was
14  a voluntary relationship, but when the two gentlemen tried
15  to stop the relationship, it continued and she continued
16  to pursue them that made them uncomfortable.
17  Q.   And am I correct that they were all coworkers on the
18  same level?
19  A.   She was a cook, so she was above them, they were
20  servers and util -- a utility worker.
21  Q.   What was the race of the individuals?
22  A.   The cook is Caucasian and the other gentlemen were
23  black.
24  Q.   How long ago did this happen?
25  A.   It happened maybe a year before I was terminated.

**110**

1   being serviced sexually by another Dining Services
2   employee, and they were being sexually harassed.  The
3   men -- these were men being sexually-harassed by a woman.
4   Q.   Okay. So they were Dining Services employees that
5   were male?
6   A.   Yes.
7   Q.   That were being serviced by a female employee?
8   A.   Yes.
9   Q.   And they were being sexually harassed by that female
10  employee?
11  A.   Correct.
12  Q.   And did all of the males come to you or just one or
13  two in the group?
14  A.   One came to me initially.  And then when he went back
15  and told his fellow employees that he had reported it, I
16  encouraged him -- he didn't want me to do anything about
17  it initially --
18  Q.   Uh-huh.
19  A.   -- and I told him that this is an environment that
20  can't be tolerated, and that if he knew other employees
21  that were experiencing the same thing, that they should
22  come to my attention.  And I told him I would give him
23  until tomorrow to make that happen.
24       And so there were another -- there were two employees
25  that came to me to complain about the Dining Services

**112**

1   Q.   And after you conducted an investigation into that,
2   what, if anything, wound up happening to the employees
3   that were involved?
4   A.   The woman was terminated.
5   Q.   How about the servers?
6   A.   They were disciplined.
7   Q.   Did Mr. Garvin support that action?
8   A.   Yes.
9            MS. DEON:   If you can just give me a
10       moment, I don't want to be redundant
11       unnecessarily.
12           MR. SCHWARTZ:   I'll use the mens room.
13           MS. DEON:   That will be fine.
14       -----
15       (Recess declared.)
16       -----
17       (After recess.)
18       -----
19  BY MS. DEON:
20  Q.   Mrs. Jungclaus, since the time that you left Waverly,
21  can you tell me where you have received your source of
22  income?
23       I know that there was a 1099 that was provided to me.
24  Can you just go through for me where you were employed or
25  engaged as an independent contractor?

114

1    A.    I was engaged as an independent contractor at Catelli
2    Brothers, the veal and lamb company.
3    Q.    And is that where the source of the approximate $7000
4    came from?
5    A.    Yes.
6    Q.    What did you do for them?
7    A.    I was an employee relations consultants. I was asked
8    by Tony Catelli to come in and interview his employees to
9    try and find out why there was so much employee turnover.
10        And so I went in and I did lots of meet-and-greets
11   with the staff, and obtained a lot of information, did a
12   Plan of Action for them to improve their employment
13   opportunities and conditions of their work environment. I
14   helped them to establish a more cohesive senior leadership
15   team. Um ...
16   Q.    How large a company is it?
17   A.    They have about 450 employees.
18   Q.    Do they have a Director of Human Resources?
19   A.    They do.
20   Q.    Was there any chance of applying for a position that
21   would be more permanent with them?
22   A.    When I was first engaged, Mr. Catelli wasn't
23   convinced about the quality of the HR director that he
24   had, and he said that if she didn't make any changes, he
25   would be interested in retaining me as the Director of HR.

115

1    close to my position. And I sent out, gosh, I don't know
2    how many resumes. I applied on indeed.com web postings, I
3    applied on ZipRecruiter postings.
4    Q.    What was that?
5    A.    Indeed.com.
6    Q.    No, what was the last one?
7    A.    ZipRecruiter.
8    Q.    Uh-huh.
9    A.    I networked, tried to find open positions, and I had
10   not a single phone call.
11   Q.    Did you keep a record of all positions that you
12   applied for?
13   A.    I don't have all of them. If you apply on indeed.com
14   you don't always get a confirmation, you just go to the
15   company website and submit an application.
16        The positions that I applied for through the
17   Pennsylvania Unemployment board, ah, that keeps a record,
18   so I think there were 57 positions that I applied for.
19   Q.    Was that the PA CareerLink?
20   A.    Yes.
21        My resume is posted on indeed.com, it's also posted
22   on ZipRecruiter.
23   Q.    Did you ever hire a headhunter?
24   A.    No.
25   Q.    Why?

116

1    A.    I thought I would be able to find a job on my own.
2    Q.    And are you able to give an estimate of the hours per
3    week that you spent on your job search?
4    A.    I don't know, it was a couple hours a day.
5    Q.    Even though some of these required you to apply
6    online and they didn't necessarily give you a
7    confirmation, did you record anywhere what you were
8    applying for?
9    A.    Well, I was always applying for the same thing, it
10   was either a Director of Human Resource position, a Vice
11   President of Human Resource position, a Generalist
12   position, even a Human Resource Manager position.
13   Q.    But did you record somewhere which -- the name of the
14   company, for instance, or the date that you submitted it,
15   so that you could keep a record and follow up with it?
16   A.    No, because I think if you log back into the
17   company's website, if you -- you could see if you were
18   under consideration or not under consideration.
19   Q.    And when you say the *company's website*, you don't
20   mean Indeed or ZipRecruiter, you mean the actual company
21   that you were applying for?
22   A.    Right. For instance, if I applied at
23   GlaxoSmithKline, you have to apply on their are website.
24   You can create a login, and then you can go back in and
25   see the status of your application. It will say whether

114

1    Q.    And is that something that's still a possibility?
2    A.    No.
3    Q.    Is that because she wound up accepting the
4    recommendations you made and things improved?
5    A.    Yes.
6    Q.    Are you familiar with an entity KMJ Consulting?
7    A.    Yes.
8    Q.    And is that the name that you utilized when you did
9    the work for Catelli Brothers?
10   A.    Yes.
11   Q.    Are you familiar with a KMJ Consulting that is an
12   engineering company?
13   A.    No.
14   Q.    Okay. Since the time that you were separated from
15   employment in September of 2016, when did you first start
16   looking for new employment?
17   A.    Right away, I believe it was the very beginning of
18   October.
19   Q.    And have you continued to search for new employment
20   since that time?
21   A.    Yes.
22   Q.    How many hours would you say that you devoted per day
23   to searching for a new position?
24   A.    In the beginning it was a lot, I was applying for
25   everything that I could find that would be even remotely

118

1  you're under consideration or not being considered.
2  Q.    Okay, so that's my question.  Did you somewhere
3  though maintain a record of May 1st, these are the
4  different companies I applied to?
5  A.    No, I did not.  I applied, like I said, through the
6  Career ... whatever that is, for the unemployment board.
7  Q.    CareerLink®?
8  A.    CareerLink®.
9        I was hired by Catilli in May of 2017, so I had been
10  doing job searches up until then.  And then when I got the
11  consulting position, I was really busy with them, so I
12  would continue to put applications in, but it wasn't as
13  often.
14       And then I was hopeful that that would turn into a
15  full-time position, so I was devoting most of my time and
16  attention that.
17  Q.    How long was the job with Catilli?
18  A.    I stopped in May of 2018.
19  Q.    And how many hours per week would you say that you
20  were devoting during that year?
21  A.    It depends on the week and it depends on what I was
22  working on.  Some weeks it was 40 hours, some weeks it
23  would have been 10 hours a week.  If I was on site, it
24  could have been longer days, um, it just depended on the
25  week and what I was working on.

120

1  Q.    What was compensation that was negotiated for your
2  work there; was it on an hourly?
3  A.    I was paid $125 an hour.
4  Q.    And the total for the year was approximately 8000?
5  A.    After taxes, that was net.
6  Q.    Did you receive an email from Mr. Garvin about a HR
7  Director position at Pine Run after your termination?
8  A.    Yes.
9  Q.    Did you apply for it?
10  A.    No.
11  Q.    Why?
12  A.    It was the day after I was fired, and I was not in
13  any condition to be applying for a job.
14  Q.    Did you ever check a couple weeks later in October
15  when you started your job search whether that was
16  available?
17  A.    Yes.
18  Q.    And was it available at that time?
19  A.    No.
20  Q.    How did you determine that it was no longer
21  available?
22  A.    I went on the PANPHA website where they list
23  all -- most companies that are CCRCs list position
24  openings.
25  Q.    I know you mentioned before that you have a degree in

119

1  Psychology.
2        Where did that come from?
3  A.    Gwynedd-Mercy College.
4  Q.    Do you belong to their alumni association?
5  A.    No.
6  Q.    Did you attempt to make any search of the
7  Gwynedd-Mercy alumni when you were doing your job search?
8  A.    No.
9  Q.    Any professional organizations that were involved in
10  your job search?
11  A.    No.
12  Q.    Did you ever engage a career counselor to help you
13  with your job search?
14  A.    No.
15  Q.    Did you ever look into outplacement services for your
16  job search?
17  A.    Like a temporary company?
18  Q.    Yes.
19  A.    I did look at, um -- there's a temporary human
20  resource company, I sent them my resume, and I never heard
21  back from them.
22  Q.    Did you interact with any community groups, Rotary,
23  or political groups or any people networking-wise for a
24  job search?
25  A.    Yes.

120

1  Q.    And which groups were those?
2  A.    I worked -- I interacted with all of the CEOs and
3  CFOs that participate in the Churchill Group.  The
4  majority of them are in the Philadelphia area.
5  Q.    And is that involved with the Captive?
6  A.    Yes.
7  Q.    Did you send emails to them?
8  A.    I did.
9  Q.    Did you attach your resume and cover letter?
10  A.    I sent my resume.
11  Q.    Did you hear back from any of them?
12  A.    That's how I got the position with Catilli.
13  Q.    Were you required to do any out-of-state travel for
14  Catilli or was everything located in Pennsylvania?
15  A.    In Pennsylvania.  It's actually in New Jersey.
16  Q.    Okay.  Do they have only a site in New Jersey or do
17  they have multiple?
18  A.    They have their office location, which is -- they
19  have an administrative office that is attached to the
20  manufacturing plant and then they have the -- what they
21  call the Kill Center.
22  Q.    Did you retain any type of a log with notes that
23  would detail all of your job efforts?
24  A.    I keep a lot of notes, but, no.
25  Q.    Do you have notes about your job search?

**Page 121** (left column, top)

1    A.    Just what I provided already.

2    Q.    Is there anything that's handwritten that would be

3    notes that you have about your job search or was

4    everything in a printed or typed form?

5    A.    Printed or typed.  The only thing that I have notes

6    on are working with Catilli.

7    Q.    Okay.  Do you keep a journal or any other type of a

8    notebook on your phone that would have information related

9    to the lawsuit?

10    A.    Maybe just appointments.  I do keep my book, it's

11    more like a to-do list.  And I do keep different -- like

12    if I'm thinking of something, I'll just write it down so I

13    don't forget.

14    Q.    Do you have any notes that would be relevant to this

15    lawsuit?

16    A.    Only notes of things that I wanted to talk to my

17    attorney about.

18    Q.    Did you seek counsel from anyone regarding the

19    updating of your resume and cover letter or did you do

20    that on your own?

21    A.    Well, I updated it on my own.  I did send it to my

22    two sisters to look at, both are professionals.

23    Q.    Did you at any time when you were employed by Waverly

24    ever look for another position?

25    A.    I did.

**Page 122** (right column, top)

1    Q.    When was that?

2    A.    In, I'm going to say, around 2012 when I was going

3    through the issue with Anne Rogers.

4       I actually spoke with the Waverly Heights

5    compensation consultant about looking for a new position,

6    and asked him if he was aware of anything within the

7    community that he worked.

8    Q.    Did he provide you with any feedback?

9    A.    I don't really remember if he did or he didn't.

10       I also talked to, um -- I'm not going to remember his

11    name, but he was a recruiter from the Health & Science

12    Institute, it's where we actually got Meg Guenveur when we

13    first hired her, and I spoke with him about looking for a

14    position as well.

15    Q.    Did you ever actually make applications for another

16    job?

17    A.    Yes, I went on interviews.

18    Q.    Okay.  How many interviews did you go on?

19    A.    Three.

20    Q.    And am I correct that you did not get offers for each

21    of those?

22    A.    I did get offers for two.

23    Q.    Why didn't you take them?

24    A.    Because at the time when I was talking to my husband

25    about it, I decided to stay with the devil I know versus

**Page 123** (left column, bottom)

1    the devil I don't.

2    Q.    And when you refer to *the devil*, what are you

3    referring to?

4    A.    Just the company.  Knowing the players, knowing your

5    fellow coworkers, um ...

6    Q.    Were the two offers that you got for similar

7    compensation?

8    A.    They were pretty close.

9    Q.    Were they more?

10    A.    I think one was more, but the benefits were

11    different.

12    Q.    Your husband testified this morning about a position

13    that you have recently accepted.

14    A.    That's correct.

15    Q.    Where is that?

16    A.    Right at Home.

17    Q.    What type of company is that?

18    A.    It's a home-care company.

19    Q.    What would your role be?

20    A.    Sales, marketing and Outreach Coordinator.

21    Q.    How large an organization is it?

22    A.    I don't know how many employees they have, I haven't

23    started yet.  I know that my territory that I'll be

24    covering will be from Elkins Park to Doylestown, Levittown

25    to Lansdale.

**Page 124** (right column, bottom)

1    Q.    Will you be working out of one of their offices or

2    are you doing sales on-the-road, so to speak?

3    A.    It's on-the-road.  There is a mandatory Monday

4    meeting that I'll be attending and the rest of the time

5    it's out on the road.

6    Q.    And what is the salary that you'll be receiving?

7    A.    It's a $45,000 base salary, and I'll be eligible for

8    a commission after 90 days.

9    Q.    And how is it that you earn commissions?

10    A.    Can I look at my note real quick because I have it

11    written down?

12    Q.    Okay.

13    A.    I haven't started yet, so I don't have it 100 percent

14    absorbed.  So it's I have to have at least $36,000 in base

15    revenue prior to earning a commission, and then it's a one

16    to two percent gross revenue based on a sliding scale.

17    Q.    And is the document that you're looking at your

18    compensation for the new position?

19    A.    It's my notes from my meeting with him to discuss the

20    compensation, it's nothing formal.

21    Q.    Okay, I understand, but just it's an explanation

22    though of how the commission structure will work?

23    A.    To the best of my ability at the time that I wrote

24    it.

25    Q.    Okay.

1    A.    It took me a couple of meetings to absorb the -- I'm
2   not a salesperson, so the commission and the percentages
3   and the base revenue is foreign to me, so I'm just
4   learning.
5             MS. DEON:   Okay. May I make a copy of that
6        then, Mr. Schwartz?
7             MR. SCHWARTZ:   Sure.
8        -----
9        (Discussion held off record.)
10       -----
11       (KJ-1, Right at Home compensation document,
12       was marked for the purpose of identification on this
13       date and is attached hereto.)
14       -----
15  BY MS. DEON:
16  Q.    Okay. Looking at what's been marked as KJ-1, I
17  believe you testified that this document reflects
18  information about your compensation package for your new
19  position; is that correct?
20  A.    That's correct.
21  Q.    And is this your handwriting?
22  A.    Yes.
23  Q.    So since you will be on the road making visits, can I
24  assume that the IRS rate for mileage would be for your
25  travel expenses?

1    A.    Correct.
2   Q.    And you'd be reimbursed for them?
3   A.    Yes.
4   Q.    And you would need to do an expense report for that.
5   Is that what the next --
6   A.    Yes.
7   Q.    And you did tell me about your territory, which I
8   believe is depicted as Elkins Park/Doylestown, Langhorne
9   to Lans -- L-A-N-S is Lansdale?
10  A.    Yes.
11  Q.    Okay. Now, the 40 to 60 a month, is that the number
12  of visits that you're expected to make?
13  A.    Yes.
14  Q.    Okay, 20 one time a week, 20 two times per month, 21
15  times per month.
16  A.    Okay, so that means that there are visits that are --
17  the top 20 -- the top 20 visits are the most important,
18  they need to be visited at least one time a week. The
19  second 20 are kind of the B tier, so they need to be
20  visited two times per month, and then the C Tier is the
21  last and that's one time per month.
22  Q.    And who are you calling on? Are they current
23  individuals that are receiving home care by the
24  organization?
25  A.    No. I'm representing the company to social workers,

127

1   outreach coordinators, hospitals, nursing homes to make
2   Right at Home their primary referral if someone needs home
3   care.
4   Q.    Okay. And is the type of home care that they're
5   talking about CNAs or not necessarily people that have a
6   CNA?
7   A.    They're Home Health Aides.
8   Q.    Okay. And it wouldn't include physical therapy,
9   occupational therapy, anything like that, this
10  organization soley does a noncertified home health
11  professional?
12  A.    Correct.
13  Q.    Okay. Do they have live-in people as well?
14  A.    Yes.
15  Q.    So the 45,000 is a base that you will receive whether
16  or not you're able to secure other business; is that
17  correct?
18  A.    Correct.
19  Q.    Now, the sliding scale, the one to two percent gross
20  revenue, can you explain what is meant by that.
21  A.    I'll do my best.
22  Q.    Okay.
23  A.    The percentage, the sliding scale percentage is based
24  off of anything over $36,000. So there has to be a base
25  revenue of sales of at least $36,000, anything above that

128

1   will be based on a one to two percent commission.
2             And the sliding scale is based on dollars. So I
3   think it's between 36 and $42,000 is one percent, 42 to
4   46 percent is like 1.3 percent, 46 percent to 50 -- or
5   46,000 to 50,000 is like one and a half percent.
6             So that's the sliding scale; as the dollars go up,
7   the percentage goes up.
8   Q.    Okay. And it's 42,000 to 46,000, I think you said,
9   percentage —
10  A.    I don't remember the exact numbers, but it's
11  somewhere in those ranges where it's a four to five
12  thousand dollar difference in sales the percentage goes up
13  minimally and it caps at two percent.
14  Q.    Okay. Is John McCabe your supervisor?
15  A.    Oh, you know what, that's like a contractor. Can
16  we -- I just happened to write his phone number down, so
17  could we cross that out? I don't like sharing the
18  person's phone number.
19             MR. SCHWARTZ:   If you can black that out,
20        it would be nice.
21  BY MS. DEON:
22  Q.    So is there any room for expansion with -- or I
23  should say for promotion within the organization?
24  A.    Not a promotion, no.
25  Q.    Have you ever done this type of work before?

130

1   A.   No. I worked for a -- I worked for BAYADA nurses for
2   10 years, they were -- they're obviously a home healthcare
3   company, but I was a Staff Supervisor and then a Director
4   in their office in Willow Grove, but the actual sales, no.
5   Q.   When will you begin that position?
6   A.   Tuesday.
7   Q.   Do you have to undergo any type of orientation before
8   you will be assigned to call on people?
9   A.   I'll be spending two weeks on the road with the CEO.
10  Q.   Do you have any benefits other than the base salary?
11  A.   I don't know.
12  Q.   And is this full time?
13  A.   Yes.
14  Q.   What is their definition of full time?
15  A.   Forty hours a week.
16  Q.   Do you know whether you get any vacation?
17  A.   I do, I get six weeks vacation.
18  Q.   You don't know whether you get medical insurance
19  coverage?
20  A.   I don't know.
21  Q.   If it is offered, is that something that you are
22  going to take?
23  A.   It depends on the coverage. I'm covered under my
24  husband's insurance right now, so I guess it's just going
25  to depend on what the cost is. We'll have to do a

131

1        And he said, Can you send me your resume, I want to
2   do, you know, some preliminary research on you, and I'll
3   call you tomorrow to set up an interview, and I never
4   heard from him again.
5   Q.   Do you know his name?
6   A.   I don't remember, it's ages ago.
7   Q.   You didn't keep a record of it anywhere?
8   A.   No. I thought it was on my LinkedIn page, but I --
9   when I went back to look, I didn't see it.
10  Q.   Was he an inside recruiter for St. Mary's or was it
11  your understanding he was an outside recruiter?
12  A.   Outside recruiter.
13  Q.   And you are speculating, because you did not hear
14  from him again, that it was because of the information
15  that he looked at online?
16  A.   Yes.
17  Q.   Other than that, do you have any direct information
18  that the information online is resulting in you not
19  getting a position?
20  A.   It's the only -- it's the only explanation that I can
21  come up with for not having a single phone call about a
22  job in two years.
23  Q.   Other than speculating that that's the reason, do you
24  have any direct evidence?
25  A.   No.

131 (page number at top right of second column, first section)

1   comparison to see what we're paying now versus what my
2   options will be with this company.
3   Q.   Is there any type of disability insurance?
4   A.   I don't think so.
5   Q.   How about life insurance?
6   A.   I don't think so.
7   Q.   In the Answers to Interrogatories, No. 4., you stated
8   that you have had difficulty getting employment because of
9   the contested unemployment proceeding, I believe is what
10  you're referencing.
11       Is that accurate?
12  A.   Yes.
13  Q.   Upon what do you base that?
14  A.   I find it nowadays when people are doing recruiting,
15  they will Google search anyone that they're considering to
16  see if there's a Facebook page or if there's an Instagram
17  page, or if there is anything. When you Google my name,
18  it's pages and pages and pages about the unemployment
19  findings.
20  Q.   Has anyone directly told you that that is a reason
21  that you were not offered a position or an interview?
22  A.   I had a call -- I had one phone call from a recruiter
23  who asked me if I would be interested in a position of
24  Vice President of Human Resources, I think it was at St.
25  Mary's Hospital, and I said I would be very interested.

132

1   Q.   Okay.
2            -----
3        (KJ-2, interrogatories, was marked for the
4        purpose of identification on this date and is
5        attached hereto.)
6            -----
7   BY MS. DEON:
8   Q.   If you would look, Mrs. Jungclaus, at -- the pages
9   are not -- oh, they are, No. 4., please.
10  A.   Question 4. or Page 4.
11  Q.   Page 4, Question 5.
12  A.   Uh-huh.
13  Q.   Can you describe for me the monetary damages that you
14  have suffered?
15  A.   Well, obviously the loss of my wages, the loss of my
16  health benefits, the loss of my contribution to my
17  retirement fund, the inability to get a job. I don't
18  really think that there's a value -- or dollar value that
19  you could put on the demoralizing and humiliating
20  experience.
21  Q.   Are you claiming that you suffer any medical ailments
22  as a result of separation from employment?
23  A.   Yes.
24  Q.   And what is that?
25  A.   I've always had low blood pressure, my blood pressure

**134**

1  is usually 90 over 60 historically.
2      The day of the unemployment hearing where I was on
3  the phone conference, it was so awful.  I had an ear
4  doctor appointment scheduled.  And when I went to the ear
5  doctor, the nursing -- the nurse took my blood pressure
6  four times because it was so exorbitantly high.  They
7  wanted to call an ambulance and send me to the hospital,
8  they were afraid I was going to have a stroke on the
9  chair.
10  Q.    How long after the hearing did you go to the doctor's
11  office?
12  A.    Within an hour.
13  Q.    And why did you have an appointment at doctor's?
14  A.    I had an earache.
15  Q.    Did you wind up going to the hospital?
16  A.    I -- they -- I didn't go to the hospital.  I called
17  my family physician, who prescribed me some kind of an
18  emergency medication you can take for blood pressure, and
19  I had to go right to the pharmacy to take the medication,
20  they filled it right away for me.
21      He thought that my going to the emergency room would
22  be more traumatic, so he just wanted to treat me with the
23  medication.  And I had to go two hours later to have my
24  blood pressure taken, um, by a blood pressure cuff, to
25  take my blood pressure to make sure that it had come down

**134**

1  to a reasonable level.  I was on the emergency medication
2  for five or six days, and I continued to be on blood
3  pressure medication.
4  Q.    To this day?
5  A.    Yes.
6  Q.    And where did you go two hours later to have your
7  blood pressure taken?
8  A.    I went to the Walgreens.
9  Q.    Like a medi-clinic or --
10  A.    Yes, and that's where I had my prescription filled,
11  also.
12  Q.    The emergency medication that you spoke of, are you
13  taking something different now?
14  A.    Yes.
15  Q.    What are you taking now?
16  A.    I knew you were going to ask me that.  Advor --
17  Atorvastatin, I think it's called.
18  Q.    How often do you take it?
19  A.    Every day.
20  Q.    How much longer will you have to take it?
21  A.    I don't know.
22  Q.    Are you being followed by a cardiologist?
23  A.    I did go to a cardiologist and I had a harness, I
24  wore a harness for 24 hours.  And I had a -- I had an EKG
25  at my doctor's office within a couple days of the episode.

**135**

1  Q.    And what were the results of that EKG?
2  A.    That I didn't have a heart attack, but my blood
3  pressure was still high.  The bottom number was -- it's
4  usually like ...  It was over 110.
5      So I had to go back to have a second echo, um --
6  electrocardiogram the following week.  My doctor thinks
7  that it's situational, and that when this case is over and
8  I can stop reliving it on a daily basis, that, hopefully,
9  within a few months my blood pressure will go back to
10  normal.
11  Q.    And when you say *reliving it on a daily basis*, what
12  do you mean?
13  A.    Just what I said; answering questions, filling out
14  interrogatories, having to do this deposition, constant
15  reliving of the worst day of -- second worst day of my
16  life.
17  Q.    And is the first worst day of your life with respect
18  to your prior husband?
19  A.    Yes.
20  Q.    And just for the record, am I correct that there was
21  a suicide involved?
22  A.    Yes.
23  Q.    Okay.  How long ago was that?
24  A.    January 28 -- 29th, 1998.
25  Q.    You were working at Waverly at the time?

**136**

1  A.    I was.
2  Q.    Have you continued to treat with your family doctor
3  concerning the ailments that you just mentioned to me
4  regarding the high blood pressure?
5  A.    I do treat with him.  I treat -- I -- in addition to
6  the blood pressure, in December of 2016 he put me on
7  lorazepam and he put me on Ambien because I wasn't
8  sleeping and I was having panic attacks.
9  Q.    And is the lorazepam an antianxiety medication?
10  A.    Yes.
11  Q.    Was that post-termination?
12  A.    Yes.
13  Q.    How often do you take lorazepam?
14  A.    I took it for four months.  I'm off lorazepam and I
15  am on escitalopram now, which is a different anxiety
16  medication.  I take it every night and I've been on it for
17  over a year and a half.
18  Q.    And how about the Ambien, is that something that you
19  take regularly or just if you're having trouble falling
20  asleep?
21  A.    Initially I took it every night.  Now I take it -- it
22  depends on the situations.  The last week and a half I've
23  been taking it every night.  I tend to at night, when I
24  get in bed, relive the events, and then I have a panic
25  attack and I can't sleep, I have anxiety, and it's just --

138

1  it's awful.
2  Q.    Have you -- I know that you are seeing a
3  psychologist, and I'll ask you about that in a moment, but
4  in addition to the medications that you've mentioned, as
5  well as treating with a psychologist, is there anything
6  else that you've been doing to address the panic attacks
7  and the anxiety?
8  A.    I meditate.
9  Q.    Did you go for any formal instruction in that or is
10 that something you've picked up on your own?
11 A.    I started under the direction of my -- of my
12 therapist to meditate. Um, I do yoga.
13 Q.    How often do you meditate?
14 A.    Every day.
15 Q.    Is there a particular time?
16 A.    In the morning.
17 Q.    Do you meditate only once per day?
18 A.    It depends on the day.
19 Q.    And how about the yoga, how often do you do that?
20 A.    A couple times a week.
21 Q.    Do they recommend any other type of physical activity
22 to address your condition?
23 A.    Just to exercise. I run a couple times a week. I
24 make sure that I go to the gym or I go for a walk every
25 single day.

139

1          THE WITNESS:    I haven't had an asthma
2      attack like that ever. I've had asthma attacks
3      as they relate to sinus infections, that's
4      typically what would bring on an asthma attack.
5      I've never had an attack like that.
6  BY MS. DEON:
7  Q.    Am I correct that the incident at Waverly was
8  August 19th, 2016?
9  A.    Yes.
10 Q.    It occurred in the attic, which is in the same
11 building as where your office was at Waverly?
12 A.    Yes.
13 Q.    Had you ever gone in that attic before?
14 A.    I had been up there just to go up and come right back
15 down again, but I had been up there for a couple hours
16 that day.
17 Q.    And what necessitated you being up there for a couple
18 of hours?
19 A.    We were -- the Senior Leadership Team was instructed
20 to go up and go through old files to see what we could get
21 rid of, what was trash and what needed to be retained. HR
22 has boxes and boxes and boxes of files for 20 years.
23        So it was finding the boxes, finding what's in the
24 boxes. Is it something that needed to be retained or was
25 it something that we could get rid of.

140

1  Q.    How long were you up there before you began having
2  any types of symptoms?
3  A.    I was up there for about three hours. I was
4  coughing, but I didn't actually have the reaction until I
5  came back down from the attic and I started to breathe
6  air, and my chest closed and I could not breathe.
7  Q.    Who at that moment was -- strike that.
8        Was anyone in your presence when that happened, when
9  you had that reaction?
10 A.    My staff.
11 Q.    And who on your staff would have been present for
12 that?
13 A.    Jacquie Levin and Jen Reardon.
14 Q.    And what did they do in response to that?
15 A.    They told me I should go down to the nurse in the
16 healthcare center.
17 Q.    Did anyone accompany you?
18 A.    Jacquie walked me down to -- halfway, and then I met
19 Meredith in the hallway and she took me down to see
20 Theresa Mscizc, who was the Assistant Director of Nursing.
21 Q.    Can you spell Mscizc, please?
22 A.    It's M-S-C-I-Z-C, I think. I know it's a lot of
23 consonants.
24 Q.    Okay. And what happened at that point?
25 A.    Theresa made me -- she went and got a puff machine

1  Q.    Are you on any other medications other than what you
2  just mentioned to me?
3  A.    I take Klonopin for cholesterol. I take Singulair
4  for my asthma.
5  Q.    And how long have you been taking medication for
6  cholesterol?
7  A.    Hmm, four years.
8  Q.    And is that something that is just hereditary or
9  diet?
10 A.    Hereditary.
11 Q.    How about the medication for your asthma, how long
12 have you taken that?
13 A.    I have taken that since I had the episode in the
14 attic.
15 Q.    And is that a pill/oral form?
16 A.    Yes.
17 Q.    Is that a daily basis?
18 A.    Yes.
19 Q.    Had you ever had an asthma attack prior to the day of
20 in the attic?
21 A.    I --
22        MR. SCHWARTZ:    By the attic, are you
23     talking about her attic, or whose attic?
24        MS. DEON:   The attic at Waverly that you
25     had an incident in, I believe, August of 2016.

142

1  where you have to blow out and it tells you what your
2  oxygen level intake is, and she immediately started me on
3  a nebulizer treatment.
4      So I sat in her office with the nebulizer treatment,
5  finished the nebulizer treatment, and within 15 minutes
6  there was no improvement.  So she said it's against
7  medical protocol, but she was going to do it anyway, to
8  give me a second nebulizer treatment.
9      So I sat through a second nebulizer treatment.  And
10 when that didn't do anything, she wanted to call an
11 ambulance and have me taken out, and I was nervous about
12 doing that.
13     So she said, Let's try one more thing, let's try the
14 freezer.  So she walked me to the kitchen and stuck me in
15 the walk-in freezer where I stayed for, I don't know,
16 several minutes before my breathing came back to normal.
17 Q.    Did she recommend that you seek medical treatment
18 from either your family doctor or from some other source
19 at that point?
20 A.    Yes, she told me to go to my allergist.
21 Q.    And did you do that?
22 A.    I did.
23 Q.    When did you do that?
24 A.    I made an appointment that afternoon and I went
25 either the next day or the following day.

1  Q.    Do you know what day of the week this happened?
2  A.    I don't recall.
3  Q.    Thursday, August 18th, 2016, this was on the
4  19th.
5      Okay.  So I'm going represent that August 19th,
6  2016 was a Friday.  Does that refresh your memory?
7  A.    I don't remember the day of the week, so I -- if I
8  made an appointment, it had to be for the following week,
9  Monday or Tuesday, because they don't have office hours on
10 the weekend.
11 Q.    And were you expecting guests at your home over the
12 weekend right after this occurred?
13 A.    I don't remember.
14 Q.    Do you recall telling anyone that you didn't want to
15 seek medical treatment because you were going to your home
16 in the Poconos and had guests coming?
17 A.    No, I don't remember that.  I have a nebulizer at
18 home, so I can, um -- if I have an asthma attack or have
19 difficulty breathing, I can use my nebulizer at home until
20 I can see my doctor.
21 Q.    Let me ask you about the psychologist that you're
22 treating with.  What is the name of your psychologist?
23 A.    Rhoda Fuchs-Morton.  Rhoda, R-H-O-D-A, F-U-C-H-S
24 hyphen Morton, M-O-R-T-O-N.
25 Q.    Are you familiar with the news articles that were

143

1  provided to me in discovery about the case?
2  A.    No.
3      MS. DEON:   Let's have this marked.
4      -----
5  (Discussion held off record.)
6      -----
7  BY MS. DEON:
8  Q.    Are you aware, Mrs. Jungclaus, of there being any
9  comments in news articles that are available online with
10 respect to this case?
11 A.    When the articles first came out, I know that people
12 were making comments.
13 Q.    And was your attorney, Mr. Schwartz, one of them?
14 A.    I don't recall.
15 Q.    The topic of emails that were sent by Mr. Soltis, can
16 you describe for me what those emails depicted to the best
17 of your recollection?
18 A.    They were racist, they were disgusting, they were
19 anti-Obama, anti- Hillary Clinton, anti-Jewish,
20 antisemitic, it was disgusting.
21 Q.    Did you make a complaint to anyone about that?
22 A.    I went to Mr. Garvin.
23 Q.    And is it -- were you offended by them?
24 A.    Yes.
25 Q.    What did Mr. Garvin say?

144

1  A.    That he's the Chairman of the Board.
2  Q.    Did you bring this to the attention of anyone else?
3  A.    No.
4  Q.    Did anyone else complain to you about them?
5  A.    Janet Thompson.
6  Q.    What was the nature of her complaints?
7  A.    Same as mine, she thought that they were awful,
8  disgusting.  She couldn't believe that we were subjected
9  to this during the workday.
10 Q.    What is, if you know, Janet Thompson's political
11 affiliation?
12 A.    I have no idea.  Based off of her Facebook page, I'd
13 say she's a Democrat.
14 Q.    How long have you treated with the psychologist?
15 A.    I started with Rhoda about a year and a half ago,
16 maybe a little longer than that.
17 Q.    What precipitated you treating with her?
18 A.    My constant panic attacks and crying jags.
19 Q.    So were you employed at Waverly or not?
20 A.    No.
21 Q.    Okay.  Other than your husband alluded this morning
22 that you may have, with your children, had some family
23 therapy following your husband's unfortunate passing.
24     Have you engaged a psychologist for yourself
25 individually or a counselor of any type on any other

146

1  occasion?
2  A.  In my whole life?
3  Q.  Yes.
4  A.  Yes.
5  Q.  Okay.  And can you just tell me approximately when
6  and for what purpose?
7  A.  I had family counseling as a young person, I was
8  about 14, we went to family counseling because my father
9  was an alcoholic.
10     I sought individual counseling at the beginning of my
11  marriage to George, who was my husband that killed
12  himself.  And then I had counseling with my children after
13  his suicide, and some individual counseling.
14  Q.  And the individual counseling that you mentioned with
15  George, was that regarding marital issues?
16  A.  It was when I was married to George.  I didn't have
17  counseling with him, I had individual counseling.
18  Q.  Okay.  And that individual counseling though, was the
19  purpose of that to deal with marital issues or something
20  else?
21  A.  Marital issues.
22  Q.  How often do you treat with your current
23  psychologist?
24  A.  In the beginning I was seeing Rhoda once a week.
25  Then it's down to like once every two weeks based on her

148

1  schedule.  So two or three times a month, depending on
2  when we can coordinate time together.
3  Q.  And how long are those sessions?
4  A.  An hour and 15 minutes.
5  Q.  Have those sessions included matters only related to
6  your Waverly separation?
7  A.  No.
8  Q.  Has she provided you with any kind of opinion
9  concerning the source of your panic attacks and anxiety
10  that you testified to?
11  A.  She thinks I have posttraumatic stress disorder.
12  Q.  What is the source of that posttraumatic stress
13  disorder, if there was one or more events?
14  A.  My termination.
15  Q.  What is the prognosis, if any, that she's provided
16  you with?
17  A.  Well, I, um -- I have been so devastated by this
18  experience that I haven't been able to move on to the
19  anger phase of like crisis mode.  So first you're sort of
20  in denial and then you go through an anger phase.
21     And then I am just starting to get into the anger
22  phase and I'm so incredibly angry for the way that I was
23  treated and for the way that I was taken off the property
24  and treated like a criminal.  And I just -- it's going
25  to -- it could be a very long time before I don't need to

147

1  see her anymore.
2  Q.  And has she given you any estimate?
3  A.  No.
4  Q.  You testified earlier that you didn't have a lot of
5  recall about what occurred when you met with Amy Blessing
6  and Janet Thompson following your meeting when you were
7  terminated.
8     Do you recall that?
9  A.  Yes.
10  Q.  Do you recall at some point going to your office?
11  A.  Yes.
12  Q.  Were you accompanied by anyone when you left -- were
13  you in Janet's office?
14  A.  I was in Janet's office; Marc Heil accompanied me
15  upstairs.
16  Q.  So Marc walked with you from where Janet's office is
17  up to where your office is locate; is that correct?
18  A.  Marc was waiting for me outside of Tom's office.  And
19  then I -- he started to walk with me and Janet's office
20  was right there.  I went into her office and then Marc
21  took me upstairs to my office.
22  Q.  So was Marc standing outside of Janet's office when
23  you were in there speaking with --
24  A.  Yes --
25  Q.  Let me --

148

1  A.  -- he was -- I'm sorry.
2  Q.  Were you -- was he standing outside the office when
3  you were in Janet's office?
4  A.  He was in the vicinity.  I'm not sure if he was right
5  there or if he had walked back to Tom's office or -- I'm
6  not sure, I don't know.  I just know that when I left her
7  office, he was there and he walked me up to my office.
8  Q.  Okay.  And was Amy Blessing already in Janet's office
9  when you came into the office?
10  A.  Amy walked with me.
11  Q.  From Tom's office into Janet's office?
12  A.  Yes.
13  Q.  And then Amy stayed there while you talked to Janet?
14  A.  Yes.
15  Q.  And how long -- do you have any sense of how long you
16  were in --
17  A.  A minute --
18  Q.  -- the office?
19  A.  -- not long.
20  Q.  And then, to your knowledge or your recollection,
21  Marc Heil -- is that who we're speaking of?
22  A.  Yes.
23  Q.  He then walked with you to your office?
24  A.  Yes.
25  Q.  Was there anyone else that you encountered while you

150

1   were walking to your office?
2   A.   Brenda McFadden.
3   Q.   And what position does she have?
4   A.   I think she's, I don't know, some kind of a social
5   liaison to the Independent Living community.
6   Q.   Did you speak with her?
7   A.   I was crying.
8   Q.   Did she attempt to approach you?
9   A.   She just looked at me like, What the hell's wrong
10   with you?
11   Q.   Did you ever speak with her afterwards?
12   A.   No.
13   Q.   At any time have you ever spoken with her since
14   seeing her that moment?
15   A.   She left a voicemail on my telephone looking for my
16   father-in-law three weeks after he came to stay with me,
17   just wondering if he was okay. So he had not even been to
18   Waverly for three weeks, but she did call to see if he
19   needed anything in the apartment.
20   Q.   Did you encounter anyone else when you were walking
21   to your office?
22   A.   When I was walking to my office, Brian Brown.
23   Q.   Where did you see him?
24   A.   He was standing at the base of the steps to my
25   office.

151

1   offices in that same visit?
2   A.   No, because they were sent home.
3   Q.   How long did you then spend in your office?
4   A.   Let's see, I went in and I laid on the floor in a
5   fetal position in tears for at least 15 minutes. And Marc
6   tried to calm me down and tell me that we had a pack my
7   office up, and he left me for a minute to go get boxes.
8   And then, I don't know, an hour, longer than an hour,
9   I don't know, I think I was in my car at like 4:15. I
10   remember because -- it must have been 4:30 because it was
11   right when all the employees were leaving.
12   Q.   And had you removed anything -- any of your personal
13   affects from your office prior to that time?
14   A.   No.
15   Q.   Did you physically put anything in boxes at that
16   time?
17   A.   No, I think Marc packed everything.
18   Q.   At a later time, am I correct that he met you at a
19   Park and Ride and delivered additional items to you?
20   A.   Yes.
21   Q.   Are there any items that you claim you did not
22   receive?
23   A.   I had years' worth of copybooks, much like my diary
24   that I keep, where I just kept to-do lists and notes, I
25   didn't get any of those back.

152

1   Q.   So when you came out of the area of Janet's office
2   and Tom's office, would you have gone out the door where
3   to the left is the Reception desk?
4   A.   Yes.
5   Q.   And then where would you have walked, straight from
6   there?
7   A.   Yes.
8   Q.   And down that hallway?
9   A.   Yes.
10   Q.   Did you make a left then to then access the stairway
11   that goes up to your office?
12   A.   Yes.
13   Q.   Did you see anybody in that stairway?
14   A.   Like I said, just Brian Brown.
15   Q.   Okay. Did you speak with him at all?
16   A.   Not that I recall.
17   Q.   Did he speak to you?
18   A.   No.
19   Q.   Okay. Did Marc walk up the stairs with you?
20   A.   Yes.
21   Q.   Did Brian go up the stairs?
22   A.   I think he was just -- he walked up the steps and was
23   just lingering in the hallway around the corner from my
24   office.
25   Q.   Did you encounter any of your HR employees who have

152

1   I think that there were personal files that I kept in
2   my office; I didn't get those. I didn't really have the
3   wherewithal to sit there and go through my file drawer.
4   Q.   Concerning the issue of Mr. Garvin -- and this on
5   Page 9 of the interrogatories that are in front of you --
6   receiving a payment in lieu of health insurance, did you
7   have any involvement in negotiations of his compensation?
8   A.   I was really just the liaison between the Chairman of
9   the Board, Chuck Soltis, and Mr. Garvin at his hire.
10   Q.   And when they removed the stipend that was provided
11   to him in lieu of health insurance, am I correct that he
12   then went on Waverly's health insurance?
13   A.   They didn't remove the stipend.
14   Q.   Well, the amount of money, was it still considered a
15   stipend in lieu of health insurance --
16   A.   Yes.
17   Q.   -- at a later point?
18   A.   It was he still received the stipend in lieu of
19   health insurance and then continued to enroll his
20   family -- full family coverage on our health insurance,
21   basically taking a double benefit.
22   Q.   So I understand that he's continued to receive money
23   after enrolling into Waverly's insurance, but was it
24   still, for accounting purposes, considered in lieu of
25   health insurance or was it an increase in salary?

**154**

1   A.   It was in lieu of health insurance.
2   Q.   And was that recorded in that manner at some --
3   someplace after that time?
4   A.   Ah, I think on all of the communications from
5   the -- from the Board to HR.
6   I have an email from Chuck Soltis, saying, um,
7   whatever Tom's compensation was at the time, $25,000
8   health insurance stipend, I don't know, $5000 bonus, plus
9   $5000 bonus later on.
10   Um, when Mr. Soltis came off the Board and Mr. Bauer
11   became the Chairman of the Board, that's when, I guess,
12   they decided to roll that into his salary to make it a
13   little bit cleaner, but that was after several years of
14   receiving the stipend and the health insurance.
15   Q.   And how is it that you are contending that that
16   constitutes discrimination or a hostile work environment?
17   A.   I think as a non-for-profit organization, it's a
18   gross misappropriation of funds. For every $100,000
19   spent, it constitutes a one percent increase to the
20   residents. That's 25 or $30,000, it's a third of a
21   percent to the residents, not to mention the discretionary
22   bonuses that were received on top of it.
23   Q.   And that would also be similar with respect to the
24   monies paid to Mr. Heil, you mentioned a cash payment and
25   a Disney trip, that also, in your mind, was a gross

**155**

1   State from, I would call that a little unethical.
2   Q.   And the matters involving the health insurance, the
3   moving expense and the curtains, were those all done with
4   the knowledge of the Board of Directors?
5   A.   I have no idea.
6   Q.   Were you involved at all in any way with any
7   negotiations he may have had with members of the Board for
8   that compensation?
9   A.   The compensation about his health insurance, yes, I
10   processed it, so I knew about that.
11   And then when he decided to enroll his family, I
12   asked him if he was going to let the Board know that he
13   was doing that. And he said, No, and that the only way
14   that they would find out is if I told them.
15   Q.   Did you tell them?
16   A.   No.
17   Q.   Do you know whether they had knowledge of that?
18   A.   Not to my knowledge.
19   Q.   Would that surprise you if they had knowledge of
20   that?
21   A.   Yes.
22   Q.   Would the individual that assisted with Wozniak,
23   Mr. Wozniak, would he have had any knowledge of that?
24   A.   Um, I believe Tom and I had a conversation about the
25   double-dipping.

**156**

1   Q.   Would he have had information about Mr. Garvin's
2   compensation and benefits?
3   A.   He would not know whether or not he was enrolled in
4   health insurance.
5   Q.   Okay. How about the payments for the moving expenses
6   or the curtains?
7   A.   I don't think he would know about that either. I'm
8   pretty sure people don't pay for that six years after you
9   started employment.
10   Q.   But you don't know whether there was any promise to
11   do that by the Board?
12   A.   No, I don't.
13   Q.   With respect to the Penn State property, what
14   knowledge, if any, do you have of Mr. Garvin disclosing
15   that to the Board?
16   A.   I only heard through the grapevine that he told the
17   Board after the fact.
18   Q.   Who told you that?
19   A.   I heard it from Marc Heil.
20   Q.   Do you know how much he paid for the property?
21   A.   Only based on what's online.
22   Q.   How much is that?
23   A.   I don't recall.
24   Q.   Do you have any reason to believe that the amount he
25   paid was not market value?

**154** (right top continuation)

1   misappropriation of non-profit money?
2   A.   Absolutely.
3   Q.   There was a reference in the Amended Complaint to
4   Mr. Garvin engaging in illegal activity.
5   Did you ever consider anything that he did or anyone
6   else within the Waverly management or Board to be illegal?
7   A.   Illegal or unethical?
8   Q.   Illegal.
9   A.   No.
10   Q.   How about unethical?
11   A.   Yes.
12   Q.   Would it be the matter that we just discussed with
13   respect to how the health insurance was handled?
14   A.   That's one thing.
15   Q.   What else?
16   A.   That having Waverly pay for his moving expenses and
17   new draperies six years after he became employed by
18   Waverly Heights seems a little excessive to me.
19   Q.   Anything else?
20   A.   I did think of one other thing, if you would just
21   give me a second.
22   I can't think of it; I've lost it.
23   I guess the purchase of his Penn State property after
24   he had signed the $30 million contract to the architect
25   firm, where one of the partners he bought a house in Penn

1   A.   I have no idea.

2   Q.   If it were market value, would that change your

3   opinion about it being unethical?

4   A.   No.

5   Q.   Why?

6   A.   When you have a relationship with someone and you're

7   awarding them a $30 million contract to do work for you

8   and then you go and buy a house, I think that that seems

9   to be a conflict of interest.

10  Q.   Even if it's at market value?

11  A.   It just seems too convenient.

12  Q.   Are you aware of any doctrine of corporate governance

13  that would support that purchasing something for market

14  value under that scenario would be improper?

15       MR. SCHWARTZ:   Objection.

16  BY MS. DEON:

17  Q.   Do you have any knowledge of that?

18  A.   I have no idea.

19  Q.   Okay. On Page 13 of the interrogatories, you

20  responded that one of the types of retaliation was that

21  you repeatedly advocated on behalf of Constance Dogan,

22  D-O-G-A-N.

23       Is that correct?

24  A.   Yes.

25  Q.   Am I correct though that your request for promoting

---

her and giving her raises were, in fact, followed?

2   A.   Promoting her, yes. Her raises, she came in doing a

3   competent job, doing a wonderful job, she should have been

4   at market value for her position, and she was at

5   90 percent market value.

6   Q.   And for how many years was that that she was --

7   A.   It was a couple years. Tom decided to take five or

8   six years to bring her to market value over the course of

9   time, which I thought was an excessive period of time, and

10  she was doing the job without any issues.

11  Q.   Do you consider that advocacy to be outside of your

12  usual duties of the VP of HR?

13  A.   It's -- advocating for other Directors is part of my

14  job, I think, when I see things that are unfair regardless

15  of who the employee is, that was part of my job.

16  Q.   Did you at any point complain to Mr. Garvin or anyone

17  else that he was treating her differently because of her

18  gender?

19  A.   No.

20  Q.   Or on the basis of any Protected Class?

21  A.   She's the only black manager, the only black

22  director, who happens to be Muslim, and she was

23  significantly paid less than everyone else.

24       And when everyone else received a promotion to Vice

25  President, Tom kept her as Director, saying that a

---

159

1   Housekeeping department and Environmental Services didn't

2   warrant a Vice President title.

3   Q.   And was she the only one that was not given a VP

4   title --

5   A.   The Dining Services Director --

6        MR. SCHWARTZ:   The Dining Director.

7        THE WITNESS:   -- was kept at a Director

8        level, but that was a FLIK decision. They were

9        contracted employees and that was the title that

10       they bestowed upon their position in the

11       community.

12  BY MS. DEON:

13  Q.   So is it your position that she was the only one that

14  Mr. Garvin had any say in that he kept at a Director

15  level?

16  A.   Yes.

17  Q.   And are you saying that that was as a result of some

18  type of discrimination against her?

19  A.   I just think it's unusual that she was the only black

20  manager who didn't get the title and who didn't receive

21  the appropriate pay.

22  Q.   Did you express that to Mr. Garvin, that you felt it

23  was discriminatory by him treating her in that manner?

24  A.   I told him that it was taking too long for her to get

25  to market value.

---

160

1   Q.   In order to establish a cause of action for

2   retaliation you have to demonstrate that you engaged in

3   protective activity.

4        Do you know what that means?

5   A.   If you could explain what you're talk -- what you're

6   asking me.

7   Q.   So if you had expressed to him that the basis for

8   someone not receiving benefits or being treated in an

9   adverse manner was because they were within a Protected

10  Class --

11  A.   Uh-huh.

12  Q.   -- and then you advocated and did that, and then you

13  were treated differently, that would be retaliation upon

14  you?

15  A.   Yes.

16  Q.   Okay. So I'm asking you, what protected activity did

17  you engage in with Mr. Garvin?

18       MR. SCHWARTZ:   I would object that that

19       calls for a legal conclusion, that's what the

20       whole lawsuit is about, but go ahead.

21       THE WITNESS:   Well, with regards to

22       Constance Dogan I -- there isn't, but with

23       regards to Meredith Feher, there certainly was.

24  BY MS. DEON:

25  Q.   And by that are you referring to the fact that you

162

1 advised Mr. Garvin that he was treating her differently
2 because she was a woman?
3 A. Yes.
4 Q. And is it your position that Miss Feher wanted a
5 company car as part of her compensation?
6 A. Miss Feher contacted me relentlessly about two
7 issues: 1) the fact that Bob Supper had a car and she
8 didn't; and 2) that she didn't receive a contribution to
9 her retirement fund for the prorated basis when she
10 started working and Bob did.
11 Where she got that information, I have no idea, but
12 it was a thorn of contention for her. And when Meredith
13 gets a bone, she doesn't let it go.
14 Q. Was the contribution to her retirement fund something
15 that was promised in her offer letter?
16 A. No.
17 Q. Were you involved in developing her offer letter?
18 A. I worked with Tom on writing the -- he gave me the
19 information for her compensation, we just did the letter.
20 Q. Do you recall at some point pulling a copy of her
21 offer letter and seeing that that was, in fact, something
22 that was promised to her?
23 A. I think I showed it to her and said she didn't
24 negotiate it.
25 Q. Well, if she didn't negotiate it, then why was she

162

1 expecting it?
2 A. I guess because she knew that Bob got it and she
3 thought that Bob was being treated very differently than
4 her, so she wasn't sure why it wasn't even offered at
5 employment by Tom.
6 Q. And in that same response to Interrogatory No. 17.,
7 there is a reference to you complaining about pay and
8 equities and comp ratios of long-term directors and
9 newly-hired directors, managers and staff.
10 I believe you responded to that previously, that it
11 was your belief that those individuals were being paid
12 improperly, but could I ask you, was it on the basis of
13 gender?
14 A. When Bob Supper was hired, his comp ratio coming in
15 was significantly higher than the market value. When
16 Meredith was hired, she came in at the market value.
17 So, yes, I would say that that's gender-based.
18 Q. And you'd agree that Mr. Supper has a CPA and 30-plus
19 years of experience?
20 A. Yes, and Meredith has 25 years and her NHA, and is
21 quite skilled in her position.
22 Q. Did you claim that you were sexually-harassed by
23 Mr. Hendrickson, H-E-N-D-R-I-C-K-S-O-N?
24 A. Yes.
25 Q. In what respect?

163

1 A. Mr. Hendrickson was a consultant -- a personal
2 financial consultant, and every time I saw him, he had
3 some kind of sexual comment to make about my clothing,
4 about the way that I looked, if I was physically fit, my
5 sweater; very uncomfortable conversations for me. Those
6 were -- those comments were made in front of Mr. Garvin
7 and Mr. Supper.
8 Q. When did they -- when did he first start making such
9 statements?
10 A. As long as I've known him.
11 Q. How long is that?
12 A. I don't know. I don't know how many years. He
13 didn't do it when I was with -- when Bill Maguire was
14 President, he didn't act like that.
15 Q. Was he a gentleman that you would say didn't have
16 good hygiene?
17 A. No.
18                    MR. SCHWARTZ:   And I think she --
19               objection, I don't think she testified he was a
20               gentleman.
21 BY MS. DEON:
22 Q. Did you answer my question?
23 A. I said, no.
24 Q. Okay. So he didn't have poor hygiene?
25 A. (Witness nodding negatively.)

164

1 Q. Were there -- there weren't any jokes that were ever
2 made about the fact that he was a bit objectionable with
3 respect to his appearance or hygiene?
4 A. That's not Mike Hendrickson.
5 Q. Who are you speaking of?
6 A. I'm talking about Mike Hendrickson.
7 Q. Do you know of someone else I might be referencing?
8 A. I think you're talking about, um -- I don't remember
9 the guy's name from Mutual of America.
10 Q. And what was his name; do you recall?
11 A. I don't remember his name.
12 Q. Did you ever contend that you were being sexually
13 harassed by that gentleman from Mutual America?
14 A. No.
15 Q. So other than Mr. Hendrickson, were you ever sexually
16 harassed as you've just described?
17 A. Anne Rogers is the only other person.
18 Q. Okay. And was Mr. Hendrickson an employee or a
19 consultant?
20 A. He had nothing to do with Waverly. He was a personal
21 financial advisor who was trying to get Tom to invest his
22 money through him to be his broker, there was no reason
23 for me to be in those meetings.
24 Q. Was there any conversation about anything unrelated
25 to Mr. Garvin's personal finances?

1  A.  Well, I think Mike Hendrickson wanted to try and get
2  in an offer, ah, some kind of benefits to Waverly
3  employees that would be, you know, purchased privately
4  through them for them.
5  Q.  So it wasn't just for Mr. Garvin's personal benefit?
6  A.  We had already -- we had already made the
7  discussion -- had the discussion and made the decision not
8  to have voluntary benefits.  So it was a meeting really
9  that was just to kind of placate him, so Tom could have
10  certainly done that on his own.
11  Q.  How many times did you meet?
12  A.  Several.
13  Q.  More than five?
14  A.  No.
15  Q.  Four?
16  A.  Maybe four.
17  Q.  How long were the meetings?
18  A.  At least an hour.
19  Q.  Did he touch you at all?
20  A.  He always wanted to give me a hug.
21  Q.  Did you allow him to give you a hug?
22  A.  No.
23  Q.  Did he attempt to touch you in any other way?
24  A.  No.
25  Q.  Did he contact you ever outside of those meetings?

1  A.  No.
2  Q.  Did he send you emails?
3  A.  No.
4  Q.  Okay.  Who is Susan Posoff, P-O-S-O-F-F?
5  A.  She's the Payroll Specialist, she reports to Bob
6  Supper.
7  Q.  And according to your response to the
8  interrogatories, she was an individual that complained
9  about Mr. Supper treating women in a demeaning manner?
10  A.  Yes, her in particular.
11  Q.  Is she still with the organization?
12  A.  I don't know.
13  Q.  When is the last time you had contact with her?
14  A.  Right after my termination, she emailed me to find
15  out if I wanted my 401(a) contribution deducted from my
16  last paycheck.
17  Q.  And are those emails that were produced in the
18  discovery?
19  A.  I don't think so.
20  Q.  Do you have access to a copy of those emails?
21  A.  Um --
22          MR. SCHWARTZ:  I believe the testimony said
23      she was called after, that you were called after
24      you were fired about --
25          THE WITNESS:  No.  Susan emailed me and I

1          think I do have copy of that, I'm not sure.
2          MR. SCHWARTZ:  Okay.  We'll look for that.
3  BY MR. SCHWARTZ:
4  Q.  With respect to Mike Hendrickson, did you ever tell
5  Mr. Hendrickson that you found his comments to you to be
6  objectionable?
7  A.  No.
8  Q.  Did you tell Mr. Garvin that you felt Mr.
9  Hendrickson's comments to you were sexually-harassing?
10  A.  Yes.
11  Q.  What was his response?
12  A.  He just laughed.
13          And then the next time, I asked him not to have to
14  attend any more meetings.  And when he called to tell me
15  that there was another meeting scheduled, his reference
16  was, Oh, your good buddy's coming.
17  Q.  There is a reference to Miss Thompson saying that
18  Mr. Garvin required her to sign his name at a continuing
19  education course?
20  A.  I'm not sure.
21  Q.  Or do I have that wrong?
22  A.  I don't know that that belongs there.
23  Q.  Are you aware of Mr. Garvin suggesting to you or
24  anyone else that they sign his name and attend a
25  continuing education course in his place?

1  A.  Silverchair Learning is a requirement of every
2  employee of Waverly Heights.  Mr. Garvin never does those
3  training, and he would often tell me, Why don't you take
4  a -- why don't you take the training for me?  Take my
5  classes for me?
6  Q.  But he didn't tell you to sign in as him?
7  A.  Yeah, I would have to login under his name.
8  Q.  Well, you thought he was serious?
9  A.  He was serious.
10  Q.  And when someone is able -- how are you able to login
11  on behalf of other people's names?
12  A.  Well, we're the Human Resources department, we have
13  everybody's login information and their password.  It was
14  their first three letters of their last name and the last
15  four numbers on their ID badge.
16  Q.  Did you do that?
17  A.  No.
18  Q.  So it's your testimony that he never completed those
19  courses?
20  A.  He very seldom -- he should have taken 14 classes a
21  year from the time that he started, and I'd say he maybe
22  took one year's worth.
23  Q.  Were you required to monitor that to ensure that the
24  individuals needed to take those courses did so?
25  A.  It was my job, yes, and I brought it to everybody's

170

1  attention on the Senior Leadership Team that didn't do it,
2  and Tom was well aware of the people that didn't do it.
3  Q.   In what form did you bring to their attention if they
4  were deficient in credits or hours?
5  A.   They were emailed from my assistant.  Tom was emailed
6  of the Directors that hadn't taken their courses.
7  Q.   Do you remember who else that might have been?
8  A.   Who didn't take their courses?
9  Q.   Yes.
10  A.   Marc Heil.  Marc Heil never attended annual training.
11  Marc Heil never did his Silverchair training.
12  Q.   Anyone else?
13  A.   They're the only two that stand -- I'm pretty sure
14  Janet Thompson probably didn't do her training.  I'm not
15  really sure, they didn't take it very seriously.
16  Q.   So what is the ramification of that, if you have
17  individuals that have not taken that training?
18  A.   That's a requirement of a position at Waverly Heights
19  that you do your Silverchair training, it's one subject a
20  month.  If it could be cultural diversity, sexual
21  harassment, bloodborne pathogens, there's all kinds of --
22  workplace violence.
23       There's a different topic every month.  It was
24  mandatory for everyone from Tom down to do the training.
25  Q.   Cultural diversity, that was a topic that you took on

1  a number occasions; is that correct?
2  A.   I had -- took it every year.
3  Q.   What was covered in that?
4  A.   Cultural diversity.
5  Q.   Can you expand on that?
6  A.   Respecting people of color, respecting races,
7  respecting religion, respecting other cultures.
8  Q.   Did the format change from year to year or was it
9  similar?
10  A.   It was pretty similar.
11       MS. DEON:   I think this is a good spot for
12       me to break.
13       -----
14       (Deposition was continued at 5:55 p.m.)
15       -----
16
17
18
19
20
21
22
23
24
25

171

**CERTIFICATE**

I hereby certify that the proceedings
and testimony taken by and before me are
contained fully and accurately in the notes
of testimony, and that the foregoing is a
true and correct transcript of the same.

*[signature]*

**MICHELLE A. KATULKA**
**REGISTERED PROFESSIONAL REPORTER**
**NOTARY PUBLIC**

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Michelle A. Katulka, Notary Public
Newtown Twp., Bucks County
My Commission Expires June 12, 2020

(THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY
REPRODUCTION OF THE SAME BY ANY MEANS,
UNLESS UNDER THE DIRECT CONTROL AND/OR
SUPERVISION OF THE CERTIFYING REPORTER.)

ERRATA SHEET

PAGE:  LINE:  CORRECTION:

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

ACKNOWLEDGMENT OF KATHLEEN JUNGCLAUS

I, *KATHLEEN M. JUNGCLAUS*, certify that I have read the foregoing transcript of my testimony given on November 1, 2018, and find it to be a true, correct and complete transcript of the answers given by me to the questions therein propounded, except for corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
KATHLEEN JUNGCLAUS
DATED:
_____

Subscribed and sworn to before me this _____ day of _____, _____.
My Commission Expires: _____.


_____
NOTARY PUBLIC

Appendix 666

IRS rate for mileage.

expense report +

Elkins Park – Doylestown – Langhorn to Lans

40 – 60 a month.

50   1X per wk
20   2X per mth
20   1X per mth.

$45,000. base

sliding scale
1-2% gross revenue
Less accounts w/low
margin
VA.

over = 36,000, base revenue

John McCabe 215-783-3408


EXHIBIT
K.5-1
11-1-18

Appendix 667

# EXHIBIT "K-2"

# SEE APPENDIX 606-621

**$**
$10,000 [1] 92/13
$100,000 [1] 153/18
$125 [1] 118/3
$25 [1] 105/19
$25,000 [1] 153/7
$30 [2] 154/24 157/7
$30 million [2] 154/24 157/7
$30,000 [1] 153/20
$36,000 [3] 124/14 127/24 127/25
$42,000 [1] 128/3
$45,000 [1] 124/7
$5000 [2] 153/8 153/9
$7000 [1] 113/3
$80,000 [1] 53/16

**1**
1-21 [1] 1/9
1.3 percent [1] 128/4
10 [3] 103/15 117/23 129/2
100 [3] 29/6 50/6 50/9
100 percent [2] 67/25 124/13
1095 [1] 3/25
1099 [1] 112/23
11 [1] 3/5
110 [1] 135/4
12 [2] 14/12 87/20
12-year-old [1] 11/21
12/20/15 [1] 10/19
125 [1] 3/9
13 [1] 157/19
132 [1] 3/10
14 [2] 145/8 168/20
15 [5] 10/19 14/14 141/5 146/4 151/5
17 [1] 162/6
17-CV-04462-RK [1] 1/7
18901 [1] 2/8
18th [1] 142/3
19010 [1] 2/4
1986 [2] 40/21 41/16
1998 [1] 135/24
19th [3] 139/8 142/4 142/5
1:33 [1] 1/16
1st [1] 117/3

**2**
20 [10] 27/25 66/24 74/1 97/10 126/14 126/14
 126/17 126/17 126/19 139/22
2002 [1] 55/14
2005 [3] 40/22 41/1 41/16
2010 [3] 41/1 41/12 41/17
2012 [1] 122/2
2014 [1] 88/25
2015 [4] 18/20 63/2 63/4 90/11
2016 [12] 10/19 18/14 18/18 36/11 36/22 63/1
 114/15 136/6 138/25 139/8 142/3 142/6
2017 [1] 117/9
2018 [3] 1/16 117/18 173/5
20th [1] 96/13
21 [2] 1/9 126/14
215 [2] 2/9 3/25
24 [1] 134/24
25 [2] 153/20 162/20
28 [1] 135/24
29th [1] 135/24

**3**
30-plus [1] 162/18
330 [1] 2/3
345-7000 [1] 2/9
348-1095 [1] 3/25

**36 [1] 128/3**

**4**
40 [2] 17/22 126/11
401 [1] 166/15
42 [1] 128/3
42,000 [1] 128/8
45,000 [1] 127/15
450 [1] 113/17
46 percent [2] 128/4 128/4
46,000 [2] 128/5 128/8
4:15 [1] 151/9
4:30 because [1] 151/10

**5**
50 [1] 128/4
50,000 [1] 128/5
525-5534 [1] 2/4
5534 [1] 2/4
57 [1] 115/18
5:55 [1] 170/14

**6**
60 [4] 1/15 2/8 126/11 133/1
610 [1] 2/4

**7**
70 [1] 53/16
7000 [1] 2/9
73 [1] 3/16

**8**
8000 [1] 118/4

**9**
90 [2] 124/8 133/1
90 percent [1] 158/5

**A**
AA [5] 29/6 30/14 30/17 31/20 32/9
abide [1] 67/16
ability [1] 124/23
able [14] 4/17 6/23 18/25 54/23 67/16 68/23
 74/14 79/15 116/1 116/2 127/16 146/18 168/10
 168/10
about [172] 5/3 5/6 5/7 8/3 9/7 22/24 23/22
 24/7 24/16 26/7 26/12 26/18 27/3 28/15 29/6
 29/25 30/8 30/22 31/6 31/8 31/12 32/1 32/8
 40/8 42/10 42/15 43/7 45/2 45/7 46/7 47/10
 48/6 48/13 49/24 53/22 55/1 55/16 56/7 57/14
 57/15 58/3 60/9 60/13 62/16 62/22 63/4 63/5
 63/23 66/3 66/18 68/21 68/22 68/23 70/1 70/9
 70/17 71/18 71/23 73/22 74/24 75/3 75/25 76/1
 76/3 76/4 76/4 76/4 76/6 76/8 76/9 77/18 77/21
 80/14 81/6 81/8 81/19 81/20 84/19 84/22 86/1
 86/5 87/11 87/19 88/4 90/1 90/17 90/24 91/19
 95/10 95/11 96/18 96/20 97/19 98/11 99/23
 100/10 100/18 101/6 101/7 102/6 103/7 103/9
 103/11 103/24 104/4 104/8 104/16 104/18 105/7
 105/9 105/21 107/16 108/5 108/6 108/7 108/8
 108/9 108/19 108/25 110/16 110/25 111/1 112/5
 113/17 113/23 118/6 120/25 121/3 121/17 122/5
 122/13 122/25 123/12 125/18 126/7 127/5 130/5
 130/18 131/21 136/18 137/3 137/19 138/11
 138/23 140/3 141/11 142/21 143/1 143/21 144/7
 144/15 145/8 147/5 154/10 155/9 155/10 155/24
 156/1 156/5 156/7 157/3 160/20 161/6 162/7
 163/3 163/4 164/2 164/6 164/8 164/24 166/9
 166/24
above [11] 50/10 52/16 56/5 56/8 57/9 57/10
 57/11 68/24 77/7 111/19 127/25
abrupt [1] 60/15

**absence [2]** 18/16 54/6
absolutely [2] 91/24 109/2
absorb [1] 125/1
absorbed [1] 124/14
absurd [1] 51/3
abuse [2] 76/25 109/4
accept [1] 28/12
accepted [1] 123/13
accepting [1] 114/3
access [1] 150/10 166/20
accessible [1] 18/22
accident [1] 11/22
accidents [1] 14/13
accommodate [1] 64/19
accompanied [2] 147/12 147/14
accompany [1] 140/17
accorded [1] 8/10
according [4] 5/7 8/10 81/2 166/7
account [5] 21/14 36/25 38/5 79/21 86/18
accounting [1] 152/24
accounts [1] 89/8
accurate [3] 29/4 34/21 130/11
accurately [1] 171/7
accuse [1] 13/15
accused [2] 14/4 14/5
ACKNOWLEDGMENT [1] 173/1
across [1] 6/4
act [3] 6/2 65/2 163/14
acted [1] 44/10
action [11] 33/11 34/15 35/19 73/11 81/11 81/15
 98/5 109/19 112/7 113/12 160/1
activity [7] 73/25 74/23 111/3 137/21 154/4
 160/3 160/16
actual [4] 60/4 98/2 116/20 129/4
actually [12] 31/3 46/4 69/7 79/23 81/15 107/14
 109/24 120/15 122/4 122/12 122/15 140/4
addition [4] 36/24 108/17 136/5 137/4
additional [2] 53/7 151/19
address [2] 137/6 137/22
addressed [1] 77/17
addressing [1] 87/22
administrative [9] 30/1 30/7 30/22 31/6 31/21
 31/24 62/4 68/2 120/19
Administrator [4] 40/4 43/16 43/17 43/25
Administrator's [1] 42/14
adopted [2] 22/12
advance [1] 9/19
advantage [1] 90/18
adverse [1] 160/9
adversely [1] 72/11
advertised [1] 86/13
advertisement [1] 86/23
advice [8] 9/2 69/4 69/21 70/1 70/3 70/6 70/8
 72/15
advise [2] 4/10 65/1
advised [1] 161/1
advisor [1] 164/21
advisory [1] 56/16
advocacy [1] 158/11
advocate [2] 90/25 91/1
advocated [2] 157/21 160/12
advocating [3] 100/23 100/23 158/13
Advor [1] 134/16
affairs [1] 75/4
affects [1] 151/13
affiliated [1] 7/20
affiliation [3] 24/23 89/23 144/11
affirmatively [1] 74/6
afforded [1] 97/21
afraid [4] 8/16 75/23 91/23 133/8
African [5] 29/9 29/15 31/21 31/25 32/11

**A**

African-American [2] 31/25 32/11
African-Americans [3] 29/9 29/15 31/21
after [37] 25/7 27/16 32/5 50/8 51/12 51/13
54/10 60/21 68/8 72/11 80/6 81/23 85/10 91/13
94/25 97/10 99/1 112/1 112/17 118/5 118/7
118/12 124/8 133/10 142/12 145/12 149/16
152/23 153/3 153/13 154/17 154/23 156/8
156/17 166/14 166/23 166/23
afternoon [2] 23/3 141/24
afterwards [2] 94/20 149/11
again [14] 7/4 23/17 30/19 42/6 57/18 66/9 76/8
77/5 77/22 92/18 103/13 131/4 131/14 139/15
against [10] 6/7 20/25 47/12 70/23 87/12 106/4
106/16 106/21 141/6 159/18
age [16] 43/2 47/24 79/11 79/12 81/2 81/18
82/13 100/18 100/19 100/21 100/25 101/2 101/2
101/11 101/25 102/2
age-wise [1] 81/18
ages [3] 82/1 82/10 131/6
aggression [1] 60/14
aging [3] 101/12 101/12 101/13
ago [9] 8/24 36/20 47/9 80/21 88/21 111/24
131/6 135/23 144/15
agree [17] 9/18 9/20 15/7 21/22 26/23 27/7
28/18 38/9 38/18 50/1 50/4 50/8 62/12 62/18
70/21 99/12 162/18
agreed [1] 111/5
agreement [1] 8/14
agreements [1] 45/14
ah [11] 13/17 23/4 71/9 76/8 84/25 101/13
101/17 108/11 115/17 153/4 165/2
ahead [3] 33/25 34/11 160/20
aid [2] 60/18 60/20
Aides [1] 127/7
ailments [2] 132/21 136/3
air [1] 140/6
alcohol [1] 76/25
alcoholic [1] 145/9
alcoholism [1] 75/10
all [35] 4/7 14/23 16/5 23/20 34/3 39/16 49/11
50/5 51/21 53/14 53/24 59/10 82/3 83/19 90/1
90/14 96/7 99/22 100/24 105/15 108/18 110/12
111/17 115/11 115/13 118/23 120/2 120/23
150/15 151/11 153/4 155/3 155/6 155/6 169/21
allegations [2] 35/4 35/10
allege [1] 90/9
alleged [1] 12/14
allergic [1] 60/6
allergist [1] 141/20
allow [1] 165/21
allowed [4] 24/22 53/6 78/3 87/24
alluded [1] 144/21
almost [1] 90/13
along [2] 107/4 107/8
already [11] 10/23 11/14 32/22 40/2 40/5 42/20
65/6 121/1 148/8 165/6 165/6
also [22] 2/12 6/8 31/25 34/18 48/8 58/19 61/12
61/25 62/15 62/22 64/18 72/17 86/16 86/25
87/12 94/20 102/17 115/21 122/10 134/11
153/23 153/25
altering [1] 52/11
although [3] 40/13 42/24 61/11
alumni [2] 119/4 119/7
always [15] 21/10 26/9 32/18 37/4 39/3 46/18
46/22 69/21 91/6 100/8 101/11 115/14 116/9
132/25 165/20
am [18] 9/16 10/24 17/6 18/21 21/23 65/23
73/2 82/11 92/10 111/17 122/20 135/20 136/1
139/7 146/21 151/18 152/11 157/25
Ambien [2] 136/7 136/18

ambulance [2] 133/7 141/11
amended [9] 16/18 34/2 34/19 35/1 35/5 35/18 96/2
154/3
America [2] 164/9 164/13
American [2] 31/25 32/11
Americans [3] 29/9 29/15 31/21
Among [1] 39/5
amongst [1] 6/25
amount [4] 5/13 54/19 152/14 156/24
Amy [6] 27/21 76/6 147/5 148/8 148/10 148/13
And were [1] 11/25
AND/OR [1] 171/22
Andrews [1] 24/9
anger [3] 146/19 146/20 146/21
angry [7] 13/20 13/21 13/23 13/25 91/6 91/7
146/22
animated [2] 5/3 5/6
Anne [11] 57/10 82/17 82/19 82/25 84/6 97/24
99/17 100/13 104/5 122/3 164/17
Anne84 [1] 54/10
annual [4] 66/16 74/17 103/8 169/10
anonymous [3] 7/13 74/15 96/14
another [8] 44/10 45/18 93/6 110/1 110/24
121/24 125/15 167/15
answer [18] 3/14 4/10 8/25 15/7 31/25 32/31
34/1 35/13 41/23 43/9 46/10 64/1 73/1 93/6
93/7 93/10 101/10 163/22
answered [3] 36/5 101/5 101/9
answering [1] 135/13
answers [2] 130/7 173/6
anti [4] 73/7 143/19 143/19 143/19
anti-Jewish [1] 143/19
anti-Obama [1] 143/19
anti-retaliation [1] 73/7
antianxiety [1] 136/9
antianxiety [1] 136/9
antisemitic [1] 143/20
anxiety [4] 136/15 136/25 137/7 146/9
anxious [1] 96/17
any [142] 4/10 6/5 8/9 11/2 13/5 13/15 15/19
15/19 15/20 19/21 20/1 20/13 20/23 22/11
22/18 27/17 28/10 28/21 30/10 32/8 33/10
33/18 34/25 35/4 36/3 36/6 37/6 38/25 41/4
41/24 44/3 44/20 47/1 47/7 47/23 48/13 48/14
48/21 48/22 49/1 49/8 49/13 49/21 51/6 52/2
55/2 55/6 56/4 57/25 58/3 58/6 58/11 59/6
59/16 62/5 63/18 63/22 66/3 66/6 68/23 74/4
74/1 77/7 77/15 80/14 81/1 83/14 83/16 83/17
88/9 88/13 89/2 89/16 89/22 91/8 98/8 101/2
102/5 102/9 102/9 102/13 103/21 104/13 104/17
113/20 113/24 118/13 119/6 119/9 119/22
119/23 120/11 120/13 120/22 121/7 121/14
121/23 122/8 128/22 129/7 129/10 129/16 130/3
131/17 131/24 132/21 137/9 137/21 138/1 140/7
143/8 144/25 144/25 146/8 146/15 147/2 148/15
149/13 150/25 151/12 151/21 151/25 152/7
155/6 155/6 155/23 156/10 156/14 156/24
157/12 157/17 158/10 158/16 158/20 159/14
164/1 164/24 165/23 167/14 171/20 171/21
173/8
any knowledge [1] 157/17
anybody [4] 35/21 56/19 91/2 150/13
anymore [2] 4/23 147/1
anyone [47] 13/15 20/6 24/15 35/16 35/25 36/8
39/25 40/23 44/6 45/25 48/18 49/14 54/5 56/4
56/8 56/23 57/8 76/14 77/16 80/14 81/1 83/6
84/22 88/24 89/2 100/15 100/16 104/18 107/5
109/9 109/11 121/18 130/15 130/20 140/8
140/17 142/14 143/21 144/2 144/4 147/12
148/25 149/20 154/5 158/16 167/24 169/12
anyone's [1] 104/13
anything [45] 7/25 8/11 8/16 9/17 11/1 15/16

16/10 16/21 18/2 26/13 28/14 30/12 31/19
32/20 37/7 37/10 49/6 64/12 68/7 71/23 72/6
74/22 81/18 90/6 91/13 93/5 99/12 103/25
109/16 110/16 112/2 112/21 122/6 127/9 127/24
127/25 130/17 137/5 141/10 149/19 151/2
151/15 154/5 154/19 164/24
anyway [1] 141/7
anywhere [4] 94/5 105/2 116/7 131/7
apart [1] 86/10
apartment [1] 149/19
apartments [2] 24/18 24/19
apology [1] 5/18
appalled [2] 92/10 96/23
appalling [1] 105/22
appear [3] 19/18 33/10 33/16
appearance [1] 164/3
APPEARANCES [1] 2/2
application [3] 21/12 115/15 116/25
applications [2] 117/12 122/15
applied [8] 115/2 115/3 115/12 115/16 115/18
116/22 117/4 117/5
apply [8] 42/8 43/9 65/19 115/13 116/5 116/23
118/9 171/20
applying [7] 43/6 113/20 114/24 116/8 116/9
116/21 118/13
appointment [4] 133/4 133/13 141/24 142/8
appointments [1] 121/10
appreciate [1] 91/4
approach [1] 149/8
approachable [1] 108/21
approached [1] 71/22 91/12
appropriate [2] 82/22 159/21
approved [4] 46/22 53/18 98/9 98/9
approximate [2] 15/12 113/3
approximately [6] 55/21 66/16 77/22 83/4 118/4
145/5
architect [1] 154/24
are [108] 4/6 4/8 5/16 7/15 7/24 7/25 8/18 10/10
10/11 15/2 15/19 16/3 16/5 17/13 17/17 23/10
27/4 29/10 30/16 33/11 34/24 34/25 35/9 35/10
37/23 38/17 38/22 39/1 40/8 45/11 45/11 45/12
45/13 45/17 45/17 46/7 51/6 54/25 57/22 58/19
63/19 65/16 66/6 67/15 69/13 70/23 71/5 72/25
73/7 73/13 79/10 79/15 82/6 82/8 82/10 87/3
89/18 98/13 100/2 106/19 107/4 109/11 114/6
114/11 116/23 116/23 117/13 118/23 120/4 121/6
121/22 123/2 124/2 126/16 126/16 126/17
126/19 126/22 126/22 126/23 129/21 130/14
131/13 132/9 132/9 132/21 134/12 134/15
134/22 137/2 138/22 142/25 143/8 143/9
146/3 151/21 152/5 153/15 157/12 158/14
159/17 160/25 164/5 166/17 167/23 168/10
171/6
area [3] 89/18 120/4 150/1
arm [1] 60/15
arm's [1] 91/13
arose [1] 12/3
around [4] 24/20 122/2 150/23
arrived [1] 108/22
articles [3] 142/25 143/9 143/11
as [102] 4/7 5/23 6/13 6/13 6/13 9/22 11/21 12/8
12/16 13/23 14/6 16/6 19/7 19/17 20/19 21/9
22/7 22/7 25/11 26/1 26/16 28/19 31/21 34/9
34/9 38/2 38/9 38/17 38/20 39/6 40/13 40/17
43/16 43/16 44/4 46/22 46/22 47/23 48/25
49/14 49/19 51/2 51/2 51/18 53/20 53/20 55/24
56/10 56/16 56/17 58/20 58/20 61/15 62/10
64/25 65/2 66/9 66/21 67/14 72/13 74/20 74/21
78/4 79/2 79/11 79/12 85/15 87/10 89/12 96/15
96/16 100/3 100/3 100/25 104/7 109/18 109/18
109/19 112/25 113/1 113/25 117/12 122/14

**A**

as... [19] 125/16 126/8 127/13 128/6 132/22
137/4 137/5 139/3 139/11 144/7 145/7 153/17
158/25 159/17 161/5 163/10 163/10 164/16
168/6
aside [2] 25/13 36/1
ask [17] 8/4 8/24 15/1 15/17 27/1 36/8 39/13
39/15 57/19 69/21 81/15 92/3 93/6 134/16
137/3 142/21 162/12
asked [33] 6/1 17/24 23/7 23/9 24/21 25/1 25/9
26/3 26/5 32/2 36/5 39/16 43/7 60/21 67/11
84/15 84/16 91/10 94/12 95/7 95/17 98/19
101/5 101/9 103/19 103/21 104/12 109/12 113/7
122/6 130/23 155/12 167/13
asking [13] 9/12 14/25 28/9 30/16 30/17 57/14
71/3 87/11 97/6 97/7 97/9 160/6 160/16
asleep [1] 136/20
aspect [1] 44/3
asserting [2] 73/10 88/12
assertive [2] 84/20 84/23
assigned [1] 129/8
assistance [4] 21/9 21/10 28/10 85/15
assistant [6] 31/6 31/24 62/4 104/7 140/20
169/5
Assistants [4] 30/1 30/7 30/22 31/21
assisted [4] 85/16 89/5 108/2 155/22
associate's [1] 52/5
association [2] 98/7 119/4
assume [5] 8/5 8/25 10/1 42/24 125/24
assumed [1] 18/17
assure [1] 8/4
asthma [7] 138/4 138/11 138/19 139/1 139/2
139/4 142/18
Atorvastatin [1] 134/17
attach [1] 120/9
attached [4] 21/9 120/9 125/13 132/5 173/9
attack [7] 135/2 136/25 138/19 139/2 139/4
139/5 142/18
attacks [7] 6/6 9/11 136/8 137/6 139/2 144/18
146/9
attempt [4] 5/1 119/6 149/8 165/23
attend [5] 54/2 61/7 100/5 167/14 167/24
attended [3] 32/14 32/20 169/10
attending [1] 124/4
attention [8] 58/24 60/16 104/14 110/22 117/16
144/2 169/1 169/3
attest [1] 34/21
attic [9] 138/14 138/20 138/22 138/23 138/23
138/24 139/10 139/13 140/5
attorney [13] 16/23 21/11 29/22 32/22 35/14
35/17 35/22 69/1 69/15 69/17 72/14 121/17
143/13
attorney-at-law [1] 69/17
attorney/client [2] 35/14 72/14
attorneys [3] 69/2 69/7 69/10
attributing [1] 79/10
August [5] 92/18 138/25 139/8 142/3 142/5
August 18th [1] 142/3
August 19th [2] 139/8 142/5
authored [1] 30/17
authority [2] 29/1 46/16
authorize [1] 35/25
automatically [1] 38/5
automobile [1] 14/13
available [8] 33/1 33/3 33/5 41/4 118/16 118/18
118/21 143/9
avenue [1] 118/16 98/17
avoid [1] 76/21
awarding [1] 157/7
aware [13] 34/24 51/4 51/6 71/5 71/9 76/13
80/16 107/4 122/6 143/8 157/12 167/23 169/2

away [8] 24/22 50/23 53/23 91/25 92/7 100/9
119/19 135/20
awful [3] 133/3 137/1 144/7

**B**

B-A-S-H-E-E-R [1] 24/8
bachelor's [3] 52/5 52/6 65/25
back [29] 41/15 43/20 55/1 55/19 59/21 59/22
68/8 71/21 72/6 85/18 93/7 93/9 95/7 99/5 99/3
105/2 110/14 116/16 116/24 119/21 120/11
131/9 135/5 135/9 139/14 140/5 141/16 148/5
151/25
background [3] 44/4 44/5 102/6
backup [1] 54/11
badge [3] 89/6 89/13 168/15
bank [3] 39/24 40/11 40/12
bargaining [1] 46/5
base [9] 94/11 124/7 124/14 125/3 127/15
127/24 129/10 130/13 149/24
based [17] 20/10 22/14 22/17 52/19 53/10 68/15
71/11 79/12 79/17 124/16 127/23 128/1 128/2
144/12 145/25 156/21 162/17
Basheer [5] 24/4 24/8 25/8 26/5 26/7
basically [2] 16/5 152/21
basis [19] 8/6 26/20 47/24 64/25 66/16 80/8
81/2 82/10 90/9 102/18 106/5 106/24 135/8
135/11 138/17 158/20 160/7 161/9 162/12
Bassett [1] 60/25
Bates [3] 40/25 41/3 41/18
Bauer [9] 2/13 4/21 6/20 28/9 92/12 95/3 95/8
96/23 153/10
Bauer's [1] 4/15
BAYADA [1] 129/1
be [139] 4/11 4/24 6/20 6/22 7/4 7/22 8/1 8/3
8/5 8/9 8/16 8/25 9/11 9/20 11/4 16/5 16/16
18/25 21/21 26/14 26/16 26/23 27/1 29/3 29/20
30/15 31/14 31/18 31/19 31/19 33/2 33/3
34/10 35/1 39/16 40/14 41/4 42/24 46/10 46/20
47/11 54/23 58/17 59/25 60/10 60/11 60/17
60/20 60/22 60/25 61/18 61/21 61/23 61/25
62/7 67/16 69/25 70/2 70/22 71/12 72/10 74/14
74/25 75/5 75/10 75/10 76/18 76/19 77/13
77/19 78/3 82/9 86/13 86/16 89/9 91/16 91/17
97/14 98/23 102/21 106/4 106/5 106/15 106/18
106/21 107/11 107/25 110/20 112/10 112/13
113/21 113/25 114/16 116/1 118/13 121/2
121/14 123/19 123/23 123/24 124/1 124/4 124/6
124/7 125/23 125/24 126/2 126/18 126/19
127/24 128/1 128/20 129/8 129/9 130/2 130/23
130/25 133/22 134/2 139/21 139/24 142/8
146/25 153/23 154/6 154/12 157/9 157/14
158/11 158/22 160/13 164/7 164/22 164/23
165/3 167/5 169/20 173/5
be referencing [1] 164/7
became [4] 41/10 48/5 153/11 154/17
because [50] 5/1 6/19 8/7 14/8 20/3 30/8 31/7
33/19 38/4 43/10 48/3 49/5 49/15 59/24 60/7
61/23 76/24 82/12 83/10 89/12 90/18 91/7
92/17 94/23 98/16 98/22 101/7 105/24 107/16
109/12 109/17 114/3 116/16 122/24 124/10
130/8 131/13 131/14 133/6 136/7 142/9 142/15
145/8 151/2 151/10 151/10 158/17 160/9 161/2
162/2
become [1] 79/22
bed [1] 136/24
bee [1] 60/6
been [57] 5/3 5/4 5/22 10/21 11/9 11/14 11/16
14/11 14/18 16/14 19/4 30/3 30/20 33/4 33/4
33/8 36/18 37/4 40/5 44/15 46/3 49/16 54/20
61/11 62/10 63/8 64/11 64/11 68/20 74/3 75/13
75/14 80/17 82/8 82/25 92/6 100/19 101/9
104/3 107/15 117/9 117/23 117/24 125/16

136/16 136/23 137/6 138/5 139/14 139/15
140/18 147/10 148/7 148/21 149/17 151/10 158/3
169/7
bees [1] 60/6
before [40] 1/13 11/6 14/16 14/17 14/24 15/6
15/18 18/20 28/24 31/11 48/6 51/12 55/21
64/25 68/7 77/22 82/8 82/24 86/5 86/6 86/22
87/8 87/11 92/18 93/6 99/23 100/10 103/16
104/5 108/21 111/25 118/25 128/25 129/7
139/13 140/1 141/16 146/25 171/6 173/16
began [1] 140/1
begged [2] 95/16 95/17
begging [1] 97/5
begin [2] 15/6 129/5
beginning [5] 39/19 114/17 114/24 145/10
145/24
behalf [7] 13/5 21/2 27/10 32/18 33/17 157/21
168/11
behavior [10] 13/3 13/5 70/17 76/5 76/8 77/23
77/24 78/15 82/19 92/15
being [50] 4/17 6/19 7/18 13/15 13/23 14/4 14/4
14/6 19/21 20/25 22/2 42/10 43/24 44/4 47/23
51/23 56/9 63/4 63/20 63/21 63/23 63/24 64/3
68/23 68/24 73/23 83/10 84/22 85/22 89/12
90/3 91/20 105/21 107/12 108/2 108/17 110/1
110/2 110/3 110/7 110/9 117/1 134/22 139/17
143/8 157/3 160/8 162/3 162/11 164/12
belief [10] 29/14 47/20 49/5 49/18 50/11 50/14
75/7 90/7 106/24 162/11
believe [25] 5/16 18/23 24/25 27/20 29/3 35/23
36/7 38/22 45/11 46/1 48/5 63/18 63/22 90/11
100/11 114/17 125/17 126/8 130/9 138/25 144/8
155/24 156/24 162/10 166/22
believed [6] 20/15 20/24 30/6 30/17 48/14 67/2
belong [1] 119/4
belongs [1] 167/22
below [4] 78/9 78/19 79/1 104/16
benefit [6] 81/7 101/14 103/5 103/11 152/21
165/5
benefits [11] 21/13 44/21 45/4 46/11 123/10
129/10 132/16 156/2 160/8 165/2 165/8
besides [2] 35/21 38/6
best [14] 17/20 23/4 61/6 84/25 84/25 90/4
90/20 104/22 105/6 108/8 108/9 124/23 127/21
143/16
bestowed [1] 159/10
betrayed [2] 96/2 96/22
between [10] 4/4 10/21 16/14 40/23 44/25 60/1
60/2 68/25 128/3 152/8
biannual [1] 61/7
big [1] 96/16
Bill [3] 40/8 50/20 163/13
billing [3] 73/20 74/19 74/21
bit [5] 9/2 60/9 100/6 153/13 164/2
bits [1] 97/4
black [7] 31/19 32/2 111/23 128/19 158/21
152/21 159/19
Blair [1] 24/18
blessing [5] 27/21 28/14 76/6 147/5 148/8
blew [1] 96/15
blindsided [1] 27/24 29/17
blood [13] 132/25 132/25 133/5 133/18 133/24
133/24 133/25 134/2 134/7 135/2 135/9 136/4
136/6
bloodborne [1] 169/21
Blotter [3] 92/22 93/14 93/20
blow [1] 141/1
blown [1] 67/2
board [51] 6/11 6/13 6/25 7/7 41/3 45/5 51/4
51/6 52/3 52/11 52/19 56/7 56/14 56/14 56/15
56/16 57/15 68/13 68/15 68/17 72/3 72/11 90/3

**B**

board... [28] 92/9 94/9 94/13 94/14 96/1 96/2
96/3 96/5 96/24 98/9 102/12 102/14 102/16
102/24 115/17 117/6 144/1 152/9 153/5 153/10
153/11 154/6 155/4 155/7 155/12 156/11 156/15
156/17
Board's [2] 51/5 102/19
Bob [17] 68/14 70/20 71/19 71/23 75/22 88/15
91/19 91/21 92/7 99/19 100/14 161/7 161/10
162/2 162/3 162/14 166/5
body [3] 12/18 28/4 68/13
bone [1] 161/13
bonus [4] 49/14 63/5 153/8 153/9
bonuses [13] 47/7 48/21 48/22 48/24 49/1 49/9
49/21 50/24 51/2 52/17 54/16 55/24 153/22
book [2] 53/23 121/10
boss [1] 25/13
both [13] 6/10 12/10 13/3 13/4 13/7 13/8 21/21
22/15 37/17 95/1 104/23 109/11 121/22
bottom [2] 87/1 135/3
bought [1] 154/25
Box [1] 2/3
boxes [7] 139/22 139/22 139/22 139/23 139/24
151/7 151/15
bragged [1] 105/21
break [6] 4/15 8/7 15/15 85/4 92/24 170/12
breathe [2] 140/5 140/6
breathing [2] 141/16 142/19
Brenda [1] 149/2
Brian [3] 149/22 150/14 150/21
brief [1] 41/18
briefly [1] 5/25
bring [9] 43/8 43/11 56/4 92/17 105/2 139/4
144/2 158/8 169/3
bringing [2] 91/5 104/13
broker [1] 164/22
Brothers [2] 113/2 114/9
brought [7] 49/16 77/6 77/7 87/13 101/19
101/20 168/25
Brown [2] 149/22 150/14
brunt [1] 9/11
Bryn [1] 2/4
buddy's [1] 167/16
budget [2] 103/2 103/4
budget-related [2] 103/2 103/4
building [3] 50/17 55/4 139/11
bullied [1] 83/10
business [6] 7/23 8/18 54/9 54/10 76/2 127/16
busy [1] 117/11
button [1] 19/1
buy [1] 157/8

**C**

cafe [1] 13/19
call [16] 33/3 34/8 71/12 74/23 97/8 115/10
120/21 129/8 130/22 130/22 131/3 131/21 133/7
141/10 149/18 155/1
called [7] 62/2 95/2 133/16 134/17 166/23
166/23 167/14
calling [4] 14/8 72/13 111/2 126/22
calls [2] 71/1 160/19
calm [1] 151/6
came [34] 23/6 27/19 30/24 41/2 41/23 52/7
54/3 55/19 58/24 67/10 67/20 75/21 82/22
88/22 91/19 91/20 91/11 103/18 104/9 108/9
109/11 109/15 110/14 110/25 113/4 140/5
141/16 143/11 148/9 149/16 150/1 153/10 158/2
162/16
can [53] 4/24 8/5 9/18 10/1 11/5 13/17 15/3
15/7 16/5 16/16 22/4 25/12 25/14 32/20 34/11
38/21 64/1 64/7 66/16 85/4 86/12 86/16 86/19

91/2 93/7 95/20 96/20 101/10 101/18 109/22
109/24 119/21 121/4 121/16 124/10 124/14
125/23 127/20 128/15 128/19 131/1 131/20
132/13 133/18 135/8 140/21 142/18 142/19
142/20 143/15 145/5 146/2 170/5
can't [9] 69/4 80/9 90/6 97/15 100/16 106/1
110/20 136/25 154/22
cancer [1] 18/5
candid [2] 63/20 63/21
capacity [5] 55/2 55/7 67/14 92/1 92/16
capital [1] 19/10
caps [1] 128/13
Captive [4] 55/14 55/16 61/7 120/5
car [20] 22/15 22/21 23/21 75/22 91/20 91/22
91/25 91/25 92/2 92/7 92/11 92/13 92/13 92/20
94/1 94/2 99/25 151/9 161/5 161/7
card [3] 105/18 105/19 105/20
cardiologist [2] 134/22 134/23
cards [1] 107/8
care [7] 53/21 53/25 108/16 123/18 126/23
127/3 127/4
career [3] 32/15 117/6 119/12
CareerLink [3] 115/19 117/7 117/8
Carpenter [2] 104/20 105/5
carrier [3] 59/11 59/15 61/5
carting [1] 108/11
case [9] 9/21 12/12 85/15 85/16 90/2 94/7 135/7
143/1 143/10
cases [6] 12/6 12/8 12/14 32/8 72/9 72/9
cash [1] 133/24
categories [1] 46/9
category [1] 69/11
Catelli [4] 113/1 113/8 113/22 114/9
catered [1] 108/14
catering [1] 108/14
Catilli [5] 117/9 117/17 120/12 120/14 121/6
Caucasian [3] 79/20 106/22 111/22
cause [2] 73/11 160/1
caused [1] 65/5
caveat [1] 59/17
CCRCs [1] 118/23
cell [6] 38/4 77/18 77/19 78/4 78/13 78/21
center [4] 25/6 46/2 120/21 140/16
CEO [14] 6/14 39/21 39/25 40/6 40/17 40/20
41/6 41/10 47/2 48/5 56/5 62/14 82/9 129/9
CEOs [1] 120/2
certain [4] 10/22 65/14 65/16 104/8
certainly [4] 4/24 15/12 160/23 165/10
certification [7] 4/6 43/13 64/14 65/9 65/13
65/17 171/19
certifications [1] 66/4
certify [2] 171/5 173/3
CERTIFYING [1] 171/23
CFO [1] 47/2
CFOs [1] 120/3
Chad [6] 79/20 79/21 79/22 80/1 80/2 86/3
chain [1] 104/24
chair [1] 133/9
Chairman [6] 6/11 51/5 102/24 144/1 152/8
153/11
chance [5] 76/23 96/15 100/11 100/13 113/20
change [4] 41/21 41/23 157/2 170/8
changed [5] 64/18 64/23 64/24 72/21 92/4
changes [2] 113/24 173/8
check [2] 46/17 118/14
chest [1] 140/6
child [1] 11/21
children [2] 144/22 145/12
choice [2] 111/5 111/5
cholesterol [2] 138/3 138/6
Chuck [2] 152/9 153/6

Churchhill [1] 120/3
circle [1] 120/6
circulated [4] 5/14 7/1 16/14 55/18
circumstances [2] 67/15 86/1
cited [1] 6/9
claim [7] 77/6 87/13 87/14 87/18 88/10 151/21
162/22
claimants [1] 13/3
claimed [3] 13/3 13/5 13/8
claiming [2] 78/15 132/21
claims [8] 12/4 20/21 21/3 53/9 53/9 73/22 81/2
87/11
class [8] 47/20 64/20 64/20 106/4 106/5 106/12 106/16
158/20 160/10
classes [7] 42/21 50/21 52/9 52/9 96/10 168/5
168/20
classification [1] 46/13
cleaner [1] 153/13
clear [2] 33/13 91/8
clearly [1] 29/21
click [3] 19/1 20/2 86/24
clicked [4] 18/24 86/21 86/22 87/4
clicking [1] 19/17
client [7] 4/10 5/2 6/4 6/7 8/23 35/14 72/14
client's [2] 4/17 4/19
clients [1] 4/10
clinic [1] 134/9
Clinton [1] 143/19
cloak [1] 9/8
close [3] 52/7 115/1 123/8
closed [1] 140/6
closet [1] 111/3
clothing [1] 163/3
CNA [1] 127/6
CNAs [3] 100/4 101/12 127/5
Cohen's [1] 72/23
cohesive [1] 113/14
Colin [3] 84/9 84/11 84/20
college [5] 50/19 50/21 51/10 51/16 119/3
collegial [1] 90/12
color [1] 170/6
combination [2] 21/21 22/2
combined [1] 22/19
come [21] 13/22 54/3 55/1 59/19 59/20 67/6
68/10 75/16 78/4 85/13 90/1 97/2 97/2 105/2
110/12 110/22 113/8 119/2 131/21 133/25
139/14
comes [5] 9/5 82/6 89/23 90/5 90/19
comfortable [3] 38/21 68/15 70/7
coming [8] 26/10 28/2 41/25 55/22 99/3 142/16
162/14 167/16
command [1] 104/25
commencing [1] 1/16
comment [4] 81/21 81/23 96/25 163/3
comments [10] 81/6 81/8 81/13 81/19 108/20
143/9 143/12 163/6 167/5 167/9
commission [8] 11/24 12/3 124/8 124/15 124/22
125/2 128/1 173/18
commissions [1] 124/9
committee [14] 55/18 57/5 92/10 94/13 94/15
95/12 95/20 95/21 96/5 98/10 102/17 102/19
103/6 104/4
common [1] 97/14
Commonwealth [3] 30/11
communicate [2] 47/18 59/2
communication [3] 24/12 72/14 92/11
communications [1] 153/4
community [7] 8/14 9/6 9/21 119/22 122/7
149/5 159/11
comp [6] 50/9 50/15 55/12 56/6 162/8 162/14
companies [2] 117/4 118/23

Case 2:17-cv-04462-PD Document 136-5 Filed 08/01/19 Page 56 of 200

company [30] 30/1 45/19 45/19 45/20 60/24
61/1 61/21 61/25 64/16 67/15 75/22 82/8 84/14
92/11 108/15 113/2 113/16 114/12 115/15
116/14 116/20 119/17 119/20 123/4 123/17
123/18 126/25 129/3 130/2 161/5
company's [3] 38/11 116/17 116/19
comparison [3] 43/3 52/14 130/1
compassion [1] 97/11
compensated [1] 56/10
compensation [32] 3/9 10/19 20/10 20/14 20/20
21/13 27/8 29/7 32/13 32/23 44/21 53/3 54/19
56/11 62/3 72/8 90/17 101/18 118/1 122/5
123/7 124/18 124/20 125/11 125/18 152/7 153/7
155/8 155/9 156/2 161/5 161/19
competent [1] 158/3
complain [5] 84/22 108/9 110/25 144/4 158/16
complained [6] 76/3 108/6 108/7 108/19 109/12
166/8
complaining [1] 162/7
complaint [25] 16/19 34/2 34/3 34/10 34/15
34/18 35/4 35/5 35/10 35/18 35/18 47/1 56/2
56/8 67/6 68/2 71/15 72/12 104/21 105/10
105/11 106/3 109/16 143/21 154/13
complaints [18] 33/11 33/16 34/7 47/10 56/4
70/16 70/20 71/14 74/1 75/25 76/2 76/6 104/9
104/18 104/20 104/22 105/7 144/6
complete [2] 15/17 173/6
completed [1] 168/18
completely [2] 29/16 90/18
compliance [8] 73/14 73/16 73/17 73/18 74/4
74/7 74/11 74/17
complimentary [2] 62/18 62/22 63/24
computation [1] 50/4
concept [1] 106/12
concern [1] 61/18 68/10 75/13
concerned [1] 75/22
concerning [5] 83/25 102/5 136/3 146/9 152/4
concerns [3] 69/3 77/5 104/25
conclusion [3] 34/9 71/1 160/19
condition [3] 60/14 118/13 137/22
conditions [1] 113/13
conduct [3] 68/11 80/15 111/8
conducted [1] 112/1
conducting [2] 24/17 66/10
conference [3] 33/3 96/17 133/3
conferences [4] 57/24 58/2 58/11 58/13
confide [1] 25/12
confident [1] 61/2
confidential [7] 7/22 8/3 8/8 9/25 11/9 25/12
109/19
confidentiality [2] 8/10 11/8
confirmation [2] 115/14 116/7
conflict [1] 157/9
confronted [1] 90/16
connection [1] 20/16
connotation [1] 32/10
connote [1] 32/10
consider [5] 40/7 58/17 68/1 154/5 158/11
consideration [5] 53/2 101/24 116/18 116/18
117/1
considered [10] 4/11 44/4 50/25 59/25 60/10
62/5 106/21 117/1 152/14 152/24
considering [2] 53/15 130/15
consonants [1] 140/23
Constance [5] 48/17 107/19 107/20 157/21
160/22
constant [3] 78/25 135/14 144/18
constantly [1] 77/20
constitutes [2] 153/16 153/19
consultant [4] 122/5 163/1 163/2 164/19

consultants [1] 113/7
consulting [3] 113/5 114/11 167/1
contact [2] 165/25 166/13
contacted [1] 161/6
contained [5] 10/22 35/4 35/10 39/1 171/7
contend [2] 12/21 164/12
contending [1] 153/15
contends [1] 4/22
content [2] 27/22 64/9
contention [1] 161/12
contents [1] 88/18
contest [1] 106/17
contested [1] 130/9
contests [2] 105/13 105/15 107/1
context [2] 20/24 32/7
continually [1] 5/12
continue [7] 6/16 14/24 50/22 92/16 96/9 98/24
117/12
continued [13] 4/16 50/24 53/11 77/22 77/23
111/15 111/15 114/19 134/2 136/2 152/19
152/22 170/14
continues [1] 99/19
continuing [3] 66/6 167/18 167/25
contract [6] 45/10 45/12 45/19 46/2 154/24
157/7
contracted [2] 45/17 84/15 159/9
contractor [3] 112/25 113/1 128/15
contractors [1] 45/17
contributed [1] 54/5
contributes [1] 54/12
contribution [6] 52/25 53/1 132/16 161/8 161/14
166/15
control [4] 54/23 171/22
controller [5] 79/14 79/23 80/3 80/8 86/3
controlling [1] 54/25
controversial [2] 26/12 26/16
convenient [1] 157/11
conversation [23] 22/14 22/21 23/2 23/21 24/15
25/7 25/21 25/22 26/14 26/24 26/7 27/6 27/17
27/22 67/22 68/6 69/1 70/9 77/21 90/24 92/12
155/24 164/24
conversations [12] 23/22 25/17 26/1 26/18 26/20
26/21 26/24 29/25 69/2 69/6 76/4 163/5
convinced [1] 113/23
cook [2] 111/19 111/22
coordinate [1] 146/2
Coordinator [2] 109/8 123/20
coordinators [1] 127/1
copies [1] 13/12
copy [4] 125/5 161/20 166/20 167/1
copybooks [1] 151/23
corner [2] 19/9 150/23
corporate [8] 4/24 7/20 73/17 74/7 74/11 74/16
74/16 157/12
correct [63] 11/14 12/9 12/20 17/6 18/21 20/7
20/8 20/17 20/18 21/25 22/3 22/8 28/12 28/13
28/22 29/12 31/15 31/17 32/1 32/23 33/1 33/11
38/15 38/23 54/17 61/22 62/10 65/20 65/23
66/1 66/2 71/7 71/13 93/18 93/19 93/21 93/22
93/24 93/25 94/21 104/14 106/23 107/18 110/11
111/17 122/20 122/24 125/20 126/1
127/12 127/17 127/18 135/20 139/7 147/17
151/18 152/11 157/23 157/25 170/1 171/9 173/5
correcting [1] 98/1
CORRECTION [1] 172/2
corrections [1] 173/7
cost [3] 53/16 55/11 129/25
coughing [1] 140/4
could [52] 13/13 17/25 18/22 18/25 20/2 20/7
23/7 25/9 26/14 28/4 29/22 29/24 30/3 30/20
31/18 31/18 31/18 31/19 33/3 33/21 35/1 43/17

43/23 53/18 55/6 55/9 57/15 59/19 59/20 64/10
67/13 69/22 70/8 79/22 97/7 97/7 97/9 97/9
114/25 116/15 116/17 117/24 128/17 132/19
139/20 139/25 140/6 146/25 160/5 162/12 165/9
169/20
couldn't [4] 48/20 77/2 98/25 144/8
counsel [17] 4/2 4/4 4/9 4/11 10/21 15/5 28/19
67/1 67/4 67/5 67/22 68/19 68/20 68/25 69/5
69/8 121/18
counseled [1] 77/14
counseling [10] 83/17 145/7 145/8 145/10
145/12 145/13 145/14 145/17 145/17 145/18
counselor [2] 119/12 144/25
couple [12] 34/5 47/6 88/21 116/4 118/14 125/1
134/25 137/20 137/23 139/15 139/17 158/7
course [8] 7/24 14/13 23/23 42/20 104/3 158/8
167/19 167/25
courses [5] 52/2 168/19 168/24 169/6 169/8
court [10] 1/3 1/15 2/8 8/9 13 15/3 30/11 43/20
85/18 90/22 93/9
cover [2] 53/8 120/9 121/19
coverage [3] 129/19 129/23 152/20
covered [5] 54/5 54/9 61/20 129/23 170/3
covering [1] 123/24
coworker [1] 42/23
coworkers [3] 94/25 111/17 123/5
CPA [1] 162/18
create [2] 81/1 116/24
created [2] 92/4 92/5
creates [1] 78/6
creating [1] 104/18
credentials [1] 102/6
credits [1] 169/4
Crest [1] 11/22
criminal [2] 97/14 146/24
crisis [1] 146/19
cross [1] 128/17
crying [4] 97/5 98/15 144/18 149/7
cuff [1] 133/24
cultural [2] 98/4 169/20 169/25 170/4
culture [1] 68/11
cultures [1] 170/7
current [4] 6/13 80/3 126/22 145/22
curtains [2] 155/3 156/6
cut [1] 10/9
CV [1] 1/7

D

D-I-P-A-U-L [1] 25/1
D-O-G-A-N [1] 157/22
daily [3] 135/8 135/11 138/17
damages [1] 132/13
Dana [3] 69/16 72/19 85/12
date [4] 64/23 116/14 125/13 132/4
DATED [1] 173/13
dates [2] 14/15 64/24
day [24] 24/17 27/12 91/12 108/16 114/22 116/4
118/12 133/2 134/4 134/19 135/15 135/15
135/17 137/14 137/17 137/18 137/23 139/18
139/16 141/25 141/25 142/1 142/7 173/16
days [6] 60/2 64/18 117/24 124/8 134/2 134/25
deal [2] 96/16 145/19
debates [2] 23/12 23/16
Debbie [10] 69/14 72/19 84/25 84/25 104/22
105/6 108/8 108/9 109/2 109/10
Debbie's [1] 69/21
December [6] 63/1 63/2 63/4 90/11 90/17 136/6
December 2015 [2] 63/2 63/4
December 2016 [1] 63/1
decide [1] 9/13
decided [5] 23/11 42/22 95/11 122/25 153/12
155/11 158/7

decision [14] 14/5 45/5 85/2 94/8 94/14 95/12 95/24 95/25 96/4 101/22 102/1 102/3 159/8 165/7
decision-making [2] 102/1 102/3
decisions [1] 90/16
declared [2] 85/8 112/15
deducted [1] 166/15
Defendant [2] 1/10 2/9
defense [1] 72/23
deficient [1] 169/4
definition [1] 129/14
degree [10] 50/19 50/21 51/10 51/17 51/24 52/6 52/13 65/24 65/25 118/25
delay [1] 9/14
delivered [2] 45/5 151/19
delivery [1] 100/6
demeaning [4] 70/17 76/5 99/22 166/9
Democrat [1] 144/13
demographic [1] 81/9
demographics [1] 101/14
demonstrate [1] 160/2
demoralize [1] 79/18
demoralizing [5] 70/18 97/15 97/25 97/25 132/19
denial [1] 146/20
denied [1] 57/7
DEON [5] 2/7 3/5 4/16 4/22 5/7
department [6] 54/6 55/4 55/5 108/13 159/1 168/12
depend [1] 129/25
depended [2] 103/1 117/24
depending [1] 146/1
depends [9] 8/22 27/6 60/18 67/8 117/21 117/22 129/23 136/22 137/18
depicted [2] 126/8 143/16
DEPONENT [1] 3/3
deponent's [1] 85/13
deposed [1] 11/16
deposition [15] 1/12 3/13 6/21 7/25 8/3 8/11 9/25 10/5 13/12 16/11 16/24 17/2 63/9 135/14 170/14
depositions [1] 12/2
depth [1] 97/15
describe [3] 21/16 132/13 143/16
described [1] 164/16
description [2] 51/9 109/22
designated [1] 62/10
desiring [1] 53/1
desk [1] 150/3
despite [1] 77/5
detail [1] 120/23
determination [2] 80/6 101/3
determinations [2] 52/19 52/19
determine [2] 81/16 118/20
determined [1] 49/14
determining [1] 45/3
detrimental [4] 61/21 61/23 67/18 69/24
devastated [4] 90/2 98/15 98/23 146/17
devastation [1] 97/16
develop [1] 46/25
developed [2] 56/17 74/11
developing [1] 161/17
devil [3] 122/25 123/1 123/2
devoted [1] 114/22
devoting [2] 117/15 117/20
diary [1] 151/23
Dick [2] 92/12 96/23
dictate [1] 71/6
dictated [6] 22/10 22/16 24/2 27/9 30/2 33/7
did [252]

didn't [69] 13/21 13/25 17/21 20/13 22/9 22/10 26/12 26/13 28/17 28/18 30/1 36/4 38/6 43/19 44/8 52/24 56/16 57/25 58/13 62/7 65/6 68/9 70/7 78/12 80/6 84/18 84/19 84/21 92/3 92/22 95/16 96/14 100/21 107/16 110/16 113/24 116/6 122/9 122/23 131/7 131/9 133/16 135/2 140/4 141/10 142/14 145/16 147/4 151/25 152/2 152/2 152/13 159/1 159/20 159/20 161/8 161/8 161/23 161/25 163/13 163/14 163/15 163/24 168/6 169/1 169/2 169/8 169/14 169/15
died [2] 5/9
diet [1] 138/9
difference [3] 14/3 68/25 128/12
different [11] 19/2 31/2 46/9 81/9 83/25 117/4 121/11 123/11 134/13 136/15 169/23
differently [7] 29/23 31/1 31/4 158/17 160/13 161/1 162/3
difficult [8] 26/1 78/2 78/7 82/11 83/19 90/14 90/25 91/1
difficulty [3] 15/20 130/8 142/19
dignity [1] 97/10
dime [1] 108/23
Dining [14] 84/13 84/24 104/22 108/10 108/13 109/24 109/25 110/1 110/4 110/25 111/3 111/4 159/5 159/6
DiPaul [1] 24/25
dipping [1] 155/25
Direc [1] 50/25
direct [9] 40/6 55/11 78/10 79/20 87/20 104/24 131/17 131/24 171/22
directed [1] 104/23
direction [1] 137/11
directive [2] 56/25 57/8
directly [4] 67/22 69/25 81/21 130/20
director [25] 46/1 46/14 46/14 46/18 46/22 51/20 56/14 58/16 58/21 67/14 84/13 108/3 113/18 113/23 113/25 116/10 118/7 129/3 140/20 158/22 158/25 159/5 159/6 159/7 159/14 142/20
directors [14] 40/4 40/7 46/8 49/15 54/6 54/8 57/22 58/19 94/9 155/4 158/13 162/8 162/9 169/6
disability [1] 130/3
disagreed [2] 52/23 52/24
disagreeing [1] 100/24
disciplinary [1] 77/12
discipline [3] 82/21 88/24 96/12
disciplined [2] 77/15 112/6
disclosing [1] 156/14
discovery [6] 10/18 16/17 16/20 63/8 143/1 166/18
discretionary [1] 153/21
discriminated [3] 20/25 79/12 106/4
discriminating [1] 104/19
discrimination [13] 20/15 32/8 38/23 47/15 66/11 66/18 67/3 70/23 71/7 88/10 109/20 153/16 159/18
discriminatory [9] 47/23 92/14 105/23 105/24 106/14 106/18 106/21 109/2 159/23
discuss [4] 8/17 25/12 78/5 124/19
discussed [6] 7/24 17/1 69/3 95/25 103/2 154/12
discussing [2] 10/16 26/15
discussion [10] 10/14 10/21 45/22 58/3 93/2 103/24 125/9 143/5 165/7 165/7
discussions [2] 22/17
disgusting [3] 143/18 143/20 144/8
dishrags [1] 55/10
Dismiss [1] 12/9
dismissed [3] 12/8 13/4 103/16
Disney [1] 153/25
disorder [2] 146/11 146/13

displayed [1] 94/4
disrespect [5] 24/24 25/1 35/5 35/6 62/24
disrespect [1] 13/11
distance [1] 91/14
distinction [1] 82/5
distraught [1] 27/23
DISTRICT [2] 1/3 1/3
diversity [4] 98/4 169/20 169/25 170/4
dividend [1] 54/20
dividends [3] 53/10 53/12 54/21
divulged [1] 11/2
do [170] 4/19 9/7 17/7 18/9 9/9 9/13 10/8 11/3 11/12 12/6 13/12 15/13 15/18 19/12 20/9 21/12 24/5 24/9 24/24 25/1 25/3 26/17 28/9 28/14 29/3 29/7 30/11 34/14 34/20 35/3 35/6 35/25 36/20 36/24 37/1 37/6 39/18 42/18 43/2 48/22 52/7 52/14 55/6 56/21 56/21 56/23 56/24 57/21 60/24 62/24 63/10 63/13 68/3 65/23 66/21 67/11 67/25 70/7 70/10 70/11 70/13 71/18 71/23 71/25 72/7 72/22 73/3 76/14 77/14 79/1 80/8 82/5 86/24 87/1 88/9 89/16 89/24 90/9 92/24 94/11 94/16 94/18 98/12 100/3 100/4 100/22 101/2 101/23 102/5 102/9 103/5 104/10 105/7 106/24 109/13 110/16 113/6 113/18 113/19 119/4 120/13 120/16 120/16 120/25 121/7 121/10 121/11 121/11 121/14 121/19 126/4 127/13 127/21 129/7 129/10 129/16 129/17 129/25 130/13 131/2 131/5 131/17 131/23 134/18 135/12 135/14 136/5 136/13 137/12 137/13 137/17 137/19 137/19 137/21 140/14 141/7 141/10 141/21 141/23 142/1 142/14 145/22 147/8 147/10 148/15 151/24 155/17 156/11 156/14 156/20 156/24 157/7 157/17 158/11 160/4 161/20 163/13 164/7 164/10 164/20 166/20 167/1 167/21 168/16 169/1 169/2 169/7 169/14 169/19 169/24 142/20
doctor [6] 133/4 133/5 135/6 136/2 141/18 142/20
doctor's [4] 60/19 133/10 133/13 134/25
doctrine [1] 157/12
document [8] 3/9 10/17 11/2 16/18 16/20 124/17 125/11 125/17
documentation [1] 59/3
documents [1] 10/10
does [25] 1/9 17/15 22/12 33/16 33/24 37/12 37/13 37/14 37/15 37/16 37/23 41/12 41/23 45/9 50/18 72/7 72/8 72/8 106/3 106/3 127/10 142/6 149/3 168/2 171/20
doesn't [8] 21/22 33/10 33/20 33/22 92/1 92/2 92/11 161/13
Dogan [4] 48/17 107/20 157/21 160/22
doing [13] 23/4 77/24 88/9 117/10 119/7 124/2 130/14 137/6 141/12 155/13 158/2 158/3 158/10
dollar [3] 52/17 128/12 132/18
dollars [4] 53/11 54/18 128/2 128/6
domain [3] 10/23 11/1 20/7
don't [99] 4/25 7/9 7/10 9/6 13/13 14/14 14/14 14/25 15/10 15/11 15/11 16/1 18/19 21/1 22/22 24/10 27/11 28/25 38/17 33/9 35/23 36/21 40/21 41/11 42/19 44/14 44/17 47/9 48/19 51/8 52/12 54/13 54/14 56/18 56/21 64/5 64/22 65/15 69/18 74/12 80/11 81/13 88/7 91/2 92/17 93/12 95/18 96/25 98/13 109/16 112/10 115/1 115/13 115/14 116/4 116/19 122/9 122/9 123/1 123/22 124/13 128/10 128/17 129/11 129/18 129/20 130/4 130/6 131/6 132/17 134/21 141/15 142/2 142/7 142/9 142/13 142/17 143/14 146/25 148/6 149/4 151/8 151/9 153/8 156/7 156/8 156/10 156/12 156/23 163/12 163/12 163/19 164/8 164/11 166/12 166/19 167/22 168/3 168/4
Donald [2] 22/25 23/25

**D**

done [16] 7/15 20/7 27/2 29/17 61/13 66/24 86/9 86/21 87/8 90/21 96/8 100/11 109/17 128/25 155/3 165/10
door [1] 150/2
doors [1] 65/14
double [2] 152/21 155/25
double-dipping [1] 155/25
down [27] 15/3 23/6 25/8 43/18 46/14 58/25 78/13 78/13 81/10 90/19 91/21 95/2 95/7 95/23 121/12 124/11 128/16 133/25 139/15 140/5 140/15 140/18 140/19 145/25 150/8 151/6 169/24
downstairs [2] 23/3 55/9
Doylestown [7] 1/15 2/8 108/10 108/11 108/18 123/24 126/8
drafting [1] 97/12
draperies [1] 154/17
drawer [1] 152/3
drills [1] 24/18
drink [1] 15/16
drinker [1] 75/23
drinking [2] 76/8 99/25
drinks [1] 91/25
driving [1] 22/22
dual [1] 54/17
due [2] 60/14 75/9
duly [1] 5/22
Dunwoody [1] 88/23
duplicated [1] 88/18
during [18] 6/11 7/24 20/19 21/5 24/23 42/17 47/7 54/16 54/20 58/7 61/11 62/13 66/13 74/1 94/24 104/3 117/20 144/9
duties [2] 58/17 158/12
duty [3] 55/6 59/5 59/5

**E**

each [7] 4/9 37/21 52/17 61/2 69/18 105/3 122/20
ear [2] 133/3 133/4
earache [1] 133/14
earlier [4] 21/19 94/16 104/8 147/4
early [2] 76/1 76/3
earn [1] 124/9
earning [1] 124/15
earns [1] 105/13
ears [1] 10/25
earth [1] 95/15
East [2] 1/15 2/8
Eastburn [2] 1/14 2/6
EASTERN [1] 1/3
easy [1] 90/25
echo [1] 135/5
education [3] 66/7 167/19 167/25
educational [1] 61/12
EEOC [3] 11/24 21/3 68/5
effect [1] 74/13
Effectively [1] 77/25
effort [3] 22/19 39/3 39/4
efforts [3] 55/25 56/10 120/23
ego [1] 108/7
egregious [4] 96/9 97/22 99/15 100/12
eight [2] 55/21 60/2
either [9] 12/11 32/14 33/16 34/2 38/25 116/10 141/18 141/25 156/7
EKG [2] 134/24 135/1
election [2] 23/10 36/12
electrocardiogram [1] 135/6
elevated [3] 39/25 40/18 108/2
eligible [1] 124/7
eliminate [2] 81/15 90/3

eliminated [1] 82/9
eliminating [1] 82/5
else [57] 8/11 16/21 21/9 24/15 28/15 30/4 30/21 36/8 37/8 37/10 38/6 39/25 42/4 43/11 45/25 48/18 49/14 54/11 56/19 68/7 76/14 77/16 79/1 80/14 81/1 81/18 83/6 84/5 84/8 90/6 91/1 91/2 91/13 93/5 99/18 100/15 103/10 104/18 107/5 109/9 109/11 137/6 144/2 144/4 145/20 148/25 149/20 154/6 154/15 154/19 158/17 158/23 158/24 164/7 167/24 169/7 169/12
email [1] 118/6 153/6
emailed [4] 166/14 166/25 169/5 169/5
emails [9] 5/14 6/5 6/24 120/7 143/15 143/16 166/2 166/17 166/20
embarrassing [1] 98/25
emergency [4] 133/18 133/21 134/1 134/12
empathy [1] 97/12
employed [12] 18/12 18/14 24/9 25/5 45/9 45/10 58/7 68/21 112/24 121/23 144/19 157/22
employee [47] 13/19 18/10 23/3 24/3 24/24 25/7 26/10 32/1 32/2 39/2 53/8 54/1 54/1 59/20 61/23 67/18 69/22 72/9 73/13 74/20 78/20 80/17 80/18 86/8 88/16 89/4 89/5 97/18 97/25 98/2 105/12 105/14 105/15 106/1 106/17 107/19 109/15 109/24 110/2 110/7 110/10 111/1 113/7 113/9 158/15 164/18 168/2
employee-related [2] 72/9 74/20
employees [47] 13/22 14/6 21/5 23/6 23/23 24/16 26/22 26/25 27/4 27/17 27/20 29/6 46/7 46/13 46/15 46/24 53/6 53/25 54/25 55/3 59/19 76/10 78/8 78/12 81/8 96/8 97/25 99/14 99/20 99/23 100/10 100/24 106/19 106/22 109/25 110/4 110/15 110/20 110/24 112/2 113/8 113/10 123/22 150/25 151/11 159/9 165/3
employer [2] 71/6 88/17
employment [15] 12/3 45/9 45/14 95/13 96/5 96/10 101/4 113/12 114/15 114/16 114/19 130/5 132/22 156/9 162/5
encounter [2] 149/20 150/25
encountered [1] 148/25
encouraged [2] 38/14 110/16
encouraged him [1] 110/16
end [4] 54/7 79/23 91/3 103/14
enforce [1] 78/5
engage [3] 78/12 119/12 160/17
engaged [10] 26/20 32/22 69/7 72/18 72/20 112/25 113/1 113/22 144/24 160/2
engagements [1] 54/1
engages [1] 54/1
engaging [2] 111/8 154/4
engineering [1] 114/12
English [1] 98/1
enhanced [1] 49/16
enjoy [2] 50/24 53/12
enjoyed [2] 26/19 52/16
enough [1] 83/9
enroll [2] 152/19 155/11
enrolled [1] 156/3
enrolling [1] 152/23
ensure [2] 15/2 168/23
entire [4] 56/7 57/12 77/20 80/17
entity [2] 7/20 114/6
envelope [1] 96/14
environment [8] 70/24 71/7 81/1 104/19 106/15 110/19 113/13 153/16
Environmental [1] 159/1
episode [2] 134/25 138/13
Equal [1] 12/3
equally [1] 92/6
equated [1] 103/11

equities [1] 162/8
equivalent [1] 65/20
ERRATA [2] 172/1 173/9
escitalopram [1] 136/15
ESQUIRE [3] 2/3 2/7 2/7
establish [4] 17/19 86/17 113/14 160/1
established [7] 18/15 18/17 40/2 40/5 64/25 74/8 74/11
establishment [2] 58/14 86/5
estimate [4] 15/12 66/16 116/2 147/2
ethnic [1] 31/16
evaluation [2] 62/13 62/15
evaluations [5] 62/12 62/19 62/21 63/13 63/19
even [20] 6/12 17/21 28/5 30/8 40/5 50/24 54/2 60/16 96/15 97/2 97/15 98/8 98/25 106/1 114/25 116/5 116/12 149/17 157/10 162/4
event [3] 59/12 63/3 70/6
events [3] 108/14 136/24 146/13
eventually [1] 88/2
ever [58] 11/16 14/7 14/11 14/18 14/21 19/25 32/7 35/16 40/6 52/18 54/11 56/4 56/8 56/23 56/24 57/8 57/9 58/3 59/6 61/15 62/2 65/1 68/10 68/19 71/21 74/3 75/18 76/10 76/12 76/19 77/11 77/14 83/16 88/24 89/14 89/23 92/17 99/3 109/11 109/15 115/23 118/14 119/12 119/15 121/24 122/15 128/25 138/19 139/2 139/13 149/11 149/13 154/5 164/1 164/12 164/15 165/25 167/4
every [21] 46/18 61/2 78/20 78/20 90/13 97/18 97/19 97/21 103/19 134/19 136/16 136/21 136/23 137/14 137/24 145/25 153/18 163/2 168/1 169/23 170/2
everybody's [2] 168/13 168/25
everyone [6] 24/21 45/10 78/20 158/23 158/24 169/24
everything [12] 16/14 16/22 29/3 34/21 54/12 63/12 64/5 98/12 114/25 120/14 121/4 151/17
everywhere [1] 16/4
evidence [4] 101/2 101/23 102/9 131/24
exact [2] 108/20 128/10
exactly [2] 82/15 91/18
examination [1] 59/3
examined [1] 5/23
example [2] 59/20 109/22
except [4] 4/7 16/3 16/6 173/7
exception [1] 82/3
exceptions [1] 50/16
excess [1] 53/11
excessive [2] 154/18 158/9
exchanged [1] 63/8
excuse [3] 47/2 52/4 106/8
Executive [5] 57/4 103/16 103/20 103/22 104/7
exercise [2] 9/14 137/23
Exhibit [1] 93/15
EXHIBITS [1] 3/8
exist [1] 17/15
exorbitantly [1] 133/6
expand [1] 170/5
expansion [1] 128/22
expected [1] 126/12
expecting [2] 142/11 162/1
expense [3] 61/24 126/4 155/3
expenses [5] 59/13 59/17 125/25 154/16 156/5
experience [7] 43/8 43/12 44/7 44/8 132/20 146/18 162/19
experiencing [1] 110/21
expert [1] 14/21
Expires [1] 173/18
explain [4] 52/18 70/15 127/20 160/5
explanation [4] 5/19 49/13 124/21 131/20
express [3] 13/23 13/25 159/22

**E**

expressed [2] 13/25 160/7
extent [2] 10/25 25/22
extraordinary [3] 58/15 58/18 58/21
extremely [1] 26/16

**F**

F-E-H-E-R [1] 42/7
F-U-C-H-S [1] 142/23
Facebook [9] 36/25 38/6 86/13 86/20 87/4 92/22
 94/5 130/16 144/12
Facebook account [1] 36/25
fact [20] 5/8 7/19 20/24 31/12 38/20 65/17 70/4
 70/21 71/10 71/20 73/10 76/14 108/2 109/3
 156/17 158/1 160/25 161/7 161/21 164/2
factor [3] 100/22 100/25 101/3
factored [1] 101/25
fair [1] 66/24
fall [1] 69/10
falling [1] 136/19
fallout [1] 11/5
familiar [6] 17/13 73/7 73/13 114/6 114/11
 142/25
family [13] 25/17 25/24 51/3 108/22 133/17
 136/2 141/18 144/22 145/7 145/8 152/20 152/20
 155/11
family's [1] 23/19
far [9] 7/16 11/10 34/9 71/20 90/21 90/22 96/8
 98/10 99/15
Fascinating [1] 23/20
fat [1] 64/8
father [3] 97/6 145/8 149/16
father-in-law [1] 149/16
favor [1] 30/11
fear [2] 47/11 68/24
federal [3] 12/2 70/22 73/8
fee [1] 69/8
feed [4] 18/22 18/24 86/25 108/15
feedback [3] 26/6 57/5 122/8
feel [4] 29/8 38/21 47/14 70/7
feet [1] 95/15
Feher [8] 42/5 42/23 99/20 100/1 100/14 160/23
 161/4 161/6
fellow [3] 6/25 110/15 123/5
felt [7] 47/16 48/3 68/15 90/18 105/1 159/22
 167/8
female [5] 42/25 70/16 83/2 110/7 110/9
females [1] 104/9
fetal [1] 151/5
few [5] 17/24 23/23 25/11 89/20 135/9
field [1] 66/7
fifties [3] 84/11 84/11 85/23
file [4] 62/2 63/11 64/8 152/3
filed [3] 33/11 34/15 35/18
files [4] 64/6 139/20 139/22 152/1
filing [2] 4/6 68/1
fill [1] 51/17
filled [3] 23/7 133/20 134/10
filling [1] 135/13
filter [1] 76/9
Finance [2] 40/3 103/6
finances [1] 164/25
financial [4] 10/10 75/4 163/2 164/21
financially [1] 49/16
financials [2] 74/25 103/6
find [12] 10/2 36/15 70/8 107/25 113/9 114/25
 115/9 116/1 130/14 155/14 166/14 173/5
finding [3] 90/2 139/23 139/23
findings [1] 130/19
fine [7] 10/8 11/13 16/8 23/8 30/15 106/9
 112/13

finish [3] 48/11 68/4 93/5
fire [2] 24/17 91/17
fired [9] 24/17 28/2 56/22 56/23 81/19 91/16
 92/19 118/12 166/24
fires [1] 96/19
firm [2] 154/25
first [24] 18/1 21/23 24/7 34/14 39/19 53/4 55/3
 55/15 60/18 60/19 68/7 69/22 86/17 87/9 89/17
 102/7 113/22 114/15 122/13 135/17 143/11
 146/19 163/8 168/14
FISH [1] 53/23
fit [2] 106/3 163/4
five [6] 80/21 103/15 128/11 134/2 158/7 165/13
fix [2] 100/8 100/8
flabbergasted [1] 30/23
flaunt [1] 105/16
FLIK [2] 67/18 159/8
floor [1] 151/4
floored [1] 29/20
Florida [1] 51/3
fold [1] 55/10
folder [1] 95/4
follow [3] 17/25 59/8 116/15
followed [4] 18/25 19/6 134/22 158/1
Follower [2] 19/17 19/22
followers [4] 17/24 17/25 19/1 19/5
following [10] 19/14 20/4 55/15 59/23 101/23
 135/6 141/25 142/8 144/23 147/6
follows [2] 5/23 19/11
food [2] 108/11 108/18
foregoing [3] 171/8 171/19 173/4
foreign [1] 125/3
forget [1] 121/13
form [6] 4/7 16/6 121/4 138/15 169/3 173/8
formal [2] 124/20 137/9
formally [2] 69/4 72/20
format [2] 62/14 170/8
formed [1] 35/10
former [2] 42/23 47/2
forms [1] 90/9
formulated [1] 21/17
formulating [1] 35/17
forth [1] 51/25
forthcoming [1] 64/3
forties [2] 43/4 102/8
Forty [1] 129/15
forum [1] 37/6
forums [1] 61/12
forward [1] 67/17 91/11 91/12
found [6] 30/11 32/9 79/2 105/11 105/21 167/5
foundation [1] 16/7
four [11] 21/7 52/9 80/21 102/22 128/11 133/6
 136/14 138/7 165/15 165/16 168/15
frame [1] 47/23
fraud [5] 73/20 73/20 73/21 74/18 74/21
fraudulent [2] 73/24 74/23
free [1] 71/7
freezer [2] 141/14 141/15
frequent [1] 75/23
frequently [1] 79/19
Friday [3] 59/23 60/1 142/6
friend [2] 27/25 42/23
friends [1] 108/22
front [5] 78/16 79/1 79/18 152/5 163/6
frowned [1] 72/4
frustrations [1] 87/25
Fuchs [1] 142/23
Fuchs-Morton [1] 142/23
full [12] 46/16 67/7 92/9 94/9 96/2 96/3 96/4
 96/24 117/15 129/14 152/20

full-blown [1] 67/7
fully [3] 51/2 87/25 171/7
fully-paid [1] 51/2
fun [1] 25/25
fund [8] 86/6 86/11 86/18 86/22 87/8 132/17
 161/9 161/14
funded [1] 53/4
funding [1] 53/4
funds [1] 153/18
further [2] 7/22 104/13

**G**

gag [1] 9/20 9/22
Gallagher [4] 60/25 84/9 84/22 85/22
gambling [3] 76/4 76/9 99/25
garbage [1] 6/24
GARVIN [80] 1/9 2/13 4/23 7/7 17/23 26/18 28/9
 39/12 40/24 41/1 41/10 41/22 41/25 44/3 46/19
 46/22 48/5 48/14 48/22 49/13 50/5 50/8 50/23
 52/12 52/18 54/2 55/22 56/9 56/17 57/2 57/9
 57/11 62/14 62/15 63/4 63/23 64/13 67/24 68/7
 68/12 68/16 68/24 70/9 70/15 70/19 71/15
 71/18 71/22 75/17 75/21 76/21 77/6 77/6 77/20
 81/4 83/13 83/19 84/5 84/21 90/12 104/5
 104/18 112/7 118/6 143/22 143/25 152/4 152/9
 154/4 156/14 158/16 159/14 159/22 160/17
 161/1 163/6 167/8 167/18 167/23 168/2
Garvin's [9] 27/19 45/2 50/1 80/22 82/2 99/16
 156/1 164/25 165/5
gas [1] 106/1
gave [3] 88/16 99/23 161/18
geared [1] 106/15
gender [9] 47/15 48/16 49/6 50/12 71/11 79/11
 158/18 162/13 162/17
gender-based [1] 162/17
general [4] 27/3 36/12 101/13 102/4
Generalist [1] 116/11
generally [2] 50/5 50/7
gentleman [3] 163/15 163/20 164/13
gentleman's [1] 111/22
gentlemen [2] 111/14 111/22
George [3] 145/11 145/15 145/16
get [50] 13/13 15/16 43/11 51/2 51/24 52/4
 52/13 53/18 55/16 55/22 56/23 58/2 59/3 59/24
 60/5 60/7 61/20 64/13 80/12 81/13 81/20 86/18
 86/23 87/2 87/5 87/10 90/23 91/4 91/16 105/20
 106/2 108/18 115/14 122/20 122/22 129/16
 129/17 129/18 132/17 136/24 139/20 139/25
 146/21 151/7 151/25 152/2 159/20 159/24
 164/21 165/1
get-togethers [1] 58/2
gets [1] 161/13
getting [7] 41/15 42/13 52/7 81/8 101/7 130/8
 131/19
giant [1] 11/22
gift [2] 105/18 107/8
give [19] 8/21 8/24 14/23 15/6 48/24 55/24 57/4
 62/16 107/2 107/2 109/22 110/22 112/9 116/2
 116/6 141/8 154/21 165/20 165/21
given [14] 17/7 48/21 53/18 67/14 71/20 82/20
 96/10 98/2 100/11 100/13 147/2 159/3 173/4
 173/6
gives [1] 101/13
giving [4] 9/1 48/22 98/17 158/1
GlaxoSmithKline [1] 116/23
go [82] 9/14 10/6 10/6 14/16 19/23 33/25 34/11
 41/4 55/9 56/12 56/18 56/18 57/9 57/10 57/11
 57/15 57/21 57/25 58/11 58/13 59/5 67/6 67/24
 68/13 68/24 69/25 70/1 71/21 75/16 75/16 76/1
 76/3 77/7 78/4 81/7 81/10 82/22 82/24 86/5
 86/11 86/11 86/18 86/22 87/8 91/2 91/3 98/3

## G

go... [35] 98/3 98/3 100/9 103/16 104/12 105/18
108/9 112/24 115/14 116/24 122/18 128/6
133/10 133/16 133/19 133/23 134/6 134/23
135/5 135/9 137/9 137/24 137/24 139/14 139/20
139/20 140/15 141/20 146/20 150/21 151/7
152/3 157/8 160/20 161/13
goal [1] 79/21
goes [3] 128/7 128/12 150/11
going [53] 6/16 6/17 6/18 6/20 6/21 7/4 7/5 8/7
8/9 8/20 8/21 9/8 9/16 9/20 10/24 21/7 29/19
31/14 33/2 43/7 43/11 46/20 55/1 56/13 56/22
65/7 71/23 72/11 74/9 74/22 82/8 91/10 91/16
91/17 91/23 96/7 98/11 98/23 122/2 122/2
122/10 129/22 129/24 133/8 133/15 133/21
134/16 141/7 142/5 142/15 146/24 147/10
155/12
gone [5] 29/23 71/20 98/21 139/13 150/2
good [6] 62/25 84/4 107/24 163/16 167/16
170/11
goodness [1] 66/15
Google [4] 89/25 89/25 130/15 130/17
Googled [2] 89/14 89/22
gosh [1] 115/1
got [18] 39/19 44/25 53/23 60/18 70/19 90/21
92/3 92/13 92/13 92/18 105/18 117/10 120/12
122/12 123/6 140/25 161/11 162/2
gotten [2] 70/20 105/1
governance [1] 157/12
grab [1] 60/15
GRACE [2] 2/7 4/16
grapevine [1] 156/16
Gray [2] 1/14 2/6
greater [2] 98/10 101/15
greets [1] 113/10
Grill [3] 23/4 78/12 78/23
gross [4] 124/16 127/19 153/18 153/25
grounds [1] 35/13
group [6] 31/5 55/17 58/1 71/10 110/13 120/3
groups [6] 31/12 31/16 31/17 119/22 119/23
120/1
Grove [1] 129/4
Guenveur [5] 42/2 42/11 82/23 83/7 122/12
guess [8] 27/6 85/23 85/24 95/5 129/24 153/11
154/23 162/2
guests [2] 142/11 142/16
guy's [1] 164/9
Gwynedd [2] 119/3 119/7
Gwynedd-Mercy [2] 119/3 119/7
gym [1] 137/24

## H

H-A-M-I-D [1] 79/16
H-E-N-D-R-I-C-K-S-O-N [1] 162/23
had [180]
had a [1] 134/24
hadn't [2] 105/1 169/6
half [5] 7/6 128/5 136/17 136/22 144/15
halfway [1] 140/18
hallway [8] 25/8 78/11 78/13 78/22 78/23
140/19 150/8 150/23
Hamid [6] 79/14 79/20 79/22 80/13 80/19 85/25
hand [3] 19/9 60/15 95/4
handbook [7] 39/2 57/17 88/16 88/17 88/18
88/19 88/23
handed [1] 96/14
handle [5] 17/12 17/19 17/21 18/3 21/6
handled [4] 21/2 21/8 25/19 154/13
hands [1] 72/21
handwriting [1] 125/21
handwritten [1] 121/2

happen [6] 43/2 63/16 75/18 100/9 110/23
122/1
happened [12] 35/24 44/25 75/20 91/18 98/12
105/20 107/14 111/25 128/16 140/8 140/24
142/1
happening [3] 79/23 94/23 112/2
happens [1] 158/22
happy [3] 76/1 76/3 91/8
harassed [7] 20/25 110/2 110/3 110/9 162/22
164/13 164/16
harasser [1] 12/15
harassing [1] 167/9
harassment [13] 20/16 38/12 38/22 66/11 66/18
67/3 72/9 87/11 87/16 88/10 97/24 109/20
169/21
hardship [2] 108/10 108/15
harm [1] 98/2
harness [2] 134/23 134/24
has [22] 4/19 10/21 11/9 30/16 37/4 37/19 63/8
71/6 73/14 76/9 85/13 91/25 98/7 101/9 106/5
127/24 130/20 139/22 146/8 147/2 162/18
162/20
hate [3] 5/4 5/12 6/24
have [263]
haven't [5] 23/11 123/22 124/13 139/1 146/18
having [19] 5/22 28/21 33/5 36/24 55/1 55/11
61/3 67/22 68/23 68/25 81/20 95/15 108/9
131/21 135/14 136/8 136/19 140/1 154/16
he [300]
he'll [2] 38/2 38/4
he's [17] 4/20 4/21 4/22 6/6 6/8 6/21 7/4 7/19
24/9 71/22 71/23 91/8 91/17 105/24 105/24
144/1 152/22
he's a [1] 105/24
head [4] 31/10 78/13 96/8 107/21
headed [1] 22/23
headhunter [1] 115/23
health [18] 122/11 127/7 127/10 132/16 152/6
152/11 152/12 152/15 152/19 152/20 152/25
153/1 153/8 153/14 154/13 155/2 155/9 156/4
healthcare [6] 25/6 42/3 42/8 46/1 129/2 140/16
hear [3] 107/16 120/11 131/13
heard [7] 95/14 106/12 107/15 119/20 131/4
156/16 156/19
hearing [11] 20/10 27/8 29/10 29/16 29/17 30/23
31/10 32/23 32/25 133/2 133/10
hearings [2] 32/13 32/19
heart [1] 135/2
heavy [1] 75/23
heck [1] 105/24
Heffron [1] 105/6
HEIGHTS [20] 1/8 10/18 17/23 49/17 53/14 53/20
53/20 53/25 54/14 55/6 69/15 75/24 88/15
89/13 90/5 106/19 122/4 154/18 168/2 169/18
Heights' [1] 88/19
Heil [10] 50/17 52/14 81/23 147/14 148/21
153/24 156/19 169/10 169/10 169/11
held [9] 10/14 45/22 57/12 61/9 61/14 90/14
93/2 125/9 143/5
hell's [1] 149/9
hello [1] 78/14
help [1] 119/12
helped [1] 113/14
Hendrickson [9] 162/23 163/1 164/4 164/6
164/15 164/18 165/1 167/4 167/5
Hendrickson's [1] 162/24
her [105] 10/6 12/12 12/21 24/25 25/1 25/4 25/9
25/10 25/21 26/3 26/4 26/5 28/1 28/2 28/6 42/1
42/24 43/2 43/4 44/15 44/15 44/21 69/20 72/15
72/25 82/19 82/22 82/24 82/24 83/17 83/25
84/4 84/25 85/15 87/21 87/21 87/22 87/24 88/3

88/8 88/9 97/24 97/24 97/25 99/20 100/4 100/4
100/6 101/9 101/22 101/7 102/7 102/8 102/11
105/9 107/23 107/25 108/2 108/20 108/23 111/1
122/13 138/23 141/4 144/6 144/12 144/17
145/25 147/1 147/20 148/6 149/6 149/11 149/13
149/14 158/1 158/1 158/2 158/2 158/4 158/8
158/17 158/17 158/25 159/18 159/23 159/24
161/1 161/5 161/9 161/12 161/14 161/15 161/17
161/19 161/20 161/22 161/23 162/4 162/20
162/21 166/10 166/13 167/18 169/14
here [4] 4/16 4/18 4/20 4/21 6/19 8/19 9/10
10/23 17/6 29/14 30/25 35/3 95/5 95/6 95/9
hereby [1] 171/5
hereditary [2] 138/8 138/10
hereto [2] 125/13 132/5
high [4] 75/8 133/6 135/3 136/4
higher [5] 50/15 101/14 101/17 101/18 162/15
highly [1] 8/15
Hillary [2] 23/14 143/19
him [77] 6/1 6/3 7/6 17/25 23/11 23/25 24/12
33/5 36/5 42/15 47/18 48/6 48/14 50/21 51/23
52/13 54/3 54/11 56/2 57/3 62/23 68/8 68/9
70/19 78/21 79/18 80/12 84/16 85/2 86/1 89/10
90/13 90/14 90/17 90/24 91/4 91/10 91/21
91/22 91/24 91/25 92/15 96/19 96/21 96/22
98/22 104/5 106/17 107/2 107/3 107/4 107/8
110/16 110/19 110/22 110/22 122/6 122/13
124/19 131/4 131/14 136/5 145/17 149/23
150/15 152/11 155/12 159/23 159/24 160/7
163/2 163/10 164/22 165/9 165/21 167/13 168/6
himself [4] 84/21 89/7 89/12 145/12
hire [5] 43/17 53/16 101/18 115/23 152/9
hired [20] 39/20 42/22 43/23 51/12 51/13 51/18
55/4 55/5 57/2 65/6 80/21 80/22 92/4 100/25
108/23 117/9 122/13 162/9 162/14 162/16
hiring [4] 44/16 45/2 51/14 53/15
his [119] 4/10 6/2 6/25 7/1 17/25 22/9 23/7
23/23 27/10 30/1 30/1 30/3 30/19 31/6 31/24
36/5 37/19 37/23 37/25 37/25 40/11 42/12 45/3
50/21 50/22 50/24 51/9 51/14 51/19 51/24
51/24 52/13 57/5 57/6 68/14 70/17 75/25 76/3
76/4 76/5 76/5 76/6 76/7 76/8 76/8 76/9
76/23 77/18 77/19 77/23 77/24 78/10 78/10
78/13 78/13 78/21 78/24 79/4 79/14 79/17
79/21 80/2 80/13 80/13 80/24 82/12 82/14
84/11 84/18 84/19 84/24 85/22 86/4 89/6 89/8
89/8 89/13 91/7 91/23 92/1 92/13 95/4 96/17
98/1 99/23 103/6 105/19 105/20 107/21 110/15
113/8 122/10 128/16 131/5 145/13 152/7 152/9
152/19 153/12 154/16 154/23 155/9 155/11
162/14 164/3 164/10 164/11 164/21 164/22
165/10 167/5 167/11 167/15 167/18 167/24
167/25 168/7 169/11
Hispanic [2] 31/18 31/24
historically [1] 133/1
Hmm [1] 138/7
home [22] 3/19 40/3 42/14 43/15 43/17 43/24
91/15 123/16 123/18 125/11 126/23 127/2 127/2
127/4 127/7 127/10 129/2 142/11 142/15 142/18
142/19 151/2
home-care [1] 123/18
homes [1] 127/1
honest [1] 26/5
honestly [13] 18/19 19/6 27/11 27/24 28/4 28/5
30/4 30/4 31/9 47/9 74/12 88/7 97/4
hopeful [1] 117/14
hopefully [1] 135/8
hospital [4] 130/25 133/7 133/15 133/16
hospitals [1] 127/1
hostile [7] 70/23 71/12 79/11 81/1 104/19
106/15 153/16

**H**

hotline [9]  73/14 73/17 73/19 73/24 74/4 74/7 74/10 74/20 74/23
hour [10]  7/6 17/5 76/2 76/3 118/3 133/12 146/4 151/8 151/8 165/18
hourly [9]  46/7 46/15 46/24 78/6 89/4 89/5 105/14 105/25 118/2
hours [16]  24/23 114/22 116/2 116/4 117/19 117/22 117/23 129/15 133/23 134/6 134/24 139/15 139/18 140/3 142/9 169/4
house [2]  154/25 157/8
housekeepers [1]  81/14
Housekeeping [7]  24/19 54/6 54/7 55/5 101/12 107/21 159/1
how [100]  11/18 17/4 21/5 22/24 24/5 24/7 27/3 30/2 32/13 33/24 36/20 39/9 40/20 44/13 45/2 45/7 46/10 47/5 48/13 48/24 49/14 49/24 52/7 52/14 54/23 60/9 60/13 66/3 66/13 66/16 69/10 73/22 74/24 75/3 78/1 78/8 80/1 80/8 80/9 83/4 84/10 88/4 89/16 100/18 102/12 102/21 104/16 105/9 105/23 106/3 106/3 106/17 108/5 108/8 111/24 112/5 113/16 114/22 115/2 117/17 117/19 118/20 120/12 122/18 123/21 123/22 124/9 124/22 130/5 133/10 134/18 134/20 135/23 136/13 136/18 137/13 137/19 137/19 138/5 138/11 138/11 140/1 144/14 145/22 146/3 148/15 148/15 151/3 153/15 154/10 154/13 156/5 156/20 156/22 158/6 163/11 163/12 165/11 165/17 168/10
however [4]  4/9 4/21 13/3
HR [28]  21/20 21/24 22/2 25/11 26/17 39/6 39/10 57/5 65/23 66/7 67/5 67/14 94/13 94/15 95/20 95/21 98/9 102/17 102/19 104/4 109/18 113/23 113/25 118/6 139/21 150/25 153/5 158/12
HR-related [1]  65/23
hug [2]  165/20 165/21
huh [7]  19/8 83/1 84/7 110/18 115/8 132/12 160/11
human [29]  11/23 20/19 32/7 38/9 38/17 39/1 57/22 58/6 58/9 58/16 58/18 58/20 65/24 66/1 66/3 66/9 71/12 79/3 92/9 95/12 96/5 97/11 113/18 116/10 116/11 116/12 119/19 130/24 168/12
human-resources [1]  66/1
humiliate [1]  96/24
humiliating [2]  95/17 132/19
husband [26]  4/17 4/19 17/7 21/14 21/23 22/7 23/1 23/21 27/9 28/21 29/25 31/3 32/25 33/17 34/3 36/1 36/2 36/15 37/12 91/15 97/8 122/24 123/12 135/18 144/21 145/11
husband's [4]  30/19 33/18 129/24 144/23
hygiene [3]  163/16 163/24 164/3
hyphen [1]  142/24
hysterical [2]  27/23 27/23

**I**

I'd [5]  11/7 57/13 85/14 144/12 168/21
I'll [9]  112/12 121/12 123/23 124/4 124/7 127/21 129/9 131/2 137/3
I'm [67]  5/5 5/17 6/8 6/9 6/16 6/17 6/18 9/1 9/7 9/8 9/10 9/12 9/19 13/13 14/25 19/6 19/7 19/13 19/21 21/7 23/11 23/16 23/17 30/15 30/17 33/13 37/18 42/1 42/6 48/12 48/19 58/5 63/2 63/12 64/21 71/2 74/9 80/16 82/13 87/2 87/8 88/23 91/16 95/6 103/9 106/8 106/16 121/12 122/2 122/10 125/1 125/3 126/25 129/23 136/14 142/5 146/22 148/1 148/4 148/5 156/7 160/16 164/6 167/1 167/20 169/13 169/14
I've [18]  5/11 8/23 8/23 11/10 27/2 29/17 32/16 71/22 85/14 86/9 87/8 132/25 136/16 136/22

139/2 139/5 154/22 163/10
ice [1]  60/16
ID [1]  168/15
idea [16]  18/13 27/24 28/1 29/18 29/19 51/5 59/25 66/15 89/19 95/6 102/11 144/12 155/5 157/1 157/18 161/11
ideas [2]  55/19 58/2
identification [2]  125/12 132/4
identified [3]  21/19 28/19 89/12
illegal [4]  154/4 154/6 154/7 154/8
immediate [2]  98/8 104/25
immediately [5]  55/15 55/20 58/25 108/23 141/2
impact [1]  54/21
impacted [1]  54/21
implementation [1]  38/10
important [4]  33/8 33/19 33/22 126/17
impounded [2]  94/2 94/3
impression [2]  64/2 82/7
improper [2]  4/12 157/14
improperly [1]  162/12
improve [1]  113/12
improved [1]  114/4
improvement [2]  83/17 141/6
in-laws [1]  132/17
inability [1]  132/17
inappropriate [3]  26/24 27/1 78/5
incessant [1]  76/4
incident [9]  59/7 60/11 60/17 60/20 60/24 61/19 96/16 138/25 139/7
incidents [2]  59/10 61/16
include [2]  62/15 127/8
included [4]  90/13 91/13 93/14 146/5
including [2]  7/1 60/2
income [1]  112/22
incompetent [1]  75/4
increase [4]  18/1 103/12 152/25 153/19
increases [1]  49/24
incredibly [2]  105/11 146/22
Indeed [1]  116/20
indeed.com [4]  115/2 115/5 115/13 115/21
independent [6]  36/19 45/17 101/2 112/25 113/1 149/5
INDEX [1]  3/13
indicating [3]  64/9 64/10 95/9
individual [25]  18/5 18/7 20/23 30/16 37/21 38/20 41/24 59/6 61/3 70/3 71/10 74/24 75/3 75/7 87/12 102/5 107/10 107/12 145/10 145/13 145/14 145/17 145/18 155/22 166/8
individual's [1]  52/20
individually [3]  21/8 38/25 144/25
individuals [16]  49/8 67/2 70/7 71/10 82/1 82/1 82/3 89/16 104/16 104/17 105/4 111/21 126/23 162/11 168/24 169/17
infections [1]  139/3
influence [1]  76/20
informal [3]  22/6 22/9 22/16
information [38]  8/8 8/20 10/22 16/19 22/15 24/1 26/10 33/8 33/10 33/12 33/19 34/9 35/9 35/17 35/22 36/3 36/6 45/1 45/6 57/18 64/11 74/15 86/1 94/4 94/11 102/5 103/18 103/19 113/11 121/8 125/18 131/14 131/17 131/18 156/1 161/11 161/19 168/13
infraction [2]  77/15 77/17
infractions [1]  77/12
initial [2]  21/12 89/17
initially [6]  51/18 53/15 110/14 110/17 111/13 136/21
initiating [1]  53/19
injured [2]  55/1 55/9
injuries [5]  54/20 54/24 54/25 58/23 59/10

injury [7]  54/24 59/7 59/16 59/25 60/4 61/3 103/25
inside [1]  131/10
Instagram [9]  37/7 37/12 37/16 37/19 37/19 37/21 38/5 38/6 130/16
instance [10]  14/7 20/23 50/17 61/2 75/8 101/14 105/17 108/6 116/14 116/22
instances [8]  50/2 59/6 67/1 67/9 67/10 67/12 101/6 103/21
instead [1]  92/12
institute [2]  55/13 122/12
instituted [4]  47/15 53/5 55/8 55/20
institution [2]  8/15 9/22
institutions [1]  9/6
instruct [2]  35/12 81/11
instructed [3]  53/22 100/5 139/19
instructing [1]  72/25
instruction [2]  3/14 137/9
instructions [1]  14/23
insulted [1]  108/24
insulting [2]  79/4 105/12
insurance [20]  55/17 129/18 129/24 130/3 130/5 152/6 152/11 152/12 152/15 152/19 152/20 152/23 152/25 153/1 153/8 153/14 154/13 155/2 155/9 156/4
intake [1]  141/2
intention [2]  30/3 30/20
interact [2]  78/8 119/22
interacted [3]  78/14 102/18 120/2
interaction [3]  57/5 78/10 102/12
interactions [2]  62/22 99/23
interest [1]  157/9
interested [3]  113/25 130/23 130/25
interesting [2]  23/2 23/15
interfere [1]  91/11
interim [1]  41/19
interject [1]  15/24
internal [1]  66/10
interrogatories [8]  3/10 16/20 130/7 132/3 135/14 152/5 157/19 166/8
Interrogatory [1]  162/6
intervene [6]  67/13 67/17 67/21 69/22 69/23 69/23
interview [3]  113/8 130/21 131/3
interviews [3]  44/18 122/17 122/18
intimidate [1]  5/2
introduced [1]  29/19
invest [1]  164/21
investigating [1]  104/13
investigation [5]  66/21 67/7 67/12 96/20 112/1
investigations [3]  66/11 66/19 66/20
invited [2]  54/3 102/16
involuntary [1]  111/12
involved [18]  4/23 13/1 44/15 44/18 45/3 46/3 46/11 51/14 51/21 83/16 83/21 103/25 112/3 119/9 120/5 135/21 155/6 161/17
involvement [8]  28/21 33/18 34/4 44/20 46/19 56/16 88/13 152/7
involving [1]  155/2
iota [1]  97/11
IRS [1]  125/24
is [232]
isn't [2]  98/8 160/22
issue [12]  13/18 41/5 48/6 68/21 68/23 70/1 87/7 101/11 102/2 102/4 122/3 152/4
issues [12]  83/14 84/24 84/25 103/2 103/3 103/4 104/23 145/15 145/19 145/21 158/10 161/7
Isthuhamil [1]  79/14
it [363]
it's [87]  5/1 18/23 26/11 30/8 30/9 30/9 30/10 30/10 33/22 33/22 35/13 35/23 37/3 38/5 40/11

## I

it's... [72] 40/12 45/19 47/9 54/25 55/1 56/21 58/9 58/18 59/4 59/15 59/23 69/24 70/20 71/19 72/13 72/23 73/17 73/20 78/2 82/11 85/24 87/6 87/9 89/21 90/25 90/25 91/1 98/1 98/24 100/8 105/24 107/17 109/4 115/21 120/15 121/10 122/12 123/18 124/3 124/5 124/7 124/14 124/15 124/19 124/20 124/21 128/3 128/8 128/10 128/11 129/24 130/18 131/6 131/20 131/20 134/17 135/3 135/7 136/25 137/1 140/22 140/22 141/6 145/25 146/24 153/17 153/20 157/10 158/13 159/19 168/18 169/19
items [3] 63/10 151/19 151/21
its [1] 10/2

## J

Jacquie [2] 140/13 140/18
jags [1] 144/18
JANE [1] 1/9
Janet [13] 27/21 28/7 48/4 48/8 73/17 74/16 75/25 105/5 144/5 144/10 147/6 148/13 169/14
Janet's [9] 147/13 147/14 147/16 147/19 147/22 148/3 148/8 148/11 150/1
January [1] 135/24
January 28 [1] 135/24
jeez [1] 74/9
Jen [1] 140/13
jerk [1] 20/11
Jersey [2] 120/15 120/16
Jewish [1] 143/19
Jim [1] 105/6
jmJungclaus [1] 19/10
JOANNE [1] 2/7
job [40] 43/11 51/9 68/18 72/5 76/20 77/24 84/4 91/5 91/23 92/1 95/16 95/17 95/19 97/6 97/16 97/17 101/16 116/1 116/3 117/10 117/17 118/13 118/15 119/7 119/10 119/13 119/16 119/24 120/23 120/25 121/3 122/16 131/22 132/17 158/3 158/3 158/10 158/14 158/15 168/25
JOHN [2] 1/9 128/14
join [1] 17/25
joint [2] 39/3 39/4
jointly [1] 38/25
jokes [1] 164/1
joking [1] 81/13
journal [1] 121/7
Jr [1] 93/17
JUNGCLAUS [20] 1/6 1/12 3/4 5/22 6/19 7/18 17/7 17/13 19/4 19/10 30/13 33/21 89/17 90/1 112/20 132/8 143/8 173/1 173/3 173/12
Jungclaus' [1] 9/25
Junkclaus [1] 11/12
just [98] 4/25 5/25 10/16 11/7 14/23 15/5 15/16 15/24 18/17 19/13 20/2 22/17 25/18 27/3 28/1 28/2 28/6 29/24 31/7 37/18 41/3 41/18 44/6 44/24 44/25 45/5 48/11 50/3 51/3 56/21 57/13 60/17 60/24 64/8 70/20 71/19 71/22 73/24 77/2 77/23 82/1 85/23 86/22 87/1 87/4 87/4 87/9 98/17 100/14 102/4 103/14 104/3 106/16 108/7 110/12 112/9 112/24 115/14 117/24 121/1 121/10 121/12 123/4 124/21 125/3 128/16 129/24 133/22 135/13 135/20 136/3 136/19 136/25 137/23 138/2 138/8 139/14 145/5 146/21 146/24 148/6 149/9 149/17 150/14 150/22 150/23 151/24 152/8 154/12 154/20 157/11 159/19 161/19 164/16 165/5 165/9 167/12

## K

KATHLEEN [10] 1/6 1/12 3/4 5/22 19/4 19/10 89/25 173/1 173/3 173/12
Kathy [7] 17/12 23/10 96/20 100/8 100/8 100/9 100/9 100/11 173/7 173/23
keep [11] 9/12 94/7 109/18 115/11 116/15 120/24 121/7 121/10 121/11 131/7 151/24
keeping [1] 106/17
keeps [1] 115/17
kept [5] 151/24 152/1 158/25 159/7 159/14
kill [1] 120/21
killed [1] 145/11
kind [12] 5/4 22/11 52/24 60/8 92/11 126/19 133/17 146/8 149/4 163/3 165/2 165/9
kindly [1] 8/4
kinds [5] 73/21 83/19 90/1 90/14 169/21
kitchen [6] 23/6 24/3 24/11 105/19 111/4 141/14
kitchen's [1] 23/18
KJ [5] 3/9 3/10 125/11 125/16 132/3
KJ-1 [3] 3/9 125/11 125/16
KJ-2 [2] 3/10 132/3
Klonopin [1] 138/3
KMJ [2] 114/6 114/11
kmjungclaus [1] 17/13
knee [1] 20/11
knee-jerk [1] 20/11
knew [9] 68/17 74/22 92/16 97/18 97/18 110/20 134/16 155/10 162/2
know [96] 5/9 7/12 7/13 14/14 15/10 15/11 15/17 17/21 23/24 23/25 24/9 24/10 25/16 26/11 28/5 29/22 31/2 33/9 34/20 36/15 36/20 42/18 43/2 44/14 46/9 48/20 51/8 52/7 52/12 52/14 54/14 62/21 63/7 65/22 72/22 77/14 77/17 77/20 80/8 80/11 82/11 83/15 86/3 86/24 87/6 90/19 91/6 91/15 95/5 102/7 102/7 103/13 105/7 105/24 108/13 108/21 112/23 115/1 116/4 118/25 122/25 123/22 123/25 128/5 129/16 129/18 129/20 131/2 131/5 134/21 137/2 140/22 141/15 142/1 143/11 144/10 148/6 148/6 149/4 151/8 151/9 153/8 155/12 155/17 156/3 156/7 156/10 156/20 160/4 163/12 163/12 164/7 165/3 166/12 167/22
knowing [4] 60/3 71/14 123/4 123/4
knowledge [13] 11/3 49/23 52/2 61/6 107/8 148/20 155/4 155/17 155/18 155/19 155/23 156/14 157/17
known [2] 79/19 163/10
knows [1] 105/13

## L

L-A-N-S [1] 126/9
labor [2] 21/10 69/15
ladylike [1] 83/9
laid [1] 83/4
lamb [1] 113/2
Langhorne [1] 126/8
language [3] 22/10 22/12 31/2
Lans [1] 126/9
Lansdale [2] 123/25 126/9
lapse [1] 41/6
large [4] 50/24 51/2 113/16 123/21
last [15] 14/14 23/23 24/5 42/6 59/23 60/1 79/24 89/17 115/6 126/21 136/22 166/13 166/16 168/14 168/14
late [2] 84/11 85/23
later [8] 42/4 52/10 118/14 133/23 134/6 151/18 152/17 153/9
laughed [1] 167/12
laundry [1] 55/9
Laurel [1] 92/22
law [4] 1/14 69/17 72/7 149/16
laws [2] 70/22 98/22
lawsuit [7] 4/23 11/23 14/11 90/4 121/9 121/15 160/20
lawsuits [1] 12/2
lawyer [3] 71/1 72/16 72/18
lead [3] 66/21 66/23 66/23
leader [1] 105/25
leaders [3] 81/22 81/25 90/16
leadership [13] 10/20 39/5 39/7 39/16 41/5 57/6 78/17 84/6 90/15 109/9 113/14 139/19 169/1
learn [1] 53/22
learned [3] 8/23 53/22 55/15
learning [2] 125/4 168/1
least [10] 53/16 66/24 66/25 76/22 95/20 124/14 126/18 127/25 151/5 165/18
leave [8] 18/16 19/20 19/22 64/2 74/14 96/17 97/10 103/19
leaving [10] 24/12 40/17 76/1 76/3 80/10 82/15 85/25 86/2 88/8 151/11
lecturing [1] 106/7
left [15] 19/9 40/21 42/18 42/19 74/3 82/12 83/10 88/3 112/20 147/12 148/6 149/15 150/3 150/10 151/7
left-hand [1] 19/9
legal [6] 34/8 68/19 68/20 68/25 71/1 160/19
length [1] 91/13
less [2] 90/21 158/23
let [18] 8/3 14/23 15/16 23/25 46/9 48/11 68/4 72/6 82/22 95/19 96/1 96/2 100/16 106/10 142/21 147/25 155/12 161/13
let's [7] 9/12 23/25 98/4 141/13 141/13 143/3 151/4
letter [15] 7/13 28/18 28/20 28/23 29/3 87/18 87/23 96/14 99/13 120/9 121/19 161/15 161/17 161/19 161/21
letter-writer [1] 7/13
letters [2] 19/10 168/14
level [15] 59/4 67/21 69/24 75/8 77/7 92/4 111/18 134/1 141/2 159/8 159/15
Levin [1] 140/13
Levittown [1] 123/24
liability [1] 75/24
liable [1] 61/25
liaison [2] 149/5 152/8
license [1] 42/14
lieu [6] 152/6 152/11 152/15 152/18 152/24 153/1
life [4] 130/5 135/16 135/17 145/2
light [3] 55/6 59/4 64/8
like [44] 18/4 23/15 29/17 45/13 57/13 64/8 64/10 67/9 81/13 84/18 84/19 84/21 85/14 90/18 90/19 91/3 95/14 97/14 97/23 103/25 105/1 107/23 108/23 117/5 119/17 121/11 121/11 127/9 128/4 128/5 128/15 128/17 134/9 135/4 139/2 139/5 145/25 146/19 146/24 149/9 150/14 151/9 151/23 163/14
line [3] 3/15 91/3 172/2
lingering [1] 150/23
linked [3] 19/21 20/1 98/7
LinkedIn [4] 37/9 38/7 86/4 131/8
list [3] 118/21 118/23 121/11
listed [1] 38/20
listening [2] 22/23 31/11
lists [2] 93/23 151/24
litigation [2] 103/25 104/2
little [7] 17/5 47/17 100/6 144/16 153/13 154/18 155/1
live [3] 9/6 98/24 127/13
live-in [1] 127/13
lived [1] 98/22
Living [2] 89/6 149/5
LLC [1] 3/25
located [2] 120/14 147/17
location [1] 120/18
log [2] 116/16 120/22

**L**

login [4] 116/24 168/7 168/10 168/13
long [29] 6/21 8/23 17/4 36/20 40/20 43/16
44/13 47/9 82/8 82/20 111/24 117/17 133/10
135/23 138/5 138/11 140/1 144/14 146/3 146/25
148/15 148/15 148/19 151/3 159/24 162/8
163/10 163/11 165/17
long-term [1] 162/8
longer [6] 52/13 117/24 118/20 134/20 144/16
151/8
longterm [1] 80/18
look [11] 18/22 19/9 98/25 119/15 119/19
121/22 121/24 124/10 131/9 132/8 167/2
looked [4] 18/4 131/15 149/9 163/4
looking [7] 49/25 114/16 122/5 122/13 124/17
125/16 149/15
lorazepam [4] 136/7 136/9 136/13 136/14
lose [4] 53/6 72/4 91/23 95/19
losing [1] 68/18
loss [6] 55/10 59/17 98/16 132/15 132/15 132/15
lost [2] 59/13 154/22
lot [7] 7/5 66/15 113/11 114/24 120/24 140/22
147/4
lots [2] 7/7 113/10
loved [1] 97/16
low [2] 55/11 132/25
lower [1] 101/19
LTD [1] 1/8
lunch [1] 4/15
lying [1] 107/10

**M**

M-I-N-I-X [1] 79/24
M-O-R-T-O-N [1] 142/24
M-S-C-I-Z-C [1] 140/22
machine [1] 140/25
made [30] 6/6 13/20 22/16 26/7 39/21 47/10
52/14 52/18 52/19 63/19 65/11 71/15 74/1
76/13 79/19 81/21 81/23 95/12 104/9 104/17
109/16 111/16 114/4 140/25 141/24 142/8 163/6
164/2 165/6 165/7
Maguire [17] 39/25 40/8 40/17 40/20 40/23 47/1
47/8 47/11 48/21 50/20 51/25 55/24 56/9
56/15 57/11 163/13
Maguire's [1] 41/15
maintain [3] 62/2 71/6 117/3
majority [2] 106/19 120/4
make [33] 13/21 25/19 26/9 26/13 38/21 40/6
47/1 56/2 56/8 67/6 80/6 81/6 81/8 81/13 81/19
96/25 97/20 100/6 100/8 100/9 110/23 113/24
119/6 122/15 125/5 126/12 127/1 133/25 137/24
143/21 150/10 153/12 163/3
makes [2] 25/25 52/16
making [11] 14/5 34/25 63/23 63/24 67/23 90/16
102/1 102/3 125/23 143/12 163/8
male [3] 49/8 76/10 110/5
males [3] 50/14 50/16 110/12
man [3] 76/9 76/16 82/4
manage [2] 78/7 79/5
management [17] 27/4 50/18 51/1 51/1 55/17
57/6 58/9 64/19 70/2 78/9 79/2 96/11 98/3
100/3 104/9 104/17 154/6
manager [11] 46/14 46/21 58/20 79/21 84/24
104/22 109/6 109/7 116/12 158/21 159/20
managers [5] 46/7 58/19 90/16 109/11 162/9
mandate [1] 6/9
mandatory [3] 43/15 124/3 169/24
Manila [1] 95/4
manner [14] 6/3 12/22 13/9 15/21 47/14 60/15
71/11 75/9 99/22 111/12 153/2 159/23 160/9
166/9

manual [1] 53/24
manufacturing [1] 120/20
many [22] 11/18 21/5 22/3 22/4 32/13 47/5
48/24 66/13 66/17 69/10 82/20 85/1 85/1 89/16
114/22 115/2 117/19 122/18 123/22 158/6
163/12 165/11
Marc [15] 50/17 81/23 147/14 147/16 147/18
147/20 147/22 148/21 150/19 151/5 151/17
156/19 169/10 169/10 169/11
March [1] 103/7
Marcia [3] 12/7 12/12 13/18
Marge [5] 104/20 105/5 105/9 108/5 109/10
Marge's [1] 105/11 109/5
Maria [3] 24/25 25/8 25/14
marital [3] 145/15 145/19 145/21
MARK [1] 2/3
marked [6] 11/9 9/17 125/12 125/16 132/3
143/3
market [13] 50/2 50/3 50/10 156/25 157/2
157/10 157/13 158/4 158/5 158/8 159/25 162/15
162/16
marketable [1] 65/11
marketing [1] 123/20
Marlene [1] 12/7
marriage [1] 145/11
married [2] 25/1 145/16
Mary's [2] 130/25 131/10
Master's [1] 52/4
matter [7] 5/15 14/12 33/17 33/22 85/12 109/20
154/12
matters [7] 7/23 7/23 11/20 65/23 73/19 146/5
155/2
Mawr [1] 2/4
may [18] 9/19 10/1 15/12 15/24 30/15 40/5 46/2
57/16 59/4 61/11 67/6 68/20 117/3 117/9
117/18 125/5 144/22 155/7
May 1st [1] 117/3
maybe [12] 14/14 21/7 40/22 48/25 52/9 78/11
80/21 111/25 121/10 144/16 165/16 168/21
McCabe [1] 128/14
McFadden [1] 149/2
me [170] 7/11 8/4 9/12 13/21 14/23 15/1 15/17
17/1 17/24 21/16 21/18 21/22 22/10 23/7 23/9
23/13 23/22 25/23 27/7 28/18 29/23 31/16 32/2
35/23 43/10 43/25 46/9 46/20 47/2 48/11 50/1
51/13 52/5 52/16 52/22 64/7 67/10 67/13 67/20
67/21 68/4 68/17 68/19 70/15 71/16 71/22 72/6
75/16 75/21 75/21 81/21 81/23 85/16 86/6
86/11 86/18 86/22 87/8 87/19 88/1 88/17 90/13
90/19 90/21 90/23 91/6 91/12 91/17 91/19
91/20 91/21 92/3 92/17 95/7 95/18 95/18 95/19
95/24 96/1 96/2 96/9 96/14 96/18 96/19 96/24
97/16 97/24 98/6 98/10 98/16 98/17 98/19
100/14 100/16 101/1 101/1 105/2 106/8 106/10
108/9 108/20 109/22 109/25 110/14 110/16
110/25 112/9 112/21 112/23 112/24 113/25
125/1 125/3 126/7 133/20 131/1 132/13 133/7
133/17 133/20 133/22 134/16 136/3 136/6 136/7
138/2 140/15 140/18 140/19 140/25 141/2 141/8
141/11 141/14 141/14 141/20 142/21 143/1
143/16 145/5 147/14 147/18 147/19 147/21
147/25 148/7 148/10 149/9 149/16 151/6 151/6
151/7 154/18 154/21 160/6 161/6 161/18 163/5
164/23 165/20 166/14 166/25 167/14 168/3
168/4 168/5 170/12 171/6 173/6 173/16
meals [1] 108/16
mean [13] 30/17 31/16 36/1 46/4 64/10 67/5
76/24 82/1 94/1 101/8 116/20 116/20 135/12
meaning [3] 82/7 83/22 83/24
means [7] 55/6 86/10 86/14 86/22 126/16 160/4
171/21

meant [11] 7/9 7/10 7/12 21/16 21/17 30/5 30/6
74/9 97/2 144/3 127/20
meant you [1] 7/9
medi [1] 134/9
medi-clinic [1] 134/9
media [8] 9/5 37/6 88/14 88/20 88/20 88/22
89/3 89/8
medical [17] 28/10 46/1 59/13 59/17 60/8 60/16
60/21 61/3 62/8 62/9 87/7 87/7 129/18 132/21
141/7 141/17 142/15
Medicare [2] 73/20 74/19
medication [11] 15/19 133/18 133/19 133/25
134/1 134/3 134/12 136/9 136/16 138/5 138/11
medications [2] 137/4 138/1
meditate [4] 137/8 137/12 137/13 137/17
meet [7] 16/23 17/4 94/12 103/13 103/15
113/10 165/11
meet-and-greets [1] 113/10
meeting [25] 13/22 17/2 57/15 55/20 77/20
87/24 87/25 90/13 91/10 94/12 94/17 94/24
94/25 96/13 97/5 98/13 103/6 103/19 104/3
104/7 124/4 124/19 147/6 165/8 167/15
meetings [18] 61/7 61/14 61/15 70/17 77/19
78/24 78/24 98/1 100/6 102/16 102/23 102/25
103/7 125/1 164/23 165/17 165/25 167/14
Meg [11] 42/2 42/10 42/18 42/22 43/5 82/23
83/7 83/9 84/4 84/6 122/12
member [4] 6/13 25/24 41/3 58/6
members [13] 6/25 7/7 25/17 51/6 55/18 68/17
78/16 90/3 94/13 95/21 102/16 104/5 155/7
memorialized [1] 5/13
memory [3] 41/13 42/1 142/6
men [7] 49/11 49/19 49/22 76/10 79/5 110/3
110/3
mens [1] 112/12
mentality [1] 78/7
mention [2] 20/13 153/21
mentioned [14] 14/12 48/20 63/7 64/5 65/22
84/6 100/13 109/10 118/25 136/3 137/4 138/2
145/14 153/24
Mercy [2] 119/3 119/7
mere [2] 96/16 96/16
Meredith [14] 42/5 42/23 42/25 44/25 65/7 92/2
99/19 100/1 100/14 140/19 160/23 161/12
162/16 162/20
Meredith's [2] 44/3 100/3
message [2] 56/18 82/14
messages [1] 111/1
met [5] 64/19 102/22 140/18 147/5 151/18
method [1] 75/14
Mexican [1] 31/18
Michael [1] 72/23
Michelle [2] 1/13 171/13
might [8] 8/25 41/5 60/13 73/25 91/16 91/16
164/7 169/7
Mike [4] 164/4 164/6 165/1 167/4
mileage [5] 86/18 87/2 87/5 87/10 125/24
million [3] 53/11 154/24 157/7
mind [7] 26/15 31/5 34/23 48/2 58/14 82/12
153/25
mine [6] 15/8 16/15 30/3 30/20 38/2 144/7
Mini [1] 79/24
minimal [3] 49/4 49/5 53/9
minimally [1] 128/13
Minix [1] 79/20
minorities [1] 22/24
minority [5] 31/5 31/12 31/16 31/17 79/17
minute [3] 92/23 148/17 151/7
minutes [6] 103/15 104/6 141/5 141/16 146/4
151/5
misappropriation [2] 153/18 154/1

**M**

misconstrued [1] 26/14
mismanaging [1] 74/24
Miss [12] 7/6 7/13 13/1 13/1 23/9 28/14 28/15
30/13 71/21 161/4 161/6 167/17
Miss Feher [2] 161/4 161/6
Miss Sandler [1] 71/21
Miss Sommers [1] 7/6
Miss Thompson [2] 28/15 167/17
mission [2] 80/12 97/19
misuse [1] 108/24
mocks [1] 25/25
mode [1] 146/19
modicum [1] 97/10
modified [1] 59/5
Mohammed's [1] 80/14
moment [7] 15/6 72/6 100/17 112/10 137/3
140/7 149/14
Monday [2] 124/3 142/9
Mondays [1] 76/22
monetary [1] 132/13
money [13] 18/4 72/21 105/13 105/25 106/17
106/25 107/3 107/9 107/9 152/14 152/22 154/1
164/22
monies [1] 153/24
monitor [1] 168/23
month [9] 92/18 126/11 126/14 126/15 126/20
126/21 146/1 169/20 169/23
months [6] 41/8 41/19 54/7 54/18 135/9 136/14
more [30] 5/1 5/16 7/5 16/16 42/21 43/8 43/12
44/6 49/10 49/11 49/22 50/9 65/11 86/18 90/22
96/8 99/15 100/7 100/12 102/18 113/14 113/21
121/11 123/9 123/10 133/22 141/13 146/13
165/13 167/14
morning [10] 17/6 19/7 21/20 28/19 33/6 36/2
77/2 123/12 137/16 144/21
mortified [1] 99/1
Morton [2] 142/23 142/24
most [12] 26/1 50/2 52/9 58/18 67/20 86/23
87/2 87/5 87/10 117/15 118/23 126/17
mostly [1] 90/1
Motion [1] 12/8
Mount [1] 92/21
mouth [3] 5/7 6/2 28/3
move [2] 67/17 146/18
moving [5] 40/7 91/11 154/16 155/3 156/5
Mr [119] 4/23 5/14 6/19 7/7 7/18 9/10 9/25
10/25 17/23 26/18 27/19 28/9 28/23 32/22 36/3
39/25 40/17 40/20 40/24 41/1 41/10 41/15
41/22 41/25 44/3 45/2 46/19 46/22 47/1 47/8
47/11 48/2 48/5 48/14 48/21 48/22 49/13 49/25
50/5 50/8 51/25 52/12 52/18 54/2 55/22 55/24
56/8 56/9 56/15 56/17 57/2 57/9 57/10 57/11
62/14 62/15 63/4 63/23 64/13 67/24 68/7 68/12
68/16 68/24 70/9 70/15 70/19 71/15 71/18
71/22 75/17 75/21 76/10 76/21 77/6 77/9 77/20
80/22 81/4 82/2 83/13 83/19 84/5 84/21 85/22
90/12 99/15 104/5 104/18 112/7 113/22 118/6
125/6 143/13 143/22 143/25 152/4 152/9 153/2
154/4 156/1 156/14 158/16 159/14 159/22
160/17 161/1 163/1 163/6 164/15 164/18 164/25
165/5 167/5 167/8 167/8 167/18 167/23 168/2
Mr. [42] 4/15 4/21 6/1 6/20 8/17 28/9 40/23
40/25 41/3 41/18 45/7 50/23 52/14 57/2 68/22
70/14 70/17 75/8 76/6 76/21 77/11 77/14 78/8
79/10 79/18 80/12 81/3 84/22 85/25 95/3 95/8
99/21 103/5 104/5 143/15 153/10 153/10 155/23
162/18 162/23 163/7 166/9
Mr. Bates [3] 40/25 41/3 41/18
Mr. Bauer [6] 4/21 6/20 28/9 95/3 95/8 153/10
Mr. Bauer's [1] 4/15

Mr. Gallagher [1] 84/22
Mr. Gallman's [1] 5/7
Mr. Hamid [1] 85/25
Mr. Heil [1] 52/14
Mr. Hendrickson [1] 162/23
Mr. Maguire [1] 40/23
Mr. Schwartz [1] 8/17
Mr. Schwartz's [1] 6/1
Mr. Soltis [4] 45/7 57/2 143/15 153/10
Mr. Supper [17] 68/22 70/14 75/8 76/19 76/21
77/11 77/14 78/8 79/10 79/18 81/3 99/21 103/5
104/5 162/18 163/7 166/9
Mr. Supper's [2] 70/17 80/12
Mr. Wozniak [1] 155/23
Mrs [1] 11/12
Mrs. [4] 11/13 112/20 132/8 143/8
Mrs. is [1] 11/13
Mrs. Jungclaus [3] 112/20 132/8 143/8
Ms [4] 3/5 11/12 33/21 69/19
Ms. [3] 4/16 4/22 5/7
Ms. Deon [3] 4/16 4/22 5/7
Mscizc [2] 140/20 140/21
much [10] 39/19 52/14 56/16 64/10 101/19
113/9 134/20 151/23 156/20 156/22
multiple [2] 38/17 120/17
Muslim [1] 158/22
must [1] 151/10
Mutual [2] 164/9 164/13
my [169] 4/17 4/19 5/2 5/7 5/8 5/19 6/4 6/7 7/3
7/17 9/5 10/5 17/20 19/19 19/23 21/22 23/1
23/18 23/21 27/25 28/3 29/22 29/25 30/11
30/19 31/2 31/5 31/10 32/16 36/1 38/4 38/5
42/1 42/13 42/13 42/17 42/21 48/11 49/23
55/15 57/12 61/6 62/4 64/8 66/15 68/4 68/18
69/4 69/16 71/24 72/5 76/11 77/13 80/6 81/23
89/25 90/4 90/17 91/15 91/20 92/8 93/7 94/12
95/8 95/8 95/13 95/15 95/16 95/17 95/19 96/5
96/8 97/6 97/8 97/16 97/16 97/17 97/19 98/6
98/22 100/21 100/23 100/23 100/24 100/25
102/2 103/4 103/7 110/22 115/1 115/21 116/1
117/2 117/15 119/20 120/10 121/10 121/16
121/21 121/21 122/24 123/23 124/10 124/19
124/19 124/23 127/21 129/23 130/1 130/17
131/8 132/15 132/15 132/16 132/16 132/25
133/5 133/17 133/21 133/23 133/25 134/10
134/25 135/2 135/6 135/9 135/15 137/11 137/11
138/4 140/6 140/10 141/16 141/20 142/19
142/20 144/18 145/2 145/8 145/10 145/11
145/12 146/14 147/21 148/7 149/15 149/15
149/22 149/24 150/23 151/6 151/9 151/23 152/2
152/3 155/18 158/13 158/15 163/3 163/4 163/22
166/14 166/15 166/15 168/4 168/25 169/5 173/4
173/18
myself [9] 19/14 31/3 46/24 48/4 53/24 57/4
90/23 100/23 104/6

**N**

name [34] 18/8 24/5 24/7 24/25 42/6 42/24
79/17 79/24 80/9 89/6 89/13 89/14 89/17 89/21
89/22 89/25 90/4 93/25 102/7 102/7 107/19
114/8 116/13 122/1 130/17 131/5 142/22 164/9
164/10 164/11 167/18 167/24 168/7 168/14
named [4] 12/16 12/18 38/17 40/15
names [3] 12/6 70/10 168/11
naming [1] 70/10
nature [5] 15/8 7/21 8/19 25/4 52/20 68/12
68/16 87/22 88/7 109/17 144/6
NCAA [1] 105/17
nd [1] 24/7
nebulizer [7] 141/3 141/4 141/5 141/8 141/9
142/17 142/19
necessarily [4] 31/22 65/12 116/6 127/5

necessitated [1] 139/17
neck [5] 92/5
need [11] 9/14 15/15 23/24 43/13 92/23 92/24
109/19 126/4 126/18 126/19 146/25
needed [7] 28/10 60/9 68/12 139/21 139/24
149/19 168/24
needs [1] 127/2
negatively [1] 163/25
negotiate [2] 161/24 161/25
negotiated [1] 118/1
negotiation [6] 44/20 44/24 46/3 46/4 46/11
46/21
negotiations [3] 45/3 152/7 155/7
neighborhood's [1] 23/19
neither [1] 7/19
nervous [1] 141/11
net [1] 118/5
network [1] 58/1
networked [1] 115/9
networking [1] 119/23
networking-wise [1] 119/23
never [34] 13/11 17/20 18/1 26/3 26/3 26/21
27/2 27/8 29/17 54/3 72/8 72/9 73/23 73/23
74/9 74/20 76/13 76/13 78/10 78/14 78/14
86/21 87/8 88/20 91/13 97/20 103/24 119/20
131/3 139/5 168/2 168/18 169/10 169/11
new [17] 8/5 8/21 9/1 54/7 57/3 82/6 82/9
101/20 114/16 114/19 114/23 120/15 120/16
122/5 124/18 125/18 154/17
newly [1] 162/9
newly-hired [1] 162/9
news [2] 142/25 143/9
next [5] 91/17 96/19 126/5 141/25 167/13
NHA [3] 43/13 64/13 162/20
nice [2] 90/12 128/20
Nicole [1] 18/9
night [5] 22/22 136/16 136/21 136/23 136/23
no [159] 1/7 7/10 9/22 10/4 10/4 10/4 11/8
12/11 13/21 14/10 14/20 14/22 15/22 17/18
18/13 22/24 24/14 24/17 27/24 28/1 29/18
29/19 32/12 32/16 34/12 35/8 35/20 36/1 36/9
36/17 37/11 38/8 44/9 45/15 46/24 47/13 47/25
49/2 52/12 53/5 54/11 55/10 56/1 56/12 56/12
56/24 57/2 59/9 59/25 60/3 63/17 64/4 64/24
66/5 66/8 66/15 67/13 68/6 68/23 69/9 72/4
72/21 75/6 75/12 76/9 76/13 76/21 77/4 77/7
79/9 79/12 80/21 81/17 83/21 85/3 88/11 89/19
91/12 91/25 94/6 95/6 96/19 96/19 96/20 98/7
98/13 98/16 98/17 98/17 98/18 98/18 98/18
99/7 99/13 100/12 103/23 107/6 109/14 111/4
111/5 114/2 114/13 115/6 115/24 116/16 117/5
118/10 118/19 118/20 119/5 119/8 119/11
119/14 120/24 126/25 128/24 129/1 129/4 130/7
131/8 131/25 132/9 141/6 142/17 143/2 144/3
144/12 144/20 146/7 147/3 149/12 150/18 151/2
151/14 151/17 154/9 155/5 155/13 155/16
152/16 157/1 157/4 157/18 158/19 161/11
161/16 162/6 163/17 163/23 164/14 164/22
165/14 165/22 165/24 166/1 166/3 166/25 167/7
168/17
nodding [2] 74/6 163/25
nominal [1] 107/9
non [3] 106/22 153/17 154/1
non-Caucasian [1] 106/22
non-for-profit [1] 153/17
non-profit [1] 154/1
noncertified [1] 127/10
nondiscrimination [1] 38/11
None [1] 83/15
noninjury [4] 62/2 62/6 62/7 62/10
nonsense [1] 10/9

**N**

noon [1] 76/22
normal [2] 135/10 141/16
not [163] 3/14 4/10 4/20 4/21 4/22 5/6 5/18 6/8
6/9 6/23 7/25 8/8 8/9 8/13 8/14 9/8 9/10 9/16
9/20 9/21 11/1 12/17 19/6 19/6 19/21 20/1 20/6
22/12 28/4 28/12 29/15 30/10 31/12 31/22 33/3
33/13 33/19 33/22 35/13 36/3 39/24 40/11
40/12 40/19 41/8 43/9 43/10 43/15 47/2 49/23
50/18 53/6 53/18 54/1 54/2 54/25 56/9 57/9
57/10 57/11 58/5 58/19 59/8 59/15 59/24 59/25
60/3 60/4 60/24 61/18 62/9 63/12 64/3 64/21
65/5 65/12 65/23 66/1 67/6 67/13 67/16 67/17
67/17 67/21 68/23 68/23 70/25 71/21 71/23
72/23 72/25 74/19 75/9 76/11 77/9 77/13 78/19
80/16 81/20 82/14 86/9 87/3 87/8 88/21 88/23
91/8 91/16 91/17 97/11 97/22 98/7 98/11 99/13
100/3 100/19 102/10 104/12 106/20 107/12
107/17 108/14 109/12 109/13 111/6 115/10
116/18 117/1 117/5 118/12 122/10 122/20 125/2
127/5 127/16 128/24 130/21 131/13 131/18
131/21 132/9 140/6 144/19 148/4 148/6 148/19
149/17 150/16 151/21 153/21 155/18 156/3
156/3 156/25 159/3 160/8 164/4 165/7 167/1
167/13 167/20 169/14 169/17 171/20
NOTARY [2] 171/14 173/23
note [4] 10/24 57/13 73/3 124/10
notebook [1] 121/8
noted [1] 173/8
notes [10] 120/22 120/24 120/25 121/3 121/5
121/14 121/16 124/19 151/24 171/7
nothing [21] 5/1 7/17 8/2 9/24 10/1 11/9 19/25
28/20 30/12 56/25 93/20 93/23 95/19 96/18
97/11 97/11 98/17 99/11 99/13 124/20 164/20
notice [1] 99/8
November [2] 1/16 173/5
now [18] 9/14 22/1 24/25 28/6 41/21 42/1 50/18
71/20 85/4 100/14 126/11 127/19 129/24 130/1
134/13 134/15 136/15 136/21
nowadays [1] 130/14
number [10] 6/6 41/6 41/19 62/21 74/10 126/11
128/16 128/18 135/3 170/1
numbers [3] 1/9 128/10 168/15
numerous [4] 26/19 54/5 64/24 70/16
nurse [2] 133/5 140/15
nurse's [1] 60/19
nurses [2] 100/4 129/1
nursing [8] 40/3 42/14 43/15 43/17 43/24 127/1
133/5 140/20

**O**

ob [1] 7/3
Obama [1] 143/19
object [5] 4/25 34/5 51/23 72/13 160/18
objected [2] 4/15 4/17
objecting [1] 51/7
objection [10] 6/18 7/17 7/21 15/5 15/6 35/12
70/25 80/14 157/15 163/19
objectionable [5] 78/16 79/2 99/12 164/2 167/6
objections [4] 4/7 15/25 16/5 16/6
obligation [1] 58/17
obnoxious [3] 76/7 99/20 105/22
obser [1] 30/9
observation [2] 30/9 30/9
observe [1] 73/25
obtain [1] 50/21
obtained [2] 39/9 113/11
obvious [1] 42/24
obviously [4] 46/18 79/17 129/2 132/15
occasion [7] 13/15 20/20 57/21 89/24 92/8
109/15 145/1

occasions [3] 26/19 47/5 170/1
occupational [2] 43/13 127/9
occur [1] 32/4
occurred [3] 139/10 142/12 147/5
occurring [2] 70/21 76/12
October [2] 114/18 118/14
off [26] 6/2 10/3 10/6 10/6 10/12 10/14 10/16
11/22 12/13 19/19 22/14 22/17 26/11 45/22
53/10 82/24 93/2 96/15 102/17 125/9 127/24
136/14 143/5 144/12 146/23 153/10
offended [1] 143/23
offense [1] 87/23
offensive [2] 30/10 98/8
offer [5] 67/4 161/15 161/17 161/21 165/2
offered [4] 67/1 129/21 130/21 162/4
offers [3] 122/20 122/22 123/6
office [53] 25/9 27/18 27/19 28/1 41/4 54/9
54/10 60/19 76/2 91/21 95/2 95/4 120/18
120/19 129/4 133/11 134/25 139/11 141/4 142/9
147/10 147/13 147/14 147/16 147/17 147/18
147/19 147/20 147/21 147/22 148/2 148/3 148/5
148/7 148/7 148/8 148/9 148/11 148/11 148/18
148/23 149/1 149/21 149/21 149/25 150/1 150/2
150/11 150/24 151/3 151/7 151/13 152/2
Officer [2] 73/16 73/18
offices [3] 1/14 124/1 151/1
official [1] 74/16
offsite [1] 61/9
often [10] 78/8 102/12 102/21 117/13 134/18
136/13 137/13 137/19 145/22 168/3
oh [6] 66/15 79/12 99/5 128/15 132/9 167/16
okay [80] 5/1 6/21 7/8 7/14 8/6 8/12 9/9 10/10
10/1 14/4 14/7 15/15 15/23 16/23 17/4 18/3
18/7 18/17 18/21 19/15 20/2 21/12 28/10 30/10
31/23 36/18 36/24 37/18 39/9 41/9 41/12 41/15
41/18 41/21 43/5 45/25 50/4 63/13 73/3 82/5
83/6 85/6 110/4 114/14 117/2 120/16 121/7
122/18 124/12 124/21 124/25 125/5 125/10
126/11 126/14 126/16 127/4 127/8 127/13
127/22 128/8 128/14 132/1 135/23 140/24 142/5
144/21 145/5 145/18 148/8 149/17 150/15
150/19 156/5 157/19 160/16 163/24 164/18
166/4 167/2
old [9] 5/8 11/21 14/12 80/1 81/21 82/13 83/4
84/10 139/20
old-timers [2] 81/21 82/13
older [5] 81/8 81/14 81/25 82/3 82/7
on-the-road [2] 124/2 124/3
once [4] 97/22 137/17 145/24 145/25
one [65] 5/5 6/9 6/11 11/21 11/23 12/8 12/14
12/25 13/1 15/2 19/4 23/6 26/1 30/3 30/20
32/16 32/20 35/9 42/17 54/1 54/2 54/3 54/11
56/12 56/24 59/1 63/10 66/20 69/14 72/24
81/22 82/4 88/12 89/4 89/8 92/3 97/11 97/19
110/12 110/14 111/2 115/6 123/10 124/1 124/15
126/14 126/18 126/21 127/19 128/1 128/3 128/5
130/22 141/13 143/13 146/13 153/19 154/14
154/20 154/25 157/20 159/3 159/13 168/22
169/19
online [6] 58/13 116/6 131/15 131/18 143/9
156/21
only [46] 5/13 6/23 13/17 15/2 15/17 17/24 22/3
22/3 32/16 32/20 45/11 47/20 49/18 59/12 64/1
65/8 68/17 74/3 77/17 79/7 79/10 86/3 89/4
102/7 102/7 103/4 103/15 104/4 108/5 120/16
121/5 121/16 131/20 131/20 137/17 146/5
155/13 156/16 156/21 158/21 158/21 159/3
159/13 159/19 164/17 169/13
onsite [2] 43/16 108/14
open [3] 18/23 19/23 38/5 115/9
opened [1] 65/14

opening [1] 6/1
operating [2] 127/9 128/24
openly [1] 78/3
operations [3] 52/21 54/14 56/17
opinion [6] 30/15 75/4 83/25 109/1 146/8 157/3
opportunities [2] 82/20 118/13
opportunity [3] 12/3 72/2 95/22
opposed [2] 31/21 79/11
options [1] 130/2
oral [1] 138/15
order [13] 8/13 9/21 9/22 11/8 50/21 51/17 65/9
74/4 74/5 90/23 106/4 106/14 160/1
organization [10] 11/5 44/11 47/16 80/10 123/21
126/24 127/10 128/23 153/17 166/11
organizations [1] 119/9
orientation [2] 103/9 129/7
other [57] 4/19 6/5 7/7 11/2 11/23 13/15 13/17
14/7 14/11 15/19 19/21 25/25 28/2 36/18 37/6
48/13 48/14 49/15 55/18 57/22 68/11 68/13
78/16 79/18 80/8 81/2 81/22 86/10 86/14 90/21
96/8 97/21 99/14 100/10 100/24 106/25 109/9
110/20 111/22 121/7 127/16 129/10 131/17
131/23 137/21 138/1 138/11 141/18 144/21
144/25 154/20 158/13 164/15 164/17 165/23
168/11 170/7
other means [1] 86/14
others [4] 7/1 32/17 46/17 101/24
our [14] 4/14 15/3 21/10 31/2 31/2 69/15 81/6
81/7 88/16 89/5 91/11 97/6 101/14 152/20
out [35] 5/4 9/12 12/12 19/24 23/7 27/19 28/3
28/4 29/24 30/24 61/24 80/12 81/20 86/18 87/2
87/5 91/20 95/15 98/14 99/8 113/9 115/1
120/13 124/1 124/5 128/17 128/19 135/13 141/1
141/11 143/11 150/1 150/2 155/14 166/15
out-of-pocket [1] 61/24
out-of-state [1] 120/13
outcome [1] 59/2
outgrew [2] 87/21 87/21
outplacement [1] 119/15
outreach [2] 123/20 127/1
outside [9] 23/3 24/18 131/1 131/12 147/18
147/22 148/2 158/11 165/25
over [16] 9/8 13/18 14/13 17/5 23/23 24/18
29/10 29/17 61/5 127/24 133/1 135/4 135/7
136/17 142/11 158/8
overall [3] 54/14 56/17 57/6
overbearing [2] 79/4 79/7
overly [3] 77/23 84/20 84/22
oversaw [4] 38/10 53/3 54/9 66/13
oversee [1] 51/1
overseeing [2] 66/22 75/3
oversight [1] 38/11
overtime [1] 36/18
own [9] 37/19 37/19 84/25 88/3 116/1 121/20
121/21 137/10 165/10
oxygen [1] 141/2

**P**

P-O-S-O-F-F [1] 166/4
P.C [2] 1/14 2/6
p.m [2] 1/16 170/14
P.O [1] 2/3
PA [3] 2/4 2/8 115/19
pack [1] 151/6
package [1] 125/18
packed [1] 151/17
page [28] 3/3 3/8 3/15 19/19 19/20 19/23 19/23
20/1 20/3 22/4 86/4 86/6 86/11 86/22 87/2 87/7
92/22 93/14 98/6 130/16 130/17 131/8 132/10
132/11 144/12 152/5 157/19 172/2
pages [5] 19/17 130/18 130/18 130/18 132/8
paid [12] 12/13 51/2 69/8 101/17 108/17

Appendix 682

**P**

paid... [6] 118/3 153/24 156/20 156/25 158/23 162/11
panel [2] 59/1 59/2
panic [5] 136/8 136/24 137/6 144/18 146/9
PANPHA [1] 118/22
Park [3] 123/24 126/8 151/19
Park/Doylestown [1] 126/8
part [6] 12/16 51/24 90/3 158/13 158/15 161/5
partial [1] 5/13
participate [3] 105/12 105/14 120/3
participated [1] 57/25
participating [3] 55/17 111/12 111/13
particular [5] 10/17 48/1 71/11 137/15 166/10
particularly [1] 5/5
parties [1] 4/5
partners [1] 154/25
Parts [1] 63/12
party [6] 4/22 7/19 12/17 14/11 16/14 108/12
passing [3] 107/4 107/8 144/23
password [1] 168/13
past [1] 25/19
pathogens [1] 169/21
patient [1] 60/9
pay [11] 47/17 49/25 64/16 90/20 92/13 106/1 106/1 154/16 156/8 159/21 162/7
paycheck [1] 166/16
paying [1] 130/1
payment [2] 152/6 153/24
payments [1] 156/5
Payroll [1] 166/5
peer [1] 69/24
pending [4] 15/18 43/21 85/19 93/10
Penn [3] 154/23 154/25 156/13
PENNSYLVANIA [5] 1/3 1/15 115/17 120/14 120/15
people [33] 5/9 19/2 22/20 25/11 25/25 38/14 38/21 45/11 55/1 67/10 67/12 67/20 72/19 74/14 79/1 82/6 82/7 82/12 90/21 98/19 101/7 101/18 101/20 109/9 119/23 127/5 127/13 129/7 130/14 143/11 156/8 169/2 170/6
people's [2] 81/16 168/11
per [9] 53/16 114/22 116/2 117/19 126/14 126/15 126/20 126/21 137/17
percent [14] 67/25 124/13 124/16 127/19 128/1 128/3 128/4 128/4 128/4 128/5 128/13 153/19 153/21 158/5
percentage [6] 103/12 127/23 127/23 128/7 128/9 128/12
percentages [1] 125/2
perfect [1] 91/24
performance [12] 62/12 62/16 62/19 63/13 63/19 63/23 80/15 83/14 83/16 83/18 84/1 84/18 84/19
perhaps [1] 5/19
period [3] 41/19 53/13 158/9
perjury [1] 35/1
permanent [1] 113/21
permission [1] 67/11
permit [1] 92/15
permitted [3] 6/10 78/3 96/9
person [14] 18/8 21/23 32/14 37/23 67/8 67/23 77/3 79/19 80/18 82/6 97/21 107/25 145/7 164/17
person's [1] 128/18
personal [16] 6/9 9/11 19/19 19/23 32/16 77/19 78/4 78/21 97/19 98/6 151/12 152/1 163/1 164/20 164/25 165/5
personnel [3] 58/1 63/11 64/6
perspective [2] 100/18 103/5
pharmacy [1] 133/19

phase [3] 146/19 146/20 146/22
phenomenon [1] 130/2
phone [13] 77/18 77/19 78/4 78/14 78/21 97/7 115/10 121/8 128/16 128/18 130/22 131/21 133/3
PHRA [1] 21/3
PHRC [1] 68/4
physical [3] 45/15 127/8 137/21
physically [2] 151/15 163/4
physician [1] 133/17
physicians [3] 45/14 59/1 59/2
pick [1] 105/17
picked [1] 137/10
picture [1] 89/7
pictures [1] 37/17
pieces [1] 97/4
pill [1] 138/15
pill/oral [1] 138/15
Pine [1] 118/7
Pineapple [3] 23/4 78/12 78/23
Pittsburgh [1] 5/9
pizza [2] 74/4 74/5
placate [1] 165/9
place [6] 22/21 70/23 71/5 88/25 97/20 167/25
Places [2] 23/4 90/4
Plaintiff [3] 1/6 2/5 12/24
plan [3] 83/17 98/4 113/12
plant [1] 120/20
play [1] 25/23
players [1] 123/4
pleaded [1] 95/17
pleadings [1] 94/7
please [10] 15/1 15/2 15/5 15/11 15/16 24/21 78/4 96/1 132/9 140/21
pleased [1] 49/1
plus [2] 153/8 162/18
pocket [1] 61/24
pockets [1] 24/20
Poconos [1] 142/16
point [14] 20/13 27/16 36/19 43/10 47/23 65/6 72/1 83/13 140/24 141/19 147/10 152/17 158/16 161/20
police [4] 92/22 93/14 93/20 94/2
policies [3] 38/12 38/18 39/1
policy [8] 39/6 52/11 88/14 88/20 88/22 89/3 101/8 103/3
political [3] 24/22 119/23 144/10
politics [4] 26/15 26/18 26/19 27/3
poor [1] 163/24
population [1] 101/13
posed [4] 17/10 69/19 75/24 108/10
position [58] 15/25 41/6 42/8 43/6 43/14 44/5 49/18 50/22 51/9 51/17 51/19 51/20 52/10 65/7 69/4 79/7 80/5 82/9 84/12 84/15 86/4 87/21 100/19 102/10 108/3 108/25 109/5 111/11 113/20 114/23 115/1 116/10 116/11 116/12 116/12 117/11 117/15 118/7 118/22 122/10 121/24 122/5 122/14 123/12 124/18 125/19 129/5 130/23 130/23 131/19 149/3 151/5 158/4 159/10 159/13 161/4 162/21 169/18
positions [10] 40/2 65/16 65/19 81/16 92/4 92/5 115/9 115/11 115/16 115/18
positive [2] 88/23 100/7
Posoff [1] 166/4
possibility [2] 42/16 114/1
possible [3] 59/13 87/10 109/19
post [5] 37/17 37/23 38/1 38/2 136/11
post-termination [1] 136/11
posted [5] 19/25 89/7 92/11 115/21 115/21
postings [2] 115/2 115/3
postponed [1] 16/6

posts [2] 37/24 37/25
postsurmistic [2] 146/11 146/12
potentially [2] 61/25 62/1
power [1] 109/4
practice [1] 72/7
praying [1] 97/6
precipitated [1] 144/17
prefer [1] 11/12
preliminary [1] 131/2
premiums [2] 81/7 81/10
preparation [3] 16/10 17/2 63/9
prepared [1] 28/23
prescribed [1] 133/17
prescription [1] 134/10
presence [3] 4/16 76/11 140/8
present [2] 2/12 140/11
presentation [1] 56/6
presented [1] 29/20
presenting [3] 14/18 26/10 84/20
presently [1] 65/13
President [19] 6/14 25/11 26/17 38/9 40/3 42/2 42/3 50/17 50/25 57/3 66/9 78/2 79/3 92/5 116/11 130/24 158/25 159/2 163/14
presidents [2] 39/17 58/19
pressure [3] 132/25 132/25 133/5 133/18 133/24 133/24 133/25 134/3 134/7 135/3 135/9 136/4 136/6
pretty [6] 26/20 39/19 123/8 156/8 169/13 170/10
prevailing [1] 1/17
prevails [1] 6/25
prevent [1] 77/24
prevented [2] 52/11 99/3
previous [1] 88/17
previously [2] 109/10 162/10
primary [3] 36/12 37/23 127/2
print [1] 19/24
printed [7] 8/25 19/16 19/18 19/19 60/20 121/4 121/5
prior [18] 4/14 16/23 27/17 32/4 32/6 32/23 39/21 39/25 40/6 40/17 41/25 49/25 50/5 82/2 124/15 135/18 138/19 151/13
private [4] 37/2 37/3 37/4 108/12
privately [1] 165/3
privilege [2] 35/14 72/14
privy [1] 8/1
prize [2] 106/25 107/3
probably [4] 31/4 41/17 100/25 169/14
problem [2] 9/4 92/17
procedure [2] 58/23 58/25
proceed [1] 109/12
proceeded [1] 21/4
proceeding [6] 9/15 19/15 20/14 29/8 63/8 130/9
proceedings [1] 171/5
process [5] 20/20 43/24 51/21 59/8 65/4
processed [3] 44/24 45/1 155/10
produced [5] 5/15 10/18 63/10 64/6 166/17
professional [7] 1/13 6/3 58/1 58/6 119/9 127/11 171/13
professionals [1] 121/22
profit [2] 153/17 154/1
prognosis [1] 146/15
program [13] 44/1 53/3 53/5 53/6 53/24 55/8 55/12 55/13 56/6 56/11 58/15 74/12 82/21
programs [4] 53/19 55/16 55/19 58/4
progressive [2] 82/21 96/11
prohibited [1] 56/13
project [3] 50/18 51/1 51/1
promise [1] 156/10
promised [2] 161/15 161/22
promoted [5] 41/24 51/19 51/20 51/23 86/3

## P

promoting [2] 157/25 158/2
promotion [5] 39/11 40/14 128/23 128/24 158/24
pronounce [1] 80/9
proper [1] 9/7
properly [2] 7/21 56/9
property [5] 99/4 146/23 154/23 156/13 156/20
propounded [1] 173/7
proprietary [5] 7/23 8/18 9/19 11/4 11/10
prorated [1] 161/9
protected [7] 106/4 106/5 106/12 106/16 158/20 160/9 160/16
protective [1] 160/3
protocol [1] 141/7
provide [8] 35/16 36/3 36/6 52/24 57/17 57/19 108/16 122/8
provided [12] 14/21 16/17 35/9 35/22 54/11 54/16 112/23 121/1 143/1 146/8 146/15 152/10
provides [1] 45/20
providing [1] 111/2
provision [2] 34/24 73/8
psychological [2] 39/11 40/13
psychologist [7] 137/3 137/5 142/21 142/22 144/14 144/24 145/23
psychology [2] 65/25 119/1
public [8] 10/23 11/1 18/23 20/6 37/2 98/1 171/14 173/23
publicly [2] 18/22 94/4
publicly-accessible [1] 18/22
puff [1] 140/25
pulled [1] 95/15
pulling [1] 161/20
purchase [1] 154/23
purchased [1] 165/3
purchasing [1] 157/13
purpose [8] 33/4 33/6 97/16 102/25 125/12 132/4 145/6 145/19
purposes [2] 35/17 152/24
pursue [3] 68/7 111/6 111/16
put [10] 9/8 24/21 32/9 83/19 86/19 117/12 132/19 136/6 136/7 151/15
puts [1] 101/15

## Q

qualifications [1] 102/11
qualified [4] 75/1 75/9 80/5 102/10
qualifying [1] 59/12
quality [1] 113/23
quarters [1] 42/20
question [25] 4/8 8/24 14/25 15/8 15/8 15/10 15/17 16/1 33/14 33/21 33/23 36/5 36/6 36/7 43/21 46/10 48/11 68/4 85/19 93/6 101/10 117/2 132/10 132/11 163/22
questions [6] 4/11 8/4 17/9 96/19 135/13 173/7
quick [1] 124/10
quiet [2] 23/13 23/17
quite [1] 162/21

## R

R-H-O-D-A [1] 142/23
race [1] 111/21
races [1] 170/6
racial [1] 31/17
racist [18] 6/5 6/5 6/22 6/24 12/22 13/3 13/5 13/8 13/16 13/24 14/4 14/6 14/9 14/9 97/1 97/3 99/11 143/18
radio [2] 22/23 22/24
raises [2] 158/1 158/2
raising [1] 18/4
rambling [1] 98/15

ramification [1] 169/16
language [1] 46/6 / 168/8
ranges [1] 128/11
rapport [1] 100/4
rate [3] 46/25 101/19 125/24
rates [1] 46/23
ratio [3] 50/4 50/9 162/14
ratios [2] 50/15 162/8
Ray [1] 17/7
reaction [3] 20/11 140/4 140/9
read [7] 32/8 43/20 85/18 93/7 93/9 96/15 173/4
real [1] 124/10
really [15] 22/17 23/24 74/19 87/8 88/21 90/17 91/1 94/22 117/11 122/9 132/18 152/2 152/8 165/8 169/15
Reardon [1] 140/13
reason [12] 5/15 15/20 63/18 63/22 64/21 77/11 91/25 102/9 130/20 131/23 156/24 164/22
reasonable [1] 134/1
reasons [2] 5/5 34/6
recall [32] 15/11 20/9 21/1 21/12 28/9 28/14 29/7 34/14 40/19 41/11 44/17 48/19 48/20 48/22 63/10 63/13 64/22 85/9 94/16 94/18 94/22 104/10 142/2 142/14 143/14 147/5 147/8 147/10 150/16 156/23 161/20 164/10
receive [8] 6/24 47/7 118/6 127/15 151/22 152/22 159/20 161/8
received [13] 11/10 49/9 49/10 49/11 49/21 60/19 61/4 64/9 70/16 112/21 152/18 153/22 158/24
receiving [5] 124/6 126/23 152/6 153/14 160/8
recently [1] 123/13
Reception [1] 150/3
recess [4] 85/8 85/10 112/15 112/17
recognition [5] 17/20 18/18 88/9 143/17 148/20
recollection [5] 17/20 18/18 88/9 143/17 148/20
recommend [2] 137/21 141/17
recommendation [2] 89/9 89/10
recommendations [1] 114/4
record [25] 6/2 10/3 10/6 10/7 10/11 10/12 10/14 10/17 10/24 45/22 57/14 57/16 73/4 85/14 93/2 115/11 115/17 116/7 116/13 116/15 117/3 125/9 131/7 135/20 143/5
recorded [1] 153/2
recording [1] 25/24
records [2] 8/18 49/25
recover [1] 76/23
recruiter [6] 46/25 122/11 130/22 131/10 131/11 131/12
recruiters [1] 32/9
recruiting [1] 130/14
redo [1] 88/16
redundant [1] 112/10
refer [1] 123/2
reference [9] 21/20 31/20 34/3 44/3 48/8 154/3 162/7 167/15 167/17
referenced [6] 18/7 20/24 22/5 40/13 72/18 94/7
references [3] 18/4 28/20 93/21
referencing [5] 29/15 64/7 94/8 130/10 164/7
referral [1] 127/2
referred [2] 22/1 29/8
referring [13] 28/6 29/10 31/5 63/3 82/16 93/15 93/17 99/14 99/21 99/24 100/2 123/3 160/25
reflect [1] 57/16
reflects [1] 125/17
refresh [2] 41/13 142/6
refreshing [1] 42/1
refused [2] 57/16 67/25
regard [1] 81/12
regarded [1] 8/15
regarding [3] 121/18 136/4 145/15

regardless [2] 30/14 158/14
regards [2] 160/21 160/23
registered [3] 1/13 36/11 171/13
registration [1] 36/16
registrations [1] 36/18
regular [4] 26/20 64/25 102/18 104/3
regularly [1] 136/19
rehab [2] 45/12 45/13
reimbursed [1] 126/2
relate [1] 139/3
related [14] 58/23 59/7 59/10 59/25 60/4 60/10 65/23 66/1 72/9 74/20 103/2 103/4 121/8 146/5
relations [3] 11/24 54/1 113/7
relationship [12] 25/4 62/25 68/16 90/12 91/1 96/22 97/14 107/23 107/24 111/14 111/15 157/6
relationships [1] 95/21
relentlessly [1] 161/6
relevant [1] 121/14
religion [1] 170/7
relive [1] 136/24
reliving [1] 135/8 135/11 135/15
remain [1] 4/18 103/22
remaining [2] 12/12 65/8
remarks [2] 6/1 62/16
remember [30] 12/6 14/15 18/19 22/22 27/11 28/17 36/21 40/21 42/19 47/9 74/12 88/7 97/4 97/5 97/5 97/6 97/7 97/9 98/12 122/9 122/10 128/10 131/6 142/7 142/13 142/17 151/10 164/8 164/11 169/7
remotely [1] 114/25
remove [1] 152/13
removed [3] 92/13 151/12 152/10
renewal [4] 81/7 101/15 103/5 103/11
rent [1] 106/1
repeated [1] 101/6
repeatedly [2] 54/3 157/21
rephrase [1] 15/1
replace [1] 84/16 85/2 101/1
replaced [2] 42/4 102/6
report [14] 38/14 38/21 59/10 60/23 60/24 61/16 61/19 68/8 75/5 75/15 77/10 79/20 87/20 126/4
reportable [1] 60/17
reported [11] 59/24 60/5 60/7 60/11 60/22 60/23 60/25 75/11 76/19 103/18 110/15
reporter [7] 1/14 15/3 43/20 85/18 93/9 171/13 171/23
reporting [1] 59/16
reports [5] 78/10 103/8 103/8 103/10 166/5
repossessed [2] 91/20 91/22
repossessing [1] 94/1
repossession [2] 92/10 92/21
represent [3] 22/12 67/15 142/5
representative [4] 4/24 6/12
representatives [1] 6/10
representing [1] 41/12
representing [5] 2/5 2/9 8/19 12/1 126/25
REPRODUCTION [1] 171/21
Republican [1] 36/11
request [4] 39/21 40/6 67/16 157/25
requested [1] 35/16
requests [2] 16/17 16/18
require [4] 51/9 59/16 62/8 62/9
required [9] 50/20 52/4 60/16 65/17 66/6 116/5 120/13 167/18 168/23
requirement [6] 50/23 51/24 52/3 52/13 168/1 169/18
research [1] 131/2
reserved [1] 4/8
reserving [1] 4/9
resident [5] 60/13 78/20 89/7 104/21 109/6
resident's [1] 25/24

**R**

residents [5] 25/17 99/9 108/16 153/20 153/21
resign [1] 97/9
resigned [2] 98/20 98/21
resolve [1] 15/6
resource [14] 38/17 38/18 39/1 58/6 58/9 58/18
66/4 92/9 95/12 96/5 116/10 116/11 116/12
119/20
resources [14] 20/19 32/7 38/10 57/22 58/16
58/20 65/24 66/1 66/10 71/12 79/3 113/18
130/24 168/12
respect [29] 15/25 27/15 33/18 44/23 45/2 45/7
49/24 56/10 58/12 62/3 64/6 70/13 79/10 79/13
81/5 85/25 89/3 99/21 100/1 105/9 108/5
135/17 143/10 153/23 154/13 156/13 162/25
164/3 167/4
respecting [4] 170/6 170/6 170/7 170/7
respective [1] 4/5
responded [2] 157/20 162/10
responding [2] 15/7 15/20
response [13] 5/25 6/3 6/17 6/18 11/7 15/12
39/23 40/11 42/12 140/14 162/6 166/7 167/11
responses [1] 21/2
responsibility [1] 53/19
responsible [2] 49/16 66/10
rest [2] 40/4 124/4
restrictions [1] 59/4
restroom [1] 15/16
result [11] 48/15 50/11 55/11 55/24 56/10 59/13
60/7 68/17 92/11 132/22 159/17
resulted [2] 59/7 98/2
resulting [1] 131/18
results [3] 31/20 98/8 135/1
resume [8] 32/10 44/15 115/21 119/20 120/9
120/10 121/19 131/1
resumes [1] 115/2
retain [1] 120/22
retained [3] 106/25 139/21 139/24
retaining [1] 113/25
retaliated [1] 47/12
retaliation [5] 73/7 73/10 157/20 160/2 160/13
retaliatory [1] 72/10
retire [1] 42/22
retired [1] 43/5
retirement [3] 132/17 161/9 161/14
retiring [1] 83/9
return [8] 53/5 53/6 55/8 55/16 55/19 55/25
58/3 58/15
return-to-work [8] 53/5 53/6 55/8 55/16 55/19
55/25 58/3 58/15
returned [2] 53/10 54/19
returning [1] 27/18
revenue [5] 124/15 124/16 125/3 127/20 127/25
review [8] 5/12 10/19 16/10 16/13 28/23 39/7
61/15 63/16
reviewed [3] 16/17 16/18 16/19
reviewing [1] 63/7
reviews [1] 42/17
Rhoda [4] 142/23 142/23 144/15 145/24
Richard [1] 2/13
rid [5] 81/8 81/14 101/7 139/21 139/25
Ride [1] 151/19
Rider [3] 69/16 72/19 85/12
right [23] 3/9 4/9 14/23 25/20 26/11 39/19 51/13
81/23 95/8 114/17 116/22 123/16 125/11 127/2
129/24 133/19 133/20 139/14 142/12 147/20
148/4 151/11 166/14
rights [1] 11/4
risk [4] 55/17 58/19 58/20 101/15
RJ [4] 19/7 21/19 28/20 93/15
RJ-1 [1] 21/19

RJ-3 [1] 19/7
RJ-4 [1] 28/20 93/15
RK [1] 1/7
road [5] 124/2 124/3 124/5 125/23 129/9
Robert [2] 93/17 93/23
Rogers [12] 54/10 57/10 82/17 82/19 82/25 84/6
97/24 99/17 100/13 104/6 122/3 164/17
role [7] 44/10 54/17 66/9 75/9 77/13 89/2
123/19
roll [1] 153/12
rollout [1] 53/12
room [5] 29/18 111/4 112/12 128/22 133/21
rose [1] 92/8
Rotary [1] 119/22
rotate [1] 102/17
round [2] 95/3 95/9
rule [1] 6/8
rules [1] 78/6
run [3] 25/18 118/7 137/23

**S**

S-H-R-M [1] 58/10
said [59] 13/10 20/2 22/18 23/8 23/11 23/13
23/15 23/15 23/17 23/20 23/20 23/24 25/14
25/15 25/16 27/8 28/1 28/5 28/6 30/4 31/11
41/16 43/7 44/6 49/15 67/13 67/20 70/20 71/19
72/2 72/4 78/24 89/17 91/1 91/15 91/24 92/17
95/5 95/6 95/10 95/20 96/1 96/4 98/20 104/12
109/16 113/24 117/5 128/8 130/25 131/1 135/13
141/6 141/13 150/14 155/13 161/23 163/23
166/22
salaried [1] 46/23
salaries [3] 48/2 48/15 50/5
salary [44] 45/3 46/11 46/20 47/3 47/10 47/14
48/10 49/24 50/1 124/6 124/7 129/10 152/25
153/12
sales [5] 123/20 124/2 127/25 128/12 129/4
salesperson [1] 125/2
same [17] 33/6 39/21 45/8 48/6 49/22 52/24
93/25 97/21 110/21 111/18 116/9 139/10 144/7
151/1 162/6 171/9 171/21
Sandler [4] 69/14 69/19 71/21 72/19
sat [4] 91/21 95/7 141/4 141/9
satisfactory [1] 40/14
satisfied [1] 47/3
Saturday [1] 5/10
saw [3] 18/3 78/11 163/2
say [44] 6/18 11/7 15/11 21/5 21/7 21/22 26/13
33/20 44/8 45/25 46/4 59/19 59/20 59/22 62/5
66/13 66/24 69/4 69/10 71/21 72/15 74/9 82/13
83/9 87/18 94/22 100/3 100/21 107/9 107/14
109/18 114/22 116/19 116/25 117/19 122/7
128/23 135/11 143/25 144/13 159/14 162/17
163/15 168/21
saying [14] 5/18 14/9 22/1 28/14 29/8 51/16
82/10 82/11 91/9 100/11 153/6 158/25 159/17
167/17
says [6] 19/9 19/13 86/18 87/1 96/25 99/11
scale [5] 124/16 127/19 127/23 128/2 128/6
scenario [1] 157/14
schedule [2] 64/20 146/1
scheduled [2] 133/4 167/15
SCHWARTZ [8] 2/3 8/17 9/10 28/23 32/22 36/3
125/6 143/13
Schwartz's [2] 6/1 10/25
Science [1] 122/11
screaming [1] 76/7
seal [2] 9/13 9/16
sealing [1] 4/5
search [12] 114/19 116/3 118/15 119/6 119/7
119/10 119/13 119/16 119/24 120/25 121/3
130/15

searched [1] 54/7
searches [1] 119/13
searching [1] 114/23
second [8] 69/16 100/13 126/19 135/5 135/15
141/8 141/9 154/21
Secondly [1] 5/3
secrecy [1] 9/8
secret [1] 92/12
secure [2] 20/6 127/16
see [21] 19/12 19/13 65/6 78/21 96/19 99/4 99/5
116/17 116/25 130/1 130/16 131/9 139/20
140/19 142/20 147/1 149/18 149/23 150/13
151/4 158/14
seeing [5] 63/13 137/2 145/24 149/14 161/21
seek [4] 68/19 121/18 141/17 142/15
seem [2] 9/4 94/22
seemed [1] 64/8
seems [3] 154/18 157/8 157/11
seen [2] 44/15 99/8
seldom [3] 32/20 37/15 168/20
self [5] 53/4 53/4 62/13 62/15 62/21
self-evaluation [2] 62/13 62/15
self-evaluations [1] 62/21
self-funded [1] 53/4
self-funding [1] 53/4
semesters [1] 52/8
seminars [4] 57/21 57/23 57/24 58/11
send [8] 23/25 59/1 95/18 120/7 121/21 131/1
133/7 166/2
sending [3] 28/15 34/4 111/1
senior [26] 10/20 39/5 39/7 39/16 41/5 57/6
64/19 67/21 70/2 78/2 78/16 79/2 81/22 81/25
82/12 82/13 84/5 90/15 90/15 92/5 104/8
105/25 109/9 113/14 139/19 169/1
senior-level [1] 67/21
sense [3] 89/16 103/4 148/15
sent [16] 20/11 21/14 24/2 27/9 28/19 28/24
29/1 32/18 33/17 53/23 96/11 115/1 119/20
120/10 143/15 151/2
separate [2] 84/14 86/10
separated [1] 114/14
separating [1] 101/3
separation [3] 101/25 132/22 146/6
September [3] 96/13 103/13 114/15
September 20th [1] 96/13
serious [2] 168/8 168/9
seriously [1] 169/15
served [1] 40/23
servers [2] 111/20 112/5
serviced [2] 110/1 110/7
services [21] 42/3 42/9 50/18 55/4 84/13 84/24
104/21 104/22 108/11 108/13 109/6 109/24
109/25 110/1 110/4 110/25 111/3 111/4 119/15
159/1 159/5
serving [1] 47/8
session [6] 54/2 54/4 57/4 103/17 103/20 103/22
sessions [3] 96/11 146/3 146/5
set [5] 46/20 47/15 51/25 86/9 131/3
setting [1] 46/4
settle [1] 14/16
settled [1] 14/17
settlement [1] 12/11
seventies [2] 80/13 80/24
several [5] 52/16 109/24 141/16 153/13 165/12
severe [1] 68/12
sexual [7] 72/9 97/24 111/2 111/3 111/8 163/3
169/20
sexually [8] 110/1 110/2 110/3 110/9 162/22
164/12 164/15 167/9
sexually-harassed [2] 110/3 162/22
sexually-harassing [1] 167/9

shall [1] 9/12
share [3] 58/2 87/6 87/7
shared [4] 23/21 26/4 86/13 86/16
shares [1] 25/25
sharing [2] 8/8 128/17
she [110] 12/21 12/23 18/12 18/14 18/16 25/2 25/6 25/14 25/23 25/25 26/3 27/24 27/25 36/8 42/2 42/4 42/19 44/10 69/19 72/2 72/8 72/8 72/10 72/15 72/15 72/17 72/17 72/18 82/20 83/2 83/4 83/8 83/9 83/10 83/10 83/14 87/18 87/20 87/20 87/23 87/24 88/2 88/3 98/2 102/8 105/11 105/13 105/21 107/21 108/6 108/7 108/19 108/20 108/24 108/24 108/25 111/15 111/19 111/19 113/24 114/3 140/19 140/25 141/2 141/6 141/7 141/10 141/13 141/14 141/17 141/20 144/7 144/8 146/8 146/11 147/2 149/3 149/8 149/9 149/15 149/18 158/2 158/3 158/4 158/6 158/10 158/22 159/3 159/13 159/19 161/2 161/7 161/8 161/9 161/11 161/13 161/23 161/25 161/25 162/2 162/2 162/4 162/16 163/18 163/19 166/5 166/8 166/11 166/14 166/23
she'll [1] 10/5
she's [13] 24/25 26/1 43/4 70/25 85/16 101/5 102/10 109/6 144/13 146/15 149/4 158/21 166/5
SHEET [2] 172/1 173/9
shocked [4] 95/14 96/6 96/7 107/11
short [2] 58/10
shot [2] 5/8 60/10
should [15] 7/25 8/25 51/16 60/11 61/16 62/9 70/10 71/25 92/6 92/7 110/21 128/23 140/15 158/3 168/20
shouldn't [2] 5/6 8/16
show [2] 19/1 96/25
showed [2] 19/25 161/23
showing [3] 19/7 24/21 96/24
shown [1] 9/19
SHRM [2] 58/9 58/12
sign [5] 34/17 91/8 167/18 167/24 168/6
signed [2] 34/20 154/24
significantly [2] 158/23 162/15
signing [1] 34/14
silence [1] 91/14
Silverchair [3] 168/1 169/11 169/19
similar [5] 49/9 123/6 153/23 170/9 170/10
simple [1] 33/23
simply [1] 98/20
since [14] 5/11 23/2 24/12 53/12 53/18 65/6 72/14 100/25 112/20 114/14 114/20 125/23 138/13 149/13
single [5] 97/18 97/21 115/10 131/21 137/25
Singulair [1] 138/3
sinus [1] 139/3
sister [5] 69/16 71/24 71/25 72/7 85/13
sister's [1] 72/16
sisters [1] 121/22
sit [6] 23/7 41/4 77/18 95/7 95/23 152/3
site [2] 117/23 120/16
sitting [7] 8/19 23/9 25/9 29/14 30/25 35/3 95/3
situation [3] 69/7 70/9 70/13
situational [1] 135/7
situations [3] 83/20 90/15 136/22
six [5] 129/17 134/2 154/17 156/8 158/8
Sixty [1] 83/5
Sixty-something [1] 83/5
skilled [1] 162/21
skills [1] 87/21
sleep [1] 136/25
sleeping [1] 136/8
slide [1] 11/22
sliding [5] 124/16 127/19 127/23 128/2 128/6

slightly [2] 50/10 52/16
slow [1] 145/18
small [1] 108/14
Smalls [2] 88/5 88/7
so [184]
social [11] 25/6 37/6 88/14 88/20 88/20 88/22 89/3 89/8 108/21 126/25 149/4
socializing [1] 61/12
societies [1] 58/9
Society [1] 58/9
soley [1] 127/10
Soltis [7] 5/14 45/7 57/2 143/15 152/9 153/6 153/10
some [33] 14/23 18/3 27/16 36/19 60/7 60/13 60/16 61/11 63/7 68/11 68/13 69/3 75/9 76/24 81/14 92/11 97/10 111/8 116/5 117/22 117/22 131/2 133/17 141/18 144/22 145/13 147/10 149/4 153/2 159/17 161/20 163/3 165/2
somebody [1] 97/23
someone [29] 14/8 21/9 28/15 42/4 43/8 43/11 43/15 43/17 43/23 44/6 54/24 59/1 60/6 60/9 61/18 66/22 75/7 75/16 78/11 81/20 91/1 97/13 101/1 107/7 127/2 157/6 168/4 164/7 168/10
someone's [3] 26/12 60/15 75/4
someplace [1] 153/2
something [42] 9/17 14/9 26/12 26/16 27/9 30/4 30/20 40/14 45/25 58/15 58/16 60/4 62/7 64/25 68/14 69/24 74/25 75/5 75/10 83/5 86/9 86/12 91/17 97/18 97/22 98/10 101/25 107/15 109/6 114/1 121/12 129/21 134/13 136/18 137/10 138/8 139/24 139/25 145/19 157/13 161/14 161/21
sometimes [4] 25/18 38/2 52/17 82/5
somewhere [4] 22/22 116/13 117/2 128/11
SOMMER [1] 2/7
Sommers [2] 7/6 7/13
son [1] 93/17
sorry [5] 9/7 42/6 48/12 63/2 148/1
sort [1] 146/19
sought [6] 69/3 69/5 72/15 91/20 145/10
source [8] 11/2 85/22 86/1 112/21 113/3 141/18 146/9 146/12
sp [1] 88/4
speak [9] 34/7 48/13 68/9 106/10 124/2 149/6 149/11 150/15 150/17
speaking [11] 15/2 24/3 31/25 42/15 45/13 48/1 68/8 106/8 147/23 148/21 164/5
Specialist [1] 166/5
specialized [1] 66/3
specific [2] 16/16 101/22
specifically [4] 9/18 30/16 64/7 100/1
speculating [2] 131/13 131/23
speech [1] 45/16
spell [3] 24/5 79/15 140/21
spend [2] 7/5 151/3
spending [1] 129/9
spent [2] 116/3 153/19
spewed [1] 29/24
spewing [1] 5/4
spoke [7] 27/19 42/10 48/6 86/5 122/4 122/13 134/12
spoken [2] 22/20 149/13
sporadically [1] 102/16
spot [1] 170/11
Sr [1] 93/23
St [2] 130/24 131/10
staff [25] 24/19 25/18 31/7 45/12 45/13 45/20 46/5 67/21 70/16 76/2 78/6 79/4 79/18 100/5 101/12 105/16 105/19 108/11 108/18 108/24 113/11 129/3 140/10 140/11 162/9
stairs [2] 150/19 150/21

stairway [2] 150/10 150/13
stand [2] 98/13 169/13
standard [1] 88/22
standards [1] 9/7
standing [3] 147/22 148/2 149/24
stands [1] 30/14
start [3] 69/18 114/15 163/8
started [18] 18/1 18/19 41/11 42/20 55/3 55/14 88/15 118/15 123/23 124/13 137/11 140/5 141/2 144/15 147/19 156/9 161/10 168/21
starting [2] 46/25 146/21
starts [1] 91/7
state [8] 34/3 70/22 73/8 85/14 120/13 154/23 155/1 156/13
stated [2] 7/21 130/7
statement [4] 21/18 23/2 30/10 59/1
statements [5] 34/25 63/18 63/22 63/25 163/9
STATES [1] 1/3
stating [1] 21/13
statistical [1] 103/8
status [7] 40/1 40/7 40/18 41/24 56/5 67/5 116/25
statutes [2] 71/5 73/8
stay [2] 122/25 149/16
stayed [2] 141/15 148/13
stellar [1] 53/9
StenoSource [1] 3/25
steps [2] 149/24 150/22
Stewart [3] 12/7 12/12 13/18
stickers [1] 24/20
still [14] 4/21 17/15 17/17 18/12 24/9 29/14 51/2 80/11 114/1 135/3 152/14 152/18 152/24 166/11
sting [1] 60/6
stipend [6] 152/10 152/13 152/15 152/18 153/8 153/14
stips [2] 16/2 16/3
stipulated [1] 4/4
STIPULATION [1] 4/2
stonewalled [1] 95/19
stop [2] 111/15 135/8
stopped [3] 52/12 77/21 117/18
straight [1] 150/5
strain [1] 59/22
strained [2] 59/21 100/5
strange [1] 36/15
Street [2] 1/15 2/8
strength [1] 97/7
stress [2] 146/11 146/12
stressed [1] 74/18
strike [5] 27/15 34/23 52/5 90/8 140/7
stroke [1] 133/8
Stroman [1] 18/9
structure [1] 124/22
stuck [1] 141/14
stuff [1] 6/22
style [1] 100/3
subject [1] 169/19
subjected [3] 20/15 67/2 144/8
submit [1] 115/15
submitted [2] 16/19 116/14
subordinates [1] 78/24
Subscribed [1] 173/16
substance [1] 173/8
substantiate [1] 6/23
substitute [1] 53/7
successful [1] 72/24
successor [1] 42/10
such [3] 61/15 108/24 163/8
suffer [1] 132/21
suffered [1] 132/14
suggest [3] 68/1 86/19 102/9

**S**

suggested [4] 57/3 64/13 66/6 88/16
suggesting [1] 167/23
suicide [2] 135/21 145/13
suit [3] 12/16 12/17 13/10
summation [1] 22/15
superior [1] 44/4
supervised [3] 105/3 105/5 105/6
SUPERVISION [1] 171/23
supervisor [7] 46/14 51/18 65/2 104/24 105/1 128/14 129/3
supervisors [1] 32/19
Supper [28] 68/14 68/22 70/14 75/8 75/22 76/10 76/19 76/21 77/11 77/14 78/8 79/10 79/18 81/3 88/15 93/17 93/23 99/19 99/21 100/14 103/5 104/5 161/7 162/14 162/18 163/7 166/6 166/9
Supper's [3] 70/17 80/12 91/19
support [7] 3/13 82/18 85/2 89/11 101/24 112/7 157/13
supported [4] 42/13 42/13 43/25 82/24
supporter [1] 36/22
supportive [1] 87/25
suppose [2] 20/5 103/6
suppressed [3] 47/17 48/3 48/15
sure [25] 13/13 19/6 25/15 25/19 26/9 26/13 58/5 63/12 64/21 71/2 82/14 85/5 87/3 100/6 125/7 133/25 137/24 148/4 148/6 156/8 162/4 167/1 167/20 169/13 169/15
surprise [6] 19/18 35/21 35/23 76/15 89/20 155/19
surprised [1] 76/18
survey [7] 22/5 22/6 22/6 22/9 22/10 22/17 23/8
surveys [1] 23/5
Susan [2] 166/4 166/25
suspend [1] 95/18
sweater [1] 163/5
sworn [3] 5/23 11/14 173/16
symbols [1] 87/3
symptoms [1] 140/2
synagogue [1] 5/8

**T**

table [3] 6/4 95/3 95/9
take [48] 8/7 8/20 11/5 15/3 15/15 22/9 22/10 50/20 52/2 53/2 58/25 65/1 65/5 65/8 66/6 81/11 81/15 81/25 85/4 91/24 95/11 96/1 96/2 96/23 104/23 104/25 107/3 109/19 122/23 129/22 133/18 133/25 134/18 134/20 136/13 136/16 136/19 136/21 138/3 138/3 158/7 168/3 168/4 168/4 168/24 169/8 169/15
taken [14] 1/12 65/22 68/15 90/18 133/24 134/7 138/12 138/13 141/11 146/23 168/20 169/6 169/17 171/6
taking [11] 15/19 23/4 92/8 104/6 105/25 134/13 134/15 136/23 138/5 152/21 159/24
talk [15] 22/23 22/24 24/25 74/10 71/2 72/2 95/20 95/23 96/2 96/2 96/20 103/11 104/4 121/16 160/5
talked [4] 101/6 103/9 122/10 148/13
talking [17] 22/24 26/12 26/19 27/3 31/6 31/7 40/8 46/7 66/18 76/1 76/8 76/9 122/24 127/5 138/23 164/6 164/8
talks [1] 101/6
tape [1] 25/23
Target [1] 105/19
taught [1] 53/24
taunt [1] 105/19
taxes [1] 118/5
team [12] 10/20 39/5 39/7 39/16 41/5 57/6 64/19 78/17 79/2 113/15 139/19 169/1
Teams [1] 90/15

tears [2] 83/13 151/5
telephone [1] 149/15
telephonically [2] 32/14 32/16
television [1] 13/18
tell [23] 18/25 33/6 46/20 48/14 64/7 69/19 71/25 72/10 75/21 79/21 97/15 98/19 98/20 112/21 126/7 145/5 151/6 155/15 167/4 167/8 167/14 168/3 168/6
telling [6] 17/1 56/25 57/8 68/19 71/16 142/14
tells [2] 98/10 141/1
telltale [1] 91/8
temporary [2] 119/17 119/19
tend [1] 136/23
tenure [9] 21/5 41/15 50/1 57/12 66/14 80/22 82/2 82/13 99/16
term [1] 162/8
termed [1] 39/11
terminate [6] 79/22 89/10 94/8 95/13 96/5 101/22
terminated [15] 20/10 27/16 54/10 68/24 81/22 82/17 83/8 88/2 89/9 90/10 97/23 100/20 111/25 112/4 147/7
termination [12] 20/16 80/7 81/24 82/25 94/12 94/17 94/24 98/9 118/7 136/11 146/14 166/14
terms [6] 6/22 41/23 46/4 46/5 47/17 103/12
terribly [1] 72/24
territory [2] 123/23 126/7
test [4] 42/22 65/2 65/5 65/9
testified [16] 5/23 30/22 30/25 31/9 36/2 48/5 72/17 76/14 94/16 100/10 104/8 123/12 125/17 146/10 147/4 163/19
testify [3] 17/9 33/5 107/7
testifying [4] 15/21 20/9 22/6 27/13
testimony [14] 13/10 14/19 14/21 15/4 17/7 19/15 24/24 27/8 99/22 166/22 168/18 171/6 171/8 173/4
tetanus [1] 60/10
text [2] 34/2 111/1
than [29] 5/1 7/6 14/7 14/11 19/21 28/2 49/22 50/15 81/2 90/21 90/22 96/9 99/15 100/12 101/1 105/14 109/9 129/10 131/17 131/23 138/7 144/16 144/21 151/8 158/23 162/3 162/15 164/15 165/13
thank [1] 5/19
that [1101]
that your [1] 47/14
that's [50] 5/4 16/14 16/22 20/8 20/18 21/25 22/3 22/5 23/15 26/12 28/22 30/15 30/24 31/7 31/15 33/19 43/16 58/21 60/3 60/4 66/5 69/24 70/3 71/22 72/23 91/8 91/18 93/19 94/3 101/8 106/6 114/1 117/2 120/12 121/2 123/14 125/20 126/21 128/6 128/15 131/23 134/10 139/3 153/11 153/20 154/14 160/19 162/17 164/4 169/18
their [42] 9/7 24/20 48/15 55/17 58/17 59/3 59/21 60/14 60/15 67/11 69/3 69/8 71/11 78/3 82/10 96/10 101/7 101/17 104/23 104/24 104/25 104/25 105/7 106/1 111/11 113/12 113/13 116/23 119/4 120/18 124/1 127/2 129/4 129/14 159/10 168/13 168/14 168/14 168/15 169/3 169/6 169/8
them [69] 5/16 13/8 13/11 13/13 20/4 21/8 24/21 24/21 24/22 25/18 27/1 35/6 44/24 53/8 63/20 66/24 67/11 67/22 67/24 67/25 69/8 69/8 69/18 70/1 70/18 78/6 81/16 84/16 92/5 95/18 95/22 95/23 96/24 97/19 98/20 98/25 99/4 99/5 101/19 104/12 104/23 107/2 108/15 109/18 111/8 111/16 111/16 111/19 113/6 113/12 113/14 113/21 115/13 117/11 119/20 119/21 120/4 120/7 120/11 122/23 126/2 143/13 143/23

144/4 155/14 155/15 157/7 165/4 165/4
themselves [3] 34/8 67/23 67/24
then [77] 8/6 13/10 19/24 23/13 23/17 23/24 25/23 26/23 31/20 33/2 39/6 41/18 42/22 45/20 53/7 56/23 59/5 60/21 61/4 62/15 67/11 69/23 69/25 72/11 77/22 78/5 78/7 79/22 81/23 84/5 86/12 86/12 87/2 87/6 92/15 92/16 96/25 100/14 103/19 105/15 107/4 108/17 108/22 110/14 116/24 117/10 117/14 120/20 124/15 125/6 126/20 129/3 136/24 140/18 145/12 145/25 146/20 146/21 147/19 147/20 148/13 148/20 148/23 150/5 150/10 150/10 151/3 151/8 152/12 152/19 155/11 157/8 160/12 160/12 161/25 167/13
therapist [1] 137/12
therapists [3] 45/15 45/16 45/16
therapy [3] 127/8 127/9 144/23
there [136] 5/19 7/22 8/9 9/17 9/24 10/10 10/21 12/11 14/13 15/19 19/18 22/24 23/9 28/20 29/19 32/2 32/8 40/2 40/3 40/17 40/23 41/1 41/6 41/22 41/24 46/9 49/8 49/13 49/21 50/8 50/14 50/16 53/5 53/12 54/20 55/10 56/12 56/25 57/8 57/21 58/3 59/5 59/6 59/12 59/17 60/2 60/3 61/11 61/12 61/14 62/14 63/14 65/16 67/1 67/9 67/10 67/12 67/15 68/10 68/11 71/5 71/9 72/20 74/1 80/12 80/13 89/4 89/18 89/20 89/22 92/16 95/19 96/11 98/10 98/13 98/16 98/23 98/24 99/13 99/19 100/15 101/23 103/2 103/15 103/21 103/24 103/24 104/2 107/19 110/24 110/24 112/23 113/9 113/20 115/18 118/2 121/2 124/3 126/16 127/24 128/22 130/3 130/17 135/20 137/5 137/15 139/14 139/15 139/17 140/1 140/3 141/6 143/8 146/13 147/20 147/23 148/5 148/7 148/13 148/25 150/6 151/21 152/1 152/3 154/3 156/10 160/22 160/23 162/7 164/1 164/1 164/22 164/24 167/15 167/17 167/22
there's [23] 8/2 8/13 8/14 9/20 11/8 14/3 15/5 19/15 30/12 34/24 43/16 60/2 68/25 93/20 93/23 99/11 99/13 119/19 130/16 130/16 132/18 169/21 169/23
therein [1] 173/7
Theresa [2] 140/20 140/25
these [15] 6/10 6/12 19/19 56/4 69/6 69/6 70/20 71/14 77/5 77/10 95/21 96/7 110/3 116/5 117/3
they [142] 12/10 13/3 14/16 14/16 14/17 20/24 20/24 24/16 24/22 27/1 29/18 30/2 38/21 38/22 40/5 45/17 45/19 48/3 49/4 49/5 49/10 52/22 53/1 53/11 53/3 55/6 56/16 56/17 57/4 58/1 58/2 59/4 59/20 59/21 60/11 60/14 60/18 60/19 60/20 60/21 61/9 61/23 67/2 67/5 67/13 67/20 67/23 68/1 68/6 68/7 68/8 68/9 69/13 69/22 69/22 72/20 75/5 78/4 82/3 84/25 86/19 87/6 92/5 93/25 95/25 96/10 96/10 96/23 98/17 98/23 98/24 98/25 99/1 100/11 100/12 103/16 105/1 105/1 107/7 108/14 108/17 109/12 109/25 110/2 110/4 110/9 110/21 111/5 111/11 111/13 111/17 111/19 112/6 113/17 113/18 113/19 116/6 118/22 120/16 120/17 120/18 120/18 120/20 120/20 123/8 123/9 123/22 126/18 126/19 126/22 127/13 129/2 130/15 132/9 133/6 133/8 133/16 133/20 137/21 139/3 140/14 140/15 142/9 143/18 143/18 143/18 144/7 151/2 152/10 152/13 153/12 155/14 155/17 155/19 159/8 159/10 160/9 163/8 167/24 169/3 169/15
they'll [1] 87/7
they're [8] 45/15 55/5 101/17 127/4 127/7 129/2 130/15 169/13
thing [13] 30/3 30/20 58/22 65/8 74/3 88/21 92/3 110/21 116/9 121/5 141/13 154/14 154/20

**T**

things [22] 4/19 22/4 25/12 28/2 29/23 38/14
71/21 73/21 77/10 87/22 87/22 90/1 96/7 96/9
98/13 99/15 100/12 100/25 106/25 114/4 121/16
158/14
think [80] 7/9 7/10 8/23 13/17 16/22 18/19
23/14 25/19 29/21 29/23 29/24 30/8 32/20 33/2
33/22 42/1 42/1 42/21 52/8 54/13 58/18 58/21
62/4 64/5 64/9 65/15 72/22 79/16 84/21 86/17
86/21 87/1 88/22 90/6 93/12 97/1 97/1 100/16
100/16 100/22 100/23 101/8 102/2 102/4 103/19
106/6 107/12 109/4 115/18 116/16 123/10 128/7
128/8 130/4 130/6 130/24 132/18 134/17 140/22
149/4 150/22 151/9 151/17 152/1 153/4 153/17
154/20 154/22 156/7 157/8 158/14 159/19
161/23 163/18 163/19 164/8 165/1 166/19 167/1
170/11
thinking [4] 31/6 48/19 107/16 121/12
thinks [2] 135/6 146/11
third [1] 153/20
thirties [1] 80/2
this [84] 4/23 4/25 5/12 5/15 7/24 8/3 9/13 9/15
9/21 9/21 10/5 11/2 11/5 11/8 16/23 17/6 18/15
19/7 19/15 21/20 22/5 23/25 25/18 28/19 28/20
28/21 31/11 32/4 33/6 33/11 33/16 34/15 35/18
36/2 57/1 60/1 63/8 64/8 64/10 71/15 73/10
85/15 85/16 89/4 91/3 91/3 91/24 96/20 96/23
101/8 109/17 109/18 109/20 110/19 111/2 111/7
111/12 111/24 121/14 123/12 125/12 125/17
125/21 127/9 128/25 129/12 130/2 132/4 134/4
135/7 135/14 142/1 142/3 142/12 143/3 143/10
144/2 144/9 144/21 146/17 152/4 170/11 171/19
173/16
THOMAS [5] 1/9 2/13 12/7 13/1 13/2
Thompson [13] 27/21 28/7 28/15 48/4 73/17
74/16 75/25 87/12 105/5 144/5 147/6 167/17
169/14
Thompson's [2] 48/8 144/10
thorn [1] 161/12
those [44] 12/2 12/6 12/8 12/14 19/4 26/20
26/21 26/24 46/22 49/1 53/12 61/4 63/16 63/25
65/19 73/21 78/19 81/14 81/16 100/24 102/23
102/25 103/10 105/3 107/8 120/1 122/21 128/17
143/16 146/3 146/5 151/25 152/2 155/3 162/11
163/5 163/6 164/23 165/25 166/17 166/20 168/2
168/18 168/24
though [11] 20/2 40/5 50/24 54/2 73/7 83/10
116/5 117/3 124/22 145/18 157/25
thought [18] 27/25 33/2 36/2 41/9 55/3 67/18
67/23 82/22 84/4 97/3 108/24 116/1 131/8
133/21 144/7 158/9 162/8 168/8
thousand [3] 52/17 54/18 128/12
thousand-dollar [1] 52/17
three [12] 11/19 42/20 48/25 52/8 53/12 108/16
122/19 140/3 146/1 149/16 149/18 168/14
three-year [1] 53/12
throb [1] 91/7
through [20] 9/14 11/23 43/25 55/16 82/21
84/15 86/4 86/10 96/8 112/24 115/16 117/5
122/3 139/20 141/9 146/20 152/3 156/16 164/22
165/4
throughout [2] 53/20 77/19
Thursday [4] 1/16 59/23 60/1 142/3
Thursdays [1] 76/1
tier [3] 104/16 126/19 126/20
time [72] 1/17 4/8 4/14 5/11 6/12 8/24 12/13
13/17 14/8 15/3 19/12 24/18 24/25 30/23 32/25
43/5 47/1 47/7 47/9 47/15 48/10 52/10 53/7
55/10 58/7 59/14 61/11 62/13 68/10 68/20 77/7
80/17 82/8 82/22 87/9 88/24 91/24 94/24 96/19
103/1 103/24 112/20 114/14 114/20 117/15

117/15 118/18 121/23 122/24 124/4 124/23
126/1 126/16 128/21 129/10 129/24 135/15
137/15 146/2 146/25 149/13 151/3 151/16
151/18 153/3 153/7 158/9 158/9 163/2 166/13
167/13 168/21
timeframe [1] 54/21
timeframes [2] 41/21 54/16
timers [2] 81/21 82/13
times [16] 8/5 8/21 9/1 11/18 54/5 64/24 64/24
102/22 126/14 126/15 126/20 133/6 137/20
137/23 146/1 165/11
title [6] 39/9 50/25 159/2 159/4 159/9 159/20
to-do [2] 121/11 151/24
today [9] 6/7 6/12 15/20 17/15 17/17 29/14
30/25 35/3 91/16
today's [1] 16/10
together [3] 85/1 90/23 146/2
togethers [1] 58/2
token [1] 103/18
told [34] 10/6 21/18 23/1 23/22 25/21 43/10
52/22 56/20 57/10 70/15 70/19 71/9 71/22
71/24 76/21 91/21 91/22 94/14 95/24 96/18
98/22 98/24 100/14 109/25 110/15 110/19
110/22 130/20 140/15 141/20 155/14 156/16
156/18 159/24
tolerance [1] 68/14
tolerate [1] 92/15
tolerated [3] 77/23 82/19 110/20
Tom [39] 39/11 39/19 42/10 42/22 43/7 44/25
56/18 69/25 70/1 84/15 84/16 87/19 87/23
87/25 92/3 92/17 95/4 95/9 95/24 98/18 98/19
98/25 100/16 100/24 101/12 101/24 102/2
105/12 108/20 155/24 158/7 158/25 161/18
162/5 164/21 165/9 169/2 169/5 169/24
Tom's [10] 89/10 91/7 95/2 95/3 108/7 147/18
148/5 148/11 150/2 153/7
tomorrow [2] 110/23 131/3
Tony [1] 113/8
too [2] 157/11 159/24
took [20] 22/7 22/7 22/21 52/8 53/4 53/14 76/24
87/23 89/7 90/23 92/7 125/1 133/5 136/14
136/21 140/19 147/21 168/22 169/25 170/2
top [5] 19/9 32/9 126/17 126/17 153/22
topic [4] 103/14 143/15 169/23 169/25
topics [2] 61/15 78/5
total [1] 118/4
touch [2] 165/19 165/23
Tournament [1] 105/17
towards [1] 109/2
trained [4] 53/24 73/23 74/20 74/21
trainer [2] 53/15 53/17
training [22] 53/14 53/19 53/23 64/11 74/17
74/17 74/18 95/18 96/10 98/3 98/3 98/3 98/4
103/9 168/3 168/4 169/10 169/11 169/14 169/17
169/19 169/24
trainings [2] 58/13 65/22
transcript [4] 171/9 171/20 173/4 173/6
transcripts [1] 13/12
trash [1] 139/21
traumatic [1] 133/22
travel [3] 92/1 120/13 125/25
treat [5] 133/22 136/2 136/5 136/5 145/22
treated [13] 13/8 13/11 72/11 92/6 97/14 99/1
108/23 144/14 146/23 146/24 160/8 160/13
162/3
treating [9] 12/21 71/10 137/5 142/22 144/17
158/17 159/23 161/1 166/9
treatment [17] 60/8 60/21 61/4 62/8 62/9 70/18
97/21 99/20 106/14 109/2 141/3 141/4 141/5
141/8 141/9 141/17 142/15
tremendous [1] 108/15

trial [6] 4/8 14/16 14/16 14/17 14/18 14/19
trials [6] 14/19 14/24 15/9 151/6
trip [2] 51/3 153/25
Trish [1] 87/12
trophy [2] 105/18 105/20
trouble [1] 136/19
true [7] 29/3 34/22 57/12 64/18 109/3 171/9
173/5
Trump [11] 22/25 23/18 23/18 23/19 23/20
23/25 24/20 29/7 30/2 31/14 36/22
Trump-supporter [1] 36/22
trustees [7] 56/14 56/15 57/17 92/9 94/13 94/15
102/14
trusting [1] 96/21
truthful [7] 15/21 27/12 63/20 63/21 107/13
107/17 107/25
truthfully [1] 17/9
try [4] 113/9 141/13 141/13 165/1
trying [5] 9/9 37/18 103/10 106/16 164/21
Tuesday [2] 129/6 142/9
turn [1] 117/14
turned [2] 61/4 108/23
Turning [1] 66/9
turnover [3] 103/8 103/9 113/9
tweet [25] 20/11 21/14 21/18 21/19 21/23 22/16
24/2 27/9 28/15 30/12 30/17 30/19 31/3 31/11
31/20 32/4 33/17 33/19 34/4 92/8 95/10
98/6 98/11 101/23
tweeted [2] 29/6 30/18
tweeting [1] 17/23
twice [1] 52/17
twist [1] 60/14
twitter [25] 17/12 17/19 17/21 17/21 17/21
17/25 18/12 18/13 18/21 18/22 18/24 19/16 19/19
19/23 19/23 20/1 20/3 22/4 36/24 86/10 86/16
86/20 86/24 87/3 98/6
two [34] 11/23 14/13 22/2 22/18 22/19 24/19
27/20 42/21 52/8 54/18 69/12 72/18 92/5 94/25
110/13 110/24 111/14 121/22 122/22 123/6
124/16 126/14 126/20 127/18 128/13
129/9 131/22 133/23 134/6 145/25 146/1 161/6
169/13
two percent [2] 124/16 127/19 128/1 128/13
type [25] 22/4 44/8 44/10 53/1 59/16 60/16 66/6
68/11 72/7 72/12 76/24 77/15 83/16 83/17
111/8 120/22 121/7 123/17 127/4 128/25 129/7
130/3 137/21 144/25 159/18
typed [3] 30/6 121/4 121/5
types [6] 11/20 26/24 58/11 73/19 140/2 157/20
typically [3] 46/19 103/7 139/4

**U**

Uh [7] 19/8 83/1 84/7 110/18 115/8 132/12
160/11
Uh-huh [7] 19/8 83/1 84/7 110/18 115/8 132/12
160/11
um [22] 25/25 30/1 61/1 74/9 87/7 90/6 111/1
113/15 117/24 119/19 122/10 123/5 133/24
135/5 137/12 142/18 146/17 153/6 153/10
155/24 164/8 166/21
umbrella [1] 27/5
unable [1] 65/19
unanimous [3] 94/14 95/24 96/4
unaware [2] 6/8 76/12
uncomfortable [4] 25/16 67/24 111/16 163/5
under [26] 13/10 27/4 27/4 45/11 47/8 50/2 50/3
50/6 50/20 50/23 56/15 56/17 57/3 76/19 80/22
82/6 99/15 100/16 116/18 116/18 117/1 129/23
137/11 157/14 168/7 171/22
undergo [1] 129/7
underneath [2] 87/3 95/15
understand [10] 5/17 14/25 15/13 16/1 37/18

## U

understand... [5] 82/5 95/16 106/17 124/21 152/22
understanding [6] 41/9 41/22 59/15 90/7 111/7 131/11
understood [1] 15/8
unemployment [17] 20/9 20/14 20/20 21/13 27/7 29/7 29/16 31/10 32/13 32/19 32/23 90/2 115/17 117/6 130/9 130/18 133/2
unethical [4] 154/7 154/10 155/1 157/3
unfair [1] 158/14
unfortunate [1] 144/23
uniform [1] 89/6
Unit [1] 89/6
UNITED [1] 1/3
unless [4] 59/16 97/3 97/22 171/22
unnecessarily [1] 112/11
unrelated [1] 164/24
unsettled [1] 26/8
unsettling [1] 26/11
until [10] 29/18 40/21 62/25 76/22 76/22 90/11 110/23 117/10 140/4 142/19
untrue [3] 34/25 63/19 63/24
unusual [3] 16/4 89/21 159/19
up [48] 5/8 9/6 19/24 19/25 22/16 42/15 43/6 62/25 72/6 77/11 79/23 80/7 81/2 85/13 86/10 89/23 90/1 90/5 90/11 92/17 97/2 97/2 112/2 114/3 116/15 117/10 128/6 128/7 128/12 131/3 131/21 133/15 137/10 139/14 139/14 139/15 139/17 139/20 140/1 140/3 147/17 148/7 150/11 150/19 150/21 150/22 151/7
updated [1] 121/21
updating [1] 121/24
upon [9] 20/10 52/20 71/11 72/4 94/11 108/22 130/13 159/10 160/13
upset [9] 14/1 14/8 17/24 63/5 90/17 94/17 94/23 95/11 108/25
upstairs [2] 147/15 147/21
us [8] 15/2 15/6 21/21 22/15 37/17 78/6 101/13 101/15
use [10] 9/5 15/15 18/3 37/16 38/4 77/18 86/19 97/7 112/12 142/19
used [1] 73/24
uses [2] 21/23 37/15
using [1] 21/14
usual [3] 16/2 16/3 158/12
usually [6] 103/7 103/13 103/15 104/24 133/1 135/4
util [1] 111/20
utility [2] 24/10 111/20
utilized [5] 73/19 73/20 75/14 85/15 114/8
utilizing [1] 17/17

## V

vacation [2] 129/16 129/17
validity [1] 35/3
value [14] 49/22 91/4 132/18 132/18 156/25 157/2 157/10 157/14 158/4 158/5 158/8 159/25 162/15 162/16
veal [1] 113/2
vehicle [1] 75/14
vein [1] 91/7
verbal [1] 57/8
verbiage [1] 30/19
Verification [4] 34/14 34/17 34/20 34/25
Vermita [3] 88/4 88/5 88/7
versus [3] 78/6 122/25 130/1
very [31] 23/1 25/11 29/23 31/2 32/19 33/23 37/15 50/24 60/15 62/18 62/25 78/7 84/4 84/20 87/9 89/20 90/12 90/25 94/17 95/11 96/18 108/21 108/21 125/23 125/25 146/25

## W

W-O-M-A-C-K [1] 24/6
wages [1] 132/15
waiting [3] 23/11 23/16 147/18
waived [1] 4/6
waiver [1] 20/13
Walgreens [1] 134/8
walk [5] 78/13 137/24 141/15 147/19 150/19
walk-in [1] 141/15
walked [10] 95/2 140/18 141/14 147/16 148/5 148/7 148/10 148/23 150/5 150/22
walking [7] 24/20 25/8 78/22 78/23 149/1 149/20 149/22
wall [1] 95/8
want [18] 4/25 5/17 10/8 25/18 26/9 67/13 67/21 69/23 73/3 87/1 87/4 96/2 97/1 109/16 110/16 112/10 131/1 142/14
wanted [13] 26/13 44/6 87/9 93/5 95/22 121/16 133/7 133/22 141/10 161/4 165/1 165/20 166/15
warrant [1] 159/2
was [633]
washrags [1] 55/10
wasn't [11] 28/16 77/2 81/20 94/4 96/16 113/22 117/12 136/7 162/4 162/4 165/5
WAVERLY [80] 1/8 5/4 6/13 10/18 12/1 13/13 17/23 18/10 18/21 18/24 19/6 19/16 19/20 19/21 19/22 19/25 20/3 21/2 21/6 24/13 24/16 24/24 25/5 27/17 27/20 32/1 32/18 38/10 45/9 53/21 53/25 53/25 54/14 55/5 58/8 61/9 68/21 69/15 73/14 73/16 74/25 75/24 82/2 87/12 88/15 88/19 89/13 89/23 90/4 93/21 93/24 97/20 98/7 106/19 107/7 112/20 121/23 122/4 135/25 138/24 139/7 139/11 144/19 146/2 149/18 154/6 154/16 154/18 164/20 165/2 168/2 169/20
Waverly's [4] 88/14 108/13 152/12 152/23
Wawa [1] 105/20
way [20] 10/2 19/21 20/1 25/20 26/11 30/10 42/21 56/13 60/3 70/8 84/20 98/8 99/2 108/18 146/22 146/23 155/6 155/13 163/4 165/23
we [69] 8/17 9/13 9/13 10/11 10/16 12/12 14/24 15/7 15/17 16/2 20/12 22/14 22/22 22/23 22/25 23/24 26/19 31/7 53/4 53/9 53/9 53/15 55/14 61/1 64/9 64/24 69/18 71/12 73/23 73/23 74/9 74/11 74/16 81/6 81/9 81/13 85/4 86/5 87/24 88/16 88/20 96/20 96/21 97/1 101/18 101/19

162/3 163/5 168/20 169/15
102/18 125/11 128/7 138/9 139/16 148/2 149/2
50/17 50/25 58/19 66/9 78/2 79/3 92/5 116/10 130/24 158/24 159/2
vice-presidents [1] 58/19
vicinity [1] 148/4
victimized [1] 38/22
viewed [2] 13/23 14/6
violation [3] 11/4 35/14 70/22
violence [1] 169/22
visit [1] 151/1
visited [2] 126/18 126/20
visits [4] 125/23 126/12 126/16 126/17
voice [2] 25/23 87/24
voicemail [2] 25/24 149/15
voluntarily [1] 111/22
voluntary [2] 111/14 165/8
volunteered [1] 54/12
voting [16] 22/25 23/10 23/14 23/17 23/18 23/19 23/20 24/16 25/2 26/3 27/2 29/6 30/2 31/14 32/1 32/3
VP [15] 20/19 21/20 21/24 22/2 39/6 39/9 40/1 40/7 40/15 40/18 41/24 42/8 109/18 158/12 159/3

## W

101/19 102/22 103/13 103/14 104/4 107/24 108/24 122/24 122/25
139/20 139/25 144/8 145/8 146/2 151/6 154/12 156/6 165/6 168/12
we'll [3] 6/22 129/25 167/2
we're [7] 7/5 8/7 39/24 66/18 130/1 148/21 168/12
web [1] 115/2
webpage [2] 86/11 86/13
website [5] 115/15 116/17 116/19 116/23 118/22
week [19] 59/23 77/22 91/17 116/3 117/19 117/21 117/23 117/25 126/14 126/18 129/15 135/6 136/22 137/20 137/23 142/1 142/7 142/8 145/24
weekend [4] 60/2 76/23 142/10 142/12
weeks [11] 23/23 64/19 90/23 117/22 117/22 118/14 129/9 129/17 145/25 149/16 149/18
well [41] 6/13 6/15 8/6 9/2 110/22 23/15 27/15 36/2 38/2 41/3 41/9 44/24 46/22 51/2 53/20 58/20 59/24 62/7 64/2 69/18 79/12 82/17 96/1 100/25 104/2 106/6 116/9 121/21 122/14 127/13 132/15 137/5 146/17 152/14 160/21 165/25 165/1 168/8 168/12 169/2
went [28] 28/1 32/21 50/23 57/2 63/4 69/22 70/19 71/15 74/12 82/20 88/25 91/15 92/12 99/8 110/14 113/10 118/22 122/17 131/9 133/4 134/8 140/25 141/24 143/22 145/8 147/20 151/4 152/12
were [242]
weren't [4] 24/22 49/21 58/1 164/1
what [164] 5/17 8/22 9/9 11/20 16/13 17/1 17/21 18/7 19/7 21/16 21/17 22/12 23/24 25/4 26/7 27/22 28/1 28/5 30/14 30/17 30/24 31/10 33/4 33/12 36/16 39/23 41/11 42/6 42/12 43/2 43/10 44/8 44/23 46/13 46/20 52/22 53/1 54/14 56/13 58/23 60/1 61/18 62/5 64/7 65/5 68/20 69/18 69/19 70/3 70/6 70/13 70/15 71/2 71/12 71/15 71/18 71/25 72/6 72/7 73/19 74/17 75/13 75/14 76/19 77/14 79/13 81/5 82/11 82/1 82/14 84/3 84/12 84/19 85/22 85/25 88/13 90/7 90/9 91/5 91/9 91/18 93/15 94/3 94/11 94/23 98/19 98/23 99/24 100/1 101/23 102/25 103/10 103/11 105/7 105/9 106/5 106/24 107/23 109/5 111/21 112/2 113/6 115/4 115/6 116/7 117/21 117/25 118/1 120/10 121/3 123/17 123/19 124/6 126/5 127/20 128/15 129/14 129/25 130/1 130/1 130/9 130/13 130/24 134/15 135/1 135/5 135/13 138/1 139/14 139/20 139/21 139/21 140/14 140/24 141/1 142/1 142/22 143/16 143/25 144/6 144/10 144/17 145/6 146/12 146/15 147/5 149/3 149/9 154/15 156/13 160/4 160/5 160/5 160/16 160/19 162/25 164/10 167/11 169/3 169/16 170/3
what's [4] 15/24 125/16 139/23 156/21
whatever [8] 10/8 15/17 29/24 86/22 95/18 105/20 117/6 153/7
when [155] 6/1 8/24 9/5 11/21 14/12 17/19 18/1 18/14 18/19 25/5 26/9 26/11 27/12 28/6 29/6 30/2 30/4 30/6 30/18 30/22 31/9 32/4 38/4 39/18 39/19 41/1 41/9 41/10 41/11 41/21 41/22 42/15 42/18 42/19 43/5 46/4 47/10 48/1 48/5 51/12 51/20 53/4 54/17 55/3 55/13 55/19 57/2 58/23 59/6 59/22 61/15 63/4 63/20 63/24 64/19 67/1 67/15 68/10 69/6 69/19 74/3 74/7 74/7 74/11 74/12 76/20 78/2 78/11 80/11 80/11 81/6 81/21 82/13 82/21 86/17 86/17 87/21 88/15 89/22 89/25 90/16 90/19 91/2 91/6 91/19 91/19 92/3 92/7 94/12 95/2 95/7 94/18 98/19 105/15 110/14 111/14 113/22 114/8 114/15 116/19 117/10 118/15 119/7 121/23 122/1 122/2 122/12 122/24 123/2 129/5 130/14 130/17 131/9 133/4

**W**

when... [40]  135/7 135/11 136/23 140/8 140/8
141/10 141/23 143/11 145/5 145/16 146/2 147/5
147/6 147/12 147/22 148/2 148/6 148/9 149/20
149/22 150/1 151/11 152/10 153/10 153/11
155/11 157/6 158/14 158/24 161/9 161/12
162/14 162/15 163/8 163/8 163/13 163/13
166/13 167/14 168/10

whenever [1]  81/19

where [42]  14/8 20/23 22/22 32/8 55/8 57/2
61/3 62/14 65/16 67/5 67/10 67/12 69/2 69/7
87/24 96/13 101/6 103/21 104/4 109/15 112/21
112/24 113/3 118/22 119/2 122/12 123/15
128/11 133/2 134/6 134/10 139/11 141/1 141/15
147/16 147/17 149/23 150/2 150/5 151/24
154/25 161/11

Whereupon [3]  43/20 85/18 93/9

wherewithal [1]  152/3

whether [20]  24/9 34/9 37/18 41/23 48/21 57/15
59/4 60/3 77/14 77/15 86/24 111/5 116/25
118/15 127/15 129/16 129/18 155/17 156/3
156/10

which [24]  7/25 12/25 13/5 21/19 27/2 28/19
40/21 47/14 51/3 53/3 53/15 53/23 55/6 60/16
79/23 93/14 99/22 116/13 120/1 120/18 126/7
136/15 139/10 158/9

while [6]  23/7 23/9 54/7 68/20 148/13 148/25

whistleblower [3]  73/22 73/24 74/19

white [3]  13/14 69/14 106/20

who [76]  5/9 6/11 7/12 12/23 18/25 21/20 23/10
24/3 24/16 25/2 26/3 27/1 29/18 30/16 31/7
32/1 32/2 32/2 32/9 39/4 40/23 41/24 42/23
43/24 49/8 50/17 55/9 56/20 60/13 60/25 61/1
67/2 67/20 69/13 69/14 69/16 73/16 76/2 78/3
79/20 82/15 84/5 84/8 89/5 89/6 90/21 93/24
96/8 99/14 99/18 102/23 104/20 105/3 105/25
106/1 109/10 109/25 126/22 130/23 133/17
140/7 140/11 140/20 145/11 148/21 150/25
156/18 158/15 158/22 159/20 159/20 164/5
164/21 166/4 169/7 169/8

whoever [1]  104/6

whole [7]  23/18 23/18 23/19 97/16 105/13 145/2
160/20

whom [3]  38/20 75/15 83/12

whose [2]  48/2 138/23

why [26]  34/20 38/3 39/15 49/3 52/12 69/18
81/13 83/8 84/14 84/17 90/8 90/9 95/5 95/6
97/2 97/2 113/9 115/25 118/11 122/23 133/13
157/5 161/25 162/4 168/3 168/4

wife [3]  7/2 76/7 111/2

Wildwood [1]  11/22

will [24]  5/6 7/22 8/3 8/5 11/3 11/3 34/8 45/10
72/4 109/18 112/13 116/25 123/24 124/1 124/21
125/23 127/15 128/1 129/5 129/8 130/2 130/15
134/20 135/9

Williams [2]  13/14 69/15

Willow [1]  129/4

wind [3]  42/15 43/6 133/15

winner [1]  105/21

winnings [1]  107/9

wise [2]  81/18 119/23

within [12]  12/18 34/24 58/17 106/3 122/6
128/23 133/12 134/25 135/9 141/5 154/6 160/9

without [4]  17/1 68/19 70/9 158/10

witness [10]  3/14 6/20 6/20 7/5 7/18 14/18
35/13 74/6 83/24 163/25

witnesses [1]  29/20

Womack [2]  24/4 25/8

woman [5]  40/18 110/3 111/7 112/4 161/2

women [9]  47/16 47/21 48/1 48/3 48/13 49/21
79/5 79/8 166/9

women's [1]  48/15

won [1]  105/15 105/17 106/25

wonderful [2]  97/20 158/3

wondering [1]  149/17

worded [1]  31/4

wore [1]  134/24

work [38]  23/4 24/23 52/20 53/5 53/6 53/7
54/18 55/2 55/8 55/16 55/19 55/25 58/3 58/15
58/23 59/7 59/10 59/13 59/18 59/25 60/4 60/10
61/3 70/23 81/1 90/4 97/20 99/19 104/19 106/2
10F/15 113/13 114/9 118/2 124/22 128/25
153/16 157/7

work-related [6]  58/23 59/7 59/10 59/25 60/4
60/10

workday [1]  144/9

worked [12]  61/1 85/1 89/5 95/22 96/21 97/13
104/20 120/2 122/7 129/1 129/1 161/18

worker [3]  24/10 25/6 111/20

workers [1]  126/25

workers' [7]  53/3 54/19 55/12 56/6 56/11 62/3
72/8

working [9]  88/15 89/12 90/12 117/22 117/25
121/6 124/1 135/25 161/10

workplace [8]  22/20 26/15 59/16 71/12 79/11
83/11 111/10 169/22

works [6]  69/14 93/24

worried [1]  98/22

worry [1]  96/18

worst [3]  135/15 135/15 135/17

worth [3]  52/8 151/23 168/22

would [208]

wouldn't [6]  26/17 43/11 61/20 61/25 87/18
127/8

wound [4]  80/9 82/15 112/2 114/3

Wozniak [2]  155/22 155/23

write [5]  38/25 39/6 77/11 121/12 128/16

writer [1]  7/13

writing [1]  161/18

writings [1]  57/14

written [3]  56/25 59/3 124/11

wrong [4]  30/12 30/12 149/9 167/21

wrote [5]  31/3 63/20 87/18 87/23 124/23

**Y**

Yeah [1]  168/7

year [21]  11/21 36/14 40/21 41/11 52/17 52/17
53/12 53/16 66/20 102/22 103/1 103/14 111/25
117/20 118/4 136/17 144/15 168/21 170/2 170/8
170/8

year's [1]  168/22

years [28]  14/12 14/14 20/19 27/25 41/7 41/8
55/21 74/1 80/21 85/1 87/20 88/21 95/22 96/21
97/10 129/2 131/22 138/7 139/22 153/13 154/17
156/8 158/6 158/7 158/8 162/19 162/20 163/12

years' [1]  151/23

yell [1]  76/10

yelling [2]  6/4 76/5

yes [223]

yet [4]  23/11 105/14 123/23 124/13

yoga [2]  137/12 137/19

York [3]  8/5 8/21 9/1

you [873]

you wrote [1]  63/20

you'd [3]  70/21 126/2 162/18

you'll [2]  27/7 124/6

you're [147]  8/8 8/14 8/19 8/20 8/20 9/9 22/1
22/5 23/14 24/3 26/9 26/10 38/20 51/16 56/21
61/2 63/3 64/7 71/2 71/5 71/9 71/16 73/10
76/12 78/15 82/15 91/9 93/15 95/5 97/1 99/11
99/14 99/21 99/24 107/16 117/1 124/17 126/12
157/16 130/10 136/19 142/21 146/19 157/6
160/5 160/5 164/8

**Z**

zealousness [1]  5/19

zip [2]  5/7 6/2

ZipRecruiter [4]  115/3 115/7 115/22 116/20

you've [11]  11/14 15/8 57/16 65/22 66/24 99/8
108/21 137/4 137/10 164/16

young [1]  145/7

younger [1]  101/1

your [191]

your psychologist [1]  142/22

yours [1]  38/1

yourself [2]  91/2 144/24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | No. 17-CV-04462-RK |
| | : | |
| WAVERLY HEIGHTS, LTD., | : | |
| THOMAS P. GARVIN and JOHN | : | |
| and JANE DOES NUMBERS 1-21 | : | |
| Defendant | : | |

### VOLUME II

Deposition of **KATHLEEN M. JUNGCLAUS**, taken by
and before Michelle C. MacArthur, Certified Court
Reporter-Notary Public, at the law offices of Eastburn and
Gray, P.C., 60 East Court Street, Doylestown,
Pennsylvania, on Friday, **November 2, 2018**, commencing at
10:00 a.m., prevailing time.



## *StenoSource, LLC*
### *Committed to the Art of Verbatim Reporting*
Visit us at www.stenosourcellc.com • Call (215) 348-1095

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
NO. 17-cv-04462-RK
VOLUME II

KATHLEEN M. JUNGCLAUS, : DEPOSITION UPON
:
Plaintiff,: ORAL EXAMINATION
:
- vs - : OF
:
WAVERLY HEIGHTS, LTD., : KATHLEEN M. JUNGCLAUS
THOMAS P. GARVIN and :
JOHN and JANE DOES :
NUMBERS 1-21, :
:
Defendants.:
-------------------------

TRANSCRIPT OF DEPOSITION, taken by and
before MICHELLE C. MacARTHUR, Certified Court
Reporter-Notary Public, at the Law Offices of
EASTBURN & GRAY, P.C., 60 East Court Street, P.O.
Box 1389, Doylestown, Pennsylvania, 18901, on
Friday, November 2, 2018, commencing at 10:00 a.m.

- - -

Page 2

APPEARANCES

LAW OFFICE OF MARK D. SCHWARTZ
BY: MARK D. SCHWARTZ, ESQUIRE
P.O. Box 330
Bryn Mawr, Pennsylvania 19010
Attorneys for the Plaintiff

EASTBURN & GRAY, P.C.
BY: GRACE M. DEON, ESQUIRE
and JOANNE D. SOMMER, ESQUIRE
60 East Court Street
P.O. Box 1389
Doylestown, Pennsylvania 18901
Attorneys for the Defendants

ALSO PRESENT

Thomas P. Garvin
Richard Bauer

Page 3

1                       I N D E X
2       WITNESS                              PAGE
        KATHLEEN M. JUNGCLAUS
3
4
5
6         By: Ms. Deon                       4, 90
          By: Mr. Schwartz                   87
7
8
9
10                        - - -
11            E X H I B I T S              PAGE
12                                        PAGE
        NUMBER       DESCRIPTION          MARKED
13      KJ-3      Plaintiff's Responses       92
                  to Request for Production
14                of Documents
        KJ-4      Multipage document          38
15      KJ-5      Employee Awareness          44
16
17
18
19
20
21
22
                          - - -
23
24

Page 4

1          (By agreement of counsel, the
2     sealing, filing and certification of the
3     transcript has been waived; and all
4     objections, except as to the form of the
5     question, have been reserved until the time
6     of trial.)
7
8          KATHLEEN M. JUNGCLAUS, after
9     having been duly sworn, was examined and
10    testified as follows:
11
12    BY MS. DEON:
13    Q.    Good morning, Ms. Jungclaus.
14    A.    Good morning.
15    Q.    With respect to the response to
16    Interrogatories, I was asking you some questions the
17    other day, they were marked yesterday as KJ-2, and
18    I'd like to just ask you about Marge Carpenter, and
19    she complained about Mr. Garvin's treatment of staff
20    and his ego.
21    A.    Uh-huh.
22          MR. SCHWARTZ:  What page are we
23    on?
24          MS. DEON:  It's on the last page,

1 (Pages 1 to 4)

KATHLEEN M. JUNGCLAUS

## Page 5

1         page 16.
2    BY MS. DEON:
3    Q.     Can you elaborate on what she complained
4    about?
5    A.     Well, she complained mostly -- I heard this
6    through Janet Thompson, who was her supervisor, she
7    was upset about Tom's participation in the employee
8    contests.  She was upset about his using the -- the
9    fitness center that was reserved for the residents
10   and the message that that sent.  She felt like he
11   had -- he had a different approach to employees than
12   our former president had, Bill Maguire.  So Bill was
13   very open with employees, he would stop and talk to
14   them; he had relationships with them, and she felt
15   like Mr. Garvin had almost like a superiority to the
16   employees.
17   Q.     How about with respect to Pattie Rodgers,
18   you stated that she complained about Bob Supper's
19   treatment of her and other women during a meeting
20   about Waverly Care in 2015; is that a specific
21   event?
22   A.     They were meeting -- I think it was about
23   her budget, and I'm not -- I don't really remember
24   the content of the meeting, I wasn't present, but

## Page 6

1    Bob was screaming at her in the meeting and she was
2    absolutely humiliated.  I've never seen Pattie cry,
3    but Pattie was in tears.
4    Q.     Was he using any language that would be
5    offensive to a woman?  And by that I mean was he
6    calling her names that were gender-based; bitch or
7    anything along those lines?
8    A.     To be demeaning you don't have to call
9    someone a name, you can just be overbearing.
10   Q.     So it wasn't necessarily the language he
11   used, it was his mannerisms and tone?
12   A.     Yes.
13   Q.     Okay.  And would that be the case -- I know
14   we spoke -- you testified yesterday about a number
15   of other instances where Mr. Supper, you allege,
16   treated women in a demeaning manner.  Do you recall
17   that?
18   A.     Yes.
19   Q.     And I'll ask you the same question; was it
20   more a tone and mannerism as opposed to verbiage
21   that would have been gender specific?
22   A.     He was demoralizing and humiliating to his
23   wife on the telephone that was audible to Amy
24   Blessing, and she was very upset about most of the

## Page 7

1    phone calls that he had with her; he would call her
2    names, and he was demeaning to her, and in the -- in
3    the business setting, he was just overbearing.
4    Q.     So more mannerism and tone in the business
5    setting?
6    A.     Yes.
7    Q.     And with respect to what Amy heard him
8    saying to his wife on the phone; what, specifically,
9    did she hear?  What types of language did he use to
10   his wife?
11   A.     Just cursing at her.
12   Q.     Okay.  I'm just going to take a look at the
13   Response to the Request for Production of Documents.
14         MS. DEON:  And I do not have
15   another copy of this at the moment, but I
16   will get a clean copy for us to mark as
17   Exhibit --
18         MR. SCHWARTZ:  That's all right.
19         MS. DEON:  -- KJ-3.
20         Off the record.
21         (At this time, a discussion was
22   held off the record.)
23         MS. DEON:  KJ-3 is going to be
24   marked as the documentation that was

## Page 8

1    attached to Plaintiff's Response to
2    Defendant's Request for Production of
3    Documents, and it is marked as P-1 through
4    P-60, which is noting the different page
5    numbers of each of the pages.
6    BY MS. DEON:
7    Q.     Mrs. Jungclaus, you're familiar with the
8    resume that was attached to the document response?
9    A.     Yes.
10   Q.     Is that your most current resume?
11   A.     I'd have to see it to know.
12   Q.     (Indicating).
13   A.     No.
14   Q.     When was that resume that I just identified
15   as P-1 and P-2?
16   A.     That was when I was actively working for
17   Waverly.
18   Q.     How about the resume that is attached at
19   P-3 and P-4 (indicating)?
20   A.     That is my current resume.
21   Q.     Okay.  At P-5 through P-8 there are
22   documents that I believe are the Pennsylvania
23   CareerLink, and you'll see that there are also a
24   number of jobs that are noted on there as applied

KATHLEEN M. JUNGCLAUS

Page 9

1    for?
2    A.    Yes.
3    Q.    Is that what you were referencing yesterday
4    during your testimony?
5    A.    Yes.
6    Q.    Do you know when this was printed off from
7    the CareerLink?
8    A.    The date should be at the bottom or the
9    top. I think it was the 28th. Whatever day I had
10   to produce the documents.
11   Q.    Okay.
12         MR. SCHWARTZ: Well, it would
13         have been a couple days before.
14   BY MS. DEON:
15   Q.    I see Current Date of 10/30/2018, would
16   that be correct?
17   A.    That's correct.
18   Q.    And am I correct that on each of these
19   where it says Activity Type and Activity Detail,
20   there's also a column that says Actions, all the way
21   to the far right?
22   A.    Yes.
23   Q.    So for the ones that are Mark As Applied,
24   those would be ones that you actually submitted a

Page 10

1    resume and applied for?
2    A.    Yes.
3    Q.    And then for the ones that there is not
4    anything contained in that far right-hand corner,
5    shall I assume that you did not apply for those
6    jobs?
7    A.    No. These were positions that I applied
8    for and was not hired. You can see that I applied
9    for them and it says Not Hired. Not Hired, Not
10   Hired, Not Hired. They are different positions that
11   I had applied for and was not hired.
12   Q.    All right. So for the positions where it
13   says Mark As Applied, were you still in the waiting
14   process?
15   A.    I never heard anything back.
16   Q.    So at some point though where you see on
17   page P-8 and it says -- there was one that says Not
18   Hired --
19   A.    Oh, that's on the second page, the Not
20   Hired.
21   Q.    I think I saw one on here, too. Senior
22   Human Resources Generalist on 11/23/2016 and it says
23   Not Hired. Do you see that?
24   A.    Yes.

Page 11

1    Q.    At some point when you had submitted a
2    resume for that, would there have been a screen shot
3    that would have showed it as Mark As Applied?
4    A.    I think it depends on the position that's
5    posted. A lot of the positions don't give you a
6    response like that, so if I went to a different
7    website it may not necessarily be reflected back on
8    this -- on their website that I -- as applied.
9    Q.    So are these --
10   A.    I think it depends on the company.
11   Q.    Are these two pages a full listing of
12   everything that you applied for through CareerLink?
13   A.    Yes.
14   Q.    I believe I asked you this yesterday, but
15   just to clarify; is there any document or
16   recordation anywhere that would show a log of all
17   positions that you applied for or any inquiries that
18   you made concerning a position from September 2016
19   through the present?
20         MR. SCHWARTZ: I think -- I'd
21         object -- that's been asked and answered,
22         but go ahead.
23         THE WITNESS: I went on the
24         Indeed website and I went on the

Page 12

1    ZipRecruiter website to see if I could go
2    back to get a history of the things that I
3    had applied for and they don't keep a
4    record. I thought that when you created an
5    account on that you would be able to go
6    back to see what positions you applied for,
7    but that's not the case.
8    BY MS. DEON:
9    Q.    Other than the CareerLink documentation
10   that I just showed you, is there any other
11   documentation that you have or that you could
12   provide to your lawyer that would detail other
13   positions that you applied for?
14   A.    No.
15   Q.    Showing you documents P-12 through P-19 of
16   KJ-3.
17   A.    Yes.
18   Q.    Do you recognize those documents?
19   A.    Yes.
20   Q.    And am I correct that pages P-10 and P-11
21   are also Facebook screen shots from Janet Thompson's
22   Facebook?
23   A.    Yes.
24   Q.    When did you obtain copies of these, if you

3 (Pages 9 to 12)

KATHLEEN M. JUNGCLAUS

## Page 13

1   were the one who obtained copies?
2   A.      You can do that today, but I obtained them
3   right before discovery.
4   Q.      Do you mean right before --
5   A.      When discovery was requested.
6   Q.      Okay.  Are you Facebook friends with Ms.
7   Thompson?
8   A.      No.
9   Q.      So it's a public site that you were able --
10  she doesn't have privacy settings on it --
11  A.      Correct.
12  Q.      -- so you were able to go on it?  Just make
13  sure you let me finish my question before you
14  respond.
15  A.      (Witness nods head.)
16  Q.      Were you able to ascertain if this Facebook
17  site was in any way linked to a Waverly Facebook
18  page or Twitter page?
19  A.      Janet is a follower of Waverly Heights.
20  Q.      Were you offended by the content of the
21  Facebook posts?
22  A.      Yes.
23  Q.      In what respect?
24  A.      I find it degrading and demoralizing to our

## Page 14

1   President.
2   Q.      And is your basis for that due to fact that
3   you supported President Trump in his election?
4   A.      No.  I believe, just like I found offense
5   to the e-mails that were circulated by Chuck Soltis
6   that were offensive to Barack Obama and to Hillary
7   Clinton, I found these equally as offensive.  As the
8   Vice President of Marketing & Sales I find it
9   appalling that she would post those things when she
10  is easily searchable.
11  Q.      How is she easily searchable?
12  A.      Well, all you have to do is Google her name
13  and her Facebook page comes up; it's not marked as
14  private, so any potential resident could open her
15  Facebook page, and if they happen to be a registered
16  Republican they might be incredibly offended.
17  Q.      Did she, at anytime in the context of these
18  posts, represent herself as the post being
19  representative of Waverly's opinion?
20  A.      No.
21  Q.      Did she reference her position at Waverly?
22  A.      I'm not sure if it's under her bio on
23  Facebook, if it says that she's the Vice President
24  of Marketing at Waverly Heights.

## Page 15

1   Q.      Does it reference any work-related
2   activities in these posts of Waverly?
3   A.      No.
4   Q.      Does it reference her conducting any kind
5   of informal survey of employees?
6   A.      No.
7   Q.      So I'm going to ask you to look at these,
8   and if you could just tell me what specifically you
9   believe is inappropriate other than what you've
10  already testified to about the posts.  You said that
11  you -- as I understand it -- that you were offended
12  that she was disrespecting the office of the
13  presidency?
14  A.      That's correct.
15  Q.      Okay.  Can you, just looking through those,
16  tell me if there's anything else?
17  A.      11/6, take our country back.  I find the
18  reference between Hillary Clinton and Judge
19  Kavanaugh offensive.
20  Q.      Why?
21  A.      That she was cool as a cucumber for 11
22  straight hours on the questioning of Benghazi and he
23  was shouting and crying for the first 20 minutes.
24  Q.      What page, for the record, is that?

## Page 16

1   A.      Page 11.
2   Q.      And P-10 was the first site that you
3   referenced in your testimony just now?
4   A.      Correct.  I find it offensive that the
5   implication that the President doesn't pay taxes
6   extremely offensive.
7   Q.      That's P-12?
8   A.      Yes.
9   Q.      How about P-13?
10  A.      I find offensive the comment you fucking
11  Republicans are bastards.  That is my money and I
12  want it back.  If someone made a comment like that
13  on my Facebook page I'd be sure to delete it.
14  Q.      That was P-13.
15  A.      I can't read the comments on these
16  (indicating).
17          MR. SCHWARTZ:  Take your time.
18  BY MS. DEON:
19  Q.      I'm sorry, P-14, what was your response to
20  that?
21  A.      I can't read what the posting is
22  underneath, so it's hard for me to say.
23  Q.      How about P-15?
24  A.      This is offensive, it's asking for an

4  (Pages 13 to 16)

**Page 17**

1  apology from the right to the left.
2  Q.    And you find that offensive?
3  A.    Yeah.  The clear bias is offensive.
4  Q.    Bias in terms of being anti-conservative?
5  A.    Yes.  It's one thing to have a disagreement
6  politically, it's another to post offensive things
7  that are in the public domain.
8  Q.    Do you consider these to be offensive to
9  everyone in the public domain?
10  A.    I think they're offensive to a lot of
11  people.
12  Q.    Would they only be offensive to people that
13  have a different view?
14  A.    I don't think so.  I think it's offensive
15  that she's calling the Speaker of the House a liar.
16  Q.    That's P-16?
17  A.    Yes.  I think it's incredibly offensive
18  that she's saying that only liberals supported these
19  benefits including ending child labor, the Federal
20  minimum wage, overtime pay, the weekend, women's
21  right to vote, unemployment insurance.  It's
22  ludicrous.  The Civil Rights Act.  It is ludicrous
23  to post something that states has been initiated by
24  liberals and opposed by conservatives.  All of those

**Page 18**

1  rights that pertain to humanity; very offensive.
2      I think this is a duplicate (indicating).
3  Q.    And that was P-17 that you just testified
4  about it being offensive?
5  A.    Yes.
6      I think this is a duplicate of one of the
7  other ones (indicating).
8  Q.    P-18 is a duplicate, and P-19 does not have
9  any content, correct?
10  A.    Correct.
11  Q.    Well, when I say content, it doesn't have a
12  posting.
13  A.    I would like to say that that's only a
14  select few of the postings that are on her Facebook
15  page.
16  Q.    And you'd agree with me that there was
17  nothing racially charged about any of the statements
18  or pictures that were contained on these pictures
19  that you saw?
20  A.    No.
21  Q.    The statement about you fucking Republicans
22  are bastards on P-13, you'd agree with me that that
23  was not a post that Ms. Thompso, but it was on her page; she was

**Page 19**

1  responsible for the content of her page.
2  Q.    At KJ-3 pages 20 through 25 appear to be
3  Facebook posts or instant messaging between you and
4  Kevin Billig; is that correct?
5  A.    Yes.
6  Q.    Are they instant messages on Facebook?
7  A.    Yes.  He -- I was not a friend with him --
8      MR. SCHWARTZ:  Wait.  There's not
9  a question.
10      THE WITNESS:  Oh, I'm sorry.
11      Yes.
12  BY MS. DEON:
13  Q.    And who is Kevin Billig?
14  A.    He is a maintenance employee at Waverly
15  Heights.
16  Q.    Were you friends with him outside of work?
17  A.    No.
18  Q.    Did you have interaction with him at work?
19  A.    Just as an employee.
20  Q.    How is it that he came to contact you?  Did
21  he initiate the contact?
22  A.    Yes.
23  Q.    And when did that occur?
24  A.    This happened -- do you mind if I reference

**Page 20**

1  my telephone?
2  Q.    Oh, whatever you need to reference.
3  A.    The date is not on here.  Oh, I'm sorry,
4  September 27th.
5  Q.    Of 2016?
6  A.    No.  September 27th of 2018.
7  Q.    Is that the first time you received contact
8  from him?
9  A.    Yes.
10  Q.    And why is it that he contacted you at that
11  time?
12  A.    He sent me this message, how did everything
13  work out with Waverly?  I saw some of it on the
14  news.
15  Q.    Do you have text messages from him?
16  A.    These are the messages that I have from
17  him.
18  Q.    What's on your phone that you were going to
19  look at?
20  A.    Through my Facebook messenger I was just
21  going to look at the date of where I printed this
22  off from.
23  Q.    Does he have your personal cell phone?
24  A.    No.  Well, actually, let me correct that.

5  (Pages 17 to 20)

KATHLEEN M. JUNGCLAUS

## Page 21

1  I gave him my cell phone through this conversation.
2  Q.    Did you speak with him by telephone?
3  A.    No.
4  Q.    Have you had any other contact with him
5  other than what's depicted in those documents?
6  A.    The only other contact I have is the next
7  document that you have where he was sending me
8  disappearing messages.
9  Q.    This was produced in discovery in Response
10  to Request for Production that we submitted to you.
11  What is the purpose in providing that from an
12  evidence standpoint?
13        MR. SCHWARTZ:  Well, that calls
14        for a legal conclusion, but I can answer
15        that.  Basically, we wanted you to have
16        everything that we had that pertains to
17        this case, and I just felt that it was
18        incumbent upon us to produce it.
19  BY MS. DEON:
20  Q.    Are you producing it just for purposes of
21  communication that you've had with Waverly employees
22  since your departure?
23        MR. SCHWARTZ:  Objection again.
24        It's not -- you asked for documents, you

## Page 22

1  got documents.  I want you to have
2  everything we have.
3        MS. DEON:  Well, I have a right
4  to know how you intend to utilize it and
5  what this does in terms of supporting the
6  claims that are being asserted or in order
7  to oppose defenses that are being asserted,
8  so I'm asking --
9        MR. SCHWARTZ:  Well, we haven't
10       made up our mind yet.  I'll let you know as
11       soon as I think of it.
12  BY MS. DEON:
13  Q.    So, Mrs. Jungclaus, you have no idea why
14  this was produced in discovery?
15  A.    I think it's interesting to note that in
16  2018 there's still discussion at Waverly Heights
17  about my case, and that there's speculation over who
18  wrote the anonymous letter amongst the employees of
19  Waverly Heights and why I was really terminated.
20  Q.    In Response to Request for Production No.
21  17; all photographs, comma, video reproductions,
22  comma, video recordings, comma, audio recordings,
23  comma, pictures, comma, drawings, comma, maps,
24  comma, plans, comma, diagrams, comma, sketches,

## Page 23

1  comma, computations, comma, calculations or other
2  similar information in your possession or in the
3  possession of your agents, comma, representatives or
4  attorney, comma, which relate to, comma, depict,
5  comma, or memorialize any facts, comma,
6  circumstances or events related to Plaintiff's
7  Amended Complaint, and this was produced in
8  response.
9        My question is, how does P-20 through P-25
10  relate to any of the facts, circumstances or events
11  contained in your Amended Complaint, if you know?
12        MR. SCHWARTZ:  Again, that
13        calls --
14        MS. DEON:  I asked if she knows.
15        MR. SCHWARTZ:  Objection.  Calls
16        for a legal conclusion, but go ahead, you
17        can answer it.
18        THE WITNESS:  Again, the fact
19        that he knows who wrote the anonymous
20        letter I think is important and that he's
21        extorting money for it.
22  BY MS. DEON:
23  Q.    I had a hard time reading these, so why
24  don't you show me where that is (indicating)?

## Page 24

1  A.    What if I had some info I thought could be
2  useful to you?  Worth anything to you?  Without my
3  name ever being involved or mentioned.
4  Q.    Let me see that.  What page is that?
5  A.    Page 22.  Would you like me to circle it?
6  Q.    No.  I see it.  Thank you.  And your
7  response to that was of course, I would never use
8  your name?
9  A.    Correct.
10  Q.    What kind of info you stated, correct?
11  A.    Yes.
12  Q.    So you're calling it extortion now, but you
13  were inquiring as to what he could give you,
14  correct?
15        MR. SCHWARTZ:  Objection.  I
16        think that misrepresents the testimony.
17        THE WITNESS:  I had no intention
18        of paying him any money; you'll see further
19        on in the conversation that I just wanted
20        the information.
21  BY MS. DEON:
22  Q.    On P-23 can you read through the
23  conversation that appears on that page?
24  A.    Yes.  Kevin wrote, just involving who

6  (Pages 21 to 24)

KATHLEEN M. JUNGCLAUS

Page 25

1  actually wrote a letter to begin with. I said well,
2  I think it was Anita Summers. Is it someone else?
3  He wrote back no, not her. I said really? How do
4  you know who wrote it? And he said I'm not sure if
5  it would matter this far along with everything you
6  have going on. And I said it matters. And he said
7  maybe we can talk later about it. Have to get back
8  to job. And I said was it a resident or employee?
9  He said rather not say. And I said come on, I will
10 not tell anyone you told me. I can't read the rest
11 of it. And he said can't chat right now, sorry.
12 Q.     And on the next page, what is the number on
13 the bottom of the page?
14 A.     Page 24.
15 Q.     Can you read that conversation?
16 A.     He said we can when I finish up later
17 today. And I said okay. Call my cell phone if you
18 would rather talk directly. It's very helpful
19 information. Thank you. I gave him my phone number
20 and I will never say who gave the information to me.
21 I mean how much is it worth to you? I could lose my
22 job potentially over it, so that's why I'm partial
23 about getting involved. And I said you can't lose
24 your job; if it ever did come out you are legally

Page 26

1  protected. You can't be terminated for
2  participating in an investigation. You would have
3  your own lawsuit.
4         On page P-25 he says, I don't really want
5  to get involved, Kathy. I apologize. I still work
6  here. And I said if you gave me the name and how
7  you know I will leave you out of it. It's really
8  important and I will have to tell my attorney that
9  you know something. I totally get it. I don't want
10 to cause you any harm. And he said I would
11 appreciate it if you didn't tell your attorney
12 anything about me, I just heard it wasn't a
13 resident. Then the conversation continues and he
14 ends with sucks about everything, at least you were
15 able to win unemployment.
16 Q.     So when you were saying that you would
17 leave him out of it that wasn't accurate, was it?
18         MR. SCHWARTZ: Objection. Calls
19        for a legal conclusion.
20         THE WITNESS: What I meant was if
21        he gave me the information I would try not
22        to use his name and put his job in
23        jeopardy.
24 BY MS. DEON:

Page 27

1  Q.     And in the context of a lawsuit, you were
2  of the belief that you'd be able to turn over
3  information about this without using his name?
4  A.     I wasn't sure.
5  Q.     But you made sure to tell him about his
6  protections for anti-retaliation, correct?
7  A.     Correct.
8  Q.     When he made the statement how much is it
9  worth to you, did you take that to mean that he was
10 asking for money?
11 A.     Yes.
12 Q.     Even though he was saying I don't want to
13 lose my job, you thought that he was still making a
14 monetary -- or trying to make a monetary exchange?
15 A.     Yes.
16 Q.     Pages 26 through 31 of KJ-3, can you
17 identify what those are for the record?
18 A.     These are more messages from Kevin Billig,
19 but they are -- I've never seen this before, these
20 are disappearing messages.
21 Q.     Have you since inquired what is meant by a
22 disappearing message?
23 A.     Well, I didn't have to inquire, I
24 experienced it.

Page 28

1  Q.     So what did you experience? Can you
2  describe it?
3  A.     He sends a message and you have seconds to
4  read it before it disappears.
5  Q.     Did you see any of the messages that
6  disappeared before they disappeared?
7  A.     I took pictures of them on my cell phone.
8  Q.     Okay. Are they contained in the documents
9  that were produced?
10 A.     Yes, and you can see next to them how many
11 seconds you have left; so this has three seconds
12 left (indicating).
13         And then on P-29 he sent a second
14 disappearing message which asks me; you didn't see
15 what I sent you and a question mark and I had four
16 seconds to read that. I had no idea what he was
17 talking about. He sent me a third disappearing
18 message, which is on P-30, and on P-31 I responded
19 no, and his response was I'm sure for the right
20 compensation you could find out everything, and I
21 had eight seconds for that.
22 Q.     So in each of the items that you just read
23 on P-26 through P-31 that you referenced, am I
24 correct that the only content you actually were able

7 (Pages 25 to 28)

KATHLEEN M. JUNGCLAUS

Page 29

1  to preserve is on P-29 when he says you didn't see
2  what I sent, and the other ones just came back as an
3  encrypted without any content or is there content in
4  here that I'm missing?  Do you understand my
5  question?
6     A.    I do, but when he sent -- he went from
7  having those previous conversations, which were on
8  messenger --
9     Q.    Yes.
10    A.    -- to sending disappearing messages two or
11 three hours later --
12    Q.    Okay.
13    A.    -- and so this was 8 o'clock at night he
14 sent the first disappearing message and it was just
15 this question mark that he sent.
16    Q.    On P-27?
17    A.    Yes.  And I didn't know what that meant.
18 So at 8:24 he sent the second disappearing message
19 which says you didn't see what I sent you; I didn't
20 get anything that he said he sent me.
21    Q.    And that's P-29 the text is contained?
22    A.    Correct.  And then at 8:41 he sent this
23 other disappearing message where I responded no,
24 that I didn't receive whatever he sent me.

Page 30

1     Q.    And you responded no on P-31?
2     A.    P-31, and his response was I'm sure for the
3  right compensation you could find out everything.
4     Q.    Okay.  Thank you.
5           MR. SCHWARTZ:  Could we go off
6     the record for just a second?
7           (At this time, a discussion was
8     held off the record.)
9  BY MS. DEON:
10    Q.    Mrs. Jungclaus, when you say the items that
11 remain with respect to the disappearing messages are
12 the ones you took pictures of, are you referring to
13 what I have in my hand, which is P-26 through
14 P-31 --
15    A.    Yes.
16    Q.    -- of KJ-3?
17    A.    Sorry.  Yes.
18    Q.    Okay.  There was also a production in the
19 response to the records request at P-32 through
20 P-37 --
21          MR. SCHWARTZ:  Before we get to
22    that, if I may, I'd like to make a request
23    that unlike his messages which disappear, I
24    don't want Mr. Billig to disappear, and I'd

Page 31

1  like the defense to produce him for a
2  deposition.
3           MS. SOMMER:  You can file a
4  notice.
5           MS. DEON:  Yeah.  I mean...
6           MR. SCHWARTZ:  All right.  Well,
7  consider it filed.
8           MS. DEON:  Well, I was in the
9  middle of a question so, I'm sorry, would
10 you mind -- well, I'll start over again.
11          MR. SCHWARTZ:  I'm sorry,
12 Counsel.
13          MS. DEON:  And in the future, why
14 don't you keep a side list and then we can
15 talk about what you need rather than
16 putting it on the deposition record.
17          MR. SCHWARTZ:  Well, I think it's
18 important to put on the record at this
19 point; people have a way of disappearing.
20 BY MS. DEON:
21    Q.    Back to where I was on Exhibit KJ-3, pages
22 32 through 37, Mrs. Jungclaus, appear to me to be a
23 printout of an internet search of your name; is that
24 correct?

Page 32

1     A.    That's correct.
2     Q.    Did you print this out or did your lawyer
3  print it out?
4     A.    I printed it.
5     Q.    And which search engine did you use to come
6  up with this?
7     A.    Google.
8     Q.    What did you put in as the terms?
9     A.    Kathleen Jungclaus.
10    Q.    Pages 38 through 43 of KJ-3 is the Mount
11 Laurel police blotter; is that correct (indicating)?
12    A.    Yes.
13    Q.    Okay.  And there's also a Court Summary
14 from Delaware County.  It's my recollection that
15 this document was attached to the letter of Mark
16 Schwartz in November of 2016?
17    A.    Correct.
18    Q.    Pages 44 through 48 of KJ-3 appear to be a
19 deed and a page on some social media for Gregory
20 Scott, an architect, that bid for work at Waverly;
21 is that correct?
22    A.    Can I see it?
23    Q.    (Indicating).
24    A.    Correct.

8  (Pages 29 to 32)

KATHLEEN M. JUNGCLAUS

## Page 33

1    Q.    You testified yesterday about a Penn State
2  property that Mr. Garvin purchased; is that correct?
3    A.    Yes.
4    Q.    And is this the documentation that is with
5  respect to that property?
6    A.    Yes.
7    Q.    KJ-3 at pages 54 through 59 appear to be a
8  series of conversations between you and a woman
9  named Andrea; is that correct?
10    A.    No.  This first one is a conversation
11  between myself and Tom Wozniak, the compensation
12  consultant that's used by Waverly Heights.
13    Q.    What page number is that?
14    A.    P-54.
15    Q.    Can you tell me, the pages that you have in
16  front of you that I just referenced, what type of --
17  is that instant messaging; is that e-mailing;
18  texting?
19    A.    This isn't -- this first one on P-54 is an
20  e-mail to my personal gmail account.
21    Q.    What is the date of that?
22    A.    Sunday, October 2nd.
23    Q.    Of which year?
24    A.    Oh, 2016.

## Page 34

1    Q.    Have you had any other communication with
2  Mr. Wozniak other than that e-mail?
3    A.    I have.
4    Q.    When was that?
5    A.    I -- he reached out to me about maybe a
6  year ago to tell me that he was getting married.
7    Q.    Did you discuss anything else?
8    A.    He just asked me how I was doing.
9    Q.    Did you discuss this lawsuit?
10    A.    No.  Not that I recall.
11    Q.    Did you have any other contact with him?
12    A.    He just asked if we wanted to get together
13  for coffee, but we could never get a date together
14  so it never happened.
15    Q.    Is there any other content of e-mail
16  between individuals on that page that you just
17  referenced, which is P --
18    A.    P-54.  No.  This is where he told me that
19  he was told I was fired for an inappropriate post on
20  Facebook.
21    Q.    Do you know who he claims told him that?
22    A.    Tom Garvin.
23    Q.    Does it state that in the text?
24    A.    No.

## Page 35

1    Q.    How did you know that he thinks it was Tom
2  Garvin or what is your basis for saying that it was
3  Tom Garvin?
4    A.    No one else would know to contact Tom
5  Wozniak or would have his contact information to let
6  him know that.
7    Q.    Sitting here today though you're not
8  certain if anyone else had communication with him
9  regarding the terms of your separation?
10    A.    No.
11    Q.    How about P-55?
12    A.    This one does not have a number
13  (indicating), but the next one is 56, so I would
14  imagine that that should be 55.
15    Q.    Okay.  Andrea Jones is a series of e-mails
16  on P-55; is that correct?
17    A.    Yes.
18    Q.    And are there other messages -- or, excuse
19  me, other e-mails between you and Andrea that
20  follow?
21    A.    P-56, P-57 -- I'm sorry, this is P-55 --
22  P-58 and P-59 are all e-mails between myself and
23  Andrea Jones.
24    Q.    Is she someone that you worked with at

## Page 36

1  Waverly?
2    A.    She was a housekeeper.
3    Q.    Is she still at Waverly?
4    A.    I don't know.
5    Q.    Am I correct that the first e-mails between
6  the two of you are in October?
7    A.    I would have to look at them.
8    Q.    Yeah.  It appears -- they're in a different
9  order, but it appears October 23rd is the earliest,
10  of 2016?
11    A.    October 23rd.  Yes.
12    Q.    Other than these e-mail exchanges, did you
13  have any other communication with her at anytime
14  following your separation from employment with
15  Waverly?
16    A.    No.
17    Q.    Did you speak with her by telephone or was
18  all of your communication by e-mail?
19    A.    She called me one day and we did talk by
20  telephone.
21    Q.    When was that?
22    A.    It was one of those times in between the
23  e-mails.
24    Q.    So it would have been some time around

9 (Pages 33 to 36)

KATHLEEN M. JUNGCLAUS

Page 37

```
1   October of 2016?
2   A.    Correct.
3   Q.    What was the nature of that call?
4   A.    She was just telling me that the
5   speculation was that I got fired for stealing.
6   Q.    What did she base that upon?
7   A.    People seeing me being escorted off the
8   property.
9   Q.    What was the normal procedure when an
10  individual was terminated whether it was for
11  stealing or anything else; would there have been an
12  escort?
13  A.    Yes.
14  Q.    Did you ever perform that function or was
15  it always someone from security?
16  A.    It was always Marc Heil and someone from
17  security.
18  Q.    During the testimony yesterday, just to
19  clarify, is the reason that you pursued a
20  discrimination claim because Waverly challenged your
21  unemployment compensation benefits?
22  A.    No.
23  Q.    Okay.  When did you first decide or
24  determine that you would pursue a claim of
```

Page 38

```
1   discrimination?
2   A.    When I was fired.
3   Q.    Just for the record, KJ-3 at P-53, is this
4   a copy of the Charge of Discrimination that you --
5   A.    Yes.
6   Q.    And the date that you submitted that to the
7   EEOC was it 12/13/16?
8   A.    Correct.
9         MS. DEON:  We can mark this as
10  KJ-4 (indicating).
11        (At this time, a document was
12  marked for identification as KJ-4.)
13  BY MS. DEON:
14  Q.    Ms. Jungclaus, I'm just going to ask you to
15  identify the first page that I handed to you which
16  was marked as KJ-4, it's page 23 from, I believe,
17  the employee handbook that was in place at the time
18  of your separation from employment; is that correct?
19  A.    Yes.
20  Q.    Would this have been the handbook that went
21  into place in 2014?
22  A.    I suppose.
23  Q.    Was this a policy that you implemented?
24  A.    Yes.
```

Page 39

```
1   Q.    Do you see the Open Door Policy that's
2   referenced there?
3   A.    I do.
4   Q.    Was that an effective policy, in your
5   opinion?
6   A.    I think so.
7   Q.    How about the Employee Problem Solving
8   Procedure, is that a policy that you, in your
9   opinion, thought was effective and necessary for
10  Waverly?
11  A.    It was a policy; it wasn't very effective.
12  Q.    Why is that?
13  A.    Employees were not comfortable going to
14  their department directors or to the President to
15  discuss issues.
16  Q.    What, if anything, did you do to change
17  that?
18  A.    I encouraged them, the best that I could,
19  or took their circumstance to the director or the
20  President myself.
21  Q.    Did you get any resolution of it after
22  doing so?
23  A.    The employees still had fear to go to their
24  director or the President for fear of retaliation
```

Page 40

```
1   and termination.
2   Q.    And I'm correct that you never reported
3   that to the Personnel Committee of the Board or any
4   of the Trustees, correct?
5   A.    Correct.
6   Q.    Did you have individuals that ever invoked
7   Step 3, which would be writing to you?  Do you see
8   on the second sentence of Step 3 it says that they
9   can submit their concern in writing to the Director
10  of HR under certain circumstances?
11  A.    I don't recall anyone doing that.
12  Q.    How about No. 4, did anyone ever put their
13  concerns in writing to the President?
14  A.    The only person I can think of is Trish
15  Thompson; I'm not sure if anyone else ever did.
16  Q.    Do you see the line under Step 4 where it
17  says you may contact the Director of Human Resources
18  at anytime in this process without fear of reprisal?
19  A.    Yes.
20  Q.    Did you believe that to be true?
21  A.    Yes.
22  Q.    And then I will just ask you with respect
23  to the next page that appears in that exhibit, it's
24  the Nondiscrimination Policy No. P-639, and if you
```

10  (Pages 37 to 40)

KATHLEEN M. JUNGCLAUS

## Page 41

1 look in the fifth paragraph under Procedure.

2 A.     (At this time, the witness complies with

3 request.)

4 Q.     What is the importance of complaints being

5 investigated immediately?

6 A.     Well, it's important for employees to feel

7 like they're being heard and that issues are being

8 addressed immediately.

9 Q.     Is it also the employer's obligation to

10 ensure an environment that is free of discrimination

11 and harassment; would that be another reason for the

12 desire to have complaints investigated immediately?

13 A.     Yes.

14 Q.     There's also a reference in that same

15 sentence that they will be handled as confidentially

16 as possible, correct?

17 A.     Yes.

18 Q.     And would that sometimes require you to

19 bring matters to the attention of management, even

20 if an employee might not want you to?

21 A.     Yes.

22       There's also a reference in that same

23 paragraph of a protection against illegal

24 retaliation.  Do you see that?

## Page 42

1 A.     Yes.

2 Q.     And in the third paragraph of that policy

3 it does say that employees who had been subjected to

4 prohibited discrimination or harassment should

5 immediately report the incident to their supervisor,

6 department director or Director of Human Resources,

7 correct?

8 A.     Yes.

9 Q.     And even though they weren't referencing

10 Vice President of Human Resources, is it your

11 understanding that Director of Human Resources still

12 applied to you?

13 A.     Yes.

14 Q.     And if that appears in any of the policies

15 that were in place and it doesn't reference VP of

16 HR, would that still be the case, that it was

17 referring to you?

18 A.     Yes.

19 Q.     And if you could just identify for the

20 record that the next page that appears, it's Policy

21 No. P-76 and it's a two-page policy, was that also

22 in place when you were the Vice President of Human

23 Resources?

24 A.     Yes.

## Page 43

1       MS. SOMMER:  676.

2       MS. DEON:  Thank you.  676.

3 BY MS. DEON:

4 Q.     Also, there is an attachment on the next

5 page of Policy No. P-685, which is a Sexual

6 Harassment Policy.  Do you see that?

7 A.     Yes.

8 Q.     And you were, likewise, the individual to

9 whom reports should be directed; it says to the

10 Director of Human Resources or to Administration for

11 confidential handling of the situation, correct?

12 A.     Yes.

13 Q.     Lastly, in the last three pages of that

14 exhibit there is the Equal Opportunity Employer

15 Policy, Harassment in the Workplace, Code of

16 Conduct, and Americans with Disabilities Act.  Am I

17 correct that those were all in place when you were

18 the VP of HR?

19 A.     Yes.

20 Q.     Did you, at anytime, if an individual made

21 a complaint to you, direct them to the resources

22 that are contained within the EEO Policy where it

23 says complaints of discrimination may be filed with

24 any of the following and it gives a number of

## Page 44

1 different resources; did you ever call that

2 specifically to anyone's attention?

3 A.     I did.

4 Q.     Do you recall whether any of those were

5 senior members of leadership?

6 A.     No.

7 Q.     Would that have only been with

8 non-managerial employees?

9 A.     If I felt that it was appropriate, I would

10 have given it to whoever I thought was appropriate.

11 Q.     And one of the resources is listed as

12 Director of Human Resources, which would have been

13 you?

14 A.     Correct.

15 Q.     Or the President?

16 A.     Correct.

17       MS. DEON:  I'm going to have this

18 marked, also (indicating).

19       (At this time, a document was

20 marked for identification as KJ-5.)

21 BY MS. DEON:

22 Q.     With respect to the policies that we were

23 just speaking about, Mrs. Jungclaus, did you ever

24 conduct trainings for management level employees

11 (Pages 41 to 44)

KATHLEEN M. JUNGCLAUS

## Page 45

1  during your tenure as VP of Human Resources?
2  A.    Yes.
3  Q.    Did you also conduct trainings of
4  non-managerial employees with respect to those same
5  policies?
6  A.    Which policies are you referring to?
7  Q.    The ones that we just looked at which were
8  KJ-4.
9  A.    I didn't conduct trainings on those.
10  Q.    At anytime?
11  A.    No. I conducted trainings on different
12  topics, but not on those. The employee handbook was
13  reviewed by Jacquie Levin, who was the recruiter,
14  during your -- during orientation.
15  Q.    You signed off on the handbook and approved
16  it as part of the senior leadership team, correct?
17  A.    As part of the handbook?
18  Q.    Did you approve, as part of the senior
19  leadership team, for the adoption of the 2014
20  handbook?
21  A.    That was approved by Tom. I wrote it, it
22  was reviewed by the senior leadership team and
23  edited by the senior leadership team for comments,
24  and it was approved by Mr. Garvin.

## Page 46

1  Q.    Was there anything in it that you believed
2  or opined was inaccurate or inappropriate from a
3  procedural standpoint?
4  A.    No.
5  Q.    And you'd agree that as the Vice President
6  of Human Resources that would certainly be something
7  within your expertise?
8  A.    Yes.
9  Q.    So with respect to trainings that would
10  have been conducted of any staff members at Waverly,
11  were there any trainings in the areas of
12  antidiscrimination and harassment that you ever
13  personally conducted?
14  A.    No.
15  Q.    Were there trainings of that nature during
16  your tenure?
17  A.    They are on the Silverchair Learning
18  Center, which is a computer-based training.
19  Q.    So other than the Silverchair or Relias
20  Learning, which would have presented topics
21  embracing diversity, preventing sexual harassment,
22  are those the only types of trainings that staff
23  underwent during your tenure on those topics?
24  A.    They were the mandatory trainings. There

## Page 47

1  was an annual training that was conducted that
2  everyone was required to attend that was on a
3  variety of subjects, including in there was
4  workplace violence; Constance Dogan talked about
5  diversity in the workplace, those were all part of
6  the annual training that everyone was supposed to
7  attend.
8  Q.    Was there a time when you personally
9  presented to the staff either as a whole or in
10  groups on antidiscrimination and harassment in the
11  workplace?
12  A.    No.
13  Q.    Did you ever, at any type of forum or staff
14  meeting, review the manner in which someone should
15  report discrimination or harassment in the
16  workplace?
17  A.    I don't recall.
18  Q.    Did anyone else, in any forum that was
19  presented to staff at Waverly, ever go through the
20  manner in which an individual should report
21  discrimination and harassment?
22  A.    I don't recall.
23  Q.    As the Vice President of Human Resources,
24  would you agree that it's important for individuals

## Page 48

1  to know their rights in that regard?
2  A.    Absolutely.
3  Q.    And would you also say that it was
4  important for individuals to know how to report if
5  they saw discrimination or experienced
6  discrimination or harassment directly or indirectly
7  in the workplace, that they would know the resources
8  of how to report that?
9  A.    Again, Jacquie Levin reviewed the employee
10  handbook which included all of those policies at
11  orientation.
12  Q.    Okay. But other than orientation, so if
13  someone's been employed for ten years, was that
14  information not reviewed again with individuals?
15          MR. SCHWARTZ: Objection. She's
16  asked and answered. She testified that
17  it's done annually.
18          MS. DEON: It's a different
19  question. I'm asking separate and distinct
20  from the Relias and Silverchair.
21  BY MS. DEON:
22  Q.    Was there any other opportunity on a
23  basis -- a regular basis when Waverly employees --
24  not just at orientation -- when there was a review

12  (Pages 45 to 48)

KATHLEEN M. JUNGCLAUS

Page 49

1  of how they report discrimination or harassment?
2  A.    It's on every employee bulletin board.
3  Q.    What's the answer to my question though?
4  Being reviewed in a seminar is what I was asking;
5  was that ever a presentation, a live meeting where
6  it's presented?
7  A.    No, but the only thing I can think of that
8  would be even close was the corporate compliance
9  training that Janet Thompson did years ago.
10  Q.    When you referenced that it's posted on the
11  bulletin board, are you speaking of the Department
12  of Labor types of signage --
13  A.    Yes.
14  Q.    --- that has various statutes and the
15  rights of employees under those statutes including
16  Title VII and other antidiscrimination statutes?
17  A.    Yes.  To my best recollection, this page is
18  also posted on the employee bulletin board
19  (indicating).
20  Q.    And for the record, you're referring to
21  KJ-5 --
22  A.    Correct.
23  Q.    -- which was produced in discovery,
24  Waverly-0325.

Page 50

1        That document is the Employee Awareness for
2  how to report discrimination that you signed upon
3  your hire on April 7th, 1997, correct?
4  A.    Yes.
5  Q.    Okay.  And if you would just take a look at
6  the documents that were produced; Waverly-0344,
7  0352, 0366, 0374, 0422, 0461, 0463, is that the type
8  of documentation that you would receive after
9  completing what's been referenced in your testimony
10  as the Silverchair and Relias Learning that's done
11  online?
12  A.    Yes.
13  Q.    Okay.  And there were subject matters, as
14  are depicted in these documents, embracing
15  diversity, preventing sexual harassment; is that
16  correct?
17  A.    Yes.
18  Q.    Okay.  If you look at the documents within
19  that exhibit that start at Waverly-0483, there's a
20  certificate from the Institute for Continuing
21  Education and Research.  Are the documents that are
22  attached to this exhibit with respect to your NHA
23  certification?
24  A.    Yes.

Page 51

1  Q.    How long a process was that in terms of the
2  coursework that you took?
3  A.    I think it was a couple months; three or
4  four months.  I don't really remember.
5  Q.    Am I correct that page numbers 0483 through
6  0490, those are all related to that NHA
7  certification?
8  A.    Yes.
9  Q.    I'm just about done.
10        Yesterday there was testimony about a
11  conversation you had with Basheer, B-A-S-H-E-E-R,
12  Womack, W-O-M-A-C-K; did I spell that correctly?
13  A.    Correct.
14  Q.    You testified that you had a conversation
15  that he initiated regarding voting for Trump; is
16  that correct?
17  A.    Yes.
18  Q.    Did I understand correctly that immediately
19  after that conversation you went to the office of
20  Maria DePaul?
21  A.    Immediately -- it wasn't immediately after
22  the conversation, but shortly thereafter.
23  Q.    Was it the same day?
24  A.    Yes.

Page 52

1  Q.    Were you there to see her for any purpose
2  other than to discuss your conversation with
3  Basheer?
4  A.    I didn't go down the hallway with the
5  intent to see her; I walked down the hallway and she
6  happened to be in her office.
7  Q.    Did you stop in solely for the purpose of
8  discussing your conversation with Basheer?
9  A.    No.
10  Q.    What was your purpose in stopping in?
11  A.    I just stopped to say hello.
12  Q.    How was it raised with her the conversation
13  with Basheer?
14  A.    I asked her if she minded if I had a
15  conversation with her that would be confidential.
16  Q.    Why did you feel the need to designate that
17  as a confidential communication?
18  A.    Because of the content of the conversation.
19  Q.    What about the content was concerning to
20  you?
21  A.    The fact that it was about politics in the
22  workplace.
23  Q.    Did I understand your testimony yesterday
24  to be that you wanted to run by her whether you had

13  (Pages 49 to 52)

Page 53

1 handled the situation correctly?
2 A. Yes.
3 Q. At that point you had been an HR executive
4 for 25-plus years; is that correct?
5 A. Yes.
6 Q. And why is it that you would feel the need
7 to get feedback from the social worker on that
8 topic?
9 A. She's dealt with difficult situations and I
10 wanted to run past her my delivery to make sure that
11 I was perceived properly. I think that when you
12 speak with employees, you know, your interpretation
13 of how you sound and how you come off is one way,
14 and their perception could be something completely
15 different; so I just wanted to run it past somebody
16 to make sure that the delivery was coming across
17 properly.
18 Q. You've had to speak with hundreds of
19 employees over your many years, and wouldn't you say
20 that that's a skill set that you already possessed
21 in terms of how to address difficult topics with
22 employees?
23 A. Absolutely, but because of the content
24 being political, it's such a -- it was such a heated

Page 54

1 debate during the political election year that I was
2 hypersensitive to how I came across, so it was
3 important to me to make sure that I talk to someone
4 who has difficult conversations to make sure that my
5 delivery was -- was proper.
6 Q. Was there anyone else within the Waverly
7 community that you would have considered having that
8 conversation with?
9 A. No.
10 Q. Is there any other time that you can
11 reflect in your career that you've felt the need to
12 confer with a coworker about whether your delivery
13 in a communication with an employee was appropriate?
14 A. Yes.
15 Q. When was that?
16 A. A couple times.
17 Q. Can you give me examples?
18 A. I would talk to Janet Thompson frequently
19 about conversations that I might have had with
20 someone. I talked to Mr. Garvin about conversations
21 that I had with someone, in particular Trish
22 Thompson, to talk about the delivery of how I was
23 managing her. You can't operate in a vacuum. When
24 you're the Vice President of Human Resources I was

Page 55

1 the only person on the senior management team that
2 was responsible for employees. Every other senior
3 leadership had something to do with the residents
4 and so I was a lone star, and I had to have some
5 coworkers that I could confide in to discuss things
6 with and so, yes, there were many times that I -- I
7 discussed situations with my peers.
8 Q. Was there anyone in senior leadership that
9 oversaw the Healthcare Center?
10 A. Meredith Feher.
11 Q. Okay. And wouldn't she have had
12 interaction with employees?
13 A. Yes.
14 Q. I thought you just said that you were the
15 only person on the senior leadership team that had
16 interaction with employees?
17 A. Interaction is one thing; oversight is
18 something different. I mean she supervised people,
19 but in terms of being sure that employees were
20 treated fairly and respectfully, that was my sole
21 purpose.
22 Q. Were there any other instances when you
23 consulted with someone at Waverly about your
24 delivery in a communication with an employee due to

Page 56

1 the sensitivity of the subject matter, other than
2 what you just testified to with respect to Maria?
3 A. I'm sure there were.
4 Q. Can you think of any examples?
5 A. I believe that I spoke with Constance Dogan
6 after I had the meeting with the housekeeping staff
7 regarding the television set. I wanted to make sure
8 that my delivery was clear and respectful. Again,
9 your perception of the way you're coming across is
10 one; it's always important to me to make sure that
11 the receiving party is getting the message the way I
12 intend it to be sent.
13 Q. What was the incident with the television
14 set?
15 A. We purchased televisions for the employee
16 lunchbox and -- because employees wanted to watch
17 basketball games mostly, and so it was decided that
18 three stations would be put on the television; it
19 was Animal Planet, ESPN, and CNN News, those were
20 the three stations, and there were no remotes to the
21 televisions. They were -- each television had a
22 different station on it. So in the morning, whoever
23 went down to turn the TV on, one of those three
24 stations would come up and that was what was on the

14  (Pages 53 to 56)

## Page 57

1  TV.
2  Q.      Just so I'm clear, it wasn't that three
3  different programs were on three different TVs, but
4  all three TVs played the same thing?
5  A.      No.
6  Q.      Okay.  Three different.
7  A.      It was the TVs were programmed so that only
8  one of those three stations would come on when a TV
9  was on.
10  Q.      Okay.
11  A.      The employees took it upon themselves to
12  take the remote controls from the Healthcare Center
13  and change the stations, and they were watching an
14  African American comedy show that was offensive to
15  employees, many employees.  I got a phone call from
16  an employee who told me that the television show had
17  been on and that they took offense to it.
18  Q.      Was it offensive to African Americans or
19  was it offensive to non-African Americans?
20  A.      Both.
21  Q.      And how about the individual making the
22  complaint to you, were they African American or
23  otherwise?
24  A.      Otherwise.

## Page 58

1  Q.      So what happened after that?
2  A.      So I went downstairs and I took the remote
3  controls back again, returned them back to the
4  Healthcare Center and put the TV stations back on.
5  I received a phone call from an employee complaining
6  that I made the decision because a white employee
7  complained about the television.
8  Q.      Had a Caucasian employee complained?
9  A.      Yes.
10  Q.      What did you do in response to that?
11  A.      And the comment on the telephone was that I
12  made it because I was siding with the white people.
13  Q.      What, if anything, did you do after that?
14  A.      I thought it was important that I address
15  the issue immediately, so I asked -- I knew the
16  voice of the employee that made the complaint, it
17  was a housekeeping staff person.  I had overseen
18  housekeeping on many, many occasions in absence of a
19  director, and I had close relationships with that
20  whole department, so I thought it was important that
21  I address the issue immediately, so I asked to
22  attend their stand-up meeting in the morning, and I
23  went downstairs and I told the employees that I had
24  received an anonymous phone call from someone in

## Page 59

1  their department complaining about my changing the
2  television station, and that I thought it was
3  important that they know that it had nothing to do
4  with the race of the person who made the complaint,
5  but that the television show itself was offensive
6  and that it was the rule that we have three stations
7  on in the cafe.
8  Q.      In terms of the show being offensive, what
9  about it was offensive?
10  A.      The language, the sexual content, the
11  sexual innuendo, that was what was offensive.
12  Q.      So it wasn't racially offensive, it was
13  sexually offensive?
14  A.      Yes.
15  Q.      When you sent the Tweet that we identified
16  yesterday as RJ-1, were you of the belief that you
17  were exercising political free speech?
18  A.      I was exercising just an observation which
19  I thought was -- there's nothing wrong with the
20  Tweet, it's an observation.
21  Q.      In the letter from Mr. Schwartz, which we
22  identified yesterday as, I believe, RJ-4, was there
23  a reference in that letter to the fact that you were
24  exercising political speech?

## Page 60

1  A.      I don't recall.
2  Q.      Do you have an opinion as to whether you
3  were expressing political speech?
4  A.      I think I was expressing free speech; I
5  don't necessarily think it was political.
6  Q.      With respect to the anonymous letter, which
7  we marked yesterday as RJ-2, who do you believe
8  wrote that anonymous letter?
9  A.      Anita Summers.
10  Q.      What is the basis for that?
11  A.      Mrs. Summers was very upset with me because
12  I had terminated her housekeeper.
13  Q.      When was that?
14  A.      A couple years before.  I don't really
15  recall the year.  She asked for a meeting with me to
16  discuss the circumstances surrounding the
17  termination.  I met with her at the bottom of my
18  office in what was -- what used to be called the
19  closing room, and now I believe it's Brenda
20  McFadden's office, and we had a discussion about the
21  termination.  She wanted to know the reason that her
22  housekeeper was fired, and I told her that I
23  couldn't disclose that information, that it was
24  confidential, but that it was for a just cause, and

15  (Pages 57 to 60)

KATHLEEN M. JUNGCLAUS

Page 61

1    that I don't make those decisions exclusively, that
2    I have the support of the President as well; I don't
3    make decisions exclusive to terminations.  She was
4    very upset with me; a lot of the language that she
5    used in that meeting is reflected in this letter.
6    Q.    Was anyone else present during that
7    meeting?
8    A.    No.
9    Q.    And am I correct that she was an individual
10   that sat on the Ethics Committee for the Board of
11   Trustees?
12   A.    She's the Chair of the Ethics Committee.
13   Q.    What in the letter, when you just
14   referenced there being language during your
15   conversations with her that was similar to the
16   anonymous letter; what are you speaking about?  And
17   for the record, that's RJ --
18         MR. SCHWARTZ: 2.
19         MS. DEON:  You have the copy,
20   could you look there?
21         MR. SCHWARTZ:  Yeah.  RJ-2.
22         MS. DEON:  Okay.
23         MR. SCHWARTZ:  While she's
24   looking, could I just take a two-minute

Page 62

1    break?
2          MS. DEON:  Yes.
3          (At this time, a short break was
4    taken.)
5    BY MS. DEON:
6    Q.    Mrs. Jungclaus, do you remember the
7    question?
8    A.    I do.  I was invited to Mrs. Summers' villa
9    to meet with her when we were developing a Risk
10   Management Committee, and when I was in her villa we
11   were having a discussion about ethics; she made a
12   comment very similar to this sentence; I've lived my
13   life among people that above all else strive to
14   conduct themselves in an honorable manner no matter
15   what situation they find themselves in; be it a
16   conversation, a close relationship, a work
17   environment, a social arena or a passing exchange.
18   I made it a point of exclusively surrounding myself
19   with people who show respect for themselves and for
20   others.  That's pretty much verbatim what she said
21   to me in her villa, and then she handed me a book to
22   read that was written by her daughter-in-law.
23   Q.    Was anyone present for that meeting in the
24   villa?

Page 63

1    A.    No.
2    Q.    What was the name of the book?
3    A.    It was a Sandberg book; I don't remember
4    the title.
5    Q.    Did you read the book?
6    A.    I did.
7    Q.    Did you return the book?
8    A.    I did.
9    Q.    What is the book about?
10   A.    It's about ethics.  I think Mrs. Summers
11   particularly likes it because she's mentioned in the
12   book.
13   Q.    Anything else discussed at that time in the
14   villa that --
15   A.    Just --
16   Q.    -- was related to the letter?
17   A.    No, but when I took this letter home and I
18   read that -- read it and actually absorbed it, that
19   those two sentences I could hear her voice in my
20   head, because it's pretty much verbatim what she
21   said to me in her villa.
22   Q.    There was a statement yesterday either by
23   your Counsel or by you about an alleged conspiracy
24   between Ms. Summers and Tom Garvin with respect to

Page 64

1    your termination.  Do you recall that?
2    A.    Yes.
3    Q.    Are you of the opinion that Mr. Garvin
4    conspired with Ms. Summers in order to terminate
5    you?
6    A.    I have no idea.  I do speculate that.
7    Q.    Okay.  When I asked you yesterday about
8    instances of sexual harassment you mentioned Ann
9    Rodgers, correct?
10   A.    Correct.
11   Q.    And would you agree with me that any
12   interaction you had with Ann Rodgers would have
13   occurred more than 300 days prior to the filing of
14   the EEOC charge?
15   A.    I guess.  I don't really know.
16   Q.    Well, if she was terminated or should I say
17   if she was separated from employment more than
18   300 days from December 13th, 2016, would you agree
19   with me that more than 300 days passed since those
20   events?
21   A.    Okay.  Yes.
22   Q.    And how about with respect to Mr. Supper,
23   what time frame would you say that you last
24   experienced alleged harassment by him prior to your

16 (Pages 61 to 64)

KATHLEEN M. JUNGCLAUS

Page 65

1  separation from employment?
2  A.      Bob Supper is pretty harassing on a daily
3  basis, so I would say probably within that week.
4  Q.      Did you interact with him on a daily basis?
5  A.      I interacted with him several times a week.
6  Q.      And is it your testimony that he sexually
7  harassed you or created a hostile work environment
8  on the basis of gender on each of those occasions
9  that you interacted with him?
10  A.      Mr. Supper is demoralizing on a regular
11  basis, so I would say yes. He's very difficult to
12  have a conversation with. He -- if you have an
13  opinion, he voices his opinion over yours and
14  there's no arguing with him.
15  Q.      And it's your belief that that is based
16  upon your gender?
17  A.      Yes.
18  Q.      How about with respect to Mr. Garvin? And,
19  again, I'm speaking of harassment on the basis of
20  gender; when did you experience that for the last
21  time prior to being separated from employment?
22  A.      I think when I addressed my concerns about
23  the car with Mr. Supper, the fact that he told me to
24  never bring it up again was demeaning to me as a

Page 66

1  woman.
2  Q.      And how about yesterday you testified about
3  a number of interactions with Mr. Hendrickson,
4  H-E-N-D-R-I-C-K-S-O-N?
5  A.      Yes.
6  Q.      When is the last time that you were ever in
7  his company, during the time that you were employed
8  by Waverly, when you claim you were subjected to
9  sexual harassment?
10  A.      I don't recall.
11  Q.      Is it possible that those interactions
12  occurred more than 300 days prior to December 13th,
13  2016?
14  A.      I don't think it was that long.
15  Q.      You referenced Mr. Garvin making a
16  statement about don't worry, I'm not getting rid of
17  the old-timers. Do you recall that?
18  A.      Yes.
19  Q.      And in connection with whose separation
20  from employment did he make that statement?
21  A.      I don't recall. I think it was Colin
22  Gallagher or -- let me go around the table -- I
23  think it was Colin Gallagher.
24  Q.      I thought -- and I may be incorrect -- is

Page 67

1  he with Dining Services?
2  A.      Yes.
3  Q.      You testified yesterday about e-mails that
4  you found to be inappropriate sent by Mr. Soltis,
5  S-O-L-T-I-S. Do you recall that?
6  A.      Yes.
7  Q.      Did you consider those e-mails to
8  constitute harassment on the basis of gender?
9  A.      I think that they're so degrading and
10  disgusting and anti-Semitic that it doesn't even
11  have to be about gender, but it was about gender
12  because it referenced Hillary Clinton in numerous
13  e-mails.
14  Q.      And you considered those references to
15  constitute a hostile work environment on the basis
16  of gender?
17  A.      Absolutely.
18  Q.      How about were those e-mails in any way
19  objectionable to you on the basis of age?
20  A.      I can't say age.
21  Q.      With respect to your claims for gender
22  discrimination, putting aside your actual
23  termination and the event of your termination, do
24  you contend that any member of the Board of Trustees

Page 68

1  ever discriminated against you on the basis of your
2  gender?
3  A.      Anyone on the Board?
4  Q.      Yes.
5  A.      I don't think that they discriminated
6  against me on the basis of my gender.
7  Q.      How about on the basis of your age?
8  A.      No.
9  Q.      How about the creation of a hostile
10  workplace on the basis of your gender; do you
11  contend that any member of the Board of Trustees did
12  so?
13          MR. SCHWARTZ: Question; this is
14  all with respect to -- you said -- you
15  prefaced your question by saying aside from
16  termination?
17          MS. DEON: Correct.
18          MR. SCHWARTZ: So this is all
19  before the termination?
20          MS. DEON: Correct.
21          THE WITNESS: I'm sorry, could
22  you repeat the question?
23          MS. DEON: Yes.
24  BY MS. DEON:

17 (Pages 65 to 68)

KATHLEEN M. JUNGCLAUS

Page 69

1    Q.     You made a claim in this case for
2    harassment and a hostile work environment on the
3    basis of gender as one aspect, and I'm asking
4    whether any member of the Board of Trustees ever
5    created a hostile workplace for you on the basis of
6    your gender?
7    A.     I had a conversation with Scott Jenkins one
8    morning after Bob Supper was hired, and he made a
9    comment to me that he was surprised that based on
10   Bob's reputation as a drinker that he got the
11   position and kind of laughed it off and gave the
12   good old boy kind of vibe, that it was an okay thing
13   that Bob was a drinker and put into this second in
14   command position; I do view that as gender
15   inequality, because I think that if a woman was like
16   that, that she wouldn't be in the position.
17   Q.     How about the same question but with
18   respect to age; did any Board of Trustees ever
19   create a hostile workplace on the basis of age?
20   A.     No.
21   Q.     Other than that one comment by Mr. Jenkins,
22   is there anything else that you would point to in
23   terms of any member of the Board of Trustees
24   creating a hostile workplace on the basis of gender?

Page 70

1    A.     Well, aside from the Chuck Soltis e-mails
2    and the forwarding of e-mails by Dick Bauer to other
3    people, I would say no.
4    Q.     And is it your position that Mr. Bauer
5    forwarded e-mails that were offensive to you from
6    the standpoint of gender?
7    A.     Yes.
8    Q.     And is that due to the fact that they may
9    have depicted Hillary Clinton?
10   A.     Yes.
11   Q.     Is there any other basis gender specific?
12   A.     I don't recall the entire content of that
13   e-mail, it was extensive.
14   Q.     Was there only one?
15   A.     Only one that I saw in the discovery, but I
16   believe that there are other e-mails that are --
17   were not produced.
18   Q.     And, again, sticking with them being
19   offensive from an gender standpoint?
20   A.     Yes.
21   Q.     Since you have testified repeatedly over
22   yesterday and today that at no time did you go to
23   the Board of Trustees with any of the complaints
24   that either you held individually or that you claim

Page 71

1    other employees brought to you; is that my -- am I
2    accurate when I say that?
3    A.     Yes.
4    Q.     So would you also agree that the Board of
5    Trustees, no one on that Board retaliated against
6    you because they would have had no way of knowing
7    that you engaged in protected activity?
8    A.     Well, it was when I was told that the full
9    Board unanimously terminated me and that the full
10   Human Resource Committee terminated me without any
11   just cause or investigation or questioning of me of
12   anything, I would say that that's a rash decision
13   and discriminatory.
14   Q.     Okay, but we're speaking about retaliation.
15   So retaliation I'm asking you specific to that; it
16   would require that you engage in a protected
17   activity and that then there was adverse employment
18   action taken against you as a result of that
19   protected activity.  So the foundation of my
20   question was that if you never brought to their
21   attention your complaints, would you agree with me
22   that you did not -- that they would not have had
23   notice of any protected activity?
24          MR. SCHWARTZ:  Objection.  The

Page 72

1    last day and now almost a half has been
2    devoted to her testimony about the illegal
3    environment and being discriminated
4    against.  You've had all of those specific
5    answers.
6          MS. DEON:  Maybe you're not
7    understanding.
8    BY MS. DEON:
9    Q.     Do you understand my question?
10   A.     I'm not really clear with what you're
11   asking me.
12   Q.     Okay.  You have testified that at no time
13   did you bring any complaints to the Board of
14   Trustees, correct?
15   A.     Correct.
16   Q.     And do you understand that bringing
17   complaints of discrimination and harassment either
18   on your behalf or on behalf of others would, under
19   the law, be a protected activity under Title VII?
20          MR. SCHWARTZ:  Objection.  Calls
21   for a legal conclusion, but you can answer
22   if you know.
23          THE WITNESS:  I understand that
24   that works in language, but in function

18 (Pages 69 to 72)

KATHLEEN M. JUNGCLAUS

## Page 73

1    that would never work.  If I went to the
2    Board of Trustees I would have been
3    immediately terminated, because they would
4    have picked up the phone and called Tom and
5    said Kathy said this, and that would have
6    been the end of my job, so to think that I
7    could go to the Board with anything is
8    ludicrous.
9  BY MS. DEON:
10    Q.    Okay.  That's not what I'm asking.  What is
11  your understanding of what it means to retaliate
12  against an employee?
13    A.    I know what it means; it means to be
14  terminated or to have some kind of an adverse action
15  against someone.
16    Q.    As a result of what?
17    A.    A complaint.
18    Q.    What else?  What type of complaint?
19    A.    It could be any kind of a complaint;
20  harassment, discrimination.
21    Q.    But you agree with me that if someone had a
22  complaint that the temperature was too low in, you
23  know, their office and then they were fired, is that
24  protected activity that you feel that would then be

## Page 74

1  retaliation for them being fired?
2    MR. SCHWARTZ:  Objection.  Calls
3    for a legal conclusion.
4    THE WITNESS:  I don't know.
5  BY MS. DEON:
6    Q.    Well, I'm just not clear that you
7  understand what retaliation is, and I'm trying to
8  understand what protected activity did the Board
9  have notice of, that they had actual notice that you
10  engaged in alleged protected activity?  What is the
11  answer to that question?
12    A.    None.
13    Q.    Okay.  Do you follow then that no member --
14  I was asking you whether any members of the Board of
15  Trustees retaliated against you, and if they didn't
16  have notice of protected activity, how could they
17  retaliate against you?
18    MR. SCHWARTZ:  This is --
19    THE WITNESS:  The retaliation
20    came in my post-termination.  I heard
21    through business owners that Board members
22    were told that I was fired for violating
23    the Social Media Policy and that I was a
24    racist; I heard that from several people

## Page 75

1  who heard it from various Board members.
2    So the message was that I -- my reputation
3    was completely ruined.
4  BY MS. DEON:
5    Q.    Is that your defamation claim or is that
6  your retaliation claim?
7    MR. SCHWARTZ:  Objection.  Calls
8    for a legal conclusion.
9  BY MS. DEON:
10    Q.    Do you know?  You're making that statement,
11  I'm just asking are you putting that forth to
12  support a defamation claim or to support a
13  retaliation claim?
14    A.    That's a defamation claim.  The
15  retaliation, the post-termination retaliation, came
16  in the unemployment case.  Never in the history of
17  Waverly Heights was any unemployment claim taken to
18  the Commonwealth Court.  That was a post-termination
19  retaliation because Tom's ego couldn't stand the
20  fact that I won my unemployment, and so he sued me
21  all the way to the Commonwealth Court, costing me
22  thousands of dollars to defend myself, and because
23  it was an unprecedented finding it got published all
24  over the internet and on every legal review, so I

## Page 76

1  call that post-termination retaliation; nothing like
2  that ever existed in the history of Waverly Heights.
3    Q.    How did you make payment for the attorney's
4  fees that you incurred for that legal work that you
5  just referenced --
6    A.    I paid personally.
7    Q.    -- for the appeal?
8    And what form did you use; credit card,
9  check --
10    A.    Check.
11    Q.    -- cash?
12    How much did you spend?
13    A.    In excess of $13,000.00.
14    Q.    I know that Mr. Schwartz represented you in
15  that proceeding; did anyone else represent you in
16  connection with that?
17    A.    No.
18    Q.    When you met with Tom Garvin in September
19  when he initially shared with you the anonymous
20  letter, do you recall that?
21    A.    Yes.
22    Q.    Did you ask him whether you were going to
23  be fired?
24    A.    I don't recall.

19  (Pages 73 to 76)

KATHLEEN M. JUNGCLAUS

Page 77

1    Q.    Based upon his tone in that meeting, was it
2    your belief that he was unconcerned about the letter
3    and about the Tweet?
4    A.    Yes.
5    Q.    Did he ask you to take it down or did you
6    offer to do so?
7    A.    He told me to take it down.
8    Q.    Did you in any way object?
9    A.    No.
10   Q.    You didn't tell him it was your free speech
11   right?
12   A.    No.  I said I'll totally go upstairs and
13   take it down.
14   Q.    I thought I read in the Amended Complaint
15   or somewhere in the filings that you made attempts
16   to see Tom on a number of occasions the day before
17   you were terminated; is that correct?
18   A.    Yes.
19   Q.    He had been away at a conference the week
20   before, correct?
21   A.    Correct.
22   Q.    Why is it that you were unable to see him
23   that Monday?
24   A.    He completely blew me off.  He was behind

Page 78

1    closed doors the entire day.  He came out of his
2    office, standing in front of Amy Blessing's desk and
3    I happened to come down; I asked him how the
4    conference was, he was very short with me and turned
5    his back and immediately went back in the office
6    behind closed doors.  I asked Amy if I could please
7    set up a time with him and she said he was booked
8    for the day.
9    Q.    Did you ask him directly if you could speak
10   with him?
11   A.    He didn't give me a chance.
12   Q.    So in person you never made that request,
13   correct?
14   A.    He didn't give me a chance.
15   Q.    Did you make the request or not?
16   A.    I made it to Amy Blessing.
17   Q.    So you did not make it to Mr. Garvin,
18   correct?
19   A.    Like I said, he did not give me the chance.
20   He came out, he saw me, he made one comment and
21   turned around and walked away from me.  The message
22   was the conversation is over.
23   Q.    You did not make the request to him in
24   person, correct?

Page 79

1    A.    Correct.
2    Q.    And how about his cell phone, did you know
3    what his cell phone was?
4    A.    Yes.
5    Q.    Had you ever text-messaged him?
6    A.    Yes.
7    Q.    Had you ever e-mailed him during the
8    business day?
9    A.    Sure.
10   Q.    Did you try to e-mail him asking for a
11   meeting?
12   A.    I --
13   Q.    It's either a yes or a no.  We'll be here a
14   long time today.  Can you just answer did you send
15   him an e-mail?
16   A.    I don't recall.
17   Q.    Did you send him a text?
18   A.    No.
19   Q.    How about the next morning, Tuesday
20   morning, did you attempt to see him on Tuesday
21   morning?
22   A.    I did.  I went down early in the morning,
23   he wasn't in yet, but I wasn't really able to see
24   him, I had fire drills in the Andrews and Blair

Page 80

1    apartment buildings scheduled, so I was tied up
2    doing that for most of the day.
3    Q.    Did you leave a message with Amy to have
4    him contact you?
5    A.    I don't recall.  I do remember that I sent
6    him an e-mail asking him if it would be okay if I
7    left at 3 o'clock for a doctor's appointment since I
8    had to see my allergist.
9    Q.    But in that communication you did not ask
10   to see him?
11   A.    I had tried to see him.
12   Q.    Did you ask in that message to try to see
13   him?
14   A.    No.  I think I may have said something like
15   I've tried to get in touch with you, but I called
16   you, would it be okay if I leave at 3 o'clock to see
17   the doctor.
18   Q.    Okay.  When you came down early Tuesday in
19   the morning and he wasn't there, did you leave any
20   type of a handwritten note on his desk?
21   A.    His office is closed and locked.
22   Q.    Did you attempt to put a handwritten note
23   under the door if the door was locked?
24   A.    I don't think so.

20  (Pages 77 to 80)

KATHLEEN M. JUNGCLAUS

Page 81

1    Q.    You testified yesterday that after the
2    conversation with Mr. Garvin in December of 2015
3    that then, in your opinion, things changed
4    drastically in your relationship.  Do you recall
5    that?
6    A.    Yes.
7    Q.    Was that actually a meeting that you had
8    with Mr. Garvin in early January related to the pay
9    and bonus you were given in 2015?
10   A.    Yes.
11   Q.    Okay.  What were you not included in going
12   forward?  I thought yesterday you testified that
13   from that time forward he no longer included you.
14   Can you give me examples of what you were no longer
15   included in?
16   A.    Sure.  In my relationship prior to that
17   meeting I spent hours with Mr. Garvin during the
18   course of a week, and it could be doing anything
19   from walking through the Healthcare Center to
20   meeting about various topics.  After that initial
21   meeting if I saw Tom once every two weeks or once a
22   month, it was a lot.
23   Q.    Were you prohibited from attending senior
24   management meetings?

Page 82

1    A.    No.
2    Q.    Did he alter your duties in any respect --
3    A.    No.
4    Q.    -- following that meeting?  No?
5    A.    No.
6    Q.    Did he demote you?
7    A.    No.
8    Q.    Did he change your title?
9    A.    No.
10   Q.    Did he require that certain people no
11   longer report to you?
12   A.    No.
13   Q.    How many people did report to you?
14   A.    Two.
15   Q.    Were they considered both in the Human
16   Resources Department?
17   A.    Yes.
18   Q.    How about the benefits, was that handled
19   within Human Resources or was that a function in the
20   Finance Department?
21   A.    HR.
22   Q.    Okay.  Prior to the January 2016 meeting
23   with Mr. Garvin when you addressed your concerns
24   about your pay and the bonus, had you ever

Page 83

1    challenged the amount that you made or the payment
2    of a bonus or lack of a bonus with Mr. Garvin on any
3    other occasion?
4    A.    I did not, because other employees had done
5    that and he thought that they were ungrateful and he
6    made it a point of letting me know that, so...
7    Q.    Who are those individuals?
8    A.    I don't recall.  Debbie Best, I think, was
9    one of them.
10   Q.    Were they members of senior leadership?
11   A.    No.
12   Q.    And you don't recall any other names?
13   A.    Janet Thompson complained about the size of
14   her bonus pretty much every year.
15   Q.    Were there certain years that you did not
16   receive a bonus at all?
17   A.    Yes.
18   Q.    Did you make complaints to Mr. Garvin on
19   those occasions?
20   A.    No.
21   Q.    Do you claim that Mr. Garvin told you not
22   to file a Workers' Compensation claim following the
23   asthma attack on August 19th?
24   A.    Yes.

Page 84

1    Q.    When did he tell you not to file a claim?
2    A.    When I told him what had happened.
3    Q.    When was that?
4    A.    I don't remember if it was that day or if
5    it was on Monday; I don't really recall.  I remember
6    going downstairs, he was sitting in his office, and
7    Amy was asking me how I was feeling, and I told her,
8    and I told Tom what had happened, and he said to me
9    well, you're not actually going to file a claim; how
10   embarrassing would that be as the risk manager.
11   Q.    Did he say that in front of Amy?
12   A.    Yes.
13   Q.    Did you in fact file a claim?
14   A.    My assistant did.
15   Q.    Which assistant?
16   A.    Jen Reardon.
17   Q.    Do you know whether she filed it on the
18   same day as the incident?
19   A.    I don't know.
20   Q.    Did you ever do anything to follow-up on
21   the claim going forward?
22   A.    I believe I tried to submit bills for my
23   allergist at one point.
24   Q.    When was that?

21 (Pages 81 to 84)

KATHLEEN M. JUNGCLAUS

Page 85

1   A.   I think it was after I was fired.
2   Q.   Were those paid?
3   A.   No.
4   Q.   Why?
5   A.   The case was closed.
6   Q.   Did you object to the case being closed at
7   anytime?
8   A.   No.
9   Q.   Do you claim that Mr. Garvin had anything
10  to do with the case being closed?
11  A.   The case was closed because of inactivity.
12  Q.   So Mr. Garvin had nothing to do with it?
13  A.   The only thing he had to do with it was the
14  fact that he intimidated me to not open a claim.
15  Q.   So he had nothing to do with the claim
16  being closed, correct?
17  A.   Correct.  I don't think he even knew that I
18  opened a claim.
19  Q.   Did you ever request any accommodations
20  related to the work-related accident?
21  A.   Accommodations?
22  Q.   Under the ADA.
23  A.   No.
24  Q.   Did you have to see a panel doctor?

Page 86

1   A.   I went to my allergist.
2   Q.   Would the medical treatment that you got at
3   Waverly -- with the Director of Nursing, I believe,
4   the day of the incident?
5   A.   Assistant Director of Nursing.
6   Q.   -- would that have been something that you
7   would have recorded on the incident form if the
8   claim -- when the claim was processed?
9   A.   I believe that Theresa recorded it on the
10  incident report.
11  Q.   And after your separation from employment,
12  was your reasoning for reopening the claim only to
13  get the allergist's bills paid?
14  A.   Yes.
15  Q.   How much were the allergist's bills?
16  A.   I don't recall.  It was for medication and
17  for doctor visits on a weekly basis for nebulizer
18  treatments.
19  Q.   Is that something not covered under your
20  insurance?
21  A.   I don't think the nebulizer treatments are
22  covered 100 percent, so yeah.
23  Q.   How about the medication, would that have
24  been covered?

Page 87

1   A.   Yes.
2        MS. DEON:  I have nothing
3   further.
4        MR. SCHWARTZ:  I have a couple
5   questions.
6   BY MR. SCHWARTZ:
7   Q.   Ms. Jungclaus, you're not a lawyer, are
8   you?
9   A.   No.
10  Q.   Did you ever go to law school?
11  A.   No.
12  Q.   Have you ever read all the cases on Title
13  VII?
14  A.   No.
15  Q.   Did you ever go to the U.S. code and look
16  up the terms of Title VII?
17  A.   No.
18  Q.   Did you ever read any of the regulations
19  that were issued under that?
20  A.   No.
21  Q.   Okay.  Well, Ms. Deon used certain words of
22  art, some of which I objected to, such as
23  discrimination, retaliation, hostile discriminatory
24  environment.  Do you remember her using those terms?

Page 88

1   A.   Yes.
2   Q.   And do you have an understanding, from a
3   legal perspective, of what those are?
4   A.   Not from a legal perspective.
5   Q.   Okay.  So when you testified that you said
6   that you never went to the Board or the Human
7   Resources Committee about the environment; is that
8   correct?
9   A.   Yes.
10  Q.   Okay.  But Mr. Garvin went to the Board and
11  the Human Resources Committee about you, didn't he?
12  A.   Yes.
13       MS. DEON:  Objection.
14  BY MR. SCHWARTZ:
15  Q.   Do you have any reason to believe that he
16  didn't say discriminatory things about you?
17       MS. DEON:  Objection.
18  BY MR. SCHWARTZ:
19  Q.   You can answer.
20  A.   Do I have any reason to believe that he
21  said discriminatory things about me?
22  Q.   Yes.
23  A.   Yes.
24  Q.   Okay.  Has Amy Blessing ever told you that

22  (Pages 85 to 88)

KATHLEEN M. JUNGCLAUS

Page 89

1  when it comes to Mr. Garvin and the Board that
2  they're a bunch of, quote, good old boys; that
3  they're the good old boys club?
4      A.    Yes.
5      Q.    Do you know if she said that to Mr. Garvin?
6      A.    I'm pretty sure she did.
7      Q.    Okay.  When it comes to these offensive
8  e-mails, okay, was there ever a time that Mr. Garvin
9  stood up or the Board stood up and said Soltis,
10  knock it off --
11          MS. DEON:  Objection.
12  BY MR. SCHWARTZ:
13     Q.    -- this isn't who we are?
14          MS. DEON:  Objection.
15  BY MR. SCHWARTZ:
16     Q.    Did that ever happen?  You can answer.
17          MS. DEON:  Objection.
18  BY MR. SCHWARTZ:
19     Q.    You can answer.
20     A.    No.
21     Q.    So as far as you know from this day -- to
22  this day forward these hatemongers continue, don't
23  they?
24          MS. DEON:  Objection.

Page 90

1  BY MR. SCHWARTZ:
2      Q.    You can answer.
3      A.    I would expect so.
4      Q.    Okay.  And isn't it a fact that you got
5  fired after Mr. Garvin went to the Board?
6          MS. DEON:  Objection.
7          THE WITNESS:  Yes.
8          MR. SCHWARTZ:  That's all I have.
9  BY MS. DEON:
10     Q.    Is the basis for your belief that Mr.
11  Garvin went to the Board the conversation you had
12  with him on the day you were terminated?
13     A.    I'm sorry --
14          MR. SCHWARTZ:  Objection.  Calls
15     for a legal conclusion.
16          THE WITNESS:  -- I'm not sure of
17     your question.
18  BY MS. DEON:
19     Q.    The day that you were terminated, I believe
20  you testified before that Mr. Garvin told you it was
21  a unanimous decision of the Board?
22     A.    Correct.
23     Q.    Is that what you base your statement that
24  you just made, that Mr. Garvin -- I lost my train of

Page 91

1  thought.
2          MS. DEON:  Excuse me.  Can you
3     read back about three sentences back when
4     she was testifying in response to Mr.
5     Schwartz's question?
6          (At this time, the court reporter
7     read back from the record as was
8     requested.)
9  BY MS. DEON:
10     Q.    Mrs. Jungclaus, when you responded that you
11  were terminated after Mr. Garvin went to the Board;
12  my question is, what is the basis for your belief
13  that you were terminated after Mr. Garvin went to
14  the Board?
15     A.    That's what he told me.
16     Q.    And that would have been in the meeting
17  when you were terminated; that's your allegation?
18     A.    Correct.
19     Q.    When Mr. Schwartz was asking you if you
20  know case law and various legal terminology just a
21  moment ago, have you attended human resource
22  seminars or continuing education where those terms
23  in the HR realm such as harassment, discrimination,
24  retaliation are utilized?

Page 92

1      A.    Yes.
2      Q.    And you're not sitting here telling us that
3  you don't know from an HR perspective what those
4  terms mean and what your obligations are as a VP of
5  HR to ensure compliance with the statutes that
6  govern discrimination, harassment, and
7  anti-retaliation?
8      A.    The question that he asked me was do I
9  understand it from a legal standpoint; I understand
10  it from an HR standpoint.
11     Q.    Okay.  That's what I was asking.
12          MS. DEON:  I have nothing
13     further.
14          (At this time, a document was
15     marked for identification as KJ-3.)
16          (Witness excused.)
17          (Deposition concluded at 11:55
18     a.m.)
19
20
21
22
23
24

23  (Pages 89 to 92)

KATHLEEN M. JUNGCLAUS

Page 93

```
1           CERTIFICATION
2
3
4
5      I, MICHELLE C. MacARTHUR, Certified Court
6   Reporter, do hereby certify that the foregoing is a
7   true and accurate transcript of the stenographic
8   notes taken by me in the aforementioned matter.
9
10
11          - - -
12
13
14
15
16
17
18
19
20
21
22   DATE:        --------------------------
23            MICHELLE C. MacARTHUR, C.C.R.
24            License No. X102192
```

Appendix 715
StenoSource, LLC (215)348-1095



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | NO.   17-cv-04462-RK |
| | : | |
| Plaintiff | : | |
| v. | : | Jury Trial Demanded |
| | : | |
| WAVERLY HEIGHTS, LTD., | : | |
| THOMAS P. GARVIN and | : | |
| JOHN and JANE DOES NUMBERS 1-21 | : | |
| | : | |
| Defendants | : | |

## PLAINTIFF'S RESPONSES TO DEFENDANT, WAVERLY HEIGHTS, LTD'S REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED TO PLAINTIFF, KATHLEEN M. JUNGCLAUS

Plaintiff Kathleen M. Jungclaus Response to Defendant Waverly Heights LTD's

request for documents is as follows;

1.     Any and all documents identified in Plaintiff's Responses to Defendant's First Set of Interrogatories.  The documents should be reasonably marked and separated so as to indicate the Interrogatory response in which each document was identified.

Answer:  As included herewith.

2.     All versions of your resume and/or curriculum vitae for the last five (5) years.

Answer: See attached P-1 through P-4.

3.     Any and all documents in Plaintiff's possession that relate to any position Plaintiff has held (if any) since September 2016 as an employee, independent contractor or otherwise, including but not limited to Plaintiff's hiring or engagement (i.e. offer letter, application), salary, conditions of engagement/employment, ability to receive bonus or other compensation over and above base salary, performance evaluation(s), job duties (i.e. job description of other writing), potential for increased salary, promotional opportunities, vacation/personal days provided and other benefits currently provided (medical, dental and/or vision insurance, 401-K,

1

disability insurance) or available after completion of probationary period or other conditions and consulting agreements.

Answer: None

4.  All documents that support the claims Plaintiff advances in the Amended Complaint.

    Answer: See both Plaintiff's and Defendant's Responses to Discovery, including that provided here.

5.  All applications, communications, contracts, letters, agreements, job descriptions, handbooks, and other related or similar materials or documents, regarding any jobs or positions regarding which you have applied for employment, or been employed since September 2016.

    Answer: See #6 below.

6.  A copy of each and every resource (i.e. newspaper classifieds or other Job Search periodical) utilized by Plaintiff to locate alternative work from September 2016 through the present.

    Answer: See attached P-5 through P-9. Resume also on Zip Recruiter and Indeed.com.

7.  Any and all documents related to services applied for and/or provided on behalf of any temporary agencies since September 2016, including but not limited to applications, notes, documentation from placements made, check stubs, 1099 forms, etc.

    Answer: See #7.

8.  Any and all documents that identify or reference any of the financial losses or any other non-economic damages allegedly sustained by the Plaintiff as a result of the claims set forth in the Amended Complaint.

    Answer. Plaintiff is collecting information documenting financial losses which will include 1099's received, as well as medical bills. Defendant is in possession of her pay records.

9.  Any and all personal records, journals, calendars, photographs, diaries, notes, tapes, or records of any kind maintained by Plaintiff that refer or relate to the allegations contained in her Amended Complaint.

2

Appendix 717

Answer: Plaintiff will provide such personal diaries and notes as she has pertinent to this request.

10.   Any and all documents that support, undermine, relate to, or otherwise form the basis for the allegations made in the Amended Complaint.

Answer: See responses herein, including #4.

11.   Any and all documents, memoranda, notes, or other similar documentation, which relate to, support, or refer to any party admissions with respect to the subject matter of this lawsuit.

Answer: Objected to as calling for a legal conclusion. Notwithstanding, Plaintiff is providing virtually all documents in her possession responsive to these requests.

12.   Copies of all medical reports, medical records, and communications with any types of medical care providers, including but not limited to psychologists, psychiatrists, mental health counselors, medical doctors, physicians, and any of their staff, and all related documentation: related to, referencing or relevant to the medical and psychiatric conditions you claim to suffer from and that in any way relate to your claim for emotional distress and/or pain and suffering, as identified in the Amended Complaint.

Answer: Plaintiff is in the process of getting this information from the following sources:

Dr. Ku Allergist who treated Plaintiff after the attic incident

Dr. Saull, examined Plaintiff noticing immensely high blood pressure immediately following the unemployment hearing.

Dr. Tom Hanley prescribed Lorazipam for stress and Ativan for sleep. He also prescribed emergency blood pressure medication the day of the unemployment hearing and thereafter ongoing medication.

Dr Rhoda Fuchs Morton is a psychologist treating for stress and post-traumatic stress disorder after her termination from employment

13.   Provide a copy of each and every document you intend or utilize in any manner or fashion or to introduce into evidence at the trial of this case.

Answer: This is objected to as being overbroad as it refers to "utilize in any manner." Notwithstanding, Plaintiff is undecided as of yet.

3

Appendix 718

14.     Provide a copy of any and all documents concerning application for unemployment compensation (if any), including but not limited to the Interview Summary, Application for Benefits and copies of all communications with the Job Center.

Answer: Defendant should be in possession of all of this information which Defendant has claimed is "privileged" and irrelevant to this proceeding.

15.     A copy of any and all documents submitted to the PHRC/EEOC during the course of the administrative investigation.

Answer: Defendant should be in possession of this information which can be requested from the EEOC /PHRC.

16.     Copies of Federal Tax Returns filed by Plaintiff, individually and/or jointly, for the tax years ending 2016 through present.  Should Plaintiff's counsel require a confidentiality agreement before producing the same, Defense Counsel will review the proposed Confidentiality Agreement sought.

Answer: This is objected to as being overbroad given the fact that Defendant is in possession of her earnings up to termination. As to proof of earnings subsequent thereto, Plaintiff will provide 1099's and/or other evidence of income.  Plaintiff's husband's tax return information on their joint return is irrelevant to these proceedings.

17.     All photographs, video reproductions, video recordings, audio recordings, pictures, drawings, maps, plans, diagrams, sketches, computations, calculations or other similar information in your possession or in the possession of your agents, representatives or attorney, which relate to, depict, or memorialize any facts, circumstances or events related to Plaintiff's Amended Complaint.

Answer: See attached P-10 through P-53.

18.     Any and all documents Plaintiff contends support her position in this lawsuit, not already produced as part of Plaintiff's Initial Disclosure (Self-Executing Disclosure).

Answer: These documents include those produced here and provided in discovery by both parties.

19.     All documents, materials, reports, letters, e-mails, testing results, medical records, or similar or related documents, related to your treatment with and/or evaluation for any physician, psychologist, psychiatrist, mental health counsel, and/or their staff, regarding any condition or complaint that you claim you suffer from in the Amended Complaint.

4

Appendix 719

Answer: See previous responses to this duplicative response.

20.    A copy of any and all medical documentation that supports Plaintiff's alleged damages.

Answer: See previous responses to this duplicative response.

21.    All written statements, transcriptions of recorded statements, and written notes or records or summaries of any kind of any oral statement made by any party and/or witness (lay or expert) or the agents, servants, workers and/or employees of the parties or witnesses relating to matters at issue in this case, that are not protected by any privilege.

Answer: See attached email from Tom Wozniac and Andrea Jones P-54 through P-59.

22.    For any and all witnesses that you have identified in this case, copies of any and all documents, materials and information that any of these witnesses have in support of the allegations in the Amended Complaint or writings you or your counsel transmitted or exchanged with said witnesses.

Answer: None

23.    Copies of all reports of experts to be used at the trial of this matter.

Answer: None as of yet.

24.    A copy of any and all documents provided to any expert considered and/or retained by Plaintiff to render an expert opinion on her behalf.

Answer: None as of yet.

25.    All documents or similar materials identified in and requested in Defendant's Interrogatories, accompanying this Request for Production of Documents.

Answer: As provided herewith.

26.    Copies of any and all documents that support your allegation(s) related to reporting discrimination on your behalf or on behalf of others while employed by Waverly.

Answer: Plaintiff has not other documents than those provided. Reference is made to Defendant's discovery responses.

5

Appendix 720

27.     Copies of any and all emails you claim constituted discrimination and/or harassment/hostile work place by Waverly employees, agents or third parties that support Plaintiff's claims.

Answer: Aside from what Plaintiff has produced Defendant is in possession of these documents which are herewith requested by Plaintiff. Do not have access to those emails.

October 30, 2018

By: /s/ Mark D. Schwartz
      Mark D. Schwartz, Esquire
      Attorney for Plaintiff
      Kathleen M. Jungclaus

6

Appendix 721

# Kathleen M. Jungclaus

1129 Mill Road Circle
Rydal Pa, 19046
215-758-2724  home
215-630-3094  cell

SUMMARY:
Human Resource professional with broad background in health care environments. More than 20 years background in increasingly responsible positions. Creative and resourceful problem solver with proven track record for the attainment of positive financial outcomes, excellent customer service scores, staff training and development, project and program development.

Recognized strengths Include:

| | | |
|---|---|---|
| Leadership Skills | Fiscal Management | Training Development |
| Redesign Strategies | Organizational Development | Staff Development |
| Strategic Planning | Customer Service | Employee Relations |

Professional experience

**Waverly Heights, Ltd.**                                        1997 - present
Gladwyne, Pa.19035
Vice President, Human Resource

- Contribute to the organizational development through short term and long range planning.
- Program development that enhances the work environment and the services provided to our residents.
- Coordinate health, dental, life, unemployment, worker's compensation, STD, LTD. FMLA and ADA benefits.
- Successful recruiting of entry level through executive level staff by an effective screening, interviewing and hiring process.
- Responsible for the recruitment and retention initiatives that have resulted in a 9% turnover rate.
- Maintain a financially stable organization by managing department, facility and capital budgets.
- Develop and implement policies and procedures that coincide with the employee handbook and company standards.
- Develop, organize and implement training and orientation programs for all staff.
- Maintain growth in the area of performance improvement through various tools.
- Ensure compliance with all Local, State, Federal and OSHA regulations
- Sitting Board Member to Churchill, a self-funded Captive Insurance Program for worker's compensation
- Direct all employee relation's issues and guide managers in effective coaching and disciplinary actions.
- Responsible for the overall morale and teamwork of employees throughout the facility.
- Responsible for the compensation system, annual review of job descriptions; pay grade placement and accurate evaluation system.
- Direct report to the President and Human Resource Committee of the Board of Trustees.
- Acting Risk Manager
- Successfully attained recognition as a "Best Place to Work" in Pa. 2011, 2012, 2013.
- Acquiring Nursing Home Administrators License.

**Northwestern Human Services**                                        1995 – 1997
Entenheim, Pa
Human Resource Director

- Overseeing 650 employees in a statewide children's' program.
- Coordination of all benefits.
- Effectively recruit, interview and select qualified candidates throughout the state.
- Program and fiscal accountability for all county locations.
- Writing and implementing company policies and procedures.
- Organized, scheduled and conducted personnel training, orientations, OSHA training and Mandt Crisis Intervention Training to all staff in thirteen counties in Pennsylvania.

P-1

- Responsible for overall morale, teamwork and employee relations function throughout the state.

**Bayada Nurses**                                                                                    1985 – 1993
Philadelphia and Willow Grove, Pa.
Senior Staff Supervisor
Staff Supervisor

- Supervised all office personnel and office functions.
- Recruited, scheduled and supervised all home care staff.
- Directed and implemented all disciplinary actions.
- Responsible for payroll through ADP system, insurance billing and authorizations.
- Prepared for JCAHO accreditation.
- Maintained contract guidelines and customer relations.

**Education**

Gwynedd Mercy College Gwynedd Valley, Pa.
BA. in Psychology
Minor in Education/ Community Services
Member: SHRM , Personnel Professional Network

**References**

Professional and personal references are available upon request.

P-2

Kathleen M. Jungclaus

1129 Mill Road Circle
Rydal Pa, 19046
215-758-2724  home
215-630-3094  cell

SUMMARY:
Human Resource professional with broad background in health care and manufacturing environments.
Creative and resourceful problem solver with proven track record for the attainment of positive financial
outcomes, excellent customer service scores, staff training and development, project and program
development.

Recognized strengths include:
Leadership Skills
Redesign Strategies
Strategic Planning

Fiscal Management
Organizational Development
Customer Service

Training Development
Staff Development
Employee Relations

Professional experience

### KMJ Consulting
5/2017 –5/2018

Catelli Brothers Inc.
- Developed Corporate Mission Statement and Strategic Departmental Goals and
  reporting process.
- Through employee engagement meetings identified areas of opportunity that would
  reduce turnover and enhance the employee experience.
- Provided direction for the development of a pay matrix to ensure compensation
  matched length of service and job skill.
- Communicated, trained, and interpreted human resource policies and procedures to
  establish uniform understanding.
- Interacted with the client to understand and gather requirements for enhancements,
  analyzed the need and proposed solutions.
- Provided specialized project administration including; analyzing data, in-depth
  research, evaluation and recommendations to management on department projects.
- Created corporate job description database.
- Served as liaison and advised management regarding legal, ethical and moral
  disciplinary and termination practices.
- Provided employee relations and retention services.
- Served as liaison with assigned areas to coordinate the HR needs including, staffing
  and succession planning, employee relations, consolidations and divestitures,
  information dissemination and policy review.
- Counseled employees in areas relating to manager-employee as well as peer-peer
  relationships, work-life balance, and organizational procedures and policies

### Waverly Heights, Ltd.
4/1997 – 9/2016

Gladwyne, Pa. 19035

Vice President, Human Resource
- Contribute to the organizational development through short term and long-range planning.
- Program development that enhances the work environment and the services provided to our
  residents.
- Coordinate health, dental, life, unemployment, worker's compensation, STD, LTD. FMLA and
  ADA benefits.
- Successful recruiting of entry level through executive level staff by an effective screening,
  interviewing and hiring process.
- Responsible for the recruitment and retention initiatives that have resulted in a 9% turnover rate.

P-3

Appendix 724

- Maintain a financially stable organization by managing department, facility and capital budgets.
- Develop and implement policies and procedures that coincide with the employee handbook and company standards.
- Develop, organize and implement training and orientation programs for all staff.
- Maintain growth in the area of performance improvement through various tools.
- Ensure compliance with all Local, State, Federal and OSHA regulations
- Sitting Board Member to Churchill, a self-funded Captive Insurance Program for worker's compensation
- Direct all employee relation's issues and guide managers in effective coaching and disciplinary actions.
- Responsible for the overall morale and teamwork of employees throughout the facility.
- Responsible for the compensation system, annual review of job descriptions; pay grade placement and accurate evaluation system.
- Direct report to the President and Human Resource Committee of the Board of Trustees.
- Acting Risk Manager
- Successfully attained recognition as a "'Best Place to Work" in Pa. 2011, 2012, 2013.

**Northwestern Human Services**                                1995 – 1997

Erdenheim, Pa

Human Resource Director

- Overseeing 650 employees in a statewide children's' program.
- Coordination of all benefits.
- Effectively recruit, interview and select qualified candidates throughout the state.
- Program and fiscal accountability for all county locations.
- Writing and implementing company policies and procedures.
- Organized, scheduled and conducted personnel training, orientations, OSHA training and Mandt Crisis Intervention Training to all staff in thirteen counties in Pennsylvania.
- Responsible for overall morale, teamwork and employee relations function throughout the state.

**Bayada Nurses**                                                1985 – 1993

Philadelphia and Willow Grove, Pa.

Senior Staff Supervisor

Staff Supervisor

- Supervised all office personnel and office functions.
- Recruited, scheduled and supervised all home care staff.
- Directed and implemented all disciplinary actions.
- Responsible for payroll through ADP system, insurance billing and authorizations.
- Prepared for JCAHO accreditation.
- Maintained contract guidelines and customer relations.

Education          Gwynedd Mercy College Gwynedd Valley, Pa.
                   BA. In Psychology
                   Minor in Education/ Community Services
                   Member: SHRM , Personnel Professional Network

P-4

Appendix 725

This application includes features that require <u>JavaScript</u> be enabled for your Web browser. These include printing, column sorting, the date picker calendar, context sensitive help, spell checking, and others. In most instances, comparable functionality is provided. If you choose not to enable JavaScript, please <u>review our accessibility statement for details about comparable features</u> that do not depend on JavaScript. If further assistance is needed, submit a <u>support request</u> or, contact the appropriate <u>service location</u> near you to obtain our services.

<u>PA CareerLink</u>

- ○
  Search Jobs
  - ▪ [                    ]
  - ▪ [                    ]
  - ▪ [ Search ]
  - ▪ <u>Browse for Jobs by Category</u>
- ○
  Saved Jobs
  - ▪ Currently no Saved Jobs.
  - ▪
- ○
  Inbox
  - ▪ You do not have any messages at this time.
  - ▪
- ○
  Announcements
  - ▪ You do not have any notifications at this time.
  - ▪
- ○ Hi Kathleen!
  My Account
  - ▪ <u>Personal Information</u>
  - ▪ <u>My Preferences</u>
  - ▪ <u>Change Password</u>
  - ▪ <u>Change Hint Q & A</u>
  - ▪ <u>Log Out</u>
- ▪
- • <u>CWDS</u>
- ▪
- • My Job Search
  - ○ <u>My PA CareerLink® Resume</u>
  - ○ <u>Resume List</u>
  - ○ <u>Search Jobs</u>
  - ○ <u>Saved Searches</u>
  - ○ <u>Saved Jobs</u>
  - ○ <u>Job Applications</u>
  - ○ <u>Job Search Activities</u>

P-5

Appendix 726

- ○ Browse for Jobs by Category
- Events
  - ○ Search Events
  - ○ My Calendar
- Career Services
  - ○ Veteran Services
  - ○ Career Resources
  - ○ Career Tools Overview
  - ○ Skills Assessment
  - ○ Career Videos
  - ○ Career Exploration
  - ○ Interview Training
  - ○ Military Translator
  - ○ Training Opportunities
  - ○ Programs and Services
- About Us
  - ○ Accessibility
  - ○ Contact Us
  - ○ Privacy Policy
  - ○ Security Policy
  - ○ Terms Of Use
  - ○ About Us
- Help
  - ○ Help Center
  - ○ Feedback
  - ○ Account Benefits
  - ○ PA CareerLink® Offices
  - ○ Sitemap
- Español

Hi Kathleen!

- My Inbox (0)
- Announcements (0)
- Saved Jobs (0)
- Personal Information
- My Preferences
- Change Password
- Change Hint Q&A
- Log out

menu

- My Dashboard
- My Job Search
  - ○ My PA CareerLink® Resume
  - ○ Resume List
  - ○ Search Jobs
  - ○ Saved Searches

P-6

- ○ Saved Jobs
  - ○ Job Applications
  - ○ Job Search Activities
  - ○ Browse for Jobs by Category
- Events
  - ○ Search Events
  - ○ My Calendar
- Career Services
  - ○ Veteran Services
  - ○ Career Resources
  - ○ Career Tools Overview
  - ○ Skills Assessment
  - ○ Career Videos
  - ○ Career Exploration
  - ○ Interview Training
  - ○ Military Translator
  - ○ Training Opportunities
  - ○ Programs and Services
- About Us
  - ○ Accessibility
  - ○ Contact Us
  - ○ Privacy Policy
  - ○ Security Policy
  - ○ Terms Of Use
  - ○ About Us
- Help
  - ○ Help Center
  - ○ Feedback
  - ○ Account Benefits
  - ○ PA CareerLink® Offices
  - ○ Sitemap
- Provide Feedback
- Español
- CWDS

## My Job Search Activities

Sep 30, 2016 - Oct 30, 2018

**Activity Summary - click on an activity box below to view details**

| Applications | Job Websites Visited | # Of Days With a Job Search | Employers Contacted | Job Fairs Attended |
|---|---|---|---|---|
| 09 | 29 | 17 | 00 | 00 |

P-7

Appendix 728

| Networking | Resume Posted To Other Websites | Other Activities | Civil Service / Pre-Employment Tests Completed | All Activities |
|---|---|---|---|---|
| 00 | 00 | 00 | 00 | 55 |

Add New Activity

**Job Search Activity Details - All Activities for Sep 30, 2016 - Oct 30, 2018**

Showing 1 - 25 of 57 results     ☒ First  First  ☒ Previous  Previous | Next  ☒ Next  Last  ☒ Last

| Date | Activity Type | Activity Detail | Follow Up Date | Actions |
|---|---|---|---|---|
| 10/4/2018 | Job Website Visited | Executive Director/Vice President, Human Resources Business Partner - (JF12501212) | | ☒ Mark As Applied |
| 10/4/2018 | PA CareerLink® Job Search | Searched for jobs in PA CareerLink® | | |
| 10/4/2018 | PA CareerLink® Job Preference | Became available for Employers | | |
| 3/8/2017 | Job Website Visited | Director Human Resources - (JF10824884) | | ☒ Mark As Applied |
| 3/8/2017 | PA CareerLink® Job Search | Searched for jobs in PA CareerLink® | | |
| 3/8/2017 | Job Website Visited | Human Resources Administrator - (JF10844682) | | ☒ Mark As Applied |
| 2/23/2017 | Job Website Visited | Human Resources Business Partner - (JF10790620) | | ☒ Mark As Applied |
| 2/6/2017 | Job Website Visited | Vice President Human Resources - (JF10791631) | | ☒ Mark As Applied |
| 1/30/2017 | PA CareerLink® Job Search | Searched for jobs in PA CareerLink® | | |
| 1/10/2017 | PA CareerLink® Job Search | Searched for jobs in PA CareerLink® | | |
| 1/10/2017 | Job Website Visited | Vice President - (JF10669788) | | ☒ Mark As Applied |
| 11/23/2016 | PA CareerLink® Job Application | Senior Human Resources Generalist - 50882372 - (10583171) - Not Hired | | |
| 11/23/2016 | Job Website Visited | Human Resources Coordinator Csa - (JF10654566) | | ☒ Mark As Applied |
| 11/23/2016 | Job Website Visited | Human Resource Generalist - (JF10640991) | | ☒ Mark As Applied |
| 11/23/2016 | | Searched for jobs in PA CareerLink® | | |

P-8

| | | | | |
|---|---|---|---|---|
| | PA CareerLink® Job Search | | | |
| 10/10/2016 | PA CareerLink® Job Application | Assistant Vice President, Talent & Development - 311317 - (10548647) - Not Hired | | |
| 10/17/2016 | PA CareerLink® Job Application | Human Resources Generalist 691452 - (10509395) - Not Hired | | |
| 10/17/2016 | PA CareerLink® Job Application | Human Resources Business Partner - (10506634) - Not Hired | | |
| 10/17/2016 | PA CareerLink® Job Application | Human Resources Generalist - (10506641) - Not Hired | | |
| 10/24/2016 | PA CareerLink® Job Application | Sr Mgr Diversity & Inclusion - 201377-00160 - (10506787) - Not Hired | | |
| 10/19/2016 | PA CareerLink® Job Application | Senior Human Resources Advisor Business Consultant - (10504968) - Not Hired | | |
| 10/10/2016 | PA CareerLink® Job Application | Vice President-Corporate Human Resources - 50878308 - (10504771) - Not Hired | | |
| 11/4/2016 | Job Website Visited | Human Resources Business Partner - (JF10618165) | | ☒ Mark As Applied |
| 11/4/2016 | PA CareerLink® Job Search | Searched for jobs in PA CareerLink® | | |
| 10/26/2016 | PA CareerLink® Job Search | Searched for jobs in PA CareerLink® | | |

☒ First   First   ☒ Previous   Previous  |  Next   ☒ Next   Last   ☒ Last

Copyright © 2018 Commonwealth of Pennsylvania.
Governor Tom Wolf

PRINT

☒ Pennsylvania Footer

Build Version: 12.2.1.16
Application Environment: (LIHBG000WWBN)
Database Environment: Database Instance
Build Timestamp: 10/12/2018 3:37:46 PM
JobActivitySummary.aspx [SSR Number 800]
Current Date: 10/30/2018 3:03:33 PM

P-9

Appendix 730



P-10



P–11



P-12



👍 Like          💬 Comment          ➦ Share

**Janet Osborn Thompson** shared a link
October 15

**COMMONDREAMS.ORG**
**51 GOP Senators Just Voted To Cut $1.5 Trillion from Medicare and Medicaid To Give Super-Rich and Corporations a Tax Cut**

👍 4                          4 Comments 1 Share

👍 Like          💬 Comment          ➦ Share

**Celeste McWhirter** You fucking Republicans are bastards. That is my money and I want it back. The fucking rich assholes don't pay taxes and I do. You better watch your backs!
Like  Reply  1w

**JoAnn Fisher Goble** This is from 2017.
Like  Reply  3w

**Robin Auer** Someone is dismissing this off this is OLD news. Second the other party is busy adopting socialism. Please tell me where you expect the $$$ to come from? Even the folks who push for socialism don't know where they're going to get the $$$. Th...  See More
Like  Reply  1w

**Robin Auer** To correct another misconception voiced here, this

(4) Janet Osborn Thompson

10/22/2018

**Anna Haag** Oh my sweet little love! I wish time travel was real and I

Add Friend

INSTANT GAMES    MORE

Janet Osborn Thompson replied · 1 Reply

**Debby Burow** Totally adorable!!! Love every minute of them growing up, it goes so fast!

Like · Reply · 4d                                          1

YOUR GAMES    MORE

Write a comment...

Jim Jungclaus

**Janet Osborn Thompson** shared a link.
October 16 at 11:09 PM ·

Peggy Branton Birdsall  1m

Kris Belisario-Scanl...  37m

Meg Anne Chambers  2h



April Quarlell Erck  1h

Photos

Tony Lepre  59m

Kendall Rieder

Nick Liddy

AF
M                                           's Trillion-Dollar
D

Andrew Key  8h

Anita Belisario  47m

Michael Metzger  1h

1 Comment

Dana Liddy Rieder  4h

Like                                    Share

Luz M Gorndt  8h

Chris Harden  1h

Patty Tawadros  1h

1

GROUP CONVERSATIONS

Create New Group

See More Recent Stories

**Friends · 237 (2 Mutual)**

See what you have in
common with Janet's friends.                 **View**

English (US) · Español · Português (Brasil) ·
Français (France)  Deutsch

Privacy · Terms · Advertising · Ad Choices     Cookies
· More
Facebook © 2018

Kevin Billig

P-14

(4) Janet Osborn Thompson

10/22/2018



INSTANT GAMES        MORE

Add Friend

YOUR GAMES        MORE

Write a comment...

**Janet Osborn Thompson**
October 18 at 8:13 PM ·

Another excuse for a horrid and deliberate political move. An apology and a commitment to right this wrong is what we need to hear.

Jim Jungclaus

Peggy Branton Birdsall   1m

Kris Belisario-Scanl... 37m

Meg Anne Chambers   2h

April Quartell Erck   1h

Tony Lepre   59m

Kendell Rieder

Nick Liddy

Andrew Key   8h

Anita Belisario   47m

Photos

Sh
S:                    milies 'actually self-
se

Michael Metzger   1h

Dana Liddy Rieder   4h

5 Comments

Luz M Gomdt   8h

Like                        Share

Chris Harden   1h

Vie                                             ork for 45?

Patty Tawadros   1h

GROUP CONVERSATIONS

ese people.
1

Create New Group

Linda Gate Only monsters would put children in cages!

**Friends · 237 (2 Mutual)**

rals. And that cage
the truth.

See what you have in
common with Janet's friends.          View

English (US) · Español · Português (Brasil) ·
Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices      Cookies
· More
Facebook © 2018

P-15

Kevin Dilly



(4) Janet Osborn Thompson

INSTANT GAMES        MORE

# PROOF THAT EVERY SUBSTANTIAL

Add Friend

YOUR GAMES        MORE

# HAS BEEN INITIATED BY LIBERALS
# AND OPPOSED BY CONSERVATIVES:

- The American Revolution     - Pell grants
- Abolition of slavery        - National parks system
- The eight-hour workday      - Civil Rights Act
- Ending child labor          - Voting Rights Act
- Federal minimum wage        - Social Security
- Overtime pay                - Medicare
- The weekend                 - Clean Water Act
- Women's right to vote       - Clean Air Act
- Unemployment Insurance      - Universal public schools
- Interstate Highway System   - Obamacare

OCCUPY DEMOCRATS

Jim Jungclaus

Peggy Bramen Birdsall 1m

Kris Belisario-Scani... 37m

Meg Anne Chambers   2h

April Quartell Erck    1h

Tony Lepre           59m

Kendall Rieder

Nick Liddy

Andrew Kay            8h

Anita Belisario      47m

Michael Metzger       1h

Dana Liddy Rieder     4h

Luz M Gorndt          6h

Chris Harden          1h

Patty Tawadros        1h

GROUP CONVERSATIONS

Create New Group

Photos                           Like Page

Like                             Share

Fr

Friends · 237 (2 Mutual)

Meg Cummins    Jo McBride

See what you have in             View        9 Comments
common with Janet's friends.
Like        Comment              Share

English (US) · Español · Português (Brasil) ·
Français (France) · Deutsch
Privacy · Terms · Advertising · Ad Choices  · Cookies
· More · Reply · 4d
Facebook © 2016

Eileen Salgun Reply Danbusy

Diane Scherer Derescavage What a cutie!
Like · Reply · 4d                    Kevin Rillig

P-17

3/4

10/22/2018

(4) Janet Osborn Thompson



Janet Osborn Thompson





⋮  Add Friend  ⋮  Message

Timeline     About     Friends 2 Mutual     Photos     More

**DO YOU KNOW JANET?**

To see what she shares with friends, send her a friend request.

 2 Mutual Friends

Photos








See what you have in common with Janet's friends.   View

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices ▷ · Cookies · More
Facebook © 2018

Janet Osborn Thompson shared a post.
October 19 at 6:32 PM ·



**Reagan Destroys McConnell's Social Security Lies**

5,079,519 Views

U.S. Senator Bernie Sanders
October 18 at 1:47 PM ·

Ronald Reagan has a message for Mitch McConnell: Social Security has absolutely
nothing to do with the deficit. via Social Security Works

Like Page

Like          Comment          Share

 Write a comment...

Janet Osborn Thompson shared a post.
October 19 at 6:20 PM ·

 Denny Bannon
October 18 at 6:05 PM ·

Thanks for sharing Susan.

Copied from a friend and it's me in a nutshell

*An open letter to friends and family who are shocked to discover I'm a liberal.. I'...

See More

Kevin Dillig

INSTANT GAMES          MORE

 

YOUR GAMES          MORE



Peggy Branton Birdsell

Jim Jungclaus

Mary Lynott

Kris Belisario-Scanl...   37m

Meg Anne Chambers    2h

April Quartell Erck    1h

Tony Lepre    58m

Kendall Rieder

Nick Liddy

Andrew Kay    8h

Anita Belisario    47m

Michael Metzger    1h

Dana Liddy Rieder    4h

Luz M Gorndt    6h

Chris Harden    1h

GROUP CONVERSATIONS

Create New Group

P-18

10/22/2018

(4) Janet Osborn Thompson

Like          Comment          Share

INSTANT GAMES          MORE

Write a comment...

YOUR GAMES          MORE

See More Recent Stories ▾

Peggy Branton Birdsall

Jim Jungclaus

Mary Lynott

Kris Bellsario-Scanl...   37m

Meg Anne Chambers   2h

April Quartell Erck   1h

Tony Lepre   58m

Kendall Rieder

Nick Liddy

Andrew Kay   6h

Anita Bellsario   47m

Michael Metzger   1h

Dana Liddy Rieder   4h

Luz M Gorndt   8h

Chris Harden   1h

GROUP CONVERSATIONS

Create New Group

Kevin Billig

P- 19

Appendix 740



P-20



P-21



P-22



P-23



P-24



P-25

10/28/2018                                          IMG_0689.PNG

 ••I  Verizon  LTE            7:58 PM            ⌁ ✳ 97% ▬



## Messages

                  
      Dave              Colleen              Bill              Natalie

 **Kevin Billig**                          7:57 pm
**Kevin sent a disappearing message.**

 **Kevin Billig**
Sucks about over flight

 **Anna Leigh**                          
37m   Your Unfortunately small. business office

 **Peggy Branton Birdsall**
11m   Peggy sent a sticker.

 **USAA**



🏠¹  Home

P-26

10/28/2018                                      IMG_0690.PNG

•• Verizon  LTE                7:58 PM                    ⇗ ✳ 97% ▬▬

⟨ Home

Kevin Billig



## Secret Conversation

### With Kevin Billig

Encrypted end-to-end across All your
mobile devices

   ?

                         

P-27

Appendix 748

10/28/2018                                    IMG_0691.PNG

**Verizon  LTE**            **8:33 PM**              97%

Messages
_____

Peggy        Colleen       Mark         Brad

**Kevin Billig**                          8:24 pm
Kevin sent a disappearing message.

**Kevin Billig**

**Anna Leigh**

**Peggy Branton Birdsall**

Mary Lynott

**Meg Anne Chambers**

**Tony Lepre**

Home



Appendix 749

10/28/2018                                    IMG_0692.PNG

ıl  Verizon  LTE            8:33 PM            ◢ ∦ 97% ▬▬

❮ Home                    Kevin Billig



## Secret Conversation

**With Kevin Billig**

Encrypted end-to-end across all your active mobile devices

   You didn't see what I sent you?

   ?

🕐 |⁙                              ☺  👍

| Q | W | E | R | T | Y | U | I | O | P |
|---|---|---|---|---|---|---|---|---|---|

| A | S | D | F | G | H | J | K | L |
|---|---|---|---|---|---|---|---|---|

⬆  Z  X  C  V  B  N  M  ⌫

123  😀  🎤        space        return

P→29

Appendix  750

10/28/2018

IMG_0693.PNG

 Verizon   LTE          10:22 PM           ⚡ ⚙ 89% ▬



Messages

            

Elissa          Sigal          Sophia          Patti

 **Kevin Billig**                    8:41 pm
Kevin sent a disappearing message.

 **Kevin Billig**                                   

 **Anna Leigh**                                     
24m

 **Peggy Branton Birdsall**
38m

 **Brooklinen**

          

          
Home

P-30

Appendix 751

10/28/2018

IMG_0694.PNG

.Il .Verizon  LTE

**10:22 PM**

*Kevin Billig*

‹ Home



## Secret Conversation

### With Kevin Billig

Encrypted end-to-end across all your active mobile devices

No

I'm sure for the right compensation you could find out everything..





| Q | W | E | R | T | Y | U | I | O | P |

| A | S | D | F | G | H | J | K | L |

| ⬆ | Z | X | C | V | B | N | M | ⌫ |

| 123 | 😀 | 🎤 | space | return |

P-31

Female exec fired after making pro-Trump tweet
hits back against employer in U.S. court ...
⊘ www.pennlive.com › 2017/11

Nov 14, 2017 · Kathleen Jungclaus, who won an
unemployment compensation case against her former
company on Monday, claims she is the victim of age
discrimination and defamation.

Exec fired for pro-Trump tweet can't be denied
unemployment comp, Pa. court says ...
⊘ www.pennlive.com › 2017/11

Nov 13, 2017 · Kathleen Jungclaus' tweet didn't directly
link her to her employer and so didn't violate the firm's
social media policy, the Commonwealth Court judges
found.

Kathy Jungclaus - Employee Relations and
Engagement Specialist - KMJ Consulting ...
https://www.linkedin.com › kathy-jungcl...

Jenkintown, Pennsylvania · Employee
Relations and Engagement Specialist ·
KMJ Consulting
View Kathy Jungclaus' profile on



P-32

fired over pro-Trump tweet - Reuters
https://www.reuters.com › article

Nov 13, 2017 · A unanimous three-judge panel of the
Commonwealth Court of Pennsylvania said Kathleen
Jungclaus did not violate Waverly Heights Ltd's social
media policy when she sent out the tweet ...

IN THE COMMONWEALTH COURT OF
PENNSYLVANIA Waverly Heights, Ltd ...
PDF   www.pacourts.us › Commonwealth › out

Nov 13, 2017 · order of the Unemployment Compensation
Board of Review (Board), which reversed a decision of a
referee and granted unemployment compensation (UC)
benefits to Kathleen M. Jungclaus ...

Kathleen Jungclaus's email | Vice President Human
Resources @ Waverly Heights Ltd ...
https://www.leadcandy.io › kathleen-jung...

Find Kathleen Jungclaus's Email, Social Profile links, and
the Mutual Contacts you and Kathleen both know. Email:
xxxx@waverlyheightsltd.org | Show email, social profile
links and mutual contacts | Leadcandy.io.

P-33

Nov 16, 2017 · Kathleen M. Jungclaus was VP of Human
Resources for Waverly Heights, a retirement home located
in a Philadelphia suburb. On July 24, 2016, she tweeted
(from a Twitter account I couldn't find, ...

VP of HR fired for a Trump tweet still manages to
collect unemployment benefits — The ...
🔾 https://www.theemployerhandbook.com › ...

Nov 14, 2017 · Back in 2016, Kathleen M. Jungclaus was
the full-time Vice President of Human Resources for a
Pennsylvania continuing care retirement community. She
had worked for the company ...

Kathleen Jungclaus | 53 records found | ...
https://www.whitepages.com › name › K...

53 records · 53 records - View phone numbers,
addresses, public records, background check reports and
possible arrest records for Kathleen Jungclaus.
Whitepages people search is the most trusted directory.

⌄            More results

P-34

Unemployment Compensation Benefits ...
https://www.lexology.com › library › detail

Dec 4, 2017 · Until her termination, Kathleen Jungclaus
had served as the vice president of human resources of a
retirement care community for nearly 20 years. Ms.
Jungclaus was terminated when she posted a ...

HR Exec's Tweet to Trump Not Grounds to Deny
UC Benefits, Court Rules | The Legal ...
https://www.law.com › sites › 2017/11/15

Nov 15, 2017 · ... on social media, a unanimous three-
judge panel of the Commonwealth Court upheld the
Unemployment Compensation Board of Review's decision
to grant UC benefits to Kathleen M. Jungclaus.

Waverly Heights named Best Place to Work in PA |
Mainlinetimes | mainlinemedianews.com
www.mainlinemedianews.com › life › wa...

Jan 6, 2014 · Pictured with the award are: Thomas P.
Garvin, president and CEO; Kathleen Jungclaus, director
of Human Resources; and Edwin B. Mahoney, chairman of
the Board of Trustees. Waverly ...



P-35

**Jungclaus V Waverly Heights Ltd Et Al - UniCourt**
https://unicourt.com › case › pc-db1-jun...

Oct 7, 2017 · (#1) COMPLAINT against THOMAS P.
GARVIN, WAVERLY HEIGHTS LTD ( Filing fee $ 400
receipt number 166934.), filed by KATHLEEN M.
JUNGCLAUS. (Attachments: #1 Exhibit, #2 ...
You visited this page on 3/24/18.

**Trump Tweet Doesn't Disqualify Manager From
Getting Unemployment | Bloomberg Law**
 https://www.bna.com › trump-tw...

Nov 14, 2017 · Kathleen M. Junglcaus, vice president of
human resources at a retirement community near ... of
Review, which found that Jungclaus hadn't violated the
company's social media policy ...

**Court Rules That Pro-Trump Tweeter Can Keep
Unemployment Benefits | 501c Agencies Trust**
https://www.501ctrust.org › court-rules-t...

Nov 14, 2017 · The employee in the case is Kathleen
Jungclaus, the former human resources director of the
Pennsylvania senior day care center, Waverly Heights.
Jungclaus was fired in September of 2016 after ...

P-36

McLaughlin & Marcus, P.A. - JDSupra
www.jdsupra.com › legalnews › trump-l...

Dec 12, 2017 · Kathleen Jungclaus worked full-time as
vice president of human resources for a retirement
community. In July 2016, she sent the following from her
personal Twitter account: "@realDonaldTrump I ...
You visited this page on 3/24/18.


Kathleen Jungclaus, Vice President of Human
Resources at Waverly Heights Ltd ...
https://relationshipscience.com › person

RelSci Relationships are individuals Kathleen Jungclaus
likely has professional access to. A relationship does not
necessarily indicate a personal connection. Scott M.
Jenkins. Vice Chairman at Waverly Heights Ltd.


Court notes 9/25/13 - Courts/Police - Citizens' ...
m.citizensvoice.com › news › courts-police

Sep 25, 2013 · Barbara S. Ziemian and Joseph A. Ziemian
to Raymond A. Jungclaus and Kathleen M. Jungclaus for
$379,000; Black Creek Township. Bernadette Hlavac to
Brian Breznay and Helene Breznay for ...

P-37

Comments

## Mount Laurel Police Department

POLICE BLOTTER:

BURGLARY: During the overnight hours of August 11th into the 12th a shed and a detached garage were entered at two different residences on the 100 block of Independence Lane. A set of bolt cutters was stolen from the garage and damage was done to the shed.

THEFT: A bicycle was reported stolen from the 4900 building of Essex Lane during the early morning hours of August 12th. The bicycle was located on a path behind the 3300 building of Chadbury Road at 8:45am on August 12th. The bike was returned to the owner.

CRIMINAL MISCHIEF: A resident of the unit block of Holly Cove reported his vehicle was vandalized between August 11th and August 12th. Someone scratched the vehicle with a sharp object.

ARREST: At 8:33 pm on August 12th Mount Laurel Police responded to a hotel on the 1100 block of Route 73 for a disturbance. During the investigation officers arrested Kashief J. White, age 32, of Camden, NJ. He was charged with possession of cocaine, possession of prescription drugs, and possession of drug paraphernalia. He was released pending a court hearing.

ARREST: At 7:14 pm Mount Laurel Police responded to a hotel on the 600 block of Fellowship Road for a disturbance. During the investigation officers arrested Christina N. Tirocke, age 21, of Mount Laurel. She had two outstanding warrants and was in possession of drug paraphernalia. She was charged with possession and released after satisfying her warrants.

CRIMINAL MISCHIEF: At 10:30 pm on August 14th Mount Laurel Police responded to the McDonalds on Route 73 for a criminal mischief. It was reported that three females in their 20's got into a dispute with the restaurant staff. The customers were upset that they were charged 40 cents for extra sauce on their order. They threw newspapers at the staff and knocked over a cement trash can as they left. The trash can, valued at $200.00 broke, when it hit the ground. The suspects could not be located.

ARREST: At 2:15 am on August 14th Mount Laurel Police conducted a motor vehicle stop on Route 73 near Rogers Walk. During the stop officers arrested Javier A. Alvarez, age 35, of Philadelphia PA and Noel Fernandez. age55, of Philadelphia. PA after officers observed drug in the vehicle. Alvarez was charged with possession of greater than 5 units of prescription legend drugs (suboxone) and possession of less than 50grams of marijuana. He also had an active arrest warrant. His bail was set at $8,500.00 with no 10% option. Fernandez was charged with possession of less than 50 grams of marijuana, possession of heroin, possession of cocaine, and possession of drug paraphernalia. His bail was set at $13,500.00 with no 10% option. Both subjects were committed to Burlington County Jail.

CRIMINAL MISCHIEF: The manager of a hotel on the 900 block of Route 73 reported that a guest caused over $1,200.00 damage to a room on August 16th. There were indications that the guest used a fraudulent name and credit card to rent the room. Investigation ongoing.

RECEIVING STOLEN PROPERTY: An investigation determined that item stolen during a residential burglary in Maple Shade were pawned at the Game Stop on Nixon Drive. The suspect was identified as Paul F. Scattergood Jr., age 24, of Maple Shade, NJ. He was charged with receiving stolen property with bail set at $30,000.00 no 10% option. He was served the warrant at the Burlington County Jail where he was being held on related charges.

ARREST: In February 2016 a representative of the Jaguars Hockey Booster Club reported that they suspected a board member was stealing money from the club. The investigation confirmed that at least $1,646.32 was stolen by board member Kelly A. Hauler, age 47, of Lumberton, NJ. On August 16th Ms. Hauler was arrested and charged with theft. Bail was set at $15,000.00 with no 10% option and she was committed to the Burlington County Jail.

ARREST: At 11:36 pm on August 16th Mount Laurel Police located a disabled vehicle on Route 38 near Marter Avenue. During the investigation officers arrested Robert L. Supper, Jr, age 29, of Springfield, PA. He was charged with driving while intoxicated and released pending a court hearing.

BURGLARY: A resident on the first block of Saddle Drive reported someone burglarized their residence on between 7:30 am and 5:20 pm on August 18th. Entry into the residence was gained by throwing a landscaping rock through a rear window. A laptop and an iPad were stolen.

ARREST: At 11:29 pm on August 18th Mount Laurel Police conducted a motor vehicle stop on Route 73 near Church Road. During the stop officers arrested Kyle M. Hendricks, age 33, of Millville, NJ. He was charged with possession of less than 50 grams of marijuana and released pending a court hearing.

P-38

ARREST: At 12:21 am on August 19th Mount Laurel Police conducted a motor vehicle stop on Larchmont Boulevard near Willow Turn. During the stop officers arrested Thomas R. Brennan, age 63, of Collingswood, NJ. He was charged with driving while intoxicated and released pending a court hearing.

All persons are considered innocent unless and until proven guilty in a court of law.

//END//

August 22 at 1:50pm · Public
Like Page · Save · More

 Like           React           Comment           Share

⚪🔵 24

**Jordan Staub**
Stealing money from a kids travel ice hockey program? Really?
Like · 𝘤 4 · Reply · Report · Aug 22

Melanie Burke replied · 1 reply

**Debbie Lepo**
Thanks for the news. You guys do a great job.
Like · Reply · Report · Aug 22

**John Jewell**
I'm glad the officers in Mount Laurel do such a great job. it seems the cheap motels along 73 are a black eye on our community. Any suggestions or Solutions people?
Like · Reply · Report · Aug 24

Write a comment...

Comment

Mention Friends

P-39



**Delaware County Court of Common Pleas**
**Court Summary**

**Supper, Robert**
Springfield, PA 19064
Aliases:
Robert L. Supper

DOB: 12/18/1986

Sex: Male
Eyes: Brown
Hair: Brown
Race: White

**Active**

**Delaware**

**CP-23-CR-0006746-2007**   Proc Status: Warrant Rescinded   DC No:   OTN:L3719936

Arrest Dt: 09/06/2007   Trial Dt:   Legacy No:
Last Action: Bench Warrant Hearing   Last Action Date: 01/26/2009   Last Action Room:
Next Action:   Next Action Date:   Next Action Room:
Disp Date: 10/22/2008   Disp Judge: Koudelis, George

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | Program Period | Sentence Length |
| 1 | 35 § 780-113 §§ A30 | F | Manuf/Del/Poss/W Int Manuf Or Del | Guilty Plea |
| | 10/22/2008 | Confinement | Other | Min: 18 Month(s) Max: 36 Month(s) |
| 2 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Nolle Prossed |
| 3 | 35 § 780-113 §§ A32 | M | Use/Poss Of Drug Paraph | Nolle Prossed |

**CP-23-CR-0005539-2016**   Proc Status: Awaiting Trial Scheduling   DC No:   OTN:T8296142

Arrest Dt: 08/17/2016   Trial Dt:   Legacy No:
Last Action: Formal Arraignment   Last Action Date: 09/28/2016   Last Action Room:
Next Action: Pre-Trial Conference   Next Action Date: 10/11/2016   Next Action Room:

| Seq No | Statute | Grade | Description | Disposition |
|---|---|---|---|---|
| 1 | 18 § 3701 §§ A1I | F1 | Robbery-Inflict Serious Bodily Injury | |
| 2 | 18 § 3701 §§ A1II | F1 | Robbery-Threat Immed Ser Injury | |
| 3 | 18 § 3701 §§ A1III | F1 | Robbery-Commit Threat 1st/2nd Deg Fel | |
| 4 | 18 § 3921 §§ A | F1 | Theft By Unlaw Taking-Movable Prop | |
| 5 | 18 § 3925 §§ A | F1 | Receiving Stolen Property | |
| 6 | 18 § 4106 §§ A1II | M1 | Access Device Issd to Another Who Did Not Auth Use | |
| 7 | 18 § 4106 §§ A1 | M1 | Access Device Used To Obt Or Att Obt Prop/Service | |
| 8 | 18 § 4106 §§ A1IV | M1 | Other Reason Access Device Is Unauth By Issuer | |
| 9 | 18 § 2706 §§ A1 | M1 | Terroristic Threats W/ Int To Terrorize Another | |
| 10 | 18 § 3928 §§ A | M2 | Unauth Use Motor/Other Vehicles | |
| 11 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | |
| 12 | 35 § 780-113 §§ A32 | M | Use/Poss Of Drug Paraph | |
| 13 | 75 § 3802 §§ D2* | M | DUI: Controlled Substance - Impaired Ability - 1st Offense | |
| 14 | 75 § 3323 §§ A | S | Intersections Controlled by Signs | |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

P-40

Appendix 761



**Delaware County Court of Common Pleas**
**Court Summary**

---

**Supper, Robert (Continued)**
**Active (Continued)**
**Delaware (Continued)**
**CP-23-CR-0005538-2016**   Proc Status: Awaiting Trial Scheduling   DC No:   OTN:T8296142

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 99999 | 75 § 3802 §§ A1* | M | DUI: Gen Imp/Inc of Driving Safely - 1st Off | Withdrawn |
| 99999 | 75 § 3802 §§ A2* | M | DUI: Gen Imp (BAC .08 - .10) 1st Off | Withdrawn |
| 99999 | 75 § 3802 §§ D1i* | | DUI: Controlled Substance - Schedule 1 - 1st Offense | Charge Changed |

**Closed**
**Delaware**
**CP-23-CR-0003861-2013**   Proc Status: Completed   DC No:   OTN:T3334052
Arrest Dt: 06/01/2013   Disp Date: 08/01/2013   Disp Judge: Hazel, Frank T.
Def Atty: Dunn, Taylor William - (PR)

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| | Sentence Dt. | Sentence Type | Program Period | Sentence Length | |
| 1 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Guilty Plea - Negotiated |
| | 08/01/2013 | Confinement | Other | Max: 12 Month(s) | |
| 2 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 3 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 4 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 5 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 6 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 7 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Dismissed |
| 8 | 35 § 780-113 §§ A32 | M | Use/Poss Of Drug Paraph | Dismissed |

**CP-23-CR-0004425-2013**   Proc Status: Completed   DC No:   OTN:L7902462
Arrest Dt: 06/03/2013   Disp Date: 08/01/2013   Disp Judge: Hazel, Frank T.
Def Atty: West, Kenneth E. - (PD)

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| | Sentence Dt. | Sentence Type | Program Period | Sentence Length | |
| 1 | 18 § 3503 §§ B1i | M3 | Def Tres Actual Communication To | Guilty Plea - Negotiated |
| | 08/13/2014 | Confinement | Other | Max: 12 Month(s) | |
| | 08/01/2013 | Probation | 1 Year | Max: 1 Year(s) | |
| | 06/24/2015 | Confinement | Other | Max: 188 Day(s) | |
| 2 | 35 § 780-113 §§ A16 | M | Int Poss Contr Subst By Per Not Reg | Guilty Plea - Negotiated |
| | 08/13/2014 | No Further Penalty | | | |
| | 08/01/2013 | Confinement | Other | Max: 12 Month(s) | |
| | 06/24/2015 | No Further Penalty | | | |
| 3 | 35 § 780-113 §§ A32 | M | Use/Poss Of Drug Paraph | Dismissed |
| 4 | 18 § 5503 §§ A1 | S | Disorderly Conduct Engage In Fighting | Dismissed |

---

CPCMS 3541                                    2                        Printed: 10/7/2016 11:10 AM

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

P-41

Appendix 762



**Delaware County Court of Common Pleas**
**Court Summary**

Supper, Robert (Continued)
  Closed (Continued)
    Delaware (Continued)

| Seq No | Statute | | Grade | Description | | Disposition |
|---|---|---|---|---|---|---|
| | Sentence Dt. | Sentence Type | | Program Period | Sentence Length | |
| 5 | 18 § 5503 §§ A4 | | S | Disorder Conduct Hazardous/Physl Off | | Dismissed |
| 99999 | 18 § 3503 §§ A1I | | | Crim Tres-Enter Structure | | Disposed at Lower Court |
| 99999 | 18 § 5104 | | | Resist Arrest/Other Law Enforce | | Disposed at Lower Court |

| CP-23-MD-0001505-2013 | | Proc Status: Completed | | DC No: | | OTN:L7902462 |
|---|---|---|---|---|---|---|
| Arrest Dt: 06/03/2013 | | Disp Date: | | Disp Judge: | | |
| Seq No | Statute | | Grade | Description | | Disposition |
| 1 | 18 § 3503 §§ A1I | | | Crim Tres-Enter Structure | | |
| 2 | 18 § 3503 §§ B1I | | | Def Tres Actual Communication To | | |
| 3 | 18 § 5104 | | | Resist Arrest/Other Law Enforce | | |
| 4 | 18 § 5503 §§ A1 | | | Disorderly Conduct Engage In Fighting | | |
| 5 | 18 § 5503 §§ A4 | | | Disorder Conduct Hazardous/Physl Off | | |
| 6 | 35 § 780-113 §§ A16 | | | Int Poss Contr Subst By Per Not Reg | | |
| 7 | 35 § 780-113 §§ A32 | | | Use/Poss Of Drug Paraph | | |

| CP-23-MD-0002497-2016 | | Proc Status: Completed | | DC No: | | OTN:T8296142 |
|---|---|---|---|---|---|---|
| Arrest Dt: 08/17/2016 | | Disp Date: | | Disp Judge: | | |
| Seq No | Statute | | Grade | Description | | Disposition |
| 1 | 18 § 3701 §§ A1I | | | Robbery-Inflict Serious Bodily Injury | | |
| 2 | 18 § 3701 §§ A1II | | | Robbery-Threat Immed Ser Injury | | |
| 3 | 18 § 3701 §§ A1III | | | Robbery-Commit Threat 1st/2nd Deg Fel | | |
| 4 | 18 § 3921 §§ A | | | Theft By Unlaw Taking-Movable Prop | | |
| 5 | 18 § 3925 §§ A | | | Receiving Stolen Property | | |
| 6 | 18 § 4106 §§ A1II | | | Access Device Issd to Another Who Did Not Auth Use | | |
| 7 | 18 § 4106 §§ A1 | | | Access Device Used To Obt Or Att Obt Prop/Service | | |
| 8 | 18 § 4106 §§ A1IV | | | Other Reason Access Device Is Unauth By Issuer | | |
| 9 | 18 § 2706 §§ A1 | | | Terroristic Threats W/ Int To Terrorize Another | | |
| 10 | 18 § 3928 §§ A | | | Unauth Use Motor/Other Vehicles | | |
| 11 | 35 § 780-113 §§ A16 | | | Int Poss Contr Subst By Per Not Reg | | |
| 12 | 35 § 780-113 §§ A32 | | | Use/Poss Of Drug Paraph | | |
| 13 | 75 § 3802 §§ A1* | | | DUI: Gen Imp/Inc of Driving Safely - 1st Off | | |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

P-42

Appendix 763



### Delaware County Court of Common Pleas
### Court Summary

**Supper, Robert (Continued)**
  **Closed (Continued)**
    **Delaware (Continued)**

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 14 | 75 § 3802 §§ A2* | | DUI: Gen Imp (BAC .08 - .10) 1st Off | |
| 15 | 75 § 3802 §§ D1* | | DUI: Controlled Substance - Schedule 1 - 1st Offense | |
| 16 | 75 § 3323 §§ A | | Intersections Controlled by Signs | |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

P-43

Appendix 764



Call us  717-560-9501

HOME   PROFILE   PORTFOLIO   NEWS   CONTACT US

Office

People

Partners

Senior Staff

Photo Credit (all staff portraits)
Mathew Tennison Photography

Services

### GREGORY J. SCOTT, AIA



RLPS employee since 1977
Bachelor of Architecture with honors, Pennsylvania State
University
Architectural Studies, University of Oslo

250 Valleybrook Drive Lancaster, PA 17601   (717) 560-9501   rlps@rlps.com   rlps.com



R 02184-0349   Jul 27, 2016
SCOTT, GREGORY J BY AGENT
GARVIN, THOMAS
07/27/2016
09:12:14
DEED   4pgs   RECORDER OF DEEDS
*Electronically Recorded / Submitted by Simplifi*

PREPARED BY and
RECORD AND RETURN TO:
Barrister's Settlement Services, LLC
131 Centerville Road
Lancaster, PA 17603

File No. B16-47916

C.C.B.O.A. Registry 07-26-16 KEE

36-22/37
Uniform Parcel Identifier

Account Number: 36-22/37
Premises: 1132 SOUTH ATHERTON STREET, STATE COLLEGE, PA 16801

This Indenture, Made the 12ᵗʰ day of July, 2016

Between
GREGORY J. SCOTT and TERRI E. SCOTT, HUSBAND AND WIFE

(hereinafter called the Grantors), of the one part, and

THOMAS GARVIN and NADINE GARVIN, HUSBAND AND WIFE

(hereinafter called the Grantees), of the other part,

Witnesseth That the said Grantors, for and in consideration of the sum of One Hundred Sixty-Nine Thousand Five Hundred and 00/100 Dollars ($169,500.00) lawful money of the United States of America, unto them, well and truly paid by the said Grantees, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, have granted, bargained and sold, released and confirmed, and by these presents, do grant, bargain and sell, release and confirm unto the said Grantees, as Tenants by the Entirety, their heirs and assigns,

ALL THAT CERTAIN messuage, tenement, and tract of land situate, lying and being in the Borough of State College, County of Centre and Commonwealth of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a point on the southerly line of South Atherton Street (70 feet wide) distant 370.89 feet easterly along the southerly line of South Atherton Street from its intersection with the southwesterly prolongation of the centerline of Westerly Parkway extended; thence South 14° 15' 43" West a distance of 115.00 feet to a point; thence South 75° 44' 17" East a distance of 40.00 feet to a point; thence North 14° 15' 43" East a distance of 115.00 feet to a point on the southerly line of South Atherton Street; thence along South Atherton Street; North 75° 44' 17" West a distance of 40.00 feet to the point or place of BEGINNING.

BEING THE SAME PREMISES which Carol Jean Frederick now known as Carol J. English by deed dated June 27, 1995 and recorded June 30, 1995 in the Office of the Recorder of Deeds in and for Centre County, Pennsylvania in Record Book 816, Page 771, granted and conveyed unto Gregory J. Scott and Terri E. Scott, their heirs and assigns, as tenants by the entireties.

P-45

**Together** with all and singular the buildings improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of the said Grantors, as well at law as in equity, of, in and to the same.

**To have and to hold** the said lot or piece of ground described hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantees, their heirs and assigns, to and for the only proper use and behoof of the said Grantees, their heirs and assigns, forever.

**And** the said Grantors, their heirs, executors and administrators do covenant, promise and agree, to and with the said Grantees, their heirs and assigns, by these presents, that the said Grantors, their heirs, all and singular the hereditaments and premises hereby granted or mentioned and intended so to be, with appurtenances, unto the said Grantees, their heirs and assigns, against the said Grantors and their heirs, and against all and every person and persons whosoever lawfully claiming or to claim the same or any part thereof, by, from or under or any of them, shall and will

SPECIALLY WARRANT and forever DEFEND.

**In Witness Whereof,** the parties of the first part hereunto set their hand and seal. Dated the day and year first above written.

Sealed and Delivered
IN THE PRESENCE OF US:

_____ {SEAL}
SANDRA EDWARDS GRAY, ESQUIRE, AGENT FOR
GREGORY J. SCOTT

_____ {SEAL}
SANDRA EDWARDS GRAY, ESQUIRE, AGENT FOR
TERRI E. SCOTT

P-4E

Appendix 767

Commonwealth of Pennsylvania
County of Lancaster                    ss:

On this the 12ᵗʰ day of July, 2016, before me, ___Lori A Landis___ a
Notary Public, the undersigned Officer, personally appeared SANDRA EDWARDS GRAY, ESQUIRE,
AGENT FOR GREGORY J. SCOTT and TERRI E. SCOTT known to me (or satisfactorily proven)
to be the persons whose names are subscribed to the within instrument, and acknowledged that they
executed the same for the purposes therein contained.

I hereunto set my hand and official seal.

_Lori A Landis_
Notary Public

My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
LORI A. LANDIS, Notary Public
City of Lancaster, Lancaster County
My Commission Expires Dec. 12, 2018

The address of the above-named Grantees
is:
10 Penn Lianor Court
Fort Washington, PA 19034

On behalf of the Grantees

P-47

Appendix 768

**THIS DEED** is executed by Sandra Edwards Gray, Esquire, as Agent for Gregory J. Scott and Terry E. Scott, pursuant to a Limited Power of Attorney dated *July 13, 20* and intended to be recorded simultaneously herewith.

P-48



**WAVERLY**
*— Heights —*

**MEMORANDUM**

**TO:**  OUR VALUED RESIDENTS
**FROM:**  THOMAS P. GARVIN, PRESIDENT AND CEO
**DATE:**  SEPTEMBER 30, 2016
**SUBJECT:** CHANGE IN PERSONNEL

Dear Residents,

I regretfully inform you that Kathy Jungclaus, our Vice President of Human Resources, is no longer with our organization. We are extremely appreciative of Kathy's many years of service to Waverly and wish her the best of luck in her future.

We will immediately begin the recruiting process, and will keep you informed of our progress. In the interim, the department's operations and needs pertaining to employees will be fulfilled by representatives of Senior Management and the current Human Resources staff.

Should you have any questions, please contact Amy Blessing at phone extension 8604.

Best regards,

Tom



EXHIBIT

P-49

Appendix 770

September 14, 2016

Mr. Thomas Garvin, President and CEO
Waverly Heights, Ltd.
1400 Waverly Road
Gladwyne, PA 19035

Dear Mr. Garvin,

I have been a member of the Waverly community for longer than I care to admit. Please excuse the anonymous nature of this letter. I would have preferred to deliver it in person, but as I am inextricably involved in this community, I do not wish my characteristically kind and considerate countenance to be defined by one outcry; even for the sake of social justice. Since my arrival at Waverly I have come to adore the staff, and have found myself heartbroken as they have come and gone over the years; sometimes without warning or explanation. I have been inquisitive in my own way in several instances, but never felt I gleaned a satisfying enough explanation for some of the dismissals in recent years. As someone who is accustomed to the nature of business, I understand that privacy and discretion are necessary tools, and that communication of such events must be carefully crafted and disseminated. This is why I have never pursued these matters beyond a level of polite conservation. However, as I have recently delved into the world of social media and am now party to the anything-goes nature of social communication, I came across something disconcerting enough that I feel it warrants mention.

Joining social media is reminiscent of the first day of school: you're not sure of yourself, you're not sure of your company, and you don't quite know who to align with. Naturally, one of the first accounts I sought out was @waverlyheights. Hoping to expand, I checked your "followers," and of course, a few familiar names stood out to me, specifically @kmjungclaus, which couldn't be a clearer identifier for Kathleen Jungclaus. I recognized the name because I have come to know her in passing, but also because my aforementioned concerns with dismissals over the years led me to inquire into who directs personnel. I was disturbed to find that Ms. Jungclaus' twitter, which is so blatantly linked with her employer's, would be so politically charged. She is of course rightfully blanketed by Free Speech, which every citizen of this country enjoys, so my distaste for her political jabs and vigorous support of extremist characters belonging to the Republican party (specifically Donald Trump) is personal, and therefore

P-50



EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 530 2017-00958 |

Pennsylvania Human Relations Commission

_State or local Agency, if any_

| Name (_indicate Mr. Ms. Mrs._) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Kathleen M. Jungclaus | 215 630-3094 | 12/09/1960 |

Street Address
1129 Mill Road Circle, Rydal, PA 19046

City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. (_If more than two, list under PARTICULARS below._)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Waverly Heights LTD | Approx. 560 (310 full time) | 610 645-8600 |

1400 Waverly Road, Gladwyne, PA 19035

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address

City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest: 2015   Latest: 9/27/2016 |

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN

☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

☒ CONTINUING ACTION

THE PARTICULARS ARE (_If additional paper is needed, attached extra sheet(s)_):

I have been discriminated against by virtue of being female, by male CEO Thomas Garvin who has been supported by a Board of Trustees that upholds one set of standards for females and another for males. After serving as the HR Manager for almost 20 years, I was fired on September 27, 2016 purportedly for violation of the Waverly "Social Media Policy". In point of fact, I did nothing of the kind. This should be contrasted with a board member's actually using Waverly email to communicate racist "birther" criticism of President Obama. I have been subjected to an illegal, sexist environment as well as age discrimination which culminated in my firing. Further, I have been retaliated against as a result of my sex and sexual orientation and as a result of my standing up for my rights and the rights of other females. Mr. Garvin and the Board have created and maintained an illegal and hostile working environment when it comes to me, other females and those over 40. I have been replaced by a younger candidate.

See attached summary provided to the Board of Waverly Heights. Ltd.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. _[signature]_ 12/13/16 | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

P-53

Recent events

Inbox

kmjungclaus@gmail.com

Sun, Oct 2, 2016, 1:24 PM

Tom Thank you for trying to contact me. I am out of town visiting my sister and will be back on Monday. I am pretty devastated and not sure that I can talk without crying.

I will give you a call one day during the week.

All the best

Kathy


scpi5 <scpi5@aol.com>

Sun, Oct 2, 2016, 3:48 PM

to me

You're entitled--to cry, yell and scream.

Just to be supportive, as you have been for me, and figure out how I can help.


Sent from my Verizon 4G LTE smartphone


kmjungclaus@gmail.com

Sun, Oct 2, 2016, 3:49 PM

to scpi5

What were you told? Do you mind if I ask?

Sent from my iPhone


scpi5 <scpi5@aol.com>

Sun, Oct 2, 2016, 4:09 PM

to me

There was an inappropriate post on Facebook.

Sent from my Verizon 4G LTE smartphone

P-54

Andrea Jones <andreaxoxo2011@gmail.com>

Mon, Nov 7, 2016, 10:55 AM

to me

Good morning how's everything

kmjungclaus@gmail.com

Mon, Nov 7, 2016, 11:00 AM

to Andrea

Things are okay. How about with you?   How is Witt?   How is waverly?

Sent from my iPhone

Andrea Jones <andreaxoxo2011@gmail.com>

Mon, Nov 7, 2016, 12:01 PM

to me

Everything is good on our end , they never gave him a interview for the supervisor position. Even tho
they kept scheduling him one . So as of this week he,knows for sure he has to find something else it's
sad ... Anton told me u came up there I'm so sad I didn't see you

Andrea Jones <andreaxoxo2011@gmail.com>

Mon, Nov 7, 2016, 12:02 PM

to me

OMG did u get my last message I sent you lol

Kathy Jungclaus <kmjungclaus@gmail.com>

Mon, Nov 7, 2016, 12:05 PM

to Andrea

yep I got both! Who set him up and canceled? That's not right. I took my mother in law shopping and just happened to see him..

Andrea Jones <andreaxoxo2011@gmail.com>

Tue, Nov 8, 2016, 5:20 AM

to me

I'm not sure .... Anton  told me we should all get together and try to get you back but sad thing is we are scared to loose are jobs....

kmjungclaus@gmail.com

Tue, Nov 8, 2016, 7:54 AM

to Andrea

Andrea

That is so sweet of Anton. Tom will not bring me back. It's not worth you guys losing your jobs!

Regardless I loved working with you guys.  The job was tough but the staff were awesome!

Besides we can keep in touch!

How are you doing?  Taking care of yourself I hope!

Sent from my iPhone

P-56

Appendix 775

From  Andrea jones

Andrea Jones <andreaxoxo2011@gmail.com>

Sun, Oct 23, 2016, 1:53 PM

to me

Good afternoon , it's so hard to write you a email I keep starting over every time I'm about to send you a email,  I don't even really know what to say but I miss you ,.... I had your number but my phone had broke I had to get a new one. My number is 267-738-9784 .

kmjungclaus@gmail.com

Sun, Oct 23, 2016, 3:33 PM

to Andrea

Andrea

I miss you too so much.

This is incredibly hard but friends like you mean a lot.

I hope all is well with you and Witt.

Keep in touch and post me on all the drama at Waverly.  What is on the grape vine?

Has anyone said anything about me?

So happy to hear from you my friend!

Kathy

Ps just write anything.  It never has to be perfect.

R-57

Sent from my iPhone

Andrea Jones <andreaxoxo2011@gmail.com>

Mon, Oct 24, 2016, 6:51 AM

to me

In that case if I send you a email about the stuff that really goes on while you were there even now that your not there it will be a book ... put it this way , once you left I been written up about rags we use to clean with, and because of that I found out Constance or anyone else did not want to hire,me back. ... That was all you thank you. .... I been drug test last week what is funny to me...why, because I can name a lot of Mangers , supervisor, security, maintenance, servers, housekeeping, cooks, CNA, one nurse shoot they won't have any staff lmao. the rumors about you not here will hurt your feelings because it's stupid and I know it's not true. They swept everything about you leaving like they do everyone else. That's when people start rumors because they higher boss don't tell us the truth.... just like the residents one thing is sum might not speak up sum might but at the end the day they talk behind close doors, that hole project they doing I know about it in more ... I don't know why your not here sum residents that' really knows you think it had to do with The Project..... me on the other had I feel like it can be two things they mad that you define employees and residents.. it's crazy how I can predict things in it comes true I was hurt that your gone but not surprise.     I gave my self to February to leave before they fire me... I know you wondering what sum say it makes me mad just thinking about it . Sum say O "she said rational statements , o yea this a good one you was bashing the company to someone and that person told. It's sad to say from the first day I walk in to know it's sad with a the new things they want and all the new attraction Waverly is going to still falling apart... and if they don't change their ways Tom's next lol .... o lord if we can meet up in Have Tea .... you will be amazed of how much I know and the scary part it I know stuff from just being very observing, and from higher management just from talking I talk to people that u won't believe..

P.S. can me you and Witt meet up . He so lost now he was thinking about going out for that supervisor position in the dining room, but I hate to kill is joy but I know they won't hire him for that, and if they did they won't pay him good.. now he just wants to leave knowing how everything is turning out.

Kathy Jungclaus <kmjungclaus@gmail.com>

Fri, Oct 5, 9:03 AM

P-58

Appendix 777

to Andrea

Hey Andrea!

How are you!  Are you still in phila? Or did you move?  Still working at waverly?  Still with Witt?.

I am doing okay. We had to move my in laws out of waverly.  Too long of a story.  They are closer to us now which is easier.

Hope all is well!

All the best!

Kathy

JUMP...... the net will find YOU!

P-59

Appendix 778

PAYER'S name, street address, city, state, and ZIP code
Catelli Brothers
50 Ferry Ave
Camden, NJ 08103
856-869-9293 ext 247

2017

1099-MISC

**Miscellaneous Income**

**Copy B For Recipient**

PAYER'S Federal Tax ID
232105736

RECIPIENT'S Identification No.
XXX-XX-8362

RECIPIENT'S Name and Address
Kathleen M. Jungclaus-KMJ Consulting
1129 Mill Road Circle
Rydal, PA 19046

7 Nonemployee Compensation
$ 15225.00

Account Number
43

Form **1099-MISC**      (Keep for your records.)      Department of the Treasury - Internal Revenue Service

---

PAYER'S name, street address, city, state, and ZIP code
Catelli Brothers
50 Ferry Ave
Camden, NJ 08103
856-869-9293 ext 247

| 1 Rents | OMB No. 1545-0115 |
| 2 Royalties | 2017 |
| 3 Other Income | 1099-MISC |

2017

1099-MISC

**Miscellaneous Income**

**Copy 2 To be filed with recipient's state income tax return, when required**

| PAYER'S Federal Tax ID 232105736 | RECIPIENT'S Identification No. XXX-XX-8362 | 5 Fishing boat proceeds | 6 Med & health care pmts |

RECIPIENT'S Name and Address
Kathleen M. Jungclaus-KMJ Consulting
1129 Mill Road Circle
Rydal, PA 19046

| 7 Nonemployee Compensation $ 15225.00 | 8 Pmts in lieu of Div or Int |
| 9 Payer made direct sales of $5000 or more of consumer products ☐ | 10 Crop insurance proceeds |
| 13 Excess Golden Par Pmts | 14 Gross paid to an attorney |

Account Number
43

| 15a Sec 409A deferrals | 15b Sec 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State Income |

Form **1099-MISC**      Department of the Treasury - Internal Revenue Ser

---

Catelli Brothers
50 Ferry Ave
Camden, NJ 08103

Important Tax Return Document Enclosed

## Instructions for Recipient

Amounts shown may be subject to self-employment (SE) tax. If your net income from self-employment is $400 or more, you must file a return and compute your SE tax on Schedule SE (Form 1040). See Pub. 334 for more information. If no income or social security and Medicare taxes were withheld and you are still receiving these payments, see Form 1040-ES. Individuals must report these amounts as explained in the box 7 instructions on this page. Corporations, fiduciaries, or partnerships must report the amounts on the proper line of their tax returns.

Form 1099-MISC incorrect? If this form is incorrect or has been issued in error, contact the payer. If you cannot get this form corrected, attach an explanation to your tax return and report your income correctly.

Box 7. Shows nonemployee compensation. If you are in the trade or business of catching fish, box 7 may show cash you received for the sale of fish. If the amount in this box is SE income, report it on Schedule C or F (Form 1040), and complete Schedule SE (Form 1040). You received this form instead of Form W-2 because the payer did not consider you an employee and did not withhold income tax or social security and Medicare tax. If you believe you are an employee and cannot get the payer to correct this form, report the amount from box 7 on Form 1040, line 7 (or Form 1040NR, line 8). You must also complete Form 8919 and attach it to your return. If you are not an employee but the amount in this box is not SE income (for example, it is income from a sporadic activity or a hobby), report it on Form 1040, line 21 (or Form 1040NR, line 21).

R1 Format(c)www.1099Express.com

Kathleen M. Jungclaus-KMJ Consulting
1129 Mill Road Circle
Rydal, PA 19046

P-60

Appendix 779



## Open Door Policy

The purpose of Waverly Heights' open door policy is to encourage open communication, feedback, and discussion about any matter of importance to an employee. If any area of your work is causing you concern, you have the responsibility to address the concern with your supervisor.

Whether you have a problem, a complaint, a suggestion or an observation, Waverly Heights and your supervisors want to hear from you. By listening to you, Waverly is able to improve, to address complaints, and to foster employee understanding of the rationale for practices, processes and decisions.

Those employees who wish to choose a more formal process may address their issue through the Employee Problem Solving Procedure.

## Employee Problem Solving Procedure (Policy P-676)

Ongoing issues, questions, concerns or problems can be resolved through effective communication. Waverly Heights believes that positive relationships and mutual trust are developed through effective communication among employees. Therefore, you should feel free to use this procedure to answer any question or respond to any concerns.
The steps in the Problem Solving Procedure are as follows:

- *Step 1.* You are encouraged to talk with your immediate supervisor regarding any issues, questions, concerns or problems you may have. Most issues can be satisfactorily resolved in this manner.
- *Step 2.* If your concern has not been resolved within 48 hours after communication with your supervisor or you believe your supervisor is part of the problem, please bring the matter to the attention of your department director.
- *Step 3.* If your concern has not resolved after communication with your department director, you should submit your concern in writing to the Director of Human Resources. A meeting will be held with you within 48 hours to discuss the concern. If needed, an additional meeting will be scheduled within 24 hours giving the opportunity to provide documentation, evidence and witnesses, regarding your case.
- *Step 4.* Should the concerns still not be resolved, you may put your concerns in writing to the President of Waverly Heights. A meeting will be held within 48 hours with you, the Director of Human Resources and your department director where all previous meetings and their outcomes will be reviewed and discussed. The president will make a final decision.

You may contact the Director of Human Resources at any time in this process without fear of reprisal. Furthermore, any employee may use this Problem Solving Program without the fear of any retaliation. Any employee who interferes with another employee's use of this program will be disciplined up to and including termination.

## Solicitation and Distribution (Policy P-687)

Selling, soliciting or canvassing during work time or distributing literature in working areas on Waverly property is not permitted. Violation of this policy will lead to disciplinary action.

## Electronic and Other Equipment

All electronic communication systems are the property of Waverly Heights and, as such, are to be used solely for work related purposes. This includes but is not limited to, personal computers, computerized databases, telephone, voice mail, the Internet, Waverly Heights Intranet, and all communications and stored information, or contained in Waverly Heights' information systems.

The use of such equipment and software for private purposes is strictly prohibited. Employees or consultants using this equipment for personal purposes do so at their own risk.

Appendix 780

# WAVERLY HEIGHTS, LTD.
# POLICY AND PROCEDURES

| SUBJECT: | NONDISCRIMINATION | | |
|---|---|---|---|
| DEPARTMENT: | HUMAN RESOURCES | POLICY NUMBER: | P-639 |
| | | PAGE #:    1 of 1 | |

**Policy**:

All persons are entitled to equal employment opportunities through Waverly Heights, Ltd.

**Procedure:**

Waverly Heights, Ltd. is committed to providing equal employment opportunity for all persons regardless of race, color, religion, sex, age, marital status, national origin, citizenship status, disability or veteran status.

Equal opportunity extends to all aspects of the employment relationship, including hiring, transfers, promotions, training, terminations, working conditions, compensation, benefits, and other terms and conditions of employment.

Waverly Heights complies with federal and state equal employment opportunity laws and strives to keep the workplace free from all forms of harassment including sexual harassment. Waverly Heights considers harassment in all forms to be a serious offense.

Employees who have been subject to prohibited discrimination or harassment should immediately report the incident to their supervisor, Department Director or Director of Human Resources.

Complaints will be investigated immediately and handled as confidentially as possible. Waverly Heights ensures that employees following this complaint procedure will be protected against illegal retaliation.

Any reported violations of EEO law or this policy will be investigated. Supervisors or employees found to have engaged in discriminatory conduct or harassment will be subject to immediate disciplinary action including possible termination of employment.

| | |
|---|---|
| APPROVED BY: _Thom P. Sa____ | |
| PRESIDENT | EFFECTIVE DATE:  8/28/2011 |
| THIS POLICY REVISES POLICY NUMBER P-639 DATED:  9/23/1998. | |

# WAVERLY HEIGHTS, LTD.
# POLICY AND PROCEDURES

| SUBJECT: | PROBLEM-SOLVING / GRIEVANCES | |
|---|---|---|
| DEPARTMENT: HUMAN RESOURCES | POLICY NUMBER: P-676 | PAGE #: 1 of 2 |

**POLICY:**

It is the philosophy of Waverly Heights that every employee is entitled to fair and equitable treatment in all activities of Waverly Heights, particularly in the application of established employment practices.

Through this policy and through the practices of Waverly Heights, all employees are offered guidelines to use in solving problems or concerns relating to their employment.

This procedure may be initiated by any employee at any time without fear of recrimination or penalty. It is in the best interest of all that problems receive proper attention.

The employee problem-solving procedure is intended to offer all employees a system for handling problems and dissatisfaction without fear of reprimand or losing their job.

**PROCEDURE:**

**A. Employee's Responsibilities – Steps in the Procedure**

If an employee has a problem concerning any work-related activity or feels that he or she has been treated unfairly, the employee should:

1. Discuss the matter with the immediate supervisor as soon as possible;

2. If no satisfactory solution is reached with the immediate supervisor, or if it is impractical to discuss the matter with the supervisor, the employee should arrange a meeting with the supervisor's manager or the Director of Human Resources.

3. If not satisfied with the results of steps one or two, the employee should state the problem in writing, describing the action of steps one and two, and submit this to the President of Waverly Heights. If the concern cannot be stated in writing, an appointment should be scheduled with the President to discuss the matter.

**B. Supervisor's Responsibilities**

1. **Initial review with employee:**

   a. Give the employee an adequate and objective conference session.

   b. Assure the employee that he or she need <u>not</u> fear <u>any</u> reprisal for registering a problem.

   c. Ask the employee to repeat the problem or situation. The supervisor should concentrate on listening to what the employee is saying: repetition may help to present to story accurately. The supervisor should make informal notes of the facts; they may be helpful later. The supervisor should ask the employee what resolution he or she feels would be appropriate.

| APPROVED BY: _Thomas P. Sarris_ | |
|---|---|
| PRESIDENT | EFFECTIVE DATE: 7/15/2011 |

THIS POLICY REVISES POLICY NUMBER P-676 DATED: 7/30/2008

# WAVERLY HEIGHTS, LTD.
# POLICY AND PROCEDURES

| SUBJECT: | PROBLEM-SOLVING / GRIEVANCES |
|---|---|

| DEPARTMENT:  HUMAN RESOURCES | POLICY NUMBER:   P-676<br>PAGE #: 2 of 2 |
|---|---|

   d. The supervisor should repeat the essential points to the employee, and ask the employee if he or she agrees with the summary.

   e. The supervisor should inform the employee that the situation will be researched, and should indicate the time frame within which the employee should anticipate a follow up conference.

**2. Obtain the Facts**

The supervisor should look into the factual details of the problem. The supervisor should talk to people concerned; review any existing policies as they pertain to the situation; and review the employee's personnel record to determine if there has been a similar experience in the past.

**3. Take Action**

   a. After assembling the facts, action should be taken immediately. Corrective action, if necessary, should be done within five (5) work days. If the employee is in error, a full and careful explanation should be made to the employee. If the employee is correct in his or her complaint, advise the employee of the corrective action that will be taken.

   b. Inform the employee of this or her right to appeal by taking the complaint to the next step in the problem-solving/grievance procedure. This should be done within five (5) working days.

**4. Follow up**

A successful problem-solving procedure depends upon proper follow-up by management. The action taken at each step should be as rapid as possible. Dissatisfied employees often negatively affect the providing of quality service.

**C. Conclusion**

If the employee chooses to appeal his or her supervisor's decision and use the problem-solving/ grievance procedure, the final step may go as far as the President.

The President will discuss the situation with the employee and also consider the recommendations of the Department Director and Director of Human Resources. The President's decision is final and will be reached within five working days.

The aggrieved employee should be advised personally by the President as to the final decision. Appropriate documentation collected during the process will then be placed in the employee's personnel file.

In all phases of this process and after its completion, all those involved should maintain strict confidentiality in order to respect the rights of the employee.

| APPROVED BY: _Thomas P. Ha___ |  |
|---|---|
| **PRESIDENT** | **EFFECTIVE DATE:** 7/15/2011 |

THIS POLICY REVISES POLICY NUMBER P-676 DATED:  7/30/2008

# WAVERLY HEIGHTS, LTD.
# POLICY AND PROCEDURES

| SUBJECT: | SEXUAL HARASSMENT | |
|---|---|---|
| DEPARTMENT: | HUMAN RESOURCES | POLICY NUMBER: P-685<br>PAGE #: 1 of 1 |

## POLICY:

It is the policy of Waverly Heights to provide a work environment free of discrimination. In keeping with this policy, Waverly Heights and its representatives will not permit or tolerate sexual harassment of its employees. Harassment on the basis of sex is unlawful.

## PROCEDURE:

Unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature constitute sexual harassment when:

1) Submission to such conduct is made either explicitly or implicitly as a term or condition of proposed or continued employment; and/or

2) Submission to or rejection of such conduct by an individual is used as the basis for employment decisions; and/or

3) Such conduct has the purpose or effect of interfering with an individual's work performance by creating an intimidating, hostile or offensive working environment.

Waverly Heights' Administration encourages any person who believes that he or she has been subjected to sexual harassment from co-workers, supervisors, non-employees or visitors on Waverly Heights' property, or clients to bring the matter to the attention of the Director of Human Resources or to Administration for confidential handling of the situation.

If, after the circumstance have been reviewed, sexual harassment is found to have occurred, appropriate action, up to and including termination, will be taken.

| APPROVED BY: _____<br>PRESIDENT | EFFECTIVE DATE: 4.1.2014 |
|---|---|
| THIS POLICY REVISES POLICY P-685 DATED 12/1/1988. | |

Appendix 784

**ETHICAL STANDARDS and CORPORATE COMPLIANCE**

Equal Opportunity Employer (Policy -P-639)

It is Waverly Heights' philosophy to provide equal employment opportunities for all employees and applicants. No person shall, on the basis of race, color, natural origin, age, sex, religion, military service, veteran status, ancestry, genetic information, disability or other basis protected under federal, state or local law, be discriminated against in hiring, training, promotion, transfer, compensation, benefits or any employment opportunity or privilege. Waverly Heights is committed to preventing illegal discrimination against employees or residents. The non-discrimination policy of Waverly Heights applies to all employees and applicants.

Applicants and employees are encouraged to contact the Human Resources Department with any questions regarding this policy.

Waverly Heights' employees are required to perform the duties of their positions in providing services to our residents, without regard to race, sex, sexual preference, age, color, religion, national origin, marital status, veteran status, ancestry or disability.

Complaints of discrimination may be filed with any of the following:

*Waverly Heights*
*Director Of Human Resources or President*
1400 Waverly Road
Gladwyne, PA 19035

*Equal Employment Opportunity Commission*
1421 Cherry Street
10th Floor
Philadelphia, PA 19102

*Department of Public Welfare*
Civil Rights Compliance Unit
1400 Spring Garden Street
State Office Building, Room 502
Philadelphia, PA 19130

*Office for Civil Rights*
U.S. Department of Health & Human Services
Region II, P. O. Box 13716
Philadelphia, PA 19101

*Pennsylvania Human Relations Commission*
711 State Office Building
Broad and Spring Garden Streets
Philadelphia, PA 19130

Harassment in the Workplace

Waverly Heights is dedicated to providing a work environment free of unlawful harassment of any kind. Unlawful harassment in any form will not be tolerated and will result in disciplinary action, up to and including termination.

Any form of harassment related to an individual's race, sex/gender, religion, age, national origin, disability, citizenship status, sexual orientation or marital status is a violation of this policy and will be treated as a disciplinary matter. All employees are responsible for ensuring the workplace is free from all forms of unlawful harassment.

The term "harassment" includes:

- Offensive remarks and comments. Jokes or slurs pertaining to any individuals race, sex/gender, religion, age, national origin, disability, citizenship status, sexual orientation, marital status or any other basis protected by law;
- Offensive sexual remarks, sexual advances, or requests for sexual favors regardless of the gender of the individuals involved;
- Offensive physical contact, including gestures and touching, regardless of the gender of the individuals involved;
- Offensive pictures, drawings, cartoons, or photographs or other communications, including e-mail or text messages;
- Threatening reprisals for an employee's refusal to respond to requests for sexual favors or for reporting a violation of this policy.

**ETHICAL STANDARDS and CORPORATE COMPLIANCE**

Waverly Heights' supervisors and managers are prohibited from engaging in any form of harassing conduct. No supervisor or other member of management has the authority to suggest to any employee or applicant that the individual's employment or advancement will be affected in any way by entering into, or refusing to enter into, any form of personal relationship with him or her. Harassment of employees in connection with their work by non-employees is also a violation of this policy. Any employee who experiences or observes any harassment by a non-employee should promptly report such harassment to his or her supervisor, or the Director of Human Resources.

If you feel that you are being harassed you should tell that individual how you feel. You should also report the matter to your supervisor to ensure the conduct is stopped. If the problem involves your supervisor or if you do not feel that the matter can be discussed with your supervisor, you should promptly report the conduct to the Human Resource Director for a complete investigation.

<u>Sexual Harassment (Policy P-685)</u>

Sexual harassment in any form will not be tolerated by Waverly Heights, regardless of level or position within the company and under appropriate circumstances shall result in termination. This includes but is not limited to any unwelcome verbal and/ or physical conduct that adversely affects the work environment.

The Equal Employment Opportunity Commission has defined sexual harassment as follows:

Unwelcome or unsolicited sexual advances, requests for sexual favors, and other inappropriate verbal or physical contact of a sexual nature made to an employee by a supervisor, a co-worker, or any individual with whom employees come in contact as part of their employment responsibilities:

- When submission to such conduct is made either implicitly or explicitly as a term or condition of an individual's employment;
- When the submission to or rejection of such conduct by an individual is used as a basis for employment decisions which affect that individual;
- When such conduct has the purpose or effect of interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Sexual harassment may include but is not limited to:

- Verbal harassment or abuse;
- Undesirable work assignments due to refusal to grant sexual favors;
- Repeated remarks to an individual with sexual or demeaning implications; including repetitive and offensive text messages of sexual content;
- Unwelcome or unsolicited touching and ;
- Suggestions or demanding sexual involvement accompanied by explicit or implicit threats concerning one's employment.

If you believe that you are being sexually harassed, you should promptly report such conduct to your supervisor or the Director of Human Resources.

<u>Harassment or Discrimination Complaint Procedure</u>

To ensure a prompt investigation and resolution of issues relating to harassment or discrimination concerns, it is essential to report any problems or concerns immediately. You should report the problem or concern to your supervisor, or should your supervisor be involved, your department director or to the Director of Human Resources. A prompt and full investigation will be complete. Waverly Heights will maintain the confidentiality of all parties to the maximum extent possible. Appropriate action will be taken based on the results of the investigation.

<u>No Retaliation Statement</u>

Retaliation against any employee who reports a discrimination or harassment complaint is strictly prohibited and will not be tolerated. Any retaliation taken towards an individual reporting a case of discrimination or harassment will result in disciplinary action, up to and including termination.

Appendix 786

**ETHICAL STANDARDS and CORPORATE COMPLIANCE**

Code of Conduct (Policy A-023)

Waverly Heights has long been a provider of Continuing Care Retirement Services. Part of the reason for this is its strong desire to maintain the highest ethical, moral and legal standards in its operations and actions. This applies to the organization itself, its employees, and those with whom it deals. Waverly Heights expects everyone to act in accordance with these ethical, moral and legal standards.

When it is determined that an action has taken place or an event has occurred that does not meet these expectations, Waverly Heights will work to discover the extent of the action or event that has strayed from the standard, and determine what must be done to correct or revise it, so that the standard may be achieved.

Waverly Heights will work to correct the action or event to the extent possible and expects its employees and those with whom it deals to do the same. Should you encounter any circumstances that do not appear to support appropriate ethical, moral, or legal standards, please contact a supervisor, department director or the Director of Human Resources.

American with Disabilities Act

As part of our commitment to Equal Employment Opportunity and in order to comply with the Americans with Disabilities Act and other applicable state and local laws, it is the policy of Waverly Heights to not discriminate in any employment practice against any individual with a disability. Waverly Heights will provide reasonable accommodation to applicants and employees, provided accommodations do not impose an undue hardship on Waverly Heights.

All employees are required to comply with safety standards. They are an essential part of every employee's job. Waverly Heights reserves the right to determine if an employee poses a direct threat of harm to himself/herself or others which cannot be eliminated by reasonable accommodation. If you believe that you require an accommodation either in the application process or in your job, please contact your immediate supervisor or the Director of Human Resources.





# WAVERLY
## HEIGHTS

### CIVIL RIGHTS COMPLIANCE

### EMPLOYEE AWARENESS

In accordance with applicable Federal and State Civil Rights laws and regulatory requirements, you, as an employee engaged in the provision of services, may not directly or indirectly:

- Refuse, withhold or deny services of this agency to any present or prospective client because of their race, color, religious creed, handicap, ancestry, national origin, age or sex.

Furthermore, as an employee of this facility, you have the right:

- To file a complaint of discrimination if you feel you have been discriminated against on the basis of your race, color, religious creed, handicap, ancestry, national origin, age or sex. Complaints of discrimination may be filed with any of the following:

    - Waverly Heights
      1400 Waverly Road
      Gladwyne, PA 19035

    - Department of Public Welfare
      Civil Rights Compliance Unit
      1400 Spring Garden Street
      State Office Building - Room 502
      Philadelphia, PA 19130

    - Pennsylvania Human Relations Commission
      711 State Office Building
      Broad & Spring Garden Streets
      Philadelphia, PA 19130

    - Office for Civil Rights
      U.S. Department of Health
      and Human Services
      Region III, P.O. Box 13716
      Philadelphia, PA 19101

(Employee Signature)                    (Date) 4/7/97

Board of Directors

William Bates, Jr., Chairman
Dan M. McGill, Ph.D., Vice Chairman
P. Vincent Kellogg, Jr., Treasurer
Jean M. Krohn, Secretary

Mary Lou Barry
George B. Barnard
H. Robert Cathcart
Randall E. Copeland

Burton H. Etherington, Jr.
Mary B. Forque
Jane Meanor Hastings
Dean J. Markezin

A. W. Marlin
William W. Olmstead
Dieter E. Pelz, M.D.
Winthrop deV. Schwab

Jane C. Wright
D. Stratton Woodruff, Jr., M.D.
Robert H. Young, Esq.

Appendix 789



# CERTIFICATE OF COMPLETION

This certifies that

### KATHLEEN JUNGCLAUS

successfully completed the requirements for

*Embracing Diversity*

on Wednesday, October 29, 2014

**Course description:**

An important part of a home&amp;amp;rsquo;s culture change process is embracing the diversity of its staff and residents and educating the staff in cultural competence. This course covers the changes that a home must make when it commits to embracing diversity as part of its culture change journey.



RELIAS LEARNING



# CERTIFICATE OF COMPLETION

This certifies that

### KATHLEEN JUNGCLAUS

successfully completed the requirements for

*Preventing Sexual Harassment*

on Thursday, October 03, 2013

**Course description:**

In long term care facilities, close interaction between staff, residents, and volunteers can create environments with a high risk for sexual harassment. This course provides guidelines for behavior and conduct, and helps employees distinguish between what is appropriate and inappropriate in their workplace.

## RELIAS LEARNING

Home of Essential Learning and Silverchair Learning Systems

107 Edinburgh South, Suite 205, Cary, NC 27511
Telephone: 1-919-653-1580



**SILVERCHAIR**
Learning Systems
310 East Main Street, Charlottesville, VA 22903
(866) 689-0846

**Nancy N. Wicklin, RN, MS,**
Editorial Director,
Silverchair Learning Systems

*Nancy N. Wickl*

# CERTIFICATE OF COMPLETION

This certifies that

## KATHLEEN JUNGCLAUS

successfully completed the requirements for

### Embracing Diversity

on Wednesday, August 15, 2012

**Course description:**

An important part of a home&amp;amp;rsquo;s culture change process is embracing the diversity of its staff and residents and educating the staff in cultural competence. This course covers the changes that a home must make when it commits to embracing diversity as part of its culture change journey.

**This course is approved for continuing education credit by the following:**

This learning activity is approved by the National Council of Certified Dementia Practitioners®, for 1 contact hour(s) of continuing education.

http://training.silverchairlearning.com/completioncertificate.aspx?rs=1&contentCompletio...   8/15/2012

SILVERCHAIR
Learning Systems
310 East Main Street, Charlottesville, VA 22903
(866) 689-0846

Nancy N. Wicklin, RN, MS,
Editorial Director,
Silverchair Learning Systems

*Nancy N. Wickle*

# CERTIFICATE OF COMPLETION

This certifies that

### KATHLEEN METZGER-JUNGCLAUS

successfully completed the requirements for

*Embracing Diversity*

on Tuesday, November 08, 2011

**Course description:**

An important part of a home&amp;amp;rsquo;s culture change process is embracing the diversity of its staff and residents and educating the staff in cultural competence. This course covers the changes that a home must make when it commits to embracing diversity as part of its culture change journey.

**This course is approved for continuing education credit by the following:**

This learning activity is approved by the National Council of Certified Dementia Practitioners®, for 1 contact hour(s) of continuing education.



# CERTIFICATE OF COMPLETION

This certifies that

### KATHLEEN JUNGCLAUS

successfully completed the requirements for

### *Preventing Sexual Harassment*

on Friday, October 31, 2014

**Course description:**

In long term care facilities, close interaction between staff, residents, and volunteers can create environments with a high risk for sexual harassment. This course provides guidelines for behavior and conduct, and helps employees distinguish between what is appropriate and inappropriate in their workplace.



RELIAS LEARNING

http://training.silverchairlearning.com/completioncertificate.aspx?rs=1&contentCompleti...   10/31/2014



This is to certify that
KATHLEEN JUNGCLAUS

has successfully completed

Embracing Diversity

Completed on: 2/2/2016

Credit Hours: 1.00

Amy Medina-MSN, RN
Amy M Johnson MSN, RH, CPN
Director of Continuing Education
Relias Learning, LLC
111 Corning Road, Suite 250
Cary, North Carolina 27518

RELIAS|LEARNING



# CERTIFICATE OF COMPLETION

This certifies that

### KATHLEEN JUNGCLAUS

successfully completed the requirements for

### *Embracing Diversity*

on Friday, October 16, 2015

**Course description:**

An important part of a home&amp;amp;rsquo;s culture change process is embracing the diversity of its staff and residents and educating the staff in cultural competence. This course covers the changes that a home must make when it commits to embracing diversity as part of its culture change journey.



http://training.silverchairlearning.com/completioncertificate.aspx?rs=1&contentCompleti...   10/16/2015



# The Institute for Continuing Education and Research

## Certifies that

Kathleen Jungclaus

Has Satisfactorily Participated in the Continuing Education Program

## *Introduction to Nursing Home Administration*
## The 120-Hour NHA Course
## Jan-May 2014

*And is Hereby Awarded this Certificate of Completion*

PR-000441-L

Provider ID

Authorized Signature
Ilene Warner-Maron, PhD NHA

May 2, 2014

Date

Waverly-0483



# The Institute for Continuing Education and Research

## Certifies that

*Kathleen Junger Clair*

Has Satisfactorily Participated in the Continuing Education Program

## *Introduction to Nursing Home Administration*
## The 120-Hour NHA Course:
## Health Support

*And is Hereby Awarded this Certificate of Completion*

## CEU 7.0

PR-000441-L
Provider ID

Authorized Signature
Ilene Warner-Maron, PhD NHA

Date
1/10/14

Waverly-0484



# The Institute for Continuing Education and Research

## Certifies that

Aileen Angelucci

Has Satisfactorily Participated in the Continuing Education Program

## PA Regulations and Administration
## On December 17, 2013

Approval # 13122014-7.25-7957-in

*And is Hereby Awarded this Certificate of Completion*

PR-000441-L
Provider ID

Authorized Signature
Ilene Warner-Maron, PhD NHA

Date
12/17/13



# The Institute for Continuing Education and Research

Certifies that _Eileen Sing Claire_

Has Satisfactorily Participated in the Continuing Education Program

## Administration and Federal Regulations Part II

## On December 19, 2013

## Approval # 03422014-7.25-7924-in
And is Hereby Awarded this Certificate of Completion

PR-000441-L
Provider ID

Authorized Signature
Ilene Warner-Maron, PhD NHA

Date
12/19/13

Waverly-0486



# The Institute for Continuing Education and Research

**Certifies that**

Kathleen Jongclaus

Has Satisfactorily Participated in the Continuing Education Program

## Administration and Federal Regulations Part I

### On December 18, 2013

*And is Hereby Awarded this Certificate of Completion*

**Approval # 1412 2014-7.25-7923-in**

_____
Authorized Signature
Ilene Warner-Maron, PhD NHA

Date
12/18/13

PR-000441-L
Provider ID

Waverly-0487

The Institute for Continuing Education and Research



Certifies that

Has Satisfactorily Participated in the Continuing Education Program

*Introduction to Nursing Home Administration*

The 120-Hour NHA Course:

Personnel Management and Unions

*And is Hereby Awarded this Certificate of Completion*

**CEU 7.0**

PR-000441-L
Provider ID

Ilene Warner-Maron, PhD NHA
Authorized Signature

11/26/13
Date



The Institute for Continuing Education and Research

Certifies that

*Kathleen Jung Claus*

Has Satisfactorily Participated in the Continuing Education Program

*Introduction to Nursing Home Administration*

The 120-Hour NHA Course:

Dietary Management

*And is Hereby Awarded this Certificate of Completion*

**CEU 7.0**

PR-000441-L
Provider ID

Authorized Signature

Ilene Warner-Maron, PhD NHA

Date

Waverly-0489



# The Institute for Continuing Education and Research

**Certifies that**

*Kathleen Jungeclaus*

**Has Satisfactorily Participated in the Continuing Education Program**

## Introduction to Nursing Home Administration
### The 120-Hour NHA Course:
### Role of Government

*And is Hereby Awarded this Certificate of Completion*

## CEU 7.0

PR-000441-L

Provider ID

Ilene Warner-Maron, PhD NHA

**Authorized Signature**

Date

9/17/13

Waverly-0490

**A**

**a.m** 1:16 92:18
**able** 12:5 13:9
13:12,16 26:15
27:2 28:24
79:23
**absence** 58:18
**absolutely** 6:2
48:2 53:23
67:17
**absorbed** 63:18
**accident** 85:20
**accommodati...**
85:19,21
**account** 12:5
33:20
**accurate** 26:17
71:2 93:7
**Act** 17:22 43:16
**action** 71:18
73:14
**Actions** 9:20
**actively** 8:16
**activities** 15:2
**activity** 9:19,19
71:7,17,19,23
72:19 73:24
74:8,10,16
**actual** 67:22
74:9
**ADA** 85:22
**address** 53:21
58:14,21
**addressed** 41:8
65:22 82:23
**Administration**
43:10
**adoption** 45:19
**adverse** 71:17
73:14
**aforementioned**
93:8
**African** 57:14
57:18,22
**age** 67:19,20
68:7 69:18,19

**agents** 23:3
**ago** 34:6 49:9
91:21
**agree** 18:16,22
46:5 47:24
64:11,18 71:4
71:21 73:21
**agreement** 4:1
**ahead** 11:22
23:16
**allegation** 91:17
**allege** 6:15
**alleged** 63:23
64:24 74:10
**allergist** 80:8
84:23 86:1
**allergist's** 86:13
86:15
**alter** 82:2
**Amended** 23:7
23:11 77:14
**American** 57:14
57:22
**Americans**
43:16 57:18,19
**amount** 83:1
**Amy** 6:23 7:7
78:2,6,16 80:3
84:7,11 88:24
**Andrea** 33:9
35:15,19,23
**Andrews** 79:24
**Animal** 56:19
**Anita** 25:2 60:9
**Ann** 64:8,12
**annual** 45:14
47:1,6
**annually** 48:17
**anonymous**
22:18 23:19
58:24 60:6,8
61:16 76:19
**answer** 21:14
23:17 49:3
72:21 74:11
79:14 88:19

89:16,19 90:2
**answered** 11:21
48:16
**answers** 72:5
**anti-conservat...**
17:4
**anti-retaliation**
27:6 92:7
**anti-Semitic**
67:10
**antidiscrimin...**
46:12 47:10
49:16
**anyone's** 44:2
**anytime** 14:17
36:13 40:18
43:20 45:10
85:7
**apartment** 80:1
**apologize** 26:5
**apology** 17:1
**appalling** 14:9
**appeal** 76:7
**appear** 19:2
31:22 32:18
33:7
**appears** 24:23
36:8,9 40:23
42:14,20
**applied** 8:24
9:23 10:1,7,8
10:11,13 11:3
11:8,12,17
12:3,6,13
42:12
**apply** 10:5
**appointment**
80:7
**appreciate**
26:11
**approach** 5:11
**appropriate**
44:9,10 54:13
**approve** 45:18
**approved** 45:15
45:21,24

**April** 50:3
**architect** 32:20
**areas** 46:11
**arena** 62:17
**arguing** 65:14
**art** 87:22
**ascertain** 13:16
**aside** 67:22
68:15 70:1
**asked** 11:14,21
21:24 23:14
34:8,12 48:16
52:14 58:15,21
60:15 64:7
78:3,6 92:8
**asking** 4:16
16:24 22:8
27:10 48:19
49:4 69:3
71:15 72:11
73:10 74:14
75:11 79:10
80:6 84:7
91:19 92:11
**asks** 28:14
**aspect** 69:3
**asserted** 22:6,7
**assistant** 84:14
84:15 86:5
**assume** 10:5
**asthma** 83:23
**attached** 8:1,8
8:18 32:15
50:22
**attachment** 43:4
**attack** 83:23
**attempt** 79:20
80:22
**attempts** 77:15
**attend** 47:2,7
58:22
**attended** 91:21
**attending** 81:23
**attention** 41:19
44:2 71:21
**attorney** 23:4

26:8,11
**attorney's** 76:3
**Attorneys** 2:5
2:11
**audible** 6:23
**audio** 22:22
**August** 83:23
**Awareness** 3:15
50:1

**B**

**B** 3:11
**B-A-S-H-E-E-R**
51:11
**back** 10:15 11:7
12:2,6 15:17
16:12 25:3,7
29:2 31:21
58:3,3,4 78:5,5
91:3,3,7
**Barack** 14:6
**base** 37:6 90:23
**based** 65:15
69:9 77:1
**Basheer** 51:11
52:3,8,13
**Basically** 21:15
**basis** 14:2 35:2
48:23,23 60:10
65:3,4,8,11,19
67:8,15,19
68:1,6,7,10
69:3,5,19,24
70:11 86:17
90:10 91:12
**basketball** 56:17
**bastards** 16:11
18:22
**Bauer** 2:17 70:2
70:4
**behalf** 72:18,18
**belief** 27:2 59:16
65:15 77:2
90:10 91:12
**believe** 8:22
11:14 14:4

15:9 38:16
40:20 56:5
59:22 60:7,19
70:16 84:22
86:3,9 88:15
88:20 90:19
**believed** 46:1
**benefits** 17:19
37:21 82:18
**Benghazi** 15:22
**best** 39:18 49:17
83:8
**bias** 17:3,4
**bid** 32:20
**Bill** 5:12,12
**Billig** 19:4,13
27:18 30:24
**bills** 84:22 86:13
86:15
**bio** 14:22
**bitch** 6:6
**Blair** 79:24
**Blessing** 6:24
78:16 88:24
**Blessing's** 78:2
**blew** 77:24
**blotter** 32:11
**board** 40:3 49:2
49:11,18 61:10
67:24 68:3,11
69:4,18,23
70:23 71:4,5,9
72:13 73:2,7
74:8,14,21
75:1 88:6,10
89:1,9 90:5,11
90:21 91:11,14
**Bob** 5:18 6:1
65:2 69:8,13
**Bob's** 69:10
**bonus** 81:9
82:24 83:2,2
83:14,16
**book** 62:21 63:2
63:3,5,7,9,12
**booked** 78:7

**bottom** 9:8
25:13 60:17
**Box** 1:15 2:4,10
**boy** 69:12
**boys** 89:2,3
**break** 62:1,3
**Brenda** 60:19
**bring** 41:19
65:24 72:13
**bringing** 72:16
**brought** 71:1,20
**Bryn** 2:5
**budget** 5:23
**buildings** 80:1
**bulletin** 49:2,11
49:18
**bunch** 89:2
**business** 7:3,4
74:21 79:8

---

### C

**C** 1:12 2:1 93:1
93:1,5,23
**C.C.R** 93:23
**cafe** 59:7
**calculations**
23:1
**call** 6:8 7:1
25:17 37:3
44:1 57:15
58:5,24 76:1
**called** 36:19
60:18 73:4
80:15
**calling** 6:6 17:15
24:12
**calls** 7:1 21:13
23:13,15 26:18
72:20 74:2
75:7 90:14
**car** 65:23
**card** 76:8
**Care** 5:20
**career** 54:11
**CareerLink**
8:23 9:7 11:12

12:9
**Carpenter** 4:18
**case** 6:13 12:7
21:17 22:17
42:16 69:1
75:16 85:5,6
85:10,11 91:20
**cases** 87:12
**cash** 76:11
**Caucasian** 58:8
**cause** 26:10
60:24 71:11
**cell** 20:23 21:1
25:17 28:7
79:2,3
**center** 5:9 46:18
55:9 57:12
58:4 81:19
**certain** 35:8
40:10 82:10
83:15 87:21
**certainly** 46:6
**certificate** 50:20
**certification** 4:2
50:23 51:7
**Certified** 1:12
93:5
**certify** 93:6
**Chair** 61:12
**challenged**
37:20 83:1
**chance** 78:11,14
78:19
**change** 39:16
57:13 82:8
**changed** 81:3
**changing** 59:1
**charge** 38:4
64:14
**charged** 18:17
**chat** 25:11
**check** 76:9,10
**child** 17:19
**Chuck** 14:5 70:1
**circle** 24:5
**circulated** 14:5

**circumstance**
39:19
**circumstances**
23:6,10 40:10
60:16
**Civil** 17:22
**claim** 37:20,24
66:8 69:1
70:24 75:5,6
75:12,13,14,17
83:21,22 84:1
84:9,13,21
85:9,14,15,18
86:8,8,12
**claims** 22:6
34:21 67:21
**clarify** 11:15
37:19
**clean** 7:16
**clear** 17:3 56:8
57:2 72:10
74:6
**Clinton** 14:7
15:18 67:12
70:9
**close** 49:8 58:19
62:16
**closed** 78:1,6
80:21 85:5,6
85:10,11,16
**closing** 60:19
**club** 89:3
**CNN** 56:19
**code** 43:15
87:15
**coffee** 34:13
**Colin** 66:21,23
**column** 9:20
**come** 25:9,24
32:5 53:13
56:24 57:8
78:3
**comedy** 57:14
**comes** 14:13
89:1,7
**comfortable**

39:13
**coming** 53:16
56:9
**comma** 22:21,22
22:22,23,23,23
22:24,24,24
23:1,1,3,4,4,5
23:5
**command** 69:14
**commencing**
1:16
**comment** 16:10
16:12 58:11
62:12 69:9,21
78:20
**comments** 16:15
45:23
**Committee** 40:3
61:10,12 62:10
71:10 88:7,11
**Commonwealth**
75:18,21
**communication**
21:21 34:1
35:8 36:13,18
52:17 54:13
55:24 80:9
**community** 54:7
**company** 11:10
66:7
**compensation**
28:20 30:3
33:11 37:21
83:22
**complained** 4:19
5:3,5,18 58:7,8
83:13
**complaining**
58:5 59:1
**complaint** 23:7
23:11 43:21
57:22 58:16
59:4 73:17,18
73:19,22 77:14
**complaints** 41:4
41:12 43:23

70:23 71:21
72:13,17 83:18
**completely**
53:14 75:3
77:24
**completing** 50:9
**compliance** 49:8
92:5
**complies** 41:2
**computations**
23:1
**computer-based**
46:18
**concern** 40:9
**concerning**
11:18 52:19
**concerns** 40:13
65:22 82:23
**concluded** 92:17
**conclusion**
21:14 23:16
26:19 72:21
74:3 75:8
90:15
**conduct** 43:16
44:24 45:3,9
62:14
**conducted** 45:11
46:10,13 47:1
**conducting** 15:4
**confer** 54:12
**conference**
77:19 78:4
**confide** 55:5
**confidential**
43:11 52:15,17
60:24
**confidentially**
41:15
**connection**
66:19 76:16
**conservatives**
17:24
**consider** 17:8
31:7 67:7
**considered** 54:7

67:14 82:15
**conspiracy**
63:23
**conspired** 64:4
**Constance** 47:4
56:5
**constitute** 67:8
67:15
**consultant** 33:12
**consulted** 55:23
**contact** 19:20,21
20:7 21:4,6
34:11 35:4,5
40:17 80:4
**contacted** 20:10
**contained** 10:4
18:18 23:11
28:8 29:21
43:22
**contend** 67:24
68:11
**content** 5:24
13:20 18:9,11
19:1 28:24
29:3,3 34:15
52:18,19 53:23
59:10 70:12
**contests** 5:8
**context** 14:17
27:1
**continue** 89:22
**continues** 26:13
**continuing**
50:20 91:22
**controls** 57:12
58:3
**conversation**
21:1 24:19,23
25:15 26:13
33:10 51:11,14
51:19,22 52:2
52:8,12,15,18
54:8 62:16
65:12 69:7
78:22 81:2
90:11

**conversations**
29:7 33:8 54:4
54:19,20 61:15
**cool** 15:21
**copies** 12:24
13:1
**copy** 7:15,16
38:4 61:19
**corner** 10:4
**corporate** 49:8
**correct** 9:16,17
9:18 12:20
13:11 15:14
16:4 18:9,10
19:4 20:24
24:9,10,14
27:6,7 28:24
29:22 31:24
32:1,11,17,21
32:24 33:2,9
35:16 36:5
37:2 38:8,18
40:2,4,5 41:16
42:7 43:11,17
44:14,16 45:16
49:22 50:3,16
51:5,13,16
53:4 61:9 64:9
64:10 68:17,20
72:14,15 77:17
77:20,21 78:13
78:18,24 79:1
85:16,17 88:8
90:22 91:18
**correctly** 51:12
51:18 53:1
**costing** 75:21
**counsel** 4:1
31:12 63:23
**country** 15:17
**County** 32:14
**couple** 9:13 51:3
54:16 60:14
87:4
**course** 24:7
81:18

**coursework**
51:2
**court** 1:1,12,14
2:10 32:13
75:18,21 91:6
93:5
**covered** 86:19
86:22,24
**coworker** 54:12
**coworkers** 55:5
**create** 69:19
**created** 12:4
65:7 69:5
**creating** 69:24
**creation** 68:9
**credit** 76:8
**cry** 6:2
**crying** 15:23
**cucumber** 15:21
**current** 8:10,20
9:15
**cursing** 7:11

---

**D**

**D** 2:3,4,9 3:1
**daily** 65:2,4
**date** 9:8,15 20:3
20:21 33:21
34:13 38:6
93:22
**daughter-in-law**
62:22
**day** 4:17 9:9
36:19 51:23
72:1 77:16
78:1,8 79:8
80:2 84:4,18
86:4 89:21,22
90:12,19
**days** 9:13 64:13
64:18,19 66:12
**dealt** 53:9
**debate** 54:1
**Debbie** 83:8
**December** 64:18
66:12 81:2

**decide** 37:23
**decided** 56:17
**decision** 58:6
71:12 90:21
**decisions** 61:1,3
**deed** 32:19
**defamation** 75:5
75:12,14
**defend** 75:22
**Defendant's** 8:2
**Defendants** 1:9
2:11
**defense** 31:1
**defenses** 22:7
**degrading** 13:24
67:9
**Delaware** 32:14
**delete** 16:13
**delivery** 53:10
53:16 54:5,12
54:22 55:24
56:8
**demeaning** 6:8
6:16 7:2 65:24
**demoralizing**
6:22 13:24
65:10
**demote** 82:6
**Deon** 2:9 3:6
4:12,24 5:2
7:14,19,23 8:6
9:14 12:8
16:18 19:12
21:19 22:3,12
23:14,22 24:21
26:24 30:9
31:5,8,13,20
38:9,13 43:2,3
44:17,21 48:18
48:21 61:19,22
62:2,5 68:17
68:20,23,24
72:6,8 73:9
74:5 75:4,9
87:2,21 88:13
88:17 89:11,14

89:17,24 90:6
90:9,18 91:2,9
92:12
**department**
39:14 42:6
49:11 58:20
59:1 82:16,20
**departure** 21:22
**DePaul** 51:20
**depends** 11:4,10
**depict** 23:4
**depicted** 21:5
50:14 70:9
**deposition** 1:3
1:11 31:2,16
92:17
**describe** 28:2
**DESCRIPTI...**
3:12
**designate** 52:16
**desire** 41:12
**desk** 78:2 80:20
**detail** 9:19 12:12
**determine** 37:24
**developing** 62:9
**devoted** 72:2
**diagrams** 22:24
**Dick** 70:2
**different** 5:11
8:4 10:10 11:6
17:13 36:8
44:1 45:11
48:18 53:15
55:18 56:22
57:3,3,6
**difficult** 53:9,21
54:4 65:11
**Dining** 67:1
**direct** 43:21
**directed** 43:9
**directly** 25:18
48:6 78:9
**director** 39:19
39:24 40:9,17
42:6,6,11
43:10 44:12

58:19 86:3,5
**directors** 39:14
**Disabilities**
43:16
**disagreement**
17:5
**disappear** 30:23
30:24
**disappeared**
28:6,6
**disappearing**
21:8 27:20,22
28:14,17 29:10
29:14,18,23
30:11 31:19
**disappears** 28:4
**disclose** 60:23
**discovery** 13:3,5
21:9 22:14
49:23 70:15
**discriminated**
68:1,5 72:3
**discrimination**
37:20 38:1,4
41:10 42:4
43:23 47:15,21
48:5,6 49:1
50:2 67:22
72:17 73:20
87:23 91:23
92:6
**discriminatory**
71:13 87:23
88:16,21
**discuss** 34:7,9
39:15 52:2
55:5 60:16
**discussed** 55:7
63:13
**discussing** 52:8
**discussion** 7:21
22:16 30:7
60:20 62:11
**disgusting** 67:10
**disrespecting**
15:12

**distinct** 48:19
**DISTRICT** 1:1
1:1
**diversity** 46:21
47:5 50:15
**doctor** 80:17
85:24 86:17
**doctor's** 80:7
**document** 3:14
8:8 11:15 21:7
32:15 38:11
44:19 50:1
92:14
**documentation**
7:24 12:9,11
33:4 50:8
**documents** 3:14
7:13 8:3,22
9:10 12:15,18
21:5,24 22:1
22:8 50:6,14
50:18,21
**Dogan** 47:4 56:5
**doing** 34:8 39:22
40:11 80:2
81:18
**dollars** 75:22
**domain** 17:7,9
**door** 39:1 80:23
80:23
**doors** 78:1,6
**downstairs** 58:2
58:23 84:6
**Doylestown** 1:15
2:11
**drastically** 81:4
**drawings** 22:23
**drills** 79:24
**drinker** 69:10
69:13
**due** 14:2 55:24
70:8
**duly** 4:9
**duplicate** 18:2,6
18:8
**duties** 82:2

| **E** |
| --- |

**E** 2:1,1,15,15 3:1
3:11 93:1
**e-mail** 33:20
34:2,15 36:12
36:18 70:13
79:10,15 80:6
**e-mailed** 79:7
**e-mailing** 33:17
**e-mails** 14:5
35:15,19,22
36:5,23 67:3,7
67:13,18 70:1
70:2,5,16 89:8
**earliest** 36:9
**early** 79:22
80:18 81:8
**easily** 14:10,11
**East** 1:14 2:10
**EASTBURN**
1:14 2:8
**EASTERN** 1:1
**edited** 45:23
**education** 50:21
91:22
**EEO** 43:22
**EEOC** 38:7
64:14
**effective** 39:4,9
39:11
**ego** 4:20 75:19
**eight** 28:21
**either** 47:9
63:22 70:24
72:17 79:13
**elaborate** 5:3
**election** 14:3
54:1
**embarrassing**
84:10
**embracing**
46:21 50:14
**employed** 48:13
66:7
**employee** 3:15
5:7 19:14,19

25:8 38:17
39:7 41:20
45:12 48:9
49:2,18 50:1
54:13 55:24
56:15 57:16
58:5,6,8,16
73:12
**employees** 5:11
5:13,16 15:5
21:21 22:18
39:13,23 41:6
42:3 44:8,24
45:4 48:23
49:15 53:12,19
53:22 55:2,12
55:16,19 56:16
57:11,15,15
58:23 71:1
83:4
**Employer** 43:14
**employer's** 41:9
**employment**
36:14 38:18
64:17 65:1,21
66:20 71:17
86:11
**encouraged**
39:18
**encrypted** 29:3
**ends** 26:14
**engage** 71:16
**engaged** 71:7
74:10
**engine** 32:5
**ensure** 41:10
92:5
**entire** 70:12
78:1
**environment**
41:10 62:17
65:7 67:15
69:2 72:3
87:24 88:7
**Equal** 43:14
**equally** 14:7

escort 37:12
escorted 37:7
ESPN 56:19
ESQUIRE 2:4,9
  2:9
ethics 61:10,12
  62:11 63:10
event 5:21 67:23
events 23:6,10
  64:20
evidence 21:12
EXAMINATI...
  1:4
examined 4:9
examples 54:17
  56:4 81:14
excess 76:13
exchange 27:14
  62:17
exchanges 36:12
exclusive 61:3
exclusively 61:1
  62:18
excuse 35:18
  91:2
excused 92:16
executive 53:3
exercising 59:17
  59:18,24
exhibit 7:17
  31:21 40:23
  43:14 50:19,22
existed 76:2
expect 90:3
experience 28:1
  65:20
experienced
  27:24 48:5
  64:24
expertise 46:7
expressing 60:3
  60:4
extensive 70:13
extorting 23:21
extortion 24:12
extremely 16:6

**F**

F 93:1
Facebook 12:21
  12:22 13:6,16
  13:17,21 14:13
  14:15,23 16:13
  18:14 19:3,6
  20:20 34:20
fact 14:2 23:18
  52:21 59:23
  65:23 70:8
  75:20 84:13
  85:14 90:4
facts 23:5,10
fairly 55:20
familiar 8:7
far 9:21 10:4
  25:5 89:21
fear 39:23,24
  40:18
Federal 17:19
feedback 53:7
feel 41:6 52:16
  53:6 73:24
feeling 84:7
fees 76:4
Feher 55:10
felt 5:10,14
  21:17 44:9
  54:11
fifth 41:1
file 31:3 83:22
  84:1,9,13
filed 31:7 43:23
  84:17
filing 4:2 64:13
filings 77:15
Finance 82:20
find 13:24 14:8
  15:17 16:4,10
  17:2 28:20
  30:3 62:15
finding 75:23
finish 13:13
  25:16
fire 79:24

fired 34:19 37:5
  38:2 60:22
  73:23 74:1,22
  76:23 85:1
  90:5
first 15:23 16:2
  20:7 29:14
  33:10,19 36:5
  37:23 38:15
fitness 5:9
follow 35:20
  74:13
follow-up 84:20
follower 13:19
following 36:14
  43:24 82:4
  83:22
follows 4:10
foregoing 93:6
form 4:4 76:8
  86:7
former 5:12
forth 75:11
forum 47:13,18
forward 81:12
  81:13 84:21
  89:22
forwarded 70:5
forwarding 70:2
found 14:4,7
  67:4
foundation
  71:19
four 28:15 51:4
frame 64:23
free 41:10 59:17
  60:4 77:10
frequently 54:18
Friday 1:16
friend 19:7
friends 13:6
  19:16
front 33:16 78:2
  84:11
fucking 16:10
  18:21

full 11:11 71:8,9
function 37:14
  72:24 82:19
further 24:18
  87:3 92:13
future 31:13

**G**

Gallagher 66:22
  66:23
games 56:17
Garvin 1:7 2:17
  5:15 33:2
  34:22 35:2,3
  45:24 54:20
  63:24 64:3
  65:18 66:15
  76:18 78:17
  81:2,8,17
  82:23 83:2,18
  83:21 85:9,12
  88:10 89:1,5,8
  90:5,11,20,24
  91:11,13
Garvin's 4:19
gender 6:21
  65:8,16,20
  67:8,11,11,16
  67:21 68:2,6
  68:10 69:3,6
  69:14,24 70:6
  70:11,19
gender-based
  6:6
Generalist 10:22
getting 25:23
  34:6 56:11
  66:16
give 11:5 24:13
  54:17 78:11,14
  78:19 81:14
given 44:10 81:9
gives 43:24
gmail 33:20
go 11:22 12:1,5
  13:12 23:16

30:5 39:23
  47:19 52:4
  66:22 70:22
  73:7 77:12
  87:10,15
going 7:12,23
  15:7 20:18,21
  25:6 38:14
  39:13 44:17
  76:22 81:11
  84:6,9,21
good 4:13,14
  69:12 89:2,3
Google 14:12
  32:7
govern 92:6
GRACE 2:9
GRAY 1:14 2:8
Gregory 32:19
groups 47:10
guess 64:15

**H**

H 3:11
H-E-N-D-R-I-...
  66:4
half 72:1
hallway 52:4,5
hand 30:13
handbook 38:17
  38:20 45:12,15
  45:17,20 48:10
handed 38:15
  62:21
handled 41:15
  53:1 82:18
handling 43:11
handwritten
  80:20,22
happen 14:15
  89:16
happened 19:24
  34:14 52:6
  58:1 78:3 84:2
  84:8
harassed 65:7

**harassing** 65:2
**harassment**
41:11 42:4
43:6,15 46:12
46:21 47:10,15
47:21 48:6
49:1 50:15
64:8,24 65:19
66:9 67:8 69:2
72:17 73:20
91:23 92:6
**hard** 16:22
23:23
**harm** 26:10
**hatemongers**
89:22
**head** 13:15
63:20
**Healthcare** 55:9
57:12 58:4
81:19
**hear** 7:9 63:19
**heard** 5:5 7:7
10:15 26:12
41:7 74:20,24
75:1
**heated** 53:24
**Heights** 1:6
13:19 14:24
19:15 22:16,19
33:12 75:17
76:2
**Heil** 37:16
**held** 7:22 30:8
70:24
**hello** 52:11
**helpful** 25:18
**Hendrickson**
66:3
**Hillary** 14:6
15:18 67:12
70:9
**hire** 50:3
**hired** 10:8,9,9
10:10,10,11,18
10:20,23 69:8

**history** 12:2
75:16 76:2
**home** 63:17
**honorable** 62:14
**hostile** 65:7
67:15 68:9
69:2,5,19,24
87:23
**hours** 15:22
29:11 81:17
**House** 17:15
**housekeeper**
36:2 60:12,22
**housekeeping**
56:6 58:17,18
**HR** 40:10 42:16
43:18 53:3
82:21 91:23
92:3,5,10
**human** 10:22
40:17 42:6,10
42:11,22 43:10
44:12 45:1
46:6 47:23
54:24 71:10
82:15,19 88:6
88:11 91:21
**humanity** 18:1
**humiliated** 6:2
**humiliating** 6:22
**hundreds** 53:18
**hypersensitive**
54:2

**I**

**idea** 22:13 28:16
64:6
**identification**
38:12 44:20
92:15
**identified** 8:14
59:15,22
**identify** 27:17
38:15 42:19
**II** 1:2
**illegal** 41:23

72:2
**imagine** 35:14
**immediately**
41:5,8,12 42:5
51:18,21,21
58:15,21 73:3
78:5
**implemented**
38:23
**implication** 16:5
**importance** 41:4
**important** 23:20
26:8 31:18
41:6 47:24
48:4 54:3
56:10 58:14,20
59:3
**inaccurate** 46:2
**inactivity** 85:11
**inappropriate**
15:9 34:19
46:2 67:4
**incident** 42:5
56:13 84:18
86:4,7,10
**included** 48:10
81:11,13,15
**including** 17:19
47:3 49:15
**incorrect** 66:24
**incredibly** 14:16
17:17
**incumbent**
21:18
**incurred** 76:4
**indicating** 8:12
8:19 16:16
18:2,7 23:24
28:12 32:11,23
35:13 38:10
44:18 49:19
**indirectly** 48:6
**individual** 37:10
43:8,20 47:20
57:21 61:9
**individually**

70:24
**individuals**
34:16 40:6
47:24 48:4,14
83:7
**inequality** 69:15
**info** 24:1,10
**informal** 15:5
**information**
23:2 24:20
25:19,20 26:21
27:3 35:5
48:14 60:23
**initial** 81:20
**initially** 76:19
**initiate** 19:21
**initiated** 17:23
51:15
**innuendo** 59:11
**inquire** 27:23
**inquired** 27:21
**inquiries** 11:17
**inquiring** 24:13
**instances** 6:15
55:22 64:8
**instant** 19:3,6
33:17
**Institute** 50:20
**insurance** 17:21
86:20
**intend** 22:4
56:12
**intent** 52:5
**intention** 24:17
**interact** 65:4
**interacted** 65:5
65:9
**interaction**
19:18 55:12,16
55:17 64:12
**interactions**
66:3,11
**interesting**
22:15
**internet** 31:23
75:24

**interpretation**
53:12
**Interrogatories**
4:16
**intimidated**
85:14
**investigated**
41:5,12
**investigation**
26:2 71:11
**invited** 62:8
**invoked** 40:6
**involved** 24:3
25:23 26:5
**involving** 24:24
**issue** 58:15,21
**issued** 87:19
**issues** 39:15
41:7
**items** 28:22
30:10

**J**

**Jacquie** 45:13
48:9
**JANE** 1:7
**Janet** 5:6 12:21
13:19 49:9
54:18 83:13
**January** 81:8
82:22
**Jen** 84:16
**Jenkins** 69:7,21
**jeopardy** 26:23
**JOANNE** 2:9
**job** 25:8,22,24
26:22 27:13
73:6
**jobs** 8:24 10:6
**JOHN** 1:7
**Jones** 35:15,23
**Judge** 15:18
**Jungclaus** 1:3,6
3:2 4:8,13 8:7
22:13 30:10
31:22 32:9

38:14 44:23
62:6 87:7
91:10

**K**

**Kathleen** 1:3,6
3:2 4:8 32:9
**Kathy** 26:5 73:5
**Kavanaugh**
15:19
**keep** 12:3 31:14
**Kevin** 19:4,13
24:24 27:18
**kind** 15:4 24:10
69:11,12 73:14
73:19
**KJ-2** 4:17
**KJ-3** 3:13 7:19
7:23 12:16
19:2 27:16
30:16 31:21
32:10,18 33:7
38:3 92:15
**KJ-4** 3:14 38:10
38:12,16 45:8
**KJ-5** 3:15 44:20
49:21
**knew** 58:15
85:17
**knock** 89:10
**know** 6:13 8:11
9:6 22:4,10
23:11 25:4
26:7,9 29:17
34:21 35:1,4,6
36:4 48:1,4,7
53:12 59:3
60:21 64:15
72:22 73:13,23
74:4 75:10
76:14 79:2
83:6 84:17,19
89:5,21 91:20
92:3
**knowing** 71:6
**knows** 23:14,19

**L**

**L** 2:15
**labor** 17:19
49:12
**lack** 83:2
**language** 6:4,10
7:9 59:10 61:4
61:14 72:24
**Lastly** 43:13
**laughed** 69:11
**Laurel** 32:11
**law** 1:13 2:3
72:19 87:10
91:20
**lawsuit** 26:3
27:1 34:9
**lawyer** 12:12
32:2 87:7
**leadership** 44:5
45:16,19,22,23
55:3,8,15
83:10
**Learning** 46:17
46:20 50:10
**leave** 26:7,17
80:3,16,19
**left** 17:1 28:11
28:12 80:7
**legal** 21:14
23:16 26:19
72:21 74:3
75:8,24 76:4
88:3,4 90:15
91:20 92:9
**legally** 25:24
**letter** 22:18
23:20 25:1
32:15 59:21,23
60:6,8 61:5,13
61:16 63:16,17
76:20 77:2
**letting** 83:6
**level** 44:24
**Levin** 45:13
48:9
**liar** 17:15

**liberals** 17:18,24
**License** 93:24
**life** 62:13
**likes** 63:11
**likewise** 43:8
**line** 40:16
**lines** 6:7
**linked** 13:17
**list** 31:14
**listed** 44:11
**listing** 11:11
**live** 49:5
**lived** 62:12
**locked** 80:21,23
**log** 11:16
**lone** 55:4
**long** 51:1 66:14
79:14
**longer** 81:13,14
82:11
**look** 7:12 15:7
20:19,21 36:7
41:1 50:5,18
61:20 87:15
**looked** 45:7
**looking** 15:15
61:24
**lose** 25:21,23
27:13
**lost** 90:24
**lot** 11:5 17:10
61:4 81:22
**low** 73:22
**ludicrous** 17:22
17:22 73:8
**lunchbox** 56:16

**M**

**M** 1:3,6 2:9 3:2
4:8
**MacARTHUR**
1:12 93:5,23
**Maguire** 5:12
**maintenance**
19:14
**making** 27:13

**liberals** 17:18,24 _(column 4)_
57:21 66:15
75:10
**management**
41:19 44:24
55:1 62:10
81:24
**manager** 84:10
**managing** 54:23
**mandatory**
46:24
**manner** 6:16
47:14,20 62:14
**mannerism** 6:20
7:4
**mannerisms**
6:11
**maps** 22:23
**Marc** 37:16
**Marge** 4:18
**Maria** 51:20
56:2
**mark** 2:3,4 7:16
9:23 10:13
11:3 28:15
29:15 32:15
38:9
**marked** 3:12
4:17 7:24 8:3
14:13 38:12,16
44:18,20 60:7
92:15
**Marketing** 14:8
14:24
**married** 34:6
**matter** 25:5 56:1
62:14 93:8
**matters** 25:6
41:19 50:13
**Mawr** 2:5
**McFadden's**
60:20
**mean** 6:5 13:4
25:21 27:9
31:5 55:18
92:4
**means** 73:11,13

73:13
**meant** 26:20
27:21 29:17
**media** 32:19
74:23
**medical** 86:2
**medication**
86:16,23
**meet** 62:9
**meeting** 5:19,22
5:24 6:1 47:14
49:5 56:6
58:22 60:15
61:5,7 62:23
77:1 79:11
81:7,17,20,21
82:4,22 91:16
**meetings** 81:24
**member** 67:24
68:11 69:4,23
74:13
**members** 44:5
46:10 74:14,21
75:1 83:10
**memorialize**
23:5
**mentioned** 24:3
63:11 64:8
**Meredith** 55:10
**message** 5:10
20:12 27:22
28:3,14,18
29:14,18,23
56:11 75:2
78:21 80:3,12
**messages** 19:6
20:15,16 21:8
27:18,20 28:5
29:10 30:11,23
35:18
**messaging** 19:3
33:17
**messenger** 20:20
29:8
**met** 60:17 76:18
**MICHELLE**

1:12 93:5,23
**middle** 31:9
**mind** 19:24
    22:10 31:10
**minded** 52:14
**minimum** 17:20
**minutes** 15:23
**misrepresents**
    24:16
**missing** 29:4
**moment** 7:15
    91:21
**Monday** 77:23
    84:5
**monetary** 27:14
    27:14
**money** 16:11
    23:21 24:18
    27:10
**month** 81:22
**months** 51:3,4
**morning** 4:13,14
    56:22 58:22
    69:8 79:19,20
    79:21,22 80:19
**Mount** 32:10
**Multipage** 3:14

**N**

**N** 2:1,15 3:1
    93:1
**name** 6:9 14:12
    24:3,8 26:6,22
    27:3 31:23
    63:2
**named** 33:9
**names** 6:6 7:2
    83:12
**nature** 37:3
    46:15
**nebulizer** 86:17
    86:21
**necessarily** 6:10
    11:7 60:5
**necessary** 39:9
**need** 20:2 31:15

52:16 53:6
    54:11
**never** 6:2 10:15
    24:7 25:20
    27:19 34:13,14
    40:2 65:24
    71:20 73:1
    75:16 78:12
    88:6
**news** 20:14
    56:19
**NHA** 50:22 51:6
**night** 29:13
**nods** 13:15
**non-African**
    57:19
**non-managerial**
    44:8 45:4
**Nondiscrimin...**
    40:24
**normal** 37:9
**note** 22:15 80:20
    80:22
**noted** 8:24
**notes** 93:8
**notice** 31:4
    71:23 74:9,9
    74:16
**noting** 8:4
**November** 1:16
    32:16
**number** 3:12
    6:14 8:24
    25:12,19 33:13
    35:12 43:24
    66:3 77:16
**numbers** 1:8 8:5
    51:5
**numerous** 67:12
**Nursing** 86:3,5

**O**

**O** 2:15 93:1
**o'clock** 29:13
    80:7,16
**Obama** 14:6

**object** 11:21
    77:8 85:6
**objected** 87:22
**Objection** 21:23
    23:15 24:15
    26:18 48:15
    71:24 72:20
    74:2 75:7
    88:13,17 89:11
    89:14,17,24
    90:6,14
**objectionable**
    67:19
**objections** 4:4
**obligation** 41:9
**obligations** 92:4
**observation**
    59:18,20
**obtain** 12:24
**obtained** 13:1,2
**occasion** 83:3
**occasions** 58:18
    65:8 77:16
    83:19
**occur** 19:23
**occurred** 64:13
    66:12
**October** 33:22
    36:6,9,11 37:1
**offended** 13:20
    14:16 15:11
**offense** 14:4
    57:17
**offensive** 6:5
    14:6,7 15:19
    16:4,6,10,24
    17:2,3,6,8,10
    17:12,14,17
    18:1,4 57:14
    57:18,19 59:5
    59:8,9,11,12
    59:13 70:5,19
    89:7
**offer** 77:6
**office** 2:3 15:12
    51:19 52:6

60:18,20 73:23
    78:2,5 80:21
    84:6
**Offices** 1:13
**Oh** 10:19 19:10
    20:2,3 33:24
**okay** 6:13 7:12
    8:21 9:11 13:6
    15:15 25:17
    28:8 29:12
    30:4,18 32:13
    35:15 37:23
    48:12 50:5,13
    50:18 55:11
    57:6,10 61:22
    64:7,21 69:12
    71:14 72:12
    73:10 74:13
    80:6,16,18
    81:11 82:22
    87:21 88:5,10
    88:24 89:7,8
    90:4 92:11
**old** 69:12 89:2,3
**old-timers** 66:17
**once** 81:21,21
**ones** 9:23,24
    10:3 18:7 29:2
    30:12 45:7
**online** 50:11
**open** 5:13 14:14
    39:1 85:14
**opened** 85:18
**operate** 54:23
**opined** 46:2
**opinion** 14:19
    39:5,9 60:2
    64:3 65:13,13
    81:3
**opportunity**
    43:14 48:22
**oppose** 22:7
**opposed** 6:20
    17:24
**ORAL** 1:4
**order** 22:6 36:9

64:4
**orientation**
    45:14 48:11,12
    48:24
**outside** 19:16
**overbearing** 6:9
    7:3
**oversaw** 55:9
**overseen** 58:17
**oversight** 55:17
**overtime** 17:20
**owners** 74:21

**P**

**P** 1:7 2:1,1,15,17
    34:17
**P-1** 8:3,15
**P-10** 12:20 16:2
**P-11** 12:20
**P-12** 12:15 16:7
**P-13** 16:9,14
    18:22
**P-14** 16:19
**P-15** 16:23
**P-16** 17:16
**P-17** 18:3
**P-18** 18:8
**P-19** 12:15 18:8
**P-2** 8:15
**P-20** 23:9
**P-23** 24:22
**P-25** 23:9 26:4
**P-26** 28:23
    30:13
**P-27** 29:16
**P-29** 28:13 29:1
    29:21
**P-3** 8:19
**P-30** 28:18
**P-31** 28:18,23
    30:1,2,14
**P-32** 30:19
**P-37** 30:20
**P-4** 8:19
**P-5** 8:21
**P-53** 38:3

**P-54** 33:14,19
34:18
**P-55** 35:11,16,21
**P-56** 35:21
**P-57** 35:21
**P-58** 35:22
**P-59** 35:22
**P-60** 8:4
**P-639** 40:24
**P-685** 43:5
**P-76** 42:21
**P-8** 8:21 10:17
**P.C** 1:14 2:8
**P.O** 1:14 2:4,10
**page** 3:2,12 4:22
4:24 5:1 8:4
10:17,19 13:18
13:18 14:13,15
15:24 16:1,13
18:15,23 19:1
24:4,5,23
25:12,13,14
26:4 32:19
33:13 34:16
38:15,16 40:23
42:20 43:5
49:17 51:5
**pages** 8:5 11:11
12:20 19:2
27:16 31:21
32:10,18 33:7
33:15 43:13
**paid** 76:6 85:2
86:13
**panel** 85:24
**paragraph** 41:1
41:23 42:2
**part** 45:16,17,18
47:5
**partial** 25:22
**participating**
26:2
**participation**
5:7
**particular** 54:21
**particularly**

63:11
**party** 56:11
**passed** 64:19
**passing** 62:17
**Pattie** 5:17 6:2,3
**pay** 16:5 17:20
81:8 82:24
**paying** 24:18
**payment** 76:3
83:1
**peers** 55:7
**Penn** 33:1
**Pennsylvania**
1:1,15 2:5,11
8:22
**people** 17:11,12
31:19 37:7
55:18 58:12
62:13,19 70:3
74:24 82:10,13
**perceived** 53:11
**percent** 86:22
**perception**
53:14 56:9
**perform** 37:14
**person** 40:14
55:1,15 58:17
59:4 78:12,24
**personal** 20:23
33:20
**personally** 46:13
47:8 76:6
**Personnel** 40:3
**perspective** 88:3
88:4 92:3
**pertain** 18:1
**pertains** 21:16
**phone** 7:1,8
20:18,23 21:1
25:17,19 28:7
57:15 58:5,24
73:4 79:2,3
**photographs**
22:21
**picked** 73:4
**pictures** 18:18

18:18 22:23
28:7 30:12
**place** 38:17,21
42:15,22 43:17
**Plaintiff** 1:4 2:5
**Plaintiff's** 3:13
8:1 23:6
**Planet** 56:19
**plans** 22:24
**played** 57:4
**please** 78:6
**point** 10:16 11:1
31:19 53:3
62:18 69:22
83:6 84:23
**police** 32:11
**policies** 42:14
44:22 45:5,6
48:10
**policy** 38:23
39:1,4,8,11
40:24 42:2,20
42:21 43:5,6
43:15,22 74:23
**political** 53:24
54:1 59:17,24
60:3,5
**politically** 17:6
**politics** 52:21
**position** 11:4,18
14:21 69:11,14
69:16 70:4
**positions** 10:7
10:10,12 11:5
11:17 12:6,13
**possessed** 53:20
**possession** 23:2
23:3
**possible** 41:16
66:11
**post** 14:9,18
17:6,23 18:23
34:19
**post-terminati...**
74:20 75:15,18
76:1

**posted** 11:5
49:10,18
**posting** 16:21
18:12
**postings** 18:14
**posts** 13:21
14:18 15:2,10
19:3
**potential** 14:14
**potentially**
25:22
**prefaced** 68:15
**present** 5:24
11:19 61:6
62:23
**presentation**
49:5
**presented** 46:20
47:9,19 49:6
**preserve** 29:1
**presidency**
15:13
**president** 5:12
14:1,3,8,23
16:5 39:14,20
39:24 40:13
42:10,22 44:15
46:5 47:23
54:24 61:2
**pretty** 62:20
63:20 65:2
83:14 89:6
**preventing**
46:21 50:15
**previous** 29:7
**print** 32:2,3
**printed** 9:6
20:21 32:4
**printout** 31:23
**prior** 64:13,24
65:21 66:12
81:16 82:22
**privacy** 13:10
**private** 14:14
**probably** 65:3
**Problem** 39:7

**procedural** 46:3
**procedure** 37:9
39:8 41:1
**proceeding**
76:15
**process** 10:14
40:18 51:1
**processed** 86:8
**produce** 9:10
21:18 31:1
**produced** 21:9
22:14 23:7
28:9 49:23
50:6 70:17
**producing** 21:20
**production** 3:13
7:13 8:2 21:10
22:20 30:18
**programmed**
57:7
**programs** 57:3
**prohibited** 42:4
81:23
**proper** 54:5
**properly** 53:11
53:17
**property** 33:2,5
37:8
**protected** 26:1
71:7,16,19,23
72:19 73:24
74:8,10,16
**protection** 41:23
**protections** 27:6
**provide** 12:12
**providing** 21:11
**public** 1:13 13:9
17:7,9
**published** 75:23
**purchased** 33:2
56:15
**purpose** 21:11
52:1,7,10
55:21
**purposes** 21:20
**pursue** 37:24

KATHLEEN M. JUNGCLAUS

pursued 37:19
put 26:22 31:18
  32:8 40:12
  56:18 58:4
  69:13 80:22
putting 31:16
  67:22 75:11

**Q**

question 4:5
  6:19 13:13
  19:9 23:9
  28:15 29:5,15
  31:9 48:19
  49:3 62:7
  68:13,15,22
  69:17 71:20
  72:9 74:11
  90:17 91:5,12
  92:8
questioning
  15:22 71:11
questions 4:16
  87:5
quote 89:2

**R**

R 2:1,15 93:1
race 59:4
racially 18:17
  59:12
racist 74:24
raised 52:12
rash 71:12
reached 34:5
read 16:15,21
  24:22 25:10,15
  28:4,16,22
  62:22 63:5,18
  63:18 77:14
  87:12,18 91:3
  91:7
reading 23:23
really 5:23
  22:19 25:3
  26:4,7 51:4

60:14 64:15
  72:10 79:23
  84:5
realm 91:23
Reardon 84:16
reason 37:19
  41:11 60:21
  88:15,20
reasoning 86:12
recall 6:16 34:10
  40:11 44:4
  47:17,22 60:1
  60:15 64:1
  66:10,17,21
  67:5 70:12
  76:20,24 79:16
  80:5 81:4 83:8
  83:12 84:5
  86:16
receive 29:24
  50:8 83:16
received 20:7
  58:5,24
receiving 56:11
recognize 12:18
recollection
  32:14 49:17
record 7:20,22
  12:4 15:24
  27:17 30:6,8
  31:16,18 38:3
  42:20 49:20
  61:17 91:7
recordation
  11:16
recorded 86:7,9
recordings
  22:22,22
records 30:19
recruiter 45:13
reference 14:21
  15:1,4,18
  19:24 20:2
  41:14,22 42:15
  59:23
referenced 16:3

28:23 33:16
  34:17 39:2
  49:10 50:9
  61:14 66:15
  67:12 76:5
references 67:14
referencing 9:3
  42:9
referring 30:12
  42:17 45:6
  49:20
reflect 54:11
reflected 11:7
  61:5
regard 48:1
regarding 35:9
  51:15 56:7
registered 14:15
regular 48:23
  65:10
regulations
  87:18
relate 23:4,10
related 23:6
  51:6 63:16
  81:8 85:20
relationship
  62:16 81:4,16
relationships
  5:14 58:19
Relias 46:19
  48:20 50:10
remain 30:11
remember 5:23
  51:4 62:6 63:3
  80:5 84:4,5
  87:24
remote 57:12
  58:2
remotes 56:20
reopening 86:12
repeat 68:22
repeatedly
  70:21
report 42:5
  47:15,20 48:4

48:8 49:1 50:2
  82:11,13 86:10
reported 40:2
reporter 91:6
  93:6
Reporter-Not...
  1:13
reports 43:9
represent 14:18
  76:15
representative
  14:19
representatives
  23:3
represented
  76:14
reprisal 40:18
reproductions
  22:21
Republican
  14:16
Republicans
  16:11 18:21
reputation
  69:10 75:2
request 3:13
  7:13 8:2 21:10
  22:20 30:19,22
  41:3 78:12,15
  78:23 85:19
requested 13:5
  91:8
require 41:18
  71:16 82:10
required 47:2
Research 50:21
reserved 4:5 5:9
resident 14:14
  25:8 26:13
residents 5:9
  55:3
resolution 39:21
resource 71:10
  91:21
resources 10:22
  40:17 42:6,10

42:11,23 43:10
  43:21 44:1,11
  44:12 45:1
  46:6 47:23
  48:7 54:24
  82:16,19 88:7
  88:11
respect 4:15
  5:17 7:7 13:23
  30:11 33:5
  40:22 44:22
  45:4 46:9
  50:22 56:2
  60:6 62:19
  63:24 64:22
  65:18 67:21
  68:14 69:18
  82:2
respectful 56:8
respectfully
  55:20
respond 13:14
responded 28:18
  29:23 30:1
  91:10
response 4:15
  7:13 8:1,8 11:6
  16:19 21:9
  22:20 23:8
  24:7 28:19
  30:2,19 58:10
  91:4
Responses 3:13
responsible 19:1
  55:2
rest 25:10
result 71:18
  73:16
resume 8:8,10
  8:14,18,20
  10:1 11:2
retaliate 73:11
  74:17
retaliated 71:5
  74:15
retaliation 39:24

41:24 71:14,15
74:1,7,19 75:6
75:13,15,15,19
76:1 87:23
91:24
**return** 63:7
**returned** 58:3
**review** 47:14
48:24 75:24
**reviewed** 45:13
45:22 48:9,14
49:4
**Richard** 2:17
**rid** 66:16
**right** 7:18 9:21
10:12 13:3,4
17:1,21 22:3
25:11 28:19
30:3 31:6
77:11
**right-hand** 10:4
**rights** 17:22
18:1 48:1
49:15
**risk** 62:9 84:10
**RJ** 61:17
**RJ-1** 59:16
**RJ-2** 60:7 61:21
**RJ-4** 59:22
**Rodgers** 5:17
64:9,12
**room** 60:19
**ruined** 75:3
**rule** 59:6
**run** 52:24 53:10
53:15

_____
**S**

**S** 2:1,15,15 3:11
**S-O-L-T-I-S**
67:5
**Sales** 14:8
**Sandberg** 63:3
**sat** 61:10
**saw** 10:21 18:19
20:13 48:5

70:15 78:20
81:21
**saying** 7:8 17:18
26:16 27:12
35:2 68:15
**says** 9:19,20
10:9,13,17,17
10:22 14:23
26:4 29:1,19
40:8,17 43:9
43:23
**scheduled** 80:1
**school** 87:10
**Schwartz** 2:3,4
3:6 4:22 7:18
9:12 11:20
16:17 19:8
21:13,23 22:9
23:12,15 24:15
26:18 30:5,21
31:6,11,17
32:16 48:15
59:21 61:18,21
61:23 68:13,18
71:24 72:20
74:2,18 75:7
76:14 87:4,6
88:14,18 89:12
89:15,18 90:1
90:8,14 91:19
**Schwartz's** 91:5
**Scott** 32:20 69:7
**screaming** 6:1
**screen** 11:2
12:21
**sealing** 4:2
**search** 31:23
32:5
**searchable**
14:10,11
**second** 10:19
28:13 29:18
30:6 40:8
69:13
**seconds** 28:3,11
28:11,16,21

**security** 37:15
37:17
**see** 8:11,23 9:15
10:8,16,23
12:1,6 24:4,6
24:18 28:5,10
28:14 29:1,19
32:22 39:1
40:7,16 41:24
43:6 52:1,5
77:16,22 79:20
79:23 80:8,10
80:11,12,16
85:24
**seeing** 37:7
**seen** 6:2 27:19
**select** 18:14
**seminar** 49:4
**seminars** 91:22
**send** 79:14,17
**sending** 21:7
29:10
**sends** 28:3
**senior** 10:21
44:5 45:16,18
45:22,23 55:1
55:2,8,15
81:23 83:10
**sensitivity** 56:1
**sent** 5:10 20:12
28:13,15,17
29:2,6,14,15
29:18,19,20,22
29:24 56:12
59:15 67:4
80:5
**sentence** 40:8
41:15 62:12
**sentences** 63:19
91:3
**separate** 48:19
**separated** 64:17
65:21
**separation** 35:9
36:14 38:18
65:1 66:19

86:11
**September**
11:18 20:4,6
76:18
**series** 33:8 35:15
**Services** 67:1
**set** 53:20 56:7,14
78:7
**setting** 7:3,5
**settings** 13:10
**sexual** 43:5
46:21 50:15
59:10,11 64:8
66:9
**sexually** 59:13
65:6
**shared** 76:19
**short** 62:3 78:4
**shortly** 51:22
**shot** 11:2
**shots** 12:21
**shouting** 15:23
**show** 11:16
23:24 57:14,16
59:5,8 62:19
**showed** 11:3
12:10
**Showing** 12:15
**side** 31:14
**siding** 58:12
**signage** 49:12
**signed** 45:15
50:2
**Silverchair**
46:17,19 48:20
50:10
**similar** 23:2
61:15 62:12
**site** 13:9,17 16:2
**sitting** 35:7 84:6
92:2
**situation** 43:11
53:1 62:15
**situations** 53:9
55:7
**size** 83:13

**sketches** 22:24
**skill** 53:20
**social** 32:19 53:7
62:17 74:23
**sole** 55:20
**solely** 52:7
**Soltis** 14:5 67:4
70:1 89:9
**Solving** 39:7
**somebody** 53:15
**someone's** 48:13
**SOMMER** 2:9
31:3 43:1
**soon** 22:11
**sorry** 16:19
19:10 20:3
25:11 30:17
31:9,11 35:21
68:21 90:13
**sound** 53:13
**speak** 21:2
36:17 53:12,18
78:9
**Speaker** 17:15
**speaking** 44:23
49:11 61:16
65:19 71:14
**specific** 5:20
6:21 70:11
71:15 72:4
**specifically** 7:8
15:8 44:2
**speculate** 64:6
**speculation**
22:17 37:5
**speech** 59:17,24
60:3,4 77:10
**spell** 51:12
**spend** 76:12
**spent** 81:17
**spoke** 6:14 56:5
**staff** 4:19 46:10
46:22 47:9,13
47:19 56:6
58:17
**stand** 75:19

stand-up 58:22
standing 78:2
standpoint
21:12 46:3
70:6,19 92:9
92:10
star 55:4
start 31:10
50:19
state 33:1 34:23
stated 5:18
24:10
statement 18:21
27:8 63:22
66:16,20 75:10
90:23
statements
18:17
states 1:1 17:23
station 56:22
59:2
stations 56:18
56:20,24 57:8
57:13 58:4
59:6
statutes 49:14
49:15,16 92:5
stealing 37:5,11
stenographic
93:7
Step 40:7,8,16
sticking 70:18
stood 89:9,9
stop 5:13 52:7
stopped 52:11
stopping 52:10
straight 15:22
Street 1:14 2:10
strive 62:13
subject 50:13
56:1
subjected 42:3
66:8
subjects 47:3
submit 40:9
84:22

submitted 9:24
11:1 21:10
38:6
sucks 26:14
sued 75:20
Summary 32:13
Summers 25:2
60:9,11 63:10
63:24 64:4
Summers' 62:8
Sunday 33:22
superiority 5:15
supervised
55:18
supervisor 5:6
42:5
Supper 6:15
64:22 65:2,10
65:23 69:8
Supper's 5:18
support 61:2
75:12,12
supported 14:3
17:18
supporting 22:5
suppose 38:22
supposed 47:6
sure 13:13 14:22
16:13 25:4
27:4,5 28:19
30:2 40:15
53:10,16 54:3
54:4 55:19
56:3,7,10 79:9
81:16 89:6
90:16
surprised 69:9
surrounding
60:16 62:18
survey 15:5
sworn 4:9

_____

**T**

**T** 2:15 3:11 93:1
93:1
table 66:22

take 7:12 15:17
16:17 27:9
50:5 57:12
61:24 77:5,7
77:13
taken 1:11 62:4
71:18 75:17
93:8
talk 5:13 25:7,18
31:15 36:19
54:3,18,22
talked 47:4
54:20
talking 28:17
taxes 16:5
team 45:16,19
45:22,23 55:1
55:15
tears 6:3
telephone 6:23
20:1 21:2
36:17,20 58:11
television 56:7
56:13,18,21
57:16 58:7
59:2,5
televisions 56:15
56:21
tell 15:8,16
25:10 26:8,11
27:5 33:15
34:6 77:10
84:1
telling 37:4 92:2
temperature
73:22
ten 48:13
tenure 45:1
46:16,23
terminate 64:4
terminated
22:19 26:1
37:10 60:12
64:16 71:9,10
73:3,14 77:17
90:12,19 91:11

91:13,17
termination
40:1 60:17,21
64:1 67:23,23
68:16,19
terminations
61:3
terminology
91:20
terms 17:4 22:5
32:8 35:9 51:1
53:21 55:19
59:8 69:23
87:16,24 91:22
92:4
testified 4:10
6:14 15:10
18:3 33:1
48:16 51:14
56:2 66:2 67:3
70:21 72:12
81:1,12 88:5
90:20
testifying 91:4
testimony 9:4
16:3 24:16
37:18 50:9
51:10 52:23
65:6 72:2
text 20:15 29:21
34:23 79:17
text-messaged
79:5
texting 33:18
Thank 24:6
25:19 30:4
43:2
Theresa 86:9
thing 17:5 49:7
55:17 57:4
69:12 85:13
things 12:2 14:9
17:6 55:5 81:3
88:16,21
think 5:22 9:9
10:21 11:4,10

11:20 17:10,14
17:14,17 18:2
18:6 22:11,15
23:20 24:16
25:2 31:17
39:6 40:14
49:7 51:3
53:11 56:4
60:4,5 63:10
65:22 66:14,21
66:23 67:9
68:5 69:15
73:6 80:14,24
83:8 85:1,17
86:21
thinks 35:1
third 28:17 42:2
Thomas 1:7
2:17
Thompso 18:23
Thompson 5:6
13:7 40:15
49:9 54:18,22
83:13
Thompson's
12:21
thought 12:4
24:1 27:13
39:9 44:10
55:14 58:14,20
59:2,19 66:24
77:14 81:12
83:5 91:1
thousands 75:22
three 28:11
29:11 43:13
51:3 56:18,20
56:23 57:2,3,4
57:6,8 59:6
91:3
tied 80:1
time 4:5 7:21
16:17 20:7,11
23:23 30:7
36:24 38:11,17
41:2 44:19

KATHLEEN M. JUNGCLAUS

47:8 54:10
62:3 63:13
64:23 65:21
66:6,7 70:22
72:12 78:7
79:14 81:13
89:8 91:6
92:14
**times** 36:22
54:16 55:6
65:5
**title** 49:16 63:4
72:19 82:8
87:12,16
**today** 13:2 25:17
35:7 70:22
79:14
**told** 25:10 34:18
34:19,21 57:16
58:23 60:22
65:23 71:8
74:22 77:7
83:21 84:2,7,8
88:24 90:20
91:15
**Tom** 33:11
34:22 35:1,3,4
45:21 63:24
73:4 76:18
77:16 81:21
84:8
**Tom's** 5:7 75:19
**tone** 6:11,20 7:4
77:1
**top** 9:9
**topic** 53:8
**topics** 45:12
46:20,23 53:21
81:20
**totally** 26:9
77:12
**touch** 80:15
**train** 90:24
**training** 46:18
47:1,6 49:9
**trainings** 44:24

45:3,9,11 46:9
46:11,15,22,24
**transcript** 1:11
4:3 93:7
**treated** 6:16
55:20
**treatment** 4:19
5:19 86:2
**treatments**
86:18,21
**trial** 4:6
**tried** 80:11,15
84:22
**Trish** 40:14
54:21
**true** 40:20 93:7
**Trump** 14:3
51:15
**Trustees** 40:4
61:11 67:24
68:11 69:4,18
69:23 70:23
71:5 72:14
73:2 74:15
**try** 26:21 79:10
80:12
**trying** 27:14
74:7
**Tuesday** 79:19
79:20 80:18
**turn** 27:2 56:23
**turned** 78:4,21
**TV** 56:23 57:1,8
58:4
**TVs** 57:3,4,7
**Tweet** 59:15,20
77:3
**Twitter** 13:18
**two** 11:11 29:10
36:6 63:19
81:21 82:14
**two-minute**
61:24
**two-page** 42:21
**type** 9:19 33:16
47:13 50:7

73:18 80:20
**types** 7:9 46:22
49:12

——————————

**U**

**U.S** 87:15
**Uh-huh** 4:21
**unable** 77:22
**unanimous**
90:21
**unanimously**
71:9
**unconcerned**
77:2
**underneath**
16:22
**understand**
15:11 29:4
51:18 52:23
72:9,16,23
74:7,8 92:9,9
**understanding**
42:11 72:7
73:11 88:2
**underwent**
46:23
**unemployment**
17:21 26:15
37:21 75:16,17
75:20
**ungrateful** 83:5
**UNITED** 1:1
**unprecedented**
75:23
**upset** 5:7,8 6:24
60:11 61:4
**upstairs** 77:12
**use** 7:9 24:7
26:22 32:5
76:8
**useful** 24:2
**utilize** 22:4
**utilized** 91:24

——————————

**V**

**vacuum** 54:23

**variety** 47:3
**various** 49:14
75:1 81:20
91:20
**verbatim** 62:20
63:20
**verbiage** 6:20
**vibe** 69:12
**Vice** 14:8,23
42:10,22 46:5
47:23 54:24
**video** 22:21,22
**view** 17:13
69:14
**VII** 49:16 72:19
87:13,16
**villa** 62:8,10,21
62:24 63:14,21
**violating** 74:22
**violence** 47:4
**visits** 86:17
**voice** 58:16
63:19
**voices** 65:13
**VOLUME** 1:2
**vote** 17:21
**voting** 51:15
**VP** 42:15 43:18
45:1 92:4
**vs** 1:5

——————————

**W**

**W-O-M-A-C-K**
51:12
**wage** 17:20
**Wait** 19:8
**waiting** 10:13
**waived** 4:3
**walked** 52:5
78:21
**walking** 81:19
**want** 16:12 22:1
26:4,9 27:12
30:24 41:20
**wanted** 21:15
24:19 34:12

52:24 53:10,15
56:7,16 60:21
**wasn't** 5:24 6:10
26:12,17 27:4
39:11 51:21
57:2 59:12
79:23,23 80:19
**watch** 56:16
**watching** 57:13
**Waverly** 1:6
5:20 8:17
13:17,19 14:21
14:24 15:2
19:14 20:13
21:21 22:16,19
32:20 33:12
36:1,3,15
37:20 39:10
46:10 47:19
48:23 54:6
55:23 66:8
75:17 76:2
86:3
**Waverly's** 14:19
**Waverly-0325**
49:24
**Waverly-0344**
50:6
**Waverly-0483**
50:19
**way** 9:20 13:17
31:19 53:13
56:9,11 67:18
71:6 75:21
77:8
**We'll** 79:13
**we're** 71:14
**website** 11:7,8
11:24 12:1
**week** 65:3,5
77:19 81:18
**weekend** 17:20
**weekly** 86:17
**weeks** 81:21
**went** 11:6,23,24
29:6 38:20

KATHLEEN M. JUNGCLAUS

| | | | |
|---|---|---|---|
| 51:19 56:23 | 55:11 69:16 | **0490** 51:6 | **28th** 9:9 |
| 58:2,23 73:1 | **Wozniak** 33:11 | | **2nd** 33:22 |
| 78:5 79:22 | 34:2 35:5 | **1** | |
| 86:1 88:6,10 | **writing** 40:7,9 | **1-21** 1:8 | **3** |
| 90:5,11 91:11 | 40:13 | **10/30/2018** 9:15 | **3** 40:7,8 80:7,16 |
| 91:13 | **written** 62:22 | **10:00** 1:16 | **300** 64:13,18,19 |
| **weren't** 42:9 | **wrong** 59:19 | **100** 86:22 | 66:12 |
| **white** 58:6,12 | **wrote** 22:18 | **11** 15:21 16:1 | **31** 27:16 |
| **wife** 6:23 7:8,10 | 23:19 24:24 | **11/23/2016** | **32** 31:22 |
| **win** 26:15 | 25:1,3,4 45:21 | 10:22 | **330** 2:4 |
| **witness** 3:2 | 60:8 | **11/6** 15:17 | **37** 31:22 |
| 11:23 13:15 | | **11:55** 92:17 | **38** 3:14 32:10 |
| 19:10 23:18 | **X** | **12/13/16** 38:7 | |
| 24:17 26:20 | **X** 3:1,11 | **13,000.00** 76:13 | **4** |
| 41:2 68:21 | **X102192** 93:24 | **1389** 1:15 2:10 | **4** 3:6 40:12,16 |
| 72:23 74:4,19 | | **13th** 64:18 66:12 | **43** 32:10 |
| 90:7,16 92:16 | **Y** | **16** 5:1 | **44** 3:15 32:18 |
| **Womack** 51:12 | **yeah** 17:3 31:5 | **17** 22:21 | **48** 32:18 |
| **woman** 6:5 33:8 | 36:8 61:21 | **17-cv-04462-R...** | |
| 66:1 69:15 | 86:22 | 1:2 | **5** |
| **women** 5:19 | **year** 33:23 34:6 | **18901** 1:15 2:11 | **54** 33:7 |
| 6:16 | 54:1 60:15 | **19010** 2:5 | **55** 35:14 |
| **women's** 17:20 | 83:14 | **1997** 50:3 | **56** 35:13 |
| **won** 75:20 | **years** 48:13 49:9 | **19th** 83:23 | **59** 33:7 |
| **words** 87:21 | 53:4,19 60:14 | | |
| **work** 19:16,18 | 83:15 | **2** | **6** |
| 20:13 26:5 | **yesterday** 4:17 | **2** 1:16 61:18 | **60** 1:14 2:10 |
| 32:20 62:16 | 6:14 9:3 11:14 | **20** 15:23 19:2 | **676** 43:1,2 |
| 65:7 67:15 | 33:1 37:18 | **2014** 38:21 | |
| 69:2 73:1 76:4 | 51:10 52:23 | 45:19 | **7** |
| **work-related** | 59:16,22 60:7 | **2015** 5:20 81:2,9 | **7th** 50:3 |
| 15:1 85:20 | 63:22 64:7 | **2016** 11:18 20:5 | |
| **worked** 35:24 | 66:2 67:3 | 32:16 33:24 | **8** |
| **worker** 53:7 | 70:22 81:1,12 | 36:10 37:1 | **8** 29:13 |
| **Workers'** 83:22 | | 64:18 66:13 | **8:24** 29:18 |
| **working** 8:16 | **Z** | 82:22 | **8:41** 29:22 |
| **workplace** 43:15 | **ZipRecruiter** | **2018** 1:16 20:6 | **87** 3:6 |
| 47:4,5,11,16 | 12:1 | 22:16 | |
| 48:7 52:22 | | **22** 24:5 | **9** |
| 68:10 69:5,19 | **0** | **23** 38:16 | **90** 3:6 |
| 69:24 | **0352** 50:7 | **23rd** 36:9,11 | **92** 3:13 |
| **works** 72:24 | **0366** 50:7 | **24** 25:14 | |
| **worry** 66:16 | **0374** 50:7 | **25** 19:2 | |
| **worth** 24:2 | **0422** 50:7 | **25-plus** 53:4 | |
| 25:21 27:9 | **0461** 50:7 | **26** 27:16 | |
| **wouldn't** 53:19 | **0463** 50:7 | **27th** 20:4,6 | |
| | **0483** 51:5 | | |