IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS, | : | |
| | : | |
| Plaintiff | : | NO.   17-cv-04462-RK |
| v. | : | |
| | : | |
| WAVERLY HEIGHTS, LTD., | : | Jury Trial Demanded |
| | : | |
| Defendant | : | |

## TABLE OF CONTENTS OF APPENDIX FOR DEFENDANT'S MOTION FOR SUMMARY JUDGMENT – VOL. VI

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. I** | |
| Appendix 1 – 90 | Waverly's Employee Handbook, 2014 |
| Appendix 91 – 93 | List of Waverly's Board of Trustees, 2015 |
| Appendix 94 – 96 | List of Waverly's Board of Trustees, 2016 |
| Appendix 97 | Waverly's EEO-1, 2015 |
| Appendix 98 | Waverly's EEO-1, 2016 |
| Appendix 99 | Waverly's Non-Discrimination Policy, 2011 |
| Appendix 100 | Waverly's Open Door Policy |
| Appendix 101 – 102 | Waverly's Problem-Solving/Grievances Policy, 2011 |
| Appendix 103 | Waverly's Sexual Harassment Policy, 2014 |
| Appendix 104 | Waverly's Civil Rights Compliance – Employee Awareness, 1997 |
| Appendix 105 – 107 | Social Media Policy, 2014 |
| Appendix 108 | Chart Showing Demographic Information Regarding Waverly's Senior Leadership Team as of 09/16 |
| Appendix 109 – 110 | Waverly's letter to Kathleen Jungclaus dated 3/26/1997 offering her employment |
| Appendix 111 – 112 | Resume of Kathleen Jungclaus 1997 – 09/16 |
| Appendix 113 – 114 | Resume of Kathleen Jungclaus 09/16 – Present |
| Appendix 115 – 117 | 1995 Job Profile of Plaintiff |
| Appendix 118 – 121 | Plaintiff's Job Profile (Job Description), 2005 |
| Appendix 122 – 128 | Silver Chair Learning Certificates Courses taken by Plaintiff covering Diversity and Sexual Harassment 2011 – 2016 |
| Appendix 129 – 136 | Class Completion Certificates for Nursing Home Administration Course 2013-2014 |
| Appendix 137 – 226 | Performance Evaluations of Plaintiff 1998 – 2015 |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 227 – 264 | Recommendations for Salary Increases from Mr. Wozniak 12/8/10-11/2/15 |
| Appendix 265 – 266 | Graph of Plaintiff's Salary History 2005 – 2016 |
| Appendix 267 | Chart showing Plaintiff's Salary History 2010 – 2016 |
| Appendix 268 | Chart of Compensation of Senior Team for 2015 |
| Appendix 269 | Chart of Compensation of Senior Team for 2016 |
| Appendix 270 – 272 | Anonymous Letter dated 09/14/16 |
| Appendix 273 – 279 | Tweet dated 7/24/16 and screenshot showing link from Waverly to Jungclaus Twitter Page |
| Appendix 280 – 281 | Chart showing Termination of Employees without Progressive Discipline 2010-2016 |
| Appendix 282 – 289 | Emails between Mr. Garvin, Mr. Bauer and Board Committee Members regarding Employment Issue, 09/22/16 – 09/26/16 |
| Appendix 290 – 293 | Plaintiff's Unemployment Compensation Application dated 10/02/16 |
| Appendix 294 – 297 | Notice of Unemployment Application dated 10/06/16 and Waverly's Response to Unemployment Claim dated 10/11/16 |
| Appendix 298 – 300 | Interview of Plaintiff by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 301 – 305 | Interview of Mr. Garvin by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 306 – 308 | Approval of Plaintiff for Unemployment Compensation dated 10/25/16 |
| Appendix 309 – 310 | Waverly's Appeal from Granting of Unemployment dated 10/31/16 |
| Appendix 311 – 326 | Letter from Mark Schwartz, Esquire to Waverly dated 11/08/16 |
| Appendix 327 – 354 | Transcript of Unemployment Compensation Hearing dated 11/28/16 |
| Appendix 355 – 361 | Decision of Unemployment Compensation Referee dated 11/29/16 |
| Appendix 362 | EEOC Complaint dated 12/13/16 |
| Appendix 363 | EEOC Notice of Charge dated 01/05/17 |
| Appendix 364 – 368 | Email from Raymond Jungclaus to Plaintiff dated 10/09/08 – Food for Thought (Why not voting for Obama) Raymond Jungclaus suggests that Plaintiff post this on her Facebook page |
| Appendix 369 – 375 | Email from Raymond Jungclaus to Plaintiff dated 04/07/11- re: Obama's Classmate Speaks out |
| Appendix 376 – 377 | Emails between Plaintiff and Raymond Jungclaus dated 06/28/12 re Health Care Bill being upheld |
| Appendix 378 – 381 | Email from Raymond Jungclaus to Plaintiff dated 10/18/12 – Why Mitt Romney is Unlikeable |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 382 – 383 | Emails between Plaintiff and her husband, Raymond Jungclaus dated 08/19/13 re making up story that she has doctor's appointment so she can leave early |
| Appendix 384 – 388 | Emails between Plaintiff and Marc Heil dated 08/26/13 re: Discipline of employee for violation of social media policy and reference to contact with Debbie Sandler, Esq. |
| Appendix 389 | Email from Plaintiff to Raymond Jungclaus – dated 08/30/13 – her reaction to Garvin email regarding a discussion about her NHA license |
| Appendix 390 – 391 | Email from Raymond Jungclaus to Plaintiff dated 10/24/13 re:  If you can't fix it with a hammer – political comment |
| Appendix 392 – 394 | Email from Gregory Gangi to Plaintiff dated 10/24/13 – "How pathetic are those of you who still love the Obama (intentional small case) man" |
| Appendix 395 – 406 | Email from Raymond Jungclaus to Plaintiff dated 12/19/13 – Problem with Public Housing – criticizing Obama for putting feet on furniture |
| Appendix 407 | Email dated 08/18/14 from Plaintiff to R. Supper asking for recommendation |
| | |
| **VOL, III** | |
| Appendix 408 – 567 | Emails from Mr. Soltis on which Plaintiff was copied 2011 – 2016 |
| Appendix 568 – 598 | First Amended Complaint |
| Appendix 598 – 603 | Plaintiff's Initial Disclosure under F.R.C.P.26 |
| Appendix 604 – 605 | Plaintiff's Supplemental Disclosure under F.R.C.P.26 |
| Appendix 606 – 621 | Plaintiff's Answers to Interrogatories |
| | |
| **VOL. IV** | |
| Appendix 622 – 690 | Deposition of Plaintiff, Kathleen Jungclaus, Day 1, 11/01/18 |
| Appendix 691 – 817 | Deposition of Plaintiff, Kathleen Jungclaus, Day 2, 11/02/18 |
| | |
| **VOL. V** | |
| Appendix 818 – 860 | Deposition of Raymond Jungclaus, 11/01/18 |
| Appendix 861 – 911 | Deposition of Anita Summers, 11/26/18 |
| Appendix 912 – 1039 | Deposition of Richard Bauer, 11/26/18 |
| | |
| **VOL. VI** | |
| Appendix 1040 – 1171 | Deposition of Thomas Garvin, Day 1, 11/02/18 |
| Appendix 1172 – 1213 | Deposition of Thomas Garvin, Day 2, 11/26/18 |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. VII** | |
| Appendix 1214 – 1218 | Bing Search of Kathleen Jungclaus, 07/30/19 |
| Appendix 1219 | Affidavit of Carolyn Baysmore |
| Appendix 1220 – 1221 | Affidavit of Debra Best |
| Appendix 1222 – 1229 | Affidavit of Amy Blessing |
| Appendix 1230 – 1231 | Affidavit of Margaret Carpenter |
| Appendix 1232 – 1235 | Affidavit of Constance Dogan |
| Appendix 1236 – 1239 | Affidavit of Meredith Feher |
| Appendix 1240 – 1241 | Resume of Meredith Feher |
| Appendix 1242 – 1251 | Affidavit of Thomas Garvin |
| Appendix 1252 – 1253 | Resume of Thomas Garvin |
| Appendix 1254 – 1256 | Affidavit of Marc Heil |
| Appendix 1257 – 1260 | Resume of Marc Heil |
| Appendix 1261 – 1265 | Affidavit of Lauren Kelley |
| Appendix 1266 – 1268 | Resume of Lauren Kelley |
| Appendix 1269 – 1270 | Affidavit of Patricia Rodgers |
| Appendix 1271 – 1272 | Resume of Patricia Rodgers |
| Appendix 1273 – 1275 | Affidavit of Tanya Salgado, Esquire |
| Appendix 1276 – 1279 | Affidavit of Deborah Sandler, Esquire |
| Appendix 1280 – 1282 | Affidavit of Robert Supper |
| Appendix 1283 – 1289 | Resume of Robert Supper |
| Appendix 1290 – 1294 | Affidavit of Janet Thompson |
| Appendix 1295 – 1296 | Resume of Janet Thompson |
| Appendix 1297 | Affidavit of Basheer Womack |
| Appendix 1298 – 1301 | Affidavit of Thomas Wozniak |
| Appendix 1302 – 1303 | Summary of Qualifications of Thomas Wozniak |

THOMAS P. GARVIN

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
NO. 17-cv-04462-RK
VOLUME I

KATHLEEN M. JUNGCLAUS, : DEPOSITION UPON
:
Plaintiff,: ORAL EXAMINATION
:
- vs - : OF
:
WAVERLY HEIGHTS, LTD., : THOMAS P. GARVIN
THOMAS P. GARVIN and :
JOHN and JANE DOES :
NUMBERS 1-21, :
:
Defendants.:
------------------------

TRANSCRIPT OF DEPOSITION, taken by and
before MICHELLE C. MacARTHUR, Certified Court
Reporter-Notary Public, at the Law Offices of
EASTBURN & GRAY, P.C., 60 East Court Street, P.O.
Box 1389, Doylestown, Pennsylvania, 18901, on
Friday, November 2, 2018, commencing at 12:00 p.m.

- - -

## Page 2

```
 1   A P P E A R A N C E S
 2
 3
 4       LAW OFFICE OF MARK D. SCHWARTZ
 5       BY:  MARK D. SCHWARTZ, ESQUIRE
         P.O. Box 330
 6       Bryn Mawr, Pennsylvania 19010
         Attorneys for the Plaintiff
 7
 8
 9
10       EASTBURN & GRAY, P.C.
         BY:  GRACE M. DEON, ESQUIRE
11       60 East Court Street
         P.O. Box 1389
12       Doylestown, Pennsylvania 18901
         Attorneys for the Defendants
13
14
15
16
17   A L S O  P R E S E N T
18
         Kathleen M. Jungclaus
19       Richard Bauer
20
21
22
23
24
```

## Page 3

```
 1
 2              I N D E X
 3   WITNESS                     PAGE
     THOMAS P. GARVIN
 4
 5
 6
 7       By: Mr. Schwartz          4
 8
 9
10
11            - - -
12         E X H I B I T S
13                        PAGE
     NUMBER     DESCRIPTION    MARKED
14   TG-1    One-page document    20
         TG-2    Mission Statement    84
15   TG-3    E-mails              97
         TG-4    Handbook            130
16   TG-5    Response to          146
                 Request for Admissions
17   TG-6    First Amended Complaint  151
         TG-7    Answers to First     151
18           Amended Complaint
19
20
21
22
23
24            - - -
```

## Page 4

```
 1       (By agreement of counsel, the
 2   sealing, filing and certification of the
 3   transcript has been waived; and all
 4   objections, except as to the form of the
 5   question, have been reserved until the time
 6   of trial.)
 7
 8       THOMAS P. GARVIN, after having
 9   been duly sworn, was examined and testified
10   as follows:
11
12   BY MR. SCHWARTZ:
13   Q.   Can you state your full name?
14   A.   Thomas Porter Garvin.
15   Q.   And what's your birth date?
16   A.   August 22nd, 1969.
17   Q.   And where do you live?
18   A.   I live in Fort Washington.
19   Q.   Okay.  Have you ever been deposed before?
20   A.   I have.
21   Q.   How many times?
22   A.   Approximately, maybe three.
23   Q.   And what kind of cases were they?
24   A.   One was an employment discrimination case
```

1 (Pages 1 to 4)

THOMAS P. GARVIN

## Page 5

1   and one was related to care-related issues when I
2   worked for a different company. Actually, I think
3   they were both from that company.
4   Q.    What company was that?
5   A.    HCR ManorCare.
6   Q.    Well, if you've done a deposition before
7   then you're aware of the procedure, but let me go
8   through at least a truncated version or you heard
9   Ms. Deon's introduction to depositions of Mr. and
10  Mrs. Jungclaus; do you pretty much understand what
11  the direction was and understand the drill?
12  A.    Yes.
13  Q.    All right. In that case I won't go over
14  it.
15       Are you under any medications or, you know,
16  things that could impair your judgment or impair the
17  truthfulness of your responses?
18  A.    No. I'm not.
19  Q.    Okay. And who is -- other than your
20  Counsel -- has been present with you yesterday and
21  today?
22  A.    Richard Bauer.
23  Q.    And who is that?
24  A.    He's a member of our Board of Trustees.

## Page 6

1   Q.    Okay. How long has he been a member of the
2   Board?
3   A.    Approximately, eight years.
4   Q.    Okay. And how long have you been at
5   Waverly?
6   A.    About eight and a half years.
7   Q.    And that has continuously been as CEO?
8   A.    That is correct.
9   Q.    Okay. When you talked about the three
10  lawsuits that you were involved in --
11  A.    Uh-huh.
12  Q.    -- two of which were at a previous
13  employer --
14  A.    Uh-huh.
15  Q.    -- were you ever named a defendant in any
16  of them?
17  A.    No.
18  Q.    Okay. Were you ever personally accused of
19  any harassment?
20  A.    No.
21  Q.    So there's never been any sexual harassment
22  or claims of discrimination filed against -- where
23  you were accused of basically doing the
24  discrimination or providing the hostile environment?

## Page 7

1   A.    No.
2       MS. DEON: Objection.
3   BY MR. SCHWARTZ:
4   Q.    Okay. So describe what your position is
5   and what your responsibilities are.
6   A.    So I'm the President and CEO of Waverly
7   Heights. My responsibilities are to oversee the
8   general operations of the entire community.
9   Q.    And do you have a job description?
10  A.    I do.
11  Q.    If you haven't provided it to us, I'd ask
12  that you do so.
13       So does your position -- who picks you?
14  A.    Well, a committee of the Board of Trustees
15  selects the President, so...
16  Q.    Okay. And what committee was that?
17  A.    I don't know if it had a -- it's a search
18  committee that they had put together.
19  Q.    Okay. And did they use a headhunter or --
20  A.    Yes. They did.
21  Q.    Okay. Do you remember the name of the
22  headhunter?
23  A.    It was Third Age.
24  Q.    And where are they?

## Page 8

1   A.    I think they merged with another
2   organization; Plymouth Meeting, perhaps. I'm not
3   really sure.
4   Q.    Don't worry about it.
5       Do you know who was on the committee that
6   hired you?
7   A.    Yeah. I remember some of the names.
8   Q.    All right. Who was that?
9   A.    So it was Chuck Soltis, it was Sam McKeel,
10  I believe Scott Jenkins was on it, Ed Mahoney; Anita
11  Summers was on it, Bernice Hunt was on it, I believe
12  Malcolm Schoenberg, Steve Kirkpatrick I believe was
13  on it. That's to the best of my recollection; there
14  may have been more. It was quite a crew of people.
15  Q.    Would you describe them as sort of the
16  cream of the Main Line?
17       MS. DEON: Objection.
18       THE WITNESS: I don't know what
19       that means.
20  BY MR. SCHWARTZ:
21  Q.    Would you describe them as pillars of the
22  community in the Main Line?
23       MS. DEON: Objection. You can
24       answer.

2 (Pages 5 to 8)

THOMAS P. GARVIN

Page 9

1      THE WITNESS: I would describe
2  them as Board members of Waverly Heights
3  and residents of Waverly Heights.
4  BY MR. SCHWARTZ:
5      Q.    Are they all residents of Waverly Heights?
6      A.    No.  They are not.
7      Q.    You heard Ray Jungclaus yesterday talk
8  about, you know, sometimes the Board picks the
9  President and sometimes the President picks the
10  Board?
11     A.    Uh-huh.
12     Q.    Were you in a position to nominate Board
13  members?
14     A.    No.
15     Q.    No.  Did you ever suggest that anybody be
16  on the Board?
17     A.    I don't believe that I did; not that I
18  recall.
19     Q.    Okay.  Scott Jenkins, is he also on the
20  Board of Bryn Mawr Trust?
21     A.    I believe that he is.  Yes.
22     Q.    And Bryn Mawr Trust has a banking facility
23  in Waverly, right?
24     A.    They do.

Page 10

1      Q.    Does your position require any training?
2      A.    I'm not sure exactly what you mean by
3  require any training.
4      Q.    Well, unfortunately your lawyer and I have
5  the awesome responsibility of completing so much
6  continuing legal education every year.  Is there
7  anything like that that you have to do?
8      A.    Yes.  There is.  I have to take a -- as a
9  licensed Nursing Home Administrator you have to take
10  48 hours of continuing education every two years.
11     Q.    And do you personally do that?
12     A.    I do.
13     Q.    Okay.  And in what setting do you do that;
14  where?
15     A.    Primarily conferences; state association
16  conferences and national association conferences.
17     Q.    So it's at those conferences like, you
18  know, lawyers can go to Aspen and ski all day with
19  an hour in the morning; is it that kind of
20  conference in some instances?  I mean you'll hear
21  there are conferences, in general, where you just
22  basically get a certain amount of continuing legal
23  education; is that correct?
24     A.    I mean I don't know about the skiing

Page 11

1  reference --
2      Q.    Right.
3      A.    -- but it's a conference; you go to a
4  convention center, you attend sessions, you learn
5  about different things that are happening in the
6  industry with your continuing education --
7      Q.    Right.
8      A.    -- and you renew your license every two
9  years and that's the process.
10     Q.    And then you have fun the rest of the day,
11  right?  Yes?  No?  Sometimes?
12     A.    Sometimes you --
13           MS. DEON:  Objection.
14           THE WITNESS:  -- do.
15  BY MR. SCHWARTZ:
16     Q.    Okay.  You heard -- I keep calling it
17  SilverSneakers, which is showing my age -- you heard
18  Kathy Jungclaus talk because Silverchair No. 14;
19  what's that?
20     A.    Silverchairs are our online training -- it
21  used to be our online training --
22     Q.    Right.
23     A.    -- it's a different name now, too.
24     Q.    Right.  Do you have to do that?

Page 12

1      A.    I don't necessarily have to, I do.  I did
2  quite a few of them.  I did not do all of them, all
3  the way along, but I have done numerous.
4      Q.    Okay.  Did you ever have a discussion with
5  Kathy or anybody else where you suggested that she
6  handle the class for you and sign in for you?
7      A.    Absolutely not.
8      Q.    That never happened, right?
9      A.    No.  It did not.
10     Q.    One of these conferences that you went to
11  did you -- would you have occasion to take your wife
12  at anytime on these conferences?
13     A.    Yes.
14     Q.    And did you have occasion for Waverly to
15  pay for her airfare and other accommodations?
16     A.    Yes.  That was part of the arrangement upon
17  my being hired at Waverly Heights.
18     Q.    So do you have a contract?
19     A.    I do not.
20     Q.    Okay.  But that was -- that's something you
21  specifically bargained for?
22     A.    No.  They offered it to me when I took the
23  job.
24     Q.    What kind of -- from a legal standpoint, if

3  (Pages 9 to 12)

THOMAS P. GARVIN

Page 13

1    you know -- what kind of organization is Waverly
2    Heights, Ltd.?
3    A.    It's a single site not-for-profit
4    organization.
5    Q.    Right. Do you think it was appropriate
6    that a not-for-profit organization pay for your wife
7    to go on trips?
8         MS. DEON: Objection. You can
9         answer.
10        THE WITNESS: My opinion is that
11        was part of the package that they offered
12        me.
13   BY MR. SCHWARTZ:
14   Q.    Was that written down, what the package
15   was?
16   A.    Yes. It was.
17   Q.    Could you please produce that for us?
18   A.    I'm sure we could.
19   Q.    That would be nice. Thanks.
20        MS. DEON: For the record, that
21        will be produced if we have a
22        confidentiality agreement, which I will
23        speak with Mr. Schwartz about when we
24        discuss other scheduling in this matter.

Page 14

1         MR. SCHWARTZ: Okay. I may not
2         have a problem with that.
3    BY MR. SCHWARTZ:
4    Q.    You were here for these various questions
5    of Ms. Jungclaus yesterday and today, were you not?
6    A.    I was.
7    Q.    And you saw, you know, a certificate that
8    you produced in terms of diversity; is that correct,
9    diversity training?
10   A.    I need to see what you're referring to.
11   Q.    Okay. Do you remember seeing anything with
12   respect to sexual harassment training, a
13   certificate?
14   A.    Again, I would need to see what you're
15   referring to.
16   Q.    Well, let me back up.
17   A.    Sure.
18   Q.    I filed an Amended Complaint in this
19   matter, right?
20   A.    Uh-huh.
21        MS. DEON: Is that a yes? You
22        need to answer.
23        THE WITNESS: Yes.
24        MR. SCHWARTZ: You have to say

Page 15

1    yes or no.
2         THE WITNESS: Thank you.
3         MR. SCHWARTZ: That's all right,
4    I do the same thing.
5    BY MR. SCHWARTZ:
6    Q.    And you filed an Answer -- or Waverly
7    Heights filed an Answer; is that correct?
8    A.    I believe our attorney filed the Answer on
9    our behalf.
10   Q.    Right. Did you go over that with your
11   attorney?
12   A.    Yes.
13   Q.    Okay. Have you gone over my Request for
14   Production of Documents? Have you looked at that
15   before you answered it?
16   A.    Yes.
17   Q.    And Interrogatories, the same question?
18   A.    Yes.
19   Q.    Okay. Request for Admissions; that, too?
20   A.    Yes.
21   Q.    Okay. Was anybody else working with your
22   attorney -- I don't want you to tell me what you
23   told your attorney, but was anyone else working with
24   your attorney in terms of responding to the various

Page 16

1    legal documents or was it just you?
2    A.    There were -- there was at least one other.
3    Q.    Who was that?
4    A.    Our Director of IT, Pannha Prak. He's
5    Director of Information Technology.
6    Q.    Okay. And his is the unpronounceable name
7    that's on top of all of the e-mails, correct,
8    that --
9    A.    That is correct.
10   Q.    Well, let -- it's nice of you to agree with
11   me before I ask the question, but wait for the
12   question.
13        Is his name on top of all of the e-mails
14   that you produced in terms of some of the request
15   for documents and stuff? Would that be the person
16   that would literally pull up the documents that were
17   requested?
18        MS. DEON: Objection.
19        THE WITNESS: I'm not sure about
20        if his name appears on every e-mail that
21        was produced to you.
22   BY MR. SCHWARTZ:
23   Q.    Right.
24   A.    But he would be the person that would have

4 (Pages 13 to 16)

THOMAS P. GARVIN

Page 17

1    the knowledge on how to pull the requested
2    information.
3    Q.    Okay.  Let's just go over the exhibits that
4    I have, that we've already looked at.  RJ-1, have
5    you seen that document before (indicating)?
6    A.    I have.
7    Q.    When is the first time you saw that?
8    A.    The day I received the anonymous letter.
9    Q.    Okay.  How did you -- did the anonymous
10   person show you the Tweet or how did you -- how did
11   you get it?
12   A.    Which one?  Which question would you like
13   me to answer?
14   Q.    That's a good point.  I'll withdraw the
15   question.
16         How did you get this document, RJ-1?
17   A.    I received --
18         MS. DEON:  Let me just raise an
19   objection.  This actual document, for the
20   record, my office enlarged and created this
21   document, but this verbiage does appear
22   elsewhere.
23         MR. SCHWARTZ:  Okay.
24   BY MR. SCHWARTZ:

Page 18

1    Q.    Where did you learn of the verbiage?
2    A.    Through an anonymous letter that I
3    received.
4    Q.    Okay.  So 2, let's take a look at RJ-2.  Is
5    this the anonymous letter that you received
6    (indicating)?
7    A.    Yes.  It is.
8    Q.    Okay.  Now, what was your first reaction to
9    getting an anonymous letter?  What did you do?
10   A.    I immediately went onto the Waverly
11   Heights' Twitter account to see if it was true.
12   Q.    If what was true?  If the quote on page 2
13   appeared there; is that what you --
14   A.    Yeah.  If what was said in that -- if the
15   accusations made in that letter were true.
16   Q.    Okay.  So what did you do; you went on the
17   Waverly Twitter account?
18   A.    Correct.
19   Q.    And did you find anything there?
20   A.    Yes.
21   Q.    What did you find?
22   A.    I clicked on followers and then pulled up
23   Kathy Jungclaus' Twitter and then found everything
24   that's been produced, and I think that's actually

Page 19

1    where -- what is this -- RJ-1 originally came from,
2    the version --
3    Q.    I believe you.  Yeah.  It's the same
4    language.  No problem.
5    A.    Yeah, but that's the version that was on
6    the Twitter account when I went on.
7    Q.    Okay.  And that's, basically, the road map
8    for what you were -- that led you to do what you did
9    came from anonymous, right?
10   A.    That was the beginning of the situation.
11   Q.    Okay.  And then what further investigation
12   did you do?  What did you do next after you saw it
13   on -- that it was -- you saw it after you went to
14   the Waverly site and then to the follower site, what
15   did you do next?
16   A.    I printed a copy of it.
17   Q.    And then what?
18   A.    And then I called Kathy to come down to my
19   office.
20   Q.    Okay.  Now, you know who Anita Summers is?
21   A.    I do.
22   Q.    Who is she?
23   A.    She's a resident and she's been on the
24   Board of Trustees.

Page 20

1    Q.    Okay.  Is there a picture of her in some --
2    oh, here we go.
3         MR. SCHWARTZ:  This would be TG-1
4    (indicating).
5         (At this time, a document was
6    marked for identification as TG-1.)
7    BY MR. SCHWARTZ:
8    Q.    So would it be your testimony that you had
9    some real slackers on that Board?
10        MS. DEON:  Objection.
11        MR. SCHWARTZ:  You can answer.
12        MS. DEON:  Objection.
13        THE WITNESS:  Was that snarky
14   or --
15        MS. DEON:  Don't answer the
16   question.
17        MR. SCHWARTZ:  You're instructing
18   him not to answer?
19        MS. DEON:  I'm instructing him
20   not to answer.  Move on.
21        MR. SCHWARTZ:  Hey, Grace, it's
22   been a long time.  The only person that I
23   respect who says that is George Soros, so
24   don't use his language.

5  (Pages 17 to 20)

THOMAS P. GARVIN

Page 21

```
1    BY MR. SCHWARTZ:
2    Q.    So you know Anita Summers, correct?
3    A.    I do know her.
4    Q.    Do you know a guy named Paul Samuelson?
5    A.    I do not; I know it's a relative of hers.
6    Q.    Do you know what the original name of her
7    husband was?
8    A.    Off the top of my head, I don't.  I'm not
9    100 percent sure.
10   Q.    Do you know who a guy named Larry Summers
11   is?
12   A.    I know who he is.  Yes.
13   Q.    Have you ever met him?
14   A.    Once.
15   Q.    As you sit here today, and given you've
16   heard about the exchange that went back and forth
17   with respect to my client and that maintenance
18   individual, Mr. Billig --
19   A.    Yes.
20   Q.    -- as you sit here under oath, do you
21   believe that Anita Summers drafted this anonymous
22   letter?  Is she the author of it?
23         MS. DEON: Objection.  Calls for
24         speculation.  You can answer.
```

Page 22

```
1          THE WITNESS: I do not believe
2          she did.
3    BY MR. SCHWARTZ:
4    Q.    Why?
5    A.    Because Anita is a very direct person and
6    if she has a problem or an issue, make no mistake
7    about it, she will let you know directly; she
8    doesn't hide behind an anonymous letter.
9    Q.    Well, you heard what Mr. Billig said; is it
10   correct to say that based upon the evidence that we
11   have so far, he thought it was somebody else,
12   correct?
13         MS. DEON: Objection.  You can
14         answer.
15         MR. SCHWARTZ: As you remember.
16         THE WITNESS: What was the
17         question again?
18   BY MR. SCHWARTZ:
19   Q.    You sat here while your Counsel was reading
20   through or had my client read through the Billig
21   texts; is that correct?
22   A.    Yes.
23   Q.    And isn't it true that he thinks it was not
24   Anita Summers but someone else, correct?
```

Page 23

```
1    A.    I don't know what Kevin Billig thinks or
2    how he thinks or where he's getting his information;
3    that was the first I've heard of it.
4    Q.    Well, we'll be asking him to testify.
5          What's your inclination?  Do you have any
6    idea who it is?
7    A.    I have absolutely no idea.
8    Q.    Let's go through these other documents and
9    then we'll take a break for lunch.
10         Let me show you RJ-3 (indicating).
11         MS. DEON: Off the record for a
12         minute.
13         (At this time, a discussion was
14         held off the record.)
15   BY MR. SCHWARTZ:
16   Q.    Forgetting the handwritten stuff and the
17   circles and all of that, just the text, have you
18   ever seen that document before?
19   A.    I believe I have.  I think this is the one
20   that I printed where it's enlarged from, but I can't
21   be sure.
22   Q.    Okay.  But, to the best of your
23   recollection, is that a document that is the
24   printout of her account; is that correct?
```

Page 24

```
1    A.    Yes.  It is.
2    Q.    It includes that language, correct?
3    A.    Includes what language?
4    Q.    The language that's in RJ-1.
5    A.    Yes.  Document RJ-3 does include the
6    language of RJ-1.
7    Q.    Let's go to RJ-4.  RJ-4 is my letter to the
8    Board of Trustees in care of Ms. Deon.  When is the
9    first time you saw this letter (indicating)?
10   A.    I don't remember the exact date.  It's
11   dated November 8th, so shortly thereafter.
12   Q.    So who did you get it from?
13   A.    From our attorney, Grace Deon.
14   Q.    Who's it directed to?
15   A.    It's directed to the Board of Trustees.
16   Q.    And do you know if it found their way to
17   the Board of Trustees -- if the letter found its way
18   to them?
19   A.    It made its way to the Executive Committee
20   and to any other trustee who was interested in
21   reading it.
22   Q.    So how did you find out who was interested
23   in reading it?
24   A.    They could have asked any of the members of
```

Appendix 1045
StenoSource, LLC   (215)348-1095

THOMAS P. GARVIN

Page 25

```
 1    the Executive Committee to review it.
 2    Q.    So who was on the Executive Committee?
 3    A.    I don't know that I recall that, as I sit
 4    here right now.
 5    Q.    Can you recall any names of people who were
 6    on the Executive Committee at the time?
 7    A.    I'd have to -- I'd have to look that up.
 8    Q.    All right. Well, can you do that and
 9    supplement your response at some point, okay, when
10    we're finished?
11          Do you remember talking about the letter
12    with any Board members, specific ones?
13    A.    I do.
14    Q.    Who?
15    A.    The entire Executive Committee.
16    Q.    And those are the ones that you don't
17    remember?
18    A.    Correct.
19    Q.    Is Scott Jenkins --
20    A.    I'd be guessing right now.
21    Q.    -- is Scott Jenkins on the -- I don't want
22    you to guess -- is Scott Jenkins on that committee?
23    A.    I don't recall if he was at that time.
24    Q.    Mr. Bauer?
```

Page 26

```
 1    A.    I believe he was on the Executive
 2    Committee.
 3    Q.    Okay. So you had discussions with Board
 4    members, but you don't remember who right now,
 5    correct?
 6    A.    I don't recall who all was on the Executive
 7    Committee.
 8    Q.    Okay. What Board members did you talk to
 9    about the letter?
10    A.    I know -- I believe -- so I believe Dick
11    Bauer, Scott Jenkins -- who else was -- I know Mike
12    Buckley, and then there were -- you know, there were
13    multiple others. Gerry Renthal. That's the only
14    ones that I can remember more solid.
15    Q.    Was there a common reaction? Was there a
16    common reaction, that you can recall; stuff that
17    they all shared in terms of a reaction?
18    A.    I don't know that I can say there was a
19    common reaction.
20    Q.    Can you give me a sampling of some of the
21    reaction that you got?
22    A.    Well, I think it's -- some of the reaction
23    is that clearly a lot of this is falsified, made up,
24    untrue, twisted facts, and it's -- it's very
```

Page 27

```
 1    obvious.
 2    Q.    What's obvious?
 3    A.    Everything I just said.
 4    Q.    All right. On the back of that there's
 5    some police reports or a police blotter and a
 6    printout of Robert Supper's criminal history, right?
 7    A.    No. There's not.
 8    Q.    Yeah. There is.
 9    A.    Do you want to clarify which Robert Supper
10    you're talking about?
11    Q.    Sure. I was going to get to that as soon
12    as you got there. Exhibit --
13          MS. DEON: B.
14    BY MR. SCHWARTZ:
15    Q.    -- B is a police blotter, correct?
16    A.    It appears as such.
17    Q.    Okay. And the next exhibit what's that,
18    behind it?
19    A.    Exhibit-C?
20    Q.    Yes. What's that called?
21    A.    Delaware County Court of Common Pleas Court
22    Summary.
23    Q.    Okay. So when you got the letter from your
24    Counsel, what did you do next? As soon as you got
```

Page 28

```
 1    the letter, what did you do?
 2    A.    I think I immediately shared it with Dick
 3    Bauer.
 4    Q.    Okay. And do you recall what his reaction
 5    was?
 6    A.    Same as what I had mentioned in the
 7    previous answer.
 8    Q.    Terrible falsehoods, right?
 9    A.    Yeah.
10          MS. DEON: Objection to the
11    categorization.
12          THE WITNESS: The exaggeration
13    and twisting of the truth in that letter is
14    very obvious.
15    BY MR. SCHWARTZ:
16    Q.    Okay. With respect to the police reports
17    did you do anything? What did you do with those
18    reports?
19    A.    Would you like to know what I did with it
20    when it came in your letter?
21    Q.    Sure.
22    A.    Well, the same thing, I gave the whole
23    letter to Dick Bauer.
24    Q.    Had you ever seen those police reports
```

7 (Pages 25 to 28)

THOMAS P. GARVIN

Page 29

1 beforehand?
2 A.   I -- I have.
3 Q.   How did you see them before my letter?
4 A.   I'm trying to remember how I saw them.  It
5 was -- I believe Kathy produced them for me.
6 Q.   Okay.  And did you conduct an investigation
7 of what happened with Mr. Supper and his son as a
8 result of getting them from Kathy?
9 A.   I did.  Yes.
10 Q.   What kind of investigation?  What did you
11 do?
12 A.   So he actually -- I should back up.  He
13 actually brought it to my attention before Kathy
14 unearthed it, which would have been, you know, much
15 later than when it actually occurred.
16        MS. DEON:  Who do you mean by he?
17        MR. SCHWARTZ:  Mr. Supper?
18        THE WITNESS:  Bob -- yeah.
19    Sorry.  Bob Supper, Sr. --
20 BY MR. SCHWARTZ:
21 Q.   Sr.  Right.
22 A.   Yeah.
23        -- who works for us, brought it to my
24 attention the day -- you know, the Monday or what

Page 30

1 have you after the incident with his son, because
2 that's what we're talking about, this is an incident
3 with his son, when that occurred.  So I don't
4 believe he -- I can't remember if he produced a
5 report of the incident.  I feel like maybe he did,
6 but I don't recall.
7 Q.   What did he tell you?  Can you remember
8 what he talked to you about?
9 A.   Yeah.
10 Q.   What did he say?
11 A.   That his son took his car in the middle of
12 the night and got arrested for speeding or reckless
13 driving and that was then arrested, and the car was,
14 you know, taken to the -- wherever -- the impound
15 lot or whatever they do.
16 Q.   Right.  Did he ever tell you about the
17 criminal history of his son?
18 A.   He had -- yeah.  Yes.  He had made that
19 known to me.
20 Q.   When did he do that?
21 A.   I believe it was shortly after he was
22 hired.
23 Q.   Okay.  And did you ever think that maybe
24 this guy shouldn't have a car?

Page 31

1 A.   No.
2 Q.   Okay.  Did he tell you that he was on a
3 gambling trip with his son in Atlantic City --
4 A.   He told me that his --
5 Q.   -- when the car was taken?
6 A.   -- what he told me was that they were
7 celebrating his mother's birthday, I believe it was,
8 in Atlantic City.
9 Q.   Right.  And did he tell you he was
10 gambling?
11 A.   I don't believe he told me specifically
12 that he was gambling.
13 Q.   Did he tell you he was drinking?
14 A.   I don't believe he told me he was drinking.
15 Q.   Did Waverly put any restrictions on his use
16 of the car that -- as to whether he could be the
17 sole driver or that family members or strangers
18 could use the car?
19 A.   There's no restrictions; family members can
20 use the car.
21 Q.   It doesn't matter whether they have a
22 criminal past or anything, right?
23 A.   There's no policy against that.
24 Q.   No policy.  Okay.

Page 32

1        All right.  So what discipline did Mr.
2 Supper get as a result of coming forward with this
3 information when the car was taken?
4 A.   So the incident with his son that occurred,
5 you know, I felt put the company at great risk for
6 liability related issues because, you know, of the
7 obvious reasons; if, God forbid, his son had injured
8 somebody or caused an accident, it would have caused
9 liability on Waverly Heights because we own the --
10 we own the vehicle --
11 Q.   Right.
12 A.   -- and we maintain the insurance on the
13 vehicle.
14 Q.   Right.
15 A.   So what I did was made the decision to take
16 the car away as, you know, a way to address that;
17 remove that liability concern.
18 Q.   Did Ms. Jungclaus make that suggestion?
19 A.   No.
20 Q.   So she never suggested that he not have a
21 car?
22 A.   Absolutely not.  Never.
23 Q.   Did she ever raise any concerns about him
24 having a car and other comparable employees, who

THOMAS P. GARVIN

## Page 33

1   were female, not having a car; did she ever raise
2   that issue?
3          MS. DEON: Objection. You can
4      answer. What is meant by comparable
5      females?
6          THE WITNESS: So rephrase your
7      question for me.
8   BY MR. SCHWARTZ:
9   Q.    Did she ever complain to you about
10  inequality in terms of car availability for Mr.
11  Supper vis-à-vis someone else?
12  A.    So she took to Meredith Feher, F-E-H-E-R;
13  she made the issue to Meredith, who she claimed made
14  an issue of it, and she brought it to me. Cars at
15  Waverly Heights go to the two positions; my
16  position, as President and CEO, and the CFO
17  position. Prior to Bob Supper there was a female
18  CFO who had been in place for probably 23, 24 years
19  who maintained a car in the exact same benefit. So
20  that's a benefit that was with those two positions,
21  decisions that were made well before I came on the
22  scene.
23  Q.    And you just continued that policy, right?
24  A.    That was --

## Page 34

1   Q.    Until you took the car away from Mr.
2   Supper?
3          MS. DEON: Objection. Let him
4      finish answering the question. He did not
5      answer your question.
6          MR. SCHWARTZ: I didn't finish
7      the question.
8          Can you reread the question?
9          (At this time, the court reporter
10     read back from the record as was
11     requested.)
12  BY MR. SCHWARTZ:
13  Q.    So is it your testimony that who got cars
14  was a prior decision of the Waverly administration,
15  correct?
16  A.    What I said was that was what was in place
17  when I arrived and it hasn't changed since.
18  Q.    Who put that in place?
19  A.    I have no idea.
20  Q.    Could it have been the Board?
21  A.    I would be guessing if I said, but it would
22  make sense that the Board would make that decision
23  on, you know, who receives a vehicle.
24  Q.    Is it fair to say that the Board would make

## Page 35

1   decisions of that nature, correct?
2   A.    Yes.
3   Q.    Okay. So is it Ms. Feher who my client
4   complained about not deserving a car? You sat here
5   through her testimony; did my client make that up?
6          MS. DEON: Objection.
7          THE WITNESS: What's your
8      question?
9          MS. DEON: Objection.
10         MR. SCHWARTZ: I'll withdraw
11     the --
12         MS. DEON: Objection.
13         MR. SCHWARTZ: I withdrew the
14     question.
15         MS. DEON: But it would be much
16     easier if you ask one question and then you
17     pause and then you ask another question.
18         MR. SCHWARTZ: Well, that's
19     better than asking a bunch of compound
20     legal questions, but go ahead -- I'll go
21     ahead, I'll rephrase the question.
22  BY MR. SCHWARTZ:
23  Q.    You sat through my client's testimony
24  yesterday, right?

## Page 36

1   A.    Yes. I did.
2   Q.    Do you remember her talking about what she
3   perceived as discrimination when it came to Ms.
4   Feher not having a car and Mr. Supper having a car?
5   Do you remember that?
6   A.    I remember parts of the story she told.
7   Q.    Do you dispute that story?
8   A.    I dispute a lot of what she has to say.
9   Q.    Okay. Well, let's just talk about the car.
10  What was wrong about what she said?
11  A.    I don't recall.
12  Q.    Okay. Do you recall right now what other
13  things she said that you dispute, as you sit here
14  now?
15  A.    No. I don't recall. I'll wait for your
16  questions.
17  Q.    Okay. So was Mr. Supper ever disciplined
18  for any reason during his tenure at Waverly?
19  A.    Formally disciplined, no; counseled, just
20  like others, verbally.
21  Q.    So counseling, you don't consider that
22  discipline?
23  A.    I consider it a form of discipline.
24  Q.    Okay. So what happened to him after this

THOMAS P. GARVIN

Page 37

1  taking of the Waverly car in terms of discipline?
2  A.    The taking of the Waverly car is a
3  benefit --
4  Q.    Right.
5  A.    -- and then we gave him a stipend in lieu
6  of that, like I said, to -- because of the liability
7  issues that were related to having a physical car
8  with Waverly Heights. Bob Supper didn't do anything
9  wrong, it was his son.
10 Q.    Are you sure about that?
11 A.    Yes. I am sure about that.
12 Q.    Are you sure that Bob Supper never covered
13 for his son with respect to his criminal activity?
14 Are you sure about that?
15     MS. DEON: Objection.
16     THE WITNESS: I'm not sure what
17     you're asking. Are you saying that you
18     think this is a different Bob Supper?
19 BY MR. SCHWARTZ:
20 Q.    No. No. No. No. I'm not suggesting that
21 Bob Supper, Sr. is Bob Supper, Jr.
22 A.    Oh, okay.
23 Q.    But what I'm suggesting is, is that -- and
24 what I'm asking you about is whether Bob Supper, Sr.

Page 38

1  ever covered for Bob Supper, Jr. when it came to his
2  criminal past?
3  A.    I have no idea.
4  Q.    Did you ever ask?
5     MS. DEON: Objection. You can
6     answer.
7  BY MR. SCHWARTZ:
8  Q.    Did you ever look at that rap sheet and say
9  Bob, what the hell is going on here? Did you ever
10 do that?
11     MS. DEON: Objection.
12     THE WITNESS: I don't use that
13     kind of language, but...
14 BY MR. SCHWARTZ:
15 Q.    Oh, you leave that to the Board, right?
16     MS. DEON: Objection. Objection.
17     Mr. Schwartz --
18     MR. SCHWARTZ: Don't lecture me.
19     MS. DEON: Mr. Schwartz --
20     MR. SCHWARTZ: This is my
21     deposition. Don't lecture me.
22     MS. DEON: Mr. Schwartz, you're
23     not going to treat my client in an
24     unprofessional manner. I was very

Page 39

1  professional with your client and I will
2  expect the same from you.
3     MR. SCHWARTZ: I'm thrilled that
4     you are representing your client so
5     zealously. Let me withdraw the question
6     and rephrase it.
7  BY MR. SCHWARTZ:
8  Q.    When you saw the extent of the rap sheet on
9  Mr. Supper, Jr., did you ever have a discussion with
10 Mr. Supper, Sr. about asking him what went on?
11 A.    I think I told you that he came to me and
12 informed me of what went on.
13 Q.    But I'm talking about the broader criminal
14 rap sheet; I'm talking about the felonies.
15 A.    Honestly, what happens with Bob Supper's
16 son is between him and his family.
17 Q.    Is it?
18 A.    Yes.
19 Q.    Okay. But you don't have a problem with
20 his entrusting your car to that son?
21     MS. DEON: Objection.
22     THE WITNESS: You were just
23     talking about something -- a rap sheet of
24     some kind versus the car.

Page 40

1  BY MR. SCHWARTZ:
2  Q.    Well, weren't there criminal charges
3  brought with respect to the car when he took it?
4     MS. DEON: Objection. You can
5     answer.
6  BY MR. SCHWARTZ:
7  Q.    If you know.
8  A.    It looks like there were criminal charges
9  against his son.
10 Q.    Well, that's what I'm saying.
11 A.    So what's your question?
12 Q.    My question is did you ever ask Bob Supper
13 why are you allowing your son to use the car?
14 A.    No, because Bob said that his son took the
15 car without his permission.
16 Q.    And you just believed that?
17     MS. DEON: Objection. You can
18     answer.
19     THE WITNESS: I had no reason not
20     to.
21 BY MR. SCHWARTZ:
22 Q.    Did you ever ask Bob, has your son had a
23 history of taking the car before without your
24 permission; did you ask him that?

Appendix 1049
StenoSource, LLC   (215)348-1095

THOMAS P. GARVIN

Page 41

1    A.    No, I didn't, because I made a decision on
2    how I was going to handle it, and my job is to
3    protect the company and that's what I felt I did,
4    and I felt I made the right decision.
5    Q.    Did you know that Bob Supper's son is a
6    known drug addict, who had been in numerous -- in
7    rehab numerous times?
8    A.    Did you know that Bob Supper's son is dead?
9    Q.    I'm sorry to hear that.  So are 11 members
10   of my synagogue, okay?
11   A.    I'm sorry to hear that.
12   Q.    Well, you're the first one that said
13   that --
14         MS. DEON:  Objection.
15   BY MR. SCHWARTZ:
16   Q.    -- so I thank you.
17         MS. DEON:  It has nothing to do
18         with --
19         MR. SCHWARTZ:  Oh, I know, Grace.
20   BY MR. SCHWARTZ:
21   Q.    No, I didn't know he was dead, but did you
22   know that he had drug problems?
23   A.    Yes.  Bob was open about that.
24   Q.    Okay.  And you knew that he had drug

Page 42

1    problems at the time he was -- or, you know, he had
2    had drug problems prior to his misappropriating the
3    car?
4    A.    I don't remember the time frame, but I knew
5    probably shortly after Bob was hired that his son
6    had some issues.
7    Q.    Okay.  Were you at all worried that okay, I
8    took the car away, but I gave him a stipend and the
9    same stuff could happen?
10        MS. DEON:  Objection.
11        THE WITNESS:  So I think I
12        answered a couple of times; my primary
13        concern, in my role, is to protect the
14        organization from being exposed to
15        liability, because it was a Waverly Heights
16        owned vehicle, and if anything happened, if
17        someone had gotten injured or hurt, my
18        feeling was that would certainly come back
19        on the company, and so by giving him a
20        stipend in lieu of a car you eliminate that
21        possibility.  So I think, again, in my role
22        I believe it was a wise decision.
23   BY MR. SCHWARTZ:
24   Q.    Do you think it eliminates the problem by

Page 43

1    just getting rid of the car and just giving him the
2    money?
3    A.    What problem are you referring to?
4    Q.    Well, couldn't some smart negligence lawyer
5    get to you as a defendant for paying for the car?
6         MS. DEON:  Objection.
7         THE WITNESS:  I'm not an
8         attorney.
9         MS. DEON:  You can answer if you
10        understand it.
11        THE WITNESS:  Yeah.  I'm not an
12        attorney, so I don't know.
13        MR. SCHWARTZ:  All right.  Why
14        don't we have lunch on that happy note?
15        (At this time, a luncheon recess
16        was taken.)
17   BY MR. SCHWARTZ:
18   Q.    I think when last we spoke we were talking
19   about Mr. Supper, Sr.  Anybody ever complain to you
20   about his alcohol use?
21   A.    No.
22   Q.    Did you ever make any comments to anyone
23   about his alcohol use?
24   A.    Not that I recall.

Page 44

1    Q.    Do you recall telling Ms. Jungclaus, you
2    know, don't talk to him until after noon?
3    A.    So that comes from actually Kathy coming
4    down to the office and she having a conversation
5    with my assistant, Amy Blessing, with me in
6    proximity, where it was in jest the two of them
7    talking about Monday mornings with Bob; so that's
8    where that's coming from.
9    Q.    But, to your knowledge, was he a drinker
10   and a partier?
11   A.    I think that Bob Supper had major family
12   issues, and I think weekends were very difficult for
13   him, and I think coming in after a weekend was
14   difficult for him because of the strain on whatever
15   it was in his personal world that he was dealing
16   with; it had nothing to do with Waverly Heights.
17   Q.    Okay.  Did Scott Jenkins ever mention to
18   you that he was concerned about his level of
19   drinking?
20   A.    Scott Jenkins never mentioned that he was
21   concerned about his level of drinking; Scott had
22   mentioned that he knew Bob liked to go out at night.
23   Q.    So you never had any concerns that he
24   couldn't perform his job?  Or did you ever have any

Appendix 1050
StenoSource, LLC   (215)348-1095

THOMAS P. GARVIN

### Page 45

1    concerns that Bob Supper, Sr. couldn't perform his
2    job?
3    A.    I never had any concerns that Bob Supper,
4    Sr. could not perform his job.
5          MS. DEON:  If I may just
6        interject that Mark Eastburn has just
7        entered the room as an observant.
8          MR. SCHWARTZ:  Okay.
9        Off the record.
10        (At this time, a discussion was
11        held off the record.)
12    BY MR. SCHWARTZ:
13    Q.    So you never had any concerns about his
14    ability to perform his job, correct?
15          MS. DEON:  Objection.  You can
16        answer.
17          THE WITNESS:  I never had any
18        concerns about Bob Supper's ability to
19        perform his job.
20    BY MR. SCHWARTZ:
21    Q.    Did you ever receive or hear of complaints
22    about how he treated females?
23    A.    I heard concerns about how he treated
24    people in general.

### Page 46

1    Q.    And what were those?
2    A.    Bob tends to get excited and, you know, is
3    just -- when he tries to make his point he just
4    sometimes needs to dial it back down, and he's done
5    it to both men and women, myself included.
6    Q.    So he's equal opportunity when it comes to
7    his temper; is that what your testimony would be?
8          MS. DEON:  Objection.  You can
9        answer.
10          THE WITNESS:  Yeah.  I disagree
11        that it's temper, it's more style.
12    BY MR. SCHWARTZ:
13    Q.    It's style.  Okay.  Well, how would you
14    describe his style?
15    A.    One that he likes to make his point.
16    Q.    And that he's, what, overly aggressive?
17    A.    I would not use the term aggressive.
18    Q.    Is he disdainful of other people?
19    A.    No.
20    Q.    Is it a style that you would encourage?
21    A.    It's not my style; it's his style.
22    Q.    Have you ever said to him maybe your style
23    is not appropriate?
24    A.    There were, I think, two occasions where I

### Page 47

1    brought him in and said you need to dial it down
2    because, again, you know, with him I think he had
3    some real concerns on outside issues that made
4    him -- he's actually much, much better since the
5    unfortunate passing of his son.
6    Q.    Okay.  Can you remember the two instances
7    when you told him to dial it back, so to speak?
8    A.    I don't remember when they were, but I
9    definitely remember them.
10    Q.    Okay.
11    A.    I handle people, when I have an issue with
12    somebody that needs to be addressed, like I said
13    earlier, I counsel with them and talk to them about
14    what they could have done differently.
15    Q.    You didn't do that with Kathy though, did
16    you?
17    A.    Well, I have done it with Kathy.  Yes.
18    Q.    Okay.  Did you do it with her prior to her
19    firing?
20    A.    Did I do what with Kathy?
21    Q.    Did you do any counseling with her after
22    you received the anonymous letter?
23    A.    The counseling that I've -- the verbal
24    counseling that I've done with her and the issues

### Page 48

1    that I addressed were prior to that.
2    Q.    Okay.  So there was no counseling after the
3    anonymous letter, correct?
4    A.    After the anonymous letter, I think I
5    already told you, I brought Kathy down to the
6    office, gave her a copy of it, told her it was
7    not -- I don't remember the exact words, but not
8    very professional of the Vice President of Human
9    Resources and that she needed to go up and take it
10    down right away, which she did.
11    Q.    Did you indicate that she would qualify for
12    progressive discipline?
13    A.    No.  We didn't have that conversation.
14    Q.    And you had already made up your -- you had
15    already consulted the Board about getting rid of her
16    prior to her coming into your office, right?
17    A.    No.
18    Q.    No?
19    A.    (Witness shakes head.)
20    Q.    When was the decision made to fire her?
21    A.    The day before she was terminated.
22    Q.    Okay.  But you received the anonymous
23    letter, correct?
24    A.    Yes.

Appendix 1051
StenoSource, LLC   (215)348-1095

THOMAS P. GARVIN

Page 49

1    Q.    Then you checked it out, correct?  You
2    found it --
3    A.    Yes.
4    Q.    -- you found it on the web or whatever,
5    right?
6    A.    Right.
7    Q.    And then you met with her?
8    A.    Correct.
9    Q.    Okay.  And then what did you do after you
10   met with her; who were the next people you consulted
11   with?
12   A.    In the days that followed, with Grace Deon,
13   our labor attorney, and Dick Bauer, our Board Chair.
14   Q.    Okay.  So let's forget about what you told
15   Ms. Deon; what did you tell Mr. Bauer?
16   A.    Well, I shared with him the letter, and we
17   had multiple conversations with our labor attorney
18   trying to figure out what the best way to handle it
19   was.
20   Q.    Forgetting the labor attorney, did you have
21   one-on-one conversations with Mr. Bauer without the
22   labor attorney?
23   A.    I believe I did.
24   Q.    Okay.  And what did you talk about then?

Page 50

1    A.    The letter and how to proceed in
2    communicating with -- between Mr. Bauer, myself, and
3    the labor attorney.
4    Q.    Okay.  Well, without communicating to the
5    labor attorney, did you suggest to Mr. Bauer
6    progressive discipline?
7    A.    I don't recall exactly what we talked
8    about, but we worked with our labor attorney on how
9    to figure out the best way to handle this difficult
10   situation that we were put in by Mrs. Jungclaus.
11   Q.    Okay.  Well, I don't want to get into Ms.
12   Deon's advice, I just want to know your discussions
13   that you had with Mr. Bauer aside and separate
14   from -- or any other Board members -- aside and
15   separate from anything you had with Ms. Deon.  Can
16   you tell me what those conversations were about?
17   A.    Again, about the content of the letter and
18   how we were going to handle it.
19   Q.    Okay.  And what did Mr. Bauer say to you as
20   far as how it should be handled?
21   A.    That we should work with our labor attorney
22   and figure out the next course of action.
23   Q.    And that's all?  That's the only discussion
24   that you had with Mr. Bauer about getting -- you

Page 51

1    know, about dealing with Ms. Jungclaus?
2    A.    That's what I recall.
3    Q.    Okay.  Did you have any other one-on-one
4    discussions with any other Board members?
5    A.    Not one-on-one.  No.
6    Q.    Okay.  Did you have any other -- so if it
7    wasn't one-on-one, who was in the group, if you
8    remember, that you would have had discussions with
9    about well, what do we do with Ms. Jungclaus?
10   A.    So on whatever the day was; Monday, maybe,
11   the 26th of September, if I have that right, our
12   attorney and Mr. Bauer and I had discussed what
13   needed to be done, which was to have a --
14         MS. DEON:  Objection.  Just
15         don't --
16         MR. SCHWARTZ:  Don't answer.  I
17         keep trying to take Ms. Deon out of the
18         picture and you keep bringing her back in.
19   BY MR. SCHWARTZ:
20   Q.    What discussions, if any, with Board
21   members did you have about Ms. Jungclaus that Ms.
22   Deon was not a part of?
23   A.    So we had a conference call on that Monday
24   to discuss the letter, the seriousness of the -- you

Page 52

1    know, what we were dealing with.
2    Q.    Did anyone offer a supposition as far as
3    who was the author of the letter?
4    A.    No.  They did not.
5    Q.    Okay.  Who would have been in the meeting,
6    the conference call?
7    A.    So I think we provided that to you.  It was
8    the Human Resources Committee, the head of the Risk
9    Assessment -- or not Risk -- Ethics Committee and --
10   Q.    That's Ms. Samuelson -- I mean Summers.
11   Her husband changed his name because he didn't get
12   the Nobel Prize.
13         MS. DEON:  Objection.
14   BY MR. SCHWARTZ:
15   Q.    So Ms. Summers is somebody that you talked
16   to?
17   A.    I'm sorry, what was that?
18   Q.    Ms. Summers is somebody that you talked to,
19   right?
20   A.    I talked to -- she's one of about eight
21   people that were involved -- approximately, eight
22   people, so you have that information; are you asking
23   for that again or...
24   Q.    Okay.  No.  No.  I'm asking -- well, let me

Appendix 1052
StenoSource, LLC    (215)348-1095

THOMAS P. GARVIN

Page 53

1    back up.
2         You put together sort of a chronology of
3    events --
4    A.    Right.
5    Q.    -- that you supplied, right?
6    A.    Correct.
7    Q.    Did you author that yourself?
8    A.    Yeah. They're my notes.
9    Q.    They're your notes. And, typically, do you
10   do that in personnel situations?
11   A.    When I have something that rises to the
12   level that I think that I need to, I -- yeah. I do.
13   Q.    Did anyone help you with those notes?
14   A.    No.
15   Q.    When were those notes, you know, produced,
16   meaning when were they created?
17   A.    Within --
18   Q.    Each day did you put in an entry or each --
19   A.    It depends which notes you're talking
20   about, but I put those notes in, generally, within
21   24 hours of an event.
22   Q.    Okay. And Mr. Bauer took similar notes,
23   correct?
24   A.    He took notes --

Page 54

1    Q.    Notes.
2    A.    Excuse me?
3    Q.    Go ahead.
4    A.    He -- Mr. Bauer took notes on the
5    termination meeting.
6    Q.    Okay. I understand.
7         And did anyone help him with those notes?
8    Do you know?
9    A.    No. They did not.
10   Q.    Did you and he ever discuss what should be
11   in your respective notes?
12   A.    We did not.
13   Q.    You did not. Okay. Can you remember the
14   sum and substance of what the discussions were with
15   the -- you know, the committee and that group that
16   we just talked about?
17   A.    We had distributed -- or I had distributed
18   the letter in advance and had them read it, let them
19   know that we were having discussions about it, and
20   that we needed -- that it was a serious -- felt that
21   it was a serious issue that we needed to convene
22   a -- you know, a Human Resources Committee meeting
23   to discuss the outcome.
24   Q.    And did you advocate anything specifically

Page 55

1    about what should be done?
2    A.    No. We all went into it to make -- to see
3    what the right decision would be, and based on the
4    content of that Tweet, the collective feeling of
5    that entire group, the unanimous decision was that
6    it was conduct that was very unbecoming of the Vice
7    President of Human Resources, very unprofessional,
8    singling out a -- you know, a class of individuals,
9    a protected class, doing a poll at work, putting it
10   out there; the way it came about is exactly the type
11   of thing that you would be concerned about
12   happening, and so the -- yeah, and along with input
13   from where we were from a legal standpoint and the
14   egregious nature of what we felt we were dealing
15   with, the unanimous decision -- and I think that's
16   important -- is, you know, while I realize, you
17   know, I'm the President and CEO and it's my job to
18   manage the organization, we had around eight highly
19   highly educated, very intelligent people take a
20   good, hard look at this and come to a unanimous
21   conclusion that our decision to terminate her was
22   the only avenue that we could go. So while it was
23   not a unilateral decision on my part, I think that's
24   very important for you to understand, it was a

Page 56

1    collective group of very talented and educated
2    professionals who looked at this objectively.
3    Q.    Did you have any concerns that it was an
4    anonymous letter?
5    A.    I don't -- anonymous letters are, by their
6    very nature, anonymous, but the content --
7    Q.    That's true.
8    A.    -- the content of it is what it was really
9    all about, and it was true; the content was true; so
10   I don't care who it came from, the fact is I, in my
11   job, have to deal with that issue. It had nothing
12   to do with -- you know, it's not a personal thing
13   between me and anybody else when I have to deal with
14   it, but I understand my job and my job, as an
15   employer and as the CEO, is to protect my company
16   so, no, I didn't have any concerns about an
17   anonymous letter when the content was accurate.
18   Q.    Ms. Summers is someone who is -- holds
19   herself out as an ethics expert, right?
20   A.    Correct.
21   Q.    Is it ethical, in your opinion, for
22   somebody to author an anonymous letter?
23   A.    I don't really know.
24   Q.    Okay.

14  (Pages 53 to 56)

THOMAS P. GARVIN

Page 57

1   A.    If someone has a concern and they want to
2   put it out there and it's true. It's probably not
3   the first anonymous letter someone ever received.
4   Q.    Is it the first anonymous letter you ever
5   received?
6   A.    I really don't remember.
7   Q.    Well, you'd remember, wouldn't you, if you
8   took personnel action before based on an anonymous
9   letter, wouldn't you?
10  A.    I have been in the working world for
11  27 years, approximately; I don't remember every
12  letter that I ever received and whether it was
13  signed or not.
14  Q.    Okay. Did you ever investigate -- I mean a
15  small part of the letter is really the Tweet; did
16  you ever investigate any of the other statements
17  that were made in the letter?
18  A.    For instance? Can you clarify?
19  Q.    The rest of the text of the letter. Take a
20  look at it.
21        MS. DEON: Where is the letter?
22        THE WITNESS: Can you show me
23        what you're referring to?
24  BY MR. SCHWARTZ:

Page 58

1   Q.    Yes. Here you go (indicating).
2         MS. DEON: For the record, RJ-2.
3   BY MR. SCHWARTZ:
4   Q.    Well, the -- if I may, can you turn to the
5   second page?
6   A.    Sure.
7   Q.    I don't mean to lean over you, but the
8   offensive language or the language you thought was
9   offensive is on -- it's after the first paragraph,
10  right (indicating)?
11  A.    Well, the language --
12  Q.    Correct?
13  A.    -- you said the language that I felt was
14  offensive; the language that the entire Human
15  Resources Committee felt was offensive.
16  Q.    Okay. So you got everybody on the Human
17  Resources Committee to decide -- you talked to
18  everybody on the Human Resources Committee, right?
19  A.    Well, I didn't get everybody on the Human
20  Resources Committee to decide anything. I don't run
21  the Human Resources Committee.
22  Q.    No, but you said everyone on the Human
23  Resources Committee. Did everyone on the Human
24  Resources Committee consider this letter?

Page 59

1   A.    Did everyone on the Human Resources
2   Committee consider this letter?
3   Q.    Yes.
4   A.    Yes. They all had a copy of it.
5   Q.    Okay. So there's this language, which you
6   found in the Tweet (indicating). What about all the
7   rest of the language, did you investigate it?
8         MS. DEON: And, for the record,
9         this language is referring just to the
10        verbiage of --
11        MR. SCHWARTZ: Yes.
12        MS. DEON: -- the Tweet itself?
13        MR. SCHWARTZ: Yes.
14  BY MR. SCHWARTZ:
15  Q.    What about the rest of the letter?
16  A.    Yeah. They had the entire letter.
17        MS. DEON: If you need to look at
18        the letter and read it; he's asking you
19        specifically a question about the letter.
20        Take your time.
21  BY MR. SCHWARTZ:
22  Q.    Yeah. Did you have any concerns or
23  investigate anything else that's raised in the
24  letter?

Page 60

1   A.    I would say we investigated the entire
2   content of the letter, to answer your question.
3   Q.    Okay. Did you find anything the matter
4   with it?
5   A.    I find the whole thing very telling; the
6   letter speaks for itself.
7   Q.    Okay. So you were very concerned about the
8   light that this would put Waverly in; is that
9   correct?
10  A.    No. I was concerned that my Vice President
11  of Human Resources would make a decision to post
12  something so easily linked to our -- to the
13  organization when this -- everything I just
14  described; calling out a protected class of
15  employees, polling employees, a political statement
16  of this nature, and then -- I mean exactly what --
17  you know, what happened here happened, and the
18  position that we felt it would put us -- could put
19  us in for future cases would be very difficult if
20  this became produced as part of evidence, perhaps,
21  somewhere down the road in another case, like the
22  one that your client was accused of in a previous
23  matter.
24  Q.    What's that? What other previous matter

**Appendix 1054**
StenoSource, LLC    (215)348-1095

THOMAS P. GARVIN

Page 61

1  are you talking about?
2      A.    The -- I think it was Marlene or -- I
3  forget the name of the staff member.
4      Q.    Okay.  Well, let's get back to this.  You
5  were concerned for the organization, right?
6      A.    What I just said is I was concerned that
7  it's my job as the president and CEO of Waverly
8  Heights, that I need to make sure that I manage
9  people and that the people that work for us follow
10 proper business standards and conduct themselves in
11 a professional --
12     Q.    We --
13     A.    I'm still finishing the question.
14     Q.    Okay.
15     A.    -- and conduct themselves in a professional
16 manner at all times --
17     Q.    Do you think --
18     A.    -- and that's my job.
19     Q.    -- the Board acted in a professional manner
20 at all times?
21            MS. DEON:  Objection.  With
22        respect to what?
23            THE WITNESS:  With respect --
24        yeah.

Page 62

1  BY MR. SCHWARTZ:
2      Q.    Anything.
3      A.    Can you expand?
4      Q.    Did the Board act professionally all the
5  time in terms of your experience with the Board; did
6  they always act in a professional manner --
7      A.    The Board of --
8      Q.    -- the individual members?
9      A.    Is your question the Board or individual
10 members?
11     Q.    Individual Board members.
12     A.    Who?
13     Q.    Mr. Soltis.
14     A.    So Mr. Soltis, with the e-mails, I would
15 say no, that that was not always professional.
16     Q.    Did you ever say to him hey, tone it back?
17     A.    No.  I did not.
18     Q.    Right.  What about Mr. Bauer, did he send
19 you some of the e-mails, too?
20     A.    I don't -- I don't recall that.  What --
21     Q.    Do you recall --
22            THE COURT REPORTER:  Hold on.
23            MS. DEON:  Excuse me.
24     BY MR. SCHWARTZ:

Page 63

1      Q.    I thought you were finished.  Go ahead.
2            MR. SCHWARTZ:  Relax, Grace.
3      BY MR. SCHWARTZ:
4      Q.    Go ahead.
5      A.    Quite frankly, as it relates to the
6  e-mails; junk e-mails of that nature, that are just
7  loaded with junk that I don't have time to read or
8  care about, whether it's related to a political
9  situation, a -- you know, animals, cats, whatever
10 kind of strange e-mails that people are able to
11 produce and send to me, I have zero time and energy
12 for that; spend no time reading them and delete them
13 right away, so the content of them is not something
14 that -- that I was privy to.
15     Q.    Well, you produced to me, did you not, you
16 know, e-mails that spanned a couple years for Mr.
17 Soltis, correct?
18     A.    Our Director of IT produced -- yeah,
19 produced the e-mails.
20     Q.    Did you review them?
21     A.    I reviewed some of them, yes.
22     Q.    And is that the first time that you ever
23 saw them?
24     A.    I would say that if they -- obviously, some

Page 64

1  with my name on it would have come to my inbox, but
2  the content of which I can almost guarantee you I
3  didn't bother with; I have no time for that.
4      Q.    But you had time for Ms. Jungclaus', right?
5            MS. DEON:  Objection.
6            THE WITNESS:  Was hers --
7      BY MR. SCHWARTZ:
8      Q.    You took the time --
9      A.    -- was --
10            THE COURT REPORTER:  Hold on.
11            MS. DEON:  Excuse me.  Would you
12        like to ask that one person finish?
13            THE COURT REPORTER:  Yes, please.
14     BY MR. SCHWARTZ:
15     Q.    Is it your position that you didn't have
16 time to read some of the Soltis e-mails or any of
17 them, but you had time to look at Ms. Jungclaus'
18 Tweet?
19            MS. DEON:  Objection.
20            THE WITNESS:  So I received an
21        anonymous letter that came to me in the
22        mail, and so I read my mail that comes to
23        me in hard copy.
24     BY MR. SCHWARTZ:

Appendix 1055
StenoSource, LLC   (215)348-1095

THOMAS P. GARVIN

Page 65

1    Q.    Your wife got some of these e-mails, didn't
2    she, or your mother?
3    A.    No.
4    Q.    Your mother.  What's your mother's name?
5    A.    Vail.
6    Q.    Vail.  What's her first name?
7    A.    Vail.
8    Q.    Her first name is Vail and the last name is
9    Garvin?
10   A.    Correct.
11   Q.    Why is she on that list?
12         MS. DEON:  Objection.
13   BY MR. SCHWARTZ:
14   Q.    If you know.
15   A.    Because they had met each other somewhere
16   along the line and Mr. Soltis would send e-mails to
17   like-minded people and they, obviously, had made a
18   connection at some point on that.
19   Q.    So your mom's a like-minded person?
20   A.    It would appear as such.
21   Q.    Did she ever discuss these e-mails with
22   you?
23   A.    No.
24   Q.    Do you know whether Mr. Bauer referred any

Page 66

1    of these e-mails forward to his wife?
2    A.    I'm not sure about that.
3          MR. SCHWARTZ:  Grace, do you have
4          something to say?
5    BY MR. SCHWARTZ:
6    Q.    All right.  Do you know whether Ms.
7    Jungclaus got any of Mr. Soltis' e-mails?
8    A.    I don't know for sure, but I believe that
9    she may have been on the receiving end of some.
10   Q.    Do you know if any of these e-mails from
11   Mr. Soltis were circulated amongst the staff?
12   A.    I do not know that.
13   Q.    Is it possible that Ms. Jungclaus looked at
14   the Soltis e-mails and made a decision that what she
15   was going to text was much less offensive; is that
16   possible?
17         MS. DEON:  Objection.  Calls for
18         speculation.
19   BY MR. SCHWARTZ:
20   Q.    That's all right, you can answer.
21   A.    I'm not her, I don't know.
22   Q.    Is it possible?
23         MS. DEON:  Objection.  Same
24         objection.

Page 67

1          THE WITNESS:  Again, I do not
2    know.
3    BY MR. SCHWARTZ:
4    Q.    Would it be logical for an employee who got
5    that kind of -- those kinds of Soltis e-mails to
6    think that they could do the same thing?
7          MS. DEON:  Objection.  You can
8          answer.
9          THE WITNESS:  One's an employee
10   and one is not, so I think judgment would
11   be -- especially in the Vice President of
12   Human Resources' role, better judgment
13   would be that political activity amongst
14   employees in the workplace is really not a
15   good idea.
16   BY MR. SCHWARTZ:
17   Q.    So then it's your testimony that employees
18   have -- can have better judgment than the Board
19   members, that the Board members are held to a lesser
20   standard?
21         MS. DEON:  Objection.
22         THE WITNESS:  No.
23   BY MR. SCHWARTZ:
24   Q.    That's not your position?

Page 68

1          MS. DEON:  Objection.
2    BY MR. SCHWARTZ:
3    Q.    What's your answer?  I mean are Board
4    members held to a lower standard than employees?
5          MS. DEON:  Same objection.  You
6          can answer.
7          THE WITNESS:  Yeah.  Board
8    members are Board members; employees are
9    employees.  Employees have a -- have to
10   follow our employment rules; all the
11   policies and procedures that you've seen
12   earlier.
13   BY MR. SCHWARTZ:
14   Q.    Is there a Board handbook?
15   A.    Yes.
16   Q.    And you refuse to produce that to us,
17   right?
18         MS. DEON:  Objection.
19         THE WITNESS:  On the advice of
20   Counsel it's not something that is --
21         MS. DEON:  Objection as to advice
22   of Counsel.
23         MR. SCHWARTZ:  Go ahead.
24         MS. DEON:  He can say as to

17  (Pages  65  to  68)

THOMAS P. GARVIN

---

Page 69

1     advice of Counsel, but then he's ending his
2     answer.
3             MR. SCHWARTZ:  Is he?  Well,
4     thank you for ending it for him.
5     BY MR. SCHWARTZ:
6     Q.    What's the handbook say about behavior of
7     Board members when it comes to political matters or
8     hate?
9             MS. DEON:  Objection.
10    BY MR. SCHWARTZ:
11    Q.    Does that Board statement say anything?
12            MS. DEON:  Objection.  He's not
13    going to discuss the content of the Board's
14    manual.
15            MR. SCHWARTZ:  Well, I'm going to
16    ask for it again.
17            MS. DEON:  If you'd like to ask
18    him whether there is anything in the Board
19    manual related to a Social Media Policy you
20    may do that and he may answer if he knows.
21            MR. SCHWARTZ:  That's a good
22    question, but I still want the document,
23    but go ahead.
24            THE WITNESS:  So your question

---

Page 70

1     is?
2     BY MR. SCHWARTZ:
3     Q.    Her question.
4     A.    I'll wait to hear it from you.
5     Q.    Is there anything in the Board manual that
6     deals with a Social Media Policy?
7     A.    I don't believe so.
8     Q.    Okay.  Do you feel that the Soltis e-mails,
9     if you've reviewed them, are harmful to the
10    reputation of Waverly?
11    A.    Like I said, I have not reviewed all the
12    Soltis e-mails.
13    Q.    Have you reviewed some of them?
14    A.    I've glanced at a few since they were
15    requested in discovery.
16    Q.    And it never struck you that it could hurt
17    Waverly's reputation?
18    A.    That was his personal e-mail.
19    Q.    Personal e-mail, but it was sent to e-mail
20    at Waverly e-mail addresses, correct?
21    A.    There were some.  Yes.
22    Q.    Ms. Jungclaus never sent that Tweet to
23    personal Waverly e-mail addresses, did she?
24    A.    Well, I don't think Twitter goes to e-mail.

---

Page 71

1     Q.    Did she forward it to anybody in using any
2     Waverly hardware or software?
3     A.    She had it posted/linked directly to our
4     Waverly Heights' Twitter account under her name and
5     identifying herself as the Vice President of Human
6     Resources.
7     Q.    Did you follow all of the events that led
8     up to the Commonwealth Court decision?  Did you pay
9     some attention to that --
10    A.    Yeah.  Of course.
11    Q.    -- and the unemployment?  You know that
12    that -- the matter of whether it was linked in any
13    way was contested?  Did I agree with you that it was
14    linked?
15    A.    I don't recall what you agreed to or not.
16    Q.    Do you recall what the Commonwealth Court
17    did as far as whether it was linked?
18            MS. DEON:  I'm going to object to
19    the fact the opinion of the Commonwealth
20    Court speaks for itself --
21            MR. SCHWARTZ:  I want to know --
22            MS. DEON:  -- but if you --
23            MR. SCHWARTZ:  -- what he knows,
24    if he knows.

---

Page 72

1             MS. DEON:  Let me finish what I'm
2     saying, Mr. Schwartz.
3             MR. SCHWARTZ:  You're just
4     prolonging things, but go ahead.
5             MS. DEON:  The Commonwealth Court
6     opinion is a writing that speaks for
7     itself, and he can certainly answer to the
8     extent that he recalls what the opinion
9     stated.
10            MR. SCHWARTZ:  That was my
11    question.
12            THE WITNESS:  The main thing I
13    remember clearly was that they -- the
14    opinion was that they called into question
15    the credibility of your client in writing
16    in the document that we received.  She was
17    caught lying in the middle of a hearing
18    there.
19    BY MR. SCHWARTZ:
20    Q.    And that's your understanding of what the
21    court said, that she lied?
22    A.    I said that's the part I could remember.
23    Q.    That's what you can remember.  Do you
24    remember the part that the court reversed what

---

StenoSource, LLC    (215)348-1095

THOMAS P. GARVIN

### Page 73

1   happened below on the denial of the unemployment
2   comp?
3   A.   I --
4   Q.   Do you remember that?
5        MS. DEON: Objection. Let him
6   answer your question.
7        THE WITNESS: What's the
8   question?
9   BY MR. SCHWARTZ:
10  Q.   Did the Commonwealth Court reinstate her
11  benefits?
12  A.   They did.
13  Q.   Were you the one that wanted to appeal --
14  that wanted to appeal her award of benefits?
15       MS. DEON: Objection.
16  BY MR. SCHWARTZ:
17  Q.   Did you make that decision?
18       MS. DEON: Objection.
19       MR. SCHWARTZ: As to what?
20       MS. DEON: To the effect of legal
21  Counsel being involved --
22       MR. SCHWARTZ: No. No.
23       MS. DEON: -- in that litigation
24  and he will not be answering that.

### Page 74

1   BY MR. SCHWARTZ:
2   Q.   Did you support that? Did you support that
3   appeal?
4   A.   I did.
5   Q.   Okay. Thanks.
6        MRS. JUNGCLAUS: He's making
7   faces at me.
8        THE WITNESS: Really?
9        MR. SCHWARTZ: What's the matter?
10       MRS. JUNGCLAUS: He's making
11  faces at me.
12       MR. SCHWARTZ: Please don't.
13  Both of you stop.
14  Grace, restrain your client.
15  Come on, you try to restrain me. Come on,
16  Grace.
17       MRS. JUNGCLAUS: He's making
18  faces at me across the table.
19       MR. SCHWARTZ: Okay. Well, the
20  record will reflect that.
21       MS. DEON: I don't have time for
22  such nonsense.
23       MR. SCHWARTZ: Oh, really?
24       MRS. JUNGCLAUS: Then speak to

### Page 75

1   your client.
2        MR. SCHWARTZ: Then speak to your
3   client. Do you want to take a few minutes,
4   Grace?
5        MS. DEON: Just get on with it.
6        MR. SCHWARTZ: Can you please
7   refrain from the faces?
8        MS. DEON: Mark, this isn't
9   ordinary, just so you know.
10       Go ahead.
11       MRS. JUNGCLAUS: I'm sorry, did
12  you observe that?
13       MS. DEON: Don't speak to him.
14  Let's go.
15       MR. SCHWARTZ: May the record
16  reflect that my client complained about
17  faces being made by this highly compensated
18  executive.
19  BY MR. SCHWARTZ:
20  Q.   Okay. Let's look at KJ-4.
21  A.   Which is what?
22  Q.   It says Open Door Policy.
23  A.   I don't think I have that.
24  Q.   All right. Here's KJ-4 (indicating). Do

### Page 76

1   you see that? Do you see KJ-4?
2   A.   I do.
3   Q.   What's the first page?
4   A.   Open Door Policy.
5   Q.   Okay. It says page 23, is that a part of
6   something?
7   A.   It looks like it's part of our -- it looks
8   like it's probably part of the handbook.
9   Q.   Okay. And then the second page has your
10  signature on it, correct, at the bottom?
11  A.   Are you talking about the Nondiscrimination
12  page?
13  Q.   Yes. The second page.
14  A.   Yes.
15  Q.   And then the third page has your signature
16  on it, correct?
17  A.   The page that says
18  Problem-Solving/Grievances?
19  Q.   Yes.
20  A.   Yes.
21  Q.   And then the fourth page says
22  Problem-Solving/Grievances again and it has your
23  signature, correct?
24  A.   Yes.

19 (Pages 73 to 76)

THOMAS P. GARVIN

Page 77

1    Q.    And then the next one is Sexual Harassment
2    for the subject, correct?
3    A.    Yes.
4    Q.    And your signature is on the bottom of that
5    page, right?
6    A.    Yes.
7    Q.    And then the next page says, at the top,
8    Ethical Standards and Corporate Compliance, and
9    that's page 10 of something; is that the handbook?
10   A.    It appears to be.  Yes.
11   Q.    Okay.  And then there is page 11 of the
12   handbook, correct?
13   A.    Yes.
14   Q.    And then there's page 12 of the handbook,
15   correct?
16   A.    I believe that is all the handbook.
17   Q.    Okay.  Now, what's the significance of your
18   having signed the pages that I referenced?
19   A.    Just approving the policies is why my
20   signature is there.
21   Q.    What was your role in terms of formulating
22   these policies in the handbook?
23   A.    As policies are updated they're brought
24   before our senior management team and then edited.

Page 78

1    We look at them over the course of a number of weeks
2    and then when we make changes -- or when we finalize
3    them, they go for my signature and then they're
4    officially inserted into our policy procedure
5    manuals.
6    Q.    Did you affirmatively make some
7    recommendations that were yours when it came to
8    formulating a policy?
9    A.    I'm sure I made recommendations on
10   policies; I generally do.
11   Q.    Can you recall any of them, any specifics
12   like gee, I really worked hard on blah?
13   A.    No.  It's a group effort really.
14   Q.    Okay.  And who's in the group?
15   A.    The senior --
16   Q.    Who was in the group?
17   A.    -- the senior management team.
18   Q.    Okay.  And who was that at the time that
19   this was formulated?
20   A.    It would have been Kathy, Janet Thompson,
21   Pattie Rodgers, Meredith Feher, Jackie Donnelly; at
22   the time I think it -- I mean what's the date, '11?
23   So probably Colin Gallagher.  In 2011 I don't know
24   if Constance Dogan may or may not have been in the

Page 79

1    position at that time.  Marc Heil, Tom Lynch, Amy
2    Blessing, and I may be forgetting somebody.
3    Q.    Okay.  And that's all with respect to the
4    formulation of the 2014 handbook, correct?
5    A.    Well, it's related to these policies --
6    Q.    Right.
7    A.    -- because what's in this KJ-2 are not only
8    portions of the employee handbook but, also,
9    portions of our policies and procedure manuals.
10   Q.    Right.
11   A.    So, you know, like I said, we review all
12   policies and procedures together as a team, the
13   entire senior management team, the people I
14   listed --
15   Q.    Okay.
16   A.    -- and then that becomes the substance for
17   the employee handbook in a lot of cases.
18   Q.    Is it the case that the employee handbook
19   that would control or be pertinent to these
20   proceedings was the 2014 one?
21        MS. DEON:  Do you mean policies
22        that were in place or procedures that --
23        MR. SCHWARTZ:  No.  The handbook.
24        THE WITNESS:  Say it -- ask your

Page 80

1    question.
2    BY MR. SCHWARTZ:
3    Q.    Is the 2014 handbook the one that applies
4    to employees?  Is that the most current one?
5    A.    Yes.
6    Q.    Okay.  Would you agree with me that it's
7    one thing to have polices and another thing to
8    enforce them?
9    A.    Well, I would certainly agree that it's one
10   thing to have policies and it's one thing to enforce
11   them.  Yeah.
12   Q.    Okay.  So is it possible that people were
13   fearful of going through the policies when it came
14   to reporting on discrimination?
15   A.    People -- define people.  Like --
16   Q.    Employees.
17   A.    -- the senior management team?
18   Q.    Employees.
19   A.    So your question is?
20   Q.    Everybody below you.
21   A.    Rephrase your question for me.
22   Q.    Is there any basis to the allegations that
23   people below you were afraid of bringing
24   discrimination to your attention?

20  (Pages 77 to 80)

THOMAS P. GARVIN

Page 81

1          MS. DEON: Objection. You can
2    answer.
3          THE WITNESS: No. Absolutely
4    not.
5    BY MR. SCHWARTZ:
6    Q.    You dispute all of my client's testimony
7    that you sat through with respect to others being
8    afraid for their jobs?
9    A.    Yes. I do.
10   Q.    Was the guy who washed your car afraid for
11   his job?
12         MS. DEON: Objection. Don't
13   answer that.
14         MR. SCHWARTZ: No, answer it.
15         MS. DEON: Don't answer that.
16   BY MR. SCHWARTZ:
17   Q.    Did someone wash your car who was an
18   employee?
19         THE WITNESS: Can I answer that?
20         MS. DEON: You can answer that.
21         THE WITNESS: So --
22         MS. DEON: Just answer did
23   someone who was an employee wash your car?
24         THE WITNESS: Yes. Occasionally.

Page 82

1    BY MR. SCHWARTZ:
2    Q.    Did you pay them?
3    A.    No.
4    Q.    Is that part of the job benefits that you
5    told me you would produce that the Board gave you?
6    A.    It is.
7    Q.    It is. So free car washes are part of it?
8    A.    Yes. It is.
9    Q.    Okay. Did that employee ever have a -- did
10   he ever complain about washing your car --
11         MS. DEON: Objection.
12   BY MR. SCHWARTZ:
13   Q.    -- to you?
14         MS. DEON: Objection. You said
15   he, I don't know if it's a he or a she.
16   BY MR. SCHWARTZ:
17   Q.    Was it a he or a she?
18   A.    I have no idea.
19   Q.    So you don't know; it could have been a
20   transgender person that washed your car, right? You
21   don't know; is that right?
22   A.    I don't --
23         MS. DEON: Objection.
24         THE WITNESS: -- I don't know.

Page 83

1    BY MR. SCHWARTZ:
2    Q.    Okay. You don't know?
3          MS. DEON: Objection. Don't
4    respond to those ridiculous questions.
5    BY MR. SCHWARTZ:
6    Q.    So you don't know the sex of the person who
7    washed your car?
8    A.    No. I have no reason to.
9    Q.    Do you ever take your car to a private car
10   wash where you pay for it?
11   A.    Again, part of the benefit of the job is
12   that it's a company car that they take care of, and
13   it's -- the reason they wash it is because they can
14   use it for residents at any given time, and it's a
15   Waverly vehicle; it's been done for 32 years.
16   Q.    How often is your car used for residents?
17   A.    I'm not sure.
18   Q.    Well, it's your car?
19   A.    It's the company's car.
20   Q.    But don't you use the car?
21   A.    I do use --
22   Q.    Aren't you the primary user of the car?
23   A.    I am.
24   Q.    Okay. When is the last time somebody said

Page 84

1    hey, we need your car to take Ms. Summers to the
2    doctor? When is the last time that happened?
3    A.    Well, let me think. I drove -- I don't
4    recall the exact amount, but I drive --
5          MS. DEON: The question was last
6    time Ms. Summers --
7          THE WITNESS: Oh, Ms. Summers.
8          MS. DEON: -- had to go to a
9    doctor and they used your car; that was the
10   question.
11         THE WITNESS: Oh, okay. Yeah, I
12   don't recall that.
13   BY MR. SCHWARTZ:
14   Q.    Don't recall. Do you recall your car ever
15   being used to take residents to the doctor?
16   A.    I don't recall.
17         MR. SCHWARTZ: This would be TG-2
18   (indicating).
19         (At this time, a document was
20   marked for identification as TG-2.)
21   BY MR. SCHWARTZ:
22   Q.    Can you tell me what this document is?
23   A.    It appears to be -- yeah, this is an old
24   Mission Statement and Statement of Purposes.

Appendix 1060
StenoSource, LLC    (215)348-1095

THOMAS P. GARVIN

Page 85

1   Q.    Do you know what Mission Statement would
2   have been in effect during Ms. Jungclaus' final
3   days?
4   A.    It would have been the one in our Strategic
5   Plan that was dated 2012 to 2018.
6   Q.    Okay. Well, regardless of whether this is
7   the latest one, can we just read certain parts of
8   it?
9         Waverly Heights, Ltd. is a nonprofit
10  corporation established to provide quality life care
11  services to its residents. Is that what it says?
12  A.    It is.
13  Q.    Its purpose is to serve the physical,
14  emotional, recreational, social, religious and
15  health needs of the Waverly Heights' population in a
16  professional and caring manner. Is that
17  appropriate?
18  A.    That's what it says.
19  Q.    Right. These services are to be provided
20  efficiently and economically within a financially
21  stable organization. Is that what it says?
22  A.    Yes.
23  Q.    Do you agree with that Mission Statement?
24  A.    I do.

Page 86

1   Q.    How is it consistent with efficiency and
2   being economical and being a nonprofit for you to be
3   paid for draperies; how is that?
4         MS. DEON:  Objection. You can
5   answer if you understand what he's getting
6   at.
7         THE WITNESS:  Okay. Well, again,
8   that was part of the offer of me coming
9   there, was that that was all included as
10  part of the recruitment package.
11  BY MR. SCHWARTZ:
12  Q.    Okay. And you'll supply that to us.
13        What about the catering that you used off
14  site? You did use catering off site, correct?
15  A.    Correct, which I did pay for and...
16  Q.    So that wasn't part of the package, right?
17  A.    No. I paid -- I hired our catering
18  department and paid for it.
19  Q.    All right. Can anyone do that, to hire
20  them and do it off site?
21  A.    Sure.
22  Q.    Anyone can?
23  A.    I wouldn't have an issue with it. We've
24  let people borrow some of our catering materials at

Page 87

1   no cost, but I --
2   Q.    How many -- go ahead. I'm sorry.
3   A.    -- but I paid for it.
4   Q.    How many people have ever asked to hire
5   Waverly employees for catering of an off-site
6   function?
7   A.    I have no idea.
8   Q.    Any?
9   A.    I have no idea.
10  Q.    Is it more than five?
11  A.    I have no idea.
12  Q.    Could it be zero?
13        MS. DEON:  Asked and answered.
14        THE WITNESS:  I really don't
15  know.
16  BY MR. SCHWARTZ:
17  Q.    Well, if I call tomorrow and say hey, I
18  want to have the Schwartz Bar Mitzvah in Doylestown,
19  would your catering facilities be available?
20  A.    Are you going to pay for it?
21  Q.    Yeah.
22  A.    We very likely might make that happen for
23  you.
24        MS. DEON:  Wait a minute.

Page 88

1   BY MR. SCHWARTZ:
2   Q.    And you would call up --
3         MS. DEON:  Let me just
4   understand. You're saying you, a
5   nonemployee?
6         MR. SCHWARTZ:  Yeah. The
7   Schwartz Bar Mitzvah.
8         MS. DEON:  And a nonresident of
9   Waverly?
10        MR. SCHWARTZ:  Right. Right. I
11  had a relative who was a resident but, no,
12  we're not talking about that.
13  BY MR. SCHWARTZ:
14  Q.    Okay. So you did a big addition recently
15  with an architecture firm, correct?
16  A.    We did.
17  Q.    Big construction. And what was the name of
18  the architecture firm?
19  A.    RLPS.
20  Q.    Right. And you ended up buying a house
21  from one of the principals, right?
22  A.    It's a duplex. Yes.
23  Q.    Okay. A house is a duplex, right? Or a
24  duplex is a house, right?

22  (Pages 85 to 88)

THOMAS P. GARVIN

Page 89

1   A.     You can call it whatever you want, it's a
2   duplex.
3   Q.     Okay. Great.
4          Given the Mission Statement that we talked
5   about, do you have any problems doing that; anything
6   bother you about that?
7   A.     No.
8   Q.     Okay. What was efficient and economical
9   about your being provided with a stipend for health
10  insurance when you didn't need it?
11         MS. DEON: Objection. You can
12         answer.
13         THE WITNESS: Well, what was said
14         was not accurate. You either have a
15         stipend or you have health insurance, you
16         don't have both, and I never had both.
17  BY MR. SCHWARTZ:
18  Q.     Well -- so you contest the testimony that
19  you sat through with respect to Ms. Jungclaus as far
20  as you're still being paid a stipend even when
21  you're on the Waverly health plan?
22  A.     Yeah. She lied about that.
23  Q.     She lied about that?
24  A.     Yes.

Page 90

1   Q.     So what was false about that?
2   A.     I didn't receive a stipend at the same time
3   that I was on the Waverly healthcare plan.
4   Q.     Is it your position that the stipend
5   continued, but it was just called something else?
6   A.     No.
7   Q.     When did you stop receiving the $25,000.00
8   stipend?
9   A.     I don't think it was ever 25,000.
10  Q.     How much was it?
11  A.     I think it started at 20, when I was hired,
12  and grew to maybe around 23, 23.5, and then at some
13  point the Board decided that they wanted to treat me
14  like every other employee with the same benefit
15  level and not have this arrangement.
16  Q.     So was your pay cut then?
17  A.     No. They rolled that into my salary as
18  part of an increase.
19  Q.     So it was sort of like taking the car away
20  from Bob Supper, but then giving him money, right?
21  A.     I think it's very different than that.
22  Q.     Why is it so different?
23  A.     Well, it's different because the Bob Supper
24  scenario related to his son getting in trouble with

Page 91

1   the car and us taking it away to avoid liability,
2   whereas the situation with me was the Board trying
3   to get my compensation the way that they wanted it.
4   Q.     Okay. The third thing under Statement of
5   Purposes says to provide opportunities for residents
6   to communicate with the Board, management, and
7   staff, and to address resident concerns promptly and
8   in a positive manner, correct? Is that what it
9   says?
10  A.     Yes.
11  Q.     Were residents able to freely communicate
12  with the Board?
13  A.     Yes.
14  Q.     Was staff -- I know it doesn't say that --
15  was staff freely able to communicate with the Board?
16  A.     Sure, certain staff especially.
17  Q.     Which ones?
18  A.     Well, we had resident trustees, so staff
19  would interact with them all the time, and then each
20  one of the senior managers who had a committee were
21  directed often to talk to them. In fact every time
22  that we had one of the meetings coming up I would
23  instruct them to make sure to speak with their Board
24  committee Chair to formulate the agenda and, you

Page 92

1   know, get ready for whatever topics we wanted to
2   cover, so there was terrific access for everybody;
3   still is.
4   Q.     All right. To provide the -- 4, to provide
5   the means whereby residents and employees
6   participate in decisions that affect them. Do you
7   see that?
8   A.     I do.
9   Q.     And is it your position that you do provide
10  the means whereby residents and employees can
11  participate in decisions that affect them?
12  A.     Yes.
13  Q.     What participation was Ms. Jungclaus
14  allowed when it came to the decision to fire her;
15  what participation did she have in terms of
16  participating in decisions that affected her?
17  A.     I don't think No. 4 is tied to decisions --
18  employment-related decisions.
19  Q.     It says to provide the means whereby
20  residents and employees participate in decisions
21  that affect them.
22  A.     Uh-huh.
23  Q.     What participation did Ms. Jungclaus have
24  in the decision to fire her?

23  (Pages 89 to 92)

THOMAS P. GARVIN

Page 93

1    A.    Again, I don't believe that No. 4 is tied
2    to employment-related decisions.
3    Q.    All right. You heard your Counsel's
4    questioning of my client yesterday about telling you
5    things that you didn't want to hear; do you remember
6    that?
7    A.    Vaguely.
8    Q.    Okay. Did you consider it part of Ms.
9    Jungclaus' job responsibilities to tell you things
10   you didn't want to hear?
11   A.    Ms. Jungclaus would communicate to me on a
12   regular basis, oftentimes first thing in the
13   morning, upon my arrival, so she'd tell me things;
14   there's not really anything I don't want to hear as
15   it relates to the -- you know, the employees at
16   Waverly Heights. So she certainly shared with me
17   good, bad, whatever was going on, so I wouldn't term
18   anything things I didn't want to hear.
19   Q.    Did you ever say to her, I don't want to
20   hear this?
21   A.    No.
22   Q.    Do you know of any other employees that
23   were afraid of telling you things that they
24   didn't -- that they were afraid you wouldn't want to

Page 94

1    hear?
2    A.    No. That's not the relationship I have
3    with the staff.
4    Q.    I want to ask you this question and,
5    perhaps, it's repetitive, and remind you that you're
6    under oath. I'm not anxious to depose Ms. Summers
7    unless I have to. Can you honestly tell me that you
8    don't know that she wrote that letter?
9    A.    I can honestly tell you that I don't know
10   that she wrote that letter. I have no idea who
11   wrote the letter.
12   Q.    Okay. And you didn't find any of that
13   letter, the verbiage, similar to what Ms. Jungclaus
14   testified to in terms of how Ms. Summers would
15   speak?
16   A.    She claimed to have a private conversation
17   with her that was verbatim to what was in that
18   letter; I was not privy to that conversation.
19   Q.    Did you have a lot of conversations with
20   her about her family and ethics and whatever?
21   A.    With Anita Summers?
22   Q.    Yes.
23   A.    Yes.
24   Q.    And can you tell me that this letter is not

Page 95

1    in her speaking style?
2    A.    I really have no idea. I don't know that
3    that's for me to decide.
4    Q.    Okay. So what official action was taken
5    then with respect to the Board in terms of my
6    client's firing; what was it? Was there a
7    resolution of the whole Board? What was it?
8    A.    No. It was not the whole Board, it was the
9    Human Resources Committee of the Board.
10   Q.    And did they have a formal vote?
11   A.    I don't know if it was a formal vote, but a
12   unanimous decision was reached on that Monday that
13   we only had one option.
14   Q.    Was it by a conference -- via conference
15   call?
16   A.    Yes.
17   Q.    And was everyone there on the conference
18   call?
19   A.    Those that weren't there I spoke to
20   separately, so... but I think -- say six of the
21   eight members were there, approximately.
22   Q.    And were there minutes of that meeting?
23   A.    No.
24   Q.    Is that common that there are not minutes

Page 96

1    of the Board meetings or committee meetings?
2    A.    The normally scheduled committee and Board
3    meetings there are; this was a conference call.
4    Q.    Was it recorded?
5    A.    No.
6          MR. SCHWARTZ: Off the record.
7          (At this time, a discussion was
8    held off the record.)
9    BY MR. SCHWARTZ:
10   Q.    Ms. Deon just handed me what was KJ
11   Exhibit-3 that includes a thing called Charge of
12   Discrimination. Do you recall her, in late morning,
13   asking my client about this?
14         MS. DEON: Page 53?
15         MR. SCHWARTZ: Yes.
16         THE WITNESS: Yes.
17   BY MR. SCHWARTZ:
18   Q.    When is the first time you saw that?
19   A.    I can't say that I know the first time that
20   I saw it.
21   Q.    But you did see it at some point?
22   A.    At some point.
23   Q.    Do you know who brought it to your
24   attention?

24  (Pages 93 to 96)

THOMAS P. GARVIN

## Page 97

1    A.    Probably Counsel.
2          MR. SCHWARTZ:  This would be TG-3
3    (indicating).
4          (At this time, e-mails were
5    marked for identification as TG-3.)
6    BY MR. SCHWARTZ:
7    Q.    Can you take a few minutes to go through
8    this?
9    A.    (At this time, the witness complies with
10   request.)
11         Okay.
12   Q.    Let's start at the back.  And, again, I
13   apologize --
14   A.    All right.
15   Q.    -- because it starts with 0892 in the back
16   and then you end up in the front with 0919, so
17   it's -- the pages are correct according to what you
18   gave me, but this must have been subject to late
19   night shuffling.
20         On page 0892, what is that?
21   A.    That appears to be a map of the campus.
22   Q.    Okay.  Turning to page 0893, Tom Garvin --
23   it's a memo from Tom Garvin to Dick Bauer regarding
24   External, and you say okay, we can finalize when we

## Page 98

1    talk tomorrow.  I think we can aim to set up the
2    call for 10:30 Monday morning, if possible.
3    Hopefully, you can connect with Anita before we talk
4    tomorrow so we can get her on board before I send
5    the invitation for a call to the HR Committee.  The
6    conference ends at noon tomorrow, so I'll call you
7    by 12:30.  Also, I expect to have the bullet point
8    e-mail from our attorney by the end of the day
9    tomorrow.
10         So was this the -- what does External mean?
11   A.    We have all e-mails that come from outside
12   of Waverly Heights marked External in case there's a
13   spam or something that -- a phishing, with a P,
14   expedition, we mark them so that employees know it's
15   coming from outside and not inside the organization.
16   Q.    So your e-mail came from outside of the
17   organization?  It's from you to Mr. Bauer.
18   A.    That's why they're marked External, so I'm
19   not sure.  Perhaps, because I was off site and I
20   wasn't on the -- it came from my laptop while I was
21   at a conference so that it -- perhaps, because I was
22   remoting in that it marked it External, because
23   e-mails within the organization don't have that.
24   Q.    Okay.  So did you talk to Mr. Bauer prior

## Page 99

1    to this e-mail about my client?
2    A.    Yes.
3    Q.    Okay.  And, again, is this all about the
4    procedural steps with respect to the termination of
5    my client?
6    A.    I think it actually outlines exactly what I
7    testified to earlier and shows you exactly what I
8    said.
9    Q.    Okay.  Well, I was asking you then about
10   discussions; now let's look at the paper trail.
11         All right.  And then the next one is
12   earlier, it's at 3:04 and it's from Mr. Bauer,
13   right?
14   A.    Yes.
15   Q.    And it's to you and it carries that subject
16   External, correct?
17   A.    Correct.
18   Q.    All right.  Hi again.  I really like your
19   approach to moving this forward and the Board
20   tactics are superb in my view.  Is that what it
21   starts by saying?
22   A.    That's the first sentence, yes.
23   Q.    Right.  And did I correctly read what your
24   e-mail to him said?

## Page 100

1    A.    I don't think you read my entire e-mail.
2    Q.    Okay.  Well, whatever.  Okay.  You don't
3    contest the fact that that's your e-mail, right?
4    A.    Yeah.  The one at the top is mine.
5    Q.    And the one at the top is a response to the
6    one to him at the bottom, right?
7    A.    That's correct.
8    Q.    Okay.  So had you discussed moving forward
9    and Board tactics with him before he wrote to you on
10   September 22nd and 3:04?
11   A.    We had discussed how we were going to
12   proceed at that point.
13   Q.    Okay.  What did you say -- you see in the
14   final paragraph:  You might want to think about the
15   possibility of my saying something to the HR
16   Committee and, perhaps, the Board later about your
17   comments to me earlier this year regarding the
18   individual in question.  What's that all about?
19   A.    In, I think it was early, 2016, it might
20   have been the end of 2017 (sic), we had a situation
21   where Kathy was unhappy with her -- how much she was
22   being paid, and so I had filled him in on that at
23   the time to make sure that he was aware that we had
24   that going on.

THOMAS P. GARVIN

Page 101

1    Q.    All right. And then let's go to 0894. I
2    guess I should probably start at the bottom one. So
3    the bottom one is from -- and I guess -- am I
4    correct in guessing that once you were away, that
5    this External thing just carried?
6    A.    Yeah, that just -- yes. Exactly. And
7    every time -- generally, every time there's a
8    return -- this was pretty early on when we started
9    using that, so it might even add to it, but it has
10   nothing to do with this. There's basically no
11   subject on this, it's just an IT acknowledgement
12   that it's coming from off campus.
13   Q.    And so would Content?
14   A.    Yeah. That's, I think -- again, that's
15   what we used to use when we were just getting
16   started.
17   Q.    All right. I sent -- the bottom; Mr. Bauer
18   starts, does it not, by saying I sent Anita an
19   e-mail last night indicating I would call her this
20   morning, correct?
21   A.    That's what it says.
22   Q.    And then it says I have not read the policy
23   information that you sent yet. What was that?
24   What's he talking about there?

Page 102

1    A.    I -- you know, I'm not 100 percent sure, I
2    would have to look, but I think it's all the
3    policies related to this issue that we were dealing
4    with, which I think you have exhibits that are most
5    of what they -- what they were, and I forget what...
6    Q.    Okay. Is that the Social Media Policy?
7    A.    It very well may have been included in
8    that. I think there was quite a few.
9    Q.    And then you say above, Friday
10   September 23rd, 2016, 9:14 a.m. you reply to him,
11   right?
12   A.    Yes. That's a reply to Dick.
13   Q.    Okay. And you say: I'm figuring that we
14   should probably send a letter and the attorney's
15   review just prior to the call. Without telling me
16   what was in it, did Ms. Deon prepare a review that
17   you shared with the Board?
18   A.    You know, I think what that's referring to
19   is the letter itself, the exhibit -- whatever
20   exhibit it was, it's the actual anonymous letter,
21   because we wanted to share that with them and give
22   them time to review it before the call, so... And I
23   think I had bullet points from our attorney just on,
24   you know, the issues at hand.

Page 103

1    Q.    But this says send the letter and the
2    attorney's review, so it's something more than the
3    letter, right, that was being sent?
4    A.    Yeah. That's what I just said, in addition
5    the attorney's bullet points on kind of what the
6    crux of the issues were.
7    Q.    Oh, okay. So without telling me, she had
8    prepared some bullet points, correct?
9    A.    That's what I recall.
10   Q.    Okay. Then let's go to 0896. That's from
11   you to Bauer, Mahoney, Bragg, Davis, Fleischer,
12   Kathleen McEndy, Charles Soltis; cc Anita Summers.
13   Who are the folks in the To caption after To, colon?
14   A.    So they're Board members who made up the
15   Human Resources Committee.
16   Q.    Okay. And cc Anita Summers, why was she
17   getting this?
18   A.    Because we had made the decision that as
19   the Chairwoman of the Ethics Committee, that she
20   should be involved in this because of the ethical
21   issues.
22   Q.    Are you sure that you didn't cc her on this
23   because she authored the anonymous letter?
24         MS. DEON: Objection. You can

Page 104

1    answer.
2         THE WITNESS: I told you I do not
3    believe nor do I have any knowledge that
4    she was the author of that letter.
5    BY MR. SCHWARTZ:
6    Q.    All right.
7    A.    She was copied because she's the
8    Chairperson of the Ethics Committee. Oh, it even
9    says that.
10   Q.    Where does it say that? It says cc.
11   A.    Second paragraph. Also, Dick and I feel
12   that the nature of the issues warrant including
13   Anita as Chair of our Ethics Committee.
14   Q.    Why did you think it needed to involve the
15   Ethics Committee? Didn't this committee have enough
16   power to do what it was going to do?
17   A.    Just good -- good practice. The more minds
18   looking at this because of the serious nature of the
19   offense.
20   Q.    Does the Ethics Committee have any bylaws
21   or procedures, anything like that?
22   A.    They have a -- it's part of our corporate
23   or Board Policy Manual.
24   Q.    So that's part of the Board Policy Manual?

26 (Pages 101 to 104)

THOMAS P. GARVIN

Page 105

1    A.    (Witness nods head.)

2    Q.    Does the Ethics Committee have any -- is

3    there anything in that Board Policy Manual about

4    conducting investigations?

5    A.    I'm not sure.

6    Q.    Anything in the Board Policy Manual with

7    respect to treatment of anonymous letters?

8    A.    Again, I'm not sure.  I don't have it in

9    front of me.

10   Q.    Okay.  Nor do I.

11         0897.

12   A.    Uh-huh.

13   Q.    It's an e-mail dated September 25th at 4:42

14   from you to Mr. Bauer, et al., correct?

15   A.    Well, it's to the entire Human Resources

16   Committee with a copy to the head of the Ethics

17   Committee, if I'm not mistaken.

18   Q.    And is that the same group of people as we

19   just -- as I just talked about with respect to your

20   September 25th e-mail?  Is it the same folks?

21   A.    Yeah.  It looks like it is.

22   Q.    Okay.  Why do all of their e-mail addresses

23   show up on this and not the other stuff?

24   A.    You know why I believe, is that we --

Page 106

1    somewhere around this time we had created/given the

2    Board Waverly Heights' e-mail addresses, but they

3    were not consistently being used, so sometimes --

4    the other e-mails are probably their personal e-mail

5    addresses.  I don't know, it's just the way Outlook

6    converts it.

7    Q.    And am I correct that Ms. Summers continued

8    to use her Wharton U Penn e-mail?

9    A.    Generally, yes.  I mean most of our

10   trustees use their -- you know, their personal

11   e-mail, not the Waverly Heights' e-mail.

12   Q.    But she's not at Wharton or U Penn and

13   hasn't been for a long time, has she?

14   A.    I believe she's an emeritus professor --

15   Q.    Right.

16   A.    -- there.

17   Q.    Right.  Okay.  At the end -- well, you

18   start by saying we have an urgent need to have a

19   confidential conference call, and you put that in

20   caps, right?

21   A.    Yes.

22   Q.    And then at the end you say please keep

23   this call confidential, correct?

24   A.    That's correct.

Page 107

1    Q.    Was confidentiality throughout this process

2    maintained?

3    A.    Related to the call; yeah, absolutely, as

4    far as I know.

5    Q.    And as far as you know was confidentiality

6    maintained with respect to why my client was fired?

7          MS. DEON:  Objection.  You can

8    answer.

9          THE WITNESS:  Yeah.  As --

10   BY MR. SCHWARTZ:

11   Q.    If you know.

12   A.    -- as far as I know --

13         MS. DEON:  As to whom?

14         THE WITNESS:  Yeah.  I mean -- as

15   to whom; as to me?

16   BY MR. SCHWARTZ:

17   Q.    As to anyone that would be on this e-mail,

18   do you have any reason to believe that they breached

19   your request for confidentiality?

20   A.    No.  I don't have any reason to believe

21   they did.

22   Q.    Do you have any knowledge of things leaking

23   out as far as my client's termination?

24   A.    No.

Page 108

1    Q.    Then at the bottom it says 0898; we have

2    your e-mail saying we're ready for the call, and Mr.

3    Bauer, two minutes before the call, says I have a

4    feeling that you are having a challenging morning.

5    Let me know how you are doing when you can.  Thanks.

6    Why did he say that?

7    A.    You'd have to ask him that question.

8    Q.    Well, I will, but why do you think he said

9    that?

10         MS. DEON:  Objection.  You can

11   answer.

12         THE WITNESS:  You know, I would

13   assume it's because of the issue I was

14   dealing with was a very difficult one; one

15   that didn't make me very happy to have to

16   make.

17   BY MR. SCHWARTZ:

18   Q.    Well, you were aware you had alternatives,

19   didn't you?

20   A.    I really didn't have any alternative.

21   Q.    You couldn't have done the progressive

22   discipline?

23   A.    The will of the Human Resources Committee

24   was -- was to terminate her.

27 (Pages 105 to 108)

THOMAS P. GARVIN

Page 109

1    Q.    Who advocated termination to the Committee;
2    you?
3    A.    It was a -- the HR Committee's decision.  I
4    didn't advocate one way or the other.  We went into
5    it, as you can see by what's written here, sort of
6    open-minded, but with a very serious issue.
7    Q.    So you didn't have -- without getting into
8    what your lawyer's decision was -- you didn't have a
9    position on whether she should be fired or not when
10   you were sending these e-mails?
11   A.    I felt that it could very well end up that
12   way.
13   Q.    Okay.  Is it fair to say that you're closer
14   to Mr. Bauer than anybody else on the Board?
15   A.    I'm close to -- whoever is the Board Chair
16   at that moment I tend to be close with.  I'm close
17   with Dick, he's been the Board Chair for three
18   years.
19   Q.    Okay.  0899 it's from -- well, let's go to
20   the bottom first.  2:29 from Anita Summers and the
21   subject is Quick Thought, and it says Tom, you are
22   such a wondrous CEO.  Quick Thought:  Should you
23   freeze her Waverly e-mail address and look over
24   recent mail?  Anita.  Is that what she says?

Page 110

1    A.    That's what's written on this e-mail.  Yes.
2    Q.    Yeah.  Did you have a discussion with her,
3    aside from the e-mail, about freezing my client's
4    Waverly e-mail address and looking over her e-mail?
5    A.    Not that I recall, just my e-mail response
6    which is on the top of this page.
7    Q.    Right.  Okay.  Did you end up freezing her
8    Waverly e-mail address?
9    A.    Yes.
10   Q.    And did you look through her recent mail?
11   A.    We did.
12   Q.    And was this pursuant to Anita's suggestion
13   or did you have this idea on your own?
14   A.    No.  We would do that for anybody in that
15   position.
16   Q.    Do you feel that -- this might be a bad
17   term to use -- do you feel that Ms. Summers had a
18   hard-on for Ms. Jungclaus?
19         MS. DEON:  Objection.
20   BY MR. SCHWARTZ:
21   Q.    That she was out to get her?
22   A.    Which question do you want me to answer
23   here?
24   Q.    Do you feel that Anita Summers didn't like

Page 111

1    Ms. Jungclaus?
2    A.    I really don't know.
3    Q.    Ms. Summers ever express problems between
4    her and Ms. Jungclaus prior to this whole Twitter
5    situation?
6    A.    Not that I recall.
7    Q.    So she never said she had any problems with
8    Kathy?
9    A.    No.  And, believe me, she would tell me if
10   she did.
11   Q.    Well, she'll get that opportunity.
12         Then you say -- and what do you think
13   motivated this e-mail?  Was it your prior e-mail
14   that said we're going to be scheduling this and she
15   said you are so wondrous?  I mean what motivated
16   this response?  Do you know?
17   A.    I think it's in response to one of these
18   previous e-mails.
19   Q.    Right.  Was she a big fan of yours?
20         MS. DEON:  Objection.
21         THE WITNESS:  I think her
22   comments speak for themselves.
23   BY MR. SCHWARTZ:
24   Q.    Okay.  And you said 10 minutes -- 20

Page 112

1    minutes later -- 30 minutes later:  Thank you so
2    much, Anita.  I appreciate your support.  And then
3    you agree that you'll pull her e-mail and freeze
4    everything the minute she is released.  Dick is
5    coming tomorrow afternoon to be with me when I
6    terminate her employer (sic).
7    A.    I'm sorry, where are you at now?
8    A.    I'm reading the second paragraph.
9         MS. DEON:  Just wait for a
10   question.
11   BY MR. SCHWARTZ:
12   Q.    Okay.  Let me just read the second
13   paragraph because I stumbled.  I will definitely
14   pull her e-mail and freeze everything the minute she
15   is released.  Dick is coming tomorrow afternoon to
16   be with me when I terminate her employer --
17   employment.  At that point her access to everything
18   will be cut off.  And then you said it should be an
19   interesting day, correct?
20   A.    Yes.  That's what it says.
21   Q.    Why was Dick coming tomorrow afternoon to
22   be with you?
23   A.    Well, he came to be a witness, if you will,
24   to the termination.

28  (Pages 109 to 112)

THOMAS P. GARVIN

Page 113

1   Q.    Oh, okay.  You didn't need him to be there
2   for any reason, right?
3             MS. DEON:  Objection.  He just
4         said he was there to be a witness.
5   BY MR. SCHWARTZ:
6   Q.    Did you ask him to come to be a witness?
7   A.    Yes.
8   Q.    There's no Board policy, is there, that a
9   member of the Board has to be present when you fire
10  an employee?
11  A.    No.  There's no Board policy that says
12  that, but when it's a member of the, you know,
13  senior management team and especially when it
14  involves the Vice President of Human Resources,
15  there's not a whole lot of alternative.
16  Q.    Did you ever give it any thought to having
17  a woman in the room?
18  A.    Well, the Chairman of the Board made the
19  most sense to me.
20  Q.    Did you ever think about having a woman in
21  the room?
22  A.    The Chairman of the Board made the most
23  sense to me.
24  Q.    Okay.  Did you consider having a woman in

Page 114

1   the room?
2             MS. DEON:  Objection.  Asked and
3         answered.
4             MR. SCHWARTZ:  No.  It isn't.
5   BY MR. SCHWARTZ:
6   Q.    Did you consider -- did it ever cross your
7   mind, maybe I should have a female in the room?  Did
8   it cross your mind or didn't it?
9   A.    Gender wasn't -- was not a deciding factor
10  on who was going to be in the room, I invited the
11  Chairman of the Board.
12  Q.    Okay.  Then you go to Waverly 0900.  Who's
13  Eleanor Davis?
14  A.    A Board member.
15  Q.    What committee is she on?
16  A.    Well, definitely the Human Resources, I'm
17  not sure what other ones she's on.
18  Q.    Okay.  And then you put out at 3:02 on the
19  top, that I want to let you know that everybody on
20  the Committee call was in agreement that Kathy
21  Jungclaus should be terminated, correct?
22  A.    That's correct.  That's what it says.
23  Q.    We will offer her the opportunity to resign
24  with a severance agreement put in place.  Did you do

Page 115

1   that?
2   A.    We did.
3   Q.    And the severance agreement -- was part of
4   the severance agreement -- did the severance
5   agreement include any language that she would have
6   to keep matters confidential?
7   A.    You know, I don't have it in front of me,
8   but I know, typically, they do.  It was a generous
9   severance agreement.
10  Q.    How much was it?
11  A.    You know, I think it was six months of
12  salary plus a payout of her PTO, plus continuing her
13  healthcare, a good reference for future employment,
14  and probably non-contest of her unemployment.  You
15  know, I'd have to see it to get it exactly, but I
16  believe that was the gist of it.
17  Q.    Okay.  Let's see, 0901.  In that
18  September 25th, 2016, 4:59 p.m. is when you wrote to
19  the -- let me back up.  Let's go to 0900, I'm sorry.
20  Go to the back page of that.  Okay.  We did deal
21  with that.  Let's go to 0901.  This is where you say
22  to the HR Committee on September 25th at 4:59, I
23  received the attached anonymous letter last week
24  regarding the conduct of Kathy Jungclaus with

Page 116

1   respect to her personal Twitter account.  The
2   content of the letter is the subject of our upcoming
3   confidential conference call.  And then, you know,
4   it then goes on to say that you've asked one of the
5   labor attorneys to review the situation and that our
6   attorney is summarizing legal issues in the e-mail
7   included below.  Is the labor relations attorney Ms.
8   Deon?
9   A.    Yes.
10  Q.    Okay.  So she is synonymous with the quote
11  our attorney; you didn't have other attorneys?
12  A.    That's correct.
13  Q.    Okay.  Let's go to 0903, and then 0904 is
14  September 27th at 5:29 p.m., and you sent that to
15  the Committee again and Ms. Summers, correct?
16  A.    Yes.
17  Q.    And you were basically saying -- giving
18  them an update, and you said she was asked -- she
19  was -- I met with her late this afternoon and
20  informed her that she was being asked to resign
21  effective immediately.  It went about as well as you
22  could expect, but the end result is that she is no
23  longer an employee of Waverly Heights.  I'll send
24  notice to the full Board within the next 24 hours.

Appendix 1068
StenoSource, LLC   (215)348-1095

THOMAS P. GARVIN

Page 117

1    You wrote that, right?
2    A.    Yes.
3    Q.    Okay. What did you mean by saying it went
4    about as well as you would expect?
5    A.    Well, whenever someone is terminated you
6    don't expect it to be an easy thing and it was not.
7    Q.    Did you mean the -- it could have -- would
8    it have been better if she had -- in terms of your
9    view, would it have been better if she had signed
10   the separation agreement and resigned?
11   A.    Well, that wouldn't have been in -- you
12   know, in play at this point.
13         (At this time, a short break was
14   taken.)
15   BY MR. SCHWARTZ:
16   Q.    Okay. 0905 is an e-mail from Eleanor
17   Davis, correct?
18   A.    Yes.
19   Q.    And who is she? What committee is she on?
20   A.    She's a member of the Board of Trustees and
21   is on the Human Resources Committee.
22   Q.    Okay. And then on page 0906 is an e-mail
23   from Ed Mahoney; who is he?
24   A.    A Board member and a member of the Human

Page 118

1    Resources Committee.
2    Q.    Okay. 0907 is an e-mail from Dick Bauer to
3    you, G. Bragg; who he? Who's he?
4    A.    Gerry Bragg's a Board member and a member
5    of the Human Resources Committee.
6    Q.    And who's E. Davis?
7    A.    That's Eleanor Davis.
8    Q.    The rest of these people are all Human
9    Resources Committee people?
10   A.    That is correct.
11   Q.    And Mr. Soltis, is he on the Human
12   Resources Committee?
13   A.    Yes.
14   Q.    Are any of these people sort of like ex
15   officio, like the Board Chair's on all the
16   committees? Do you have that?
17   A.    Yeah. The Board Chair is a member of all
18   committees ex officio, and the Board Chair is
19   automatically the Chair of the Human Resources
20   Committee.
21   Q.    Okay. So that was Mr. Bauer acting in that
22   capacity?
23   A.    Correct.
24   Q.    It says Tom and I -- second sentence -- oh,

Page 119

1    no. Third sentence of the first paragraph; Kathy's
2    comments were very telling. What's that mean?
3    A.    I think we produced notes about how that
4    meeting went and the things that Kathy said,
5    admitting that she did the Tweet and then
6    apologizing profusely for sending such a Tweet,
7    asking us to, you know, tell the Board how sorry she
8    was -- I mean amongst a lot of other things but, you
9    know, she knew she was -- she knew she was wrong and
10   then tried to say she didn't do it, and that's where
11   everything got a little...
12   Q.    Isn't it fair to say she was pretty
13   emotional in that meeting?
14   A.    She was emotional. You know, we did offer
15   to have the nurse come and check on her because she
16   was, you know, breathing real heavily, and then we
17   also offered to get her a ride home, send her in an
18   Uber, so... You know, again, the notes speak for
19   themselves that I know you have.
20   Q.    All right. I just --
21   A.    But that's where --
22   Q.    -- was wondering what you thought his
23   specific -- when he said Kathy's comments were very
24   telling -- and, you know, I'll be asking him about

Page 120

1    that, but my question is, what do you think he was
2    talking about when he said her comments were
3    telling?
4    A.    I think I just answered that.
5    Q.    Okay. Okay. That's fine.
6          THE WITNESS: Can you read that
7    back for him --
8          MR. SCHWARTZ: No. No, don't.
9          THE WITNESS: -- or is that
10   necessary?
11         MR. SCHWARTZ: No. No, it's not
12   necessary.
13   BY MR. SCHWARTZ:
14   Q.    Then it says thank you all for your
15   thoughtful consideration and willingness to be
16   generous under these unusual circumstances. Is that
17   what it says? Is that what that sentence says?
18   A.    Yes. It is.
19   Q.    What was generous?
20   A.    I really don't know, you'd have to ask Dick
21   Bauer that.
22   Q.    All right. We will.
23         (At this time, a short break was
24   taken.)

30 (Pages 117 to 120)

THOMAS P. GARVIN

Page 121

1   BY MR. SCHWARTZ:
2   Q.    Let's skip to 0912, it's an e-mail from you
3   to All Waverly Care Associates Employees and All
4   Waverly Heights Employees and it says Announcement,
5   correct?
6   A.    Correct.
7   Q.    And who did this go to?
8   A.    People who are on e-mail at Waverly Heights
9   and Waverly Care Associates.
10  Q.    Is that virtually everybody?
11  A.    No.
12  Q.    So what kind of employees are not on the
13  e-mail?
14  A.    Most of the sort of line staff, you know,
15  housekeeping, maintenance, CNAs, I think some
16  nurses, just people in
17  non-management/non-supervisory type roles for the
18  most part.
19  Q.    So they don't get the e-mail?
20  A.    Correct.
21  Q.    Okay. And it says what it says, right? I
22  regretfully inform you Kathy isn't at the
23  organization; that's the term you use, right?
24  A.    That's what it says. Yes.

Page 122

1   Q.    Okay. Who are Jacquie, J-A-C-Q-U-I-E,
2   Levin and Jennifer Davies?
3   A.    Jacquie Levin was the benefits specialist
4   and the recruiter in Human Resources, and Jennifer
5   Davies was the human resources assistant.
6   Q.    Okay. So are you, basically, saying that
7   they were the designated temporary replacements?
8   A.    Well, no, what I said here was that members
9   of senior management and our current Human Resources
10  Department staff, which is Jacquie Levin and
11  Jennifer Davies, will fulfill the needs of our
12  employees during the recruitment and transition
13  period, that's what I said.
14  Q.    Okay. Were Ms. Levin and/or Ms. Davies
15  sent home early the day that my client was fired?
16  A.    I don't recall that. No. Not that I
17  recall.
18  Q.    Would you have been the one to send them
19  home early?
20  A.    Probably, but I don't recall doing that.
21  Q.    Looking at 0914, who's Annie Conroy?
22  A.    Well, Anne Conroy is a Board member and a
23  resident.
24  Q.    And then on the bottom you see an e-mail

Page 123

1   from Dick Bauer sent September 28th, 2016 at 1:23,
2   and is that an e-mail to the entire Board?
3   A.    It appears that it is.
4   Q.    And he says, in part, that you have -- Tom
5   has been thoughtful and deliberate throughout the
6   discovery and termination process, correct? Is that
7   what it says in part?
8   A.    In part, yes.
9   Q.    Did you ask him to write this e-mail?
10  A.    No. I did not.
11  Q.    Last page, 0918 -- or next to the last
12  page, 0918, who's Susan Buehler?
13  A.    Susan Buehler is -- was at our public
14  relations firm.
15  Q.    Really? E-mailing employee announcement:
16  Hi, Susan. Attached is the memo that went to staff.
17  I'll also send you the memo that went to our
18  residents. Correct?
19  A.    That's -- yep. That's what it says.
20  Q.    Why did you contact her if everything was
21  supposed to be confidential?
22  A.    Well, she's our public relations person,
23  and the notice was certainly not confidential; we
24  sent it to all of our residents, all of our

Page 124

1   employees and so it made sense that we'd send it to
2   our PR staff just like we would anything else, so
3   that was not a confidential document by any means.
4   Q.    Well, what did you expect her to do with
5   the announcement?
6   A.    Just having her be aware of what was
7   happening.
8   Q.    Did you expect her to put out an
9   announcement to the media about this?
10  A.    No.
11  Q.    Do you know if she did?
12  A.    No.
13  Q.    No, you don't know or she did not?
14  A.    She did not.
15  Q.    So whenever you fire somebody do you send a
16  copy, you know, memorializing that to Susan Buehler?
17  A.    You know, we had just recently started with
18  a PR firm; I'm not sure when exactly we started with
19  them but, yeah, anything that affects the
20  organization. I think, you know, in looking at
21  this, November 23rd, I probably already received
22  your very interesting letter at that point. What's
23  the date of that letter?
24  Q.    This is November 23rd.

THOMAS P. GARVIN

Page 125

1    A.    And what's the date of your letter that you
2    sent to my Board?
3    Q.    Do you want to conduct the deposition?
4    You're doing great, but go ahead.  November 8th.
5    A.    All right.  Well, there you go.  So I sent
6    it to Susan Buehler after false accusations were
7    made against me and my entire organization in a
8    nine-page, single-spaced, typewritten letter, so it
9    seemed appropriate to do that.
10   Q.    Well, that was, what, in excess of several
11   weeks of the date of that letter, right?  Why did
12   you do it on November -- why did you wait till
13   November 23rd?
14   A.    I don't recall that.
15   Q.    Did you ever say to her I better notify you
16   of this because -- did you ever talk to her about my
17   letter?
18   A.    I don't recall, but it wouldn't surprise me
19   if I did.  I have nothing to hide, so I have no
20   problem sharing that with the people who protect our
21   organization.
22   Q.    What does she do to protect your
23   organization?
24   A.    Handles our public relations.

Page 126

1    Q.    So was she going to be the spokesman if
2    something came out about this?
3    A.    No.
4    Q.    Why did you send it to her?
5    A.    Because she's our public relations firm.
6    Q.    What's the name of her firm?
7    A.    Bellevue Communications.
8    Q.    Do you know who heads that firm?
9    A.    I don't.
10   Q.    Could it be Brian Tierney?
11   A.    I really don't know.
12   Q.    Would it refresh your memory if you sensed
13   that I might have put that letter out in the public
14   and you wanted somebody to respond to it?
15   A.    No, just -- again, we engaged a public
16   relations firm a few years ago; I'm not sure of the
17   exact date, and anything that -- we bring them in on
18   things like this, so...
19   Q.    Did you ever have a discussion with Ms.
20   Buehler about the PR aspects of Mr. Soltis' hate
21   e-mail?
22   A.    I don't recall.
23         MS. DEON:  Objection.
24   BY MR. SCHWARTZ:

Page 127

1    A.    Don't recall.
2          What was the reason that you hired a PR
3    firm a couple years before this?
4    A.    It was a suggestion of the Board that we
5    should have someone do media training and also help
6    us with all of our marketing and advertising because
7    developing a stronger -- stronger public relations
8    presence was one of the Vice President of
9    Marketing's goals, and so -- and we really didn't
10   have anybody coordinating all of our --
11   coordinating, creating all of our marketing and
12   advertising, handling our social media, things of
13   that nature, so they've been very helpful with all
14   of those things.
15   Q.    Well, how does that announcement that you
16   made, how does that e-mail that you made pertaining
17   to my client not being there any longer serve any of
18   the functions you just described?
19   A.    Like I said, this is a long time ago, but
20   we received your nine-page letter and so, you know,
21   we needed to make sure that we were -- make sure
22   people knew within the organization about it, and
23   they're under contract with us, so...
24   Q.    Are they paid hourly?

Page 128

1    A.    No.
2    Q.    Okay.  Do you know if she ever reviewed my
3    letter?
4          MS. DEON:  Susan Buehler?
5          MR. SCHWARTZ:  Yes.
6          THE WITNESS:  I don't think so,
7      but I can't really recall.
8    BY MR. SCHWARTZ:
9    Q.    Don't you have a Vice President of
10   Marketing?
11   A.    We do.
12   Q.    Wouldn't that be within her role?  Was she
13   so inadequate that you needed Bellevue
14   Communications?
15         MS. DEON:  Objection.  You can
16     answer.
17         THE WITNESS:  So Bellevue
18   Communications helps us with all of our
19   public relations and our marketing, our
20   development of advertisements and marketing
21   content, doing SEO, and they help us with
22   training on media relations, they help us
23   with website development, so... Yeah.  I
24   mean the Vice President of Marketing

32  (Pages 125 to 128)

THOMAS P. GARVIN

Page 129

1      doesn't have all of that, you go through a
2      third-party, which is why we hired Bellevue
3      Communications; they serve multiple roles
4      for us and have done a terrific job.
5   BY MR. SCHWARTZ:
6      Q.    Have they ever done any investigation into
7   social media matters with respect to your employees
8   or Board members?
9      A.    Any investigations?
10     Q.    Right.
11     A.    No.
12     Q.    Did they ever review the VP of Marketing's
13  Facebook account?
14     A.    I have no idea.
15     Q.    Did you ever ask them?
16     A.    No.
17     Q.    Did you ever say to them gee, you know,
18  we're sort of concerned about social media practices
19  of our employees, you know, can you check into this?
20  Did you ever do that?
21     A.    To Bellevue Communications, no.
22     Q.    Or to anybody else?
23     A.    Not that I can recall.
24     Q.    All right. Let's go to the full handbook.

Page 130

1            MR. SCHWARTZ: This would be TG-4
2      (indicating).
3            (At this time, a document was
4      marked for identification as TG-4.)
5   BY MR. SCHWARTZ:
6      Q.    Do you know what this is?
7      A.    It would appear to be the employee
8   handbook.
9      Q.    Turn to -- this is something you produced,
10  and turn to page 23 or Bates stamp Waverly-0833.
11     A.    (At this time, the witness complies with
12  request.)
13     Q.    Do you see that page?
14     A.    I do.
15     Q.    Can you compare that to page 23 of Exhibit
16  KJ-4?
17     A.    Okay. I see that.
18     Q.    They're totally different, aren't they?
19     A.    It appears that they are.
20     Q.    Okay. So could KJ-4, page 23, be from some
21  other older or newer handbook, if you know?
22     A.    This one's dated Employee Handbook 2014.
23  May I see the one that you're --
24     Q.    (Indicating).

Page 131

1      A.    This one does not have a date, but 2014 is
2   the most recent so this, perhaps, was the one before
3   that, but I'm -- you know, I'm guessing. I don't
4   see a date on this.
5      Q.    Yeah. There certainly wasn't one
6   afterwards, right?
7      A.    No. Correct.
8      Q.    All right. Be that as it may.
9            Why was Ms. Jungclaus fired?
10     A.    For the Tweet that is whatever exhibit that
11  it is where she singled out a protected class of
12  people, addressed doing a poll of --
13     Q.    Okay. RJ-1, correct?
14           MS. DEON: Excuse me, let him
15  finish his answer.
16           MR. SCHWARTZ: Oh. Go ahead,
17  keep going.
18           THE WITNESS: -- minorities in
19  the workplace and expressing a political,
20  you know, opinion on her personal Twitter
21  which was easily linked to the Waverly
22  Heights' Twitter account, and we found that
23  to be conduct that was very unbecoming of
24  the Vice President of Human Resources and,

Page 132

1      quite frankly, compromised her ability to
2      do her job going forward.
3   BY MR. SCHWARTZ:
4      Q.    So what part of this handbook did that
5   violate?
6      A.    I'm going to need a little bit of time to
7   review this document.
8      Q.    Well, without referring specifically to the
9   document, is there a category or a heading that
10  might help?
11     A.    I just need some time to review the
12  document.
13     Q.    All right. Take your time.
14     A.    It's going to be between -- I mean there
15  are multiple policies that are addressed that are --
16  this is the handbook, but then they're also backed
17  up by policies, so Corporate Compliance, Business
18  Ethics, but then specifically I'm looking for the --
19  okay. So page 78.
20     Q.    Okay.
21     A.    And these are just examples that are
22  included in the handbook. It says examples of more
23  serious offenses which may result in immediate
24  dismissal include, but are not limited to, and if

33 (Pages 129 to 132)

THOMAS P. GARVIN

## Page 133

1  you go down, halfway through, you start with
2  immoral, indecent or improper conduct; willful
3  hampering of production or gross carelessness, then
4  conduct which is detrimental to resident care or
5  organizational operations.
6  Q.    Did you bring this up to the Board's
7  attention, these specific ones?
8  A.    I think it was fairly obvious that we
9  had -- that this was at the critical level of
10  conduct detrimental to the operations and public
11  relations of Waverly Heights.
12  Q.    But did you bring up these specific
13  sections with any trustees?
14  A.    No.
15  Q.    Anything else?  And you're sure this is the
16  latest version?
17  A.    It's the one that was created in 2014, so I
18  believe that's the last one that was done; certainly
19  the one that was in effect at the time of Kathy's
20  termination.
21  Q.    Okay.  Anything else?
22  A.    Well, you know, there's a lot here;
23  Corporate Compliance, Ethical Standards and, again,
24  I haven't read this word-for-word right here, but

## Page 134

1  those were the things that we were, you know,
2  concerned about; Social Media Policy, et cetera,
3  Code of Conduct.
4  Q.    And, again, did you raise any of those buzz
5  words with the Board?
6  A.    I don't recall.  We dealt with the issue
7  that we were -- that we were handed.
8  Q.    Did the Board ever reflect on the handbook
9  and say well, these are the ones that we think
10  apply?
11  A.    We -- yeah.  We reviewed our policies,
12  which are really the meat; the handbook is not the
13  meat, the policies are the crux of what we reviewed,
14  and we absolutely did review those, so...
15  Q.    Well, let me direct your attention to
16  something that came up in the Commonwealth Court
17  matters; Personal Blogs, page Waverly-0854 or page
18  44.  Please turn to that.
19  A.    (At this time, the witness complies with
20  request.)
21        All right.
22  Q.    The heading Personal Blogs, under it the
23  first sentence says Waverly Heights respects the
24  right of employees to write blogs and use social

## Page 135

1  networking sites and does not want to discourage
2  employees from self-publishing and self-expression;
3  is that correct?
4  A.    That's what it says.  Yeah.
5  Q.    And is that the statement of policy with
6  respect to that?
7         MS. DEON:  Objection.  You can
8  answer.
9  BY MR. SCHWARTZ:
10  Q.    Is that a statement of policy?
11  A.    You know, it's a statement in the handbook,
12  I don't know that it's necessarily a statement of
13  policy.
14  Q.    And then it goes further, it says Waverly
15  Heights respects the right of employees to use blogs
16  and social networking sites as a medium of
17  self-expression and public conversation and does not
18  discriminate against employees who use their media
19  for personal expressions and affiliations or other
20  lawful purposes.  Is that what it says?
21  A.    That's what it says.
22         MS. DEON:  These media.
23         MR. SCHWARTZ:  Yes, I'm sorry,
24  these media.

## Page 136

1  BY MR. SCHWARTZ:
2  Q.    So did my client violate those two
3  sentences?
4  A.    Well, what your client violated, in her
5  role as the Vice President of Human Resources, she
6  connected herself very clearly to Waverly Heights in
7  a, you know, public domain, where she singled out a
8  class of employees based on their race, in that
9  case, conducted a poll, and then kind of bragged
10  about it and said 100 percent of those that she
11  polled were voting for Trump, so...
12  Q.    But -- okay.  Go ahead.  Do you find that
13  the -- do you feel that the Commonwealth Court ruled
14  differently than what you just expressed?
15         MS. DEON:  Objection.  You can
16  answer.
17         THE WITNESS:  Yeah.  I mean, in
18  my opinion, the Commonwealth Court doesn't
19  rule on -- they just ruled on is she
20  eligible for unemployment compensation;
21  they're not making any ruling on -- you
22  know, on the issue itself.
23  BY MR. SCHWARTZ:
24  Q.    Wasn't the argument -- wasn't all the

34  (Pages 133 to 136)

THOMAS P. GARVIN

## Page 137

1    argument over that Section 402 which dealt with
2    willfulness?
3            MS. DEON:  Objection.
4    BY MR. SCHWARTZ:
5    Q.    Do you remember that being an issue?
6            MS. DEON:  Objection.  You can
7        answer.
8            THE WITNESS:  Repeat that.  Which
9        argument?
10   BY MR. SCHWARTZ:
11   Q.    Do you remember this question about whether
12   she was in willful noncompliance with any rules?  Do
13   you remember that issue coming up?
14   A.    Well, willful misconduct is usually what
15   the unemployment uses to consider whether or not
16   unemployment rights are granted, so...
17   Q.    Wasn't the language of the Social Media
18   Policy brought into focus in those proceedings?
19   A.    I believe that it was.  It's been a while
20   since I've looked at that.
21   Q.    All right.  What about this next paragraph:
22   Employees are not permitted to use employer owned
23   equipment including computers, company licensed
24   software or other electronic equipment nor

## Page 138

1    facilities or company time to conduct personal
2    blogging or social networking activities.
3            Did you find that she did anything there
4    that involved employer owned equipment, et cetera?
5    A.    I really don't know when she did her
6    Tweeting.
7    Q.    You don't?
8    A.    Well, I could probably look at it on the --
9    whatever exhibit that was, but...
10   Q.    Well, do you know whenever she -- do you
11   know if she used any employer owned equipment?
12   A.    No.  I'm not sure if she did.
13   Q.    You're sure she did?
14   A.    I said I'm not sure if she did.
15   Q.    Oh, you're not sure if she did.  Okay.
16          Then it says in the last sentence of that
17   paragraph:  Employees are not permitted to post on
18   personal blogs or other sites the trademark or logo
19   of Waverly Heights or any business with a connection
20   to Waverly Heights.
21          Did my client post on a personal
22   blog anything -- or on -- did she post on RJ-1
23   anything with respect to trademark or logo of
24   Waverly Heights?

## Page 139

1    A.    She identified herself as the VP of Human
2    Resources at a company outside of Philadelphia under
3    her real name, K. Jungclaus or however it's written
4    there, and a Google search would have turned that
5    up.  And I see, also, the sentence that you skipped:
6    Employees are not permitted to use blogs or social
7    networking sites to harass, threaten, discriminate,
8    defame or disparage other employees, residents or
9    anyone associated with or doing business with
10   Waverly Heights.
11   Q.    And you felt that she did that?
12   A.    I felt that she singled out a class of
13   employees, you know, within her -- within her Tweet
14   and then spoke on their behalf as though it was --
15   Q.    So isn't your testimony consistent with --
16          THE COURT REPORTER:  I didn't
17       hear the end of his answer.
18   BY MR. SCHWARTZ:
19   Q.    Are you finished?
20          (At this time, the court reporter
21       read back from the record as was
22       requested.)
23          THE WITNESS:  -- representing
24       100 percent of that protected class.

## Page 140

1    BY MR. SCHWARTZ:
2    Q.    And what's the protected class?
3    A.    African Americans as evidenced in the Tweet
4    with the capital A, capital A.
5    Q.    So you would agree with the anonymous
6    letter that, basically, accused her of being a
7    racist, right?
8            MS. DEON:  Objection.
9            THE WITNESS:  No one ever called
10       her a racist.
11   BY MR. SCHWARTZ:
12   Q.    Never?
13   A.    Never.  Not from my lips or anybody on the
14   Board's.
15   Q.    What about the anonymous letter; isn't that
16   calling her a racist?
17   A.    It -- I don't believe it calls her a
18   racist.
19   Q.    All right.
20   A.    She -- what actually happened was when --
21   and it's in the notes -- when she was terminated
22   that she said so you think I'm a racist, and we said
23   absolutely not, that's not at all what this is
24   about, and that's, you know, clearly in my notes.

**Appendix 1074**
StenoSource, LLC   (215)348-1095

THOMAS P. GARVIN

## Page 141

1    Q.    Are you sure that wasn't a gratuitous
2  comment on your part; I don't want you to think
3  you're a racist?
4            MS. DEON:  Objection.  You can
5    answer.
6  BY MR. SCHWARTZ:
7    Q.    I'm a racist?
8    A.    No.  I don't make gratuitous comments, I --
9    Q.    Oh, you don't?
10   A.    -- just speak facts.  No.
11   Q.    Oh, you just speak facts, correct?
12           MS. DEON:  Objection.  You can
13   answer.
14           MR. SCHWARTZ:  No.  He just said
15   he just spoke fact, but you also don't
16   remember a lot, right?
17           MS. DEON:  Objection.  Objection.
18           MR. SCHWARTZ:  All right.  The
19   testimony speaks for itself.
20  BY MR. SCHWARTZ:
21   Q.    All right.  Where on RJ-1 is there a logo
22  of Waverly Heights?
23   A.    There is not a logo of Waverly Heights on
24  RJ-1.

## Page 142

1    Q.    Okay.  Where is there a trademark of
2  Waverly Heights?
3    A.    There is not a trademark on that.
4    Q.    Where does it make any reference to Waverly
5  Heights that is detectable from just reading this
6  Tweet?
7    A.    So where it came from is exactly where --
8  how whoever the anonymous letter writer, whoever
9  that is, they found it the same way, because the VP
10  of Human Resources in a comp outside of Philly was
11  on her Twitter, which was linked or followed by --
12  she followed Waverly Heights and so that's where the
13  connection was made.  It's in her name, and a quick
14  Google search, like I said before, of her name and
15  VP of HR in Philadelphia, you know, would easily
16  turn up the position at Waverly Heights.
17   Q.    How many VPs of HR can be found in
18  companies outside of Philly?  Do you know how many
19  people would fit that description?
20   A.    Well, I would add in a company outside of
21  Philly by the name of Kathy Jungclaus --
22   Q.    That's not my question.
23   A.    -- only one.
24   Q.    Just look at the text.  How many VPs of HR

## Page 143

1  are there in companies outside of Philly?
2    A.    Yeah, I'm sure there are plenty but, again,
3  by the name of K --
4    Q.    I understand.
5            MS. DEON:  Excuse me.  Don't cut
6    him off.
7            THE WITNESS:  -- by the name of
8    Kathy Jungclaus with a Twitter handle
9    @KMJungclaus, I think there's one.
10  BY MR. SCHWARTZ:
11   Q.    Do you consider this RJ-1 as being linked
12  to Waverly Heights' internal or external website?
13   A.    It was linked to our Twitter account as a
14  follower.
15   Q.    No.  Is it linked to your internal or
16  external website?
17   A.    There -- on our main website is our Twitter
18  connection.
19   Q.    Is it linked?  I'm reading page 0855,
20  Waverly-0855:  Employees are not permitted to link
21  from a personal blog or social networking site to
22  Waverly Heights' internal or external website.
23   A.    So --
24   Q.    Did she do that?  Did she link to their

## Page 144

1  internal or --
2    A.    Indirectly, yes.
3            MS. DEON:  Let him finish.
4            THE WITNESS:  I'm sorry.
5            MS. DEON:  He asked a question
6    and then he didn't let you answer and then
7    he asked another question.
8            THE WITNESS:  Okay.
9            MS. DEON:  So let him ask the
10   question.
11  BY MR. SCHWARTZ:
12   Q.    Did she link to Waverly Heights' internal
13  or external website, to either one?
14   A.    First can I ask you what page you're on?
15   Q.    Yes.  Waverly-0855, second full paragraph.
16   A.    And then the answer to that is yes, when
17  you -- if you went to our website, clicked on our
18  Twitter feed or whatever, the icon, you get to our
19  Twitter account and then you click on our followers
20  and so, yes, it is -- it is linked from that
21  perspective.
22   Q.    If I click on, as I have, Waverly Heights'
23  external website, does Kathy Jungclaus come up?
24   A.    No.

36 (Pages 141 to 144)

THOMAS P. GARVIN

Page 145

1  Q.    If I clicked Waverly Heights' internal
2  website, does Kathy Jungclaus' name come up?
3  A.    You said if you click on our internal
4  website?
5  Q.    That's your language.  Do you have an
6  internal website?
7  A.    Well, we did not at that time; we have
8  something that you could construe as an internal
9  website now, but not back then.
10  Q.    Then the next paragraph:  In a blog or any
11  other communication you identify yourself as an
12  employee of Waverly Heights, please understand that
13  you may be viewed by some as a spokesman for Waverly
14  Heights.
15        Where does it indicate on RJ-1 that Kathy
16  Jungclaus is a spokesman for Waverly Heights?  Is
17  there any language there?  Is there any language on
18  that form?
19  A.    That says she's a spokeswoman for Waverly
20  Heights?
21  Q.    Yes.
22  A.    No.
23        MR. SCHWARTZ:  Let's mark this as
24        the next exhibit (indicating).

Page 146

1        (At this time, a document was
2        marked for identification as TG-5.)
3  BY MR. SCHWARTZ:
4  Q.    Can you tell me what this is?
5  A.    This is the Defendant Waverly Heights,
6  Ltd.'s Response to Plaintiff's Request for
7  Admissions.
8  Q.    Okay.  Did you have any role in formulating
9  the responses to this?
10  A.    Yes.
11  Q.    Anyone else have a role in formulating the
12  response other than your lawyer?
13  A.    No.  I don't believe so.
14  Q.    There's no verification on this, is there,
15  by you?  Do you know what a verification is?
16  A.    I do.
17  Q.    Is there one on this?
18  A.    Not in what you handed out.  No.
19  Q.    Okay.  It's just signed on page 4, is it
20  not, by Eastburn & Gray, correct?
21  A.    Correct.
22  Q.    And it's dated April 18th, 2018, correct?
23  A.    Yes.
24  Q.    Okay.  Let's go through some of these.  1,

Page 147

1  kindly admit that e-mail authored by former Board
2  Chairman, Charles Soltis, e-mail that was critical
3  of Barack Obama was at one time on Waverly's e-mail
4  system, and it's checked denied; is that true?
5  A.    Well, you can read the response below.
6  Q.    Yeah.  Well, is it true that Mr. Soltis'
7  e-mails that were critical of Barack Obama were on
8  the Waverly e-mail system; yes or no?
9  A.    Well, I didn't read all the content of
10  Chuck Soltis's e-mails, but he copied some employees
11  from time to time on his e-mails who, I think -- I'm
12  not sure how he decided, but who I believe he felt
13  were politically like-minded.
14  Q.    And it showed up on the Waverly e-mail
15  system, right?
16  A.    Well, it came through the -- you know, it
17  said Waverly Heights e-mail addresses for a couple
18  of people.
19  Q.    And you say or someone said -- you say it's
20  denied that the e-mails were racist, correct?
21  A.    I don't believe that he would send
22  something that was racist but, again, I didn't
23  review every e-mail that he sent because I don't
24  have -- I don't take the time to review e-mails that

Page 148

1  I consider non-business --
2  Q.    And your mother never --
3  A.    -- related.
4  Q.    -- discussed them with you?
5  A.    No.
6        MS. DEON:  Excuse me, you gotta
7        stop cutting him off she's going to like
8        inflame.
9        THE COURT REPORTER:  Restate your
10        question.
11  BY MR. SCHWARTZ:
12  Q.    Did you discuss Mr. Soltis' e-mails with
13  your mother?
14  A.    No.
15  Q.    3, kindly admit that prior to her dismissal
16  no meeting was had of the full Human Resource
17  Committee of the Board of Trustees to discuss and/or
18  vote on the termination of the Plaintiff for
19  violating the Waverly's Social Media Policy, and you
20  have admitted and denied, correct?
21  A.    That is correct.
22  Q.    So what's the answer?
23        MS. DEON:  Objection.  The answer
24        speaks for itself.  The answer is there in

Appendix 1076
StenoSource, LLC   (215)348-1095

THOMAS P. GARVIN

Page 149

1  writing. What do you mean what is the
2  answer? It's right there.
3          MR. SCHWARTZ: I've never had one
4  that was admitted and denied.
5          MS. DEON: Well, portions of it
6  are admitted and portions are denied, so I
7  can't fully admit or fully deny it.
8          MR. SCHWARTZ: Okay. Thanks.
9  Oh, so you admitted or denied it, correct?
10  That's your testimony? Okay. Fine.
11          MS. DEON: I'm not under oath,
12  I'm not testifying, Mr. Schwartz; you're
13  fully aware of that.
14          MR. SCHWARTZ: You volunteered
15  it.
16  BY MR. SCHWARTZ:
17  Q.    And then the same with 4 you have checked
18  there admitted and denied, correct?
19  A.    Yes.
20  Q.    Same with 5, correct; you have admitted and
21  denied?
22  A.    Yes.
23  Q.    7, kindly admit that Kathleen Jungclaus was
24  sexually harassed in the workplace in the presence

Page 150

1  of Defendant Garvin and Robert Supper and no action
2  was taken, and you marked denied, correct?
3  A.    That is correct.
4  Q.    So is it your testimony that at no time
5  this Plaintiff ever contended that she was sexually
6  harassed?
7  A.    That's correct. She never made a complaint
8  of sexual harassment.
9  Q.    So was she making up the testimony that you
10  sat through yesterday and today?
11  A.    I think she has manipulated the facts that
12  she's someone that hugs a lot of people and I think
13  she's turning it into sexual harassment based on
14  hugs or whatever, because I can't think of anything
15  that was said or done to her, certainly nothing she
16  ever complained about that was sexual harassment.
17  Q.    So would it be your testimony that she
18  comes on to people physically?
19  A.    Definitely not.
20          MR. SCHWARTZ: I think it's clear
21  that we're not going to finish today; do
22  you want to quit now?
23          MS. DEON: No. I'd like you to
24  continue.

Page 151

1          MR. SCHWARTZ: All right.
2          Let me show you the next exhibit
3  (indicating).
4          (At this time, a document was
5  marked for identification as TG-6.)
6          MR. SCHWARTZ: And let me show
7  you Exhibit-7 (indicating).
8          (At this time, a document was
9  marked for identification as TG-7.)
10  BY MR. SCHWARTZ:
11  Q.    I want to focus on your Answer, which I
12  believe is Exhibit-7, but I want to give you the
13  benefit of having Exhibit-6, which is the Amended
14  Complaint so you can match them up, okay? Have you
15  seen these two documents?
16  A.    Yes.
17  Q.    And you'll note at the top -- do you know
18  what that blue lettering is?
19  A.    It appears to be a case number, a document
20  number, date of filing, and page numbers.
21  Q.    Let's look at page 3 of the Answer.
22  A.    Is that TG-7?
23  Q.    Yes, sir. On page 3, if you look at the
24  second full sentence it says: It is admitted that

Page 152

1  Plaintiff was responsible for employee training, but
2  it is denied that there was any quantifiable
3  correlation between that aspect of her job and
4  saving Waverly money. Is that correct? Is that
5  what it says?
6  A.    That's what it says.
7  Q.    Did you have input into this --
8  A.    Yes.
9  Q.    -- response? And if you want to take a
10  look at paragraph 13 of the Amended Complaint that
11  would have the assertion that we made, okay? Do you
12  want to take a look at that for a minute?
13  A.    (At this time, the witness complies with
14  request.)
15          Okay.
16  Q.    How can you substantiate the statement that
17  you admit that she was responsible for employee
18  training, but deny that there was any quantifiable
19  correlation between that aspect of her job and
20  saving Waverly money?
21  A.    Yeah. Well, Waverly Heights takes really
22  good care of their employees, so our employees --
23  and that has to do with a lot of people, not just
24  the Vice President of Human Resources, so having low

THOMAS P. GARVIN

Page 153

1    turnover and engaged employees I think is as much a
2    product of the way that they're treated there by
3    everyone; the residents, you know, their co-workers,
4    everybody in supervision and management, so...
5    Q.    But doesn't proper employee training save
6    money as far as Waverly's concerned?
7    A.    Well, you hope that with proper training
8    that's a component -- you know, one small component
9    of the bigger picture of reducing -- of keeping
10   turnover low.
11   Q.    How many employees would be trained by
12   Plaintiff or her department?
13   A.    Yeah. I think her department did a lot of
14   the training along with her on the phish training,
15   so all the employees would go through it over the
16   course of the year.
17   Q.    But you couldn't -- you don't think that
18   there is intended savings, correct?
19   A.    It's just part of the job.
20   Q.    Then you say by way of further answer,
21   Waverly would hope that its Vice President of Human
22   Resources would treat people fairly.
23         Other than the -- what transpired as a
24   result of RJ-1, when was my client treating people

Page 154

1    unfairly?
2         MS. DEON: Well, the text of it
3         says justified concerns about continued
4         ability.
5         THE WITNESS: Going forward.
6    BY MR. SCHWARTZ:
7    Q.    Okay. But there's the statement: Waverly
8    would hope that its Vice President of Human
9    Resources would treat people fairly. I guess my
10   question is, other than what you've testified about
11   the blog and your allegations in conjunction with
12   that, when did she ever not treat people fairly?
13   A.    I believe that's just a statement.
14   Q.    Oh, okay. You don't think it has a
15   negative connotation?
16   A.    I believe it has a statement that we would
17   hope that the Vice President of Human Resources
18   would treat people fairly.
19   Q.    Did you put that language in the Answer?
20   A.    It's a combination of the -- my attorney
21   and me.
22   Q.    Okay. And then in 14, didn't you just
23   testify that my client is a huggy sort of person and
24   that there was no sexual harassment? Didn't you

Page 155

1    just say that?
2    A.    What's it say in 14 that you're asking me
3    about?
4    Q.    All right. Then if you go down to where it
5    says further; it's 1, 2, 3, 4 -- 5th line down at
6    the end. Further, if Plaintiff is referencing the
7    time she advised Mr. Garvin that the female CFO was
8    allegedly harassing her, Mr. Garvin promptly
9    commenced an investigation of the matter. Plaintiff
10   made clear that although she consulted an attorney,
11   she requested that Mr. Garvin take no action.
12   Plaintiff also stated that she would never sue
13   Waverly. Is that language your language?
14   A.    Part of it is, and you have my notes on the
15   outcome of that meeting.
16   Q.    Okay. So my client did complain to you
17   about being harassed; did she not?
18   A.    Your client complained about being
19   harassed, but not sexually. She complained about
20   her being mistreated by the female CFO, Ann Rodgers,
21   who, apparently, the two of them had a long, long
22   history of, you know, mistrust and dislike for one
23   another.
24   Q.    Do you remember anything specific about her

Page 156

1    complaints about Ms. Rodgers that caused you to
2    promptly commence an investigation?
3    A.    Yeah. I'm trying to -- my notes would be
4    the best frame of reference on that, but she had
5    made comments -- Kathy had made comments that she
6    couldn't work with her anymore, the way she was
7    treating -- mistreating her and what have you, and
8    that she had consulted an attorney, and so just like
9    anything else when I -- you know, when I heard that
10   I felt I need to take this seriously. I really
11   wanted the three of us to sit down and go through it
12   so that, you know, there could be follow-up, and
13   multiple times Kathy asked me not to because, again,
14   her concern was that it had been going on for years.
15   Apparently, I don't know if the previous CEO ever
16   addressed it, but I was certainly -- did and was
17   ready, willing, and able to.
18   Q.    Could she have -- could the attorney she
19   have consulted been Waverly's labor attorney at the
20   time?
21   A.    She didn't tell me who it was, but she
22   knows that was the -- you know, when she said that,
23   I took that very seriously; I wanted to make sure
24   that we were handling this correctly, like I do with

39 (Pages 153 to 156)

THOMAS P. GARVIN

Page 157

1    everything else.
2    Q.    So if someone says that they have consulted
3    an attorney that -- that puts off signals that you
4    relate to, right?
5    A.    No.  More the words harassment are the --
6    you know, the trigger points for a higher level of
7    concern.  Anybody that says anything about
8    harassment or discrimination to me is going to get
9    a -- you know, a thorough professional response.
10   Q.    Okay.  What did you take her saying that
11   she had consulted an attorney to mean?
12   A.    How to deal with what she felt was Ann
13   Rodgers' treatment of her.
14   Q.    Did she indicate to you that she was going
15   to sue Waverly over this?
16   A.    No.  In fact, she made the comment that she
17   would never sue Waverly.
18   Q.    Okay.  What about Mr. Hendrickson, who's
19   he?
20   A.    He was someone that they had been working
21   with for years.  I'm not sure exactly how he even
22   came to be at Waverly, but he was trying to sell us
23   on like additional disability insurance or
24   something; I'm not -- apparently, he worked with

Page 158

1    them prior to my coming there, so he was constantly
2    trying to sell us something; that's who he was.
3    Q.    Was he an outside consultant to Waverly?
4    A.    You know, in retrospect I wouldn't call him
5    a consultant, I'd call him a salesperson.  I just --
6    I don't even -- the name of the company was like
7    Hendrickson-something.
8    Q.    Fair enough.
9          Was he pitching the company or was he
10   pitching you or both?
11   A.    So it started him pitching the company; he
12   would have loved to have gotten something broader
13   for the company as a whole, and then he tried to
14   sell me on more -- I think -- it was either -- I
15   think it was disability, so that's what he tried to
16   pitch to me.
17   Q.    Did he pitch you first, personally, and
18   then Waverly?
19   A.    Not that I recall.
20   Q.    No?
21   A.    No.  It was someone that they had been
22   engaged with at Waverly, it's just I come in and he
23   wants to continue whatever their relationship was
24   and, you know, when you're a new CEO lots of people

Page 159

1    are trying to get to you and -- you know.
2    Q.    You're kidding?
3    A.    Yeah.  Trying to get our business is a, you
4    know, pretty normal thing.
5    Q.    Any comments made to you by my client about
6    overt sexual moves or physical moves that he made on
7    her?
8    A.    No.
9    Q.    And you never observed anything?
10   A.    No.  Like I said, just the normal, you
11   know, greeting; they clearly new each other.
12   Q.    Let's go to paragraph 18 on page 4.
13   A.    (At this time, the witness complies with
14   request.)
15   Q.    And you might want to look at paragraph 18
16   on page 6 and 7 of the Amended Complaint.
17   A.    (At this time, the witness complies with
18   request.)
19   Q.    Are you ready?
20   A.    Sure.
21   Q.    Okay.  In terms of the Answer, third
22   sentence down, middle of line three:  It is denied
23   that during their meeting that Plaintiff was
24   dumbfounded.  It is admitted that she appeared

Page 160

1    distraught.  So would it be your testimony that she
2    wasn't surprised about what was happening?
3    A.    I think she was surprised that it had come
4    to light, for sure, because she asked the question
5    am I going to lose my job; that was -- I mean that
6    whole meeting was probably two minutes in total
7    duration.
8    Q.    Did she say to you oh, my -- or words to
9    the effect oh, my, it came to light; you discovered
10   it?  Did she say that?
11   A.    Not that I recall, I just remember that
12   quote that we put in the Answer, which is am I going
13   to lose my job.
14   Q.    Yeah, well -- but I'm focussing on the
15   words it's denied that during the 16  Plaintiff was dumbfounded.  What's your
17   understanding of what that term means?
18   A.    I'd have to look at a Webster definition of
19   dumbfounded but, you know, surprised.
20   Q.    Shocked maybe?
21   A.    Surprised is my word.
22   Q.    So she didn't seem to be surprised?
23   A.    She seemed to be surprised that it had come
24   to light, sure.  I mean I handed her an envelope

Appendix 1079
StenoSource, LLC   (215)348-1095

THOMAS P. GARVIN

Page 161

1    with a three-page anonymous letter about -- well,
2    you've read it.
3    Q.    Okay.  And then she claims, does she not,
4    in the Complaint that you, quote, characterized the
5    situation as a mere nuisance.  Did you ever say
6    that?
7    A.    No.
8    Q.    Are you sure?
9    A.    Positive.
10   Q.    Did you say in fact that, quote, you could
11   not give her any promise as to whether she would be
12   fired?  Did you say that to her?
13   A.    It would be language like that.  Again, it
14   was a two-minute conversation; the issue had just
15   come to light maybe ten minutes before, we had a
16   very quick meeting and she went up and took the --
17   took the Tweet down.
18   Q.    Okay.  So is it possible that you said
19   don't worry about it; you won't be fired?
20        MS. DEON:  Objection.  You --
21        THE WITNESS:  No.
22        MS. DEON:  -- can answer.
23        THE WITNESS:  No.
24   BY MR. SCHWARTZ:

Page 162

1    Q.    And is it possible that you told her not to
2    be worried?
3         MS. DEON:  Objection.  You can
4    answer.
5         THE WITNESS:  No.  It's not.
6    BY MR. SCHWARTZ:
7    Q.    And you would deny that you ever
8    characterized the situation as a mere nuisance?
9    A.    I would deny that wholeheartedly because in
10   my role, again, as the CEO, when you receive
11   something like this, me burying it and not doing any
12   type of follow-up on it would be extremely
13   irresponsible of me.  So I think that makes it clear
14   that the -- common sense would prevail that I
15   couldn't just ignore the anonymous letter and its
16   contents.
17   Q.    Okay.  Let's go to 19.  The Amended
18   Complaint says directly after that initial meeting
19   Plaintiff deleted the posting which had attracted
20   neither comment, sharing or responses.  Is that what
21   it says?
22   A.    Show me where you are again.
23   Q.    Paragraph 19 on page 7 and paragraph 19 on
24   the Answers, page 4.  Do you see those?

Page 163

1    A.    I do.
2    Q.    All right.  You admit that she immediately
3    deleted the Tweet, correct?
4    A.    That is correct.
5    Q.    Did you notice, from your investigation,
6    whether the Tweet had any comments on it or comments
7    to it; responses to it?
8    A.    I don't recall seeing any.
9    Q.    Okay.  And you say Waverly is without
10   knowledge or information sufficient to form a belief
11   as to whether there were any comments, sharing or
12   responses and such allegations are denied.  Is that
13   correct?  Is that what the Answer says?
14   A.    That is correct.
15   Q.    However, from your own investigation you
16   couldn't find any comments, sharing or responses,
17   right?
18        MS. DEON:  Objection.
19        Foundation.
20   BY MR. SCHWARTZ:
21   Q.    At the time that you did your investigation
22   you just testified that you didn't see any comments,
23   sharing or responses, so that's all I'm asking?
24   A.    What I received was the three-page

Page 164

1    anonymous letter.
2    Q.    Right.  But from your examination of the
3    Tweet, did you observe any comments, sharing or
4    responses?
5    A.    On the Twitter feed itself?
6    Q.    Yes.
7    A.    I don't recall that.
8    Q.    21, Defendant -- let me read from the
9    Complaint.  Defendant Garvin told her that this
10   meeting was about the anonymous letter and the
11   Twitter posting.  He stated he was very upset by it.
12        Okay.  You say that you didn't state that
13   you were upset; is that correct?
14   A.    That is correct.
15   Q.    Okay.  And further you said that -- in your
16   Answer -- at no time did Mr. Garvin state that the
17   Human Resources Committee and the full Board of
18   Trustees had voted unanimously to terminate her
19   employment based upon a violation of the Defendant's
20   Social Media Policy.  So you didn't tell her that?
21   A.    No.
22   Q.    Okay.  Did Ms. Jungclaus ever complain to
23   you about Mr. Soltis' e-mail?
24   A.    No.

Appendix 1080

THOMAS P. GARVIN

Page 165

1    Q.    Do you ever remember making the comment
2    he's on the Board?
3    A.    No.  The -- any discussion about the Soltis
4    e-mails were just saying I got the -- you know, an
5    e-mail from -- you know, from Soltis; it was never a
6    complaint and never a concern, it was more they
7    would -- she would tend to joke about a lot of
8    things, and so that's a lot of what's been
9    manipulated here.
10   Q.    What did she manipulate?
11   A.    The facts.
12   Q.    The whole facts of the whole Amended
13   Complaint is manipulated; is that your testimony?
14   A.    A very large portion of it.
15   Q.    All right.  What portion?  I've heard that
16   before with respect to my letter, so what portion?
17   A.    Well, do you have a specific question?
18   Q.    You said that she manipulated the facts in
19   the Complaint, what was manipulated?
20         MS. DEON:  Well, I guess he can
21   go through the Answer.
22         THE WITNESS:  Yes.  Let's just go
23   through it one-by-one; I'm happy to do
24   that.

Page 166

1          MS. DEON:  I mean he can go
2    through each of the spots where we deny it
3    and say that we're not in agreement with
4    the factual assertions; if you want him to
5    do that, we'll do that.
6          MR. SCHWARTZ:  All right.
7          THE WITNESS:  I'd love to do
8    that.
9          MR. SCHWARTZ:  Your Answer speaks
10   for itself.  That's fine.
11   BY MR. SCHWARTZ:
12   Q.    And is it your testimony that you never
13   told Plaintiff that you didn't want her to think
14   that you thought she was a racist; did you ever say
15   that?
16   A.    Where is that?
17   Q.    Anywhere.
18   A.    So --
19   Q.    Did you ever say to her or anybody else I
20   don't want you to think that I think you're a
21   racist?
22         MS. DEON:  Objection.
23         THE WITNESS:  No.  I --
24         MS. DEON:  Asked and answered.

Page 167

1          THE WITNESS:  Yeah.
2    BY MR. SCHWARTZ:
3    Q.    What's the answer?
4    A.    That, no, I have never said that.  Where
5    that came up was she, in the termination meeting,
6    said so you think I'm a racist, and the answer by
7    Dick Bauer and I was that no, absolutely not.
8    Q.    But doesn't the --
9    A.    Nobody ever said that.
10   Q.    -- but doesn't the anonymous letter
11   indicate that she was a racist?
12   A.    I don't believe it does.
13   Q.    And Dick Bauer was with you throughout this
14   entire meeting, correct, with her?
15   A.    Which meeting?
16         MS. DEON:  The termination
17   meeting?
18         MR. SCHWARTZ:  The termination
19   meeting.
20         THE WITNESS:  Yes.
21   BY MR. SCHWARTZ:
22   Q.    Did my client tell you that she was
23   concerned about the affect this would have on her
24   in-laws who were Waverly residents; did she tell you

Page 168

1    that?
2    A.    She did.
3    Q.    Do you remember what it is she -- do you
4    remember her words?
5    A.    I don't remember it exactly, but we gave
6    her full access and authorization to, you know,
7    visit them whenever she wanted.
8    Q.    All right.  I do remember one letter from
9    Ms. Deon complaining about her visitation.  Did you
10   talk to Ms. Deon and is that what resulted in a
11   letter being issued?
12   A.    Yeah, because she went into a restricted
13   area.  Specifically she was there for dinner one
14   night and Kathy went into the kitchen -- again, as
15   seen on video -- hugging our staff in there and --
16   you know, in a restricted area where she could have
17   gotten hurt, been injured was, again, interacting
18   with our staff in that way, and it was just very
19   inappropriate.  She could be -- we told her she
20   could be there in public areas and that was never
21   restricted at all, but she went beyond that with
22   what I just said, and she also was pulling staff
23   members aside and taking them away from doing their
24   duties and -- which was interrupting our normal

42 (Pages 165 to 168)

THOMAS P. GARVIN

Page 169

1 business operations, so...
2 Q.    How do you know that?
3 A.    Because we have it on video camera.
4 Q.    Will you provide the tape, please? We'd
5 like to see it.
6 A.    (Witness nods head.)
7 Q.    Thank you. Is that a yes?
8 A.    Yes. Sure.
9 Q.    Did my client tell you that she was worried
10 about her reputation?
11 A.    I don't recall that.
12 Q.    Did you reassure her that you would be very
13 careful about what was said?
14        MS. DEON: Is this during the
15     termination meeting?
16        MR. SCHWARTZ: Yes.
17        THE WITNESS: You know, my notes
18     speak for themselves on what was said in
19     that meeting.
20 BY MR. SCHWARTZ:
21 Q.    Why is it that you don't remember --
22 A.    Well, I remember --
23 Q.    -- and keep referring to your notes?
24 A.    Well, you're asking questions that may or

Page 170

1 may not be in there, so I didn't memorize the entire
2 page of notes, but you have that, so...
3 Q.    Did you editorialize at all with respect to
4 those notes?
5 A.    No. They're very factual. They were done
6 right away with the events exactly as I remembered
7 them without conferring with anyone.
8 Q.    As is your practice, right?
9 A.    On significant issues, yes.
10 Q.    Okay. Did you promise that you would say
11 that she had simply resigned and wouldn't be back?
12 A.    Where are you referring?
13 Q.    Paragraph 26.
14 A.    And whereabouts?
15        MS. DEON: In the Complaint, if
16     you go to 26.
17     Mr. Schwartz, did you ask: He
18     reassured her that he would be very careful
19     about what was said? Third line up --
20        MR. SCHWARTZ: Correct.
21        MS. DEON: -- within paragraph
22     26; was that your question?
23        MR. SCHWARTZ: Yes.
24 BY MR. SCHWARTZ:

Page 171

1 Q.    Did you do that?
2 A.    Let me finish reading. I'm on 26. Sorry,
3 I was reading the first line.
4        MS. DEON: So just if you read
5     26, but Mr. Schwartz was asking you about
6     the fourth line up, there's a sentence --
7        THE WITNESS: That he reassured
8     her that he would --
9        MS. DEON: Yes. He's asking if
10     you did that.
11        THE WITNESS: Okay. Can you
12     repeat your question?
13 BY MR. SCHWARTZ:
14 Q.    Yes. Did you reassure her that you would
15 be very careful about what was said?
16 A.    So I don't recall the exact language that I
17 used but, you know, what we answered in the -- you
18 know, the Answer to the Complaint, you know, stands
19 that --
20 Q.    Well, you say at no time did Plaintiff
21 express any concern about her reputation in the
22 community nor did she say she was worried about her
23 reputation.
24 A.    Yeah. We said, in very generic terms, Mr.

Page 172

1 Garvin never publicized the circumstances underlying
2 Plaintiff's termination and announced her departure
3 in very generic terms to the community stating that
4 simply she would no longer be employed at Waverly,
5 which is actually -- that's how we do it; we say,
6 you know, generic, neutral things and don't talk
7 about anything that would damage someone's
8 reputation.
9 Q.    Oh, okay. So your testimony is you've
10 never damaged anyone's reputation let alone Ms.
11 Jungclaus', correct?
12 A.    I personally haven't done anything to
13 damage her reputation. I think when people are held
14 accountable for things that they do wrong and can't
15 accept that, that that damages their own reputation.
16 Q.    Okay. But you did or you didn't reassure
17 her that you would be careful about what you said?
18 Did you or didn't you?
19 A.    I mean I don't recall reassuring her, but I
20 am careful because that's my job.
21 Q.    Now, do you dispute that Plaintiff was
22 escorted out by two individuals in plain view of the
23 Waverly staff and residents?
24 A.    Yeah. So the way that it actually happened

THOMAS P. GARVIN

Page 173

1   and the way that it was arranged was that -- and she
2   was told, when she was terminated, that she could go
3   directly up to her office, without anybody with her,
4   and that Mark and Brian would be up there to help
5   her get her things together and pack her office and
6   then take her down -- help her carry the boxes down
7   to the car, which she doesn't go by -- it's a very
8   non-public area, so she was not paraded and escorted
9   through. You know, and, again, the walk from her
10  office to her car is about maybe 40 feet down a
11  stairwell and out the front of our Manor House.
12  She, upon leaving the office, however, went into
13  Janet Thompson's office, and I think Amy Blessing
14  followed her in, and they had a whole discussion
15  about what Kathy had done, and she admitted doing it
16  and that she had made a mistake, a horrible mistake,
17  and it went from there.
18  Q.    Okay. But was she, in fact, escorted out
19  of the building? Were there people --
20  A.    Yeah.
21  Q.    -- accompanying her?
22  A.    Up from her office down to her car, which
23  is standard practice.
24  Q.    And did people see that?

Page 174

1   A.    I'm not aware of anybody seeing it. Again,
2   the location of her office to her car is, you know,
3   40, 50 feet. It goes by, I think, only one person's
4   office and there's no other -- unless someone
5   happened to be walking by, it would be -- it's a
6   very -- it's an area that's not -- doesn't have a
7   lot of traffic. We wanted -- our intention was to
8   make it as easy on her as possible, and we did tell
9   her that, and we had set it up that way.
10  Q.    But you just did say people do walk by that
11  area, correct?
12  A.    Rarely. It's one of the less used areas of
13  the -- you know, of the community.
14  Q.    Would you dispute her testimony that she
15  said that others saw this?
16  A.    Oh, I don't know, because I didn't follow
17  her all the way through.
18  Q.    Right.
19  A.    Like I said, we just let her go up on her
20  own.
21  Q.    Okay. Paragraph 40 starts with the
22  sentence. a plain reading of Defendant's Social
23  Media Policy shows that there was no violation by
24  Plaintiff, correct?

Page 175

1   A.    You're just repeating what 40 says --
2   Q.    Yes.
3   A.    -- that you wrote?
4   Q.    What I wrote. Right.
5   A.    Yes.
6   Q.    Okay. And, again, there is the language
7   that I talk about company owned assets, work-related
8   blogging on the one hand and personal on the other.
9   Your Answer is that the Social Media Policy
10  speaks for itself. Is it your testimony that she
11  did violate the Social Media Policy?
12  A.    So she did a couple of things. The Social
13  Media Policy is really -- you're referring to the
14  handbook, you should be referring to the actual
15  Social Media Policy; so that, in conjunction with
16  the conduct that is completely inappropriate for the
17  Vice President of Human Resources to -- to have done
18  related to -- singling out a protected class,
19  representing 100 percent of that protected class,
20  having been polled, being tied to our social
21  media -- or being tied to our Twitter account and --
22  so those were the reasons that it all ended the way
23  that it did.
24  Q.    That wasn't my question. Did she violate

Page 176

1   the Social Media Policy?
2   A.    Well, yes.
3   Q.    Okay. You heard Ray Jungclaus' testimony
4   yesterday, didn't you?
5   A.    Yes.
6   Q.    And he explained what led to the Tweet,
7   correct?
8   A.    He did.
9   Q.    Is there any part of his testimony that you
10  take issue with as far as how the Tweet eventuated?
11  A.    I really don't know. I've been told
12  different stories by your -- by Kathy on -- she did
13  it, she didn't do it; he did it, he didn't do it, so I
14  really don't know what to believe.
15  Q.    Okay. Do you have any reason to disbelieve
16  his testimony?
17  A.    Yes.
18  Q.    Specifically what? What don't you believe
19  as far --
20  A.    Because --
21  Q.    -- as his rendition?
22  A.    -- his wife contradicted that and never
23  said that in the couple of times that she had the
24  opportunity to.

THOMAS P. GARVIN

Page 177

1    Q.    Okay. Well, what is it that she said that
2    varied with what he -- varied with his testimony, as
3    you recall it?
4    A.    So -- well, when we first met, when I
5    brought it to her attention, she didn't deny doing
6    it and went up and took it down.
7    Q.    Right.
8    A.    And then during the termination meeting she
9    admitted to doing it only before denying it saying
10   someone else did it, but not identifying the person,
11   and then at the end admitting it and, you know,
12   again, hugging us, apologizing profusely, leaving
13   asking us to apologize to the Board so yeah, I
14   don't know what the truth is.
15   Q.    So you said that she said that somebody
16   else did it; isn't that correct? Didn't her husband
17   dictate to her what to put on her page?
18         MS. DEON: Objection.
19   BY MR. SCHWARTZ:
20   Q.    Isn't that what happened?
21         MS. DEON: Objection. The first
22         part of your question was didn't someone
23         else do it.
24         MR. SCHWARTZ: Right.

Page 178

1    BY MR. SCHWARTZ:
2    Q.    Didn't someone -- strike that part.
3          Didn't her husband testify that he dictated
4    the language --
5    A.    So in the --
6    Q.    -- yesterday?
7    A.    Yes. Her husband testified that he
8    dictated the language.
9    Q.    Okay.
10   A.    And in the termination meeting, after
11   admitting that she did it, she all the sudden said I
12   didn't do it, somebody -- somebody hacked my Twitter
13   and kind of totally right turned, so I guess the
14   person that hacked her Twitter, I don't know who
15   that is.
16   Q.    Okay. Could she have been pretty shook up
17   when she said that?
18   A.    She could have been.
19   Q.    You say in paragraph 41, the third
20   sentence: Then, remarkably when filing for
21   unemployment compensation, Plaintiff claimed that
22   her husband posted the subject Tweet, correct?
23   A.    That is correct.
24   Q.    Even more interesting is the fact that this

Page 179

1    new theory is not alleged in any Complaint filed in
2    the above action nor in the voluminous letter from
3    Plaintiff's Counsel reciting Plaintiff's version of
4    the events underlying her separation from
5    employment. Is that your language?
6    A.    It's a combination of my language with
7    Counsel.
8    Q.    Didn't -- in her meeting prior to firing,
9    didn't she basically say, hey, it's on my blog, I
10   adopt it; didn't she take responsibility for it?
11   A.    No. She went up and removed it.
12   Q.    Well, you asked her to remove it, right?
13   A.    She asked am I going to be fired and then I
14   said you need to go up and remove this right away,
15   which she did; she didn't take immediate
16   responsibility for it there, but she didn't deny it.
17   Q.    You were going to fire her anyway, right?
18         MS. DEON: Objection.
19         THE WITNESS: That wasn't --
20   BY MR. SCHWARTZ:
21   Q.    Whether she took it down or not?
22         MS. DEON: Objection. You can
23         answer.
24   BY MR. SCHWARTZ:

Page 180

1    Q.    Correct?
2    A.    That decision wasn't made until almost a
3    week later after the investigation was completed.
4    Q.    Did she ever disclaim responsibility for
5    this being on her blog? By this I'm saying RJ-1.
6    A.    Do you mean did she ever deny --
7    Q.    That it was on her blog?
8    A.    -- that she was the author of it?
9    Q.    No. Did she ever deny; say that's not my
10   blog? Did she ever say that?
11   A.    No. What she said was that -- I mean she
12   said a lot of things, but not the least of which was
13   that somebody hacked it, so you could kind of
14   reference that she's saying she didn't do it, it's
15   not hers, because she said somebody hacked her
16   Twitter account.
17   Q.    Okay. Let's look at your response to
18   paragraph 43. Read the Complaint and then read the
19   response.
20   A.    (At this time, the witness complies with
21   request.)
22   Q.    Do you see that?
23   A.    Uh-huh. Yes.
24   Q.    You say that you admitted that paragraph in

45 (Pages 177 to 180)

THOMAS P. GARVIN

Page 181

1   part and denied it in part, correct?
2   A.   That is correct.
3   Q.   Now, the paragraph -- let me break it down.
4   Waverly deliberately -- first sentence:  In
5   pertinent point of fact, Waverly deliberately
6   discriminated against Plaintiff after disregarding
7   blatantly offensive e-mail of other males
8   circulating on and throughout Waverly's e-mail
9   system.  You knew about the offensive e-mails, did
10  you not?
11  A.   I knew that he sent e-mails; I didn't know
12  the content of all of his e-mails.
13  Q.   But you knew the content of some of it,
14  right?
15  A.   You know, I never read through them.  Like
16  I said, when they come -- when his e-mails would
17  come to me and they were that -- you know,
18  whatever the --
19  Q.   Yeah.  I'm sorry.  Go ahead.
20  A.   -- so whatever the content was, if it
21  wasn't business related would get immediately
22  deleted by me.  I don't have time to read a bunch of
23  e-mails that don't pertain to work.
24  Q.   Weren't you concerned about what this Board

Page 182

1   member was circulating?  Were you ever concerned
2   about what he was circulating?
3   A.   Not having read the content and just seeing
4   that it was generally just passing on other e-mails
5   and other cartoons from newspapers and things like
6   that, no, I -- you know, he's not an employee and I
7   just would delete them.
8   Q.   You don't remember anything anti-Sematic?
9   A.   No.  I don't.
10  Q.   You don't remember anything anti-Muslin?
11  A.   I do not.
12  Q.   You don't remember anything about a, quote,
13  Obama picked judge being sworn in on the Koran and
14  he made fun of that?  Do you remember that?
15  A.   I can't say that I do.
16  Q.   And do you know that in fact that that
17  judge that he's talking about was a municipal court
18  judge that was never appointed by Obama; do you know
19  about that?
20  A.   I don't know anything about that.
21  Q.   And you don't know any -- you didn't look
22  at any of the racial content of the cartoons?
23       MS. DEON:  Objection.  You can
24  answer if you --

Page 183

1   BY MR. SCHWARTZ:
2   Q.   Did you look at them?
3        MS. DEON:  Objection.  I'm
4   objecting to it and asking him if he can
5   answer.
6        Now, I doubt you remember the
7   question.
8        THE WITNESS:  You know, like I
9   said, I didn't go through his e-mails from
10  front to back; I'd see the gist of it and
11  see that it was something non-work-related
12  and delete it.  That's the way I handled
13  it.
14  BY MR. SCHWARTZ:
15  Q.   Didn't you consider him at the time to be
16  your boss?
17  A.   Well, he was the Chairman of the Board at
18  the time.
19  Q.   He's your boss?
20  A.   So my boss is the entire Board of Trustees,
21  but he's the person I deal with -- dealt with most
22  directly.
23  Q.   And you felt you could just disregard what
24  he had to say, right?

Page 184

1        MS. DEON:  Objection.  Don't
2   answer that.
3   BY MR. SCHWARTZ:
4   Q.   Did you feel that you could disregard what
5   one of the Board members had to say?
6        MS. DEON:  About any topic?
7        MR. SCHWARTZ:  About anything.
8        MS. DEON:  You can answer that;
9   did you disregard things the Board members
10  said to you?
11       MR. SCHWARTZ:  No.  That's not
12  the question.
13  BY MR. SCHWARTZ:
14  Q.   Did you feel that you could disregard
15  anything that Board members said to you?
16       MS. DEON:  Verbally said to him?
17       MR. SCHWARTZ:  Any way; verbally,
18  text, e-mail, barometric pressure,
19  lightning bolt.
20       THE WITNESS:  You know, I give
21  Board members the professional courtesy,
22  but I -- I do what's right for the
23  organization.
24  BY MR. SCHWARTZ:

46 (Pages 181 to 184)

THOMAS P. GARVIN

Page 185

1    Q.    And you didn't think it was right for the
2  organization to read his e-mails?
3    A.    Again, I didn't have time to read all of
4  his e-mails let alone, you know, all the content. I
5  know you've seen the volumes of just forward --
6  forwarded e-mails; I don't have time for that,
7  that's not my -- I'm not a political person and I'm
8  not interested in that and so I would just delete
9  them.
10   Q.    Would your media relations person have
11 concerns if she saw some of the ones that you did
12 see?
13         MS. DEON:  Objection.
14 BY MR. SCHWARTZ:
15   Q.    Do you know?
16         MS. DEON:  Foundation.
17 BY MR. SCHWARTZ:
18   Q.    Testified about?
19         MS. DEON:  If you know.
20         MR. SCHWARTZ:  If you know.
21         THE WITNESS:  Yeah, I really
22    don't know.
23 BY MR. SCHWARTZ:
24   Q.    You don't know.

Page 186

1         So you wouldn't have any concerns if all of
2  these e-mails went into the public domain, would
3  you?  It didn't bother you, right?
4         MS. DEON:  Objection to the
5    extent of e-mails that he saw and he's
6    aware of.  He's testified that he only
7    recalls seeing samplings; he does not
8    recall every e-mail that was ever sent.
9  BY MR. SCHWARTZ:
10   Q.    Have you reviewed the e-mails that you
11 produced?
12   A.    Not all of them in detail.
13   Q.    Okay.  Well, the ones that you have
14 reviewed, that you can remember, would you have any
15 problem with that going into the public domain?
16   A.    I think most of it, from what I recall in
17 the first set that we gave you, was from the public
18 domain but, again, I didn't -- I don't spend time on
19 that type of -- reading that type of information.
20   Q.    But knowing the Board as you do, would they
21 have a problem if somebody outed those e-mails to
22 the public?  Would they have a problem with that?
23         MS. DEON:  Of the ones that he's
24    aware of?

Page 187

1         MR. SCHWARTZ:  Uh-huh.
2         THE WITNESS:  Not the ones that
3    I'm aware of.
4  BY MR. SCHWARTZ:
5    Q.    No problem?
6    A.    No.
7    Q.    It wouldn't affect Waverly in the least,
8  right?
9    A.    I'm not really sure.
10   Q.    Do you think Jewish people would want to be
11 at Waverly if they saw those e-mails?
12   A.    Again, I don't know what the content is
13 that you're referring to.
14   Q.    Do you think my father-in-law, who you met,
15 who was at Waverly, would want to be there if he saw
16 what came from Mr. Soltis?  Do you think he'd want
17 to be there?  You met him.
18         MS. DEON:  Objection.
19 BY MR. SCHWARTZ:
20   Q.    He liberated the Nazi death camps; do you
21 think he'd want to be there?
22         MS. DEON:  Objection.
23 BY MR. SCHWARTZ:
24   Q.    Answer it.

Page 188

1         MS. DEON:  Mr. Schwartz, do you
2    have a question?
3         MR. SCHWARTZ:  Yeah.  That's the
4    question.
5         MS. DEON:  Well, he's not
6    answering that question, so --
7         MR. SCHWARTZ:  Well --
8         MS. DEON:  -- if you'd like to
9    ask him -- and don't overtalk me.  Let me
10   state my objection.
11        MR. SCHWARTZ:  Then you ask the
12   question.  Why don't you go ahead, Grace,
13   you can ask it.  Do you have a question for
14   him?
15        MS. DEON:  Mr. Schwartz, stop
16   playing your unprofessional games.  I know
17   it's late in the day and --
18        MR. SCHWARTZ:  Professional is
19   having a witness sit here --
20        MS. DEON:  Mr. Schwartz --
21        MR. SCHWARTZ:  -- who's going to
22   be testifying?  You said it.  I want to
23   renew my objection to Mr. Bauer here; he's
24   going to be testifying, and I'm quite sure

Appendix 1086
StenoSource, LLC    (215)348-1095

THOMAS P. GARVIN

## Page 189

1  he'll be colluding with you and Mr. Garvin
2  as far as how to corroborate word-for-word
3  what Mr. Garvin said, and that's why --
4  MS. DEON: Mr. Schwartz --
5  MR. SCHWARTZ: I have a
6  continuing objection to his being here.
7  BY MR. SCHWARTZ:
8  Q.  Okay. So you would have no problem with
9  any of those e-mails being put in the public domain,
10  right?
11  MS. DEON: Asked and answered.
12  Objection.
13  BY MR. SCHWARTZ:
14  Q.  What's the answer? What's the answer?
15  Just repeat it.
16  MS. DEON: Objection. Of the
17  e-mails that Mr. Garvin said he recalls, he
18  has already testified he would not have a
19  concern; they were political in nature, and
20  then you went on a rant, so where are we
21  now?
22  MR. SCHWARTZ: Okay.
23  BY MR. SCHWARTZ:
24  Q.  Ms. Jungclaus' Tweet was political in

## Page 190

1  nature, wasn't it? Was it political? Look at this.
2  Is this political in nature (indicating)?
3  A.  Well, certainly. It says @realDonaldTrump,
4  I am the VP of HR in a company outside of
5  Philadelphia; an informal survey of our employees
6  shows 100 percent AA, African American, employees
7  voting Trump.
8  Q.  Does that involve politics?
9  A.  It seems to, yes.
10  Q.  So this one you paid attention to, right?
11  A.  She's an employee.
12  Q.  Board members you didn't pay attention to,
13  right?
14  A.  Again, I don't see the -- my responsibility
15  are the employees down, not to manage the Board.
16  Q.  And it's not your responsibility to suggest
17  to the Board what would be in the entity's best
18  interest? You don't have a fiduciary
19  responsibility?
20  A.  Well, of course, I do for the fiduciary
21  responsibility.
22  Q.  Did your assistant ever refer to Waverly as
23  the good ole boy network? That's in 43.
24  A.  My assistant?

## Page 191

1  Q.  Amy Blessing.
2  A.  Did she refer to Waverly as the good ole
3  boys network? No.
4  Q.  Never?
5  A.  Not that I recall.
6  Q.  Does the Board handbook provide for any
7  sanctions to be taken against offending Board
8  members?
9  A.  There's not a Board handbook, there's a
10  Board Policy Manual, and I don't know that it
11  addresses sanctions unless there's things like
12  attendance issues at meetings.
13  Q.  So other than attendance issues, there's
14  not a code of conduct for how Board members should
15  behave?
16  A.  You know, I'd have to review the documents;
17  there's quite a few Board documents.
18  Q.  I'd like to review them, too, if you can
19  provide them.
20  In any event, the Board -- to your
21  knowledge, the Board never sanctioned Mr. Soltis for
22  his e-mails; is that correct?
23  MS. DEON: Objection. You can
24  answer the question.

## Page 192

1  THE WITNESS: Yeah. Not to my
2  knowledge.
3  BY MR. SCHWARTZ:
4  Q.  This is touching on by -- it's touched on
5  in 47 on page 13 of the Amended Complaint and page 9
6  of the Answer, and what it touches on is a question
7  of compensation being -- compensation ratio being
8  determined with the assistance of the Human
9  Resources Compensation Consultant, right?
10  A.  Correct.
11  Q.  What's a compensation ratio; what is that?
12  A.  It's a measure of where someone's salary is
13  compared to what is a determined market value by a
14  third-party compensation consultant.
15  Q.  Okay. Does that rule the day, the
16  compensation -- I mean are those ratios ever changed
17  or do you have any discretion?
18  A.  So the way that it works is --
19  Q.  Please.
20  A.  -- the market values can move every year
21  based on the consultant's recommendations.
22  Q.  Right.
23  A.  So this year it may be X and maybe that
24  whole chart goes up by two percent. So the market

THOMAS P. GARVIN

## Page 193

1    values change based on when the charts change and
2    based on the person's percent of increase that they
3    receive.
4    Q.    Right.  So do you have discretion when it
5    comes to increasing pay?
6    A.    It's limited discretion.  We have a chart,
7    it's called a pay increase guide chart that we try
8    to follow as a guideline.  I do have discretion
9    beyond that because, you know, oftentimes I'll --
10   I've advocated for larger increases and gone off of
11   the chart, so... But then everything I recommend
12   based on our -- you know, my analysis and the
13   compensation consultant's review goes to the full
14   Human Resources Committee for their approval.
15   Q.    Okay.  So what are the various factors that
16   go into one's compensation review?
17   A.    So the various factors -- base compensation
18   is big.  We started looking at all compensation a
19   few years back where we included not just base, but
20   any variable compensation; bonuses, healthcare,
21   meals, resident -- we even included the resident
22   twice-a-year gift monies that would be distributed
23   to, you know, all the staff with the exception of
24   me; I opted out of that, didn't take resident money

## Page 194

1    that was really meant for the line staff.  So we put
2    all that together so that they could see total
3    compensation of, you know, everybody.  They being
4    the Human Resources Committee could see the total
5    compensation of each director.  We always made sure
6    that our compensation ratios -- actually, when I
7    first arrived the compensation ratios, for a large
8    part, were below market value.  I worked with Kathy,
9    over the course of a few years, to move all of the
10   senior managers to comp ratios that were, you know,
11   roughly between 1.03 and 1.05 meaning above market
12   value on their base compensation; that was something
13   that was important to Kathy from the beginning and I
14   did not disagree with her on it, and we have been
15   very consistent with making sure that people are at
16   least at their market value within three years of
17   being either promoted or being hired, and that's our
18   normal process and then, again, comp ratios usually
19   land somewhere around 1.05 in a mature, you know,
20   community, if you will.  So it's very -- it's very
21   prescribed and very consistent, you know, and,
22   again, it's really driven by this very well-done
23   program that has been developed at Waverly and been
24   in place for years.

## Page 195

1    Q.    If you wanted to, could you have somebody
2    sort of jump levels?  If you -- suppose I were your
3    employee and you particularly liked me --
4    doubtful -- is there a way that I could jump levels?
5    A.    Well, the only way you can -- I mean jump
6    levels -- you mean move up a level?
7    Q.    Yeah.
8    A.    That has to come from the compensation
9    consultant.  We could recommend -- if the job
10   changed, like if there was a significant change in
11   the aspects of the job from where they were to where
12   they are now --
13   Q.    Right.
14   A.    -- you know, we could certainly have a
15   conversation with a compensation consultant and then
16   that would involve giving him a -- you know, a new
17   job profile, job description for him to evaluate,
18   and he would actually make the recommendation on
19   whether or not it made sense to move that to the
20   next level, and there are times that we have done
21   that.
22   Q.    Can you remember specific people you did
23   that with?
24   A.    Pattie Rodgers is one.  Meredith Feher was

## Page 196

1    one.  Both of them received, you know, significant
2    size increases over the years because, again, with
3    that theory when the market -- when they were moved
4    to the next level up, then their comp ratio would
5    have dropped, so then that same theory -- in some
6    cases we used three years; in other cases we bumped
7    them, you know, close to the new market value to
8    make sure that we were consistent in our
9    programming, so those were -- those were a couple
10   that I remember.  There were a number of people at
11   the same compensation level which was Kathy, the
12   Vice President of Human Resources; Marc Heil, the
13   Vice President of Building Services, and Janet
14   Thompson, the Vice President of Marketing; all three
15   of them were at the same level within the pay
16   charts.
17   Q.    Did you ever make any recommendations with
18   respect to, you know, jumping the levels with my
19   client or on behalf of my client?
20   A.    To move the Vice President of Human
21   Resources to the next level up?
22   Q.    Or even at anytime in her career?
23   A.    No.  There was no reason to do that.
24        MS. DEON:  Excuse me one moment;

49 (Pages 193 to 196)

THOMAS P. GARVIN

Page 197

1    I have to just excuse myself.
2        (At this time, a short break was
3    taken.)
4        MR. SCHWARTZ:  We'll continue the
5    deposition at a time mutually convenient
6    for Ms. Deon and myself and Mr. Garvin, and
7    the opportunity, if you want it, is I can
8    certainly arrange for an office that's
9    closer to where Mr. Garvin works for future
10   depositions; whatever you want.
11       MS. DEON:  Okay.
12       (Witness excused.)
13       (Deposition suspended at 4:55
14   p.m.)
15
16
17
18
19
20
21
22
23
24

Page 198

1    C E R T I F I C A T I O N
2
3
4
5        I, MICHELLE C. MacARTHUR, Certified Court
6    Reporter, do hereby certify that the foregoing is a
7    true and accurate transcript of the stenographic
8    notes taken by me in the aforementioned matter.
9
10
11           - - -
12
13
14
15
16
17
18
19
20
21
22   DATE:      ---------------------------
23           MICHELLE C. MacARTHUR, C.C.R.
24           License No. X102192

50 (Pages 197 to 198)





Robert L. Robinson

Former Senior Vice President and Chief Counsel Litigation and Insurance Law, CIGNA;
Former Senior Vice President and Officer for Insurance Company of North America, Connecticut
General Life Insurance and CIGNA Reinsurance Company;
Former Director for Philadelphia Reinsurance Corp.;
Former Counsel and Managing Attorney for Xerox Corp.



Anita A. Summers

Professor Emeritus, University of Pennsylvania
Former Professor of Public Policy and Management and also Department Chair, Wharton School of
University of Pennsylvania
Director of Research, Samuel Zell and Robert Lurie Real Estate Center, Wharton

Appendix 1090



# MISSION STATEMENT

Waverly Heights, Ltd. is a non-profit corporation established to provide quality lifecare services to its residents. Its purpose is to serve the physical, emotional, recreational, social, religious and health needs of the Waverly Heights population in a professional and caring manner. These services are to be provided efficiently and economically within a financially stable organization.

# STATEMENT OF PURPOSES

1. To provide residents with services of the highest quality which meet the reasonable expectations of residents, and to provide those services within the budgets approved by the Board of Directors.

2. To provide the grounds, buildings, and equipment which reflect a quality environment.

3. To provide opportunities for residents to communicate with the Board, management, and staff; and to address resident concerns promptly and in a positive manner.

4. To provide the means whereby residents and employees participate in decisions that affect them.

5. To recruit, train, compensate, and manage employees in a fair manner so that they can participate effectively and enthusiastically in the professional delivery of the service we strive to achieve.

6. To provide an opportunity for residents to continue to contribute to the local community by supporting and participating in the activities of the Lower Merion Township community.

Waverly Heights • 1400 Waverly Road, Gladwyne, PA 19035 • 610-645-8764

*Waverly Heights*
*Confidential 1999 Competitive Review*

## WAVERLY STRENGTHS

- Residential location
- Spacious campus/extensive landscaping
- Percentage of health care beds to residential units
- Size of Assisted Living Units
- Reputation of Health Center
- In-House TV Channel (vs. Beaumont)

- Special Needs Unit
- Type of Building Construction
- Pub
- Garage Parking
- CCAC Accreditation (vs. Quadrangle)
- 100% Recoverable Entrance Fee
- Optional Pricing Plans (vs. Beaumont)
- Prescription Drug Coverage
- Meal Plan Flexibility
- No Limit on Number of Health Center Days
- No Charge for Transportation to Medical Appointments

## WAVERLY WEAKNESSES

- Size of apartments (vs. Beaumont)
- Dinner Hours (vs. all)
- Lowest Amount of Meal Credit (vs. all)
- No U.S. Mail Delivery to Villas (vs. all)
- Telephone System*
- No Nurse Practitioner for ILU

*Enhancements to the telephone system were made in 1998. Certain features have yet to be made available to Waverly residents in 1999.*

Waverly-0394



# Thomas Garvin

**From:** Thomas Garvin
**Sent:** Wednesday, November 23, 2016 9:15 AM
**To:** Buehler, Susan
**Subject:** Memo to Residents Personnel Change HR 9.30.2016
**Attachments:** Resident Memo Personnel Announcement HR 9.30.2016.pdf

Hi Susan,

Here is the notice that went to our residents.

tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax:   610.645.8602





**From:** Amy Blessing
**Sent:** Friday, September 30, 2016 2:00 PM
**To:** Leadership Team <leaderteam@whltd.org>
**Cc:** Kaitlyn Devany <kaitlyn.devany@waverlyheightsltd.org>; Cheryl Minnick <cheryl.minnick@waverlyheightsltd.org>;
Front Desk <frontdesk@waverlyheightsltd.org>
**Subject:** Memo to Residents Personnel Change HR 9.30.2016

Team,
We are distributing the attached memo to our residents today.

aeb

CONFIDENTIALITY NOTICE
This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited.

**Thomas Garvin**

| | |
|---|---|
| From: | Thomas Garvin |
| Sent: | Wednesday, November 23, 2016 9:11 AM |
| To: | Buehler, Susan |
| Subject: | Emailing: employee announcement |
| Attachments: | employee announcement.pdf |

Hi Susan,

Attached is the memo that went to staff.  I'll also send you the memo that went to our residents.

Thank you,

Tom

Waverly-0918

Best regards,
Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602





Waverly-0917

## Thomas Garvin

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Thursday, September 29, 2016 12:50 PM |
| **To:** | rebauer65@yahoo.com |
| **Subject:** | FW: Announcement |

Hi Dick,

Below is the memo that was sent to staff yesterday. I also had all the Directors meeting with their respective teams to inform them about the change.

I'll send you what we have prepared for distribution to the residents in a separate email. I don't plan to put that memo out until tomorrow due to the fact that her in-laws live her and I need to be sure they are aware before a memo goes out. Not a lot of the resident really even know Kathy so it should be okay to distribute by tomorrow.

Thanks,

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road – Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602





**From:** Thomas Garvin
**Sent:** Wednesday, September 28, 2016 4:10 PM
**To:** All Waverly Care Associates Employees ; All Waverly Heights Employees
**Subject:** Announcement

TO: OUR VALUED EMPLOYEES
FROM: THOMAS P. GARVIN, PRESIDENT AND CEO .
DATE: SEPTEMBER 28, 2016
SUBJECT: PERSONNEL CHANGES

Dear Employees,
I regretfully inform you that Kathy Jungclaus, our Vice President of Human Resources, is no longer with our organization. We are extremely appreciative of Kathy's many years of service to Waverly and wish her the best of luck in her future.
Members of Senior Management and our current Human Resources Department staff, Jacquie Levin and Jennifer Davies, will fulfill the needs of our employees during this recruitment and transition period. Should you have any questions, please contact your Department Director.

Waverly-0916

*Dick*

Richard E. Bauer

**From:** Thomas Garvin [mailto:thomas.garvin@waverlyheightsltd.org]
**Sent:** Wednesday, September 28, 2016 12:28 PM
**To:** 'Anita Summers'; Anne Conroy; 'Bill Bates'; 'Chuck Soltis'; 'David J. Farling'; 'Dick Conway'; 'Don Fleischer'; 'Dr. Lewis W. Bluemle'; 'Ed Mahoney'; edavis5167@gmail.com; 'Gary L. Bragg'; Gerald Renthal - Trustee (agrenthal@gmail.com); 'Howard Buzzard'; Jerry Hansen; 'Kathleen A. McEndy'; 'Malcolm L. Schoenberg'; Michael Buckley MD (rmbmd7@gmail.com); 'Richard E. Bauer'; 'Robert Barry'; 'Scott Jenkins'; 'Stephen W. Fugale'; Steven D. Kirkpatrick - WHL Trustee (kirkpatricks@mlhs.org); wessdeb@gmail.com
**Subject:** Kathy Jungclaus

Trustees:

Over the last week I have been dealing with a significant issue involving our VP of Human Resources, Kathy Jungclaus. The issue came to light early last week when I received an anonymous letter about a major concern with something Kathy posted on her personal Twitter account which was directly linked to Waverly and her position in HR. Given the significance of the issue, I took the issue to our Human Resources Committee and to a labor attorney for review and consideration. The end result of our investigation was that Kathy had committed a very blatant violation of our Social Media Policy by placing a very inappropriate statement on her Twitter account. She has subsequently been asked to resign and is no longer an employee of Waverly Heights. She will be given a severance agreement that is very fair given her length of service with the organization.

I will certainly cover this in executive session at the October board meeting. In the meantime, if you have any questions regarding this matter, please do not hesitate to contact me directly.

Thank you,

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

**BEST PLACES** 
to work in



CONFIDENTIALITY NOTICE: This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited. If you have received this message in error, please notify the sender immediately then delete the original message.

**Thomas Garvin**

| | |
|---|---|
| **From:** | Dick Bauer <rebauer65@yahoo.com> |
| **Sent:** | Wednesday, September 28, 2016 4:36 PM |
| **To:** | anneconroy@cs.com |
| **Cc:** | Thomas Garvin |
| **Subject:** | [EXTERNAL]RE: Kathy Jungclaus |

Thank you for your kind note, Anne.

See you soon.

*Dick*

Richard E. Bauer

**From:** anneconroy@cs.com [mailto:anneconroy@cs.com]
**Sent:** Wednesday, September 28, 2016 2:51 PM
**To:** rebauer65@yahoo.com
**Cc:** thomas.garvin@waverlyheightsltd.org
**Subject:** Re: Kathy Jungclaus

Thank you for that additional note. I am sure it was a terrible situation, leaving everyone feeling miserable, but I trust it was handled as well as possible.
Anne

-----Original Message-----
From: Dick Bauer
To: 'Thomas Garvin' ; 'Anita Summers' ; 'Anne Conroy' ; 'Bill Bates' ; 'Chuck Soltis' ; 'David J. Farling' ; 'Dick Conway' ; 'Don Fleischer' ; 'Dr. Lewis W. Bluemle' ; 'Ed Mahoney' ; edavis5167 ; 'Gary L. Bragg' ; 'Gerald Renthal - Trustee' ; 'Howard Buzzard' ; 'Jerry Hansen' ; 'Kathleen A. McEndy' ; 'Malcolm L. Schoenberg' ; 'Michael Buckley MD' ; 'Robert Barry' ; 'Scott Jenkins' ; 'Stephen W. Fugale' ; 'Steven D. Kirkpatrick - WHL Trustee' ; wessdeb
Sent: Wed, Sep 28, 2016 1:23 pm
Subject: RE: Kathy Jungclaus

This is just a brief follow-up to Tom's message about this unfortunate situation.

Tom has been thoughtful and deliberate throughout the discovery and termination process and he handled yesterday's difficult termination discussion in a clear, compassionate and professional manner. He has a long list of next steps to follow up on yesterday's termination and is doing an excellent job of communicating with all of the appropriate parties. This will take some time to sort out, but we are well on the way in that regard.

I would be remiss if I failed to mention that Kathy Jungclaus tearfully asked me to apologize to both the HR Committee and the full Board for her poor judgment.

Please feel free to touch base with me (or Tom) if you have comments or questions.

HR Committee: thanks so much for your helpful insights and perspectives!

Appendix 1098

Waverly-0914

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Wednesday, September 28, 2016 4:10 PM |
| **To:** | All Waverly Care Associates Employees; All Waverly Heights Employees |
| **Subject:** | Announcement |

TO: OUR VALUED EMPLOYEES

FROM: THOMAS P. GARVIN, PRESIDENT AND CEO

DATE: SEPTEMBER 28, 2016

SUBJECT: PERSONNEL CHANGES

Dear Employees,

I regretfully inform you that Kathy Jungclaus, our Vice President of Human Resources, is no longer with our organization. We are extremely appreciative of Kathy's many years of service to Waverly and wish her the best of luck in her future.

Members of Senior Management and our current Human Resources Department staff, Jacquie Levin and Jennifer Davies, will fulfill the needs of our employees during this recruitment and transition period. Should you have any questions, please contact your Department Director.

Best regards,

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

**BEST PLACES** 
to work in



## Thomas Garvin

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Wednesday, September 28, 2016 4:10 PM |
| **To:** | All Waverly Care Associates Employees; All Waverly Heights Employees |
| **Subject:** | Announcement |

TO: OUR VALUED EMPLOYEES

FROM: THOMAS P. GARVIN, PRESIDENT AND CEO

DATE: SEPTEMBER 28, 2016

SUBJECT: PERSONNEL CHANGES

Dear Employees,

I regretfully inform you that Kathy Jungclaus, our Vice President of Human Resources, is no longer with our organization. We are extremely appreciative of Kathy's many years of service to Waverly and wish her the best of luck in her future.

Members of Senior Management and our current Human Resources Department staff, Jacquie Levin and Jennifer Davies, will fulfill the needs of our employees during this recruitment and transition period. Should you have any questions, please contact your Department Director.

Best regards,

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

BEST PLACES
to work in



Waverly-0912

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road – Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

BEST PLACES to work in PA 2015 2017 2019 2021



CONFIDENTIALITY NOTICE: This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited. If you have received this message in error, please notify the sender immediately then delete the original message.

Waverly-0911

**Thomas Garvin**

| | |
|---|---|
| **From:** | Stephen Fugale <stephen.fugale@villanova.edu> |
| **Sent:** | Wednesday, September 28, 2016 12:52 PM |
| **To:** | Thomas Garvin |
| **Subject:** | [EXTERNAL][CONTENT] RE: Kathy Jungclaus |

Sorry to hear this Tom but thanks for taking prompt and appropriate action.

I know October will be upon us soon, is there anything you need from me regarding the Risk Committee?

Steve

**Stephen Fugale**
Vice President & Chief Information Officer | Villanova University
800 Lancaster Ave | Technology Services Building | Villanova, PA 19085
Tel 610-519-4402 | Fax 610-519-4435 | Stephen.Fugale@villanova.edu



 Think before you print

From: Thomas Garvin [mailto:thomas.garvin@waverlyheightsltd.org]
Sent: Wednesday, September 28, 2016 12:28 PM
To: 'Anita Summers'; Anne Conroy; 'Bill Bates'; 'Chuck Soltis'; 'David J. Farling'; 'Dick Conway'; 'Don Fleischer'; 'Dr. Lewis W. Bluemle'; 'Ed Mahoney'; edavis5167@gmail.com; 'Gary L. Bragg'; Gerald Renthal - Trustee (agrenthal@gmail.com); 'Howard Buzzard'; Jerry Hansen; 'Kathleen A. McEndy'; 'Malcolm L. Schoenberg'; Michael Buckley MD (rmbmd7@gmail.com); 'Richard E. Bauer'; 'Robert Barry'; 'Scott Jenkins'; Stephen Fugale; Steven D. Kirkpatrick - WHL Trustee (kirkpatricks@mlhs.org); wessdeb@gmail.com
Subject: Kathy Jungclaus

Trustees:

Over the last week I have been dealing with a significant issue involving our VP of Human Resources, Kathy Jungclaus. The issue came to light early last week when I received an anonymous letter about a major concern with something Kathy posted on her personal Twitter account which was directly linked to Waverly and her position in HR. Given the significance of the issue, I took the issue to our Human Resources Committee and to a labor attorney for review and consideration. The end result of our investigation was that Kathy had committed a very blatant violation of our Social Media Policy by placing a very inappropriate statement on her Twitter account. She has subsequently been asked to resign and is no longer an employee of Waverly Heights. She will be given a severance agreement that is very fair given her length of service with the organization.

I will certainly cover this in executive session at the October board meeting. In the meantime, if you have any questions regarding this matter, please do not hesitate to contact me directly.

Thank you,

Waverly-0910

## Thomas Garvin

**From:**      Thomas Garvin
**Sent:**      Wednesday, September 28, 2016 12:28 PM
**To:**        'Anita Summers'; Anne Conroy; 'Bill Bates'; 'Chuck Soltis'; 'David J. Farling'; 'Dick
               Conway'; 'Don Fleischer'; 'Dr. Lewis W. Bluemle'; 'Ed Mahoney'; edavis5167@gmail.com;
               'Gary L. Bragg'; Gerald Renthal - Trustee (agrenthal@gmail.com); 'Howard Buzzard'; Jerry
               Hansen; 'Kathleen A. McEndy'; 'Malcolm L. Schoenberg'; Michael Buckley MD (rmbmd7
               @gmail.com); 'Richard E. Bauer'; 'Robert Barry'; 'Scott Jenkins'; 'Stephen W. Fugale';
               Steven D. Kirkpatrick - WHL Trustee (kirkpatricks@mlhs.org); wessdeb@gmail.com
**Subject:**   Kathy Jungclaus

Trustees:

Over the last week I have been dealing with a significant issue involving our VP of Human Resources, Kathy Jungclaus. The issue came to light early last week when I received an anonymous letter about a major concern with something Kathy posted on her personal Twitter account which was directly linked to Waverly and her position in HR. Given the significance of the issue, I took the issue to our Human Resources Committee and to a labor attorney for review and consideration. The end result of our investigation was that Kathy had committed a very blatant violation of our Social Media Policy by placing a very inappropriate statement on her Twitter account. She has subsequently been asked to resign and is no longer an employee of Waverly Heights. She will be given a severance agreement that is very fair given her length of service with the organization.

I will certainly cover this in executive session at the October board meeting. In the meantime, if you have any questions regarding this matter, please do not hesitate to contact me directly.

Thank you,

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602





Waverly-0909





CONFIDENTIALITY NOTICE: This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited. If you have received this message in error, please notify the sender immediately then delete the original message.

**Thomas Garvin**

| | |
|---|---|
| **From:** | Dick Bauer <rebauer65@yahoo.com> |
| **Sent:** | Tuesday, September 27, 2016 8:21 PM |
| **To:** | Thomas Garvin; gbragg@obs-law.com; edavis5167@gmail.com; ebmahoney@ebmahoney.com; donfle@comcast.net; kmcendy@comcast.net; soltis@earthlink.net |
| **Cc:** | Anita Summers |
| **Subject:** | [EXTERNAL]RE: K Jungclaus |

It was indeed a gut wrenching and difficult experience. Tom was deliberate, considerate and firm in his approach. Kathy's comments were very telling.

Tom and I are documenting the discussion for the record.

Thank you all for your thoughtful consideration and willingness to be generous under these unusual circumstances.

Tom will keep our committee advised of future events.

Feel free to connect with Tom or me if you wish to discuss further.

*Dick*

Richard E. Bauer

**From:** Thomas Garvin [mailto:thomas.garvin@waverlyheightsltd.org]
**Sent:** Tuesday, September 27, 2016 5:29 PM
**To:** rebauer65@yahoo.com; gbragg@obs-law.com; edavis5167@gmail.com; ebmahoney@ebmahoney.com; donfle@comcast.net; kmcendy@comcast.net; soltis@earthlink.net
**Cc:** Anita Summers
**Subject:** K Jungclaus

HR Committee:

Thank you again for your guidance and support in dealing with the situation with Kathy Jungclaus. I wanted to let you know that Dick and I met with her late this afternoon and informed her that she was being asked to resigned effective immediately. It went about as well as you would expect, but the end result is that she is no longer an employee of Waverly Heights.

I will send notice to the full board within the next 24 hours.

Thank you again,

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road · Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

1

Waverly-0907

**Thomas Garvin**

| | |
|---|---|
| **From:** | Ed Mahoney <ebmahoney@ebmahoney.com> |
| **Sent:** | Tuesday, September 27, 2016 5:40 PM |
| **To:** | Thomas Garvin |
| **Cc:** | rebauer65@yahoo.com; gbragg@obs-law.com; edavis5167@gmail.com; donfle@comcast.net; kmcendy@comcast.net; soltis@earthlink.net; Anita Summers |
| **Subject:** | [EXTERNAL]Re: K Jungclaus |

Rough day Tom
Thank you

Sent from my iPhone

On Sep 27, 2016, at 5:28 PM, Thomas Garvin <thomas.garvin@waverlyheightsltd.org> wrote:

> HR Committee:
> Thank you again for your guidance and support in dealing with the situation with Kathy Jungclaus. I wanted to let you know that Dick and I met with her late this afternoon and informed her that she was being asked to resigned effective immediately. It went about as well as you would expect, but the end result is that she is no longer an employee of Waverly Heights.
> I will send notice to the full board within the next 24 hours.
> Thank you again,
> Tom
> **Thomas P. Garvin**
> *President & Chief Executive Officer*
> Waverly Heights Ltd.
> 1400 Waverly Road - Gladwyne, PA 19035
> www.waverlyheightsltd.org
> Phone: 610.645.8607
> Fax: 610.645.8602
> CONFIDENTIALITY NOTICE: This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited. If you have received this message in error, please notify the sender immediately then delete the original message.

Waverly-0906

**Thomas Garvin**

| | |
|---|---|
| From: | Eleanor Davis <edavis5167@gmail.com> |
| Sent: | Tuesday, September 27, 2016 5:40 PM |
| To: | Thomas Garvin |
| Cc: | rebauer65@yahoo.com; gbragg@obs-law.com; ebmahoney@ebmahoney.com; donfle@comcast.net; kmcendy@comcast.net; soltis@earthlink.net; Anita Summers |
| Subject: | [EXTERNAL]Re: K Jungclaus |

I know how difficult this has been for all involved and thank you for your steadfast leadership.
Eleanor

Sent from my iPhone

On Sep 27, 2016, at 10:28 PM, Thomas Garvin <thomas.garvin@waverlyheightsltd.org> wrote:

> HR Committee:
> Thank you again for your guidance and support in dealing with the situation with Kathy Jungclaus. I wanted to let you know that Dick and I met with her late this afternoon and informed her that she was being asked to resigned effective immediately. It went about as well as you would expect, but the end result is that she is no longer an employee of Waverly Heights.
> I will send notice to the full board within the next 24 hours.
> Thank you again,
> Tom
> **Thomas P. Garvin**
> *President & Chief Executive Officer*
> Waverly Heights Ltd.
> 1400 Waverly Road - Gladwyne, PA 19035
> www.waverlyheightsltd.org
> Phone: 610.645.8607
> Fax: 610.645.8602

CONFIDENTIALITY NOTICE: This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited. If you have received this message in error, please notify the sender immediately then delete the original message.

Waverly-0905

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Tuesday, September 27, 2016 5:29 PM |
| **To:** | rebauer65@yahoo.com; gbragg@obs-law.com; edavis5167@gmail.com; ebmahoney@ebmahoney.com; donfle@comcast.net; kmcendy@comcast.net; soltis@earthlink.net |
| **Cc:** | Anita Summers |
| **Subject:** | K Jungclaus |

HR Committee:

Thank you again for your guidance and support in dealing with the situation with Kathy Jungclaus. I wanted to let you know that Dick and I met with her late this afternoon and informed her that she was being asked to resigned effective immediately. It went about as well as you would expect, but the end result is that she is no longer an employee of Waverly Heights.

I will send notice to the full board within the next 24 hours.

Thank you again,

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road – Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

 



Waverly-0904

Human Resources Committee:

We have an urgent need to have a CONFIDENTIAL conference call regarding a significant issue with one of our senior managers. Dick and are hoping to plan the call for 11:00 Monday Morning. Please RSVP to this email regarding your availability.

Time: 11:00 AM
Date: Monday, September 26th
Call-In Number: 800-501-8979
Meeting I.D.: 6458600

By way of separate email, I will forward documents for your review prior to the call.

We are also asking Anita, as Chair of Ethics Committee to join the discussion.

Please keep this call confidential.

Thank you,

Tom

CONFIDENTIALITY NOTICE
This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited.

CONFIDENTIALITY NOTICE: This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited. If you have received this message in error, please notify the sender immediately then delete the original message.

**From:** Tom Garvin <thomas.Garvin@waverlyheightsltd.org>
**Date:** Sunday, September 25, 2016 at 4:42 PM
**To:** Richard Bauer <richard.bauer@waverlyheightsltd.org>, Edwin Mahoney
<edwin.mahoney@waverlyheightsltd.org>, Gary Bragg <gary.bragg@waverlyheightsltd.org>, Eleanor
Davis <eleanor.davis@waverlyheightsltd.org>, Donald Fleischer
<donald.fleischer@waverlyheightsltd.org>, Kathleen McEndy
<kathleen.mcendy@waverlyheightsltd.org>, Charles Soltis <charles.soltis@waverlyheightsltd.org>
**Cc:** Anita Summers <summers@wharton.upenn.edu>
**Subject:** HIGHLY CONFIDENTIAL Conference Call

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

**From:** Thomas Garvin
**Sent:** Sunday, September 25, 2016 4:59 PM
**To:** Richard Bauer <richard.bauer@waverlyheightsltd.org>; Edwin Mahoney <edwin.mahoney@waverlyheightsltd.org>; Gary Bragg <gary.bragg@waverlyheightsltd.org>; Eleanor Davis <eleanor.davis@waverlyheightsltd.org>; Donald Fleischer <donald.fleischer@waverlyheightsltd.org>; Kathleen McEndy <kathleen.mcendy@waverlyheightsltd.org>; Charles Soltis <charles.soltis@waverlyheightsltd.org>
**Cc:** Anita Summers <summers@wharton.upenn.edu>
**Subject:** Re: HIGHLY CONFIDENTIAL

HR Committee:

I received the attached anonymous letter last week regarding the conduct of Kathy Jungclaus with respect to her personal Twitter account. The content of the letter is the subject of our upcoming confidential conference call. The issue is very serious and I have asked one of our Labor Relations Attorneys to review the situation. Our attorney has summarized the legal issues in the email included below.

Also, Dick and I feel that the nature of the issues warrant including Anita as Chair of our Ethics Committee.

Please let me know if you are able to attend the conference call at 11:00 tomorrow morning.

Thank you,

Tom

Waverly-0901

# Thomas Garvin

**From:** Thomas Garvin
**Sent:** Monday, September 26, 2016 3:02 PM
**To:** 'Eleanor Davis'; ebmahoney@ebmahoney.com; donfle@comcast.net
**Cc:** rebauer65@yahoo.com
**Subject:** RE: [EXTERNAL]Re: HIGHLY CONFIDENTIAL

Hi Eleanor, Don & Ed,

I wanted to let you know that everyone on the HR Committee call was in agreement that Kathy Jungclaus should be terminated from Waverly Heights. We will offer her the opportunity to resign with a severance agreement put in place.

Dick Bauer and I plan to meet with Kathy tomorrow afternoon so I can communicate that she is being relieved our her duties. Until then, please keep this highly confidential.

Thank you for your support on this very difficult situation.

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602





**From:** Eleanor Davis [mailto:edavis5167@gmail.com]
**Sent:** Monday, September 26, 2016 2:02 PM
**To:** Thomas Garvin
**Subject:** [EXTERNAL]Re: HIGHLY CONFIDENTIAL

Tom,
Please keep me informed of the out come of the conference call. I can be reached by email now.
Glad we had a chance to talk this morning.
I will return on Wed.
Sincerely,
Eleanor

Sent from my iPhone

On Sep 26, 2016, at 2:11 PM, Thomas Garvin <thomas.garvin@waverlyheightsltd.org> wrote:

Waverly-0900

**Thomas Garvin**

**From:**       Thomas Garvin
**Sent:**       Monday, September 26, 2016 2:59 PM
**To:**         'Summers, Anita A'
**Subject:**    RE: [EXTERNAL]quick thought

Thank you so much Anita, I appreciate your support on this very difficult situation.

I will definitely pull her email and freeze everything the minute she is released. Dick is coming tomorrow afternoon to be with me when I terminate her employment. At that point her access to everything will be cut-off.

It should be an interesting day!

Tom

**Thomas P. Garvin**
*President & Chief Executive Officer*
Waverly Heights Ltd.
1400 Waverly Road – Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax: 610.645.8602

BEST PLACES
to work in



**From:** Summers, Anita A [mailto:summers@wharton.upenn.edu]
**Sent:** Monday, September 26, 2016 2:29 PM
**To:** Thomas Garvin
**Subject:** [EXTERNAL]quick thought

Tom: You are such a wondrous CEO!
Quick thought: should you freeze her Waverly email address, and look over recent mail?.....................Anita

Waverly-0899

**Thomas Garvin**

| | |
|---|---|
| From: | Thomas Garvin |
| Sent: | Monday, September 26, 2016 10:22 AM |
| To: | 'Richard Bauer' |
| Subject: | RE: [EXTERNAL] |

Hi Dick,

We are ready for the call. I have touched based with everyone and all can be on the call except Eleanor and Don. I spoke in detail to both of them and they concur that she cannot remain in her role given the fact of the situation.

I'll talk to you on the call at 11.

Tom

Thomas P. Garvin
President & Chief Executive Officer
Waverly Heights Ltd.
1400 Waverly Road - Gladwyne, PA 19035
www.waverlyheightsltd.org
Phone: 610.645.8607
Fax:   610.645.8602


-----Original Message-----
From: Richard Bauer [mailto:rebauer65@yahoo.com]
Sent: Monday, September 26, 2016 10:20 AM
To: Thomas Garvin <thomas.garvin@waverlyheightsltd.org>
Subject: [EXTERNAL]

I have a feeling that you are having a challenging morning. Let me know how you are doing when you can. Thanks.

Sent from my iPhone

Waverly-0898

From: Tom Garvin <thomas.Garvin@waverlyheightsltd.org>
Date: Sunday, September 25, 2016 at 4:42 PM
To: Richard Bauer <richard.bauer@waverlyheightsltd.org>, Edwin Mahoney <edwin.mahoney@waverlyheightsltd.org>, Gary Bragg <gary.bragg@waverlyheightsltd.org>, Eleanor Davis <eleanor.davis@waverlyheightsltd.org>, Donald Fleischer <donald.fleischer@waverlyheightsltd.org>, Kathleen McEndy <kathleen.mcendy@waverlyheightsltd.org>, Charles Soltis <charles.soltis@waverlyheightsltd.org>
Cc: Anita Summers <summers@wharton.upenn.edu>
Subject: HIGHLY CONFIDENTIAL Conference Call

Human Resources Committee:

We have an urgent need to have a CONFIDENTIAL conference call regarding a significant issue with one of our senior managers. Dick and are are hoping to plan the call for 11:00 Monday Morning. Please RSVP to this email regarding your availability.

Time: 11:00 AM
Date: Monday, September 26th
Call-In Number: 800-501-8979
Meeting I.D.: 6458600

By way of separate email, I will forward documents for your review prior to the call.

We are also asking Anita, as Chair of Ethics Committee to join the discussion.

Please keep this call confidential.

Thank you,

Tom

CONFIDENTIALITY NOTICE
This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited.

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Sunday, September 25, 2016 4:59 PM |
| **To:** | Richard Bauer; Edwin Mahoney; Gary Bragg; Eleanor Davis; Donald Fleischer; Kathleen McEndy; Charles Soltis |
| **Cc:** | Anita Summers |
| **Subject:** | Re: HIGHLY CONFIDENTIAL |
| **Attachments:** | Twitter Issue.pdf |

HR Committee:

I received the attached anonymous letter last week regarding the conduct of Kathy Jungclaus with respect to her personal Twitter account. The content of the letter is the subject of our upcoming confidential conference call. The issue is very serious and I have asked one of our Labor Relations Attorneys to review the situation. Our attorney has summarized the legal issues in the email included below.

Also, Dick and I feel that the nature of the issues warrant including Anita as Chair of our Ethics Committee.

Please let me know if you are able to attend the conference call at 11:00 tomorrow morning.

Thank you,

Tom



Waverly-0896

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Sunday, September 25, 2016 4:42 PM |
| **To:** | Richard Bauer; Edwin Mahoney; Gary Bragg; Eleanor Davis; Donald Fleischer; Kathleen McEndy; Charles Soltis |
| **Cc:** | Anita Summers |
| **Subject:** | HIGHLY CONFIDENTIAL  Conference Call |
| | |
| **Categories:** | My Contacts |

Human Resources Committee:

We have an urgent need to have a CONFIDENTIAL conference call regarding a significant issue with one of our senior managers. Dick and are are hoping to plan the call for 11:00 Monday Morning. Please RSVP to this email regarding your availability.

Time: 11:00 AM
Date: Monday, September 26th
Call-In Number: 800-501-8979
Meeting I.D.: 6458600

By way of separate email, I will forward documents for your review prior to the call.

We are also asking Anita, as Chair of Ethics Committee to join the discussion.

Please keep this call confidential.

Thank you,

Tom

CONFIDENTIALITY NOTICE
This transmission may contain information that is privileged, confidential and/or otherwise protected from disclosure to anyone other than its intended recipient(s). Any disclosure, dissemination, distribution, or copying of this communication or its contents except as permitted by law governing privacy of information issues is strictly prohibited.

Waverly-0895

**Thomas Garvin**

From:        Thomas Garvin
Sent:        Friday, September 23, 2016 9:14 AM
To:          Dick Bauer
Subject:     Re: [EXTERNAL][CONTENT]

Hi Dick,

Thank you for your assistance with this unfortunate situation. Let's definitely plan to talk on Sunday.
Please let me know after you speak with Anita so I can send out an invitation for a call with the HR Committee on Monday. I agree that in advance of that call, I'll send out the policy information. I'm figuring that we should probably send the letter and the attorney's review just prior to the call. I would really like to have the committee review the letter and the twitter feed prior to the call so they have all the information.

We can talk more about that when we speak this weekend.

Tom

From: Richard Bauer <rebauer65@yahoo.com>
Date: Friday, September 23, 2016 at 8:59 AM
To: Tom Garvin <thomas.Garvin@waverlyheightsltd.org>
Subject: [EXTERNAL][CONTENT]

HI Tom,
I sent Anita an e-mail last night indicating that I would call her this morning. She responded that she will be unavailable until this afternoon and I sent a note back indicating that I would call after 3 today. I will send you an email summary following that discussion.
I have not read the policy info that you sent yet, but I will get to that today. It might be good to send this same info to the HR Committee and Anita prior to our upcoming meeting if you feel that is appropriate.
Feel free to call if I can be helpful on Sunday any time if you wish to discuss any of this but do not feel obliged to do so.
I know this is a big issue and you are handling it extremely well. Enjoy your family time and safe trip home.
*Dick*
Richard E. Bauer

**Thomas Garvin**

| | |
|---|---|
| **From:** | Thomas Garvin |
| **Sent:** | Thursday, September 22, 2016 3:12 PM |
| **To:** | Dick Bauer |
| **Subject:** | Re: [EXTERNAL] |

Okay, we can finalize when we talk tomorrow. I think we can aim to set-up the call for 10:30 Monday morning if possible. Hopefully you can connect with Anita before we talk tomorrow so we can get her onboard before I send the invitation for a call to the HR Committee.

The conference ends at noon tomorrow, so I'll try to call you by 12:30.

Also, I expect to have the bullet point email from our attorney by end of day tomorrow.

Thanks again,

Tom

From: Richard Bauer <rebauer65@yahoo.com>
Date: Thursday, September 22, 2016 at 3:04 PM
To: Tom Garvin <thomas.Garvin@waverlyheightsltd.org>
Subject: [EXTERNAL]

Hi again,
I really like your approach to moving this forward and the Board tactics are superb in my view.
I have an early morning dental appointment which should be done by 10:15 at the latest. It is in Bryn Mawr. I am free the rest of the day with one exception which I can handle. I can be very flexible the rest of the week. If you are free around 10:30 on Monday I can either swing by or give you a call to discuss further.
You might want to think about the possibility of my saying something to the HR Committee and perhaps the Board later about your comments to me earlier this year regarding the individual in question. I have some other questions and suggestions which we can discuss either tomorrow afternoon or next week as circumstances warrant.
I hope you can enjoy your weekend down there. This, too, shall pass.

*Dick*
Richard E. Bauer

Waverly-0893

Appendix 1119

# EXHIBIT "TG 4"

# SEE APPENDIX 1-90



EXHIBIT

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | **NO. 17-CV-4462** |
| **v.** | : | |
| WAVERLY HEIGHTS LTD., | : | |
| THOMAS P. GARVIN and John and Jane Doe | : | |
| Numbers 1 through 23 | : | |
| **Defendants** | : | |

## DEFENDANT, WAVERLY HEIGHTS LTD.'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS[1]

Defendant, Waverly Heights Ltd ("Waverly" or "Defendant"), responds to Plaintiff's

Request for Admissions, by and through its counsel, and in response thereto avers as follows:

1.  Kindly admit that email authored by former Board Chairman Charles Soltis, email that
    was critical of Barack Obama, was at one time on Waverly's email system?

    Admitted _____        Denied _____X_____

    Denied.  At no time were emails sent to the public at large. The Board Chairman was
    not an employee.  It is admitted only that on occasion he sent emails to non-Waverly
    individuals and he would also include Thomas Garvin, Janet Thompson and/or Plaintiff
    politically themed emails.  However, it is denied that the emails were racist.  It is

---

[1] By virtue of the dismissal with prejudice of Counts V and VI of the Complaint, there are claims remaining only
against Waverly Heights Ltd.  The Court is in the process of communicating to the Civil Clerk that the other two
defendants should be dismissed as parties to this action.  As such, Waverly Heights Ltd. is the responding party

believed and therefore averred that said emails were conservatively than liberally oriented (i.e. political cartoons that appear in the public domain).

2. Kindly admit that the "Anonymous" letter sent to Defendant Garvin was written by a Board of Trustees member.

    Admitted _____     Denied__X_____

    Denied. Defendant is without knowledge or information to form a belief as to the identity of who wrote the anonymous letter.

3. Kindly admit that, prior to her dismissal, no meeting, was had of the full Human Resource Committee of the Board of Trustees to discuss, and/or vote on the termination of the Plaintiff for violating the Waverly's Social Media Policy.

    Admitted ____X_____     Denied____X____

    Admitted in part, denied in part. It is admitted that the full Human Resources Committee did not meet; however, the members of the committee that did meet constituted a quorum. Further, said meeting was held for the sole purpose of discussing Plaintiff's conduct and the outcome. It is denied that violation of the social media policy was the sole reason for her termination. Rather, it was primarily due to exercising poor judgment for a Vice President of Human Resources and conduct detrimental to Waverly's operations going forward given her role to enforce Waverly's policies amongst a diverse employee population. Moreover, such conduct negatively impacted Waverly's public relations with members of its community and potentially outside of the Waverly community.

4. Kindly admit that prior to her dismissal, no meeting was held of the full Board of Trustees to discuss, and/or vote on the termination of the Plaintiff for violating Waverly's Social Media Policy.

    Admitted____X_____     Denied____X____

    Admitted in part, denied in part. It is admitted that Waverly's full Board of Trustees did not meet to discuss Plaintiff's conduct and termination. It is denied for the reasons specified in Defendant's response to Request for Admissions No. 3, above, that the sole reason for termination was only related to an alleged violation of the social media policy. The response to Request for Admissions No. 3 is incorporated herein by reference as if set forth at length.

5. Kindly admit that the full members of the Human Resource Committee of the Board of Trustees and the full Board of Trustee members were notified of the termination of the Plaintiff for violating the Waverly Social Media Policy after the termination of the plaintiff.

Admitted _____X_____    Denied___X_____

Admitted in part, denied in part. It is admitted that following Plaintiff's termination, at some point thereafter, the full Board of Trustees and full Human Resource Committee members were made aware of Plaintiff's separation from employment. Although the writing transmitted to the aforementioned referenced the violation of the social media policy, the additional grounds for termination as referenced in Defendants' response to Request for Admission No. 3, above, were also communicated orally.

6. Kindly admit that at no time was Plaintiff interviewed or provided an opportunity to discuss the terminating offense with Defendant Garvin, the Human Resource Committee members, or Full Board of Trustee members either individually or collectively prior to being terminated.

Admitted _____    Denied___X_____

Denied. Plaintiff had an opportunity to discuss the subject events with Thomas Garvin upon his discovery of the same, as well as on another occasion when Defendants' agents informed her of the decision to terminate her employment. By way of further answer, while Mr. Garvin was away on business the following week, Plaintiff packed up her office and informed others in the office that she anticipated being terminated. Plaintiff did not, as she now claims, attempt to reach Mr. Garvin.

7. Kindly admit that Kathleen Jungclaus was sexually harassed in the workplace in the presence of Defendant Garvin and Robert Supper, and no action was taken.

Admitted _____    Denied___X_____

Denied. By way of further answer, at no time has Plaintiff even contended that she was sexually harassed. By way of further answer, there is a corporate compliance line and at no time did she ever make a complaint of any type of harassment or discrimination that would be legally actionable. Rather, Plaintiff verbally complained to Mr. Garvin that the female CFO was causing a hostile workplace without any claim that Plaintiff

was in a protected class.  Mr. Garvin promptly addressed the situation with Plaintiff and
when he wanted to proceed further, Plaintiff requested that no action be action.

EASTBURN AND GRAY, P.C.

By: _____

Dated: April 18, 2018

Grace M. Deon
Attorneys for Defendant

60 East Court Street
P.O. Box 1389
Doylestown, PA  18901
Phone:  (215) 345-7000
Facsimile:  (215)345-9142
gdeon@eastburngray.com

# EXHIBIT "TG 6"

# SEE APPENDIX 568-597

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | NO.   17-cv-04462-RK |
| | : | |
| Plaintiff | : | |
| v. | : | Jury Trial Demanded |
| | : | |
| WAVERLY HEIGHTS, LTD., | : | |
| THOMAS P. GARVIN and | : | |
| JOHN and JANE DOES NUMBERS 1-21 | : | |
| | : | |
| Defendants | : | |

## ANSWER WITH AFFIRMATIVE DEFENSES BY DEFENDANT, WAVERLY HEIGHTS, LTD., TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant, Waverly Heights, Ltd. ("Waverly" or "Defendant"),[1] by and through its

attorneys, Eastburn and Gray, P.C., answers the First Amended Complaint of Plaintiff, Kathleen

M. Jungclaus ("Plaintiff"), and in response thereto avers as follows:

### NATURE OF THIS ACTION

1.     Denied.  The First Amended Complaint is a writing, the language of which speaks

for itself.  To the extent that the allegations contained in paragraph 1 constitute conclusions of law,

they are denied and no further response is required.

### PARTIES

2.     Admitted.  By way of further answer, it was Thomas Garvin's ("Mr. Garvin") idea

to designate Plaintiff as a vice-president.

---

[1] On April 9, 2018, this Honorable Court granted Defendants' Motion to Dismiss whereby Count V (Defamation) and Count VI (Negligent Supervision of Thomas Garvin) were dismissed with prejudice.  As a result, neither Thomas P. Garvin nor John and Jane Doe Numbers 1-21 (Waverly's Board of Trustees) are parties to this action.

3.     Admitted in part, denied in part. Defendant's location, establishment and reference to its website are admitted.  The remaining allegations contained in paragraph 3 constitute conclusions of law, they are denied and no further response is required.

4.     Admitted. By way of further answer, Mr. Garvin is no longer a party to this action.

5.     It is admitted that Defendant is supervised by a Board of Trustees.  Defendants John and Jane Doe Numbers 1-21 are no longer parties to this action.

## JURISDICTION AND VENUE

6. through 8.   Denied.  The allegations contained in paragraphs 6 through 8 constitute conclusions of law, they are denied and no further response is required.

## FULFILLMENT OF TITLE VII CONDITIONS

9.     Denied.  The allegations contained in paragraph 9 constitute conclusions of law, they are denied and no further response is required.

## FACTUAL ASSERTIONS

10.     Admitted in part, denied in part.  It is admitted that Plaintiff's resume reflects her background as stated.  It is denied that Plaintiff was "key" to Waverly attaining a "Best Place to Work" designation.

11.     Denied.  The content of Waverly's website is a writing, the language of which speaks for itself.

12.     Denied.   After reasonable investigation, Defendant is without knowledge or information to form a belief as to the truth of said averments, they are denied and no further response is required.

13.     Admitted in part, denied in part.  It is admitted that Plaintiff received performance evaluations scores that generally reflected a satisfactory performance level.  It is denied that her

2

job performance resulted in a particular level of reduced job turnover. Plaintiff's responsibilities included risk control and oversight of workers compensation claims; however, her job performance had nothing to do with the manner in which the workers compensation insurer distributed dividends to Waverly over the implicated years. It is admitted that Plaintiff was responsible for employee training, but it is denied that there was any quantifiable correlation between that aspect of her job and saving Waverly money. By way of further answer, Waverly would hope that its Vice-President of Human Resources would treat people fairly; however, due to the events leading up to her termination, Waverly management had justified concerns about her continued ability to do so. Concerning the allegations as to Mr. Garvin, who is no longer a party to this action, Waverly is unclear as to what Plaintiff is talking about and therefore cannot respond. The remaining allegations contained in paragraph 13 are denied and no further response in required.

      14.     Denied. In light of the fact that Plaintiff does not specify the alleged protesting of various discriminatory and questionable practices by Mr. Garvin it is impossible to respond. If Plaintiff is referencing an instance when she advised Mr. Garvin that a female employee was upset about not having a company car, after investigation with the implicated employee, it was determined that on the contrary she was not upset about the absence of a company car. Further, if Plaintiff is referencing the time she advised Mr. Garvin that the female CFO was allegedly "harassing her", Mr. Garvin promptly commenced an investigation of the matter. Plaintiff made clear that although she had consulted an attorney, she requested that Mr. Garvin take no action. Plaintiff also stated that she would never sue Waverly. Ultimately the female CFO was terminated for reasons unrelated to Plaintiff's interactions with her. To the extent that the allegations contained in paragraph 14 of Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

15.     Denied.    After reasonable investigation, Defendant is without knowledge or information to form a belief as to the truth of said averments, they are denied and no further response is required.

16.     Admitted.

17.     Denied.  The text of the Tweet at issue is a writing, the language of which speaks for itself.

18.     Admitted in part, denied in part.  It is admitted that after Mr. Garvin's initial meeting with Plaintiff that he left to attend a conference in Florida and did not return to the office until Monday, September 26, 2016.  It is denied that during their meeting that Plaintiff was dumbfounded.  It is admitted that she appeared distraught.  In light of the fact that Plaintiff immediately asked Mr. Garvin "Am I going to lose my job?" it is difficult to believe she was dumbfounded. Mr. Garvin replied that he could not give her any promise as to whether she would be fired and at no time did he tell her she should not be worried.  Mr. Garvin never categorized the situation as a mere nuisance.   By way of further answer, following this meeting Plaintiff immediately removed the subject Tweet.

19.     Admitted in part, denied in part.  It is admitted that Plaintiff immediately deleted the Tweet following the meeting with Mr. Garvin.  Waverly is without knowledge or information sufficient to form a belief as to whether there were any comments, sharing and/or responses and such allegations are denied. Waverly did, however, receive the anonymous letter raising concerns about Plaintiff's conduct.

20.     Admitted in part, denied in part.  It is admitted that the meeting occurred towards the end of the day.  It is denied that Plaintiff attempted to see Mr. Garvin several times or that he

was evasive. By way of further answer, Mr. Garvin was in the office all day and at no time did Plaintiff leave a message with his assistant for Mr. Garvin to contact Plaintiff.

21. Denied. Mr. Garvin did not state that he was upset. Mr. Garvin expressed concern about Plaintiff's actions and informed her that the matter was reviewed by Waverly's Human Resources Committee and outside legal counsel. At no time did Mr. Garvin state that the Human Resources Committee and the full Board of Trustees had voted unanimously to terminate her employment based upon a violation of Defendant's Social Media Policy. Mr. Garvin advised her that the violation of the Social Media Policy was an aspect of the basis for her termination but he also referenced her lack of judgment and conduct as being generally inappropriate and unbecoming of a Vice-President of Human Resources.

22. Denied. After reasonable investigation, Waverly is without knowledge or information to form a belief as to Plaintiff's rationale for questioning the matters stated in paragraph 22 of Plaintiff's First Amended Complaint. It is denied that Waverly failed to investigate and/or to consider the matter fully. To the extent that the allegations contained in paragraph 22 of the Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

23. Admitted. It is admitted that Plaintiff begged for her job and asked to be heard by the Board of Trustees. Mr. Garvin communicated that the decision was final.

24. Admitted. It is admitted that Plaintiff asked to resign and to stay for an additional 30 days. Waverly denied this request.

25. Denied. Mr. Garvin never made such a statement. By way of further answer, it is denied that Mr. Garvin made such a statement to any others as which Plaintiff without justification continues to insist upon.

26. Admitted in part, denied in part. It is admitted that Mr. Garvin informed Plaintiff that there were people available to help her remove her belongings and to accompany her for this purpose. Initially Plaintiff went to her office without any escort. The two Waverly employees met her in her office so as not to draw attention to her or to embarrass her. Further, Plaintiff had already confided in a Waverly employee that she had cleaned out her office while Mr. Garvin was away at his conference. Plaintiff was also offered a ride home form the office. It is a typical procedure that others accompany an individual after they have been terminated. At no time did Plaintiff express any concern about her reputation in the community nor did she say she was worried about her reputation. Interestingly, Plaintiff is the one who after the meeting with Mr. Garvin and Dick Bauer ("Mr. Bauer") interacted with other Waverly employees informing them about what she had done and admitting to the fact that she made a mistake. Mr. Garvin never publicized the circumstances underlying Plaintiff's termination and announced her departure in very generic terms to the community stating that she would simply no longer be employed at Waverly. Plaintiff's categorization of her "escort" from Waverly's administrative offices is misconstrued and overdramatized where her car was located in a private area no more than 50 feet from her office. The individuals that accompanied her were present to assist her with carrying her things and to ensure that she was not taking company property, a very typical manner of proceeding when an employee is terminated.

27. Admitted in part, denied in part. It is admitted only that Mr. Garvin met with the Senior Management Team to advise that Plaintiff would no longer be employed at Waverly and in the interim human resource related questions should be directed to Mr. Garvin. The remaining allegations contained in paragraph 27 of Plaintiff's First Amended Complaint are denied and no further response is required.

28. Denied. It is admitted only that Mr. Garvin informed certain vendors of Waverly that Plaintiff would no longer be employed by Waverly but at no time did he specify the reasons. To the best of Mr. Garvin's recollection, he made these calls the day after Plaintiff's termination. The remaining allegations contained in paragraph 28 of Plaintiff's First Amended Complaint are denied and no further response is required.

29. Denied. It is denied that at any time Mr. Garvin advised Meg Guenveur about the circumstances involving Plaintiff's termination. Waverly has no knowledge of a telephone conversation between Plaintiff and Ms. Guenveur and said allegations are denied.

30. Denied. Waverly has no knowledge of a telephone conversation between Bill Macguire and Plaintiff, said allegations are denied and no further response is required.

31. Denied. It is denied that Mr. Garvin defamed Plaintiff to anyone. By way of further answer, the defamation claim in this matter was dismissed with prejudice by this Honorable Court.

32. Denied. Waverly has no knowledge concerning a telephone conversation that allegedly occurred between Plaintiff and an unidentified housekeeping employee of Waverly, the allegation is denied and no further response is required.

33. Denied. It is denied that Mr. Garvin defamed Plaintiff to the Board of Trustees and/or claimed she was a racist. By way of further answer, the full Board of Trustees did not approve the termination but would have learned about the circumstances shortly thereafter.

34. Denied. Waverly's response to paragraph 33, above, is incorporated by reference as if set forth at length.

35. Denied. By way of further answer, the defamation claim against Mr. Garvin and the Board of Trustees (John and Jane Doe Numbered 1-21) has been dismissed with prejudice by this Honorable Court.

36 and 37.      Any and all assertions made in the context of the Unemployment Compensation proceeding are privileged and it is denied that anyone at any time ever claimed that Plaintiff was a racist or that this was a basis for her termination.  By way of further answer, the defamation claim in this action was dismissed with prejudice.

38.      Denied.  Plaintiff's Tweet was in writing, the language of which speaks for itself. The allegations concerning the characterization of the Tweet are likewise denied.

39.      Denied.  Defendant's Social Media Policy is a writing, the language of which speaks for itself and said allegations are denied.

40.      Denied.  Defendant's Social Media Policy is a writing, the language of which speaks for itself and said allegations are denied.

41.      Denied.  Plaintiff admitted to posting the subject Tweet.  Then during the meeting terminating her employment Plaintiff suddenly started saying that she didn't do it and someone else did it.  Then, remarkably when filing for unemployment compensation, Plaintiff claimed that her husband posted the subject Tweet.  Even more interesting is the fact that this new theory is not alleged in any complaint filed in the above action nor in the voluminous letter from Plaintiff's counsel reciting Plaintiff's version of the events underlying her separation from employment.  It is denied that progressive discipline is required by Waverly or any other employer for that matter.

42.      Denied.  The Social Media Policy is a writing, the language of which speaks for itself.  Waverly admits that it does not discriminate against its employees.

43.      Admitted in part, denied in part.  It is admitted that the former Board Chairman sent emails that were political in nature to a small group of people, including Plaintiff, with whom he believed he shared similar political beliefs.  The remaining allegations contained in paragraph 43 of Plaintiff's First Amended Complaint are denied.

8

44.    Denied.   After reasonable investigation, Waverly is unaware of what Plaintiff means by an alleged hostile environment and her supposed advocacy.  To the extent that the allegations contained in paragraph 44 of Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

45.    Denied.  After reasonable investigation, Waverly is unclear as to what Plaintiff is referencing about her supposed challenges directed towards Mr. Garvin and the alleged "male dominated empire".  To the extent that the allegations contained in paragraph 45 of Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

46.    Admitted.

47.    Admitted in part, denied in part.  It is admitted only that although she was making more than $110,000.00, Meredith Feher, Senior Vice President of Health Care Service, told Plaintiff that if she was unhappy with her compensation she should speak to Mr. Garvin.  After doing so, Mr. Garvin increased Plaintiff's compensation as well as others to achieve a higher compensation ratio as determined with the assistance of a Human Resources Compensation Consultant.  Defendant has always used the Compensation Consultant's guidelines and Plaintiff was above market value.  Senior management received increases over a 3 year period and to get senior management into a compensation ration between 1.02 and 1.06.  The remaining allegations contained in paragraph 47 of Plaintiff's First Amended Complaint are denied.

48.    Denied.  It is denied that there was an atmosphere of male superiority at Waverly or that Mr. Garvin, as its CEO, engaged in conduct or behavior that was objectionable to female members of the leadership team.  Further, at no time were such complaints brought against Mr. Garvin and Plaintiff is making the allegations contained in her First Amended Complaint solely

for the purpose of personally attacking Mr. Garvin without any justification or legal basis whatsoever.  To the extent that the allegations contained in paragraph 48 of Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

49.    Denied.  It is denied that Mr. Garvin engaged in the conduct claimed in paragraph 49 of Plaintiff's First Amended Complaint.  Further, at no time were such complaints brought against Mr. Garvin and Plaintiff is making the allegations contained in her First Amended Complaint solely for the purpose of personally attacking Mr. Garvin without any justification or legal basis whatsoever.  To the extent that the allegations contained in paragraph 49 of Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

50.    Denied.   Mr. Garvin requested a meeting with Plaintiff because she was demonstrating an odd demeanor (i.e. appeared overly sorrowful) in the workplace.  After Mr. Garvin met with her and found out she was upset about her bonus being less than others on the management team, he explained the correlation for others earing more.  Further, Mr. Garvin made suggestions to Plaintiff about how she could increase her salary including a Nursing Home Administrator Licensing certification program which Defendant paid for (and gave Plaintiff permission to miss work to attend) but Plaintiff failed to ever complete without explanation.  Also, even prior to Mr. Garvin taking on the role as CEO, Defendant had engaged a Compensation Consultant to review employee salaries and after doing so Plaintiff and others (including females) received increases in their salaries. The remaining allegations and Plaintiff's categorization are denied and no further response is required.

51.     Denied. It is denied that Plaintiff's bonus was the smallest in comparison to other senior leadership management members since certain individuals received no bonus at all. The bonus is discretionary and in Mr. Garvin's opinion, others had taken actions that directly attributed to Defendant's success in a much different manner and with more impact than in comparison to Plaintiff. At no time did her gender or age motivate his decision-making. The remaining allegations are denied and no further response is required.

52.     Denied. It is denied that Mr. Garvin reacted unprofessionally towards Plaintiff when in fact he offered her words of encouragement and advised her as to how she could make more money if she so desired. Defendant's responses to paragraphs 47, 50 and 51, above, are incorporated herein by reference as if set forth at length.

53.     Denied. Defendant incorporates by reference its response to paragraph 14, above, as if set forth at length.

54.     Denied. It is denied that Plaintiff was subjected to a hostile work environment as a woman or that Defendant favored Mr. Supper, a male. To the extent that the allegations contained in paragraph 54 of Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

55.     Denied. Plaintiff would advise Mr. Garvin she was upset about Mr. Supper talking about gambling in front of staff. There existed no reason to believe that he was doing anything illegal or inappropriate and he performed his job duties very well.

56.     Admitted in part denied in part. It is admitted only that an unfortunate issue occurred without Mr. Supper's knowledge, involving his son and the company car. Thereafter, the company car was taken away from Mr. Supper in an overabundance of caution. Defendant's agents didn't have a trust issue as to Mr. Supper in making this decision.

11

57.     Denied.

58.     Denied.  Plaintiff had nothing to do with Mr. Garvin removing the company car from Mr. Supper.  The fact that a female member of management did not have a company car was never raised by anyone, including the implicated employee who was allegedly took issue with the same.  The CEO and CFO have always had a company car.  The female CFO prior to Mr. Supper had a company issued car.

59.     Admitted in part, denied.  It is admitted only that on occasion when passionate about a topic or point, Mr. Supper may have a tendency to "speak over someone" but it is in no way gender specific.  The remaining allegations in paragraph 59 of Plaintiff

60.     Denied.  It is denied that Mr. Garvin told Plaintiff not to file a worker's compensation claim.  In fact, he was not even present on the day when Plaintiff suffered an asthma attack after being in the attic of a building.  Plaintiff was assessed by a nurse on premises but refused to go to the hospital.  To the extent that the allegations contained in paragraph 60 of Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

61.     Denied.  It is denied that Defendant has permitted or encourages a hostile and discriminatory environment through Mr. Garvin's actions and inactions or on any other basis.  To the extent that the allegations contained in paragraph 63 of Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

62.     Denied.  It is denied that Defendant's decision to terminate Plaintiff's employment was discriminatory on the basis of gender or any other basis. It is denied that Waverly favors males in any respect.  To the extent that the allegations contained in paragraph 62 of Plaintiff's First

Amended Complaint constitute conclusions of law, they are denied and no further response is required. By way of further answer, Plaintiff's replacement is also in the protected class for age.

63.     Denied. Any and all assertions made in the context of the Unemployment Compensation proceeding are privileged and it is denied that anyone at any time ever claimed that Plaintiff was a racist or that this was a basis for her termination. It is denied that Defendant retaliated against Plaintiff. To the extent that the allegations contained in paragraph 63 of Plaintiff's First Amended Complaint constitute conclusions of law, they are denied and no further response is required.

## COUNT I

## ALLEGED VIOLATION OF TITLE VII – GENDER

### (Kathleen Jungclaus v. Waverly Heights, Ltd.)

64.     Defendant incorporates its response to paragraphs 1 through 63 by reference as if set forth at length.

65 through 74. Denied. The allegations contained in paragraphs 65 through 74 of Plaintiff's First Amended Complaint constitute conclusion of law, they are denied and no further response is required. By way of further answer, it is denied that Waverly discriminated against Plaintiff on any basis at any time, maintained a hostile work environment and/or retaliated against her.

WHEREFORE, Defendant, Waverly Heights, Ltd., respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff, Kathleen M. Jungclaus, and award costs in favor of Defendant.

## COUNT II

## ALLEGED VIOLATION OF TITLE VII – POST EMPLOYMENT RETALIATION

### (Kathleen Jungclaus v. Waverly Heights, Ltd.)

75.     Defendant incorporates its response to paragraphs 1 through 74 by reference as if set forth at length.

76 through 81. Denied.    The allegations contained in paragraphs 76 through 81 of Plaintiff's First Amended Complaint constitute conclusion of law, they are denied and no further response is required.  By way of further answer, it is denied that Waverly discriminated against Plaintiff on any basis at any time, maintained a hostile work environment and/or retaliated against her.

WHEREFORE, Defendant, Waverly Heights, Ltd., respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff, Kathleen M. Jungclaus, and award costs in favor of Defendant.

## COUNT III

## ALLEGED VIOLATION OF THE ADEA

### (Kathleen Jungclaus v. Waverly Heights, Ltd.)

82.     Defendant incorporates its response to paragraphs 1 through 81 by reference as if set forth at length.

83 through 93. Denied.    The allegations contained in paragraphs 83 through 93 of Plaintiff's First Amended Complaint constitute conclusion of law, they are denied and no further response is required.  By way of further answer, it is denied that Waverly discriminated against

14

Plaintiff on any basis at any time, maintained a hostile work environment and/or retaliated against her.

WHEREFORE, Defendant, Waverly Heights, Ltd., respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff, Kathleen M. Jungclaus, and award costs in favor of Defendant.

## COUNT IV

### ALLEGED VIOLATION OF THE PHRC – GENDER AND AGE

### (Kathleen Jungclaus v. Waverly Heights, Ltd.)

94.    Defendant incorporates its response to paragraphs 1 through 93 by reference as if set forth at length.

95 through 98. Denied.    The allegations contained in paragraphs 95 through 98 of Plaintiff's First Amended Complaint constitute conclusion of law, they are denied and no further response is required.  By way of further answer, it is denied that Waverly discriminated against Plaintiff on any basis at any time, maintained a hostile work environment and/or retaliated against her.

WHEREFORE, Defendant, Waverly Heights, Ltd., respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff, Kathleen M. Jungclaus, and award costs in favor of Defendant.

## COUNT V

## DEFAMATION

**(Kathleen Jungclaus v. Thomas P. Garvin, Waverly Heights, Ltd., and John and Jane Doe Numbers 1-21)**

99.    Defendant incorporates its response to paragraphs 1 through 98 by reference as if set forth at length.

100 through 109.    Denied.  No response required in light of the Order dated April 9, 2018.  On April 9, 2018, this Honorable Court granted Defendants' Motion to Dismiss whereby Count V (Defamation) and Count VI (Negligent Supervision of Thomas Garvin) were dismissed with prejudice.  As a result, neither Thomas P. Garvin nor John and Jane Doe Numbers 1-21 (Waverly's Board of Trustees) are parties to this action.

WHEREFORE, Defendant, Waverly Heights, Ltd., respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff, Kathleen M. Jungclaus, and award costs in favor of Defendant.

## COUNT VI

## NEGLIGENT SUPERVISION OF THOMAS GARVIN

**(Kathleen Jungclaus v. Waverly Heights, Ltd. and John and Jane Doe Numbers 1-21)**

110.    Defendant incorporates its response to paragraphs 1 through 109 by reference as if set forth at length.

111 through 113.    Denied.  No response required in light of the Order dated April 9, 2018.  On April 9, 2018, this Honorable Court granted Defendants' Motion to Dismiss whereby Count V (Defamation) and Count VI (Negligent Supervision of Thomas Garvin) were dismissed

Appendix 1141

with prejudice.  As a result, neither Thomas P. Garvin nor John and Jane Doe Numbers 1-21 (Waverly's Board of Trustees) are parties to this action.

WHEREFORE, Defendant, Waverly Heights, Ltd., respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff, Kathleen M. Jungclaus, and award costs in favor of Defendant.

## RELIEF REQUESTED

Defendant denies the Relief Requested by Plaintiff in paragraphs (a) and (b), including subparagraphs therein as conclusions of law, whereby no further response is required.

## DEFENDANT'S AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed to set forth viable causes of action under Title VII, the ADEA and/or the PHRA for discrimination, hostile work environment and/or retaliation/post termination retaliation on the basis of age, gender or any other basis protected under federal and state law.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff has failed to establish that she suffered adverse employment action motivated by or resulting from discrimination and/or reatliation by Defendant

### THIRD AFFIRMATIVE DEFENSE

Defendant had a legitimate business reason when it terminated Plaintiff's employment.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that the allegations of the First Amended Complaint are not set forth in her administrative charge of discrimination.

17

## FIFTH AFFIRMATIVE DEFENSE

If Plaintiff suffered any damages, the same being denied, she has failed to mitigate her damages.

## SIXTH AFFIRMATIVE DEFENSE

Plainitff's claims are barred by the after acquired evidence doctrine.

## SEVENTH AFFIRMATIVE DEFENSE

Defendant, by and thorugh its agents, at all times relevant hereto acted in good faith and complied with applicable laws.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of waiver.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred where Defednant's decision to terminate her employment was on a basis other than Plaintiff's age and/or gender.

WHEREFORE, Defendant, Waverly Heights, Ltd., respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff, Kathleen M. Jungclaus, and award costs in favor of Defendant.

**EASTBURN AND GRAY, P.C.**

Dated: 4/17/18

By: _Grace M Deon_
Grace M. Deon
Attorneys for Defendant

60 East Court Street
P.O. Box 1389
Doylestown, PA 18901
Phone: (215) 345-7000
Facsimile: (215)345-9142
gdeon@eastburngray.com

18

THOMAS P. GARVIN

**A**

**a.m** 102:10
**AA** 190:6
**ability** 45:14,18
  132:1 154:4
**able** 63:10 91:11
  91:15 156:17
**absolutely** 12:7
  23:7 32:22
  81:3 107:3
  134:14 140:23
  167:7
**accept** 172:15
**access** 92:2
  112:17 168:6
**accident** 32:8
**accommodati...**
  12:15
**accompanying**
  173:21
**account** 18:11
  18:17 19:6
  23:24 71:4
  116:1 129:13
  131:22 143:13
  144:19 175:21
  180:16
**accountable**
  172:14
**accurate** 56:17
  89:14 198:7
**accusations**
  18:15 125:6
**accused** 6:18,23
  60:22 140:6
**acknowledge...**
  101:11
**act** 62:4,6
**acted** 61:19
**acting** 118:21
**action** 50:22
  57:8 95:4
  150:1 155:11
  179:2
**activities** 138:2
**activity** 37:13

67:13
**actual** 17:19
  102:20 175:14
**add** 101:9
  142:20
**addict** 41:6
**addition** 88:14
  103:4
**additional**
  157:23
**address** 32:16
  91:7 109:23
  110:4,8
**addressed** 47:12
  48:1 131:12
  132:15 156:16
**addresses** 70:20
  70:23 105:22
  106:2,5 147:17
  191:11
**administration**
  34:14
**Administrator**
  10:9
**Admissions** 3:16
  15:19 146:7
**admit** 147:1
  148:15 149:7
  149:23 152:17
  163:2
**admitted** 148:20
  149:4,6,9,18
  149:20 151:24
  159:24 173:15
  177:9 180:24
**admitting** 119:5
  177:11 178:11
**adopt** 179:10
**advance** 54:18
**advertisements**
  128:20
**advertising**
  127:6,12
**advice** 50:12
  68:19,21 69:1
**advised** 155:7

**advocate** 54:24
  109:4
**advocated** 109:1
  193:10
**affect** 92:6,11,21
  167:23 187:7
**affiliations**
  135:19
**affirmatively**
  78:6
**aforementioned**
  198:8
**afraid** 80:23
  81:8,10 93:23
  93:24
**African** 140:3
  190:6
**afternoon** 112:5
  112:15,21
  116:19
**age** 7:23 11:17
**agenda** 91:24
**aggressive** 46:16
  46:17
**ago** 126:16
  127:19
**agree** 16:10
  71:13 80:6,9
  85:23 112:3
  140:5
**agreed** 71:15
**agreement** 4:1
  13:22 114:20
  114:24 115:3,4
  115:5,9 117:10
  166:3
**ahead** 35:20,21
  54:3 63:1,4
  68:23 69:23
  72:4 75:10
  87:2 125:4
  131:16 136:12
  181:19 188:12
**aim** 98:1
**airfare** 12:15
**al** 105:14

**alcohol** 43:20,23
**allegations**
  80:22 154:11
  163:12
**alleged** 179:1
**allegedly** 155:8
**allowed** 92:14
**allowing** 40:13
**alternative**
  108:20 113:15
**alternatives**
  108:18
**Amended** 3:17
  3:18 14:18
  151:13 152:10
  159:16 162:17
  165:12 192:5
**American** 190:6
**Americans**
  140:3
**amount** 10:22
  84:4
**Amy** 44:5 79:1
  173:13 191:1
**analysis** 193:12
**and/or** 122:14
  148:17
**animals** 63:9
**Anita** 8:10 19:20
  21:2,21 22:5
  22:24 94:21
  98:3 101:18
  103:12,16
  104:13 109:20
  109:24 110:24
  112:2
**Anita's** 110:12
**Ann** 155:20
  157:12
**Anne** 122:22
**Annie** 122:21
**announced**
  172:2
**announcement**
  121:4 123:15
  124:5,9 127:15

**anonymous** 17:8
  17:9 18:2,5,9
  19:9 21:21
  22:8 47:22
  48:3,4,22 56:4
  56:5,6,17,22
  57:3,4,8 64:21
  102:20 103:23
  105:7 115:23
  140:5,15 142:8
  161:1 162:15
  164:1,10
  167:10
**answer** 8:24
  13:9 14:22
  15:6,7,8 17:13
  20:11,15,18,20
  21:24 22:14
  28:7 33:4 34:5
  38:6 40:5,18
  43:9 45:16
  46:9 51:16
  60:2 66:20
  67:8 68:3,6
  69:2,20 72:7
  73:6 81:2,13
  81:14,15,19,20
  81:22 86:5
  89:12 104:1
  107:8 108:11
  110:22 128:16
  131:15 135:8
  136:16 137:7
  139:17 141:5
  141:13 144:6
  144:16 148:22
  148:23,24
  149:2 151:11
  151:21 153:20
  154:19 159:21
  160:12 161:22
  162:4 163:13
  164:16 165:21
  166:9 167:3,6
  171:18 175:9
  179:23 182:24

THOMAS P. GARVIN

183:5 184:2,8
187:24 189:14
189:14 191:24
192:6
**answered** 15:15
42:12 87:13
114:3 120:4
166:24 171:17
189:11
**answering** 34:4
73:24 188:6
**Answers** 3:17
162:24
**anti-Muslin**
182:10
**anti-Sematic**
182:8
**anxious** 94:6
**anybody** 9:15
12:5 15:21
43:19 56:13
71:1 109:14
110:14 127:10
129:22 140:13
157:7 166:19
173:3 174:1
**anymore** 156:6
**anyone's** 172:10
**anytime** 12:12
196:22
**anyway** 179:17
**apologize** 97:13
177:13
**apologizing**
119:6 177:12
**apparently**
155:21 156:15
157:24
**appeal** 73:13,14
74:3
**appear** 17:21
65:20 130:7
**appeared** 18:13
159:24
**appears** 16:20
27:16 77:10

84:23 97:21
123:3 130:19
151:19
**applies** 80:3
**apply** 134:10
**appointed**
182:18
**appreciate**
112:2
**approach** 99:19
**appropriate**
13:5 46:23
85:17 125:9
**approval** 193:14
**approving** 77:19
**approximately**
4:22 6:3 52:21
57:11 95:21
**April** 146:22
**architecture**
88:15,18
**area** 168:13,16
173:8 174:6,11
**areas** 168:20
174:12
**argument**
136:24 137:1,9
**arrange** 197:8
**arranged** 173:1
**arrangement**
12:16 90:15
**arrested** 30:12
30:13
**arrival** 93:13
**arrived** 34:17
194:7
**aside** 50:13,14
110:3 168:23
**asked** 24:24
87:4,13 114:2
116:4,18,20
144:5,7 156:13
160:4 166:24
179:12,13
189:11
**asking** 23:4

35:19 37:17,24
39:10 52:22,24
59:18 96:13
99:9 119:7,24
155:2 163:23
169:24 171:5,9
177:13 183:4
**aspect** 152:3,19
**aspects** 126:20
195:11
**Aspen** 10:18
**assertion** 152:11
**assertions** 166:4
**Assessment** 52:9
**assets** 175:7
**assistance** 192:8
**assistant** 44:5
122:5 190:22
190:24
**associated** 139:9
**Associates** 121:3
121:9
**association**
10:15,16
**assume** 108:13
**Atlantic** 31:3,8
**attached** 115:23
123:16
**attend** 11:4
**attendance**
191:12,13
**attention** 29:13
29:24 71:9
80:24 96:24
133:7 134:15
177:5 190:10
190:12
**attorney** 15:8,11
15:22,23,24
24:13 43:8,12
49:13,17,20,22
50:3,5,8,21
51:12 98:8
102:23 116:6,7
116:11 154:20
155:10 156:8

156:18,19
157:3,11
**attorney's**
102:14 103:2,5
**attorneys** 2:6,12
116:5,11
**attracted** 162:19
**August** 4:16
**author** 21:22
52:3 53:7
56:22 104:4
180:8
**authored** 103:23
147:1
**authorization**
168:6
**automatically**
118:19
**availability**
33:10
**available** 87:19
**avenue** 55:22
**avoid** 91:1
**award** 73:14
**aware** 5:7
100:23 108:18
124:6 149:13
174:1 186:6,24
187:3
**awesome** 10:5

_____

**B**

**B** 3:12 27:13,15
**back** 14:16
21:16 27:4
29:12 34:10
42:18 46:4
47:7 51:18
53:1 61:4
62:16 97:12,15
115:19,20
120:7 139:21
145:9 170:11
183:10 193:19
**backed** 132:16
**bad** 93:17

110:16
**banking** 9:22
**Bar** 87:18 88:7
**Barack** 147:3,7
**bargained** 12:21
**barometric**
184:18
**base** 193:17,19
194:12
**based** 22:10
55:3 57:8
136:8 150:13
164:19 192:21
193:1,2,12
**basically** 6:23
10:22 19:7
101:10 116:17
122:6 140:6
179:9
**basis** 80:22
93:12
**Bates** 130:10
**Bauer** 2:19 5:22
25:24 26:11
28:3,23 49:13
49:15,21 50:2
50:5,13,19,24
51:12 53:22
54:4 62:18
65:24 97:23
98:17,24 99:12
101:17 103:11
105:14 108:3
109:14 118:2
118:21 120:21
123:1 167:7,13
188:23
**beginning** 19:10
194:13
**behalf** 15:9
139:14 196:19
**behave** 191:15
**behavior** 69:6
**belief** 163:10
**believe** 8:10,11
8:12 9:17,21

THOMAS P. GARVIN

15:8 19:3
21:21 22:1
23:19 26:1,10
26:10 29:5
30:4,21 31:7
31:11,14 42:22
49:23 66:8
70:7 77:16
93:1 104:3
105:24 106:14
107:18,20
111:9 115:16
133:18 137:19
140:17 146:13
147:12,21
151:12 154:13
154:16 167:12
176:14,18
**believed** 40:16
**Bellevue** 126:7
128:13,17
129:2,21
**benefit** 33:19,20
37:3 83:11
90:14 151:13
**benefits** 73:11
73:19 82:4
122:3
**Bernice** 8:11
**best** 8:13 23:22
49:18 50:9
156:4 190:17
**better** 35:19
47:4 67:12,18
117:8,9 125:15
**beyond** 168:21
193:9
**big** 88:14,17
111:19 193:18
**bigger** 153:9
**Billig** 21:18 22:9
22:20 23:1
**birth** 4:15
**birthday** 31:7
**bit** 132:6
**blah** 78:12

**blatantly** 181:7
**Blessing** 44:5
79:2 173:13
191:1
**blog** 138:22
143:21 145:10
154:11 179:9
180:5,7,10
**blogging** 138:2
175:8
**blogs** 134:17,22
134:24 135:15
138:18 139:6
**blotter** 27:5,15
**blue** 151:18
**board** 5:24 6:2
7:14 9:2,8,10
9:12,16,20
19:24 20:9
24:8,15,17
25:12 26:3,8
34:20,22,24
38:15 48:15
49:13 50:14
51:4,20 61:19
62:4,5,7,9,11
67:18,19 68:3
68:7,8,14 69:7
69:11,18 70:5
82:5 90:13
91:2,6,12,15
91:23 95:5,7,8
95:9 96:1,2
98:4 99:19
100:9,16
102:17 103:14
104:23,24
105:3,6 106:2
109:14,15,17
113:8,9,11,18
113:22 114:11
114:14 116:24
117:20,24
118:4,15,17,18
119:7 122:22
123:2 125:2

127:4 129:8
134:5,8 147:1
148:17 164:17
165:2 177:13
181:24 183:17
183:20 184:5,9
184:15,21
186:20 190:12
190:15,17
191:6,7,9,10
191:14,17,20
191:21
**Board's** 69:13
133:6 140:14
**Bob** 29:18,19
33:17 37:8,12
37:18,21,21,24
38:1,9 39:15
40:12,14,22
41:5,8,23 42:5
44:7,11,22
45:1,3,18 46:2
90:20,23
**bolt** 184:19
**bonuses** 193:20
**borrow** 86:24
**boss** 183:16,19
183:20
**bother** 64:3 89:6
186:3
**bottom** 76:10
77:4 100:6
101:2,3,17
108:1 109:20
122:24
**Box** 1:15 2:5,11
**boxes** 173:6
**boy** 190:23
**boys** 191:3
**Bragg** 103:11
118:3
**Bragg's** 118:4
**bragged** 136:9
**breached** 107:18
**break** 23:9
117:13 120:23

181:3 197:2
**breathing**
119:16
**Brian** 126:10
173:4
**bring** 126:17
133:6,12
**bringing** 51:18
80:23
**broader** 39:13
158:12
**brought** 29:13
29:23 33:14
40:3 47:1 48:5
77:23 96:23
137:18 177:5
**Bryn** 2:6 9:20,22
**Buckley** 26:12
**Buehler** 123:12
123:13 124:16
125:6 126:20
128:4
**building** 173:19
196:13
**bullet** 98:7
102:23 103:5,8
**bumped** 196:6
**bunch** 35:19
181:22
**burying** 162:11
**business** 61:10
132:17 138:19
139:9 159:3
169:1 181:21
**buying** 88:20
**buzz** 134:4
**bylaws** 104:20

——— C ———
**C** 1:12 2:1 198:1
198:1,5,23
**C.C.R** 198:23
**call** 51:23 52:6
87:17 88:2
89:1 95:15,18
96:3 98:2,5,6

101:19 102:15
102:22 106:19
106:23 107:3
108:2,3 114:20
116:3 158:4,5
**called** 19:18
27:20 72:14
90:5 96:11
140:9 193:7
**calling** 11:16
60:14 140:16
**calls** 21:23 66:17
140:17
**camera** 169:3
**camps** 187:20
**campus** 97:21
101:12
**capacity** 118:22
**capital** 140:4,4
**caps** 106:20
**caption** 103:13
**car** 30:11,13,24
31:5,16,18,20
32:3,16,21,24
33:1,10,19
34:1 35:4 36:4
36:4,9 37:1,2,7
39:20,24 40:3
40:13,15,23
42:3,8,20 43:1
43:5 81:10,17
81:23 82:7,10
82:20 83:7,9,9
83:12,16,18,19
83:20,22 84:1
84:9,14 90:19
91:1 173:7,10
173:22 174:2
**care** 24:8 56:10
63:8 83:12
85:10 121:3,9
133:4 152:22
**care-related** 5:1
**career** 196:22
**careful** 169:13
170:18 171:15

THOMAS P. GARVIN

172:17,20
**carelessness**
133:3
**caring** 85:16
**carried** 101:5
**carries** 99:15
**carry** 173:6
**cars** 33:14 34:13
**cartoons** 182:5
182:22
**case** 4:24 5:13
60:21 79:18
98:12 136:9
151:19
**cases** 4:23 60:19
79:17 196:6,6
**categorization**
28:11
**category** 132:9
**catering** 86:13
86:14,17,24
87:5,19
**cats** 63:9
**caught** 72:17
**caused** 32:8,8
156:1
**cc** 103:12,16,22
104:10
**celebrating** 31:7
**center** 11:4
**CEO** 6:7 7:6
33:16 55:17
56:15 61:7
109:22 156:15
158:24 162:10
**certain** 10:22
85:7 91:16
**certainly** 42:18
72:7 80:9
93:16 123:23
131:5 133:18
150:15 156:16
190:3 195:14
197:8
**certificate** 14:7
14:13

**certification** 4:2
**Certified** 1:12
198:5
**certify** 198:6
**cetera** 134:2
138:4
**CFO** 33:16,18
155:7,20
**Chair** 49:13
91:24 104:13
109:15,17
118:17,18,19
**Chair's** 118:15
**Chairman**
113:18,22
114:11 147:2
183:17
**Chairperson**
104:8
**Chairwoman**
103:19
**challenging**
108:4
**change** 193:1,1
195:10
**changed** 34:17
52:11 192:16
195:10
**changes** 78:2
**characterized**
161:4 162:8
**Charge** 96:11
**charges** 40:2,8
**Charles** 103:12
147:2
**chart** 192:24
193:6,7,11
**charts** 193:1
196:16
**check** 119:15
129:19
**checked** 49:1
147:4 149:17
**chronology** 53:2
**Chuck** 8:9
147:10

**circles** 23:17
**circulated** 66:11
**circulating**
181:8 182:1,2
**circumstances**
120:16 172:1
**City** 31:3,8
**claimed** 33:13
94:16 178:21
**claims** 6:22
161:3
**clarify** 27:9
57:18
**class** 12:6 55:8,9
60:14 131:11
136:8 139:12
139:24 140:2
175:18,19
**clear** 150:20
155:10 162:13
**clearly** 26:23
72:13 136:6
140:24 159:11
**click** 144:19,22
145:3
**clicked** 18:22
144:17 145:1
**client** 21:17
22:20 35:3,5
38:23 39:1,4
60:22 72:15
74:14 75:1,3
75:16 93:4
96:13 99:1,5
107:6 122:15
127:17 136:2,4
138:21 153:24
154:23 155:16
155:18 159:5
167:22 169:9
196:19,19
**client's** 35:23
81:6 95:6
107:23 110:3
**close** 109:15,16
109:16 196:7

**closer** 109:13
197:9
**CNAs** 121:15
**co-workers**
153:3
**code** 134:3
191:14
**Colin** 78:23
**collective** 55:4
56:1
**colluding** 189:1
**colon** 103:13
**combination**
154:20 179:6
**come** 19:18
42:18 55:20
64:1 74:15,15
98:11 113:6
119:15 144:23
145:2 158:22
160:3,23
161:15 181:16
181:17 195:8
**comes** 44:3 46:6
64:22 69:7
150:18 193:5
**coming** 32:2
44:3,8,13
48:16 86:8
91:22 98:15
101:12 112:5
112:15,21
137:13 158:1
**commence**
156:2
**commenced**
155:9
**commencing**
1:16
**comment** 141:2
157:16 162:20
165:1
**comments** 43:22
100:17 111:22
119:2,23 120:2
141:8 156:5,5

159:5 163:6,6
163:11,16,22
164:3
**committee** 7:14
7:16,18 8:5
24:19 25:1,2,6
25:15,22 26:2
26:7 52:8,9
54:15,22 58:15
58:17,18,20,21
58:23,24 59:2
91:20,24 95:9
96:1,2 98:5
100:16 103:15
103:19 104:8
104:13,15,15
104:20 105:2
105:16,17
108:23 109:1
114:15,20
115:22 116:15
117:19,21
118:1,5,9,12
118:20 148:17
164:17 193:14
194:4
**Committee's**
109:3
**committees**
118:16,18
**common** 26:15
26:16,19 27:21
95:24 162:14
**Commonwealth**
71:8,16,19
72:5 73:10
134:16 136:13
136:18
**communicate**
91:6,11,15
93:11
**communicating**
50:2,4
**communication**
145:11
**Communicati...**

THOMAS P. GARVIN

126:7 128:14
128:18 129:3
129:21
**community** 7:8
8:22 171:22
172:3 174:13
194:20
**comp** 73:2
142:10 194:10
194:18 196:4
**companies**
142:18 143:1
**company** 5:2,3,4
32:5 41:3
42:19 56:15
83:12 137:23
138:1 139:2
142:20 158:6,9
158:11,13
175:7 190:4
**company's**
83:19
**comparable**
32:24 33:4
**compare** 130:15
**compared**
192:13
**compensated**
75:17
**compensation**
91:3 136:20
178:21 192:7,7
192:9,11,14,16
193:13,16,17
193:18,20
194:3,5,6,7,12
195:8,15
196:11
**complain** 33:9
43:19 82:10
155:16 164:22
**complained** 35:4
75:16 150:16
155:18,19
**complaining**
168:9

**complaint** 3:17
3:18 14:18
150:7 151:14
152:10 159:16
161:4 162:18
164:9 165:6,13
165:19 170:15
171:18 179:1
180:18 192:5
**complaints**
45:21 156:1
**completed** 180:3
**completely**
175:16
**completing** 10:5
**Compliance**
77:8 132:17
133:23
**complies** 97:9
130:11 134:19
152:13 159:13
159:17 180:20
**component**
153:8,8
**compound**
35:19
**compromised**
132:1
**computers**
137:23
**concern** 32:17
42:13 57:1
156:14 157:7
165:6 171:21
189:19
**concerned** 44:18
44:21 55:11
60:7,10 61:5,6
129:18 134:2
153:6 167:23
181:24 182:1
**concerns** 32:23
44:23 45:1,3
45:13,18,23
47:3 56:3,16
59:22 91:7

154:3 185:11
186:1
**conclusion**
55:21
**conduct** 29:6
55:6 61:10,15
115:24 125:3
131:23 133:2,4
133:10 134:3
138:1 175:16
191:14
**conducted** 136:9
**conducting**
105:4
**conference**
10:20 11:3
51:23 52:6
95:14,14,17
96:3 98:6,21
106:19 116:3
**conferences**
10:15,16,16,17
10:21 12:10,12
**conferring**
170:7
**confidential**
106:19,23
115:6 116:3
123:21,23
124:3
**confidentiality**
13:22 107:1,5
107:19
**conjunction**
154:11 175:15
**connect** 98:3
**connected** 136:6
**connection**
65:18 138:19
142:13 143:18
**connotation**
154:15
**Conroy** 122:21
122:22
**consider** 36:21
36:23 58:24

59:2 93:8
113:24 114:6
137:15 143:11
148:1 183:15
**consideration**
120:15
**consistent** 86:1
139:15 194:15
194:21 196:8
**consistently**
106:3
**Constance** 78:24
**constantly** 158:1
**construction**
88:17
**construe** 145:8
**consultant** 158:3
158:5 192:9,14
195:9,15
**consultant's**
192:21 193:13
**consulted** 48:15
49:10 155:10
156:8,19 157:2
157:11
**contact** 123:20
**contended** 150:5
**content** 50:17
55:4 56:6,8,9
56:17 60:2
63:13 64:2
69:13 101:13
116:2 128:21
147:9 181:12
181:13,20
182:3,22 185:4
187:12
**contents** 162:16
**contest** 89:18
100:3
**contested** 71:13
**continue** 150:24
158:23 197:4
**continued** 33:23
90:5 106:7
154:3

**continuing** 10:6
10:10,22 11:6
115:12 189:6
**continuously**
6:7
**contract** 12:18
127:23
**contradicted**
176:22
**control** 79:19
**convene** 54:21
**convenient**
197:5
**convention** 11:4
**conversation**
44:4 48:13
94:16,18
135:17 161:14
195:15
**conversations**
49:17,21 50:16
94:19
**converts** 106:6
**coordinating**
127:10,11
**copied** 104:7
147:10
**copy** 19:16 48:6
59:4 64:23
105:16 124:16
**corporate** 77:8
104:22 132:17
133:23
**corporation**
85:10
**correct** 6:8
10:23 14:8
15:7 16:7,9
18:18 21:2
22:10,12,21,24
23:24 24:2
25:18 26:5
27:15 34:15
35:1 45:14
48:3,23 49:1,8
53:6,23 56:20

THOMAS P. GARVIN

63:17 65:10
70:20 76:10,16
76:23 77:2,12
77:15 79:4
86:14,15 88:15
91:8 97:17
99:16,17 100:7
101:4,20 103:8
105:14 106:7
106:23,24
112:19 114:21
114:22 116:12
116:15 117:17
118:10,23
121:5,6,20
123:6,18 131:7
131:13 135:3
141:11 146:20
146:21,22
147:20 148:20
148:21 149:9
149:18,20
150:2,3,7
152:4 153:18
163:3,4,13,14
164:13,14
167:14 170:20
172:11 174:11
174:24 176:7
177:16 178:22
178:23 180:1
181:1,2 191:22
192:10
**correctly** 99:23
156:24
**correlation**
152:3,19
**corroborate**
189:2
**cost** 87:1
**counsel** 4:1 5:20
22:19 27:24
47:13 68:20,22
69:1 73:21
97:1 179:3,7
**Counsel's** 93:3

**counseled** 36:19
**counseling**
36:21 47:21,23
47:24 48:2
**County** 27:21
**couple** 42:12
63:16 127:3
147:17 175:12
176:23 196:9
**course** 50:22
71:10 78:1
153:16 190:20
194:9
**court** 1:1,12,14
2:11 27:21,21
34:9 62:22
64:10,13 71:8
71:16,20 72:5
72:21,24 73:10
134:16 136:13
136:18 139:16
139:20 148:9
182:17 198:5
**courtesy** 184:21
**cover** 92:2
**covered** 37:12
38:1
**cream** 8:16
**created** 17:20
53:16 133:17
**created/given**
106:1
**creating** 127:11
**credibility** 72:15
**crew** 8:14
**criminal** 27:6
30:17 31:22
37:13 38:2
39:13 40:2,8
**critical** 133:9
147:2,7
**cross** 114:6,8
**crux** 103:6
134:13
**current** 80:4
122:9

**cut** 90:16 112:18
143:5
**cutting** 148:7

---

**D**

**D** 2:4,5 3:2
**damage** 172:7
172:13
**damaged** 172:10
**damages** 172:15
**date** 4:15 24:10
78:22 124:23
125:1,11
126:17 131:1,4
151:20 198:22
**dated** 24:11 85:5
105:13 130:22
146:22
**Davies** 122:2,5
122:11,14
**Davis** 103:11
114:13 117:17
118:6,7
**day** 10:18 11:10
17:8 29:24
48:21 51:10
53:18 98:8
112:19 122:15
188:17 192:15
**days** 49:12 85:3
**dead** 41:8,21
**deal** 56:11,13
115:20 157:12
183:21
**dealing** 44:15
51:1 52:1
55:14 102:3
108:14
**deals** 70:6
**dealt** 134:6
137:1 183:21
**death** 187:20
**decide** 58:17,20
95:3
**decided** 90:13
147:12

**deciding** 114:9
**decision** 32:15
34:14,22 41:1
41:4 42:22
48:20 55:3,5
55:15,21,23
60:11 66:14
71:8 73:17
92:14,24 95:12
103:18 109:3,8
180:2
**decisions** 33:21
35:1 92:6,11
92:16,17,18,20
93:2
**defame** 139:8
**defendant** 6:15
43:5 146:5
150:1 164:8,9
**Defendant's**
164:19 174:22
**Defendants** 1:9
2:12
**define** 80:15
**definitely** 47:9
112:13 114:16
150:19
**definition**
160:18
**Delaware** 27:21
**delete** 63:12
182:7 183:12
185:8
**deleted** 162:19
163:3 181:22
**deliberate** 123:5
**deliberately**
181:4,5
**denial** 73:1
**denied** 147:4,20
148:20 149:4,6
149:9,18,21
150:2 152:2
159:22 160:15
163:12 181:1
**deny** 149:7

152:18 162:7,9
166:2 177:5
179:16 180:6,9
**denying** 177:9
**Deon** 2:10 7:2
8:17,23 11:13
13:8,20 14:21
16:18 17:18
20:10,12,15,19
21:23 22:13
23:11 24:8,13
27:13 28:10
29:16 33:3
34:3 35:6,9,12
35:15 37:15
38:5,11,16,19
38:22 39:21
40:4,17 41:14
41:17 42:10
43:6,9 45:5,15
46:8 49:12,15
50:15 51:14,17
51:22 52:13
57:21 58:2
59:8,12,17
61:21 62:23
64:5,11,19
65:12 66:17,23
67:7,21 68:1,5
68:18,21,24
69:9,12,17
71:18,22 72:1
72:5 73:5,15
73:18,20,23
74:21 75:5,8
75:13 79:21
81:1,12,15,20
81:22 82:11,14
82:23 83:3
84:5,8 86:4
87:13,24 88:3
88:8 89:11
96:10,14
102:16 103:24
107:7,13
108:10 110:19

111:20 112:9
113:3 114:2
116:8 126:23
128:4,15
131:14 135:7
135:22 136:15
137:3,6 140:8
141:4,12,17
143:5 144:3,5
144:9 148:6,23
149:5,11
150:23 154:2
161:20,22
162:3 163:18
165:20 166:1
166:22,24
167:16 168:9
168:10 169:14
170:15,21
171:4,9 177:18
177:21 179:18
179:22 182:23
183:3 184:1,6
184:8,16
185:13,16,19
186:4,23
187:18,22
188:1,5,8,15
188:20 189:4
189:11,16
191:23 196:24
197:6,11
**Deon's** 5:9 50:12
**department**
86:18 122:10
153:12,13
**departure** 172:2
**depends** 53:19
**depose** 94:6
**deposed** 4:19
**deposition** 1:3
1:11 5:6 38:21
125:3 197:5,13
**depositions** 5:9
197:10
**describe** 7:4

8:15,21 9:1
46:14
**described** 60:14
127:18
**description** 3:13
7:9 142:19
195:17
**deserving** 35:4
**designated**
122:7
**detail** 186:12
**detectable** 142:5
**determined**
192:8,13
**detrimental**
133:4,10
**developed**
194:23
**developing**
127:7
**development**
128:20,23
**dial** 46:4 47:1,7
**Dick** 26:10 28:2
28:23 49:13
97:23 102:12
104:11 109:17
112:4,15,21
118:2 120:20
123:1 167:7,13
**dictate** 177:17
**dictated** 178:3,8
**different** 5:2
11:5,23 37:18
90:21,22,23
130:18 176:12
**differently**
47:14 136:14
**difficult** 44:12
44:14 50:9
60:19 108:14
**dinner** 168:13
**direct** 22:5
134:15
**directed** 24:14
24:15 91:21

**direction** 5:11
**directly** 22:7
71:3 162:18
173:3 183:22
**director** 16:4,5
63:18 194:5
**disability**
157:23 158:15
**disagree** 46:10
194:14
**disbelieve**
176:15
**discipline** 32:1
36:22,23 37:1
48:12 50:6
108:22
**disciplined**
36:17,19
**disclaim** 180:4
**discourage**
135:1
**discovered**
160:9
**discovery** 70:15
123:6
**discretion**
192:17 193:4,6
193:8
**discriminate**
135:18 139:7
**discriminated**
181:6
**discrimination**
4:24 6:22,24
36:3 80:14,24
96:12 157:8
**discuss** 13:24
51:24 54:10,23
65:21 69:13
148:12,17
**discussed** 51:12
100:8,11 148:4
**discussion** 12:4
23:13 39:9
45:10 50:23
96:7 110:2

126:19 165:3
173:14
**discussions** 26:3
50:12 51:4,8
51:20 54:14,19
99:10
**disdainful** 46:18
**dislike** 155:22
**dismissal** 132:24
148:15
**disparage** 139:8
**dispute** 36:7,8
36:13 81:6
172:21 174:14
**disregard**
183:23 184:4,9
184:14
**disregarding**
181:6
**distraught** 160:1
**distributed**
54:17,17
193:22
**DISTRICT** 1:1
1:1
**diversity** 14:8,9
**doctor** 84:2,9,15
**document** 3:14
17:5,16,19,21
20:5 23:18,23
24:5 69:22
72:16 84:19,22
124:3 130:3
132:7,9,12
146:1 151:4,8
151:19
**documents**
15:14 16:1,15
16:16 23:8
151:15 191:16
191:17
**Dogan** 78:24
**doing** 6:23 55:9
89:5 108:5
122:20 125:4
128:21 131:12

139:9 162:11
168:23 173:15
177:5,9
**domain** 136:7
186:2,15,18
189:9
**Donnelly** 78:21
**Door** 75:22 76:4
**doubt** 183:6
**doubtful** 195:4
**Doylestown** 1:15
2:12 87:18
**drafted** 21:21
**draperies** 86:3
**drill** 5:11
**drinker** 44:9
**drinking** 31:13
31:14 44:19,21
**drive** 84:4
**driven** 194:22
**driver** 31:17
**driving** 30:13
**dropped** 196:5
**drove** 84:3
**drug** 41:6,22,24
42:2
**duly** 4:9
**dumbfounded**
159:24 160:15
160:19
**duplex** 88:22,23
88:24 89:2
**duration** 160:7
**duties** 168:24

**E**

**E** 2:1,1,17,17 3:2
3:12 118:6
198:1
**e-mail** 16:20
70:18,19,19,20
70:23,24 98:8
98:16 99:1,24
100:1,3 101:19
105:13,20,22
106:2,4,8,11

THOMAS P. GARVIN

106:11 107:17
108:2 109:23
110:1,3,4,4,5,8
111:13,13
112:3,14 116:6
117:16,22
118:2 121:2,8
121:13,19
122:24 123:2,9
126:21 127:16
147:1,2,3,8,14
147:17,23
164:23 165:5
181:7,8 184:18
186:8
**E-mailing**
123:15
**e-mails** 3:15
16:7,13 62:14
62:19 63:6,6
63:10,16,19
64:16 65:1,16
65:21 66:1,7
66:10,14 67:5
70:8,12 97:4
98:11,23 106:4
109:10 111:18
147:7,10,11,20
147:24 148:12
165:4 181:9,11
181:12,16,23
182:4 183:9
185:2,4,6
186:2,5,10,21
187:11 189:9
189:17 191:22
**earlier** 47:13
68:12 99:7,12
100:17
**early** 100:19
101:8 122:15
122:19
**easier** 35:16
**easily** 60:12
131:21 142:15
**East** 1:14 2:11

**Eastburn** 1:14
2:10 45:6
146:20
**EASTERN** 1:1
**easy** 117:6 174:8
**economical** 86:2
89:8
**economically**
85:20
**Ed** 8:10 117:23
**edited** 77:24
**editorialize**
170:3
**educated** 55:19
56:1
**education** 10:6
10:10,23 11:6
**effect** 73:20 85:2
133:19 160:9
**effective** 116:21
**efficiency** 86:1
**efficient** 89:8
**efficiently** 85:20
**effort** 78:13
**egregious** 55:14
**eight** 6:3,6 52:20
52:21 55:18
95:21
**either** 89:14
144:13 158:14
194:17
**Eleanor** 114:13
117:16 118:7
**electronic**
137:24
**eligible** 136:20
**eliminate** 42:20
**eliminates** 42:24
**emeritus** 106:14
**emotional** 85:14
119:13,14
**employed** 172:4
**employee** 67:4,9
79:8,17,18
81:18,23 82:9
90:14 113:10

116:23 123:15
130:7,22
145:12 152:1
152:17 153:5
182:6 190:11
195:3
**employees** 32:24
60:15,15 67:14
67:17 68:4,8,9
68:9 80:4,16
80:18 87:5
92:5,10,20
93:15,22 98:14
121:3,4,12
122:12 124:1
129:7,19
134:24 135:2
135:15,18
136:8 137:22
138:17 139:6,8
139:13 143:20
147:10 152:22
152:22 153:1
153:11,15
190:5,6,15
**employer** 6:13
56:15 112:6,16
137:22 138:4
138:11
**employment**
4:24 68:10
112:17 115:13
164:19 179:5
**employment-r...**
92:18 93:2
**encourage** 46:20
**ended** 88:20
175:22
**ends** 98:6
**energy** 63:11
**enforce** 80:8,10
**engaged** 126:15
153:1 158:22
**enlarged** 17:20
23:20
**entered** 45:7

**entire** 7:8 25:15
55:5 58:14
59:16 60:1
79:13 100:1
105:15 123:2
125:7 167:14
170:1 183:20
**entity's** 190:17
**entrusting** 39:20
**entry** 53:18
**envelope** 160:24
**environment**
6:24
**equal** 46:6
**equipment**
137:23,24
138:4,11
**escorted** 172:22
173:8,18
**especially** 67:11
91:16 113:13
**ESQUIRE** 2:5
2:10
**established**
85:10
**et** 105:14 134:2
138:4
**ethical** 56:21
77:8 103:20
133:23
**ethics** 52:9
56:19 94:20
103:19 104:8
104:13,15,20
105:2,16
132:18
**evaluate** 195:17
**event** 53:21
191:20
**events** 53:3 71:7
170:6 179:4
**eventuated**
176:10
**everybody** 58:16
58:18,19 80:20
92:2 114:19

121:10 153:4
194:3
**evidence** 22:10
60:20
**evidenced** 140:3
**ex** 118:14,18
**exact** 24:10
33:19 48:7
84:4 126:17
171:16
**exactly** 10:2
50:7 55:10
60:16 99:6,7
101:6 115:15
124:18 142:7
157:21 168:5
170:6
**exaggeration**
28:12
**examination** 1:4
164:2
**examined** 4:9
**examples** 132:21
132:22
**exception**
193:23
**excess** 125:10
**exchange** 21:16
**excited** 46:2
**excuse** 54:2
62:23 64:11
131:14 143:5
148:6 196:24
197:1
**excused** 197:12
**executive** 24:19
25:1,2,6,15
26:1,6 75:18
**exhibit** 27:12,17
102:19,20
130:15 131:10
138:9 145:24
151:2
**Exhibit-3** 96:11
**Exhibit-6**
151:13

**Exhibit-7** 151:7
151:12
**Exhibit-C** 27:19
**exhibits** 17:3
102:4
**expand** 62:3
**expect** 39:2 98:7
116:22 117:4,6
124:4,8
**expedition** 98:14
**experience** 62:5
**expert** 56:19
**explained** 176:6
**exposed** 42:14
**express** 111:3
171:21
**expressed**
136:14
**expressing**
131:19
**expressions**
135:19
**extent** 39:8 72:8
186:5
**external** 97:24
98:10,12,18,22
99:16 101:5
143:12,16,22
144:13,23
**extremely**
162:12

**F**

**F** 198:1
**F-E-H-E-R**
33:12
**Facebook**
129:13
**faces** 74:7,11,18
75:7,17
**facilities** 87:19
138:1
**facility** 9:22
**fact** 56:10 71:19
91:21 100:3
141:15 157:16

161:10 173:18
178:24 181:5
182:16
**factor** 114:9
**factors** 193:15
193:17
**facts** 26:24
141:10,11
150:11 165:11
165:12,18
**factual** 166:4
170:5
**fair** 34:24
109:13 119:12
158:8
**fairly** 133:8
153:22 154:9
154:12,18
**false** 90:1 125:6
**falsehoods** 28:8
**falsified** 26:23
**family** 31:17,19
39:16 44:11
94:20
**fan** 111:19
**far** 22:11 50:20
52:2 71:17
89:19 107:4,5
107:12,23
153:6 176:10
176:19 189:2
**father-in-law**
187:14
**fearful** 80:13
**feed** 144:18
164:5
**feel** 30:5 70:8
104:11 110:16
110:17,24
136:13 184:4
184:14
**feeling** 42:18
55:4 108:4
**feet** 173:10
174:3
**Feher** 33:12

35:3 36:4
78:21 195:24
**felonies** 39:14
**felt** 32:5 41:3,4
54:20 55:14
58:13,15 60:18
109:11 139:11
139:12 147:12
156:10 157:12
183:23
**female** 33:1,17
114:7 155:7,20
**females** 33:5
45:22
**fiduciary** 190:18
190:20
**figure** 49:18
50:9,22
**figuring** 102:13
**filed** 6:22 14:18
15:6,7,8 179:1
**filing** 4:2 151:20
178:20
**filled** 100:22
**final** 85:2
100:14
**finalize** 78:2
97:24
**financially**
85:20
**find** 18:19,21
24:22 60:3,5
94:12 136:12
138:3 163:16
**fine** 120:5
149:10 166:10
**finish** 34:4,6
64:12 72:1
131:15 144:3
150:21 171:2
**finished** 25:10
63:1 139:19
**finishing** 61:13
**fire** 48:20 92:14
92:24 113:9
124:15 179:17

**fired** 107:6
109:9 122:15
131:9 161:12
161:19 179:13
**firing** 47:19 95:6
179:8
**firm** 88:15,18
123:14 124:18
126:5,6,8,16
127:3
**first** 3:17,17
17:7 18:8 23:3
24:9 41:12
57:3,4 58:9
63:22 65:6,8
76:3 93:12
96:18,19 99:22
109:20 119:1
134:23 144:14
158:17 171:3
177:4,21 181:4
186:17 194:7
**fit** 142:19
**five** 87:10
**Fleischer** 103:11
**focus** 137:18
151:11
**focussing**
160:14
**folks** 103:13
105:20
**follow** 61:9
68:10 71:7
174:16 193:8
**follow-up**
156:12 162:12
**followed** 49:12
142:11,12
173:14
**follower** 19:14
143:14
**followers** 18:22
144:19
**follows** 4:10
**forbid** 32:7
**foregoing** 198:6

**forget** 49:14
61:3 102:5
**forgetting** 23:16
49:20 79:2
**form** 4:4 36:23
145:18 163:10
**formal** 95:10,11
**Formally** 36:19
**former** 147:1
**formulate** 91:24
**formulated**
78:19
**formulating**
77:21 78:8
146:8,11
**formulation**
79:4
**Fort** 4:18
**forth** 21:16
**forward** 32:2
66:1 71:1
99:19 100:8
132:2 154:5
185:5
**forwarded**
185:6
**found** 18:23
24:16,17 49:2
49:4 59:6
131:22 142:9
142:17
**Foundation**
163:19 185:16
**fourth** 76:21
171:6
**frame** 42:4
156:4
**frankly** 63:5
132:1
**free** 82:7
**freely** 91:11,15
**freeze** 109:23
112:3,14
**freezing** 110:3,7
**Friday** 1:16
102:9

THOMAS P. GARVIN

**front** 97:16
105:9 115:7
173:11 183:10
**fulfill** 122:11
**full** 4:13 116:24
129:24 144:15
148:16 151:24
164:17 168:6
193:13
**fully** 149:7,7,13
**fun** 11:10
182:14
**function** 87:6
**functions**
127:18
**further** 19:11
135:14 153:20
155:5,6 164:15
**future** 60:19
115:13 197:9

---

**G**

**G** 118:3
**Gallagher** 78:23
**gambling** 31:3
31:10,12
**games** 188:16
**Garvin** 1:6,7 3:3
4:8,14 65:9
97:22,23 150:1
155:7,8,11
164:9,16 172:1
189:1,3,17
197:6,9
**gee** 78:12 129:17
**Gender** 114:9
**general** 7:8
10:21 45:24
**generally** 53:20
78:10 101:7
106:9 182:4
**generic** 171:24
172:3,6
**generous** 115:8
120:16,19
**George** 20:23

**Gerry** 26:13
118:4
**getting** 18:9
23:2 29:8 43:1
48:15 50:24
86:5 90:24
101:15 103:17
109:7
**gift** 193:22
**gist** 115:16
183:10
**give** 26:20
102:21 113:16
151:12 161:11
184:20
**given** 21:15
83:14 89:4
**giving** 42:19
43:1 90:20
116:17 195:16
**glanced** 70:14
**go** 5:7,13 10:18
11:3 13:7
15:10 17:3
20:2 23:8 24:7
33:15 35:20,20
44:22 48:9
54:3 55:22
58:1 63:1,4
68:23 69:23
72:4 75:10,14
78:3 84:8 87:2
97:7 101:1
103:10 109:19
114:12 115:19
115:20,21
116:13 121:7
125:4,5 129:1
129:24 131:16
133:1 136:12
146:24 153:15
155:4 156:11
159:12 162:17
165:21,22
166:1 170:16
173:2,7 174:19

179:14 181:19
183:9 188:12
193:16
**goals** 127:9
**God** 32:7
**goes** 70:24 116:4
135:14 174:3
192:24 193:13
**going** 27:11 38:9
38:23 41:2
50:18 66:15
69:13,15 71:18
80:13 87:20
93:17 100:11
100:24 104:16
111:14 114:10
126:1 131:17
132:2,6,14
148:7 150:21
154:5 156:14
157:8,14 160:5
160:12 179:13
179:17 186:15
188:21,24
**good** 17:14
55:20 67:15
69:21 93:17
104:17,17
115:13 152:22
190:23 191:2
**Google** 139:4
142:14
**gotta** 148:6
**gotten** 42:17
158:12 168:17
**Grace** 2:10
20:21 24:13
41:19 49:12
63:2 66:3
74:14,16 75:4
188:12
**granted** 137:16
**gratuitous** 141:1
141:8
**Gray** 1:14 2:10
146:20

**great** 32:5 89:3
125:4
**greeting** 159:11
**grew** 90:12
**gross** 133:3
**group** 51:7
54:15 55:5
56:1 78:13,14
78:16 105:18
**guarantee** 64:2
**guess** 25:22
101:2,3 154:9
165:20 178:13
**guessing** 25:20
34:21 101:4
131:3
**guide** 193:7
**guideline** 193:8
**guy** 21:4,10
30:24 81:10

---

**H**

**H** 3:12
**hacked** 178:12
178:14 180:13
180:15
**half** 6:6
**halfway** 133:1
**hampering**
133:3
**hand** 102:24
175:8
**handbook** 3:15
68:14 69:6
76:8 77:9,12
77:14,16,22
79:4,8,17,18
79:23 80:3
129:24 130:8
130:21,22
132:4,16,22
134:8,12
135:11 175:14
191:6,9
**handed** 96:10
134:7 146:18

160:24
**handle** 12:6 41:2
47:11 49:18
50:9,18 143:8
**handled** 50:20
183:12
**Handles** 125:24
**handling** 127:12
156:24
**handwritten**
23:16
**happen** 42:9
87:22
**happened** 12:8
29:7 36:24
42:16 60:17,17
73:1 84:2
140:20 172:24
174:5 177:20
**happening** 11:5
55:12 124:7
160:2
**happens** 39:15
**happy** 43:14
108:15 165:23
**harass** 139:7
**harassed** 149:24
150:6 155:17
155:19
**harassing** 155:8
**harassment** 6:19
6:21 14:12
77:1 150:8,13
150:16 154:24
157:5,8
**hard** 55:20
64:23 78:12
**hard-on** 110:18
**hardware** 71:2
**harmful** 70:9
**hate** 69:8 126:20
**HCR** 5:5
**he'll** 189:1
**head** 21:8 48:19
52:8 105:1,16
169:6

THOMAS P. GARVIN

Page 209

**headhunter** 7:19 7:22
**heading** 132:9 134:22
**heads** 126:8
**health** 85:15 89:9,15,21
**healthcare** 90:3 115:13 193:20
**hear** 10:20 41:9 41:11 45:21 70:4 93:5,10 93:14,18,20 94:1 139:17
**heard** 5:8 9:7 11:16,17 21:16 22:9 23:3 45:23 93:3 156:9 165:15 176:3
**hearing** 72:17
**heavily** 119:16
**Heights** 1:6 7:7 9:2,3,5 12:17 13:2 15:7 32:9 33:15 37:8 42:15 44:16 61:8 85:9 93:16 98:12 116:23 121:4,8 133:11 134:23 135:15 136:6 138:19,20,24 139:10 141:22 141:23 142:2,5 142:12,16 145:12,14,16 145:20 146:5 147:17 152:21
**Heights'** 18:11 71:4 85:15 106:2,11 131:22 143:12 143:22 144:12 144:22 145:1
**Heil** 79:1 196:12

**held** 23:14 45:11 67:19 68:4 96:8 172:13
**hell** 38:9
**help** 53:13 54:7 127:5 128:21 128:22 132:10 173:4,6
**helpful** 127:13
**helps** 128:18
**Hendrickson** 157:18
**Hendrickson-...** 158:7
**hey** 20:21 62:16 84:1 87:17 179:9
**Hi** 99:18 123:16
**hide** 22:8 125:19
**higher** 157:6
**highly** 55:19 75:17
**hire** 86:19 87:4
**hired** 8:6 12:17 30:22 42:5 86:17 90:11 127:2 129:2 194:17
**history** 27:6 30:17 40:23 155:22
**Hold** 62:22 64:10
**holds** 56:18
**home** 10:9 119:17 122:15 122:19
**honestly** 39:15 94:7,9
**hope** 153:7,21 154:8,17
**Hopefully** 98:3
**horrible** 173:16
**hostile** 6:24
**hour** 10:19
**hourly** 127:24

**hours** 10:10 53:21 116:24
**house** 88:20,23 88:24 173:11
**housekeeping** 121:15
**HR** 98:5 100:15 109:3 115:22 142:15,17,24 190:4
**hugging** 168:15 177:12
**huggy** 154:23
**hugs** 150:12,14
**human** 48:8 52:8 54:22 55:7 58:14,16 58:18,19,21,22 58:23 59:1 60:11 67:12 71:5 95:9 103:15 105:15 108:23 113:14 114:16 117:21 117:24 118:5,8 118:11,19 122:4,5,9 131:24 136:5 139:1 142:10 148:16 152:24 153:21 154:8 154:17 164:17 175:17 192:8 193:14 194:4 196:12,20
**Hunt** 8:11
**hurt** 42:17 70:16 168:17
**husband** 21:7 52:11 177:16 178:3,7,22

_____
**I**
**icon** 144:18
**idea** 23:6,7 34:19 38:3

67:15 82:18 87:7,9,11 94:10 95:2 110:13 129:14
**identification** 20:6 84:20 97:5 130:4 146:2 151:5,9
**identified** 139:1
**identify** 145:11
**identifying** 71:5 177:10
**ignore** 162:15
**immediate** 132:23 179:15
**immediately** 18:10 28:2 116:21 163:2 181:21
**immoral** 133:2
**impair** 5:16,16
**important** 55:16 55:24 194:13
**impound** 30:14
**improper** 133:2
**in-laws** 167:24
**inadequate** 128:13
**inappropriate** 168:19 175:16
**inbox** 64:1
**incident** 30:1,2,5 32:4
**inclination** 23:5
**include** 24:5 115:5 132:24
**included** 46:5 86:9 102:7 116:7 132:22 193:19,21
**includes** 24:2,3 96:11
**including** 104:12 137:23
**increase** 90:18 193:2,7

**increases** 193:10 196:2
**increasing** 193:5
**indecent** 133:2
**indicate** 48:11 145:15 157:14 167:11
**indicating** 17:5 18:6 20:4 23:10 24:9 58:1,10 59:6 75:24 84:18 97:3 101:19 130:2,24 145:24 151:3,7 190:2
**Indirectly** 144:2
**individual** 21:18 62:8,9,11 100:18
**individuals** 55:8 172:22
**industry** 11:6
**inequality** 33:10
**inflame** 148:8
**inform** 121:22
**informal** 190:5
**information** 16:5 17:2 23:2 32:3 52:22 101:23 163:10 186:19
**informed** 39:12 116:20
**initial** 162:18
**injured** 32:7 42:17 168:17
**input** 55:12 152:7
**inserted** 78:4
**inside** 98:15
**instance** 57:18
**instances** 10:20 47:6
**instruct** 91:23
**instructing**

THOMAS P. GARVIN

20:17,19
**insurance** 32:12
89:10,15
157:23
**intelligent** 55:19
**intended** 153:18
**intention** 174:7
**interact** 91:19
**interacting**
168:17
**interest** 190:18
**interested** 24:20
24:22 185:8
**interesting**
112:19 124:22
178:24
**interject** 45:6
**internal** 143:12
143:15,22
144:1,12 145:1
145:3,6,8
**Interrogatories**
15:17
**interrupting**
168:24
**introduction** 5:9
**investigate**
57:14,16 59:7
59:23
**investigated**
60:1
**investigation**
19:11 29:6,10
129:6 155:9
156:2 163:5,15
163:21 180:3
**investigations**
105:4 129:9
**invitation** 98:5
**invited** 114:10
**involve** 104:14
190:8 195:16
**involved** 6:10
52:21 73:21
103:20 138:4
**involves** 113:14

**irresponsible**
162:13
**issue** 22:6 33:2
33:13,14 47:11
54:21 56:11
86:23 102:3
108:13 109:6
134:6 136:22
137:5,13
161:14 176:10
**issued** 168:11
**issues** 5:1 32:6
37:7 42:6
44:12 47:3,24
102:24 103:6
103:21 104:12
116:6 170:9
191:12,13

───── **J** ─────

**J-A-C-Q-U-I-E**
122:1
**Jackie** 78:21
**Jacquie** 122:1,3
122:10
**JANE** 1:7
**Janet** 78:20
173:13 196:13
**Jenkins** 8:10
9:19 25:19,21
25:22 26:11
44:17,20
**Jennifer** 122:2,4
122:11
**jest** 44:6
**Jewish** 187:10
**job** 7:9 12:23
41:2 44:24
45:2,4,14,19
55:17 56:11,14
56:14 61:7,18
81:11 82:4
83:11 93:9
129:4 132:2
152:3,19
153:19 160:5

160:13 172:20
195:9,11,17,17
**jobs** 81:8
**JOHN** 1:7
**joke** 165:7
**Jr** 37:21 38:1
39:9
**judge** 182:13,17
182:18
**judgment** 5:16
67:10,12,18
**jump** 195:2,4,5
**jumping** 196:18
**Jungclaus** 1:3
2:18 5:10 9:7
11:18 14:5
32:18 44:1
50:10 51:1,9
51:21 66:7,13
70:22 74:6,10
74:17,24 75:11
89:19 92:13,23
93:11 94:13
110:18 111:1,4
114:21 115:24
131:9 139:3
142:21 143:8
144:23 145:16
149:23 164:22
**Jungclaus'**
18:23 64:4,17
85:2 93:9
145:2 172:11
176:3 189:24
**junk** 63:6,7
**justified** 154:3

───── **K** ─────

**K** 139:3 143:3
**Kathleen** 1:3
2:18 103:12
149:23
**Kathy** 11:18
12:5 18:23
19:18 29:5,8
29:13 44:3

47:15,17,20
48:5 78:20
100:21 111:8
114:20 115:24
119:4 121:22
142:21 143:8
144:23 145:2
145:15 156:5
156:13 168:14
173:15 176:12
194:8,13
196:11
**Kathy's** 119:1
119:23 133:19
**keep** 11:16
51:17,18
106:22 115:6
131:17 169:23
**keeping** 153:9
**Kevin** 23:1
**kidding** 159:2
**kind** 4:23 10:19
12:24 13:1
29:10 38:13
39:24 63:10
67:5 103:5
121:12 136:9
178:13 180:13
**kindly** 147:1
148:15 149:23
**kinds** 67:5
**Kirkpatrick**
8:12
**kitchen** 168:14
**KJ** 96:10
**KJ-2** 79:7
**KJ-4** 75:20,24
76:1 130:16,20
**KMJungclaus**
143:9
**knew** 41:24 42:4
44:22 119:9,9
127:22 181:9
181:11,13
**know** 5:15 7:17
8:5,18 9:8

10:18,24 13:1
14:7 19:20
21:2,3,4,5,6,10
21:12 22:7
23:1 24:16
25:3 26:10,11
26:12,18 28:19
29:14,24 30:14
32:5,6,16
34:23 40:7
41:5,8,19,21
41:22 42:1
43:12 44:2
46:2 47:2
50:12 51:1
52:1 53:15
54:8,15,19,22
55:8,16,17
56:12,23 60:17
63:9,16 65:14
65:24 66:6,8
66:10,12,21
67:2 71:11,21
75:9 78:23
79:11 82:15,19
82:21,24 83:2
83:6 85:1
87:15 91:14
92:1 93:15,22
94:8,9 95:2,11
96:19,23 98:14
102:1,18,24
105:24 106:5
106:10 107:4,5
107:11,12
108:5,12 111:2
111:16 113:12
114:19 115:7,8
115:11,15
116:3 117:12
119:7,9,14,16
119:18,19,24
120:20 121:14
124:11,13,16
124:17,20
126:8,11

THOMAS P. GARVIN

129:17,19
130:6,21 131:3
131:20 133:22
134:1 135:11
135:12 136:7
136:22 138:5
138:10,11
139:13 140:24
142:15,18
146:15 147:16
151:17 153:3,8
155:22 156:9
156:12,15,22
157:6,9 158:4
158:24 159:1,4
159:11 160:19
165:4,5 168:6
168:16 169:2
169:17 171:17
171:18,18
172:6 173:9
174:2,13,16
176:11,14
177:11,14
178:14 181:11
181:15,17
182:6,16,18,20
182:21 183:8
184:20 185:4,5
185:15,19,20
185:22,24
187:12 188:16
191:10,16
193:9,12,23
194:3,10,19,21
195:14,16
196:1,7,18
**knowing** 186:20
**knowledge** 17:1
44:9 104:3
107:22 163:10
191:21 192:2
**known** 30:19
41:6
**knows** 69:20
71:23,24

156:22
**Koran** 182:13

———————
**L**
———————
**L** 2:17
**labor** 49:13,17
49:20,22 50:3
50:5,8,21
116:5,7 156:19
**land** 194:19
**language** 19:4
20:24 24:2,3,4
24:6 38:13
58:8,8,11,13
58:14 59:5,7,9
115:5 137:17
145:5,17,17
154:19 155:13
155:13 161:13
171:16 175:6
178:4,8 179:5
179:6
**laptop** 98:20
**large** 165:14
194:7
**larger** 193:10
**Larry** 21:10
**late** 96:12 97:18
116:19 188:17
**latest** 85:7
133:16
**Law** 1:13 2:4
**lawful** 135:20
**lawsuits** 6:10
**lawyer** 10:4 43:4
146:12
**lawyer's** 109:8
**lawyers** 10:18
**leaking** 107:22
**lean** 58:7
**learn** 11:4 18:1
**leave** 38:15
**leaving** 173:12
177:12
**lecture** 38:18,21
**led** 19:8 71:7

176:6
**legal** 10:6,22
12:24 16:1
35:20 55:13
73:20 116:6
**lesser** 67:19
**let's** 17:3 18:4
23:8 24:7 36:9
49:14 61:4
75:14,20 97:12
99:10 101:1
103:10 109:19
115:17,19,21
116:13 121:2
129:24 145:23
146:24 151:21
159:12 162:17
165:22 180:17
**letter** 17:8 18:2
18:5,9,15
21:22 22:8
24:7,9,17
25:11 26:9
27:23 28:1,13
28:20,23 29:3
47:22 48:3,4
48:23 49:16
50:1,17 51:24
52:3 54:18
56:4,17,22
57:3,4,9,12,15
57:17,19,21
58:24 59:2,15
59:16,18,19,24
60:2,6 64:21
94:8,10,11,13
94:18,24
102:14,19,20
103:1,3,23
104:4 115:23
116:2 124:22
124:23 125:1,8
125:11,17
126:13 127:20
128:3 140:6,15
142:8 161:1

162:15 164:1
164:10 165:16
167:10 168:8
168:11 179:2
**lettering** 151:18
**letters** 56:5
105:7
**level** 44:18,21
53:12 90:15
133:9 157:6
195:6,20 196:4
196:11,15,21
**levels** 195:2,4,6
196:18
**Levin** 122:2,3,10
122:14
**liability** 32:6,9
32:17 37:6
42:15 91:1
**liberated** 187:20
**license** 11:8
198:24
**licensed** 10:9
137:23
**lied** 72:21 89:22
89:23
**lieu** 37:5 42:20
**life** 85:10
**light** 60:8 160:4
160:9,24
161:15
**lightning** 184:19
**like-minded**
65:17,19
147:13
**liked** 44:22
195:3
**likes** 46:15
**limited** 132:24
193:6
**line** 8:16,22
65:16 121:14
155:5 159:22
170:19 171:3,6
194:1
**link** 143:20,24

144:12
**linked** 60:12
71:12,14,17
131:21 142:11
143:11,13,15
143:19 144:20
**lips** 140:13
**list** 65:11
**listed** 79:14
**literally** 16:16
**litigation** 73:23
**little** 119:11
132:6
**live** 4:17,18
**loaded** 63:7
**location** 174:2
**logical** 67:4
**logo** 138:18,23
141:21,23
**long** 6:1,4 20:22
106:13 127:19
155:21,21
**longer** 116:23
127:17 172:4
**look** 18:4 25:7
38:8 55:20
57:20 59:17
64:17 75:20
78:1 99:10
102:2 109:23
110:10 138:8
142:24 151:21
151:23 152:10
152:12 159:15
160:18 180:17
182:21 183:2
190:1
**looked** 15:14
17:4 56:2
66:13 137:20
**looking** 104:18
110:4 122:21
124:20 132:18
193:18
**looks** 40:8 76:7
76:7 105:21

THOMAS P. GARVIN

**lose** 160:5,13
**lot** 26:23 30:15
  36:8 79:17
  94:19 113:15
  119:8 133:22
  141:16 150:12
  152:23 153:13
  165:7,8 174:7
  180:12
**lots** 158:24
**love** 166:7
**loved** 158:12
**low** 152:24
  153:10
**lower** 68:4
**Ltd.'s** 146:6
**lunch** 23:9 43:14
**luncheon** 43:15
**lying** 72:17
**Lynch** 79:1

**M**

**M** 1:3 2:10,18
**MacARTHUR**
  1:12 198:5,23
**Mahoney** 8:10
  103:11 117:23
**mail** 64:22,22
  109:24 110:10
**main** 8:16,22
  72:12 143:17
**maintain** 32:12
**maintained**
  33:19 107:2,6
**maintenance**
  21:17 121:15
**major** 44:11
**making** 74:6,10
  74:17 136:21
  150:9 165:1
  194:15
**Malcolm** 8:12
**males** 181:7
**manage** 55:18
  61:8 190:15
**management**

**materials** 86:24
**matter** 13:24
  14:19 31:21
  60:3,23,24
  71:12 74:9
  155:9 198:8
**matters** 69:7
  115:6 129:7
  134:17
**mature** 194:19
**Mawr** 2:6 9:20
  9:22
**McEndy** 103:12
**McKeel** 8:9
**meals** 193:21
**mean** 10:2,20,24
  29:16 52:10
  57:14 58:7
  60:16 68:3
  78:22 79:21
  98:10 106:9
  107:14 111:15
  117:3,7 119:2
  119:8 128:24
  132:14 136:17
  149:1 157:11
  160:5,24 166:1
  172:19 180:6
  180:11 192:16
  195:5,6
**meaning** 53:16
  194:11
**means** 8:19 92:5
  92:10,19 124:3
  160:17
**meant** 33:4
  194:1
**measure** 192:12
**meat** 134:12,13
**media** 69:19
  70:6 102:6
  124:9 127:5,12
  128:22 129:7
  129:18 134:2
  135:18,22,24
  137:17 148:19

**materials** 86:24
**164:20 174:23**
  175:9,11,13,15
  175:21 176:1
  185:10
**medications**
  5:15
**medium** 135:16
**meeting** 8:2 52:5
  54:5,22 95:22
  119:4,13
  148:16 155:15
  159:23 160:6
  161:16 162:18
  164:10 167:5
  167:14,15,17
  167:19 169:15
  169:19 177:8
  178:10 179:8
**meetings** 91:22
  96:1,1,3
  191:12
**member** 5:24
  6:1 61:3 113:9
  113:12 114:14
  117:20,24,24
  118:4,4,17
  122:22 182:1
**members** 9:2,13
  24:24 25:12
  26:4,8 31:17
  31:19 41:9
  50:14 51:4,21
  62:8,10,11
  67:19,19 68:4
  68:8,8 69:7
  95:21 103:14
  122:8 129:8
  168:23 184:5,9
  184:15,21
  190:12 191:8
  191:14
**memo** 97:23
  123:16,17
**memorializing**
  124:16
**memorize** 170:1

**memory** 126:12
**men** 46:5
**mention** 44:17
**mentioned** 28:6
  44:20,22
**mere** 161:5
  162:8
**Meredith** 33:12
  33:13 78:21
  195:24
**merged** 8:1
**met** 21:13 49:7
  49:10 65:15
  116:19 177:4
  187:14,17
**MICHELLE**
  1:12 198:5,23
**middle** 30:11
  72:17 159:22
**Mike** 26:11
**mind** 114:7,8
**minds** 104:17
**mine** 100:4
**minorities**
  131:18
**minute** 23:12
  87:24 112:4,14
  152:12
**minutes** 75:3
  95:22,24 97:7
  108:3 111:24
  112:1,1 160:6
  161:15
**misappropriat...**
  42:2
**misconduct**
  137:14
**Mission** 3:14
  84:24 85:1,23
  89:4
**mistake** 22:6
  173:16,16
**mistaken** 105:17
**mistreated**
  155:20
**mistreating**

77:24 78:17
79:13 80:17
91:6 113:13
122:9 153:4
**managers** 91:20
  194:10
**manipulate**
  165:10
**manipulated**
  150:11 165:9
  165:13,18,19
**manner** 38:24
  61:16,19 62:6
  85:16 91:8
**Manor** 173:11
**ManorCare** 5:5
**manual** 69:14
  69:19 70:5
  104:23,24
  105:3,6 191:10
**manuals** 78:5
  79:9
**map** 19:7 97:21
**Marc** 79:1
  196:12
**mark** 2:4,5 45:6
  75:8 98:14
  145:23 173:4
**marked** 3:13
  20:6 84:20
  97:5 98:12,18
  98:22 130:4
  146:2 150:2
  151:5,9
**market** 192:13
  192:20,24
  194:8,11,16
  196:3,7
**marketing** 127:6
  127:11 128:10
  128:19,20,24
  196:14
**Marketing's**
  127:9 129:12
**Marlene** 61:2
**match** 151:14

156:7
mistrust 155:22
Mitzvah 87:18
88:7
mom's 65:19
moment 109:16
196:24
Monday 29:24
44:7 51:10,23
95:12 98:2
money 43:2
90:20 152:4,20
153:6 193:24
monies 193:22
months 115:11
morning 10:19
93:13 96:12
98:2 101:20
108:4
mornings 44:7
mother 65:2,4
148:2,13
mother's 31:7
65:4
motivated
111:13,15
move 20:20
192:20 194:9
195:6,19
196:20
moved 196:3
moves 159:6,6
moving 99:19
100:8
multiple 26:13
49:17 129:3
132:15 156:13
municipal
182:17
mutually 197:5

**N**

N 2:1,17 3:2
198:1
name 4:13 7:21
11:23 16:6,13

16:20 21:6
52:11 61:3
64:1 65:4,6,8,8
71:4 88:17
126:6 139:3
142:13,14,21
143:3,7 145:2
158:6
named 6:15 21:4
21:10
names 8:7 25:5
national 10:16
nature 35:1
55:14 56:6
60:16 63:6
104:12,18
127:13 189:19
190:1,2
Nazi 187:20
necessarily 12:1
135:12
necessary
120:10,12
need 14:10,14
14:22 47:1
53:12 59:17
61:8 84:1
89:10 106:18
113:1 132:6,11
156:10 179:14
needed 48:9
51:13 54:20,21
104:14 127:21
128:13
needs 46:4 47:12
85:15 122:11
negative 154:15
negligence 43:4
neither 162:20
network 190:23
191:3
networking
135:1,16 138:2
139:7 143:21
neutral 172:6
never 6:21 12:8

32:20,22 37:12
44:20,23 45:3
45:13,17 70:16
70:22 89:16
111:7 140:12
140:13 148:2
149:3 150:7
155:12 157:17
159:9 165:5,6
166:12 167:4
168:20 172:1
172:10 176:22
181:15 182:18
191:4,21
new 158:24
159:11 179:1
195:16 196:7
newer 130:21
newspapers
182:5
nice 13:19 16:10
night 30:12
44:22 97:19
101:19 168:14
nine-page 125:8
127:20
Nobel 52:12
nods 105:1
169:6
nominate 9:12
non-business
148:1
non-contest
115:14
non-managem...
121:17
non-public
173:8
non-work-rel...
183:11
noncompliance
137:12
Nondiscrimin...
76:11
nonemployee
88:5

nonprofit 85:9
86:2
nonresident
88:8
nonsense 74:22
noon 44:2 98:6
normal 159:4,10
168:24 194:18
normally 96:2
not-for-profit
13:3,6
note 43:14
151:17
notes 53:8,9,13
53:15,19,20,22
53:24 54:1,4,7
54:11 119:3,18
140:21,24
155:14 156:3
169:17,23
170:2,4 198:8
notice 116:24
123:23 163:5
notify 125:15
November 1:16
24:11 124:21
124:24 125:4
125:12,13
nuisance 161:5
162:8
number 3:13
78:1 151:19,20
196:10
numbers 1:8
151:20
numerous 12:3
41:6,7
nurse 119:15
nurses 121:16
Nursing 10:9

**O**

O 2:17 198:1
oath 21:20 94:6
149:11
Obama 147:3,7

182:13,18
object 71:18
objecting 183:4
objection 7:2
8:17,23 11:13
13:8 16:18
17:19 20:10,12
21:23 22:13
28:10 33:3
34:3 35:6,9,12
37:15 38:5,11
38:16,16 39:21
40:4,17 41:14
42:10 43:6
45:15 46:8
51:14 52:13
61:21 64:5,19
65:12 66:17,23
66:24 67:7,21
68:1,5,18,21
69:9,12 73:5
73:15,18 81:1
81:12 82:11,14
82:23 83:3
86:4 89:11
103:24 107:7
108:10 110:19
111:20 113:3
114:2 126:23
128:15 135:7
136:15 137:3,6
140:8 141:4,12
141:17,17
148:23 161:20
162:3 163:18
166:22 177:18
177:21 179:18
179:22 182:23
183:3 184:1
185:13 186:4
187:18,22
188:10,23
189:6,12,16
191:23
objections 4:4
objectively 56:2

THOMAS P. GARVIN

observant 45:7
observe 75:12
 164:3
observed 159:9
obvious 27:1,2
 28:14 32:7
 133:8
obviously 63:24
 65:17
occasion 12:11
 12:14
Occasionally
 81:24
occasions 46:24
occurred 29:15
 30:3 32:4
off-site 87:5
offending 191:7
offense 104:19
offenses 132:23
offensive 58:8,9
 58:14,15 66:15
 181:7,9
offer 52:2 86:8
 114:23 119:14
offered 12:22
 13:11 119:17
office 2:4 17:20
 19:19 44:4
 48:6,16 173:3
 173:5,10,12,13
 173:22 174:2,4
 197:8
Offices 1:13
official 95:4
officially 78:4
officio 118:15,18
oftentimes 93:12
 193:9
oh 20:2 37:22
 38:15 41:19
 74:23 84:7,11
 103:7 104:8
 113:1 118:24
 131:16 138:15
 141:9,11 149:9

154:14 160:8,9
 172:9 174:16
okay 4:19 5:19
 6:1,4,9,18 7:4
 7:16,19,21
 9:19 10:13
 11:16 12:4,20
 14:1,11 15:13
 15:19,21 16:6
 17:3,9,23 18:4
 18:8,16 19:7
 19:11,20 20:1
 23:22 25:9
 26:3,8 27:17
 27:23 28:4,16
 29:6 30:23
 31:2,24 35:3
 36:9,12,17,24
 37:22 39:19
 41:10,24 42:7
 42:7 44:17
 45:8 46:13
 47:6,10,18
 48:2,22 49:9
 49:14,24 50:4
 50:11,19 51:3
 51:6 52:5,24
 53:22 54:6,13
 56:24 57:14
 58:16 59:5
 60:3,7 61:4,14
 70:8 74:5,19
 75:20 76:5,9
 77:11,17 78:14
 78:18 79:3,15
 80:6,12 82:9
 83:2,24 84:11
 85:6 86:7,12
 88:14,23 89:3
 89:8 91:4 93:8
 94:12 95:4
 97:11,22,24
 98:24 99:3,9
 100:2,2,8,13
 102:6,13 103:7
 103:10,16

105:10,22
 106:17 109:13
 109:19 110:7
 111:24 112:12
 113:1,24
 114:12,18
 115:17,20
 116:10,13
 117:3,16,22
 118:2,21 120:5
 120:5 121:21
 122:1,6,14
 128:2 130:17
 130:20 131:13
 132:19,20
 133:21 136:12
 138:15 142:1
 144:8 146:8,19
 146:24 149:8
 149:10 151:14
 152:11,15
 154:7,14,22
 155:16 157:10
 157:18 159:21
 161:3,18
 162:17 163:9
 164:12,15,22
 170:10 171:11
 172:9,16
 173:18 174:21
 175:6 176:3,15
 177:1 178:9,16
 180:17 186:13
 189:8,22
 192:15 193:15
 197:11
old 84:23
older 130:21
ole 190:23 191:2
once 21:14
 101:4
one's 67:9
 130:22 193:16
one-by-one
 165:23
one-on-one

49:21 51:3,5,7
One-page 3:14
ones 25:12,16
 26:14 91:17
 114:17 133:7
 134:9 185:11
 186:13,23
 187:2
online 11:20,21
open 41:23
 75:22 76:4
open-minded
 109:6
operations 7:8
 133:5,10 169:1
opinion 13:10
 56:21 71:19
 72:6,8,14
 131:20 136:18
opportunities
 91:5
opportunity
 46:6 111:11
 114:23 176:24
 197:7
opted 193:24
option 95:13
ORAL 1:4
ordinary 75:9
organization 8:2
 13:1,4,6 42:14
 55:18 60:13
 61:5 85:21
 98:15,17,23
 121:23 124:20
 125:7,21,23
 127:22 184:23
 185:2
organizational
 133:5
original 21:6
originally 19:1
outcome 54:23
 155:15
outed 186:21
outlines 99:6

Outlook 106:5
outside 47:3
 98:11,15,16
 139:2 142:10
 142:18,20
 143:1 158:3
 190:4
overly 46:16
oversee 7:7
overt 159:6
overtalk 188:9
owned 42:16
 137:22 138:4
 138:11 175:7

P

P 1:6,7 2:1,1,17
 3:3 4:8 98:13
P.C 1:14 2:10
p.m 1:16 115:18
 116:14 197:14
P.O 1:14 2:5,11
pack 173:5
package 13:11
 13:14 86:10,16
page 3:3,13
 18:12 58:5
 76:3,5,9,12,13
 76:15,17,21
 77:5,7,9,11,14
 96:14 97:20,22
 110:6 115:20
 117:22 123:11
 123:12 130:10
 130:13,15,20
 132:19 134:17
 134:17 143:19
 144:14 146:19
 151:20,21,23
 159:12,16
 162:23,24
 170:2 177:17
 192:5,5
pages 77:18
 97:17
paid 86:3,17,18

THOMAS P. GARVIN

87:3 89:20
100:22 127:24
190:10
**Pannha** 16:4
**paper** 99:10
**paraded** 173:8
**paragraph** 58:9
100:14 104:11
112:8,13 119:1
137:21 138:17
144:15 145:10
152:10 159:12
159:15 162:23
162:23 170:13
170:21 174:21
178:19 180:18
180:24 181:3
**part** 12:16 13:11
51:22 55:23
57:15 60:20
72:22,24 76:5
76:7,8 82:4,7
83:11 86:8,10
86:16 90:18
93:8 104:22,24
115:3 121:18
123:4,7,8
132:4 141:2
153:19 155:14
176:9 177:22
178:2 181:1,1
194:8
**participate** 92:6
92:11,20
**participating**
92:16
**participation**
92:13,15,23
**particularly**
195:3
**partier** 44:10
**parts** 36:6 85:7
**passing** 47:5
182:4
**Pattie** 78:21
195:24

**Paul** 21:4
**pause** 35:17
**pay** 12:15 13:6
71:8 82:2
83:10 86:15
87:20 90:16
190:12 193:5,7
196:15
**paying** 43:5
**payout** 115:12
**Penn** 106:8,12
**Pennsylvania**
1:1,15 2:6,12
**people** 8:14 25:5
45:24 46:18
47:11 49:10
52:21,22 55:19
61:9,9 63:10
65:17 79:13
80:12,15,15,23
86:24 87:4
105:18 118:8,9
118:14 121:8
121:16 125:20
127:22 131:12
142:19 147:18
150:12,18
152:23 153:22
153:24 154:9
154:12,18
158:24 172:13
173:19,24
174:10 187:10
194:15 195:22
196:10
**perceived** 36:3
**percent** 21:9
102:1 136:10
139:24 175:19
190:6 192:24
193:2
**perform** 44:24
45:1,4,14,19
**period** 122:13
**permission**
40:15,24

**permitted**
137:22 138:17
139:6 143:20
**person** 16:15,24
17:10 20:22
22:5 64:12
65:19 82:20
83:6 123:22
154:23 177:10
178:14 183:21
185:7,10
**person's** 174:3
193:2
**personal** 44:15
56:12 70:18,19
70:23 106:4,10
116:1 131:20
134:17,22
135:19 138:1
138:18,21
143:21 175:8
**personally** 6:18
10:11 158:17
172:12
**personnel** 53:10
57:8
**perspective**
144:21
**pertain** 181:23
**pertaining**
127:16
**pertinent** 79:19
181:5
**Philadelphia**
139:2 142:15
190:5
**Philly** 142:10,18
142:21 143:1
**phish** 153:14
**phishing** 98:13
**physical** 37:7
85:13 159:6
**physically**
150:18
**picked** 182:13
**picks** 7:13 9:8,9

**picture** 20:1
51:18 153:9
**pillars** 8:21
**pitch** 158:16,17
**pitching** 158:9
158:10,11
**place** 33:18
34:16,18 79:22
114:24 194:24
**plain** 172:22
174:22
**Plaintiff** 1:4 2:6
148:18 150:5
152:1 153:12
155:6,9,12
159:23 160:15
162:19 166:13
171:20 172:21
174:24 178:21
181:6
**Plaintiff's** 146:6
172:2 179:3,3
**plan** 85:5 89:21
90:3
**play** 117:12
**playing** 188:16
**Pleas** 27:21
**please** 13:17
64:13 74:12
75:6 106:22
134:18 145:12
169:4 192:19
**plenty** 143:2
**plus** 115:12,12
**Plymouth** 8:2
**point** 17:14 25:9
46:3,15 65:18
90:13 96:21,22
98:7 100:12
112:17 117:12
124:22 181:5
**points** 102:23
103:5,8 157:6
**police** 27:5,5,15
28:16,24
**polices** 80:7

**policies** 68:11
77:19,22,23
78:10 79:5,9
79:12,21 80:10
80:13 102:3
132:15,17
134:11,13
**policy** 31:23,24
33:23 69:19
70:6 75:22
76:4 78:4,8
101:22 102:6
104:23,24
105:3,6 113:8
113:11 134:2
135:5,10,13
137:18 148:19
164:20 174:23
175:9,11,13,15
176:1 191:10
**political** 60:15
63:8 67:13
69:7 131:19
185:7 189:19
189:24 190:1,2
**politically**
147:13
**politics** 190:8
**poll** 55:9 131:12
136:9
**polled** 136:11
175:20
**polling** 60:15
**population**
85:15
**Porter** 4:14
**portion** 165:14
165:15,16
**portions** 79:8,9
149:5,6
**position** 7:4,13
9:12 10:1
33:16,17 60:18
64:15 67:24
79:1 90:4 92:9
109:9 110:15

THOMAS P. GARVIN

142:16
positions 33:15
33:20
positive 91:8
161:9
possibility 42:21
100:15
possible 66:13
66:16,22 80:12
98:2 161:18
162:1 174:8
post 60:11
138:17,21,22
posted 178:22
posted/linked
71:3
posting 162:19
164:11
power 104:16
PR 124:2,18
126:20 127:2
practice 104:17
170:8 173:23
practices 129:18
Prak 16:4
prepare 102:16
prepared 103:8
prescribed
194:21
presence 127:8
149:24
present 5:20
113:9
president 7:6,15
9:9,9 33:16
48:8 55:7,17
60:10 61:7
67:11 71:5
113:14 127:8
128:9,24
131:24 136:5
152:24 153:21
154:8,17
175:17 196:12
196:13,14,20
pressure 184:18

pretty 5:10
101:8 119:12
159:4 178:16
prevail 162:14
previous 6:12
28:7 60:22,24
111:18 156:15
Primarily 10:15
primary 42:12
83:22
principals 88:21
printed 19:16
23:20
printout 23:24
27:6
prior 33:17
34:14 42:2
47:18 48:1,16
98:24 102:15
111:4,13
148:15 158:1
179:8
private 83:9
94:16
privy 63:14
94:18
Prize 52:12
probably 33:18
42:5 57:2 76:8
78:23 97:1
101:2 102:14
106:4 115:14
122:20 124:21
138:8 160:6
problem 14:2
19:4 22:6
39:19 42:24
43:3 125:20
186:15,21,22
187:5 189:8
Problem-Solvi...
76:18,22
problems 41:22
42:1,2 89:5
111:3,7
procedural 99:4

procedure 5:7
78:4 79:9
procedures
68:11 79:12,22
104:21
proceed 50:1
100:12
proceedings
79:20 137:18
process 11:9
107:1 123:6
194:18
produce 13:17
63:11 68:16
82:5
produced 13:21
14:8 16:14,21
18:24 29:5
30:4 53:15
60:20 63:15,18
63:19 119:3
130:9 186:11
product 153:2
production
15:14 133:3
professional
39:1 48:8
61:11,15,19
62:6,15 85:16
157:9 184:21
188:18
professionally
62:4
professionals
56:2
professor
106:14
profile 195:17
profusely 119:6
177:12
program 194:23
programming
196:9
progressive
48:12 50:6
108:21

prolonging 72:4
promise 161:11
170:10
promoted
194:17
promptly 91:7
155:8 156:2
proper 61:10
153:5,7
protect 41:3
42:13 56:15
125:20,22
protected 55:9
60:14 131:11
139:24 140:2
175:18,19
provide 85:10
91:5 92:4,4,9
92:19 169:4
191:6,19
provided 7:11
52:7 85:19
89:9
providing 6:24
proximity 44:6
PTO 115:12
public 1:13
123:13,22
125:24 126:5
126:13,15
127:7 128:19
133:10 135:17
136:7 168:20
186:2,15,17,22
189:9
publicized 172:1
pull 16:16 17:1
112:3,14
pulled 18:22
pulling 168:22
purpose 85:13
purposes 84:24
91:5 135:20
pursuant 110:12
put 7:18 31:15
32:5 34:18

50:10 53:2,18
53:20 57:2
60:8,18,18
106:19 114:18
114:24 124:8
126:13 154:19
160:12 177:17
189:9 194:1
puts 157:3
putting 55:9

Q

qualify 48:11
quality 85:10
quantifiable
152:2,18
question 4:5
15:17 16:11,12
17:12,15 20:16
22:17 33:7
34:4,5,7,8 35:8
35:14,16,17,21
39:5 40:11,12
59:19 60:2
61:13 62:9
69:22,24 70:3
72:11,14 73:6
73:8 80:1,19
80:21 84:5,10
94:4 100:18
108:7 110:22
112:10 120:1
137:11 142:22
144:5,7,10
148:10 154:10
160:4 165:17
170:22 171:12
175:24 177:22
183:7 184:12
188:2,4,6,12
188:13 191:24
192:6
questioning
93:4
questions 14:4
35:20 36:16

83:4 169:24
**quick** 109:21,22
142:13 161:16
**quit** 150:22
**quite** 8:14 12:2
63:5 102:8
132:1 188:24
191:17
**quote** 18:12
116:10 160:12
161:4,10
182:12

**R**
**R** 2:1,17 198:1
**race** 136:8
**racial** 182:22
**racist** 140:7,10
140:16,18,22
141:3,7 147:20
147:22 166:14
166:21 167:6
167:11
**raise** 17:18
32:23 33:1
134:4
**raised** 59:23
**rant** 189:20
**rap** 38:8 39:8,14
39:23
**Rarely** 174:12
**ratio** 192:7,11
196:4
**ratios** 192:16
194:6,7,10,18
**Ray** 9:7 176:3
**reached** 95:12
**reaction** 18:8
26:15,16,17,19
26:21,22 28:4
**read** 22:20
34:10 54:18
59:18 63:7
64:16,22 85:7
99:23 100:1
101:22 112:12

120:6 133:24
139:21 147:5,9
161:2 164:8
171:4 180:18
180:18 181:15
181:22 182:3
185:2,3
**reading** 22:19
24:21,23 63:12
112:8 142:5
143:19 171:2,3
174:22 186:19
**ready** 92:1
108:2 156:17
159:19
**real** 20:9 47:3
119:16 139:3
**realDonaldTr...**
190:3
**realize** 55:16
**really** 8:3 56:8
56:23 57:6,15
67:14 74:8,23
78:12,13 87:14
93:14 95:2
99:18 108:20
111:2 120:20
123:15 126:11
127:9 128:7
134:12 138:5
152:21 156:10
175:13 176:11
176:14 185:21
187:9 194:1,22
**reason** 36:18
40:19 83:8,13
107:18,20
113:2 127:2
176:15 196:23
**reasons** 32:7
175:22
**reassure** 169:12
171:14 172:16
**reassured**
170:18 171:7
**reassuring**

172:19
**recall** 9:18 25:3
25:5,23 26:6
26:16 28:4
30:6 36:11,12
36:15 43:24
44:1 50:7 51:2
62:20,21 71:15
71:16 78:11
84:4,12,14,14
84:16 96:12
103:9 110:5
111:6 122:16
122:17,20
125:14,18
126:22 127:1
128:7 129:23
134:6 158:19
160:11 163:8
164:7 169:11
171:16 172:19
177:3 186:8,16
191:5
**recalls** 72:8
186:7 189:17
**receive** 45:21
90:2 162:10
193:3
**received** 17:8,17
18:3,5 47:22
48:22 57:3,5
57:12 64:20
72:16 115:23
124:21 127:20
163:24 196:1
**receives** 34:23
**receiving** 66:9
90:7
**recess** 43:15
**reciting** 179:3
**reckless** 30:12
**recollection** 8:13
23:23
**recommend**
193:11 195:9
**recommendati...**

195:18
**recommendati...**
78:7,9 192:21
196:17
**record** 13:20
17:20 23:11,14
34:10 45:9,11
58:2 59:8
74:20 75:15
96:6,8 139:21
**recorded** 96:4
**recreational**
85:14
**recruiter** 122:4
**recruitment**
86:10 122:12
**reducing** 153:9
**refer** 190:22
191:2
**reference** 11:1
115:13 142:4
156:4 180:14
**referenced**
77:18
**referencing**
155:6
**referred** 65:24
**referring** 14:10
14:15 43:3
57:23 59:9
102:18 132:8
169:23 170:12
175:13,14
187:13
**reflect** 74:20
75:16 134:8
**refrain** 75:7
**refresh** 126:12
137:15 141:16
**regarding** 97:23
100:17 115:24
**regardless** 85:6
**regretfully**
121:22
**regular** 93:12
**rehab** 41:7

**reinstate** 73:10
**relate** 157:4
**related** 5:1 32:6
37:7 63:8
69:19 79:5
90:24 102:3
107:3 148:3
175:18 181:21
**relates** 63:5
93:15
**relations** 116:7
123:14,22
125:24 126:5
126:16 127:7
128:19,22
133:11 185:10
**relationship**
94:2 158:23
**relative** 21:5
88:11
**Relax** 63:2
**released** 112:4
112:15
**religious** 85:14
**remarkably**
178:20
**remember** 7:21
8:7 14:11
22:15 24:10
25:11,17 26:4
26:14 29:4
30:4,7 36:2,5,6
42:4 47:6,8,9
48:7 51:8
54:13 57:6,7
57:11 72:13,22
72:23,24 73:4
93:5 137:5,11
137:13 141:16
155:24 160:11
165:1 168:3,4
168:5,8 169:21
169:22 182:8
182:10,12,14
183:6 186:14
195:22 196:10

THOMAS P. GARVIN

remembered 170:6

remind 94:5

remoting 98:22

remove 32:17 179:12,14

removed 179:11

rendition 176:21

renew 11:8 188:23

Renthal 26:13

repeat 137:8 171:12 189:15

repeating 175:1

repetitive 94:5

rephrase 33:6 35:21 39:6 80:21

replacements 122:7

reply 102:10,12

report 30:5

reporter 34:9 62:22 64:10,13 139:16,20 148:9 198:6

Reporter-Not... 1:13

reporting 80:14

reports 27:5 28:16,18,24

representing 39:4 139:23 175:19

reputation 70:10,17 169:10 171:21 171:23 172:8 172:10,13,15

request 3:16 15:13,19 16:14 97:10 107:19 130:12 134:20 146:6 152:14 159:14,18 180:21

requested 16:17 17:1 34:11 70:15 139:22 155:11

require 10:1,3

reread 34:8

reserved 4:5

resident 19:23 88:11 91:7,18 122:23 133:4 193:21,21,24

residents 9:3,5 83:14,16 84:15 85:11 91:5,11 92:5,10,20 123:18,24 139:8 153:3 167:24 172:23

resign 114:23 116:20

resigned 117:10 170:11

resolution 95:7

Resource 148:16

resources 48:9 52:8 54:22 55:7 58:15,17 58:18,20,21,23 58:24 59:1 60:11 71:6 95:9 103:15 105:15 108:23 113:14 114:16 117:21 118:1,5 118:9,12,19 122:4,5,9 131:24 136:5 139:2 142:10 152:24 153:22 154:9,17 164:17 175:17 192:9 193:14 194:4 196:12 196:21

Resources' 67:12

respect 14:12 20:23 21:17 28:16 37:13 40:3 61:22,23 79:3 81:7 89:19 95:5 99:4 105:7,19 107:6 116:1 129:7 135:6 138:23 165:16 170:3 196:18

respective 54:11

respects 134:23 135:15

respond 83:4 126:14

responding 15:24

response 3:16 25:9 100:5 110:5 111:16 111:17 146:6 146:12 147:5 152:9 157:9 180:17,19

responses 5:17 146:9 162:20 163:7,12,16,23 164:4

responsibilities 7:5,7 93:9

responsibility 10:5 179:10,16 180:4 190:14 190:16,19,21

responsible 152:1,17

rest 11:10 57:19 59:7,15 118:8

Restate 148:9

restrain 74:14 74:15

restricted 168:12,16,21

restrictions 31:15,19

result 29:8 32:2 116:22 132:23 153:24

resulted 168:10

retrospect 158:4

return 101:8

reversed 72:24

review 25:1 63:20 79:11 102:15,16,22 103:2 116:5 129:12 132:7 132:11 134:14 147:23,24 191:16,18 193:13,16

reviewed 63:21 70:9,11,13 128:2 134:11 134:13 186:10 186:14

Richard 2:19 5:22

rid 43:1 48:15

ride 119:17

ridiculous 83:4

right 5:13 8:8 9:23 11:2,7,11 11:22,24 12:8 13:5 14:19 15:3,10 16:23 19:9 25:4,8,20 26:4 27:4,6 28:8 29:21 30:16 31:9,22 32:1,11,14 33:23 35:24 36:12 37:4 38:15 41:4 43:13 48:10,16 49:5,6 51:11 52:19 53:4,5 55:3 56:19 58:10,18 61:5 62:18 63:13 64:4 66:6,20

68:17 75:24 77:5 79:6,10 82:20,21 85:19 86:16,19 88:10 88:10,20,21,23 88:24 90:20 92:4 93:3 97:14 99:11,13 99:18,23 100:3 100:6 101:1,17 102:11 103:3 104:6 106:15 106:17,20 110:7 111:19 113:2 117:1 119:20 120:22 121:21,23 125:5,11 129:10,24 131:6,8 132:13 133:24 134:21 134:24 135:15 137:21 140:7 140:19 141:16 141:18,21 147:15 149:2 151:1 155:4 157:4 163:2,17 164:2 165:15 166:6 168:8 170:6,8 174:18 175:4 177:7,24 178:13 179:12 179:14,17 181:14 183:24 184:22 185:1 186:3 187:8 189:10 190:10 190:13 192:9 192:22 193:4 195:13

rights 137:16

rises 53:11

risk 32:5 52:8,9

RJ-1 17:4,16 19:1 24:4,6

THOMAS P. GARVIN

131:13 138:22
141:21,24
143:11 145:15
153:24 180:5
**RJ-2** 18:4 58:2
**RJ-3** 23:10 24:5
**RJ-4** 24:7,7
**RLPS** 88:19
**road** 19:7 60:21
**Robert** 27:6,9
150:1
**Rodgers** 78:21
155:20 156:1
195:24
**Rodgers'** 157:13
**role** 42:13,21
67:12 77:21
128:12 136:5
146:8,11
162:10
**roles** 121:17
129:3
**rolled** 90:17
**room** 45:7
113:17,21
114:1,7,10
**roughly** 194:11
**rule** 136:19
192:15
**ruled** 136:13,19
**rules** 68:10
137:12
**ruling** 136:21
**run** 58:20

― S ―

**S** 2:1,17,17 3:12
115:12 192:12
**salary** 90:17
**salesperson**
158:5
**Sam** 8:9
**sampling** 26:20
**samplings** 186:7
**Samuelson** 21:4
52:10

**sanctioned**
191:21
**sanctions** 191:7
191:11
**sat** 22:19 35:4
35:23 81:7
89:19 150:10
**save** 153:5
**saving** 152:4,20
**savings** 153:18
**saw** 14:7 17:7
19:12,13 24:9
29:4 39:8
63:23 96:18,20
174:15 185:11
186:5 187:11
187:15
**saying** 37:17
40:10 72:2
88:4 99:21
100:15 101:18
106:18 108:2
116:17 117:3
122:6 157:10
165:4 177:9
180:5,14
**says** 20:23 75:22
76:5,17,21
77:7 85:11,18
85:21 91:5,9
92:19 101:21
101:22 103:1
104:9,10 108:1
108:3 109:21
109:24 112:20
113:11 114:22
118:24 120:14
120:17,17
121:4,21,21,24
123:4,7,19
132:22 134:23
135:4,14,20,21
138:16 145:19
151:24 152:5,6
154:3 155:5
157:2,7 162:18

**scenario** 90:24
**scene** 33:22
**scheduled** 96:2
**scheduling**
13:24 111:14
**Schoenberg**
8:12
**Schwartz** 2:4,5
3:7 4:12 7:3
8:20 9:4 11:15
13:13,23 14:1
14:3,24 15:3,5
16:22 17:23,24
20:3,7,11,17
20:21 21:1
22:3,15,18
23:15 27:14
28:15 29:17,20
33:8 34:6,12
35:10,13,18,22
37:19 38:7,14
38:17,18,19,20
38:22 39:3,7
40:1,6,21
41:15,19,20
42:23 43:13,17
45:8,12,20
46:12 51:16,19
52:14 57:24
58:3 59:11,13
59:14,21 62:1
62:24 63:2,3
64:7,14,24
65:13 66:3,5
66:19 67:3,16
67:23 68:2,13
68:23 69:3,5
69:10,15,21
70:2 71:21,23
72:2,3,10,19
73:9,16,19,22
74:1,9,12,19
74:23 75:2,6
75:15,19 79:23

80:2 81:5,14
81:16 82:1,12
82:16 83:1,5
84:13,17,21
86:11 87:16,18
88:1,6,7,10,13
89:17 96:6,9
96:15,17 97:2
97:6 104:5
107:10,16
108:17 110:20
111:23 112:11
113:5 114:4,5
117:15 120:8
120:11,13
121:1 126:24
128:5,8 129:5
130:1,5 131:16
132:3 135:9,23
136:1,23 137:4
137:10 139:18
140:1,11 141:6
141:14,18,20
143:10 144:11
145:23 146:3
148:11 149:3,8
149:12,14,16
150:20 151:1,6
151:10 154:6
161:24 162:6
163:20 166:6,9
166:11 167:2
167:18,21
169:16,20
170:17,20,23
170:24 171:5
171:13 177:19
177:24 178:1
179:20,24
183:1,14 184:3
184:7,11,13,17
184:24 185:14
185:17,20,23
186:9 187:1,4
187:19,23
188:1,3,7,11

188:15,18,20
188:21 189:4,5
189:7,13,22,23
192:3 197:4
**Scott** 8:10 9:19
25:19,21,22
26:11 44:17,20
44:21
**sealing** 4:2
**search** 7:17
139:4 142:14
**second** 58:5 76:9
76:13 104:11
112:8,12
118:24 144:15
151:24
**Section** 137:1
**sections** 133:13
**see** 14:10,14
18:11 29:3
55:2 76:1,1
92:7 96:21
100:13 109:5
115:15,17
122:24 130:13
130:17,23
131:4 139:5
162:24 163:22
169:5 173:24
180:22 183:10
183:11 185:12
190:14 194:2,4
**seeing** 14:11
163:8 174:1
182:3 186:7
**seen** 17:5 23:18
28:24 68:11
151:15 168:15
185:5
**selects** 7:15
**self-expression**
135:2,17
**self-publishing**
135:2
**sell** 157:22 158:2
158:14

**send** 62:18
63:11 65:16
98:4 102:14
103:1 116:23
119:17 122:18
123:17 124:1
124:15 126:4
147:21
**sending** 109:10
119:6
**senior** 77:24
78:15,17 79:13
80:17 91:20
113:13 122:9
194:10
**sense** 34:22
113:19,23
124:1 162:14
195:19
**sensed** 126:12
**sent** 70:19,22
101:17,18,23
103:3 116:14
122:15 123:1
123:24 125:2,5
147:23 181:11
186:8
**sentence** 99:22
118:24 119:1
120:17 134:23
138:16 139:5
151:24 159:22
171:6 174:22
178:20 181:4
**sentences** 136:3
**SEO** 128:21
**separate** 50:13
50:15
**separately** 95:20
**separation**
117:10 179:4
**September**
51:11 100:10
102:10 105:13
105:20 115:18
115:22 116:14

123:1
**serious** 54:20,21
104:18 109:6
132:23
**seriously** 156:10
156:23
**seriousness**
51:24
**serve** 85:13
127:17 129:3
**services** 85:11
85:19 196:13
**sessions** 11:4
**set** 98:1 174:9
186:17
**setting** 10:13
**severance**
114:24 115:3,4
115:4,9
**sex** 83:6
**sexual** 6:21
14:12 77:1
150:8,13,16
154:24 159:6
**sexually** 149:24
150:5 155:19
**shakes** 48:19
**share** 102:21
**shared** 26:17
28:2 49:16
93:16 102:17
**sharing** 125:20
162:20 163:11
163:16,23
164:3
**she'd** 93:13
**she'll** 111:11
**sheet** 38:8 39:8
39:14,23
**Shocked** 160:20
**shook** 178:16
**short** 117:13
120:23 197:2
**shortly** 24:11
30:21 42:5
**show** 17:10

23:10 57:22
105:23 151:2,6
162:22
**showed** 147:14
**showing** 11:17
**shows** 99:7
174:23 190:6
**shuffling** 97:19
**sic** 100:20 112:6
**sign** 12:6
**signals** 157:3
**signature** 76:10
76:15,23 77:4
77:20 78:3
**signed** 57:13
77:18 117:9
146:19
**significance**
77:17
**significant**
170:9 195:10
196:1
**Silverchair**
11:18
**Silverchairs**
11:20
**SilverSneakers**
11:17
**similar** 53:22
94:13
**simply** 170:11
172:4
**single** 13:3
**single-spaced**
125:8
**singled** 131:11
136:7 139:12
**singling** 55:8
175:18
**sir** 151:23
**sit** 21:15,20 25:3
36:13 156:11
188:19
**site** 13:3 19:14
19:14 86:14,14
86:20 98:19

143:21
**sites** 135:1,16
138:18 139:7
**situation** 19:10
50:10 63:9
91:2 100:20
111:5 116:5
161:5 162:8
**situations** 53:10
**six** 95:20 115:11
**size** 196:2
**ski** 10:18
**skiing** 10:24
**skip** 121:2
**skipped** 139:5
**slackers** 20:9
**small** 57:15
153:8
**smart** 43:4
**snarky** 20:13
**social** 69:19 70:6
85:14 102:6
127:12 129:7
129:18 134:2
134:24 135:16
137:17 138:2
139:6 143:21
148:19 164:20
174:22 175:9
175:11,12,15
175:20 176:1
**software** 71:2
137:24
**sole** 31:17
**solid** 26:14
**Soltis** 8:9 62:13
62:14 63:17
64:16 65:16
66:11,14 67:5
70:8,12 103:12
118:11 147:2
165:3,5 187:16
191:21
**Soltis'** 66:7
126:20 147:6
147:10 148:12

164:23
**somebody** 22:11
32:8 47:12
52:15,18 56:22
79:2 83:24
124:15 126:14
177:15 178:12
178:12 180:13
180:15 186:21
195:1
**someone's** 172:7
192:12
**son** 29:7 30:1,3
30:11,17 31:3
32:4,7 37:9,13
39:16,20 40:9
40:13,14,22
41:5,8 42:5
47:5 90:24
**soon** 27:11,24
**Soros** 20:23
**sorry** 29:19 41:9
41:11 52:17
75:11 87:2
112:7 115:19
119:7 135:23
144:4 171:2
181:19
**sort** 8:15 53:2
90:19 109:5
118:14 121:14
129:18 154:23
195:2
**spam** 98:13
**spanned** 63:16
**speak** 13:23
47:7 74:24
75:2,13 91:23
94:15 111:22
119:18 141:10
141:11 169:18
**speaking** 95:1
**speaks** 60:6
71:20 72:6
141:19 148:24
166:9 175:10

THOMAS P. GARVIN

**specialist** 122:3
**specific** 25:12
  119:23 133:7
  133:12 155:24
  165:17 195:22
**specifically**
  12:21 31:11
  54:24 59:19
  132:8,18
  168:13 176:18
**specifics** 78:11
**speculation**
  21:24 66:18
**speeding** 30:12
**spend** 63:12
  186:18
**spoke** 43:18
  95:19 139:14
  141:15
**spokesman**
  126:1 145:13
  145:16
**spokeswoman**
  145:19
**spots** 166:2
**Sr** 29:19,21
  37:21,24 39:10
  43:19 45:1,4
**stable** 85:21
**staff** 61:3 66:11
  91:7,14,15,16
  91:18 94:3
  121:14 122:10
  123:16 124:2
  168:15,18,22
  172:23 193:23
  194:1
**stairwell** 173:11
**stamp** 130:10
**standard** 67:20
  68:4 173:23
**standards** 61:10
  77:8 133:23
**standpoint**
  12:24 55:13
**stands** 171:18

**start** 97:12
  101:2 106:18
  133:1
**started** 90:11
  101:8,16
  124:17,18
  158:11 193:18
**starts** 97:15
  99:21 101:18
  174:21
**state** 4:13 10:15
  164:12,16
  188:10
**stated** 72:9
  155:12 164:11
**statement** 3:14
  60:15 69:11
  84:24,24 85:1
  85:23 89:4
  91:4 135:5,10
  135:11,12
  152:16 154:7
  154:13,16
**statements**
  57:16
**STATES** 1:1
**stating** 172:3
**stenographic**
  198:7
**steps** 99:4
**Steve** 8:12
**stipend** 37:5
  42:8,20 89:9
  89:15,20 90:2
  90:4,8
**stop** 74:13 90:7
  148:7 188:15
**stories** 176:12
**story** 36:6,7
**strain** 44:14
**strange** 63:10
**strangers** 31:17
**Strategic** 85:4
**Street** 1:14 2:11
**strike** 178:2
**stronger** 127:7,7

**struck** 70:16
**stuff** 16:15
  23:16 26:16
  42:9 105:23
**stumbled** 112:13
**style** 46:11,13,14
  46:20,21,21,22
  95:1
**subject** 77:2
  97:18 99:15
  101:11 109:21
  116:2 178:22
**substance** 54:14
  79:16
**substantiate**
  152:16
**sudden** 178:11
**sue** 155:12
  157:15,17
**sufficient**
  163:10
**suggest** 9:15
  50:5 190:16
**suggested** 12:5
  32:20
**suggesting** 37:20
  37:23
**suggestion** 32:18
  110:12 127:4
**sum** 54:14
**summarizing**
  116:6
**Summary** 27:22
**Summers** 8:11
  19:20 21:2,10
  21:21 22:24
  52:10,15,18
  56:18 84:1,6,7
  94:6,14,21
  103:12,16
  106:7 109:20
  110:17,24
  111:3 116:15
**superb** 99:20
**supervision**
  153:4

**Supper** 27:9
  29:7,17,19
  32:2 33:11,17
  34:2 36:4,17
  37:8,12,18,21
  37:21,24 38:1
  39:9,10 40:12
  43:19 44:11
  45:1,3 90:20
  90:23 150:1
**Supper's** 27:6
  39:15 41:5,8
  45:18
**supplement** 25:9
**supplied** 53:5
**supply** 86:12
**support** 74:2,2
  112:2
**suppose** 195:2
**supposed**
  123:21
**supposition** 52:2
**sure** 8:3 10:2
  13:18 14:17
  16:19 21:9
  23:21 27:11
  28:21 37:10,11
  37:12,14,16
  58:6 61:8 66:2
  66:8 78:9
  83:17 86:21
  91:16,23 98:19
  100:23 102:1
  103:22 105:5,8
  114:17 124:18
  126:16 127:21
  127:21 133:15
  138:12,13,14
  138:15 141:1
  143:2 147:12
  156:23 157:21
  159:20 160:4
  160:24 161:8
  169:8 187:9
  188:24 194:5
  194:15 196:8

**surprise** 125:18
**surprised** 160:2
  160:3,19,21,22
  160:23
**survey** 190:5
**Susan** 123:12,13
  123:16 124:16
  125:6 128:4
**suspended**
  197:13
**sworn** 4:9
  182:13
**synagogue** 41:10
**synonymous**
  116:10
**system** 147:4,8
  147:15 181:9

— T —

**T** 2:17 3:12
  198:1,1
**table** 74:18
**tactics** 99:20
  100:9
**take** 10:8,9
  12:11 18:4
  23:9 32:15
  48:9 51:17
  55:19 57:19
  59:20 75:3
  83:9,12 84:1
  84:15 97:7
  132:13 147:24
  152:9,12
  155:11 156:10
  157:10 173:6
  176:10 179:10
  179:15 193:24
**taken** 1:11 30:14
  31:5 32:3
  43:16 95:4
  117:14 120:24
  150:2 191:7
  197:3 198:8
**takes** 152:21
**talented** 56:1

THOMAS P. GARVIN

**talk** 9:7 11:18
26:8 36:9 44:2
47:13 49:24
91:21 98:1,3
98:24 125:16
168:10 172:6
175:7
**talked** 6:9 30:8
50:7 52:15,18
52:20 54:16
58:17 89:4
105:19
**talking** 25:11
27:10 30:2
36:2 39:13,14
39:23 43:18
44:7 53:19
61:1 76:11
88:12 101:24
120:2 182:17
**tape** 169:4
**team** 77:24
78:17 79:12,13
80:17 113:13
**Technology** 16:5
**tell** 15:22 30:7
30:16 31:2,9
31:13 49:15
50:16 84:22
93:9,13 94:7,9
94:24 111:9
119:7 146:4
156:21 164:20
167:22,24
169:9 174:8
**telling** 44:1 60:5
93:4,23 102:15
103:7 119:2,24
120:3
**temper** 46:7,11
**temporary**
122:7
**ten** 161:15
**tend** 109:16
165:7
**tends** 46:2

**tenure** 36:18
**term** 46:17
93:17 110:17
121:23 160:17
**terminate** 55:21
108:24 112:6
112:16 164:18
**terminated**
48:21 114:21
117:5 140:21
173:2
**termination**
54:5 99:4
107:23 109:1
112:24 123:6
133:20 148:18
167:5,16,18
169:15 172:2
177:8 178:10
**terms** 14:8 15:24
16:14 26:17
33:10 37:1
62:5 77:21
92:15 94:14
95:5 117:8
159:21 171:24
172:3
**Terrible** 28:8
**terrific** 92:2
129:4
**testified** 4:9
94:14 99:7
154:10 163:22
178:7 185:18
186:6 189:18
**testify** 23:4
154:23 178:3
**testifying** 149:12
188:22,24
**testimony** 20:8
34:13 35:5,23
46:7 67:17
81:6 89:18
139:15 141:19
149:10 150:4,9
150:17 160:1

165:13 166:12
172:9 174:14
175:10 176:3,9
176:16 177:2
**text** 23:17 57:19
66:15 142:24
154:2 184:18
**texts** 22:21
**TG-1** 3:14 20:3
20:6
**TG-2** 3:14 84:17
84:20
**TG-3** 3:15 97:2
97:5
**TG-4** 3:15 130:1
130:4
**TG-5** 3:16 146:2
**TG-6** 3:17 151:5
**TG-7** 3:17 151:9
151:22
**thank** 15:2
41:16 69:4
112:1 120:14
169:7
**Thanks** 13:19
74:5 108:5
149:8
**the** 16 160:15
**theory** 179:1
196:3,5
**thing** 15:4 28:22
55:11 56:12
60:5 67:6
72:12 80:7,7
80:10,10 91:4
93:12 96:11
101:5 117:6
159:4
**things** 5:16 11:5
36:13 72:4
93:5,9,13,18
93:23 107:22
119:4,8 126:18
127:12,14
134:1 165:8
172:6,14 173:5

175:12 180:12
182:5 184:9
191:11
**think** 5:2 8:1
13:5 18:24
23:19 26:22
28:2 30:23
37:18 39:11
42:11,21,24
43:18 44:11,12
44:13 46:24
47:2 48:4 52:7
53:12 55:15,23
61:2,17 67:6
67:10 70:24
75:23 78:22
84:3 90:9,11
90:21 92:17
95:20 98:1
99:6 100:1,14
100:19 101:14
102:2,4,8,18
102:23 104:14
108:8 111:12
111:17,21
113:20 115:11
119:3 120:1,4
121:15 124:20
128:6 133:8
134:9 140:22
141:2 143:9
147:11 150:11
150:12,14,20
153:1,13,17
154:14 158:14
158:15 160:3
162:13 166:13
166:20,20
167:6 172:13
173:13 174:3
185:1 186:16
187:10,14,16
187:21
**thinks** 22:23
23:1,2
**third** 7:23 76:15

91:4 119:1
159:21 170:19
178:19
**third-party**
129:2 192:14
**Thomas** 1:6,7
3:3 4:8,14
**Thompson**
78:20 196:14
**Thompson's**
173:13
**thorough** 157:9
**thought** 22:11
58:8 63:1
109:21,22
113:16 119:22
166:14
**thoughtful**
120:15 123:5
**threaten** 139:7
**three** 4:22 6:9
109:17 156:11
159:22 194:16
196:6,14
**three-page**
161:1 163:24
**thrilled** 39:3
**tied** 92:17 93:1
175:20,21
**Tierney** 126:10
**till** 125:12
**time** 4:5 17:7
20:5,22 23:13
24:9 25:6,23
34:9 42:1,4
43:15 45:10
59:20 62:5
63:7,11,12,22
64:3,4,8,16,17
74:21 78:18,22
79:1 83:14,24
84:2,6,19 90:2
91:19,21 96:7
96:18,19 97:4
97:9 100:23
101:7,7 102:22

THOMAS P. GARVIN

106:1,13
117:13 120:23
127:19 130:3
130:11 132:6
132:11,13
133:19 134:19
138:1 139:20
145:7 146:1
147:3,11,11,24
150:4 151:4,8
152:13 155:7
156:20 159:13
159:17 163:21
164:16 171:20
180:20 181:22
183:15,18
185:3,6 186:18
197:2,5
**times** 4:21 41:7
42:12 61:16,20
156:13 176:23
195:20
**today** 5:21 14:5
21:15 150:10
150:21
**told** 15:23 31:4,6
31:11,14 36:6
39:11 47:7
48:5,6 49:14
82:5 104:2
162:1 164:9
166:13 168:19
173:2 176:11
**Tom** 79:1 97:22
97:23 109:21
118:24 123:4
**tomorrow** 87:17
98:1,4,6,9
112:5,15,21
**tone** 62:16
**top** 16:7,13 21:8
77:7 100:4,5
110:6 114:19
151:17
**topic** 184:6
**topics** 92:1

**total** 160:6
194:2,4
**totally** 130:18
178:13
**touched** 192:4
**touches** 192:6
**touching** 192:4
**trademark**
138:18,23
142:1,3
**traffic** 174:7
**trail** 99:10
**trained** 153:11
**training** 10:1,3
11:20,21 14:9
14:12 127:5
128:22 152:1
152:18 153:5,7
153:14,14
**transcript** 1:11
4:3 198:7
**transgender**
82:20
**transition**
122:12
**transpired**
153:23
**treat** 38:23
90:13 153:22
154:9,12,18
**treated** 45:22,23
153:2
**treating** 153:24
156:7
**treatment** 105:7
157:13
**trial** 4:6
**tried** 119:10
158:13,15
**tries** 46:3
**trigger** 157:6
**trip** 31:3
**trips** 13:7
**trouble** 90:24
**true** 18:11,12,15
22:23 56:7,9,9

57:2 147:4,6
198:7
**Trump** 136:11
190:7
**truncated** 5:8
**Trust** 9:20,22
**trustee** 24:20
**trustees** 5:24
7:14 19:24
24:8,15,17
91:18 106:10
117:20 133:13
148:17 164:18
183:20
**truth** 28:13
177:14
**truthfulness**
5:17
**try** 74:15 193:7
**trying** 29:4
49:18 51:17
91:2 156:3
157:22 158:2
159:1,3
**turn** 58:4 130:9
130:10 134:18
142:16
**turned** 139:4
178:13
**turning** 97:22
150:13
**turnover** 153:1
153:10
**Tweet** 17:10
55:4 57:15
59:6,12 64:18
70:22 119:5,6
131:10 139:13
140:3 142:6
161:17 163:3,6
164:3 176:6,10
178:22 189:24
**Tweeting** 138:6
**twice-a-year**
193:22
**twisted** 26:24

**twisting** 28:13
**Twitter** 18:11
18:17,23 19:6
70:24 71:4
111:4 116:1
131:20,22
142:11 143:8
143:13,17
144:18,19
164:5,11
175:21 178:12
178:14 180:16
**two** 6:12 10:10
11:8 33:15,20
44:6 46:24
47:6 108:3
136:2 151:15
155:21 160:6
172:22 192:24
**two-minute**
161:14
**type** 55:10
121:17 162:12
186:19,19
**typewritten**
125:8
**typically** 53:9
115:8

**U**

**U** 106:8,12
**Uber** 119:18
**Uh-huh** 6:11,14
9:11 14:20
92:22 105:12
180:23 187:1
**unanimous** 55:5
55:15,20 95:12
**unanimously**
164:18
**unbecoming**
55:6 131:23
**underlying**
172:1 179:4
**understand** 5:10
5:11 43:10

54:6 55:24
56:14 86:5
88:4 143:4
145:12
**understanding**
72:20 160:17
**unearthed** 29:14
**unemployment**
71:11 73:1
115:14 136:20
137:15,16
178:21
**unfairly** 154:1
**unfortunate**
47:5
**unfortunately**
10:4
**unhappy** 100:21
**unilateral** 55:23
**UNITED** 1:1
**unprofessional**
38:24 55:7
188:16
**unpronounce...**
16:6
**untrue** 26:24
**unusual** 120:16
**upcoming** 116:2
**update** 116:18
**updated** 77:23
**upset** 164:11,13
**urgent** 106:18
**use** 7:19 20:24
31:15,18,20
38:12 40:13
43:20,23 46:17
83:14,20,21
86:14 101:15
106:8,10
110:17 121:23
134:24 135:15
135:18 137:22
139:6
**user** 83:22
**uses** 137:15
**usually** 137:14

THOMAS P. GARVIN

Page 224

194:18

**V**

**Vaguely** 93:7
**Vail** 65:5,6,7,8
**value** 192:13
 194:8,12,16
 196:7
**values** 192:20
 193:1
**variable** 193:20
**varied** 177:2,2
**various** 14:4
 15:24 193:15
 193:17
**vehicle** 32:10,13
 34:23 42:16
 83:15
**verbal** 47:23
**verbally** 36:20
 184:16,17
**verbatim** 94:17
**verbiage** 17:21
 18:1 59:10
 94:13
**verification**
 146:14,15
**version** 5:8 19:2
 19:5 133:16
 179:3
**versus** 39:24
**Vice** 48:8 55:6
 60:10 67:11
 71:5 113:14
 127:8 128:9,24
 131:24 136:5
 152:24 153:21
 154:8,17
 175:17 196:12
 196:13,14,20
**video** 168:15
 169:3
**view** 99:20
 117:9 172:22
**viewed** 145:13
**violate** 132:5

136:2 175:11
 175:24
**violated** 136:4
**violating** 148:19
**violation** 164:19
 174:23
**virtually** 121:10
**vis-à-vis** 33:11
**visit** 168:7
**visitation** 168:9
**VOLUME** 1:3
**volumes** 185:5
**voluminous**
 179:2
**volunteered**
 149:14
**vote** 95:10,11
 148:18
**voted** 164:18
**voting** 136:11
 190:7
**VP** 129:12 139:1
 142:9,15 190:4
**VPs** 142:17,24
**vs** 1:5

**W**

**wait** 16:11 36:15
 70:4 87:24
 112:9 125:12
**waived** 4:3
**walk** 173:9
 174:10
**walking** 174:5
**want** 15:22
 25:21 27:9
 50:11,12 57:1
 69:22 71:21
 75:3 87:18
 89:1 93:5,10
 93:14,18,19,24
 94:4 100:14
 110:22 114:19
 125:3 135:1
 141:2 150:22
 151:11,12

152:9,12
 159:15 166:4
 166:13,20
 187:10,15,16
 187:21 188:22
 197:7,10
**wanted** 73:13,14
 90:13 91:3
 92:1 102:21
 126:14 156:11
 156:23 168:7
 174:7 195:1
**wants** 158:23
**warrant** 104:12
**wash** 81:17,23
 83:10,13
**washed** 81:10
 82:20 83:7
**washes** 82:7
**washing** 82:10
**Washington**
 4:18
**wasn't** 51:7
 86:16 98:20
 114:9 131:5
 136:24,24
 137:17 141:1
 160:2 175:24
 179:19 180:2
 181:21 190:1
**Waverly** 1:6 6:5
 7:6 9:2,3,5,23
 12:14,17 13:1
 15:6 18:10,17
 19:14 31:15
 32:9 33:15
 34:14 36:18
 37:1,2,8 42:15
 44:16 60:8
 61:7 70:10,20
 70:23 71:2,4
 83:15 85:9,15
 87:5 88:9
 89:21 90:3
 93:16 98:12
 106:2,11

109:23 110:4,8
 114:12 116:23
 121:3,4,8,9
 131:21 133:11
 134:23 135:14
 136:6 138:19
 138:20,24
 139:10 141:22
 141:23 142:2,4
 142:12,16
 143:12,22
 144:12,22
 145:1,12,13,16
 145:19 146:5
 147:8,14,17
 152:4,20,21
 153:21 154:7
 155:13 157:15
 157:17,22
 158:3,18,22
 163:9 167:24
 172:4,23 181:4
 181:5 187:7,11
 187:15 190:22
 191:2 194:23
**Waverly's** 70:17
 147:3 148:19
 153:6 156:19
 181:8
**Waverly-0833**
 130:10
**Waverly-0854**
 134:17
**Waverly-0855**
 143:20 144:15
**way** 12:3 24:16
 24:17,19 32:16
 49:18 50:9
 55:10 71:13
 91:3 106:5
 109:4,12 142:9
 153:2,20 156:6
 168:18 172:24
 173:1 174:9,17
 175:22 183:12
 184:17 192:18

195:4,5
**we'll** 23:4,9
 166:5 197:4
**we're** 25:10 30:2
 88:12 108:2
 111:14 129:18
 150:21 166:3
**we've** 17:4 86:23
**web** 49:4
**website** 128:23
 143:12,16,17
 143:22 144:13
 144:17,23
 145:2,4,6,9
**Webster** 160:18
**week** 115:23
 180:3
**weekend** 44:13
**weekends** 44:12
**weeks** 78:1
 125:11
**well-done**
 194:22
**went** 12:10
 18:10,16 19:6
 19:13 21:16
 39:10,12 55:2
 109:4 116:21
 117:3 119:4
 123:16,17
 144:17 161:16
 168:12,14,21
 173:12,17
 177:6 179:11
 186:2 189:20
**weren't** 40:2
 95:19 181:24
**Wharton** 106:8
 106:12
**whereabouts**
 170:14
**wholeheartedly**
 162:9
**wife** 12:11 13:6
 65:1 66:1
 176:22

THOMAS P. GARVIN

willful 133:2 137:12,14
willfulness 137:2
willing 156:17
willingness 120:15
wise 42:22
withdraw 17:14 35:10 39:5
withdrew 35:13
witness 3:3 8:18 9:1 11:14 13:10 14:23 15:2 16:19 20:13 22:1,16 28:12 29:18 33:6 35:7 37:16 38:12 39:22 40:19 42:11 43:7,11 45:17 46:10 48:19 57:22 61:23 64:6,20 67:1,9,22 68:7 68:19 69:24 72:12 73:7 74:8 79:24 81:3,19,21,24 82:24 84:7,11 86:7 87:14 89:13 96:16 97:9 104:2 105:1 107:9,14 108:12 111:21 112:23 113:4,6 120:6,9 128:6 128:17 130:11 131:18 134:19 136:17 137:8 139:23 140:9 143:7 144:4,8 152:13 154:5 159:13,17 161:21,23 162:5 165:22

166:7,23 167:1 167:20 169:6 169:17 171:7 171:11 179:19 180:20 183:8 184:20 185:21 187:2 188:19 192:1 197:12
woman 113:17 113:20,24
women 46:5
wondering 119:22
wondrous 109:22 111:15
word 160:21
word-for-word 133:24 189:2
words 48:7 134:5 157:5 160:8,15 168:4
work 50:21 55:9 61:9 156:6 181:23
work-related 175:7
worked 5:2 50:8 78:12 157:24 194:8
working 15:21 15:23 57:10 157:20
workplace 67:14 131:19 149:24
works 29:23 192:18 197:9
world 44:15 57:10
worried 42:7 162:2 169:9 171:22
worry 8:4 161:19
wouldn't 57:7,9 86:23 93:17,24 117:11 125:18

128:12 158:4 170:11 186:1 187:7
write 123:9 134:24
writer 142:8
writing 72:6,15 149:1
written 13:14 109:5 110:1 139:3
wrong 36:10 37:9 119:9 172:14
wrote 94:8,10,11 100:9 115:18 117:1 175:3,4

---

**X**

X 3:2,12 192:23
X102192 198:24

---

**Y**

yeah 8:7 18:14 19:3,5 27:8 28:9 29:18,22 30:9,18 43:11 46:10 53:8,12 55:12 59:16,22 61:24 63:18 68:7 71:10 80:11 84:11,23 87:21 88:6 89:22 100:4 101:6,14 103:4 105:21 107:3,9 107:14 110:2 118:17 124:19 128:23 131:5 134:11 135:4 136:17 143:2 147:6 152:21 153:13 156:3 159:3 160:14 167:1 168:12 171:24 172:24

173:20 177:13 181:19 185:21 188:3 192:1 195:7
year 10:6 100:17 153:16 192:20 192:23
years 6:3,6 10:10 11:9 33:18 57:11 63:16 83:15 109:18 126:16 127:3 156:14 157:21 193:19 194:9,16,24 196:2,6
yep 123:19
yesterday 5:20 9:7 14:5 35:24 93:4 150:10 176:4 178:6

---

**Z**

zealously 39:5
zero 63:11 87:12

---

**0**

0855 143:19
0892 97:15,20
0893 97:22
0894 101:1
0896 103:10
0897 105:11
0898 108:1
0899 109:19
0900 114:12 115:19
0901 115:17,21
0903 116:13
0904 116:13
0905 117:16
0906 117:22
0907 118:2
0912 121:2
0914 122:21
0918 123:11,12

0919 97:16

---

**1**

1 146:24 155:5
1-21 1:8
1.03 194:11
1.05 194:11,19
1:23 123:1
10 77:9 111:24
10:30 98:2
100 21:9 102:1 136:10 139:24 175:19 190:6
11 41:9 77:11 78:22
12 77:14
12:00 1:16
12:30 98:7
13 152:10 192:5
130 3:15
1389 1:15 2:11
14 11:18 154:22 155:2
146 3:16
151 3:17,17
17-cv-04462-R... 1:2
18 159:12,15
18901 1:15 2:12
18th 146:22
19 162:17,23,23
19010 2:6
1969 4:16

---

**2**

2 1:16 18:4,12 155:5
2:29 109:20
20 3:14 90:11 111:24
2011 78:23
2012 85:5
2014 79:4,20 80:3 130:22 131:1 133:17
2016 100:19

---

Appendix 1170

THOMAS P. GARVIN

102:10 115:18
123:1
**2017** 100:20
**2018** 1:16 85:5
146:22
**21** 164:8
**22nd** 4:16
100:10
**23** 33:18 76:5
90:12 130:10
130:15,20
**23.5** 90:12
**23rd** 102:10
124:21,24
125:13
**24** 33:18 53:21
116:24
**25,000** 90:9
**25,000.00** 90:7
**25th** 105:13,20
115:18,22
**26** 170:13,16,22
171:2,5
**26th** 51:11
**27** 57:11
**27th** 116:14
**28th** 123:1

---
**3**
---
**3** 148:15 151:21
151:23 155:5
**3:02** 114:18
**3:04** 99:12
100:10
**30** 112:1
**32** 83:15
**330** 2:5

---
**4**
---
**4** 3:7 92:4,17
93:1 146:19
149:17 155:5
159:12 162:24
**4:42** 105:13
**4:55** 197:13
**4:59** 115:18,22

**40** 173:10 174:3
174:21 175:1
**402** 137:1
**41** 178:19
**43** 180:18
190:23
**44** 134:18
**47** 192:5
**48** 10:10

---
**5**
---
**5** 149:20
**5:29** 116:14
**50** 174:3
**53** 96:14
**5th** 155:5

---
**6**
---
**6** 159:16
**60** 1:14 2:11

---
**7**
---
**7** 149:23 159:16
162:23
**78** 132:19

---
**8**
---
**84** 3:14
**8th** 24:11 125:4

---
**9**
---
**9** 192:5
**9:14** 102:10
**97** 3:15

Page 199

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                        - - -

3

    KATHLEEN M. JUNGCLAUS,        :   CIVIL ACTION

4                                 :

                Plaintiff          :

5                                 :

            v.                     :

6                                 :

    WAVERLY HEIGHTS LTD.,          :

7   THOMAS P. GARVIN and John     :

    and Jane Doe Numbers 1        :

8   through 23,                   :

                                   :

9           Defendants   :  NO. 17-cv-4462

10                      - - -

11       Monday, November 26, 2018

12                      - - -

13           Continued oral deposition of

14  THOMAS P. GARVIN, taken at the law offices of

15  Eastburn and Gray, PC, 60 East Court Street,

16  Doylestown, Pennsylvania  18901, beginning at

17  1:56 p.m., before Cheryl L. Goldfarb, a

18  Registered Professional Reporter, Notary

19  Public, and an approved reporter of the United

20  States District Court.

21                      - - -

22

            VERITEXT LEGAL SOLUTIONS

23            MID-ATLANTIC REGION

        1801 Market Street - Suite 1800

24      Philadelphia, Pennsylvania  19103

Page 200

1 A P P E A R A N C E S :
2
3    LAW OFFICE OF MARK D. SCHWARTZ
     BY:  MARK D. SCHWARTZ, ESQUIRE
4    300 Sandcastle Drive
     Bryn Mawr, Pennsylvania  19010
5    610.525.5534
     MarkSchwartz6814@gmail.com
6    Representing the Plaintiff
7
8    EASTBURN and GRAY, PC
     BY:  GRACE M. DEON, ESQUIRE
9    60 East Court Street
     Doylestown, Pennsylvania  18901
10   215.345.7000
     gdeon@eastburngray.com
11   Representing the Defendants
     and the Witness
12
13
            - - -
14
15 A L S O   P R E S E N T :
16
     KATHLEEN JUNGCLAUS
17
     RICHARD E. BAUER
18
19          - - -
20
21
22
23
24

Page 201

1          I N D E X
2          - - -
3  WITNESS:  THOMAS P. GARVIN
4  QUESTIONED BY:            PAGE:
5     MR. SCHWARTZ           203
6          - - -
7      E X H I B I T S
8  NUMBER    DESCRIPTION    MARKED FOR ID
9  (No exhibits)
10         - - -
11   PREVIOUSLY MARKED EXHIBITS
12   NUMBER...............PAGE
13   TG-6..................217
14   TG-7..................217
15   Summers 1.............249
16   Bauer 4...............250
17   Bauer 5...............252
18   Bauer 6...............253
19   Bauer 7...............254
20   Bauer 8...............256
21   Bauer 9...............257
22   Bauer 10..............258
23         - - -
24

Page 202

1        DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4  Page   Line        Page   Line
5  214   24          215   7
6
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS
9  Page   Line   Description
10  242   1-4   Records of compensation level
11          With respect to Robert
12          Supper and Kathy Jungclaus
13
14
15  STIPULATIONS
16  Page   Line
17  (Pursuant to Federal Rules of Civil Procedure)
18
19
20  QUESTIONS MARKED
21  Page   Line
22  (None)
23
24

Page 203

1          (It is hereby stipulated and
2      agreed by and between counsel that
3      reading, signing, sealing, certification
4      and filing are waived; and that all
5      objections, except as to the form of the
6      question, are reserved until the time of
7      trial.)
8          - - -
9          THOMAS P. GARVIN, after having
10     been duly sworn/affirmed, was examined
11     and testified as follows:
12          - - -
13     CONTINUED EXAMINATION
14          - - -
15  BY MR. SCHWARTZ:
16     Q.    Mr. Garvin, we're continuing
17  your deposition, and hopefully we'll get you
18  out of here in a couple hours.
19          You sat here through
20  Mr. Billig's deposition, correct?
21     A.    Correct.
22     Q.    Have you had any conversation
23  with him since we produced to you the
24  transcript of his communications with my

2 (Pages 200 - 203)

THOMAS P. GARVIN

1 client?
2    A.    No, I have not.
3    Q.    He did meet with your lawyer,
4 though, correct?
5    A.    Yes, he did.
6    Q.    Were you present?
7    A.    I was not.
8    Q.    Did he meet with HR as well?  I
9 believe he said he did.
10    A.    The vice president of human
11 resources was in the room with our attorney
12 when they met.
13    Q.    As you sit here today, did you
14 learn anything new about who may have written
15 this letter?
16    A.    No, I did not.
17    Q.    You were here through
18 Mr. Bauer's deposition as well, correct?
19    A.    I was, yes.
20    Q.    As is your right.
21          He mentioned something about
22 bubbling up from some people, some discussion
23 bubbling.
24          Remember that?

1    A.    I do.
2    Q.    Bubbling discussions.  And then
3 he mentioned something about Waverly Care.
4          Do you remember that?
5    A.    Yes.
6    Q.    What do you know about the
7 bubbling discussions with respect to Waverly
8 Care?
9    A.    Yes.  So what Mr. Bauer is
10 referring to is that after Kathy was
11 terminated, when the word circulated out that
12 she had been terminated, it was brought to my
13 attention that pretty much the entire
14 administrative team in Waverly Care Associates
15 had been aware of the tweet.  And the
16 African-American staff who work in the
17 administrative offices of Waverly Care were
18 extremely angry and extremely upset by the
19 content of the tweet.
20          So that's -- he had his order a
21 little bit mixed up.  But that's exactly how it
22 went down, because apparently they were privy
23 to it before it had come to my attention via
24 the anonymous letter.

1    Q.    Who was --
2    A.    And it's hard to --
3    Q.    I'm sorry.  Go ahead.
4    A.    It's hard to explain to your
5 African-American staff, when, you know, clearly
6 it was something that they were -- where they
7 were separated out from everybody else.  So it
8 put me in a very difficult position of having
9 to try to explain why our vice president of
10 human resources would take it upon herself to
11 do such a thing.
12          Does that clarify it enough for
13 you?
14    Q.    Absolutely.
15    A.    Good.
16    Q.    Any of those same
17 African-Americans ever have an opportunity to
18 see Mr. Soltis' e-mail?
19    A.    I would have no idea.
20    Q.    Can you imagine what their
21 reaction would be?
22          MS. DEON:  Objection.
23    A.    Well, I have not seen the
24 e-mails.

1          MS. DEON:  Calls for
2    speculation.
3 BY MR. SCHWARTZ:
4    Q.    You sat here.  You saw the
5 e-mails.  You saw the cartoons of Obama and so
6 forth, correct?
7    A.    Actually, I was --
8          MS. DEON:  Objection.
9    A.    (Continuing) -- sitting at the
10 end of the table and did not look at the
11 e-mails.
12 BY MR. SCHWARTZ:
13    Q.    I really hope I don't have to go
14 through them all again, but be that as it may.
15          Who is the head of Waverly Care?
16    A.    Her name is Patty Rodgers,
17 R-o-d-g-e-r-s.
18    Q.    Does she get along with my
19 client?
20          MS. DEON:  Objection.
21 BY MR. SCHWARTZ:
22    Q.    Have they had a good rapport?
23    A.    They both complained about each
24 other from time to time.

3 (Pages 204 - 207)

THOMAS P. GARVIN

Page 208

1   Q.   What did Ms. Rodgers complain
2 about my client?  What did she say?
3   A.   She had, you know, told me that
4 there were trust issues between the two of them
5 over past history, of which she didn't share.
6   Q.   What did my client say about
7 Ms. Rodgers?
8   A.   Pretty much the same thing, that
9 there were trust issues between the two of them
10 that were related to long-gone history.
11   They really didn't work together
12 very often.  They kept each other very much at
13 arm's length because of whatever their history
14 was with each other.
15   Q.   Would Ms. Rodgers have
16 interacted with Ms. Summers?
17   A.   She may have from time to time,
18 yes.
19   Q.   Do you have an opinion whether
20 Ms. Rodgers wrote the anonymous letter?
21   MS. DEON:  Objection.  Calls for
22 speculation.
23   You can answer.
24   A.   I have no idea or opinion on who

Page 209

1 wrote the letter.
2 BY MR. SCHWARTZ:
3   Q.   Since your last sitting here,
4 did you take any opportunity to find out who
5 wrote the letter?  Did you make any efforts to
6 find that out?
7   A.   No, I did not.  Because to me,
8 the content of the letter speaks for itself.
9 Who wrote the letter to me is somewhat
10 irrelevant.
11   I know we'd all like to know who
12 wrote the letter to compliment them on their
13 writing abilities for sure.  And the
14 articulation of exactly why your client was
15 terminated from our employment is very well
16 laid out in that letter.  But who wrote it is
17 not really of that great interest to me.
18   Q.   Did you ever ask anybody to
19 write it?
20   A.   Absolutely not.  That's not my
21 style.  That's not my values.  And I would
22 never do something like that.
23   Q.   You sat here through Mr. Bauer's
24 testimony and he was directed to my initial

Page 210

1 letter, remember, which you were examined over
2 and which was not one of your favorite pieces
3 of correspondence in your career.
4   Do you remember my letter?
5   A.   Oh, yes.  Yes.
6   Q.   Do you remember your testimony
7 about where that letter was circulated?
8   A.   Yes, I do.
9   Q.   Is Mr. Bauer a member of the
10 executive committee?
11   A.   I believe he was, yes, indeed.
12   Q.   Yes.  And you said it made its
13 way to the executive committee and to any other
14 trustee who was interested in reading it.
15   Isn't that your testimony?
16   A.   That's absolutely true.
17   Q.   So would Mr. Bauer have received
18 it?
19   A.   He did.
20   Q.   As you sit here, is there
21 anything else that may have jumped out about
22 the accuracy or inaccuracy of his testimony?
23   A.   So just to clarify, because I
24 know he would certainly like to clarify how it

Page 211

1 was handled.  When your letter was received, it
2 was received through our attorney's office.
3   Q.   Right.
4   A.   And our attorney then filtered
5 it to me.  And then we subsequently did share
6 it with the entire executive committee in an
7 executive committee meeting.  And it was read
8 by the members of the executive committee.
9   And then we had our attorney
10 come to a full board meeting, where we
11 discussed the letter, the content, and the
12 direction that your client was positioning on
13 this thing.  And we offered it to any board
14 member who would have liked to have seen it or
15 read it, to read it.
16   Because, quite frankly, your
17 letter is, as I said the last time, pretty much
18 100 percent false, exaggerated, inaccurate.
19 And whether you know it or not, your client
20 knows it.
21   So we did share it the way we
22 shared it.  You asked me a question.  I'm
23 answering you honestly.
24   Q.   Go for it.

4 (Pages 208 - 211)

THOMAS P. GARVIN

Page 212

1    A.    So that's how we shared the
2  content of your letter with everybody.
3    Q.    Okay.
4    A.    So Dick didn't have all the
5  recollection that I did.  But believe me, I
6  remember it very well.
7         MR. SCHWARTZ:  All right.  I
8  don't even remember the question.  Let me
9  just look for something else.
10         MS. DEON:  For the record, just
11  so we're clear when this gets looked at
12  later, the letter we're speaking of is
13  November -- why don't we get an exhibit
14  on that.
15         MR. SCHWARTZ:  It's Exhibit
16  Bauer 2.
17         MS. DEON:  And the date of the
18  letter is November 6th?
19         MR. SCHWARTZ:  Eighth.
20         MS. DEON:  Eighth, 2016.
21  BY MR. SCHWARTZ:
22    Q.    Did you ever fire any employees
23  whom you felt were extorting money from other
24  people?  Have you ever had an occasion to do

Page 213

1  that?
2    A.    Not that I recall, no.
3    Q.    Did anything that Mr. Billig
4  said give you pause about whether he should
5  continue to be employed at Waverly?
6         MS. DEON:  Objection to the
7         extent that he is not a lawyer, so the
8         use of the word "extortion," or
9         suggestion of whether someone committed
10         extortion.  But he can answer.
11    A.    Yeah, the relationship between
12  your client and a maintenance man at our
13  facility, I know nothing about.  I have no
14  reason to be involved in it.  I have no opinion
15  on what their conversations were about.
16         And I'm not about to sit here
17  and try to guess on what the content of what he
18  meant or what she meant in that very awkward
19  exchange that they had on between vanishing
20  messages on Facebook and whatever else they
21  were using.  I -- that is completely between
22  the two of them.  It has nothing to do, as far
23  as I can see, with his employment status at
24  Waverly.

Page 214

1    Q.    Well, let me ask you this:  If
2  he had insisted upon the payment of money from
3  someone for information, that wouldn't give you
4  pause about whether he should continue to be
5  employed?
6    A.    That's up to your client,
7  really.
8    Q.    No, no.  My client doesn't
9  employ him.  You do.
10    A.    I don't know anything about
11  that.  And I -- the context of that
12  conversation between the two of them, that's
13  between them.  And I really don't, you know,
14  have an opinion on if he was trying to extort
15  money.  Who knows what he wanted for it.  And
16  I'm not about to sit here and guess on that.
17  Because I want -- that is --
18    Q.    Are you going to investigate it?
19    A.    That was something they did on
20  their own time.
21    Q.    And that's okay?  To ask
22  somebody for money on their own time is okay?
23         MS. DEON:  Objection.
24         Don't answer the question.

Page 215

1  BY MR. SCHWARTZ:
2    Q.    When one knows there are court
3  proceedings, is that okay?
4         MS. DEON:  Objection.
5         MR. SCHWARTZ:  Are you
6         instructing her not to answer?
7         MS. DEON:  I am.
8         MR. SCHWARTZ:  Well, for the
9         record, I'd like to ask you to conduct an
10         investigation and to fire him.  Okay?
11         Off the record.
12              - - -
13         (Whereupon, a discussion was
14         held off the record.)
15              - - -
16  BY MR. SCHWARTZ:
17    Q.    Have you provided all of the
18  Soltis e-mails that I requested?
19    A.    Yes.
20    Q.    Have you gone back to check to
21  see if any of those were forwarded from
22  recipients of his e-mail who were Waverly
23  employees?
24    A.    We had Pannha Prak, our IT --

5 (Pages 212 - 215)

THOMAS P. GARVIN

1 head of IT go and do a thorough -- thorough
2 search.
3      Q.      This is after your last
4 deposition? Was it after we last were
5 together? Did he look at it again?
6      A.      It was -- the timing was when
7 you requested it via, I think, a second set of
8 Interrogatories that came.
9      Q.      Right.
10     A.      So we went back and did another
11 search.
12     Q.      Did you find anything?
13     A.      Just what was produced. And
14 really --
15          MS. DEON: I can represent that
16 there are Janet Thompson e-mails that
17 contain a lot of business things as well.
18          MR. SCHWARTZ: Business stuff.
19 And we haven't resolved that yet.
20          MS. DEON: It's this big, and
21 I'm going through it.
22          MR. SCHWARTZ: Fine.
23          MS. DEON: And I just actually
24 gave you a confidentiality agreement for

1 your review with a letter. And there's
2 also a Soltis letter in here explaining
3 that.
4          MR. SCHWARTZ: All right. Let's
5 go back and do this Amended Complaint,
6 which I'm glad I brought extra copies of.
7          MS. DEON: These have already
8 been marked. The first Amended is TG-6.
9 And the Answers are TG-7.
10 BY MR. SCHWARTZ:
11     Q.      If you turn to Paragraph 23 of
12 the Complaint and of the Answer. Do you see
13 the two of them? And then go to 23 on the
14 Answer. All right? Are we good?
15          Paragraph 23, the Complaint
16 reads, "Without success, Plaintiff begged for
17 her job, asking Messrs. Bauer and Garvin to
18 reconsider and/or to allow her to discuss the
19 situation with the Human Resources Committee
20 and the full Board of Trustees. Her request
21 was refused."
22          And you stated, correct,
23 "Admitted. It is admitted that Plaintiff
24 begged for her job and asked to be heard by the

1 Board of Trustees. Mr. Garvin communicated
2 that the decision was final."
3          Is that what your answer is?
4      A.      That is correct.
5      Q.      And that's a response. What did
6 you mean by "final decision"? What did you
7 mean by that?
8      A.      That, unfortunately, we couldn't
9 change what the decision of the committee was
10 based on the facts as we -- you know, as we had
11 investigated and as the committee saw them.
12     Q.      So "as the committee saw them,"
13 you're talking about the HR committee?
14     A.      No. The human resources
15 committee in conjunction with counsel and, you
16 know, every -- everyone involved in the human
17 resources committee.
18     Q.      The executive committee, too?
19     A.      No. The human resources
20 committee.
21     Q.      Okay. And if you go to 25. "At
22 this meeting, Defendant Garvin then told
23 Plaintiff, 'I don't want you to think that you
24 are a racist. That's not the case.' This

1 proved to be at complete variance with what
2 Defendant Garvin came to tell others about
3 Plaintiff."
4          And then in 25 you say, "Denied.
5 Mr. Garvin never made such a statement. By way
6 of further answer, it is denied that Mr. Garvin
7 made such a statement to any others as which
8 Plaintiff without justification continues to
9 insist upon."
10          Is that your answer?
11     A.      That is my answer.
12     Q.      Is it your testimony that you've
13 never said to anybody, I don't want you to
14 think I'm a racist?
15     A.      I never said to anybody that,
16 no, I didn't think -- I never used the term
17 "racist" in anything.
18          I was asked by your client in
19 the termination meeting with Mr. Bauer, so you
20 think I'm a racist? And the answer is, I am,
21 absolutely not. And I never once said to a
22 single person that I felt that Kathy was a
23 racist.
24     Q.      Okay. That's not my question.

6 (Pages 216 - 219)

Page 220

1    A.    Actually, that was your
2 question.
3    Q.    All right.  Well, then let me
4 phrase it a different way.
5        Did you ever say to anyone other
6 than Kathy, I don't want you to think that
7 you're a racist?
8    A.    No.
9    Q.    Did you ever use the term
10 "racist"?  Have you ever used that term?
11    A.    Not that I'm aware of.
12        MS. DEON:  Any time in your
13 life, is what he's asking.
14        MR. SCHWARTZ:  At any time.
15        THE WITNESS:  Oh.
16    A.    (Continuing)  Not that I recall.
17 BY MR. SCHWARTZ:
18    Q.    Did you ever make a statement to
19 anyone, I don't want people to think that I'm
20 getting rid of old-timers?  Did you ever say
21 that?
22    A.    No.  That's not the kind of
23 language that I use.
24    Q.    Anything similar?

Page 221

1    A.    No.
2    Q.    Paragraph 28, the second
3 sentence in 28.  If I'm going too quickly, let
4 me know.  "As an example, on the very next day
5 after her departure, Plaintiff learned from an
6 outside consultant that Defendant Garvin had
7 told him that she was fired and that it was
8 because of an inappropriate post on Facebook."
9        Did you ever say that?
10    A.    No.  And I think your Question
11 Number 28 would show that, because why would I
12 say to anybody that it was an inappropriate
13 post on Facebook, when, actually, it was a
14 Twitter issue?  So no.
15    Q.    Did you say to anyone that it
16 was an inappropriate post on Twitter?
17    A.    No.
18    Q.    And the last sentence of 28 is,
19 "This same misinformation was passed on to
20 others, including Waverly residents in what was
21 clearly a malicious fashion."
22        Other than the statement that
23 you put out that she was no longer at Waverly,
24 other than the official statement, did you

Page 222

1 supply any specifics to anybody else who worked
2 at Waverly or was affiliated with Waverly?
3    A.    I didn't get into the specifics
4 of any -- of anything.
5    Q.    Okay.
6    A.    I certainly can't control what
7 rumors --
8    Q.    No, I didn't say that.
9    A.    -- were passed around.  But I
10 did not get into the specifics.
11    Q.    So that all you did was put out
12 the official statement, correct?
13    A.    That is correct.  And as I
14 mentioned earlier, I think the folks who had
15 seen her tweet from Waverly Care Associates,
16 you know, where it went from there had nothing
17 to do with me.  It had everything to do with
18 the way that they read the tweet, how they
19 interpreted the tweet.  And, you know, I can't
20 control what 300 employees talk about.  But it
21 didn't come from me.
22    Q.    Why would the tweet have had the
23 attention of Waverly Care Associates?
24        MS. DEON:  Objection.

Page 223

1        You can answer the question.
2 BY MR. SCHWARTZ:
3    Q.    If you know.  Why, I mean?
4    A.    The answer is, because one of
5 them somehow saw it.
6    Q.    And you don't think that the
7 lady who headed it, who didn't get along with
8 my client, distributed that information?
9    A.    I don't believe that's her
10 style.
11    Q.    Do you know for a fact whether
12 she did, whether she tried to fan the flames of
13 the tweet?
14        MS. DEON:  Objection.
15        You can answer.
16 BY MR. SCHWARTZ:
17    Q.    If you know.
18    A.    No, I don't, because she didn't
19 even bring it to my attention, when she very
20 well could have if she wanted to see something
21 happen to your client, so.
22    Q.    Who brought it to your
23 attention?
24    A.    It was brought to my attention

7 (Pages 220 - 223)

THOMAS P. GARVIN

1 through the anonymous letter.

2    Q.    You sat through Ms. Summers'
3 deposition when she said, you know, how
4 articulate the person was and that she wasn't
5 as articulate as the writer, correct?

6    A.    Correct.

7    Q.    Does that level of
8 articulateness resemble anybody that you know
9 at Waverly or connected with Waverly?

10    A.    I have no idea who can write
11 that well.  But I would certainly like to meet
12 the person.

13    Q.    Twenty-nine.  "Sometime on or
14 about October 7, 8 or 9, Plaintiff received a
15 telephone call from a previous coworker, Meg
16 Guenveur who said that she learned that
17 Plaintiff was fired for violating Waverly's
18 Social Media Policy."

19        Is that what it says?

20    A.    Yes.

21    Q.    And then you deny that at any
22 time you advised her about the circumstances,
23 correct?

24    A.    Correct.

1    Q.    So how did Ms. Guenveur -- who
2 is Ms. Guenveur?

3    A.    So that's pronounced Genveer
4 (ph).

5    Q.    Oh, okay.

6    A.    G-u-e-n-v-e-u-r.

7    Q.    Yes.  How did she learn about
8 it?

9    A.    I have no idea.  I would assume
10 it was the rumor mill.  Meg is not someone that
11 I have stayed in touch with since she left.  I
12 ran into her one time at a restaurant, but
13 certainly had no conversation with her about
14 the dismissal of Kathy.

15    Q.    Did you meet with the senior
16 leadership team and tell them that my client
17 was fired for violating the social media
18 policy?

19    A.    I met with the senior leadership
20 team to let them know that she was no longer
21 employed.

22    Q.    And that was it?  You didn't say
23 anything more?

24    A.    You know, I don't recall the

1 content of the discussion.  But I certainly
2 didn't get into she sent a tweet that
3 segregated a class of employees and apparently
4 polled employees and tweeted about it.  No, I
5 didn't get into that level of detail.

6    Q.    When is progressive discipline
7 used?

8    A.    Progressive discipline is used
9 depending on the level of the infraction.  So
10 if somebody is late to work, they may start
11 with an oral counseling as step number one.
12 And then if they're late to work in a pattern,
13 meaning they call out every Friday or every
14 Monday and you start to notice it over a period
15 of time, maybe that progresses to a written
16 warning.

17    Q.    Okay.

18    A.    And then say they, whatever,
19 call out multiple times and it's a significant
20 pattern, then it progresses to a final written
21 warning.

22    Q.    Right.

23    A.    And then you have the different
24 options of dismissal or what have you.

1        Within progressive discipline,
2 there are levels of seriousness of the offense.
3 So in your client's case, her offense was what
4 would be considered to be a critical offense.
5 And so, therefore, progressive discipline
6 wouldn't apply.

7    Q.    Do you remember the specific
8 instance that Ms. Summers testified to with
9 respect to the, you know, worker who was
10 assigned to her in the matter of laundry theft
11 or whatever?  Do you remember that?

12    A.    Yes, I remember.

13    Q.    Did Ms. Summers come to you and
14 try to have something less than a firing occur?

15    A.    You know, I don't recall
16 specifically.  But it seems like if she
17 communicated with your client, she probably
18 said to me that she, you know, was upset about
19 it, because it was her housekeeper, as she
20 articulated, someone she was very fond of and,
21 you know, didn't -- didn't necessarily feel
22 that she should have been fired for stealing.

23    Q.    You didn't feel that?

24    A.    No, no.  She didn't --

8 (Pages 224 - 227)

THOMAS P. GARVIN

Page 228

1    Q.    She didn't, okay.
2    A.    -- feel that.
3         Stealing is a great example of a
4  critical offense, so something that doesn't
5  require progressive discipline.
6         There are other examples at
7  Waverly Heights where if we catch someone
8  stealing from us, we consider that to be a
9  critical offense, and so they're terminated.
10  And there are multiple examples of that.
11        So as I said earlier, a critical
12  offense can take on many -- you know, many
13  faces. One is stealing. One is tweeting about
14  a protected class, representing them on behalf
15  of the company. So, yeah, those -- those are
16  things that are critical offenses.
17    Q.    So did you look into whether
18  this health care worker committed a critical
19  offense yourself?
20    A.    The health -- that we didn't say
21  anything about a health care worker.
22    Q.    The home care worker, whoever
23  was assigned to Ms. Summers.
24    A.    You're talking about the

Page 229

1  housekeeper?
2    Q.    The housekeeper?
3    A.    Okay. There's a big difference
4  between home care worker and housekeeper, so.
5    Q.    The housekeeper, did you look
6  into whether that was really a critical
7  offense?
8    A.    Yes, we did a full investigation
9  on it, determined that it was a critical
10  offense. We had videotap of her stealing the
11  sheets. And -- and so we let her go.
12    Q.    Were they new sheets as opposed
13  to old sheets?
14    A.    They were new sheets.
15    Q.    They were new sheets, okay.
16    A.    High-count sheets, if I recall
17  correctly.
18    Q.    High-count sheets?
19    A.    Yes.
20    Q.    Paragraph 40 in the Complaint.
21  "Set forth in the Waverly Heights Employee
22  Handbook, the Social Media Policy makes a clear
23  distinction between 'company-owned assets' and
24  'work-related blogging' on the one hand, and

Page 230

1  'personal blogging' on the other, stating that
2  'Waverly Heights respects the rights of
3  employees to write blogs and use social
4  networking sites and does not want to
5  discourage employees from self-publishing and
6  self-expression.'"
7         Is that the social media policy,
8  as you understand it?
9    A.    Like I said, it's -- it's in
10  writing in the answer and it speaks for itself,
11  if that's what it says. It's a pretty
12  lengthy -- lengthy policy.
13    Q.    Did my client use company-owned
14  assets to do her tweet?
15    A.    Well, all I can say is that when
16  I brought it to her attention, she was
17  immediately up to her work-owned computer on
18  her Twitter deleting it within a matter of
19  minutes. So I would have to say, yes, that she
20  did use company-owned property.
21    Q.    She used company-owned property
22  to take it off, correct?
23    A.    Yeah. But your question was,
24  did she use company-owned --

Page 231

1    Q.    Did she use it to put it on?
2    A.    Can I answer?
3         She asked -- your question was,
4  did she use company-owned property --
5    Q.    Okay.
6    A.    -- to do blogging.
7    Q.    Right.
8    A.    So I said, my answer is that I
9  can only assume yes, since when I brought it to
10  her attention, that within minutes of it being
11  brought to her attention, she was up on
12  whatever Twitter account she has deleting it.
13    Q.    Did you see her do that --
14    A.    No.
15    Q.    -- delete it?
16    A.    But I certainly saw the result
17  that it wasn't there any longer.
18    Q.    Well, how else, if she's at
19  work, is she going to take it off her Twitter
20  account than to use a computer that the company
21  has? How else is she going to do that?
22    A.    You asked me a question and I --
23    Q.    That's my new question.
24    A.    -- my answer speaks for itself.

9 (Pages 228 - 231)

THOMAS P. GARVIN

Page 232

1    Q.    No.  But that's my question.
2          How else is she going to take it
3  off?  If you instructed her to take it off, how
4  else is she going to quickly take it off?  Is
5  she going to wait until she gets home?
6    A.    That's up to her on how to take
7  off what she put on.  I'm just answering your
8  question that did she --
9    Q.    I understand.
10   A.    -- use a company computer to
11  access her Twitter or her social media or
12  blogging, and the answer is yes.
13   Q.    And you have personal knowledge
14  of that?
15   A.    Yes, because it went away within
16  minutes of my bringing it to her attention.
17   Q.    Could she have done it on her
18  cell phone?
19   A.    I don't know.  Perhaps.
20   Q.    Could she have put it on using
21  non-company assets, you know, published the
22  tweet?
23   A.    I assume that she probably could
24  have.

Page 233

1    Q.    Work-related blogging.  Was that
2  work-related blogging on the one hand?  Did you
3  consider that tweet work-related?
4    A.    I certainly don't consider it
5  work-related.
6    Q.    Okay.
7    A.    And I'm not necessarily in tune
8  to what blogging is as opposed to tweeting.
9    Q.    I don't make a distinction.  Do
10  you?
11   A.    I think there is a distinction,
12  but . . .
13   Q.    Well, I'm using the words
14  interchangeably, so.
15   A.    I don't know that you should do
16  that.
17   Q.    All right.  Then was it a
18  work-related tweet?
19   A.    It was tied directly to Waverly
20  Heights.
21   Q.    How was it tied directly to
22  Waverly Heights?
23   A.    Because she represented herself
24  under her own name as the vice president of a

Page 234

1  company outside of Philadelphia, having polled
2  the -- 100 percent of the African-American
3  staff, AA, and then saying that they were all
4  voting for Trump.  So --
5    Q.    And you're saying that --
6    A.    -- you can tie her name with a
7  simple Google search against Waverly Heights
8  human resource -- I'm sorry, human resources,
9  Kathy Jungclaus, and you're going to come up
10  with Waverly Heights, a direct correlation.
11   Q.    I think we've done that.  We've
12  been through this before.
13        Did you ever sign a conflict of
14  interest statement?
15   A.    Yeah, I think I did.
16   Q.    You sat here through Mr. Bauer's
17  deposition with respect to the Facebook page of
18  Janet Thompson, right?  You sat though
19  Mr. Bauer's deposition testimony when we talked
20  about Janet Thompson?
21   A.    Yes, I did.
22   Q.    Have you ever had cause to look
23  at her Facebook page?
24   A.    No, I have not.

Page 235

1    Q.    Have you ever had cause to look
2  at anybody else's Facebook page or tweets other
3  than my client --
4    A.    No.
5    Q.    -- who worked for Waverly?
6  None?
7    A.    No.  I don't do that.
8    Q.    On 49 --
9    A.    Page 49 or paragraph?
10   Q.    Paragraph 49 of the Complaint
11  and the Answer.  Forty-nine reads, "Since
12  Defendant Garvin started his employment at
13  Waverly in 2010, he has systematically removed
14  senior level management and replaced them with
15  his own male-dominated, hand-picked team.
16  Notwithstanding, each time someone was
17  terminated, Garvin made it a point to tell
18  Plaintiff and others, 'You don't have to worry
19  about your job, I am really not out to get the
20  old-timers.'"
21        Did you ever make a statement
22  like that to my client?
23        MS. DEON:  Objection.  Asked and
24        answered.

10 (Pages 232 - 235)

THOMAS P. GARVIN

Page 236

1      MR. SCHWARTZ:  This time it's to
2  my client.
3  BY MR. SCHWARTZ:
4      Q.      Did you ever say that, you don't
5  have to worry about your job.  I'm really not
6  out to get the old-timers?
7      A.      No, that's not language that I
8  use.
9      Q.      Anything similar to that?
10      A.      No.  I expressed appreciation
11  for the team that's there and the hard work
12  they do regardless of how long they worked for
13  us.
14      Q.      Why would Marc Hiel tell my
15  client that you said that?
16      MS. DEON:  Objection.
17      You can answer.
18  BY MR. SCHWARTZ:
19      Q.      Why would he say that?
20      MS. DEON:  Objection.
21      A.      Well, I have every reason to
22  believe --
23      THE WITNESS:  Can I answer it?
24      MS. DEON:  Yes.

Page 237

1      MR. SCHWARTZ:  Yes.
2      A.      (Continuing) -- that your client
3  is exaggerating whatever conversation she
4  claims to have had with Marc Hiel.
5  BY MR. SCHWARTZ:
6      Q.      If he said that he had heard you
7  make that comment, would he be lying?
8      A.      Yes.
9      Q.      Maybe we've touched on this.
10  Paragraph 50.  Do you recall the meeting in
11  December of 2015 when my client met with you
12  and asked why she hadn't received pay raises?
13      A.      That was not the content of that
14  meeting, nor how it --
15      Q.      What happened in that meeting?
16      A.      -- nor how it went down.
17      Q.      What happened in that meeting?
18      A.      Your client spent the better
19  part of two-and-a-half days in what I can only
20  describe as a state of, you know, mopiness
21  (sic).  I don't know how to spell that.  But
22  made it very clear to everybody that she was
23  moping for days.
24      And I asked her, specifically in

Page 238

1  the hallway, what was wrong.  And she said she
2  didn't want to talk about it.
3      And when I pressed her on it, I
4  said, is it -- because I was worried for her,
5  because clearly her whole personality, which
6  is, you know, generally friendly and outgoing,
7  went into this just sagging, mopey state.
8      And so when I pressed her on it,
9  I said, look, is it something personal or
10  something professional?  Because she wouldn't
11  tell me.
12      Q.      Okay.
13      A.      And she said it was -- you know,
14  it was professional.  So I said okay.  So then
15  this went on for the better part of another --
16  whatever it was, a day or two days, when
17  finally, you know, I asked her, I said, are you
18  ready to tell me, you know, what's wrong?
19      And the gist of what she
20  complained about is because her job as vice
21  president of human resources was to process
22  bonuses for senior level staff.  And she was
23  getting a bonus, but she didn't feel it was
24  enough compared to some of her -- her

Page 239

1  co-workers.
2      So that was -- you know, and
3  then my notes all speak for themselves, which
4  you have and I think are a matter of record on
5  the detail.  I'm just giving you what I recall
6  in summary.
7      Q.      That's fine.  How would you
8  differentiate the bonuses and compensation
9  ratio that Mr. Supper received, as well as his
10  performance over the years, and that of my
11  client?  How would you contrast them?
12      MS. DEON:  Which time frame are
13      you speaking about, Mr. Schwartz?  Do you
14      mean in December 2015?
15      MR. SCHWARTZ:  Yes, about that
16      time and forward.
17  BY MR. SCHWARTZ:
18      Q.      How would you compare, contrast
19  them, when it came to justifying his pay?
20      A.      So speaking specifically of
21  Mr. Supper, I would -- I would tell you that
22  your client, in my time at Waverly, advanced
23  quicker on her compensation ratio than
24  Mr. Supper.

11 (Pages 236 - 239)

THOMAS P. GARVIN

Page 240

1    I would spend a lot of time
2 talking with your client about comp ratios when
3 I arrived. And she knows darn well that many
4 of them, many of her peers, were below a comp
5 ratio of 1.0.
6    And we use a compensation
7 consultant. And Kathy and I would talk about
8 this a lot. And I did not disagree that we
9 needed to advance the senior level managers to
10 a reasonable comp ratio, which I would tell you
11 would be, you know, between a 1.02 and
12 whatever, 1.06.
13    And so we made it a mission,
14 over the course of a couple of years, to get
15 everybody to that point, including your client,
16 who advanced from -- I think she was below a
17 1.0, to whatever it ended up being. We can
18 pull the numbers. But it was clearly like a
19 1.04, 1.03, 1.05, which meant significant
20 raises to get her there, along with her peers.
21 It was not just her, it was her peers. Because
22 I completely agreed that that was the right
23 approach to take.
24    Q.    Can I -- go ahead. Keep going.

Page 241

1    A.    Well, that's -- you know, that's
2 the answer. So as it compares to Bob Supper,
3 he came in at a comp ratio. I know you have
4 some fabrication in here that he was at a 1.20.
5 Well, that couldn't be farther from the truth.
6 He came in, you know, right around where
7 everybody else was, you know, at a comp ratio
8 that was in that range that I had mentioned,
9 around a 1.05, 1.06.
10    Q.    Well, let's look at
11 Paragraph 51. "In contrast to Plaintiff's
12 situation, when performance reviews were
13 completed for 2015, the male Senior VP of
14 Finance, Robert Supper (employed for only three
15 years), was assigned a compensation ratio of
16 approximately 125 percent of market value, in
17 contrast to Plaintiff's ratio of 102 percent of
18 market value, despite her many years of
19 service."
20    Do you agree that that's what
21 his assignment was?
22    A.    No. That's a complete lie on
23 your part and on your client's part, and
24 easily -- easily proven. And she knows that.

Page 242

1    Q.    Well, then, why don't you
2 produce those records, okay, as far as his
3 compensation levels and hers throughout their
4 respective --
5    A.    If it will enlighten you --
6    Q.    Yes, it will enlighten me.
7    A.    -- it will enlighten you to the
8 truth.
9    MR. SCHWARTZ: Do you want to
10    strike that question? I have never been
11    deposed. I'm waiting for the first time,
12    and this ain't it.
13 BY MR. SCHWARTZ:
14    Q.    Did we already talk about the
15 workers' comp claim and you denied that you
16 told her not to file one? Do you have a
17 recollection?
18    A.    I don't recall if we talked
19 about that or --
20    THE WITNESS: Did we talk about
21    that the last time (addressing Ms. Deon)?
22 BY MR. SCHWARTZ:
23    Q.    Well, let's go to 60 then.
24    MS. DEON: I don't recall that.

Page 243

1 BY MR. SCHWARTZ:
2    Q.    It may be quicker to just
3 address it than to remember what we did.
4    Take a look at Paragraph 60.
5 Just read it to yourself. I'm not going to
6 read it.
7    A.    I'm familiar with this.
8    Q.    So in your response, in the
9 Answer, it says, "It is denied that Mr. Garvin
10 told Plaintiff not to file a workers'
11 compensation claim," correct?
12    A.    That's correct.
13    Q.    In fact, you were not even
14 present on the day when she suffered an
15 asthmatic attack after being in the attic of a
16 building, correct?
17    A.    That's correct.
18    Q.    How did you learn about it then?
19    A.    I'm trying to recall. It would
20 have been early in the following week when I
21 came back. And I think I was actually having a
22 conversation with your client in front of my
23 assistant, where in sort of a joking fashion,
24 they were all talking about how it would look

12 (Pages 240 - 243)

THOMAS P. GARVIN

Page 244

```
 1  for the, you know, vice president to have this
 2  workers' comp report.  It never was something
 3  that I told her not to report.  In fact, it
 4  was -- I'd have no reason to not report any
 5  work-related injury.  There's no --
 6      Q.      I mean, no matter who you are,
 7  if you've got a bona fide workers' compensation
 8  claim, you can file it, right?
 9      A.      If you have a cut on a finger at
10  work, you can -- you should file a report with
11  the workers' compensation company.
12      Q.      And she did, didn't she?
13      A.      Yes.
14      Q.      "Plaintiff was assessed by a
15  nurse on premises but refused to go to the
16  hospital."
17              How did you know that?
18      A.      There's an incident report and,
19  you know --
20      Q.      So you looked at that
21  afterwards, right?
22      A.      Yes.  I was not there the day
23  that it went down when they tried to help her.
24      Q.      When did you see the incident
```

Page 245

```
 1  report, if you can remember?  After the lawsuit
 2  started?
 3      A.      Yeah, maybe.  I honestly don't
 4  recall when -- when I saw it for the first
 5  time.
 6              MR. SCHWARTZ:  Can you pull out
 7  all of the Soltis e-mails.
 8              Off the record.
 9                  - - -
10              (Whereupon, a recess was taken
11      from 2:41 p.m. to 2:45 p.m.)
12                  - - -
13  BY MR. SCHWARTZ:
14      Q.      Before we get to the e-mails of
15  Mr. Soltis.
16              Mr. Bauer testified that he took
17  notes with respect to the meeting with you and
18  my client, correct?
19      A.      Yes.
20      Q.      And you also took notes which
21  you supplied me with, correct?
22      A.      That's correct.
23      Q.      Whose idea was it to take notes?
24      A.      I think we thought together it
```

Page 246

```
 1  would be good practice to each document our
 2  take on how the meeting went.
 3      Q.      Did you ever do anything like
 4  that with respect to another firing?
 5      A.      I probably have.  I would tend
 6  to do that on -- on more serious issues.
 7      Q.      And you'd have Mr. Bauer or
 8  someone else from the board as a witness?
 9      A.      It would depend on the -- the
10  person, really.  In this case -- in, you know,
11  a case before, I would have the vice president
12  of human resources with me.
13      Q.      Sure.
14      A.      But in this case in particular,
15  I think it would be inappropriate to have
16  another one of her peers there.  And so, yeah,
17  the chairman of the human resources committee
18  made -- made common sense to -- you know, to
19  all of us.
20      Q.      So it was your idea that you
21  each take notes?
22      A.      You know, like I said, I think
23  Dick and I both said, we need to document this
24  conversation.
```

Page 247

```
 1      Q.      Okay.  That's fine.
 2              To your knowledge, were minutes
 3  kept of the HR meeting that dealt with my
 4  client?
 5      A.      No.
 6      Q.      No.  So are you sure that there
 7  weren't any minutes taken?
 8      A.      Yeah.  That would be considered
 9  an executive session, so.
10      Q.      So if Mr. Bauer had testified --
11  and, again, I don't remember exactly what he
12  said -- but if he had testified that there were
13  minutes, he would be wrong?
14      A.      Yes, because they're in
15  executive session.  We have human resources
16  committee minutes, but we don't discuss
17  personnel matters, you know, in --
18      Q.      In that context, okay.
19      A.      -- in that context.
20      Q.      You've testified -- and I'm not
21  going to ask you again, to go over it again --
22  but you testified that virtually all of the
23  meetings that you had included counsel, when it
24  came to the decision to fire my client,
```

13 (Pages 244 - 247)

THOMAS P. GARVIN

Page 248

1 correct?
2    A.    That's correct.
3    Q.    Aside from the meeting that you
4 had with Mr. Bauer and my client, did you talk
5 to anyone else about the firing of my client
6 without counsel?
7    A.    No.  We -- we kept it, you know,
8 very much within the small group of the human
9 resources committee, of which Mr. Bauer is a
10 member, and then, of course, you know, with
11 outside counsel.
12    Q.    All right.  Let's do these
13 e-mails.  Let me give you the whole pile.
14        And correct me if I am wrong,
15 Mr. Garvin or Grace.  We only talked about
16 these e-mails in the abstract, correct?
17        I remember your testimony was
18 that you didn't pay attention to these things,
19 correct?
20    A.    That's correct.
21    Q.    But we didn't talk about any of
22 the specifics of them, did we?
23        MS. DEON:  Correct.  That's my
24    understanding.

Page 249

1        MR. SCHWARTZ:  Okay.  Thanks.
2 BY MR. SCHWARTZ:
3    Q.    Let's go to Exhibit -- what do
4 you have in front of you?
5    A.    Summers 1.
6    Q.    What's the Bates number on the
7 bottom?  Five --
8    A.    The Bates number, Waverly 537.
9    Q.    This document is named
10 Summers 1.  And it comes from, does it not.
11 Chuck Soltis, correct?
12    A.    Yes.
13    Q.    And it was sent February 29,
14 2016.
15        You are not a recipient,
16 correct?
17    A.    I do not see my name on the
18 recipient list.
19    Q.    Other than these proceedings and
20 the last time we were together, do you remember
21 any e-mails circulating around about Mr. Soros
22 and Hitler's henchman, Adolf Eichmann?  Do you
23 remember anything like that?
24    A.    No.

Page 250

1        MR. SCHWARTZ:  So that's that.
2 What's the next one, Grace?
3        MS. DEON:  It's Bauer 4.
4        MR. SCHWARTZ:  Off the record.
5        - - -
6        (Whereupon, a discussion was
7 held off the record.)
8        - - -
9        MR. SCHWARTZ:  Back on.
10 BY MR. SCHWARTZ:
11    Q.    Bauer 4 is from Chuck Soltis
12 dated Friday, December 6, 2013, to Dick Bauer,
13 et al.
14        Are you there?
15    A.    I do not see my name.
16    Q.    I don't see your name there.  I
17 see your mother's name there, right?
18    A.    Yes.
19    Q.    And Ms. Jungclaus's name is
20 there, correct?
21    A.    Yes, I see her name there.
22    Q.    If you go down further, it says,
23 "This is worth reading.  Canada Free Press.
24 The unspoken success of ObamaCare."

Page 251

1        Did you ever see this before
2 your depositions?
3    A.    No.
4    Q.    Did Ms. Jungclaus ever complain
5 to you about receiving e-mail from Mr. Soltis
6 of a political nature?
7    A.    She never complained about it.
8    Q.    Did anyone ever complain about
9 it to you?
10    A.    No, nobody complained.  Some
11 people would say they got them.  And the
12 general consensus was, everybody just deleted
13 them because they tend to be lengthy and nobody
14 at Waverly has the time to get in to be reading
15 all this.
16    Q.    So you're talking about Waverly
17 employees just not having the time to read this
18 stuff.  You said nobody at Waverly.
19    A.    Yeah.  Well, the people that
20 they -- nobody ever complained.
21    Q.    Right.
22    A.    And so anybody that was a
23 recipient, no, nobody ever complained about it.
24    Q.    Do you know if any of the

14 (Pages 248 - 251)

THOMAS P. GARVIN

1 recipients passed them around to other
2 employees at Waverly?
3    A.    I don't think so, because we did
4 a search to see if anybody forwarded them, and
5 didn't turn that up.
6    Q.    Is it that it didn't turn up or
7 maybe you weren't able to search in that level
8 of detail?
9    A.    I think it's that it didn't turn
10 up.
11    Q.    It didn't turn up, okay.
12        The next one is Bauer 5 --
13    A.    Okay.
14    Q.    -- from Chuck Soltis to -- are
15 you on this?  Yes.
16    A.    Yes.
17    Q.    Robert Supper, Thomas Garvin,
18 Dick Bauer and so forth.  "Famous Presidential
19 Lies Contest."
20        Do you remember this?
21    A.    No, I do not.
22    Q.    Did you ever say to
23 Mr. Soltis -- and forgive me if I asked this
24 before -- did you ever say to Mr. Soltis, you

1 know, nobody has time for this.  Don't do it.
2 We don't want political stuff?
3        Did you ever say anything to him
4 about knock it off?
5    A.    No, I did not.
6    Q.    Mr. Bauer testified earlier
7 today that it was sometimes as much as once a
8 week.
9        Do you remember that testimony?
10    A.    I remember it, yes.
11    Q.    Do you remember the frequency at
12 which you got these things?
13    A.    It was -- you know, it was
14 somewhat frequent.  But to put a time frame on
15 it, I would be completely guessing.  It was
16 frequent enough that literally when they came,
17 you just hit delete and you don't -- you didn't
18 even give it a second thought.
19    Q.    So he might not be off if he's
20 talking about once a week, Mr. Bauer?
21    A.    I mean, he's definitely not off.
22    Q.    By much?
23    A.    Yeah.
24    Q.    All right.  Bauer 6, from Chuck

1 Soltis, February 24th.  I don't believe you're
2 on it, although Mr. Supper is, correct?
3    A.    Yes, I see his name there.
4    Q.    Just page through it.  This is
5 the one about the first Muslim woman on the
6 municipal court in Brooklyn holding the Koran.
7        Do you have any recollection of
8 seeing this?
9    A.    No, and I'm not copied on it.
10    Q.    Right.  Let's go to Bauer 7 from
11 Chuck Soltis, June 14, 2016, right?
12    A.    Yes.
13    Q.    And it's to Dick Bauer and a
14 bunch of other people, right?
15    A.    Yes.
16    Q.    You are on the second line from
17 the bottom, on the far right, correct?
18    A.    It looks like he copied me on
19 this.
20    Q.    The subject is, "Unfortunately,
21 based on all, she has said, Clinton appears to
22 be cut from the same cloth," correct?
23    A.    That's what it says.
24    Q.    And then when you go back into

1 it, there are all of these Obama cartoons,
2 correct?
3    A.    Let's see.  Overseas cartoons.
4 Are these from newspapers from overseas?
5    Q.    I guess --
6    A.    It looks like they're about -- I
7 have not seen them.  But it looks like it's
8 about the United States.  And it looks like it
9 was cartoons that were in newspapers, I guess,
10 across the world.
11    Q.    Okay.  And then on 5/29, there's
12 a cartoon that has a caricature of Obama that
13 says, "My policies have created jobs," and then
14 it says, "ISIS Beheaders Wanted.  Now hiring
15 bomb makers."
16        Is that what it says?  Is that
17 what the cartoon says?
18    A.    It says, "My policies have
19 created jobs."
20    Q.    Right.
21    A.    And then there's the next
22 caption that says, ISIS Beheaders Wanted."
23    Q.    Right.
24    A.    The next says, "Now hiring bomb

15 (Pages 252 - 255)

THOMAS P. GARVIN

Page 256

1 makers." And it says, "None of these are from
2 USA papers." So I would have to assume that
3 it's from newspapers somewhere overseas.
4      Q.      Then it concludes by saying,
5 does it not, "How is it that much of the world
6 sees Obama for what he really is and yet many
7 in the U.S. think he's doing just fine and
8 admire him"?
9              Is that what it says?
10     A.      That's what it says at the
11 bottom.
12     Q.      Do you have any recollection of
13 getting this?
14     A.      No.
15     Q.      All right. How about Bauer 8?
16 Let's see if you're on this.
17             I'll say that when it comes to
18 Bauer 8, it's called "Trust is Gone by Dennis
19 Prager."
20             Do you have any recollection of
21 seeing this?
22             MS. DEON: And he's not on it.
23 BY MR. SCHWARTZ:
24     Q.      And you're not on it.

Page 257

1      A.      No, I don't.
2      Q.      Did your mother ever discuss
3 these with you? She's on this one.
4      A.      No.
5      Q.      She never discussed or mentioned
6 the fact that she got them?
7      A.      No.
8      Q.      She was what, a friend of his or
9 a social friend?
10     A.      They attended an event where
11 they met each other. And then, you know,
12 somehow she ended up on a few of his e-mails
13 here.
14     Q.      Okay. Bauer 9 from Soltis,
15 Sunday, February 1st, 2015, to Dick Bauer,
16 et al., and then you're on the second line from
17 the bottom, correct?
18     A.      Yes.
19     Q.      Any recollection of this? It
20 says, "Amazing how deaf, dumb, and blind
21 America has apparently become."
22     A.      No, no recollection. Like I
23 said, I would just delete this kind of stuff.
24     Q.      And then the next page, I don't

Page 258

1 believe you're on it.
2              On Page 601, do you know
3 Dhimmitude is?
4      A.      I do not.
5      Q.      All right. Bauer 10, from Chuck
6 Soltis to Mr. Bauer. You're not on this one?
7      A.      Correct.
8      Q.      The second page is Hillary
9 Clinton in a tiara, correct?
10     A.      It would appear as such.
11     Q.      Do you have any recollection of
12 seeing this?
13     A.      No. And it doesn't look like
14 I'm copied on this one anyway.
15     Q.      No, you're not.
16             The next one is 534 on this
17 group. I don't believe you're on this one
18 either.
19             Who is Peggy Faha?
20     A.      She's our sales consultant at
21 Waverly Heights. She's an employee.
22     Q.      So does she have a Waverly
23 Heights e-mail?
24     A.      She does.

Page 259

1      Q.      And the way that these show up,
2 when we're talking about employees, if it just
3 says "Peggy Faha," that means she's at the
4 Waverly e-mail, correct?
5      A.      You know, I'm not sure about
6 that. It's Peggy Fay (ph), is how you say it.
7      Q.      Sorry.
8      A.      But, you know, I don't think
9 that's the sole reason. Because if you look at
10 some of the other names on there that are just
11 the names, they're not all Waverly employees.
12     Q.      Right. Did board members have
13 Waverly e-mail addresses, too?
14     A.      You know, they did for a short
15 period of time, but nobody used them. So they
16 don't anymore.
17     Q.      Do you know when that changeover
18 happened?
19     A.      It never really started. We
20 wanted them to use them and they just didn't.
21 It was just another e-mail. So we, you know,
22 continued to use their -- you know, their
23 personal contact e-mail.
24     Q.      So your testimony is that when

16 (Pages 256 - 259)

THOMAS P. GARVIN

Page 260

1 you'd see e-mails from Mr. Soltis, you would
2 just hit the delete button?
3      A.      If they were not work-related,
4 yes, I would absolutely hit the delete button.
5      Q.      Did you ever hit the delete
6 button by mistake and then find out, oh, they
7 were work-related?
8      A.      Not that I recall.
9              MR. SCHWARTZ:  Let's take a
10 break and maybe we're done.
11              - - -
12              (Whereupon, a recess was taken
13 from 3:02 p.m. to 3:06 p.m.)
14              - - -
15              MR. SCHWARTZ:  I think we are
16 finished for the time being, but reserve
17 the right to call you back in light of
18 any other new discovery that we receive.
19              Thank you for your time.
20              - - -
21              (Witness excused.)
22              (Whereupon, the deposition was
23 adjourned at 3:06 p.m.)
24              - - -

Page 261

1          C E R T I F I C A T E
2
3          I do hereby certify that I am a
4 Notary Public in good standing, that the
5 aforesaid testimony was taken before me,
6 pursuant to notice, at the time and place
7 indicated; that said deponent was by me duly
8 sworn to tell the truth, the whole truth, and
9 nothing but the truth; that the testimony of
10 said deponent was correctly recorded in machine
11 shorthand by me, to the best of my ability, and
12 thereafter transcribed under my supervision
13 with computer-aided transcription; that the
14 deposition is a true and correct record of the
15 testimony given by the witness; and that I am
16 neither of counsel nor kin to any party in said
17 action, nor interested in the outcome thereof.
18          WITNESS my hand and official
19 seal this 3rd day of December, 2018.
20
21
22          Cheryl L. Goldfarb
23          Notary Public
24

17 (Pages 260 - 261)

# EXHIBIT "TG 6"

# SEE APPENDIX 568-597

# EXHIBIT "TG 7"

# SEE APPENDIX 1126-1143

# EXHIBIT "SUMMERS 1"

# SEE APPENDIX 875-894

# EXHIBIT "BAUER 4"

# SEE APPENDIX 964-973

# EXHIBIT "BAUER 5"

# SEE APPENDIX 974-977

# EXHIBIT "BAUER 6"

# SEE APPENDIX 978-989

# EXHIBIT "BAUER 7"

# SEE APPENDIX 990-997

# EXHIBIT "BAUER 8"

# SEE APPENDIX 998-1001

EXHIBIT "BAUER 9"

SEE APPENDIX 1002-1005

# EXHIBIT "BAUER 10"

# SEE APPENDIX 1006-1011

**[1 - answer]**

| 1 |
|---|
| **1** 199:7 201:15 249:5,10 |
| **1-4** 202:10 |
| **1.0** 240:17 |
| **1.0.** 240:5 |
| **1.02** 240:11 |
| **1.03** 240:19 |
| **1.04** 240:19 |
| **1.05** 240:19 241:9 |
| **1.06.** 240:12 241:9 |
| **1.20.** 241:4 |
| **10** 201:22 258:5 |
| **100** 211:18 234:2 |
| **102** 241:17 |
| **125** 241:16 |
| **14** 254:11 |
| **17** 199:9 |
| **1800** 199:23 |
| **1801** 199:23 |
| **18901** 199:16 200:9 |
| **19010** 200:4 |
| **19103** 199:24 |
| **1:56** 199:17 |
| **1st** 257:15 |

| 2 |
|---|
| **2** 212:16 |
| **2010** 235:13 |
| **2013** 250:12 |
| **2015** 237:11 239:14 241:13 257:15 |
| **2016** 212:20 249:14 254:11 |
| **2018** 199:11 261:19 |
| **203** 201:5 |
| **214** 202:5 |

| 215 |
|---|
| **215** 202:5 |
| **215.345.7000** 200:10 |
| **217** 201:13,14 |
| **23** 199:8 217:11,13 217:15 |
| **24** 202:5 |
| **242** 202:10 |
| **249** 201:15 |
| **24th** 254:1 |
| **25** 218:21 219:4 |
| **250** 201:16 |
| **252** 201:17 |
| **253** 201:18 |
| **254** 201:19 |
| **256** 201:20 |
| **257** 201:21 |
| **258** 201:22 |
| **26** 199:11 |
| **28** 221:2,3,11,18 |
| **29** 249:13 |
| **2:41** 245:11 |
| **2:45** 245:11 |

| 3 |
|---|
| **300** 200:4 222:20 |
| **3:02** 260:13 |
| **3:06** 260:13,23 |
| **3rd** 261:19 |

| 4 |
|---|
| **4** 201:16 250:3,11 |
| **40** 229:20 |
| **4462** 199:9 |
| **49** 235:8,9,10 |

| 5 |
|---|
| **5** 201:17 252:12 |
| **5/29** 255:11 |
| **50** 237:10 |
| **51** 241:11 |
| **534** 258:16 |

| 537 |
|---|
| **537** 249:8 |

| 6 |
|---|
| **6** 201:13,18 217:8 250:12 253:24 |
| **60** 199:15 200:9 242:23 243:4 |
| **601** 258:2 |
| **610.525.5534** 200:5 |
| **6th** 212:18 |

| 7 |
|---|
| **7** 201:14,19 202:5 217:9 224:14 254:10 |
| **743** 261:22 |

| 8 |
|---|
| **8** 201:20 224:14 256:15,18 |

| 9 |
|---|
| **9** 201:21 224:14 257:14 |

| a |
|---|
| **aa** 234:3 |
| **abilities** 209:13 |
| **ability** 261:11 |
| **able** 252:7 |
| **absolutely** 206:14 209:20 210:16 219:21 260:4 |
| **abstract** 248:16 |
| **access** 232:11 |
| **account** 231:12,20 |
| **accuracy** 210:22 |
| **action** 199:3 261:17 |
| **address** 243:3 |
| **addresses** 259:13 |
| **addressing** 242:21 |

**adjourned** 260:23
**administrative** 205:14,17
**admire** 256:8
**admitted** 217:23 217:23
**adolf** 249:22
**advance** 240:9
**advanced** 239:22 240:16
**advised** 224:22
**affiliated** 222:2
**affirmed** 203:10
**aforesaid** 261:5
**african** 205:16 206:5,17 234:2
**agree** 241:20
**agreed** 203:2 240:22
**agreement** 216:24
**ahead** 206:3 240:24
**aided** 261:13
**ain't** 242:12
**al** 250:13 257:16
**allow** 217:18
**amazing** 257:20
**amended** 217:5,8
**america** 257:21
**american** 205:16 206:5 234:2
**americans** 206:17
**angry** 205:18
**anonymous** 205:24 208:20 224:1
**answer** 202:3 208:23 213:10 214:24 215:6 217:12,14 218:3 219:6,10,11,20

[answer - cause]                                                                Page 2

223:1,4,15 230:10
231:2,8,24 232:12
235:11 236:17,23
241:2 243:9
**answered** 235:24
**answering** 211:23
232:7
**answers** 217:9
**anybody** 209:18
219:13,15 221:12
222:1 224:8 235:2
251:22 252:4
**anymore** 259:16
**anyway** 258:14
**apparently** 205:22
226:3 257:21
**appear** 258:10
**appears** 254:21
**apply** 227:6
**appreciation**
236:10
**approach** 240:23
**approved** 199:19
**approximately**
241:16
**arm's** 208:13
**arrived** 240:3
**articulate** 224:4,5
**articulated** 227:20
**articulateness**
224:8
**articulation**
209:14
**aside** 248:3
**asked** 211:22
217:24 219:18
231:3,22 235:23
237:12,24 238:17
252:23
**asking** 217:17
220:13

**assessed** 244:14
**assets** 229:23
230:14 232:21
**assigned** 227:10
228:23 241:15
**assignment** 241:21
**assistant** 243:23
**associates** 205:14
222:15,23
**assume** 225:9
231:9 232:23
256:2
**asthmatic** 243:15
**atlantic** 199:23
**attack** 243:15
**attended** 257:10
**attention** 205:13
205:23 222:23
223:19,23,24
230:16 231:10,11
232:16 248:18
**attic** 243:15
**attorney** 204:11
211:4,9
**attorney's** 211:2
**aware** 205:15
220:11
**awkward** 213:18

**b**

**b** 201:7
**back** 215:20
216:10 217:5
243:21 250:9
254:24 260:17
**based** 218:10
254:21
**bates** 249:6,8
**bauer** 200:17
201:16,17,18,19
201:20,21,22
205:9 210:9,17

212:16 217:17
219:19 245:16
246:7 247:10
248:4,9 250:3,11
250:12 252:12,18
253:6,20,24
254:10,13 256:15
256:18 257:14,15
258:5,6
**bauer's** 204:18
209:23 234:16,19
**begged** 217:16,24
**beginning** 199:16
**behalf** 228:14
**beheaders** 255:14
255:22
**believe** 204:9
210:11 212:5
223:9 236:22
254:1 258:1,17
**best** 261:11
**better** 237:18
238:15
**big** 216:20 229:3
**billig** 213:3
**billig's** 203:20
**bit** 205:21
**blind** 257:20
**blogging** 229:24
230:1 231:6
232:12 233:1,2,8
**blogs** 230:3
**board** 211:10,13
217:20 218:1
246:8 259:12
**bob** 241:2
**bomb** 255:15,24
**bona** 244:7
**bonus** 238:23
**bonuses** 238:22
239:8

**bottom** 249:7
254:17 256:11
257:17
**break** 260:10
**bring** 223:19
**bringing** 232:16
**brooklyn** 254:6
**brought** 205:12
217:6 223:22,24
230:16 231:9,11
**bryn** 200:4
**bubbling** 204:22
204:23 205:2,7
**building** 243:16
**bunch** 254:14
**business** 216:17
216:18
**button** 260:2,4,6

**c**

**c** 200:1 261:1,1
**call** 224:15 226:13
226:19 260:17
**called** 256:18
**calls** 207:1 208:21
**canada** 250:23
**caption** 255:22
**care** 205:3,8,14,17
207:15 222:15,23
228:18,21,22
229:4
**career** 210:3
**caricature** 255:12
**cartoon** 255:12,17
**cartoons** 207:5
255:1,3,9
**case** 218:24 227:3
246:10,11,14
**catch** 228:7
**cause** 234:22
235:1

[cell - correct]

cell 232:18
certainly 210:24
  222:6 224:11
  225:13 226:1
  231:16 233:4
certification 203:3
certify 261:3
chairman 246:17
change 218:9
changeover
  259:17
check 215:20
cheryl 199:17
chuck 249:11
  250:11 252:14
  253:24 254:11
  258:5
circulated 205:11
  210:7
circulating 249:21
circumstances
  224:22
civil 199:3 202:17
claim 242:15
  243:11 244:8
claims 237:4
clarify 206:12
  210:23,24
class 226:3 228:14
clear 212:11
  229:22 237:22
clearly 206:5
  221:21 238:5
  240:18
client 204:1
  207:19 208:2,6
  209:14 211:12,19
  213:12 214:6,8
  219:18 223:8,21
  225:16 227:17
  230:13 235:3,22

236:2,15 237:2,11
  237:18 239:11,22
  240:2,15 243:22
  245:18 247:4,24
  248:4,5
client's 227:3
  241:23
clinton 254:21
  258:9
cloth 254:22
come 205:23
  211:10 222:21
  227:13 234:9
comes 249:10
  256:17
comment 237:7
committed 213:9
  228:18
committee 210:10
  210:13 211:6,7,8
  217:19 218:9,11
  218:12,13,15,17
  218:18,20 246:17
  247:16 248:9
common 246:18
communicated
  218:1 227:17
communications
  203:24
comp 240:2,4,10
  241:3,7 242:15
  244:2
company 228:15
  229:23 230:13,20
  230:21,24 231:4
  231:20 232:10,21
  234:1 244:11
compare 239:18
compared 238:24
compares 241:2

compensation
  202:10 239:8,23
  240:6 241:15
  242:3 243:11
  244:7,11
complain 208:1
  251:4,8
complained
  207:23 238:20
  251:7,10,20,23
complaint 217:5
  217:12,15 229:20
  235:10
complete 219:1
  241:22
completed 241:13
completely 213:21
  240:22 253:15
compliment
  209:12
computer 230:17
  231:20 232:10
  261:13
concludes 256:4
conduct 215:9
confidentiality
  216:24
conflict 234:13
conjunction
  218:15
connected 224:9
consensus 251:12
consider 228:8
  233:3,4
considered 227:4
  247:8
consultant 221:6
  240:7 258:20
contact 259:23
contain 216:17

content 205:19
  209:8 211:11
  212:2 213:17
  226:1 237:13
contest 252:19
context 214:11
  247:18,19
continue 213:5
  214:4
continued 199:13
  203:13 259:22
continues 219:8
continuing 203:16
  207:9 220:16
  237:2
contrast 239:11,18
  241:11,17
control 222:6,20
conversation
  203:22 214:12
  225:13 237:3
  243:22 246:24
conversations
  213:15
copied 254:9,18
  258:14
copies 217:6
correct 203:20,21
  204:4,18 207:6
  217:22 218:4
  222:12,13 224:5,6
  224:23,24 230:22
  243:11,12,16,17
  245:18,21,22
  248:1,2,14,16,19
  248:20,23 249:11
  249:16 250:20
  254:2,17,22 255:2
  257:17 258:7,9
  259:4 261:14

[correctly - employed]                                                        Page 4

correctly  229:17
  261:10
correlation  234:10
correspondence
  210:3
counsel  203:2
  218:15 247:23
  248:6,11 261:16
counseling  226:11
count  229:16,18
couple  203:18
  240:14
course  240:14
  248:10
court  199:1,15,20
  200:9 215:2 254:6
coworker  224:15
created  255:13,19
critical  227:4
  228:4,9,11,16,18
  229:6,9
cut  244:9 254:22
cv  199:9

d

d  200:3,3 201:1
  207:17
darn  240:3
date  212:17
dated  250:12
day  221:4 238:16
  243:14 244:22
  261:19
days  237:19,23
  238:16
deaf  257:20
dealt  247:3
december  237:11
  239:14 250:12
  261:19
decision  218:2,6,9
  247:24

defendant  218:22
  219:2 221:6
  235:12
defendants  199:9
  200:11
definitely  253:21
delete  231:15
  253:17 257:23
  260:2,4,5
deleted  251:12
deleting  230:18
  231:12
denied  219:4,6
  242:15 243:9
dennis  256:18
deny  224:21
deon  200:8 206:22
  207:1,8,20 208:21
  212:10,17,20
  213:6 214:23
  215:4,7 216:15,20
  216:23 217:7
  220:12 222:24
  223:14 235:23
  236:16,20,24
  239:12 242:21,24
  248:23 250:3
  256:22
departure  221:5
depend  246:9
depending  226:9
deponent  261:7,10
deposed  242:11
deposition  199:13
  202:1 203:17,20
  204:18 216:4
  224:3 234:17,19
  260:22 261:14
depositions  251:2
describe  237:20

description  201:8
  202:9
despite  241:18
detail  226:5 239:5
  252:8
determined  229:9
dhimmitude  258:3
dick  212:4 246:23
  250:12 252:18
  254:13 257:15
difference  229:3
different  220:4
  226:23
differentiate  239:8
difficult  206:8
direct  234:10
directed  209:24
direction  202:3
  211:12
directly  233:19,21
disagree  240:8
discipline  226:6,8
  227:1,5 228:5
discourage  230:5
discovery  260:18
discuss  217:18
  247:16 257:2
discussed  211:11
  257:5
discussion  204:22
  215:13 226:1
  250:6
discussions  205:2
  205:7
dismissal  225:14
  226:24
distinction  229:23
  233:9,11
distributed  223:8
district  199:1,1,20

document  246:1
  246:23 249:9
documents  202:8
doe  199:7
doing  256:7
dominated  235:15
doylestown
  199:16 200:9
drive  200:4
duly  203:10 261:7
dumb  257:20

e

e  200:1,1,15,15,17
  201:1,7 206:18,24
  207:5,11,17
  215:18,22 216:16
  225:6,6 245:7,14
  248:13,16 249:21
  251:5 257:12
  258:23 259:4,13
  259:21,23 260:1
  261:1,1
earlier  222:14
  228:11 253:6
early  243:20
easily  241:24,24
east  199:15 200:9
eastburn  199:15
  200:8
eastburngray.com
  200:10
eastern  199:1
efforts  209:5
eichmann  249:22
eighth  212:19,20
either  258:18
else's  235:2
employ  214:9
employed  213:5
  214:5 225:21
  241:14

employee 229:21 258:21
employees 212:22 215:23 222:20 226:3,4 230:3,5 251:17 252:2 259:2,11
employment 209:15 213:23 235:12
ended 240:17 257:12
enlighten 242:5,6 242:7
entire 205:13 211:6
esquire 200:3,8
et 250:13 257:16
event 257:10
everybody 206:7 212:2 237:22 240:15 241:7 251:12
exactly 205:21 209:14 247:11
exaggerated 211:18
exaggerating 237:3
examination 203:13
examined 203:10 210:1
example 221:4 228:3
examples 228:6,10
exchange 213:19
excused 260:21
executive 210:10 210:13 211:6,7,8 218:18 247:9,15

exhibit 212:13,15 249:3
exhibits 201:9,11
explain 206:4,9
explaining 217:2
expressed 236:10
expression 230:6
extent 213:7
extort 214:14
extorting 212:23
extortion 213:8,10
extra 217:6
extremely 205:18 205:18

**f**

f 261:1
fabrication 241:4
facebook 213:20 221:8,13 234:17 234:23 235:2
faces 228:13
facility 213:13
fact 223:11 243:13 244:3 257:6
facts 218:10
faha 258:19 259:3
false 211:18
familiar 243:7
famous 252:18
fan 223:12
far 213:22 242:2 254:17
farther 241:5
fashion 221:21 243:23
favorite 210:2
fay 259:6
february 249:13 254:1 257:15
federal 202:17

feel 227:21,23 228:2 238:23
felt 212:23 219:22
fide 244:7
file 242:16 243:10 244:8,10
filing 203:4
filtered 211:4
final 218:2,6 226:20
finally 238:17
finance 241:14
find 209:4,6 216:12 260:6
fine 216:22 239:7 247:1 256:7
finger 244:9
finished 260:16
fire 212:22 215:10 247:24
fired 221:7 224:17 225:17 227:22
firing 227:14 246:4 248:5
first 217:8 242:11 245:4 254:5
five 249:7
flames 223:12
folks 222:14
following 243:20
follows 203:11
fond 227:20
forgive 252:23
form 203:5
forth 207:6 229:21 252:18
forty 235:11
forward 239:16
forwarded 215:21 252:4

frame 239:12 253:14
frankly 211:16
free 250:23
frequency 253:11
frequent 253:14 253:16
friday 226:13 250:12
friend 257:8,9
friendly 238:6
front 243:22 249:4
full 211:10 217:20 229:8
further 219:6 250:22

**g**

g 207:17 225:6
garvin 199:7,14 201:3 203:9,16 217:17 218:1,22 219:2,5,6 221:6 235:12,17 243:9 248:15 252:17
gdeon 200:10
general 251:12
generally 238:6
genveer 225:3
getting 220:20 238:23 256:13
gist 238:19
give 213:4 214:3 248:13 253:18
given 261:15
giving 239:5
glad 217:6
gmail.com 200:5
go 206:3 207:13 211:24 216:1 217:5,13 218:21 229:11 240:24

242:23 244:15
247:21 249:3
250:22 254:10,24
**going** 214:18
216:21 221:3
231:19,21 232:2,4
232:5 234:9
240:24 243:5
247:21
**goldfarb** 199:17
**good** 206:15
207:22 217:14
246:1 261:4
**google** 234:7
**grace** 200:8
248:15 250:2
**gray** 199:15 200:8
**great** 209:17 228:3
**group** 248:8
258:17
**guenveur** 224:16
225:1,2
**guess** 213:17
214:16 255:5,9
**guessing** 253:15

### h

**h** 201:7
**half** 237:19
**hallway** 238:1
**hand** 229:24 233:2
235:15 261:18
**handbook** 229:22
**handled** 211:1
**happen** 223:21
**happened** 237:15
237:17 259:18
**hard** 206:2,4
236:11
**head** 207:15 216:1
**headed** 223:7

**health** 228:18,20
228:21
**heard** 217:24
237:6
**heights** 199:6
228:7 229:21
230:2 233:20,22
234:7,10 258:21
258:23
**held** 215:14 250:7
**help** 244:23
**henchman** 249:22
**hiel** 236:14 237:4
**high** 229:16,18
**hillary** 258:8
**hiring** 255:14,24
**history** 208:5,10
208:13
**hit** 253:17 260:2,4
260:5
**hitler's** 249:22
**holding** 254:6
**home** 228:22
229:4 232:5
**honestly** 211:23
245:3
**hope** 207:13
**hopefully** 203:17
**hospital** 244:16
**hours** 203:18
**housekeeper**
227:19 229:1,2,4,5
**hr** 204:8 218:13
247:3
**human** 204:10
206:10 217:19
218:14,16,19
234:8,8 238:21
246:12,17 247:15
248:8

### i

**idea** 206:19
208:24 224:10
225:9 245:23
246:20
**imagine** 206:20
**immediately**
230:17
**inaccuracy** 210:22
**inaccurate** 211:18
**inappropriate**
221:8,12,16
246:15
**incident** 244:18,24
**included** 247:23
**including** 221:20
240:15
**index** 202:1
**indicated** 261:7
**information** 214:3
223:8
**infraction** 226:9
**initial** 209:24
**injury** 244:5
**insist** 219:9
**insisted** 214:2
**instance** 227:8
**instructed** 232:3
**instructing** 215:6
**interacted** 208:16
**interchangeably**
233:14
**interest** 209:17
234:14
**interested** 210:14
261:17
**interpreted**
222:19
**interrogatories**
216:8

**investigate** 214:18
**investigated**
218:11
**investigation**
215:10 229:8
**involved** 213:14
218:16
**irrelevant** 209:10
**isis** 255:14,22
**issue** 221:14
**issues** 208:4,9
246:6

### j

**jane** 199:7
**janet** 216:16
234:18,20
**job** 217:17,24
235:19 236:5
238:20
**jobs** 255:13,19
**john** 199:7
**joking** 243:23
**jumped** 210:21
**june** 254:11
**jungclaus** 199:3
200:16 202:12
234:9 251:4
**jungclaus's** 250:19
**justification** 219:8
**justifying** 239:19

### k

**kathleen** 199:3
200:16
**kathy** 202:12
205:10 219:22
220:6 225:14
234:9 240:7
**keep** 240:24
**kept** 208:12 247:3
248:7

[kin - mill]

kin 261:16
kind 220:22
  257:23
knock 253:4
know 205:6 206:5
  208:3 209:11,11
  210:24 211:19
  213:13 214:10,13
  218:10,16 221:4
  222:16,19 223:3
  223:11,17 224:3,8
  225:20,24 227:9
  227:15,18,21
  228:12 232:19,21
  233:15 237:20,21
  238:6,13,17,18
  239:2 240:11
  241:1,3,6,7 244:1
  244:17,19 246:10
  246:18,22 247:17
  248:7,10 251:24
  253:1,13 257:11
  258:2 259:5,8,14
  259:17,21,22
knowledge 232:13
  247:2
knows 211:20
  214:15 215:2
  240:3 241:24
koran 254:6

l

l 199:17 200:15
lady 223:7
laid 209:16
language 220:23
  236:7
late 226:10,12
laundry 227:10
law 199:14 200:3
lawsuit 245:1

lawyer 204:3
  213:7
leadership 225:16
  225:19
learn 204:14 225:7
  243:18
learned 221:5
  224:16
left 225:11
legal 199:22
length 208:13
lengthy 230:12,12
  251:13
letter 204:15
  205:24 208:20
  209:1,5,8,9,12,16
  210:1,4,7 211:1,11
  211:17 212:2,12
  212:18 217:1,2
  224:1
level 202:10 224:7
  226:5,9 235:14
  238:22 240:9
  252:7
levels 227:2 242:3
lie 241:22
lies 252:19
life 220:13
light 260:17
liked 211:14
line 202:4,4,9,16
  202:21 254:16
  257:16
list 249:18
literally 253:16
little 205:21
long 208:10
  236:12
longer 221:23
  225:20 231:17

look 207:10 212:9
  216:5 228:17
  229:5 234:22
  235:1 238:9
  241:10 243:4,24
  258:13 259:9
looked 212:11
  244:20
looks 254:18 255:6
  255:7,8
lot 216:17 240:1,8
lying 237:7

m

m 199:3 200:8
machine 261:10
mail 206:18
  215:22 251:5
  258:23 259:4,13
  259:21,23
mails 206:24
  207:5,11 215:18
  216:16 245:7,14
  248:13,16 249:21
  257:12 260:1
maintenance
  213:12
makers 255:15
  256:1
male 235:15
  241:13
malicious 221:21
man 213:12
management
  235:14
managers 240:9
marc 236:14 237:4
mark 200:3,3
marked 201:8,11
  202:20 217:8
market 199:23
  241:16,18

markschwartz68...
  200:5
matter 227:10
  230:18 239:4
  244:6
matters 247:17
mawr 200:4
mean 218:6,7
  223:3 239:14
  244:6 253:21
meaning 226:13
means 259:3
meant 213:18,18
  240:19
media 224:18
  225:17 229:22
  230:7 232:11
meet 204:3,8
  224:11 225:15
meeting 211:7,10
  218:22 219:19
  237:10,14,15,17
  245:17 246:2
  247:3 248:3
meetings 247:23
meg 224:15
  225:10
member 210:9
  211:14 248:10
members 211:8
  259:12
mentioned 204:21
  205:3 222:14
  241:8 257:5
messages 213:20
messrs 217:17
met 204:12 225:19
  237:11 257:11
mid 199:23
mill 225:10

[minutes - peggy]                                                      Page 8

**minutes** 230:19
231:10 232:16
247:2,7,13,16
**misinformation**
221:19
**mission** 240:13
**mistake** 260:6
**mixed** 205:21
**monday** 199:11
226:14
**money** 212:23
214:2,15,22
**mopey** 238:7
**mopiness** 237:20
**moping** 237:23
**mother** 257:2
**mother's** 250:17
**multiple** 226:19
228:10
**municipal** 254:6
**muslim** 254:5

**n**

**n** 200:1,15 201:1
225:6
**name** 207:16
233:24 234:6
249:17 250:15,16
250:17,19,21
254:3
**named** 249:9
**names** 259:10,11
**nature** 251:6
**necessarily** 227:21
233:7
**need** 246:23
**needed** 240:9
**neither** 261:16
**networking** 230:4
**never** 209:22
219:5,13,15,16,21
242:10 244:2

251:7 257:5
259:19
**new** 204:14 229:12
229:14,15 231:23
260:18
**newspapers** 255:4
255:9 256:3
**nine** 224:13
235:11
**non** 232:21
**notary** 199:18
261:4,23
**notes** 239:3 245:17
245:20,23 246:21
**notice** 226:14
261:6
**notwithstanding**
235:16
**november** 199:11
212:13,18
**number** 201:8,12
221:11 226:11
249:6,8
**numbers** 199:7
240:18
**nurse** 244:15

**o**

**o** 200:15 207:17
**obama** 207:5
255:1,12 256:6
**obamacare** 250:24
**objection** 206:22
207:8,20 208:21
213:6 214:23
215:4 222:24
223:14 235:23
236:16,20
**objections** 203:5
**occasion** 212:24
**occur** 227:14

**october** 224:14
**offense** 227:2,3,4
228:4,9,12,19
229:7,10
**offenses** 228:16
**offered** 211:13
**office** 200:3 211:2
**offices** 199:14
205:17
**official** 221:24
222:12 261:18
**oh** 210:5 220:15
225:5 260:6
**okay** 212:3 214:21
214:22 215:3,10
218:21 219:24
222:5 225:5
226:17 228:1
229:3,15 231:5
233:6 238:12,14
242:2 247:1,18
249:1 252:11,13
255:11 257:14
**old** 220:20 229:13
235:20 236:6
**once** 219:21 253:7
253:20
**opinion** 208:19,24
213:14 214:14
**opportunity**
206:17 209:4
**opposed** 229:12
233:8
**options** 226:24
**oral** 199:13 226:11
**order** 205:20
**outcome** 261:17
**outgoing** 238:6
**outside** 221:6
234:1 248:11

**overseas** 255:3,4
256:3
**owned** 229:23
230:13,17,20,21
230:24 231:4

**p**

**p** 199:7,14 200:1,1
200:15 201:3
203:9
**p.m.** 199:17
245:11,11 260:13
260:13,23
**page** 201:4,12
202:4,4,9,16,21
234:17,23 235:2,9
254:4 257:24
258:2,8
**pannha** 215:24
**papers** 256:2
**paragraph** 217:11
217:15 221:2
229:20 235:9,10
237:10 241:11
243:4
**part** 237:19
238:15 241:23,23
**particular** 246:14
**party** 261:16
**passed** 221:19
222:9 252:1
**pattern** 226:12,20
**patty** 207:16
**pause** 213:4 214:4
**pay** 237:12 239:19
248:18
**payment** 214:2
**pc** 199:15 200:8
**peers** 240:4,20,21
246:16
**peggy** 258:19
259:3,6

**pennsylvania**
199:1,16,24 200:4
200:9
**people** 204:22
212:24 220:19
251:11,19 254:14
**percent** 211:18
234:2 241:16,17
**performance**
239:10 241:12
**period** 226:14
259:15
**person** 219:22
224:4,12 246:10
**personal** 230:1
232:13 238:9
259:23
**personality** 238:5
**personnel** 247:17
**ph** 225:4 259:6
**philadelphia**
199:24 234:1
**phone** 232:18
**phrase** 220:4
**picked** 235:15
**pieces** 210:2
**pile** 248:13
**place** 261:6
**plaintiff** 199:4
200:6 217:16,23
218:23 219:3,8
221:5 224:14,17
235:18 243:10
244:14
**plaintiff's** 241:11
241:17
**point** 235:17
240:15
**policies** 255:13,18
**policy** 224:18
225:18 229:22

230:7,12
**political** 251:6
253:2
**polled** 226:4 234:1
**position** 206:8
**positioning** 211:12
**post** 221:8,13,16
**practice** 246:1
**prager** 256:19
**prak** 215:24
**premises** 244:15
**present** 204:6
243:14
**president** 204:10
206:9 233:24
238:21 244:1
246:11
**presidential**
252:18
**press** 250:23
**pressed** 238:3,8
**pretty** 205:13
208:8 211:17
230:11
**previous** 224:15
**previously** 201:11
**privy** 205:22
**probably** 227:17
232:23 246:5
**procedure** 202:17
**proceedings** 215:3
249:19
**process** 238:21
**produce** 242:2
**produced** 203:23
216:13
**production** 202:8
**professional**
199:18 238:10,14
**progresses** 226:15
226:20

**progressive** 226:6
226:8 227:1,5
228:5
**pronounced** 225:3
**property** 230:20
230:21 231:4
**protected** 228:14
**proved** 219:1
**proven** 241:24
**provided** 215:17
**public** 199:19
261:4,23
**published** 232:21
**publishing** 230:5
**pull** 240:18 245:6
**pursuant** 202:17
261:6
**put** 206:8 221:23
222:11 231:1
232:7,20 253:14

**q**

**question** 203:6
211:22 212:8
214:24 219:24
220:2 221:10
223:1 230:23
231:3,22,23 232:1
232:8 242:10
**questioned** 201:4
**questions** 202:20
**quicker** 239:23
243:2
**quickly** 221:3
232:4
**quite** 211:16

**r**

**r** 200:1,15 207:17
207:17 225:6
261:1

**racist** 218:24
219:14,17,20,23
220:7,10
**raises** 237:12
240:20
**ran** 225:12
**range** 241:8
**rapport** 207:22
**ratio** 239:9,23
240:5,10 241:3,7
241:15,17
**ratios** 240:2
**reaction** 206:21
**read** 211:7,15,15
222:18 243:5,6
251:17
**reading** 203:3
210:14 250:23
251:14
**reads** 217:16
235:11
**ready** 238:18
**really** 207:13
208:11 209:17
214:7,13 216:14
229:6 235:19
236:5 246:10
256:6 259:19
**reason** 213:14
236:21 244:4
259:9
**reasonable** 240:10
**recall** 213:2
220:16 225:24
227:15 229:16
237:10 239:5
242:18,24 243:19
245:4 260:8
**receive** 260:18
**received** 210:17
211:1,2 224:14

237:12 239:9
**receiving** 251:5
**recess** 245:10
 260:12
**recipient** 249:15
 249:18 251:23
**recipients** 215:22
 252:1
**recollection** 212:5
 242:17 254:7
 256:12,20 257:19
 257:22 258:11
**reconsider** 217:18
**record** 212:10
 215:9,11,14 239:4
 245:8 250:4,7
 261:14
**recorded** 261:10
**records** 202:10
 242:2
**referring** 205:10
**refused** 217:21
 244:15
**regardless** 236:12
**region** 199:23
**registered** 199:18
**related** 208:10
 229:24 233:1,2,3,5
 233:18 244:5
 260:3,7
**relationship**
 213:11
**remember** 204:24
 205:4 210:1,4,6
 212:6,8 227:7,11
 227:12 243:3
 245:1 247:11
 248:17 249:20,23
 252:20 253:9,10
 253:11

**removed** 235:13
**replaced** 235:14
**report** 244:2,3,4
 244:10,18 245:1
**reporter** 199:18
 199:19
**represent** 216:15
**represented**
 233:23
**representing**
 200:6,11 228:14
**request** 202:8
 217:20
**requested** 215:18
 216:7
**require** 228:5
**resemble** 224:8
**reserve** 260:16
**reserved** 203:6
**residents** 221:20
**resolved** 216:19
**resource** 234:8
**resources** 204:11
 206:10 217:19
 218:14,17,19
 234:8 238:21
 246:12,17 247:15
 248:9
**respect** 202:11
 205:7 227:9
 234:17 245:17
 246:4
**respective** 242:4
**respects** 230:2
**response** 218:5
 243:8
**restaurant** 225:12
**result** 231:16
**review** 217:1
**reviews** 241:12

**richard** 200:17
**rid** 220:20
**right** 204:20 211:3
 212:7 216:9 217:4
 217:14 220:3
 226:22 231:7
 233:17 234:18
 240:22 241:6
 244:8,21 248:12
 250:17 251:21
 253:24 254:10,11
 254:14,17 255:20
 255:23 256:15
 258:5 259:12
 260:17
**rights** 230:2
**robert** 202:11
 241:14 252:17
**rodgers** 207:16
 208:1,7,15,20
**room** 204:11
**rules** 202:17
**rumor** 225:10
**rumors** 222:7

**s**

**s** 200:1,15,15
 201:7 207:17
**sagging** 238:7
**sales** 258:20
**sandcastle** 200:4
**sat** 203:19 207:4
 209:23 224:2
 234:16,18
**saw** 207:4,5
 218:11,12 223:5
 231:16 245:4
**saying** 234:3,5
 256:4
**says** 224:19
 230:11 243:9
 250:22 254:23

255:13,14,16,17
 255:18,22,24
 256:1,9,10 257:20
 259:3
**schwartz** 200:3,3
 201:5 203:15
 207:3,12,21 209:2
 212:7,15,19,21
 215:1,5,8,16
 216:18,22 217:4
 217:10 220:14,17
 223:2,16 236:1,3
 236:18 237:1,5
 239:13,15,17
 242:9,13,22 243:1
 245:6,13 249:1,2
 250:1,4,9,10
 256:23 260:9,15
**seal** 261:19
**sealing** 203:3
**search** 216:2,11
 234:7 252:4,7
**second** 216:7
 221:2 253:18
 254:16 257:16
 258:8
**see** 206:18 213:23
 215:21 217:12
 223:20 231:13
 244:24 249:17
 250:15,16,17,21
 251:1 252:4 254:3
 255:3 256:16
 260:1
**seeing** 254:8
 256:21 258:12
**seen** 206:23
 211:14 222:15
 255:7
**sees** 256:6

[segregated - team]

**segregated** 226:3
**self** 230:5,6
**senior** 225:15,19
  235:14 238:22
  240:9 241:13
**sense** 246:18
**sent** 226:2 249:13
**sentence** 221:3,18
**separated** 206:7
**serious** 246:6
**seriousness** 227:2
**service** 241:19
**session** 247:9,15
**set** 216:7 229:21
**share** 208:5 211:5
  211:21
**shared** 211:22
  212:1
**sheets** 229:11,12
  229:13,14,15,16
  229:18
**short** 259:14
**shorthand** 261:11
**show** 221:11 259:1
**sic** 237:21
**sign** 234:13
**signature** 261:22
**significant** 226:19
  240:19
**signing** 203:3
**similar** 220:24
  236:9
**simple** 234:7
**single** 219:22
**sit** 204:13 210:20
  213:16 214:16
**sites** 230:4
**sitting** 207:9 209:3
**situation** 217:19
  241:12

**small** 248:8
**social** 224:18
  225:17 229:22
  230:3,7 232:11
  257:9
**sole** 259:9
**soltis** 206:18
  215:18 217:2
  245:7,15 249:11
  250:11 251:5
  252:14,23,24
  254:1,11 257:14
  258:6 260:1
**solutions** 199:22
**somebody** 214:22
  226:10
**somewhat** 209:9
  253:14
**soros** 249:21
**sorry** 206:3 234:8
  259:7
**sort** 243:23
**speak** 239:3
**speaking** 212:12
  239:13,20
**speaks** 209:8
  230:10 231:24
**specific** 227:7
**specifically** 227:16
  237:24 239:20
**specifics** 222:1,3
  222:10 248:22
**speculation** 207:2
  208:22
**spell** 237:21
**spend** 240:1
**spent** 237:18
**staff** 205:16 206:5
  234:3 238:22
**standing** 261:4

**start** 226:10,14
**started** 235:12
  245:2 259:19
**state** 237:20 238:7
**stated** 217:22
**statement** 219:5,7
  220:18 221:22,24
  222:12 234:14
  235:21
**states** 199:1,20
  255:8
**stating** 230:1
**status** 213:23
**stayed** 225:11
**stealing** 227:22
  228:3,8,13 229:10
**step** 226:11
**stipulated** 203:1
**stipulations**
  202:15
**street** 199:15,23
  200:9
**strike** 242:10
**stuff** 216:18
  251:18 253:2
  257:23
**style** 209:21
  223:10
**subject** 254:20
**subsequently**
  211:5
**success** 217:16
  250:24
**suffered** 243:14
**suggestion** 213:9
**suite** 199:23
**summary** 239:6
**summers** 201:15
  208:16 224:2
  227:8,13 228:23
  249:5,10

**sunday** 257:15
**supervision**
  261:12
**supper** 202:12
  239:9,21,24 241:2
  241:14 252:17
  254:2
**supplied** 245:21
**supply** 222:1
**support** 202:1
**sure** 209:13
  246:13 247:6
  259:5
**sworn** 203:10
  261:8
**systematically**
  235:13

**t**

**t** 200:15 201:7
  261:1,1
**table** 207:10
**take** 206:10 209:4
  228:12 230:22
  231:19 232:2,3,4,6
  240:23 243:4
  245:23 246:2,21
  260:9
**taken** 199:14
  245:10 247:7
  260:12 261:5
**talk** 222:20 238:2
  240:7 242:14,20
  248:4,21
**talked** 234:19
  242:18 248:15
**talking** 218:13
  228:24 240:2
  243:24 251:16
  253:20 259:2
**team** 205:14
  225:16,20 235:15

236:11
**telephone**  224:15
**tell**  219:2 225:16
  235:17 236:14
  238:11,18 239:21
  240:10 261:8
**tend**  246:5 251:13
**term**  219:16 220:9
  220:10
**terminated**  205:11
  205:12 209:15
  228:9 235:17
**termination**
  219:19
**testified**  203:11
  227:8 245:16
  247:10,12,20,22
  253:6
**testimony**  209:24
  210:6,15,22
  219:12 234:19
  248:17 253:9
  259:24 261:5,9,15
**tg**  201:13,14 217:8
  217:9
**thank**  260:19
**thanks**  249:1
**theft**  227:10
**thereof**  261:17
**thing**  206:11 208:8
  211:13
**things**  216:17
  228:16 248:18
  253:12
**think**  216:7
  218:23 219:14,16
  219:20 220:6,19
  221:10 222:14
  223:6 233:11
  234:11,15 239:4
  240:16 243:21

245:24 246:15,22
  252:3,9 256:7
  259:8 260:15
**thomas**  199:7,14
  201:3 203:9
  252:17
**thompson**  216:16
  234:18,20
**thorough**  216:1,1
**thought**  245:24
  253:18
**three**  241:14
**tiara**  258:9
**tie**  234:6
**tied**  233:19,21
**time**  203:6 207:24
  207:24 208:17,17
  211:17 214:20,22
  220:12,14 224:22
  225:12 226:15
  235:16 236:1
  239:12,16,22
  240:1 242:11,21
  245:5 249:20
  251:14,17 253:1
  253:14 259:15
  260:16,19 261:6
**timers**  220:20
  235:20 236:6
**times**  226:19
**timing**  216:6
**today**  204:13
  253:7
**told**  208:3 218:22
  221:7 242:16
  243:10 244:3
**touch**  225:11
**touched**  237:9
**transcribed**
  261:12

**transcript**  203:24
**transcription**
  261:13
**trial**  203:7
**tried**  223:12
  244:23
**true**  210:16
  261:14
**trump**  234:4
**trust**  208:4,9
  256:18
**trustee**  210:14
**trustees**  217:20
  218:1
**truth**  241:5 242:8
  261:8,8,9
**try**  206:9 213:17
  227:14
**trying**  214:14
  243:19
**tune**  233:7
**turn**  217:11 252:5
  252:6,9,11
**tweet**  205:15,19
  222:15,18,19,22
  223:13 226:2
  230:14 232:22
  233:3,18
**tweeted**  226:4
**tweeting**  228:13
  233:8
**tweets**  235:2
**twenty**  224:13
**twitter**  221:14,16
  230:18 231:12,19
  232:11
**two**  208:4,9
  213:22 214:12
  217:13 237:19
  238:16

| u |
|---|
| **u**  225:6,6 |
| **u.s.**  256:7 |
| **understand**  230:8 |
|   232:9 |
| **understanding** |
|   248:24 |
| **unfortunately** |
|   218:8 254:20 |
| **united**  199:1,19 |
|   255:8 |
| **unspoken**  250:24 |
| **upset**  205:18 |
|   227:18 |
| **usa**  256:2 |
| **use**  213:8 220:9,23 |
|   230:3,13,20,24 |
|   231:1,4,20 232:10 |
|   236:8 240:6 |
|   259:20,22 |

| v |
|---|
| **v**  199:5 225:6 |
| **value**  241:16,18 |
| **values**  209:21 |
| **vanishing**  213:19 |
| **variance**  219:1 |
| **veritext**  199:22 |
| **vice**  204:10 206:9 |
|   233:24 238:20 |
|   244:1 246:11 |
| **videotape**  229:10 |
| **violating**  224:17 |
|   225:17 |
| **virtually**  247:22 |
| **voting**  234:4 |
| **vp**  241:13 |

| w |
|---|
| **wait**  232:5 |
| **waiting**  242:11 |

[waived - years]                                                    Page 13

| | | |
|---|---|---|
| **waived** 203:4 | **woman** 254:5 | 246:16 247:8 |
| **want** 214:17 | **word** 205:11 213:8 | 251:19 253:23 |
| 218:23 219:13 | **words** 233:13 | **years** 239:10 |
| 220:6,19 230:4 | **work** 205:16 | 240:14 241:15,18 |
| 238:2 242:9 253:2 | 208:11 226:10,12 | |
| **wanted** 214:15 | 229:24 230:17 | |
| 223:20 255:14,22 | 231:19 233:1,2,3,5 | |
| 259:20 | 233:18 236:11 | |
| **warning** 226:16 | 244:5,10 260:3,7 | |
| 226:21 | **worked** 222:1 | |
| **waverly** 199:6 | 235:5 236:12 | |
| 205:3,7,14,17 | **worker** 227:9 | |
| 207:15 213:5,24 | 228:18,21,22 | |
| 215:22 221:20,23 | 229:4 | |
| 222:2,2,15,23 | **workers** 239:1 | |
| 224:9,9 228:7 | 242:15 243:10 | |
| 229:21 230:2 | 244:2,7,11 | |
| 233:19,22 234:7 | **world** 255:10 | |
| 234:10 235:5,13 | 256:5 | |
| 239:22 249:8 | **worried** 238:4 | |
| 251:14,16,18 | **worry** 235:18 | |
| 252:2 258:21,22 | 236:5 | |
| 259:4,11,13 | **worth** 250:23 | |
| **waverly's** 224:17 | **write** 209:19 | |
| **way** 210:13 211:21 | 224:10 230:3 | |
| 219:5 220:4 | **writer** 224:5 | |
| 222:18 259:1 | **writing** 209:13 | |
| **we've** 234:11,11 | 230:10 | |
| 237:9 | **written** 204:14 | |
| **week** 243:20 253:8 | 226:15,20 | |
| 253:20 | **wrong** 238:1,18 | |
| **went** 205:22 | 247:13 248:14 | |
| 216:10 222:16 | **wrote** 208:20 | |
| 232:15 237:16 | 209:1,5,9,12,16 | |
| 238:7,15 244:23 | | |
| 246:2 | **x** | |
| **witness** 200:11 | **x** 201:1,7 | |
| 201:3 202:3 | **y** | |
| 220:15 236:23 | | |
| 242:20 246:8 | **yeah** 213:11 | |
| 260:21 261:15,18 | 228:15 230:23 | |
| | 234:15 245:3 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Appendix 1212

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.