## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                                   |     |                        |
|-----------------------------------|-----|------------------------|
| KATHLEEN M. JUNGCLAUS,            | :   |                        |
|                                   | :   |                        |
| Plaintiff                         | :   | NO.   17-cv-04462-RK   |
| v.                                | :   |                        |
|                                   | :   |                        |
| WAVERLY HEIGHTS, LTD.,            | :   | Jury Trial Demanded    |
|                                   | :   |                        |
| Defendant                         | :   |                        |

## TABLE OF CONTENTS OF APPENDIX FOR DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT – VOL. VII

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. I** | |
| Appendix 1 – 90 | Waverly's Employee Handbook, 2014 |
| Appendix 91 – 93 | List of Waverly's Board of Trustees, 2015 |
| Appendix 94 – 96 | List of Waverly's Board of Trustees, 2016 |
| Appendix 97 | Waverly's EEO-1, 2015 |
| Appendix 98 | Waverly's EEO-1, 2016 |
| Appendix 99 | Waverly's Non-Discrimination Policy, 2011 |
| Appendix 100 | Waverly's Open Door Policy |
| Appendix 101 – 102 | Waverly's Problem-Solving/Grievances Policy, 2011 |
| Appendix 103 | Waverly's Sexual Harassment Policy, 2014 |
| Appendix 104 | Waverly's Civil Rights Compliance – Employee Awareness, 1997 |
| Appendix 105 – 107 | Social Media Policy, 2014 |
| Appendix 108 | Chart Showing Demographic Information Regarding Waverly's Senior Leadership Team as of 09/16 |
| Appendix 109 – 110 | Waverly's letter to Kathleen Jungclaus dated 3/26/1997 offering her employment |
| Appendix 111 – 112 | Resume of Kathleen Jungclaus 1997 – 09/16 |
| Appendix 113 – 114 | Resume of Kathleen Jungclaus 09/16 – Present |
| Appendix 115 – 117 | 1995 Job Profile of Plaintiff |
| Appendix 118 – 121 | Plaintiff's Job Profile (Job Description), 2005 |
| Appendix 122 – 128 | Silver Chair Learning Certificates Courses taken by Plaintiff covering Diversity and Sexual Harassment 2011 – 2016 |
| Appendix 129 – 136 | Class Completion Certificates for Nursing Home Administration Course 2013-2014 |
| Appendix 137 – 226 | Performance Evaluations of Plaintiff 1998 – 2015 |

1

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 227 – 264 | Recommendations for Salary Increases from Mr. Wozniak 12/8/10-11/2/15 |
| Appendix 265 – 266 | Graph of Plaintiff's Salary History 2005 – 2016 |
| Appendix 267 | Chart showing Plaintiff's Salary History 2010 – 2016 |
| Appendix 268 | Chart of Compensation of Senior Team for 2015 |
| Appendix 269 | Chart of Compensation of Senior Team for 2016 |
| Appendix 270 – 272 | Anonymous Letter dated 09/14/16 |
| Appendix 273 – 279 | Tweet dated 7/24/16 and screenshot showing link from Waverly to Jungclaus Twitter Page |
| Appendix 280 – 281 | Chart showing Termination of Employees without Progressive Discipline 2010-2016 |
| Appendix 282 – 289 | Emails between Mr. Garvin, Mr. Bauer and Board Committee Members regarding Employment Issue, 09/22/16 – 09/26/16 |
| Appendix 290 – 293 | Plaintiff's Unemployment Compensation Application dated 10/02/16 |
| Appendix 294 – 297 | Notice of Unemployment Application dated 10/06/16 and Waverly's Response to Unemployment Claim dated 10/11/16 |
| Appendix 298 – 300 | Interview of Plaintiff by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 301 – 305 | Interview of Mr. Garvin by Unemployment Compensation Staff Member on 10/18/16 |
| Appendix 306 – 308 | Approval of Plaintiff for Unemployment Compensation dated 10/25/16 |
| Appendix 309 – 310 | Waverly's Appeal from Granting of Unemployment dated 10/31/16 |
| Appendix 311 – 326 | Letter from Mark Schwartz, Esquire to Waverly dated 11/08/16 |
| Appendix 327 – 354 | Transcript of Unemployment Compensation Hearing dated 11/28/16 |
| Appendix 355 – 361 | Decision of Unemployment Compensation Referee dated 11/29/16 |
| Appendix 362 | EEOC Complaint dated 12/13/16 |
| Appendix 363 | EEOC Notice of Charge dated 01/05/17 |
| Appendix 364 – 368 | Email from Raymond Jungclaus to Plaintiff dated 10/09/08 – Food for Thought (Why not voting for Obama) Raymond Jungclaus suggests that Plaintiff post this on her Facebook page |
| Appendix 369 – 375 | Email from Raymond Jungclaus to Plaintiff dated 04/07/11- re: Obama's Classmate Speaks out |
| Appendix 376 – 377 | Emails between Plaintiff and Raymond Jungclaus dated 06/28/12 re Health Care Bill being upheld |
| Appendix 378 – 381 | Email from Raymond Jungclaus to Plaintiff dated 10/18/12 – Why Mitt Romney is Unlikeable |

| BATES NUMBER | DOCUMENT |
|---|---|
| **VOL. II** | |
| Appendix 382 – 383 | Emails between Plaintiff and her husband, Raymond Jungclaus dated 08/19/13 re making up story that she has doctor's appointment so she can leave early |
| Appendix 384 – 388 | Emails between Plaintiff and Marc Heil dated 08/26/13 re: Discipline of employee for violation of social media policy and reference to contact with Debbie Sandler, Esq. |
| Appendix 389 | Email from Plaintiff to Raymond Jungclaus – dated 08/30/13 – her reaction to Garvin email regarding a discussion about her NHA license |
| Appendix 390 – 391 | Email from Raymond Jungclaus to Plaintiff dated 10/24/13 re:  If you can't fix it with a hammer – political comment |
| Appendix 392 – 394 | Email from Gregory Gangi to Plaintiff dated 10/24/13 – "How pathetic are those of you who still love the Obama (intentional small case) man" |
| Appendix 395 – 406 | Email from Raymond Jungclaus to Plaintiff dated 12/19/13 – Problem with Public Housing – criticizing Obama for putting feet on furniture |
| Appendix 407 | Email dated 08/18/14 from Plaintiff to R. Supper asking for recommendation |
| | |
| **VOL, III** | |
| Appendix 408 – 567 | Emails from Mr. Soltis on which Plaintiff was copied 2011 – 2016 |
| Appendix 568 – 598 | First Amended Complaint |
| Appendix 598 – 603 | Plaintiff's Initial Disclosure under F.R.C.P.26 |
| Appendix 604 – 605 | Plaintiff's Supplemental Disclosure under F.R.C.P.26 |
| Appendix 606 – 621 | Plaintiff's Answers to Interrogatories |
| | |
| **VOL. IV** | |
| Appendix 622 – 690 | Deposition of Plaintiff, Kathleen Jungclaus, Day 1, 11/01/18 |
| Appendix 691 – 817 | Deposition of Plaintiff, Kathleen Jungclaus, Day 2, 11/02/18 |
| | |
| **VOL. V** | |
| Appendix 818 – 860 | Deposition of Raymond Jungclaus, 11/01/18 |
| Appendix 861 – 911 | Deposition of Anita Summers, 11/26/18 |
| Appendix 912 – 1039 | Deposition of Richard Bauer, 11/26/18 |
| | |
| **VOL. VI** | |
| Appendix 1040 – 1171 | Deposition of Thomas Garvin, Day 1, 11/02/18 |
| Appendix 1172 – 1213 | Deposition of Thomas Garvin, Day 2, 11/26/18 |

| BATES NUMBER | DOCUMENT |
| --- | --- |
| **VOL. VII** | |
| Appendix 1214 – 1218 | Bing Search of Kathleen Jungclaus, 07/30/19 |
| Appendix 1219 | Affidavit of Carolyn Baysmore |
| Appendix 1220 – 1221 | Affidavit of Debra Best |
| Appendix 1222 – 1229 | Affidavit of Amy Blessing |
| Appendix 1230 – 1231 | Affidavit of Margaret Carpenter |
| Appendix 1232 – 1235 | Affidavit of Constance Dogan |
| Appendix 1236 – 1239 | Affidavit of Meredith Feher |
| Appendix 1240 – 1241 | Resume of Meredith Feher |
| Appendix 1242 – 1251 | Affidavit of Thomas Garvin |
| Appendix 1252 – 1253 | Resume of Thomas Garvin |
| Appendix 1254 – 1256 | Affidavit of Marc Heil |
| Appendix 1257 – 1260 | Resume of Marc Heil |
| Appendix 1261 – 1265 | Affidavit of Lauren Kelley |
| Appendix 1266 – 1268 | Resume of Lauren Kelley |
| Appendix 1269 – 1270 | Affidavit of Patricia Rodgers |
| Appendix 1271 – 1272 | Resume of Patricia Rodgers |
| Appendix 1273 – 1275 | Affidavit of Tanya Salgado, Esquire |
| Appendix 1276 – 1279 | Affidavit of Deborah Sandler, Esquire |
| Appendix 1280 – 1282 | Affidavit of Robert Supper |
| Appendix 1283 – 1289 | Resume of Robert Supper |
| Appendix 1290 – 1294 | Affidavit of Janet Thompson |
| Appendix 1295 – 1296 | Resume of Janet Thompson |
| Appendix 1297 | Affidavit of Basheer Womack |
| Appendix 1298 – 1301 | Affidavit of Thomas Wozniak |
| Appendix 1302 – 1303 | Summary of Qualifications of Thomas Wozniak |

 

Try Visual Search
Search with a picture instead of text
    Drag an image here orbrowse
Drop an image here
OR
    Paste image or URL

    Take photo
Click a sample image to try it



Learn more

The photos you provided may be used to improve Bing image processing services.
To use Visual Search, enable the camera in this browser

Search

Sign in      15

- **All**
- Images

- Videos
- Maps
- News
- Shopping
- |
- My saves

20,300 resultsAny time

### 1. Lawsuit: Tweeting at Trump got her dumped | Stu Bykofsky

https://www.inquirer.com/philly/columnists/stu_bykofsky/lawsuit-tweet-trump-waverly...

**Kathleen Jungclaus**, 57, former vice president of human resources for Waverly Heights, a high-end Gladwyne continuing-care retirement community, was fired after her boss confronted her about the tweet, according to the complaint filed in October 2017.

- **Author:** Stu Bykofsky

### 2. Exec fired for pro-Trump tweet can't be denied ...

https://**www.pennlive.com**/news/2017/11/exec_fired_for_pro-trump_tweet.html

Nov 13, 2017 · **Kathleen Jungclaus**' tweet didn't directly link her to her employer and so didn't violate the firm's social media policy, the Commonwealth Court judges found.

- **Author:** Matt Miller | Mmiller@Pennlive.Com

### 3. Images of Kathleen Jungclaus

bing.com/images



See more images of Kathleen Jungclaus

### 4. Kathleen Jungclaus, Vice President of Human Resources at ...

https://relationshipscience.com/person/**kathleen-jungclaus**-239640360

**Kathleen Jungclaus** is Vice President of Human Resources at Waverly Heights Ltd. View **Kathleen Jungclaus**'s professional profile on Relationship Science, the database of decision makers.

### 5. Kathy Jungclaus - Marketing Coordinator - Right at Home ...

https://www.linkedin.com/in/**kathy-jungclaus**-897777113

**Kathy Jungclaus** liked this Don't miss this years Los Angeles Business Council ,... This annual summit at the Getty Center is a momentous event in our city, annually drawing more than...

### 6. Woman Fired For Pro-Trump Tweet Gets Unemployment Benefits ...

https://blog.ericgoldman.org/archives/2017/11/woman-fired-for-pro-trump-tweet-gets...

Nov 16, 2017 · **Kathleen** M. **Jungclaus** was VP of Human Resources for Waverly Heights, a retirement home located in a Philadelphia suburb. On July 24, 2016, she tweeted (from a Twitter account I couldn't find, so maybe it's gone):

### 7. WAVERLY HEIGHTS LTD v. UNEMPLOYMENT COMPENSATION

...

https://caselaw.findlaw.com/pa-commonwealth-court/1879660.html

Nov 13, 2017 · Waverly Heights, Ltd. (Employer) petitions for review from a final order of the Unemployment Compensation Board of Review (Board), which reversed a decision of a referee and granted unemployment compensation (UC) benefits to Kathleen M. Jungclaus (Claimant) upon determining Claimant was not ineligible for UC benefits under Section 402(e) of the Unemployment ...

## 8. Pro-Trump Tweeter Keeps Unemployment Benefits On Appeal

https://www.law360.com/.../984311/pro-trump-tweeter-keeps-unemployment-benefits-on-appeal

Jungclaus is represented by Mark Schwartz. The case is Waverly Heights Ltd. v. Unemployment Compensation Board of Review, case number 32 CD 2017, in the Commonwealth Court of Pennsylvania.

9.   [PDF]

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN

...

www.paed.uscourts.gov/documents/opinions/18D0257P.pdf

Plaintiff Kathleen Jungclaus ("Ms. Jungclaus") filed suit in this Court on October 6, 2017, against Defendants Waverly Heights, LTD. ("Waverly Heights") and Thomas Garvin ("Mr. Garvin"). On November 17, 2017, Ms. Jungclaus filed an Amended Complaint that added

10.  [PDF]

## Waverly Heights, Ltd., - Judiciary of Pennsylvania

www.pacourts.us/assets/opinions/Commonwealth/out/312CD17_11-13-17.pdf?cb=1

benefits to Kathleen M. Jungclaus (Claimant) upon determining Claimant was not ineligible for UC benefits under Section 402(e) of the Unemployment Compensation Law (Law) 1 for willful misconduct based on a tweet she sent regarding the 2016

## 11.    JUNGCLAUS v. WAVERLY HEIGHTS LTD et al - Law360

https://www.law360.com/cases/59d7af1277238e547c000003

Parties, docket activity and news coverage of federal case JUNGCLAUS v. WAVERLY HEIGHTS LTD et al, case number 2:17-cv-04462, from Pennsylvania Eastern Court.

- o
- o   1
- o   2
- o   3
- o   4
- o   5
- o

© 2019 Microsoft

- Privacy and Cookies
- Legal
- Advertise
- About our ads
- Help
- Feedback

11-24 of 20,400 resultsAny time

# 1. Woman Fired For Pro-Trump Tweet Gets Unemployment Benefits

...

https://blog.ericgoldman.org/archives/2017/11/woman-fired-for-pro-trump-tweet-gets...
Nov 16, 2017 · Kathleen M. Jungclaus was VP of Human Resources for Waverly Heights, a retirement home located in a Philadelphia suburb. On July 24, 2016, she tweeted (from a Twitter account I couldn't find, so maybe it's gone):

# 2. PA court upholds unemployment pay for woman fired over pro ...

https://www.reuters.com/article/employment-tweet-idUSL1N1NJ20S
Nov 13, 2017 · A unanimous three-judge panel of the Commonwealth Court of Pennsylvania said Kathleen Jungclaus did not violate Waverly Heights Ltd's ...

# 3. VP of HR fired for pro-Trump tweet has no defamation claim ...

https://www.hrdive.com/news/vp-of-hr-fired-for-pro-trump-tweet-has-no-defamation-claim...
Kathleen Jungclaus, who worked for senior care facility Waverly Heights, was fired after tweeting " I am the VP of HR in a comp[any] outside of Philly[. A]n informal survey of our employees ...

# 4. 610-645-8610 | Kathleen **M** Jungclaus - **Philadelphia, PA** ...

https://www.whitepages.com/phone/1-**610-645-8610**
View **Kathleen**'s address, public records, background check, and more for **6106458610** with Whitepages reverse phone lookup - know who is calling from **610-645-8610**. Sign up to gain access to mobile numbers, public records, and more.

5. [PDF]

## Case 2:17-cv-04462-RK Document 1 Filed 10/06/17 Page 1 of 18

https://images.law.com/contrib/content/uploads/documents/402/6737/**Jungclaus**.pdf
Plaintiff Kathleen M. Jungclaus ("Jungclaus" or "Plaintiff ") is an adult Caucasian American female over the age of 40, who resides at 1129 Mill Road Circle, Rydal, PA 19046. For virtually her entire career, beginning in 1985, Plaintiff has been employed in the human

# 6. Jungclaus

**jungclaus**.feedsrss.com
A unanimous three-judge panel rejected senior center Waverly Heights' contention that **Kathleen Jungclaus** explicitly identified herself in a tweet that indicated she was the vice president of human ...

# 7. JUNGCLAUS v. WAVERLY HEIG | Civil Action No. 17-4462 ...

https://www.leagle.com/decision/infdco20180410c09
**KATHLEEN** M. **JUNGCLAUS**, Plaintiff, represented by MARK DANIEL SCHWARTZ . WAVERLY HEIGHTS LTD, THOMAS P. GARVIN & JOHN AND JANE DOE NUMBERS 1-21, Defendants, represented by GRACE M. DEON , EASTBURN & GRAY PC.

# 8. **Kathy** Jungclaus – **Marketing Coordinator – Right at Home** ...

https://www.linkedin.com/in/kathy-**jungclaus**-897777113/de

Sehen Sie sich das Profil von Kathy **Jungclaus** auf LinkedIn an, dem weltweit größten beruflichen Netzwerk. 3 Jobs sind im Profil von Kathy **Jungclaus** aufgelistet. ... A lawsuit claims **Kathleen** ...

## 9.   Kathleen **Metzger (M), 58 - Hazleton, PA Has Court Records ...**

https://www.mylife.com/**kathleen**-metzger/e483063496626

FREE Background Report & Reputation Score (1.85) for **Kathleen** Metzger in Hazleton, PA - View Criminal & Court Records | Photos | Address, Emails & Phone Number | 1 Personal Review | ...

## 10.     Jungclaus V. Waverly Heights Ltd **Et Al - E-D-PA**

https://**www.open-public-records.com**/court/pennsylvania-17803506.htm

View **jungclaus v. waverly heights ltd** et al: eastern district of pennsylvania various court filings, court venue of filed actions, upcoming trials or motions on calendar and post comments or questions.

## 11.     **WAVERLY HTS. v. UNEMPLOYM | 173 A.3d 1224 (2017 ...**

https://**www.leagle.com**/decision/inpaco20171113284

OPINION BY JUDGE WOJCIK.. Waverly Heights, Ltd. (Employer) petitions for review from a final order of the Unemployment Compensation Board of Review (Board), which reversed a decision of a referee and granted unemployment compensation (UC) benefits to **Kathleen** M. **Jungclaus** (Claimant) upon determining Claimant was not ineligible for UC benefits under Section 402(e) of the Unemployment ...

## 12.     **Joanne** Jungclaus **Obituary - Indianapolis, IN | The ...**

https://**www.legacy.com**/obituaries/indystar/obituary.aspx?pid=144928309

Joanne Knepper **Jungclaus** 78, of Indianapolis, died March 9, 2010. Joanne was born August 26, 1931 in Indianapolis, IN to the late Charles and **Kathleen** Knepper. She was a graduate of Shortridge High

## 13.     Jungclaus in Pennsylvania **(PA) | 161 records found ...**

https://**www.whitepages.com**/name/Jungclaus/PA

View phone numbers, addresses, public records, background check reports and possible arrest records for **Jungclaus in Pennsylvania** (PA). Whitepages people search is the most trusted directory.

## 14.     **Social Media Post – HiringToFiring.Law Blog**

https://hiringtofiring.law/tag/social-media-post

Until her termination, **Kathleen Jungclaus** had served as the vice president of human resources of a retirement care community for nearly 20 years. Ms. **Jungclaus** was terminated when she posted a tweet to her personal Twitter account in July 2016 that stated "@realDonaldTrump I am the VP of HR in a comp outside of philly an informal survey of ...

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS          :     NO.   17-cv-04462-RK

         v.                               :          **Jury Trial Demanded**

WAVERLY HEIGHTS, LTD.,          :

## AFFIDAVIT OF CAROLYN BAYSMORE

I, Carolyn Baysmore hereby swear or affirm as follows:

1.     I am the Scheduling Manager at Waverly Care Associates, and I have worked at Waverly Care for the past twenty six (26) years.  I am an African American.

2.     I was present during lunch when I was shown the tweet that Mrs. Jungclaus posted on Twitter.  Several of my co-workers were present and there was a discussion regarding the content of the tweet.

3.     All of us were offended by the way that Mrs. Jungclaus was viewing the African Americans at Waverly as a "group" and how she reported the results of some polls she took at work.  None of us was asked about our political viewpoints by Mrs. Jungclaus.  It was demeaning to those of us who read the tweet.

4.     It was clear to all of us that the term "AA" referred to African Americans.

5.     After Mrs. Jungclaus left Waverly, Mr. Garvin met with the employees and offered an apology for the content of the tweet.

Carolyn Baysmore
Carolyn Baysmore

Sworn to and subscribed before me,
this  29th day of July, 2019.

Amy E Blessing
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
AMY E BLESSING
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Nov 22, 2020

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | NO.   17-cv-04462-RK |
| v. | : | **Jury Trial Demanded** |
| WAVERLY HEIGHTS, LTD., | : | |

### AFFIDAVIT OF DEBRA BEST

I, Debra Best, do hereby swear and affirm as follows:

1.     I am the Service Manager for Dining Services at Waverly Heights, Ltd. ("Waverly") and have been employed there for more than 18 years.  I am over the age of 40.

2.     I worked with Kathleen Jungclaus when she was the V.P. of Human Resources. My supervisor is James Heffren and he does my annual evaluation reports and recommends raises and promotions for me.

3.     I understand that the way annual raises are determined is two-fold: (1) an analysis of the market value of the position compared to similar positions in the non-profit healthcare world; and (2) an evaluation of performance.

4.     I do not believe that I have been discriminated against on the basis of either my age or gender in the area of compensation.  I have never been discriminated against while employed at Waverly and have never felt that I would be retaliated against for advocating for myself or others whom I supervise.

5.     My direct contact with Mrs. Jungclaus was limited.  I did participate in a meeting with Mrs. Jungclaus many years ago about the alleged complaints about me and my management style that she allegedly received from several women that were on the Dining Services management team.   I later learned that these women had not made a complaint to Mrs. Jungclaus.

6.     My relationship with Mr. Garvin is very good.  He is encouraging and supportive and solicits my opinion about matters involving the dining service department. Mr. Garvin is always ready to look for a solution to any problem. I have never felt that Mr. Garvin discriminated against me using age or gender as a criteria for criticism of my work.

7.     Mr. Supper is also a very nice man.  I have never heard him demean women and in my experience, he is always courteous, kind and respectful.

Appendix 1220

8. I was approached by Mr. Garvin and asked whether I would be interested in catering a private party that he was hosting in his home. I agreed to do so. Mr. Garvin was provided with a bill from Waverly for the event and he also generously tipped the staff who worked the event. Mr. Garvin was friendly to me and my workers at all times. I wanted everything to be perfect and expressed some concerns about how to execute an offsite catered event given the distance between Mr. Garvin's home and Waverly. I never told Mrs. Jungclaus that Mr. Garvin had treated me in a demeaning way because that did not happen.

9. When I first started working with Mrs. Jungclaus, I would go to her for guidance about how to handle human resource related matters within my department. As the years passed, toward the end of her employment I stopped going to her because I did not trust her. Instead, I would approach my supervisor for guidance.

10. Mrs. Jungclaus never complained to me that she was herself the victim of discrimination in the workplace.

11. I have known Mr. Soltis for many years as well. I am copied on some of the emails he sent to friends and some of us at work. I never told Mrs. Jungclaus or anyone that I believed Mr. Soltis' emails were offensive nor did I ask Mr. Soltis to stop sending me emails. If I didn't have time to read the emails, I simply deleted them.

12. Mrs. Jungclaus never told me that she was offended by Mr. Soltis' emails. We never discussed Mr. Soltis or his emails.

13. I do not understand why Mrs. Jungclaus used my name as an example of someone who was the victim of age and gender discrimination at Waverly. I never said this and it is simply not true.

_Debra Best_
Debra Best

Sworn to and subscribed before me, this 26 day of July, 2019.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020

Appendix 1221

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS      :     NO.   17-cv-04462-RK

v.                   :     **Jury Trial Demanded**

WAVERLY HEIGHTS, LTD.,      :

## AFFIDAVIT OF AMY BLESSING

My name is Amy Blessing and I have been the Executive Services Manager at Waverly

Heights, Ltd. ("Waverly") for more than eight years.  At the time I was hired, I was 43 years old.

I work closely with Mr. Garvin, President and Chief Executive Officer of Waverly as well as Mr.

Supper, the Senior Vice President and Chief Financial Officer.  I also interface with the Board of

Trustees regularly, including attending all Board and Board Committee meetings.  My job is to

assist the CEO, CFO and Board of Trustees, supervise the customer service staff, manage vendors

and contracts, and manage the Board of Trustees portal.  I also manage activities relating to the

Waverly Heights Foundation, the vehicle through which charitable contributions to Waverly

Heights are processed.

During my employment, I had occasion to interact often with Kathleen Jungclaus.  Because

I attend the Board's Human Resources Committee meetings, I often heard about personnel matters.

I never made a complaint of discrimination in pay or any of the terms or conditions of my

employment to Kathleen Jungclaus or anyone else at Waverly.  I have found both Mr. Garvin and

Mr. Supper supportive and respectful of women.  I have never been contacted by any employee

alleging harassment or discrimination on any basis, including gender and age.

Waverly is one of the nicest places I have ever worked.  Mr. Garvin is wonderful to work

with.  He is supportive, respectful of women and values and understands the work/life balance of

Waverly's employees.  He is a very approachable and is interested in the employees and their families in a respectful way.

I also work closely with Robert Supper.  Both Mr. Garvin and Mr. Supper supported my advancement in job level, job titles and pay increases.  I have never heard Mr. Supper act in a demeaning way to any employee and certainly I have never heard Mr. Supper denigrate an employee because of his or her gender or age.  Mr. Supper is himself 61 years old. I have never felt that I was discriminated against because of my gender or age.

I first learned that Mrs. Jungclaus had posted a tweet when I received an anonymous letter. I typically open Mr. Garvin's mail.  I do not know and have never known who wrote this letter. When I received the letter, I gave it to Mr. Garvin.  He and I found the tweet by clicking on plaintiff's name listed as a "follower" on the Waverly Twitter page.   Given the uncommon name, it was not difficult to see that Mrs. Jungclaus was the Vice President of HR referred to in the tweet.

I don't know whether Mrs. Jungclaus actually took a poll of workers, but I was appalled that she would make this statement as a representative of Waverly and singling out African American workers.  When I read the tweet, I was certain that the term "AA" referred to African American workers and it certainly was not difficult to determine that she worked for Waverly, especially since the tweet was linked to the Go Fund Me page for "Dilly", a Waverly employee's son.

Immediately after seeing the tweet, Mr. Garvin asked Mrs. Jungclaus to come to his office. I was not present for the meeting but Mr. Garvin told me that Mrs. Jungclaus had been asked to take down the posting.  Thereafter, Mr. Garvin left to attend a conference.

While Mr. Garvin was away, Mrs. Jungclaus came to my office.  She stated on more than one occasion, that she had been cleaning out her office.

2

Waverly's employees. He is a very approachable and is interested in the employees and their families in a respectful way.

I also work closely with Robert Supper. Both Mr. Garvin and Mr. Supper supported my advancement in job level, job titles and pay increases. I have never heard Mr. Supper act in a demeaning way to any employee and certainly I have never heard Mr. Supper denigrate an employee because of his or her gender or age. Mr. Supper is himself 61 years old. I have never felt that I was discriminated against because of my gender or age.

I first learned that Mrs. Jungclaus had posted a tweet when I received an anonymous letter. I typically open Mr. Garvin's mail. I do not know and have never known who wrote this letter. When I received the letter, I gave it to Mr. Garvin. He and I found the tweet by clicking on plaintiff's name listed as a "follower" on the Waverly Twitter page. Given the uncommon name, it was not difficult to see that Mrs. Jungclaus was the Vice President of HR referred to in the tweet.

I don't know whether Mrs. Jungclaus actually took a poll of workers, but I was appalled that she would make this statement as a representative of Waverly and singling out African American workers. When I read the tweet, I was certain that the term "AA" referred to African American workers and it certainly was not difficult to determine that she worked for Waverly, especially since the tweet was linked to the Go Fund Me page for "Dilly", a Waverly employee's son.

Immediately after seeing the tweet, Mr. Garvin asked Mrs. Jungclaus to come to his office. I was not present for the meeting but Mr. Garvin told me that Mrs. Jungclaus had been asked to take down the posting. Thereafter, Mr. Garvin left to attend a conference.

While Mr. Garvin was away, Mrs. Jungclaus came to my office. She stated on more than one occasion, that she had been cleaning out her office.

3

On September 26, 2016, Mr. Garvin and Mr. Bauer, the Board Chairman, met with Mrs. Jungclaus. I was not present for the meeting. After the meeting, I could see that Mrs. Jungclaus was visibly upset. She went into Janet Thompson's office and I followed her in as well.

Mrs. Jungclaus stated that she had done something wrong and was being terminated. She then stated that she had not been the person who posted the tweet. I asked her if she told Mr. Garvin and Mr. Bauer this and she said that she had not. I offered to go with her to see Mr. Garvin and Mr. Bauer to let them know that Mrs. Jungclaus had not posted the tweet but she declined. I offered to drive Mrs. Jungclaus home but she declined.

Mrs. Jungclaus was never a champion of women in the Waverly workplace. She was not a leader of the management/leadership team fighting for women's rights. It is my opinion, that Mrs. Jungclaus was only interested in fighting for herself. Two years after I began my employment, I revamped my job description and wanted both a title change and a salary increase. When I revamped the job title for my position, I asked Mrs. Jungclaus to go to Mr. Garvin to ask for increased pay for me or to consult with Mr. Thomas Wozniak, the outside consultant who reviews job titles and duties and makes recommendations to Mr. Garvin regarding the market value for a particular position. She did not. Instead, I went to Mr. Garvin personally, and he reviewed my job description and my pay and increased my salary. Mr. Garvin has always recognized my contribution to the company and has never discriminated against me in any way.

Neither Mr. Garvin nor Mr. Supper degrade or denigrate women in the way they speak to them or deal with them. To the contrary, both men support the employees, male and female, equally. Likewise, I have never heard Mr. Garvin or Mr. Supper make any statement derogatory to older workers. I never complained to Mrs. Jungclaus that Mr. Supper was demeaning to his wife over the telephone. He never tried to humiliate me or to denigrate me or my work.

On September 26, 2016, Mr. Garvin and Mr. Bauer, the Board Chairman, met with Mrs. Jungclaus. I was not present for the meeting. After the meeting, I could see that Mrs. Jungclaus was visibly upset. She went into Janet Thompson's office and I followed her in as well.

Mrs. Jungclaus stated that she had done something wrong and was being terminated. She then stated that she had not been the person who posted the tweet. I asked her if she told Mr. Garvin and Mr. Bauer this and she said that she had not. I offered to go with her to see Mr. Garvin and Mr. Bauer to let them know that Mrs. Jungclaus had not posted the tweet but she declined. I offered to drive Mrs. Jungclaus home but she declined.

Mrs. Jungclaus was never a champion of women in the Waverly workplace. She was not a leader of the management/leadership team fighting for women's rights. It is my opinion, that Mrs. Jungclaus was only interested in fighting for herself. Two years after I began my employment, I revamped my job description and wanted both a title change and a salary increase. When I revamped the job title for my position, I asked Mrs. Jungclaus to go to Mr. Garvin to ask for increased pay for me or to consult with Mr. Thomas Wozniak, the outside consultant who reviews job titles and duties and makes recommendations to Mr. Garvin regarding the market value for a particular position. She did not. Instead, I went to Mr. Garvin personally, and he reviewed my job description and my pay and increased my salary. Mr. Garvin has always recognized my contribution to the company and has never discriminated against me in any way.

Neither Mr. Garvin nor Mr. Supper degrade or denigrate women in the way they speak to them or deal with them. To the contrary, both men support the employees, male and female, equally. Likewise, I have never heard Mr. Garvin or Mr. Supper make any statement derogatory to older workers. I never complained to Mrs. Jungclaus that Mr. Supper was demeaning to his wife over the telephone. He never tried to humiliate me or to denigrate me or my work.

Mrs. Jungclaus never complained to me that she was the victim of age or gender discrimination. She never complained about any emails she received from Mr. Soltis and, in fact, made it clear that she was an avid supporter of Donald Trump as was Mr. Soltis. Janet Thompson likewise never told me that she was offended by any email she received from Mr. Soltis. I was also copied on emails from Mr. Soltis. I never believed they were insulting to me as a woman or in any way offensive to me as a woman and an employee near 40. I never asked Mr. Soltis to stop sending me emails nor asked Mr. Garvin to intervene with Mr. Soltis to stop the emails.

Mrs. Jungclaus' statements regarding Mr. Garvin's conduct vis a vis employees is a total mischaracterization of the truth. Mr. Garvin would sometimes use the residents' gym at 5:00 a.m. when other employees were not present. Mrs. Jungclaus was certainly not present at the time and employees were not either. Likewise, Mr. Garvin participated in employee contests, to increase employee morale and give them a sense that management and employees were team members. When he won the contest he never retained the money but gave it back to the employees. Likewise, Mr. Garvin's car was cleaned each week because it was used to pick up residents when needed. If other Waverly vehicles are in use and a vehicle is needed for a resident, it is Mr. Garvin's car that is used.

Waverly is a wonderful place to work and is not a workplace dominated by male superiority. To the contrary, more than half of the senior leadership team is female and only one is under the age of 40. I have not been pressured into giving this affidavit nor do I believe that my job hinges on supporting Waverly, Mr. Garvin and Mr. Supper. I am offended by what Mrs. Jungclaus did and by her claims in this case.

Mrs. Jungclaus never complained to me that she was the victim of age or gender discrimination. She never complained about any emails she received from Mr. Soltis and, in fact, made it clear that she was an avid supporter of Donald Trump as was Mr. Soltis. Janet Thompson likewise never told me that she was offended by any email she received from Mr. Soltis. I was also copied on emails from Mr. Soltis. I never believed they were insulting to me as a woman or in any way offensive to me as a woman and an employee near 40. I never asked Mr. Soltis to stop sending me emails nor asked Mr. Garvin to intervene with Mr. Soltis to stop the emails.

Mrs. Jungclaus' statements regarding Mr. Garvin's conduct vis a vis employees is a total mischaracterization of the truth. Mr. Garvin would sometimes use the residents' gym at 5:00 a.m. when other employees were not present. Mrs. Jungclaus was certainly not present at the time and employees were not either. Likewise, Mr. Garvin participated in employee contests, to increase employee morale and give them a sense that management and employees were team members. When he won the contest he never retained the money but gave it back to the employees. Likewise, Mr. Garvin's car was cleaned each week because it was used to pick up residents when needed. If other Waverly vehicles are in use and a vehicle is needed for a resident, it is Mr. Garvin's car that is used.

Waverly is a wonderful place to work and is not a workplace dominated by male superiority. To the contrary, more than half of the senior leadership team is female and only one is under the age of 40. I have not been pressured into giving this affidavit nor do I believe that my job hinges on supporting Waverly, Mr. Garvin and Mr. Supper. I am offended by what Mrs. Jungclaus did and by her claims in this case.

*Amy E. Blessing*

Amy Blessing

Sworn to and subscribed before me,

this 29 day of July, 2019.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020

Notary Public

Appendix 1229

8

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS         :      NO.    17-cv-04462-RK

           v.                    :      **Jury Trial Demanded**

WAVERLY HEIGHTS, LTD.,       :

## AFFIDAVIT OF MARGARET CARPENTER

My name is Margaret Carpenter and I was the Resident Services and Program Manager at Waverly Heights, Ltd. (Waverly). I worked for Waverly for the past 19 years and my supervisor was Janet Thompson. I retired from Waverly as of January 11, 2019.

I read the allegations in the complaint that she was an advocate for me with Mr. Garvin regarding my salary and job title. To the contrary, Mrs. Jungclaus did not advocate for me. I raised all issues relating to my employment with my supervisor, Janet Thompson, whom I trusted to advocate on my behalf. I never believed that I would be the victim of retaliation for discussing my salary and compensation with Mrs. Thompson nor asking Mrs. Thompson to go to bat for me.

It was Mr. Garvin who reviewed my job performance and my salary in relation to the market value for the position and decided to both promote me and give me salary increases so that my salary was in line with the market value in the healthcare industry. I believe that my salary was determined by Mr. Garvin in a non-discriminatory fashion and that neither my age or my gender was a factor in Mr. Garvin's decision to either promote me or give me salary increases.

I have never felt that Mr. Garvin discriminated against me because of my age. I never heard him make any negative comments about any person because of his or her age. I never made any complaint to Mrs. Jungclaus let alone the "constant complaints" she alleges in paragraph 49

Appendix 1230

of the complaint.  I do not agree that Mr. Garvin or Mr. Supper created an atmosphere of male

superiority nor an elitist attitude.  To the contrary, I was always  treated fairly at Waverly.


Margaret Carpenter


Sworn to and subscribed before me,

this 26 day of July, 2019.


7/26/2019

Notary Public
COMMONWEALTH OF PENNSYLVANIA

NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020


Appendix 1231

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS      :     NO.    17-cv-04462-RK

         v.                     :     **Jury Trial Demanded**

WAVERLY HEIGHTS, LTD.,         :

### AFFIDAVIT OF CONSTANCE DOGAN

My name is Constance Dogan and I have worked for Waverly Heights for more than 12 years. I am 36 years old and started my career at Waverly at the age of 23. I am one class away from finishing my Master's degree in Organizational Leadership. This schooling was paid for and supported by Waverly Heights. I started in Dining Services as a supervisor. I have been promoted regularly and currently, I am currently the Vice President of Housekeeping and Environmental Services. I am a member of the Senior Leadership Team and interact regularly with both Mr. Garvin and Mr. Supper.

I supervise approximately 30 people. When employees have work-related problems, typically, they come to me and we resolve the issues.

I read the allegations made by Mrs. Jungclaus about the way in which women are treated at Waverly by Mr. Garvin and Mr. Supper. I do not agree with the statements made in the complaint. I have never heard either Mr. Garvin or Mr. Supper make any derogatory or demeaning statement about any women in the workplace nor have I heard either one make any derogatory statement about the age or race of any individual in the workplace.

Mr. Garvin has always supported my advancement in the company. Shortly after Mr. Garvin became the CEO in 2010, he increased my compensation and I have received regular raises

since that time.  I have been treated fairly with regard to wages and bonuses and never complained to Mrs. Jungclaus about anything remotely related to the way in which I have been treated by Mr. Garvin.

I would not hesitate to bring any matter concerning my employment or the employment of others to Mr. Garvin nor am I afraid that I would be retaliated against for doing this.

I did not make a complaint of discrimination to her nor ask Mrs. Jungclaus to refrain from conducting an investigation at any time.  Mrs. Jungclaus advised me that she was going to advocate for an increase in pay for me when Mr. Garvin started as CEO in 2010, and I was unconcerned that any advocacy for me would result in retaliation against Mrs. Jungclaus.  She never advised me that there had been any form of retaliation against her for going to bat for me on my compensation issue.

I did see the Tweet that is the subject of Mrs. Jungclaus' lawsuit prior to her termination from employment. I am an African American and was disturbed that Mrs. Jungclaus, as V.P. of H.R. would post something in the public like this.    I don't recall who told me about the Tweet, but another employee came to me and mentioned the tweet that was authored by Mrs. Jungclaus. I was offended by the content of the tweet but didn't mention it to Ms. Jungclaus or to any member of management.

I have regular contact with both Mr. Supper and Mr. Garvin both in meetings and in the workplace generally.  Neither Mr. Supper nor Mr. Garvin are in any way degrading or demeaning to women or frankly, anyone else.  When Mr. Garvin participates in employee contests, he never keeps the money he might win but instead returns it to the employees.   I never stated to Mrs. Jungclaus that I thought women were discriminated against at Waverly.  Though we had a good

relationship, Mrs. Jungclaus never stated to me that she believed she was a victim of discrimination on the basis of age or gender or for any other reason.

After Mrs. Jungclaus' employment was terminated she called me to "explain herself". She said: "What they are saying is not true". I had no idea what she was referring to and told her this. I did not hear anything in the workplace about why Mrs. Jungclaus' employment had been terminated.

Constance Dogan

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020

SWORN TO AND SUBSCRIBED BEFORE ME ON JULY 29, 2019.

Grace M Bregman, 7/29/19.
NOTARY PUBLIC

Appendix 1234

Sworn to and subscribed before me,

this          day of July, 2019.

_____
Notary Public

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | NO. | 17-cv-04462-RK |
| v. | | : | **Jury Trial Demanded** |
| WAVERLY HEIGHTS, LTD., | : | | |

## AFFIDAVIT OF MEREDITH FEHER

I, Meredith Feher, do hereby swear and affirm as follows:

1.     I am the Senior Vice President of the Health Care Center at Waverly Heights ("Waverly") I was hired in 2014 to replace Meg Guenveur who retired. I am 48 years old.

2.     Prior to my employment at Waverly, I had been the Vice President at the Abramson Center for Jewish Life for nine and half years. I have been employed in the healthcare industry since 1998 and hold a licenses in Pennsylvania as a Personal Care Administrator and a Nursing Home Administrator.

3.     I am responsible for managing all of the healthcare functions at Waverly including oversight of all Health Care staff.

4.     I knew Mr. Garvin prior to my employment at Waverly having worked with him previously. When the position opened for a Vice President of Health Care, Mr. Garvin contacted me to ask me to apply. I did so and was hired in 2014. One of the prerequisites for the position was having the Nursing Home administration license.

5.     When I arrived at Waverly, I met Kathleen Jungclaus, the Vice President of Human Resources who informed me that she had been the Board of Directors' choice to fill the position vacated by Ms. Guenver. I learned thereafter that Mrs. Jungclaus had not applied for the position nor been considered by the Board for the position. She did not have a nursing home administrator license so was not qualified for the position.

6.     After I got to know and work with Mrs. Jungclaus, I realized that her version of events was not always accurate. She divulged confidential employee related information regarding the compensation packages of others and often complained that Human Resources was not a valued component of the community. Though I was a FaceBook "Friend" of Mrs. Jungclaus, we were not close socially.

7.     Around April/ May of 2015, I contacted Mrs. Jungclaus to advise her that I was entitled to participate without any waiting period in the company's profit sharing plan. I asked her to confirm this with Mr. Garvin. Mr. Garvin told Mrs. Jungclaus to look in the file for the offer letter I received. Mrs. Jungclaus took no steps to look in my file and insisted that I was not entitled to participate. Thereafter, I sent Mrs. Jungclaus a copy of my offer letter and again requested that I be enrolled in the profit sharing plan. Mrs. Jungclaus asked me not to tell Mr. Garvin that I had to send my letter to her and to act like I was surprised when I received the check from Mr. Garvin. I did receive a check and did act surprised though it was not a surprise.

8.     After my first year at Waverly, I received a 15% salary increase and a nice bonus and was recognized for the hard work I did to develop a cohesive team with the employees I supervised and to establish myself as someone that employees could come to with any complaints or concerns.

9.     Mrs. Jungclaus shared on many occasions that I should ask for a car as part of my compensation package because Mr. Supper and Mr. Garvin both had cars. I did not want a car and did not believe that there was any sort of discrimination because I didn't get a car. I knew that only the CEO and CFO received a car as part of their compensation package. I actually made a joke out of it and said I would much rather enjoy a clothing allowance.

10.     Mrs. Jungclaus was jealous because of the salary and compensation packages of other members of the senior leadership team. She divulged information about the compensation and in my opinion was unprofessional as a human resource person charged with maintaining the confidentiality of employee information.

11.     When Mrs. Jungclaus complained that in her opinion, the human resource department was not valued by Mr. Garvin, I advised her that, in my opinion, Mr. Garvin was very fair with all employees and that she should meet with him to discuss her views about her compensation. Every time that salary increases and bonuses were being awarded, Mrs. Jungclaus would complain that she did not get enough and would constantly compare herself with others. I suggested she discuss this with Mr. Garvin.

12.     More than half of the senior leadership team members are females and except for one, all of the members of the senior leadership team are over the age of 40. I never heard anyone, including Mrs. Jungclaus, make any statement or complaint that she was victim of discrimination on the basis of either gender or age. I certainly never complained about anything related to my employment at Waverly as it is the best place I have ever worked.

13.     I regularly spoke with many of the other women on the senior leadership team and never heard any complaint or statement or even comment that suggested that there was ongoing discrimination on the basis of either gender or age.

14.     I never made any statement about a "good ole boys" network at Waverly.

15.     I was present when Mrs. Jungclaus had her asthma attack in August 2016.  One of the nurses called me to tell me that Mrs. Jungclaus was having an asthma attack but had refused an offer to be taken to the hospital because she was leaving for vacation in the Poconos over the weekend.  The nurse gave Mrs. Jungclaus a nebulizer treatment and had her go into the walk in refrigerator to help diffuse any allergens.  Over the weekend, Mrs. Jungclaus went to the Poconos and on Monday, she returned to work without any further complaints.  I never heard Mr. Garvin make any comment about Mrs. Jungclaus completing a worker's compensation report and Mrs. Jungclaus did not tell me this either.

16.     Mr. Garvin informed the senior leadership team that Mrs. Jungclaus would no longer be employed at Waverly.  He stated that we should not hesitate to contact her or to continue any friendship we had and noted that Mrs. Jungclaus' in-laws lived at Waverly so she would be on campus.

17.     On or about September 28, 2016, I was in touch with Mrs. Jungclaus.  Mrs. Jungclaus texted that she had not "done something right".

18.     At some point thereafter, I spoke with Mrs. Jungclaus.  She claimed that it was her husband who posted the tweet in question.  I advised her the "something didn't make sense."  She made the statement that "no one is going to be happy".

19.     Because I was concerned that there might be litigation, I "de-friended" her on FaceBook.  A week later, I got a text from Mrs. Jungclaus that said:  "Are you F-ing kidding me?" referring to my "de-friending" her.  I decided not to maintain any contact with Mrs. Jungclaus because I was concerned that she would misrepresent the communication. I was never asked by Mr. Garvin to cease any contact with Mrs. Jungclaus and was not concerned that I would lose my job if I continued to maintain a friendship with her.

20.     I have never heard Mr. Supper demean or degrade a female employee.  He has always treated me with respect and I would certainly tell him if anything that he was doing or saying was offensive.  Mr. Supper's style can be abrasive but he treats everyone the same and, his demeanor has improved significantly over the past few years.

21.     Mrs. Jungclaus never complained that she was receiving offensive emails from Mr. Soltis, the former President of the Board of Trustees.  I overheard that Mr. Soltis sent many emails but no one complained about the content except to say that there were too many emails to read.  Mrs. Jungclaus shared the political view espoused by Mr. Soltis and didn't hesitate to express her political views while at work.  Mrs. Jungclaus shared with me that she was very fond of Mr. Soltis.

22.     I have been approached by other prospective employers looking to hire me but I have always refused other job offers.  The atmosphere created by Mr. Garvin and the other members of the staff at Waverly is warm, welcoming and open.  There is no "male superiority" culture at Waverly.  I have never heard any female employee or employee over the age of 40 complain about Mr. Garvin or Mr. Supper nor complain that he or she had been the victim of discrimination or retaliation.  Mrs. Jungclaus never made this claim either.

23.    I never saw Mr. Supper drinking on the job nor did he leave to go to bars during the work day.  I never saw Mr. Supper leave work to gamble and never was told by Mr. Garvin not to approach Mr. Supper on a Monday.  All of us were aware that Mr. Supper's son had a drug problem, eventually dying.  But this sad situation was not an excuse for Mrs. Jungclaus to claim that it was Mr. Supper who was involved in a drunk driving incident with his company car.

Meredith Feher
Meredith Feher

Sworn to and subscribed before me,
this 25th day of July, 2019.

Notary Public

Commonwealth of Pennsylvania - Notary Seal
LAURA SANTANGELO - Notary Public
Montgomery County
My Commission Expires Feb 25, 2023
Commission Number 1347093

# Meredith L. Feher

438 Round Hill Road, Wayne, PA 19087 ● 610.357.1101 (cell) ● merri.feher@gmail.com

## EXECUTIVE

Results-oriented, creative leader with comprehensive knowledge in management, marketing, planning and tactical experience in health and long term care organizations. Recognized skills in strategic planning, organizational change, business development, communications, and human resource development.

## SELECTED CAREER ACCOMPLISHMENTS

**Abramson Center for Jewish Life**

*Vice President of Business Development*                                    *June 2008 to present*

- Assisted in creating a joint venture with external partner for an 8 chair dialysis unit
- Opened a 54 bed transitional care unit which generates over $8M in annual revenue
- Unveiled Medical Adult Day Center to serve over 300 indigent community clients
- Supported and launched Nurse Practioner House Calls program to service over 1,800 community residents
- Successfully implemented an information and referral hot line which qualifies over 1,200 new prospective clients annually
- Assisted in the creation of new business units including $4M Hospice program which included contracting with area providers for referral services
- Identified and assisted in the acquisition of a fully accredited Medicare Home Health Agency which generates over $3.6M in annual revenue
- Recruited and hired 2 external sales representatives to support community service programs
- Serve as liaison to 162 Abramson Center for Jewish Life Members of the Board
- Continue to develop new branding initiatives which includes new print and web advertising campaigns
- Establish effective working relationships with facility senior team and functioned as a mentor in all areas of market development, census strategy, and community relations

*Vice President, Program Services, Director, Inn for Assisted Living*          *July 2004 – June 2008*

- Created immediate impact on the bottom-line with strategic restructuring and implementation of sound management systems
- Directed strategic general services for 48 – bed Assisted Living facility with management responsibilities for 100 employees and $3.5 million budget
- Managed service departments in skilled nursing center; social service, admissions, dietary, volunteers, and recreation
- Provided overall center management in the absence of the nursing home administrator
- Increased company profitability with implementation of specific productivity and accountability standards for individual and agency performance
- Evaluated challenges and market opportunities throughout the region and designed systematic plan to achieve the organizational goals of census enhancement for the Adult Day Care Program
- Successfully transitioned and trained staff from paper based Medical Record system to an Electronic Medical Record system which streamlined resident care while providing real time documentation
- Assisted in the development of audit tools for Quality Improvement to support compliance programs
- Transitioned center to a new Pharmacy provider to service 372 residents
- Successfully educated and enrolled over 250 residents in Medicare Part D plans. Created training sessions for family members and staff

**HCR/ManorCare - Devon Manor Independent & Assisted Living Community**
*Executive Director, Residential Living*                          *November 2003 – July 2004*
- Translated comprehensive marketing plans in subacute programs, wellness centers, and other senior services into utilization, outcome and revenue targets
- Created cohesive management teams through extensive revision of facility systems and operating policies
- Developed and directed marketing plans, achieving significant increase in census

**Genesis Health Ventures**
*Quality Control Coordinator, Mid Atlantic Region*                *May 2002 – November 2003*
- Developed audit tools including policies & procedures regarding Sarbanes Oxley assuring compliance with centralized billing
- Decreased days outstanding from 60 to 40 days through aggressive training and consistent follow-up
- Implemented effective operating and quality management systems to ensure high performing services and compliance with Centers for Medicare and Medicaid

**HCR/ ManorCare**

*Collections Manager/Business Office Manager*                     *June 1998 – May 2002*
- Established aggressive monthly A/R goals for facility
- Implemented front end collections methodologies to reduce accounts older than 60 days
- Managed accounts payable and ancillary service teams

*Arcadia Unit Manager/ Alzheimer/ Dementia Unit*
- Performed pre-admission screening protocols for eligibility to unit
- Networked and created referral sources through marketing calls and community outreach
- Established monthly support groups for family members

**EDUCATION:**
Bachelor of Science                                              West Chester University, May 1995

**LICENSES:**
State of Pennsylvania Personal Care Administrator
State of Pennsylvania Nursing Home Administrator

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | NO. 17-cv-04462-RK |
| v. | : | Jury Trial Demanded |
| WAVERLY HEIGHTS, LTD., | : | |

## AFFIDAVIT OF THOMAS GARVIN

I, Thomas Garvin, do hereby swear and affirm as follows:

1.      I am the President and Chief Executive Officer of Waverly Heights, Ltd. and I have held that position for the past nine years. I was the CEO during the time that Plaintiff, Kathleen Jungclaus was employed and terminated by Waverly Heights, Ltd.. I have a Master's Degree in Management-Healthcare Administration and a Bachelor's Degree in Hotel, Restaurant and Institutional Management. I have been a licensed nursing home administrator for nearly 24 years. My resume is attached to this affidavit.

2.      I am 49 years old.

3.      At no time during the course of my tenure as CEO did Kathleen Jungclaus (hereinafter "Plaintiff") make any claim to me that she had been the victim of discrimination on the basis of her age or gender. At no time did I make any decision using age or gender or any other protected class as a factor in the decision.

4.      I was present during some of the times that Plaintiff met with various Board Committees including but not limited to the Human Resource Committee and the Ethics Committee.

5.      At no time did Plaintiff make any complaint to any Board Committee or Board member that she was the victim of discrimination on the basis of her age or gender.

6.      No individual member of the Board of Trustees including members of the Human Resource Committee or Ethics Committee reported to me that Plaintiff alleged that she had been or was the victim of discrimination in any form.

7.      At no time when I was present during any meeting with the Board of Trustees and/or the Human Resource Committee and/or the Ethics Committee did Plaintiff claim that anyone had been the victim of discrimination on any basis. In fact, when Plaintiff discussed several legal matters filed against Waverly alleging that she engaged in discriminatory practices, Plaintiff

1

assured the Board Committee that there had been no discrimination and that Waverly continued to be free of discriminatory practices.

8.     No individual member of the Board of Trustees, including members of the Human Resource Committee and Ethics Committee reported to me that Plaintiff alleged that any employee had been or was the victim of discrimination on any basis.

9.     Plaintiff never made any complaint on her own behalf or on behalf of any other that the emails from former Board President Soltis were unwelcome or offensive. Mr. Soltis is not an employee of Waverly and used his personal email to send emails to certain individuals who he knew had common political beliefs. No employee, including the Plaintiff, requested that Mr. Soltis be asked to stop sending emails. The first time that I learned that Plaintiff viewed Mr. Soltis' mails as offensive or unwelcome was when we received a letter from Plaintiff's counsel making that allegation. However, when we reviewed emails sent between Plaintiff and her husband on Plaintiff's work computer, it is clear that Plaintiff and Mr. Soltis' views were in line with one another. (See emails attached in Appendix) In those emails, Plaintiff and her husband made the same remarks about President Obama and others which, at her deposition, so offended her.

10.     In 2010, when I began as CEO at Waverly, there was a senior leadership team in place. I was told that many of these individuals, including the Plaintiff, believed that I would terminate the senior leaders to replace them with individuals chosen by me. I did not do this. I did not replace anyone or ask anyone to leave for more than four years and used performance and position market value as provided by an outside contractor, Mr. Wozniak, as the basis for all decisions relating to the terms and conditions of employment. I have never used age or gender as a factor when making employee related decisions and did not use age or gender as a factor when terminating the employment of Plaintiff in 2016.

11.     Plaintiff never brought to my attention any concern she had about the termination/resignation of Mr. Ishmail Hamid or that she believed that his termination/resignation was based on age discrimination. The first time I learned of this was when Plaintiff testified at her deposition. Plaintiff was involved in the discussions about Mr. Hamid's performance and was aware that there had been a performance improvement plan developed for him. Mr. Hamid was employed in the business office and interacted with Waverly's outside auditors. The auditors brought to our attention that there were concerns about the work he was doing. We worked with him and developed a performance improvement plan. Thereafter, Mr. Hamid decided to resign. There were no decisions regarding Mr. Hamid' s performance that were in any way related to his age. It was Mr. Hamid's decision to resign. He did not file a complaint of discrimination with either the EEOC or the Pennsylvania Human Relations Commission against Waverly and Plaintiff never reported to me that Mr. Hamid filed a complaint with her alleging age discrimination. He was given a severance package.

12.     Not one of the employees Plaintiff claims was the victim of age discrimination, such as Mr. Hamid, Meg Guenveur, Anne Rogers, or Colin Gallagher filed a complaint of discrimination for either age or gender with either the EEOC or the PHRC. If any of those

2

individuals filed a complaint under Waverly's non-discrimination policies, Plaintiff did not inform me of this and none of the employees reported any discrimination to me.

13.     Anne Rogers was the Chief Financial Officer when I began my tenure as CEO at Waverly. I worked closely with her for about four years before her performance became an issue. In fact, Anne Rogers' termination was the result of an investigation by me into complaints brought by staff members, including the Plaintiff, about Mrs. Rogers' interactions with them. I tried to work with and counsel Mrs. Rogers but she did not improve her staff interactions and was unwilling to follow through with improving her performance. However, none of the employee complaints were framed in terms of discrimination but rather were complaints about personality issues. Plaintiff was not only supportive but pressed me to make the decision for some time. Plaintiff knows that neither age nor gender was a factor in the decision to terminate Mrs. Rogers' employment because she advocated for her termination.

14.     Meg Guenveur was the Vice President of the Health Care Center for many years until her retirement. She was 64 at the time of her retirement. When Mrs. Guenveur announced that she was going to retire, Waverly solicited applications for the position. Plaintiff never applied for the position despite the fact that Waverly had paid for her to attend and complete the nursing home administrator licensing program; a requirement for the Health Care Center administrative position since the law require a person running a nursing home to have a license as a nursing home administrator. It is the Vice President of Health Care (now the Senior V.P. of Healthcare) who is responsible for the day to day operation of the continuing care aspects of the Waverly community relating to assisted living and nursing home services. Though Plaintiff attended the courses required for certification, she never followed through to obtain her license as a nursing home administrator. Plaintiff was given paid time away from work to attend the nursing home administrator classes. Mr. Garvin even moved his standing meeting with the senior management team from Tuesdays to Wednesday so Mrs. Jungclaus would not miss these meetings. She was also paid for time away from work to teach a portion of the human resources module of the nursing home administrator course. Because Plaintiff never applied for the position held by Mrs. Guenveur, and did not meet the legal requirement, she was not considered for it by either me or the Board. However, she reported to other employees that she had been the choice of the Board for this position.

15.     Meredith Feher was hired as the Vice President of Health Care in 2014. She was 43 years old at the time of her hire. Mrs. Feher is a licensed nursing home administrator. I worked with Mrs. Feher when I was employed by ManorCare Inc. and recruited her to apply for the position as the Vice President of Healthcare. She was hired by the Board and has received regular pay raises, bonuses and a promotion to Senior Vice President. Her salary and bonus were calculated in the same manner as all of the senior leadership team members; performance and market value. Ms. Feher has never advised me that she believes that she or any woman at Waverly has been the victim of gender or age discrimination. She has never hesitated to bring matters involving her compensation package or the compensation of the individuals she supervises to me directly. I have never retaliated against her for advocating on behalf of herself or others.

16.     I have never made the statement regarding getting "rid of old timers". All except one of the members of the senior leadership team are over the age of 40. I did not "clean house"

3

when I became CEO and evaluated the existing managers on their merit not their age or gender. I have never called anyone a racist or used that term.

17.     Contrary to the testimony of the plaintiff, Plaintiff did not support salary increases for female senior managers. Janet Thompson, the Vice President of Marketing, came directly to me to discuss her salary and the salaries of her staff members because Plaintiff was not receptive to this when Mrs. Thompson brought salary increases to her attention. She was never an advocate for the rights of women in the workplace.

18.     At no time did Plaintiff complain about Mr. Supper or his treatment of either women or any other employee. Plaintiff never stated that the behavior of Mr. Supper was demeaning to her or that his behavior prevented her from doing her job. Plaintiff and I discussed the fact that Mr. Supper was sometimes argumentative but this style was not dependent upon whether he was speaking with a male or female employee. I did speak with Mr. Supper and he improved the way in which he communicates with employees and his colleagues.

19.     Mr. Supper had a vehicle as part of his employment compensation. I have a vehicle as well. For more than twenty five years, the only two individuals with company cars were the CEO and the CFO. That did not change in 2010 when I arrived at Waverly or in 2014 when Mr. Supper was hired as the new CFO replacing Anne Rogers. Mrs. Rogers, a female, had a company car as well. The decision to provide a car as a benefit to the CFO and the CEO was made without regard to the gender of the person who occupied the position and this is a benefit decided by the Board of Trustees, not me or any other member of senior management.

20.     Plaintiff nevertheless tried to undermine my relationship with Meredith Feher who is the Senior Vice President of Health Care by suggesting to Mrs. Feher that she was being treated differently because she did not have a car. Mrs. Feher came to me and specifically told me that she did not want a car and that Mrs. Jungclaus was the one who tried to make an issue of it, not Mrs. Feher.

21.     Neither age nor gender has ever played a part in the way in which salaries and bonuses are set each year. Waverly employs an outside consultant, Thomas Wozniak, who worked with Plaintiff for many years before I became the CEO and continues today as the expert on market values for non-profit leadership positions. Each year, Mr. Wozniak would look at the salary and benefits available at Waverly and compare each position data to the market value for similar positions at other non-profit organizations. Thereafter, he would make a recommendation to me and the Board Human Resources Committee regarding the salary range for each leadership position, including a percentage increase. I would then evaluate the performance of the team member and determine what raise to award for the upcoming year. I would make these recommendations to the Board Human Resources Committee who were ultimately responsible for approving my recommendations. At no time did I take age or gender into account as a factor in the decision regarding the amount of salary increase to be awarded. This system is described in the Employee Handbook.

4

22.     In addition to regular salary increases linked to performance and market value, I could award a discretionary bonus to senior members of the team and others who, in my opinion, performed their duties in an exemplary way, above the expectations for the position. For example, during a period when Waverly was engaged in a large construction project, Marc Heil, the Vice President of Building Services, worked many long hours and long days coordination the entirety of the construction project; something he did in addition to completing all of the duties of his position. The decision by the board and myself to give Mr. Heil a large bonus and a vacation was based on his exemplary work and not, as suggested by Plaintiff, because he is a male.

23.     Plaintiff received four discretionary bonuses from me between 2010 and 2016. She would have been eligible for additional bonuses or even a pay grade increase had she completed the nursing home administrator course which was paid for by Waverly.

24.     Each year, when I received the salary analysis from Mr. Wozniak, there would be recommendations made regarding not only yearly increases for Mr. Supper, Mrs. Fehr and Mrs. Rodgers, but also a calculation of variable pay/bonus percentages to assist me and the Board in making a determination as to what the salary increase would be and whether a bonus might be warranted.

25.     The recommendations from Mr. Wozniak were based on his market analysis and neither age nor gender were factors in this analysis. I regularly awarded bonuses to female members of the senior leadership team including Mrs. Thompson, Mrs. Rodgers, Mrs. Guenveur and Mrs. Feher. Occasionally, I awarded a bonus to Plaintiff when extra duties were taken on.  For example, In 2011 and 2013, Plaintiff was given a bonus for the work she did spearheading completion of surveys by employees which have Waverly voted as a "Best Place to Work" in the Delaware Valley.  In 2014, I gave Plaintiff a bonus when she covered the Environmental Services Department while Waverly searched for a new director to fill an open position.  Plaintiff was awarded a bonus in 2016 because the company had a very good year financially and though I could not tie the bonus to any special work that Plaintiff did that year, I thought she should receive a bonus.  She had not received a bonus in 2015.

26.     Plaintiff's role in the organization was not one where extra duties or responsibilities were taken on except as noted. For the most part, Plaintiff seemingly did the job described in her 2005 job description but nothing more.

27.     When I began as the CEO, Plaintiff held the title of Director of Human Resources. Soon after I arrived, Plaintiff came to me to request that I award her a promotion and that I increase her salary more in line with the market value for her position. Though her salary was within the margin of error for the position, it was below the mean market value. I reviewed Plaintiff's job duties and agreed to promote her to the position of Vice President of Human Resources. This promotion came with a salary increase which brought her to at or above the market value for her new position. During the entirety of the time I worked with Plaintiff, her salary was at or above market value. That was not the case when Plaintiff worked for Mr. McGuire. Mr. McGuire refused Plaintiff's request for a promotion and refused to bring her salary up to market level though it was always close.

5

28.     In December 2015, Plaintiff was moping around the office. I repeatedly asked her what was wrong and she refused to tell me. Finally, after several days of this behavior, I asked her whether she was upset about some work related matter. Plaintiff then came into my office and advised that she was unhappy with the raise and bonus she had been awarded. Plaintiff felt that she was undervalued. I considered her arguments but did not change my mind. Plaintiff's increase was in line with the market value for her position and the bonus she was given reflected the fact that Plaintiff was doing what she was paid to do and little more. It was Plaintiff's job to enforce work place rules and monitor employee satisfaction and to bring matters of importance regarding these areas to my attention. Employee satisfaction is not usually tied to any relationship with the HR department but rather tied to the salary and benefits available to employees. I declined the request to re-visit the award of salary and bonus for 2016. In my opinion, Plaintiff did her job; nothing more.

29.     After we met in December 2015, I treated her the same as I always had. The salary issue occurred in December 2015. Plaintiff's termination occurred on September 27, 2016.

30.     Had Plaintiff completed the Nursing Home Administrator coursework and examination, she would have been eligible for a discretionary bonus.

31.     I want my colleagues to come to me with questions or concerns about compensation and bonuses. It is important to me that employees' compensation and benefits are fair and competitive in the non-profit workplace or Waverly will lose employees. I have never retaliated against someone because he or she has advocated for a better raise or bonus for him/herself. I did not retaliate against Plaintiff when she asked me to reconsider her raise or bonus amount. I did not use Plaintiff's gender or age as a factor when setting her salary and bonus for 2016 or any other year.

32.     The benefits I receive about which Mrs. Jungclaus complains, such as having my company car washed, or receiving a sum of money for moving expenses or being paid a stipend for health insurance, were items that are the subject of an employment agreement between the Board of Trustees and me. I have always advised the Board about any matter relating to my compensation that could be perceived as a conflict of interest. For example, before purchasing my summer home from an architect who does work with Waverly, I contacted members of the Executive Committee, including legal counsel of the Board of Directors. All of the benefits I received were part of the compensation package I negotiated with the Board.

33.     I requested that Plaintiff set up a Go Fund Me page for the benefit of a Waverly employee's child who had cancer. Upon learning about Plaintiff sending the Tweet that is the subject of this lawsuit, I learned that Plaintiffs Twitter account "followed" Waverly. I also learned that Plaintiff used her Twitter account to promote the Go Fund Me page for the Waverly's employee's child, as well as for her own personal social media purposes.

34.     At the time I first met with Plaintiff about the Tweet on September 20, 2016, she did not state that she had not created or posted the tweet nor did she say that the initials "AA" stood for "Administrative Assistant". Instead, she stated that she was surprised that the tweet had come to light. At the time of her termination on September 27, 2016, Plaintiff first apologized about the tweet then claimed that her account had been hacked but she did not know who was

responsible. She did not tell Mr. Bauer and me that her husband posted the tweet in question using her Twitter account. I didn't find out about this version of events until the unemployment compensation hearing on November 28, 2017.

35. The termination of the plaintiff had nothing to do with her age or gender or the fact that nine months previously, Plaintiff advised that she was unhappy about her raise and bonus. Neither age, gender nor participation in protected activity was a factor in the decision made by the Human Resource Committee and me to terminate Plaintiff's employment. Instead, Plaintiffs incredibly bad judgment exposing Waverly to claims of racial discrimination and the taking of an unlawful poll was the reason for her termination. The taking of a poll of a protected group of individuals in the workplace and then posting of information on a public website is a violation of IRS regulations governing non-profit corporations that could result in a withdrawal of funding and other liability. Plaintiff knew or certainly should have known this as a long time human resource professional.

36. I was told by Patricia Rodgers, Vice President and Director of Operations, that several of her African American employees approached her because they had seen and were upset by the Plaintiff's tweet. Shortly after Plaintiff was terminated, I met with these employees and tendered an apology to them. The employees told me that they had seen the Tweet before it was taken down and were offended that Plaintiff would post a tweet purporting to group African Americans together and purporting to speak for the employees. I confirmed Waverly's commitment to non-discrimination.

37. Michael Hendrickson was an insurance sales person who had worked with Mr. McGuire, the former CEO and with Plaintiff for many years. When I began my tenure as CEO, Mr. Hendrickson wanted to continue to do business with me. There were several meetings between us. Plaintiff was present at these meetings as she had worked with Mr. Hendrickson previously. Plaintiff never advised me at any time that she was uncomfortable with Mr. Hendrickson nor did she ask me not to attend the meetings. Instead, both Plaintiff and Mr. Hendrickson behaved as "friends" with one another and I never saw or heard anything inappropriate during these meetings. Plaintiff did not report to me that anything inappropriate occurred or that anything was said to make her uncomfortable. The first time I learned that Plaintiff was alleging that Mr. Hendrickson made her uncomfortable was when she was deposed. There was no mention of this in either Mr. Schwartz' letter of November 8, 2016 or in the complaint filed with the EEOC.

38. Waverly has a strong history of immediately terminating individuals for impropriety. (See Termination Chart included in the Appendix) For example, we terminated two male workers for inappropriate language and sexual harassment. We terminated a female manager who requested sex from her male employees.

39. As someone who taught the course offered as part of the Nursing Home Administrator educational requirements regarding human resource practices and procedure, Plaintiff knew her conduct was prohibited.

40. As an experienced human resources professional and someone who admittedly drafted and implemented Waverly's policies prohibiting discrimination and retaliation, Plaintiff knew that the making of a claim of discrimination or harassment was protected and that retaliation against the individual making the complaint was prohibited.

41.    Plaintiff's claim that the atmosphere and culture at Waverly was discriminatory is not true but if any such "atmosphere" existed, it was Plaintiff's responsibility to identify this and to take steps designed to investigate the claim, remediate the issue and prevent it from occurring in the future.

42.    I have never withheld information from the Board of Trustees regarding the benefits of my employment. I advised the Board prior to my purchase of a home from an architect who works with Waverly. I provided the Chairman of the Board with the real estate comparables, as requested by the Executive Committee, for similar properties so that they would be able to determine if I received some inappropriate benefit from this outside contractor.

43.    I have never created an atmosphere of male superiority. To the contrary, I am an approachable CEO who regularly interacts with the individuals employed by Waverly. I participate in employee events such as the NCAA basketball pool. When I won the pool several years ago, I immediately gave all of the money to the next ten employees and the employee who finished in last place, with successful brackets. At least 50 employees were present when this occurred. I have never retained any money or anything else of value I won as part of an employee or resident contest.

44.    I never "double-dipped" health insurance benefits. Contrary to Plaintiff's version, I did not receive both a stipend to pay for health benefits and receive health insurance paid for by the company. Plaintiff's version is simply wrong. I do not have a written executive employment agreement. Plaintiff was never involved in the negotiations of the terms of my employment, including but not limited to my benefits/compensation package.

45.    When I was hosting a private party in my home, I asked Debra Best, the Service Manager for Dining Services at Waverly whether she would be willing to privately cater the party. I paid for her services and the services of those she asked to work with her on this project. I paid full market value for any and all food provided for the catered event. Mrs. Best acted as the caterer for this party and she was treated with courtesy and respect. I have a good relationship with Mrs. Best and she never advised me that she was upset by the way in which she was treated in my home. I was in the hospitality industry and understand the difficulties of catering events. I would never disrespect any person working in my home and certainly did not do so with Mrs. Best.

46.    I never asked Plaintiff to attend a course or sign in to a course for me. I am not required or expected to take the SilverChair classes, as my continuing education is completed by attending 48 hours of continuing education required for my nursing home administrator's license. Those programs are designed to keep employees current on company policies and procedures and matters relating to their work for Waverly. I attend conferences and continuing education programs to maintain my license as a nursing home administrator and to keep up with current practices in the healthcare industry. I have completed SilverChair trainings and continue to do so when relevant to my position and for morale purposes. I would not and did not ask anyone to sign in for me for a course I did not take.

47.    When Plaintiff suffered an asthma attack after working in the attic with others, I did not ask that she refrain from filing a worker's compensation report of the incident. I was not even at work due to a vacation day on the Friday when the event occurred. Instead, I inquired whether

she was okay. The reporting of work-related injuries or illness does not trigger an increase in insurance premiums. I do not keep track of and do not know what reports are made. I don't recall making any joke to Plaintiff about the V.P. of H.R. filing a workers compensation report and never checked to see whether she filed a report or not. It was of no concern to me whether a report was filed or a claim made.

48.    Plaintiff's claim that she was responsible for saving the company money on worker's compensation premiums is false. All human resource professionals are expected to implement training programs designed to keep workplace injuries to a minimum and this was part of her job description. She instituted no new initiatives that had not been in place for many years prior to my coming in as CEO. She developed no innovative training programs and did not work long hours at her job. She was expected to monitor employee related matters such as absences, disability claims and benefits and was expected to investigate claims of discrimination, harassment or any other employee complaint brought to her attention. She was not given extra duties or asked to work on special projects. In short, Plaintiff was simply asked to do the job for which she was hired.

49. Plaintiff and I met regularly to discuss the human resource aspects at Waverly. Plaintiff always expressed herself very clearly about matters she felt were unfair both in her meetings with me and with the senior leadership team. The claim that she was afraid of me or afraid of retaliation from me for bringing employee concerns or her own concerns to my attention is ludicrous. I never retaliated against her for anything she brought to my attention.

50. Plaintiff was not responsible for creating an atmosphere that warranted recognition as one of the best places to work in Pennsylvania. It is the line managers and employees working together as a team and the benefits and competitive compensation packages that are offered to employees to entice them to stay that deserve the credit for this recognition. It is also establishing and maintaining an atmosphere free of discriminatory or retaliatory practices that help retain good employees. This was the job of all of the managers and the employees themselves. That Plaintiff would take credit for this while claiming that there was a culture of discrimination, demonstrates Plaintiff's distortion of the facts to serve her own purpose.   She received a discretionary bonus from me because of her work getting employees to complete the workplace survey and for submitting it to the contest organizers.

51.    My philosophy is to treat all individuals fairly and equally and I did so in this case. I did not discriminate against the Plaintiff on the basis of her age or gender nor did I retaliate against her for any conduct constituting protected activity. My decision to challenge her application for unemployment benefits was made more than a month before I received a letter from Mr. Schwartz and several months prior to any filing with the EEOC or PHRC. (See documents attached with Appendix).

9

Appendix 1250

_Thomas P. Ga__

Thomas Garvin

Sworn to and subscribed before me,

this   30th   day of July, 2019.

_Amy E. Blessing_

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
AMY E BLESSING
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Nov 22, 2020

# FUNCTIONAL EXPERIENCE-THOMAS P. GARVIN

**EMPLOYMENT**

*Waverly Heights Ltd.*
- President and Chief Executive Officer (July 2010-Present)

*Christ's Home Retirement Community*
- Senior Administrator/Executive Director Retirement Services (March 2006-June 2010)

*HCR ManorCare* (May 1993-March 2006)
- Regional Director of Operations (May 2000-March 2006)
- Administrator ManorCare Health Services at Mercy Fitzgerald (May 1998-May 2000)
- Administrator ManorCare King of Prussia (April 1997-May 1998)
- Administrator ManorCare Yardley (January 1996-April 1997)
- Assistant Administrator ManorCare Health Services Yardley (Sept. 1995 -January 1996)
- Administrator -in-Training ManorCare Wilmington (August 1994 - September 1995)
- Environmental Services Director MedBridge Huntingdon Valley (May 1993 -August 1994)

**ADMINISTRATIVE MANAGEMENT**

*Four Seasons Hotels Corporation:* (May 1991-May 1993)
- Philadelphia Four Seasons Hotel, Operations Management Positions

Duties and responsibilities include:

- Spearheaded multiple major construction/expansion and renovation projects.
- Oversaw Capitalization planning including initiation and completing public bond financing
- Responsible for eight skilled nursing and rehabilitation facilities with 1360 beds
- Develop new business ventures and creating consistent revenue enhancement and margin growth
- Developed and implemented policies and procedures to support corporate objectives
- Monitor and managing of accounts receivable
- Ensure compliance with any and all state and federal regulations
- Develop, plan, and implement facility capital and operating budgets
- Adhere to affirmative action programs, ensuring access to all departmental and promotional opportunities in an environment of non-discrimination
- Monitor all aspects of employee recruitment, interviewing, training, counseling, benefit services and termination processing

Accomplishments:
- Successfully created expanded CCRC community including cottages and a clubhouse
- Lowered accounts receivable DSO by 20 days. Decreased bad debt expense to 1.35 per patient day in FY 2004
- Increased customer satisfaction by 5% through dynamic problem resolution and communication skills, and program implementation
- Successfully achieved and maintained "agency free" status through consistent management and creating an environment of respect and trust amongst all employees
- Experienced tremendous success at building a team of committed qualified Nursing Home Administrators and Assisted Living Director
- Increased census quality mix to 50% of total regional occupancy

**OPERATIONAL MANAGEMENT**

Duties and responsibilities include:

- Analyze monthly operating statements to develop reports for operational reviews
- Manage accounts receivables by conducting full monthly reviews
- Develop educational programs to ensure staff safety and proficient performance
- Create a positive environment for staff which encourages creativity, positive problem solving and job satisfaction
- Total corporate accountability for a budget in excess of 95 million dollars of revenue annualized
- Expand revenues while maintaining strong expense control
- Maintain staff awareness and ensuring compliance with all applicable regulation of government agencies including city, state, and federal

Accomplishments
- Achieved significant compliance with Department of Health Surveys.
- Served on corporate project team for Outcomes-based sales/marketing approach to census growth
- Assisted in developing and successfully implementing Nursing Leadership programs within region

THOMAS B. GARVEY
10 Penn Manor Ct.
Fort Washington, PA  19034
610.506.6709
tngarv@comcast.net

## PRESENTATION OF QUALIFICATIONS

----

### SUMMARY

Over 28 years of experience in the healthcare and hotel industry.  Broad based skills in operational management, customer service and sales/marketing.  A highly analytical businessman with a proven track record at expanding gross revenue and net operating income through effective and dynamic leadership and exceptional expense control.  An individual with an exceptionally high energy level combined with outstanding problem resolution skills and a hospitality mentality.

### EDUCATION

Master  of Management  Degree
Health Care Administration
Pennsylvania State University

Bachelor of Science Degree
Hotel, Restaurant & Institutional Management
Pennsylvania State University

Licensed Nursing Home Administrator
Pennsylvania

### COMPUTER RELATED SKILLS
PC, Macintosh, Windows, Word, Excel, Power Point.

### CUSTOMER SERVICE TRAINING
Walt Disney World - Disney University Training/Internship
Four Seasons Hotels - Customer Service Orientation Program
HCR ManorCare - Circle of Care
Waverly Heights-Fish and Wave Training

### PROFESSIONAL A S S O C I A T I O N
Penn Wood HealthCare Academy Board of Directors – Former
President Bucks County Drug and Alcohol Council – Former Board
Member/Treasurer Mercy/Manor Partnership – Former Board Member

### PROFESSIONAL  PRESENTATIONS
Outcomes Marketing - HCR ManorCare Regional  Director Meeting
Changing Times in the Healthcare  Industry - Pennsylvania  State University
The Dynamics  of Customer  Service - St. Francis  College
LeadingAge PA-Creating a Hospitality Culture in Senior Living Communities
LeadingAge PA-Addressing Workforce Development Issues through University Partnerships
LeadingAge PA-Bon Appetite Dining for the Next Generation in Life Plan Communities
Pennsylvania State University Hospitality Management School-Careers in Senior Living
Life Plan Community Council-Hospitality Trends in Senior Living Communities

Appendix 1253

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | NO.  17-cv-04462-RK |
| v. | : | **Jury Trial Demanded** |
| WAVERLY HEIGHTS, LTD., | : | |

### AFFIDAVIT OF MARC HEIL

I, Marc Heil, do hereby swear and affirm as follows:

1. I am the Vice President of Building Services at Waverly Heights, Ltd. ("Waverly") and I have been employed at Waverly for more than 22 years. I am 48 years old and have been working for Waverly since I was 26.

2. Kathleen Jungclaus hired me 22 years ago and since that time, I have worked hard for the promotions and responsibility I have been given.  It is my responsibility to manage all aspects of the physical plant including the health center, residential units, grounds, security and maintenance at Waverly.  I provide oversight to many managers, supervisors, and employees.

3. I worked for Mr. McGuire, the prior CEO at Waverly and currently work with Mr. Garvin.  At the time Mr. Garvin was hired, I was a member of the senior leadership team and that has not changed.  Though the senior leadership team members were concerned that their jobs would be on the line when Mr. Garvin began as CEO, that didn't occur.  The team has remained almost unchanged from its composition in 2010.

4. Mrs. Jungclaus and I were friendly at work but did not socialize outside of work.

5. During the time that I worked with Mrs. Jungclaus, she never made any statement to me about discrimination against her or older workers or females at work.  No employee made a claim of discrimination to me and if that had occurred, I would have reported it to Mrs. Jungclaus.

6. I never heard Mr. Garvin make the statement "Don't worry, I'm not getting rid of old-timers" and I never said otherwise to Mrs. Jungclaus. However, even if that statement had been made, I would have assumed that it referred to me too because of the length of time I have been with Waverly not because of my age. I am younger than Mr. Garvin. Mr. Garvin has never made a derogatory comment about either the gender or age of an employee.

7. I was asked by Mr. Garvin to monitor the termination process for Mrs. Jungclaus when she left on September 27, 2016. This is not atypical as I am responsible for security and whenever an employee is asked to leave, or even resigns, we accompany the employee so that he or she can get his/her personal belongings.

8. Mr. Garvin told me that he wanted Mrs. Jungclaus' departure to be unobtrusive and private and wanted me, as a member of the senior leadership team to monitor the situation. I was not present when she was terminated nor did I follow her from Mr. Garvin's office to Mrs. Thompson's office.

9. I first saw Mrs. Jungclaus on September 27, 2019 when I knocked on her office door and observed that she was cleaning out her desk. I waited with her and we walked together to the Manor House exit. Her office is right at the top of the stairs leading to the Manor House Exit and there are no offices near to her. We saw no one else as we left the building. Mrs. Jungclaus' car was parked at the Manor House exit.

10. At the time I met Mrs. Jungclaus in her office, and as we were leaving her office, I didn't notice if she had cleaned out her entire office but she did have a box filled with personal items.

11. A few days later, Mrs. Jungclaus called me and asked if she could come get some additional personal items. I went to her office and gathered all of the personal effects that she left behind and met her at the Park and Ride station.

12. Mrs. Jungclaus stated that she hoped she would never see me again and then, wished me luck in the future. I have not seen or spoken with her since September 2016.

13. Mrs. Jungclaus never stated to me that she believed she was the victim of discrimination in her compensation. We are all aware how the salary and bonuses are calculated using both performance and market value as guidelines. All of the senior leadership team was advised by Mr. Garvin that bonus amounts were given only where the employee had made a significant contribution over and above the expectation of the job description. In my case, I received a significant bonus and a vacation for me and my family after completion of a big construction project. During that project, I worked many long hours making certain that every aspect of the project was done properly. I coordinated all of the contractors and sub-contractors and interfaced with the local municipal governments providing the permits for the project. I handled this construction project in addition to the normal duties I still had to complete as the Building Services Vice President. I earned the bonus and pay increase I received toward the end of the project.

Marc Heil

Sworn to and subscribed before me,
this ___ day of July, 2019.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020

Appendix 1256

Marc D. Heil
729 Belvidere Road
Phillipsburg, N.J.  08865
(908-454-0406)

## EMPLOYMENT EXPERIENCE:

July16,1997 to Present
Simpson House
Position: Director of Environmental Services
Responsibilities and Duties:

-Simpson House is a managed account of Health Care Hospitality Services, Inc.
-Simpson House is a transitional care facility which houses 154 Nursing beds, 170
Independent Living Units, and 22 Personal Care Units.
-Direct the Housekeeping and Linen Services Departments
to initiate and administrate programs necessary to maintain the facility's
environment.
-Insure facility compliance with Federal, State, and Local guidelines.
-Maintain established budgets.
-Provide training and inservicing to employees for educational compliance with
Federal, State and Local guidelines.
-The applicant is also well informed and educated in many areas concerning the
O.S.H.A. standards for healthcare and industry requirements.
-The applicant remains on-call during off hours for emergency situations or
concerns that require immediate attention.

Februrary 10,1997 to July 16,1997
Silverstream Nursing and Rehabilitation Center, Health Care Hospitality Services
Position: Director of Environmental Services
Responsibilities and Duties:

-Direct the departments of Maintenence, Housekeeping, and Laundry to initiate
and administrate programs necessary to maintain the facility's environment.
-Maintain all mechanical systems and preventive maintenance programs.
-Insure facility compliance with Federal, State, and Local guidelines.
-Maintain established budgets.
-Provide training and inservicing to employees for educational compliance with
Federal, State and Local guidelines.
-The applicant is also well informed and educated in many areas concerning the
O.S.H.A. standards for healthcare and industry requirements.
-The applicant remains on-call during off hours for emergency situations or
concerns that require immediate attention.

August 1996 to February 10,1997
Cooper River Convalescent Center, Health Care Hospitality Services
Position: Director of Environmental Services, West Building.
Responsibilities and Duties:

-Direct the departments of Maintenence, Housekeeping, and Laundry to initiate
and administrate programs necessary to maintain the facility's environment.
-Maintain a computerized payroll system.
-Maintain all mechanical systems and preventive maintenance programs.
-Insure facility compliance with Federal, State, and Local guidelines.
-Maintain established budgets.
-Provide training and inservicing to employees for educational compliance with
Federal, State and Local guidelines.
-The applicant is also well informed and educated in many areas concerning the
O.S.H.A. standards for healthcare and industry requirements.
-The applicant remains on-call during off hours for emergency situations or
concerns that require immediate attention.

November 1994 to August 1996
The Care Center of Lopatcong, Health Care Hospitality Services:
Position: Director of Environmental Services/ North Jersey Training and
Development Coordinator.
Responsibilities and Duties:
    -Direct the departments of Maintenence, Housekeeping, and Laundry to initiate
    and administrate programs necessary to maintain the facility's environment.
    -Develop and implement training programs for managers to provide initial and
    ongoing education.
    -Maintain a departmental Quality Assurance program and participate in the
    company Quality Assesment program for sister Facilities.
    -Maintain all mechanical systems and preventive maintenance programs.
    -Insure facility compliance with Federal, State, and Local guidelines.
    -Maintain established budgets.
    -Provide training and inservicing to employees for educational compliance with
    Federal, State and Local guidelines.
    -The applicant is also well informed and educated in many areas concerning the
    O.S.H.A. standards for healthcare and industry requirements.
    -The applicant remained on-call during off hours for emergency situations or
    concerns that require immediate attention.

November 1992 to November 1994;
The Care Center of Phillipsburg, Health Care Hospitality Services
Position: Director of Environmental Services
Responsibilities and Duties:
    - Areas of responsibility same as mentioned above for the Care Center of
    Lopatcong. As the applicant's abilities enhanced, so did the opportunity for
    advancement

December 1990 to November 1992;
The Care Center of Lopatcong
Position: Assistant Director of Environmental Services
Responsibilities and Duties:
    -Assisted the Director in management of Housekeeping, Laundry and

Maintenance departments.

-Performed maintenance duties to maintain mechanical systems and preventive maintenance programs.

-Supervised all Maintenance projects.

-Performed corrections and repairs to comply with Federal, State and Local guidlines.

January 1988 to December 1990;
Life Time Door Company
Position: Foreman's Assistant, Machine Operator
Responsibilities and Duties:

-Supervised several areas of fabrication and production.

-Operation and set-up of machine presses, production machines, industrial tool stations, and other similar equipment.

-Organize and operate shipping and recieving procedures. Operate materials handling equipment including fork-lift trucks and other mechanical means.

-Chemical mixing and application.

-Various maintenance duties.

*Additional employment experience can be presented upon request.

Skills and Experience:

The applicant is a very motivated individual who takes great pride in providing quality service to his employer. Achievement, advancement, and the ability to provide leadership and direction are attributes which allow the applicant to reach almost any goal.

The applicant has experience in several areas of maintenance aptitude including carpentry, plumbing, electrical, and mechanical knowledge. Has ability to perform technical and detailed work. Very artistically inclined.

Education:
Northampton County Community College
Bethlehem, Pennsylvania 18107
English, Math, Art, History, Engineering.
1989 to 1990

Phillipsburg Catholic High School
Phillipsburg, New Jersey 08865
Diploma, 1989

References, Employment:
Dorothy Herkalo
Resident District Manager, Health Care Hospitality Services
(610)-863-7982

35 - 36006                    Appendix 1259

Additional references are available upon request.

Employer Information:

Simpson House
Belmont Avenue
Philadelphia, P.A.
(215) 878-3600

Silverstream Nursing and Rehablitation Center
905 Pennlynn Pike
Springhouse, P.A.
(215) 646-1500

Cooper River Convelescent Center
North Park Drive
Pennsauken, N.J.
(609) 665-9111

Care Center of Lopatcong
390 Red School Lane
Phillipsburg, N.J.
(908) 859-0200

Care Center of Phillipsburg
843 Wilbur Avenue
Phillipsburg, N.J.
(908) 454-2627

Life Time Door Co.
Sullivan Trail
Fork's Township, P.A.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS         :     NO.   17-cv-04462-RK

       v.                       :     **Jury Trial Demanded**

WAVERLY HEIGHTS, LTD.,          :

## AFFIDAVIT OF LAUREN KELLEY

I, Lauren Kelley, do swear or affirm as follows:

1. I am the current Vice President of Human Resources and I replaced Kathleen Jungclaus after her termination.

2. I was 43 years old at the time of my hire on December 19, 2016.

3. I hold a Masters Degree in Human Resources from Holy Family University where I maintained a 4.0 Grade Point Average.  (See Resume of Lauren Kelley attached as part of Appendix to Motion for Summary Judgment).

4. I have been employed in the non-profit sector for fifteen years since I began my career in human resources and from 2007 to 2013 was the Director of Human Resource Operations and Staff Training for Bancroft, a non-profit $100 million multi-site behavioral healthcare organization supporting a staff of over 2000 employees.

5. From 2013-2014, I was the Vice President of Human Resources for Source4Solutions, a company providing over 1000 permanent and 10,000 per diem teachers and other educational staff members to school districts in both Pennsylvania and New Jersey.

6. Until my employment with Waverly, I was employed beginning in 2014 as the Director of Human Resources for NorthEast Treatment Centers, a non-profit multi-site behavioral health and social service organization supporting a staff of over 800 employees.

7. As an adjunct professor at Holy Family College, I developed the course curriculum for the Human Resource Management course in the college's school of business administration.

8. I was a nominee for the Delaware Valley Human Resources Person of the Year in 2009 and have chaired the Tri-State Human Resource Management Association Non-Profit Committee.

9. I reviewed the complaint filed by Mrs. Jungclaus alleging discrimination at Waverly and listing her accomplishments.

10. Waverly Heights employed more than 300 employees and Waverly Care Associates employed more than 200 employees at the time of Ms. Jungclaus' termination. The number of employees has increased but not significantly since I became the Vice President of Human Resources.

11. When I was hired at Waverly, I was hired as a Vice President reporting to CEO Thomas Garvin.

12. It is the job of the Vice President of Human Resources to implement the policies set forth in the Employee Handbook.  There are specific policies prohibiting discrimination, harassment, and retaliation.  It is the job of the V.P. of Human Resources to conduct the investigations required by the policies and to reach conclusions regarding whether there has been any form of discrimination.

13. The V.P. of Human Resources' job is to report to the CEO, Mr. Garvin, instances of discrimination or harassment.  Where a complaint of discrimination and/or harassment has been filed against the CEO, it is the human resource professional who must report this to the Board of Directors or corporate counsel and the Corporate Compliance Officer.

14. At Waverly, employees know that there will be no retaliation against an individual for making a complaint and it is the job of the Human Resource professional to monitor and remedy any claim of retaliation.

15. I have made many recommendations to Mr. Garvin and others during my tenure as Vice President of Human Resources and have never refrained from reporting instances of alleged discrimination or harassment or hostile environment for fear that I would be the victim of retaliation.  Mr. Garvin has always been receptive to my opinions and recommendations.  It would be irresponsible of me, as a senior level team member, not to do my job as the Vice President of Human Resources, if or when instances of harassment or discrimination were reported or discovered by me in the course of my employment.

16. It is also the job of the V.P. of Human Resources to manage the workers' compensation claims of employees.  The implementation of safety programs in an effort to prevent workplace accidents is commonplace and part of the human resource professional's job responsibilities.

17. Ms. Jungclaus' claim that she saved the company thousands of dollars in insurance premiums for worker's compensation is misleading at best and a misrepresentation of her contribution.  Premiums for worker's compensation insurance are based on a claims history.  Safety programs are routinely offered to employees and I have provided this type of training to employees both prior to

Appendix 1262

and since my employment at Waverly.  However, there is no way to predict how many claims will be made or what injuries might be sustained in any given year and the insurance premiums can increase or decrease given the claims history.  To suggest that one person was responsible for saving the company money on insurance premiums is ridiculous.

18. Mr. Garvin has never asked me not to file a worker's compensation claim on behalf of any individual.

19. The mere reporting of a worker's compensation claim does not result in an increase of premium.  Thus, all claims should be reported and that has been my consistent practice.

20. There is an Employee Handbook that describes many of the company's employment policies and practices including its policies prohibiting discrimination.  The handbook also describes the company's open door philosophy for the free discussion of workplace issues among colleagues and this includes discussions about working conditions such as salary and benefits.  The handbook is given to all employees.  (See Policies attached to Motion for Summary Judgment.)

21. The company prohibits discrimination in any form and I and the supervisors and Senior Leadership Team work hard to make sure that employees know their rights to be free from discrimination and harassment and that there will be no retaliation against them for making any complaint about working conditions.  I found this to be the case at the time I began working for Waverly in December 2016.

22. The pay practices of Waverly are set forth in the Employee Handbook.  This provision was in effect at the time of Ms. Jungclaus' employment and has not changed since my tenure as V.P. of Human Resources.

23. The starting pay for all new employees is based on education and related work experience. Thereafter, pay increases or bonuses, if any, are set after the annual performance review by using the employee's current compensation rate in relation to the market value of his or her pay grade and his or her performance. (See Pay Raise Policy)  All pay increases are based on satisfactory performance.

24. Waverly uses an outside consultant, Thomas Wozniak, to analyze compensation levels and practices for members of the senior leadership team compared to those at other non-profits and also to analyze the market value of director and senior level management.   This practice has been in place for many years and remains the way in which salary levels and increases are reviewed. (See affidavit of Mr. Wozniak)  Mr. Wozniak submits his recommendations for percentage increases each year to both me and Mr. Garvin.

25. Mr. Garvin's compensation and benefit package is negotiated between him and the Board of Directors.

26. At no time is the gender or age or any other protected characteristic of an employee used as a factor to determine an employee's pay or pay increase. When I began my employment at Waverly, this practice was in place and has remained in place to date.

27. During the course of my employment at Waverly, I have had occasion to discuss pay increases with Mr. Garvin. At no time has Mr. Garvin used an individual's age or gender as a factor in the discussion of wage increases.

28. I have never believed that I was the victim of age or gender discrimination with regard to my salary increases nor have I ever expressed to anyone an opinion that Waverly's policy, practice or custom discriminated against women or those over the age of 40.

29. I regularly work with other members of the senior leadership team. At no time, have I received a complaint of gender or age discrimination or harassment in any form from any member of senior leadership nor any individual in a supervisory role.

30. I also work with Robert Supper, the Chief Financial Officer. I have never heard Mr. Supper make a remark demeaning or humiliating to or about women or those over the age of forty nor have I received a complaint from any employee that Mr. Supper has treated them in a discriminatory or harassing way. However, if I were to hear or see any inappropriate behavior on the part of any employee, supervisor or member of senior management, including but not limited to Robert Supper, or Mr. Garvin, I would make a report and begin an investigation. If Mr. Garvin was the subject of the complaint, I would report the conduct to either corporate counsel for Waverly or to the Board of Directors and the Corporate Compliance Officer.

31. It is my responsibility to conduct investigations of discrimination claims and would not hesitate to do my job as V.P. of Human Resources for Waverly. I have never feared retaliation from anyone in a position to affect my job for conducting an investigation as Waverly's policies mandate.

32. A human resource professional should be aware that it is a violation of law as well as Waverly policy to retaliate against an individual for engaging in a protected activity such as the reporting of discrimination. I have never feared retaliation or that I would lose my job for following Waverly's policy regarding the investigation of discrimination or for finding that there had been discrimination even against a member of the senior leadership team, including Mr. Garvin.

33. I received no complaint of discrimination in the manner in which any female supervisor was treated by either Mr. Garvin or Mr. Supper at any time during my tenure at Waverly.

34. I have received no complaint that any individual was the victim of retaliation for making a report on the company's Corporate Compliance Hotline.

35. In the healthcare field, as well as others, it is not the V.P. or Director of Human Resources that is responsible for preventing employee turnover. In my experience, it is the benefits and working conditions provided by the employer and the employee's satisfaction with the salary, benefits, working conditions and interaction with the employee's co-workers and supervisors. Ms. Jungclaus' suggestion that she was personally responsible for a low turnover rate cannot be supported. There are no facts to support the claim in paragraph 13 of the complaint that it was Ms. Jungclaus' performance that resulted in a low turnover rate. Rather the turnover rate has remained stable since she left Waverly.

36. Mrs. Jungclaus' claim that she was responsible for over $1,000,000 in dividends being paid back to Waverly is also a gross misstatement of the truth. The Human Resources professional has no control over the claims made for insurance nor any return or reduction of premium.

37. Mrs. Jungclaus' claim in paragraph 13 of the complaint that her development of employee training saved the company costs is not supported by any facts that I could find nor any statistics. As a Human Resources professional for several large non-profits, it was always my responsibility to develop and implement training programs for employees and this is part of my current job duties.

38. As the V.P. of Human Resources for Waverly, I am acutely aware of my responsibility to represent its core values and non-discrimination practices at all times. I read the tweet posted on Mrs. Jungclaus' twitter page and was appalled that any human resource professional, especially one employed by a company that has a high population of minority workers, would take any kind of political poll in the workplace or report the results of a poll in the public domain. When I read the tweet, I read it to mean that it had been the company that conducted the poll of its African American employees and that the human resource professional posting the tweet was reporting the results of this company poll. I was not surprised that Mrs. Jungclaus' employment had been terminated for doing this.


*Lauren Kelley*
Lauren Kelley
Vice President, Human Resources


Sworn to and subscribed before me
this 25TH day of July, 2019.

*Grace M Bregman,* 7/25/2019
Notary COMMONWEALTH OF PENNSYLVANIA

NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020

Appendix 1265

## LAUREN E. KELLEY, MHR

336 ROOSEVELT DRIVE, CHERRY HILL, NJ 08002
CELL PHONE: (609) 313-9643
LKelley519@yahoo.com

## SUMMARY OF QUALIFICATIONS

Human Resources Professional with over 15 years of progressive experience in the non-profit world. Strong focus on operational efficiency and effectiveness and the role of HR as a strategic business partner, dedicated to achieving the mission and delivering results. Excellent communication skills and a demonstrated ability to problem-solve and make sound decisions in a fast-paced environment.

## PROFESSIONAL EXPERIENCE

### NorthEast Treatment Centers, Philadelphia, PA

Northeast Treatment Centers is a non- profit, $65 million multi-site behavioral health and social service organization with a staff of over 800 full-time, part-time and per diem employees.

**Director of Human Resources**                                    August 2014 – Present

Responsible for oversight of all Human Resource Functions including talent acquisition, on-boarding, employee relations, legal and regulatory compliance, benefits administration, worker's compensation, leave administration, and performance management.

- Lead implementation of new HRIS/Payroll system to better meet organizational needs and drive employee self-service initiatives.
- Strengthened relationships between program leaders and HR Business Partners to ensure positive collaboration and direction in program-specific goals and objectives.
- Conduct investigations regarding discrimination, harassment, retaliation and employee misconduct.
- Work with outside counsel regarding employment claims from the EEOC, PHRC, DOL, and PCHR.
- Ensure HR Practices are aligned with legal and regulatory compliance.
- Supervise team of six HR staff including Benefits Administrator, HR Business Partners, and HR Assistants.
- Developed and trained supervisory staff on proactive corrective action processes promoting constructive relationships between supervisors and their staff. Continually work with program management to fairly and consistently implement performance management practices.
- Chair Organizational Safety Committee; lead proactive initiatives to encourage staff members to work safely to ensure their wellbeing and decrease worker's compensation costs.

### Source4Solutions, Cherry Hill, NJ

Source4Solutions is the management company for Source4Teachers and MissionOne, educational staffing and management organizations that provide over 1000 permanent and over 10,000 per diem, highly skilled teachers, paraprofessionals, clerical staff, and other non-certified personnel to school districts in multiple states including New Jersey and Pennsylvania.

**Vice President of MissionOne/Vice President of Human Resources**          April 2013 – August 2014

Responsible for overall operations functions in over 30 school districts in Pennsylvania and New Jersey. Worked with district administration to ensure programs and services provided are meeting or exceeding expectations. Oversee District Manager and Area Managers to ensure the delivery of high quality services.

- Ensured consistent HR practices are implemented according to company policies and procedures.
- Directed managers on implementation of performance management procedures including coaching, feedback, training and evaluations processes.
- Responsible for ensuring all new staff meet strict credentialing and compliance standards.
- Lead onboarding process of school district employees transitioning to Source4Teachers employees upon award of bids.

Appendix 1266

## Bancroft, Cherry Hill, NJ

Bancroft is a not-for-profit, $100 million multi-site behavioral healthcare organization with a staff of over 2000 full-time, part-time and per diem employees.

| | |
|---|---|
| **Director of HR Operations & Staff Training/Talent Management** | December 2007 – April 2013 |
| **Sr. Human Resources Operations Manager** | August 2005-December 2007 |
| **Sr. Human Resources Generalist** | June 2003 – August 2005 |
| **Sr. Employment Specialist** | June 2002 - June 2003 |
| **Recruiter/Sr. Recruiter** | November 1999 – November 2001 |

Managed human resources operations and training & development functions.  Partnered with all levels of management for guidance and problem resolution in the areas of recruitment/sourcing, employee relations, employee discipline, compensation, performance management, training/education, departmental restructuring, job eliminations, and other HR related issues.

- Ensured fair and equitable treatment of all employees according to organizational policies, procedures, and guidelines.  Worked with management to ensure consistent interpretation and implementation.
- Generated and analyzed detailed key performance indicators and metrics related to hiring, turnover, and vacancy rates, and training and development initiatives.   Reported findings to Senior Leadership team and assisted in problem solving and developing strategies to meet specific goals related to unique program needs and organizational objectives.
- Ensured Human Resource practices were aligned with state and federal laws and regulations, including EEOC, Department of Labor, FLSA, Joint Commission, CARF and Department of Health and Human Services.
- Conducted internal investigations in response to employee complaints, harassment allegations, civil rights and discrimination complaints; recommended appropriate courses of action for problem resolution while ensuring strict confidentiality.
- Supervised Employee Relations Manager and Compliance Team in carrying out daily operations including compensation assessments, employee relations investigations, and regulatory compliance audits.
- Restructured training initiatives of Bancroft University aimed to align strategic goals of the organization to the orientation and training being offered in four key focus areas: Regulatory Compliance, Skill Development, Professional Development, and Formal Education & Certifications.
- Created and facilitated professional development trainings for management staff on topics including behavioral interviewing, coaching and feedback, change management, communication, and team building.
- Trained management staff on goal setting and performance management processes linked to organization's strategic plan.
- Directed the full-cycle recruitment and onboarding process from sourcing and advertising to on-site orientation and training.   Developed new procedures to ensure efficient and effective on-boarding processes.
- Facilitated the development of recruitment branding strategy and researched and piloted new advertising sources to attract talent in specific target markets.
- Managed recruitment budget, negotiated advertising contracts, and measured the effectiveness of recruitment sources.

## Holy Family University, Philadelphia, PA

**Adjunct Professor**          June 2002 – May 2003

- Development of course curriculum & instruction of Human Resource Management undergraduate course in the School of Business Administration

## NursePower, Inc., Cheltenham, PA

**Human Resources Assistant/Manager**          May 1996 – November 1999

- Performed Human Resource functions including recruiting new staff, verifying background information on job candidates, conducting new hire orientation, staffing and scheduling nurses and certified nursing assistants, processing unemployment claims, and maintaining employee files and electronic records.

## EDUCATION

**Holy Family University, Philadelphia, PA**
Master of Science in Human Resources, May 2002, GPA 4.0

**The Pennsylvania State University, University Park, PA**
Bachelor of Arts in Advertising/Communications May 1996

## PROFESSIONAL ASSOCIATIONS & CERTIFICATIONS

Tri-State Human Resource Management Association, Chair Non-Profit Committee (2009 – 2010)
Select International Behavior Based Interviewing Certified Trainer
Sigma Beta Delta International Honor Society in Business Administration
Golden Key International Honor Society
Kappa Tao Alpha National Honor Society in Journalism & Mass Communication
Delaware Valley HR Person of the Year, 2009 Nominee

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS          :          NO.   **17-cv-04462-RK**

v.                                              :          **Jury Trial Demanded**

WAVERLY HEIGHTS, LTD.,          :

### AFFIDAVIT OF PATRICIA RODGERS

I, Patricia Rodgers, do hereby swear and affirm as follows:

1. I am the Vice President and Director of Operations of Waverly Care Associates, ("Waverly Care") a provider of home care services for senior citizens requiring help with daily living needs in order to help them remain in their homes longer. I have been at Waverly Care for more than 27 years.

2. I have a degree in Social Work. I am 60 years old.

3. I worked with Mrs. Jungclaus during the entirety of her employment with Waverly. I handle all aspects of Waverly Care including managing all of the employees, finances, marketing, and human resources, including investigating claims of discrimination. I am a member of the senior leadership team.

4. Mr. Garvin is my direct supervisor. He is open and direct but also very respectful and professional. I have never felt that I would be retaliated against in any way for bringing any matter to Mr. Garvin's attention.

5. Mr. Garvin has always treated me fairly with regard to my compensation and benefits. Mrs. Jungclaus was never supportive of my elevation to Vice President and did not believe I should be making a competitive salary. I have never considered Mrs. Jungclaus an advocate for me or for anyone else who threatened her position.

6. I have never filed a complaint of discrimination nor have I ever made any statement to Mrs. Jungclaus that I believed I was being discriminated against because of either my age or gender. My salary was competitive with others in similar positions and based on performance and market value. I was evaluated carefully each year by Mr. Garvin and always felt that I could approach him with any concern I had either about my pay or about any other issue impacting me or my employees.

7. I have never heard Mr. Supper demean or degrade women or anyone else. Mrs. Jungclaus never complained that Mr. Supper was demeaning to her nor did she ever say that she was

afraid to bring matters to Mr. Garvin's attention. I highly doubt that Mrs. Jungclaus ever hesitated to speak her mind about issues in the workplace.

8.  Mrs. Baysmore brought the tweet to my attention, but I was not at the lunch table where it was shown to the employees. I was appalled at the lack of judgment the posting of such a tweet showed. The African American workers were also offended and stated that having someone speak for them was insulting.

9.  Mr. Garvin came and spoke with my employees and apologized for Mrs. Jungclaus inappropriate tweet.

10. There has never been an atmosphere of male superiority created by Mr. Garvin. He is caring of his employees and in my opinion, would never discriminate against anyone on any basis.

*Patricia C. Rodgers*
Patricia C. Rodgers

Sworn to and subscribed before me,
this ⟨25⟩ day of July, 2019.

Notary Public COMMONWEALTH OF PENNSYLVANIA

NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020

Appendix 1270

*Patricia Catagnus-Rodgers*
*1448 Mauck Rd.*
*Blue Bell, Pa. 19422*
*(610)279-3785*

**EXPERIENCE:**

*1992-present   Waverly Care Associates, Gladwyne, Pa.*
   *Private-duty care to aging clients.*
   ***Jan. 1997-present   Assistant to the Director of Companion Services***
   - *Recruit, interview, hire, and orient new companions.*
   - *Assess client needs and match companion to client.*
   - *Interface with other departments to assure client needs are met.*
   - *Evaluate companion performance.*
   - *Assist with developing and changing policies and procedures.*
   - *Process bi-weekly time sheets.*
   - *Maintain monthly schedules.*

*1995-1997 Aerobic Rhythmics, Inc., Collegeville, Pa..*
   *Fitness Instructor, CPR certified.*

*1984-1991   American Red Cross, Penn-Jersey Region, Phila., Pa.*
   *1989-1991 Assistant Director, Field Operations, DRD*
   - *Maintained schedule involving the collection of a yearly goal of over 100,000 pints of blood.*
   - *Directly supervised 6 Program Managers located in offices throughout the tri-county area.  Indirectly supervised a staff of 20 sales/recruitment professionals.*
   - *Marketing.  Targeted expansion in key markets including, industry, health care, education, church and community.*
   - *Wrote and presented proposals.*
   - *Analyzed and collected production data.*
   - *Developed and conducted monthly team meetings and various special events and projects.*

*Accomplishments:*
*Involved in the successful merger of two branch offices.*
*Increased production over previous year with fewer staff.*
*Served on Quality Committee.*

   *1987-1989   Blood Service Director, Delaware County*
   - *Supervised 3 professional Blood Donor Recruiters.*
   - *Recruited and developed volunteer base.*

Appendix 1271

- *Maintained collection schedule of 25,000 pints.*
- *Educated community.*
- *Dealt with diverse client population including CEO's of major corporations, high school presentations, and church and community leaders.*

*Accomplishments:*
*Increased production two consecutive years in a branch that had been experiencing losses.*
*Awarded for expansion and Holiday blood collection support.*

*1984-1987  Blood Donor Recruiter,  Central Montgomery County Branch*
- *Maintained account portfolio and expansion.*
- *Sales, public speaking*
- *Planning, organizing and advertising blood drives.*

*Accomplishments:*
*Unprecedented 4-time winner of the Recruiter of the Month award.*
*Developed and managed systems in satellite office*

*1983-1984  Tyler Associates*
*Recruitment representative specializing in recruiting Pharmaceutical Regulatory Affairs Professionals and Research Scientists.*

*1981-1983  Robert Half and Accountemps*
*Recruitment representative specializing in Accounting and Data Processing Professionals.  Became Manager of Accountemps in Satellite office.*

*Education:*
*B.A. Social Work,  Millersville State University.  Graduated Magna cum Laude 1981.*

*References available upon request.*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS            :      NO.    17-cv-04462-RK

v.                               :      **Jury Trial Demanded**

WAVERLY HEIGHTS, LTD.,           :

### AFFIDAVIT OF TANYA SALGADO, ESQUIRE

    I, Tanya Salgado, hereby swear or affirm that the following information is true and correct.

1. I am an attorney and counsel at White and Williams in Philadelphia, Pennsylvania. I have been practicing law for more than twenty (20) years and concentrate my practice in the area of employment law, primarily defending businesses and non-profit companies against allegations of discrimination.

2. In addition, I regularly provide advice and guidance to human resource professionals regarding company compliance with the federal and state laws relating to employment issues such as Title VII, the Equal Pay Act, and the ADEA.

3. I represented Waverly Heights, Ltd. ("Waverly") in employment related matters and worked with Kathleen Jungclaus ("Plaintiff") on a few occasions. Specifically, we worked together on a case in which Plaintiff and Waverly were accused of race discrimination after the termination of an employee.

4. At no time did Plaintiff call me to advise that any employee was making a claim that Thomas Garvin had engaged in or was engaging in discriminatory acts such as creating a hostile environment or using age or gender as a factor in any employment decision.

5. Plaintiff never called me to advise that any employee was making a claim of discrimination, including hostile environment discrimination on the basis of age or gender against Robert Supper.

6. Plaintiff never complained that she was the victim of gender or age discrimination relating to her pay or any other term or condition of employment.

7. Plaintiff never complained to me that she was the victim of age or gender discrimination perpetrated by Mr. Garvin.

8. Plaintiff never contacted me to complain that Mr. Soltis was sending emails to plaintiff or others at Waverly that created a hostile environment or that were offensive to her or others.

9. Plaintiff never complained to me that she was afraid of losing her job if employee complaints of discrimination, harassment or hostile environment were brought to Mr. Garvin's attention, to the attention of the Board of Directors or to my attention.

10. At no time did Plaintiff advise that she was afraid of retaliation for making a complaint of discrimination either on her own behalf or on behalf of any other person.

11. At no time did plaintiff report to me that she had been the victim of discrimination on the basis of her gender or age in relation to her compensation.

12. At no time did Plaintiff report to me that she had been the victim of retaliation for complaining to Mr. Garvin about her salary increase/bonus amount.

13. At no time did Plaintiff report any instance of what she perceived was corporate misconduct on the part of either Mr. Garvin or Mr. Supper.

14. If Plaintiff had reported to me that she was the victim of discrimination, including harassment and/or retaliation or that others were victims, or that there had been corporate misconduct by a member of senior leadership, I would have brought this matter to the Board's attention and recommended that an independent investigation occur.

15. No member of the Board reported to me at any time that he/she had received a complaint of discrimination, including harassment and retaliation on any basis from Plaintiff or anyone else.

16. At no time did I receive any communication from any attorney, including but not limited to Dana Rieder, Esquire, Plaintiff's sister, that Plaintiff was concerned about retaliation should she make a complaint on behalf of others about the behavior of Robert Supper or Thomas Garvin to the Board of Directors.

17. I never told the Plaintiff to obtain an employee's permission to intervene before instituting or conducting an investigation about an employee's complaint of discrimination and would not give this advice to any human resource professional such as the plaintiff. Instead, I would have advised Plaintiff to conduct an investigation in accordance with company policies.

18. At no time did Plaintiff contact me to request legal advice because she was being subjected to discrimination or harassment or a hostile work environment by Mr. Garvin, the CEO, Mr. Soltis, Mr. Supper or anyone else.

19. At no time did Plaintiff bring to my attention any issue involving a claim of age or gender discrimination against Thomas Garvin or Robert Supper.

20. At no time, did Plaintiff report to me that she had been the victim of prohibited retaliation for complaining to Mr. Garvin about her salary increase/bonus amount.

21. No member of the Board reported to me at any time that he/she had received a complaint of discrimination on any basis from Plaintiff.

22. At no time did I receive any communication from any attorney, including but not limited to Dana Rieder, Esquire, Plaintiff's sister, that Plaintiff was concerned about retaliation should she make a complaint on behalf of others about the behavior of Robert Supper or Thomas Garvin to the Board of Directors.

23. At no time did Plaintiff contact me to request legal advice because she was being subjected to discrimination or harassment or a hostile work environment by Mr. Garvin, the CEO, or anyone else.

24. Plaintiff never brought the actions of Mr. Soltis, the former Board President, to my attention. Specifically, Plaintiff did not tell me that Mr. Soltis was sending offensive, racist or otherwise inappropriate emails to her and other members of senior management or anyone else.


Tanya Salgado, Esquire


Sworn to and subscribed before me,

this 22ᴺᴰ day of July, 2019.


Notary Public

Commonwealth of Pennsylvania

Notarial Seal
MYRA FRYZ – Notary Public
CITY OF PHILADELPHIA, PHILADELPHIA CNTY
My Commission Expires Oct 1, 2021

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KATHLEEN M. JUNGCLAUS** | : | **NO.   17-cv-04462-RK** |
| **v.** | : | **Jury Trial Demanded** |
| **WAVERLY HEIGHTS, LTD.,** | : | |

### AFFIDAVIT OF DEBBIE RODMAN SANDLER, ESQUIRE

I, Debbie Rodman Sandler, Esquire hereby swear and affirm as follows:

1. I am a partner in the law firm of White and Williams, LLP in Philadelphia, Pennsylvania.

2. I have been practicing law for approximately thirty five (35) years and have spent my career counseling employers and human resource professionals about employment best practices including how to prevent, address and remediate complaints of employment discrimination, harassment and retaliation.

3. I have been outside corporate counsel to Waverly Heights, Ltd. ("Waverly") for over twenty years. During that time, I worked closely with Kathleen Jungclaus (hereinafter Plaintiff) in her capacity as Vice President of Human Resources. I spoke regularly with the Plaintiff about employment best practices and personnel issues and often gave her advice regarding the procedure for handling employee complaints of both unfair and discriminatory treatment in the workplace.

4. In addition, I considered Plaintiff a friend and socialized with her outside of the office.

5. As Vice President of Human Resources, it was Plaintiff's responsibility to address issues relating to employee complaints about working conditions including but not limited to claims of discrimination and/or harassment in the workplace. She often contacted me with questions she had about how to address different workplace issues. In addition, I represented Waverly when employment related claims were brought against them.

6. I do not recall Plaintiff ever calling me to advise that any employee was making a claim that Thomas Garvin had engaged in or was creating a hostile environment or using age or gender as a factor in any employment decision.

23159076v.1        Appendix 1276

7. Plaintiff never called me to advise that any employee was making a claim of discrimination, including hostile environment discrimination on the basis of age or gender against Robert Supper.

8. Plaintiff never complained that she was the victim of gender or age discrimination relating to her pay or any other term or condition of employment.

9. Plaintiff never complained to me that she was the victim of age or gender discrimination perpetrated by Mr. Garvin.

10. Plaintiff never complained to me that she was afraid of losing her job if employee complaints of discrimination were brought to Mr. Garvin's attention. On the contrary, I recall Plaintiff on many occasions praising Mr. Garvin to me and stating that he was one of the most decent people she had ever worked with.

11. At no time did I advise plaintiff to refrain from investigating claims of discrimination made by employees or to refrain from intervening in an employment matter alleging discrimination if the employee did not wish to participate in an investigation. To the contrary, Board Policy required that an investigation occur and that findings be made. Moreover, Plaintiff was well aware that all claims of discrimination had to be investigated, as we had more than one discussion over the years on that subject. (See Equal Employment Opportunity Board Policy, P-639).

12. At no time did Plaintiff tell me that she was afraid of retaliation from Mr. Garvin or anyone else for making a complaint of discrimination either on her own behalf or on behalf of any other person.

13. At no time before or after December 2015, did plaintiff report to me that she had been the victim of discrimination on the basis of her gender or age in relation to her compensation.

14. At no time after December 2015, did Plaintiff report to me that she had been the victim of retaliation for complaining to Mr. Garvin about her salary increase/bonus amount.

15. If Plaintiff had reported to me that she was the victim of discrimination or that others were victims, I would have brought this matter to the Board's attention and recommended that an independent investigation occur.

16. No member of the Board reported to me at any time that he/she had received a complaint of discrimination on any basis from Plaintiff.

17. At no time did I receive any communication from any attorney, including but not limited to Dana Rieder, Esquire, Plaintiff's sister, that Plaintiff was concerned about

retaliation should she make a complaint on behalf of others about the behavior of Robert Supper or Thomas Garvin to the Board of Directors.

18. I never told the Plaintiff to obtain an employee's permission to intervene before instituting or conducting an investigation about an employee's complaint of discrimination. Moreover, Plaintiff was an experienced human resources professional who already knew that every claim of discrimination had to be investigated.

19. At no time did Plaintiff contact me to request legal advice because she was being subjected to discrimination, harassment, retaliation or a hostile work environment by Mr. Garvin, the CEO, or anyone else.

20. I worked closely with the Plaintiff on many employment related issues and issues involving termination of employees and she appeared as a witness for me on many occasions. At no time did Plaintiff bring to my attention any issue she was having involving a claim of age or gender discrimination against Thomas Garvin or Robert Supper.

21. Plaintiff never brought the actions of Mr. Soltis, the former Board President, to my attention. Specifically, Plaintiff did not tell me that Mr. Soltis was sending offensive, racist or otherwise inappropriate emails to members of senior management or anyone else.

22. Neither Plaintiff nor anyone else employed by Waverly brought the issue of Mr. Soltis' emails to my attention or made a complaint about any emails.

23. In addition, I considered Plaintiff a friend; she visited my home on at least one occasion and I visited her at her house. At no time did Plaintiff complain that Mr. Garvin, Mr. Supper or anyone else at Waverly had engaged in discriminatory conduct, harassment or retaliation against Plaintiff. If she had, I would have immediately recommended that the Board institute an independent investigation into the claims.

24. I read that portion of the plaintiff's deposition wherein she references her contact with me and specifically where she testified that I advised to her to "ask the employee if they want you to intervene first. And if they want you to intervene, then you have to intervene. And if it's something that's detrimental or at a peer level that could go directly to Tom, then that would be your advice to them. Go to Tom and talk about the issue." I have never provided that advice to the Plaintiff and her assertion to the contrary is not truthful nor accurate.

25. It was Plaintiff's job to enforce the company's policy prohibiting discrimination, harassment and /or retaliation and she never advised me that she was not taking action to enforce the company's policy because of any fear of retaliation against her by any person.

26. Likewise, Plaintiff did not tell me that numerous employees were complaining about the behavior of Robert Supper nor that she wanted to speak with the Board about either the behavior of Mr. Supper or Mr. Garvin.

27. Plaintiff did not make a report to me that Mr. Garvin was receiving salary, healthcare coverage, or any other company provided service to which he was not entitled.

28. Plaintiff never advised me that she was concerned that there would be retaliation against her by Mr. Garvin or anyone else at Waverly because she advocated for wages or title changes or alterations in the working conditions at Waverly on behalf of other employees including other members of senior management.

29. Plaintiff never advised me that any employment decisions were made by using an employee's age or gender as a factor or that there was any form of discrimination regarding wages, raises, promotions or other terms or conditions of employment at Waverly.

30. All of the items listed above relating to the actions of members of the senior management team, including but not limited to Mr. Garvin or Mr. Supper were matters that I would have brought to the attention of the Board of Directors if Plaintiff had raised them with me.

Debbie Rodman Sandler, Esquire

Sworn to and subscribed before me this 22nd day of July, 2019.

Notary

Commonwealth of Pennsylvania

Notarial Seal
MYRA FRYZ – Notary Public
CITY OF PHILADELPHIA, PHILADELPHIA CNTY
My Commission Expires Oct 1, 2021

23159076v.1

Appendix 1279

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS      :     NO.    17-cv-04462-RK

       v.                  :       **Jury Trial Demanded**

WAVERLY HEIGHTS, LTD.,       :

## AFFIDAVIT OF ROBERT SUPPER

I, Robert Supper, do hereby swear and affirm as follows:

1. I am the Senior Vice President of Finance and Chief Financial Officer ("CFO") at Waverly Heights, Ltd. ("Waverly") I have been employed at Waverly since May of 2014 replacing Anne Rogers. I am 61 years old and turned 55 shortly after being hired.

2. I have thirty eight years' experience in the healthcare field, with 35 of those years in the Continuing Care/Senior Living industry. My resume is attached.

3. I have a Master's Degree in management and active licenses in Pennsylvania as a Certified Public Accountant and Nursing Home Administrator

4. I never met Mr. Garvin prior to applying for the CFO position at Waverly. I met with the Board of Trustees for an interview. Later, my compensation package was negotiated with Mr. Garvin.

5. As part of my compensation and benefit package, I was given a company car. I was permitted to use the car for personal business. My predecessor, a female, also had a company car as a benefit.

6. All employees' salaries are established in the same manner; through performance evaluations and a review of the current market rates for similar positions. Mr. Thomas Wozniak does the analysis and provides the information to Mr. Garvin. I supervise several employees and use the same method to determine salary increases, bonuses and other compensation. I have never used age or gender as a factor when making a recommendation for salary increase or bonus and I do not believe that Mr. Garvin or any other manager who makes salary recommendations uses age or gender as a factor for consideration.

7. I was never told by Mrs. Jungclaus that she was offended by anything I said or did nor was I advised that any employee complained that I was discriminating against him or her for any reason. No formal complaint has been filed against me with the EEOC or PA HRC alleging discrimination. I had very little interaction with Mrs. Jungclaus except in meetings

1

of the senior leadership team and her limited involvement in implementing the new HR software package.

8. Mrs. Jungclaus never told me that I had done anything that adversely affected her ability to do her job. I expected Mrs. Jungclaus to do her job especially if she believed that I was doing something in violation of a Waverly policy. Mr. Garvin likewise never advised me that any employee complain that he or she was a victim of discrimination by me. The first time I learned that Mrs. Jungclaus was claiming that my conduct affected her was after her deposition.

9. I have never retaliated against anyone who disagrees with me or brings a concern to my attention.

10. I never drank on the job nor did I leave work to go to a bar or to gamble. My colleagues were aware that my son had a drug problem. Unfortunately, he lost his 10 year battle with this disease on August 1, 2017.

11. The suggestion by Mrs. Jungclaus that I was irresponsible or involved in a drunk driving incident is a total falsehood. My son stole my Waverly car without my knowledge or consent and was arrested in the early morning hours in NJ for driving under the influence. On the same morning after receiving a call from the police, I advised Mr. Garvin of the incident. I agreed with Mr. Garvin that in view of my son's problems, having a company car was a concern from a liability standpoint. I relinquished my car and received, instead, a stipend to replace this benefit. The benefit I received was the same amount as the taxable dollar value of keeping the car.

12. I am offended by the statements in the complaint and in Mrs. Jungclaus' deposition that I was drinking on the job or gambling on the job and the claim that Mr. Garvin treated me differently with regard to the car issue, all of which are simply untrue. The fact that Mrs. Jungclaus continues to claim that I was involved in the car accident or driving drunk even though the newspaper account and other criminal court records she produced clearly show that the defendant was my son, is just an example of the way in which she would distort and misrepresent the facts.

13. In my experience, Human Resource professionals are not typically considered for a bonus unless they implement some new technology or develop some innovative human resource program. Mrs. Jungclaus did none of these things. In fact, in 2016 we implemented a new software system that interfaced some of the financial aspects I managed such as payroll with the human resource record keeping aspects of Mrs. Jungclaus' job. When training was offered, Mrs. Jungclaus sent her assistant. She was not interested in learning the new technology impacting human resources in this day and age.

14. I have never been the subject of a complaint of discrimination and no decision I made with regard to the individuals I supervised was discriminatory. Mrs. Jungclaus never advised me that any employee had made a complaint against me. A couple years ago, I was asked by Mr. Garvin to "tone it down" during meetings and I have complied with this request. However, I have never treated women in a demeaning or humiliating way. I do not treat my wife in a demeaning or humiliating way and have been married for 39 years. I do not make employment decisions using age or gender as a factor.


_____
Robert Supper

Sworn to and subscribed before me,
this 25ᵀᴴ day of July, 2019.

_____  7/25/2019
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020

3
Appendix 1282

**ROBERT L. SUPPER: BS, MBA, CPA & NHA**

100 Park Place
Media, PA 19063
Supper4@comcast.net

484-444-2142 (H)
610-908-2374 (M)

## SUMMARY

Significant experience in the healthcare field with over 38 years in the CCRC/Senior Living Industry. Direct experience with leadership with all aspects of both operations and finance. Successful track record in several areas including, but not limited to; Operations Management, Long-Range Strategic Planning, Financial Management and Resident & Board Relations. Recognized for superior interpersonal skills, outstanding team leadership and a strong presence in the Senior Living Industry.

## EXPERIENCE

**WAVERLY HEIGHTS LTD (WAVERLY)**                                    **MAY 2013 TO PRESENT**
**GLADWYNE, PA**

Waverly is one of the most affluent CCRC's in the Main Line suburbs of Philadelphia. The CCRC has a $40 million in annual revenue, with 220 Independent Living Units (70 Villas), 49 Skilled Nursing Units, 16 Memory Support Units & 33 Personal Care Units. Waverly owns a very successful home care company with over $8 million in annual revenue. Waverly also has a Foundation to provide support for various charitable purposes. Waverly is CARF accredited with the most recent successful reaccreditation in June of 2019.

**SENIOR VICE PRESIDENT & CFO:** Responsible for financial operations as chief financial officer with direct responsibility including Finance with Controller and staff of 5, Information Systems with staff of 3. Report to CEO & an officer in the organization with extensive Board & resident relations, including responsibility for all finances, strategic planning, business planning, treasury function, annual audits, information technology, financial feasibility analysis, capital projects, property insurance, corporate compliance, monthly closings & debt financings. Works closely with CEO & operations team.

**Waverly significant accomplishments include:**

**LONG-RANGE STRATEGIC PLANNING**
- Part of long-range planning process including a complete process revision that yielded a new long-range planning financial model. Communicated the annual updated long-range financial plan to the Waverly Board, management and residents.
- Strategic planning including development of a financial model for a $23 million expansion including the operating plan.
- Assisted in the development of a strategic risk assessment approach for management & the new Board Risk Assessment Committee. Worked with management teams to develop an assessment plan for Finance & IT.

**OPERATIONS**
- Recruited, hired and developed Business Office & IT teams while revising & upgrading the operating and financial systems involving the use of team dynamics.
- Developed and communicated departmental standards in the areas of information systems, accounting and finance.
- Ability to analyze operations resulting in the creation of an efficiency plan. Demonstrated the ability to create efficient operations in the areas of staffing and contributing to improved operating results
- Improved financial position helped lead to a Fitch A- investment grade rating.

**BOARD RELATIONS**
- Established effective working relationships with the Boards & the committees through quarterly board & monthly committee meetings including Property, HR, Finance, Audit, Marketing, Foundation, and Health & Wellness.
- Prepared and presented various educational sessions such as current trends and issues in senior care, long-range planning and financing topics.

## FINANCE

- Significant financial turnaround post major health care center expansion project including the 2019 refinancing of all $47 million in debt.
- Financed an additional $15 million in 2015/2016 for our new expansion project.
- Worked with the Finance Committee to revise & streamline our investment policy.
- Developed monthly written variance report accountability system & quarterly formal review meetings.
- Information systems experience in new software and hardware purchases, implementation and training with MatrixCare.
- Served chair of management IT Steering Committee overseeing new system selection, existing system upgrades, formulating staff training plans and projecting resource allocations.
- Helped implement new campus wide Wi-Fi in 2019.

## RESIDENT RELATIONS

- Developed a specific relations plan focusing on positive, quality relationships with residents through the resident political body.
- An active participant & presenter in the quarterly "town meetings" where administration reports on various campus activities and finances including answering resident questions.
- Part of the team that produced excellent resident satisfaction results in the recent Holleran survey.

## EMPLOYEE RELATIONS

- Active member in annual review & renewal of employee benefit packages including Health Insurance & retirement plans resulting in employees who are highly satisfied per the recent Holleran survey.

## EXTERNAL RELATIONS

- Serve as a CARF/CCAC surveyor and trainer.
- Actively involved with local community to attempt to represent our local presence & industry interests.
- Promote, attend, and present in industry membership groups and associations such as Leading Age.

**ACTS RETIREMENT LIFE COMMUNITIES, INC. (ACTS),**     **2010 TO APRIL 2013**
**WEST POINT, PA**                                    **1984 TO 1989**

ACTS is a nationally known faith based non-profit organization in the CCRC field, listed as the third largest in the latest Ziegler AZ 100.  With its twenty-three (23) campuses in eight (8) states along the East Coast  totaling $300MM in annual revenue and over $1.2B in assets, ACTS provides top quality mission based care through a continuing care model to close to 9,000 seniors.  ACTS facilities span the East Coast Region with a capacity of 5,800 independent living units, 900 assisted living units and 1,460 skilled nursing beds.  The staff includes over 5,500 non-union members.  As one of the few non-profit continuing care retirement organizations to receive an A- bond rating from both Standard & Poor's & Fitch rating agencies, the organization's conservative fiscal policy has allowed for expansion and affiliation into new markets.  The leadership philosophy of the organization embraces concepts of long range strategic planning, cutting-edge architectural and program design, and financially efficient operations.  CARF/Continuing Care Accreditation Commission (CCAC) has become the standard for each of the ACTS campuses, assuring that a consistent, high level of service is provided at each location.  ACTS Senior Care Organization's strong service-oriented foundation is perpetuated by the organization's on-going commitment to undertake all that it does relative to its statement of mission and purpose, which is built on Christian Values known as "Loving Kindness", as well as quality and exemplary resident services.

**VICE PRESIDENT OF OPERATIONS – MID-ATLANTIC REGION:**     **2010 TO PRESENT**
Responsible for operations & financial management of 4 CARF/CCAC accredited not-for-profit continuing care retirement communities affiliated with ACTS effective May 1, 2010.  CCRC's have 700 residential apartments, 200 skilled nursing beds, 200 assisted living units & over 650 non-union FTE's. The $60+ million a year operation delivers top quality services, offers type A & C CCRC contracts & provides private duty companion services.  A Board Member & Secretary of PUMH Foundation, Inc., a separate fundraising corporation.  PUMH achieved Fitch BBB rating with a positive outlook in 2012.  Direct reports include 4 Executive Directors of each community and indirect reports include regional VP's & support staff for Operations, Clinical, Real Estate, Human Resources, Information Technology & Sales/Marketing. Leader in successful implementation of affiliation transition including resident & staff communication, numerous new systems including ACTS policies & procedures. Instrumental in improved resident & staff satisfaction as well as the improved financial position of PUMH.

ACTS significant accomplishments include:

## LONG-RANGE STRATEGIC PLANNING

- Spearheaded entire long-range planning process for four (4) campuses. This included a complete process revision that yielded a new long-range planning model. A member of the ACTS long-range planning committee, which was made up of residents and staff. Communicated the annual updated long-range plan to the PUMH Board and facility residents.
- Developed long-range strategic initiatives for the 4 campuses as part of the overall long-range plan.
- Presented leadership development forums on long-range planning to the PUMH campuses.

## OPERATIONS

- Recruited, hired and developed multi-disciplinary leadership teams for the campuses while implementing the ACTS operating and financial systems involving the use of team dynamics.
- Developed and communicated departmental standards in the areas of human resources, information systems, accounting and finance, dining services, spiritual life, resident activities, wellness and resident assessment.
- Known for the ability to analyze campus operations resulting in the creation of an efficiency plan. Demonstrated the ability to create efficient operations in the areas of staffing, utilities and administration, contributing to improved operating ratios leading to current evaluation for an investment grade rating from Fitch.

## BOARD RELATIONS

- Established effective working relationships with the three Boards (PUMH, Heron Point and the PUMH Foundation) through quarterly board meetings, retreats and social events.
- Provided direction to the new board member selection team assuring proper coverage of professional background, expertise and advancing the diversity of the board.
- Prepared and presented various educational sessions such as current trends and issues in senior care, long-range planning, resident life and quality improvement to both the PUMH Board and the ACTS Board of Directors.
- Communicate the progress of the PUMH campuses to the PUMH Board of Directors on a quarterly basis.

## FINANCE

- Successful financial turnaround of PUMH resulting in "BBB" investment grade bond rating.
- Developed monthly written variance report accountability system.
- Presented leadership development sessions on budgetary planning for PUMH staff.
- Extensive information systems experience in new software and hardware purchases, implementation and training.
- Served on the ACTS Information Technology Committee overseeing new system selection, existing system upgrades, formulating staff training plans and projecting resource allocations for all twenty three campuses.

## RESIDENT RELATIONS

- Developed a specific relations plan focusing on positive, quality relationships with residents through the resident political body leadership group at each community.
- Established a Residents' Council structure for the purpose of fielding resident concerns and communicated facility issues.
- Communication outlets were established via quarterly "town meetings" where administration reported on various campus activities and answered resident questions.
- Ongoing events such as resident chats, quarterly financial updates and annual budget reviews assisted in attaining a high level of communication between residents and administration.

## EMPLOYEE RELATIONS

- Developed employee town meetings to maintain open communications during the affiliation transition.
- Active member of the "Great Place to Work Committee".

## EXTERNAL RELATIONS

- Serve as a CARF/CCAC surveyor and trainer.
- Actively involved with local Rotary and politics to attempt to represent our industry interests.
- Promote, attend, present and budget for staff involvement in industry membership groups and associations such as Leading Age and the Delaware Healthcare Facilities Association.

## MISSION DEVELOPMENT RENOVATION/EXPANSION PROJECTS

- Responsible for management of the $5.5MM in the annual capital improvement budget including the architectural planning and design of all major renovation projects.
- Responsible for developing strategic plans and mission development related renovation/expansion projects.

**PENINSULA UNITED METHODIST HOMES, INC. (PUMH),
HOCKESSIN, DE**

2008 TO 2010

PUMH is a CARF/CCAC accredited not-for-profit corporation owning 3 CCRC's, 1 CCRC under development, 1 managed accredited CCRC & a PUMH Foundation. CCRC's have 700 independent living units, 200 assisted living units and 200 skilled nursing beds. PUMH serves close to 1,000 seniors with a staff including over 650 non-union FTE's. The $60+ million a year operation delivers top quality services, offers type A & C CCRC contracts, has a charitable foundation corporation serving the needy & provides private duty companion services. PUMH is a highly respected CCRC in the Delaware & Maryland suburban CCRC market.

**EXECUTIVE VICE-PRESIDENT, CFO & TREASURER:** Responsible for financial operations as chief financial officer with direct responsibility including Finance with VP/Controller and staff of 10, Information Systems with staff of 4 & Materials Management with staff of 4. Reported to CEO & an officer in four (4) separate companies with extensive Board relations including full responsibility for all finances, the strategic planning, business planning, treasury function, annual audits, information technology, financial feasibility analysis, capital projects, property insurance, corporate compliance, monthly closings & debt financings.

**PUMH significant accomplishments include:**

**LONG-RANGE STRATEGIC PLANNING**
- Significant strategic planning experience resulting in successful $25MM in expansions of Residential, SNF & AL capacity. Developed financial & operating plans.
- Worked with local authority, management, board & consultant to develop & implement financial turnaround for a challenged organization resulting in an affiliation with ACTS Retirement Life Communities, Inc.

**OPERATIONS**
- Worked with Management Team to improve financial data and report to assist in managing the day to day finances of the four communities.
- Developed & revised numerous policies & procedures.
- Continued commitment to values of CARF including serving as finance & administrative surveyor on numerous surveys & serving as a CARF surveyor training mentor.

**BOARD RELATIONS**
- Reorganized Board Committee Structure and meeting schedule.
- Initiated monthly morning coffee meeting with Finance Committee Chair.
- Revised the Investment Policy to make more conservative.
- Simplified the Board financial presentations to include focus on key metrics including financial ratios and benchmarks.
- Served as interim office of the Co-CEO from January 1 to April 30, 2010.

**FINANCE**
- Restructured Finance Department after losing top 3 professional positions immediately prior to employment.
- Streamlined monthly closing process resulting in faster & more accurate monthly statements.
- Implemented budget development & monitoring systems involving all operating management "customers". Assisted in developing goals providing key benchmarks/metrics to measure the success of our plans.
- Financial management responsibility for over $40 million in cash & investments.
- Coordinated annual audit process resulting in consistent "adjustment free" financial statements with excellent management letters.
- Filed accurate 990 tax returns and Medicare & Medicaid cost reports.
- Implemented operations cost reduction strategy resulting in more than 5% in savings by eliminating positions, reducing hours, pay rates & freezing wages.
- Reduced a number of costs with more aggressive bidding processes through materials management.
- Reduced insurance costs by 20% in 2009.
- Developed new resident contracts with pricing in working with our actuary & legal counsel.
- Significant experience in dealing with legal matters such as revised contracts & agreements.

**RESIDENT RELATIONS**
- Strong leadership skills and improved communications working with the Residents' Councils/Associations.

**EMPLOYEE RELATIONS**
- Strong leadership skills and improved communications working with the Management Team & Staff.

**EXTERNAL RELATIONS**
- Maintained excellent relationships with key stakeholders such as bankers, investment consultants & investment bankers.
- Excellent communications including hosting quarterly presentations with Letter of Credit Bank Group that resulted in a favorable renewal.
- Worked with the investment consultant and Board to revise our "overly aggressive" Investment Policy.

**MISSION DEVELOPMENT RENOVATION/EXPANSION PROJECTS**
- Leader in the planning and completion of the $25MM in major renovation projects completed at the three PUMH communities
- Significant experience in development, marketing & financing/feasibility for a new CCRC project.

**DUNWOODY VILLAGE (DV),**                                                    **1989 - 2008**
**NEWTOWN SQUARE, PA**

DV is a CARF/CCAC accredited not-for-profit non-sectarian continuing care retirement community (CCRC) opened in 1974 having 275 residential apartments, 81 private skilled nursing beds, 81 private personal care units & over 300 non-union FTE's. DV is a well-known non-profit organization in the highly competitive CCRC Philadelphia market. DV has nearly $25MM in annual revenue and over $50MM in assets.  DV provides top quality mission based care through a continuing care model to close to 450 seniors.  The $25+ million a year operation delivers top quality services, offers a type A CCRC contract, has a charitable trust program serving the needy, a long-term care insurance & case management program offered to a local senior housing facility, & a separate corporation providing private duty companion services.  Dunwoody is a highly respected CCRC in the extremely competitive Philadelphia suburban CCRC market. ACTS facilities span the East Coast Region with a capacity of 5,800 independent living units, 900 assisted living units and 1,460 skilled nursing beds.  As one of the few non-profit continuing care retirement organizations to receive an "A" rating from both Standard & Poor's & Fitch rating agencies, the organization's conservative fiscal policy has allowed for expansion and affiliation into new markets.  The leadership philosophy of the organization embraces concepts of long range strategic planning, cutting-edge architectural and program design, and financially efficient operations.  CARF/Continuing Care Accreditation Commission (CCAC) has become the standard for each of the ACTS campuses, assuring that a consistent, high level of service is provided at each location.  ACTS Senior Care Organization's strong service-oriented foundation is perpetuated by the organization's on-going commitment to undertake all that it does relative to its statement of mission and purpose, which is built on Christian Values as well as quality and exemplary service to each one of its residents.

**COO/CFO:**  Responsible for residential operations & chief financial officer duties for Major departments of direct responsibility include Skilled Nursing, Assisted Living, Dining Services, Maintenance, Housekeeping, Laundry, Groundskeeping, Transportation, Security, Accounting (Controller and staff of 5) & IS (150+ FTE's & $15+ million). Have functioned as interim CEO (2002, 2004-5), Marketing Director (1991) & Nursing Home Administrator (1996) during vacancies in the positions. Report to CEO & an officer in the Corporation with full responsibility for all operations & finances.

**Dunwoody significant accomplishments include:**

- Leadership skills to include development & implementation of Core Values to include significant ongoing efforts for culture change.  Improved communications with residents & staff at all levels.
- Excellent financial management skills reflected by turnaround of troubled facility resulting in Standard & Poor's "A" rating in 1997. Improved marketing program, streamlined operations, tightened financial controls, reduced costs & restructured debt.
- Implemented budget development & monitoring systems involving all operating management "customers".
- Significant strategic planning experience resulting in 3 successful expansions of Residential, SNF & AL capacity including recent Memory Unit addition. Developed financing & operating plans & managed the construction.
- Strategic planning efforts resulted in developing Allied Services private duty companion agency with $1.5 million in annual revenue & contracts with a local over 55 community for long-term care & case management programs.
- Completed 5 successful tax-exempt bond financings of $12 million in 1992, $12 million in 1997, $10 million in 2000, $12 million in 2003 & $14 million in 2006 involving fixed, variable & synthetic techniques.
- Financial management responsibility working with consultant in managing over $25 million in cash & investments with excellent performance record.

- Built financial models and operating plans for 3 internal expansion projects & proposed new facilities.
- Coordinated annual audit process resulting in consistent "adjustment free" financial statements with excellent management letters.
- Developed policies & procedures in finance to assist operating managers in providing quality resident services at a reasonable cost.
- Significant successful Board Governance experience with the Board of Trustees including presentations at all general meetings as well as the Strategic Planning, Finance & Governance/Nominating Committees.
- Implemented new computer hardware & software systems (AOD) resulting in better efficiency & providing quality financial & operating information for operations management, the Board & other stakeholders.
- Self-study coordinator for recommendation-free reaccreditations obtained from the CARF/CCAC in 1992, 1997, 2002 & 2007. Team leader in the 1999 JCAHO accreditation with commendation.
- Significant experience as a team leader on CARF/CCAC site visits & past member of the CCAC Financial Advisory Panel (FAP). Made presentations with excellent evaluations at the 1998 & 1999 fall AAHSA meetings on strategic planning, financial modeling, financial ratios & investment grade ratings.
- Managed the skilled nursing facility & assisted living facility in 1996 with no deficiencies in the federal/state surveys.  Developed a successful long-range strategic & renovation plan. Currently function as back-up licensed administrator.
- Served both as Corporate Compliance & Safety Officer.

### ACTS, BLUE BELL, PA
**1988 TO 1989**

**CONTROLLER (Promotion)**: Responsible for management of centralized accounting department which included seven professional accountants, thirteen bookkeepers & seven clerical staff members for a $60 million (1989 budget) multi-facility not-for-profit CCRC corporation operating 12 CCRC's (7in PA, 4 in FL, 1 in NC) & 3,500 residential units, 300 AL units, & 700 SNF units.  Other key responsibilities included statutory compliance, pension plan, coordination of annual audit, risk management, cash management & budget management. Reported to CFO.

### ACTS, BLUE BELL, PA
**1985 TO 1988**

**ASSISTANT CONTROLLER (Promotion)**:  Responsible for day-to-day operations & management of all revenue-related functions, payroll, accounts payable, construction accounting, financial statement preparation, fixed assets, & budgeting.  Developed & implemented numerous accounting policies & procedures. Presented training seminars on accounting policies & procedures at all company facilities to help improve operating manager's technical competence & improve communications.  Responsible for the management of computer hardware & software applications. Reported to Controller.

### ACTS, INC., BLUE BELL, PA
**1984 TO 1985**

**ACCOUNTING MANAGER**:  Responsible for the management of all revenue related functions.  Have developed & implemented accounting procedures in the areas of cash receipts, cash management, marketing, monthly closing, medical billing, trust account earnings, monthly maintenance fee billing & amortization of entrance fees. Reported to Controller.

### ACTS significant accomplishments include:

- Organized & structured a growing organization lacking systems & control by building a stronger accounting team through recruiting new staff, reorganizing existing staff, writing numerous policies & procedures, & creating tighter internal financial control systems.
- Improved relationships between the accounting department and facility staff through numerous internal & external meetings to train the management team & to determine how to provide better information.
- Established accounting department as a service department.
- Improved accuracy & timing of distributing financial data to senior management, facility management, residents & the Board.
- Completed financial models & financing required to build new communities in PA, FL, & NC.
- Improved communications with external financial institutions as a part of a successful treasury function.
- Coordinated the annual audit that resulted in "adjustment-free" audits from 1996-1998.

### PENNSYLVANIA HOSPITAL & THE INSTITUTE OF PENNSYLVANIA HOSPITAL, PHILADELPHIA, PA
**1981 TO 1984**

**INTERNAL AUDITOR**: Worked with director to establish the Internal Audit function for the oldest hospital in the USA, currently a part of the University of PA Hospital System.  Have audit experience with all operating & financial operations. Worked extensively with independent auditors.

## EDUCATION

Saint Joseph's University, Masters of Business Administration in Management, Philadelphia, PA-1984.
West Chester State University, Bachelor of Science in Business Administration, West Chester, PA-1980.

## LICENSURES

Certified Public Accountant (CPA) in PA, License # CA-026849-L-1989.
Nursing Home Administrator (NHA) in PA, License # NH-003497-L-1990.

## PROFESSIONAL ASSOCIATIONS

Leading Age (Formerly AAHSA) – Member & Presenter – 1989 to Present.
CARF/Continuing Care Accreditation Commission (CCAC) - Surveyor & Mentor -1992 to 2014.
CARF/CCAC Financial Advisory Panel (FAP) – Member -1997 to 1999.
Delaware Health Care Facilities Association (DEHCFA) – Member - 2008 to 2013.
Pennsylvania Institute of Certified Public Accountants (PICPA) – Member - 1990 to Present.
Pennsylvania Leading Age (Formerly PANPHA) – Member - 1990 to Present.
Treasurer of South East PANPHA-1998 & 1999.
Life Beyond Abuse, Inc. - Volunteer Treasurer, Board Member & Donor – 2004 to 2015.
Springhaven Country Club - Board Member & Member – 1994 to 2015.
Rolling Green Golf Club – 2016 to Present.

## REFERENCES

Available upon request.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | NO.   17-cv-04462-RK |
| v. | : | **Jury Trial Demanded** |
| WAVERLY HEIGHTS, LTD., | : | |

## AFFIDAVIT OF JANET THOMPSON

I, Janet Thompson, do hereby swear and affirm as follows:

1.      My name is Janet Thompson and I am currently the Vice President of Marketing of Waverly Heights.  I have been employed at Waverly Heights (hereinafter "Waverly") for more than twenty-four (24) years.  I am currently 68 years old.  I worked with Mr. Maguire when he was the CEO of Waverly, and beginning in 2010, I have been working with Mr. Garvin who is the current CEO of Waverly.  I also work with Robert Supper and, until her termination, worked with the Plaintiff, Kathleen Jungclaus.

2.      I have also been the Corporate Compliance Officer for more than 12 years and was responsible for manning the Corporate Compliance Hotline.  Waverly maintains this hotline so that individuals can report claims of fraud, misconduct or violations of company policy, including any claim of discrimination.  A complaint may be made anonymously through the Corporate Compliance Hotline.   Thus, anyone who believes that he or she has observed something inappropriate in the workplace, including discrimination, may make an anonymous report and upon receipt of that report, an investigation will be done into the allegations.   The Corporate Compliance and Ethical Standards section of the Employee Handbook also contains all of the non-discrimination policies including the policies prohibiting retaliation in the workplace for bringing a complaint of discrimination or for reporting any other conduct of concern.

3.      During the time that Mr. Garvin has been the CEO, there has not been any complaint made against him through the Corporate Compliance Hotline of discrimination, harassment, retaliation, fraud, misconduct, conflict of interest or other policy violation.  There have been no complaints against Mr. Supper either.

4.      I worked with Ms. Jungclaus for twenty (20) years.  We were friendly and often talked about our children, family and problem employees.  I was invited to two of Mrs. Jungclaus' weddings, and attended the one to Raymond Jungclaus, as did many of the senior management team.

5.      I reviewed the allegations in the amended Complaint that were made by Ms. Jungclaus that I was the victim of age and/or gender discrimination while at Waverly and that I made many and constant complaints about the working conditions at Waverly and that I felt that I was the victim of age and/or gender discrimination.  Ms. Jungclaus stated in the Complaint and at

Appendix 1290

her deposition that I complained about how I was treated by Mr. Garvin and Mr. Supper and that I believed there was a male-dominated elitist atmosphere at Waverly created and maintain by Mr. Garvin and others.  She also claimed that I was offended by emails on which I was copied sent by Mr. Soltis.   All of these allegations are false.

6.      Ms. Jungclaus was never a champion of women in her role as V.P. of Human Resources at Waverly.  Under Mr. Garvin's tenure, there was an equal balance of men and women members of the senior leadership team.  All of the women were strong, confident and assertive in their own right and to suggest that I, or any of the others, needed Ms. Jungclaus or asked Ms. Jungclaus to speak for us is ludicrous.  Ms. Jungclaus was not viewed as a leader.  All of the other senior management supervised many employees and it was their advocacy on their employee's behalf that garnered higher salary increases or promotions; not that of Ms. Jungclaus.

7.      I am unaware that any employee I supervised asked Ms. Jungclaus to "go to bat" for him or her.  To the contrary, Ms. Jungclaus was not viewed as sympathetic, empathetic, or trustworthy by several staff.  Instead, she was viewed as showing favoritism to some employees and not maintaining confidentiality.

8.      It is important to state that I have never made any claim that I was the victim of any form of discrimination or harassment, including age or gender discrimination/harassment while at Waverly; either before Mr. Garvin's tenure or during.  I certainly never made such a complaint to Ms. Jungclaus.

9.      Further, I have never been in fear that I would be fired for making any complaint or statement regarding my employment conditions, including my salary and benefits.  I have never feared retaliation for advocating on behalf of those I supervise.  Likewise, I have not been asked to complete this affidavit or risk losing my job.  Instead, I am completing this affidavit because the statements made about me, Mr. Garvin, Mr. Supper, Mr. Soltis and others by Ms. Jungclaus are not true.

10.      I have never complained that Mr. Garvin does not perform his job duties or "do anything" as suggested by Ms. Jungclaus.  Further, I did not complain that Mr. Garvin "dumped" work on me.  The work I do for Waverly is part of my job description and job duties.  Mr. Garvin and I work collaboratively and I have never believed or felt that I was the victim of age or gender discrimination while at Waverly or that I was asked to do more work because of my gender or age.

11.      I do not believe that any of the terms of my employment including the salary and benefits I received in the past and currently receive were disparate from my peers because of my age or gender.  Employees understand that their pay is not only dependent upon performance, but also upon the "market value" of the position.  As a member of senior leadership, my salary is reviewed annually by Mr. Thomas Wozniak and analyzed against the market value of similar positions in the non-profit corporate world.  Once Mr. Wozniak makes his recommendation, Mr. Garvin evaluates my performance and determines the pay increase and bonus amount, if any, to be awarded.

12.    I understand the market value comparison that is done and believe that I am earning salary and benefits commensurate with the market.  I have never hesitated to discuss my salary and benefits with Mr. Garvin and have never felt that I was retaliated against for expressing my opinion regarding salary and benefits for the work I perform.  I have also spoken to Mr. Garvin about the salary of the employees I supervise.  He is always receptive and fair in his assessments and I have never been retaliated against by Mr. Garvin for expressing my opinion about someone's salary.

13.    I never saw Mr. Garvin take any money earned from an employee contest.  To the contrary, when Mr. Garvin won the NCAA basketball employee pool several years ago, he accepted the prize money and then divided it among the first ten employees who finished after he did in the pool.  For Mrs. Jungclaus to say that Mr. Garvin took contest money from employees because most of the employees were African American is simply a lie.

14.    Mrs. Jungclaus never stated to me nor reported on the Compliance Hotline that Mr. Garvin was engaged in fraudulent or inappropriate conduct.

15.    I never "complained" to Ms. Jungclaus about the receipt of emails from Mr. Soltis.  Mr. Soltis and I did not agree politically, but I did not find his emails to be offensive, racist or anything other than a nuisance.  I typically did not read the emails sent by Mr. Soltis unless work related because he sent many emails.  I never heard Mrs. Jungclaus complain about the Soltis emails she received nor did she state that they were offensive to her in any way.  I never filed any sort of complaint over the emails with human resources as is the procedure set forth in our employee handbook nor did I complain to Mr. Garvin about the emails.  I did not ask Mr. Soltis to stop writing the emails or to stop copying me on his emails. I did not ask Ms. Jungclaus to make a complaint on my behalf about the Soltis emails.

16.    I never complained to Ms. Jungclaus or anyone else about the alleged mistreatment of female employees and women in general by Mr. Supper, nor did I ever believe that Mr. Supper was drinking or gambling while working.

17.    I also do not agree with Ms. Jungclaus' comments about Mr. Supper's treatment of women employees or women in general.  I have never found Mr. Supper to be condescending and in my opinion, he is a good manager of the business office; effectively managing men and women of all ages.  He is complimentary of his employees' work and has built a strong team.

18.    Mr. Supper could be very passionate when discussing budgetary issues, but I never took offense at the way in which Mr. Supper treated me and I never heard him demean or belittle anyone.

19.    I have never known Mr. Supper to leave the office to gamble or to drink during work hours nor did Mr. Garvin suggest that approaching Mr. Supper on a Monday because of Mr. Supper's drinking on the weekend was not a good idea.  I also did not complain to Ms. Jungclaus

or anyone else about Mr. Supper's phone conversations with his wife. I never overheard any such conversations.

20.    I never heard Mr. Garvin make any stray remark about the age of an individual. I have never felt that I was being discriminated against because of my age. I never heard Mr. Garvin say that he wasn't "out to get old timers" when employees were terminated or left. Given the ages of the members of the senior leadership team, it is ridiculous to suggest that there was any discrimination on the basis of age.

21.    At no time did Ms. Jungclaus complain to me that she believed that she had not received enough of a pay raise or bonus in December 2015 or at any other time. I never saw any difference in the way that Mr. Garvin acted around Ms. Jungclaus nor did I sense any animosity from Mr. Garvin at all.

22.    After Ms. Jungclaus' termination, Mr. Garvin informed me that she was let go. He did not explain why, but stated that there was a good reason for this action. I thanked him for speaking with me in person and stated that I believe Waverly does not make any dismissal lightly or without cause.

23.    On September 26, 2016, Ms. Jungclaus came to my office after she was fired by Mr. Garvin. She was very upset and in tears. She stated that "she had done something wrong" and, because we had worked together for so long, she wanted me to know about it in person. She said that there was a social media post but that she had not posted it. She said someone else had and she knew who it was. Amy Blessing, who had followed Mrs. Jungclaus to my office, suggested that she tell Tom that someone else had made the post. She replied that it was too late.

24.    I suggested like Amy that she speak again with Mr. Garvin to discuss this but she stated that she would not ask for another meeting. I asked Mrs. Jungclaus if I could call someone to come and get her or if I could drive her home. She said that she didn't want anyone to know what she did and did not want me to call anyone.

25.    No one accompanied Mrs. Jungclaus to my office. She was not escorted there. Mrs. Blessing came in right behind her because Mrs. Jungclaus was so upset. Mrs. Jungclaus was not lying on the floor in tears.

26.    I read Ms. Jungclaus' tweet after the fact and was appalled with the reference to a poll having been taken of "AA's" in the Waverly workplace. There was no such authorized poll and I thought it inappropriate for Mrs. Jungclaus to conduct one on her own singling out Waverly's African American staff. I thought that a senior human resource professional affiliated with Waverly should not post an inappropriate and demeaning Tweet.

27.    I spoke with other workers at Waverly who had seen Ms. Jungclaus' tweet and who were upset with the content.

28.     I have a private Facebook page.  Only those individuals who have received and accepted a friend request can access that page.  Kathleen Jungclaus was one of the individuals who had accepted my friend request; however, my Facebook page is not linked in any way to the Waverly site nor to the Go Fund Me site for Dilly.  If you click on my name on the Go Fund Me page, you are not directed to any of my personal online accounts.

29.     The Facebook postings I made from my private account, submitted in discovery by Ms. Jungclaus were posts I made after Ms. Jungclaus was terminated and were retrieved from my private FaceBook page.  The only way that Ms. Jungclaus was able to access my Facebook page was because I issued a friend request to her previously which she accepted.  Though I am listed as a follower of Waverly on its page, a member of the public could not access my Facebook page by clicking on my name as a follower of Waverly.

30.     The Facebook posts submitted by Ms. Jungclaus to which she now takes exception were not available on any public site and only those individuals I accepted as "friends" had access to them. To suggest that my posts were public is false.  It is interesting that Mrs. Jungclaus is trying to link my private posts to the very public tweet she made as a representative of Waverly and especially given her position as the Vice President of Human Resources.

31.     In my opinion, Waverly is a wonderful place to work.  There is an atmosphere of collegiality and employees who engage in discriminatory practices are disciplined and terminated. I have not been discriminated against and Ms. Jungclaus' distortion of the facts is troubling.  I never heard her claim that either she or anyone else was a victim of discrimination or retaliation and given her strong personality and willingness to always express her views in meetings and in the workplace, I do not believe that she felt that there would be retaliation against her for doing her job as the human resource professional.


_Janet Thompson_
Janet Thompson


Sworn to and subscribed before me,
this 25 day of July, 2019.

_Grace M Bregman_, 7/25/2019
Notary Public   COMMONWEALTH OF PENNSYLVANIA

NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020

Appendix 1294

*JANET L. THOMPSON*
*425 Clemens Mill Road*
*Harleysville, Pennsylvania  19438*
*Home: (215) 256-8673   Work: (610) 391-8500*

## RESUME

**PUBLIC
RELATIONS:**

Managed  the corporate travel program of a $30 million client (Merck & Co.) of
Rosenbluth International. Provided comprehensive travel management services
and established effective communications channels on behalf of the client and
its travel suppliers.  Planned business strategies and implemented effective
programs in response to corporate reorganization. Accountable for maintaining
the corporate relationship between Merck and Rosenbluth.

Developed and directed the public relations program of the Fairmount Institute, a
140-bed psychiatric hospital. Created and maintained media, community, and
employee relations. Conducted employee opinion surveys, designed and
implemented award programs, and coordinated orientation and inservice
programs.

Planned and executed the public and professional education programs for the
American Heart Association.  Coordinated health service projects for industry
and community groups. Effectively developed relationships with physicians and
allied health personnel to ensure a viable volunteer network.

Skilled in writing and editing communications materials.  Proficient in preparing
and making presentations, including public speaking.

**ADVERTISING
and MARKETING:**

Successfully managed two corporate accounts for Hill & Partners Inc., a
pharmaceutical advertising agency. Clients included a contract clinical research
firm and a national distributor of medical products. Developed marketing
strategies, corporate campaigns,  media schedules, direct mail programs, and
sales promotions. Responsible for overall account service and supervision.

Directed the marketing department of a national medical products company,
including the customer service and telemarketing operations. Created and
administered sales promotions and product launches.  Planned business strategy
for development of competitive advantage.

Conducted focus groups and market research efforts.  Proficient in developing
and implementing marketing and business plans.

**CONFERENCE and
EVENT PLANNING:**

Successfully planned and coordinated national sales conferences, seminars,
business conferences,  motivational events, and trade shows.   Proficient in all
aspects of meeting planning, including: site selection, contract negotiation,
special events, and travel arrangements.

Effectively supervised the group travel program for Merck & Co.  Designed and
implemented meeting procedures and provided creative solutions to client
needs.

Appendix 1295

*Resume*
*Janet L. Thompson*
*Page 2*

**MANAGEMENT:**    Effectively supervised the staff and operations of a travel reservations center. Implemented programs and strategies to maintain production standards and quality service.

Created and managed budgets and good fiscal controls. Reduced operating costs while increasing cost-effectiveness. Effectively supervised people and projects. Consistently achieved or exceeded performance objectives and corporate benchmarks.

**EMPLOYMENT HISTORY:**

| | | |
|---|---|---|
| **Rosenbluth International**<br>Philadelphia, PA | Account Leader<br>Client Services Account Executive | 1993 - present<br>1992 - 1993 |
| **Hill & Partners Advertising**<br>Bala Cynwyd, PA | Account Supervisor | 1990 - 1991 |
| **SePro Healthcare Inc.**<br>Montgomeryville, PA | Marketing Services Manager | 1982 - 1989 |
| **Fairmount Institute**<br>Philadelphia, PA | Public Relations Director | 1977 - 1980 |
| **American Heart Association**<br>Erie, PA and Riverside, CA | Program Director | 1972 - 1976 |

**EDUCATION:**
Bachelor of Science Degree in Secondary Education (English and Speech)
Slippery Rock University, Slippery Rock, Pennsylvania

Other studies include courses and seminars on: *Management, Public Relations, Advertising, Marketing, the Media, and Direct Mail.*

**VOLUNTEER AFFILIATIONS:**
Advisory Council on Youth Activities, Calvary Church of Souderton
World Missions Conference, Calvary Church of Souderton
Home and School Association, Oak Ridge Elementary School

**INTERESTS:**
Creative writing, reading, theatre.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KATHLEEN M. JUNGCLAUS** | : | **NO.   17-cv-04462-RK** |
| **v.** | : | **Jury Trial Demanded** |
| **WAVERLY HEIGHTS, LTD.,** | : | |

## AFFIDAVIT OF BASHEER WOMACK

I, Basheer Womack, do hereby swear and affirm as follows:

1.      I am employed by Waverly Heights and have worked there since 2015.  I am a utility worker with the kitchen staff and I serve in the dining room.  During the course of my employment, I spoke to Kathleen Jungclaus only in passing and only to say hello.  I do not vote and did not vote in the 2016 election and I do not discuss politics in the workplace at all.

2.      Specifically, I did not have a discussion or conversation with Kathleen Jungclaus in 2016 about either who she was voting for, who I was voting for or who my co-workers in the kitchen were voting for in the 2016 election.  First, as I stated before, I do not vote and was not going to vote in the 2016 election.  Second, I would never have a conversation with a manager or any senior staff member about politics and didn't have one with Ms. Jungclaus.  I did not and do not know who my co-workers were voting for in the 2016 election. I never had a personal discussion with Ms. Jungclaus at all during the course of my employment.

3.      I understand that Ms. Jungclaus testified at a deposition that she and I had a conversation about the 2016 election and who the kitchen staff favored.  This did not occur.

4.      I did not have and currently do not have a Twitter account.

Basheer Womack
Basheer Womack

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
GRACE M BREGMAN
Notary Public
LOWER MERION TWP, MONTGOMERY COUNTY
My Commission Expires Oct 26, 2020

Sworn to and subscribed before me this 25 day of JULY , 2019.

Notary

Appendix 1297

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN M. JUNGCLAUS | : | NO.   17-cv-04462-RK |
| v. | : | **Jury Trial Demanded** |
| WAVERLY HEIGHTS, LTD., | : | |

## AFFIDAVIT OF THOMAS WOZNIAK

I, Thomas Wozniak, do swear and affirm as follows:

1.  I am employed by Strategic Compensation Planning, Inc. ("SCP") and am the founding member and the Managing Principal of that company.  SCP has been working as an independent contractor with Waverly Heights, Ltd. ("Waverly") for the past twenty-five (25) years and I have provided the consulting services to Waverly for that same period of time.

2.  I hold a B.A. in Economics from St. John Fisher College, Rochester, New York, am a member of several professional organizations and have authored articles on executive compensation trends and Workforce 2000.

3.  I have more than forty (40) years experience working with non-profit organizations in all areas of employee compensation planning, including performance management systems, individual and work team incentive plan design, equity participation plans, and deferred compensation arrangements.

4.  In addition, I regularly consult with senior executives on organization design, job role definition and Human Resource Management policies and practices, including regulatory compliance. (See Biography attached.)

5.  Prior to her termination, I worked closely with Kathleen Jungclaus for about 20 years.  We were friendly and she often spoke with me regarding her

1

salary.  She did not, however, speak with me about the salary of anyone other than herself.

6.  Each year, I did an annual review of compensation levels and practices for selected executive positions on the leadership team.  I would then provide a summary of the research findings and make recommendations to ensure that the salary and benefits were competitive with other organizations like Waverly.

7.  I always conducted my review the same way and never used age or gender or any other protected characteristic as a factor in my market analysis. Specifically, I never used either age or gender as a factor when I provided an analysis of the market value of Mrs. Jungclaus' human resource position.

8.  Each year, I contacted Mrs. Jungclaus to ask for a pay run that would tell me what the employees' salaries were, what incentive awards might be earned, and what benefit programs were given to employees as well as any special programs provided to the highly compensated executives.

9.  My practice of analyzing the data against nationally recognized and reliable survey sources such as Towers Watson's *Top Management Personnel Report,* PRM Consulting's annual *Management Compensation Report for Not-for-Profit Organizations* and the Economic Research Institute (ER) executive compensation database was the same when Mr. McGuire was the CEO and since Mr. Garvin has been the CEO.  Mrs. Jungclaus received a copy of my analysis reports and recommendations every single year.  Thus, she knew that neither age nor gender was a factor in my analysis.

10.I also contacted Mrs. Jungclaus to find out whether there were any positions that Waverly was having difficulty filling, and then, my analysis would focus on that group.

11.My analysis for all job positions, including that of Mrs. Jungclaus, started with an assessment of the nature, scope and impact of each job.  Then, after gathering and analyzing the data, I would create a salary range for each position and would provide that information to Mrs. Jungclaus and Mr. Garvin in a report that summarized where each employee's compensation fell within the range.

2

12. Sometimes I would meet with Mrs. Jungclaus to discuss a particular job position but typically, we would communicate by phone or email.

13. Market values were set at the "median" and each employee's compensation was rated against the "median" market value. Neither age nor gender was a factor in any research or calculation or recommendation I made. The only data I use is the published market data from reliable sources.

14. When Mrs. Jungclaus was the Human Resource Director working for Mr. McGuire, she and I discussed her view of her position and the fact that she wanted to be named a Vice President and earn more money. Mrs. Jungclaus had a very strong personality and never suggested to me that she was being discriminated against in wages, promotion or benefits on the basis of her age or gender.

15. When Mr. McGuire was the CEO at Waverly, Plaintiff's salary was never at or above the median market value for her position but was slightly under the median market value as compared to the other organizations used for comparison.

16. When Mr. Garvin was hired as the CEO at Waverly, Mrs. Jungclaus again advocated for a promotion to Vice President and a salary increase. Mr. Garvin consulted with me and agreed to promote Mrs. Jungclaus and to increase her salary to bring it to market value. Throughout Mr. Garvin's tenure as CEO he elevated Mrs. Jungclaus' salary above the median market value and above others in similar positions in the non-profit healthcare marketplace. In fact, Mrs. Jungclaus was earning more than $6,000.00 above the median market at the time she was terminated.

17. Another aspect of my annual review, was to provide an assessment as to the amount of variable payment opportunities, such as bonuses, were paid to top level executives in non-profit organizations. Typically, I would look at the CFO, Senior Health Care Administrator and the Administrator of Waverly Cares positions and would provide recommendations for variable pay options. Individuals filling those positions, whether male or female, were usually the recipients of significant bonuses. This was the pattern at Waverly. Prior to the retirement of Ms. Guenever as CFO, all three of the top tier executives were female. Two of the three top tier executives typically receiving bonuses are female at present.

3

18. In non-profit healthcare organizations such as Waverly, the human resource department is considered a third tier function with the CEO at the first level and the CFO and Healthcare Administrators at the second level. Human Resources is considered a supporting role with less bonus opportunity. For example, the CEO's responsibilities touch every aspect of the Waverly operation from marketing, resident interaction, business plan implementation, and oversight of all departments and aspects of the community. Likewise, the CFO's responsibilities touch every aspect of the business and the Senior V.P. of Healthcare oversees every aspect of the services provided to residents in the health care area. Human Resources professionals support these broader programs and areas of activity as requested/required by the leaders of those broader programs and areas.

19. I was aware that Mr. Garvin was given the authority to award discretionary bonuses to members of his senior staff, including the plaintiff and know that he recognized individual achievement for some of the senior level administrators. Mrs. Jungclaus received four bonuses from Mr. Garvin between 2010 and 2016.

20. During the twenty(20) years I knew Mrs. Jungclaus, she never advocated for a pay increase for any person other than herself during her interactions with me. She did not suggest to me that either age or gender was a factor in my recommendations or Mr. Garvin's decisions regarding her salary or bonus. As stated previously, I do not consider the age or gender of any individual when researching compensation information or providing recommendations for salary increase or title changes.

Thomas Wozniak

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
D. Blair Kalemjian. Notary Public
East Whiteland Twp., Chester County
My Commission Expires Sept. 30, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Sworn to and subscribed before me, this _30th_ day of July, 2019.

Notary Public

4

## Thomas (Tom) E. Wozniak,
## Managing Principal
## Strategic Compensation Planning, Inc.

Tom Wozniak works with for-profit (private and public) and nonprofit organizations in all areas of employee compensation planning, including performance management systems, individual and work team incentive plan design, equity participation plans, and deferred compensation arrangements.    Additionally, he consults with senior executives on organization design, job role definition and Human Resources Management policies and practices, including regulatory compliance.

Prior to founding Strategic Compensation Planning, Wozniak was U.S. practice leader for cash compensation consulting with Sedgwick Noble Lowndes, and, earlier, worked as a Senior Consultant with WMS & Co., a Philadelphia based consulting firm specializing in point-factor base pay systems (programs similar to those offered by the Hay Group).

Tom's experiences in corporate human resources management with Xerox Corporation (information management products) and SEI Corporation (trust management/investment advisory services) coupled with diverse consulting assignments across many industries enable him to bring strong technical skills and a sound business perspective to client situations.

Wozniak holds a BA in Economics from St. John Fisher College, Rochester, NY.  He is a member of *WorldatWork* (formerly the American Compensation Association) and the National Association of Stock Plan Professionals.  Tom has authored articles on executive compensation trends and Workforce 2000.  He has been quoted in leading financial and business publications, including **The Wall Street Journal**, **The New York Times**, **Philadelphia Business Journal**, and **The Economist** and **Wealth** magazines.

*Strategic Compensation Planning, Inc.   5 Great Valley Parkway, Suite 210*
*Malvern, PA 19355   610.644.3599*
e-mail: ***tom@scpsmartpay.com***   website: ***www.scpsmartpay.com***

# Tax-Exempt Organizations Served by
# Strategic Compensation Planning, Inc.

American Board of Internal Medicine (Philadelphia, PA)
American College of Physicians Foundation (Philadelphia, PA)
AtlantiCare Health System (Atlantic City, NJ)
Board of Directors of City Trusts
(including Wills Eye Institute and Girard College) (Philadelphia, PA)
Catholic Health Services (Philadelphia, PA)
Catholic Social Services (Philadelphia, PA)
Chester County Hospital (West Chester, PA)
**Combined Jewish Philanthropies (Boston, MA)**
Elwyn, Inc. (Elwyn, PA)
Energy Association of Pennsylvania (Harrisburg, PA)
Family Health Council of Central Pennsylvania (Camp Hill, PA)
Franklin Mint Federal Credit Union (Broomall, PA)
International Center for Photography (New York, NY)
**International Youth Foundation (Baltimore, MD)**
**Jewish Federation of Greater Philadelphia (Philadelphia, PA)**
Lutheran Social Ministries of New Jersey (Burlington, NJ)
**Lutheran Immigration & Refugee Service (Baltimore, MD)**
**Lutheran World Relief (Baltimore, MD)**
Miss America Organization (Atlantic City, NJ)
Melmark, Inc. (Bryn Mawr, PA)
National Human Services Assembly (Washington, DC)
National Whitewater Center (Charlotte, NC)
NHS Human Services (Lafayette Hill, PA)
Northeast Treatment Centers (Philadelphia, PA)
OMG Center for Collaborative Learning (Philadelphia, PA)
Pennsylvania Food Merchants Association (Harrisburg, PA)
Pennsylvania School Boards Association (Harrisburg, PA)
Public Health Management Corporation (Philadelphia, PA)
Refugees International (Washington, DC)
The American College (Bryn Mawr, PA)
The Evergreens (Moorestown, NJ)
The Hill at Whitemarsh (Lafayette Hill, PA)
The Mary Campbell Center (Wilmington, DE)
United Way of Southeastern PA and Southern NJ (Philadelphia, PA)
Waverly Heights (Gladwyne, PA)