**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

KATHLEEN M. JUNGCLAUS,    :
             :
       Plaintiff  :  NO.  17-cv-04462-RK
  v.            :
             :
WAVERLY HEIGHTS, LTD.,    :  Jury Trial Demanded
             :
       Defendant :

# <u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

Respectfully Submitted,

**EASTBURN AND GRAY, P.C.**

Joanne D. Sommer
Grace M. Deon
Attorneys for Defendants

60 East Court Street
P.O. Box 1389
Doylestown, PA 18901
Phone: (215) 345-7000
Facsimile: (215)345-9142
jsommer@eastburngray.com
gdeon@eastburngray.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................iii

I.     CASE HISTORY/PROCEDURAL POSTURE.........................................1

II.    FACTS OF THE CASE.........................................................5

    A.  INTRODUCTION........................................................5

    B.  PLAINTIFF'S JOB RESPONSIBILITIES.......................................7

    C.  TWITTER, THE TWEET, PLAINTIFF'S TERMINATION...................15

    D.  PLAINTIFF'S COMPENSATION – CLAIMS OF GENDER DISCRIMINATION..................................................24

    E.  RETALIATION CLAIM...................................................31

        i.     Complaint about Salary and Raise in December 2015...................31

        ii.    Advocacy for Others...............................................34

             a.    Meredith Feher.............................................36

             b.    Constance Dogan..........................................37

             c.    Janet Thompson...........................................37

             d.    Other Females .............................................38

        iii.   Post-employment Retaliation........................................40

    F.  PLAINTIFF'S CLAIM OF HARASSMENT – HOSTILE WORK ENVIRONMENT.....................................................44

    G.  THERE ARE NO FACTS TO SUPPORT A CLAIM OF GENDER OR AGE DISCRIMINATION.............................................48

II.    STATEMENT OF THE LEGAL QUESTIONS PRESENTED.....................53

III.   LEGAL ARGUMENT.......................................................53

    A.  LEGAL STANDARD....................................................53

B. Defendants are entitled to summary judgment regarding Plaintiff's
Title VII and PHRA claims for discrimination,
hostile work environment and retaliation on the basis
gender fail to state causes of action and summary judgment
should be granted in favor of Waverly.....................................55

    i.     Plaintiff's Title VII Discrimination Claim...................55

    ii.    Plaintiff's Title VII Hostile Workplace Claim..............58

    iii.   Plaintiff's Title VII Retaliation Claim.......................60

C. Defendants are Entitled to Summary Judgment regarding
Plaintiff's Post-Employment Retaliation under Title VII..............65

D. Defendant is entitled to summary judgment regarding
Plaintiff's ADEA and PHRA claims for discrimination,
hostile work environment and retaliation on the basis age
fail to state causes of action and summary judgment should
be granted in favor of Waverly.............................................70

    i.     Plaintiff's Age Discrimination Claim under the
ADEA and the PHRA.........................................70

    ii.    Plaintiff's ADEA Hostile Workplace Claim.................74

    iii.   Plaintiff's ADEA Retaliation Claim.............................77

IV.    CONCLUSION..........................................................................78

**TABLE OF AUTHORITIES**

**STATUTORY AUTHORITY AND/OR RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 56(c)...............................................................54

29 U.S.C. § 623(a)(1)..............................................................70

42 U.S.C. § 2000e-2(a)............................................................55

43 Pa.C.S. § 955(a)................................................................70

**CASELAW**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...............................................54

*Barber v. CSX Distribution Servs.*, 68 F.3d 694 (3d Cir. 1995)................................60, 61

*Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249 (3d Cir. 2010).............................54

*Brown-Baumbach v. B&B Auto., Inc.*, 437 F. Appx. 129 (3d Cir. Pa. 2011)...................58

*Burgess-Walls v. Brown*, 11-CV-275, 2011 U.S. Dist. LEXIS 94087, at *26-27 (E.D. Pa. Aug. 22, 2011)..............................................................58

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)............................................................66

*Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).......................................71, 72

*Byrd v. Elwyn*, No. 16-02275, 2016 WL 5661713 (E.D. Pa. 2016 Sept. 30, 2016)............67

*Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005)...............................................75

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).......................................................54

*Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194 (3d Cir. 1994)...............................60, 66

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130 (3d Cir. 2006).....61

*Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181 (3d Cir. 2015).......................................77

*Davis v. City of Newark*, 417 F. Appx. 201, 203 (3d Cir. 2011)......................................60

*DiFrancesco v. A–G Adm's, Inc.*, No. 13-4284, 2014 WL 4379114, at *7 (E.D. Pa. Sept. 4, 2014), *aff'd*, 625 F. Appx. 95 (3d Cir. 2015)..........................................................72

*Evanoski v. United Parcel Serv., Inc.*, 571 F. Appx. 92, 95, n. 2 (3d Cir. 2014)................71

*Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509 (3d Cir. 1992)......................75

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–81 (3d Cir.2000).........................68

*Fasold v. Justice*, 409 F.3d 178 (3d Cir. 2005).................................................71

*Gharzouzi v. Northwestern Human Servs. of Pa.*, 225 F.Supp. 2d 514 (E.D. Pa. 2002)...........61

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)...........................................71

*Hare v. Potter*, 220 F. Appx. 120 (3d Cir. 2007)...............................................60

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)..............58

*Hook v. Ernst & Young*, 28 F.3d 366 (3d Cir. 1994)............................................77

*Howell v. Millersville Univ. of Pa.*, 283 F.Supp.3d 309 (E.D. Pa. 2017), *aff'd*, No. 17-3538, – Fed.Appx. ——, 2018 WL 4236592 (3d Cir. Sept. 6, 2018)........................................72

*Johnson v. Phila. Hous. Auth.*, 218 F.Supp.3d 424 (E.D. Pa. 2016)...............................75

*Jones v. School Dist. of Philadelphia*, 198 F.3d 403 (3d Cir. 1999)..............................55

*Kargbo v. Philadelphia Corp. for Aging*, 16 F.Supp. 3d 512 (2014)...............................77

*Kaucher v. County. of Bucks*, 455 F.3d 418 (3d Cir. 2006)......................................53

*Krouse v. American Sterilizer* Co.,126 F.3d 494 (3d Cir.1997)...................................66

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217 (3d Cir.2007)........................68

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)..................................................................55, 77

*Marra v. Phila. Hous. Auth.*, 497 F.3d 286 (3d Cir. 2007).......................................77

*Mullen v. Chester County Hospital*, No. 14-2836, 2015 WL 1954399 (E.D. of Pa. 2016 April 30, 2015)......................................................67

iv

*Nelson v. Upsala Coll.*, 51 F.3d 383 (3d Cir. 1995)..................................................60

*Omogbehin v. Cino*, 485 F. Appx. 606 (3d Cir. 2012).............................................60

*Perry v. Harvey*, 332 F. Appx. 728 (3d Cir. 2009)..................................................61

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)......................................................66

*Robuck v. Mine Safety Appliances Co.*, 10-CV-00763, 2010 U.S. Dist. LEXIS 116871, at *17-19 (W.D. Pa. Nov. 3, 2010)...............................................................61

*Sanchez v. Sungard Availability Servs., LP*, 362 F. Appx. 283, 288 (3d Cir. 2010)..............61

*Senador v. Zober Indus., Inc.*, 07-CV-4144, 2009 U.S. Dist. LEXIS 36059, at *32 (E.D. Pa. Apr. 28, 2009)................................................................61

*Smith v. City of Allentown*, 589 F.3d 684 (3d Cir. 2009)....................................71, 72, 74

*Stezzi v. Citizens Bank of Pa.*, No. 10-4333, 2012 WL 4717900 (E.D. Pa. Oct. 4, 2012).........66

*Tomasso v. Boeing Co.*, 445 F.3d 702 (3d Cir. 2006)..................................................72

*Vance v. Ball State Univ.*, 570 U.S. 421, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013)................75

*Weston v. Pennsylvania*, 251 F.3d 420 (3d Cir. 2001)................................................75

*Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015)..................71

*Zelinski v. Pa. State Police*, 108 Fed.Appx. 700 (3d Cir. 2004)......................................67

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN M. JUNGCLAUS,                       :
                                             :
                              Plaintiff      :        NO.    17-cv-04462-RK
            v.                               :
                                             :
WAVERLY HEIGHTS, LTD.,                        :        Jury Trial Demanded
                                             :
                              Defendant      :

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendant, Waverly Heights, Ltd., by and through its attorneys, Eastburn and Gray, P.C., hereby moves this Honorable Court to enter summary judgment in favor of Defendant, Waverly Heights, Ltd., and against Plaintiff, Kathleen M. Jungclaus, for the reasons set forth herein.

## I.     CASE HISTORY/PROCEDURAL POSTURE

Defendant, Waverly Heights, Ltd. ("Waverly"), is a Pennsylvania corporation that operates a continuing care retirement community, offering a range of services and residential living opportunities to its 360 residents, including independent living, assisted living, personal care and skilled nursing. Waverly employed Plaintiff from April, 1997 through September 27, 2016. *See* Plaintiff's Amended Complaint at ¶ 3. Immediately prior to her termination, Plaintiff was employed as the Vice President of Human Resources. *Id.*

The events leading up to Plaintiff's termination revolve around her dissemination of a Twitter post about the upcoming Presidential election. *Id.* at ¶ 16. Thomas P. Garvin, the President and CEO of Waverly ("Mr. Garvin"), received an anonymous letter alerting him to the Tweet. *Id.*

1

The Tweet is time-stamped July 24, 2016 and reads as follows:

> @realdonaldtrump I am the VP of HR in a comp outside of Philly
> an informal survey of our employees shows 100% AA employees
> voting Trump!"

Plaintiff posted the Tweet on her Twitter account, on which she is identified by her initials and last name: "@kmjungclaus." *Id.* at ¶ 17. After Mr. Garvin met with Plaintiff to discuss the concerning Tweet, Plaintiff immediately deleted it. *Id.* at ¶ 19. Following a review of the matter by Mr. Garvin and the Board's Personnel Committee, Waverly terminated Plaintiff's employment based upon the legitimate business reasons discussed herein.

Following her termination, Plaintiff filed gender and age based discrimination, hostile workplace and retaliation claims with the Equal Employment Opportunity Commission and Pennsylvania Human Relations Commission. Plaintiff also applied for unemployment compensation benefits. Plaintiff appealed the decision of the Bureau of Unemployment Compensation Referee who found her ineligible for unemployment compensation benefits. Thereafter, the Board of Review reversed the decision of the Referee and the Commonwealth Court upheld that decision.

On October 6, 2017, Plaintiff filed a Complaint in the above captioned matter against Defendants Waverly and Mr. Garvin, only. The sole claim against Mr. Garvin was for defamation. Counsel for Defendants sent a notice to Plaintiff's counsel informing him that Plaintiff failed to make out a viable claim for defamation; further, even if the claim were sufficiently plead, the claim was barred by the applicable one-year statute of limitations. Defense counsel further notified Plaintiff's counsel that if he failed to voluntarily dismiss the defamation claim against Mr. Garvin, Defendants would file a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

In response, on November 17, 2017, Plaintiff's counsel filed an Amended Complaint. Plaintiff's Amended Complaint asserted six causes of action. The first four are gender and age related discrimination, hostile workplace and retaliation based claims (Title VII, the ADEA and the PHRA). Count V purported to make out a claim for defamation against Garvin. Further, Plaintiff added another defendant to the lawsuit. Plaintiff named John and Jane Doe Numbers 1-22, representing "the governing body of Waverly, its Board of Trustees" ("hereinafter referred to as "the Board"). *See* Amended Complaint at ¶ 5. Plaintiff asserted a claim for Defamation and Negligent Supervision against the Board. Count VI also extended the claim for Negligent Supervision against Waverly. Accordingly, Defendants filed a Motion to Dismiss the Counts V and VI of the Amended Complaint against Garvin and the Board. By Order entered April 9, 2018, this Honorable Court granted Defendants' Motion to Dismiss.

Defendant filed a timely Answer with Affirmative Defenses to the Amended Complaint. Fact discovery closed on January 30, 2019 [1] and the exchange of expert reports occurred by the deadlines set forth in the Case Management Order, namely on February 28, 2019 as to Plaintiff and on March 31, 2019 as to Waverly.[2] In accordance with the Court's Scheduling Order of June 20, 2019, the deadline for the filing of Dispositive Motions is August 1, 2019 and the subject Motion for Summary Judgment is being filed by Defendant on August 1, 2019.

---

[1] The depositions in this case included defense counsel deposing Plaintiff, Ray Jungclaus (Plaintiff's husband), as well as Rhoda Fuchs-Morton, Plaintiff's counselor. Plaintiff deposed the following individuals: Thomas Garvin, President and CEO of Waverly; Richard Bauer, the Chairman of Waverly's Board of Trustees at the time of Plaintiff's termination); Anita Sommers (member of the Board of Trustees and member of the Personnel Committee); and Kevin Billig (Waverly Facilities department employee who Plaintiff believed knew the identity of the individual who sent the anonymous letter to Mr. Garvin complaining about the subject Tweet). Plaintiff also noticed the deposition of Charles Soltis but agreed not to depose him due to his medical/mental condition at the time. Mr. Soltis has since passed away following his battle with cancer.

[2] The only expert witnesses identified by the respective parties are economists concerning monetary damages Plaintiff allegedly suffered, as well as Defendant's position that she failed to mitigate her damages by undertaking a sufficient job search.

Plaintiff's remaining claims are as follows:  (a) Discrimination, hostile workplace and retaliation on the basis of gender in violation of Title VII of the Civil Rights Action of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII") (Count I); (b) Post-employment retaliation in violation of Title VII for appealing the decision entered by the Unemployment Compensation Board of Review which granted Plaintiff an award of unemployment compensation benefits (Count II);   (c) Discrimination, hostile workplace and retaliation on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"),  29 U.S.C. §§621 – 634 (Count III); and (d) Discrimination, hostile workplace and retaliation on the basis of gender and age in violation of the Pennsylvania Human Relations Act ("PHRA") 43 P. S. §§ 951-963 (Count IV).   Defendant moves for summary judgment and argues that all of the aforementioned claims fail as a matter of law.

Although the PHRA is a statute of independent force under Pennsylvania law, it has generally been construed to be coextensive with its federal counterparts. *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir.1996). For this reason, in the absence of contrary authority from the Pennsylvania courts, the provisions of the PHRA are typically construed in the same manner as the corresponding federal antidiscrimination provisions unless the relevant statutory language indicates that a different construction is warranted. *Fogleman v. Mercy Hospital, Inc.,* 283 F.3d 561, 567 (3d Cir.2002).  As such, the Court should consider Waverly's legal arguments for the claims under Title VII and the ADEA to apply equally to the PHRA claims.  Waverly maintains that Plaintiff's PHRA claims should be dismissed for the same reasons as those articulated as to the federal gender and age based claims.

## II.    STATEMENT OF THE FACTS

### A.    INTRODUCTION

Waverly Heights, Ltd. is a single site, nationally accredited, continuing care retirement community located in Gladwyne, Pennsylvania.  It has been in operation for more than thirty (30) years and provides independent, assisted living and nursing home care for residents. (Employee Handbook, App. 10-12;  Garvin dep App. 1043; Transcript from Unemployment Compensation Hearing, App. 336)  Waverly Heights, Ltd. (hereinafter "Waverly") is a 501(c)(3) not for profit corporation. It is governed by the IRS regulations pertaining to 501(c)(3) corporations. (Supper affidavit, App. 1280 – 1282),   Waverly is nationally accredited by the Commission on Accreditation of Rehabilitation Facilities—Continuing Care Accreditation Commission (CARF-CCAC), the only accrediting body of continuing care retirement communities in the United States. (Waverly Website)  It is a member of Leading Age and Leading Age PA, the national and state professional member organizations for senior living housing and services. (Id.)

Waverly employs a CEO and Executive Team.  At the time of Plaintiff's employment and to date, at least fifty percent (50%) of the Executive Team ("Senior Leadership") were women and all but one were over the age of 40. (*See* chart of Senior Leadership Team App.108).  Waverly Heights is served by a volunteer Board of Trustees comprised of men and women with demonstrated experience and expertise in many professions, including: finance, law, insurance, medicine, education, construction, real estate, and human resources. Approximately one-third of the trustees are residents of Waverly Heights ensuring that residents have input in the highest area of governance of the community. (App. 91-96).  In 2015, there were twenty-one (21) members of the Board of Trustees. Five (5) of the members were women and two members were attorneys. (*See* List of Board 2015, App. 91-93).  In 2016, there were twenty-one (21) members of the Board

of Trustees. Seven (7) of the members were women and two members were attorneys. (See List of Board Members 2016, App. 94-96). Richard Bauer was the Chairman of the Board of Trustees during both 2015 and 2016. (App. 91-96)

There are several Board Committees. One of these committees is the Human Resource Committee. The Vice President of Human Resources and the other members of the senior leadership team work with the Human Resource Committee to address the terms and conditions of employment of Waverly's employees. (*See* affidavit of Thomas Garvin, App. 1242-1243). Plaintiff met with the Human Resource Committee approximately four times each year. At that time, Plaintiff reported on various aspects of the Human Resource arena such as benefits for employees, turnover of employees and employee training. (Pl's Dep. App. 648). Another committee is the Ethics Committee whose purpose is to ensure that staff members engage in ethical behavior. One of the ways this occurs is to provide staff training on ethical behavior. There is a procedure for the reporting of ethical concerns. (Deposition of Anita Arrow Summers, App. 865). The Board hires the Chief Executive Officer and other top executives and must approve the annual raises. The CEO's compensation package is negotiated by the Board. (Garvin affidavit, App. 1247-12480). Waverly employed approximately three hundred twenty (320) employees in 2016, of those approximately 190 of the employees were African American. (App. 98). The 2015 EEO-1 reports similar numbers. (App. 97)

At no time did Plaintiff make a complaint of discrimination on the basis of gender or age on either her own behalf or on behalf of another to the Board of Trustees or any member of the Human Resources Committee. (Summers deposition, App. 866; Garvin Affidavit, App. 1242-1244)

6

At no time did Plaintiff make a complaint of discrimination on the basis of gender or age on either her own behalf or on behalf of another to the Ethics Committee or any of its members. (Summers, N.T. 21, App. 866)

### B.    PLAINTIFF'S JOB RESPONSIBILITIES

Plaintiff was employed by Waverly on or about March 26 1997 as Director of Human Resources. (App. 109-110).  Though she had prior experience in the health care field, she had never been a director of human resources before coming to Waverly.  (App. 111-112).  Plaintiff has a Bachelor's degree in psychology but no specialized degree in human resources, personnel or benefits management. (P's dep. N.T. 65-66, App. 639) Plaintiff did not enroll in any advanced degree program in Human Resource Management to further her education and expertise in human resources. (App. 111-112; 113-114).  Waverly has a generous tuition reimbursement program and many employees take advantage of this to fund their undergraduate and graduate degree programs. Plaintiff did not take advantage of this program but her enrollment in the Nursing Home Administrator course was paid in full by Waverly. (Plaintiff dep. App. 633 Garvin Affidavit, App. 1247).  At the time of her hire and for many years thereafter, Plaintiff's supervisor was William McGuire, the President and Chief Executive Officer (hereinafter "CEO") of Waverly.  At the time of her hire, a Job Profile was in place delineating Plaintiff's responsibilities as Director of Human Resources. (App. 115-117).   Employee training, maintaining good staff relationships, and compliance with governmental mandates were essential elements of her job. (Id.).  The Job Profile was revised over the years.  As of January 2005, the Job Profile was a detailed document delineating the categories on which Plaintiff would be evaluated.  (*See* App.  118-121)  Each category was given a "priority weight" from 1-3. (*See* i.e. Performance Evaluation 2015, App. 217-226).

The essential functions of Plaintiff's job involved the management of staff, including the hiring, firing and other discipline of employees as well as the investigation of employee complaints or complaints from residents about employees. (App. 632, 118-121) Plaintiff also developed and managed employee training programs including those involving company policies and procedures. (Plaintiff's deposition, App. 636, Job Description 2005, App. 118-121). Other essential functions were compliance with and implementation of governmental and accreditation regulation, managing the documentation of unemployment and worker's compensation matters, managing employee healthcare systems, including obtaining input from employees regarding their benefits, completing the AASHA Annual salary surveys and the Personnel Professional Networks Salary and Benefits Survey. (Id.).

In fact, Plaintiff was responsible for reviewing and approving all pay increases below the level of Department Director of more than 200 staff members. (App. 634)  She was also involved in negotiation of wages for staff from the Director level down. (Pl's Dep., App. 46, 2005 Job Description, App. 118-121)[3].  Plaintiff was responsible for managing "the hiring, promotion, demotion, discipline, and discharge of all employees within the corporation in conjunction with the Department Directors." (Id.)   This responsibility included investigating and making determinations about complaints made by employees alleging discrimination. (Pl's Dep., App. 632, 639).  Plaintiff conducted at least one harassment/discrimination investigation each year of her employment and was familiar with all of the federal and state laws governing workplace discrimination. (App. 639).   If an employee was dissatisfied with Plaintiff's determination regarding a complaint he or she made, Plaintiff referred them to Mr. Garvin for a response. (Pl's Dep. App. 639).   Plaintiff was responsible for writing company human resource policies in

---

[3] Plaintiff claims that there was gender discrimination in the calculation of pay increases for her and other managers. Presumably, she is not claiming that she engaged in discrimination when approving or awarding pay increases.

conjunction with the senior leadership team. (Pl's Dep. App. 632).  It was the Plaintiff who drafted the social media policy adopted by the Company. (Pl's Dep. App. 644).  Plaintiff also conducted all training in personnel practices of employees not only for Waverly Heights, Ltd., but for Waverly Care, a separate home care agency. (App. 636).  Plaintiff administratively managed the worker's compensation claims and decided what claims to report to the insurance carrier. (Id. App. 637).

To support Plaintiff's performance of her job duties, Waverly paid for plaintiff to attend various training seminars each year.  Included were seminars addressing discrimination in the workplace.  In fact, Plaintiff took at least five courses entitled "Embracing Diversity" from 2011-2016 and in 2013 and 2014, attended a course in Preventing Sexual Harassment. (Certificates of Completion 2011-2016, App. 122-128).  Plaintiff and all employees were required to attend employee training programs each year.  It was plaintiff's responsibility to maintain the records of this. Some of this training was called "Silver Chair" training. (Garvin Dep. App. 2041).

At no time did Plaintiff make a complaint of discrimination on the basis of gender or age on either her own behalf or on behalf of another to the Board of Trustees or any member of the Human Resources Committee. (Summers Dep, App. 866; Garvin Affidavit, App. 1242-1244; Pl's Dep. 11/2/16, App. 701).  At no time did Plaintiff make a complaint of discrimination on the basis of gender or age on either her own behalf or on behalf of another to the Ethics Committee. (Summers Dep, App. 866).  As Vice President of Human Resources, it was Plaintiff's responsibility to make certain that Waverly's policies, including those prohibiting discrimination were implemented.  It was Plaintiff's responsibility to ensure that there was no discrimination in the work place. In addition, it was her responsibility to investigate and/or resolve employment related matters under Waverly's policies. (*See* policies attached as App. 99-107) (Pl's Dep.

11/2/18, App. 701-703).   Waverly has an Open Door Policy designed "to encourage open communication, feedback and discussion about any matter of importance to an employee." (*See* Policy attached as App. 100)  In Plaintiff's opinion, this was an effective policy. (Pl's Dep.11/2/18, App. 701).  Employees are encouraged to discuss matters of concern with their supervisors. (*See* Policy, App. 100.)

If an employee's problem cannot be resolved by the supervisor, there is also an Employee Problem Solving Procedure. (*See* Policy P-676, App.  101-102)  There are four steps to the policy and the Director of Human Resources is responsible for attempting to resolve employee complaints at Step 3 of the policy.   The policy contemplates that the Director of Human Resources would weigh the evidence, consider testimony of witnesses and assess the evidence.   Appeal from the decision of the Director/Vice President of Human Resources is made to the President of Waverly. (*See* Policy, App. 101-102).  There is also an Equal Employment Opportunity policy (Policy P-639, attached as App. 99).   Employees with complaints or concerns about equal employment issues, including workplace harassment and retaliation are encouraged to contact the Human Resource Department.  Under the complaint procedure of Waverly's Non-Discrimination Policy, an employee may make a report of discrimination/harassment to either the supervisor or Human Resources.(Id.)  It is Human Resources that is ultimately responsible for investigating a complaint, and making findings regarding the complaint.  It was also Plaintiff's job to make certain that there was no discrimination or retaliation against employees. (Pl's Dep. 11/2/18, App. 701-703; Policy, App. 99).   Policy A-023 is the company "Code of Conduct" policy and again, it is Human Resources that enforces this code. (*See* App. 26)

Waverly has a social media policy.  (*See* Policy P-699 attached as App. 105-107).   The social media policy clearly states that "behavior that is not permitted in the workplace is also

10

prohibited on social media." Violation of the social media policy is listed as a ground for immediate termination. (Policy P-699, App. 105-107). Plaintiff was the author of the social media policy. (Pl's Dep. App. 644). Waverly has a policy prohibiting sexual harassment and discrimination. (App. 99, 103, 104) Plaintiff was responsible for implementation of this policy, including conducting investigations, and disciplining employees found in violation of the policy. (Plaintiff N.T. 11/1 App. 639, Pl's Dep. 11/2 App. 701-702).

The employment of Waverly's staff members, including the senior leadership team is governed by the Employee Handbook. (App. 1-90). This manual provides employees with information regarding the philosophy and mission statement of this non-profit continuing care retirement community. Throughout the handbook, the company confirms its commitment to fair employment practices, competitive pay and benefits, and career opportunities. (*See* e.g. App. 17-27, 47-53, 72-73). Prominent in the handbook are the Ethical Standards and Corporate Compliance provisions. Employees, including members of the senior leadership team, are asked to bring matters to the attention of the department director, Director of Human Resources or the president. If the employee does not believe that appropriate action has been taken within a reasonable period of time, he or she is urged to call the Corporate Compliance Hotline (Handbook, App. 17-27). Thus, the Corporate Compliance Hotline is not just for the reporting of fiscal responsibility or fraud concerns but also any concern relating to compliance with company policies. (Id.). Included within the Ethical Standards and Corporate Compliance section of the handbook is the Equal Opportunity Policy promising a workplace free from discrimination for its employees and applicants for employment. (App. 22) Employees and applicants are encouraged to report any violation of the non-discrimination policy. In addition, the names and addresses of governmental agencies charged with enforcing the non-discrimination laws are set forth. (App. 23).

Waverly's Harassment Policy prohibits harassment of any kind and there is a procedure for employees to follow to make a complaint of harassment.  Under the policy, an individual who believes he or she is being harassed is encouraged to approach the harasser to advise him or her that conduct is unwelcome or offensive while at the same time, the employee's supervisor should be contacted.  It is Waverly's responsibility to make sure that the conduct is stopped. (App. 24-26, App. 103).  There is a complaint procedure and a specific provision prohibiting retaliation against any employee reporting discrimination or harassment. (App. 26).  Violation of the company's policies prohibiting discrimination can result in the termination of employment. (Id.).  Waverly also employed corporate counsel who advised Waverly and its leadership team, including Plaintiff and the Board of Trustees about legal issues. (Affidavit of Deborah Sandler, Esquire and Tonya Salgado, Esquire, App. 1273-1279; Pl's Dep., App. 640).  Plaintiff consulted with Ms. Sandler and Ms. Alvarado regarding human resource matters. (Pl's Dep., App. 628 ).  At no time during Plaintiff's employment did she advise counsel that either she or any other person was the victim of discrimination on the basis of age or gender or any other protected activity. (Affidavits of Sandler and Alvarado, App. 1273-1279, respectively).  Specifically, Plaintiff never complained to counsel that Mr. Garvin had discriminated against her with regard to her own salary or benefits. (Id.).  Plaintiff never complained to counsel that Mr. Garvin retaliated against her because she advocated on behalf of women or older employees about workplace terms or conditions. (Id.).  Plaintiff never brought to the attention of counsel that she believed that Mr. Garvin was engaging in inappropriate conduct of any kind such as "double dipping" for healthcare coverage or asking her not to file a worker's compensation claim. (Id)  If Plaintiff had made a complaint against Mr. Garvin or any other member of the senior leadership team, counsel would have brought this to the attention of the Board of Trustees. (Id.).  Plaintiff never advised counsel that a Board member, Mr.

12

Soltis, was sending offensive emails to her or any other member of the leadership team. (Id.). Plaintiff never advised counsel that she or anyone else was the victim of a hostile work environment. (Id.).   Plaintiff worked with Tanya Salgado, Esquire, on two employment discrimination cases filed against Waverly.  In one of those cases, the plaintiffs claimed that it was Kathleen Jungclaus, the Plaintiff here, who engaged in discriminatory conduct against them. (App. 1273-1275; Pl's Dep., N.T. 12-14, App. 626).

Likewise, Plaintiff never filed a complaint about any financial, business or personal conduct she viewed as inappropriate with the Corporate Compliance Hotline. (Id.; App. 640-642). Plaintiff never brought any financial, business or personal conduct of Mr. Garvin to the attention of the Board of Directors, Ethics Committee, Human Resources Committee or to the Board President.  (App. 1273-1279, Affidavits of Salgado and Sandler; Affidavit of Garvin, App. 1242-1243).   It was Plaintiff's responsibility to implement Waverly's policies prohibiting discrimination, establishing an open door process and managing social media issues.(*See* Policies, App. 99-107).  Plaintiff knew her rights and the rights of others regarding non-discrimination in the workplace and the protection from retaliation for participating in protected activity such as making a complaint of discrimination.  (Pl's Dep. 11/2, p. 26, 42-43, App.  698, 702, 641).  All of the policies above mentioned were implemented, monitored and enforced by the Human Resources department with Plaintiff as the Vice President responsible for human resource functions. (Plaintiff dep. App. 639-641)  She was not responsible for the human resource functions of the Waverly Cares arm of the company.   Instead, that role fell to Vice President, Patricia Rogers, who administered that program.  (App. 1269-1270).  Plaintiff received training paid for by Waverly to assist her with implementation of Waverly's non-discrimination and other employment-related policies. (*See* certificates of attendance attached as App. 122-136).  In addition, at Waverly's

expense, Plaintiff enrolled in the nursing home administration course in order to obtain the Nursing Home Administrator Certification. As part of that course, Plaintiff was required to take and successfully complete courses such as "Human Resources in Health Care". (See coursework summary of Plaintiff's Administrator's course, App. 129-136, 1244). More importantly, apparently, "[w]ith glowing reviews, she taught the Human Resource section of the Nursing Home Administration certification program." (First Amended Complaint, paragraph 13, App. 572)[4]. In addition, Plaintiff was responsible for developing and implementing all employee training. (Paragraph 13 of the First Amended Complaint, App. 572) This training included topics relating to non-discrimination in employment.

As Vice President of Human Resources, plaintiff was acutely aware of all issues relating to equal employment opportunity including non-discrimination in all aspects of employment, harassment and hostile environment issues, as well as social media issues. (App. 701-702). Plaintiff knew that as a member of the senior leadership team, she was held to a higher standard and that her conduct reflected on Waverly. (Garvin deposition, N.T. 131 133, 175-177 App. 1072-73, 1083-1084, 1248). She also knew of her responsibility to maintain the impression of neutrality so that employees would feel comfortable reporting policy violations, including discrimination. As the "face" of Waverly, Plaintiff knew that discrimination in any form would not be tolerated. (Garvin Affidavit, App. 1249). In 2011 and 2013, Waverly was designated as a Best Place to Work in the Delaware Valley. The designation is achieved through the completion and submission of surveys completed by employees. Plaintiff coordinated the completion of the employee surveys and the submission of the surveys. (Garvin Affidavit, App. 1242-1251). The satisfaction of Waverly employees with their salary, benefits and overall working conditions, including an

---

[4] There is no documentary evidence that there were any "reviews".

atmosphere of non-discrimination led to the positive survey results from the employees. (Id.) (Garvin Affidavit App. 1250). Plaintiff knew or should have known that engaging in political activity in the workplace on behalf of or related to a particular candidate was prohibited for not-for-profit corporations and could result in loss of IRS 501(c)(3) designation. (App. 628). Plaintiff knew or should have known, as Vice President of Human Resources and a member of the senior leadership team that her conduct in posting the Tweet as a "V.P. of HR" could result in liability for Waverly. (Garvin Dep., N.T, 175-176, App. 1083). Plaintiff knew or should have known that her conduct in posting the tweet was a violation of the social media policy. (App. 1083). Plaintiff knew or should have known that her conduct in posting the tweet could affect the working conditions of African American workers and adversely impact her ability to fairly enforce the non-discrimination and equal employment opportunity policies. In fact, Waverly's African American employees saw Plaintiff's tweet and were offended by it. Mr. Garvin met with them to apologize. (Id., App. 1219, 1248, 1270). It was Plaintiff's responsibility to make certain that there was no retaliation against employees who made a complaint of discrimination and/or harassment and Plaintiff knew that employees making claims of discrimination were protected from retaliation against them. (Pl's Dep. 11/1/2018, App. 641, 701-702).

## C.    TWITTER, THE TWEET, PLAINTIFF'S TERMINATION

Twitter is an online news and social networking site where people communicate in short messages called tweets. Tweeting is posting short messages for anyone who follows a specific person or organization on Twitter, with the hope that the messages are useful and interesting to someone in the audience. Waverly had a Twitter account where Mr. Garvin posted items on behalf of Waverly of interest to those looking for or receiving long-term care. Waverly's Twitter page has "followers". Plaintiff is shown as a "follower". (See Screen Shot of Twitter Page and Tweet

App. 273-279).  Initially Plaintiff opened this account at the request of Mr. Garvin solely for the purpose of "following" him because, according to Plaintiff, Garvin did not have followers on his Waverly Twitter account. (Jungclaus deposition, p.17-19, App. 627; Deposition of Raymond Jungclaus, N.T. 17, App. 823).  When the Twitter account was established, Plaintiff "followed" Garvin as a Twitter user.  (Jungclaus, p. 19 App. 627) Since Plaintiff was listed as a "follower" of Mr. Garvin, any person who accessed the Waverly page could click on her "follower" name and access Plaintiff's  Twitter page because Plaintiff's Twitter account was public.(See Anonymous Letter, App. 270-272; Twitter/Tweet pages showing as a follower, App. 273-279; Pl's Dep. App. 627).

Plaintiff also set up a Go Fund Me web page for "Dilly", a Waverly employee's son who was undergoing cancer treatments.  Updates regarding the treatment and condition of the boy were posted on the webpage along with donation information and well-wishes. (R. Jungclaus Dep., N.T. 17, 86-87, App. 823- 840, Pl's Dep., p. 86-87 App. 644).  When Plaintiff established the Go Fund Me page, she clicked the Facebook and Twitter icons at the bottom of the page so that she could get "the most mileage out of it." (Pl's Dep., p. 86-87, App. 644)  This meant that information on the Go Fund Me page would be shared on the public Facebook and public Twitter accounts as well. (Id.).  Further, to access Plaintiff's public twitter account, an individual would only have to "google" her name, click on it, and the individual would be directed to the public Twitter page where all of Plaintiff's tweets could be viewed.  (Plaintiff's interview with Unemployment Compensation, App. 298-300).  Plaintiff also posted updates regarding Dilly's treatment on her own public Twitter page.  (See App. 273-279).  Plaintiff donated to the fund and her public Twitter account address was listed on the Go Fund Me page.  By clicking on Plaintiff's name, anyone, including residents and employees of Waverly as well as members of the public, could access

Plaintiff's public Twitter account from the Go Fund Me page established by Waverly. (Anonymous letter, App. 270-272; Garvin Dep., App. 1044; *See* Affidavit of Amy Blessing, App. 1222-1229).

Plaintiff used her own public Twitter account to report on the health condition of "Dilly", the young son of the Waverly employee, who was the beneficiary of the "Go Fund Me" page. (*See* App. 273-279, 1247). There were no privacy settings on Plaintiff's Twitter account. Any resident, member of the public or employee of Waverly could access this account and read its content. (Pl's Dep. App. 1222-1229). During the 2016 the campaign for President was ongoing. Plaintiff and her husband were avid supporters of Donald Trump. (Pl's Dep. 11/1/18, p. 36 App. 628; Affidavit of Janet Thompson, App. 1290-1294). On July 24, 2016, Plaintiff wrote and posted a tweet from her own Twitter page. The tweet read: "@realdonaldtrump, I am the VP of HR at a comp outside of Philly, an informal survey of our employees shows 100 percent AA employees voting Trump 7/24/16" (*See* App. 273-279). The Twitter account which Plaintiff used to post the tweet in question still exists. (Pl's Dep., N.T. p. 17-19 App. 627).

On or after September 14, 2016, Mr. Garvin, CEO of Waverly, received an anonymous letter from a "member of the Waverly community". (See App. 270-272) In it, the resident, who has never been identified by either party, informed Mr. Garvin that he/she had gone to the @waverly heights social media site. He/she checked to see who the "followers" were and immediately saw @kmjungclaus. Given the unusual last name, coupled with the first two initials of Plaintiff's first and middle names, the resident knew that this follower was Plaintiff, Kathleen M. Jungclaus, with whom he/she had contact over the years in Plaintiff's capacity as V.P. of Human Resources of Waverly. When he/she clicked onto the @kmjungclaus link, he/she was directed to the Twitter page Plaintiff established and read the tweet above. (Anonymous letter,

App 270-272). The content of the tweet was disturbing to the resident who was alarmed that a high ranking staff member would report that she had conducted a survey linked to Waverly. He/she stated: "...I would have no choice but to deduce from this 'tweet' that the Caucasian Vice President of an equal-opportunity employer, Waverly Heights, ltd.[sic], conducted an informal survey of the staff that seemed to communicate that despite having hundreds employees of varying racial backgrounds, she feels confident enough to report publically that 100% the African American employees will be voting for Donald Trump." (*See* App. 271).

The resident went on to express his/ her astonishment that a person in the position of Vice President of Human Resources would not recognize how inappropriate and detrimental to Waverly publically reporting this information would be and questioned whether employees had been treated fairly by the person whose job it was to demonstrate "moral and ethical judgment". (Id.). Prior to Garvin's receipt of the anonymous letter, he was unaware that this tweet had been posted by Plaintiff. However, Plaintiff had no authority to conduct a survey in the workplace of employees' political views. To do so constitutes a violation of law. "All charities...are absolutely prohibited from intervening in a political campaign for or against any candidate for an elective public office. If a charity does intervene in a political campaigning, it will lose both its tax-exempt status and its eligibility to receive tax-deductible charitable contributions." – *See* IRS instructions for <u>Schedule A, IRS Form 990</u>. At the time of the tweet, Waverly employed approximately one hundred ninety (190) African American Employees. (App. 97-98).

Mr. Garvin and Executive Services Manager, Amy Blessing went onto the internet to the Waverly Twitter page and clicked onto @KMJungclaus, who was shown as a follower of Waverly and also linked through a "like" of Waverly. They were immediately taken to Plaintiff's public Twitter page entitled Kathy Jungclaus, where the Tweet was posted and available to members of

the public, including Waverly employees. (Affidavit of Amy Blessing, App. 1222-1229 ; Garvin deposition, App. 1074-1076) Garvin testimony at Unemployment Hearing, App. 336-337, N.T. 9-10).  Plaintiff's Twitter account was listed under Kathy Jungclaus and linked to her personal email, @kmjunclaus. (*See* Referee Decision, p. 2, App.  355-361, Tweet, App. 273-279).

It was Plaintiff's responsibility to enforce Waverly's equal employment policy and the policy prohibiting discrimination and to ensure that there was a workplace free of discrimination in any form, including racial discrimination.  Publicly asserting that she had polled African American employees about their voting preferences as the "V.P. of a comp outside of Philly" and listing her name as KMJungclaus left no doubt as to her identity.  (App. 270-272).  Mr. Garvin believed that, as Vice President of Human Resources, whose responsibility it was to enforce human relations policies, Plaintiff's conduct in posting this particular Tweet directly attributable to Waverly, demonstrated an extreme lack of good judgment. (Garvin testimony at UC hearing, App. 338-339).  Mr. Garvin met with the Plaintiff on September 20, 2016.  At that time, he showed her the anonymous letter. (App. 337).  Plaintiff was asked to immediately delete the post, "unfollow" Waverly and make sure that there was no link between her Twitter account and Waverly. Plaintiff did not advise Mr. Garvin that her husband had posted the tweet, (App. 337; *See* Affidavit of Thomas Garvin, App. 1247-1248).  Plaintiff did not assert that her Twitter account had been hacked. (U.C. hearing testimony App. 338).  Plaintiff did not assert that the term "AA" referred to "Administrative Assistant". (App. 1242-1251, Affidavit of Garvin, Garvin UC testimony, App. 344-345).  Plaintiff's response to the discovery of the tweet was to ask Mr. Garvin if she was going to be fired. (Garvin, App. 1079-1080).  She stated that she was surprised that the Tweet had come to light. (Id.).

When shown the anonymous letter, Plaintiff admitted that the tweet was on her Twitter page. (U.C. testimony App. 347). Mr. Garvin did not make any statement regarding whether Plaintiff would be fired but merely asked Plaintiff to take down the Twitter posting. (Garvin testimony at UC hearing, App. 337). Between September 20, 2016 and September 26, 2016, while Mr. Garvin was on vacation, Plaintiff stopped by his office several times and told Amy Blessing, the Executive Services Manager, that she was in the process of cleaning out her office. (See Affidavit of Amy Blessing, App.1223). At the time of her termination, Plaintiff confirmed that she had been clearing out her belongings after the September 20, 2016 meeting while waiting for Mr. Garvin's return from a business meeting. (Bauer App. 931). Meanwhile, Mr. Garvin advised the members of the Human Resources Committee about Plaintiff's tweet and the anonymous letter that had been received. A copy of the letter was circulated to the members of the committee and to the Chairwoman of the Ethics Committee, Anita Summers. (Bauer N.T. App. 917; Garvin App. 1051-1055; emails between Garvin and Committee, App. 282-289). During a conference call with members of the Human Resource Committee, Mr. Bauer, the Board President, Mrs. Summers and Mr. Garvin, it was decided that Plaintiff would be offered the opportunity to resign and would be given a severance package but ultimately, Plaintiff's employment would be terminated. (Garvin, App. 1051-1055, 1068-1069). On September 26, 2016, Mr. Garvin and Mr. Bauer, President of the Board of Trustees, met with the Plaintiff to advise her that her employment was being terminated but that she could resign with a severance package. (Garvin App. 1068-1069; Bauer notes App. 934-935.)

At that time, Plaintiff admitted that she had posted the tweet in question and apologized for doing this. She stated that she knew it had been wrong. (Garvin, App. 1069; Bauer, App. 921-922). During the same meeting, Plaintiff back-pedaled and stated that she had not posted the tweet

20

and that her account had been hacked.  (Id.; Garvin U.C. hearing testimony, App. 340)  Then, Plaintiff stated that she wanted to apologize to the Board and the HR Committee. (Garvin U.C Testimony App. 340).  Plaintiff never stated that her husband had created or posted the Tweet. (Garvin affidavit, App. 1247).  Plaintiff's husband is also a V.P. of Human Resources in a small Philadelphia based company. (R Jungclaus Dep., App. 824).  Plaintiff never stated that the term "AA" was a reference to "Administrative Assistant".  (Id.) (App. 824).

    At her deposition, Plaintiff testified that the individual she spoke with about his political preferences and for whom he planned to vote was Basheer Womack, an African American kitchen worker.  (Pl's Dep. App. 628, 704).  He was not an administrative assistant.  Mr. Womack submitted an affidavit in support of this Motion for Summary Judgment.  He denies ever having a conversation with the Plaintiff about politics or anything else as he does not vote.  He stated that he does not talk about politics at all at work because he does not vote and does not believe he should give any opinion if he is not going to vote. Mr. Womack further said that he had no information regarding who the other kitchen workers were voting for and certainly would not have given that information to the plaintiff.  He denied that he told plaintiff that he thought she would be a "Hillary supporter".  (Womack Affidavit, App. 1297).  Plaintiff's husband, Raymond Jungclaus, testified at his deposition, that at the time the tweet was posted, the "AA" referred to African Americans. (R. Jungclaus Dep., App. 824).  Only later was he "told" that "AA" might refer to something else. (Id.).

    Plaintiff was permitted to go to her office to clean out her personal belongings.  She was not accompanied by anyone but was told that Mr. Heil and Mr. Brown would come to help her with her personal effects.  Plaintiff was not paraded before other employees nor did the route to her office from Mr. Garvin's pass employees. (Garvin dep. 11/2, App. 1083).  Immediately after

leaving Mr. Garvin's office on September 26, 2016, Plaintiff went to the office of Janet Thompson, V.P. of Marketing.  Mrs. Blessing, Executive Services Manager, followed Plaintiff into the office. (*See* Affidavits of Janet Thompson and Amy Blessing, App. 1225, 1293, respectively).  Plaintiff was crying visibly upset.  She stated that she was being terminated because she did something wrong.  She then stated that "it wasn't even me".  Plaintiff stated that she had no idea who had created or posted the tweet in question. Both Mrs. Thompson and Mrs. Blessing urged Plaintiff to tell Mr. Garvin about this but Plaintiff refused. (Affidavits of Blessing and Thompson App. 1225, 1293).  Plaintiff did not tell Mrs. Thompson or Mrs. Blessing that her husband had posted the tweet using her Twitter account. (Id.)

Plaintiff then went to her office.  Marc Heil, Vice President of Building Services, was asked by Mr. Garvin to monitor the termination process for Plaintiff when she left on September 27, 2016.  This is not atypical as he is responsible for security.  Whenever an employee is asked to leave, or resigns, either Mr. Heil or one of his staff members accompanies the employee so that he or she can get his/her personal belongings.  (*See* Affidavit of Heil, App. 1255).  Mr. Garvin told Mr. Heil that he wanted Plaintiff' departure to be unobtrusive and private and wanted him, as a member of the senior leadership team to monitor the situation.  Mr. Heil was not present when Plaintiff was terminated nor did he follow Plaintiff from Mr. Garvin's office to Mrs. Thompson's office. (App. 1255).  Mr. Heil first saw Plaintiff on September 27, 2019 when she was cleaning out her desk.  He and another staff member waited with her and walked together to the Manor House exit.  Plaintiff's office was right at the top of the stairs leading to the Manor House Exit and there are no offices near to her.  Mr. Heil saw no one else as he left the building with Plaintiff. Plaintiff's car was parked at the Manor House exit. (Id.).  At the time Mr. Heil left with Plaintiff, she had a box filled with personal items. (Id.).  A few days later, Plaintiff called Mr. Heil and asked

if she could get some additional personal items. Mr. Heil gathered the remaining personal effects and met her at the Park and Ride station near Waverly where Plaintiff's personal items were delivered to her. (Affidavit of Heil, App. 1255).

Plaintiff was fired for her "Tweet" because it singled out a protected class by stating that she had conducted a poll of minority, "AA" workers and reported that 100% of the "AA" workers were voting for Donald Trump. This conduct compromised Plaintiff's ability to do her job and was detrimental to Waverly's public relations. (Garvin dep. 11/2/18, App. 1072-1074 p. 139-140). It violated Waverly's social media policy and showed an appalling lack of judgment for a senior team leader, corporate human resource professional and representative of Waverly. After Plaintiff's termination, Mr. Garvin was told by Mrs. Rodgers, V. P. of Waverly Cares, that the Tweet had been brought to her attention prior to September 14, 2016 by her African American employees who were angry and upset that Plaintiff would publicly post a comment purporting to speak for African Americans as a group. (Rodgers Affidavit, App. 1269-1270; Garvin Dep. 11/26/18, App. 1174, Garvin Affidavit, App. 1248). Mr. Garvin met with the Waverly Cares employees to apologize for Plaintiff's conduct and to assure them that she had not been authorized to take any kind of political poll in the workplace and that she did not speak for Waverly in the tweets about her "survey". (Id.) (App. 1248).

The first time that Mr. Garvin learned that Plaintiff was claiming that her husband and not her, posted the Tweet using Plaintiff's twitter account was in connection with the unemployment compensation ("UC") hearing when afforded the opportunity to review the UC documents, including Plaintiff's application for benefits contained this allegation. However, prior to the November 28, 2016 hearing, on November 9, 2016, Mr. Schwartz, Plaintiff's counsel, sent a nine (9) page letter to Waverly, describing his, and presumably Plaintiff's, version of her experience at

Waverly and the "facts" leading to her termination. Strikingly, Mr. Schwartz' version of events, reviewed and approved by both the Plaintiff and her husband, does not assert that it was Raymond Jungclaus who posted the Tweet in question. (Schwartz letter, App. 311-326; Pl's Dep 11/1/18, App. 629-630, R. Jungclaus Dep., App. 820). Nor does the complaint filed in this case contain any allegation that it was Raymond Jungclaus who posted the tweet. Indeed, Mr. Jungclaus testified at his deposition that it was a joint effort with Plaintiff posting on her Twitter account his and her conclusions from a "poll" of workers, that the African American workers would be voting for Mr. Trump. (R. Jungclaus Dep. App. 822-823).

Plaintiff's varying and creative versions of how the tweet came to be demonstrates her lack of credibility. The fact is that no matter what, the tweet was posted by the Plaintiff on a public twitter page linked directly to Waverly through the Go Fund Me page and because Plaintiff listed herself as a follower of Mr. Garvin and Waverly. As V.P. of Human Resources responsible for maintaining an non-discriminatory workplace and responsible as the face of Waverly for day to day interaction with employees, Plaintiff knew or should have known that her very public tweet would be offensive to many of the employees she supervised. There is no evidence that the termination of employment was a pretext for discrimination. Plaintiff's replacement is Lauren Kelley, a 43-year-old female with credentials in the human resource field far superior to those possessed by the Plaintiff. (*See* Affidavit and Resume of L. Kelley, App. 1261-1268).

### D.    PLAINTIFF'S COMPENSATION – CLAIMS OF GENDER DISCRIMINATION

As part of its Employee Handbook, Waverly also provided information to its employees regarding the manner in which their performance would be judged and rewarded by annual pay increases. (App. 72). Starting pay rates for new employees were based on education and related work experience. (Id.) Pay increases were/are dependent upon satisfactory annual performance

review.  Employees are advised from the first day of their employment that the employee's compensation rate in relation to the market value of his or her pay grade is considered along with performance when determining an annual increase, including merit increases.  Each year, for more than twenty-five (25) years, Waverly contracted with an outside consultant, Thomas Wozniak.  He is employed by Strategic Compensation Planning, Inc. ("SCP") and is the founding member and the Managing Principal of that company.  Mr. Wozniak holds a B.A. in Economics from St. John Fisher College, Rochester, New York, and is a member of several professional organizations and has authored articles on executive compensation trends and Workforce 2000.  Mr. Wozniak has more than forty (40) years' experience working with non-profit organizations in all areas of employee compensation planning, including performance management systems, individual and work team incentive plan design, equity participation plans, and deferred compensation arrangements.  In addition, he regularly consults with senior executives on organization design, job role definition and Human Resource Management policies and practices including regulatory compliance.  (Affidavit of Thomas Wozniak, App. 1298-1301).

Each year, Mr. Wozniak did an annual review of compensation levels and practices for selected executive positions on the Waverly leadership team.  A summary of the research findings and recommendations were made to Waverly to ensure that the salary and benefits were competitive with other organizations like Waverly.  (Id.)  Mr. Wozniak did not use either age or gender or any other protected characteristic as a factor in his market analysis.  Specifically, he did not use either age or gender as a factor when he provided an analysis of the market value of Plaintiff' human resource position.  (Affidavit of Wozniak, App. 1298-1301).  In fact, it was the Plaintiff who provided all of the information necessary for Mr. Wozniak's analysis and she sent him a pay run showing employee salaries, incentive award information and benefits received.  In

addition, Plaintiff provided information regarding any special benefits that the highly compensated employees received.

Mr. Wozniak analyzed Waverly's data against nationally recognized and reliable survey sources such as Towers Watson's *Top Management Personnel Report,* PRM Consulting's annual *Management Compensation Report for Not-for-Profit Organizations* and the Economic Research Institute (ER) executive compensation database.  The same survey sources were used when Mr. McGuire was the CEO and since Mr. Garvin has been the CEO.  Plaintiff received a copy of Mr. Wozniak's analysis reports and recommendations every single year.  Thus, she knew that neither age nor gender was a factor in the analysis. (Id.).  If Plaintiff advised Mr. Wozniak  that there were positions that Waverly was having trouble filling, he did an additional focus analysis on that group in an effort to determine what it would take in terms of salary and benefits to attract workers to fill the positions. (Id.).  Mr. Wozniak's analysis for all job positions, including that of the Plaintiff, started with an assessment of the impact that each job had on the overall success of the organization.  After gathering and analyzing the data, Mr. Wozniak created a salary range for each position and provided that information to Plaintiff and Mr. Garvin in a report that summarized where each employee's compensation fell within the range. (Id.).  Market values were set at the "median" and each employee's compensation was rated against the "median" market value.  Neither age nor gender was a factor in any research or calculation or recommendation made by Mr. Wozniak. The only data he used was published market data from reliable sources. (Id.).

When Plaintiff was the Human Resource Director working for Mr. McGuire, prior to 2010, she discussed with Mr. Wozniak her view of her position and the fact that she wanted to be named a Vice President and earn more money.  Plaintiff never suggested or stated to Mr. Wozniak that she was being discriminated against in wages, promotion or benefits on the basis of her age or

gender by Mr. McGuire. (Id.).  When Mr. McGuire was the CEO at Waverly, Plaintiff's salary was never at or above the median market value for her position but was slightly under the median market value as compared to the other organizations used for comparison.  (*See* Graph, App. 265-266).  Plaintiff never received a bonus when Mr. McGuire was her boss. (Chart of Salary and Bonus 2005-2016 App. 265-266; Pl's Dep. App. 632).  In 2010, when Mr. Garvin was hired as the CEO of Waverly, Plaintiff again advocated for a promotion to Vice President and a salary increase. Mr. Garvin consulted with Mr. Wozniak and agreed to promote Plaintiff and to increase her salary to bring it to market value.  (Wozniak Affidavit, App. 1298-1301; P dep. App. 632).  Plaintiff stated that it was satisfying to be named a Vice President by Mr. Garvin. (Pl's Dep App. 632). Throughout Mr. Garvin's tenure as CEO he elevated Plaintiff' salary above the median market value and above others in similar positions in the non-profit healthcare marketplace.  In fact, Plaintiff was earning more than $6,000.00 above the median market at the time she was terminated. (*See* Graph, App. 265).  In non-profit healthcare organizations such as Waverly, the human resource department is considered a third tier function with the CEO at the first level and the CFO and Healthcare Administrators at the second level. (Affidavit of Wozniak, App. 1298-1301) Human Resources is considered a supporting role with less bonus opportunity.  For example, the CEO's responsibilities touch every aspect of the Waverly operation from marketing, resident interaction, business plan implementation, and oversight of all departments and aspects of the community.  Likewise, the CFO's responsibilities touch every aspect of the business and the Senior V.P. of Healthcare oversees every aspect of the services provided to residents in the health care area. Human Resource professionals are involved in day to day functions that do not touch any other operational aspects. (Id.).  In addition to the salary analysis, Mr. Wozniak provided an analysis of variable pay opportunities, such as bonuses, available to high level executives in the

non-profit sector.  He made recommendations for bonus percentages for certain members of the senior level management team; in particular, Mr. Supper (CFO), Mrs. Feher (Health Care Administrator) and Mrs. Rodgers (Waverly Care administrator).   (App. 267-269 Wozniak Affidavit, App. 1298-1301).  The Human Resource Professionals in the survey group were not typically considered for awards of these variable pay opportunities.(Id.).

During the twenty (20) years Mr. Wozniak worked as a consultant and interacted with Plaintiff, she never advocated for a pay increase for any person other than herself.  She did not question Mr. Wozniak's salary recommendations nor suggest that either age or gender was a factor in the recommendations.  Likewise, Mr. Wozniak was not told by the plaintiff that Mr. Garvin's decisions regarding her compensation were age or gender biased.  (Id.).  Mr. Garvin was given the authority by the Board of Directors, to award discretionary bonuses to other senior level team members, including Plaintiff. (App. 1245-1247).  Mr. Garvin evaluated the performance of his senior leadership team and they, in turn, evaluated their direct reports.  Other company supervisors evaluated the remaining employees.  Mr. Garvin's performance was evaluated by the Board of Directors. (Garvin Affidavit, App. 1245).

There is no evidence that Mr. Garvin used gender or age as a factor when making the decision whether Plaintiff should receive the salary increase recommended by Mr. Wozniak or whether Plaintiff should receive a higher salary or a bonus or both.  Plaintiff produced no expert report or any analysis whatsoever comparing her compensation to others at a similar level in the non-profit world to support a claim of discrimination.  Plaintiff never received a bonus when she worked for the prior CEO, Mr. McGuire.  Her salary was never at or above median market level when working for Mr. McGuire.  (*See* graph of Plaintiff's compensation, App. 265)  Though she asked, Mr. McGuire refused to give her the title of Vice President. (Pl's Dep. App. 632).  When

Mr. Garvin arrived, Plaintiff asked to be elevated to a Vice President level.  Mr. Garvin considered her request and, after consultation with Mr. Wozniak, granted Plaintiff's request.  (Pl's Dep. App. 632).  Between 2010 and 2016, after Mr. Garvin began his tenure as CEO, Plaintiff received four bonuses.  In 2011 and 2013, Plaintiff worked to get employees to complete surveys for inclusion with Waverly's bid to receive the designation of "Best Place to Work".  Waverly was awarded that distinction; not because of anything that the Plaintiff did to foster job satisfaction but because of the pay and benefits offered by Waverly and because of the good working relationship between supervisors who were "in the trench" with their staff members and the staff members themselves.  (App. 1245-1247).

In 2012, the position of Director of Environmental Services was vacant.  While Waverly was searching for a replacement, Plaintiff stepped in and handled the duties of the Director in addition to her own.  She was awarded a bonus for this. (App. 1246).  In 2015, Waverly had a good year financially.  Mr. Garvin decided to reward senior level staff, including plaintiff, with a discretionary bonus of $2,500.00.  Plaintiff did not believe that she had been awarded a large enough bonus.  She was able to and did access the information regarding the bonus amounts awarded to her colleagues and felt that she was undervalued.  Mr. Garvin did not agree.  (Garvin Affidavit, App. 1246).  Mr. Garvin suggested to Plaintiff that she obtain a Nursing Home Administrator certification so that she could fill in as supervisor.  She signed up and completed all coursework to obtain her certification; all paid for by Waverly. (Pl's Dep. App. 638-639)  However, Plaintiff never took the test to obtain the certification. Had she taken the certification, she would have received a discretionary bonus. (Id.) (App. 1247).  Mr. Garvin also possesses the Nursing Home Administrator Certification.  (*See* Resume of Garvin, App. 1253).

29

Plaintiff thought that she would obtain the position of Nursing Home Administrator at Waverly when the position opened but never applied for it. Instead, Meredith Feher, (Age 43) was hired. (Pl's Dep, App. 639; Chart of Senior Leadership, App. 108). Plaintiff had not applied for the position and did not possess the required certification.(Id.). After Mrs. Feher was hired and before Plaintiff's termination on September 27, 2019, Plaintiff decided not to take the test to become certified as a nursing home administrator because she did not think that this certification would make her more marketable. (Pl's Dep., App, 639). After Plaintiff's termination, she did not take the test to obtain the Nursing Home Administrator certification either. (*See* Resume, App. 113-114). Plaintiff has no specialized degree in human resources and has never taken any college coursework in human resource management. (App. 111-112).

Plaintiff did not depose Mr. Wozniak nor any female member of the senior leadership team in support of her claim that there was gender discrimination in the setting of salaries. Plaintiff did not retain an expert to challenge Mr. Wozniak's market analysis of the salary ranges for the human resource position in the non-profit healthcare industry or indeed, in any other field nor was there any evidence produced by plaintiff to support her allegation that the decision not to award a bonus was discriminatory or that the amount of the bonuses she did receive was discriminatory. Plaintiff deposed no witness nor named any individual as a witness who has any evidence to support Plaintiff's claim that gender was a factor in the decisions regarding Plaintiff's salary and bonuses or in any decision made relating to plaintiff's employment. Plaintiff deposed no witness nor named any individual as a witness who has any evidence to support Plaintiff's claim that age was a factor in any decision regarding plaintiff's salary or employment. (*See* affidavits of Garvin, Thompson, Fehr, Blessing, Best, Dogan, Carpenter, Rodgers, Supper, Sandler, Salgado, Wozniak, Heil, App. 1220-1331).

### E.   RETALIATION CLAIM

#### i.   <u>Complaint about Salary and Raise in December 2015</u>

Plaintiff worked for Waverly from 1997 to 2010 before Mr. Garvin became CEO.  Mr. Garvin's predecessor, Mr. McGuire, awarded raises to plaintiff that brought her annual income to below the median for her position though it was within the accepted range for the position.  (*See* Graph of 2005-2016 raises, App. 265-266).  Mr. McGuire did not elevate Plaintiff's grade level nor award her the title of Vice President as she requested. (Id., App. 634).  Despite Plaintiff's complaints to Mr. McGuire that, in her opinion, women's salaries were repressed at Waverly, she did not fear retaliation from him. (Pl's Dep 11/1/18, App. 634).  However, Plaintiff filed no complaint nor reported to the Board or counsel that she was the victim of discrimination when Mr. McGuire was CEO.  That lack of action continued while Mr. Garvin was CEO.  (App. 1273-1279, 1242-1251). Plaintiff never believed that age was a factor in any salary decisions and her opinion didn't change when Mr. Garvin became CEO.  (Pl's Dep. App. 634)  Thus, her only claim relating to salary/compensation is that she was the victim of gender discrimination with regard to the award of salary increases and bonus amounts.

When Mr. Garvin became CEO in 2010, Plaintiff again requested a title change and grade level increase.  Mr. Garvin agreed with Plaintiff, elevated her to the position of Vice President of Human Resources, and increased her grade level resulting in a salary increase.  (Garvin affidavit, App. 1246-1247 App. 632).  Plaintiff's annual evaluations by Mr. Garvin were good and she received regular raises that brought her annual compensation first to the median market level and, after 2010, above market level. (*See* Performance Evaluations, App. 137-226; *See* Salary Graph, App. 265-266).  Indeed, by the time Plaintiff received her raise for 2016, her salary was more than

$6,000.00 above the median market level for comparable positions in the non-profit healthcare industry as assessed by the outside salary consultant, Mr. Wozniak. (*See* graph of Plaintiff's compensation, App. 265-266; Affidavit of Mr. Wozniak, App. 1302-1303). Plaintiff made no claim of discrimination on the basis of gender in her compensation until after her employment was terminated. Plaintiff never received a bonus when Mr. McGuire was CEO. Indeed, human resource professionals are considered in supportive roles in the healthcare industry and typically, bonuses are not awarded to them. (Affidavit of Wozniak, App. 1298-1301). However, Mr. Garvin's practice was to provide bonuses to those who took on tasks beyond what was typically expected under the job description. (*See* job description 2005, App. 118-121, Garvin Affidavit, App. 1246-1247).

Plaintiff knew what each senior staff member's bonus was each year because she processed the payments as part of her duties as V.P. of Human Resources. (See affidavit of Meredith Feher, App. 1237; Affidavit of Janet Thompson, App. 1292-1293). Plaintiff received four bonuses from Mr. Garvin; 2011, 2013, and 2014.(See Garvin Affidavit, App. 1246-1247) She had a good relationship with Mr. Garvin. (P. dep. App. 638) In December 2015, Plaintiff was dissatisfied when she learned that she would be receiving a bonus of only $2,500.00 in 2016. She had not received a bonus in 2015. (App. 634-635). She complained about the size of her bonus to Mrs. Feher, the Senior V.P. of Healthcare. Mrs. Feher told her to discuss her dissatisfaction with Mr. Garvin. (Affidavit of Feher, App. 1237). Plaintiff did not tell either Ms. Feher that she believed that the bonus amount was discriminatory because of her gender. Plaintiff did not claim that her salary increase for 2016 was discriminatory. Indeed, Mr. Wozniak conducted the same market analysis for the 2016 salary recommendations as he had for twenty five years. Plaintiff knew this. (Wozniak Affidavit App. 1298-1301). It is important to note that both Mrs. Feher's and Mrs.

Thompson's bonuses were higher than that of Plaintiff and that only five individuals were awarded bonuses to be delivered in 2016. Of the five, two were men and the other three were women. (App. 268-269). Neither Mrs. Feher nor Mrs. Thompson believed that gender was a factor in the decision of Mr. Garvin regarding the size of the bonus. (Affidavit of Feher, App. 1240-1241; Affidavit of Thompson, App. 1290-1294).

Plaintiff met with Mr. Garvin after he noticed that she was "moping" about the office. Though Mr. Garvin listened to plaintiff's statements regarding why her bonus should have been higher, Mr. Garvin declined to increase the bonus believing that the only reason Plaintiff had been awarded a bonus at all was because the year had been profitable to Waverly and plaintiff had not received a bonus the year previously. (Garvin Affidavit App. 1246-1247). Mr. Garvin did not believe that Plaintiff had done more than her job during 2015. (Id.). According to Plaintiff, Mr. Garvin was angry because she complained about her bonus. Beyond that, she was unable to identify or produce any evidence to support a claim that after December 2015, she was treated differently by Mr. Garvin or that she suffered any adverse employment decision. (App. 645). Plaintiff's attempt to tie her complaint about her bonus to the termination of employment is not supported by any evidence. More than 9 months passed between Plaintiff's December 2015 meeting with Mr. Garvin and the termination of her employment without any other adverse comments or action by Mr. Garvin. Moreover, Plaintiff's complaint to Mr. Garvin about her bonus was not framed in terms of gender discrimination but merely a complaint that she had made a valuable contribution that warranted a higher bonus. (Pl's Dep. 11/1, App. 645). Plaintiff's self-assessment of her value was not supported by any evidence nor were her self-reported contributions anything more than performance of the supportive functions of the human resources department. (Wozniak Affidavit, App. 1298-1301; Pl's Dep. App. 635-636). Plaintiff was

33

"devastated" that Mr. Garvin did not agree with her self-assessment of her worth. (Pl's Dep. App. 645).

Plaintiff has produced no evidence that gender was a factor in any bonus or salary decision and certainly not in the bonus decision in 2015. Her job duties and the job duties of the males who received a bonus are too different to compare. Her salary and compensation amount were well above the median for the human resources position. (Wozniak Affidavit, App. 1298-1301). There is no evidence of retaliation because of Plaintiff's complaint about her bonus. She failed to mention to Mr. Garvin that she believed her bonus amount was less because of her gender and Mr. Garvin had no reason to suspect that Plaintiff harbored the belief that she was the victim of discrimination. Plaintiff was jealous because others, both males and females, were considered more valuable than she was. (Pl's Dep. 11/1, App. 636). She touted her many accomplishments but failed to mention that when she covered for the open environmental services director position and she received a bonus. She did not complain about that bonus. (Affidavit of Garvin, App. 1246; Pl's Dep. App. 636). The "return to work policy" she allegedly put in place, was started in 2002, long before Mr. Garvin became CEO. This was in place more than 8 years by the time Mr. Garvin arrived. (Pl's Dep. App. 636). Plaintiff must produce evidence to support her claims of discrimination in the award of salary and bonus.

### ii.    Advocacy for Others

Plaintiff made several vague allegations that her termination was really in retaliation for advocating for salary increases in other female senior level team members or for complaining about the alleged behavior of Mr. Supper. She was unable to state when any of the alleged incidents occurred, what was said, what the basis of any claim was and who was present or witnessed the action. The designation of individuals who will support this claim was set forth in

Plaintiff's Answers to Interrogatories and Rule 26 Disclosures (App. 620, 598-600, 604). Plaintiff deposed only Mrs. Summers but did not depose anyone else on his list of these individuals in support of her claim of retaliation or gender or age discrimination or in support of any other allegation in the complaint. Plaintiff produced no statements or documentary evidence to support or confirm her claim that other females were discriminated against in salary on the basis of gender. Plaintiff produced no statements or documentary evidence to support or confirm the claim that there was discrimination on the basis of age against her. As with the gender claim, there is no expert analysis of Waverly practices nor a comparative analysis of comparable corporate positions.

Plaintiff made no complaint to anyone at any time during her employment at Waverly alleging that she was the victim of discrimination. (*See* Affidavit of Feher, Blessing, Thompson, Rodgers, Dogan, Wozniak, Sandler, Salgado App. 1225-1303). Indeed, though she had regular access to counsel for Waverly and the Board, Plaintiff made no complaint of discrimination nor any claim that there was severe or pervasive harassment creating a hostile environment. (*See* Affidavit of Sandler and Salgado, App. 1273-1279). Plaintiff claims that she was retaliated against for advocating for the rights of others. She produced no statement, took no deposition and produced no documents to support her allegations. She cannot state when this advocacy occurred or what the basis of the advocacy was. Indeed, every person she claimed would support her claims has submitted an affidavit challenging Plaintiff's version of events. (*See* Affidavit of Feher, Thompson, Rodgers, Blessing, Best, Dogan, Carpenter, Supper, Heil, Wozniak, App. 1236, 1220, 1222, 1230, 1232, 1236, 1242, 1254, 1261, 1269, 1273, 1276, 1280, 1290, 1298, 1302). Not one individual Plaintiff alleges was the victim of discrimination ever filed any formal or informal complaint with Human Resources, with the Board, with Mr. Garvin, with the EEOC or the PHRC. (*See* Affidavits of Garvin, Feher, Sandler, Supper, Salgado, Carpenter, Dogan, Rodgers,

Thompson, Wozniak, Blessing, Best, App. 1242-1251, 1236-1239, 1276-1279, 1280-1282, 1273-1275, 1230-1231, 1232-1235, 1269-1270, 1294-1294, 1298-1301, 1222-1229, 1220-1221) Id.

Plaintiff claimed that she was told by Ann Rogers that if she made a claim to the Board about Mr. McGuire, the prior CEO, she would be fired. This was the reason she said she did not make a report of discrimination to Mr. Garvin or the Board. (Pl's Dep. App. 636-637). Plaintiff advocated for the termination of Mrs. Rogers when Mr. Garvin became CEO reporting to Mr. Garvin that Mrs. Rodgers "harassed her." (App. 1244, 643).

### a.  Meredith Feher

Mrs. Feher is the Senior Vice President of the Health Care Center and replaced Meg Guenever in this position when she retired.[5]  Mrs. Feher holds a nursing home administrator certification and had significant experience as an administrator prior to being recruited by Mr. Garvin to fill the vacant Health Care Center position.  (*See* affidavit of Feher App. 1240).  Plaintiff expected that she would be considered to fill this position and spoke to Mr. Garvin.  He encouraged her to obtain a Nursing Home Administrator, license, a prerequisite for the position, and Waverly paid Plaintiff's tuition. However, before completing the course, Mrs. Fehr was hired to fill the vacancy. (Pl's Dep. App. 643, 639).  Thereafter, Plaintiff failed to complete the administrator program. (Garvin Affidavit, App. 1244).  When Mrs. Feher arrived, Plaintiff was of the opinion that Mrs. Feher should have a company car despite the fact that for 25 years, only the CEO and CFO were given cars as a benefit.  (Garvin Affidavit, App. 1245, Feher Affidavit App. 1237). Plaintiff claims that because Mr. Supper, the CFO, is a male, the award of the car is gender based. Plaintiff failed to recall that Mrs. Rodgers, the prior CFO, had a car and is a female.  In addition, Mrs. Feher repeatedly advised Plaintiff that she did not want a car and told Mr. Garvin this as well.

---

[5] Defendant believes that Mrs. Guenever will not support Plaintiff's version of these events.

(Garvin Affidavit, App. 1248, Feher Affidavit, 1237).  Plaintiff's action in claiming that she should have a car were not advocacy on behalf of Mrs. Feher. (Feher Affidavit App. 1236-1239).  The only time Mrs. Feher asked Plaintiff to look into a negotiated benefit on her behalf, Plaintiff failed to check the offer letter as directed by Mr. Garvin.  When called on this by Mrs. Feher, Plaintiff asked her "not to tell Tom" that she had failed to comply with his request and to "act surprised when he gives you a check." (*See* Feher affidavit App. 1236-1239).  When Plaintiff reported to Mr. Garvin that Mrs. Fehr's offer letter contained the requested payment, Mr. Garvin immediately issued a check.  There was no retaliation against the Plaintiff and Plaintiff cannot point to any. (App. 1237)[6].

### b.  Constance Dogan

Mrs. Dogan is the Vice President of Housekeeping and Environmental Services.  She has been employed for more than 12 years.  Plaintiff claims that she advocated for a promotion and pay increase for Mrs. Dogan.  She cannot state when this occurred but admitted that Mr. Garvin agreed that Mrs. Dogan should be promoted and receive a pay increase and this occurred.  (See Dogan affidavit, App. 1232-1235, Garvin affidavit App. 1242-1251).  There was no retaliation against Plaintiff for her advocacy.

### c.  Janet Thompson

Mrs. Thompson is the Vice President of Marketing.  She is 66 years old and has been at Waverly for 24+ years.  Plaintiff claims that Mrs. Thompson's salary and bonuses were repressed because of her gender.  Mrs. Thompson does not agree. (Affidavit of Thompson, App. 1290-1293).  Mrs. Thompson's salary and benefit package, including the bonus amounts, was determined in

---

[6] Contrast these facts with Plaintiff's version that Mrs. Feher "contacted her "relentlessly" about this benefit, that Plaintiff looked at the offer letter and decided that Feher had not negotiated the benefit. (Pl Dep. p. 161, App. 663)

precisely the same way as every other member of the senior leadership team. Mr. Wozniak, the outside consultant, did the same analysis for her position market value as for the others. (Wozniak affidavit, App. 1302-1303. Mrs. Thompson does not agree with Plaintiff's claim that she was an advocate or her peers. (Thompson Affidavit, App. 1290-1292). She did not ask Plaintiff to advocate on her behalf and did not hesitate to go directly to Mr. Garvin about her own pay raises, bonuses or the compensation of her staff members. (Thompson affidavit, App. 1291) Mrs. Thompson does not believe that she has ever been the victim of discrimination at Waverly. (Affidavit, App. 1290-1292). Likewise, Mrs. Thompson denies that she complained about emails received from former Board chairman, Mr. Soltis or that Plaintiff complained about the content of the emails. Mr. Garvin likewise denied that Plaintiff complained about the Soltis emails or asked him to ask Mr. Soltis to stop sending emails to Waverly executives. (Thompson Affidavit, App. 1292; Garvin Affidavit, App. 1243). Mrs. Thompson and Mr. Soltis did not share political views but she was not offended by those emails she read. Mrs. Thompson confirmed that not only didn't Plaintiff complain about the Soltis emails, but Plaintiff's political views were in sync with those of Mr. Soltis. (Thompson affidavit, App. 1290-1294, Garvin Affidavit App. 1243, emails from and to Plaintiff, App. 364-406). Indeed, out of the hundreds of pages of emails sent over a period of several years and produced by Waverly, Plaintiff was copied on only twenty-five (25) and these were emails with Disney videos, cute stories and generally innocuous comments. (App. 408-567).

### d.   Other Females

Plaintiff makes generalized, unspecific claims that other women in the workplace complained about the conduct of Mr. Garvin but she points to and produced no facts to support a claim that she complained about this conduct or that the conduct was directed to her or that the conduct created a "hostile work environment" so severe or pervasive that the terms and conditions

of women were affected.[7] Plaintiff claims that Margaret Carpenter complained that Mr. Garvin participated in employee contests and retained the prize if he won. Plaintiff framed this practice as taking away from money and other prizes that would typically go to African American workers. (Pl's Dep. App. 649) Plaintiff never brought this perception to Mr. Garvin's attention. Mrs. Carpenter strongly disagrees with Plaintiff's version of events, (App. 1230-1231). Mr. Garvin participated in employee contests in an effort to show leadership support of employee events and if he won, he returned all of the prize money and divided it among the employees. (Garvin affidavit, App. 1249, Carpenter Affidavit, App. 1230-1231). Mrs. Carpenter denies that she ever made this complaint to Plaintiff or anyone else and supports Mr. Garvin's version about his return of the money. Mrs. Carpenter is retired. (Carpenter Affidavit App. 1230-1231).

Plaintiff claimed that Debbie Best complained that Mr. Garvin did not treat her well when she was hired to cater a private event for him. (Pl's Dep. App. 649-650). Mrs. Best also denies the Plaintiff's version. (Best affidavit, App. 1220-1221).

Plaintiff claims that Mr. Garvin engaged in "gross misappropriation of funds" that was not illegal but was unethical. (Pl's Dep. App. 661). She made no complaint to anyone about this, despite knowing the availability of an anonymous Corporate Compliance Hotline for the making of complaints like this. (App. 917, 20-22, 1290, 1273-1275, 1276-1279). Other than making this allegation, Plaintiff cannot prove and has not testified that Mr. Garvin's employment compensation package, negotiated between him and the Board, was a form of discrimination against her. Having never reported this "gross misappropriation", she cannot claim she was the victim of retaliation. Likewise, Mr. Garvin's purchase of a home from a subcontractor of Waverly had no impact on Plaintiff's job or compensation. As with the other efforts to blacken Mr. Garvin's reputation,

---

[7] Other than Mr. Garvin, Mr. Bauer and Mrs. Summers, Plaintiff took no depositions nor requested any comparative salary data.

Plaintiff has no proof of any misconduct.  (*See* Garvin Affidavit, App. 1249; Bauer Dep. App. 924).

### iii.    Post-employment Retaliation

On October 2, 2016, Plaintiff filed an application for unemployment compensation. (*See* Application for Unemployment Compensation, App. 290-293).  At no time during her employment or as part of the unemployment compensation proceedings did Plaintiff ever make a complaint of discrimination.  She did not claim that her employment was terminated as a result of gender or age discrimination or harassment or retaliation.   (*See* transcript of U.C Hearing, App. 347-349; Interview of Plaintiff by Unemployment representative, App. 298-300).  On October 11, 2016, Waverly filed a response to the application for unemployment compensation (*See* Response, App. 294-297).  Plaintiff had made no claim of discrimination either before or after the termination of employment.  On October 18, 2016, both Plaintiff and Mr. Garvin were interviewed separately by an unemployment compensation staff member.  (*See* Interviews, App. 298-305).  Waverly did not see or receive a copy of the record of the oral interview of the Plaintiff until prior to the hearing before Referee Fisher on November 28, 2016.

During her oral interview, plaintiff told the interviewer that her husband told her that he had posted the Tweet in question at the time it was posted just to "let me know".  The tweet was mistakenly attributed to her but neither her nor her husband felt there was anything wrong with the Tweet.  According to the plaintiff, both she and her husband know that "you don't talk about your personal politics at work." (Interview of Plaintiff, App. 298-300).  In order to access that Tweet, all an individual would have to do, was search her name, go to her page and scroll down. (Id.).  Plaintiff's husband, also a V.P. of Human Resources, apparently has no Twitter account so used his wife's to post this tweet. (App. 298-300).  However, At Mr. Jungclaus' deposition, he testified

that he and Plaintiff were together and that he asked her to post the Tweet on her account so that the Trump campaign would know that Plaintiff's discussions with her employees and Mr. Jungclaus' discussion with his led to the conclusion that <u>all</u> AA workers would be voting for Mr. Trump. (Dep. of R. Jungclaus, App. 822-824). Plaintiff opined that it was an elderly resident whose housekeeper had been fired by the plaintiff over the resident's objection, who has written the anonymous letter written to Waverly that formed the basis for the termination.[8] (App. 298-300).

Plaintiff confirmed that the reason she was given for termination was her violation of the social media policy which she wrote. (App. 298). She also confirmed that it had been Mr. Garvin's request that she "set up a Go Fund Me account for someone, and when you set that up, it says you'll get more 'mileage' if you have the Twitter account also". (Interview, App. 299). Plaintiff acknowledged that she was aware of "the rule" (governing social media) because she had written the rule. (App. 298). Plaintiff stated that she did not know what the term "AA" referred to . (Id) App. 299). The resident, Anita Summers, to whom Plaintiff referred, denied under oath at a deposition that she was the author of the letter. (Summers Dep., App. 870-871). Thus, the author of the letter remains anonymous.

On October 25, 2016, Plaintiff was approved for unemployment compensation. (*See* p.1, Referee's Decision, App. 355). On October 31, 2016, Waverly filed an appeal from the initial determination of benefits. (Referee's Decision, App. 355). Plaintiff had made no complaint of discrimination or retaliation either prior to or after the termination of employment. A hearing was scheduled before Referee Jennifer Fisher for November 28, 2016. On or after November 8, 2016, after the filing of its appeal from the granting of unemployment compensation benefits, Waverly

---

[8] Neither Plaintiff nor Waverly has been able to determine who was the author of the "Tweet".

received a letter from Mark D. Schwartz, Esquire on behalf of Plaintiff. (*See* letter, App. 311-326) According to Mr. Schwartz, the letter was not to be construed as a confidential settlement communication but instead should be part of the public record. (Id.)  Throughout the 9-page letter, counsel for the Plaintiff describes the actions of the Plaintiff in creating and posting the Tweet on her account. (Schwartz letter, App. 312-313).  Though making all sorts of allegations, Mr. Schwartz' letter at no time alleges that it was not the Plaintiff who created or posted the Tweet. (Id.)  Indeed, Plaintiff confirmed that she reviewed her attorney's letter prior to its delivery to Waverly. (Pl's Pep. App. 629-630; *See* also App. 352 at Unemployment Compensation hearing). Plaintiff testified under oath at an unemployment compensation hearing on November 28, 2016. At that time, for the first time, she testified that it was her husband who posted the tweet in question.  (U.C. N.T., App. 349-351).  She also claimed that the term "AA" when referring to employees "does not mean African American". (Id.).  She also testified that her termination was a "knee jerk reaction". (Pl's Dep. 11/1, p. 20, App. 627) but never mentioned that the termination of her employment was the result of some discriminatory practice at Waverly. (Unemployment testimony, App. 327-354).

At her deposition, however, Plaintiff confirmed that the employee she was referring to when she was discussing her "poll" of employees with her husband was Basheer Womack, an African American kitchen worker. (App, 628).  Plaintiff did not ask her husband to testify on her behalf to confirm her testimony at the Unemployment Compensation hearing. (R. Jungclaus Dep., App. 822).  At the unemployment hearing, Plaintiff testified that the reference to "AA" voting for Trump actually meant "Administrative Assistant" even though it was her husband who allegedly drafted the tweet. (App. 350).  However, when questioned at deposition, Raymond Jungclaus, Plaintiff's husband, testified that at the time he dictated the information for the posting to his wife,

he meant "African American". (R. Jungclaus dep., App. 824). Plaintiff's claim that the term "AA" stood for "Administrative Assistant" in the post is not credible in light of her identification of the source of her information about the voting tendency of the staff was an African American kitchen worker. (*See* affidavit of Basheer Womack, App. 1297) It is simply another example of Plaintiff's attempt to twist the facts so to avoid ownership of her inappropriate conduct on behalf of Waverly. Since the filing of this lawsuit, Mr. Jungclaus *now* knows that "AA" could mean "Administrative Assistant" or "Alcoholics Anonymous" though this was not what he meant when he dictated the post. (Dep. R Jungclaus, App. 824).

Plaintiff claimed that she never questioned a single employee about who they were voting for. She admitted, however, that it would be inappropriate for a human resource professional to ask employees whom they were voting for. (Id.) (App. 351). Plaintiff argued at the unemployment hearing that she was fired "over a knee jerk reaction to an anonymous letter and speculation over what the meaning of the tweet was." (App. 353) At no time during the hearing, did plaintiff claim that she had been the victim of age or gender discrimination. The Unemployment Compensation Referee found in favor of Waverly on November 29, 2016 and denied benefits to Plaintiff. (App. 355-361). She found Plaintiff's testimony under oath to be untruthful. Plaintiff then filed a complaint with the EEOC on December 13, 2016, after the unemployment decision in favor of Waverly. (App. 362) She also filed an appeal of the unemployment compensation decision to the Commonwealth Court.

On October 6, 2017, Plaintiff's Complaint was filed in this Court. Paragraphs 16-25 recite the alleged sequence of events leading to Plaintiff's termination including Plaintiff's discussion with Mr. Garvin and Mr. Bauer. A First Amended Complaint was filed on November 17, 2017 containing the same allegations in paragraphs 16-25. (App. 598-603) There is nothing in either the

complaint or amended complaint that mentions Plaintiff's husband as the author of or individual posting the Tweet. (Id.). On or about November 13, 2017, the Pennsylvania Commonwealth Court reversed the decision of the unemployment compensation Referee and granted unemployment compensation benefits to Plaintiff. Plaintiff seems to be claiming that the filing of the unemployment compensation challenge by Waverly made it impossible for her to obtain a job post-termination. She claims that no employer would hire her because when her name is "googled", only the unemployment matter comes up. Plaintiff produced no evidence of this. More importantly, the only information discovered after an internet search of Plaintiff's is mention of the November 2017 decision of the Commonwealth Court granting benefits. This was more than 14 months after Plaintiff was terminated from employment. (*See* Bing search, App. 1214-1218)

According to Plaintiff, she began applying for jobs immediately but was not successful. The plaintiff had more than 14 months to obtain a job BEFORE the decision of the Commonwealth Court was filed and appeared on "Google." (or Bing). Plaintiff has produced no evidence to corroborate her testimony that she engaged in an active job search after her termination. Plaintiff cannot support a claim of retaliation by claiming that her failure to get a job was due to the unemployment compensation litigation when a simple search shows that the unemployment compensation decision was not reported until November, 2017. Again, the absence of proof is damning.

### F.   PLAINTIFF'S CLAIM OF HARASSMENT – HOSTILE WORK ENVIRONMENT

Plaintiff claims that Robert Supper, the CFO, created a hostile work environment because of his behavior in the workplace and that Mr. Garvin tolerated this. Plaintiff did not report the behavior of Mr. Supper to either counsel for Waverly or the Board. (App. 639, Salgado affidavit, Sandler affidavit App. 1273-1275, 1276-1279). No other employee supports plaintiff's claims

about Mr. Supper's behavior. (*See* Affidavits of Thompson, Blessing, Best, Feher, Kelley, Dogan, Rodgers, Carpenter, App. 1220-1241, 1254-1294). Mr. Supper treats men and women equally and when told to "tone it down" has done this. (Garvin affidavit, Thompson, Fehr, Rodgers, Supper affidavits) (App. 1236-1239, 1245, 1269-1270, 1280-82, 1290-1294). Plaintiff did not provide any specific facts or instances where Mr. Supper harassed her, when these allegedly occurred and who may have witnessed the events. She claims that Mr. Supper's behavior prevented her from doing her job enforcing the rules but admitted that Supper never interacted with anyone but direct reports and the senior leadership team. (Pl's Dep. App. 642). Plaintiff admitted that Supper treated the men and women equally. (Pl's Dep. App. 642). There is no documentation of this in any record and Plaintiff failed to produce any documentation or even claim that one existed of a written report about Mr. Supper's alleged behavior.

Instead, Plaintiff is outraged that Mr. Supper's son used his car and got into an accident. She claims that others told her that Mr. Supper was leaving work to gamble and drink, though she never witnessed this herself. (Pl's Dep. App. 641). Plaintiff's complaint, the November Schwartz letter and her testimony all suggest that it was Mr. Supper who was in an accident with the car. But the police report provided to Mr. Garvin by Plaintiff, clearly lists Robert Supper, *Jr.* as the accused. (Pl Dep. App. 646, Police blotter App. 311-326)[9]. The police report does not mention Waverly in it. (Id.). She claims that Mr. Supper yelled at his wife on the phone in the presence of Mrs. Blessing. Mrs. Blessing denies this occurred or that she ever complained about Mr. Supper's behavior to the Plaintiff. (Blessing affidavit, App. 1222-1229). None of these things constitute instances or a pattern of harassment against the Plaintiff. None have any relation to Plaintiff's age

---

[9] By the time the Plaintiff brought the newspaper article to Mr. Garvin in triumph in her effort to undermine Mr. Supper, Mr. Supper had already reported this to Mr. Garvin and the decision had been made to offer a stipend in lieu of a car to Mr. Supper. Mr. Supper's son has since died.

or gender.  Plaintiff, as V.P. of Human Resources was charged with the duty of reporting instances of harassment in the workplace.  But, according to Plaintiff, it was not her role to go to the Board if Mr. Garvin was not receptive. (Pl's Dep. App. 642).  It was Plaintiff's role and responsibility and her job to prevent harassment in the workplace and to take steps to stop it.  Plaintiff's claim that she feared for her job is an excuse and not supported by any evidence. (*See* affidavit of Lauren Kelley, App. 1261-1265).

Plaintiff claims that the termination of Ann Rodgers was justified.  It was the Plaintiff, among others, who, without fear for her job, made a claim of harassment and brought the matter to Mr. Garvin attention.  Mr. Garvin investigated and terminated Ann Rodgers as CFO. (Pl's dep. App 643).  Yet, when Plaintiff supposedly was harassed by Mr. Supper, she was all of a sudden, afraid she would lose her job.  What Plaintiff failed to mention was that employees made claims of harassment and discrimination against her.  When this occurred, both Mr. Garvin and the company, through its counsel came to her defense even after claims were filed with the Pennsylvania Human Relations Commission. (Pl's Dep. App, 644, Sandler Affidavit, App. 1276-1277, Salgado Affidavit, App. 1273-1275).  Plaintiff also claims that the former President of the Board sent "racist, disgusting, anti-Obama, anti-Clinton" emails to her and other members of the senior leadership team and that she was offended by this. (Pl's Dep. 11/1, p. 143-144, App. 658). Plaintiff claims that she complained to Mr. Garvin who did nothing. (Id.)  Waverly produced hundreds of pages of these emails covering several years.  Plaintiff was copied on only twenty-five (25) and, for the most part, these were cute stories or ordinary political comment passed on from some newspaper article. (*See* emails from Soltis, App. 408-567).  Janet Thompson did not complain about this to either Plaintiff or Mr. Garvin. (*See* Thompson Affidavit, App. 1290-1294)

The few emails on which Plaintiff was actually copied and that contain political comments, contain sentiment remarkably similar, "racist and disgusting" as those emails sent between Plaintiff and her husband using her work email account. (*See* emails between Plaintiff and Mr. Jungclaus, App. 364-383, 389-391, 393-406). Plaintiff never told Mr. Soltis to stop sending her emails despite having known him for more than twenty years. The rest of the emails Plaintiff claims were racist or disgusting were emails on which she was not copied. Thus, while inflammatory, the emails are irrelevant to Plaintiff's work environment. Again, it was Plaintiff's job to stop any form of harassment and Plaintiff knew that reporting harassment or taking steps to stop it was protected activity. She knew that retaliation was a violation of law.

Plaintiff also claims that Mr. Garvin failed to stop Mr. Hendrickson from harassing her. She did not take Mr. Hendrickson's deposition. Mr. Hendrickson was an outside insurance salesman who had worked with Mr. McGuire and the plaintiff for more than 20 years. Plaintiff never complained to anyone about Mr. Hendrickson's behavior nor did Plaintiff state specifically what it was that Mr. Hendrickson did or said and when that created a severe and pervasive hostile environment. (Pl's Dep. p. 162-166, App. 663-664). Plaintiff admitted that she did not tell Mr. Hendrickson that his comments were unwelcome or to stop trying to hug her and did not tell Mr. Garvin that Hendrickson was "harassing" her or behaving inappropriately. She simply asked not to attend the meetings. Mr. Garvin contradicts Plaintiff's testimony about the demeanor between Plaintiff and Hendrickson. (*See* Garvin Affidavit, App. 1242-1251)

Plaintiff admitted that there was no attempt by Mr. Hendrickson to contact her outside of work. (Pl's Dep. 166-167, App. 664). Plaintiff cannot meet her burden of proving workplace retaliation or harassment.

### G. THERE ARE NO FACTS TO SUPPORT A CLAIM OF GENDER OR AGE DISCRIMINATION OR HARASSMENT

Plaintiff has produced no evidence or data to support her own opinion that she was the victim of either age or gender discrimination. Her performance ratings by Mr. Garvin were good. Her salary was consistently at or above market level after Mr. Garvin replaced Mr. McGuire as CEO of Waverly. (*See* Chart of Salary History, App. 267). She alleged that "age was an issue" with Mr. Garvin but produced no evidence to support this claim. (Pl's Dep. N.T. 100-102, App. 663-664). According to Plaintiff, her claim that there was discrimination on the basis of gender was related only to her salary and bonus. Plaintiff took no depositions of any current or former Waverly employee who would support either claim of age or gender discrimination. Plaintiff requested no documentation from Waverly such as the personnel files of those allegedly also victims of gender or age discrimination. Plaintiff has not listed any former employee as a witness to support her claim that others were the victims of age or gender discrimination. Plaintiff has engaged no expert witness to analyze Waverly's hiring and/or compensation plans to determine whether age or gender bias are evident.

Plaintiff complained that Mr. Garvin participated in employee contests, that he "double dipped" health insurance, that he received benefits pursuant to an employment contract that were not deserved, that he purchased a house from a contractor of Waverly, that he received moving expenses after he had already been employed. (Pl's Dep., N.T. 107-109, 152-158, App. 649-650, 660-662) She alleged that as CEO of a non-profit organization, he engaged in "gross misappropriation". (Id.). None of these allegations has any relevance to whether Plaintiff was the victim of either gender or age discrimination nor relate in any way to the allegations in the complaint. Plaintiff admitted that she never made a complaint through the Corporate Compliance hotline, that she never made a complaint about Mr. Garvin to either the Ethics or Human Resources

committee of Waverly and that she never made a complaint to the Board of Directors nor any member of the Board of Directors. (Pl's Dep. N.T. 71-73, App. 640-641; Summers Dep., N.T. 21, App. 866).  Though she worked closely with corporate counsel or matters relating to her position as Vice President of Human Resources, Plaintiff never advised counsel about any ongoing age or gender discrimination within Waverly or about the alleged "gross misappropriation" of Mr. Garvin. (Affidavit of Sandler, App. 1276-1279; Affidavit of Salgado, App. 1273-1275).  Thus, since Plaintiff never made any complaint to anyone about any form of discrimination, she cannot now claim that she was the victim of retaliation for complaining about discrimination.

Plaintiff has not deposed any witness nor listed any witness in response to discovery requests to support her allegations about the conduct of Mr. Garvin unrelated to her own claim of discrimination.  Despite being the "point person" for all company claims of discrimination, Plaintiff never raised a claim of discrimination or investigated any claim of discrimination relating to any of the charges she now asserts for the first time as part of this lawsuit. (Pl's Dep. N.T. 158, App. 662).  Plaintiff produced no evidence that she was the victim of retaliation by Mr. Garvin or anyone else at Waverly after she allegedly brought claims of disparate treatment relating to gender to the attention of Mr. Garvin.  For example, Plaintiff went to Mr. Garvin to discuss the job title and raise situation of Constance Dogan, Director of Environment Services, Housekeeping and Laundry.  Mr. Garvin agreed to increase Ms. Dogan's pay and to change her job title as a promotion.  Plaintiff made no complaint that she was retaliated against for allegedly advocating for Ms. Dogan. (Pl's Dep., N.T. 157-162, App. 662-663).

Plaintiff knew that it was a violation of law for a company to retaliate against an employee for making a complaint of discrimination.  Plaintiff had been listed as the respondent in EEOC/PHRC complaints and understood both the right of an employee to file a complaint of

49

discrimination and the prohibition against retaliation for the filing of a complaint. Nevertheless, Plaintiff claims that she did not discharge her responsibility to make the workplace free from discrimination by reporting her belief that there was pervasive and ongoing gender discrimination against female senior leadership team members. Plaintiff uses the excuse that she was afraid she would be fired in retaliation for the making of a complaint. Yet, when she advocated to Mr. Garvin for a change in title for senior leadership team members, including herself, Mr. Garvin considered her request and granted it. Plaintiff and others, both male and female, were given new job titles as vice-presidents. There was no claim raised by Plaintiff that she was retaliated against for advocating for this change.

In fact, Plaintiff testified at her deposition that until December 2015, she and Mr. Garvin had a very good relationship. (Pl's Dep., N.T. 90-92, App. 645). Even prior to the time of the termination of employment, Plaintiff "trusted him" referring to Mr. Garvin. (Id., N.T. 96). Likewise, when Plaintiff was dissatisfied with the bonus and salary increase she received in December 2015, she shared this with Mr. Garvin when, because of Plaintiff's behavior and demeanor, he approached her to ask her what was the matter. When Plaintiff complained about the bonus and raise she received in December 2015 and compared it to the raises and bonus received by male senior leadership team members, Mr. Garvin did not fire her or in any way retaliate against her. To the contrary, he explained how her raise and bonus were calculated and the rationale for giving higher bonuses to others. Plaintiff's feelings were hurt when Mr. Garvin would not change the bonus amount or salary increase in December 2015 and even mentioned to her husband that she thought she would be fired. (Pl's Dep., N.T. 90-91, App. 645). Yet, she was not fired.

50

Plaintiff can point to no adverse action by Waverly or Mr. Garvin against her between December 2015 and September, 2016. There is clearly no nexus between Plaintiff's salary related complaint and the termination of her employment. To support her claim that she was the victim of discrimination, Plaintiff makes numerous claims that others were victims of discrimination. Specifically, she lists the following individuals as having been victims of age or gender discrimination: (First Amended Complaint, Paragraph 48, App. 581). Yet, Plaintiff has not listed any of these individuals as witnesses for the trial of this case in her answer to Interrogatories nor did she seek to depose these individuals. None of the individuals Plaintiff claims were victims of discrimination on the basis of age or gender filed a written complaint with either Waverly's human resource department or with the Pennsylvania Human Relations Commission ("PHRC") or federal Equal Employment Opportunity Commission ("EEOC").

Plaintiff acknowledges that she was responsible for enforcing company non-discrimination policies but alleges that she utterly failed to do this on behalf of any person she now claims was a victim. Plaintiff had access to experienced employment attorneys and regularly consulted with them about employment related matters yet failed to discharge her responsibility to implement the non-discrimination policies with respect to any action of either Mr. Garvin or Mr. Supper or presumably, the Board of Directors. Plaintiff had access to seasoned members of the Waverly Board of Directors including those on the Human Resource Committee with whom she regularly met, yet utterly failed to mention her alleged belief that there was ongoing gender or age discrimination or harassment perpetuated by Mr. Garvin or Mr. Supper.

Plaintiff admitted at her deposition that though she believed she was the victim of gender discrimination only in December 2015 relating only to the salary and bonus issue, she failed to file any complaint of discrimination with either the HRC or EEOC until more than 300 days after this

51

alleged act of discrimination. (App. 707-708). Plaintiff admitted that as of December 2015, she consulted with her sister, attorney, Dana Rider, Esquire about the salary/bonus issue as was told to file a complaint. (Id., App. 640). Given Plaintiff's expertise as a human resource professional and her knowledge of the laws prohibiting both discrimination and retaliation for making a complaint of discrimination, Plaintiff's claim that she did not make a complaint either internally with the Board or Human Resources Committee or externally with the administrative agencies charged with enforcing the non-discrimination laws of the land because she was afraid she would lose her job, is simply not credible.

Plaintiff has produced no evidence nor listed any witness and has no evidence or witness to support her claim that any person was the victim of discrimination on the basis of gender or age. Plaintiff cannot support a claim of discrimination against her by pointing to perceived discrimination against others. She has no documentary evidence and no witnesses. Plaintiff claims that the emails generated from a private email account maintained by the former Board President of Waverly and directed to some individuals in senior management created a hostile environment. But, Plaintiff produced no evidence that she advised Mr. Soltis or anyone else to refrain from sending the emails to either her or any other Waverly employee or that the emails were unwelcome.

Indeed, it is interesting that Plaintiff denounced the political emails sent by Mr. Soltis given those generated by plaintiff herself and her husband and communicated using Waverly owned email servers. Plaintiff's seeming outrage over Mr. Soltis' views about President Obama is clearly fabricated in light of the emails she shared with her husband. (App. 364-381, 390-391, 395-406). Plaintiff's claim that she was offended by the Soltis emails does not rise to the level of discrimination against her and she has not claimed otherwise. Moreover, Plaintiff shared the same political viewpoint as Mr. Soltis and communicated this by emails with her husband. (App. 364-

381, 390-391, 395-406).  Plaintiff has made no claim that her employment was terminated because of her age.  (App. 78).

## II.     STATEMENT OF THE LEGAL QUESTIONS PRESENTED

a.    Is Defendant entitled to summary judgment where Plaintiff has failed to state a claim for gender discrimination under Title VII (Count I) and the PHRA (Count IV)?  (Suggested Answer:  Yes).

b.    Is Defendant entitled to summary judgment where Plaintiff has failed to state a claim for hostile work environment on the basis of gender under Title VII (Count I) and the PHRA (Count IV)?  (Suggested Answer:  Yes).

c.    Is Defendant entitled to summary judgment where Plaintiff has failed to state a claim for retaliation under Title VII (Count I) and the PHRA (Count IV)?  (Suggested Answer:  Yes).

d.    Is Defendant entitled to summary judgment where Plaintiff has failed to state a claim for post-termination retaliation under Title VII (Count II)?  (Suggested Answer:  Yes).

e.    Is Defendant entitled to summary judgment where Plaintiff has failed to state a claim for age discrimination under the ADEA (Count III) and PHRA (County IV)?  (Suggested Answer:  Yes).

f.    Is Defendant entitled to summary judgment where Plaintiff has failed to state a claim for hostile work environment on the basis of age under the ADEA (Count III) and the PHRA (Count IV)?  (Suggested Answer:  Yes).

g.    Is Defendant entitled to summary judgment where Plaintiff has failed to state a claim for retaliation under the ADEA (Count IV) and the PHRA (Count IV)?  (Suggested Answer:  Yes).

## III.    LEGAL ARGUMENT

### A.    Legal Standard

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. County. of Bucks,* 455

F.3d 418, 423 (3d Cir. 2006) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**B.      Defendants are entitled to summary judgment regarding Plaintiff's Title VII and PHRA claims for discrimination, hostile work environment and retaliation on the basis gender fail to state causes of action and summary judgment should be granted in favor of Waverly.**

### i.      Plaintiff's Title VII Discrimination Claim

In accordance with Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a).   Title VII claims are analyzed via the familiar *McDonnell Douglas* burden-shifting framework. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). Under this standard, a plaintiff must first establish a *prima facie* case of discrimination by showing: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) the action was taken under circumstances that give rise to an inference of unlawful discrimination.   *Jones*, 198 F.3d at 410-11 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). If a plaintiff is successful, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. Once a legitimate reason for the employment action is presented, the burden shifts back to the plaintiff to show that the employer's proffered reason was in fact pretext for gender discrimination. *Id.* at 804.

Plaintiff argues that Mr. Garvin discriminated against her on the basis of her gender concerning her bonus.   Plaintiff's position is without merit for a number of reasons.   For over 25 years, Waverly has utilized Thomas Wozniakl, a managerial consultant having forty (40) years' experience working with non-profit organizations in all areas of employee compensation planning, including performance management systems, individual and work team incentive plan design, equity participation plans, and deferred compensation arrangements.   On an annual basis Mr.

Wozniak reviews certain of Waverly's compensation plans and makes recommendations for raises, as well as bonuses in order to ensure that Waverly is paying competitive salaries based upon national baselines/data. Mr. Wozniak's point of contact to receive the information needed for his review came directly from Plaintiff. Part of Mr. Wozniak's analysis includes the impact the particular employee (through his or her role) has on Waverly's financial success. In his experience, Human Resource related employees do not receive bonuses as part of their compensation packages. Mr. Wozniak would establish a median salary based upon market value information for the particular job title.

Under the reign of the prior CEO, Mr. McGuire, Plaintiff never received a bonus and she was not compensated at the fair market median for a Human Resources professional in a non-profit such as Waverly. She also complained to Mr. McGuire that she wanted a Vice President title and he refused this request. However, when Mr. Garvin came to Waverly and Plaintiff requested a Vice President Title, he agreed and designated her as such. Further, when Mr. Garvin learned that certain salaries within his senior management team were under the median salary for those particular positions, he began increasing salaries to reach the median. He did this for Plaintiff and others on his team. (See Graph at App. 2011-2016) Mr. Garvin also awarded discretionary bonuses to Plaintiff on 4 occasions between 2011 and 2016. (App. 1245-1247) [10]

Plaintiff now claims that when she complained to Mr. Garvin about her 2015 bonus in December 2015[11] he was angry and things were never the same between them. Mr. Garvin denies

---

[10] Mr. Garvin also encouraged Plaintiff to take courses needed to obtain her certification as a Nursing Home Administrator, a certification held by Mr. Garvin. Waverly paid for this and Mr. Garvin even changed the day of his senior management team meeting so that Plaintiff would not miss it when she had classes. She also received her Waverly salary during the days and times she attended these classes but she neglected to sit for the examination. As a result, she was unable to act as interim Nursing Home Director when Waverly was looking to fill the role.

[11] Plaintiff made no complaint about her base salary, only her bonus amount.

becoming angered.  Rather, when they met (at his request in response to Plaintiff overtly "moping around" the office), he professionally explained that he did not award bonuses for doing one's job but for something additional over and above.  Plaintiff testified at her deposition that until December 2015, she had a very good relationship with Mr. Garvin and even said she trusted him up until the date of her termination on September 27, 2016. (Pl's Dep. N.T. 90-91 and 96, App. 645-646).  Plaintiff now asserts that Mr. Garvin's failure to award her a higher bonus constitutes gender discrimination.  There is no basis whatsoever to claim that Plaintiff's gender ever played a part in Mr. Garvin's decision making.  In fact, of the 5 people who received bonuses in 2015 from the senior leadership team, 3 were women and 2 were men.  Further, Madams Fehr and Thompson (both female) received bonuses of greater value than Plaintiff.  Her claim that she was somehow targeted due to her gender is unsupportable, particularly where two other women on the team received larger bonuses than Plaintiff.

In addition to the fact that Plaintiff never advised Mr. Garvin or anyone else that she believed that the allegedly insufficient bonus constituted gender based discrimination, Waverly maintains that Plaintiff did not suffer any adverse employment action on the basis of gender and her claim must fail.  Finally, even if one assume for the sake of argument that she suffered a discriminatory, actionable act in December 2015, she did not file her charge of discrimination with the EEOC until December 13, 2017; thus, her administrative claims were not asserted/filed within the 300 day time frame required under the law and the claim should be dismissed on that basis. Plaintiff's claim for gender based discrimination cannot survive Waverly' motion for summary judgment for these reasons and her claim should be dismissed with prejudice.

### ii.     Plaintiff's Title VII Hostile Workplace Claim

Plaintiff contends that in addition to being discriminated against on the basis of her gender, she was also subjected to a hostile work environment. In order to demonstrate the existence of a hostile work environment, a plaintiff must establish that: "(1) the employee suffered intentional discrimination because of [her] sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability." *Brown-Baumbach v. B&B Auto., Inc.*, 437 F. Appx. 129, 132 (3d Cir. Pa. 2011) (citations omitted). "To state a hostile work environment, a plaintiff must plausibly allege that her workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victims' employment and create an abusive work environment." *Burgess-Walls v. Brown*, 11-CV-275, 2011 U.S. Dist. LEXIS 94087, at *26-27 (E.D. Pa. Aug. 22, 2011). In determining whether the conduct is severe or pervasive, the court must examine the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

Plaintiff maintains that Mr. Supper acted in a demeaning manner towards women and this created a hostile workplace; however, she offers no specification about the nature of his alleged comments, the date)s) when he allegedly acted or where the infractions occurred. Plaintiff admits she never made a claim of hostile workplace environment related to her interaction with Mr. Supper or anyone else.

Plaintiff also claims that Waverly had an "old boy" network that created a hostile workplace environment.[12] As an example, she claims that Mr. Soltis, a member of the Board of Trustees, sent racially charged emails and no one ever took action to prohibit him from doing so. Mr. Soltis, who was also a Waverly resident, sent emails from his personal email address. He sent political articles and social media posts, including ones that depicted pictures of animals. Of the hundreds and hundreds of pages of emails produced during discovery, Plaintiff was only copied on about 25 emails from Mr. Soltis; further, the ones she was copied on were neither racial in tone nor offensive in any respect. Given Plaintiff's personal political views (which are apparent from the emails she exchanged from her work email to her husband) it is difficult to believe that Plaintiff found Mr. Soltis' emails highlighting conservative views to be offensive in any respect. Moreover, query that if she was receiving offensive emails in the workplace and knew that others in the workplace were likewise receiving them didn't she as the Director of Human Resources have an affirmative duty and obligation to bring this to the attention of Mr. Garvin and if he rebuffed her complaint (which he would not), she had avenues of reporting through the Board of Trustees or

---

[12] Plaintiff asserts that Mr. Garvin was engaging in unethical conduct and "wasting" Waverly's assets, yet again she never reported him to anyone.   Mr. Garvin vehemently denies any wrongdoing and believes Plaintiff is only asserting such matters in the context of this lawsuit to make Mr. Garvin appear to be unethical and unprofessional which given his reputation (personally and professionally) could not be further from the truth. Plaintiff assets that Mr. Garvin utilized Waverly for catering a party at his home; however, she fails to mention that he paid Waverly for the catering and also generously tipped the employees who worked the party.   Plaintiff claims Mr. Garvin spent large sums on new drapes for his office; however, he negotiated every aspect of his compensation package with the Board of Trustees and providing such an allowance is permissible.   Plaintiff claims that Mr. Garvin required Waverly staff to wash his private viable; however, she fails to mention that this occurred due to the fact that Waverly staff sometimes had to use his car to transport residents or prospective residents visiting the property.   Plaintiff claims Mr. Garvin engaged in unethical behavior by purchasing a second home from an architect who was awarded a large contract with Waverly.   Yet again, Plaintiff fails to mention that before doing so he obtained permission from Waverly and paid fair market value for the property.   Plaintiff even calls Mr. Garvin to task for allegedly participating in a company contest and "taking" the prize proceeds for himself rather than Waverly staff.   This is just another misstatement by Plaintiff.   The record is clear that Mr. Garvin accepted the prize and then proceeded to split the $100 amongst those individuals who came in below him (i.e. second place, third place, etc.).   Mr. Garvin is the one who walked away without any prize monies but he generously provided the proceeds to his staff members.

even the Ethics Committee. She could have also reported the matter via the Ethics hotline or by directing the issue to Waverly's Ethical Compliance Officer.[13]

Plaintiff's claims for a hostile workplace environment on the basis of gender lacks merit and Waverly contends that no reasonably jury could find in favor of Plaintiff in light of the evidence (or rather lack of evidence) that supports her claim.

### iii.    Plaintiff's Title VII Retaliation Claim

Plaintiff maintains that as a result of engaging in protected activity (i.e. reporting gender discrimination as to herself and others in the workplace), she was terminated in retaliation for engaging in "protected" conduct. In order to sufficiently plead a case of unlawful retaliation, a plaintiff must present facts that could establish: (1) he engaged in an activity protected by Title VII; (2) the employer took a "materially adverse" employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *See Hare v. Potter*, 220 F. Appx. 120, 128 (3d Cir. 2007); *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)(citing *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir. 1994)).

In order to establish the first element of a Title VII retaliation claim, a plaintiff must report an unlawful practice prohibited by the applicable statute. *Omogbehin v. Cino*, 485 F. Appx. 606, 611 (3d Cir. 2012). "[O]nly complaints about discrimination prohibited by Title VII - that is, discrimination on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2 -constitute 'protected activity.'" *Davis v. City of Newark*, 417 F. Appx. 201, 203 (3d Cir. 2011) (citing *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)). Moreover,

---

[13] Plaintiff also claims a third party vendor, Mr. Hendrickson, made her feel uncomfortable on the brief occasions she met with him (in the presence of others). Again, Plaintiff never reported her feelings to Mr. Garvin or anyone else.

complaints about unlawful discriminatory practices are a "protected activity" only if they are communicated directly to the employer and "specific enough to notify management of the particular type of discrimination at issue." *Sanchez v. Sungard Availability Servs., LP*, 362 F. Appx. 283, 288 (3d Cir. 2010) (citing *Barber*, 68 F.3d at 702); *see also Perry v. Harvey*, 332 F. Appx. 728, 733 (3d Cir. 2009) (requiring that internal complaints about unlawful discrimination not be equivocal or vague); *Gharzouzi v. Northwestern Human Servs. of Pa.*, 225 F.Supp. 2d 514, 540 (E.D. Pa. 2002) ("The complaint must specifically mention the plaintiff's belief that he/she was discriminated against on account of his/her membership in some protected class.").

As such, it is "the objective message conveyed [by the employee], not the subjective intent of the person sending the message" that determines whether plaintiff has sufficiently opposed discrimination. *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006); *see also Barber*, 68 F.3d at 702 ("[The court's] analysis requires only that [it] analyze the message that [the employee] conveyed . . . ."; *Senador v. Zober Indus., Inc.*, 07-CV-4144, 2009 U.S. Dist. LEXIS 36059, at *32 (E.D. Pa. Apr. 28, 2009) ("The complaint must 'explicitly or implicitly allege that [plaintiff's protected class status] was the reason for the alleged unfairness.' In determining whether plaintiff has engaged in opposition conduct, [the court] must look to the message being conveyed rather than to the means of conveyance.") (citations omitted); *Robuck v. Mine Safety Appliances Co.*, 10-CV-00763, 2010 U.S. Dist. LEXIS 116871, at *17-19 (W.D. Pa. Nov. 3, 2010) (finding that a plaintiff's Amended Complaint was devoid of any facts to demonstrate that he complained of gender discrimination to his employer and that his "generalized complaints of unfairness" including allegations that his employer "always gave priority" to a female co-worker over him, "do not and cannot constitute protected activity.") (citations omitted).

61

In the instant case, Plaintiff's Title VII retaliation claim fails to satisfy the first element set forth above because the factual allegations set forth in the Amended Complaint do not demonstrate that Plaintiff engaged in a "protected activity" under Title VII.  Plaintiff's claims are based entirely upon her alleged complaints to Mr. Garvin about his conduct and actions towards her and other females, as well as Mr. Supper's alleged conduct. However, neither the pleadings nor the record in this case support Plaintiff's contention that she actually reported her belief that the alleged conduct was discriminatory and/or created a hostile workplace on the basis of gender or on any protected basis.  Certainly as the Director Human Resources (who ensures that Waverly is free of discrimination and a hostile work environment by implementing its policies against the same) she knows how to report such claims.  She also knew the appropriate avenue to take with respect to complaints against Mr. Garvin if she was uncomfortable with addressing such issues with him directly given that he was her immediate supervisor and the fact that she claims to believe that he was engaging in discrimination and illegal conduct.  Plaintiff had numerous individuals with whom she could have reported the alleged impropriety.  In fact, it was her duty and obligation as a fiduciary of Waverly and the top seated member of senior management responsible for ensuring that Waverly was free of such impropriety.  Plaintiff could have easily communicated the claims to the Board of Trustees, the Board's Personnel Committee, the Board's Ethics Committee or even Waverly's employment lawyers, Ms. Sandler and Ms. Salgado.  The record is clear that she never communicated her alleged claims against Tom Garvin to anyone.

Simply pleading the existence of potentially unlawful practices *alone* does not establish a "protected activity." Rather, it is the substance of the objective communication to the employer that defines the "protected activity" and remains the foundation of a retaliation case.  Plaintiff needed to specifically communicate the offensive conduct and further, state that she believed such

conduct was discriminatory and. /or created a hostile work environment on the basis of gender. As such, any retaliation Plaintiff claims to have suffered as a result of her supposed opposition to discrimination and harassment in the workplace is not action able and summary judgment should be granted in favor of Waverly.

In the instant case, Plaintiff contends that she was retaliated against as a result of engaging in certain projected activity on her own behalf and on behalf of other female employees at Waverly. Plaintiff relies upon the objection she made to the amount of her bonus in December 2015, as well as her supposed advocacy on behalf of other female staff related to complaints about how Mr. Supper treated women on the senior management team. Of importance, as detailed in the Facts section above, none of the individuals whom Plaintiff claims requested her to advocate on their behalf corroborate her claims. Essentially, they neither complained to her nor did they ask her to intercede because they did not view themselves as being subjected to a hostile environment or discriminatory treatment. Moreover, if one took Plaintiff's assertion as true, isn't it the role of the Director of Human Resources to address such issues?

Plaintiff claims that Ms. Fehr complained about not having a company car. Ms. Fehr neither requested that her compensation package include a car nor have persons in her role ever received such a benefit. On the contrary, Mr. Supper as CFO had a company car, just as his predecessor who was female.[14] The position held by Ms. Fehr has never included a car. Plaintiff claims that Ms. Dugan was overlooked on the basis of her gender in terms of her compensation and title; however, the record reflects that Mr. Garvin agreed to change her title to a director level and to increase her pay accordingly. Ms. Dugan denies that she ever made complaints to Plaintiff.

---

[14] Plaintiff also objected to Mr. Supper receiving a car allowance after his company car was taken away due to an incident with his son and the company car as a result of his son's addiction. Sadly his son is now deceased. It is believed and therefore averred that these allegations are made solely to cast negativity upon Mr. Supper and his role in the organization without any justification.

Lastly, Plaintiff claims that Ms. Thompson made complaints about her salary and the emails sent by Mr. Soltis but she denies having done so. Ms. Thompson likewise disputes that she ever complained to Plaintiff or requested that she advocate on her behalf. *See* Affidavits of Fehr, Dugan and Thompson.

Plaintiff's Title VII retaliation claim fails to satisfy the first element set forth above because the factual allegations set forth in the Amended Complaint do not demonstrate that Plaintiff engaged in a "protected activity" under Title VII. Plaintiff's claims are based entirely upon her alleged complaints to Mr. Garvin about his conduct and actions towards her and other females, as well as Mr. Supper's alleged conduct. However, neither the pleadings nor the record in this case support Plaintiff's contention that she actually reported her belief that the alleged conduct was discriminatory and/or created a hostile workplace on the basis of gender or on any protected basis. Certainly as the Director Human Resources (who ensures that Waverly is free of discrimination and a hostile work environment by implementing its policies against the same) she knows how to report such claims. She also know the appropriate avenue to take with respect to complaints against Mr. Garvin if she was uncomfortable with addressing such issues with him directly given that he was her immediate supervisor and the fact that she claims to believe that he was engaging in discrimination and illegal conduct. Plaintiff had numerous individuals with whom she could have reported the alleged impropriety. In fact, it was her duty and obligation as a fiduciary of Waverly and the top seated member of senior management responsible for ensuring that Waverly was free of such impropriety. Plaintiff could have easily communicated the claims to the Board of Trustees, the Board's Personnel Committee, the Board's Ethics Committee or even Waverly's employment lawyers, Ms. Sandler and Ms. Salgado. The record is clear that she never communicated her alleged claims against Tom Garvin to anyone.

Simply pleading the existence of potentially unlawful practices *alone* does not establish a "protected activity." Rather, it is the substance of the objective communication to the employer that defines the "protected activity" and remains the foundation of a retaliation case. Plaintiff needed to specifically communicate the offensive conduct and further, state that she believed such conduct was discriminatory and. /or created a hostile work environment on the basis of gender. As such, any retaliation Plaintiff claims to have suffered as a result of her supposed opposition to discrimination and harassment in the workplace is not action able and summary judgment should be granted in favor of Waverly.

Even if this Honorable Court finds that Plaintiff engaged in protected activity, her claim for Title VII retaliation still fails. Plaintiff's termination satisfies the prong requiring an adverse employment action; however, there must be a nexus between the protected activity and the adverse employment action. There is nothing in the record upon which Plaintiff can rely to substantiate that she engaged in protected activity even remotely in or around the time of her termination on September 27, 2016. There is no basis for finding a causal connection between Plaintiff's challenge to her bonus that occurred in December of 2015 and a termination 9 months later. Similarly, because there is no specification as to any other complaints (about hostile workplace environment), Plaintiff cannot make out the element of a causal relationship between protected activity and adverse employment action. Plaintiff's claim for VII retaliation must be dismissed with prejudice and the Court should grant summary judgment in Waverly's favor.

### C.    Defendants are entitled to summary judgment regarding Plaintiff's Post-Employment Retaliation Claim under Title VII

In Count II of her Complaint, Plaintiff asserts a claim for post-employment retaliation under Title VII. (*See* Amended Complaint at ¶¶ 75-81; App. 568 – 598). Plaintiff claims that

Waverly's appeal of the Unemployment Compensation Board of Review's decision on March 21, 2017 to the Commonwealth Court constituted retaliation. Waverly vehemently disputes this theory as discussed below.

In order to establish a retaliation claim, Plaintiff must show: (1) a protected action; (2) an adverse employment action; and (3) a causal link. *Krouse v. American Sterilizer* Co.,126 F.3d 494, 500 (3d Cir.1997). In addition, post-employment retaliation claims are actionable under Title VII. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 339 (1997) (holding post-employment retaliation is an actionable claim under Title VII because "employee" in Title VII includes current and former employees alike). A former employee may bring a retaliation action for post-employment conduct when the former employer acts in retaliation for a protected activity that arose out of employment relationship. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200 (3d Cir. 1994); *see also Stezzi v. Citizens Bank of Pa.*, No. 10-4333, 2012 WL 4717900 (E.D. Pa. Oct. 4, 2012) (plaintiff suing her former employer because it challenged her unemployment benefits and labeled her "grossly negligent" in their appeal). As long as a plaintiff has demonstrated a protected activity and a potentially retaliatory act, a jury must decide whether the action taken is of the kind that could "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

In *Byrd v. Elwyn,* No. 16-02275, 2016 WL 5661713 (E.D. Pa. 2016 Sept. 30, 2016), the district court found that the former employee engaged in a protected activity in the form of filing an EEOC Charge against her employer. *Byrd*, at *5. In order to establish adverse employment action, the plaintiff alleged that her employer challenged, for the first time, her unemployment compensation benefits *as a result of* her filing an EEOC claim. *Id.* The *Byrd*

Court refused to dismiss plaintiff's Complaint as a matter of law where the temporal proximity between the filing of the EEOC charge and the challenge to the unemployment benefits was "unusually suggestive of a causal connection". *Id.* at \*6; *See, e.g., Zelinski v. Pa. State Police*, 108 Fed.Appx. 700, 706 (3d Cir. 2004) ("A discharge occurring two days after a plaintiff filed an EEOC complaint is 'unusually suggestive.' ").

Similarly, in *Mullen v. Chester County Hospital*, No. 14-2836, 2015 WL 1954399  (E.D. of Pa. 2016 April 30, 2015), the plaintiff claimed post-employment retaliation when her former employer opted to report her termination to a licensing board on the same day she threatened to file a discrimination lawsuit. *Id.* at \*10.  The district court noted that the report to the licensing board occurred contemporaneously on the day of the former employee notifying employer of her intention to file a discrimination claim.  Further, the former employee claimed that she was initially advised that employer did not intend to report her termination to the Nursing Board; however, the same day it received notice of her intent to engage in protected activity, employer retaliated by doing so. *Id.*

The district court found that reporting plaintiff to the Nursing Board for practicing outside the scope of her license was a materially adverse employment action, because it is the kind of activity that could have dissuaded plaintiff from proceeding with the filing of the EEOC charge. The "[u]nusually suggestive" temporal proximity between the protected activity and the adverse action—both on the same day—may alone be sufficient to create an inference of causality and defeat summary judgment. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,* 503 F.3d 217, 232 (3d Cir.2007) (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279–81, 284 (3d Cir.2000)).

In the case at bar, Plaintiff was terminated on September 27, 2016 and she applied for unemployment compensation benefits on October 2, 2016 (App. 290-293).   On October 6, 2016

Waverly received notice of the application for unemployment compensation benefits and on October 12, 2016, Mr. Garvin provided the Unemployment Compensation Bureau with Waverly's response contesting Plaintiff's application for unemployment compensation. (App. 294-297). Bureau staff interviewed Plaintiff and Mr. Garvin by telephone on October 18, 2016. (*See* Telephone transcripts; App. 298-305). The Bureau office found Plaintiff eligible for benefits on October 25, 2016 and on October 31, 2016, Waverly again contested Plaintiff's entitlement to receive unemployment compensations. This is the <u>second time</u> that Waverly contested Plaintiff's application for unemployment compensation (App. 306-310).

At no time in Plaintiff's initial application for benefits nor at the time of her telephone interview with Bureau staff did she contend that her termination was discriminatory or retaliatory. In fact, it was not until Waverly's counsel received a letter from Plaintiff's attorney, Mark Schwartz, Esquire dated November 8, 2016, that he claimed (on Plaintiff's behalf) that Plaintiff was prepared to file a Charge of Discrimination with the EEOC. (App. 311-326).[15] Interestingly, Mr. Schwartz commented on Plaintiff's lost opportunity to secure other employment as early as November 8, 2016, proclaiming that Mr. Garvin and the Board of Trustees had already "made [Plaintiff] virtually unemployable in her chosen field." (App. 319).

Following a hearing on November 28, 2016, the Unemployment Compensation Referee found in favor of Waverly on November 29, 2016 (App. 327-354; 355-361). When questioned as to why she was terminated, Plaintiff did not state that she was the victim of discrimination, hostile work environment or retaliation. Rather, she stated at her Unemployment Compensation hearing

---

[15] Notably, the 9 page, single spaced letter from Mr. Schwartz makes no reference to Plaintiff's husband being the one who sent the Tweet, a position that Plaintiff only referenced mid-way through the meeting with Mr. Garvin and Mr. Bauer when being terminated on September 27, 2016. The referee also discounted the weight of Plaintiff's testimony and found that she was not a credible witness. (App.355-361).

that she "was fired over a knee jerk reaction to an anonymous letter, and speculation over what the meaning of the tweet was". (App. 353).

It was only after Waverly contested Plaintiff's application for unemployment compensation on *two occasions* and the entry of an award in favor of Waverly that Plaintiff filed her Charge of Discrimination with the EEOC on December 13, 2016. The EEOC issued Notice of the Charge on January 5, 2017. (App. 362-363). Plaintiff appealed that Referee's decision and on February 21, 2017, the Unemployment Compensation Board of Review entered a decision reversing the Referee's ruling. Waverly filed a Petition for Review of the Board's determination on March 21, 2017.[16] This is the act upon which Plaintiff bases her post-termination retaliation claim.

For the sake of argument, Plaintiff suffered an adverse employment action when Waverly terminated her employment.[17] Plaintiff engaged in post-termination "protected activity" when she made a claim of discrimination against Waverly. Plaintiff's counsel communicated Plaintiff's threat to file a discrimination claim in his letter dated November 8, 2016. Plaintiff waited another 6 weeks to file a Charge of Discrimination with the EEOC on December 13, 2016. The EEOC issued a Notice of the Charge to Waverly on January 5, 2017. Plaintiff's post-termination retaliation claim must fail where she has not established a temporal proximity between the filing of the EEOC Charge (or even the threat of filing a claim) and Waverly's *multiple* challenges to her application for unemployment benefits.

---

[16] The Commonwealth Court affirmed the Board's ruling. At no time did the Commonwealth Court (or any other tribunal or anyone affiliated with Waverly) find that Plaintiff was racist. This is a contention that Plaintiff's counsel makes repeatedly in a failed attempt to account for Plaintiff's inability to secure new employment.

[17] Waverly does not waive its position that said termination was based upon a legitimate business reason and was neither discriminatory nor retaliatory.

Plaintiff improperly argues that the post-termination retaliation did not occur until Waverly

challenged the decision of the Review Board on March 21, 2017, but the aforementioned chronology

establishes that this event could not be viewed as retaliatory and/or in response to Plaintiff engaging

in protected activity where Waverly had already on three separate instances contested her application.

Waverly contested Plaintiff's application in writing upon receiving notice of her initial filing and

again during the telephone interview with Bureau staff.  The third objection to her application

occurred on October 31, 2016 when Mr. Garvin appealed the Bureau Office's award of benefits in

favor of Plaintiff. All of these events occurred well before receiving notice of Plaintiff's "protected"

post-employment activity.  Accordingly, summary judgment should be granted in Waverly's favor

and Count II of the Amended Complaint should be dismissed with prejudice.

### D. Defendant is entitled to summary judgment regarding Plaintiff's ADEA and PHRA claims for discrimination, hostile work environment and retaliation on the basis age fail to state causes of action and summary judgment should be granted in favor of Waverly.

#### i. Plaintiff's Age Discrimination Claim under the ADEA and the PHRA

Plaintiff asserts age discrimination claims under the ADEA (Count III) and the PHRA

(Count IV).  The ADEA provides that "[i]t shall be unlawful for an employer ... to discharge any

individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, the PHRA makes

it unlawful "[f]or any employer because of the ... age ... of any individual ... to discharge from

employment such individual ... if the individual ... is the best able and most competent to perform

the services required." 43 Pa.C.S. § 955(a).  Age discrimination claims under the ADEA and the

PHRA follow the *McDonnell Douglas* framework. *See Evanoski v. United Parcel Serv., Inc.*, 571

F. Appx. 92, 95, n. 2 (3d Cir. 2014) (*quoting Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005),

n. 8) ("interpret[ing] the implicated provisions of the ADEA and PHRA as applying identically ...

and as being governed by the same set of decisional law"); *see also Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (approving of the "continued application of the McDonnell Douglas paradigm in age discrimination cases").

In order to prevail on an age discrimination claim under the ADA or the PHRA, "a plaintiff must show that his ... age 'actually motivated' or 'had a determinative influence on' the employer's adverse employment decision." *Fasold*, 409 F.3d at 183–84 (citations omitted); see also Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (*quoting Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009) ("[A] plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action.") ). A plaintiff can meet this burden by first establishing a *prima facie* case of age discrimination. *Fasold*, 409 F.3d at 184.

The *McDonnell Douglas* framework requires initially that Plaintiff prove that: (1) she is forty years of age or older; (2) the employer took an adverse action against her; (3)  she was qualified for the position at issue; and (4) she was ultimately replaced by another employee 'who was sufficiently younger to support an inference of discriminatory animus.' " *Evanoski*, 571 F. Appx. at 95 (*quoting Burton*, 707 F.3d at 426).

In the instant case, Plaintiff can establish a *prima facie* case of age discrimination since she was 40 years of age or older,[18] she suffered an adverse employment action, she was qualified for the position and a sufficiently younger individual replaced her.[19]  Although Waverly argues that it terminated Plaintiff's position due to concerns about Plaintiff's future competency and business judgment given her conduct stemming from the Tweet incident, courts have held that when the

---

[18] Plaintiff was born on December 9, 1960; thus, she was 55 years old on September 27, 2016, the date of the date of her termination. *See* App. 108.

[19] Lauren Kelley was 43 years old when she accepted the Director of Human Resources position at Waverly on December 19, 2016.

issue of a plaintiff's qualifications is intertwined with the employer's assertion of a legitimate reason, the *McDonnell Douglas* analysis should not fail. The *Howell* court noted that "[w]hen a defendant's argument regarding a plaintiff's qualifications is intertwined with its assertion of a legitimate reason for the employment action, courts should be careful not to collapse the entire *McDonnell Douglas* analysis in [the] first step." *Howell v. Millersville Univ. of Pa.*, 283 F.Supp.3d 309, 323 (E.D. Pa. 2017), *aff'd*, No. 17-3538, —— Fed.Appx. ——, 2018 WL 4236592 (3d Cir. Sept. 6, 2018) (quoting *DiFrancesco v. A–G Adm's, Inc.*, No. 13-4284, 2014 WL 4379114, at *7 (E.D. Pa. Sept. 4, 2014), *aff'd*, 625 F. Appx. 95 (3d Cir. 2015) ).

When an employee has established a *prima facie* case of age discrimination, the burden switches to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision." *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). The Third Circuit has held that this burden is " 'relatively light' and is satisfied if the employer provides evidence which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (*quoting Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) ).

Waverly contends that it has met the "relatively light" burden. Waverly's President and CEO, Mr. Garvin, recommended to the Board of Trustee's Personnel Committee that Plaintiff be terminated due to the events surrounding the Tweet, using incredibly poor judgment and exposing Waverly to claims of racial discrimination and the taking of an unlawful poss. Taking a poll of a protected group of employees (African Americans) and then publicly posting the information is conduct that could also expose Waverly to a violation of the IRS regulations which specify that non-profit organizations (here through their employees according to her Tweet) cannot endorse or

have the appearance of endorsing a political campaign or candidate. (See Garvin Affidavit, App. 1242-1251).

Whether the parties dispute whether Plaintiff's conduct rose to the level of violating Waverly's social media policy or whether her conduct violated the policy is not the correct analysis. When Plaintiff was first approached by Mr. Garvin about the Tweet she immediately asked whether she would be terminated. She did not state at that time that her husband supposedly sent the Tweet using her account and this "theory" she first articulated when applying for unemployment compensation benefits. *Id.* This "theory" was also not contained in the 9 page letter sent by her counsel, Mark Schwartz, Esquire dated November 8, 2016, wherein her chastised Waverly about the basis of the termination but never argued that his client was "innocent" because her husband actually sent to objectionable Tweet. (*See* Schwartz letter, App. 311 - 326).

After receiving the anonymous letter (App. 270 - 272), Mr. Garvin shared the concerns stated in the letter and essentially lost faith in Plaintiff's managerial decision-making skills and ability to oversee Waverly's human resource related activities for its diversified employee population in all areas, including the review of clams of discrimination, resulting investigations and making recommendations for disciplinary action and even termination. Mr. Garvin maintained and the Board's Personnel Committee agreed that the issuance of a Tweet from her personal account (for which she was a follower of Waverly) where she professed in a public tweet to have taken a poll of African American ("AA") employees about their political views on the upcoming presidential election demonstrated very poor judgment, particularly for the member of senior management who is charged with ensuring that Waverly's workplace is free of hostility or any appearance that a protected class (such as Waverly's African American employees) is being

singled out or targeted in any way.  These justifications, taken as true, allow the conclusion that there was a non-discriminatory reason for Plaintiff's termination.

Finally, where the employer articulates a legitimate, non-discriminatory reason for the employee's termination, as in the case at hand, "the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual." *Smith*, 589 F.3d at 691. "To make a showing of pretext sufficient to defeat summary judgment, the employee 'must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.' " *Evanoski*, 571 F. Appx. at 95 (*quoting Burton*, 707 F.3d at 427).

Defendants argue that other than meeting the prerequisites for a *prima facie* case, Plaintiff has failed to establish pretext or that age was a motivating in Waverly's decision to terminate her employment.  The record is void of any direct or indirect evidence that Plaintiff's age affected the decision making process that lead to her termination.  Waverly maintains that this Honorable Court should conclude that Plaintiff has failed to meet her burden and as such, summary judgment should be granted in favor of Waverly.

**ii.    Plaintiff's ADEA Hostile Workplace Claim**

In order to assert a viable claim for hostile work environment under the ADEA a plaintiff must show: (1) [s]he suffered intentional discrimination because of [her] age; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected [her]; (4) the harassment would detrimentally affect a reasonable person in that position; and (5) *respondeat superior* liability. *Howell,* 283 F.Supp.3d at 332 (E.D. Pa. 2013 (citations omitted).  "The alleged harassment 'must be so severe or pervasive that it alters the conditions of the [plaintiff's] employment and creates an

abusive environment.' " *Id.* (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) ). Stray remarks made by non-decision-makers that are discriminatory generally are considered insufficient to support an inference of discrimination. *Id.* (citing *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ).

To determine whether conduct is sufficiently hostile to support a claim, a court must consider the totality of the circumstances, which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Johnson v. Phila. Hous. Auth.*, 218 F.Supp.3d 424, 438 (E.D. Pa. 2016) (quoting *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005) ). The *Howell* court went on to note that "offhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." *Id.* (*quoting Caver v. City of Trenton*, 420 F.3d 243, 263). Further, "When the alleged harasser is a supervisor, vicarious liability is established if the harassment culminates in a tangible employment action." *Id.* (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 423, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013) ).

Plaintiff claims that Mr. Supper created a hostile workplace environment on the basis of age but does not provide any specificity on the date(s) when this alleged conduct occurred.[20]  She bases this assertion upon her feeling that Mr. Supper was on a "mission" to get Isthuhamil Hamid (who she thinks was in his 70's) fired.  She conceded at her deposition that she does not know the reasons for Mr. Hamid's separation from employment since it occurred after she was terminated. (Pl's Dep. N.T. 79; App. 642).  It is denied that age played any part in Mr. Hamid's separation from employment.

---

[20] Mr. Supper's date of birth is June 20, 1958.

Plaintiff also claims that Mr. Garvin created a hostile work environment on the basis of age by allegedly saying things about getting rid of older employees to reduce insurance premiums.[21] When asked if he instructed her to take action to effectuate this result Plaintiff admitted that Mr. Garvin never told her to take action against any employees for this purpose. Plaintiff also claims that when a member of senior management was terminated, Mr. Garvin supposedly stated that he wasn't out to get the "old timers".[22]  (Pl's Dep. N.T. 81; App. 643).  Mr. Garvin testified under oath that he never made such a statement and that he does not say such things. (*See* Marc Heil Affidavit; App. 1254-1256).  Plaintiff claims Mr. Garvin said the same thing about her to Marc Heil after her termination.  (Pl's Dep. N.T. 81; App. 643).  Mr. Heil disputes ever hearing Mr. Garvin make such a remark or telling Plaintiff that Mr. Garvin made such a remark.   (*See* Marc Heil Affidavit; App. 1254-1256).

Plaintiff's claims of harassment on the basis of age must fail for a variety of reasons, including the fact that the circumstances she complains about were in no way severe or pervasive, even if her account of what occurred is accepted (solely for the purpose of this motion).  Even if Mr. Garvin made the "old timer's" comment, which he denies, such a statement does not automatically refer to the age of the employees but rather it could refer to the seniority and length of service.  Moreover, even if Mr. Garvin had made such a stray remark, it is not actionable as to Plaintiff where the remark was temporarily remote as to Plaintiff's date of termination and the remark has nothing to do with Plaintiff's job performance. *See Kargbo v. Philadelphia Corp. for*

---

[21] Plaintiff likewise does not provide specification as to when Mr. Garvin engaged in conduct she claims constituted harassment on the basis of age.

[22] Plaintiff admitted that she supported the termination Anne Rogers. (Pl's Dep. N.T. 82; App. 643).  In fact, Plaintiff and other employees were subjected to inappropriate, harassing behavior by Ms. Rogers and this lead to Mr. Garvin recommending her termination.  This is yet another example of Mr. Garvin's effective management style in support of a professional/harassment free environment.  Further, Plaintiff's claim avers age discrimination as to herself and does not aver that Waverly engaged in a pattern or practice of discriminatorily terminating older employees; thus, Plaintiff's deposition testimony about other employees in the protected class for age being terminated or leaving Waverly has no relevance to her claim.

*Aging*, 16 F.Supp. 3d 512, 528 (2014)(*citing Hook v. Ernst & Young*, 28 F.3d 366, 375 (3d Cir. 1994). Contrary to Plaintiff's contentions, Mr. Garvin did not assume his role as President and CEO in 2010 and start terminating the senior management team. On the contrary, the majority of those who served on the senior management team prior to Mr. Garvin are still with the organization. Further, there is no evidence whatsoever that Plaintiff's ability to do her job was impacted as a result or that a reasonable person in her position would have been detrimentally affected.

Indeed, the first senior level executive who left after Mr. Garvin assumed his duties as CEO was Ann Rogers in 2014, who resigned four years after Garvin arrived and her termination was based in part on investigation by Mr. Garvin of complaints made by the Plaintiff herself and because of Plaintiff's request that Mrs, Rogers be terminated. It is ironic that Plaintiff now suggests an ageist motive in this employment action. Not only is it impossible for Plaintiff to show she suffered detriment from this action, but, her working conditions improved as a result. For the above reasons, Waverly's motion should be granted and Plaintiff's claim for ADEA Hostile Workplace should be dismissed with prejudice.

### iii.    Plaintiff's ADEA Retaliation Claim

In order to make out a claim for age based retaliation, Plaintiff must prove that she: "(1) engaged in protected employee activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (*quoting Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) ). After reviewing the record in this matter, Plaintiff has not asserted that during the tenure of her employment she complained about age based conduct on the part of

Mr. Supper, Mr. Garvin or anyone else.  In light of the absence of Plaintiff engaging in age based protected activity, Plaintiff has not satisfied the first prong of an ADEA retaliation based claim. Furthermore, if Plaintiff asserts that she complained about the conduct she contends created a hostile environment on the basis of age, she fails to offer any specificity about when such events occurred, let alone that there was a nexus between the alleged time of her complaint and her termination.  For the foregoing reasons, Waverly requests that summary judgment be granted in its favor with respect to Plaintiff's failed age based retaliation claim.

## V.   <u>CONCLUSION:</u>

For the foregoing reasons, Defendant, Waverly Heights, Ltd., respectfully requests that its Motion for Summary Judgment be granted and that Plaintiff's Complaint be dismissed, with prejudice.  A proposed Order is attached hereto for your Honor's consideration.

Respectfully Submitted,

**EASTBURN AND GRAY, P.C.**

By: _____

Dated: August 1, 2019

Joanne D. Sommer
Grace M. Deon
Attorneys for Defendants

60 East Court Street
P.O. Box 1389
Doylestown, PA  18901
Phone:  (215) 345-7000
Facsimile:  (215)345-9142
jsommer@eastburngray.com
gdeon@eastburngray.com

78