### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KATHLEEN M. JUNGCLAUS** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | **NO. 17-cv-04462 PD** |
| | : | |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **WAVERLY HEIGHTS LTD.** | : | |
| | : | |
| | : | |
| **Defendant** | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT WAVERLY HEIGHTS LTD.'s MOTION FOR SUMMARY JUDGMENT

Plaintiff, Kathleen M. Jungclaus ("Plaintiff"), by her undersigned counsel Mark D. Schwartz, Esquire hereby submits this Memorandum of Law in Opposition to the Summary Judgment Motion filed by Defendant Waverly Heights LTD. ("Defendant" or "Waverly").

### A. OVERVIEW

Instead of focusing on the state of the facts developed in this case pertinent to the standard of Summary Judgment, Defendant has chosen to submit a bloated and wholly unnecessary 84-page brief together with a 1300-page appendix ("Appendix" when referenced herein). Granting Summary Judgment is an extraordinary remedy to be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Instead of submitting an unwieldy document, if Defendant had truly considered the facts in issue, it would not have made the motion in the first place.

This case is simply about the ramifications of a two-line Tweet that reads as follows:

> "@realdonaldtrump, I am the VP of HR at comp outside of Philly, an informal survey of our employees shows 100 percent AA employees voting Trump "

This Tweet is referenced in Defendant's Brief (Def's Brief, 17) and Defendant acknowledges that it was on Plaintiff's "own Twitter page", not on the Waverly email system.

While Defendant's appendix is helpful when it comes to Plaintiff's opposition and will be referenced when appropriate, it is noteworthy for what it does not include, namely the proceedings in the Commonwealth Court of Pennsylvania found at Commonwealth Docket No. 312 CD 2017 ("Pltf. Exhibit 1") culminating in the decision in the matter of *Waverly Heights, Ltd v. Unemployment Compensation Board of Review*, No. 312 C.D. 2017, Argued: October 17, 2017 and filed November 13, 2017 ("Pltf. Exhibit 2").  This case upheld the Unemployment Compensation Board of Review decision of February 21, 2017 ("Pltf Exhibit 3")

Waverly was unrelenting in it staunch opposition to Plaintiff's unemployment compensation claim, taking this matter through the unemployment compensation system up through the Commonwealth Court, where there  was a full and final adjudication in Plaintiff's favor. What is key is that Court's adjudication based upon the very same issue as presented here; i.e., an examination of Plaintiff's above-referenced Tweet  in terms of compliance with Defendant's Social Media Policy, the self-same issue raised in this matter; i.e., whether a Tweet by Plaintiff constituted willful misconduct in the context of Defendant's Social Media Policy.

 Finally, it is noteworthy that normal practice is for the party proceeding to file for Summary Judgment is to attempt to arrive at "stipulated material facts" and/or "unstipulated to material facts" which was not done here. Defendant did not so much as contact the undersigned to arrive at a list of stipulated material facts. Instead the Court is left to guess.

### What This Case is About

While pleadings and motion practice are designed to narrow issues between opposing parties, this motion, together with a total lack of specific material facts, shows a deliberate avoidance of recognizing what this case is simply all about.

The very first paragraph of Plaintiff's amended complaint sets forth Plaintiff's claims pursuant to applicable civil rights acts, stating that:

> Plaintiff has been retaliated against, as a result of her advocacy for equal treatment of women, ultimately being fired for that advocacy, contrary to Defendants' pretextual assertion that she was fired for Tweeting what amounted to personally protected political speech. This Tweet was written entirely away from Waverly's sites or email. This is in contrast to circumstances where other males connected with Waverly Heights, LTD were allowed to directly use Waverly sites and email to express racist political views. (Amended Comp., par 1,  Appendix, 568-598)

Discovery fully supports this allegation, which can be simply set forth in the following three paragraphs:

1) Plaintiff is and was a member of a protected class, which Defendant admits.

2)  Defendant contends that Plaintiff was fired for a Twitter posting on her personal account that Plaintiff contends was wholly compliant with Defendant's Social Media Policy.

3)  Given that Plaintiff was working in an environment which permitted worse in terms of political, racist and anti-feminine email exchanges on the Waverly email network,  Plaintiff contends that her firing over a personal Tweet was a mere pretext for Defendant's violation of her civil rights, given her status in legally

protected categories and her advocacy for herself and other similarly situated females.

### The Applicable Burden Shifting Analysis

For purposes initially of Summary Judgment and then for trial, the burden shifting analysis is applicable as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

> Under *McDonnell Douglas*, an employment discrimination plaintiff bears  the initial burden of establishing a prima facie case of employment discrimination. 411 U.S. at 802, 93 S. Ct. at 1824; *Chipollini,* 814 F.2d at 897. A plaintiff may use either    direct evidence or circumstantial evidence to establish that the employer's decision was motivated by plaintiff's membership in a protected class. *Chipollini*, 814 F.2d at 897. Once the plaintiff has established a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. The plaintiff then regains its ultimate burden of proving discrimination: he must prove by a preponderance of the evidence "that the legitimate reasons offered by the defendant were not its true reasons but were a pretext [for] discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981). *Tukesbrey v. Midwest Transit, Inc.* 822 F. Supp. 1192 (W.D. Pa. 1993)

Using the three-paragraph description of the case set forth hereinabove, the facts adduced at discovery must be viewed as to their sufficiency to support the *McDonnell* analysis.  Plaintiff has set forth sufficient facts to establish her protected status and has supplied facts supporting her contention that the employer's decision was motivated by her being in that class. Defendant has then set forth a non-discriminatory reason that both Plaintiff and the Commonwealth Court of Pennsylvania have found to be illegitimate; namely, Plaintiff's Tweet and her alleged violation of the Waverly's Social Media Policy. .

Discovery demonstrates that the parties both agree that Plaintiff is a member of protected age and sex categories. Aside from that, there is not much in the way of factual agreement in the

record. However, that record shows sufficient facts supporting Plaintiff's claims to let this case proceed to a jury.

There are clear factual differences between the parties when it comes to Plaintiff's allegations that her termination was really in retaliation for advocating for compensation and benefits of females, including herself, in contrast to compensation and benefits accorded males, including Mr. Robert "Bob" Supper. Defendant characterizes Plaintiff's protests as somehow being deficient (Def's Brief, 35), claiming that there was a plethora of people that Plaintiff could have contacted. However, Plaintiff's deposition and affidavit attached hereto ("Pltf. Exhibit 3") demonstrated that she indeed complained to her superior, Mr. Garvin, in a manner that was clearly articulated and legally sufficient for civil rights purposes.

Defendant claims that Plaintiff's case is somehow deficient because Plaintiff has not provided "expert analysis of Waverly practices." (Def's Brief, 35) Expert analysis coming from either side would be questionable at best, and more likely to be irrelevant, as the ultimate expert in this instance involving Plaintiff's firing is and should be the jury.

### What This Case is Not About

Plaintiff wastes this Court's time in setting forth, ad nauseum, alleged facts that are not relevant, including but not limited to the following:

-whether it was Plaintiff's husband or Plaintiff who posted the Tweet as admittedly it was on Plaintiff's Twitter page. (Def's Brief, 24).

- how Plaintiff could have deposed various parties. (repeatedly in Def's Brief). How the Plaintiff conducts discovery and prepares for trial is not relevant or necessary as an element for Summary Judgment; Plaintiff asserts that there are enough questions of fact to be presented to the jury as to whether the Claimant was terminated in violation of Title VII.

- statistics concerning females employed or the awards received by Defendant Waverly such as being "designated as a Best Place to Work in the Delaware Valley." (Def, Brief, 14). This is also simply irrelevant for the purpose of Summary Judgment. Moreover, Defendant has thus created its own question of fact. This fact – evidence- could be presented to the Jury, but really has no bearing on the issue of whether Plaintiff was terminated, whether the termination was due to her internal complaints regarding the treatment of women, and whether the stated basis for the termination, the Tweet was pretextual. These alleged facts would go to the credibility and weight of the evidence, but can not be seen as relevant to establishing without question whether the Claimant was discriminated against under the law; therefore, Defendant's motion should be denied.

-who Plaintiff could have complained to and the universe of options purportedly available to her. (Def's Brief ,13 and throughout). It is elemental that Waverly's counsel represents the entity and not Plaintiff. Further, calling a corporate compliance hotline, again something maintained by and for the employer, merely categorizes the caller as a troublemaker, putting a bulls-eye on his or her forehead. Instead, the issue involves to whom the Plaintiff did complain i.e., her boss Mr. Garvin when it came to advocating for herself and other women and his turning down her plea upon his firing her to meet with a Board committee which she and others have characterized as a good ole boy's club, having one standard for women and another for men. This is also a question of fact. It is the jury as the sole fact finder who can make the determination whether the Plaintiff made the complaint to the proper parties at Waverly; therefore, also an issue of fact to be sent to the jury for determination.

-a Handbook professing a commitment to "fair employment practices, competitive pay and benefits, and career opportunities" (Def's Brief ,11) Clearly, in this case pronouncements and actual practice can and do differ.

-the training that Plaintiff did or could have received or what human resource functions she was not responsible for. (Def's Brief, 13)

-when and why Plaintiff was cleaning out her desk (Def's Brief, 20)

-Defendant's consultant's annual review of market compensation levels and practices (Def's Brief, 25-29) and where Plaintiff's compensation and bonus fell in terms of the "market". (Def's Brief, 34) This is not about some generalized "market." It is about Plaintiff's compensation experience at Waverly and Plaintiff's Verified Affidavit ("Pltf. Exhibit 4" or "Pltf. Affidavit") which states that CEO Garvin made selective and discriminatory choices of who received adjustments recommended by the compensation consultant. (Pltf Affidavit, pars. 91,92)

-various employment certifications maintained by or available to Plaintiff and others at Waverly. (Def's Brief 30)

-whether or not Plaintiff had a problem with the CEO who preceded Mr. Garvin covering the period from 1997 through 2010 (Def's Brief, 31).

-whether or not any individual Plaintiff alleges was the victim of discrimination ever filed any formal or informal complaint with Human Resources, with the Board, with Mr. Garvin, with the EEOC or the PHRC. (Def's Brief, 35). The law specifically protects from retaliation those who make a claim on behalf of someone else. Given Plaintiff's position as  Human Resource Director, one would hope that if she saw unequal treatment and potential claims, she would seek to rectify the situation or otherwise prevent it. The purpose of an H.R. Director should not be a mouth-piece for an improper corporate status quo.  It seems elementary that if  more H.R.

Directors were employee-friendly, advocating for them (Affidavit, par 90) then perhaps the number of claims filed with the EEOC would be reduced. Only a jury of her peers should be permitted, based on credibility, whether Plaintiff advocated for females and whether she was terminated because of it. It is just that simple. Accordingly, Defendant's assertion that they are entitled to Summary Judgment must fail.

This list is by no means exhaustive. The point remains however that Defendant does not focus on the three-paragraph analysis set forth hereinabove that describes this case. Instead it bulks up with extraneous matters that are anything but relevant.

### The Inherent Fallibility of Affidavits

Defendant's Memorandum of Law is overwhelmingly based upon the affidavits of individuals whom it uniquely controls. While virtually every page of Defendant's brief and every contention is based on affidavits, headings are provided for some of those individuals; i.e.,

        a. Meredith Feher (Def's Brief, 35,36)

        b. Constance Dogan (Def's Brief, 37)

        c. Janet Thompson (Def's Brief, 37)

        d. Other Females (Def's Brief, 38-40)

It should be remembered that Plaintiff repeatedly asserted that she was fearful of job loss if she complained to anyone above Tom Garvin and she described an atmosphere of fear when it came to complaining. Specific citation is provided later herein.

Defendant could have called those individuals who supplied affidavits for deposition to rebut Plaintiff's allegations, but clearly did not do so. Undoubtedly Defendant did not want them to be subjected to cross-examination. Instead, Defendant seeks to rely upon affidavits from those controlled individuals, doctored specifically for them. Plaintiff trusts that this Court will see them

for what they are, something inherently untrustworthy which cannot be cross examined.  As a result, Plaintiff has been forced to supply her own verified "Affidavit in Opposition" previously referenced herein as "Pltf Exhibit 4" disputing the purported facts set forth in Defendant's various affidavits, thus placing them and their alleged pertinent facts all at issue for a jury to consider.

A simple piling on of affidavits reciting Defendant's laundry list of criticism of Plaintiff should not be the determining factor about whether this matter proceeds to a jury.   The simple question at this point is whether the facts adduced through discovery suffice to proceed to trial before a jury. Plaintiff contends that a reading of Defendant's Memorandum, Plaintiff's responsive brief, as well as the record referenced herein, dictates that this matter be allow to proceed to jury trial.

## I.    CASE HISTORY/PROCEDURAL POSTURE

Defendant spends a full five pages of self-serving editorial narration, including extraneous and inflammatory accusations against Plaintiff's counsel. Plaintiff has supplied herein a three-paragraph description of what the case is about.

### Case History

The docket of which this Court is well aware explains the case history.  Indeed, a Complaint was filed. Irrespective of Defendants' threats against Plaintiff for filing a defamation claim against CEO Garvin,  Plaintiff did file an Amended Complaint which asserted six causes of action including a defamation count against CEO Garvin, all of which the undersigned and Plaintiff felt were well based and justified.   The Court dismissed two counts on April 9, 2018 leaving four counts which have survived.

**II.      PLAINTIFF'S AMENDED COMPLAINT & STATEMENT OF THE FACTS**

**Pertinent Provisions of Plaintiff's Amended Complaint As Supported by Pertinent Facts**

Before getting to whether or not relevant facts as alleged by Plaintiff in its Amended Complaint are material and have been adequately substantiated in discovery so as to warrant survival of Summary Judgment, there needs to be an understanding of what those allegations are, given the fact that Defendant made no effort to work with Plaintiff to stipulate what material facts might be agreed.  What follows are pertinent allegations first made in Plaintiff's verified amended complaint supported by facts as aduced by discovery as particularized herein and in subsequent sections. (For ease of reference Plaintiff utilizes Defendant's Appendix and refers to his as "Appendix")

1.   For years prior to her firing, as would be consistent with her responsibilities as HR Director, Plaintiff made the mistake of protesting various discriminatory and questionable practices employed by Defendant Garvin and acquiesced in by the Board of Trustees of Waverly. (Amended Comp., par 14, Appendix, 568-598). These were made on behalf of others and on her own behalf, including an instance of sexual harassment over which CEO made a joke instead of rectifying (Affidavit 93-95) As for other instances  of Plaintiff's complaints, see (Affidavit, pars 12,27,38,40,43,44,85,90,93-95,135, 148, 150)

2.   After almost twenty years Plaintiff was called into Defendant's CEO Tom Garvin's office on September 20, 2016 and confronted with an anonymous letter protesting a July 24,2016 Twitter posting by Plaintiff. (Amended Comp., par 16,  Appendix, 568-598)

3.   The actual Tweet was:

> @realdonaldtrump I am the VP of HR in a comp outside of Philly
> An informal survey of our employees shows 100% AA employees
> Voting Trump   (Amended Comp., par 17,  Appendix, 568-598)

4.    The actual Tweet was as above quoted. (Amended Comp., par 16, Appendix, 568-598.)

5.    On September 27, 2016, Plaintiff was again called into Mr. Garvin's office and found Mr. Dick Bauer, Chairman of Defendant's board of trustees where it was  announced that she was being fired. She was told  that the Human Resources Committee of the Board and the full board had voted unanimously to terminate her employment based upon a violation of Defendant's Social Media Policy. (Amended Comp., pars. 20,21,  Appendix, 568-598)

6.    At that meeting Plaintiff asked for reconsideration and/or to allow her to discuss the situation with the Board's Human Resources Committee. This request was refused. (Amended Comp., par 23, Appendix, 568-598)

7.    Although Defendant resisted Plaintiff's being awarded benefits proceeding through the unemployment process structure up and through the Commonwealth Count, that Court  affirmed the Unemployment Compensation Board of Review's previous granting of unemployment compensation benefits in an Opinion of November 13, 2017. (Amended Comp., par 36,  Appendix, 568-598)

8.    A plain reading of the words of Plaintiff's Tweet can only be characterized as a matter of individual belief; a political observation regarding a matter of public concern; i.e., the Presidential election. (Amended Comp., par 38, Appendix, 568-598)

9.    The Tweet was purely a matter of personal opinion, not in any way referent to or connected with Defendant, done on personal time on Plaintiff's personal twitter account, not linked in any to Defendant's websites.  It was done on personal time and was not posted using any Waverly software or hardware. There was no disclosure of Plaintiff's name or of any affiliation with Defendant. (Amended Comp., par 39, Appendix, 568-598)

10.   Defendant's Social Media Policy makes a clear distinction between "company owned assets" and "work-related" blogging on the one hand , and personal "blogging" on the other, also stating that "Waverly Heights respects the rights of employees to write blogs and use social networking sites and does not want to discourage employees from self-publishing and self-expression.". Accordingly, Plaintiff acted fully within the parameters of Defendant's Social Media Policy. (Amended Comp., par 40, Appendix, 568-598) (Affidavit, par 125)

11.   Defendant has a system and practice of progressive discipline which was not applied to Plaintiff. (Amended Comp., par 41, Appendix, 568-598)

12.   Applicable policies of Defendant state that it does not "discriminate against employees" when it comes to Social Media Policy, or anything else for that matter. Plaintiff contends that this is not the case when it came to her. (Amended Comp., par 42, 43., Appendix, 568-598)

13.   The environment at Waverly is a discriminatory good ole boy network as exemplified by former Board Chairman Charles Soltis' use of Waverly email to transmit his own unsolicited, base and deplorable political views, which included fallacious "birther" jokes and racial slurs against President Obama.  Plaintiff did not invite such emails, though she received them regularly. Mr. Soltis was never sanctioned for this activity.  (Amended Comp., par 43., Appendix, 568-598) (Affidavit, pars 29,61,62,110)

14.   Defendant's contention that Plaintiff violated any Social Media Policy is a mere pretext for firing her in retaliation for her repeatedly advocating for herself and other females.  (Amended Comp., par 44.,45,47., Appendix, 568-598)

15.   Defendant maintained an illegal and hostile working environment, characterized by sex discrimination disfavoring women and those over forty years of age. (Amended Comp., par 49, Appendix, 568-598) (Affidavit pars 48,64,65,67.69,86)

16.   Mr. Garvin has made it a point to tell Plaintiff and others: "You don't have to worry about your job, I am really not out to get the old timers." This in and of itself constitutes an admission of age discrimination. (Amended Comp., par 42, 43., Appendix, 568-598) (Affidavit, pars 66,67, 74,77)

17.   In January, 2016, Plaintiff decided to discuss her dissatisfaction with her performance review and compensation with Garvin, knowing full well that he would be unhappy and that he would hold it against her.  Since she was a direct report to Garvin, her only option was to advocate for herself.   Defendant Garvin's response was to become visibly upset with her for challenging his decisions. He then went so far as to question whether she could do her job at all.  After this meeting, Plaintiff and Defendant Garvin's relationship was never the same. (Amended Comp., par 52., Appendix, 568-598) (Affidavit, pars 47,121)

18.   In August, 2016, Plaintiff discussed another compensation disparity issue with Defendant Garvin. At the time, Waverly had only two Sr. VP positions. One was held by a male and the other by a female. Only the male was afforded a car.  The female Sr. VP of Healthcare was not and complained about the discriminatory situation to Plaintiff.  Again, not only was Defendant Garvin not receptive, but he was  hostile to this complaint brought by Plaintiff. (Amended Comp., par 53., Appendix, 568-598)

19.    The extent of the hostile working environment for women can be contrasted with the favorable environment enjoyed by Robert Supper, Sr. VP of Finance. Mr. Supper was a known drinker, but notwithstanding was provided a company vehicle. Notwithstanding this and

the liability it posed for Waverly; Mr. Supper was provided with a company vehicle while a woman of comparable status was not being provided with one.  In August of 2016, Mr. Supper took his family to Atlantic City.  With him was his son who has struggled with addiction issues and had a criminal record.  Sometime during the evening, his son removed the Waverly company vehicle from the hotel valet. Driving erratically, he was pulled over by the police. The Waverly car was impounded and he was arrested for DUI, drug possession and other offenses. (Amended Comp., par 55,56., Appendix, 568-598) (Affidavit, pars 5,35,36,59,78,121,137-138, 141-142, 156)

    20.   Defendant Garvin discussed the Supper car incident with Plaintiff in her office. Knowing that Defendant Garvin would not fire Mr. Supper for his obvious negligence, Plaintiff again sought to have Defendant Garvin remove the car from him, noting that there was no traveling required of him. Further, Plaintiff emphasized that the other Senior Vice President, a female, was being discriminated against by not having the same benefit. Garvin was emphatic in retorting that he would not bring about parity for the female Senior Vice President.  Instead, Defendant asked Mr. Supper to return the car. In turn Mr. Garvin replaced this perk with a new car stipend amounting to $10,500 per year.  Plaintiff again requested that Defendant Garvin simply take the benefit away, given the discriminatory optics of having two Senior V. P's of different gender with vastly different benefits.  Again, Defendant Garvin expressed resentment over Plaintiff's questioning his decision. Incredibly, given Mr. Supper's misbehavior, Mr. Garvin simply gave him a raise. (Amended Comp., par 58., Appendix, 568-598) (Affidavit, pars 54,56,57, 80-87)

    21.   Mr. Supper made it a practice of uttering degrading comments about women to those on Waverly's Leadership Team, as well as to his staff. He also made it a practice of

14

yelling, talking over, and dismissing women's comments in meetings.   When Plaintiff and

others complained, Defendant Garvin's response was dismissive, saying "It's just Bob."

(Amended Comp., par 59., Appendix, 568-598) (Affidavit, par 26)

### The Remaining Counts Allowed by this Court

Listed below are the remaining counts against Defendant Waverly:

> -Count I   Violation of Title VII of the Civil Rights Act of 1964 for Sex
> Discrimination, Maintenance of a Hostile Work Environment and Retaliation
>
> - Count II   Violation of Title VII of the Civil Rights Act of 1964, for Post
> Employment Retaliation
>
> -Count III Age Discrimination in Employment, Creating a Hostile Work
> Environment and Retaliation in Violation of the U.S. Age Discrimination in
> Employment Act
>
> -Count IV Violation of the Pennsylvania Human Relations Act for Sex and Age
> Discrimination in Employment, Creating a Hostile Work Environment and
> Retaliation

The elements of what is required to fulfill those respective counts were set forth in the

Amended Complaint as follows:

**As to Count I:**

65.        Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, *et seq.* as
amended by the Civil Rights Act of 1991 ("Title VII), makes it unlawful to discriminate
against any individual in the terms, conditions, or privileges of employment on the basis
of sex.

66.       Discrimination on the basis of sex that creates an abusive and hostile work
environment, such that the conditions of employment are altered, is actionable under Title
VII as sex discrimination. In order to establish a hostile work environment, five factual
elements must be established: (1) that the employee suffered intentional discrimination
because of his or her sex; (2) that the discrimination detrimentally affected him or her; (3)
that the discrimination was pervasive and regular; (4) that the discrimination would
detrimentally affect a reasonable person in the same position as the employee; and (5)
that respondeat Superior liability exists….

**As to Count II:**

78.    Section 704 of Title VII, cited by this Court in *Stezzi v. Citizens Bank of*

*Pennsylvania*, Civil Action No. 10-4333 at page four reads as follows:

> It shall be unlawful employment practice for an employer to discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice… or because he has made a charge… under this subchapter.

79.    As in *Strezzi,* Plaintiff contends that Defendant Waverly has violated Title VII in opposing her being granted unemployment benefits to the extent that Defendant Waverly has unsuccessfully appealed the determination that Plaintiff was eligible for benefits with the Commonwealth Court issuing an Order with findings that Defendant Waverly's arguments of racism and violation of Social Media Policy were both wanting. The appeal was made despite clear court precedent and plain statutory wording and applicable case law as to what constitutes "willful misconduct" as well as the wording of its own Social Media Policy.

**As to Count III:**

83.    The Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, *et seq.* as amended ("ADEA"), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of age.  At all times complained of herein, Plaintiff was an employee in the protected age category, of at least 40 years of age pursuant to 29 U.S.C. §631.

84.    The ADEA at Section 623 (a) provides that it is unlawful for an employer "(1)…to discharge or otherwise discriminate against any individual with respect to his compensation, terms conditions, or privileges of employment because of such individual's age; (2) to limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;" Further, Section 623(d) makes it illegal for an employer to discriminate against an employee for his or her opposition to unlawful practices.

**As to Count IV:**

95.    This claim arises under the Pennsylvania Human Relations Act ("PHRA"). The Pennsylvania Human Relations Act, 43 P.S. § 955 *et seq.*, makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment.

### III. PREVIOUS LITIGATION OF FACTS ATTENDANT TO THIS MATTER

Previous litigation between the parties has taken place with respect to whether or not Plaintiff violated Defendant's Social Media Policy should be viewed by this Court as being sufficient in and of itself to defeat Summary Judgment. Interestingly enough, Defendant's Brief and extensive appendix contain reference to Plaintiff's unemployment proceedings in attacking Plaintiff, but say nothing of the November 13, 2017 decision of Pennsylvania's Commonwealth Court in *Waverly Heights Ltd. v. Unemployment Compensation Board of   Review,* No. 312 C.D. 2017.  This decision was in Plaintiff's favor and uniquely bears on her federal case.

Interestingly, while Defendant took pains to include portions of the unemployment proceedings and interviews in  its Appendix submitted with its Motion for Summary Judgment proceedings, it omits the Commonwealth Court docket ("Pltf Exhibit 1") and decision ("Pltf Exhibit 2") as well as the preceding decision of the Unemployment Compensation Board of Review. ("Pltf Exhibit 3")

Most importantly, it was  Defendant which contested Plaintiff's unemployment taking this matter to the Commonwealth Court. The result was a ruling against Defendant regarding the self-same arguments made herein by Defendant as to the Tweet constituting "willful misconduct" at variance to Waverly's Social Media policy.  The very same argument was made after briefing and argument and decisively found to be lacking.

The Commonwealth Court opened its decision setting forth the language of Plaintiff's Tweet that is in issue here and noted the procedural history of the case. The local service center granted Plaintiff unemployment which employer appealed to a referee who held a hearing. The referee erroneously determined that Claimant's "behavior violated Employer's policy and fell below the standards of behavior Employer had the right to expect. Thus, the referee concluded

Claimant was ineligible for UC benefits under Section 402 (e) of the Law for willful misconduct.

Claimant appealed." *Waverly Heights Ltd,* at 2.

The Commonwealth Court went on to state:

On appeal the Board reversed. Based on the record created by the referee, the Board made the following findings. Employer maintains a Social Media Policy, which provides in relevant part:

[Employer] has an interest in promoting and protecting its reputation [,] as well as the dignity, respect, and confidentiality of its residents, clients and employees as depicted in social media, whether through [Employer's] own postings or that of others. Towards that end, [Employer] will actively manage the content of its social media sites to uphold the mission and values of the company. Also, [Employer] expects employees who identify themselves with [Employer] in either internal or external social media to conduct themselves according to this policy." *Waverly Ltd*., 2,3

The Court states that the Board found the Tweet did not violate Waverly's policy "because Claimant did not identify herself with Employer. The Court goes on to say that "Although her Twitter post identifies Claimant as a vice president of human resources for a company located outside of Philadelphia, the Board concluded that such a statement is 'overly-broad'. *Id.* The mere fact that Claimant 'follows' Employer's Twitter account is insufficient to say that she 'identified' herself with Employer. *Id.* Although an individual through additional research efforts, could determine that Claimant worked for Employer, the Board reasoned that 'such is not the standard presented by [E]mployer's [S]ocial [M]edia [P]olicy. *Id.,* Ultimately, the Board concluded that Employer failed to meet its burden of proving" willful misconduct" under Section 402(e) of the Law." *Waverly Ltd*. at 3.

Waverly then petitioned the Commonwealth Court for review.  In footnote 2 on page 5 the court states the extent of that review as being "limited to determining whether necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated." *Johns v. Unemployment Compensation Board of*

*Review,* 87 A. 3d 1006 (Pa. Cmwlth.) appeal denied, 97 A.3d 746 (Pa.2014). Further, the Court stated:

At pages 5 and 6, the Court emphasizes that the employer bears "the burden of proving that it discharged an employee for willful misconduct." citing *Adams v. Unemployment Compensation Board of Review*, 56 A.3d 76, 78-79 (Pa. Cmwltth. 2012) and went on to state that:

> This Court has defined willful misconduct as:
>
> (1) wanton and willful disregard of an employer's interests; (2) deliberate violation of rules; (3) disregard of the standards of behavior which an employer can rightfully expect from an employee; or (4) negligence showing an intentional disregard of the employer's interests or the employee's duties and obligations *Johns v. Unemployment Compensation Board of Review*, 87 A.3d 1006, 1009 (Pa. Cmwlth.) appeal denied, 97 A.3d 746 (Pa. 2014)

Then, citing the reproduced record the Court quotes the Social Media Policy requirement that an employee *"identify themselves with Employer"* and the fact that the Board found that Plaintiff did not so identify with Employer, but only as "a vice president of human resources of an unnamed company located outside of Philadelphia." Further, the Court noted that Plaintiff's "Twitter account is not 'linked' to Employer's Twitter page or website" and that "her personal Twitter feed did not represent the Employer." Moreover, "Her personal Twitter feed did not represent the Employer." *Waverly*, *Ltd.* at 6.

Now in support of its Summary Judgment Motion, Defendant has herein again  utilized the very same arguments that failed in previous litigation; suggesting that Plaintiff's  Twitter account was linked by virtue of some torturous and illogical process one could go through to identify Plaintiff , her place of employment, and thus the identity of Defendant.  The Commonwealth Court summarily dismissed that argument by stating that:

While one could investigate Claimant and ultimately determine the identity of her Employer in the process, the Board reasoned such is not the standard presented by Employer's Social Media Policy. Board Op., at 3; see N.T. at 17. Employer's policy clearly pertained to "employees who *identify* themselves with Employer. Because Claimant did not identify Employer in her Tweet or otherwise hold herself out as a representative of Employer on her personal Twitter page, the policy did not apply. Thus, the Board did not err in concluding that Claimant did not violate Employer's Social Media Policy. *Waverly Ltd.* at 6,7

The Court then went on to state that the Employer failed to prove that Claimant violated its Communications Policy, which provides that employees may not link from a personal blog or social networking site to Employer's internal of external website concluding  that there was no link to Waverly's website. *Waverly Ltd,* at 7

Again, what Waverly now claims in support of its Summary Judgment Motion has been litigated and determined to lack viability..  First, the Unemployment Board ("Pltf Exhibit 3') heard them and instead ruled for Plaintiff as claimant. Then Waverly took this case to the Commonwealth Court asserting that the Board erred by not finding Plaintiff's post to be racially charged, demonstrating a wanton and willful disregard for Waverly's interests and standards of behavior. Upon its review, the Commonwealth Court stated:

> Upon review, we conclude that the Board did not err in this regard. First, the record does not support Employer's assumption that "AA" stands for "African American." Contrary to Employer's assertions, Claimant never admitted to this. See *R.R.* at 25a, 80a. The certified record contains an exhibit listing various meanings for the acronym, AA," the first of which is "Alcoholics Anonymous," followed by "African Americans." R.R. at 67a. Claimant testified it stood for "Administrative Assistants." N.T. at 214.

> Notwithstanding, even assuming that AA stands for "African American," the Tweet did not "single out" "African- American" staff regarding their political preferences as alleged by Employer. Rather, the Tweet itself refers to "an informal survey of *our employees*," not just African-American employees. R.R. at 25a (emphasis added).

> Insofar as Employer contends that the act of taking an informal survey of political preferences during work defied Employer's standards, Employer offered no proof, beyond the Tweet itself, that she actually took a survey or poll of political preferences or

that she did so during company time. In fact, Employer's witness testified that Claimant merely shared a conversation with her regarding political preferences, but "it wasn't necessarily that she told me she was conducting any polls, it was just a conversation that she had shared." R.R. at 25a. Mere discussion of current affairs, such as an upcoming Presidential Election, do not rise to a level of disqualifying willful misconduct. *Waverly Ltd.* 9,10

Simply stated, the *Waverly Ltd.* Commonwealth Court decision undercuts and invalidates Defendant's argument as to why it fired Plaintiff, leaving for the jury the question of whether, in fact, Plaintiff was fired for discriminatory reasons. It is clearly for this reason that Defendant purposefully omitted the court's decision ("Pltf' Exhibit 2") as well as the Unemployment Compensation Board of Review's ruling ("Pltf Exhibit 3")  from Vol II of its Appendix otherwise including portions of the unemployment record.

Defendant seeks herein to reassert its clearly failing unemployment compensation arguments. (Def's Brief, 40-44) The simple fact is that on September 27, 2016 Plaintiff was fired. (Def's Brief, 1) Then on October 2, 2016 she applied for unemployment and on October 11, 2016 Defendant opposed it. (Def's Brief, 40) In November 2, 2017 Plaintiff prevailed in the Commonwealth Court of Pennsylvania (Def's Brief, 44) . The case demonstrates a clear factual difference between the parties as to whether the Tweet constituted "political activity… that could result in loss of IRS 501(c) (3) designation" (Def's Brief, 15) or merely an observation. The Commonwealth Court clearly indicated it was the latter.

 In having litigated the issue, the Commonwealth Court invalidated Defendant's contention that it articulated a legitimate non-discriminatory reason for Plaintiff's firing. In so doing it validated Plaintiff's position that Defendant's reason was mere pretext.

### Issue Preclusion

As cited by this Circuit's Court of appeals in *Swineford v. Snyder County, Pa* 15 F3d 1258 (February 4, 1994),  issue preclusion also known as collateral estoppel bars relitigation of

issues adjudicated in a prior action. *Bradley v. Pgh Bd of Ed*, 913 F.2d 1064, 1074 (3d Cir 1990). Further, as cited by *US v. Utah Const and Mining Co*., 384 US 394, 422, 86 S.Ct 1545, 1560, 16 L.Ed 2d 642 (1966) "a losing litigant deserves no rematch after defeat fairly suffered, in adversary proceedings, on an issue identical in substance to the one he subsequently seeks to raise." What is more, federal courts must give a state court judgment the same preclusive effect as would the courts of that state.  See 28 U.S.C. Sec 1738 (1988), see also *Mira v. Warren City School Bd of Education*, 465 U.S. 75 (1984)

There is a question as to whether unreviewed state agency decisions can be considered as preclusive for collateral estoppel purposes. However, thanks to Defendant's elevating the matter to the Commonwealth Court, we don't have this problem here. Even for unreviewed state agency decisions, Pennsylvania courts apply issue preclusion when four conditions are met: first, the issue determined in the prior action is the same as that in a subsequent action; second, the party against whom the defense is invoked is identical to or in privity with the party in the first action; third, the previous judgment is final on the merits; fourth the party had a full and fair opportunity to litigate on the merits, *Safeguard Mut. Ins. Co., v. Williams,* 463 Pa 567, 345 A.2d 664, 668 (Pa. 1975). Regardless of the fact that this case was finally determined by the Commonwealth Court, reviewing the agency action, the four conditions are met here.

The Superior Court in *Frederick v. American Hardware Supply Co.*, 384 Pa. Supper. 72, 557 A.2d 779 (1989) held that an earlier decision of the UCBR denying plaintiff's compensation because of willful misconduct precluded plaintiffs from asserting that they had been wrongfully discharged in a subsequent contract claim. There, the Court found the Unemployment Compensation Board of Review's prior determination that the employee engaged in willful

misconduct was the equivalent of good cause permitting discharge in the subsequent contract suit.

At the very least, this Court should take judicial notice of what has been litigated previously.

## IV. TESTIMONY IN SUPPORT OF PLAINTIFF'S STATEMENT OF FACTS AND IN REBUTTAL OF DEFENDANT'S FACTUAL ASSERTIONS MADE IN ITS BRIEF

### Affidavit of Kathleen M. Jungclaus

In light of Defendant's heavy reliance upon affidavits of persons it controls, Plaintiff has submitted her own affidavit ("Pltf Exhibit 4" or "Affidavit") addressing those averments and putting the facts squarely at issue; facts that only a jury can decide.  Moreover, a reading of Plaintiff's affidavit shows support for the statements of fact asserted hereinbefore, which in and of itself precludes a summary judgment ruling in favor of Defendant. However, given the undersigned's assertions about the limited nature of an affidavit, Plaintiff relies more heavily on the deposition testimony taken in this case.

### Deposition Testimony of Plaintiff- Day 1 (KJ Dep I, Appendix 622-690)

The following comprises pertinent testimony of Plaintiff taken in her deposition. Reference is made to Defendant's appendix pages when citing "Appendix."

Plaintiff has a Twitter account (KJ Dep I p18, Appendix 627)

Plaintiff 's Twitter account is "not linked in any way" to Defendant. (KJ Dep I p 20, Appendix 627, Commonwealth Court Op in *Waverly*) Nor has Plaintiff violated applicable Waverly policy. (Affidavit, par 125, 126)

Plaintiff asserts that her husband articulated the Tweets and she posted them on her Twitter account. (KJ Dep I, p 21, Appendix 628) No poll was taken by Plaintiff of Waverly employees. (Affidavit, par 1)

Plaintiff maintains that both she and her husband were Vice Presidents of HR at different companies (KJ Dep I, p 22, Appendix 628)

With respect to a conversation with social worker Maria Di Paul, Plaintiff testified that " I never asked her who she was voting for. I never had that conversation" (KJ Dep I, p 26, Appendix 629) The conversation that Plaintiff did have with her was to consult with her about the propriety of kitchen employee Basheer Womack's just previously having asked Plaintiff who she was voting for.( KJ Dep I, p 23, Appendix 628)

Contrary to Defendant's contention that politics should not be discussed, Defendant's CEO Tom Garvin often initiated political discussions with Plaintiff. (KJ Dep I, p 26, Appendix 629) Specifically, "On many occasions Mr. Garvin engaged me [Plaintiff] in conversation about politics and the up and coming election. Indeed, in these conversations were discussions brought up by him about whether minorities would vote for Donald Trump. Based on these conversations' the disgusting political email transmitted over the Waverly email system by Board Chair Soltis' and Tom Garvin's and Waverly's open environment accepting them I [Plaintiff] NEVER thought my observation-based tweet would be objectionable." (Affidavit, par 63)

In the discussions leading up to Plaintiff's publication of the Tweet, she never asked anyone who they were voting for. (KJ Dep I, p18, Appendix 627) (Affidavit, par 1)

Plaintiff testified that Commonwealth Court found in her favor and that there was nothing wrong with the Tweet. (KJ Dep I, p 30, Appendix 630)

Plaintiff signed a verification of her Amended Complaint and was aware of its meaning. (KJ Dep I, p 34, Appendix 631)

Plaintiff protested the treatment of women to Waverly CEO Garvin. (KJ Dep I, p 48, Appendix 634)

Plaintiff protested her minimal bonus because of gender and never received more (KJ Dep I,  p 49, Appendix 635) even when  a male, Mr. Heil, who lacked a college degree made more and received bonuses of several $1,000 each year, sometimes twice a year. Plaintiff  "disagreed that I didn't provide the same kind of contribution." (KJ Dep I, p. 52, Appendix 635)

Plaintiff testified as to the consequences of complaining to  others than Tom Garvin:. "But the message is, you go to Tom and you don't go to anyone else,… if you  do ..[you are ] going to get fired." (KJ Dep I,  p.56, Appendix 636) Plaintiff was informed of this by Anne Rogers. (KJ Dep I, p. 56, Appendix 637) Plaintiff was asked if there came a time when she wanted to go over Mr. Garvin's head and her response was that she was afraid of being fired. (KJ Dep I . pps. 68,69, Appendix 639,640) Further, she did not feel that it was her role to go above CEO Garvin (KJ Dep I, p.77, Appendix 642). Upon her firing, when Plaintiff specifically asked to go to the trustees, this avenue was refused as she was told that her firing was a final decision. (KJ Dep I . p.94, Appendix 646)

Plaintiff was asked as to whether she did have a discussion with attorneys. While complaining to her superior clearly sufficed under the law, Plaintiff did consult with attorneys including Defendant's labor counsel, Ms. Sandler, Esq., and her sister, Attorney Dana Reider ( KJ Dep I, p. 69, 72, Appendix 640).

Plaintiff consulted with Attorney Sandler and also Ms. Feher who contacted her repeatedly about problems with Mr. Supper's behavior (KJ Dep I., p.161, Appendix 663)  Ms.

Sandler suggested that she go to Mr. Garvin. Plaintiff did so and described Mr. Supper's discriminatory treatment of others including women, minorities, and those over forty years of age as well as a hostile environment when it came to Defendant's tolerating the discriminatory behavior of Mr. Supper. . Mr. Garvin's response was - "It's just Bob. (KJ Dep I ., p. 70, 79, Appendix 640, 642) On more than one occasion Plaintiff had conversations with Ms. Sandler "about the way Tom Garvin was handling certain employment issues and creating a hostile work environment." (Affidavit, par 143)

As far as rebutting Defendant's assertion that Plaintiff could have used the Waverly hotline for reporting misconduct, to Plaintiff testified that from her knowledge, it was only used for a pizza delivery. (KJ Dep I., p.73, Appendix 642).

Plaintiff testified as to the discriminatory attitude held by CEO Garvin and the hostile environment created by him with respect to age. This was evidenced by his comments addressed to Plaintiff and others concerning his getting rid of older employees, or bullying them as he did Meg Gueneur, and then covering himself by saying to others that it really wasn't based on age. (KJ Dep I, pps. 81,83, Appendix 643) Shared common experience shows that when the speaker volunteers statements such as this, or "I don't want you to think we're racist."( KJ Dep I .p. 97, Appendix 647 ) that such disclaimers are an admission of the very discrimination being denied. that race and/or age are exactly age or race. It's reminiscent of the phrase: "Some of my best friends are _____".

Plaintiff contends that up until her advocacy for herself as a female in December of 2015, that interaction with CEO Garvin was not hostile. (KJ Dep I .p 90-92, Appendix 645)

I believe that up until December of 2015, I had a very nice, collegial working relationship with Mr. Garvin. He included me—I was with him in almost every meeting that he held…. (KJ Dep I., p. 90, Appendix 645)

…

And I asked him in that meeting if it was going to interfere in our relationship moving forward, and he said no, but from that day forward, he approached me with an arm's length. I was never included in anything else after that, it was distance and silence. (KJ Dep I, p. 91, Appendix 645)

And I went home and I said to my husband, I know that I'm going to get fired; it might not be today, it might not be next week, but he's going to fire me for something, and that's exactly what happened.( KJ Dep I, p 91, Appendix 645)

 According to Plaintiff, age has always been a motivating factor with CEO Garvin when it came to replacing older employees with younger employees. (KJ Dep I .pps 100,101, Appendix 647-649)

Plaintiff testified that stress has developed to such a level with her firing that she has been forced to see a practitioner for the last one and one/half years.  (KJ Dep I .pp.135, 145 Appendix 656,658)

Plaintiff testified that, together with a host of others, she was included as a recipient of email from Board Chair Chuck Soltis on the Waverly email system (Appendix 408-568) These emails can only be characterized as being anti-Semitic, racist and anti-feminine political demagoguery. When she complained to CEO Garvin, he simply shrugged it off, doing nothing whatsoever, because it came from the Chair of the Board. (KJ Dep I p. 143, Appendix 658)

Plaintiff complained to CEO Garvin over a specific incident of her being sexually harassed and he just laughed, doing nothing whatsoever.  ( KJ Dep I, p. 157, Appendix 661)

**Deposition Testimony of Plaintiff – Day Two (KJ Dep II, Appendix 691-817)**

Plaintiff  testified as to Mr. Supper's  demeaning behavior directed to women,  "He was demoralizing and humiliating to his wife on the telephone that was audible to Amy Blessing, and she was very upset about most of the phone calls that he had with her, he would call her names, and he was demeaning to her, and in the—in the business setting, he was just overbearing." He would swear at women. (KJ Dep II, p. 5,6, Appendix 693) Plaintiff testified that he was harassing on practically a daily basis. (KJ Dep II, p.64, Appendix 708)

Plaintiff testified about  communications from an employee who contacted her about information he purportedly had about her firing. . She testified that he said "I mean how much is it worth to you?"  He told her that he could lose his job over it. (KJ Dep II, p.25, Appendix 698)

Plaintiff was questioned about Waverly's "open door policy" and "employee problem solving procedure." Her response was that "The employees still had fear to go to their director or the President for fear of retaliation and termination." (KJ Dep II, p.39, Appendix 701) At the same time Plaintiff agreed that it is also the employer's obligation to ensure an environment free of discrimination   KJ Dep II, p. 41,Appendix 702)

Plaintiff testified that she wrote the employee handbook which contained the Social Media and Communications Policy, which was reviewed by senior leadership and edited. Ultimately it was approved by CEO Garvin. (KJ Dep II, p. 45, Appendix 703)

Plaintiff was asked "Do you have an opinion as to whether you were expressing political speech ?" Her  answer was  "I think I was expressing free speech; I don't necessarily think it was political."( KJ Dep II , p. 60, Appendix 706)

Plaintiff again testified that CEO Garvin would repeatedly make the claim: "Don't worry I'm not getting rid of the old timers" (KJ Dep II, p. 66, Appendix 708)

Plaintiff against testified that board member Scott Jenkins acknowledged to her that Waverly was a "boys' network." (KJ Dep II, p.69, Appendix 709)   Asked if Amy Blessing told her that "when it comes to Garvin and the Board, that they're a bunch of, quote, good old boys; that they're the good old boys club?", Plaintiff's response was. "Yes." (KJ Dep II pps. 88,89, Appendix 714)

When asked about a hostile environment with respect to women "And is it your position that Mr. Bauer forwarded e-mails that were offensive to you from the standpoint of gender?", Plaintiff's response was "Yes."  (KJ Dep II, p.70, Appendix 709)

When asked about her not going to the board with her complaints, Plaintiff stated " If I went to the Board of Trustees I would have been immediately terminated, because they would have picked up the phone and called Tom and said Kathy said this, and that would have been the end of my job, so to think that I could go to the Board with anything is ludicrous."( KJ Dep II, p. 73, Appendix 710)

Plaintiff was asked what she considered to be post-employment retaliation. Her response was:  "The retaliation, the post-termination retaliation, came in the unemployment case. Never in the history of Waverly Heights was any unemployment claim taken to the Commonwealth Court. That was a post-termination retaliation because Tom's ego couldn't stand the fact that I won my unemployment, and so he sued me all the way to the Commonwealth Court, costing me thousands of dollars to defend myself, and because it was an unprecedented finding it got published all over the internet and on every legal review, so I call that post-termination

retaliation; nothing like that ever existed in the history of Waverly Heights." (KJ Dep II, pp. 75,76, Appendix 710)

Plaintiff testified further about how her relationship changed with CEO Garvin after a January, 2016 meeting with him when she complained about her bonus in the context of discrimination. "Sure. In my relationship prior to that meeting I spent hours with Mr. Garvin during the course of a week, and it could be doing anything from walking through the Healthcare Center to meeting about various topics. After that initial meeting, if I saw Tom once every two weeks or once a month, it was a lot."  (KJ Dep II, p. 81, Appendix 712)

Plaintiff was asked about Mr. Soltis' emails: "When it comes to these offensive e-mails, okay, was there ever a time that Mr. Garvin stood up or the Board stood up and said., Soltis, knock it off--- ?" Her answer was "No."  (KJ Dep II,  p, 89, Appendix 714)

Plaintiff was examined by Defendant with respect to her EEOC charge which read as follows:

I have been discriminated against by virtue of being female, by male CEO Thomas Garvin who has been supported by a Board of Trustees that upholds one set of standards for females and another for males. After serving as the HR Manager for almost 20 years, I was fired on September 27, 2016 purportedly for violation of the Waverly "Social Media Policy." In point of fact, I did nothing of the kind. This should be contrasted with a board member's actually using Waverly email to communicate racist "birther" criticism of President Obama. I have been subjected to an illegal, sexist environment as well as age discrimination which culminated in my firing. Further, I have been retaliated against as a result of my sex and sexual orientation and as a result of my standing up for my rights and the rights of other females. Mr. Garvin and the Board have created and maintained an illegal and hostile working environment when it comes to me, other females and those over 40. I have been replaced by a younger candidate." (Ex to KJ Dep II)

### Deposition Transcript of Raymond Jungclaus ( RJ Dep, Appendix 818-860)

Defendant deposed Plaintiff's husband asking him to characterize  an "informal survey". His reply was that it meant "through discussions". He distinguishes between formal and informal surveys saying that a formal survey is written survey, "An informal survey to me is a discussion

with people."  He stated that he formulated the Tweet and spoke of his company as well. He also

testified that he was the author of the Tweet, that he meant to refer to African Americans and that

he also was a VP of Human Relations.  (RJ Dep, pp. 20,21 Appendix 823)   He corroborated

Plaintiff's testimony explaining that the Tweet resulted from  his asking her to type it, like

dictation a court stenographer. (RJ Dep, p. 36, Appendix 825):

> Q. "It is my understanding correct that you two were in a car, and she related what had
> happened in work when she had talked informally to other employees and that you then
> said, This is—this is something we should send to Donald Trump. …… Q. Okay. And
> then you basically dictated the language that eventuated into RJ-1; is that correct?
>
> A. I did. , based on a conversation they were having, about what taking place at both
> places of employment. (RJ Dep, p 8, Appendix 839)

 He went on to testify about the Tweet" "It was based on Kathy having some conversations at

work, but I agreed with those and I dictated it based on that. Did you speak to any of your fellow

coworkers about the election? I mean, everybody was talking about the election I think that's

pretty common." (RJ Dep, p. 97, Appendix 839)

Mr. Jungclaus testified that he was shocked at her firing and the manner in which it was

handled: "People were always given progressive discipline."  Further, "Well, that was a personal

Tweet on a personal account." (RJ Dep, p. 24 Appendix 824)

When asked about his wife's not "reaching out" to the board (notwithstanding the fact

that she testified that she wanted to speak with the Board), he testified that if the firing as

represented by Garvin was unanimous, "then what would be the point of reaching out?"  (RJ

Dep, p. 27, Appendix 825)

This deponent validates Plaintiff's concern about Mr. Supper, recalling: " She said that he

was demeaning to female staff." Further he recalled that Mr. Supper talked over "only the

women". (RJ Dep, pps. 45,46 Appendix 830)  He recalled Plaintiff  telling him "that there was

two people with the same title, Bob [Supper] and another woman, I think Meredith, who had the

same title, and Bob had benefits that were different than the female with the-the same title "( RJ

Dep p 48 Appendix 830)  Further, "She felt that she was being discriminated against by Mr.

Garvin financially, and that other women in the workplace were being discriminated against by

Mr. Garvin in the workplace." ( RJ Dep, p. 53 Appendix 832) When asked about what was

demeaning, he replied "Ah, yeah, he would say things of a sexual nature during a meeting that

were inappropriate for a business meeting."  (RJ Dep, p.57, Appendix 833)  He testified further

to the fact that his wife was advocating for women in the leadership committee with regard to

Mr. Supper's demeaning treatment. (RJ Dep, p. 63, Appendix 834)

Mr. Jungclaus remembered Plaintiff telling him after the December, 2015 discussion with

Mr. Garvin that "she came home from that discussion and she told me that she was afraid she

was getting fired." She was fearful that she was challenging him.  (RJ Dep, pps.54,55, Appendix

832)

As far as his own experience, Mr. Jungclaus was asked what he would have done were he

in his wife's shoes. "Well, as an officer in a company, it's a very touchy situation when you have

an issue with your boss You don't have a lot of leverage, you're afraid for your job. It's not like

a public company where, you know, you have avenues, so I would have a discussion with my

boss. And as to the matter of going to the board:  "She never told me that she reported that to the

Board, I wouldn't do that in her situation, nobody in their right mind would." (RJ Dep, pps

54,55,59,60, Appendix 833, 833)

Asked why he believes that his wife was fired, "I believe that she was terminated because

she was advocating for herself and advocating for other women in the workplace for fair

compensation, and that Mr. Garvin didn't agree with her and that he used his anonymous letter as an excuse" (RJ Dep, p 62, Appendix 834)

When it came to the Soltis emails, he branded them as being  blatantly racist and  "I believe she complained to Mr. Garvin." (RJ Dep, pps 73,74 Appendix 837)

When he was asked if, in his job capacity, he would have denied Plaintiff unemployment, his response was: " I don't think so" … "So, even in case -so- so you never bring a case to the unemployment, the employer never brings a case to unless it's something egregious like stealing. The employer virtually never wins unless it's something like that. Or, you know, if they just don't show up for work." Then he was asked, "If you really want to get somebody to sue you, you deny their unemployment." His answer was, "Yeah, for sure." (RJ Dep pps 82, 83 Appendix 839)

Mr. Jungclaus also testified that  his wife complained to him about CEO Garvin jocularly saying, "ah I don't want you to think that I'm just out to get the old folks." (RJ Dep  90, Appendix 841)


**Deposition of Anita Summers (AS Dep, Appendix 861-911)**

Ms. Summers testified that she was a member of the Waverly Board who also chaired the ethics committee.  (AS Dep, p16, Appendix 865)

Ms. Summers was asked if the Board ever considered emails of Mr. Soltis (AS Dep Exhibit 1, Appendix 875-894):

> Q. Would it concern you if there were emails that were distributed over the years from Mr. Soltis to Mr. Garvin and other Waverly employees that were sexist or anti- semitic or racist? Would that bother you?

A. Of course it would bother me.

Q. But nothing was ever raised at the board level?

A. Never." (AS Dep, pps 19, 20. Appendix 866 )

**Deposition of Richard Bauer (RB Dep, Appendix 912-1039)**

Mr. Bauer and CEO Garvin sat through the depositions conducted in this matter. At Mr. Bauer's deposition, he testified that he has been a Waverly Board member board member since 2010 and Board Chair from 2015 through 2018 (RB Dep. pps. 6,13. Appendix 914, 915)

He admitted that there was never any consideration of progressive discipline for Plaintiff. (RB Dep, p 17, Appendix 916),  that the HR committee met with its counsel on the telephone prior to the firing (Grace Deon, Esq., the same party defending Waverly in this case) and that, in fact, the full board was not involved in the decision to fire Plaintiff. (RB Dep, p 25. Appendix 917, 918)

Mr. Bauer  admitted that he received the emails from Board member Soltis that were presented in this case (RB Dep, p. 27, Appendix 919) and that typically he was listed as the first recipient on those emails sent to a host of people including Waverly board members, and employees, including Plaintiff, at their Waverly email addresses. (RB Dep, p 56, Appendix 925) When presented with one email entitled "The unspoken success of Obama Care" which included a  statement that Obama Care involved Marxist tactics, he said he didn't read it " Because typically, e-mails coming from Chuck that appear to have any kind of political or social connotation to it went straight to the delete box."  (RB Dep, p 58, Appendix 926) He acknowledged that it bothers him that they went to people who worked at Waverly. Notwithstanding his statement that he didn't read the emails,  he testified that "I'm sure I read

34

some of them." (RB Dep, p 67, Appendix 929). Noteworthy was the fact that he admitted that he was not a passive recipient, but that he did recirculate one of them. (RB Dep, p 59, Appendix 926). When asked to depict the emails as being "unfair", his response was "I don't know how to answer. I simply don't know. This is—it's a lot of junk." (RB Dep, pp 62,63, Appendix 928) While Mr. Bauer purported not to remember some emails, he remembered their velocity as being "more than I would have liked, because I don't travel in it.". He testified that he was getting them once a week. (WB Dep, p. 65, Appendix 928) When asked if he viewed them as being detrimental to Defendant, he testified "I don't think anybody would like to see stuff circulated that doesn't help the overall cause." (WB Dep, p 67, Appendix 929)

Being shown one email after another directed to him that he received from Mr. Soltis, he claimed that he did not remember getting them. (WB Dep, pp 70-74, Appendix 930) One of the Soltis emails shown to him showed Hilary Clinton in a tiara with a host of falsehoods printed in the email and then another entitled "Trump's First Day" which, in part, says:

> Barack Obama flees the United States under cover of darkness and homeland of Kenya before his trial for treason begins. He deplanes on jungle airstrip. It was reported that he was last seen wandering through singing "Hakuna Maatata' with a chimp named Commie………. And Hilary Clinton is in prison where she belongs. Her cell is directly next to Jesse Jackson and Al Sharpton who are serving time. (WB Dep, p 75, Appendix 931)

When asked whether the board ever had an occasion to investigate any's social media post, Mr. Bauer's response was "I don't know." (WB Dep, p 82, Appendix 933)

The Soltis emails shown to Mr. Bauer are found at Bauer deposition Exhibit 4, Appendix 964. They are captioned as follows:

"The unspoken success of ObamaCare",

"Famous Presidential Lies Contest",

"What Egyptian News station react to Obama's speech on global security",

"Truly a travesty. How dare they swear someone in as a Federal judge using the Koran.'"

"Suggested Debate Question for Hilary",

"We Have Not Yet Begun to Fight",

"Our Leader! Clearly well respected internationally.",

 "Trust is Gone",

"Rev Graham to Obama, Unlike Christ, Mohammed 'Killed Many Innocent People' His 'True Followers' Emulate Him",

A picture of Hilary in tiara and letter from her signed "Your Queen-in-Waiting 'and 'Trump's First Day"

They can only be classified as disgusting, bigoted, political discourse. The above-referenced unchallenged emails circulating on the Waverly email system  need to be contrasted with the innocuous observation Tweeted by Plaintiff, that Defendant claim was the reason for her firing.

Additionally, Mr. Bauer  testified that the board committee endorsed Garvin's resolution for Mr. Supper's misuse of a company car by taking the car away and then giving him an allowance for a car (WB Dep, p 45 Appendix 923)

**Deposition of Tom Garvin Day 1 (TG Dep I, Appendix 1040-1171)**

CEO Garvin testified that Plaintiff gave him police reports with respect to Mr. Supper's son  (TG Dep I, p 29, Appendix, 1047) and that Plaintiff complained to him about the provision of a car for Mr. Supper and not for Ms. Meredith Feher. (TG Dep I, p 34, Appendix 1048)

Throughout his deposition CEO Garvin claimed "I don't recall," such as when pressed on the details of the Supper car incident/ accident in Atlantic City. Further, although he sat through Plaintiff's complete deposition, when asked what exactly he disputed about Plaintiff's testimony he said "I dispute a lot of what she has to say." However, when asked to particularize what it was he disputed, his response was "I don't recall." (TG Dep I , p. 36, Appendix 1048)  When questioned about Mr. Supper's son's use of the Waverly car given the son's rap sheet, Mr. Garvin's answer was "Honestly what happens with Bob' Supper's son is between him and his family."  (TG Dep I, p 39, Appendix 1049) This showed a complete disregard for protection of Waverly's interests in this instance.

Further he testified that no one complained about Supper's alcohol use. (Dep. 41, Appendix 1050) This is simply contrary to the facts. Mr. Supper's alcohol use was "renowned" amongst employees and board members. Mr. Garvin made it known that he was concerned about Mr. Supper's alcohol use and his having a Waverly car.  (Affidavit, pars 5,80)

When it came to progressive discipline as a result of Plaintiff's Tweet, he said that there was no counseling extended to her and that there was no consideration or conversation about her qualifying for progressive discipline. (TG Dep I , p 48, Appendix 1051) At another point he took another tack and did not recall if there was a consideration of progressive discipline in terms of the firing decision. (Dep. 50, Appendix 1052).

His explanation for the decision to fire Plaintiff was "No. We all went into it to make—to see what the right decision would be, and based on the content of the Tweet, the collective feeling of the entire group, the unanimous decision was that it was conduct that was very unbecoming of the Vice President of Human Resources, very unprofessional, singling out a –you know, a class of individuals, a protected class, doing a poll at work, putting it out there; the way it came about is exactly the type of thing that you would be concerned about happening (TG Dep I , p 55, Appendix 1053)  He claimed that he was  worried about "the position that we felt it would put us – could put us in for future cases would be very difficult if this because produced as part of evidence, perhaps somewhere down the road in another case….." (TG Dep I, p 58, Appendix 1054).   He emphasized that at all times the board acted in a "professional manner". (TG Dep I , p 61, Appendix 1053) Further, he testified, "but I understand my job and my job, as an employer and as the CEO, is to protect my company"  (TG Dep I , p 56, Appendix 1053) This should be contrasted with his professed  lack of concern with "protecting my company" when it came to  the disgusting Soltis emails that were transmitted throughout the Waverly email system

Again this sort self- serving language about professionalism at Waverly and his professed concern for protecting "my company" when it came to Plaintiff's Tweet are noticeably absent when it came to his regard for the Soltis emails.   When Mr. Garvin was questioned about the professionalism of the Board and the Soltis emails, his answer was "So. Mr. Soltis, with the e-mails, I would say no, that that was not always professional.

Q. "Did you ever say to him hey, tone it back?"

A." No I did not." (TG Dep I, p 62, Appendix 1055)

Notwithstanding his professed concern for the institution, instead of looking into them, he claimed that he just deleted them: "I have zero time and energy for that, spend no time reading them and delete them right away, so the content of them is not something that—that I was privy to." (TG Dep I, p 63, Appendix 1055)

So much for Mr. Garvin's concern for the institution.

He continued to reiterate that he had no time for salacious email sent throughout the Waverly system, but he had time for Plaintiff's Tweet.

Q. "But you had time for Ms. Jungclaus', right? …..Q. Is it your position that you didn't have time to read some of the Soltis e-mails or any of them, but you had time to look at Ms. Jungclaus' Tweet?"

A.  "So I received an anonymous letter that come to me in the mail, and so I read my mail that comes to me in hard copy." (TG Dep I, p 64, Appendix 1055)

Apparently, communication from an anonymous source regarding Plaintiff's personal Tweet away from the Waverly system takes precedence over Mr. Soltis' sordid communications on the Waverly email system . Later on, Mr. Garvin simply would not answer whether the Soltis emails were harmful to the reputation of Waverly, saying simply that he didn't review all of them. (TG Dep I . 70, Appendix 1057)

Mr. Garvin acknowledged that Plaintiff may have been on the receiving end of some email. He was then asked:

Q.  Is it possible that Ms. Jungclaus looked at the Soltis e-mails and made a decision that what she was going to text was much less offensive; is that possible?

A. I do not know." (TG Dep I, p 66, Appendix 1057)

Yet it was Waverly's tolerance for the Soltis emails that prompted Plaintiff to issue her Tweet. "Based on these conversations [with Garvin] the disgusting political email transmitted over the Waverly email system by Board Chair Soltis' and Tom Garvin's and Waverly's open environment accepting them, I NEVER thought my observation-based tweet would be objectionable." (Affidavit, par 62)

Further, Mr. Garvin disputed Plaintiff's contention that people were afraid for their jobs. (TG Dep I, p 81, Appendix 1060)

When specifically asked who advocated Plaintiff's termination, ironically Mr. Garvin sought to avoid responsibility, answering "It was a –the HR Committee's decision. I didn't advocate one way or the other." (TG Dep I, p 109, Appendix 1067) Again, like his concern for "my company" and his self-described professionalism, this testimony simply isn't credible. The idea to fire her didn't come out of thin air.

Interestingly when later asked why Ms. Jungclaus was fired, he testified that it was "for the Tweet"  ((TG Dep I, p 131, Appendix 1072)

Next, Mr. Garvin's testimony returned to the world of "not recall" He testified that Waverly had engaged a public relations firm employing a Ms. Buehler and showed her correspondence sent on behalf of Defendant. The question was then posed to him: "Did you ever have a discussion with Ms. Buehler about the PR aspects of Mr. Soltis' hate e-mail?" "His answer was "I don't recall." ((TG Dep I, p 126, Appendix 1071)

Most noteworthy, other than the investigation of the Tweet of Ms. Jungclaus, Mr. Garvin testified that Waverly had never investigated the social media practices of others. (TG Dep I, p 129, Appendix 1072)

While blaming the Board for making the decision to fire the Plaintiff, Mr. Garvin testified that he never brought up specific handbook policies with the Trustees. (TG Dep I, p 133, Appendix 1073) So now we are to believe that a Board which did not have the specific policies before them nevertheless made the critical decision to terminate the 20 year employment of Plaintiff who was VP for HR.

Applicable policies were read to Mr. Garvin as follows:

"The heading Personal Blogs, under it the first sentence says Waverly Heights respects the rights of employees to write blogs and use social networking sites and does not want to discourage employees from self-publishing and self-expression. Is that correct?"

His answer was "That's what it says. Yeah……"

Then the question is posed "….. it says Waverly Heights respects the rights of employees to use blogs and social networking sites as a medium of self-expression and public conversation and does not discriminate against employees who use their media for personal expressions and affiliations or other lawful purposes. Is that what it says?"

His answer was  "That's what it says."

The following question was "So did my client violate those two sentences ?"

The answer that Mr. Garvin gave was unresponsive: "She connected herself very clearly to Waverly Heights in a, you know, public domain, where she singled out a class of employees on their race,, in that case, conducted a poll and then kind of bragged about it and said 100 percent of those that she polled were voting for Trump, so…"   (TG Dep I, p 134,135 Appendix 1073)

Moreover, he wouldn't address the fact that this issue of whether or not the rules had been followed had already been litigated in the unemployment compensation hearings.

Q. "Wasn't the language of the Social Media Policy brought into focus in those proceedings?"

A. "I believe that it was…."

Q. "What about this next paragraph: "Employees are not permitted to use employer owned equipment including computers, company licenses software or other electronic equipment nor facility or company tine to conduct personal blogging or social networking activities. Did you find that she anything there that involved employer owned equipment, et cetera?"

A. I really don't know when she did her Tweeting., (TG Dep I, p 138, Appendix 1055)

Then he said he was "not sure if she used [Waverly] equipment". Ultimately, despite the Tweet's plain words, he would not admit that there was nothing in Plaintiff's Tweet whatsoever referring to  Waverly Heights.  (TG Dep I, p 139, Appendix 1055) Then in his answer he brings up another section of the handbook: " And I see also,   ….Employees are not permitted to use blogs or social networking sites to harass, threaten, discriminate, defame or disparage other employees, residents or anyone associated with or doing business with Waverly Heights. "

Q. "And you felt that she did that?"

A. "I felt that she singled out a class of employees .within her Tweet …"  (TG Dep I, p 139, Appendix 1055)

 Yet, despite his words that she "singled out a class of employees", he then backs away from the question of whether Plaintiff was a racist, referring to his canned notes that when she was fired and when she asked if they thought she was racist they said "absolutely not." (TG Dep I, p 140, Appendix 1055)  Again he simply is not credible.

The exchange became heated over Plaintiff's concern that Mr. Garvin's testimony was questionable. The undersigned accused him of making gratuitous comments and not remembering things. Instead of admitting that no reference to Waverly exists in the Tweet, Mr. Garvin claimed that one can connect it up with Waverly because of the phrase "VP of HR in comp outside of Philly." This response is then contradicted by him. When asked how many VP's

are in companies outside of Philadelphia, his response was" I am sure there are plenty"   On the

question of linkage of her twitter account and Waverly, he claims that she indirectly linked her

account, going through a convoluted process to click on the Waverly website , and then click on

"followers." However, when it came to the simple question:

> Q "If I click on, as I have, Waverly Heights' external website, does Kathy Jungclaus
> come up?"
> A. "No."

When he was asked if there was any language on the Tweet referring to Plaintiff as a

spokesman for Waverly, his response was "No." (TG Dep I, pp 141-145, Appendix 1075,1076)

Mr. Garvin's deposition revisited the Soltis emails. Initially, he claimed that he

did not know the content of the Soltis emails:

> A."—so whatever the content was, if it wasn't business related would get immediately
> deleted by me. I don't have time to read a bunch of e-mails that don't pertain to work."

He further testified that he was not concerned because it was not coming from an employee:

> . Q. "Didn't you consider him at the time to be your boss?"

> A. "Well, he was the Chairman of the Board at the time.

> Q. "And you felt you could just disregard what he had to say, right?".

His counsel instructed him not answer the question. Mr. Garvin went on to state "You

know, I give Board members the professional courtesy, but I—I do what's right for the

organization." (TG Dep I, pp 181-184, Appendix 1085)

Mr. Garvin came to acknowledges that the Soltis emails were political as he said " I'm

not a political person and I'm not interested in that and so I would just delete then." What is

more, unlike Plaintiff's innocuous Tweet, he said that he had no problem with the Soltis emails being in the public domain. When asked if Jewish people would want to be at Waverly if they saw the Soltis emails,  Mr. Garvin wouldn't answer and was directed not to answer.  (TG Dep I, p 185,187, Appendix 1086)

Again,  Mr. Garvin's expressed concern for the welfare of the organization fails miserably when his disregard of the offensive Soltis emails is contrasted with his extreme reaction in firing Plaintiff for her Tweet, something totally innocuous in comparison.

The exhibits to this first day of deposition include Waverly's Response to Plaintiff's Request for Admissions (Appendix 1121), which on their face are inconsistent, misleading, and in some cases outright false.


**Deposition of Tom Garvin Day 2 (TG Dep II, Appendix 1172-1213)**

Mr. Garvin testified that black employees at Waverly Care, a component of Waverly were upset at the Tweet and very concerned, supposedly having known of it before the anonymous letter surfaced. Mr. Garvin was then asked if any of those same African- Americans ever had an opportunity to see Mr. Soltis' emails. Despite the wide list of recipients and the ability of those recipients, such as Mr., Bauer to recirculate, Mr. Garvin answered with boundless hypocrisy claimed: "I would have no idea."  The follow-up question was  "You sat here. You saw the emails. You saw the cartoons of Obama and so forth, correct?" His answer was "Actually I was sitting at the end of the table and did not look at the e-mails."  (TG Dep II, pp 205-207, Appendix 1174) To Mr. Garvin, his deposition was clearly a game.

When it came to the matter of the employee who texted Plaintiff offering her information in what could only be viewed as an extortion attempt, Mr. Garvin would not denounce the employee's activities and would not answer a question about whether Waverly would investigate. Instead Mr. Garvin testified that the matter was between the employee and Plaintiff. (Dep TG Dep II p 214. Appendix 1176) Clearly this again demonstrates nothing in the way of professionalism or concern for the image of Waverly, and everything in the way of selective malice towards Plaintiff.

Mr. Garvin denied that he told Plaintiff at her firing that "I don't want you to think that you are a racist." Further, he claimed that he never said to anybody "I don't want you to think I'm racist."……… "I never said to anybody that, no, I didn't think—I never used the term "racist" in anything." Notwithstanding, he subsequently admitted that the issue did come up in the termination meeting (TG Dep II, pp 218, 219. Appendix 1177) (Affidavit, par 77)

Mr. Gavin's was determined to stick to a farcical line of testimony, notwithstanding the facts,  when he  claimed that Plaintiff's deleting Tweet at the office after he confronted her, thus using company owned equipment was  proof that she used company equipment to put it up in the first place.  (TG Dep II, p 231. Appendix 1180). This necessitated a follow-up question: "Could she have put it on using non-company assets, you know, published the Tweet?" His response was "I assume that she probably could have." (TG Dep II. p 232, Appendix 1180)

Again, despite all of the litigation protracted by Waverly that eventuated in the Commonwealth Court ruling that Plaintiff did not exhibit willful misconduct under applicable Waverly policies, Mr. Garvin clung to  his convoluted attempt to tie her private Tweet to Waverly Heights: "It was tied directly to Waverly Heights. He was asked the question:" How was it tied directly to Waverly Heights?" His nonsensical answer was "Because she represented

herself under her own name as the vice-president of a company outside of Philadelphia, having

polled the –100 percent of the African- American staff, AA, and then saying that they were all

voting for Trump. So-—you can tie her name with a simple Google search against Waverly

Heights human resource—I'm sorry, human resources, Kathy Jungclaus, and you're going to

come up with Waverly Heights, a direct correlation."  Not only is it obvious that Mr. Garvin is

being disingenuous and that there is no correlation, but it is also obvious there was no violation

of any applicable Waverly policy. (TG Dep II , pp 233,234, Appendix 1181)

Mr. Garvin was then asked if he made the statement to Plaintiff and others "You don't

have to worry about your job, I am really not out to get the old-timers." Specifically, he was

asked" Did you ever make a statement like that to my client?" His answer was: "No, that's not

language that I use." (TG Dep II, pp 235,236. Appendix 1181,1182)  Again this is inconsistent

with Plaintiff's deposition as well as her affidavit at 127,130 and 131 when it came to age

discrimination.

Similarly, Mr. Garvin denied that he ever told Plaintiff not to file a worker's

compensation claim.  (TG Dep II , p 243. Appendix 1183). This is inconsistent with Plaintiff's

deposition as well as her affidavit which states that "Mr. Garvin directed that I should not file a

Workers' Compensation claim because of how embarrassing it would be to the Churchill Group

(the Workers Compensation Collective) as I was the participating Director and documented

Shareholder Participant in that entity. (Affidavit, par 108)

The gamesmanship and inconsistency go on with Mr. Garvin's claims that no one ever

complained about Soltis' email. At the same time, he remembered Board member Bauer

lamenting that the frequency of them was as much as once a week. (TG Dep II . pp. 250, 251.

Appendix 1185) What is one to infer; that Mr. Bauer liked getting them?

As alleged by Plaintiff with respect to the Dec, 2015 and January 2016 interaction with Mr. Garvin, Mr. Garvin did admit that he met with her and she complained about the insufficiency of her bonus.  (TG Dep II, p. 238, Appendix 1182).

Defendant has attacked Plaintiff's credibility. At the same time, there are more than sufficient contradictions and inadequacies with respect to the testimony of Mr. Garvin and others connected with Defendant to question their credibility. The remedy for this, plain and simple is jury consideration and not the award of summary judgment.

## V.      ARGUMENT

### A.  <u>Summary Judgment Standard</u>

Granting Summary Judgment is an extraordinary remedy. Summary Judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether such relief is warranted, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 181 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). "The inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. (quoting Anderson, 477 U.S. at 251-52). "A genuine dispute is one that 'may reasonably be resolved in favor of either party.'" *Lomando v. United States*, 667 F.3d 363, 371 (3d Cir. 2011) (quoting Anderson, 477 U.S. at 250). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" Id. (quoting *Anderson,* 477 U.S. at 248).

In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric*

*Company,* 862 F.2d 56, 59 (3d Cir. 1988*)*. "[T]he court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party." *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995*)*.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. *Anderson*, 477 U.S. at 255.

### B.  <u>Discrimination Standard under Title VII</u>

The "*McDonnell Douglas* framework" is a three-step burden-shifting test that was laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 36 L. Ed. 2d 668 (1973). Under Title VII, a plaintiff must carry the initial burden of establishing a "prima facie case" of unlawful discrimination. Id. 411 U.S. at 802.

The distinct method of proof in employment discrimination cases, relying on presumptions and shifting burdens of articulation and production, arose out of the Supreme Court's recognition that direct evidence of an employer's motivation will often be unavailable or difficult to acquire. See *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989) (O'Connor, J., concurring) ("The entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by."); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 83 L. Ed. 2d 523, 105 S. Ct. 613 (1985) ("The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence." (internal quotation marks omitted)); see also *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 359 n.45, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977) (recognizing that burden-shifting rules "are often created…to conform with a party's superior access to the proof").

In order to establish a prima facie case of discrimination resulting in unlawful termination under Section 1981, Title VII and the PHRA, Plaintiff must show that he/she: (1) is a member of a protected class; (2) was qualified for the position; (3) was terminated; and (4) the circumstances of the termination give rise to an inference of discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999). An "inference of discrimination" can be demonstrated in a multitude of ways, including replacement by someone outside of the protected class, less favorable treatment than similarly situated colleagues those outside the protected class, or other evidence or statements evincing discrimination. *Bullock v. Children's Hosp.*, 71 F. Supp. 2d 482 (E.D. Pa. 1999); *Pivirotto v. Innovative Sys.*, 191 F.3d 344 (3d Cir. 1999).

If the plaintiff succeeds in establishing a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citations omitted). The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. Id. A plaintiff survives Summary Judgment, "by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d 759 at 763.

The Supreme Court of the United States has made clear that discrimination on the basis of race could be proven using a "motivating factor" standard because the language prohibiting this type of discrimination expressly requires a lower burden of proof as to causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013); 42 U.S.C. §2000e-2(a), (m) ("an unlawful employment practice is established when the complaining

party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice").

### C.   There are Sufficient Facts by Which a Reasonable Jury May Find in Favor of Plaintiff's Title VII and PHRA Claims for Discrimination, Hostile Work

As has hereinbefore been made evident by Plaintiff's review of evidence set forth hereinbefore., there is anything but an "absence of direct evidence" to substantiate Plaintiff's claims;  something  Defendant must demonstrate in order to support a summary judgment ruling..

Going through the Mc Donnell Douglas burden shifting analysis, Plaintiff has demonstrated: (1) that she is a member of a protected class, (2) that she was qualified for and acting in the position for decades, and (3) that she was discharged under circumstances that give rise to an inference of unlawful discrimination.

Once a prima facie case is established, the burden does shift to Defendant to articulate a legitimate nondiscriminatory reason.  Simply pulling something out of the air does not satisfy the burden. Then the burden shifts to the Plaintiff to show that the proffered reason is a pretext. Plaintiff has alleged as much in her lawsuit and in the record. Moreover, the Commonwealth Court decision, occasioned by Defendant's appeal of a decision of the Unemployment Compensation Review Board, demonstrated Defendant's professed reason for firing Plaintiff as being an empty pretext.

The burden shifting analysis is all fact based. Given the quantity and quality of the facts, this is not something to be determined as a matter of law by the Court, but instead must be determined by a jury.

### i.   Ms. Jungclaus Has Stated a *Prima Facie* Case of Discrimination

As set forth hereinbefore, Plaintiff has established a prima facie case.

Given the fact that Defendant allowed Plaintiff to be in her position for as long as she has, Defendant is estopped from making the claim that she was not qualified to be in her position.

As to "circumstances giving rise to an inference of discrimination" there is an abundance of circumstantial and direct evidence. There is evidence that Plaintiff complained on behalf of herself and behalf of other females.  Moreover, Plaintiff is additionally a member of the protected age class when it when it came to age and presented evidence as to Mr. Garvin's replacing older people with younger individuals and then making the statement that he didn't want others to think he was firing people on account of age. Simply stated there is sufficient circumstantial and direct evidence with respect to Mr. Garvin's intent and discriminatory treatment of Plaintiff amidst a  hostile work environment.

### ii.   Defendant Has Not Met Its Burden to Articulate A Legitimate, Non-Discriminatory Reason for Terminating Mr. Robinson's Employment.

Defendant has asserted that it was Plaintiff's Tweet that was in violation of applicable policies and was the reason for her firing. Given her receipt of noxious political and hate-based c email from the former Board chairman, Plaintiff was fully justified in thinking that her Tweet would be innocuous.  Not only are there abundant facts asserted herein as to the lack of a legitimate, non-discriminatory reason for her firing, but there is the conclusiveness of the Commonwealth Court decision in the case brought by Defendant when it came to unemployment and its invalid assertion that Plaintiff engaged in willful misconduct in violation of Waverly's Social Media and Communications policies. This was extensively litigated and the Court found Plaintiff's conduct to be within applicable Waverly policy.

### iii. There Is Sufficient Evidence by Which A Jury May Conclude That Plaintiff's Gender and Age Were A "Motivating Factor" In Her Termination

This has largely been addressed hereinbefore. Once Plaintiff spoke with Mr. Garvin with respect to her compensation as a female, everything changed between them. This was simply exacerbated when she made inquiries on behalf of others regarding what she perceived as a hostile environment and civil rights discrimination.  The record is abundantly full when it comes to "discriminatory animus".

Again,  Plaintiff's evidence and the Commonwealth Court's decision demonstrate that Defendant's purported reason for terminating Plaintiff were an empty pretext.

In addition, there is ample evidence to support Plaintiff's allegation that she and other women were treated less favorably than other male employees and that decision makers acted with a discriminatory motive when it came to age and sex.

## D. Plaintiff's Hostile Work Environment Claims Under Title VII and the PHRA Are Viable.

Plaintiff can and has established a prima facie hostile environment claim under Title VII and the PHRA.  Specifically, she has shown that:

(1) she suffered intentional discrimination because of her gender and age;

(2) the discrimination was severe or pervasive;

(3) this detrimentally affected her;

(4) it would have detrimentally affected a reasonable person in like circumstances; and

(5) there is a basis for employer liability present.

First, Plaintiff has more than adequately described the manner in which Waverly, its CEO and its Board acted in terms of fostering an environment that was hostile to Plaintiff and others that amounted to intentional discrimination.

Second, the discrimination was certainly severe as to Plaintiff Jungclaus, as it resulted in her dismissal. Further sex and age discrimination has been pervasive as testified to by Plaintiff, including but not limited to CEO Garvin's backhanded refrains/ admissions of "I don't want you to think that we think you are a racist" or "I don't want you to think that I'm getting rid of people because of their age."

Third, sex and age discrimination have been shown to detrimentally affect Plaintiff given her losing her long livelihood as a result of standing up for those of her sex.

Fourth, the discrimination would have and in fact has detrimentally affected a reasonable person; namely females and those over 40 who work at Waverly.

Fifth, Plaintiff's Counts include applicable civil rights claims making for Waverly's liability.

The testimony of Plaintiff, with respect to what happened to her specifically, shows that the working environment at Waverly is permeated with discriminatory intimidation.

## VI. CONCLUSION

For the foregoing reasons Plaintiff, Kathleen M. Jungclaus,  respectfully requests that Defendant's Motion for Summary Judgment be dismissed and that Plaintiff's case be allowed to proceed to trial. A proposed Order is attached hereto for this Court's consideration.

Respectfully Submitted,


**MARK D. SCHWARTZ, ESQUIRE**

By:_____/s/ Mark D. Schwartz_____
        MARK D. SCHWARTZ, ESQUIRE
        PA ID #30527
        300 Sandcastle Drive
        BRYN MAWR, PA 19010
        Telephone & Fax 610 525-5534
        Markschwartz6814@gmail.com

Attorney for Kathleen M. Jungclaus, Plaintiff

DATED: October 15, 2019