**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

KATHLEEN M. JUNGCLAUS      :

           **v.**                         :      **No. 17-cv-04462-RK**

                               :

**WAVERLY HEIGHTS**             :


**AFFIDAVIT OF PLAINTIFF KATHLEEN M. JUNGLAUS
IN OPPOSITION TO AFFIDAVITS SUPPLIED BY DEFENDANT**


**I, Kathleen M. Jungclaus, herby swear and affirm the following statements:**

1. No poll was taken of any Waverly Heights's ("Waverly" or "Waverly Heights") or Waverly Cares' ("WCA") employees, as sworn and affirmed by Mrs. Baysmore.

2. The Human Resource Department is located in the upstairs of the Manor House on Waverly Heights Property. My office was outside of the main Human Resource area and separated by some distance from all other departments.

3. If I did not go down to the main common areas during the day, I would never see another person.

4. The only time anyone would make the effort to walk the distance up the stairs to my office was when they wanted to make a complaint in private.

5. I was personally and repeatedly made aware of Mr. Supper's alcohol use by Tom Garvin, Janet Thompson, Amy Blessing, the Finance Department Staff. Additionally, it was brought up to me Board Member, Scott Jenkins; and Former Waverly President Bill Maguire. Former Waverly President Bill Maguire expressed shock and disappointment over the selection of Mr. Supper given his reputation as abusive to women and his renowned alcohol use.

**Debra Best**

6. Debra Best was the Dining Services Manager.

7. Her Direct Supervisor was Jim Heffron, Director of Dining Services.

8. Ms. Best was a weekly visitor to my office.



9. Had Ms. Best not informed me about the party that the Dining Services Department catered for Mr. Garvin's son's graduation, I would never have known about it.

10. Additionally, Debra Best, on more than one occasion, complained about her compensation.

11. Debra Best also complained to me, in my capacity as the Human Resource Director, about how she was managed by the men in the company.

12. While employed at Waverly, in my capacity as H.R. Director, I advocated for Debra Best to be hired as a direct employee of WHL. Prior to this, she had been an Independent Contractor staffed by Morrisons Company.

13. Ms. Best complained to anyone who would listen about how she was mistreated by the department heads, the head chefs, and the CEO, Tom Garvin.

14. Ms. Best came to my home uninvited to "chat offsite about how horrible Waverly was."

15. It was during that conversation that Ms. Best opined that Mr. Garvin is an egomaniac. She specifically stated that she heard and witnessed Nadine Garvin, Tom Garvin's wife, during the graduation party and said what an amazing job he was doing. Ms. Best relayed that she was stroking his ego all day long. She further stated that Tom Garvin spoke to Ms. Best while setting up the party, but then informed her that she would be considered "hired help when the party began". Ms. Best related to me that she found this demoralizing and degrading. She stated that Mr. Garvin never thanked her or the staff and that they never received tips. Ms. Best stated that she couldn't stand Tom Garvin and "his cheesy smile." She stated that Mr. Garvin only cares about himself and what makes him look good.

16. Ms. Best was always fearful of losing her job. I believe she still feels this way.

17. In addition to launching complaints against Tom Garvin, Ms. Best frequently complained about Mr. Supper. Ms. Best made the following statement about Mr. Supper, "he walked through the community like the king, never saying hello to anyone or talking with the staff."

18. Ms. Best would state that she believed he thought he was above everyone else. Ms. Best took particular issue with this behavior because she felt she was held to a higher standard of interaction, yet the men had exceptions.

19. I would not have this knowledge unless it was told to me by Ms. Best.

**Amy Blessing**

20. Amy Blessing was employed as the Executive Administrative Assistant to Tom Garvin and Bob Supper.

21. Her office was located directly outside of Mr. Garvin and Mr. Supper's office, located in the Commons Building.

22. Amy Blessing would come to my building and make complaints about Bob Supper's treatment of women.

23. Ms. Blessing would complain about Bob Supper screaming at his wife on the phone about credit card bills and other family issues.

24. Ms. Blessing on more than several occasions made sarcastic comments about Bob Supper leaving for happy hour on Thursdays nights and how happy hour gets earlier every week.

25. Since my office was in another building, I would have no information or knowledge about this unless Ms. Blessing has told me.

26. Ms. Blessing on several occasions complained about the way Mr. Supper spoke to women. She stated to me that she spoke to Tom Garvin about it and his response was "It's just Bob."

27. When Amy Blessing asked for her job to be revamped, I took that information to Tom Garvin and was directed not to pursue it.

28. Amy Blessing stated that the emails from Chuck Soltis were inappropriate and should not happen. She then asked, "What are we going to do?" and shrugged her shoulders.

29. Mrs. Blessing and Mrs. Thompson both complained about the misuse of Waverly funds to pay for the moving expenses and draperies afforded Mr. Garvin, 6 years after his employment. Both expressed the existence of a "good ole boy" mentality by the Board, Mr. Garvin and Mr. Supper.

30. Had they not brought this information to my attention; I would have never known about this abuse of funds.

**Marge Carpenter**

31. Ms. Carpenter was the Residence Services and Activities Manager.

32. She reported to Janet Thompson.

33. I am aware of Marge Carpenter's dislike for Tom Garvin through her supervisor Janet Thompson.

**Constance Dogan**

34. Ms. Dogan was employed by Waverly as the Director of Environmental Services.

35. Ms. Dogan informed me of a meeting she attended where Mr. Supper's behavior was demoralizing.

36. She informed me that Pattie Rodgers, VP of Waverly Care, came to her in tears because of the way Bob Supper treated her in a meeting.

37. I would not have this knowledge unless it was told to me by Ms. Dogan.

38. I advocated for Ms. Dogan to be better compensated in her position.

39. I believed Ms. Dogan brought experience and knowledge to the position that warranted more pay.

40. She was paid significantly less than the market value of the position. I advocated that she was entitled to the same position title change that the rest of the directors received to become Vice - President.

41. This was rejected by Mr. Garvin because her Department was "Environmental Services."

42. Mr. Garvin rejected my plea and stated, "she needed to grow into her position."

43. Ms. Dogan was performing in an exemplary manner and deserved to be paid appropriately for doing the job.

44. Ms. Dogan would not know about my advocating for her. I did not advise the employees when and if I was advocating on their behalf.

**Meredith Feher**

45. Mrs. Feher and I agreed that the Human Resources Department was under recognized.

46. After having this conversation with Ms. Feher, I decided to advocate for myself pursuant to her direction as the Senior VP of Health Care Services.

47. After my conversation with Mr. Garvin in December 2015, I had a follow up conversation with Mrs. Feher because she "wanted to know what happened."

48. "When I informed her of the outcome she stated: "He would never treat you that way if you were a man."

49. Meredith Feher, on more than one occasion, asked about the benefits received by Bob Supper.

50. She would then compare them to her own.

51. Ms. Feher texted me at night or called me during the day.

52. Tom Garvin directed me to "babysit Meredith Feher, because he didn't trust her."

53. I was then required to attend all of her meetings to ensure that she treated employees fairly.

54. When Tom Garvin changed titles for the Senior Level Staff, he should have adjusted Ms. Feher's benefits to equal Mr. Supper's benefits.

55. Mr. Garvin changed the Titles of all directors (with the exception of the Housekeeping Director and Dining Director) to Vice Presidents.

56. At that time, he elevated Bob Supper, VP of Finance, and Meredith Feher, VP of Healthcare Services to "Senior Vice Presidents."

57. This change in title entitled Ms. Feher to comparable benefits, which included a car. However, she did not receive one.

58. Ms. Feher continued her communication with me after my termination. Frequently she told me that I was the best HR person she ever worked with. She informed me that Amy Blessing was interested in my position and Tom Garvin said, "No."

59. She stated how horrible it was to work there.

**Tom Garvin**

60. Chuck Soltis, Former Chairman of the Board, while acting Chairman of the Board, distributed unsolicited derogatory, racist, and anti-female political emails on the Waverly Server to Waverly employees.

61. I discussed the inappropriateness of the emails, some of which I received, and Ms. Thompson's complaint about receiving the emails to Tom Garvin.

62. No action was taken to stop the Chairman of the Board from continuing these actions.

63. On many, many occasions Mr. Garvin engaged me in conversation about politics and the up and coming election. Included in these conversations were discussions brought up by him about whether minorities would vote for Donald Trump. Based on these conversations; the disgusting political email transmitted over the Waverly email system by Board Chair Soltis; and Tom Garvin's and Waverly's open environment accepting them, I NEVER thought my observation- based tweet would be objectionable.

64. During benefit renewal meetings, Mr. Garvin made numerous comments about the aging workforce and perhaps that we should work toward getting rid of them to save money.

65. Tom Garvin stated to me "I'm not getting rid of the old timers" after he terminated Colin Gallagher. As communicated to me, this defensive statement amounted to an admission of age bias.

66. I later discovered that the same comment was told to Marc Heil, as Marc Heil stated directly to me.

67. Mr. Garvin systematically targeted older Senior leadership members until they resigned.

68. Margaret Guenveur and Linda Larrabee both resigned because Mr. Garvin made them aware that if they didn't resign, they would be terminated.

69. Both Mr. Garvin and Mr. Supper targeted Mr. Hamid, WHL Controller, because he was too old.

70. They informed Chad Minix that he would have the job as soon as they "could get rid of Hamid."

71. Mr. Hamid resigned when he realized that he must quit or be fired.

72. Mr. Garvin affirmed the statement that Hamid resigned, but was granted a severance package.

73. Severance packages are only given in a forced resignation.

74. This forced resignation was based on Hamid's age.

75. Mr. Minix presently holds the position of Controller.

76. I would not know this information unless it had been told to me by Chad Minix.

77. When I was terminated by Mr. Garvin and Mr. Bauer, Mr. Garvin made it a point of saying "I don't want you to think that we think you're a racist." The use of this phrase typifies the same defensiveness and admissions as his frequent utterance of the phrase, "I'm not getting rid of the old timers."

78. I complained to Mr. Garvin about Mr. Suppers' inappropriate treatment of women in meetings.

79. That is why as stated in his affidavit #18, Mr. Garvin met with Mr. Supper and told him to "tone it down."

80. Mr. Garvin had spoken with me about his fear of Mr. Supper having a car and his drinking.

81. Mr. Garvin was terrified at the liability of his having a company car, yet he did nothing about it.

82. When Mr. Suppers' son stole the car and it was confiscated, Mr. Garvin came to my office to discuss what to do.

83. I advised Mr. Garvin this was a perfect time to take the car away and make things equitable between Mr. Supper and Mrs. Feher. so as to eliminate this instance of disparate treatment of women.

84. Instead, Mr. Garvin took the car and replaced it with stipend of equal value, basically giving Mr. Supper a raise

85. I advocated on Ms. Feher's behalf for her to receive a car benefit or stipend comparable to Mr. Supper when Mr. Garvin changed their position titles.

86. I informed Mr. Garvin that, at the very least, the optics are bad when you have comparable positions with the man receiving a better benefit than the women.

87. Mr. Garvin angrily stated, "I am not doing that and don't bring it up again."

88. I was fired less than two months later.

89. I was not undermining Mr. Garvin's relationship with Mrs. Feher.

90. I was doing my job as the Human Resource Director advocating for equal treatment and rights as outlined in the Human Resource Manual.

91. Despite that manual, Mr. Garvin made selective and discriminatory choices of who received pay adjustments based on pay grade changes recommended by Tom Wozniac, the compensation consultant. Contrary to Mr. Garvin's assertion, the supposedly even-handed approach of the consultant could be and was overridden.

92. As an example: Two different positions were recommended to move up a pay grade. This typically would result in a pay adjustment to the employee to better align them with the correct compensation for their position. Mr. Garvin agreed to have the positions relocated on the charts. However, only the male employee received a pay adjustment. The female employee did not receive an adjustment even though she was a long-term employee, who was an excellent performer.

93. On more than one occasion, I complained to Mr. Garvin about Mr. Hendrickson making me uncomfortable.

94. Instead of investigating my complaint, Mr. Garvin made a joke about it and still made me attend the meetings though I expressly asked not to.

95. Mr. Garvin did not remedy the situation.

96. Mr. Garvin was to receive a stipend in lieu of health benefits. All increases, bonuses etc. were submitted to me for processing and documentation to Mr. Garvin's file.

97. Had there been an agreement about moving expenses, draperies, etc. it would have been documented in some way to his file through the Human Resource department. This policy ensured fairness, consistency and appropriate taxation.

98. Mr. Garvin collected both income for benefits and enrolled in the Family Health Insurance Plan, a duplication of benefits.

99. Mr. Garvin informed me he was going to take the Family Health Insurance during open enrollment in February.

100. Mr. Garvin had just had his performance review and increase in December.

101. He received double the value of those benefits for ten (10) months.

102. The HR Committee was not informed of his decision to enroll until his next review, the following December.

103. Mr. Garvin testified in his deposition that he had a compensation letter stating that this included coverage for extraneous expenses like draperies, 6 years after he started his position.

104. Contrary to Mr. Garvin's affidavit #32, no such letter existed. No such letter was produced and no such agreement can be proved.

105. Mr. Garvin on more than one occasion directed me to take his "Silverchair" continuing education training for him.

106. This was a mandatory program for all staff including Mr. Garvin.

107. During work one afternoon, I experienced a severe asthma attack.

108. Mr. Garvin directed that I should not file a Workers' Compensation claim because of how embarrassing it would be to the Churchill Group (the Workers Compensation Collective) as I was the participating Director and documented Shareholder Participant in that entity.

109. Mr. Garvin may not recall that statement, but he said it and it was unkind, inappropriate, and unbecoming a CEO.

110. Mr. Garvin would negotiate with whomever the new Chairman of the Board was, without their having a solid understanding of his compensation package, further solidifying the "Good ole boy network."

111. Mr. Garvin states at Affidavit #44 that he does not have an employment agreement, but in Affidavit #32 he states there is an agreement.

112. During my employment Mr. Garvin did not have an employment agreement.

113. During my employment with Waverly, I was assigned numerous additional responsibilities outside the scope of my position,

114. For three months, I was required to have daily oversight and directed the Environmental Services in the absence of a Department Director.

115. During that time, I was also running the HR Department and Directing the Bed and Breakfast Services in the Manor House.

116. This occurred on three separate occasions when Mr. Garvin terminated the Housekeeping Director.

117. I was told by Mr. Garvin to "clean up the mess' and make it happen."

118. When Mr. Garvin terminated Anne Rodgers, the VP of Finance, I was directed to provide supervision and oversight to the finance department. I was required to hold daily stand up meetings with the department and was again told to "clean up the mess and make it happen."

119. When a trainer was not approved in the annual budget, I was directed by Mr. Garvin to develop an Employee Engagement Training in order to change the culture of Waverly. I researched and found a program called FISH. I taught myself the program, developed a training program for all staff and planned out the sessions for the next five years. The training was a tremendous success and loved by all staff.

120. Mr. Garvin never attended one session, though invited on many occasions, further exemplifying his lack of respect for my work and my position. This training, had it been subcontracted out, would have cost at least $20,000.00 per year or more.

121. I received nominal bonuses of $500.00 and $2000.00. This was in sharp contrast of the male bonuses of $10,000. and $20,000. This was the result of sex discrimination, a hostile environment, and retaliation against me for standing up for other females.

122. I drafted the Risk Management Manual and updated all of the Risk Management policies.

123. These are only a fraction of the additional responsibilities assigned to me by Mr. Garvin, in addition to my regular fulltime position,

124. Mr. Garvin stated on many occasions that he had to be careful giving our discretionary bonuses through the year so there was enough money at the end of the year for his and Mr. Supper's bonuses.

125. I did not violate any Waverly Heights Policy.

126. This assertion was confirmed by the Commonwealth Court of Pennsylvania.

**Marc Heil**

127. Marc Heil stated that Tom Garvin told him "I am not out to get the old timers."

128. Mr. Heil expressed concern that perhaps he would be next.

129. I would not have this knowledge unless it was told to me by Mr. Heil

130. Under Mr. Garvin's leadership six (6) of the eleven (11) original senior leaders were let go: 1) Margaret Guenveur ,VP of Healthcare Services; 2)  Linda Larrabee, Director of Nursing; 3) Jan DeGroat and three (3) of her successors Director of Environmental Services; 4) Anne Rogers VP of Finance; 5) Colin Gallagher, Director of Dining Services; 6) Kathleen Jungclaus, VP of HR.   All were over forty years of age and in the protected age category.

131. Not one of these employees left under good circumstances. Aside from being over forty, they were either terminated outright or were made so miserable that they left their jobs.

132.  After my firing, Mr. Heil accompanied me to my office while I was visibly upset, passing several employees and residents along the way.

133.  I was escorted out of the office and to the car in full view of employees as they were getting on the van to leave and residents walking out front.

134.  I was humiliated.


**Patricia Rodgers**

135.  I was always supportive of Mrs. Pattie Rodgers' position and advocated for her advancement.

136.  I celebrated her success and am proud of her accomplishments.

137.  I saw Ms. Rodgers visibly shaken after attending a meeting she had with Mr. Supper.

138.  She expressed that he "is an ass."

139.  This was spoken directly to me as I was outside of the conference room when she came out.

140. The meeting was about her management of Waverly Care Assoc.

141. Pattie stated that he wouldn't let her speak, screamed at her, spoke over her and was generally inappropriate and abusive.

142. I later was informed by Constance Dogan that Pattie went to her on a different occasion also crying about another meeting she had with Mr. Supper.

## Debbie Sandler

143. On more than one occasion I had conversations with Debbie Sandler about the way Tom Garvin was handling certain employment issues and creating a hostile work environment.

## Robert Supper

144. I met with Mr. Supper more than once to discuss his treatment of Susan Popoff, the payroll specialist in his department.

145. I informed Mr. Supper that Ms. Posoff had come to HR to discuss his general "meanness to her." She stated that he screamed at her and treated her disrespectfully. Mr. Supper was well aware of how uncomfortable he made women in the workplace.

146. The decision to change HRIS Systems was made without any conversation of input from myself or anyone else in the HR department.

147. This is an example of the men making the decisions and I, as a woman having to "get on board and make it work."

148. When I expressed my anger and frustration over this clear and blatant disregard for me and my position, I was told to "get over it and make it work."

149. The HRIS is the foundation for everything done in the HR department and this was an abomination of mismanagement. The HRIS housed all employee information required by state and federal law; and provided all of the necessary reports needed throughout the calendar year. The new system selected by Mr. Supper was not user friendly and did not allow the HR department staff the flexibility of reporting offered by other HRIS systems. The new system was a hardship for the entire HR department.

## Janet Thompson

150. More than once, Ms. Thompson complained about the volume of work given to her by Mr. Garvin. Ms. Thompson would frequently exclaim "What does he do?" "Kathy, he does nothing! He can't even go to a meeting by himself." Ms. Thompson was frequently upset by the pay and bonuses she received based on the sheer volume of work that she did. She did not feel it was equitable.

151. Ms. Thompson also complained about Mr. Supper.

152. She stated that she could hear him screaming at his wife from her office. She stated that she found it appalling the way he treated woman in meetings. She stated that Mr. Supper was degrading, demoralizing and talked right over her. These statements were frequent. I directed Ms. Thompson to speak directly to Mr. Garvin. She refused because she feared she would lose her job.

153. Mrs. Thompson and Mrs. Blessing expressed anger, frustration and disgust over the mismanagement of funds allocated to Mr. Garvin's moving expenses and draperies six (6) years after he started working at Waverly. They both were appalled that Waverly is supposed to be a not-for-profit organization, but was operating like a good ole boys club.

154. Ms. Thompson came to my office to complain about the emails she was receiving from Chuck Soltis. She was offended by them. I again told her that she needed to speak to Tom Garvin. She stated, "I can't and you can't. He is a board member and we could lose our jobs."

155. Ms. Thompson often complained about Mr. Supper leaving for happy hour, and about his gambling. She stated that she was appalled that he was hired and she stated that he was an embarrassment to his department. Ms. Thompson informed me that Mr. Supper's staff were very aware of his drinking and gambling habits.

156. I would not have this knowledge unless it was told to me by Ms. Thompson.

SIGNED on _Orteher 11_, 2019.


_Kathleen M Jungclaus_
Kathleen M. Jungclaus, Affiant


**SUBSCRIBED AND SWORN TO BEFORE ME** on _October 11, 2019_, by
_Kathleen M Jungclaus_


Notary Public, Commonwealth of Pennsylvania

Commonwealth of Pennsylvania   Notary Seal
KATHLEEN BRADFIELD, Notary Public
Bucks County
My Commission Expires October 31, 2021
Commission Number 1097214