**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KATHLEEN M. JUNGCLAUS,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. No. 17-4462** |
| | : | |
| **WAVERLY HEIGHTS LTD.,** | : | |
| **Defendant.** | : | |
| | : | |

**Diamond, J.**                                                                 **April 12, 2022**

## MEMORANDUM

Kathleen Jungclaus charges her former employer, Waverly Heights, LTD, with sex and age discrimination, retaliation, and hostile work environment.  (Doc. No. 1.)  Jungclaus' filings generate more heat than light and show little more than that she disliked her supervisor and resented colleagues—women and men all over forty—who she believed unfairly received more generous compensation than she.  Those antipathies are not a substitute for evidence and do not make out a violation of federal law.  I will thus grant Waverly's Motion for Summary Judgment.

## I.  BACKGROUND

I have resolved all factual disputes and made all reasonable inferences in Jungclaus' favor.  Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

Plaintiff's Employment and Colleagues

Waverly is a private retirement residence.  (App. 10.)  Starting in 1997, Jungclaus served first as Waverly's Human Resources Director and then Vice President of Human Resources until her termination on September 27, 2016 (when she was 55 years old).  (App. 108-110.)  As a "third tier senior leader," Jungclaus managed all employee hiring, promotion, discipline, and termination; evaluated performance; and directed the resolution of grievances.  (App. 118-121.)  She has a

1

bachelor's degree in psychology from Gwynedd Mercy College.  (App. 112.)

Waverly's Chief Executive Officer, Thomas Garvin, was Jungclaus' supervisor.  (App. 185.)   Unlike Jungclaus, Garvin is licensed by the Commonwealth as a Nursing Home Administrator.  (App. 1253.)  At the time of his 2010 appointment, Garvin learned that Jungclaus and others "believed that [he] would terminate the senior leaders to replace them with individuals" he selected.  (Garvin Aff. ¶ 10.)  Between 2010 and Jungclaus' 2016 termination, however, only three of the ten senior leaders were replaced.  (App. 108.)  Jungclaus testified at deposition that Meg Guenveur, Pattie Rogers, and Colin Gallagher were the three senior leaders Garvin unfairly fired.  The record shows, however, that this is untrue.  Ms. Guenveur, Vice President of the Health Care Center, *retired* in 2013 when she was in her sixties and was replaced by Ms. Meredith Feher (then forty-three years old).  (Pl. Dep. I 83:7-15; App. 108.)  In 2013, Garvin fired Chief Financial Officer Anne Rogers (who was in her sixties) because of behavioral and communication problems—*a decision that Jungclaus supported*.  (Pl. Dep. I 82:15-22.)  Waverly promoted Robert Supper (then fifty-four years old) to replace Ms. Rogers.  (App. 108.)

In 2013, Waverly employed a contracting agency to replace Mr. Gallagher, the Director of Dining Services.  (Pl. Dep. I 85:23.)  Jungclaus testified at deposition that she disagreed with Gallagher's firing, although there is no contemporaneous or other evidence showing that disagreement.  (Id.)  Rather, the record shows only that Gallagher, in his late fifties, was "overly assertive" and could not work with Dining Services Manager, Debbie Best.  (Pl. Dep. I 84:9-25.)  At the recommendation of the agency, Waverly hired James Heffren (then forty-nine years old) to replace Gallagher.  (App. 108.)

<u>Compensation</u>

Garvin conducted annual performance evaluations; Jungclaus' were generally good.  (App.

2

185-226.)  Beginning in 1994, Waverly employed salary consultant Thomas Wozniak of Strategic Compensation Planning to make recommendations each year respecting senior leadership compensation and so "ensure that the salary and benefits were competitive with other organizations."  (Wozniak Aff. ¶ 6.)  Garvin had "limited discretion" to accept, reject or modify Wozniak's recommendations; the Waverly Board's Human Resources Committee reviewed Wozniak's recommendations and Garvin's decisions.  (Garvin Dep. I 193:4-14.)

Wozniak did not include age or gender in his analysis.  (Wozniak Aff. ¶ 7.)  Indeed, Jungclaus provided him with the data he analyzed.  (Wozniak Aff. ¶ 8.)  Jungclaus received and reviewed a copy of each annual report Wozniak prepared.  (Wozniak Aff. ¶ 9.)  Based on Wozniak's recommendations, Garvin gave Jungclaus regular raises.  (App. 265-67.)  In 2016, her $120,659 annual salary was 5% above market.  (App. 267.)  In addition, at Garvin's direction, Waverly continued to pay Jungclaus while she took classes (whose tuition Waverly also paid for) that would have allowed her to take the Nursing Home Administrator exam and thus make her eligible for greater compensation.  (Garvin Aff. ¶ 23, 30; Pl. Dep. I 64:13-25.)  Jungclaus never sat for the examination.  (Pl. Dep I 65:4-10.)

Wozniak also made bonus recommendations for the first tier (CEO) and second tier (Chief Financial Officer and Healthcare Administrators) senior leadership positions.  (Wozniak Aff. ¶ 18.)  Wozniak's December 2015 recommendations included $15,000 to $25,000 bonuses for Robert Supper, Meredith Feher, Janet Thompson (age 66), and Pattie Rogers (age 57)—second tier senior leaders (three of whom are women).  (App. 108, 269; Wozniak Aff. ¶ 17.)  Garvin awarded bonuses in addition to those recommended by Wozniak, including discretionary bonuses to third tier senior leaders.  (Garvin Aff. ¶ 22.)  Jungclaus could not recall ever receiving a bonus from Garvin's predecessor.  (Pl. Dep. I 47:7-9.)  Moreover, Garvin, who became CEO in 2010,

promoted Jungclaus to HR Vice President, raised her salary accordingly, and awarded her: (1) bonuses in 2011 and 2013, not because her performance was exceptional, but because Waverly had been designated a "Best Place to Work"; (2) a bonus in 2012 for taking on extra responsibilities while the Director of Environmental Services position was vacant; and (3) a $2,500 bonus in 2015. (App. 226, 267, 1246.)  In 2012, Wozniak recommended that Building Services Vice President Marc Heil (a third tier senior leader, age 45) receive an $8,000 bonus after completion of a large construction project requiring Heil to take on extra hours and responsibilities.  (App. 244; Garvin Aff. ¶ 22; Heil Aff. ¶ 13.)  Wozniak also recommended that Ms. Guenveur receive a $6,000 bonus and Ms. Thompson receive a $4,000 bonus because of their contributions to the construction project.  (Id.)  Jungclaus offers no information, however, as to whether any of Wozniak's recommendations were accepted or modified, the dates and amount of any bonus Heil actually received, or the amounts of Jungclaus' 2011, 2012, or 2013 bonuses.

Jungclaus testified at deposition both that her bonuses were "minimal" because of her gender, and that "all of the men received" larger bonuses. (Pl. Dep. I 49:1-6.)  Once again, she offers no supporting evidence.  Rather, Jungclaus *believes* that Heil "enjoyed several thousand-dollar bonuses each year, sometimes twice a year."  (Pl. Dep. I 52:16-17.)  The only years for which Jungclaus provides any payroll data, however, are: (1) 2012, when Wozniak (whom Jungclaus has not named as a Defendant) recommended $4,000 to $8,00 bonuses for Guenveur, Thompson, and Heil because of their contributions to the construction project; and (2) 2015, when Wozniak recommended $15,000 to $25,000 bonuses for Supper, Feher, Thompson, and Rogers. (App. 108, 244, 269.)  Upset with her 2015 bonus of $2,500, Jungclaus told Garvin in January 2016 that "other people who had done far less than [she had] got far more than [she] did."  (Pl. Dep. I 64:3-6, 90:11-24; Pl. Dep. II 81:7-10.)   Garvin's notes indicate that she explicitly

4

complained about the bonuses awarded to Heil, Supper, Thompson, and Feher. Jungclaus disagreed with Garvin's response that she "didn't provide the same kind of contribution" as colleagues who received larger bonuses. (Pl. Dep. I 52:18-25.) Garvin explained that Jungclaus' $2,500 bonus "reflected the fact that [she] was doing what she was paid to do and little more." (Garvin Aff. ¶ 28.)

Jungclaus has provided no other data respecting her own compensation or that received by other Waverly senior leaders. The minimal data she has provided does not show that Waverly compensated male senior leaders more generously than female leaders, and (as I have described) that almost all senior leaders were well over 40.

Colleagues

Jungclaus believes that after their January 2016 meeting, her relationship with Garvin changed. (Pl. Dep. II 81:1-82:21.) She testified that before the meeting, she would spend hours with Garvin each week, "doing anything from walking through the Healthcare Center to meeting about various topics." (Pl. Dep. II 81:16-20.) After the meeting, if she "saw [Garvin] once every two weeks or once a month, it was a lot." (Pl. Dep. II 81:20-22.) Jungclaus acknowledged, however, that her title remained the same, she was not demoted, her duties and salary remained the same, the same employees continued to report to her, and she continued to attend senior management meetings. (Pl. Dep. II 81:23-82:14.) Moreover, at Garvin's direction, Waverly provided a defense to Jungclaus whenever employees filed complaints against her, including claims before the Pennsylvania Human Relations Commission. (Salgado Aff. ¶3.)

Jungclaus stresses that she "repeatedly advocated" on behalf of herself and other women, a version of events none of these women confirms and otherwise has no evidentiary support. (Pl. Resp. Interrog. ¶ 17.) Insofar as Jungclaus specifies the targets of her purported advocacy,

discrimination was not among them.  Jungclaus described only two specific complaints.  She testified at deposition that Ms. "Feher contacted [her] relentlessly about . . . the fact that Bob Supper had a car [as part of his compensation] and she didn't[,] and [] that she didn't receive a contribution to her retirement fund on a prorated basis . . . and Bob did."  (Pl. Dep. I 161:4-13.) Ms. Feher refutes this testimony, however, which, again, has no documentary or other evidentiary support.  (Feher Aff. ¶ 7.)

Jungclaus also testified that she relayed to Garvin the complaints of  women leaders about "Supper's behavior in meetings and his demeaning and demoralizing treatment of them."  (Pl. Dep. I 70:16-18.)  According to Jungclaus: (1) Pattie Rodgers told Jungclaus about Supper "screaming at [Rogers] in [a] meeting and she was absolutely humiliated"; (2) Amy Blessing told Jungclaus about conversations she overheard between Supper and his wife: he was "demoralizing . . . he would call her names and he was demeaning to her"; and (3) Janet Thompson also complained to Jungclaus about Supper.  (Pl. Dep. II 6:1-3, 22-7:2; Pl. Aff. ¶ 151.)  Yet again, each of these women denies that she ever complained to Jungclaus about Supper.  (Rodgers Aff. ¶ 7; Blessing Aff. 1; Thompson Aff. ¶ 16.)  Moreover, there is no evidence that Jungclaus said anything to Garvin (or anyone else) about discrimination.  Nor did Jungclaus ever employ means of redress available to all Waverly employees: she never relayed complaints to other senior leaders, corporate counsel, or Trustees.  (Salgado Aff. ¶¶ 4-13; Pl. Dep. I 72:2-5.)  Nor did she use Waverly's Corporate Compliance Hotline.  (Pl. Dep. I 74:3-6.)

Significantly, Jungclaus' own description of Supper's conduct refutes any suggestion that he discriminated on the basis of sex.  Jungclaus testified that  Supper is "very difficult to have a conversation with" because "he voices his opinion over yours, and there's no arguing with him," but acknowledged that Supper never used gender-specific language.  (Pl. Dep. II, 6:4-12 65:2-14.)

6

To the contrary, she described his "mannerisms and tone" as "overbearing" to both men and women.  (Pl. Dep. I 79:7-9.)  Feher similarly describes Supper as "abrasive," but notes that he "treats everyone the same and, his demeanor has improved significantly over the years."  (Feher Aff. ¶ 20.)  Garvin confirmed that Supper "improved the way in which he communicates with employees and his colleagues."  (Garvin Aff. ¶18.)

Emails

For some five years, Richard Bauer, Chairman of Waverly's Board of Trustees and former Chairman Chuck Soltis (who has since passed away) sent Jungclaus numerous emails.  After she began this suit, she said (apparently for the first time) that she found the messages to be "racist . . . disgusting, . . . anti-Obama, anti-Hillary Clinton, anti-Jewish, [and] antisemitic."  (Pl. Dep. I 143:15-20.)  The emails themselves do not support Jungclaus' belated characterizations.  They include a "Halloween Spoof" video (App. 435), political messages such as "The unspoken success of ObamaCare" (App. 489-493) and speeches by Senator Rand Paul (App. 485), and many photos of sleeping cats (App. 530-547).  Jungclaus also sent and received, without complaint, emails at her Waverly email address to and from her husband; these reflected the same kind of political bias as did those sent by Bauer and Soltis.  (App. 364-381.)  Indeed, while interviewing a job applicant, Jungclaus indicated that many of Waverly's residents express "conservative" viewpoints, which she deemed "the right side of the issue."

Jungclaus' Firing

On September 14, 2016, Garvin received a letter from a "member of the Waverly community" who had gained access to Jungclaus' Twitter account by which she designated herself as a "follower" of Waverly's Twitter account.  (App. 270-72.)  The anonymous writer suggested that Jungclaus could not properly do her HR job in light of her July 24, 2016 tweet:

7

@realDonaldTrump I am the VP of HR in a comp outside of philly an informal survey of our employees shows 100% AA employees voting Trump!

(App. 270-72, 276.)   The writer concluded that Jungclaus was a Trump supporter who had discussed partisan politics with Waverly's minority employees, and that "she feels confident enough to report [publicly] that 100% [of] the African American employees will be voting for Donald Trump."  (App. 271.)   Although Jungclaus directed the tweet to Mr. Trump's Twitter account ("@realDonaldTrump"), it was accessible to the public because she had placed no privacy settings on her own account.  (See App. 273-276.)

Garvin met with Jungclaus on September 20, 2016 to discuss the anonymous letter.  (Pl. Dep. I 96:13-18.)  Jungclaus did not deny writing the July 24 tweet, and told Garvin that she had immediately deleted it (although she later suggested that her account had been "hacked," that her husband had posted the tweet, and that her husband had dictated the tweet and she posted it). (Garvin Dep.  I 177:4-179:16.)  She testified that Garvin "blew it off" and told her "not to worry about it."  (Pl. Dep. I 96:13-18.)  She does not dispute, however, that Garvin told her to delete the post immediately and "unfollow" Waverly.  (App. 337.)  Garvin emailed the Waverly Board's HR Committee and its Ethics Committee Chair Anita Summers, informing them of the anonymous letter and requesting an emergency meeting.  (App. 284-287.)  On Monday September 26, 2016, the HR Committee unanimously agreed that because of her July 24, 2016 tweet, Jungclaus should be fired for violating Waverly's social media policy.  (App. 289.)  Waverly's full Board of Trustees concurred.  (Id.)  That policy, which was *drafted by Jungclaus*, provides that: (1) other Waverly employees should not be mentioned in a social media post without permission from those individuals; (2) "behavior that is not permitted in the workplace is also prohibited on social media"; and (3) a violation of the policy is grounds for termination.  (App. 105-107; Pl. Dep. I  88:15-23.)

On September 27, 2016, Garvin and Bauer met with Jungclaus and fired her for violating

8

the social media policy.  (App. 289.)  Ms. Lauren Kelly (age 43) replaced her.  (App. 108.)

Unemployment Benefits

On October 2, 2016, Jungclaus applied for unemployment compensation, telling state authorities that she was "terminated through no fault of [her] own," and citing the "anonymous letter" as the reason she was given for being discharged.  (App. 290-93.)  At no point in the unemployment proceedings did Jungclaus mention gender or age discrimination.  (App. 290-300.)  On October 11, 2016, Garvin submitted a form to the same authorities, stating that Waverly fired Jungclaus for violating its social media policy and so "put into question her ability to enforce the polices of [Waverly Heights] in an equitable fashion."  (App. 294-97.)

On October 18, 2016, state officials interviewed Garvin, who again said that Jungclaus was terminated because she had violated Waverly's social media policy.  (App. 301-302.)  After Jungclaus was found eligible for unemployment compensation, Waverly appealed to a Referee, who discredited Jungclaus and denied her claim, finding that Jungclaus violated Waverly's social media policy.  Waverly Heights, Ltd. v. Unemployment Comp. Bd. of Rev., 173 A.3d 1224, 1226 (Pa. Commw. 2017).  Jungclaus appealed to the Board, which reversed, finding that Waverly had not "sustained its burden of proof."  (App. 306.)  Waverly appealed to the Commonwealth Court, which affirmed.  Waverly Heights, 173 A.3d at 1230.

## II. PROCEDURAL HISTORY

On November 8, 2016, Jungclaus' lawyer (who continues to represent her) sent Waverly a demand letter, threatening to file an EEOC complaint based on her firing.  (App. 311-319.)  On December 13, 2016, Jungclaus filed the complaint, charging Waverly with age and sex discrimination, hostile work environment, and retaliation.  (App. 362.)  On January 5, 2017, Jungclaus received Notice of Charge of Discrimination.  (App. 363.)  The Commission issued a

Right to Sue Letter on August 16, 2017.  (Am. Compl. ¶ 9.)

On October 6, 2017, Jungclaus initiated suit in this Court against Waverly and Garvin. (Compl. ¶¶ 2-4.)  The matter was assigned to Judge Robert Kelly.  On November 17, Jungclaus filed an Amended Complaint, adding twenty-one unnamed members of Waverly's Board of Trustees and including claims against Waverly for: sex discrimination, retaliation, and hostile work environment in violation of Title VII (Counts I and II); age discrimination, retaliation, and hostile work environment in violation of the Age Discrimination Employment Act (Count III); and sex and age discrimination, retaliation, and hostile work environment in violation of the Pennsylvania Human Relations Act (Count IV).  (Am. Compl. ¶¶ 5, 64-98); 42 U.S.C. § 2000e *et seq*.; 29 U.S.C. § 621, *et seq.*; 43 P.S. § 955 *et seq*.  Jungclaus also sued Garvin and the unnamed Board Members for defamation (Count V) and negligent supervision (Count VI).  (Am. Compl. ¶¶ 99-113.)

Garvin and the Board Members moved to dismiss the defamation and negligent supervision claims.  (Doc. No. 5.)  Repeatedly finding that Jungclaus' legal conclusions were unsupported by factual allegations, Judge Kelly granted the Motion, leaving only claims against Waverly for violations of Title VII, the ADEA, and the PHRA.  (Doc. No. 11 at 7-9.)

This matter was reassigned to me on October 11, 2019.  (Doc. No. 43.)

Waverly moves for summary judgment on all remaining claims.  (Doc. No. 38.)  The matter has been fully briefed.  (Doc. Nos. 39, 44, 46.)

### III. LEGAL STANDARDS

Summary judgment is warranted if the moving party shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is material only if it

could affect the result of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  I "must view the facts in the light most favorable to the non-moving party," and

make every reasonable inference in that party's favor.  Hugh, 418 F.3d at 267.

Summary judgment is also warranted when the moving party shows that there is an absence

of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325.  The non-moving

party "must [then] rebut the motion with facts in the record and cannot rest solely on assertions

made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Grp., Ltd. v. Colkitt,

455 F.3d 195, 201 (3d Cir. 2006).

If I determine that the moving party is entitled to judgment as a matter of law, I must grant

summary judgment in that party's favor.  Celotex, 477 U.S. at 322.

## IV. DISCUSSION

The liability standards governing Jungclaus' PHRA, Title VII, and ADEA claims are the

same.  Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995) (Title VII);

Colwell v. Rite Aid Corp., 602 F.3d 495, 500 n.3 (3d Cir. 2010) (ADEA).  Applying those

standards, Waverly asks me to dismiss the claims.  (Doc. No. 39.)  My task has been made more

difficult by Jungclaus' heavy reliance on her own indignant beliefs and conclusory statements.

Worse, she repeatedly mischaracterizes evidence, or points to inapposite or non-existent evidence.

Finally, because Jungclaus bases all her claims on the same purported acts of discrimination, I am

compelled to discuss the same facts again and again.  Jungclaus' repetition adds nothing to the

substance of her claims, however, all of which fail as a matter of law.

### A.  Title VII Sex and ADEA Discrimination

The "McDonnell Douglas burden shifting analysis applies to [] claims of discrimination

under both Title VII and the ADEA."  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir.

2003) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)).   Once Jungclaus "establish[es] a *prima facie* case by a preponderance of the evidence," Waverly must then "articulate some legitimate, nondiscriminatory reason for the [adverse action]." <u>Id.</u> (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802).   If Waverly rebuts her *prima facie* case, Jungclaus must "establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination." <u>Id.</u>

To make out a *prima facie* case of sex or age discrimination, Jungclaus must show that: (1) she belongs to a protected class; (2) she was qualified for the position she held; (3) she was subject to adverse employment action despite being qualified; and (4) her employer acted in circumstances raising an inference of discriminatory action.  <u>See</u> <u>id.</u> (Title VII); <u>Smith v. City of Allentown</u>, 589 F.3d 684, 689 (3d Cir. 2009) (ADEA).

The Parties do not dispute that Jungclaus, who was 55 when she was fired, is within a protected class under both statutes, or that she was qualified to serve as Waverly's Human Resources Vice President.  (App. 108.)  It is unclear, however, which actions Jungclaus alleges are "adverse."  She urges her termination was adverse, and also apparently suggests that Waverly adversely awarded her "minimal bonuses."  (Pl. Affidavit ¶ 121; Resp. at 50.)  I will consider both.

<u>Bonuses</u>

It appears that this claim is time-barred.  Jungclaus had to bring her discrimination claims to the EEOC within 300 days of the offending events.  <u>Williams v. Pa. Hum. Rels. Comm'n</u>, 870 F.3d 294, 298 (3d Cir. 2017).  Here, the most recent bonus about which Jungclaus complains was awarded in December 2015—more than 300 days before she brought her EEOC action on December 13, 2016.  (App. 226, 362.)  In more usual circumstances, I would likely dismiss Jungclaus' bonus-based claim as untimely.  Because Waverly devotes only a single sentence to

this issue (which Jungclaus does not address at all) I will, in an abundance of caution, not address it further at this time.  (Doc. No. 39 at 57.)

Assuming her bonus claim is timely, Jungclaus must still "establish some causal nexus" between her gender and the deficient bonus amounts.  Sarullo, 352 F.3d at 798.  Waverly urges that the record does not make out such a nexus.  (Doc No. 39 at 48, 55, 70.)  I agree.

Jungclaus alleges that because she is female, she received "nominal bonuses" (for years she does not disclose) "of $500.00 and $2000.00, . . . in sharp contrast of the male bonuses of $10,000 and $20,000."  (Pl. Affidavit ¶ 121.)  Yet, Jungclaus offers no payroll records or the like setting out the bonuses each employee received—even her own.  Rather, she presents only an incomplete patchwork:  (1) documents that show Jungclaus received discretionary bonuses in 2011, 2012, 2013, and 2015, but do not indicate the amounts (App. 267); (2) Jungclaus' 2015 performance review, which provides that Garvin awarded her a $2,500 discretionary bonus (App. 226); (3) a chart of the senior leadership compensation for 2015 that includes the salaries for each senior leader, and the bonus amounts for the second tier leaders; and (4) Wozniak's 2012 recommendations.  (App. 244, 269).  Jungclaus has not, however, provided evidence of: (1) the bonus awards for anyone—including herself—in any year other than 2015; or (2) the bonus awards for any other third-tier leaders in 2015.  (App. 269.)  The senior leadership compensation chart for 2015 thus includes the bonus amounts for just second tier leaders.  (App. 269.)  Jungclaus has not shown who, if anyone, actually received a bonus in any other year.

Jungclaus thus relies almost entirely on her own very general recollection.  The basis of her recollection—whether word of mouth or the like—is unknown.  It is thus not surprising that, in addition to including almost nothing specific—she does not specify her bonuses in 2011, 2012, or 2013—her recollection is demonstrably unreliable.  For instance, Jungclaus testified that she

recalled Garvin giving her three bonuses that were "minimal because of [her] gender," and that "all of the men received more." (Pl. Dep. I 49:5-11.) Yet, the record indicates that Garvin awarded Jungclaus *four* bonuses. (App. 267.) More importantly, as I have described, Jungclaus has not produced any actual evidence confirming her belief that "all of the men received more." See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 414 (3d Cir. 1999) (plaintiff's "allegations in his affidavit which he predicates on nothing more than his beliefs," which were not supported by the record were insufficient to survive summary judgment); Robertson v. Allied Signal, Inc., 914 F.2d 360, n.12 (3d Cir. 1990) ("[A]n inference based on speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."); Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011) ("In light of both [plaintiff's] earlier testimony and the other record evidence, [his] subsequent self-serving deposition testimony is insufficient to raise a genuine issue of material fact."); Le v. City of Wilmington, 736 F. Supp. 2d. 842, 854 (D. Del. 2010), aff'd 480 F. App'x 678 (3d Cir. 2012) (self-serving allegations and deposition testimony, without more, usually cannot create a disputed issue of fact).

Jungclaus testified that Marc Heil, Vice President of Project Management, "enjoyed several thousand-dollar bonuses each year, sometimes twice a year." (Pl. Dep. I 52:14-17.) But Jungclaus' evidence shows only that Heil received a "large bonus and a vacation" after completion of construction project that required Heil to work long hours and take on extra responsibilities. That evidence does not disclose the year in which he received the bonus, its amount, or that he received more than one bonus in any year. (Garvin Aff. ¶ 22; Heil Aff. ¶ 13.) Because Jungclaus thus offers little more than her own pique respecting the bonuses her colleagues might have received, and almost no evidence respecting the bonuses she herself actually received, Jungclaus has not established *prima facie* case.

14

Even if Jungclaus had made out a discriminatory inference, Waverly has identified a legitimate, non-discriminatory reason for Jungclaus' 2015 bonus: her merely adequate performance.  Once again, every year, Wozniak made salary recommendations for all senior leaders and bonus awards for first and second tier leaders.  (Wozniak Aff. ¶ 6.)  Garvin had the discretion to award bonuses to third tier leaders.  (Garvin Aff. ¶ 22.)  Garvin explained that he awarded larger bonuses when employees "performed their duties in an exemplary way, above the expectations for the position"—such as that apparently awarded to Marc Heil.  (Id.)

Gavin explained that Jungclaus' 2015 bonus of $2,500—the only third tier discretionary bonus amount in the record—"reflected the fact that [she] was doing what she was paid to do and little more." (Id. at ¶ 28.)  This is a legitimate, non-discriminatory reason to award Jungclaus a smaller bonus than that purportedly awarded to other third tier leaders (assuming those others received larger bonuses).  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). To show that Garvin's reason was pretextual, Jungclaus

> must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons (for the adverse action); or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Id. at 764.  Jungclaus has done neither.  Rather, she states only that evidence of pretext is "in the record."  (Doc. No. 44 at 50.)  It is not.  Jungclaus has shown, at most, that she "disagreed that [she] didn't provide the same kind of contribution" to merit a larger bonus.  (Pl. Dep. I at 52:24-25.)  Pretext is not made out, however, by "simply show[ing] that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes, 32 F.3d at 759.

In these circumstances, because Jungclaus has made out neither a *prima facie* case nor

shown pretext, I will dismiss her claim of sex discrimination based on her bonuses.

Termination

Jungclaus was 55 years old when she was replaced in 2016 by Ms. Kelly who, then 43 years old, was in the same protected gender and age classes.  (App. 108.)  Jungclaus need not show, however, that she was replaced with someone outside those classes.  Pivirotto v. Innovative Sys., 191 F.3d 344, 354-355 (3d Cir. 1999).  To raise an inference of discrimination, Jungclaus must nonetheless provide more than her own belief that discrimination occurred.  See Sarullo, 352 F.3d at 798 (The plaintiff failed to make out a *prima facie* case because his "evidence of race discrimination consist[ed] solely of his own assertion that he was not rehired because he is Native American.").  Unfortunately, to meet that burden, Jungclaus once again states that there is "an abundance of circumstantial and direct evidence" of discrimination.  (Doc. No. 44 at 51.)  Once again, this is simply untrue.

Jungclaus offers her own very general statement that she "complained on behalf of herself and other females," but, as I have discussed, provides no other evidence and cannot show how her complaints caused her termination.  (Id.)  Indeed, even the "other females" do not support Jungclaus' version of events.  (Best Aff. ¶¶ 5, 8-9; Blessing Aff. 1; Carpenter Aff. 1; Dogan Aff. 2; Feher Aff. ¶¶ 7, 9, 11; Rodgers Aff. ¶ 6; Thompson Aff. ¶¶ 5-6.)

Jungclaus also points to inapposite testimony: (1) her own statement that a Board Member used "Waverly email to communicate racist 'birther criticism of President Obama"; (2) Board Chairman Bauer's acknowledgement that the Board did not consider imposing progressive discipline; and  (3) Garvin's testimony that Waverly "had never investigated the social media practices of others."  (Doc. No. 44 at 30, 34, 41.)  Even if true (and this is by no means clear), none of this relates to Jungclaus' gender, or shows either that Jungclaus suffered disparate treatment or

that there is any "logical connection" between Jungclaus' sex and her termination. Pivirotto, 191 F.3d at 355 (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996)). Jungclaus has thus failed to establish that her termination raises an inference of sex discrimination.

Jungclaus can, however, make out *prima facie* age discrimination because she was "ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive"—here some 12 years younger. Willis v. UPMC Children's Hosp. of Pittsburg, 808 F.3d 638, 644 (3d Cir. 2015). The Third Circuit has "concluded that nine years difference was sufficient to establish a prima facie case of age discrimination even though the favorably treated employee was also within the protected class." Barber v. CSX Distrib. Servs., 68 F.3d 694, 699 (3d Cir. 1995) (citing Healy v. N.Y. Life Ins. Co., 860 F.2d 1209 (3d Cir. 1988)).

Waverly again identifies the legitimate, non-discriminatory reason for Jungclaus' firing: her July 24, 2016 tweet. (Doc. No. 39 at 72-73.) Undisputed evidence confirms that the tweet was indeed the reason. Garvin ordered Jungclaus to delete the tweet and "unfollow" Waverly. (App. 336; Pl. Dep. II 77:7-9.) Emails between Garvin and the Waverly Board's HR Committee further confirm his concerns. Garvin called an emergency HR Committee meeting to discuss Jungclaus' continued employment in view of the tweet and Waverly's social media policy. (App. 282-89.) Garvin subsequently told Board Members not in attendance that "everyone on the HR Committee call was in agreement that Kathy Jungclaus should be terminated." (Id.) Garvin testified as to Waverly's reasoning:

Q: Why was Ms. Jungclaus fired?

A: For the Tweet . . . where she singled out a protected class of people, addressed doing a poll of . . . minorities in the workplace and expressing a political . . . opinion on her personal Twitter which was easily linked to the Waverly Heights' Twitter account, and we found that conduct to be conduct that was very unbecoming of the Vice President of Human Resources, and quite frankly, compromised her ability to do her job going forward.

(Garvin Dep. 131:9 – 132:2.)

17

As Jungclaus—the drafter of Waverly's social media policy—well knew, her July 24 tweet violated the policy and so allowed for her immediate termination.  (Id. at 132:21-133:11.) Waverly was understandably disturbed that the HR Vice President questioned "100% [of Waverly's] AA employees" and, apparently at her partisan urging, said that they would vote for the same Presidential candidate.  This is a legitimate, non-discriminatory reason for Jungclaus' termination.  To show that this explanation was pretextual, Jungclaus must show that it suffers from "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions."  Fuentes, 32 F.3d at 765.  Jungclaus purports to meet this burden by invoking issue preclusion.  Noting that the Commonwealth Court ruled that she did not violate Waverly's social media policy, Jungclaus urges that Waverly is collaterally estopped from advancing the violation as the reason for her termination.  (Doc. No. 44 at 21-23); Waverly Heights, 173 A.3d at 1229.  I disagree.

Collateral estoppel (or issue preclusion) bars relitigation of issues adjudicated in a prior action.  Swineford v. Snyder Cnty. Pa., 15 F.3d 1258, 1266 (3d Cir. 1994).  A federal court considering the preclusive effect of a state court judgment must "look[] to the law of the adjudicating state."  Del. River Porth Auth. v. Fraternal Ord. of Police, 290 F.3d 567, 573 (3d Cir. 2002).  Contrary to Jungclaus' assertions, Pennsylvania statutory law prohibits giving preclusive effect to adjudications in an unemployment compensation proceeding:

> No finding of fact or law, judgment, conclusion or final order made with respect to a claim for unemployment compensation under this act may be deemed to be conclusive or binding in any separate or subsequent action or proceeding in another forum.

43 P.S. § 829.

Waverly thus may show that it fired Jungclaus because she violated its social media policy. See Williams v. Temple Univ. Hosp., Inc., 345 F. Supp. 3d 590, 595 (E.D. Pa. 2018) ("[B]ecause Pennsylvania courts do not give preclusive effect to decisions made with respect to a claim for

unemployment compensation, there is no legal basis upon which a federal court can do so.").  As I have discussed, the record confirms this reason, which thus was not a pretext to hide discrimination.  Indeed, throughout her unemployment compensation proceedings, Jungclaus never suggested that she was the victim of discrimination. Rather, she told state authorities that she "was fired over a knee jerk reaction to an anonymous letter, and speculation over what the meaning of the tweet was."  (Unemployment Comp. Hr'g Test. Tr. 8.)

Moreover, even if I give the Commonwealth Court's decision preclusive effect, that would show only that Waverly's determination that Jungclaus violated the social media policy was incorrect, not that the Waverly Board was untruthful when it decided that Jungclaus could not properly do her job after she sent the July 24 tweet.  Plainly, the Commonwealth Court's ruling neither "impugns" nor "weakens" the credibility of the Board's stated reason for firing her.

Nor does the Commonwealth Court's decision show that Jungclaus' age or sex were Waverly's "motivating or determinative cause" in firing her.  See Fuentes, 32 F.3d at 764.  To make such a showing, Jungclaus must "point to evidence with sufficient probative force."  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45.  Examples of such evidence could include: (1) that Waverly "previously discriminated against her"; (2) that Waverly discriminated against others within Jungclaus' protected class or persons within another protected class; and (3) that Waverly treated "similarly situated persons not within [her] protected class" more favorably.  Id. at 645.  Jungclaus offers no such evidence.  Instead, she yet again blithely states that the "record is abundantly full when it comes to discriminatory animus."  (Doc. No. 44 at 52.)  Yet again, it is not.

Jungclaus again relies heavily on her own belief that Waverly "decision makers acted with a discriminatory motive when it came to age and sex."  (Doc. No. 44 at 52.)  Once again, Jungclaus

testified that after she complained about her bonus in January 2016, her relationship with Garvin "was never the same."  (Doc. No. 44 at 13; Pl. Dep. II 81:1-10.)  As I have discussed, however, she acknowledges that her position, title, responsibilities, and compensation did not change.  (Pl. Dep. II 81:23-82:14.)  Any purported "change" in her relationship with Garvin thus does not make out previous discrimination.  See Willis, 808 F.3d at 649.

Jungclaus also testified that "[a]ge is always an issue with Tom [Garvin]," and that Garvin "would make comments [] whenever he fired someone . . . that he wasn't out to get the old-timers. He made that comment to me directly when he had terminated one of the other senior leaders." (Pl. Dep. I 81:19-24; 101:11-12.)  No other witness confirms that Garvin ever made the comment. (Garvin Dep. II 236:4-8; Heil Aff. ¶ 6.)  Moreover, as I have discussed, the record does not support Jungclaus' testimony that three senior leaders were terminated because of their age (or gender): Anne Rogers (60-year-old female), Meg Guenveur (female in her sixties), and Colin Gallagher (male in his late fifties).  (Pl. Dep. I 82:15-85:3.)  To the contrary, Jungclaus acknowledges that: (1) Rogers had behavioral issues and Jungclaus supported Rogers' termination; (2) Guenveur was not terminated, but retired; and (3) although Jungclaus purportedly disagreed with the decision, Gallagher was terminated based on performance issues.  (Id.)  Jungclaus has not provided any contrary information, such as work reviews or personnel files.

In sum, to support her age discrimination claim, the only evidence Jungclaus offers is Garvin's use of the expression "old timers," and Gallagher's termination for poor performance.  A jury could not reasonably infer from this that Waverly's stated reason for Jungclaus' termination was a pretext for discrimination of any kind.  See Fuentes, 32 F.3d at 763.  I will thus grant Waverly's Motion for Summary Judgment as to those discrimination claims.

20

### B. Retaliation

The McDonnell Douglas burden shifting analysis also applies to Jungclaus' retaliation claims under Title VII and the ADEA. Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 192-93 (3d Cir. 2015). To make out a *prima facie* case of retaliation Jungclaus must show:

> (1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.

Id. at 193 (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)) (alteration in original). Jungclaus makes no such showing, but simply repeats the conclusions offered in her Complaint. (See Doc. No. 44 at 10-16.)

Termination

Jungclaus again urges that Waverly fired her to retaliate for "repeatedly advocating for herself and other females": (1) her January 2016 complaint about her 2015 bonus; (2) her August 2016 complaint that Supper had use of a company car and Feher did not; and (3) her "advoca[cy] for women in the leadership committee with regard to Mr. Supper's demeaning treatment." (Id. at 13, 32.) I disagree.

First, Jungclaus' purported complaints could not give rise to a valid retaliation claim. A complaint constitutes a "protected employee activity" only if it implicates an employment practice that is illegal under Title VII or the ADEA. See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006). Although "a formal letter of complaint to an employer or the EEOC" is not required, an informal complaint "must be specific enough to notify management of the particular type of discrimination at issue in order to constitute 'protected activity.'" Sanchez v. SunGard Availability Servs. LP, 362 F. App'x 283, 288 (3d Cir. 2010) (citing Barber, 68 F.3d at 702).

21

The record does not show that either Jungclaus' January or August 2016 complaint to Garvin was "protected activity" because she did not mention discrimination in either.   As Jungclaus has produced no documentation of the complaints, I can consider only Garvin's and her testimony, which are consistent on this point.   Garvin stated that during that January 2016 conversation, Jungclaus told him her bonus "wasn't enough compared to some of her [] coworkers." (Garvin Dep. II 238:19-239:1.)   Garvin's notes from the meeting indicate that she complained that Heil, Supper, Thompson, and Feher—two men and two women—received larger bonuses.  Jungclaus herself confirms Garvin's testimony:  she told Garvin that "other people who had done far less than me got far more than I did."  (Pl. Dep. I 90:11-24.)   Similarly, as to the August 2016 complaint, Jungclaus testified that in speaking with Garvin about Supper's company car, she told Garvin "he has no reason for a car, he doesn't travel in any capacity for his job, and Meredith [Feher] doesn't have a car."  (Pl. Dep. I 91:25-92:2.)   Jungclaus thus never mentioned discrimination in either instance—rather, she complained of unfairness.   Once again, the Third Circuit has held that "[a] general complaint of unfair treatment does not translate into a charge of illegal [] discrimination." Barber, 68 F.3d at 702.

Jungclaus' assertion that she generally "advocated for women" is "too vague to support a finding that" she was terminated "because [s]he engaged in behavior that was protected" under Title VII. Id. (letter questioning employer's hiring decision with no mention of discrimination was not a protected activity).   Jungclaus did not actually name the senior women leaders on whose behalf she generally "advocated."   Insofar as she relayed the complaints of particular women who objected to Supper's behavior, she never mentioned discrimination. To the contrary, as I have discussed, Jungclaus said that Supper did not discriminate: he was "overbearing" to both men and women.  (Pl. Dep. I 79:7-9.)  This comports with the statements of all the senior leaders on whose

behalf Jungclaus might have acted: that they did not find Supper's behavior "demeaning and demoralizing." (Rodgers Aff. ¶ 7; Best Aff. ¶ 7; Blessing Aff. 1; Carpenter Aff. 1; Dogan Aff. 2; Feher Aff. ¶ 20; Thompson Aff. ¶ 16.)

A colleague may be obnoxious without violating Title VII. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). In these circumstances, Jungclaus relaying others' complaints about Supper's rude behavior was not a protected activity on which a retaliation claim could be based. Barber, 68 F.3d at 702.

Even if Jungclaus' activities were protected, she has not established a causal connection between those activities and her termination. To do so, Jungclaus must identify evidence from which a factfinder could reasonably infer that Waverly "likely" fired her in retaliation for some of these activities. Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 253 (3d Cir. 2017). Yet Jungclaus has not shown that Waverly's Board or its HR Committee—the bodies that fired her— *even knew* of her protected activities. See Daniels, 776 F.3d at 196 (requiring "some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted"). Remarkably, Jungclaus herself concedes the that they did not know. (Pl. Dep. II 74:6-17 (Q: "What protected activity did the Board have notice of, that they had actual notice that you engaged in alleged protected activity?" A: "None.").)

Nor has Jungclaus offered any other evidence that might make out *prima facie* causation, such as: (1) a temporal proximity unusually suggestive of retaliatory motive; (2) a pattern of antagonism against the plaintiff; (3) an employer's inconsistent explanation for taking an adverse employment action; or (4) any other evidence suggesting retaliatory animus. Daniels, 776 F.3d at 196. "[T]he proffered evidence, looked at as a whole, may" also be sufficient to establish a causal connection. Carvalho-Grevious, 851 F.3d at 260.

Not surprisingly, because she cannot make out causation, Jungclaus does not address the issue.  Had she done so, she could not have met any of the <u>Daniels</u> criteria.  There is no evidence of a pattern of antagonism or inconsistent explanations for her firing.  Nor could Jungclaus show that the timing of her termination was unusually suggestive because "temporal proximity greater than ten days requires supplementary evidence of retaliatory motive."  <u>Blakney v. City of Phila.</u>, 559 F. App'x 183, 186 (3d Cir. 2014).  Jungclaus testified that her 2015 bonus complaint occurred in January 2016 (at least 9 months before her termination) and her complaints about Supper's company car occurred in August 2016 (at least one month before her termination).  (Pl. Dep. I 90:11, 92:18.)  Jungclaus offers no evidence showing even the approximate dates when she generally "advocated for women."  (<u>See</u> Pl. Dep. I 157-161.)  The timing of Jungclaus' firing thus cannot show causation.

Finally, even if Jungclaus could make out a *prima facie* case of retaliation, Waverly has shown a legitimate, non-discriminatory reason for her termination: the July 24, 2016 tweet.  Although Jungclaus does not argue that this reason was pretextual, I will nonetheless address the issue.

Jungclaus must "produce evidence showing that the employer's reason for its action was false and retaliation for engaging in the protected activity was the real reason, or 'but-for' cause, for its actions."  <u>Young v. City of Phila. Police Dep't</u>, 651 F. App'x 90, 97 (3d Cir. 2016).  Because, as I have discussed, Jungclaus presents no evidence even suggesting "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" impugning that stated reason, she cannot show pretext.  <u>Fuentes</u>, 32 F.3d at 765.

In sum, I will grant Waverly's Motion for Summary Judgment on Jungclaus' Title VII and ADEA retaliation claims.

<u>Unemployment Compensation</u>

Jungclaus alleges that that Waverly's decision to oppose her claim for unemployment compensation is post-employment retaliation.  (Doc. No. 44 at 16.)  Once again, the record does not support the claim.

Although employer opposition to unemployment compensation can constitute retaliation, the claimant must still make out a protected activity and causation.  <u>See</u> <u>Hartley v. Pocono Mountain Reg'l Police Dep't.</u>, 417 F. App'x 153, 158 n.5 (3d Cir. 2011) (citing <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 126 (2006)) (allowing plaintiff to "prove that their motivation to retaliate against her caused appellees to oppose her claim for unemployment compensation"); <u>Byrd v. Elwyn</u>, Civ. No. 16-2275, 2016 WL 5661713, at *6 (E.D. Pa. Sept. 30, 2016).  Jungclaus cannot show either.

Jungclaus does not explain what "protected activity" prompted Waverly's opposition. Rather, she says only that Waverly opposed her claim because Garvin's "ego couldn't stand the fact that I won my unemployment so he sued me all the way to the Commonwealth Court."  (Pl. Dep. II 75:10-76:1.)  Jungclaus' filing for unemployment compensation is not a protected activity, however, because it does not implicate Title VII.  <u>See</u> <u>Curay-Cramer</u>, 450 F.3d at 135.

I will also consider whether Waverly made the decision to oppose unemployment compensation to retaliate for Jungclaus filing an EEOC complaint—another argument that Jungclaus does not make.  (Doc. No. 39 at 67-68.)  Unlike her "general advocacy," Jungclaus' filing of a complaint with the Commission was a protected activity.  <u>Moore v. City of Phila.</u>, 461 F.3d 331, 341 (3d Cir. 2006).  Jungclaus cannot make out causation, however, because she made the filing *after* Waverly decided to oppose her unemployment claim.  Jungclaus applied for unemployment compensation on October 2, 2016.  (App. 290-23.)  Waverly opposed that

application: (1) in its response (October 11, 2016); (2) in communicating its opposition to the Unemployment Compensation Bureau (October 18, 2016); and (3) in appealing the Bureau's initial eligibility finding (October 31, 2016).  (App. 290-310.)  Jungclaus' lawyer did not send his demand letter threatening to file an EEOC complaint until November 8, 2016.  Jungclaus filed the administrative complaint on December 13, 2016.  (App. 311-319, 362-363.)  Jungclaus thus cannot establish a causal connection between that filing and Waverly's decision to oppose to her unemployment compensation claim.  See Mazur v. Sw. Veterans Ctr., 803 F. App'x 657, 662 (3d Cir. 2020) (no causal connection where adverse action occurred before protected activity).

Because Jungclaus has failed to establish *prima facie* case of retaliation, I will dismiss her claim.

## C.  Hostile Work Environment

These claims are not analyzed under the McDonnell Douglas burden shifting because "there can be no legitimate justification for a hostile work environment."  Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 213 n.11 (3d Cir. 2017).  The plaintiff must show that her place of work was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (internal quotation marks omitted).  The discrimination must be "because of" the employee's protected status or activity.  Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007).

Under both Title VII and ADEA, to show a hostile work environment, Jungclaus must establish that: (1) she suffered intentional discrimination because of her sex (under Title VII) or age (under the ADEA); (2) the discrimination was "severe or pervasive"; (3) the discrimination "detrimentally affected [her]"; (4) "the discrimination would detrimentally affect a reasonable

person in like circumstances"; and (5) the "existence of *respondeat superior* liability."  See Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d. Cir. 2013); Slater v. Susquehanna Cnty., 465 F. App'x 132, 138 (3d Cir. 2012) ("We assume, without deciding, that the ADEA makes available a hostile work environment claim for age-based discrimination, analyzed under the same standards as a Title VII hostile work environment claim.") (citing Brennan v. Metro. Opera Ass'n Inc., 192 F.3d 310, 318 (2d Cir. 1999); Crawford v. Medina Gen. Hosp., 96 F.3d 830, 834 (6th Cir. 1996)).

Once again, Jungclaus offers almost no explanation of her hostile work environment claim, which she apparently bases entirely on her discrimination allegations.  (Doc. No. 44 at 53.) Jungclaus thus appears to allege that the following comprised Waverly's hostile work environment: (1) Supper's behavior; (2) Garvin's animus against older members of the management team; and (3) the emails Jungclaus received from Bauer and Soltis.  (See Doc. No. 44 at 26, 29.)  Yet, because, as I have discussed at length, none of this was discriminatory, Jungclaus necessarily cannot show severity, pervasiveness, or any resulting harm.

I will not again repeat in full my discussion of Jungclaus' claimed discrimination. Although there is no "talismanic expression[] which must be invoked as a condition-precedent" to show intentional discrimination, there must be some evidence to permit such an inference.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996).  Jungclaus testified that Supper was "pretty harassing" because he is "very difficult to have a conversation with" and that "he voices his opinion over yours, and there's no arguing with him."  (Pl. Dep. II, 65:2-14.)  Such behavior, although obnoxious, is not discriminatory.  See Aman, 85 F.3d at 1083 (discrimination occurs if someone outside the protected class "would not have been treated in the same manner"). Once again, Jungclaus acknowledges that Supper did not discriminate on the basis of sex: he was rude to men and women alike.  (Pl. Dep. I 79:7-9; Pl. Dep. II 6:4-12.)  Although Jungclaus believes

that Supper offended other women executives, as I have discussed, she offers no evidence of discrimination.  To the contrary, the "other women" confirm Jungclaus' testimony that Supper was rude to men and women.  (Best Aff. ¶ 7; Blessing Aff. 1; Carpenter Aff. 1; Dogan Aff. 2; Feher Aff. ¶ 20.)  Although she suggests that the affidavits of these women are "inherently untrustworthy," Jungclaus declined to depose any of them.  (Doc. No. 44 at 8-9.)  The undisputed evidence thus shows that Supper's behavior was not discriminatory and so did not contribute to a hostile work environment.

Jungclaus also alleges that the emails circulated by Soltis created a hostile work environment.  She testified Soltis' emails were "racist . . . disgusting, . . . anti-Obama, anti-Hillary Clinton, anti-Jewish, [and] antisemitic."  (Pl. Dep. I 143:15-20.)  If the record supported this conclusory allegation, this would be a very different case.  The record shows, however, that, like so much that Jungclaus' urges, the allegation is largely imagined.

The Parties have submitted some 150 pages of emails that Jungclaus received from Soltis—none she received from Bauer.  (App. 408-567.)  As I have discussed, the great bulk has nothing to do with politics, gender, religion, or age—the emails include innocuous photos of cats, YouTube videos Soltis found amusing, and pop culture stories.  (Id.)  Jungclaus makes specific complaint about only eleven emails; these were sent by Soltis between December 2013 and June 2016.  Once again, they include criticisms of "liberal" policies.  Although some emails may be offensive (for example, depictions of Secretary Clinton in a tiara or of President Obama purportedly endorsing terrorism and drug cartels), they do not support an inference of sex or age discrimination, nor are they racist or antisemitic.  Cf. Aman, 85 F.3d at 1083 (to support an inference of discrimination statements must "send a clear message and carry the distinct tone of [discriminatory] motivations and implications"); see also Bridges v. Scranton Sch. Dist., 644 F. App'x 172, 180 (3d Cir. 2016)

(calling the only African-American student a "gabber," without more, does not support an inference of racial discrimination).

The eleven messages—sent over almost three years—however offensive, were not severe or pervasive. Moreover, of the eleven emails, Jungclaus was copied on only the December 2013 email titled, "The unspoken success of ObamaCare." (App. 964-1012.) Although the emails need not have been directed to Jungclaus to be severe or pervasive, she must have been "aware of the[m]." Cagnetti v. Juniper Vill. at Bensalem Operations, Civ. No. 18-5121, 2020 WL 4039027, at *8 (E.D. Pa. July 17, 2020); see also Perkins v. Int'l Paper Co., 936 F.3d 196, 211 (4th Cir. 2019) ("[I]nformation about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. . . . [and] is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim."). Jungclaus has provided no evidence that she was aware of the other ten emails. Rather, it appears she first learned of them during discovery in this case.

Finally, none of the emails had a "detrimental effect" on Jungclaus. To the contrary, she exchanged emails with her husband at her Waverly email address that included the same kinds of political messages as did the eleven of which she now complaints, and, in discussions at Waverly, had referred to "conservative" viewpoints as "the right side of the issue." (App. 364-381.) Finally, Jungclaus has not even alleged that the eleven emails "unreasonably interfere[d] with [her] work performance." Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017).

In sum, Jungclaus has failed to show that any of Supper's or Garvin's comments or Soltis' emails—even when considered together—created a "workplace [that] was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the [] employment and create an abusive working environment.'" Brooks v. CBS

29

Radio, Inc., 342 F. App'x 771, 776 (3d Cir. 2009) (quoting Morgan, 536 U.S. at 116).  I will thus grant Waverly's Motion for Summary Judgment on Jungclaus' hostile work environment claim.

## V.  CONCLUSION

Although Jungclaus seeks to present herself as Waverly's frustrated agent of reform, the record shows otherwise.  Waverly had valid, non-discriminatory reasons for its decisions. Jungclaus offers almost no evidence to support her bonus allegations, and averred in unemployment proceedings that she was fired for posting her July 24 tweet (not because of discrimination).  Jungclaus has shown, at most, that she: is angry that in 2015 other senior leaders (at least three of whom are women) apparently received larger bonuses than she; finds one senior leader rude and offensive; and believes her firing was unfair.  She has thus not made out a prima facie case of discrimination or shown pretext.  Although Title VII and the ADEA prohibit workplace discrimination, they do not ensure "fairness" or generous compensation, nor do they compel collegiality.  See Oncale, 523 U.S. at 75 (neither statute is "a general civility code for the American Workplace").  Because no reasonable jury could find that Jungclaus was the subject of discrimination, retaliation, or workplace hostility, I will grant Waverly's Motion for Summary Judgment.

An appropriate Order follows.


April 12, 2022                                                    _/s/ Paul S. Diamond_____
                                                                          Paul S. Diamond, J.